**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
(Electronically Filed on January 27, 2006)

| | | |
|---|---|---|
| **NORTHERN STATES POWER COMPANY**, Plaintiff, | ) | |
| v. | ) | No. 98-484C (Senior Judge Wiese) |
| **THE UNITED STATES**, Defendant. | ) | |

## SECOND AMENDED COMPLAINT AND SUPPLEMENTAL COMPLAINT

Pursuant to RCFC 15(a) and RCFC 15(d), Plaintiff Northern States Power Company ("NSP"), by and through the undersigned counsel, alleges as follows:

## NATURE OF THE CASE

1. NSP brings this lawsuit to recover significant damages caused by the Department of Energy's ("DOE") partial material breach of its unconditional obligation to begin disposing of spent nuclear fuel and high level nuclear waste (collectively, "SNF") generated by commercial nuclear power plants owned and operated by NSP. Pursuant to the Nuclear Waste Policy Act of 1982, as amended, 42 U.S.C. §§ 10101 *et seq.* ("NWPA"), DOE and NSP entered into contracts in 1983 under which NSP has paid and continues to pay substantial fees in return for DOE's obligation to remove and dispose of SNF beginning no later than January 31, 1998. NSP has fully complied with its fee payment obligations under the contracts. DOE, however, has failed to perform its reciprocal obligation to dispose of SNF, and has stated that it will not do so until 2010 at the earliest. NSP has incurred and will continue to incur significant costs associated with

procuring additional SNF storage capacity and other damages as a result of DOE's total disregard of its contractual obligations.

## PARTIES

2. NSP is the owner and operator of the Monticello Nuclear Generating Plant, located in Monticello, Minnesota, for which an operating license was issued by the Atomic Energy Commission ("AEC") in 1970. NSP also owns and operates the Prairie Island Nuclear Generating Plant, which has two operating units and is located in Red Wing, Minnesota. Operating licenses for these reactor units were issued by the AEC in 1973 and 1974. Both of NSP's nuclear plants have generated and continue to generate SNF, which is stored at the plant sites. NSP has entered into the Standard Contracts for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (the "Standard Contract") with DOE pursuant to which DOE is to accept and dispose of the SNF generated by NSP's nuclear plants in return for payment of specified fees by NSP.

3. Defendant is the United States of America, acting through DOE.

## JURISDICTION

4. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1491(a)(1).

5. DOE's complete failure to comply with its essential contractual obligation to begin disposing of SNF by January 31, 1998, constitutes a material partial breach of its Standard Contracts with NSP, for which NSP may seek recovery of its damages without exhausting any administrative remedies. In companion decisions handed down on August 31, 2000, the Federal Circuit has conclusively rejected the Government's exhaustion of remedies jurisdictional defense. See Northern States Power Co. v. United States, 224 F.3d 1361 (Fed. Cir. 2000)

("Northern States"); Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336 (Fed. Cir. 2000) ("Maine Yankee").

6. Furthermore, Article XI of the Standard Contracts state, "Nothing in this contract shall be construed to preclude either party from asserting its rights and remedies under the contract or at law." Pursuant to this provision, NSP is entitled to pursue its legal claims without exhausting any administrative remedies.

## FACTUAL BACKGROUND

### The Standard Contract

7. In 1982, Congress enacted the NWPA, codifying the Federal Government's long-standing commitment to accept responsibility and provide for the timely disposition of commercial SNF. Pursuant to Section 302(a)(5)(B) of the NWPA, 42 U.S.C. § 10222(a)(5)(B), DOE was required to commence disposing of commercially-generated SNF no later than January 31, 1998, in return for the payment of fees by utilities and others that generated or held title to the SNF. The fees are paid into the Nuclear Waste Fund, which is the source of funds to cover DOE's costs for disposing of SNF.

8. Pursuant to Section 302 of the NWPA, in 1983 DOE developed the Standard Contract. The Standard Contract embodies the reciprocal obligations mandated by the NWPA, pursuant to which contract holders agree to pay fees into the Nuclear Waste Fund in return for the provision of SNF disposal services by DOE, beginning no later than January 31, 1998. See 10 C.F.R. Part 961.11. Specifically, the Standard Contract provides that "[t]he services to be provided by DOE under this contract shall begin, after commencement of facility obligations, not later than January 31, 1998 and shall continue until such time as all SNF . . . has been disposed of." 10 C.F.R. § 961.11, Art. II.

