**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
(Electronically Filed on September 1, 2006)

| | |
|---|---|
| **NORTHERN STATES POWER COMPANY,**<br><br>Plaintiff,<br><br>v.<br><br>**THE UNITED STATES**,<br><br>Defendant. | No. 98-484C<br>(Senior Judge Wiese) |

**NORTHERN STATES POWER COMPANY'S**
**MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

Alex D. Tomaszczuk
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7940
(703) 770-7901 (fax)

Counsel of Record for Plaintiff
Northern States Power Company

*Of Counsel:*

Jay E. Silberg
Daniel S. Herzfeld
Jack Y. Chu
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
2300 N Street, N.W.
Washington, D.C. 20037
(202) 663-8000
(202) 663-8007 (fax)

Kerry C. Koep
**XCEL ENERGY**
414 Nicollet Mall, 5th Floor
Minneapolis, MN 55401
(612) 215-4583
(612) 215-4544

September 1, 2006

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........ iii

I. INTRODUCTION ........ 1

II. BACKGROUND FACTS ........ 3

A. The Nuclear Waste Policy Act Is Enacted To Codify The Federal Government's Longstanding Policy To Dispose Of Spent Nuclear Fuel And To Assure Sufficient Storage For Commercial Nuclear Utilities ........ 3

B. NSP's Three Standard Contracts And The Expectations At The Time The Contracts Were Signed ........ 5

1. NSP's Three Contracts And Its Nuclear Plants ........ 5

2. Both Parties To The Contract Expected DOE To Perform At A Rate Sufficient To Remove The Need For Utilities To Acquire Additional Storage Capacity After 1998 And To Begin To Remove The Backlog ........ 7

C. DOE's Forecast of Delay ........ 8

D. NSP Decides To Build A Dry Storage Facility Instead Of Conducting A Third Re-Rack At Prairie Island Because NSP Realized That DOE Would Not Begin Timely Performance ........ 9

E. The Certificate of Need Proceedings Before The Minnesota Public Utilities Commission And Appeal To The Minnesota Court of Appeals ........ 12

F. The 1994 Prairie Island Legislation ........ 14

G. NSP Pursues Private Fuel Storage And An Alternate Storage Site In Goodhue County, Minnesota ........ 16

1. NSP And Other Utilities Succeed In Licensing Private Fuel Storage Where DOE Failed To Pursue An MRS ........ 16

2. NSP Incurs Costs In Attempting To Site An Alternative Dry Storage Facility In Goodhue County ........ 17

H. The Government Breaches The Standard Contracts In 1998 And, To Date, Has Not Yet Begun Performance ........ 17

I. The 2003 Legislation And The Monticello ISFSI ........ 18

III. LEGAL AUTHORITY ........ 20

A. NSP's Damages Were Foreseeable, Caused By DOE's Breach, And Will Be Proved With Reasonable Certainty ........ 20

1. The Government Caused And Should Have Foreseen That NSP Would Have To Build Dry Storage Facilities ........ 21

2. The Government Caused And Should Have Foreseen That NSP Would Pursue Alternate Locations For Its Dry Storage Facilities, Such As PFS And The Goodhue County Location ........ 23

3. The Government Caused And Should Have Foreseen Other Legislative Mandates As A Possibility Based On The Political Difficulty Of Siting A Nuclear Waste Storage Facility ........ 27

a. Biomass Mandate And Renewable Development Fund ........ 27

b. Tribal Payment ........ 28

B. The Government Cannot Show That NSP's Mitigation Efforts Were Unreasonable ........ 30

1. The Federal Circuit Did Not Create A Per Se Cut-Off Of 1994 To Recover Mitigation Costs In SNF Cases ........ 30

2. The Government Should Not Receive An Offset For Incremental Labor Costs ........ 31

3. Any Offsets Based On What DOE Might Do When It Picks Up NSP's SNF In The Future Are Speculative ........ 32

4. NSP's Costs of Capital Are Appropriate And Reasonable Damages ........ 33

C. The Parties Understood That DOE Would Perform At A Rate To Avoid Additional At-Reactor Storage And To Begin Reducing The Backlog Of SNF, Which Is A 3,000 MTU Steady-State Rate ........ 34

IV. CONCLUSION ........ 35

**TABLE OF AUTHORITIES**

## Cases

*California Fed. Bank, FSB v. United States*,
395 F.3d 1263 (Fed. Cir. 2005), *cert. denied* 126 S. Ct. 344 (2005) ................................ 22, 24

*Commonwealth Edison Co. v. United States*,
271 F.3d 1327 (Fed. Cir. 2001) (*en banc*) .................................................................... 26

*Commonwealth Edison Co. v. United States*,
56 Fed. Cl. 652 (2003) ............................................................................................ 7, 21

*Energy Capital Corp. v. United States*,
302 F.3d 1314 (Fed. Cir. 2002)...................................................................................... 20

*First Heights Bank, FSB v. United States*,
422 F.3d 1311 (Fed. Cir. 2005)...................................................................................... 30

*Florida Power & Light Co. v. Westinghouse Elec. Corp.*,
826 F.2d 239 (4th Cir. 1987) ........................................................................................... 4

*Home Savings of Am., FSB v. United States*,
399 F.3d 1341 (Fed. Cir. 2005)...................................................................................... 30

*In re Application for Certificate of Need for Construction of an Independent Spent Fuel Storage Installation*,
501 N.W.2d 638 (Minn. Ct. App. 1993) ("*In re ISFSI*")........................................... 13, 14, 26

*In re Kellett Aircraft Corp.*,
186 F.2d 197 (3d Cir. 1950)........................................................................................... 30

*Indiana Mich. Power Co. v. Dep't of Energy*,
88 F.3d 1272 (D.C. Cir. 1996) ................................................................................... 5, 18

*Indiana Mich. Power Co. v. United States*,
422 F.3d 1369 (Fed. Cir. 2005)................................................................................ passim

*Koby v. United States*,
53 Fed. Cl. 493 (2002) .................................................................................................. 30

*Locke v. United States*,
283 F.2d 521 (Ct. Cl. 1960) ................................................................................ 23, 26, 28

*Maine Yankee Atomic Power Co. v. United States*,
225 F.3d 1336 (Fed. Cir. 2000)........................................................................................ 1

*Maine Yankee Atomic Power Co. v. United States*,
44 Fed. Cl. 372 (1999), *aff'd*, 271 F.3d 1357 (Fed. Cir. 2001)............................................... 26

*Northern States Power Co. v. United States Dep't of Energy*,
128 F.3d 754 (D.C. Cir. 1997)........................................................................................ 18

*Northern States Power Co. v. United States*,
224 F.3d 1361 (Fed. Cir. 2000)....................................................................................... 1, 5

*Robinson v. United States*,
305 F.3d 1330 (Fed. Cir. 2002)........................................................................................ 20

*Sacramento Mun. Util. Dist. v. United States*,
70 Fed. Cl. 332 (2006)............................................................................................... 32, 33

*Tenn. Valley Auth. v. United States*,
69 Fed. Cl. 515 (2006)............................................................................................... passim

*Wickham Constr. Co. v. Fischer*,
12 F.3d 1574 (Fed. Cir. 1994)......................................................................................... 34

**Statutes and Codes**

Nuclear Waste Policy Act of 1982,
Pub. L. No. 97-425, 96 Stat. 2201 (1983)......................................................... 4, 5, 24

Nuclear Waste Policy Amendments Act of 1987,
Pub. L. No. 100-203, 101 Stat. 1330-227 (1987) ................................................ 9, 24

28 U.S.C. § 2516.......................................................................................................... 33

42 U.S.C. § 10222.......................................................................................................... 5

42 U.S.C. § 10131.......................................................................................................... 5

42 U.S.C. § 10132.......................................................................................................... 24

42 U.S.C. § 10133.......................................................................................................... 24

42 U.S.C. § 10136.......................................................................................................... 29

42 U.S.C. § 10156.......................................................................................................... 29

42 U.S.C. § 10161.................................................................................................... 24, 29

42 U.S.C. § 10168.......................................................................................................... 9

42 U.S.C. § 10169 ........ 29

42 U.S.C. § 10173 ........ 28

42 U.S.C. § 10173a ........ 29

42 U.S.C. § 10195 ........ 29

42 U.S.C. § 10199 ........ 29

1994 Minn. Sess. Laws Ch. 641 ........ 14, 15, 28

2003 Minn. Sess. Laws, 1st Special Session, Ch. 11 ........ 15, 18, 19

Minn. Stat. § 116C.77 ........ 14

Minn. Stat. § 116C.771 ........ 14

Minn. Stat. § 116C.779 ........ 15, 19, 28

Minn. Stat. § 116C.80 ........ 15

Minn. Stat. § 116C.83 ........ 18

Minn. Stat. § 216B.241 ........ 15

Minn. Stat. § 216B.2423 ........ 15

Minn. Stat. § 216B.2424 ........ 15, 19, 28

Minn. Stat. § 216B.243 ........ 12

Minn. Stat. § 216B.1645 ........ 19

**Rules and Regulations**

10 C.F.R. Part 50, App. F ........ 4

35 Fed. Reg. 17,530 (Nov. 14, 1970) ........ 4

Final Interpretation of Nuclear Waste Acceptance Issues,
60 Fed. Reg. 21,793, 21,794-95 (May 3, 1995) ........ 18

