No. 98-484C
(Senior Judge Wiese)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

NORTHERN STATES POWER COMPANY,

Plaintiff,

v.

UNITED STATES,

Defendant.

# DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE THE TESTIMONY OF PLAINTIFF'S EXPERT WITNESS, MS. EILEEN M. SUPKO

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

HAROLD D. LESTER, JR.
Assistant Director

HEIDE L. HERRMANN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, NW
Washington, D.C. 20530
Tel: (202) 305-3315
Fax: (202) 307-2503

Attorneys for Defendant

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

ANDREW P. AVERBACH
ALAN J. LO RE
STEPHEN FINN
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

October 4, 2006

# TABLE OF CONTENTS


Statement of Fact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Summary of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I. THE COURT HAS THE POWER AND DUTY TO GRANT MOTIONS TO LIMIT THE SCOPE OF TRIAL IN APPROPRIATE CIRCUMSTANCES . . . . . 5

II. A MOTION *IN LIMINE* IS APPROPRIATE IF THE TESTIMONY OF A PROPOSED EXPERT WITNESS FAILS TO SATISFY FEDERAL RULE OF EVIDENCE 702 OR THE STANDARDS SET BY THE SUPREME COURT IN *DAUBERT AND KUMHO TIRE* . . . . . . . . . . . . . . . . . . . . . . . 5

A. Federal Rul of Evidence 702 Requires That, To Be Admissible, Any Expert Witness Opinions Must Be Both Relevant and Reliable . . . . . . . . . . . 5

B. The Court Must Determine Whether The Proposed Expert Testimony is Relevant, Including Whether It Is Helpful To The Trier Of Fact . . . . . . . . . 7

C. The Proponent Must Also Establish That The Methodology Underlying The Expert's Conclusions Is Reliable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

III. THE COURT SHOULD EXCLUDE MS. SUPKO'S OPINIONS CONCERNING THE "REASONABLENESS" OF A PARTICULAR RATE OF ACCEPTANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

A. The Court Should Reject Ms. Supko's Opinions Because They Are Neither Relevant Nor Reliable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

1. Ms. Supko's Opinions Are Not Relevant To Any Issue In This Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

2. Ms. Supko's Opinions Should Not Be Afforded Any Weight Because They Are Not Reliable . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

B. The Court Should Disregard Ms. Supko's Opinions Because Her Model Lacks Evidentiary Support . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

C. Even If the Court Were To Accept Counsel's Assertions Concerning The Key Issues, Under Ms. Supko's Model A 3,000 MTU Rate Of Acceptance Does Not Satisfy The Goals NSP Claims Were Expectations Of The NWPA And Standard Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

IV. THE COURT SHOULD EXCLUDE MS. SUPKO'S TESTIMONY REGARDING THE REQUIREMENTS OF THE NUCLEAR WASTE POLICY ACT AND STANDARD CONTRACT BECAUSE MS. SUPKO WAS NOT INVOLVED IN THEIR PROMULGATION AND HER PROFFERED TESTIMONY EXCEEDS THE OPINIONS AND BASES FOR THOSE OPINIONS DISCLOSED IN HER EXPERT REPORTS . . . . . . . . . 28

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

# TABLE OF AUTHORITIES

## CASES

Baskett v. United States, 2 Cl. Ct. 356 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Bluebonnet Sav. Bank, F.S.B. v. United States,
266 F.3d 1348 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Bluebonnet Sav. Bank v. United States,
339 F.3d 1341 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Bluebonnet Savings Bank FSB v. United States,
67 Fed. Cl. 231 (2005) appeal filed No. 06-5024 (Fed. Cir. Nov. 10, 2005) . . . . . . . . . 17

Boston Edison Company v. United States,
No. 99-447C (Fed. Cl.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Brown v. Wal-Mart Stores, Inc.,
402 F. Supp. 2d 303 (D. Maine 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Castle v. United States,
48 Fed. Cl. 187 (2000), aff'd in part, rev'd in part and remanded in
part, 301 F.3d 1328 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

Commonwealth Edison Co. v. United States,
No. 98-621C (Fed. Cl.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 16

Daubert v. Merrell Dow Pharmaceuticals, Inc.,
509 U.S. 579 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.,
773 F.3d 1506 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Domingo v. T.K., M.D.,
289 F.3d 600 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Duke Power v. United States,
No. 98-485C (Fed. Cl.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Employers Reinsurance Corp. v. Mid-Continent Cas. Co.,
202 F. Supp. 2d 1212 (D. Kan. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Ericsson, Inc. v. Harris Corp.,
352 F.3d 1369 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Fifth Third Bank v. United States,
55 Fed. Cl. 223 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Fuesting v. Zimmer, Inc.,
421 F.3d 528 (7th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

General Elec. Co. v. Joiner,
522 U.S. 136 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Glendale Fed. Bank, FSB v. United States,
43 Fed. Cl. 390 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Glendale Fed. Bank FSB v. United States,
239 F.3d 1374 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

Guillory v. Domtar Indus. Inc.,
95 F.3d 1320 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Home Sav. of Am. v. United States,
57 Fed. Cl. 694 (2003), aff'd in part, rev'd in part, 399 F.3d 1341 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Indiana Michigan Power Co. v. United States,
60 Fed. Cl. 639 (2004) aff'd 422 F.3d 1369 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . 2, 15

Joy v. Bell Helicopter Textron, Inc.,
999 F.2d 549 (D.C. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Kidder, Peabody & Co. v. IAG Int'l Acceptance Group N.V.,
28 F. Supp. 2d 126 (S.D.N.Y. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Kumho Tire Co. v. Carmichael,
526 U.S. 137 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

LaSalle Talman Bank, F.S.B. v. United States,
45 Fed. Cl. 64 (1999), aff'd in part, rev'd in part, 317 F.3d 1363 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Masters v. Hesston Corp.,
291 F.3d 985 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 8

McAbee Constr., Inc. v. United States,
97 F.3d 1431 (Fed. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Microstrategy Inc. v. Business Objects, S.A.,
429 F.3d 1344 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Needleman v. John Hancock Life Ins. Co.,
No. 03-1955, 2006 WL 842370 (N.D. Tex. Mar. 31, 2006) . . . . . . . . . . . . . . . . . . . . . 11

O'Conner v. Commonwealth Edison Co.,
13 F.3d 1090 (7th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Oddi v. Ford Motor Co.,
234 F.3d 136 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

Omaha Public Power Co. v. United States,
No. 01-115C (Fed. Cl.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

PSEG Nuclear, L.L.C. v. United States,
No. 05-5162 (Fed. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

Palmerin v. City of Riverside,
794 F.2d 1409 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Rink v. Cheminova, Inc.,
400 F.3d 1286 (11th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Sacramento Municipal Utility District v. United States,
70 Fed. Cl. 332 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 12

Seaboard Lumber Co. v. United States,
308 F.3d 1283 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Sherbert v. Alcan Aluminum Corp.,
66 F.3d 965 (8th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

South Carolina Electric & Gas Co. v. United States,
No. 04-101C (Fed. Cl.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 16

Southern Nat'l Corp. v. United States,
57 Fed. Cl. 294 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Southern Nuclear Operating Co. v. United States,
No. 98-614C (Fed. Cl) . . . . . . . . . . 2

Southern Nuclear Operating Company v. United States,
No. 98-614 (Fed. Cl.) . . . . . . . . . . passim

Southern Pac. Communications Co. v. AT&T,
556 F. Supp. 2d 825 (D.D.C. 1982) . . . . . . . . . . 18

Suess v. United States,
52 Fed. Cl. 221 (2002) . . . . . . . . . . 19

Summers v. Missouri Pacific R.R. Sys.,
132 F.3d 599 (10th Cir. 1997) . . . . . . . . . . 7

System Fuels, Inc. (Arkansas) v. United States,
No. 03-2623C (Fed. Cl.) . . . . . . . . . . 2

System Fuels, Inc. (Mississippi) v. United States,
No. 03-2624C (Fed. Cl.) . . . . . . . . . . 2

System Fuels, Inc. v. United States,
No. 03-2624 (Fed. Cl.) . . . . . . . . . . passim

