# INDEX TO THE APPENDIX

Document Page

Southern Nuclear Operating Company, Alabama Power Company, and Georgia Power Company v. United States, No. 98-614, Trial Transcript, (October 19, 2005) . . . . . . . . 1

Southern Nuclear Operating Company, Alabama Power Company, and Georgia Power Company v. United States, No. 98-614, Trial Transcript, (October 20, 2005) . . . . . . . . 6

Wisconsin Electric Power Co., v. United States, No. 00-697, Deposition Transcript, of Eileen M. Supko, (June 27, 2006) . . . . . . . . 34

System Fuels, Inc., System Energy Resources, Inc. And South Mississippi Electric Power Association v. United States, No. 03-2426C, Deposition Transcript, of Eileen M. Supko, (July 19, 2006) . . . . . . . . 44

System Fuels, Inc., System Energy Resources, Inc. And South Mississippi Electric Power Association v. United States, No. 03-2426C, Trial Transcript, (September 21, 2006) . . . . . . . . 90

System Fuels, Inc., System Energy Resources, Inc. And South Mississippi Electric Power Association v. United States, No. 03-2426C, Trial Transcript, (September 22, 2006) . . . . . . . . 103

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

SOUTHERN NUCLEAR OPERATING :
COMPANY, ALABAMA POWER COMPANY, :
and GEORGIA POWER COMPANY, :NO. 98-614C
Plaintiffs :
vs. :
THE UNITED STATES, :
Defendant. :

Courtroom 5
Court of Federal Claims
717 Madison Place N.W.
Washington, D.C.

Wednesday, October 19, 2005

VOLUME 3

The parties met, pursuant to the notice of the Judge, at 10:10 a.m.

BEFORE THE HONORABLE JAMES F. MEROW

APPEARANCES:

ON BEHALF OF THE PLAINTIFFS:

M. STANFORD BLANTON, ESQ.
K.C. HAIRSTON, ESQ.
S. ALLEN BAKER, JR., ESQ.
Balch & Bingham
1710 Sixth Avenue North
Birmingham, Alabama 35203
(205) 226-3417

RONALD A. SCHECHTER, ESQ.
Arnold & Porter
555 12th Street, N.W.
Washington, D.C. 20004

ON BEHALF OF THE DEFENDANT:

JOHN EKMAN, ESQ.
HEIDE HERRMANN, ESQ.
MARIAN SULLIVAN, ESQ.
JOSHUA E. GARDNER, ESQ.
ALAN LO RE, ESQ.
STEPHEN FINN, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, DC 20530

***Index appears at end of transcript***

them to accommodate it? Would they have needed additional dry storage?

A. As I said earlier, I looked at the numbers for the plants, the additional requirements were typically under 100 metric tons, in some cases one or two reloads of spent nuclear fuel. That type of quantity could have been accommodated by providing additional racks and just some of the flexibilities, unracked areas of the pool, providing temporary racks, for example, in the spent fuel cask. That's been done at some plants.

Using part of the full core discharge capability, there are a wide range of things that could have been done, had they believed performance was going to occur.

Q. Okay. Moving down now to the average post -- you were talking about scenario 1 and walking us through the chart. Tell us what the results are for -- first of all, average post shutdown storage is obviously an industry-wide average?

A. It is an average over all of the plants. There are 70 some sites, so this is based on each site. Some sites have more than one reactor operating.

The range of numbers in this ranges from

five years of post shutdown storage to approximately 12 or 14 years for operating nuclear power plants.

Q. And that's under scenario 1?

A. Under scenario 1, yes.

Q. Could you continue with your discussion of scenario 1, please?

A. Yes. The years maximum acceptance capacity utilized, 28 years, that means that from the start of waste acceptance in 1998, DOE would pick up 3,000 metric tons per year for a total of 28 years over about a 40 year period. So that's about three-quarters of the program.

Q. And what are your views in terms of scenario 1 in terms of its efficiency?

A. The fact that it does minimize the amount of additional storage requirements and it provides a reasonable time post shutdown storage and it provides what I would consider to be an efficient and a practicable time period for utilizing the system capacity, I think this is a reasonable rate of acceptance that would have been practicable.

