utilities here?

A. No.

Q. So, for example, your analysis would allow Georgia Power to exchange acceptance rates with Alabama Power, correct?

A. Southern Nuclear Operating Company is the operator of those three plants within that operating system, yes.

Q. And so Southern could decide that Georgia Power could get the acceptance rights of Alabama Power under your analysis; is that right?

A. I modeled that the three sites for Southern Nuclear, that Southern Nuclear operates could, in fact, use those rights at any of the sites.

Q. They could share rights?

A. Yes.

Q. Now, you would agree that the decision to engage in intra-utility trades is very company-specific, correct?

A. Yes.

Q. It is also very region-specific?

MR. SCHECHTER: I will object on vagueness. I don't know what region-specific means.

THE COURT: Does the witness know?

purport to represent that it is everywhere.

THE WITNESS: No, I don't believe that I state that.

BY MR. GARDNER:

Q. Have you stated that in other reports, Ms. Supko?

A. Not that I recall. What I state on page 17 of my report is that if nuclear operating companies exercised the provision in the standard contract that allows 20 percent flexibility in the amount of spent fuel delivered to DOE, it is possible that the additional storage requirements summarized in table 2 would be at least 20 percent lower.

That's not saying that every nuclear operating company who has acceptance rights in 1998, 1999, whenever, is going to increase their requirements. I was only looking at that portion who had additional storage requirements calculated.

Q. And, by the way, just as utilities could request 20 percent more spent nuclear fuel, they could also request 20 percent less spent nuclear fuel to be accepted, correct?

A. It is a plus or minus 20 percent flexibility, yes.

CERTIFICATE OF REPORTER

DOCKET NO.: 98-614C

CASE TITLE: Southern Nuclear Operating Co v U.S.

HEARING DATE: October 20, 2005

LOCATION: Washington, D.C.

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Claims.

Date: 10/20/05

[signature]

Karen Brynteson, RMR, CRR
Official Reporter
Heritage Reporting Corp.
Suite 600
1220 L Street, N.W.
Washington, D.C. 20005-4019

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-----------------------------x

WISCONSIN ELECTRIC POWER COMPANY, :
Plaintiff :
vs. : NO. 00-697 C
THE UNITED STATES :
Defendant :

-----------------------------x

The deposition of EILEEN M. SUPKO was held on Tuesday, June 27, 2006, commencing at 9:22 a.m., at the U.S. Department of Justice, 1100 L Street, N.W., Washington, D.C., before Ronald E. Bennett, Notary Public.

REPORTED BY: Ronald E. Bennett

CERTIFIED CO[illegible]

APPEARANCES

DONALD J. CARNEY, ESQUIRE
Perkins Coie LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
Tel: 202-434-1675
Fax: 202-434-1690
E.mail: Dcarney@perkinscoie.com
On behalf of Plaintiff

JOSHUA E. GARDNER, ESQUIRE
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D.C. 20530
Tel: 202-305-7583
Fax: 202-514-8624
E.mail: joshua.e.gardner@usdoj.gov
On behalf of Defendant

ALSO PRESENT: Ted Lunsford, Navigant
Hugh Hill and Rachel Anglin, Interns

INDEX

Deposition of EILEEN M. SUPKO

June 27, 2006


| Examination by: | Page |
|---|---|
| Mr. Gardner | 4 |

| No. | Description | Marked |
|---|---|---|
| 1-3 | Documents | 16 |
| 4 | Retention Agreement | 17 |
| 5 | Invoice | 25 |
| 6 | Rebuttal Report | 98 |
| 7 | Document | 121 |
| 8 | Document | 129 |
| 9 | Concept Paper | 142 |
| 10 | Document | 209 |

they have large number of plants. They may have benefits, I've not seen what everybody's contract looks like. I have a snapshot of it, but it's hard to say.

Q. Is it fair to say that in the dry storage industry that all dry storage projects are basically negotiated projects? In other words, there's no off-the-price shelf or no off-the-shelf price regarding storage; is that fair to say?

A. I don't know. The dual purpose casks themselves are typically very similar from site to site, if you are using the same product cask with the same certification. However, the individual sites will, in terms of building a facility, will differ dramatically.

