rate and/or sequence of SNF that DOE would be obligated to maintain under the standard contract?

A. I believe that I answered the question that discussing DOE's obligation is a legal issue, and I'm not making a legal conclusion.

I'm fully aware of acceptance rates that the Department of Energy has used over the lifetime of the program, and I've analyzed those rates, as you know, in my expert reports.

**Q. Outside of your expert reports, do you have any understanding as to the rate and/or sequence of SNF that DOE would be obligated to maintain under the standard contract?**

MR. SILBERG: Objection, asked and answered.

A. From the beginning of the program, the intent of the program was to have an acceptance rate set such that utilities, nuclear operating companies would not be required to add additional storage capacity after 1998, and to

work off the backlog to allow timely decommissioning, and a rate that does that is a rate that reaches 3,000 metric tons with a fairly short 5- to 6-year rampup period.

BY MR. GARDNER:

Q. So is the answer to my question, no, that you have no knowledge about the rate and/or sequence that DOE would be obligated to maintain under the standard contract?

MR. SILBERG: Objection, asked and answered.

A. I stated I have -- that I believe discussing what DOE's obligation is is a legal issue, and that's not something that I'm opining on.

BY MR. GARDNER:

Q. I understand you're not opining.

I'm asking if you have an understanding.

Do you have any knowledge?

A. I know that my client, NSP -- I don't recall if Entergy or System Fuels Inc. has

submitted reports regarding -- briefs regarding the Department of Energy's -- the facts associated with DOE's obligations regarding spent fuel acceptance.

I know there were many briefs filed. I know that NSP did in fact file one, and their opinion is they were required to pick up spent nuclear fuel at a rate that would have limited the amount of spent fuel storage such that no one would have to add additional storage after '98.

Q. Now, that's in their brief.

I'm asking for your view.

Outside of this expert report, do you have any understanding or knowledge about the rate and/or sequence that DOE would be obligated to maintain under the standard contract?

MR. SILBERG: Objection, asked and answered.

She gave you the information.

A. As I said, whether DOE is obligated is a legal issue. That's all that I can tell you.

BY MR. GARDNER:

Q. Okay. So you have no knowledge about that?

MR. SILBERG: Asked and answered.

A. I have no legal knowledge about it, no, I don't.

BY MR. GARDNER:

Q. Do you have any nonlegal knowledge about the DOE's obligations under the standard contract?

A. It's a legal issue.

Q. Okay. So the answer is, no, you have no knowledge?

A. No.

Q. Thank you.

Ms. Supko -- and I think you testified to this. You certainly said this in your report -- that the notion of no additional at-reactor storage was a key issue identified by utilities.

Correct?

A. Yes.

Q. Now, that's in fact what you say in your expert report.

Correct?

I believe it's page 1.

MR. SILBERG: Excuse me.

We're referring to the overall --

MR. GARDNER: Yeah.

Why don't we go to exhibit 1 as an illustrative example.

BY MR. GARDNER:

Q. The very first paragraph, it looks like the middle of the paragraph, you say --

A. I don't say that no additional storage.

I say that counsel asked me to provide an opinion on the DOE's rate of acceptance of spent nuclear fuel on -- as a whole on 2 key issues identified by DOE in the nuclear industry.

One of those is the aggregate amount of additional storage that would be required.

Q. Now, are you just relying upon

of SNF equal to the year's generation rate plus a reasonable share of the backlog, to be tantamount to a request that the rate be sufficient to preclude all additional at-reactor storage?

A. That would be the result of doing it, yes.

Q. But of course, even under your analysis, there are utilities that required additional at-reactor after 1998.

Correct?

A. My calculation as we've discussed many times before is based on an oldest fuel first analysis. The -- one of the sensitivity analyses that I do examines the use of acceptance rights within a company at any reactor that that company owns, and it reduces the number fairly significantly such that with the flexibilities in the system, that number -- the amount of additional storage would approach zero, or could approach zero.

Q. So I just want to be sure.

Your opinion is that under the

analysis you conduct, no utility needs additional at-reactor storage after 1998?

A. That's not what I said.

Q. I'm asking you, is that in fact the case?

A. My calculations in the way that I calculate additional at-reactor storage requirements do show that there would be some amount of additional at-reactor storage.

Looking at exhibit 1, table 3, which is a sensitivity analysis that includes intracompany use of acceptance rights, I calculated 690 metric tons of spent nuclear fuel. That was at maybe a dozen or so nuclear power plants that would require that.

Q. It's 14, actually, isn't it?

MR. SILBERG: Excuse me.

If you could let her finish her answer.

A. That may be. I said approximately.

And the additional storage requirements could be accommodated -- they don't

1998, doing other -- taking other actions prior to 1998 rather than implementing dry storage such as a rerack if possible, and they would be plant-specific.

