acceptance, correct?

A. I hadn't discussed it with them, no.

Q. Now, you are not offering an opinion that the 3,000 rate of acceptance would have been utilized by DOE in the nonbreach world, correct?

A. I'm not offering an opinion regarding what DOE would have done.

Q. Now, I believe you indicate this on your written direct, and I am going to put it up in a second, but you have essentially evaluated various acceptance rates to determine how they would impact, I think it is three criteria, correct?

A. Yes.

Q. Okay. Why don't we pull up, and I think we have it electronically, paragraph 16 of that written direct. And I believe you have a copy in front of you, right, Ms. Supko?

A. Yes.

MR. GARDNER: And, Your Honor, do you have a copy of Ms. Supko's report?

THE COURT: You are going to put it up? I will read it off the ELMO.

MR. GARDNER: Okay, that's fine. As

Q. Now, you were not involved in the DOE program in 1983, correct?

A. That's correct.

Q. And you weren't involved in any contract holder's discussions with DOE before the execution of the standard contract?

A. That's correct.

Q. Now, I believe you say in your written direct that you began working at ERI in 1990. Is that right?

A. Yes.

Q. Okay. Now, prior to working at ERI in 1990, you never had any discussions with DOE employees regarding issues related to the standard contract, correct?

A. Prior to 1990, no.

Q. Now -- but you have, in your capacity working at ERI, you have reviewed portions of the administrative record concerning the rulemaking leading up to the standard contract, correct?

A. I have.

Q. Okay. And, in fact, you believe that some utilities may have identified the two key issues during that rulemaking, right?

found that to be strange, but that's your choice so here we are. I thought you were going to argue relevance. Go ahead.

BY MR. GARDNER:

Q. Ms. Supko, I will repeat the last question then. It is fair to say that despite the utilities' request for the inclusion of a rate that would meet the discharge rate plus work out the backlog, TVA's view is that DOE did not accept those comments, correct?

A. That's what the document says.

Q. And, again, that's consistent with your understanding that DOE did not include a rate or any qualitative test on the standard contract, correct?

A. I believe that's what I said earlier.

THE COURT: Counsel, maybe this would be helpful to you and to your colleagues. To the extent I have to get into determining what the acceptance rate is, maybe I can fix some clever way around that.

MR. GARDNER: Then you are more clever than me, Your Honor.

THE COURT: But if I do, I don't intend to rely on Ms. Supko's opinion in that

regard. There is a lot of documents that we have here and that's -- I will make my decision based on those documents. This is nothing to do with your work or anything else like that. I'm sure you have done a very thorough job, but I don't intend to rely on an expert for something like that.

MR. GARDNER: Your Honor, that is precisely the government's point in the motion in limine.

THE COURT: This may shorten your cross substantially. You have my promise on that.

MR. GARDNER: Well, then I guess we are left in a bit of an awkward position, Your Honor, because unless the Court strikes Ms. Supko's testimony, which has already been filed.

THE COURT: I don't have to strike it. I can do --

MR. GARDNER: Then it is in the record, Your Honor.

THE COURT: So what?

MR. GARDNER: Then it is for the Federal Circuit. So unless I explore --

scenarios I modeled. And I would point out that scenario 1 is the scenario that was used by the other experts for Grand Gulf, the Kenrich Group, in modeling damages. Scenarios 2 and 3 are two of the three scenarios that the government's expert, Mr. -

Q. Dr. Hartman?

A. Dr. Hartman used in his expert report. There was a third one that I happened not to have modeled, but this is, if one wanted to look at the effect of the various rates to the industry as a whole, not just to this case, you could look at what I believe Mr. Gardner would put up as another demonstrative later to see the results, that it is label -- one of the tables in my expert report, which I'm sure we will get to later.

Q. We will, Ms. Supko. Now, you believe there is a possibility that rates lower than 3,000 may be reasonable, correct?

A. I have not modeled in my analysis any rates lower than 3,000 that appeared to be reasonable.

Q. But you believe there is a possibility that rates lower than 3,000 may be reasonable,

correct?

A. It is possible.

Q. And you haven't endeavored to determine what the minimum reasonable rate of acceptance is, correct?

A. I have not.

Q. Now, you would equate APPA's request to accept at a rate that's equal to that year's generation rate, plus a reasonable share of the backlog, to be equivalent to a request that the rate result in no additional at-reactor storage after 1998, correct?