9. NSP executed its Standard Contracts with DOE on June 20, 1983. To date, NSP has paid more than $270 million into the Nuclear Waste Fund pursuant to these contracts and continues to pay fees of approximately $12 million per year.

**DOE's Anticipatory Breach of the Contractual Deadline**

10. Notwithstanding the obligation imposed upon DOE by the Standard Contract, DOE failed to meet most of the early milestones established by the NWPA. These early failures eventually led to problems further along the program schedule, particularly in establishing the geologic repositories called for by the NWPA. At the same time, however, DOE continued to make commitments and representations that it would begin to dispose of SNF by the 1998 deadline.

11. For example, in a September 7, 1984 letter by Donald P. Hodel, then Secretary of Energy, to United States Senator J. Bennett Johnston, Secretary Hodel stated, "Pursuant to my authority, it is my intention that this commitment together with the overall thrust of the [NWPA], will create an obligation for [DOE] to accept spent fuel in 1998 whether or not a repository is in operation."

12. Similarly, in its 1987 Mission Plan Amendment, DOE announced that the geologic repository called for by the NWPA would not be available until 2003. DOE indicated, however, that it would be able to begin accepting SNF by 1998 at a Monitored Retrievable Storage ("MRS") facility designed to store SNF until commencement of repository operation.

13. Congress substantially amended the NWPA in 1987. As amended, the NWPA required DOE to focus its entire repository development effort on characterizing Yucca Mountain, Nevada, one of the earlier-identified candidate sites, to determine its suitability as the nation's first geologic repository. 42 U.S.C. § 10133. Congress also authorized DOE to

construct a MRS but did not name a specific site. Rather, the NWPA provided two different options for siting a MRS. Under the first option, a MRS could be sited through the efforts of the Nuclear Waste Negotiator, an Executive Branch position created by the 1987 Amendments. 42 U.S.C. §§ 10242-10249. Under the second option for MRS siting, DOE was authorized to site and develop a MRS on its own, but on a schedule that was linked by the NWPA to the development of the repository. 42 U.S.C. §§ 10165(b), 10168(d).

14. By 1987, the repository program was more than ten years behind schedule. Despite the fact that in less than five years, the repository program had fallen ten years behind schedule, DOE relied solely on the efforts of the Nuclear Waste Negotiator for development of the MRS. DOE did not develop any contingency plans for meeting the January 31, 1998 deadline in the event that the Negotiator was unsuccessful, a state of events that continued even after the Negotiator's authority expired with the unsuccessful completion of his mission. Not surprisingly, DOE's waste disposal program fell further behind schedule.

15. In 1995, DOE issued a Final Interpretation of Nuclear Waste Acceptance Issues ("Final Interpretation") wherein DOE retreated from its earlier acknowledgments that it had an unconditional obligation to begin disposing of SNF by January 31, 1998. 60 Fed. Reg. 21973, 21974 (May 3, 1995). In its Final Interpretation, DOE stated that, since passage of the NWPA, it "has become apparent that neither a repository nor an interim storage facility constructed under the Act will be available by 1998," and that it would commence disposing of SNF at a repository by 2010 at the earliest. 60 Fed. Reg. at 21794. The Final Interpretation also stated DOE's conclusion that the NWPA does not impose an obligation on DOE to commence disposing of contract holders' SNF in 1998 in the absence of a disposal or interim storage facility. Id. at 21794-95.

**DOE's Breach of its Contractual Obligation**

16. NSP and other utilities filed in the U.S. Court of Appeals for the District of Columbia Circuit petitions for review of the Final Interpretation. The D.C. Circuit ruled in favor of the petitioners and held that the NWPA imposed on DOE an unconditional obligation to begin disposing of SNF by January 31, 1998. Indiana Michigan Power Co. v. Department of Energy, 88 F.3d 1272 (D.C. Cir. 1996). The Court further held that this obligation was reciprocal to the utilities' obligation to pay fees into the Nuclear Waste Fund. The Court remanded the matter to DOE for proceedings consistent with the opinion.

17. Notwithstanding the D.C. Circuit's unequivocal ruling, DOE advised NSP and other Standard Contract holders that it would not begin to dispose of SNF by the January 31, 1998, deadline. Specifically, DOE announced in a December 17, 1996 letter to contract holders "that DOE anticipates it will be unable to begin acceptance of spent nuclear fuel for disposal in a repository or interim storage facility by January 31, 1998." DOE further took the position that its failure to meet the deadline was excused because its delay was unavoidable.