Notice of Inquiry, 59 Fed. Reg. 27,007 (May 25, 1994) ........ 17

**Other Authorities**

13 Wkly. Comp. Pres. Doc. 502 (1977)........................................................................................ 4

H.R. Rep. No. 97-491, pt. 1 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3792. ........................... 4, 26

H.R. Rep. No. 97-785, pt. 1 ............................................................................................................ 4

Restatement (Second) of Contracts § 350........................................................................................ 20

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
(Electronically Filed on September 1, 2006)

| | | |
|---|---|---|
| **NORTHERN STATES POWER COMPANY,** Plaintiff, v. **THE UNITED STATES,** Defendant. | ) | No. 98-484C (Senior Judge Wiese) |

**NORTHERN STATES POWER COMPANY'S**
**MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

Pursuant to this Court's September 14, 2005 Order and RCFC Appendix A, ¶ 16, Plaintiff Northern States Power Company ("NSP"), respectfully files this memorandum of contentions of fact and law in support of breach-of-contract damages claim in the instant action.[1]

## I. INTRODUCTION

This trial presents this Court with NSP's straightforward claim for breach of contract damages. This Court already has determined that Defendant, the United States (the "Government") is liable for breach of contract. *See* July 31, 2001 Order (granting NSP's renewed motion for summary judgment on liability); *see also generally Northern States Power Co. v. United States*, 224 F.3d 1361 (Fed. Cir. 2000); *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1342 (Fed. Cir. 2000) ("The breach involved all the utilities that had

[1] In accordance with RCFC, Appendix A, ¶ 15, NSP is filing its Exhibit and Witness Lists with this Memorandum. Drafts of the Exhibit and Witness Lists were exchanged with counsel for the Government on August 23, 2006. Because NSP's discovery of the Government is on-going and because NSP only took the depositions of the Government's expert witnesses on August 28-31, 2006, NSP reserves its right to file pre-trial evidentiary motions.

signed the contract—the entire nuclear electric industry.”). Therefore, the sole purpose of this trial will be to determine the quantum of NSP’s damages for the Government’s partial breach of NSP’s contracts.

The U.S. Court of Appeals for the Federal Circuit (“Federal Circuit”) has provided a legal framework for partial breach cases, where the non-breaching party has taken steps to mitigate its damages prior to breach. *Indiana Mich. Power Co. v. United States*, 422 F.3d 1369, 1374-75 (Fed. Cir. 2005). The Federal Circuit has stated that a utility may recover such pre-breach expectancy damages if a utility can show “foreseeability, causation, and reasonableness.” *Id.* The Government as the breaching party bears the burden of showing that NSP’s mitigation efforts as the non-breaching party were unreasonable. *See Tenn. Valley Auth. v. United States*, 69 Fed. Cl. 515, 523 (2006).

NSP seeks mitigation damages through December 31, 2004 for: (1) ***on-site storage*** of spent nuclear fuel (“SNF”) at its nuclear plants, which includes its licensing and operation of its SNF dry storage facility at its Prairie Island nuclear plant and its costs of licensing and beginning to construct a dry storage facility at its Monticello nuclear plant; (2) ***alternate storage facilities***, which include (a) its costs for its participation in Private Fuel Storage, LLC, which successfully received licensing from the Nuclear Regulatory Commission to construct a dry storage facility in Utah and (b) its efforts to license an away-from-reactor SNF storage facility in Goodhue County, Minnesota, which effort was a condition of NSP receiving permission from Minnesota to build a dry storage facility; (3) the costs of implementing up to 125 megawatts (later lowered to 110 megawatts) of ***mandated biomass generation***, which was imposed by the Minnesota legislature as a condition of NSP being allowed to build its dry storage facility at the Prairie Island nuclear plant; (4) ***other mandated payments***, which include, *inter alia*, (a) a mandated payment into and

administration of a fund for renewable energy – the Renewable Development Fund – for every dry storage cask that remained at Prairie Island after 1999 – the year that the Department of Energy ("DOE") was expected to begin picking up NSP's SNF, and (b) settlement payments to the Prairie Island Indian Community, whose land sits immediately next to the Prairie Island nuclear plant, which payments were a condition placed by the Minnesota legislature on building a dry storage facility. A summary of NSP's damages in both nominal and present value dollars corresponding to the above bolded categories follows and will be discussed at trial by NSP's damages experts – Kenneth Metcalfe and Richard Sieracki:

**SUMMARY OF DAMAGES (in Millions of Dollars)**[2]

| CATEGORY | NOMINAL DOLLARS | PRESENT VALUE "2005" DOLLARS |
|---|---|---|
| *On-Site Storage* | $ 44 | $ 79 |
| *Alternate Storage Facilities* | 27 | 40 |
| *Mandated Biomass Generation* | 23 | 26 |
| *Other Mandated Payments* | 23 | 27 |
| TOTAL | $117 | $172 |

## II. BACKGROUND FACTS

### A. The Nuclear Waste Policy Act Is Enacted To Codify The Federal Government's Longstanding Policy To Dispose Of Spent Nuclear Fuel And To Assure Sufficient Storage For Commercial Nuclear Utilities

Early in the history of American atomic power, the Government acknowledged a definite federal responsibility to provide for the permanent disposal of SNF and high-level waste

[2] As noted above, the cut-off date for damages in this case is December 31, 2004. Damages incurred by NSP after that date will be the subject of a future action.

("HLW") byproduct from the commercial use of nuclear power. *See Florida Power & Light Co. v. Westinghouse Elec. Corp.*, 826 F.2d 239, 244 (4th Cir. 1987) (discussing President Eisenhower's Atoms-for-Peace commercial nuclear program and the passage of the Atomic Energy Act).[3]

The Government's effort to manage the disposal of SNF and HLW was redirected when President Carter announced in 1977 that the Government intended to postpone indefinitely reprocessing in the United States. 13 Wkly. Comp. Pres. Doc. 502, 503 (1977). As a result, "[t]he domestic nuclear industry was confronted not only with a shift in its technical future but with a sudden and unanticipated liability in the form of spent fuel stored at reactor sites with no near-term destination." H.R. Rep. No. 97-491, pt. 1, at 27 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3792, 3793. The majority of spent fuel pools existing at nuclear reactor sites, including those at NSP's Prairie Island and Monticello nuclear plants, were sized with the intention that SNF would be stored therein temporarily before being shipped to a reprocessing facility. *See, e.g.*, H.R. Rep. No. 97-785, pt. 1, at 47. The lack of reprocessing meant that SNF had to be removed and stored somewhere outside the pool if plant operation was to continue. *Id*.

On January 7, 1983, President Reagan signed into law the Nuclear Waste Policy Act of 1982, Pub. L. No. 97-425, 96 Stat. 2201 (1983) ("NWPA") (codified as amended at 42 U.S.C. §§ 10131-10270). The NWPA formalized the Government's long-standing policy of accepting responsibility and providing for the timely disposition of commercial SNF and HLW. *See* 42

[3] This commitment is reflected, for example, in the Atomic Energy Commission's ("AEC") statement of its "Policy Relating to the Siting of Fuel Processing Plants and Related Waste Management Facilities," adopted in 1970, which provides that "[d]isposal of high-level radioactive fission product waste material will not be permitted on any land other than that owned and controlled by the Federal Government." 10 C.F.R. Part 50, App. F. In announcing this policy, the AEC reaffirmed that "high-level waste repositories should be under Federal ownership and responsibility." 35 Fed. Reg. 17,530, 17,532 (Nov. 14, 1970).

U.S.C. § 10131(b)(2) (indicating that one purpose of NWPA was "to establish the Federal responsibility, and a definite Federal policy, for the disposal of such waste and spent fuel . . . .").

In the NWPA, Congress expressly acknowledged that "[a] national problem has been created by the accumulation of . . . spent nuclear fuel from nuclear reactors . . . ." 42 U.S.C. § 10131(a)(2)(A). To solve this problem, the NWPA acknowledged that one of the key purposes of the Act was to impose upon the Government a firm schedule and deadline by which the Government would assume responsibility for the disposal of commercially-generated SNF. *See* 42 U.S.C. § 10131(b)(1) (indicating that one purpose of the NWPA was "to establish a schedule for the siting, construction, and operation of repositories" to receive SNF and HLW).