White Mountain Apache Tribe of Az. v. United States,
10 Cl. Ct. 115 (1986) . . . . . . . . . . 5

Wisconsin Electric Power Co. v. United States,
No. 00-697C (Fed. Cl.) . . . . . . . . . . 2, 13

Zaremba v. General Motors Corp.,
360 F.3d 355 (2d Cir. 2004) . . . . . . . . . . 14, 15

Zenith Electronics Corp. v. WH-TV Broadcasting Corp.,
395 F.3d 416 (7th Cir. 2005), cert. denied, 125 S. Ct. 2978 (U.S. June 27, 2005) . . . . . . . . . . 9, 10, 14

**STATUTES AND REGULATIONS**

10 C.F.R. 961.11, Art. IV.B.5.(a) . . . . . . . . . . passim

**MISCELLANEOUS**

Fed. R. Civ. P. 16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 5

Fed. R. Evid. 602, 701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Fed. R. Evid. 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

Restatement (Second) of Contracts § 347(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
vii

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| NORTHERN STATES POWER COMPANY<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA<br><br>Defendant. | ) | No. 98-484C<br>(Senior Judge Wiese) |

DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE THE
TESTIMONY OF PLAINTIFF'S EXPERT WITNESS, MS. EILEEN M. SUPKO

Pursuant to Rule 16 of the Rules of the Court of Federal Claims ("RCFC"), defendant, the United States, requests that the Court enter an order to exclude the testimony of Ms. Eileen M. Supko at the forthcoming trial concerning her opinions regarding the Department of Energy's ("DOE") rate of acceptance of spent nuclear fuel ("SNF") under the Standard Contract, including the reasonableness of a 3,000 metric tons of uranium ("MTU") per year steady-state acceptance rate. In addition, the United States requests that the Court enter an order excluding Ms. Supko's proffered expert testimony regarding the Nuclear Waste Policy Act ("NWPA") and the Standard Contract. As we set forth below, Ms. Supko's proposed testimony is inadmissible because it does not assist the Court in determining DOE's obligations under the Standard Contract.

STATEMENT OF FACTS

In support of its damages claims, Northern States Power Company ("NSP"), retained Ms. Supko to prepare a report pursuant to RCFC 26(a)(2)(B) regarding "the impact of the DOE's rate of acceptance of SNF assemblies from the nuclear industry as a whole" on two issues chosen by counsel: (1) the aggregate additional at-reactor storage capacity that nuclear utilities would need

to provide to continue operations after January 31, 1998; and (2) the ability of the utilities to timely decommission their nuclear power plants. Expert Report Regarding Determination of the U.S. Department of Energy's Overall Spent Nuclear Fuel Acceptance Rate ("Acceptance Rate Report"), submitted August 1, 2005, at 1.[1]

Ms. Supko opined in her report that a 3,000 MTU per year steady-state acceptance rate, with a 400-600-1200-2000 MTU ramp up rate, is "reasonable." Acceptance Rate Report at 19, 23. Ms. Supko explained that her methodology consisted of reviewing various program documents that DOE had published over the years and using her computer SPNTFUEL model to perform an analysis of a range of acceptance rates. Id. at 4. Ms. Supko modeled four different rate "scenarios" assuming that on January 31, 1998 DOE began to accept SNF from the industry. Id. at 7-9. The rates Ms. Supko modeled included: a 3,000 MTU steady-state rate after a five year ramp up (Scenario 1), a 900 MTU steady-state rate after a three year ramp up (Scenario 2), a 900 MTU rate of acceptance that ramped up to 3,000 MTU by 2015 (Scenario 3), and a 6,000 MTU steady-state rate of acceptance with an eight year ramp up (Scenario 4). Id.

---

[1] To date, Ms. Supko has filed reports pursuant to RCFC 26(a)(2)(B) in the following spent nuclear fuel cases: Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639 (2004) aff'd 422 F.3d 1369 (Fed. Cir. 2005); Sacramento Municipal Utility District v. United States, 70 Fed. Cl. 332 (2006) ("SMUD"); Southern Nuclear Operating Co. v. United States, No. 98-614C (Fed. Cl); Commonwealth Edison Co. v. United States, No. 98-621C (Fed. Cl.); Wisconsin Electric Power Co. v. United States, No. 00-697C (Fed. Cl.); Omaha Public Power Co. v. United States, No. 01-115C (Fed. Cl.); South Carolina Electric & Gas Co. v. United States, No. 04-101C (Fed. Cl.); System Fuels, Inc. (Arkansas) v. United States, No. 03-2623C (Fed. Cl.); System Fuels, Inc. (Mississippi) v. United States, No. 03-2624C (Fed. Cl.); Boston Edison Company v. United States, No. 99-447C (Fed. Cl.); and Duke Power v. United States, No. 98-485C (Fed. Cl.). In her deposition in this case, Ms. Supko testified that her past testimony in other cases, with regard to rate and schedule issues, is equally applicable to her opinions in this case and that her past deposition and trial testimony remains accurate. A. 47, 48-53 (Deposition of Eileen Supko, July 19, 2006, 10; see Wisconsin Electric Power Company v. United States, No. 00-697C (Fed. Cl.) deposition testimony of Eileen Supko, June 27, 2006, 11-16).

In determining the "reasonableness" of a particular rate of acceptance, Ms. Supko has explained that she measures different rates of acceptance based upon how they compare to the two criteria identified by counsel, as well as a third criteria, and the extent to which the maximum annual steady state acceptance capacity would have been fully utilized over the life of the program. Id. at 9-10; see A. 53 [2] (System Fuels, Inc. v. United States, No. 03-2624 (Fed. Cl.) written direct testimony of Eileen Supko, 16)). Ms. Supko ultimately opined that it is "reasonable" to use the 3,000 MTU steady-state rate of acceptance (Scenario 1), after a brief ramp-up, because, if DOE had begun acceptance of SNF by January 31, 1998, an overall "steady-state" acceptance rate of 3,000 MTU per year would have limited the amount of additional storage capacity needed at nuclear plants after that date, would have kept up with the utilities' annual discharge rate of 2,000 MTU of SNF, would have worked off the 37,000 MTU backlog of SNF in storage at nuclear plants to allow timely decommissioning, and would have ensured that DOE's waste management system was fully utilized and not overbuilt or underutilized. Acceptance Rate Report at 1, 18-19, 23. However, Ms. Supko's calculations also demonstrate that had DOE performed under the 3,000 MTU steady-state rate, with a brief ramp up (Scenario 1), 1,030 MTU of additional at reactor storage would have been required at fourteen nuclear plants after 1998. Id. at 10-11; A. 98 (System Fuels, Inc. v. United States, No. 03-2624 (Fed. Cl.) trial testimony of Eileen Supko, 1404:11-15).

Ms. Supko also prepared a second report regarding the timing of DOE's acceptance of spent nuclear fuel from NSP's Prairie Island and Monticello plants assuming DOE performance on an industry-wide basis at 3,000 MTU per year. Expert Report Regarding Spent Fuel

---

[2] "A. ___" is a reference to the attached appendix.

Acceptance Rights for Northern States Power Company's Prairie Island and Monticello Plants ("Acceptance Rights Report"). With respect to the methodology that she used to reach the conclusions in her Acceptance Rights Report, Ms. Supko used DOE's historical and projected future discharges through 2002, contained in certain DOE forms called "RW-859s," and then reviewed future projected discharges that NSP provided to Ms. Supko in connection with this case. Id. at 3-5

NSP also indicated in its witness list that Ms. Supko would provide expert testimony at trial "regarding the rate at which DOE would have accepted spent nuclear fuel from NSP's Prairie Island and Monticello plants, had DOE begun acceptance of spent nuclear fuel in accordance with the NWPA and the Standard Contract." Plaintiff's Witness List at 12 (emphasis added).