Q. How about scenario 2?

A. Scenario 2 is the flat 900 metric ton rate. I calculated additional storage requirements after 1998 of 13,130 metric tons. This is more than

CERTIFICATE OF REPORTER

DOCKET NO.: 98-614C

CASE TITLE: Southern Nuclear Operating Co v U.S.

HEARING DATE: October 19, 2005

LOCATION: Washington, D.C.

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Claims.

Date: 10/19/05

Karen Brynteson, RMR, CRR

Official Reporter

Heritage Reporting Corp.

Suite 600

1220 L Street, N.W.

Washington, D.C. 20005-4019

# UNITED STATES
# COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SOUTHERN NUCLEAR OPERATING | : |
| COMPANY, ALABAMA POWER COMPANY, | : |
| and GEORGIA POWER COMPANY, | :NO. 98-614C |
| Plaintiffs | : |
| vs. | : |
| THE UNITED STATES, | : |
| Defendant. | : |

Pages: 723 through 1006

Place: Washington, D.C.

Date: October 20, 2005

HERITAGE REPORTING CORPORATION
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
hrc@concentric.net

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

SOUTHERN NUCLEAR OPERATING :
COMPANY, ALABAMA POWER COMPANY, :
and GEORGIA POWER COMPANY, :NO. 98-614C
Plaintiffs :
vs. :
THE UNITED STATES, :
Defendant. :

Courtroom 5
Court of Federal Claims
717 Madison Place, N.W.
Washington, D.C.

Thursday, October 20, 2005

VOLUME 4

The parties met, pursuant to the notice of the Judge, at 10:00 a.m.

BEFORE THE HONORABLE JAMES F. MEROW

APPEARANCES:

ON BEHALF OF THE PLAINTIFFS:

M. STANFORD BLANTON, ESQ.
K.C. HAIRSTON, ESQ.
S. ALLEN BAKER, JR., ESQ.
Balch & Bingham
1710 Sixth Avenue North
Birmingham, Alabama 35203
(205) 226-3417

RONALD A. SCHECHTER, ESQ.
Arnold & Porter
555 12th Street, N.W.
Washington, D.C. 20004

BENTINA TERRY, ESQ.
Southern Nuclear
P.O. Box 1295
Birmingham, Alabama 35201

APPEARANCES:

ON BEHALF OF THE DEFENDANT:

JOHN EKMAN, ESQ.
HEIDE HERRMANN, ESQ.
MARIAN SULLIVAN, ESQ.
JOSHUA E. GARDNER, ESQ.
ALAN LO RE, ESQ.
STEPHEN FINN, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, DC 20530

***Index appears at end of transcript***

Q. I understand, Ms. Supko, it is your belief that these are important factors to consider in the nuclear waste program. But my question to you is slightly different.

All I am simply asking you is if those two factors are rejected by the Court, you would need new assumptions, correct, to measure the various rates against?

A. I suppose that's true.

Q. And, in fact, sitting here today, you can't identify an alternative methodology that you would utilize to determine the reasonableness of a particular rate, correct?

A. As I said, the amount of additional storage at nuclear power plants and how long spent nuclear fuel remains at those sites are the important factors from the nuclear industry perspective.

They are factors that the Department of Energy itself has kept track of. Yes, you are right, I don't know what else one would evaluate.

Q. You had spoken a little bit yesterday about the ERI computer model. Do you recall that testimony?

A. Yes.

Q. And the ERI computer model, that was created

incorrect.

A. As I explained yesterday briefly, what I did was I decided to export data that was calculated by the SPNTFUEL program into an Excel spreadsheet. The reason that I did that was during, I believe it was during my Southern Nuclear deposition, based on questions that were asked me by counsel for the government, it appeared that there were questions such as, well, where is the output from the model? And I said, well, they are in the output files, but it seemed as though it wasn't 100 percent clear as to how it was that the model worked.

And so I thought I would be more transparent and export the results and calculate the additional requirements for each plant so that you could see, everybody knows or most people are very familiar with Excel, and Excel spreadsheets, I would calculate the additional requirements in an Excel spreadsheet.