Q. Does that mean that obviously the prices would vary from utility to utility in terms of dry storage cost?

A. They might.

Q. Do you know if they do?

A. I don't.

Q. We have spoken I think at extraordinary lengths about your model, your fuel management models, and your opinions about the 3,000 rate. You recall that, of course?

A. Yes.

Q. May I rely upon your previous testimony with respect to that topic?

A. I suppose that you can.

Q. Okay. For example, we have talked about how your calculations for additional extra storage, they ever changed from report to report; correct; the numbers have changed?

A. They changed from the SMUD report to the Southern Nuclear report and from the Southern Nuclear report to any report issued after that. But I believe that all of the numbers have been the same in reports issued from the middle of last year forward.

Q. Since South Carolina; correct?

A. Yes.

Q. Let me just make sure I have got this right. Your report changed from comment to SMUD, in terms of the numbers of additional at reactor storage?

A. I believe I did some additional analyses there.

Q. Then it changed from Southern Nuclear to South Carolina; correct?

A. That's correct. I did the analysis in a

different way.
Q. I can rely upon all your previous testimony about why it changed; correct?
A. Yes.
Q. We don't need to go into that?
A. Yes.
Q. Thank you.
A. I want to make sure I understood what you meant by rely upon.
Q. Just that I don't have to ask you the same questions about the issues you and I have already talked about?
A. I certainly endorse that.
Q. Me too. I do want to ask one question though. With respect to your opinions regarding the rate and schedule, the reports that you have offered in this case, have you conducted the same type of analysis as you conducted in South Carolina?
A. I don't understand the question.
Q. Well, your initial reports basically made the conclusion that at 3,000 rate of acceptance was reasonable because it satisfied what you understood to be two primary requirements; correct? The amount of additional at reactor storage and average post shutdown time; correct?

A. I believe that is correct.
Q. Okay.
A. I'll have to look at those reports.
Q. Sure. We can if you need to. My understanding is that in South Carolina you have actually done slightly different analysis where you just calculated under various rate assumptions how much additional at reactor storage there would be and what the average post shutdown time is; correct?
A. I performed the same analysis I believe or similar analysis. What I've done that is different in the report from South Carolina and any that I've completed after that was essentially to relate that to measures that were provided to me by counsel which was tell us how much additional a reactor storage would be required. And discussed timely decommissioning and how these various acceptance rates that I analyzed affect those two factors.
Q. You measured, you used the same two measurements in Commonwealth Edison, SMUD and Southern Nuclear; correct?
A. I did.
Q. What are you doing differently --
A. My analysis is the same, essentially the same. I'm just not discussing the requirements of

the contract in order to not make any legal arguments such as the many, many questions you are asking me, whether I was issuing a, making a legal opinion in earlier reports. I'm doing an analysis.

Q. Is it fair to say that one of the differences between some of your original opinions and say your post South Carolina opinions is that you are no longer offering an independent opinion about the two primary requirements?

MR. CARNEY: Objection. Mischaracterizes prior testimony.

A. I wasn't often an opinion about the primary requirements in Southern Nuclear report either. I believe I told you in the SMUD and Commonwealth that counsel had given me those primary requirements. I have just discussed them in the text of the report. I no longer discuss them in the text of the report.

Q. Okay. So for my purposes today you are not offering an independent opinion about the fact there are two primary requirements; correct? You are simply relying upon counsel?

A. That's correct.

Q. Okay. Are there any statements you've made either in deposition or trial testimony that

you believe are incorrect?
A. Not that I can recall.
Q. Okay. Now you have offered three separate reports in this case; correct?
A. Yes.
Q. You have offered two dealing with the written schedule of acceptance; correct?
A. Yes.
Q. You have offered one that calculates WEPCO's acceptance rights under a 3,000; correct?
A. That's correct.
Q. And you offered one given about the overall rate acceptance?
A. Yes.
Q. I think as you alluded to earlier you got a report dealing with the dual-purpose dry storage market; correct?
A. Yes.
Q. Why don't we mark all three of these.
(Deposition Exhibit Number 1-3 marked for purposes of identification.)
BY MR. GARDNER:
Q. I have handed you what has been marked as Exhibits 1, 2 and 3. Can you just confirm for me what those exhibits are.