Q. That's my question.

Have you done any plant-specific analysis to confirm whether a temporary rack was technically feasible for any of those 14 utilities you've identified?

A. No.

Q. Have you made any determination as to whether -- first of all, let me ask you this: Those 14 utilities that have additional storage needs in 1998, do you know of any of those utilities were already impinging upon full core reserve in 1998?

A. I don't recall.

Q. Would that matter?

A. It would, but they could have taken other actions prior to 1998 as I stated earlier. One of the alternatives is to impinge on full core reserve capability. That's not the only

would have been able to exercise.

Q. Correct me if I'm wrong: You've actually testified that even absent any flexibilities being utilized that 1,030 MTUs of additional at-reactor storage is a reasonable amount of additional at-reactor storage.

Correct?

A. I don't think it's unreasonable. It's a calculated amount based on the information that I used in my analysis.

Q. And you believe that that amount is a reasonable amount of additional at-reactor storage.

Correct?

A. The number is what it is. It's based on my analysis.

It's not unreasonable given that it's a small number of plants and a relatively -- again this is a calculated number. It's not necessarily what would have occurred had the industry believed DOE was coming.

Q. Is there a difference between not

unreasonable and reasonable?
You seem very hesitant to tell me that 1030 is reasonable.
A. I know that based on what I know makes up that number in terms of the number of nuclear power plants that -- whose additional requirements are calculated within that number and the amount of storage requirements calculated at those plants that that number is reasonable and could have been accommodated within the flexibilities that existed.
Q. And we've talked about this before I think most recently in perhaps South Carolina that your upper limit of reasonable additional at-reactor storage would be approximately one year's worth of discharge.
Correct?
A. Yes.
Q. Do you know under scenario 3, had the flexibilities been utilized, would there have been more than 2,000 MTUs of additional at-reactor storage?

A. I have not calculated that.

Q. So you don't know?

A. Well, as I stated under scenario 3, even if one were -- this is -- I'll characterize this as a qualitative analysis that I'm doing here as we sit -- that from -- from the period 2005 to 2009, 900 metric tons per year wouldn't have been enough to eliminate even using trading or only those companies who needed requirements would be able to ship their spent fuel.. It wouldn't have been enough to eliminate that.

Q. **But do you know if it would have been enough to get the amount of additional at-reactor storage to 2,000 MTU in total?**

A. I have not calculated that number.

MR. GARDNER: I'm having marked what is going to be exhibit number 14.

(Supko Exhibit No. 14 was marked for identification.)

BY MR. GARDNER:

Q. Ms. Supko, do you recognize what

going to increase, and they've done that for a long time in their analyses.

Q. I'm asking a different question.

My question is, have you done any analysis to determine whether the number you've calculated here, 1,031.5, would have been different had DOE begun performance in 1998?

A. No.

Q. Have you done any analysis to determine of these 14 utilities whether there would have been a cost for any of these utilities to accommodate those additional storage requirements that you've calculated?

A. No, I haven't.

Q. Now, you don't include shutdown utilities in this calculation.

Correct?

A. No.

This is only looking at operating plants.

Q. Do you know what the views are of, say, PG&E and Humboldt Bay with respect to when

expert opinion from the Yankee case?

A. That's correct.

Q. I take it since you don't know Mr. Graves or his analysis, you don't know if his analysis is consistent with yours.

Is that fair to say?

A. That's correct.

I don't know.

Q. If the court in these cases, Judge Lettow, Judge Braden, and Judge Weiss, if those judges conclude that they need to determine what rate the government is contractually obligated to perform at, you can't address that issue.

Correct?

A. I'm not qualified to make a legal conclusion, so I wouldn't be addressing that.

Q. Are you making an affirmative conclusion that scenario 3 is unreasonable?

A. My conclusion is that scenario 1 -- and I'll -- so I don't misquote myself -- which is a 3,000 metric tons per year rate of acceptance, and I'm looking at exhibit one page

transit?

A. Turn-around time.

Q. What else?

A. And using that plus some downtime was able to calculate based on an annual rate of acceptance of 3,000 metric tons approximately how many casks would be needed.

Q. What rampup did you assume for that analysis?

A. It was either -- it was the rampup rate that was in legislation, so it depended upon the legislation.

Q. Do you recall the different rates, the rampup rates?

A. I know that the very first rampup rate was consistent with the 1990 ACR shown in table 4 of exhibit 1. The rest of them I don't recall.

Q. And what was the -- was your analysis -- you say that you did it on NEI; is that correct?

A. Yes.

Q. Was the purpose of that for NEI to demonstrate that 1020 was a good idea?

Is that kind of the purpose behind that?