A. I'm sorry, can you repeat that?

Q. Sure. You recall we discussed a little bit earlier the APPA?

A. Yes.

Q. Okay. And what the APPA had been requesting to be included in the draft standard contract?

A. Yes.

Q. And you would equate the APPA's request for an accepted rate that's equal to that year's generation rate, plus a reasonable share of the backlog, to be equivalent to a request that the rate result in no additional

at-reactor storage after 1998, correct?

A. Yes.

Q. But you would agree, Ms. Supko, that even under your scenario 1, your 3,000 rate, there are utilities that require additional at-reactor storage after 1998, correct?

A. In my calculation, for scenario 1, using a strict oldest fuel first acceptance priority, I do calculate additional storage requirements. However, using flexibilities in the contract, those numbers could be decreased significantly.

Q. And we will talk about those flexibilities, maybe not today, but we will see how far we get. Now, Ms. Supko, the next demonstrative I have put up here is table 2 of your written direct testimony, which can be found on page 18, correct?

A. Yes.

Q. And when we were talking about the calculations under the different scenarios, the additional storage requirement calculation that you have calculated under scenario 1 results in 1,030 MTUs of additional at-reactor storage, correct?

under your scenario 1, OFF priority will not necessarily meet the needs of individual plant sites to avoid adding dry storage capacity?

A. That's correct. That was recognized even by the Department of Energy at the beginning of the program, that the oldest fuel first acceptance rate in the aggregate may not meet everyone's needs. I believe that was discussed in one of the mission -- draft mission plans in the early 1980s.

Q. And under your scenario 1, in fact, you have calculated that there are 14 utilities that had additional at-reactor storage needs after 1998, correct?

A. I did.

Q. And why don't we take a look at that demonstrative. Ms. Supko, this next demonstrative we're handing up here, I believe it is also referred to as Supko demonstrative 3.

A. Yes.

Q. You recognize this to be an extract from your spreadsheet that calculates additional at-reactor storage under 3,000 rate, correct?

In year one on this chart, if you go down, I don't know, maybe 10 or 12 lines, the U.S. Department of Energy actually has allocations in the queue for 29.5 metric tons in year one under this scenario.

Because they took title to some commercial spent nuclear fuel. And so they get allocations in the queue. And that fuel is being stored at Idaho National Engineering Lab and some other national laboratories. You know, could those allocations, could DOE possibly have traded them? I don't know. But that's the type of thing.

Obviously, they wouldn't have needed additional storage capacity at those sites.

BY MR. GARDNER:

Q. Ms. Supko, you talked about the flexibility for exchanges being a possibility, but, again, you don't know how much the amount of additional at-reactor storage would have decreased had utilities engaged in exchanges, correct?

A. I have not modeled that.

Q. And you haven't done any analysis to determine what a potential exchange would cost,

correct?

A. I have not. I have not done that either, no.

Q. You have never done any analysis to determine how much a utility would be willing to pay to engage in an exchange, correct?

A. Let me think. No, I don't believe I have looked at that.

Q. And you have not conducted any analysis to determine the timing of when an exchange's market really developed in the but-for world, correct?

A. I haven't, but I believe I did offer a response to a question from Judge Merrow in the Southern Nuclear trial regarding that issue. And I will repeat more or less what I said, is that by the time the acceptance rate reached 3,000 metric tons or exceeded the annual generation rate, meaning it was more than 2,000 metric tons per year, there would have been significant flexibility that may have allowed trading.

Q. So you think after the ramp-up period is when the exchanges market could have taken place?

A. What the contract -- excuse me. What the contract says is that the purchaser shall have the right to adjust the quantities of SNF and/or high level waste, plus or minus 20 percent, and the delivery schedules up to two months until submission of the final delivery schedule.

Q. And you understand that that adjustment of the amount and timing relate to the amounts contained in the delivery commitment schedule, correct?

A. Yes.

Q. Okay. Now, going back to Supko demonstrative 3 one more time here, of the 14 utilities you have identified as having additional storage requirements after 1998, you do not know which one of these utilities have acceptance rights in 1998, correct?

A. I didn't analyze it. It would be very easy to determine by looking at the information in my model which ones did or did not.

Q. Yeah. But that wasn't part of your analysis in this case, correct?

A. It was not.

Q. Now, you have not done any analysis to

CERTIFICATE OF REPORTER

DOCKET NO.: 03-2624C

CASE TITLE: System Fuels, Inc.

HEARING DATE: September 21, 2006

LOCATION: Washington, D.C.

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Federal Claims.