18. In response to DOE's recalcitrance, NSP and other utilities filed another petition with the D.C. Circuit for a writ of mandamus to compel DOE to comply with the mandate in Indiana Michigan. In Northern States Power Co. v. United States, 128 F.3d 754 (D.C. Cir. 1997) ("Northern States I"), the D.C. Circuit reiterated that DOE had an unconditional obligation under both the NWPA and the Standard Contract to begin disposing of utilities' SNF by January 31, 1998. The Court also held that DOE had a clear duty to act in accordance with this unconditional obligation and issued a writ of mandamus precluding DOE from arguing that its failure to meet the January 31, 1998, deadline was unavoidable. On November 30, 1998, the

United States Supreme Court denied DOE's petition for a writ of certiorari in the Northern States I case, 525 U.S. 1016 (1998).

19. Despite the ruling in Northern States I, DOE made no effort to meet the contractual deadline. DOE did not begin to dispose of SNF by January 31, 1998, as required by the NWPA and Standard Contract, and has maintained the position announced prior to the D.C. Circuit's rulings that it will not begin to dispose of SNF until 2010 at the earliest. DOE has failed and refused to provide any firm commencement date for the disposal of NSP's SNF.

20. In the Maine Yankee case decided by the Federal Circuit on August 31, 2000, the Federal Circuit concluded that DOE's admitted failure to begin accepting spent nuclear fuel by the January 31, 1998 contractual deadline constituted a breach of the Standard Contract. In the companion Northern States case, the Federal Circuit held that the unavoidable delays provision of the contract "does not bar a suit seeking damages for the Government's failure to begin performance at all by the statutory and contractual deadline of January 31, 1998." Northern States, 224 F.3d at 1367. In summary, the Federal Circuit has determined as a matter of law that DOE breached the contract and that NSP and other similarly-situated utilities that are parties to the Standard Contract can bring an action for breach of contract damages in this Court.

**Nature of Damages Sustained by NSP as a Result of DOE's Breach**

21. As a direct consequence of DOE's disregard of its contractual obligations and defiance of the D.C. Circuit's rulings, NSP has been and will be forced to incur substantial additional costs to provide for extended on-site storage of its SNF. Moreover, NSP has incurred and will continue to incur other substantial damages, including but not limited to regulatory costs associated with efforts to ensure sufficient on-site storage capacity or alternative off-site storage capacity to permit continued operation of its nuclear plants.

## CLAIMS FOR RELIEF

### COUNT I
### (Partial Breach of Contract)

22. Paragraphs 1 through 21 are incorporated herein by reference as if set forth in full.

23. NSP has complied and continues to comply with all of its obligations under the Standard Contracts, including the payment of all required fees into the Nuclear Waste Fund.

24. DOE has failed to perform its obligation under the Standard Contracts to dispose of SNF beginning no later than January 31, 1998, and thereby has partially and materially breached the Standard Contracts.

25. As a direct and proximate result of DOE's partial breach of the Standard Contracts, NSP has incurred and will incur substantial damages, in an amount to be determined at trial. The rate at which these damages will continue to accrue is dependent upon various factors including but not limited to when DOE commences performance of its contractual obligation, and NSP reserves all rights to recover presently unascertainable damages that may be caused by DOE's future partial breaches of the Standard Contracts.

### COUNT II

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

26. Paragraphs 1 through 25 are incorporated herein by reference as if fully set forth in full.

27. The Standard Contracts between NSP and DOE contain an implied covenant of good faith and fair dealing, pursuant to which DOE has a duty to perform its obligations under the contracts in good faith and not to take actions detrimental to NSP's contractual rights. DOE has breached the covenant of good faith and fair dealing by failing and refusing to make any effort to meet the contractual deadline for beginning to dispose of SNF; by steadfastly attempting

to avoid its obligations under the contracts as defined by the D.C. Circuit; by failing to make any effort to dispose of NSP's SNF or even to provide NSP with a firm date on which DOE will begin to do so; and by insisting on NSP's continued performance of its reciprocal obligation to pay fees into the Nuclear Waste Fund despite DOE's refusal to perform.

28. DOE's failure to act has not been the result of inadequate resources. DOE annual expenditures from the Nuclear Waste Fund have consistently been well below the level of annual receipts into the Nuclear Waste Fund. There are ample funds available to DOE to comply with its contractual obligations.