### B. NSP's Three Standard Contracts And The Expectations At The Time The Contracts Were Signed

The NWPA created a quid pro quo arrangement such that utilities, such as NSP, would pay fees into the Nuclear Waste Fund in exchange for the Government's performance of SNF and HLW disposal services beginning no later than January 31, 1998. *See Indiana Mich. Power Co. v. Dep't of Energy*, 88 F.3d 1272, 1277 (D.C. Cir. 1996). The NWPA instructed DOE and commercial nuclear utilities to enter into contracts for the disposal of each utility's SNF and HLW. NWPA, Pub. L. No. 97-425, § 302, 96 Stat. 2201, 2257 (1983) (codified at 42 U.S.C. § 10222(a)(1) (1982)); *see also Northern States*, 224 F.3d at 1364. Pursuant to NWPA § 302, DOE created a "Standard Contract for the Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste," ("Standard Contract"). *Northern States*, 224 F.3d at 1364.

#### 1. NSP's Three Contracts And Its Nuclear Plants

On or about June 20, 1983, NSP entered three of these "Standard Contracts" with DOE for the disposal of its SNF and HLW at (1) NSP's Prairie Island nuclear plant, (2) NSP's

Monticello nuclear plant, and (3) NSP's SNF that was subsequently shipped to the General Electric plant in Morris, Illinois. Plaintiffs Exhibits ("PX") 56-58.

Prairie Island is a two-reactor plant located near Red Wing, Minnesota, on the Mississippi River. Prairie Island's unit 1 reactor began commercial operation in December 1973 and is currently licensed to operate until August 2013. Prairie Island's unit 2 reactor began commercial operation in December 1974 and is currently licensed to operate until October 2014. Prior to signing the Prairie Island Standard Contract with DOE, NSP had re-racked the spent fuel pools at Prairie Island twice – in 1975 and 1981 – increasing the total storage capacity of the spent nuclear fuel pools from 210 assemblies to 1,386 assemblies.[4]

Monticello is a single reactor plant located within the city limits of Monticello, Minnesota, also on the Mississippi River. The Monticello nuclear plant began commercial operation in June 1971 and is currently licensed to operate until September 2010. Prior to signing its Monticello Standard Contract with DOE, NSP had re-racked its spent fuel pool at the Monticello nuclear plant once – in 1978 – increasing its total storage capacity from 740 assemblies to 2,237 assemblies.

Between 1984 and 1987, NSP shipped 1,058 spent fuel assemblies from its Monticello nuclear plant to General Electric's ("G.E.") Morris, Illinois facility. NSP and G.E. had entered

[4] The capacity of a spent fuel pool refers to the total number of spent fuel assemblies that can be safely stored in the spent fuel pool. Generally, each assembly is formed into a square array referred to as a fuel "assembly." Each fuel rod includes small cylindrical pellets of enriched uranium. After several cycles (each lasting from 12 to 18 months) of using an assembly for the production of nuclear power in a nuclear reactor, these assemblies become "spent" and no longer usable. They are then removed to a spent fuel pool for storage in racks or other storage facility – such as a dry storage facility.

into an agreement to store these spent fuel assemblies. NSP's "Morris" contract encompasses these spent fuel assemblies.

To date, NSP has paid DOE approximately $350 million for nuclear waste disposal services and will continue to pay at a rate of approximately $12 million per year.

### 2. Both Parties To The Contract Expected DOE To Perform At A Rate Sufficient To Remove The Need For Utilities To Acquire Additional Storage Capacity After 1998 And To Begin To Remove The Backlog

As noted above, one of the purposes of the NWPA was to create a firm schedule for the removal of the accumulated SNF at commercial nuclear reactors. At the time the Standard Contracts were signed, both DOE and NSP expected that DOE would perform at a rate sufficient to remove the need for NSP (or any utility) to acquire additional storage capacity after 1998 – the statutorily mandated date to begin performance – and to begin removal of the accumulated backlog of SNF that increased at NSP's (and other utilities) facilities.

Many of the witnesses the Government plans to call at the upcoming trial have already acknowledged these goals. *See Tenn. Valley Auth.*, 69 Fed. Cl. at 519 (citing testimony of current DOE official Thomas E. Pollog and former DOE official Lake Barrett for the conclusion that, "One of the goals of the Nuclear Waste Policy Act was to reduce the backlog of spent nuclear fuel that had accumulated at nuclear power facilities around the nation. Another goal of the waste disposal program was to preclude utilities need to provide for storage of spent fuel outside the pools attendant to their reactors."); *see also Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 667 (2003) (citing deposition testimony and the Draft Mission Plan – here PX154); *see also* Civilian Radioactive Waste Management Program Mission Plan, at 2-1 (Dec. 20, 1983 Draft), PX154, at KRGNSP03179 ("The waste materials will be accepted in

accordance with a Waste Acceptance Schedule designed to provide an acceptance rate in the first five years such that no utility will have to provide additional storage capacity after January 31, 1998."); Robert Morgan, *Program Overview*, Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting (Feb. 1984), PX155, at KRGNSP03299 (Acting-Director of DOE's program stated, "The basic strategy which we've only outlined in the mission plan, is that beginning in 1998, utilities will not have to provide any additional storage facilities on site. During the first year of operation of the repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on site or at another location.").

NSP will call Mr. James Karalus and perhaps Mr. David Peterson (Mr. Karalus's supervisor at the time in NSP's Nuclear Fuels department), both of whom will confirm NSP's similar understanding of these objectives of DOE's nuclear waste program. Mr. Peterson witnessed the execution of NSP's three Standard Contracts and Mr. Karalus has knowledge of these objectives from the time of contract formation. *See* Deposition of David Peterson at 74-75 (May 17, 2006) ("We believed in the contract and what the contract said and what they told us, which was they would start taking fuel no later than '98 and at a rate such that we did not have to add any more fuel storage beyond the amount to get us to '98."); Deposition of James Karalus at 31-32 (understanding DOE's contractual obligation required DOE to "design its facilities with the capacity to receive SNF/HLW at a rate commensurate with the amount of SNF/HLW and be generated together with the accumulated backlog of SNF/HLW").

### C. DOE's Forecast of Delay

In 1987, DOE issued a Mission Plan Amendment to Congress detailing the need for Congress to authorize an interim storage facility – a Monitored Retrievable Storage ("MRS")

facility – to assure that DOE could timely begin disposing of SNF by 1998. OCRWM Mission Plan Amendment at 63, PX304. In this regard, DOE stated, "If Congress does not approve the MRS facility, the transfer of waste to DOE facilities may not be able to begin in 1998." *Id.*

In 1987, Congress passed the Nuclear Waste Policy Amendments Act, which authorized DOE to build its requested MRS facility, but with certain scheduling linkages to the permanent repository. Pub. L. No. 100-203, § 5021, 101 Stat. 1330-227, 1330-236 (1987) (codified, as amended, at 42 U.S.C. § 10168(d)(1)). By June 1988, DOE recognized that the Amendment Act's linkages between the construction of the MRS and the construction of the repository were too restrictive and that DOE would not be able to perform by 1998 if the law was not altered. Draft 1988 Mission Plan Amendment at 18-19, PX156. "The DOE recognizes that, under current conditions, waste acceptance at a waste-management facility cannot begin in 1998; furthermore, the delay in the repository schedule and the linkages between that schedule and key milestones in the siting and construction of an MRS facility make it unlikely that the DOE will be able to start accepting waste significantly before 2003." *Id.*

### D. NSP Decides To Build A Dry Storage Facility Instead Of Conducting A Third Re-Rack At Prairie Island Because NSP Realized That DOE Would Not Begin Timely Performance

In the late 1980s, NSP was determining how it should meet SNF storage needs for its Prairie Island nuclear plants in light of DOE's responsibilities under the NWPA and its contracts with NSP. NSP was faced with the need to increase storage capacity, as its spent fuel pools would run out of space in approximately 1995.

In evaluating the leadup to and fallout from the 1987 Amendments Act, NSP's Ms. Laura McCarten concluded that DOE would not meet the 1998 deadline if Congress enacted restrictive

linkages between the construction of the MRS and the repository. *See* Laura McCarten, Special Nuclear Programs Strategies for Managing NSP's Spent Nuclear Fuel (August 1987), PX398 ("The DOE's waste acceptance schedule will depend on whether or not Congress authorizes construction of an MRS, the linkage between MRS operation and the first repository development, and when the first repository begins operating."); *see also* Laura McCarten, Northern States Power Company Spent Nuclear Fuel Strategic Plan (July 1988), PX398. Based on her assessment even prior to the passage of the Amendments Act, Ms. McCarten noted, "[G]iven the uncertainties and opportunities for further delay, NSP should anticipate having to provide storage for its spent fuel out to the end of the life of the plants." Laura McCarten, Special Nuclear Programs Strategies for Managing NSP's Spent Nuclear Fuel (August 1987), PX398.