## SUMMARY OF ARGUMENT

Ms. Supko's opinion regarding the reasonableness of a particular rate of acceptance is not relevant to any issue in this case, is not based upon a reliable or testable methodology, and is inconsistent with the plaintiff's theory of DOE's contractual obligations. Further, NSP failed to disclose during discovery that Ms. Supko had discoverable information, or opinions, regarding DOE's obligations under the NWPA and the Standard Contract and, therefore, any testimony by Ms. Supko regarding DOE's obligations under either the NWPA or Standard Contract should be excluded.

## ARGUMENT

### I. THE COURT HAS THE POWER AND DUTY TO GRANT MOTIONS TO LIMIT THE SCOPE OF TRIAL IN APPROPRIATE CIRCUMSTANCES

This Court has acknowledged that "[a] motion *in limine* is a recognized method under [RCFC 16] and Fed. R. Civ. P. 16 for obtaining a pretrial order simplifying issues for trial." White Mountain Apache Tribe of Az. v. United States, 10 Cl. Ct. 115, 116 (1986); see Baskett v. United States, 2 Cl. Ct. 356, 367-68 (1983); Palmerin v. City of Riverside, 794 F.2d 1409, 1413 (9th Cir. 1986). In fact, the Court has a duty to exercise its power to exclude testimony or evidence in appropriate cases:

> There is no question under [RCFC] 16, that this court, as a trial court, has the power to issue pretrial orders simplifying issues for trial. Not only does this court have such power, it has a duty to exercise it in appropriate cases. This power allows the court, *inter alia*, to define the issues, facts, and theories actually in contention and to weed out extraneous issues. Too, this court also has the authority to issue pretrial rulings concerning the admissibility at trial of proposed testimony and documentary evidence.

Baskett, 2 Cl. Ct. at 359 (emphasis added).

### II. A MOTION *IN LIMINE* IS APPROPRIATE IF THE TESTIMONY OF A PROPOSED EXPERT WITNESS FAILS TO SATISFY FEDERAL RULE OF EVIDENCE 702 OR THE STANDARDS SET BY THE SUPREME COURT IN *DAUBERT* AND *KUMHO TIRE*

#### A. Federal Rule of Evidence 702 Requires That, To Be Admissible, Any Expert Witness Opinions Must Be Both Relevant and Reliable

To be admissible, the testimony and opinions of an expert witness must satisfy the requirements of FRE 702:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill,

> experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

FRE 702 imposes upon the Court a special "gatekeeping obligation" to prevent the introduction of certain expert testimony that is irrelevant or unreliable. See, e.g., Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999); Joy v. Bell Helicopter Textron, Inc., 999 F.2d 549, 569 (D.C. Cir. 1993). Specifically, the Supreme Court's decisions in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and Kumho Tire, 526 U.S. 137 (1999), require "judges to determine that scientific testimony," as well as technical or other specialized expert testimony, "offered under FRE 702 is both relevant and reliable." Masters v. Hesston Corp., 291 F.3d 985, 991 (7th Cir. 2002). Further, the party proposing to introduce expert opinion testimony "has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence." Advisory Committee Notes, 2000 Amendments, Fed. R. Evid. 702 (citing Bourjaily v. United States, 483 U.S. 171 (1987)).

The United States Supreme Court has rejected the familiar refrain that it has sufficient safeguards against irrelevant or unreliable expert testimony in the opponent's ability to present its own expert testimony or to cross-examine each other's experts at trial. Daubert, 509 U.S. at 596; see Joy, 999 F.2d at 569 (rejecting "'let it all in' philosophy" of expert testimony). The Supreme Court requires Federal courts to exercise greater care to prevent the admission of unreliable or irrelevant expert opinion because "Federal Rules of Evidence 702 and 703 grant expert witnesses testimonial latitude unavailable to other witnesses upon the 'assumption that the

expert's opinion will have a reliable basis in the knowledge and experience of his discipline.'" Kumho Tire, 526 U.S. at 138 (quoting Daubert, 509 U.S. at 592).

Further, the United States Court of Appeals for the Federal Circuit has explained that, under the Supreme Court's decision in Daubert the Court has an obligation to screen expert testimony for both relevance and reliability. Seaboard Lumber Co. v. United States, 308 F.3d 1283, 1301 (Fed. Cir. 2002). The standard articulated by the Supreme Court in Daubert must be met even in non-jury cases such as this one. Seaboard Lumber Co., 308 F.3d at 1302.

B. The Court Must Determine Whether The Proposed Expert Testimony is Relevant, Including Whether It Is Helpful To The Trier Of Fact

An expert's testimony is not admissible unless it is relevant:

> Rule 702 further requires that the evidence or testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." This condition goes primarily to relevance. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." The consideration has been aptly described by Judge Becker as one of "fit." "Fit" is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes.

Daubert, 509 U.S. at 590-91 (citations omitted). Thus, whenever expert testimony is offered, the Daubert inquiry must be conducted, including an inquiry into whether the opinion is relevant and "tied to the facts" of a particular "case."

As part of this relevance inquiry, the Court must determine whether the proffered expert testimony is helpful to the trier of fact. See, e.g., Daubert, 509 U.S. at 591 (helpfulness goes primarily to relevance); Summers v. Missouri Pacific R.R. Sys., 132 F.3d 599, 603 (10th Cir. 1997); Employers Reinsurance Corp. v. Mid-Continent Cas. Co., 202 F. Supp. 2d 1212, 1215 (D. Kan. 2002). The opinion of an expert is not "helpful" to the Court, and therefore is not

admissible, if it answers a question that the fact-finder could answer without the purported expert opinion. See Sherbert v. Alcan Aluminum Corp., 66 F.3d 965, 967-68 (8th Cir. 1995).

C. The Proponent Must Also Establish That The Methodology Underlying The Expert's Conclusions Is Reliable

"To gauge reliability, the [trial] judge must" not only determine whether the expert is qualified in the relevant field, but must also determine "whether the methodology underlying the expert's conclusions is reliable." Masters v. Hesston Corp., 291 F.3d 985, 991 (7th Cir. 2002). FRE 702 expressly incorporates the requirements for admission of expert testimony established by the United States Supreme Court in Daubert and Kumho Tire. Pursuant to those decisions, "[p]roposed testimony must be supported by appropriate validation--i.e., 'good grounds', based on what is known." Daubert, 509 U.S. at 590, 593-94; see Advisory Committee Notes, 2000 Amendments, Fed. R. Evid. 702; Kumho Tire, 526 U.S. at 149-50.

As the Supreme Court explained in Daubert, 509 U.S. at 590, expert "'knowledge' connotes more than subjective belief or unsupported speculation." Accord O'Conner v. Commonwealth Edison Co., 13 F.3d 1090, 1106 (7th Cir. 1994). "[N]othing in either Daubert or the FRE requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). "The reasoning between steps in a theory must be based on objective, verifiable evidence and scientific" or other "methodology of the kind traditionally used by experts in the field." Domingo v. T.K., M.D., 289 F.3d 600, 607 (9th Cir. 2002). In some cases, reliability will depend upon the "scientific foundations" of the opinion testimony, while, in other cases "the relevant reliability concerns may focus upon personal knowledge or experience." Kumho Tire,

526 U.S. at 150. However, "it will at times be useful to ask even of a witness whose expertise is based purely on experience, say, a perfume tester able to distinguish among 140 odors at a sniff, whether his preparation is of a kind that others in the field would recognize as acceptable." Id.

The Court in Daubert set forth the following, non-exclusive list of factors for lower courts to consider in determining whether an expert's opinion is reliable: (1) whether the scientific theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the theory's known or potential rate of error when applied; and (4) whether the theory has been "generally accepted" in the scientific community. Daubert, 509 U.S. at 593-94. At bottom, "[a]n expert must offer good reason to think that his approach produces an accurate estimate using professional methods, and this estimate must be testable. Someone else using the same data and methods must be able to replicate the result." Zenith Electronics Corp. v. WH-TV Broadcasting Corp., 395 F.3d 416, 419 (7th Cir. 2005), cert. denied, 125 S. Ct. 2978 (U.S. June 27, 2005).