In doing that, I discovered that I did the calculation differently in the spreadsheet than the code had been using and discovered that I had, what is the word I am looking for -- basically underestimated the requirements at the eight sites that had dry storage prior to 1998. I

underestimated their requirements post-1998 because of the way I had linked things in the model.

In my spreadsheet, it was very clear the way that I calculated it that these results were a better reflection of what would happen at sites not only that had dry storage before 1998 but those that did not.

Q. That was very helpful, thank you, Ms. Supko. And, in fact, stated another way, you have in this case underestimated the amount of storage requirements for those utilities that had dry storage as of 1998, correct?

A. Yes. There were, I believe, about eight sites.

Q. About eight sites. And then yesterday you endeavored to correct that oversight by using the numbers that you used in subsequent reports such as South Carolina, correct?

A. That's correct. It doesn't change my opinion. The numbers are different.

Q. And, in fact, none of the changes in the numbers over the course of the iterations of your report have changed your conclusion about the reasonableness of the 3,000 rate, correct?

A. No. If you look at the various acceptance

Q. Doesn't change the overall result, fair enough.

And with regard to pool capacities generally, your model is not always utilizing pool capacity for utilities as they existed in 1998, correct?

A. That's correct. I think there may be a dozen or so pool capacities that had been upgraded after 1998. Again, it wouldn't change -- I think we discussed this qualitatively in my South Carolina Electric & Gas deposition.

It wouldn't change the overall results because if I modified the pool capacities, all of the scenarios would potentially increase additional storage capacities or additional storage requirements somewhat, and you would have the same relative difference.

Q. Sure. And just so I'm clear, so, in other words, your model utilizes certain pool capacities that were modeled after or modified after 1998, correct?

A. It does, yes.

Q. For example, you include Plant Hatch's post-1998 rack addition in your model in this case, correct?

A. I did include that, yes.

Q. Okay. And, in fact, you also used South Carolina's 2002 post rerack capacity in your acceptance rate model, correct?

A. I did. And it is interesting, that doesn't come into play or it wouldn't come into play if I used the lower capacity in scenario 1 or scenario 4 because South Carolina Electric & Gas would have had plenty of capacity at their old rerack, at their old pool capacity, had DOE begun acceptance at either the scenario 1 or scenario 4 rates.

It would have increased the scenario 2 and 3 rates and by and large I think that's the case for most of the pool capacities in which I used the newer capacities.

Q. But, of course, you do agree, though, using these post-1998 storage additions was simply an oversight in terms of the inputs you were placing into your model, correct?

A. I didn't go back and attempt to try to see what the world looked like for every pool in 1998. That would have required my going into the Nuclear Regulatory Commission's docket for every nuclear power plant and looking at license amendments.

acceptance right, correct?

A. For a fraction of the pools.

Q. And you would agree that, in fact, as you continue to change the pool capacities for particular utilities, based upon the information you received from your clients, it is possible these numbers could change again in the future, correct?

A. It is -- if I get new information and I believe that information is useful, I will use it.

Q. Sure. Even if those changes occurred after 1998, correct?

A. I'm sorry, I don't understand that.

Q. Even if those utilities added additional at-reactor storage after 1998, if you received that information in the course of your representation of those clients, you may include those in your 1998 model, correct?

A. I'm not sure that I would. It depends on what it is and how I believe it would affect the analysis. I would use my judgment.

Q. So it is situational when you would choose to use a utility that had that additional at-reactor storage, whether you would put that into your 1998 model?

A. Well, there are plants that are adding or

Q. And you are certainly not looking in terms of 1998 what particular utilities' intentions were with respect to seeking license extensions or not seeking license extensions, correct?

A. Again, the industry has moved forward and is operating their nuclear power plants despite the government's failure to begin acceptance and they are upgrading their plants. They would have done that had the government begun acceptance in 1998. So I am reflecting what has occurred at nuclear power plants.

Q. But the answer to my question is no, you are not looking in terms of 1998 as to what particular utilities would or would not have done with respect to license extensions, correct?