WASHINGTON, D.C.

NOTARY PUBLIC, to wit:

I, Ronald E. Bennett, a Notary Public of the District of Columbia, do hereby certify that the within-named witness personally appeared before me at the time and place herein set out, and after having been duly sworn by me according to law, was examined by counsel.

I further certify that the proceedings were recorded stenographically by me and this transcript is a true record of the proceedings.

I further certify that I am not of counsel to any of the parties, nor in any way interested in the outcome of this action.

As witnessed my hand and notarial seal this 13 day of July, 2006.

Ronald E Bennett

Ronald E. Bennett,

Notary Public

My commission expires:

February 14, 2010

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| NORTHERN STATES POWER COMPANY, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 98-484C |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |
| and | ) | |
| SYSTEMS FUELS, INC., et al., | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 03-2623C |
| THE UNITED STATES, | ) | |
| Defendant. | ) | DEPOSITION OF |
| and | ) | EILEEN M. SUPKO |
| SYSTEMS FUELS, INC., etc., | ) | July 19, 2006 |
| Plaintiff, | ) | |
| v. | ) | No. 03--2624C |
| THE UNITED STATES, | ) | |
| Defendant. | ) | Job No. 175436 |

The deposition of EILEEN M. SUPKO commenced at 9:00 AM, at the UNITED STATES DEPARTMENT OF JUSTICE, CIVIL DIVISION, COMMERCIAL LITIGATION BRANCH, 1100 L Street, N.W.,

Washington, D.C., before Cheryl A. Lord, Registered Professional Reporter, Certified Realtime Reporter, and Notary Public for the District of Columbia.

APPEARANCES

For Plaintiff:

Jay E. Silberg, Esquire
PILLSBURY WINTHROP SHAW PITTMAN LLP
2300 N Street, N.W.
Washington, D.C. 20037-1128
(202) 663-8000

For Defendant:

Joshua E. Gardner, Esquire
Alan J. Lo Re, Esquire
UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION COMMERCIAL LITIGATION BRANCH
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-0226

APPEARANCES CONTINUED

For Xcel Energy:

Kerry C. Koep, Esquire
XCEL ENERGY
Assistant General Counsel
414 Nicollet Mall, Suite 500
Minneapolis, MN 55402
(612) 215-4583

Also present:

Eric Heintz and Ted Lunsford

15 minutes, every hour and a half, although if you ever need a break at any time, please let me know and we'll take one.

Is that fair?

A. Yes.

Q. The only request I have is, is that if there's a question pending, you answer the question, and then we'll go on break.

Okay?

A. Yes.

(Mr. Lunsford entered the room.)

BY MR. GARDNER:

Q. Now, I'm sure you recall that several weeks ago, I took your deposition in the Wisconsin Electric case.

Correct?

A. Yes.

Q. Is it fair to say that the answers you gave in that case with respect to the rating schedule would apply equally to your opinions in this case or these cases?

A. I believe they would.

they have large number of plants. They may have benefits, I've not seen what everybody's contract looks like. I have a snapshot of it, but it's hard to say.

Q. Is it fair to say that in the dry storage industry that all dry storage projects are basically negotiated projects? In other words, there's no off-the-price shelf or no off-the-shelf price regarding storage; is that fair to say?

A. I don't know. The dual purpose casks themselves are typically very similar from site to site, if you are using the same product cask with the same certification. However, the individual sites will, in terms of building a facility, will differ dramatically.

Q. Does that mean that obviously the prices would vary from utility to utility in terms of dry storage cost?

A. They might.

Q. Do you know if they do?

A. I don't.

Q. We have spoken I think at extraordinary lengths about your model, your fuel management models, and your opinions about the 3,000 rate. You recall that, of course?

A. Yes.

Q. May I rely upon your previous testimony with respect to that topic?

A. I suppose that you can.

Q. Okay. For example, we have talked about how your calculations for additional extra storage, they ever changed from report to report; correct; the numbers have changed?