MR. SILBERG: Objection, calls for speculation.

A. It also included a cost analysis, because part of the discussion was what would the impact on budget be.

MR. GARDNER: Off the record.

(Recess.)

BY MR. GARDNER:

Q. Ms. Supko, now, I want to change gears a bit and talk about exchanges, specifically not intracompany exchanges, but intercompany exchanges.

And I believe that one way utilities could have additional storage requirements after 1998 met was through the use of exchanges.

Correct?

A. Could you repeat that?

Q. Sure.

That one way that utilities -- the numbers you've calculated for additional at-reactor storage after 1998, one way that could be met is through the use of exchanges.

Correct?

A. This is a flexibility in the contract, yes.

Q. Do you think exchanges would cost money?

A. I don't know.

Q. You haven't done any analysis to determine what a potential exchange would cost.

Correct?

A. No.

Q. Do you think they'd be free?

A. I don't know.

Q. Have you ever thought about it?

A. Not in any level of detail.

Q. You've never done any analysis to determine how much a utility would be willing to pay to engage in an exchange.

Is that fair to say?

A. That's correct.
I have not.
Q. Have you done any analysis to determine how exchanges would actually work?
A. Since the current system where the government is not coming now until 2017 or 2018 if we're lucky, it's highly unlikely that anybody would exchange acceptance rights.
Q. Let me be clear: I'm talking about the but-for world and you're running but-for world scenarios.
My question relates to have you conducted any exchanges analysis in these but-for worlds that --
A. I have not.
Q. I presume you'd agree that an analysis could be done to determine what an exchange marketplace would have looked like in the but-for world.
Correct?
A. I suppose so.
Q. Do you believe that you've got the

expertise to develop such an exchanges model?

A. I haven't thought about it.

Q. So you don't know one way or the other?

A. No.

Q. Hypothetical question for you: Let's take Boston Edison. They come to you and say, Ms. Supko, could you model exchange rights across the industry.

Would you be able to do that for them?

A. I don't know if I would be able to do it. I don't know that I would be willing to do it.

Q. Why wouldn't you be willing to do it?

A. There are a lot of variables and factors involved in such an analysis, and I think it would be difficult to try to capture all of those variables and factors.

Q. I'm curious, what do you view as being the different variables and factors that

would go into an exchange analysis?
A. I haven't thought about it.
Q. I had thought previously you had testified and maybe it was the Southern Nuclear trial. Maybe it was SMUD -- I can't remember -- but I recall that in the past you had said you had run an analysis of exchanges; is that correct?
A. I ran analyses of decommissioning shutdown reactor priority in the early 1990s.
Q. Offering -- in other words, taking the OFF queue as it exists but affording priority to the Yankees and SMUDs of the world?
A. Yes.
Q. Then I'm misremembering that you have not engaged in any type of analysis exchanges?
A. I don't recall that I've ever done any.
Q. Based on -- you've read the standard contract many times.
Correct?

A. Yes.

Q. Based on your reading of the standard contract, what is actually being exchanged if you know?

A. I'd have to look at the contract.

Q. Why don't we do that.

For the record, I am going to give you New England states standard contract. I'll represent to you it's my understanding that they should be identical between all 3 sites and in fact all the 103 reactors I suppose.

MR. GARDNER: This will be exhibit 15.

(Supko Exhibit No. 15
was marked for
identification.)

BY MR. GARDNER:

Q. Ms. Supko, I've handed you what's been marked as exhibit 15, which I'll represent to you is the standard contract between Northern States and the United States Department of Energy.

Have you seen the standard contract before?

A. This specific one?

Q. I knew you were going to ask that.

No. More generally.

A. I have seen the standard contract as it's identified in part 961 of title 10 of the United States Code of Federal Regulations.

Q. Okay. Fair enough.

If you could turn to page 12 of the document. It's got a Bates label of COF double 0 21679.

You should see a section there entitled, E exchanges.

Do you see that?

A. Yes.

Q. The second paragraph says: Purchaser shall have the right to exchange approve delivery commitment schedules with parties to other contracts for disposal of SNF or HLW.

Do you see that?

A. Yes.
Q. And is that consistent with your recollection that in fact exchanges would have taken place between approved delivery commitment schedules?
A. Honestly, I haven't thought about it much. That's what the language in the contract says.
Q. But you haven't really thought about exchanges?
A. I haven't analyzed it other than to know that it is a flexibility that does exist.
Q. Do you know -- if we can go back to your spreadsheet, which is exhibit 14, do you know which of these utilities that you've identified as having additional storage requirements have approved DCSs?
A. I don't.
Q. Okay. Ms. Supko, do you have an opinion as to when the market for exchanges would have developed?
MR. SILBERG: Objection, vague and

ambiguous.