Date: September 21, 2006

Karen Brynteson, FAPR, RMR, CRR
Official Reporter
Heritage Reporting Corporation
Suite 600
1220 L Street, N.W.
Washington, D.C. 20005-4019

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-------------------------------------x

SYSTEM FUELS, INC., on its own behalf :
and as agent for SYSTEM ENERGY :
RESOURCES, INC., and SOUTH : No. 03-2624C
MISSISSIPPI ELECTRIC :
POWER ASSOCIATION, :
Plaintiff, :
vs. :
THE UNITED STATES, :
Defendant. :

-------------------------------------x

Courtroom 5
National Courts Building
717 Madison Place NW
Washington, D.C.

Friday, September 22, 2006

VOLUME 5

The parties met, pursuant to the notice of the Judge at 9:06 a.m.

BEFORE THE HONORABLE SUSAN G. BRADEN

APPEARANCES:

ON BEHALF OF PLAINTIFF:

ALEX D. TOMASZCZUK, ESQ.
JACK Y. CHU, ESQ.
Pillsbury Winthrop Shaw Pittman
1650 Tysons Boulevard
14th Floor
McLean, Virginia 22102
(703) 770-7674

and

JAY E. SILBERG, ESQ.
Pillsbury Winthrop Shaw Pittman
2300 N Street, NW
Washington, D.C. 20037
(202) 663-8000

and

L. JAGER SMITH, JR., ESQ.
Wise Carter Child & Caraway, P.A.
600 Heritage Building
401 East Capitol Street
Jackson, Mississippi 39201
(601) 968-5500

APPEARANCES (Continued:)

ON BEHALF OF THE DEFENDANT:

SHARON A. SNYDER, ESQ.
ALAN J. LO RE, ESQ.
STEPHEN FINN, ESQ.
SCOTT DAMELIN, ESQ.
JOSHUA E. GARDNER, ESQ.
JOHN EKMAN, ESQ.
U.S. Department of Justice
1100 L Street, NW
Washington, D.C. 20036

***Index appears at end of transcript***

company-by-company and determined what it is that in 1998, say, Entergy would have done with respect to swapping its allocations between it plants?

A. I didn't, between the oldest fuel first analysis that I've done, which we see the results of in scenario one, and the sensitivity for intrautility trading, you cover all, the whole range.

Q. Now, you're aware that there are some plants that are owned by multiple entities, correct?

A. Yes.

Q. For example, Southern Company has co-owners of particular plants, correct?

A. That sounds right.

Q. And you've never had any discussions with co-owners of a particular plant about their willingness to engage in intrautility exchanges, correct?

A. I would assume that the operating companies would have those discussions if they needed to do it at the time. I would have no reason that I would speak to the co-owners.

Q. So you've not had any discussions with

the co-owners about their willingness to engage in such trading, correct?

A. No.

Q. Now, when you're confirming the reasonableness of the 3,000 rate, one way in which you measure the reasonableness of additional at-reactor storage is by how it compares to one year's worth of discharges, correct?

A. That's one unit of measure you could use. Nuclear operating companies as a whole in the U.S. discharge approximately 2000 metric tons per year.

Q. And that is in fact one of the metrics you use, correct, to determine the reasonableness, is how the number of additional storage requirements compare to the 2000 MTUs, which is one year's worth of discharge, correct?

A. Yes.

Q. Now, going back to table two here, we can put this up, for scenario three, you've calculated the additional storage requirements to be 6200 MTUs, correct?

A. Yes.

Q. And under your sensitivity analysis for intracompany use of acceptance rights, scenario three drops from 6200 MTU to 4980 MTU, correct?

A. Yes.

Q. And in fact, that number for scenario three goes from 4980 MTU to 3980 MTU, if you assumed the use of the plus or minus 20 percent provision, correct?

A. It could be as much as that. It might not be that much.

Q. It could be less?

A. As we discussed yesterday, it would depend on whether or not there were delivery commitment schedule.

Q. That's right. Now, it could be the case that had the flexibilities you identified in the contract been utilized, there could have been 2000 MTUs of additional at-rector storage under scenario three, correct?

A. I have not calculated that number, so I can't answer your question.

Q. You don't know?

A. I don't.

Q. Now, in addition to modelling the

A. Yes.

Q. And System Fuels, the Arkansas case, correct?

A. Yes.

Q. And Boston Edison?

A. Yes.

Q. By my count, that's 13, does that sound right?

A. That sounds correct.

Q. And it's fair to say that with the exception of the Indiana Michigan case and Entergy Northwest, you're offering the same opinion in each of these cases regarding the reasonableness of the 3000 rate, correct?