29. In contrast to DOE's failure to take any action to meet its contractual commitments, DOE has taken action to receive, transport and store SNF from other entities. For example, DOE continues to accept and store SNF from foreign research reactors.

30. As a direct and proximate result of DOE's breach of the implied covenant of good faith and fair dealing, NSP has suffered and will continue to suffer damages as alleged above.

**COUNT III**

**(Taking Without Just Compensation)**

31. Paragraphs 1 through 30 are incorporated herein by reference as if set forth in full.

32. The Government was and is unequivocally obligated under the Standard Contracts to commence acceptance and disposal of NSP's SNF no later than January 31, 1998. By fully complying with its obligations under the Standard Contracts, NSP obtained a vested contract right to have the Government dispose of NSP's SNF in accordance with the terms of the contract.

33. The Government's failure and refusal to comply with the requirements of the Standard Contract for acceptance and disposal of NSP's SNF constitutes a taking of NSP's

vested contract rights. In addition, the Government's failure to honor its commitments under the Standard Contract will prevent NSP from being able to decommission its nuclear plant sites and devote those sites to commercial uses as soon as it otherwise would have been able to do so. The Government's conduct has deprived, and will continue to deprive, NSP of the full valuable economic use of those sites, as well as the real property on which the SNF is stored and from which it cannot lawfully be removed.

34. NSP is entitled to just compensation for this taking of NSP's vested contract rights and this taking of NSP's real property in an amount to be determined at trial.

## SUPPLEMENTAL PLEADING

35. Since the filing of the First Amended Complaint in December 2000, NSP has continued to pay fees into the Nuclear Waste Fund of approximately $12 million per year. To date, NSP has paid nearly $350 million into the Nuclear Waste Fund.

36. Since the filing of the First Amended Complaint, NSP has incurred and continues to incur additional damages at its Monticello and Prairie Island plants, which damages arise from the same continuing partial breach of NSP's Standard Contracts and continuing taking of NSP's property without just compensation by the Government.

37. Between December 2000 and continuing through December 2004, the following transactions, occurrences, and events, *inter alia*, took place as a direct and proximate result of the Government's continuing partial breach of NSP's Standard Contracts and continuing taking of NSP's property without just compensation: NSP began incurring costs for the licensing, engineering and construction of an on-site dry fuel storage facility at Monticello, as well as continuing costs associated with the purchase, design and engineering, delivery, and loading of

casks for the dry fuel storage facility at Prairie Island. NSP also continued to pay Nuclear Regulatory Commission licensing and inspection fees for the dry storage facility at Prairie Island and make payments to the Private Fuel Storage Project. Furthermore, NSP incurred costs associated with the development of installations for 125 megawatts of bio-mass generation, payments into the Renewable Development Fund, and settlement payments to the Prairie Island Indian Community – which activities were mandated by the State of Minnesota as conditions for NSP to obtain a certificate of need to build an on-site dry fuel storage facility at Prairie Island.

38. As a direct and proximate result of DOE's continuing partial breach of NSP's Standard Contracts, continuing taking of NSP's property without just compensation, and the actions taken in paragraph 37 above, NSP has incurred substantial damages in addition to those sought in its First Amended Complaint. The amount of these damages is to be determined at the trial currently scheduled to commence in October 2006.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Northern States Power Company respectfully requests that the Court enter judgment in its favor and against the United States as follows:

(a) On Count I, for damages in an amount to be determined at trial;

(b) On Count II, for damages in an amount to be determined at trial;

(c) On Count III, for damages in an amount to be determined at trial;

(d) Pre-judgment and post-judgment interest as permitted by law;

(e) Costs of suit, including reasonable attorneys' fees as permitted by law; and

(f) Such other and further relief as this Court may deem proper.

Dated: January 27, 2006

Respectfully submitted,

s/ Alex D. Tomaszczuk by s/ Jack Y. Chu

Alex D. Tomaszczuk
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 770-7940
(703) 770-7901 (fax)
Counsel of Record for Plaintiff
Northern States Power Company

Of Counsel:

Jay E. Silberg
Daniel S. Herzfeld
Jack Y. Chu
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
2300 N Street, N.W.
Washington, D.C. 20037-1128
(202) 663-8000
(202) 663-8007 (fax)

Kerry C. Koep
**XCEL ENERGY**
800 Nicollet Mall, Suite 2900
Minneapolis, Minnesota 55402