As a result of the enactment of the the Amendments Act, Ms. McCarten was aware that the 1987 Amendments Act "created a restrictive link between the MRS construction schedule and the repository development schedule." *See* Laura McCarten, Northern States Power Company Spent Nuclear Fuel Strategic Plan (July 1988), PX398. Because of the schedule linkage and the accompanying "uncertainties and opportunities for delay," Ms. McCarten again concluded that NSP should anticipate storing its SNF until the end of the life of the plants. *Id.*

In light of this reality, Ms. McCarten and Mr. Jon Kapitz (another nuclear engineer at Prairie Island who will testify at trial) evaluated NSP's options for storing its SNF, including whether to consolidate the fuel rods at Prairie Island to create additional space in the pools or to construct an on-site dry storage facility using storage casks. Prairie Island Spent Fuel Storage Technology Evaluation Report (Sept. 6, 1988), PX399 ("The DOE's revised program schedule projects an MRS operational by 2004 and the first respository fully operational by 2006. *This*



400447098v2

*schedule is optimistic by at least three years*. . . . Notwithstanding DOEs projected schedules and possibilities for an earlier MRS operation, *it is conceivable that a permanent repository will not be operational by 2013-2014*, when [Prairie Island's] current licenses will expire.") (emphasis added). Ultimately, NSP, through Ms. McCarten and Mr. Kapitz, decided to store the Prairie Island SNF by licensing and constructing a dry storage facility – known as an Independent Spent Fuel Storage Installation ("ISFSI") – utilizing Transnuclear ("TN") dry storage casks. *See* Prairie Island Dry Spent Fuel Storage System Evaluation and Recommendation (July 17, 1989), PX400.

Had NSP believed with reasonable certainty that DOE would meet its obligation to begin accepting fuel from utilities in 1998, NSP could have re-racked its pool for a third time or used rod consolidation to assure sufficient storage space in its pool without constructing a dry storage facility. In this regard, the spent fuel pools at Prairie Island could have accommodated at least a 20 percent increase, which would have allowed for storage space through 1999 or 2000. *See, e.g.*, Nutech, Structural Evaluation Of Spent Fuel Storage Rack For Consolidated Fuel At The Prairie Island Nuclear Generating Plant (1987), PX595; *see also* Application for Certificate of Need at 91, PX60. However, because of the uncertainty of DOE's plans, NSP opted to license and build a dry storage facility to assure that NSP would have sufficient storage capacity through 2005. This has proven to be a prescient analysis, especially given DOE's most recent pronouncement that it will not commence performance until 2017 at the earliest.[5]

---

[5] On July 19, 2006, DOE announced that the "best-achievable" date to begin receipt of SNF is now March 31, 2017. Even this date, signifying a breach of at least 19 years, is one that DOE characterizes as "aggressive" and assumes among other highly optimistic assumptions "the absence of litigation related delays." Statement of Edward F. Sproat III, Director, Office of Civilian Radioactive Waste Management, U.S. Department of Energy, before the Subcommittee

For nearly two decades, DOE's management of the waste disposal program has been marked by delays and failed performance. For example, in 1989, DOE announced it would not begin accepting fuel at a repository until at least 2010. Report to Congress on Reassessment of the Civilian Radioactive Waste Management Program, PX158. From 1991 through 1992, NSP's CEO and Chairman of the Board, Mr. James Howard, and Commissioner Kris Sanda of Minnesota's Department of Public Service corresponded with DOE, included its Secretary – Admiral Watkins. Mr. Howard sought some guarantee that DOE would begin acceptance in 1998 and Commissioner Sanda petitioned DOE for a rulemaking to amend the Standard Contracts to assure that Minnesota ratepayers would not pay for DOE's delay. PX498-PX509. DOE essentially ignored these pleas. In the course of this correspondence, DOE's John Bartlett wrote to Commissioner Sanda on February 14, 1992, and stated, "Neither the NWPA nor the Standard Contract imposes an unconditional obligation on the Department [of Energy] to accept SNF by January 31, 1998." PX501.

### E. The Certificate of Need Proceedings Before The Minnesota Public Utilities Commission And Appeal To The Minnesota Court of Appeals

To build a dry storage facility at Prairie Island, NSP had to (1) seek a license from the Nuclear Regulatory Commission to increase its storage capacity, build, and operate its ISFSI (*i.e.* its dry storage facility)[6] and (2) petition the Minnesota Public Utilities Commission to issue a Certificate of Need, because the ISFSI is considered a "large energy facility" pursuant to Minn. Stat. § 216B.243. The NRC granted NSP a license in October 1993 to build and operate an

---

on Energy and Air Quality, Committee on Energy and Commerce, U.S. House of Representatives (July 19, 2006), PX1002.

[6] For example, Prairie Island's dry storage ISFSI consists of two large concrete pads used to store dry casks, surrounded by a security fence.

ISFSI, which could hold up to 715.29 MTUs (or approximately 48 TN-40 casks). In 1991, NSP set out on a much longer journey to receive its Certificate of Need from the Minnesota PUC.

NSP submitted its application for a Certificate of Need to the Minnesota PUC in April 1991. Application for Certificate of Need, PX60. Initially, the PUC referred the certificate of need application to an administrative law judge ("ALJ") for a contested case hearing, which included numerous filings, 18 days of evidentiary hearings, and three days of public hearings. *See In re Application for Certificate of Need for Construction of an Independent Spent Fuel Storage Installation*, 501 N.W.2d 638, 641 (Minn. Ct. App. 1993) ("*In re ISFSI*"). In April 1992, the ALJ recommended that the PUC deny the certificate of need, because Minnesota law required legislative approval of a "permanent" storage facility and the DOE's inability to "take spent fuel away from Prairie Island in the predictable future" meant the ISFSI would be permanent. *See* PX749; *In re ISFSI*, 501 N.W.2d at 642.

In August 1992, the PUC rejected the ALJ's recommendation and granted a limited Certificate of Need to NSP to build an ISFSI. *See* Order Granting Limited Certificate of Need, PX61. The PUC noted that "principles of intergovernmental comity" counseled the PUC to give DOE the benefit of the doubt that it begin removing SNF "within a reasonable time frame" of its pronouncements. *Id.* at 10. However, the PUC echoed the ALJ's concerns of the permanence of NSP's Prairie Island ISFSI, by limiting the number of casks that NSP could use at its ISFSI to only 17 (instead of the 48 requested). *Id.* at 33. The PUC stated:

> One of the main reasons the Commission is limiting the number of casks, though, is to guard against the possibility that the federal government will be unable to site, construct, and open a permanent national repository within its projected time frame and cost constraints. Should that happen, the environmental and cost assumptions underlying this limited certificate of need will no longer apply, and

other resource options will have to be re-evaluated in light of the new situation.
*Id.* at 10.

Thus, the PUC through its grant of only a "limited" Certificate of Need, concluded that this assured the ISFSI would not be a "permanent" storage facility and, therefore, did not require approval by the Minnesota legislature. *See In re ISFSI*, 501 N.W.2d at 642.

Several of the parties to the PUC proceedings other than NSP appealed the PUC's decision to the Minnesota Court of Appeals. The appellate court reversed the PUC's grant of the limited Certificate of Need, concluding that the Prairie Island ISFSI would be "permanent" under Minnesota law and, therefore, would have to receive approval from the Minnesota legislature. *In re ISFSI*, 501 N.W.2d at 648. NSP petitioned the Minnesota Supreme Court to review the Court of Appeals' decision, but the Minnesota Supreme Court denied review.

**F. The 1994 Prairie Island Legislation**

Based on the Minnesota Court of Appeals decision, NSP's pursuit of an ISFSI moved from a court of law to the court of public opinion. In 1994, the Minnesota legislature passed legislation allowing NSP to build an ISFSI at the Prairie Island plant. *See* 1994 Minn. Sess. Laws Ch. 641. The law ratified the PUC's grant of a limited Certificate of Need for only 17 casks. *See* 1994 Minn. Sess. Laws Ch. 641, Art. 1, § 1 (codified at Minn. Stat. § 116C.77). The law provided that NSP could immediately fill and store five casks at Prairie Island. *Id.*, Art. 1, § 2(a) (codified at Minn. Stat. § 116C.771(a)).

However, the legislation conditioned NSP's ability to load the additional 12 casks based on its meeting certain legislative mandates. *Id.*, Art. 1, § 2(codified at Minn. Stat. § 116C.771(b)-(c)). In this regard, the law required NSP to take several actions:

- *Goodhue County Site*: The law required NSP to attempt to site an alternate ISFSI in Goodhue County, Minnesota (which is near but not on Prairie Island). *Id.*, Art. 6, § 1 (codified at Minn. Stat. § 116C.80).

- *Biomass Mandate*: The law required NSP to add up to 125 megawatts of "farm grown closed-loop" biomass energy capacity to its energy resources for producing power. *Id.*, Art. 3, § 3 (codified, as amended, at Minn. Stat. § 216B.2424).[7]

- *Renewable Development Fund*: The law required NSP to create and administer a fund to develop renewable energy sources. The law directed NSP to pay "$500,000 each year for each dry cask containing spent fuel that is located" at Prairie Island's ISFSI. *Id.*, Art. 2, § 10 (codified, as amended, at Minn. Stat. § 116C.779).[8]

During the upcoming trial in this case, NSP may offer, among other witnesses, Mr. Merle Anderson (then NSP's Director of State and Metro Public Affairs), Mr. Jim Alders (currently Manager of Regulatory Projects at NSP's holding company – Xcel Energy, Inc. ("Xcel"))[9], the Honorable Steve Novak (a key Senate sponsor of the legislation in the Minnesota legislature), and the Honorable Gene Merriam (another Senate sponsor of the legislation in the Minnesota legislature) to discuss the legislative process. Additionally, Ms. McCarten (formerly the project

---

[7] In 2003, the legislature defined "biomass" to include:

> (1) methane or other combustible gases derived from the processing of plant or animal material; (2) alternative fuels derived from soybean and other agricultural plant oils or animal fats; (3) combustion of barley hulls, corn, soy-based products, or other agricultural crops; (4) wood residue from the wood products industry in Minnesota or other wood products such as short-rotation woody or fibrous agricultural crops; and (5) landfill gas, mixed municipal solid waste, and refuse-derived fuel from mixed municipal solid waste.