In a recent decision, the United States Court of Appeals for the Seventh Circuit concluded that the district court properly excluded proffered expert testimony concerning lost profits because the expert lacked a sufficient methodology. In Zenith Electronics, 395 F.3d at 419, plaintiff, an electronics manufacturer, sued WH-TV, a digital television broadcaster, to recover payments for converter boxes that WH-TV had ordered. WH-TV filed breach of contract and fraud counterclaims alleging defective merchandise and seeking lost profits. WH-TV proposed to rely upon an expert's opinion that its business would have grown rapidly, and its profits greatly increased, had the plaintiff's product been delivered as promised. Id. at 417-418. However, rather than basing his opinions on the actual sales numbers and shares of digital

broadcasting business in other markets, the expert "proposed to testify that [the San Juan market] is 'unique' and that all experience in other markets is irrelevant." Id. at 418. When asked to identify the methods that he had used to generate his projections that defendant's business would have grown rapidly, the expert repeatedly answered "my expertise" or "my industry experience" or made other similar statements. Id. The court concluded that this "is to say that [the proffered expert] either had no method or could not describe one. He was relying on intuition, which we won't do." Id. (citations omitted). The court stated that, if a witness "could or would not explain how his conclusions met [FRE 702] requirements, he was not entitled to give expert testimony." Id.

## III. THE COURT SHOULD EXCLUDE MS. SUPKO'S OPINIONS CONCERNING THE "REASONABLENESS" OF A PARTICULAR RATE OF ACCEPTANCE

### A. The Court Should Reject Ms. Supko's Opinions Because They Are Neither Relevant Nor Reliable

#### 1. Ms. Supko's Opinions Are Not Relevant To Any Issue In This Case

With respect to the first prong of the Daubert inquiry, Ms. Supko's testimony concerning the reasonableness of a particular rate of acceptance is not relevant to any issue in this case. Whether a particular rate of acceptance is "reasonable" is simply not at issue in this case. Rather, the only issue in this case is the damages, if any, that flow from the Government's failure to perform its contractual obligations. As the United States Court of Appeals for the Federal Circuit recently noted in another spent nuclear fuel case, "[a]ny issues related to the types of damages permitted under the contract, if any, and the extent of those damages permitted under the contract, if any, and *the extent of those damages can be resolved by solely resolving the DOE's*

*contractual obligations*. PSEG Nuclear, L.L.C. v. United States, No. 05-5162, slip op. at 15 (Fed. Cir. 2006)(emphasis added). It is axiomatic that under FRE 702, as well as Daubert and its progeny, the Court may only admit expert testimony that is relevant to determine a fact in issue. See Rink v. Cheminova, Inc., 400 F.3d 1286, 1291 (11th Cir. 2005); Needleman v. John Hancock Life Ins. Co., No. 03-1955, 2006 WL 842370, at *10 (N.D. Tex. Mar. 31, 2006) (holding that expert testimony was not relevant to resolution of issues in case). The burden of demonstrating Ms. Supko's satisfaction of the Daubert standards lies squarely upon NSP. Daubert, 509 U.S. at 592 n.10 (citation omitted); Rink, 400 F.3d at 1292.

Ms. Supko admits that she is not offering any opinions concerning the DOE's obligations under Standard Contract. A. 54-55, 73 (Deposition Testimony of Eileen Supko, July 19, 2006, 18-19, 142). Indeed, Ms. Supko has conceded that she had no involvement in the formation of the Standard Contract or the NWPA and, moreover, she herself did not speak to any DOE employees prior to 1990 regarding issues related to the Standard Contract, seven years after NSP and DOE entered into the Standard Contracts at issue in this case. A. 92 (System Fuels, Inc. v. United States, No. 03-2624 (Fed. Cl.) trial testimony of Eileen Supko, 1355:1-7, 12-16). Ms. Supko also concedes she is not offering an opinion that DOE would have performed at a 3,000 MTU steady-state rate of acceptance in the "but for" world. A. 91 (System Fuels, Inc. v. United States, No. 03-2624 (Fed. Cl.) trial testimony of Eileen Supko, 1348:3-8).

Simply put, Ms. Supko is offering an opinion as to what she believes is "reasonable," without reference to the Government's contractual obligations. Yet, by ignoring the actual contract requirements, such as DOE's obligation to issue an annual acceptance priority ranking beginning on April 1, 1991 (see 10 C.F.R. 961.11, Art. IV.B.5.(a)), in conjunction with the

issuance of the annual capacity report beginning in 1987 (see 10 C.F.R. 961.11, Art. IV.B.5.(b)), which form the only basis for evaluating the Government's contract liability, (see, PSEG Nuclear L.L.C., slip op. at 15), Ms. Supko's analysis lacks foundation for any issue properly presented in this case. Because Ms. Supko's opinions fail to address any relevant issue in this case, Ms. Supko's opinions are of no assistance to the Court in determining the Government's contractual obligations concerning the SNF acceptance rate and schedule. Consequently, Ms. Supko's opinions fail to satisfy the first prong of the Daubert test.[3]

2. Ms. Supko's Opinions Should Not Be Afforded Any Weight Because They Are Not Reliable

Because Ms. Supko has not employed any scientific or readily testable methodology in determining what would be a "reasonable" rate of acceptance under the Standard Contract, her opinions lack any indicia of reliability. Possessing requisite credentials is insufficient to render expert testimony admissible. See Kumho Tire, 526 U.S. at 153 (affirming trial court's exclusion

[3] Similarly, in SMUD, Ms. Supko offered the same opinions related to the "reasonableness" of the 3,000 MTU steady-state rate of acceptance that she offers in this case. The Court did not qualify Ms. Supko as an expert and, instead, concluded that "the evidence presented on the acceptance rate under the terms of the Standard Contract [is] highly speculative, therefore, the court declines to make any determination of the acceptance rate based on this record." SMUD, 70 Fed. Cl. at 375 n.40.

Further, as Judge Braden recently observed:

> To the extent I have to get into determining what the acceptance rate is . . . I don't intend to rely on Ms. Supko's opinion in that regard. There is a lot of documents that we have here and that's - I will make my decision based on those documents . . . [B]ut, I don't intend to rely on an expert for something like that.

A. 93-94 (System Fuels, Inc. v. United States, No. 03-2624 (Fed. Cl.) trial transcript, 1373:18-1374:7).

of expert and noting that, despite the trial court's acceptance of expert's qualifications, the expert lacked a reliable methodology); Fuesting v. Zimmer, Inc., 421 F.3d 528, 535 (7th Cir. 2005). Rather, the Federal Circuit has explained that the trial court must ensure that the expert testimony is reliable. Microstrategy Inc. v. Business Objects, S.A., 429 F.3d 1344, 1355 (Fed. Cir. 2005) (affirming trial court's exclusion of expert witness that used flawed methodology in reaching conclusions).

First, Ms. Supko's methodology concerning the "reasonableness" of a rate of acceptance is simply a determination of whether a particular rate of acceptance satisfies the "key issues" chosen by counsel, Acceptance Rate Report at 1, 7-10; A. 50-52 (Wisconsin Electric Power Company v. United States, No. 00-697C (Fed. Cl.) deposition testimony of Eileen Supko, June 27, 2006, 13-15), and, consequently, is not subject to any type of scientific testing. Whether any particular rate of acceptance is "reasonable" is a subjective judgement call made by Ms. Supko. It is not possible to test such a theory, because it is not science.[4] Indeed, Ms. Supko concedes that rates of acceptance lower than the 3,000 MTU steady-state rate may be reasonable but she has not endeavored to determine what the minimum reasonable rate of acceptance is. A.95-96 (System Fuels, Inc. v. United States, No. 03-2624 (Fed. Cl.) trial testimony of Eileen Supko, 1400:24-1401:6).

---

[4] Indeed, Ms. Supko admitted at trial in Southern Nuclear that, were the Court to reject the two "requirements" (which are essentially the same as the "key issues" of the instant case) upon which she modeled various acceptance rates, she would need to utilize new assumptions against which to measure various rates. A. 10 (Southern Nuclear Operating Company v. United States, No. 98-614 (Fed. Cl.) trial testimony of Eileen Supko, 739:5-9). However, Ms. Supko was unable to identify any alternative criteria that could be used to evaluate the "reasonableness" of various DOE acceptance rates. A. 10 (Id. at 739:10-21).