A. That's correct, I think it was, would have been difficult to determine in 1998.

Q. Okay. Now, in fact, in your industry-wide model, you assumed that utilities do not seek license extensions, correct?

A. That's right.

Q. But in calculating acceptance rights for Southern Nuclear, you do assume license extensions, correct?

A. I did, but, again, given the Indiana

Michigan decision regarding the calculation of damages, any of those projected discharges, whether it is through 40 years or through 60 years, don't come into play and don't matter.

Q. Well, whether or not they matter, Ms. Supko, you agree that for overall industry-wide acceptance, no license extensions are assumed, but for Southern Nuclear, you do assume license extensions, correct?

A. That's correct. And I did talk, I believe it was in the, my Southern Nuclear deposition, I did talk qualitatively about what the effect of license extension would have. And, in fact, since then I actually did look at it, I modeled it. And my qualitative discussion in my deposition was correct.

Q. Well, and I would like to talk with you about that, but before we do that, I have one other quick question.

Both analyses, the industry-wide analysis and the utility-specific analysis, they are both but-for nonbreach analyses, correct?

A. I'm sorry. Repeat that, please?

Q. Of course. Certainly. Both the utility-wide projection that you are doing or analysis that you are doing and the utility-specific, the Southern Nuclear analysis you are doing, are both

endeavoring to model a nonbreach but-for world, correct?

A. That's correct, that in both cases I model a nonbreach scenario, but I also model a breach scenario for the utility-specific calculation of acceptance rights.

Q. In this case?

A. Yes.

Q. Yes. Now, if you had modeled license extensions in your industry-wide analysis, your industry-wide model, you would expect the average post shutdown numbers, that's the number in the Plaintiff's demonstrative 6, that third box, average post shutdown storage time, you would expect that number to decrease, correct?

A. I believe what I stated in my deposition was that I believed that scenario 1 and scenario 4 post shutdown storage time would decrease somewhat and, in fact, that is what happens. Scenario 3 also decreased somewhat, but it was still, I want to say, maybe 12 or 13 years.

Q. So -- I'm sorry.

A. I'm sorry.

Q. Please.

A. In scenario 2 it actually increased.

Q. For scenario 3, that's the 1992 ACR rate, the number of average post shutdown storage time you think went from about 16.5 to, what, approximately 12?

A. I think it was 12 or 13. I don't recall the number.

Q. By the way, just so we're on the same page here, the reason these numbers decrease are because you are assuming 20 more years of time for DOE to work off the backlog, correct?

A. That's correct.

Q. I have maybe five more questions and then why don't we take a break. We have been going for a while.

A. The other thing that I also discussed qualitatively was that the, in my Southern Nuclear deposition regarding license extension was that the effect of, assuming license extension in this overall analysis, would be that the additional storage requirements in scenario 1 and scenario 4 wouldn't change, but they would increase in scenarios 2 and 3 and, that, in fact, does occur.

Q. Yes. Now, with respect to all your inputs, you would agree that the inputs you are using in your model are evolving, correct?

A. No. The historical discharges remain the

A. It is possible.
Q. And as that representation of that particular client stops, you may take out that particular utility's information, correct?
A. I'm not sure that I would.
Q. I mean, you did that with Commonwealth Edison, correct?
A. I did, because -- that was because I was updating my entire database. To the extent that the Department of Energy doesn't issue another RW-859 database for several years, I probably will not make major changes to the historical and projected discharges.
MR. GARDNER: Your Honor, may we take a ten-minute break now?
THE COURT: Sure. Why don't we return at 25 past.
MR. GARDNER: That would be great.
(A recess was taken at 11:11 a.m., after which the trial resumed at 11:31 a.m.)
BY MR. GARDNER:
Q. Ms. Supko, you would agree that you are an advocate for the nuclear industry, correct?
A. I'm a nuclear engineer. I have worked in the nuclear industry for 20 years. I serve as an

advisor to Pennsylvania State University's nuclear engineering program. Yes, of course I'm an advocate for nuclear power and nuclear energy.

Q. I would like to turn now from the inputs of your model which you have been talking about this morning to the outputs of your model. In other words, the numbers that we had started to talk about a little bit.

Now, you are offering an opinion in this case about what you believe to be a reasonable overall spent fuel acceptance rate had DOE begun accepting spent fuel in 1998, correct?