A. They changed from the SMUD report to the Southern Nuclear report and from the Southern Nuclear report to any report issued after that. But I believe that all of the numbers have been the same in reports issued from the middle of last year forward.

Q. Since South Carolina; correct?

A. Yes.

Q. Let me just make sure I have got this right. Your report changed from comment to SMUD, in terms of the numbers of additional at reactor storage?

A. I believe I did some additional analyses there.

Q. Then it changed from Southern Nuclear to South Carolina; correct?

A. That's correct. I did the analysis in a

different way.

Q. I can rely upon all your previous testimony about why it changed; correct?

A. Yes.

Q. We don't need to go into that?

A. Yes.

Q. Thank you.

A. I want to make sure I understood what you meant by rely upon.

Q. Just that I don't have to ask you the same questions about the issues you and I have already talked about?

A. I certainly endorse that.

Q. Me too. I do want to ask one question though. With respect to your opinions regarding the rate and schedule, the reports that you have offered in this case, have you conducted the same type of analysis as you conducted in South Carolina?

A. I don't understand the question.

Q. Well, your initial reports basically made the conclusion that at 3,000 rate of acceptance was reasonable because it satisfied what you understood to be two primary requirements; correct? The amount of additional at reactor storage and average post shutdown time; correct?

A. I believe that is correct.
Q. Okay.
A. I'll have to look at those reports.
Q. Sure. We can if you need to. My understanding is that in South Carolina you have actually done slightly different analysis where you just calculated under various rate assumptions how much additional at reactor storage there would be and what the average post shutdown time is; correct?
A. I performed the same analysis I believe or similar analysis. What I've done that is different in the report from South Carolina and any that I've completed after that was essentially to relate that to measures that were provided to me by counsel which was tell us how much additional a reactor storage would be required. And discussed timely decommissioning and how these various acceptance rates that I analyzed affect those two factors.
Q. You measured, you used the same two measurements in Commonwealth Edison, SMUD and Southern Nuclear; correct?
A. I did.
Q. What are you doing differently --
A. My analysis is the same, essentially the same. I'm just not discussing the requirements of

the contract in order to not make any legal arguments such as the many, many questions you are asking me, whether I was issuing a, making a legal opinion in earlier reports. I'm doing an analysis.

Q. Is it fair to say that one of the differences between some of your original opinions and say your post South Carolina opinions is that you are no longer offering an independent opinion about the two primary requirements?

MR. CARNEY: Objection. Mischaracterizes prior testimony.

A. I wasn't often an opinion about the primary requirements in Southern Nuclear report either. I believe I told you in the SMUD and Commonwealth that counsel had given me those primary requirements. I have just discussed them in the text of the report. I no longer discuss them in the text of the report.

Q. Okay. So for my purposes today you are not offering an independent opinion about the fact there are two primary requirements; correct? You are simply relying upon counsel?

A. That's correct.

Q. Okay. Are there any statements you've made either in deposition or trial testimony that

you believe are incorrect?
A. Not that I can recall.
Q. Okay. Now you have offered three separate reports in this case; correct?
A. Yes.
Q. You have offered two dealing with the written schedule of acceptance; correct?
A. Yes.
Q. You have offered one that calculates WEPCO's acceptance rights under a 3,000; correct?
A. That's correct.
Q. And you offered one given about the overall rate acceptance?
A. Yes.
Q. I think as you alluded to earlier you got a report dealing with the dual-purpose dry storage market; correct?
A. Yes.
Q. Why don't we mark all three of these.
(Deposition Exhibit Number 1-3 marked for purposes of identification.)
BY MR. GARDNER:
Q. I have handed you what has been marked as Exhibits 1, 2 and 3. Can you just confirm for me what those exhibits are.

BY MR. GARDNER:

Q. Why don't I reask it, and tell me what part you're having difficulty with.

Do you have an understanding as to the rate of acceptance that DOE would be obligated to maintain under the standard contract?

A. There is no rate of acceptance in the standard contract specified.

Q. Okay. So you have, then, I presume no understanding, then, as to what rate DOE is obligated to perform that?

MR. SILBERG: Objection.

That calls for a legal conclusion.