We're referring to the but-for world, I assume?

A. I haven't thought about it.

BY MR. GARDNER:

Q. Do you remember in the Southern Nuclear trial Judge Merrill asked you that exact question?

A. I recall he asked me a question about exchanges and whether I thought they would have been possible.

Q. Do you recall giving a time frame for that?

A. I don't.

Q. I assume sitting here today you haven't really given any thought as to the timing of when that market would have developed.

Is that fair to say?

A. Well, if the government had performed in '98 -- and I believe this is what I said to Judge Merow -- if they had performed at a 3,000 metric tons rate of acceptance and if in

fact it appeared that performance was going to continue uninterrupted, the market most likely would have developed.

Q. When?

A. After 1998.

It could have happened before. I have not really thought about it, but there would have been sufficient flexibility in the system to allow exchanges once the rampup rate started increasing.

Q. You do no analysis to determine the timing at which a market would have developed?

A. I have not.

Q. You also recall -- this goes back to the SMUD trial I think -- that you offered testimony that you thought an exchanges market would work similar to a uranium enrichment exchanges market.

Do you recall that?

That was in your written direct testimony.

A. Yes.

The companies have exchanged uranium in its various forms since the mid-1980s. And it works in a fairly seamless way.

Q. When were the uranium enrichment contracts originally signed?

A. Well, there have been a range of them.

Are you talking about the enrichment contracts with the Department of Energy, with USEC, with European --

Q. When you've made the conclusion in your written direct testimony before Judge Braden that you think that exchanges of acceptance rates would work like exchanges of uranium enrichment contracts, to what were you referring?

A. At the time, it was associated with toll enrichment services under Department of Energy contracts. Those no longer exist. Companies still do exchange and borrow material from time to time.

Q. So were you basing your conclusion about the similarities between those 2 markets to

taking that 20 percent from another utility.
Correct?
A. It doesn't make an assumption per se.
It just assumes that those companies who had additional requirements could potentially have requirements that were 20 percent less. I didn't analyze the effect on an annual basis.
Q. You've done no analysis, then, as to what would happen if DOE were to grant a particular utility's request for an additional 20 percent, what impact that would have on other purchasers as that term is used in the standard contract.
Correct?
A. I did not.
Q. It's your understanding that utilities that have approved delivery commitment schedules may adjust their allocations by 20 percent in either direction subject to DOE approval.
Correct?

Q. And then it says: The total systemwide spent fuel arisings are projected to be approximately 86,000 MTUs.

Do you see that?

A. Yes.

Q. Does your analysis in these spent fuel cases assume these same assumptions or make these same assumptions?

A. No.

Q. How have your assumptions changed between, say, this private fuel storage analysis in 2000 and the analysis you're doing for this litigation?

(Pause.)

A. I don't wish to misspeak as to what my current assumptions are, and I don't have them committed to memory, so I'll give you some approximate answers.

BY MR. GARDNER:

Q. Okay.

A. The overall analysis that I've done for the various clients assumes 40-year licenses,

but I've also done the analysis assuming license extension for all plants. And I believe that analysis has been provided to you.

Q. I want to take them one at a time.
The license extension analysis you're not offering that in your actual opinion.
Right?

A. I didn't change my opinion. It doesn't change my opinion. The results are similar.

Q. You don't even provide that analysis in any of your reports.
Correct?

A. It's not in the report, no.
It is a sensitivity to show that my opinion wouldn't change.

Q. So 40-year licenses you still assume that for what I'll call your base case?

A. The overall analysis, yes.

Q. That assumption will stay the same.

A. For the projection, although it doesn't matter for the projection of acceptance

CERTIFICATE OF COURT REPORTER

UNITED STATES OF AMERICA )
DISTRICT OF COLUMBIA )

I, CHERYL A. LORD, the reporter before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was sworn by me; that the testimony of said witness was taken by me in machine shorthand and thereafter transcribed by computer-aided transcription; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially or otherwise interested in the outcome of this action.

Cheryl Lord

CHERYL A. LORD

Notary Public in and for the

District of Columbia

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

--------------------------------------x

SYSTEM FUELS, INC., on its own behalf :
and as agent for SYSTEM ENERGY :
RESOURCES, INC., and SOUTH :NO. 03-2624C
MISSISSIPPI ELECTRIC :
POWER ASSOCIATION, :
Plaintiff, :
vs. :
THE UNITED STATES, :
Defendant. :

--------------------------------------x

Courtroom 5
National Courts Building
715 Madison Place, NW
Washington, D.C.

Thursday, September 21, 2006

VOLUME 4

The parties met, pursuant to the notice of the Judge, at 9:00 a.m.

BEFORE: THE HONORABLE SUSAN G. BRADEN