A. I suppose that's true.

Q. Now, you're modelling a world in which DOE began performance on an industry wide basis beginning in 1998, correct?

A. Yes.

Q. Now, with regard to pool capacities, your model is not always utilizing pool capacities for utilities as they existed in 1998, correct?

A. I believe there are maybe a dozen utilities that I inadvertently used pool

capacities from the 1999, 2000 period. There were a small number that had increased their storage capacity at that time.

Q. For example, let's take Southern Nuclear's plant Hatch. Now, you've included Southern Nuclear's plant Hatch's post 1998 rerack in your model, correct?

A. I was directed by Southern Nuclear to include one of their temporary racks in the analysis, yes.

Q. And that direction in Southern Nuclear, that's maintained in your model to this day, correct?

A. I believe it is. I don't recall. I believe it is. I don't believe I've changed it.

Q. You believe you have not changed it?

A. That's correct.

Q. I just didn't hear you. Now, in addition to the post 1998 Southern's plant Hatch rerack that they actually installed, you also included a second bathtub rack that wasn't installed, correct?

A. That, I don't recall. I would have to look at the numbers.

Q. Let me see if I can refresh your recollection, the transcript I have previously given you for Southern Nuclear, and I want you to read this to yourself. I want to direct you to page 753.

THE COURT: Can we have some lines here?

MR. GARDNER: I was going to wait until Ms. Supko got to the page.

BY MR. GARDNER:

Q. Then I was going to direct you.

A. Okay.

Q. If you look at lines 3 through 6, if you can just look at those and let me know when you're done?

A. Okay.

Q. Does that refresh your recollection, Ms. Supko, in addition to the rerack post 1998, the plant Hatch actually did install, that your model also assumed the second backup rack that wasn't installed?

A. Yes.

Q. And I think you've said this, but I want to make sure I understand, you include about a dozen utilities post 1998 reracks in

any report after that, so anything done in the past year-and-a-half, that delta between the SMUD scenario two and Southern Nuclear scenario two is related to a smaller pool capacity. I believe it was for plant Farley.

Q. So let me see if I understand this because I may have misunderstood you. You're saying 500 delta is related to smaller pool capacity, not for plant Hatch, but for plant Farley?

A. I believe that's correct because if I increased the capacity for plant Hatch, the number would be lower, not higher.

Q. Now, you did not endeavor to determine what the world looked like for every pool, for every plant, as of 1998, correct?

A. I have not gone back and changed my analysis.

Q. And you're relying upon post 1998 pool modifications modelling what you believe the additional at-reactor storage requirements would look like in a 1998 acceptance world, correct?

A. I am, and I believe that these are representative, even using several plants,

their post '98 pool capacity that I believe was representative, the analysis and the results would not change significantly if I changed the pool capacities.

Q. You agree that the amount of at-reactor storage you've calculated would be even greater if you omitted the 2000 plant Hatch rerack from your pool capacity analysis, correct?

A. It would be somewhat greater. It would depend on which scenario one was looking at. It would definitely be greater in scenarios two and three.

Q. In fact, if you did not assume the post 1998 rerack for Southern Nuclear, you would have calculated Southern Nuclear as requiring additional at-reactor storage after 1998, is that correct?

A. That's possible.

Q. And that would take additional utilities with additional at-reactor storage on this demonstrative from 14 to 15, correct?

A. That's possible, but in looking at intrautility use of acceptance rights, they wouldn't necessarily increase those numbers if

they were able to in fact use the rights at different plants.

Q. But that's only after you've done your calculation, correct, because there's two issues, right? You do the calculation to see who has additional storage requirements, and then you determine whether there are flexibilities that could somehow reduce those requirements, correct?

A. No, I do two separate calculations. I calculate additional storage requirements using oldest fuel first priority ranking, which is what we're looking at here, and I calculate additional storage requirements assuming intracompany trading. I can do them in any order. I don't have to know what the results are using oldest fuel first.

Q. I think we're saying the same thing, but based upon a strict oldest fuel first calculation, if you were to calculate pool capacities as of 1998, these 14 that you've calculated, this 1031, you would have to put plant Hatch on there as the 15th utility, correct, or 15th plant?