2003 Minn. Sess. Laws, 1st Special Session, Ch. 11, Art. 2, § 6 (codified at Minn. Stat. § 216B.241, subdivision 2(c)).

[8] The 1994 legislation also imposed a wind power mandate, but NSP does not seek damages for this mandate. *See* 1994 Minn. Sess. Laws, Ch. 641, Art. 3, § 2 (codified, as amended, Minn. Stat. § 216B.2423).

[9] Xcel Energy Inc. is a public utility holding company that has various operating subsidiaries including NSP. At trial, Mr. Charles Bomberger is expected to explain briefly the corporate history of Xcel and NSP's reliance on the Nuclear Management Company ("NMC") to operate the Prairie Island and Monticello plants.

manager of the Prairie Island ISFSI) and Mr. Kapitz (project engineer and later project manager of the Prairie Island ISFSI) will discuss the process of obtaining the Certificate of Need for the Prairie Island ISFSI as well as the costs of construction of the ISFSI and the purchase of dry storage casks.

### G. NSP Pursues Private Fuel Storage And An Alternate Storage Site In Goodhue County, Minnesota

#### 1. NSP And Other Utilities Succeed In Licensing Private Fuel Storage Where DOE Failed To Pursue An MRS

By 1994, the Government had all but abandoned the idea of trying to site, locate, and build an MRS facility. As noted above, DOE's efforts to site and build an MRS facility was always speculative based on the linkages in the Amendments Act. However, one of the tribes that considered hosting an MRS facility on tribal land included the Mescalero Apache Tribe. This tribe, with the support of Commissioner Sanda of the Minnesota Department of Public Service, approached NSP with an interest in pursuing a private storage facility with utilities similar to the proposed DOE MRS. *See* Deposition of Scott Northard at 116 (Apr. 24, 2006). NSP was among the lead utilities participating in the effort, in large part because it was unclear how much SNF (or for how long) the Minnesota legislature would allow NSP to store its SNF at Prairie Island. *Id.* at 119. NSP and other utilities created Mescalero Fuel Storage, LLC, which later became Private Fuel Storage, LLC ("PFS"), when the utilities entered a lease for the storage facility on the land of the Skull Valley, Utah, Band of Goshute Indians.

Over time, NSP (and the other utilities that formed PFS) pursued licensing of this away-from-reactor storage facility in Skull Valley. Ultimately, PFS successfully received a license from the NRC. Mr. Scott Northard, who served as project manager and later on the Board of

Directors for PFS, will discuss at trial NSP's participation in PFS and its dogged (and ultimately successful) pursuit of having this alternative storage facility licensed by NRC.

#### 2. NSP Incurs Costs In Attempting To Site An Alternative Dry Storage Facility In Goodhue County

In 1995, NSP submitted a request for a certificate of site compatibility assessment to the Minnesota Environmental Quality Board ("EQB") for the siting of an off-site dry storage facility in Goodhue County, Minnesota pursuant to the mitigation mandates imposed by the 1994 Minnesota legislation. Preliminary Application for Goodhue County Independent Spent Fuel Storage Facility, PX150. NSP also submitted a license request to the NRC for the Goodhue County site. Ultimately, on October 2, 1996, the EQB denied NSP's request for certificate of site compatibility, concluding that any other site in Goodhue County would be inferior to the existing on-site ISFSI at the Prairie Island plant. EQB Findings of Fact, Conclusions of Law, & Order, PX142. Mr. Alders will discuss at trial the effort and resultant costs NSP incurred in pursuing this alternative off-site dry storage facility.

### H. The Government Breaches The Standard Contracts In 1998 And, To Date, Has Not Yet Begun Performance

Consistent with DOE's earlier pronouncements in 1988 and its correspondence with Commissioner Sanda in 1992, DOE published a "Notice of Inquiry" in the Federal Register stating DOE "has no statutory obligation to accept spent nuclear fuel beginning in 1998 in the absence of an operational repository or other facility constructed under the [NWPA], although the Department in implementing the Standard Contract may have created an expectation that it would begin accepting such spent nuclear fuel in 1998." Notice of Inquiry, 59 Fed. Reg. 27,007, 27,008 (May 25, 1994). A year later, DOE issued its "Final Interpretation of Nuclear Waste Acceptance Issues," which reiterated its position that DOE had no obligation to begin accepting

SNF in 1998 and that DOE's performance would commence in 2010, at the earliest. 60 Fed. Reg. 21,793, 21,794-95 (May 3, 1995).

In 1996 and 1997, the D.C. Circuit rejected the Government's interpretation of its obligation under the NWPA. *See Indiana Mich.*, 88 F.3d at 1277; *see also Northern States Power Co. v. United States Dep't of Energy*, 128 F.3d 754, 755 (D.C. Cir. 1997). DOE failed to begin performance in 1998 and, to date, has not begun performance of its obligations under NSP's (or any of the utilities') Standard Contracts.

**I. The 2003 Legislation And The Monticello ISFSI**

DOE's continued failure to begin performance required NSP to return to the legislature to seek additional storage capacity for its Prairie Island Plant. NSP has also begun the process of seeking a Certificate of Need for an ISFSI at the Monticello plant.

In 2003, the Minnesota legislature amended the 1994 law to provide NSP with the ability to use up to 48 dry storage casks, per its NRC license. 2003 Minn. Sess. Laws, 1st Spec. Sess, Ch. 11, Art. 1, § 2, Subdiv. 1 (codified, as amended, at Minn. Stat. § 116C.83). The Minnesota legislature also provided authority to the PUC to make final determinations regarding future expansions of the Prairie Island ISFSI and the establishment of any new ISFSI. *Id.*, Subdiv. 2 (codified, as amended, at Minn. Stat. § 116C.83).

Consistent with the 2003 law, NSP is pursuing the licensing and construction of an ISFSI at Monticello before the Minnesota PUC. *See* Monticello Certificate of Need, PX170. Mark McKeown, formerly of NSP and now an employee of the Nuclear Management Company that operates NSP's Prairie Island and Monticello nuclear plants, will discuss the effort and resultant costs NSP has incurred in pursuing this licensing process.

The 2003 law lowered the mandated amount of biomass energy the Minnesota legislature required NSP to add to its energy production resources from 125 megawatts of energy to 110 megawatts energy. 2003 Minn. Sess. Laws, 1st Spec. Sess, Ch. 11, Art. 2, § 16, Subdiv. 5a (codified, as amended, at Minn. Stat. § 216B.2424). At trial, Ms. Betsy Engelking, the Manager of Resource Planning & Bids at NSP's holding company (Xcel) will discuss NSP's mitigation damages as a result of the biomass mandates.

The 2003 law also changed NSP's mandated payments into the Renewable Development Fund from $500,000 per cask per year, to a flat $16 million per year starting in 2004. 2003 Minn. Sess. Laws, 1st Spec. Sess, Ch. 11, Art. 2, § 1, Subdiv. 1 (codified, as amended, at Minn. Stat. § 116C.779). Ms. Michelle Swanson, who is Manager, Policy Analysis for Xcel and a Renewable Development Fund Board Member, will discuss the Renewable Development Fund and NSP's mitigation costs related thereto.

The legislation also codified a settlement brokered by the Minnesota legislature between between NSP and the Mdewakanton Dakota Tribe at Prairie Island. 2003 Minn. Sess. Laws, 1st Spec. Sess., Ch. 11, Art. 1, § 3 (codified, as amended, at Minn. Stat. 216B.1645, Subd. 4). In this regard, the settlement provides for annual payments of $2.5 million to the tribe for the purchase of up to 1500 acres of land in Minnesota away from Prairie Island (and the storage facility), which land may be taken into trust by the federal government for the benefit of the tribal community. *Id.* Mr. Scott Wilensky, Executive Director of State Government Affairs for Xcel, will discuss the negotiations regarding this settlement and NSP's commensurate mitigation costs.

## III. LEGAL AUTHORITY

### A. NSP's Damages Were Foreseeable, Caused By DOE's Breach, And Will Be Proved With Reasonable Certainty

Generally, the "remedy for breach of contract is damages sufficient to place the injured party in as good a position as it would have been had the breaching party fully performed." *Indiana Mich.*, 422 F.3d at 1373. "Damages for a breach of contract are recoverable where: (1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach is a substantial causal factor in the damages; and (3) the damages are shown with reasonable certainty." *Id.* (citing *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1320 (Fed. Cir. 2002)).