For example, although Ms. Supko utilizes the aggregate annual SNF discharge rate of all utilities, 2,000 MTU per year, as a benchmark for determining the reasonableness of the amount of additional at-reactor storage after 1998, Ms. Supko has not endeavored to determine how far above that annual discharge rate the amount of additional at-reactor storage number could be and still be deemed "reasonable." A. 69-71; 107; 23 (Deposition Testimony of Eileen Supko, July 19, 2006, 119-121, 139; System Fuels, Inc. v. United States, No. 03-2624 (Fed. Cl.) trial testimony of Eileen Supko, 1448:4-20); Southern Nuclear Operating Company v. United States, No. 98-614 (Fed. Cl.) trial testimony of Eileen Supko, 808:15-24). Indeed any such determination would necessarily be based upon nothing more than a subjective judgment incapable of scientific testing. Courts have not hesitated to exclude proposed expert testimony based upon subjective judgments or "intuition" such as the testimony that Ms. Supko intends to offer in this case. See Zenith Electronics, 395 F.3d at 418-19; Brown v. Wal-Mart Stores, Inc., 402 F. Supp. 2d 303, 309 (D. Maine 2005) (rejecting expert opinion that "merely places an expert sheen on common sense," without employing any testable methodology).

Second, Ms. Supko has acknowledged that she has never subjected her methodology concerning the reasonableness of a particular rate of acceptance to peer review. A. 128-129 (System Fuels, Inc. v. United States, No. 03-2624 (Fed. Cl.) trial testimony of Eileen Supko, 1486:24-1487:3). Although "[p]ublication, which is an element of peer review, 'is not a *sine qua non* of admissibility,'" it may suggest "good science." Oddi v. Ford Motor Co., 234 F.3d 136, 145 (3d Cir. 2000) (quoting Daubert, 509 U.S. at 593); see Zaremba v. General Motors Corp., 360 F.3d 355, 358 (2d Cir. 2004) (affirming trial court's exclusion of expert where expert had not subjected methodology to peer review or publication); Fuesting, 421 F.3d at 537 (affirming

trial court's exclusion of expert witness based, in part, upon lack of peer review of opinion or methodology offered by expert). The lack of peer review or publication highlights the fact that Ms. Supko's opinion concerning the "reasonableness" of a particular rate of acceptance is nothing more than a subjective judgment that is incapable of testing.

Third, there is no support that Ms. Supko's methodology is one that is "generally accepted" in the relevant scientific community. "Widespread acceptance can be an important factor in ruling particular evidence admissible, and a known technique which has been able to attract only minimal support with the community may properly be viewed with skepticism." Oddi, 234 F.3d at 145 (quoting Daubert, 509 U.S. at 594); see Zaremba, 360 F.3d at 358 (affirming trial court's exclusion of expert where party tendering expert failed to demonstrate that expert's opinion or methodology was generally accepted). In this case, Ms. Supko's expert reports fail to demonstrate or suggest that her methodology in determining the "reasonableness" of a particular rate of acceptance possesses widespread acceptance in the relevant community.[5]

Finally, and perhaps most significantly, with respect to the rate of error in Ms. Supko's methodology, Ms. Supko has continuously revised her analysis based upon previous significant errors in her model. Although Ms. Supko has, to date, authored expert reports on behalf of approximately 12 plaintiffs in spent nuclear fuel cases, the numbers, or outputs, from Ms. Supko's model in each of these reports have changed – and, in many instances, changed

[5] Similarly, the Court in Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639 (2004), aff'd, 422 F.3d 1369 (Fed. Cir. 2005), rejected Ms. Supko's opinions concerning a prediction as to when DOE would open a repository, concluding that "[s]he did not present a 'methodology' that could be used by experts in such a field." Id. at 647.

significantly. These changes, which were made after recognition that her model was producing flawed results, call into question the reliability of her overall conclusions in this case.

Although Ms. Supko has offered the same opinion concerning the reasonableness of a 3,000 MTU steady-state rate (Scenario 1) in virtually every acceptance rate report that she has authored to date, the amount of additional at-reactor storage that she calculates has changed dramatically over the course of her reports. In Ms. Supko's expert report in Commonwealth Edison v. United States, No. 98-621C (Fed. Cl.), Ms. Supko concluded that there would be 1,600 MTUs of additional at-reactor storage under a 3,000 MTU steady-state rate. A. 124 (System Fuels, Inc. v. United States, No. 03-2624 (Fed. Cl.) trial testimony of Eileen Supko, 1481:13-24). In Ms. Supko's next expert report in SMUD, however, Ms. Supko concluded that there would be 600 MTUs of additional at-reactor storage under a 3,000 MTU steady-state rate. Ms. Supko admitted that the reason for this 1,000 MTU decrease in her calculation of additional storage requirements was her failure to consider linking a utility that had dry storage in 1998 with that utility's wet pool. A. 125 (System Fuels, Inc. v. United States, No. 03-2624 (Fed. Cl.) trial testimony of Eileen Supko, 1482:4-12).

Significantly, Ms. Supko has admitted that she committed another error in her calculations in SMUD and underestimated the amount of additional at-reactor storage under a 3,000 MTU steady-state rate of acceptance by 430 MTUs. A. 124-127 (Id. at 1481:18-1484:3). Ms. Supko conceded that, in a report that she subsequently authored for another SNF client in South Carolina Electric & Gas Co. v. United States, No. 04-101C (Fed. Cl.), she calculated 1,030 MTUs of additional at-reactor storage under a 3,000 MTU steady-state rate (Scenario 1). A. 127 (System Fuels, Inc. v. United States, No. 03-2624 (Fed. Cl.) trial testimony of Eileen Supko,

1484:4-9). Ms. Supko has explained that the reason that she has now increased her calculation of the amount of additional at-reactor storage by 430 MTUs was Bluebonnet Savings Bank FSB v. United States, 67 Fed. Cl. 231, 238-239 (2005) appeal filed No. 06-5024 (Fed. Cir. Nov. 10, 2005) because she had "underestimated the requirements at the eight sites that had dry storage prior to 1998. I underestimated their requirements post-1998 because of the way that I linked things in the model." A. 11-12; 127 (Southern Nuclear Operating Company v. United States, No. 98-614 (Fed. Cl.) trial testimony of Eileen Supko, 746:2-747:7; System Fuels, Inc. v. United States, No. 03-2624 (Fed. Cl.) trial testimony of Eileen Supko, 1484:10-14). Tellingly, and despite these drastic changes in the amount of additional at-reactor storage that Ms. Supko has calculated, Ms. Supko has never modified her opinion concerning the reasonableness of a 3,000 MTU steady-state rate of acceptance. Indeed, Ms. Supko has conceded that the numbers which she has calculated regarding additional at-reactor storage may change yet again in the future as she receives updated information from utilities whom she represents as clients. A.15 (Id. at 756:3-9). Yet, this tremendous variance in at-reactor storage – from a high of 1,600 MTU to a low of 600 MTU – calls into serious question the reliability of the results of Ms. Supko's analysis in this case.