A. Yes.

Q. But you are not offering an opinion concerning what rate of acceptance is required by the standard contract, right?

A. That's correct.

Q. And you are not offering an opinion about what rate of acceptance is required by the Nuclear Waste Policy Act, correct?

A. That's correct.

Q. But you agree that a 3,000 MTU rate of acceptance is not included in either the standard contract or the Nuclear Waste Policy Act?

A. Yes, that's correct.

discharge rate, correct?

A. I'm sorry, I don't understand what you are talking about.

Q. Well, let me reask it and I will try to be clearer. When you are determining the amount of additional at-reactor storage that would or would not be reasonable, you are benchmarking that against the annual discharge rate, correct?

A. That's the annual discharge rate which is 2,000, approximately 2,000 metric tons per year, is one of the benchmarks. But in addition, I also look at the underlying data to see how many plants and how much storage would be required at each. It is not just a simple look at the overall number.

Q. Okay. And, by the way, I think you just said this, did you say that 2,000 is an average, right, annual discharge rate?

A. It has increased in recent years. It is probably a bit above that.

Q. I think it could go as high as 2100, correct?

A. It could go as high as 23 or 2400.

Q. And it could also go as low as 1800 at times, correct?

A. Historically, it has. I would say in

today's environment, it is rare that -- just because of the fact that utilities are operating at fairly high capacity factors and with more and more operating in two-year cycles, it typically doesn't dip below to 1800.

Q. And sitting here today, you can't identify how far above 2,000 the amount of additional at-reactor storage could be and still satisfy the first primary requirement, correct?

A. I don't understand your question.

Q. Okay. We just discussed 2,000 and that is one of the things that you look at to determine reasonableness, correct, among other factors?

A. Yes.

Q. But sitting here today, you cannot tell me how far above 2,000 the additional storage number would be and still satisfy this first primary requirement identified for you, correct?

A. I modeled acceptance rates, overall acceptance rates that I found in Department of Energy documents. I didn't attempt to do -- I don't know if you would call it a break-even analysis, so, no, I have not modeled a scenario that attempts to determine what level.

Q. Okay. Now, if you assumed all the other

numbers in your analysis for scenario 1, the 3,000 rate, you would agree that it is possible that if the number of additional at-reactor storage were, say, as high as 1999 MTUs, that could still satisfy the first primary requirement, correct?

A. I'm sorry, I did not understand your question.

Q. That's fine. Kristin, could you please put up Plaintiff's demonstrative, I believe it is 4, I believe. I'm sorry, it was 6. Ms. Supko, I have put on the screen Plaintiff's demonstrative 6 again, the same slide we were looking at earlier.

My question is you have got three categories here, additional SNF storage requirements, average post shutdown storage time, years maximum acceptance capacity utilized.

Hypothetically, if average post shutdown remained at 9 and the years maximum acceptance capacity remained at 28, if the first number were as high as 1999, that might still satisfy the first primary requirement, correct?

A. It might. It would depend upon a wide range of things such as, as I said earlier, looking at the underlying numbers, how many plants, how much additional storage, but 2,000 metric tons is, I

reserve utilized the plus 20 percent flexibility, that 690 would go down to 552. So I quantified those two numbers. I did not model the inter-utility exchanges.

Q. I see. So you don't know how much further those numbers would get with exchanges, in other words, you haven't done that analysis?

A. No, and, in addition, there are other flexibilities that companies have on their own.

Q. And you haven't looked at those flexibilities. And those flexibilities, by the way, as I think you talked about yesterday, are things like how they manage the full core reserve policies, whether or not they want to add racks, things of that nature, correct?

A. Yes.

Q. And you haven't endeavored in this case to model how those flexibilities affect these numbers on Plaintiff's demonstrative 11, correct?

A. That's correct.

Q. Now, in the South Carolina case, you determined that under the 1991 ACR rate, there would be 4980 MTUs of additional at-reactor storage once intra-utility exchanges are applied, correct?

A. Yes.

Q. And that's, again, reflected in Plaintiff's demonstrative 11. But you don't know sitting here today if it is possible under this 1991 ACR rate to bring the additional at-reactor storage numbers from 4980 to, say, 2,000, if all the flexibilities were exercised, correct?