A. As I said, there's no rate in the contract.

BY MR. GARDNER:

Q. So the answer is no, you have no understanding as to the rate of acceptance that DOE is obligated to perform that?

MR. SILBERG: Same objection.

A. I'm not going to offer an opinion as

to what their obligations are.

BY MR. GARDNER:

Q. I understand you're not going to offer an opinion.

Do you have an understanding?

Just yes or no.

A. Yes.

Q. Yes, you do have an understanding, is that correct?

Yes, you have an understanding to what DOE's obligations are with respect to rate under the standard contract?

A. As I stated, there is no rate in the standard contract.

That's my understanding.

Q. So is the answer to my question, no, you do not have an understanding as to DOE's obligations with respect to the rate of acceptance under the standard contract?

MR. SILBERG: Asked and answered.

A. I answered your question that the contract doesn't have a rate in it.

That's my understanding.

BY MR. GARDNER:

Q. Okay. And therefore if the contract doesn't contain a rate, then you have no understanding otherwise as to what rate DOE's obligated to perform at under the standard contract; is that correct?

MR. SILBERG: Objection, legal conclusion, asked and answered.

A. I don't know how else to answer your question other than to tell you what I know.

MR. GARDNER: I'm going to have marked what will be exhibit number 7.

(Supko Exhibit No. 7 was marked for identification.)

BY MR. GARDNER:

Q. All right. Ms. Supko, I've handed you what's been marked as exhibit number 7.

And before I describe the document, have you ever seen that document before?

I'll represent to you it's an

excerpt, because I'm trying to save the environment today.

A. I don't recall.

Q. I'll describe it to you.

It is plaintiff's -- and this is Northern States now.

This is plaintiff's objections and responses to the defendant's first set of interrogatories and requests for production of documents. This is basically a pretrial discovery document, and we -- which we asked the plaintiff for certain information, and they purport to give us that information through written responses.

And if you turn to the second page of this document, the excerpt -- actually page number 7 on the bottom, you'll see there's an interrogatory number 7 on the top.

Do you see that?

A. M-hm.

Q. And the interrogatory -- this is an interrogatory by the way -- this is a question

that the government has asked NSP.

And we ask the following question: Identify those persons both within plaintiff's organization and outside of plaintiff's organization who are the most knowledgeable about the parties' understanding at any time subsequent to the execution of plaintiff's contract as to the rate and/or sequence of SNF and/or HLW acceptance that DOE would be obligated to maintain under the standard contract.

And then it goes on to list some subparts.

Now, if you go to page 7 D, which is the next page of this document, NSP has identified Eileen Supko, which of course is you.

Correct?

A. Yes.

Q. Now, Ms. Supko, do you agree that you are one of the most knowledgeable persons with respect to the rate and/or sequence of SNF that DOE would be obligated to maintain under the standard contract?

MR. SILBERG: Objection, vague and ambiguous.

You can answer it if you understand it.

A. I'm aware of the fact that NSP identified me as such a person.

It also states that the plaintiff's, NSP's, response to this was that the interrogatory was overly broad, et cetera, but they did identify individuals with the most knowledge of these issues, which is the acceptance rate and rate and sequence of spent fuel acceptance.

BY MR. GARDNER:

Q. That's actually a nonresponsive answer, Ms. Supko.

My question is, do you consider yourself to be one of the most knowledgeable persons with respect to DOE's obligations concerning the rate schedule of acceptance under the standard contract.

MR. SILBERG: Objection,

mischaracterizes the document.

A. I consider myself to be one of the most knowledgeable persons associated with an understanding of the rate and sequence of spent fuel acceptance by DOE.

Whether or not it would be an obligation under the standard contract is a legal issue.

BY MR. GARDNER:

Q. Let me ask you, do you have any knowledge about the rate and/or sequence of SNF that DOE would be obligated to maintain under the standard contract?

MR. SILBERG: Objection, legal conclusion.

(Discussion off the record.)

BY MR. GARDNER:

Q. Ms. Supko, I'm going to read back the last question, because I think there was -- there's some separation.

(Reading the realtime screen:) Let me ask you, do you have any knowledge about the