A. That's possible.

Q. Now, Ms. Supko, is there a difference, do you know, between a pool's licensed capacity and a pool's usable capacity?

A. There may be, not always.

Q. Does your model use licensed capacity or actual usable capacity?

A. I use licensed capacity for the majority of plants. However, for a good, since a good number of the nuclear operating companies are clients of mine, I also have usable capacity for a significant portion of the plants, I have that information.

Q. Now, is it fair to say that a pool's licensed capacity would be greater than a pool's actual capacity?

A. They may be the same.

Q. Are they often the same?

A. They can be.

Q. I know they can be. Are they often the same?

A. I would have to say it would depend on the individual nuclear plant and the pool configuration and what else they're storing in their pool.

Q. And have you done any analysis,

Ms. Supko, to compare all of the utilities' license capacity versus actual capacity?

A. I believe those numbers are typically reported by the operating companies in RW-859, so to the extent that I have that information, I would use it.

Q. And I guess I'm a little confused. You say to the extent you have that information, you use it, but in fact, you said for the majority of the plants, you aren't using it. You're using the license capacity, correct?

A. It would depend. I would use the information as it's reported. In some instances, the reported information may have changed after that, after the fact.

Q. And I guess I'm getting confused, I understand you to be saying that the RW-859 data -- and let's back up so we have a clear record. What is the RW-859 data, Ms. Supko?

A. The RW-859 data is information nuclear operating companies supply to the Department of Energy in accordance with the standard contract. It's supposed to be on an annual basis, but that doesn't happen anymore. I

mean, it includes historical spent fuel discharges and also information regarding the spent nuclear fuel pools and parameters associated with that.

Q. Thank you. Now, and you're using the 2002 RW-859 data, correct?

A. Yes, but I'm using the historical discharges from the RW-859 information and some of the projected information from that. I am not using information, with respect to where the fuel is located, I'm still assuming the location of fuel in 1998 because a significant amount of fuel moved from spent fuel storage pools into dry storage after 1998 because of the government's default.

The pool information also, for the most part, came from 1998, but also from my discussions with nuclear operating company clients.

Q. Let me see if I can break that down a little bit. When you're looking at pool capacities in your model, are you taking that information from the 2002 RW-859s?

A. No.

Q. Where are you taking the pool capacity

information from?

A. It would have originally come from the 1998 RW-859s, some of it between 1998, and I would say 2002, I would have updated, and there were just a few plants that had changes to the pool capacities during that period of time.

Q. Now, the 1998 RW-859 data that you're using to determine pool capacity, I understand you to say that the RW-859 provides both license pool capacity and usable pool capacity, correct?

A. I don't recall if that's the terminology that's used, but there are two numbers sometimes reported. Many times, the two numbers are the same.

Q. And whatever the actual term is, you understand they are conveying the concept of what the plant's licensed to store versus what it can actually store, correct?

A. Yes, and both numbers are actually in my model.

Q. Now, when you're doing your calculation of additional storage requirements, for those utilities who aren't your clients, are you using the licensed pool capacity or the

actual pool capacity?

A. I believe that the model uses the maximum pool capacity, which would be as it's reported.

Q. Now, do you know, let's take Grand Gulf as an example, do you know how their licensed capacity compares to their actual usable capacity?

A. I believe that, and I don't recall the exact number, there may be somewhere between 10 and 30 assemblies difference between the two.

Q. And is that assuming the cell recovery that took place after 1998?

A. I don't recall.

Q. So you don't know?

A. I don't recall the numbers. I have the information.

Q. Now, it's fair to say that on the whole though, the usable capacity will be less than the licensed capacity, correct?

A. It may be. It depends on the plant and the pool configuration.

Q. And do you know, Ms. Supko, if you used actual capacity, rather than licensed capacity, do you know if the additional storage

requirements for the 14 utilities you've listed here, did they go up?
A. I haven't calculated that. In some of those instances, I know I'm using usable capacity, but I haven't calculated it for all of those plants.
Q. And by the way, when we say, "license capacity," again, we're talking maximum license capacity, correct? I believe that's the term you used?
A. I used maximum capacity. Licensed capacity is the capacity that the Nuclear Regulatory Commission has approved.
Q. And, again, that doesn't take into, for example, nonrecoverable cells or unusable cells or boroflex degradation issues, correct?
A. It may.
Q. The license capacity would?
A. In my model, I have two columns, one is maximum, and the other one might be nominal for pool capacity. If I know, from talking to a nuclear operating company that -- and I'll just use a hypothetical number -- their pool capacity is 1,000 cells, that's been approved by the Nuclear Regulatory Commission, but for