Generally, "'[o]nce a party has reason to know that performance by the other party will not be forthcoming, . . . he is expected to take such affirmative steps as are appropriate in the circumstances to avoid loss by making substitute arrangements or otherwise.'" *Indiana Mich.*, 422 F.3d at 1375 (quoting Restatement (Second) of Contracts § 350, cmt. b). "Mitigation is appropriate where a reasonable person, in light of the known facts and circumstances, would have taken steps to avoid damage." *Id.* (citing *Robinson v. United States*, 305 F.3d 1330, 1334 (Fed. Cir. 2002)). A mitigating party, such as NSP, is "'not precluded from recovery . . . to the extent that it has made reasonable but unsuccessful efforts to avoid loss.'" *Id.* (citing Restatement (Second) of Contracts § 350(2)). The breaching party – here the Government – bears the burden of proving that any of the mitigation efforts of the non-breaching party – NSP – were unreasonable. *Tenn. Valley Auth.*, 69 Fed. Cl. at 523 ("To eliminate or reduce [the utility's]

mitigation related damages, the government bears the burden of showing that [the utility's] mitigation efforts were unreasonable.").

NSP will show that its mitigation damages were foreseeable, caused by DOE's breach of its contracts with NSP, and will prove the costs with reasonable certainty. The Government will not be able to meet its burden of establishing that NSP's efforts were unreasonable.

**1. The Government Caused And Should Have Foreseen That NSP Would Have To Build Dry Storage Facilities**

NSP will prove at trial approximately $79 million in damages (including $35 million for the costs of capital) for (1) licensing and constructing an on-site dry storage facility and constructing and loading dry storage casks at its Prairie Island nuclear plant, and (2) its costs of beginning the process of licensing and constructing an on-site dry storage facility at its Monticello nuclear plant.

It was clearly foreseeable at the time of contract formation that a utility would need to provide alternative storage facilities for SNF if the Government failed to pick-up the fuel. As noted above, one of the primary objectives of the NWPA was to assure that utilities would not have to build additional at-reactor storage after 1998. *See Tenn. Valley Auth.*, 69 Fed. Cl. at 519; *see also Commonwealth Edison,* 56 Fed. Cl. at 667. Thus, it was foreseeable that NSP would have to find alternative storage for its SNF, when DOE failed to perform. *Indiana Mich.*, 422 F.3d at 1375 ("Having been placed in a position where they are required to find alternate storage for SNF, the utilities must *de facto* accept responsibility to guard against the environmental impact of improperly-disposed and maintained SNF, a situation which the NWPA was enacted to avoid.").

Additionally, NSP's decision to license and construct an ISFSI at Prairie Island is directly attributable to its knowledge that DOE would not begin performance in 1998. In 1988 (as discussed above), NSP's Ms. McCarten evaluated DOE's program and, based on the Government's public pronouncements, concluded with others at NSP that DOE would not timely commence performance in 1998. Notably, NSP's damages calculations include an offset in favor of the Government, because NSP would have had to provide SNF storage at Prairie Island from 1994 through 1999 (whether or not DOE ever performed). This offset (which has the effect of reducing NSP's damages) is appropriate in light of the fact that NSP would have re-racked its pool to provide the additional storage space needed prior to DOE's commencement of performance in 1998 and its pick-up of fuel at Prairie Island in 1999.

The Government apparently intends to contend that NSP would have had to build an ISFSI regardless of DOE's breach and that NSP could not have provided enough additional SNF storage by a third re-rack of the Prairie Island spent fuel pools. NSP will show that the Government's arguments lack merit. But, even assuming *arguendo* that DOE's non-performance was not the sole reason that NSP opted to build an ISFSI, it was certainly the primary reason. The Federal Circuit has stated that the breach need not be "the sole factor or sole cause" of damages. *California Fed. Bank, FSB v. United States*, 395 F.3d 1263, 1268 (Fed. Cir. 2005), *cert. denied*, 126 S. Ct. 344 (2005). "The existence of other factors operating in confluence with the breach will not necessarily preclude recovery based on the breach." *Id.* As NSP will prove at trial, however, and as common sense dictates, NSP would not have undertaken the substantial expense and effort to build an ISFSI had it known that DOE would begin performance in 1998 and begin picking up NSP's SNF in 1999; it would have simply re-racked

its spent fuel pool at Prairie Island, thus avoiding the more difficult Certificate of Need and legislative process that was triggered by the dry storage project.

The Government similarly should have no defense to NSP's efforts to site and construct an ISFSI at its Monticello plant, as this undertaking was also directly caused by DOE's continuing breach. The bulk of the Monticello ISFSI costs are yet to be incurred, and thus most of those costs will be the subject of a future claim. The current suit does include the costs incurred by NSP in preparing its application for a Certificate of Need to the Minnesota PUC for additional on-site storage for the Monticello plant, which application NSP filed in January 2005, and certain other "start-up" costs.

Ultimately, NSP will establish with reasonable certainty through witnesses (such as Mr. Kapitz, Ms. McCarten, and Mr. McKeown) and business records that NSP incurred the ISFSI and dry cask costs it seeks in this case. *See Locke v. United States*, 283 F.2d 521, 524 (Ct. Cl. 1960) ("Certainty is sufficient if the evidence adduced enables the court to make a fair and reasonable approximation of the damages.").

**2. The Government Caused And Should Have Foreseen That NSP Would Pursue Alternate Locations For Its Dry Storage Facilities, Such As PFS And The Goodhue County Location**

NSP will prove at trial approximately $40 million (including $13 million in costs of capital) for its efforts to investigate and site alternate locations for storage of its SNF in Goodhue County, Minnesota and Skull Valley, Utah through Private Fuel Storage ("PFS").

NSP's investigation of alternate sites for storage of its SNF was entirely foreseeable. The Government should not be surprised that a utility would examine alternate sites for storing its SNF. For example, the NWPA itself directed DOE to investigate various sites in searching for

both a repository and its MRS. *See* NWPA, Pub. L. No. 97-425, §§ 112-113, 141, 96 Stat. 2201, 2208-12, 2241-44 (1983) (codified as amended at 42 U.S.C. §§ 10132-10133, 10161) (discussing siting of a repository and investigations of possible sites for an MRS); *see also* Nuclear Waste Policy Amendments Act of 1987, Pub. L. No. 100-203, §§ 5021, 101 Stat. 1330-228, 1330-232 to 1330-236 (1987) (codified, as amended, 42 U.S.C. §§ 10162-10169). The PFS project was a direct result of DOE's failure to successfully pursue the MRS effort, with PFS negotiating with tribes that had been part of the MRS effort until DOE ended it and ultimately entering into a lease with one of them – the Skull Valley Band of Goshute Indians. Not only was it foreseeable that utilities could potentially need an away-from-reactor storage facility to ship SNF prior to the repository's construction, the NWPA (and amendments) provided for just such a facility in the MRS. NSP's pursuit of both the PFS and Goodhue County facilities as alternative storage facilities was foreseeable to the Government.

NSP's decision to pursue the PFS project was directly caused by DOE's impending breach. While the Government may argue that NSP stands to make a profit on the PFS as a business venture, this was decidedly not the reason NSP decided to pursue this off-site storage facility.[10] As Scott Northard will testify, NSP pursued this project to assure sufficient storage for Prairie Island's SNF and as a means eventually to move SNF out of Minnesota. DOE itself has acknowledged that PFS could serve as an available alternative for storing NSP's Prairie Island SNF. *See* DOE, Spent Fuel Management Alternatives Available To Northern States Power Company Inc. [SIC] & the Federal Government for the Prairie Island Nuclear Plant, Units 1 & 2

[10] Even if the Government can prove that NSP treats some PFS costs as a capital investment in a business venture, profit was not the primary (and certainly not the sole) cause for pursuing PFS. DOE's breach and the resultant need to store NSP's SNF was the primary and direct reason for pursuing PFS. *See California Fed.,* 395 F.3d at 1268.

(Jan. 2001), PX1019.[11] Finally, to date NSP has not earned any profit for its successful efforts to site and license PFS with the NRC. The Government's assertion that NSP may one day earn such a profit is speculative and inappropriate to consider in a partial breach case. *See Tenn. Valley Auth.*, 69 Fed. Cl. at 543 (concluding that the Federal Circuit's framework of disallowing consideration of future damages as speculative in *Indiana Michigan* also dictates disallowance of future "setoffs as too speculative").

The need to mitigate DOE's impending breach also directly led to NSP's investigation of the Goodhue County alternate storage facility. Apparently, the Government will assert that NSP's decision to pursue this alternate facility is not compensable because it was based on the direction of the 1994 Minnesota legislation. Absent the Government's impending breach, however, NSP would not have needed to be at the legislature seeking permission to build an ISFSI. Thus, the "but for" and direct cause of NSP's needing to investigate Goodhue County was the Government's impending breach. Furthermore, NSP can recover these reasonable mitigation costs despite its lack of success in siting the Goodhue County facility. *See Indiana Mich.*, 422 F.3d at 1375 (noting that a utility is "'not precluded from recovery . . . to the extent that it has made reasonable but unsuccessful efforts to avoid loss.'").