### B. The Court Should Disregard Ms. Supko's Opinions Because Her Model Lacks Evidentiary Support

In determining whether a hypothetical model such as the one that Ms. Supko offers provides a sufficient basis for an award of damages, plaintiff must establish a realistic and complete "but for" world. See Ericsson, Inc. v. Harris Corp., 352 F.3d 1369, 1379-80 (Fed. Cir. 2003) (patentee seeking lost profits for infringement must account for the effects of

"hypothetically increased price" in "but for" world); Bluebonnet Sav. Bank v. United States, 339 F.3d 1341, 1345-46 (Fed. Cir. 2003) (requiring trial court to determine costs that plaintiff would have incurred in absence of breach); Glendale Fed. Bank FSB v. United States, 239 F.3d 1374, 1380 (Fed. Cir. 2001) (plaintiffs bear the burden of proving "what might have been"); Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc., 773 F.3d 1506, 1512 (9th Cir. 1985) ("[i]n projecting free market profits, antitrust plaintiffs are not entitled to assume favorable aspects of an anticompetitive market"); Restatement (Second) of Contracts § 347(c). Where, as here, NSP attempts to prove that it has suffered damages using a "computer [model] of the hypothetical 'but for'" world premised upon a number of critical assumptions, the "failure to establish the reasonableness of these assumptions is fatal" to the damage claim. Southern Pac. Communications Co. v. AT&T, 556 F. Supp. 2d 825, 1076 (D.D.C. 1982); see Bluebonnet Sav. Bank, F.S.B. v. United States, 266 F.3d 1348, 1358 (Fed. Cir. 2001); LaSalle Talman Bank, F.S.B. v. United States, 45 Fed. Cl. 64, 93-95 (1999), aff'd in part, rev'd in part, 317 F.3d 1363 (Fed. Cir. 2003); Kidder, Peabody & Co. v. IAG Int'l Acceptance Group N.V., 28 F. Supp. 2d 126, 134 (S.D.N.Y. 1998). NSP's damages model may not be based upon mere speculation or hypotheticals. Home Sav. of Am. v. United States, 57 Fed. Cl. 694, 727 (2003), aff'd in part, rev'd in part, 399 F.3d 1341 (Fed. Cir. 2005) (citing Franklin Fed. Sav. Bank v. United States, 55 Fed. Cl. 108 (2003); Willems Indus., Inc. v. United States, 155 Ct. Cl. 360, 295 F.2d 822 (1961)).

This Court has repeatedly rejected expert models that lack evidentiary foundation, on the grounds that such models are improperly speculative. In Castle v. United States, 48 Fed. Cl. 187 (2000), aff'd in part, rev'd in part and remanded in part, 301 F.3d 1328 (2002), this Court

rejected the expert's model because it was based upon assumptions that were contrary to facts in the record. Id. at 206. Specifically, this Court held, "[a] claim whose basic structural components lack such factual foundation is simply speculation." Id.

Likewise, in Fifth Third Bank v. United States, 55 Fed. Cl. 223 (2003), the Court rejected plaintiff's damages model, explaining that:

> Plaintiff's model ignores the presence of competitors similarly unfettered by the breaching provisions of FIRREA. But the most outstanding flaw is the assumption that the But-for-Bank would, even if it could, engage in the same type of activities without identifying any specific investments or opportunities, and that these activities would produce the same results (discounted to be conservative) as the actual business activities in which plaintiff engaged. The court agrees with defendant that this deficiency renders plaintiff's model speculative as a matter of fact and law.

Id. at 241; accord Southern Nat'l Corp. v. United States, 57 Fed. Cl. 294, 305 (2003); see also Glendale Fed. Bank, FSB v. United States, 43 Fed. Cl. 390, 399 (1999), aff'd in part, vacated in part, remanded on other grounds, 239 F.3d 1374 (Fed. Cir. 2001) ("The court believes that plaintiff's lost profits model suffers from serious defects, which undercut the basis for using it as a credible model for ascertaining lost profits . . . ."); Suess v. United States, 52 Fed. Cl. 221, 228 (2002) (rejecting damages model is "premised on unrealistic assumptions").

Ms. Supko's hypothetical model of the "but for" world is not based upon actual facts, but, rather, is based upon industry-wide assumptions which, in many instances, bear no relation to the actual or "but for" world. For example, despite Ms. Supko's concession that the determination of an operating reserve[6] is utility-specific, Ms. Supko has not endeavored to apply individual

---

[6] A full core reserve refers to utilities reserving enough space in their spent fuel pools to offload all of the nuclear fuel in the reactor. A. 121 (System Fuels, Inc. v. United States, No. 03-2624 (Fed. Cl.) trial testimony of Eileen Supko, 1478:1-8). Some companies reserve more than a

utilities' operating reserve policies in her industry-wide acceptance rate model. A. 123 (System Fuels, Inc. v. United States, No. 03-2624 (Fed. Cl.) trial testimony of Eileen Supko, 1480:10-17). Rather, regardless of what an individual utility's operating reserve policy actually is, and despite the fact that Ms. Supko has endeavored to model what reasonable acceptance would have looked like in the "but for" world, Ms. Supko has simply assumed one full core reserve per pool for each utility and has not endeavored to determine what individual utilities reserve more space than a full core reserve. A. 123 (Id. at 1480:10-17). Ms. Supko admitted that, had she increased her operating reserve assumption beyond one full core, it could potentially increase the amount of additional at-reactor storage that she has calculated. A. 123 (Id. at 1480:18-24).

Another example of the lack of evidentiary foundation for Ms. Supko's model is relates to spent fuel pool capacities. Ms. Supko acknowledges using spent fuel pool capacities for plants that had added additional storage capacity to their pools after 1998. A. 109-110 (Id. at 1459:20-1460:3). In fact, her model assumes spaces for Southern Nuclear's Plant Hatch spent fuel pool that include not only a post-1998 rerack but also a temporary rack that was never actually installed. A. 110; 111 (Id. at 1460:4-16; 1461:17-22). Additionally, Ms. Supko utilized South Carolina Electric & Gas's 2002 rerack of its spent fuel pool in her model for purposes of modeling DOE performance beginning in 1998. A. 13-14 (Southern Nuclear Operating Company v. United States, No. 98-614 (Fed. Cl.) trial testimony of Eileen Supko, 751:23-752:5). These differences in pool capacity decrease the post-1998 additional at reactor storage results from her models. Thus, as Ms. Supko concedes, if 1998 data were properly used, it would

---

full core. The amount of space a utility actually reserves is referred to as a operating reserve. A. 122-123 (Id. at 1479:23-1480:4).

increase the number of plants requiring additional at reactor storage after 1998. A. 113-114 (System Fuels, Inc. v. United States, No. 03-2624 (Fed. Cl.) trial testimony of Eileen Supko, 1465:5-1466:25).

Ms. Supko admitted that she is using post-1998 pool capacity modifications for "about a dozen" plants. A. 112-113 (Id. at 1464:14-1465:4). When asked why she used post-1998 actual additional storage for purposes of determining what the "but for" world would have looked like in 1998, Ms. Supko candidly admitted that she did not "go back and try to see what the world looked like for every pool in 1998. That would have required my going back into the Nuclear Regulatory Commission's docket for every nuclear power plant and looking at license amendments." A. 14 (Southern Nuclear Operating Company v. United States, No. 98-614 (Fed. Cl.) trial testimony of Eileen Supko, 752:21-25). Yet, that is precisely the type of analytical rigor expected from an expert. Ms. Supko has also failed to perform any analysis regarding the use of temporary storage racks for wet storage of spent nuclear fuel for the 14 utilities that required additional storage or whether utilities were impinging on full core reserve in 1998. A. 68 (Deposition of Eileen Supko, July 19, 2006, 109). Ms. Supko's failure to properly model the "but for" world simply reflects a flaw in her overall analysis and calls into question her overall opinions in this case.

In addition, Ms. Supko admitted to using the licensed capacity of the spent fuel pools, rather than 1998 actual usable capacity, in her model for those utilities that are not her clients.[7] A. 118-119 (System Fuels, Inc. v. United States, No. 03-2624 (Fed. Cl.) trial testimony of Eileen

[7] For those utilities that are her clients, she uses the actual usable capacity in her model to the extent her clients provide her this information. A. 118-119; 119-120 (Id. at 1470:22-1471:4; 1471:23-1472:6 ).

Supko, 1470:22-1471:4). However, as Ms. Supko has acknowledged, the number of spaces in spent fuel pools may differ between licensed and actual usable capacity. A. 115; 116-117 (Id. at 1467:5-12; 1468:7-1469:4). Ms. Supko has also acknowledged that usable capacity is generally the same or less than licensed capacity. A. 119 (Id. at 1471:18-22). However, she has not calculated whether her use of licensed capacity over actual usable capacity affects additional at-reactor storage requirements under her model. A. 119-120 (Id. at 1471:23-1472:6). Consequently, Ms. Supko's model does not properly account for available at reactor storage in the "but for" world.