A. Well, I have reviewed the underlying numbers associated with the rollup of the numbers, the 4980 metric tons, and it is on the order of about 30 plants, 25 or 30 plants, several hundred metric tons per plant of additional capacity.

I haven't modeled how far down that number could come, that's correct, but the other factors that also have to be considered is you don't just look at additional at-reactor storage requirements. One of the other important factors is the average post shutdown storage time of 16.5 years.

That means that, on average, plants would be storing spent fuel for 16 and a half years after they shut down for decommissioning. In some cases, it is 20 years or longer. That's one of the other factors that I also considered. It is not just looking at the additional storage requirements line.

Q. Of course, by the way, if you had assumed license extensions in your model, as I think you

testified earlier, that 16.5 drops down to 12, correct?

A. On average, but, again, the numbers range from 10 to probably, probably still 20 and higher for some plants.

Q. Sure. But, in any event, just to get back to my initial question, you haven't, you don't know sitting here today whether it is possible under the 1991 ACR rate -- or here you used the 1992 ACR rate, called it scenario 3, you don't know whether it is possible to bring that 4980 number for additional storage down to 2,000 if all the flexibilities are exercised, correct?

A. I have not modeled that.

THE COURT: Do you know what would happen if they are probably already shut down plants?

THE WITNESS: I haven't done that in this, Your Honor, but in the early 1990s, that was an issue that was discussed quite extensively in the industry, and I did actually model shutdown reactor priority.

And what I found at that time was that a 3,000 metric ton acceptance rate would help the fuel to move not just from shutdown plants, but would also prevent adding additional storage at operating

Q. So are your workpapers incorrect here when it represents there are 14?

A. No, this is modeling that they would have had to have done something, but it wasn't adding on-site additional capacity.

Q. Okay. But they would have had to have done something after 1998?

A. Yes.

Q. By the way, Ms. Supko, since you mentioned transshipments, are there any costs associated with transshipment of spent nuclear fuel?

A. There is.

Q. Do you know how much?

A. Well, it depends. Particular reactors involved here actually own their own spent fuel transportation casks and have for more than a decade. So it would be the operating costs associated with loading fuel and transferring it.

Q. Ms. Supko, turning to what I just provided to you from your workpapers, by my count there are four utilities here, four reactors, I should say, with over 100 MTUs of maximum additional storage required, correct?

A. Yes.

Q. In fact, one of those, I believe it is Palo

Verde Number 1 has 184.9 MTUs of additional storage, correct? It is the Number 2 plant.

A. Yes, I see it.

Q. Is that correct?

A. That's correct. But those are actually three nuclear power plants with three separate pools, which would average about 61 metric tons per pool, which is a reload and a half maybe.

Q. By the way, with 184.9 MTUs, if they had to go to dry storage, that could be as much as 18 casks, correct, if you assume ten MTUs per cask?

A. Well, actually 15 metric tons per cask is probably a more reasonable number today.

Q. Okay, 15.

A. But I would say that a plant, and just looking at each individual pool, as I said, let me calculate it back, 184.9 divided by 3 is approximately 62 metric tons per pool. I can't imagine that any utility would build on-site dry storage to ship -- or, excuse me, to store just 61 metric tons. There would have been other alternatives that would have made more sense.

Q. And do you know what Palo Verde is doing?

A. They are storing their spent fuel in dry storage today, but that is in the breach world where

generation rate, correct?

A. A rate -- what do you mean?

Q. A rate of acceptance of the 2,000 MTUs per year, it would keep up with the generation rate, correct?

A. Roughly. The number is higher in some years, so --

Q. And lower in others, correct?

A. Right.

Q. So it would approximately keep up with the generation rate?

A. Yes.

Q. But it is also your belief that the DOE acceptance rate must also accept a portion of the backlog of each year or some amount above 2,000, correct?

A. Could you repeat that?

Q. Sure. Not only must the generation -- or not only must the acceptance rate keep up with the generation rate -- sorry, not only must the acceptance rate keep up with the generation rate, it also, you believe, requires it to work off the backlog, correct?

A. It is not my opinion. That's the requirements that were identified to me by counsel. The second issue identified was that spent fuel