Nor, for that matter, should the Minnesota legislature's mandating the site investigation be considered an intervening event, as it was foreseeable that the state of Minnesota, acting

[11] Congress had directed DOE to submit a report to Congress "containing a description of all alternatives that are available to Northern States Power Company and the Federal government to allow the company to continue to operate the Prairie Island nuclear generating plant until the end of the term of the license issued to the company . . . ." DOE, Spent Fuel Management Alternatives Available To Northern States Power Company Inc. [SIC] & the Federal Government for the Prairie Island Nuclear Plant, Units 1 & 2, at 3 (Jan. 2001), PX1019. DOE noted that NSP could fulfill its storage needs by making SNF shipments to, among other places, "the proposed Private Fuel Storage (PFS) facility which is currently undergoing licensing review by the NRC . . . ." *Id.* at 7.

through its legislature and state agencies, would have to weigh-in on any dry storage facility. As the Federal Circuit has commented, "the production of energy from nuclear sources is one of the most highly regulated human activities." *Commonwealth Edison Co. v. United States*, 271 F.3d 1327, 1348 (Fed. Cir. 2001) (*en banc*) (quotation omitted). In this regard, "[h]eavy industry regulation of the sort seen in the nuclear industry means that few legislative changes can truly be seen as wholly unanticipated." *Maine Yankee Atomic Power Co. v. United States*, 44 Fed. Cl. 372, 381 (1999), *aff'd*, 271 F.3d 1357 (Fed. Cir. 2001). In NSP's circumstance, a Minnesota law dating back to 1977 made receiving legislative approval a foreseeable and necessary link in order for NSP to build an ISFSI. *See In re ISFSI*, 501 N.W.2d at 646-48 (discussing 1977 Minnesota law and the need to have legislative approval for a "radioactive waste management facility" such as an ISFSI). More generally, the Government clearly knew and could foresee the political difficulty of siting a facility for the storage of the SNF; the legislative history of the NWPA reveals it. *See, e.g.*, H.R. Rep. No. 97-491, pt. 1, at 27 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3792, 3793 (discussing the "political uproar" in Michigan that defeated an attempt to site a nuclear waste facility in 1976); *id.* at 31, *reprinted in* 1982 U.S.C.C.A.N. at 3798 (noting "political setbacks" over the prior decade);

Ultimately, as noted above, during the trial NSP will present evidence and witnesses to prove its damages with reasonable certainty. *See Locke*, 283 F.2d at 524. Mr. Northard will discuss NSP's damages relating to its successful licensing of PFS and Mr. Alders will discuss NSP's damages regarding the attempt to site a facility in Goodhue County. NSP will also present, among other witnesses, Mr. Anderson, Mr. Alders, and former Minnesota Senator Novak to discuss these legislative mandates.

### 3. The Government Caused And Should Have Foreseen Other Legislative Mandates As A Possibility Based On The Political Difficulty Of Siting A Nuclear Waste Storage Facility

NSP will prove at trial damages of $53 million (including $7 million in costs of capital) for the legislative mandates requiring NSP to pursue alternative energy sources by the use of biomass energy production and the Renewable Development Fund. This category also includes payments NSP began making to the Mdewakanton Dakota Tribe at Prairie Island pursuant to Minnesota legislation passed in 2003.

#### a. Biomass Mandate And Renewable Development Fund

Like the mandate to site a Goodhue County facility, Minnesota's 1994 legislation required NSP to meet a biomass mandate and create and administer a fund for renewable energy – the Renewable Development Fund – as a condition to receive its Certificate of Need to build the ISFSI at the Prairie Island plant.[12] As noted above, it was foreseeable that siting a nuclear waste storage facility would require the Minnesota legislature to pass on its acceptability.

The Government's impending breach served as the direct and primary cause of the biomass mandate and requirement to make payments into the Renewable Development Fund. No other utility regulated in the state of Minnesota was required to meet these mandates; only NSP was so directed. Furthermore, the Minnesota legislature directly tied these mandates to NSP's need to store SNF on-site based on the breach. For example, the 1994 Minnesota law tied NSP's payments into the Renewable Development Fund directly to the dates when DOE was

[12] Arguably, the Minnesota legislature mandated the biomass initiative and Renewable Development Fund to mitigate NSP's damages by providing for alternate methods of production (biomass mandate) and research and development into cutting-edge technologies (in the case of the Renewable Development Fund) to reduce the future production of SNF. The cost of such measures may be recoverable, even if to date they have proved unsuccessful and expensive. *See Indiana Mich.*, 422 F.3d at 1375 (noting that a utility is "not precluded from recovery . . . to the extent that it has made reasonable but unsuccessful efforts to avoid loss") (quotation omitted).

expected to begin acceptance of NSP's waste. *See* 1994 Sess. Laws, Ch. 641, Art. 1, § 10 (codified, as amended, at Minn. Stat. § 116C.779) (requiring "transfer to a renewable development account $500,000 each year for each dry storage cask that is located at the independent spent fuel storage installation at Prairie Island *after January 1, 1999*") (emphasis added). Similarly, the biomass mandate required NSP to begin acquiring the first 50 megawatts of biomass generating power by December 31, 1998. *See id.*, Art. 3, § 3 (codified, as amended, at Minn. Stat. § 216B.2424). Furthermore, as noted above, NSP would not have been before the legislature to receive approval for the Prairie Island ISFSI but for the Government's impending breach.

At trial, NSP will present evidence and witnesses to prove its damages with reasonable certainty. *See Locke*, 283 F.2d at 524. Ms. Engelking will discuss the biomass mandate and Ms. Swanson will discuss the Renewable Development Fund. As noted above, NSP also expects to present testimony from Mr. Anderson and former Minnesota Senator Novak, among others, to discuss these legislative mandates.

**b. Tribal Payment**

Based on DOE's continuing breach, the 2003 Minnesota law codified and implemented a settlement agreement between NSP and the Mdewakanton Dakota Tribe at Prairie Island. It was foreseeable that NSP might have to incur these costs. In fact, Congress foresaw the need for just such financial and technical assistance agreements in the federal NWPA.

The NWPA and amendments provided for benefits agreements with tribes and states. 42 U.S.C. § 10173(a) ("The Secretary may enter into a benefits agreement with the State of Nevada concerning a repository or with a State or an Indian tribe concerning a monitored retrievable

storage facility for the acceptance of high-level radioactive waste or spent nuclear fuel in that State or on the reservation of that tribe, as appropriate."). The NWPA provisions concerning benefits agreements even include an annual payment schedule ranging from $5 million to $20 million per year. *Id.* § 10173a (a)(1); *see also id.* §§ 10195 & 10199(a) (providing DOE authority to enter agreements and make payments of up to $3 million to states or tribes that seek to conduct independent testing and monitoring of a site being investigated for storage). The mandated payments from NSP to the Mdewakanton tribe only amount to $2.5 million per year, well below the amount Congress authorized DOE to pay tribes for benefits agreements.

The NWPA also provided for financial assistance to states and localities. For example, for Nevada:

> (i) The Secretary shall provide financial and technical assistance to the State of Nevada, and any affected unit of local government requesting such assistance.
>
> (ii) Such assistance shall be designed to mitigate the impact on such State or affected unit of local government of the development of such repository and the characterization of such site.

42 U.S.C. § 10136(c)(2)(A)(i)-(ii). The NWPA provided for assistance to state and local governments for any federal interim storage, directing DOE to "make annual impact assistance payments to a State or appropriate unit of local government, or both, in order to mitigate social or economic impacts occasioned by the establishment and subsequent operation of any interim storage capacity within the jurisdictional boundaries of such government or governments . . . ." *Id.* § 10156(e). The NWPA provided for similar "impact assistance" regarding the siting of an MRS. *Id.* § 10161(e); *see also id.* § 10169. Thus, the Minnesota legislature's decision to have NSP pay the Mdewakanton tribe was entirely foreseeable.

But for the Government's continuing breach and failure to perform by 2003, NSP would not have had to enter this agreement and make these annual payments. At trial, NSP will present the testimony of Mr. Wilensky and documentary evidence to prove these damages.

### B. The Government Cannot Show That NSP's Mitigation Efforts Were Unreasonable

Generally, "fair and reasonable efforts to mitigate are all that the law requires." *Home Savings of Am., FSB v. United States*, 399 F.3d 1341, 1353 (Fed. Cir. 2005); *Indiana Mich.*, 422 F.3d at 1375. "'The rule of mitigation of damages may not be invoked by a contract breaker as a basis for hypercritical examination of the conduct of the injured party, or merely for the purpose of showing that the injured person might have taken steps which seemed wiser or would have been more advantageous to the defaulter.'" *Koby v. United States*, 53 Fed. Cl. 493, 497 (2002) (quoting *In re Kellett Aircraft Corp.*, 186 F.2d 197, 198-99 (3d Cir. 1950)). As noted above, the Government bears the burden to show that NSP's mitigation efforts were unreasonable. *Tenn. Valley Auth.*, 69 Fed. Cl. at 523.