Ms. Supko has admitted that, despite the fact that she is endeavoring to model a "but for" acceptance scenario, as she represents more utilities in the SNF litigation, it is possible that she will continue to change her model to reflect those utilities' pool capacities, future projected discharges, and other utility-specific information. A. 20-21 (Id. at 787:20-788:1). This concession simply highlights the malleability inherent in her model, and its lack of a relationship to the "but for" world, a world which would have been fixed at some point prior to January 31, 1998. Consequently, the Court should reject Ms. Supko's conclusions and assumptions because they fail to properly account for the "but for" world. See Guillory v. Domtar Indus. Inc., 95 F.3d 1320, 1330 (5th Cir. 1996) (limiting expert testimony because it was not "sufficiently grounded in scientific methodology or the facts as presented in the in the testimony of other witnesses").

Another uniform assumption that Ms. Supko has made in her model is the use of license extensions. A. 87-88 (Deposition Transcript of Eileen Supko, July 19, 2006, 207-208). Although they both purport to be "but for" analyses, Ms. Supko has made entirely inconsistent assumptions between her industry-wide acceptance model (Acceptance Rate Report) and her

NSP acceptance rights model (Acceptance Rights Report). A. 17-18 (Southern Nuclear Operating Company v. United States, No. 98-614 (Fed. Cl.) trial testimony of Eileen Supko, 783:22-784:6). For example, Ms. Supko has assumed that, for purposes of her industry-wide model, no utility seeks a license extension. A. 16 (Id. at 782:18-21). Yet, for purposes of modeling NSP's acceptance rights, Ms. Supko assumes that NSP seeks and obtains a license extension for its plants. A. 16 (Id. at 782:22-25).[8]

Had Ms. Supko assumed license extensions on an industry-wide basis, this assumption would have had a significant effect upon her calculations in this case. Ms. Supko has testified that, if she assumed license extensions in her industry-wide acceptance model (Acceptance Rate Report), the amount of average post-shutdown storage time would decrease in Scenarios 1, 3, and 4 and would increase in Scenario 2. A. 18 (Id. at 784:9-21). The reason for the decrease in the average post-shutdown storage time if Ms. Supko assumed license extensions is because, with license extension and assuming the requirements for SNF that NSP alleges, DOE would have 20 more years to work off the "backlog" of SNF generated by utilities. A. 19 (Id. at 785:6-10). Ms. Supko has stated that, if she had assumed license extensions in her industry-wide model, the amount of average post-shutdown storage time with respect to Scenario 3 would decrease from 16.5 years to approximately 12 or 13 years. A. 19 (Id. at 785:1-5). Ms. Supko also explained that, under a 3,000 MTU rate of acceptance, which she claims is "reasonable," the range of

---

[8] Ms. Supko had not endeavored to model whether, in 1998, a particular utility would have sought a license extension. A. 16 (Southern Nuclear Operating Company v. United States, No. 98-614 (Fed. Cl.) trial testimony of Eileen Supko, 782:12-17). Indeed, Ms. Supko testified that it "would have been difficult to determine in 1998" whether a particular utility would have sought and received a license extension. A. 16 (Id. at 782:16-17).

average post-shutdown storage is "approximately 12 or 14 years for operating nuclear power plants." A. 3-4 (Id. at 689:25-690:2).

C. Even If The Court Were To Accept Counsel's Assertions Concerning The Key Issues, Under Ms. Supko's Model A 3,000 MTU Rate Of Acceptance Does Not Satisfy The Goals NSP Claims Were Expectations Of The NWPA And Standard Contract

NSP asserts that performance under the Standard Contract required DOE to accept SNF at a rate sufficient to preclude the need for utilities to acquire additional storage capacity after 1998 and to remove the accumulated backlog of SNF from the utilities' plants. Northern States Power Company's Memorandum of Contentions of Law and Fact at 7. According to NSP, these "goals" required DOE to perform at a steady-state rate of 3,000 MTU (Scenario 1). Id. at 34. Ms. Supko's analysis demonstrates that a 3,000 MTU steady-state rate of acceptance beginning in the fifth year of the DOE program violates NSP's proffered views of both the NWPA and the Standard Contract, because the rate results in significant additional at-reactor storage after 1998. Indeed, under the plaintiff's theory of DOE's contractual obligations, Ms. Supko's modeling establishes that performance by DOE under the 3,000 MTU rate of acceptance constitutes a breach of the Standard Contract with respect to numerous contract-holders. Because the 3,000 MTU rate of acceptance does not attain NSP's alleged two goals of the NWPA and Standard Contract, Ms. Supko's analysis merely demonstrates that the 3,000 MTU steady-state rate removes more spent fuel from the industry's nuclear plants than other slower rates of acceptance she models (Scenarios 2 & 3).

NSP claims that the goals of the NWPA and the Standard Contract were to ensure the utilities would not have to build any additional at-reactor storage after 1998 and work off the

backlog of SNF already stored at the site as of 1998. NSP's Memorandum Contentions of Law and Fact at 19. Ms. Supko's conclusion in this case, that under a 3,000 MTU steady-state rate of acceptance (Scenario 1) there would be 1030 MTUs of additional at-reactor storage and nine years of average post shutdown storage time, Acceptance Rate Report at 10-11, plainly violates the "goals" of the NWPA and the Standard Contract as NSP has articulated them. Indeed, Ms. Supko conceded that, under the 3,000 MTU steady-state rate, she calculated that at least 14 utilities would have to add additional at-reactor storage after 1998. A. 66-67; 97; 98 (Deposition of Eileen Supko, July 19, 2006, at 49-50; System Fuels, Inc. v. United States, No. 03-2624 (Fed. Cl.) trial testimony of Eileen Supko, 1402:3-12; 1404:11-15).[9]

Moreover, Ms. Supko's analysis reflects that a rate of acceptance lower than 3,000 MTU per year could satisfy these "goals." First, with respect to the first prong of NSP's claimed objectives – the amount of additional at-reactor storage after 1998 – Ms. Supko explained that one of the benchmarks that she utilizes to determine whether the amount of additional at-reactor storage after 1998 is reasonable is how that number compares to the annual cumulative discharge rates of all commercial reactors. A. 22 (Southern Nuclear Operating Company v. United States, No. 98-614 (Fed. Cl.) trial testimony of Eileen Supko, 807:3-14). Notably, Ms. Supko has admitted that a 2,000 MTU rate of acceptance would generally keep up with the annual discharge rate. A. 30 (Id. at 831:3-12). Further, Ms. Supko has testified that the amount of additional at-

[9] Of the approximately 14 utilities that Ms. Supko has identified as requiring additional at-reactor storage after 1998 even under a 3,000 MTU steady-state rate of acceptance four of those utilities had over 100 MTUs of additional at-reactor storage. A. 28 (Southern Nuclear Operating Company v. United States, No. 98-614 (Fed. Cl.) trial testimony of Eileen Supko, 823:19-24). For example, Palo Verde Number 1 had 184.9 MTUs of additional at-reactor storage even under Ms. Supko's 3,000 MTU steady-state rate of acceptance. A. 28-29 (Id. at 823:25-824:5).

reactor storage after 1998 could be as high as 1,999 MTU and still satisfy the first "objective" identified by counsel. A. 24 (Id. at 809:17-22).[10] Indeed, although Ms. Supko testified that the amount of additional at-reactor storage number would decrease if utilities utilized certain contract provisions such as "exchanges,"[11] Ms. Supko has not endeavored to model how the additional at-reactor storage number would decrease had exchanges been utilized under the Standard Contract or what exchanges would have cost in a "but for" world. A. 74-85; 99-100, (Deposition of Eileen Supko, July 19, 2006, 157-168; (System Fuels, Inc. v. United States, No. 03-2624 (Fed. Cl.) trial testimony of Eileen Supko, 1427:17-1428:3).