#### 1. The Federal Circuit Did Not Create A Per Se Cut-Off Of 1994 To Recover Mitigation Costs In SNF Cases

As part of its defense, the Government's expert witnesses have been instructed to presume that any of NSP's damages prior to 1994 were *per se* unreasonable. This latest *per se* rule by the Government cannot stand serious scrutiny and undermines the need to look at the facts and circumstances presented in each case. *See Indiana Mich.*, 422 F.3d at 1375 ("Mitigation is appropriate where a reasonable person, in light of the known facts and circumstances, would have taken steps to avoid damage."). The Government should not be allowed to avoid its burden of proving the unreasonableness of NSP's actions, which it cannot do on these facts, by attempting to cloak its argument as one of causation. *Cf. First Heights Bank,*

*FSB v. United States*, 422 F.3d 1311, 1317 (Fed. Cir. 2005) ("We thus conclude that the government's so-called causation argument is identical to the government's mitigation argument and reject it for the reasons described above.").

The Government has seized on the factual findings by Judge Hodges in *Indiana Michigan*, which the Federal Circuit "on these facts" considered "supportable." *Indiana Mich.*, 422 F.3d at 1375. In this regard, Judge Hodges concluded that Indiana Michigan had failed to prove as a matter of fact that its knowledge of the Government's impending breach constituted the cause of its efforts to conduct a full rather than a partial re-rack. *Id.* at 1376. However, the Federal Circuit clearly limited its ruling to the facts presented in that case.

In the instant case, the Government cannot show that NSP's mitigation efforts were unreasonable. Those efforts were clearly undertaken as a result of DOE's impending breach. In this regard, Ms. McCarten and Mr. Kapitz, among others, will testify regarding why they believed DOE would not perform and will discuss contemporary documentation supporting those beliefs. (Needless to say, their beliefs as to DOE's prospective lack of performance proved to be completely justified.) Unlike in *Indiana Michigan*, NSP will also provide, *inter alia*, unequivocal evidence from NSP's contemporaneous internal documents, Government documents, NSP's Certificate of Need filings before the Minnesota PUC, and correspondence from DOE to Commissioner Sanda of the Minnesota Department of Public Service in 1992, all of which will show that NSP acted reasonably.

**2. The Government Should Not Receive An Offset For Incremental Labor Costs**

The Government attacks NSP's labor costs, because they are not "incremental." In this regard, the Government contends that NSP's use of its own employees does not constitute an

incremental cost and therefore is unreasonable. This argument has been rejected by other Judges of this Court.

For example, Judge Lettow conducted an exhaustive review of precedents regarding the recoverability of internal labor and concluded,

> [T]he fact that [the utility] used its own internal resources to support is mitigation is not fatal to its claim for damages in mitigating a breach of contract. Rather, the test for recovery is a targeted one: whether use of the internal resources by [the utility] deprived it of the ability to employ those resources on other projects. That [the utility] would have paid its employees in all events is not material to this inquiry.

*Tenn. Valley Auth.*, 69 Fed. Cl. at 539; *see also Sacramento Mun. Util. Dist. v. United States*, 70 Fed. Cl. 332, 376 (2006) ("The fact that an injured party has used internal resources to mitigate a breach does not foreclose the injured party from recovering such costs."). Therefore, notwithstanding the Government's arguments, NSP's decision to use internal labor to mitigate the damages from the Government's breach was reasonable and recoverable.

### 3. Any Offsets Based On What DOE Might Do When It Picks Up NSP's SNF In The Future Are Speculative

The Government will apparently attempt to prove that NSP's damages should be offset, because the Government believes NSP benefited from DOE's failure to perform. For example, the Government posits that NSP hypothetically benefited from not incurring cask loading costs – *i.e.*, the costs NSP would have had to expend had DOE timely arrived at Prairie Island and loaded casks per the terms of NSP's Standard Contracts. While such costs may eventually be incurred in the future, they are too speculative to consider in a partial breach case. *See Indiana Mich.*, 422 F.3d at 1376-77 (noting that a claim for partial breach precludes future damages).

In other SNF cases, Judge Lettow and Judge Braden have rejected the Government's contentions regarding future offsets as speculative. Judge Lettow concludes,

> [T]he government claims that in the non-breach, but-for world, [the utility] would have had to incur costs in loading casks with SNF for delivery to DOE. As a result of DOE's breach, the government claims that [the utility] has temporarily avoided these costs, that [the utility] has received a benefit as a result, and that the government should be credited with an offset to [the utility's] damages to reflect this benefit.
>
> The alleged benefit stems purely from timing; both DOE and [the utility] contemplate that DOE will still perform under the contract at some future date. As matters now stand, any benefit inhering in [the utility] because of delayed loading costs would be entirely speculative. It is not possible to ascertain the method DOE will ultimately use for SNF acceptance. The size and type of casks to be used to transport the SNF are not known; no casks have been approved for the purpose. The mode of transport has not been determined. Additionally, the date at which DOE will begin to perform in the future cannot even be estimated, let alone determined with reasonable certainty.

*Tenn. Valley Auth.*, 69 Fed. Cl. at 542-43 (citations omitted). Similarly, Judge Braden held that because "DOE and [the plaintiff] both contemplate that DOE will still perform under the Standard Contract at some future date, any benefit to [the utility], because of delayed loading costs, would be entirely speculative." *Sacramento Mun. Util. Dist.*, 70 Fed. Cl. at 372.

**4. NSP's Costs of Capital Are Appropriate And Reasonable Damages**

Contrary to the Government assertions, NSP's costs of capital are appropriate and reasonable damages and do not constitute forbidden "pre-judgment" interest. This Court and the Federal Circuit have allowed recovery of costs of capital in appropriate circumstances, such as this.

For example, Judge Lettow ruled that an Allowance for Funds Used During Construction ("AFUDC") may be recovered against the Government in a SNF damages case, despite the general prohibition against recovery of interest against the Government set forth in 28 U.S.C. §

2516(a). *See Tenn. Valley Auth.*, 69 Fed. Cl. at 541-42. The Federal Circuit recognized the recovery of AFUDC in *Wickham Constr. Co. v. Fischer*, 12 F.3d 1574 (Fed. Cir. 1994), holding that 28 U.S.C. § 2516(a) "does not bar an interest award as part of an equitable adjustment under a fixed-price contract if the contractor has actually paid interest because of the government's delay in payment." *Wickham*, 12 F.3d at 1582-83. In *Tennessee Valley Authority*, Judge Lettow found that because the facts in the case were conceptually indistinguishable from those in *Wickham*, and because the plaintiff utility established "its use of a widely-accepted, FERC-mandated standard for calculating the cost of the funds used in building the dry storage facilities," its AFUDC costs were recoverable as damages against the Government. *Tenn. Valley Auth.*, 69 F.3d at 542. Here, the evidence will show that NSP's incurred cost of capital in building the dry fuel storage facilities, licensing and siting alternate storage facilities, and complying with the biomass and Renewable Development Fund mandates, like the AFUDC costs in *Tennessee Valley Authority*, is akin to the type of interest award that the Federal Circuit permitted in *Wickham*.

### C. The Parties Understood That DOE Would Perform At A Rate To Avoid Additional At-Reactor Storage And To Begin Reducing The Backlog Of SNF, Which Is A 3,000 MTU Steady-State Rate

As discussed above, at the time the parties contracted, they expected that DOE would perform at a rate to avoid additional at-reactor storage and to begin reducing the backlog of SNF already produced. NSP will present documentary evidence and the testimony of its expert, Ms. Eileen Supko, who will testify, *inter alia*, that these objectives require DOE to perform at a steady-state rate of 3,000 MTU after a five year ramp-up period. There is also a wealth of evidence establishing that DOE's current plans for the repository at Yucca Mountain call for a steady-state performance rate of 3,000 MTU after a five-year ramp-up period.

## IV. CONCLUSION

For the foregoing reasons and based upon the evidence to be presented at trial, NSP respectfully requests that this Court award NSP $171 million for its efforts to mitigate the damages caused by the Government's breach of NSP's contracts.

Dated: September 1, 2006

Respectfully submitted,

s/ Alex D. Tomaszczuk by s/ Daniel S. Herzfeld

Alex D. Tomaszczuk
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7940
(703) 770-7901 (fax)

Counsel of Record for Plaintiff
Northern States Power Company

OF COUNSEL:
Jay E. Silberg
Daniel S. Herzfeld
Jack Y. Chu
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
2300 N Street, N.W.
Washington, D.C. 20037
(202) 663-8000
(202) 663-8007 (fax)

Kerry C. Koep
**XCEL ENERGY**
414 Nicollet Mall, 5th Floor
Minneapolis, MN 55401
(612) 215-4583
(612) 215-4544