Similarly, although Ms. Supko claimed that the amount of additional at-reactor storage number could be even lower depending upon individual utilities' decisions regarding matters such as full core reserve policies and the management of pool capacities and wet racks, Ms. Supko admitted that she did not endeavor to model how that number would be affected had utilities made such decisions. A. 123, 25 (Id. at 1480:10-17; Southern Nuclear Operating Company v. United States, No. 98-614 (Fed. Cl.) trial testimony of Eileen Supko, 813:10-20).[12]

---

[10] The amount of "reasonable" additional at-reactor storage could potentially be even higher under Ms. Supko's analysis because, although Ms. Supko utilizes the annual discharge rate of 2,000 MTU as a benchmark for determining the "reasonableness" of the amount of additional at-reactor storage after 1998, she has not endeavored to determine how far above that annual discharge rate the amount of additional at-reactor storage number could be and still be deemed reasonable. A. 23 (Southern Nuclear Operating Company v. United States, No. 98-614 (Fed. Cl.) trial testimony of Eileen Supko, 808:15-24).

[11] Pursuant to Article V.E. of the Standard Contract, utilities have the right to exchange approved delivery commitment schedules with other utilities. However, DOE has the right to approve or disapprove any exchanges. See 10 C.F.R. 961.11, Art. V.E.

[12] Similarly, although Ms. Supko has performed a "sensitivity" analysis in which she models intra-utility exchanges of acceptances rights (i.e., trading of acceptance rights between common owners), she admitted that the decision to engage in intra-utility trades is very company-

Ms. Supko also admitted that had she assumed license extensions in her utility-wide analysis, under Scenario 3, the amount of average post-shutdown time that would decrease from 16.5 years to approximately 12 years, a period of time she deemed "reasonable" under the 3,000 MTU steady-state rate. A. 3-4; 26-27 (Id. at 689:25-690:2; 814:24-815:5).

In short, Ms. Supko's opinions are irrelevant to any issue in this case, lack any indicia of reliability, and are entirely inconsistent with NSP's purported understanding of DOE's obligations under the NWPA and the Standard Contract.

---

specific and she has not spoken to any utilities regarding their willingness to engage in such trades. A. 106-107; 31 (System Fuels, Inc. v. United States, No. 03-2624 (Fed. Cl.) trial testimony of Eileen Supko, 1447:17-1448:3; Southern Nuclear Operating Company v. United States, No. 98-614 (Fed. Cl.) trial testimony of Eileen Supko, 849:18-21).

Further, Ms. Supko opined that the amount of additional at-reactor storage may decrease if utilities utilized the plus/minus 20 percent provision of the Standard Contract (Articles V.B.2. & C of the Standard Contract permits utilities holding approved delivery commitment schedules to adjust the quantity of SNF to be delivered by plus or minus twenty percent until they submit their final delivery schedule but DOE must approve the final delivery schedule) she admitted that she did not analyze how the 20 percent provision would work on a specific utility-by-utility basis. A. 86 (Deposition of Eileen Supko, July 19, 2006, 184). Indeed, Ms. Supko did not offer an opinion in this case as to the effect of the plus/minus 20 percent provision on any particular utility. Further, Ms. Supko has admitted that utilities could also request that DOE accept 20 percent less fuel under the plus/minus 20 percent provision of the Standard Contract. A. 32 (Southern Nuclear Operating Company v. United States, No. 98-614 (Fed. Cl.) trial testimony of Eileen Supko, 856:20-25).

Additionally, Ms. Supko concedes that the intrer-utility exchanges and the plus/minus 20% provisions of the Standard Contract are contingent upon DOE having approved the utilities' delivery commitment schedules under Article V.B. of the Standard Contract. See 10 C.F.R. 961.11, Art. V.B.; A. 108; 101 (System Fuels, Inc. v. United States, No. 03-2624 (Fed. Cl.) trial testimony of Eileen Supko, 1449:16-23; 1432:13-24). However, Ms. Supko does not know which of the 14 utilities had approved DCSs. Consequently, Ms Supko has not factual basis for her conclusions that the amount of at-reactor storage could be lower using her flexibilities.

## IV. THE COURT SHOULD EXCLUDE MS. SUPKO'S TESTIMONY REGARDING THE REQUIREMENTS OF THE NUCLEAR WASTE POLICY ACT AND STANDARD CONTRACT BECAUSE MS. SUPKO WAS NOT INVOLVED IN THEIR PROMULGATION AND HER PROFFERED TESTIMONY EXCEEDS THE OPINIONS AND BASES FOR THOSE OPINIONS DISCLOSED IN HER EXPERT REPORTS

NSP's witness list indicates that Ms. Supko will testify as an expert "regarding the rate at which DOE would have accepted spent nuclear fuel from NSP's Prairie Island and Monticello plants, had DOE begun acceptance of spent nuclear fuel in accordance with the Nuclear Waste Policy Act and Standard Contract." Plaintiff's Witness List at 12 (emphasis added).

First, Ms. Supko was not involved in the promulgation of either the NWPA or Standard Contract. A. 92 (System Fuels, Inc. v. United States, No. 03-2624 (Fed. Cl.) trial testimony of Eileen Supko, 1355:1-16). Ms. Supko did not begin to work with issues related to the Standard Contract until 1990, seven years after its promulgation. A. 92 (Id. At 1355:1-16). Therefore, she is not competent to provided fact testimony regarding the NWPA and Standard Contract due to her lack of personal knowledge. Fed. R. Evid. 602, 701. Any testimony Ms. Supko has to offer on the NWPA and Standard Contract are simply irrelevant and should be excluded.

Second, such testimony constitutes impermissible parol evidence. Where a contract is integrated, parol testimony is prohibited. McAbee Constr., Inc. v. United States, 97 F.3d 1431, 1434 (Fed. Cir. 1996) (holding that integration clause of Government contract precluded use of extrinsic evidence to add or modify the contractual terms). The Standard Contract contains a clear and unambiguous integration clause:

> This contract, which consists of Articles I through XXI and Appendices A through G, annexed hereto and made a part hereof, contains the entire agreement between the parties with respect to the subject matter hereof. Any representation, promise, or

> condition not incorporated in this contract shall not be binding on either party. No course of dealing or usage of trade or course of performance shall be relevant to explain or supplement any provision contained in this contract.

See 10 C.F.R. 961.11, Art. XXII.A.

Third, RCFC 26(a)(2) requires an expert witness to provide a report with "a complete statement of all opinions to be expressed and the basis and reasons therefor." "A party that without substantial justification fails to disclose information required by RCFC 26(a) . . . is not, unless such failure is harmless, permitted to use as evidence at trial, at a hearing, or on a motion any witness or information not so disclosed." RCFC 37(c)(1).

Ms. Supko has not offered an opinion, either in her expert report or deposition in this case, regarding the NWPA or the Standard Contract and, along with counsel, has asserted any such testimony calls for a legal conclusion. Indeed, when deposed in this case, Ms. Supko refused to offer testimony on this point because she claims it is a legal issue and *counsel interposed objections that the question called for a legal conclusion*:

> Q. Do you have an understanding as to the rate of acceptance that DOE would be obligated to maintain under the standard contract?
>
> A. *There is no rate of acceptance in the standard contract specified.*
>
> Q. Okay. So you have, then, I presume no understanding, then, as to what rate DOE is obligated to perform that?
>
> MR. SILBERG: Objection. That calls for a legal conclusion.
>
> A. *As I said, there's no rate in the contract.*
>
> Q. So the answer is no, you have no understanding as to the rate of acceptance that DOE is obligated to perform that?

MR. SILBERG: Same objection.

A. *I'm not going to offer an opinion as to what their obligations are.*

A. 54-65 (Deposition of Eileen Supko, July 19, 2006, 18-29). Consequently, Ms. Supko should not be permitted to testify regarding the NWPA or the Standard Contract.

CONCLUSION

For the foregoing reasons, the Government respectfully requests that this Court exclude the opinions of Ms. Supko as a witness at the forthcoming trial concerning the DOE's rate of acceptance, including the reasonableness the 3,000 MTU per year steady-state acceptance rate. In addition, the United States requests that the Court enter an order excluding Ms. Supko's proffered expert testimony regarding the Nuclear Waste Policy Act and the Standard Contract.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/Heide L. Herrmann by Stephen Finn
HEIDE L. HERRMANN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 305-3315
Fax: (202) 307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

ANDREW P. AVERBACH
ALAN J. LO RE
STEPHEN FINN
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

October 4, 2006

Attorneys for Defendant