**No. 98-484C**
**(Senior Judge Wiese)**

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

NORTHERN STATES POWER COMPANY,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

# DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

HAROLD D. LESTER, JR.
Assistant Director

HEIDE L. HERRMANN
Trial Attorney
Department of Justice
Civil Division
Commercial Litigation Branch
Attn: Classification Unit
1100 L Street, N.W., 8th Floor
Washington, D.C. 20530
Telephone: (202) 305-3315
Facsimile: (202) 307-2503

Attorneys for Defendant

OF COUNSEL:

JANE E. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

ALAN J. LO RE
ANDREW P. AVERBACH
STEPHEN P. FINN
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

October 10, 2006

TABLE OF CONTENTS

Page

DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW . . . . . . . . . . . 1

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I. THE ORIGINAL PROVISIONS OF THE NUCLEAR WASTE POLICY ACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II. THE DEPARTMENT OF ENERGY'S PROMULGATION OF THE "STANDARD CONTRACT FOR DISPOSAL OF SPENT NUCLEAR FUEL AND/OR HIGH-LEVEL RADIOACTIVE WASTE" THROUGH NOTICE AND COMMENT RULEMAKING IN THE FEDERAL REGISTER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

A. The Proposed Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

B. Public Comments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

C. The Final Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

III. NSP'S EXECUTION OF ITS STANDARD CONTRACTS . . . . . . . . . . . . . . . 11

IV. ISSUANCE OF THE MISSION PLAN AND ITS AMENDMENT . . . . . . . . . . 11

V. THE 1987 AMENDMENTS TO THE NUCLEAR WASTE POLICY ACT . . . 13

VI. DOE'S ISSUANCE OF ANNUAL CAPACITY REPORTS . . . . . . . . . . . . . . . 14

A. The 1987 Through 1990 Annual Capacity Reports . . . . . . . . . . . . . . . . . 14

B. The 1991 Annual Capacity Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

C. The 1992 Through 1995 Annual Capacity Reports . . . . . . . . . . . . . . . . . 17

VII. PROGRAM DOCUMENTS REFLECT PLANNED ACCEPTANCE AT AN MRS FACILITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

A. Program Reassessment And 1991 Draft Mission Plan Amendment . . . . 18

B. Preliminary Estimates Of The Total-System Life Cycle Cost For The Restructured Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

VIII. INDUSTRY SUBMISSION OF DELIVERY COMMITMENT SCHEDULES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

IX. NSP DECIDES TO BUILD AND OBTAINS LEGISLATIVE AUTHORIZATION FOR A DRY STORAGE FACILITY . . . . . . . . . . . . . . . . . 22

DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

I. NSP BEARS THE BURDEN OF ESTABLISHING ALL ELEMENTS OF ITS CLAIM, INCLUDING LIABILITY, CAUSATION, FORESEEABILITY, AND REASONABLE CERTAINTY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

A. NSP Has The Burden Of Proving All Elements Of Its Case . . . . . . . . . . 25

B. NSP Must Prove That Its Damages Were Directly Caused By The Government's Breach . . . . . . . . . . . . . . . . . . . 26

C. Regardless Of Whether NSP Characterized Its Damages As "Mitigation Costs," NSP Bears The Burden Of Establishing That Its Costs Were Incurred As A Result Of The Breach And Would Not Have Been Incurred In The "But For" World . . . . . . . . . . . 27

D. The Damages Available To NSP For Breach Of Contract Are Limited To Those That Are Foreseeable As The Probable Outcome Of The Breach . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

E. NSP Must Prove Its Damages With Reasonable Certainty . . . . . . . . . . . 32

F. After Establishing The Legal And Factual Predicates To Damages, NSP Must Demonstrate That Its Action Mitigated Those Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

II. THE RATE OF ACCEPTANCE TO BE APPLIED TO THE STANDARD CONTRACT IS IRRELEVANT FOR TH E PURPOSES OF DETERMINING CAUSATION AND DAMAGES THROUGH 2004 . . . . . . . . . . . . . . . . . . . . . . . 34

III. TO THE EXTENT THAT THE COURT DETERMINES THAT THE RATE OF ACCEPTANCE SHOULD BE DEFINED IN THIS LITIGATION, REGARDLESS OF ITS EFFECT UPON DAMAGES, NSP CANNOT MEET ITS BURDEN OF PROVING THAT DOE WAS OBLIGATED TO ACCEPT SNF AT AN ANNUAL RATE OF 3,000 MTU . . . . . . . . . . . . . . . . . . . . . . . . 35

A. NSP Cannot Establish That DOE Was Obligated To Accept SNF At A Rate Sufficient To Preclude The Need For Additional At-Reactor Storage And Some "Backlog" Of Utility-Stored SNF . . . . . 35

B. NSP Cannot Rely Upon Program Planning Documents To Establish The Government's Obligation To Accept SNF At An Annual Rate Of 3,000 MTU . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

C. DOE's Acceptance Obligations Should Be Determined Pursuant To The Schedule Mechanism In The Contract . . . . . . . . . . . . . . . . . . . . 43

1. The Acceptance Schedule Was Established In The Dealings Between The Parties . . . . . . . . . . . . . . . . . . . . . . . . . . 43

2. Some Of The Decisions Issued Concerning The Rate Of Acceptance Incorrectly Analyze The Standard Contract Schedule Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

IV. NSP CANNOT ESTABLISH THE NECESSARY CAUSAL LINK BETWEEN CERTAIN OF ITS CLAIMED DAMAGES AND DOE'S DELAY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

A. NSP Would Have Built A Dry Storage Facility Regardless Of DOE's Delay In Accepting SNF . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

B. The Damages Sought By NSP For Costs Resulting From State Legislative Mandates are Unforeseeable, Consequential Damages, Unrecoverable As A Matter Of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

C. NSP's Investment In The Private Fuel Storage Venture Was Unforeseeable As A Matter Of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

D. NSP Is Precluded As A Matter Of Law From Recovering Any Of Its Claimed Costs Prior To 1994 . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

E. NSP's Claim For The Cost Of Capital Is A Legally Unsupported Attempt To Recover Prejudgment Interest . . . . . . . . . . . . . . . . . . . . . . . . 57

F. NSP Cannot Establish Causation For Certain Costs It Allegedly Incurred For Internal Labor And "Overheads" . . . . . . . . . . . . . . . . . . . . . 58

G. Additional Adjustments Must Be Made To NSP's Claim . . . . . . . . . . . . 60

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

## TABLE OF AUTHORITIES

### CASES

AES Tech. Sys., Inc. v. Coherent Radiation,
583 F.2d 933 (7th Cir. 1978) . . . . . . . . . . 59

Alaska Pulp Corp. v. United States,
59 Fed. Cl. 400 (2004) . . . . . . . . . . 25, 26

Autotrol Corp. v. Cont'l Water Sys. Corp.,
918 F.2d 689 (7th Cir. 1990) . . . . . . . . . . 59

Aviation Contractor Employees, Inc. v. United States,
945 F.2d 1568 (Fed. Cir. 1991) . . . . . . . . . . 51

Barrow Utils. & Elec. Co. v. United States,
20 Cl. Ct. 113 (1990) . . . . . . . . . . 33

Bel Pre Health Care Center, Inc. v. United States,
24 Cl. Ct. 495 (1991), aff'd,
980 F.2d 745 (Fed. Cir. 1992) (table) . . . . . . . . . . 49

Bell v. United States,
404 F.2d 975 (Ct. Cl. 1968) . . . . . . . . . . 57

Bluebonnet Sav. Bank, F.S.B. v. United States,
339 F.3d 1341 (Fed. Cir. 2003) . . . . . . . . . . 26, 29

Bluebonnet Savings Bank, FSB v. United States,
67 Fed. Cl. 231 (Fed. Cl.),
appeal docketed, No. 06-5024 (Fed. Cir. Nov. 10, 2005) . . . . . . . . . . 28

Bohac v. Department of Agric.,
239 F.3d 1334 (Fed. Cir. 2001) . . . . . . . . . . 31

Boyajian v. United States,
423 F.2d 1231 (Ct. Cl. 1970) . . . . . . . . . . 58

Branhill Realty Co. v. Montgomery Ward & Co.,
60 F.2d 922 (2d Cir. 1932) . . . . . . . . . . 42

California Fed. Bank v. United States,
395 F.3d 1263 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

City of Tacoma, Dep't of Public Utilities v. United States,
31 F.3d 1130 (Fed. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Commercial Metals Co. v. United States,
176 Ct. Cl. 343 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Commonwealth Edison Co. v. United States,
56 Fed. Cl. 652 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46, 48

Coyle's Pest Control, Inc. v. Cuomo,
154 F.3d 1302 (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

David Nassif Assocs. v. United States,
214 Ct. Cl. 407,
557 F.2d 249 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49, 50

Department of Energy v. Westland,
565 F.2d 685 (CCPA 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

DPJ Co. v. FDIC,
30 F.3d 247 (1st Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Fawick Corp. v. United States,
149 Ct. Cl. 623 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Fraas Surgical Mfg. Co. v. United States,
215 Ct. Cl. 820,
571 F.2d 34 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Glendale Fed. bank, FSB v. United States,
239 F.3d 1374 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Honeywell, Inc. v. United States,
228 Ct. Cl. 591,
661 F.2d 182 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

In re Independent Spent Fuel Storage Installation,
501 N.W.2d 638 (Minn. Ct. App. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Indiana Michigan Power Co. v. Department of Energy,
88 F.3d 1272 (D.C. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Indiana Michigan Power Co. v. United States,
57 Fed. Cl. 88 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 48

Indiana Michigan Power Co. v. United States,
422 F.3d 1369 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

J.D. Hedin Const. Co. v. United States,
456 F. 2d 1315 (Ct. Cl. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Jetco, Inc. v. United States,
11 Cl. Ct. 837 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Julius Goldman's Egg City v. United States,
697 F.2d 1051 (Fed. Cir. 1983), cert. denied,
464 U.S. 814 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Koby v. United States,
54 Fed. Cl. 493 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

LaSalle Talman Bank, F.S.B. v. United States,
45 Fed. Cl. 64 (1999) , rev'd on other grounds,
317 F.3d 1363 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Landmark Land Co. v. Federal Deposit Insur. Corp.,
256 F.3d 1365 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Maine Yankee Atomic Power Co. v. United States,
225 F.3d 1336 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Massachusetts Bay Transp. Auth. v. United States,
129 F.3d 1226 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Massengill v. Guardian Mgt. Co.,
19 F.3d 196 (5th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Mays v. Trump Indiana, Inc.,
255 F.3d 351 (7th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

McAbee Constr, Inc. v. United States,
97 F.3d 1431 (Fed. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

McDonnell Douglas Corp., ASBCA No. 26747,

83-1 BCA ¶ 16,377 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Modern Sys. Tech. Corp. v. United States,
979 F.2d 200 (Fed. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Myerle v. United States,
33 Ct. Cl. 1,
1800 WL 2024 (1897) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 32

National By-Products, Inc. v. United States,
186 Ct. Cl. 546,
405 F.2d 1256 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Nebraska Public Power District v. United States,
No. 01-116C (Fed. Cl.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Neeley v. Bankers Trust Co. of Tex.,
757 F.2d 621 (5th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Northern Helex,
207 Ct. Cl. 682,
524 F.2d at 713 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 33

Northern States Power Co. v. United States,
128 F.3d 754 (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Omni Corp. v. United States,
41 Fed. Cl. 585 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

PSEG Nuclear, LLC v. United States,
No. 05-5162 (Fed. Cir.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Prudential Ins. Co. v. United States,
801 F.2d 1295 (Fed. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Ramsey v. United States,
101 F. Supp. 353 (Ct. Cl. 1951) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Rapid City Indian Health Advisory Bd. of Directors, ASBCA No. 26641,
83-1 BCA ¶ 16,311 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Ridge Runner Forestry v. Veneman,
28 F.3d 1058 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Robinson v. United States,
305 F.3d 1330 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Roseburg Lumber Co. v. Madigan,
978 F.2d 660 (Fed. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 32

SAB Constr., Inc. v. United States,
66 Fed. Cl. 77 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

S.W. Eng'g Co. v. Cajun Elec. Power Coop.,
915 F.2d 972 (5th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

Saddler v. United States,
287 F.2d 411 (Ct. Cl. 1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

San Carlos Irrig. & Drainage Dist. v. United States,
877 F.2d 957 (Fed. Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

San Carlos Irrigation & Drainage Dist. v. United States,
111 F.3d 1557 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Selman v. United States,
204 Ct. Cl. 675,
498 F.2d 1354 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Shann v. Dunk,
84 F.3d 73 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Sylvania Elec. Prods., Inc. v. United States,
198 Ct. Cl. 106,
458 F.2d 994 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Tennessee Valley Authority v. United States,
69 Fed. Cl. 515 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Thomas W. Yoder Co., VABCA No. 997,
74-1 BCA ¶ 10,424 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Transamerica Equip. Leasing Corp. v. Union Bank,
426 F.2d 273 (9th Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

United States Fidelity & Guaranty Co. v. United States,
230 Ct. Cl. 355,
676 F.2d 622 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

United States Steel Corp. v. United States,
618 F. Supp. 496 (CIT 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Wells Fargo Bank, N.A. v. United States,
88 F.3d 1012 (Fed. Cir. 1996) . . . . . . . . . . 31, 32

White v. Delta Constr. Int'l. Inc.,
285 F.3d 1040 (Fed. Cir. 2002) . . . . . . . . . . 26

Wickham Contracting Co. v. United States,
12 F.3d 1574 (1994) . . . . . . . . . . 57

Willems Indus., Inc. v. United States,
155 Ct. Cl. 360,
295 F.2d 822 (1961) . . . . . . . . . . 25

Willred Co. v. Westmoreland Metal Mfg. Co.,
200 F. Supp. 59 (E.D. Pa. 1961) . . . . . . . . . . 59

Wilner v. United States,
23 Cl. Ct. 241 (1991) . . . . . . . . . . 58

Wilson v. Marquette Elecs., Inc.,
630 F.2d 575 (8th Cir. 1980) . . . . . . . . . . 59

Yankee Atomic Electric Co. v. United States,
No. 98-126C (Merow, S.J.) . . . . . . . . . . 51

**STATUTES**

28 U.S.C. § 2516(a) . . . . . . . . . . 57

42 U.S.D. § 10101 (1982) . . . . . . . . . . 4, 5

42 U.S.C. §§ 10132, 10134, 10135 . . . . . . . . . . 5

42 U.S.C. §§ 10133, 10161-69 . . . . . . . . . . 41

42 U.S.C. § 10139 . . . . . . . . . . 4

42 U.S.C. § 10161(b)-(c) (1982) . . . . . . . . . . 12

42 U.S.C. § 10162(b) . . . . . . . . . . 13

42 U.S.C. § 10168(d)(1) . . . . . . . . . . 14, 45

42 U.S.C. § 10172(a) . . . . . . . . . . 13

42 U.S.C. § 10221 . . . . . . . . . . 11, 40

42 U.S.C. § 10222(a)(1) (1982) . . . . . . . . . . 5

42 U.S.C. § 10222(a)(2) . . . . . . . . . . 20

42 U.S.C. § 10242(a) . . . . . . . . . . 14

28 U.S.C. § 2516(a) (1976) . . . . . . . . . . 57

10 C.F.R. § 961.11 . . . . . . . . . . passim

48 Fed. Reg. 16590 (Apr. 18, 1983) . . . . . . . . . . 9, 37, 39

48 Fed. Reg. 5458 (Feb. 4, 1983) . . . . . . . . . . 6, 7, 8, 9, 37

Minn. Stat. § 116C.83 . . . . . . . . . . 24

On January 7, 1983, the Nuclear Waste Policy Act of 1982 ("NWPA"),
Pub. L. 97-425, 96 Stat. 2201 . . . . . . . . . . 4, 5

S. Rep. No. 100-152 . . . . . . . . . . 13

**MISCELLANEOUS**

Restatement (Second) of Contracts § 211 (1981) . . . . . . . . . . 38

Restatement (Second) of Contracts § 344(a) (1981) . . . . . . . . . . 28

Restatement (Second) of Contracts § 350, cmt. b . . . . . . . . . . 33

Restatement (Second) of Contracts § 351, cmt. a . . . . . . . . . . 31

Restatement (Second) of Contracts § 352 cmt. a . . . . . . . . . . 32

Am. Jur. 2d *Damages* § 416 (2004) . . . . . . . . . . 59

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

NORTHERN STATES POWER COMPANY,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

No. 98-484C
(Senior Judge Wiese)

DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

Pursuant to this Court's order dated September 14, 2005, defendant, the United States, respectfully submits the following memorandum of contentions of fact and law.

SUMMARY OF ARGUMENT

This case involves a damages claim by plaintiff, Northern States Power Company ("NSP"), for approximately $172 million in costs that it allegedly has incurred through December 31, 2004, at its Prairie Island and Monticello nuclear power plants, associated with the storage of spent nuclear fuel ("SNF"). NSP's claim includes costs for, among other things, the design, licensing, and fabrication of a dry storage facility at the Prairie Island nuclear plant. NSP also seeks damages for various actions that it was required to take by the Minnesota legislature, and for amounts paid in the 1990s for the yet-to-be-constructed Private Fuel Storage ("PFS") facility in Utah. NSP contends that the Government is liable for all of these costs because the need for additional storage was caused by the Government's failure to begin accepting SNF from commercial nuclear reactors on January 31, 1998, pursuant to the "Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste" ("Standard Contract") between the Department of Energy ("DOE") and NSP.

At trial, NSP bears the burden of proving that its damages were foreseeable, were caused by DOE's partial breach, and are reasonably certain. As part of that legal obligation, NSP must establish that it properly has accounted for costs that would have been incurred had DOE performed beginning in 1998. NSP also must show that its actions were actually intended to mitigate its damages. This legal burden is real, and NSP must do more at trial than simply identify costs that it has incurred in connection with the storage of SNF and shift to the Government the burden of disproving foreseeability, causation, and reasonable certainty. NSP apparently intends to characterize all of its claimed costs as "mitigation efforts" in an attempt to place the burden on the Government to disprove their reasonableness, without ever establishing as an initial matter that the need for these efforts was actually caused by DOE's delay and would not have been necessary in the "but for" world. It has no basis for avoiding its own need to meet its own burden of proof.

NSP's claim requires significant adjustment based upon NSP's inability to establish its burden of proof. First, NSP cannot establish causation for many of its claimed costs. The vast majority of NSP's damages are based upon the assertion that, but for DOE's delay in acceptance of SNF, NSP would not have had to build a dry storage facility. However, the evidence will show that NSP would have had to build its dry storage facility regardless of DOE's breach.

Second, NSP cannot recover costs that were not foreseeable at the time of contracting. These costs include those associated with various requirements imposed upon NSP by the Minnesota legislature. Indeed, at the time of contracting, the Government had no reason to know that the Minnesota legislature would even be involved in NSP's operational decisions with regard to the storage of its SNF. Certainly DOE could not have foreseen that the legislature

would impose upon NSP millions of dollars of mandated payments, for which NSP would ultimately seek reimbursement from the Government.

Likewise, NSP's attempt to recover amounts paid in connection with the Private Fuel Storage ("PFS") facility in Utah is flawed because the PFS venture was not foreseeable at the time of contract formation and did not constitute reasonable mitigation. These costs were for a highly speculative venture that had little chance – applying foresight at the time that the decision to invest in PFS was made – of providing NSP with an appropriate or available alternative option for the storage of SNF. See Indiana Michigan Power Co. v. United States, 422 F.3d 1369, 1376 (Fed. Cir. 2005) (affirming this Court's finding that amounts paid to PFS did not constitute reasonable mitigation because the investment was speculative and the cost unforeseeable).

Although NSP may be entitled to compensation for certain costs associated with the storage of SNF that it incurred after 1998, the trial evidence will show that its damages claim is grossly in excess of the costs that it actually incurred as a result of DOE's partial breach of the Standard Contract. NSP must be held to its burden of proof so that only foreseeable damages, directly caused by the Government's breach, are included in the amount of damages recovered.[1]

---

[1] As the Court is aware, the DOE contracting officer, in 1997, made a preliminary determination that DOE's delay was unavoidable under the "Unavoidable Delays" clause of the Standard Contract. That provision states that "[n]either the Government nor Purchaser shall be liable under this contract for damages caused by failure to perform its obligations hereunder, if such failure arises out of causes beyond the control and without the fault or negligence of the party failing to perform." 10 C.F.R. § 961.11, Art. IX.A (emphasis added). Included in the excusable bases for a failure to perform are delays in the scheduled delivery, acceptance, or transport of SNF arising out of causes beyond the "reasonable control of . . . [the Department of Energy ('DOE')]," including "acts of Government in either its sovereign or contractual capacity:" Id. The United States Court of Appeals for the Federal Circuit has held that DOE's delay in accepting spent nuclear fuel constitutes a "[f]ailure to perform." Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336, 1343 (Fed. Cir. 2000). Nevertheless, following the contracting officer's issuance of her preliminary determination, the United States Court of

## STATEMENT OF FACTS

### I. THE ORIGINAL PROVISIONS OF THE NUCLEAR WASTE POLICY ACT

On January 7, 1983, the Nuclear Waste Policy Act of 1982 ("NWPA"), Pub. L. 97-425, 96 Stat. 2201 (codified at 42 U.S.C. §§ 10101-10270 (1982)), was enacted. In its statement of the statutory purposes underlying the NWPA, Congress identified the following four objectives: developing repositories to ensure the protection of the public and the environment from the hazards posed by SNF and high level radioactive waste ("HLW"); establishing Federal

---

Appeals for the District of Columbia Circuit issued a writ of mandamus, ordering DOE "to proceed with contractual remedies in a manner consistent with NWPA's command that it undertake an unconditional obligation to begin disposal of the SNF by January 31, 1998." Northern States Power Co. v. United States, 128 F.3d 754, 760 (D.C. Cir. 1997). The D.C. Circuit, after barring "DOE from concluding that its delay is unavoidable on the ground that it has not yet prepared a permanent repository or that it has no authority to provide storage in the interim," held that the "Unavoidable Delays" clause, "insofar as it is applied to DOE's failure to perform by 1998, is inconsistent with DOE's statutory obligation to assume an unconditional duty" and issued its writ to preclude DOE from relying upon that provision. Id. at 760-61.

We have consistently argued, most recently in briefing before the Federal Circuit in PSEG Nuclear, LLC v. United States, No. 05-5162 (Fed. Cir.),and this Court in Nebraska Public Power District v. United States, No. 01-116C (Fed. Cl.), that the D.C. Circuit overstepped its jurisdiction and authority in issuing this writ of mandamus (given that the judicial review provision of the NWPA, 42 U.S.C. § 10139, does not permit the D.C. Circuit to review contract administration matters) and, further, that the "Unavoidable Delays" clause in the Standard Contract was wholly appropriate and legal. The D.C. Circuit has eliminated one of the central provisions of the Standard Contract that governs the parties' liability in the event of delays in SNF acceptance. With this clause, DOE would have had the ability to present an absolute defense to liability in this case. The effect of the D.C. Circuit's elimination of at least a portion of this contract clause from the Standard Contract, 14 years after the contract was entered, has a staggering effect upon the United States: rather than excusing DOE's liability for the course of the unavoidable delay, DOE now faces billions of dollars in damages claims. The writ of mandamus wholly changes the nature of the Standard Contract, essentially and inappropriately creating a contract (one without an "Unavoidable Delays" clause) between the parties to which DOE never agreed, further bringing into question the appropriateness of a liability finding here. Nevertheless, because the D.C. Circuit's writ of mandamus is continuing, we are currently barred from attempting to invoke the "Unavoidable Delays" clause.

responsibility and policy for the disposal of SNF and HLW; defining the relationship between the Federal Government and state governments regarding SNF and HLW disposal; and establishing a Nuclear Waste Fund, financed by the utilities, to pay for the costs of the DOE program. Id. § 10131(b).

The NWPA defines a specific process by which the Secretary of Energy, the President of the United States, and the United States Congress would determine a site for a repository for the permanent deep geologic disposal of SNF. See 42 U.S.C. §§ 10132, 10134, 10135. Congress also included in the NWPA provisions allowing the Secretary to study the possibility of creating Monitored Retrievable Storage ("MRS") facilities, with Congress finding that "long-term storage of high-level radioactive waste or spent nuclear fuel in monitored retrievable storage facilities is an option for providing safe and reliable management of such waste or spent fuel." 42 U.S.C. § 10161(a)(1) (1982).[2]

In addition, the NWPA authorized the Secretary to enter into contracts with the owners and generators of SNF of domestic origin for "the acceptance of title, subsequent transportation, and disposal of such [SNF]." 42 U.S.C. § 10222(a)(1) (1982). The contracts had to "provide for payment to the Secretary of fees . . . sufficient to offset expenditures" described elsewhere in the statute. Id.

[2] By July 1, 1985, the Secretary was to "complete a detailed study of the need for and feasibility of, and shall submit to the Congress a proposal for, the construction of one or more monitored retrievable storage facilities for high-level radioactive waste and spent nuclear fuel." Id. § 10161(b)(1).

## II. THE DEPARTMENT OF ENERGY'S PROMULGATION OF THE "STANDARD CONTRACT FOR DISPOSAL OF SPENT NUCLEAR FUEL AND/OR HIGH-LEVEL RADIOACTIVE WASTE" THROUGH NOTICE AND COMMENT RULEMAKING IN THE FEDERAL REGISTER

### A. The Proposed Rule

On February 4, 1983, the Department of Energy ("DOE"), in furtherance of its obligations under the NWPA, published a notice of proposed rulemaking in the Federal Register, proposing terms for the Standard Contract. See 48 Fed. Reg. 5458 (Feb. 4, 1983). The proposed Standard Contract provided a mechanism for determining the order in which, and the rate at which, the contract holders' SNF would be accepted. As for the order of SNF acceptance, the Standard Contract proposed that DOE would issue an "acceptance priority ranking" ("APR") of SNF and/or HLW, through which SNF and/or HLW would receive acceptance priority based generally upon its age. Id. at 5464 (Art. VI.B.3). Although the proposed Standard Contract did not identify a specific rate by which DOE would accept contract holders' SNF, it provided for DOE's issuance of documents for planning purposes to assist in the eventual definitization of the specific rate and order of SNF acceptance and disposal. Id. at 5463 (Art. V.B.5 & Art. V.B.6). The proposed contract further provided that, following DOE's issuance of planning documents, rates of SNF acceptance, as well as the specific order of SNF acceptance from particular contract holders, would be defined through the contract holders' submission, and DOE's approval, of delivery commitment schedules ("DCSs"). Id. at 5462. The proposed Standard Contract also provided for the contract holders' submission of Final Delivery Schedules ("FDSs"), which would take the annual allocation defined in an approved DCS and refine it to reflect as closely as possible the month(s) and day(s) upon which acceptance of particular SNF would occur. Id. at 5463 (Art. IV.C). The term "DOE facility" in the proposed Standard Contract referred to a

permanent repository for disposal of the SNF and/or HLW. Id. at 5462 (Art. I.11). The proposed rule provided for written comments to be submitted by March 7, 1983. Id. at 5458.

B. Public Comments

DOE received numerous comments in response to the proposed rule. A number of the comments recognized that the Standard Contract did not establish a specific rate at which DOE must accept SNF, and sought to have such a rate included. The Edison Electric Institute ("EEI"), an association of the nuclear power industry to which NSP belonged, requested as follows:

> The contract should include a recognition that DOE will design its facilities with the capacity to receive SNF/HLW at a rate commensurate with the amount of SNF/HLW then being generated together with the accumulated backlog of SNF/HLW. We believe that DOE should be able to take delivery of SNF/HLW equal to that year's generation plus a reasonable share of the backlog. While the contract may not be the appropriate place to commit DOE to a specific numerical receiving rate, DOE should recognize, at least qualitatively, the need to have adequate annual receiving capacity to handle industry needs.

DX 2.34, Attachment A at 2 (ARC0010334).

Other utilities submitted similar comments seeking firm commitments regarding the rate of SNF acceptance. For example, Tennessee Valley Authority ("TVA") submitted a comment, stating that "a commitment to do no more than start accepting deliveries by 1998 is empty and meaningless without setting forth some reasonable minimum rate of acceptance which corresponds to the purposes of the Act." DX 2.63 at 5 (ARC0010537). Although TVA recognized that, "under the priority ranking system in the draft contract, it would be difficult at the time contracts are executed to give each Purchaser assurances of delivery acceptance at any specific rate," it suggested that "[t]his could, however, be done on an industry wide basis." Id.

TVA suggested that DOE add a contract provision to provide that "DOE shall start accepting delivery of SNF or HLW not later than January 31, 1998, at not less than the annual rate [at which] SNF and/or HLW is then being produced from civilian nuclear power plants covered by contracts . . . ." Id. DOE also received comments seeking a commitment for DOE to accept SNF at the rates set forth in the Mission Plan that DOE was to prepare in accordance with statutory requirements for ultimate submission to Congress, for its review and consideration. For instance, Florida Power & Light Company, expressly stated that DOE should create a mandatory obligation that would require DOE to accept SNF and HLW at the rates identified in the Mission Plan, once that plan was approved by Congress. DX 2.43, attachment 1 at 1 (ARC0010439).

NSP submitted its comments to DOE on March 3, 1983. DX 2.12. Like many other utilities, NSP endorsed EEI's comments upon the draft Standard Contract.

EEI also suggested that "[t]he definition of 'DOE Facility' (Article I.11) should be broadened to include destinations other than the repository." DX. 2.34, Attachment A at 4 (ARC0010336). EEI stated that "[t]he contract does not recognize the possibility that DOE might send SNF/HLW to an intermediate location (such as a monitored retrievable storage facility) before it goes to a repository" and, "[t]o accommodate this, the definition of 'DOE Facility' should be broadened." Id. at 5 (ARC0010337); see DX 2.14 (ARC0010180) (change to contract language "would implicitly recognize DOE's option to reprocess SNF or to utilize Monitored Retrievable Storage prior to permanent disposal"); DX 2.69 (ARC0010625) ("[t]his change would recognize the possibility of DOE shipping SNF/HLW to an intermediate storage facility such as a monitored retrievable storage facility").

C. The Final Rule

On April 18, 1983, DOE issued the Standard Contract as a final rule. The final rule, as promulgated, made certain modifications to the Standard Contract as set forth in the proposed rule. Although the proposed rule provided that "services provided to the Purchaser by DOE under this contract are related to disposal of SNF," 48 Fed. Reg. at 5462, that "disposal" was defined as emplacement in a permanent repository, id., and that such "disposal" services would begin by January 31, 1998, id., the final Standard Contract eliminated any requirement for DOE to begin SNF "disposal" in a permanent repository by January 31, 1998. Instead, the final Standard Contract only required DOE to begin SNF acceptance by January 31, 1998, after the commencement of "facility" operations. 10 C.F.R. § 961.11, Art. II. The "facility" to which the final Standard Contract refers is either a permanent repository to be constructed pursuant to the NWPA or such other facility to which SNF might be shipped by DOE prior to its transportation to a permanent repository. Id. § 961.11, Art. I.10. As the preamble to the final rule expressly recognized, the final Standard Contract would not obligate DOE to have an operational permanent repository by January 31, 1998:

> The definition of "DOE facility" (Article I.10) was expanded to expressly state, in accordance with the Act, that there may be an interim storage facility (or facilities) which DOE may utilize prior to emplacement in a repository.

48 Fed. Reg. 16590, 16591 (Apr. 18, 1983).

DOE did not adopt the suggestion of EEI and many of the utilities to incorporate into the contract a requirement that DOE accept SNF at a rate equal to the annual generation rate plus some additional amount to reduce the accumulated backlog. The Government will show at trial that DOE determined it could not obligate itself to satisfy such a commitment because the

number of uncertainties concerning the development of the program, the development of the contemplated disposal facilities, and the potential capabilities for accepting SNF that could be developed by 1998. Accordingly, DOE specifically declined to create any commitment to accept SNF beginning in 1998 at a specific minimum rate or based upon any mandatory minimum criteria. Instead, the contract provided that the acceptance rate would be developed later through the promulgation of the 1991 ACR.

The utilities acknowledged that DOE rejected their requests regarding the inclusion of a qualitative description of the acceptance rate in both internal memoranda and correspondence with DOE. For example, TVA noted that its request regarding the acceptance rate term had been rejected:

> DOE did not accept TVA's suggestion that DOE should start accepting delivery of SNF and HLW in 1998 at a rate not less than that which they are being produced by the civilian nuclear power industry as a whole.

DX 32, Attachment 2 at 3 (TV1471) (TVA memorandum, dated May 24, 1983); see also DX 39 at 1 (Yankee Atomic memorandum, dated January 20, 1984). Similarly, in a letter to Robert Morgan of DOE, EEI complained that the Standard Contract as promulgated lacked "standards or milestones for DOE's performance . . . ." DX 34, Attachment 1 at 1 (SN011049).[3] Finally, the Standard Contract contained an integration clause, which precluded reliance upon any representation, promise, or condition not expressly incorporated into the contract:

[3] DOE likewise did not adopt Florida Power & Light Company's request that DOE add a contract clause obligating DOE to accept SNF and/or HLW under "the schedule and capacities detailed in the approved 1984 DOE Mission Plan . . . ." DX 2.43, Attachment 1 at 1 (ARC0010439).

> This contract, which consists of Articles I through XXII and Appendices A through G, annexed hereto and made a part hereof, contains the entire agreement between the parties with respect to the subject matter hereof. Any representation, promise, or condition not incorporated in this contract shall not be binding on either party. No course of dealing or usage of trade or course of performance shall be relevant to explain or supplement any provision contained in this contract.

10 C.F.R. § 961.11, Art. XXII.[4]

## III. NSP'S EXECUTION OF ITS STANDARD CONTRACTS

On June 20, 1983, NSP executed three Standard Contracts with DOE, which covered the SNF generated at the Prairie Island nuclear plant, the SNF generated and stored at the Monticello nuclear plant, and the SNF generated at the Monticello nuclear plant that was subsequently shipped to the General Electric Morris facility. These three Standard Contracts contained essentially the same terms and conditions as the final rule promulgated by DOE on April 14, 1983. See DX 1.

## IV. ISSUANCE OF THE MISSION PLAN AND ITS AMENDMENT

In June 1985, DOE issued and submitted to Congress the Mission Plan, in accordance with the requirements of 42 U.S.C. § 10221, which was to "provide an informational basis sufficient to permit informed decisions to be made in carrying out the repository program and the research, development, and demonstration programs required under this chapter." 42 U.S.C. § 10221(a). In the 1985 Mission Plan, DOE projected for informational purposes that an initial permanent repository would begin operations in 1998 and that a second permanent repository

---

[4] The Standard Contract also included a "Disputes" clause that provided a mandatory administrative mechanism for the resolution of disputes arising under the contract. 10 C.F.R. § 961.11, Art. XVI.A.

would commence operations in 2006. DX 45, Volume 1 at 25-26 (HQR0031129-30). The schedules contained in the Mission Plan projected annual SNF generation rates from utilities nationwide of approximately 3,000 MTU in 1998 and increasing by 2007 to over 4,000 MTU per year. Id.[5] The Mission Plan noted that these schedules were "only an approximation of how the system may operate and is subject to considerable variation. The DOE will further define and specify the system acceptance parameters as the program progresses." DX 45 at 29 (HQR0031133). The Mission Plan further advised:

> Under the terms of the contracts for disposal services that have been signed between the DOE and the utilities, an annual capacity report with projected annual receiving capacities and rankings will be issued by the DOE beginning in 1987. In 1991, the DOE will begin to publish firm waste-acceptance schedules for individual reactors, including shipment allocations.

Id.

In the 1987 Mission Plan Amendment, submitted to Congress in June 1987, DOE recommended deferral of the date contemplated for operation of the first repository from 1998 to 2003, with the second repository becoming operational by 2023. The Mission Plan Amendment reflected DOE's recognition that acceptance beginning in 1998 could not begin at a permanent repository. DOE explained that its recommendation was based upon experience gained in the program, a budget decrease for Fiscal Year 1987, and budget uncertainty for Fiscal Year 1988. However, DOE noted that it could nonetheless begin waste acceptance in 1998 at an MRS facility.[6] DX 53 at 6 (HQR0031634). The 1987 Mission Plan Amendment acknowledged the

---

[5] Today, utilities discharge approximately 2,000 MTU of SNF per year.

[6] The ability to start accepting waste in 1998 at an MRS facility was dependent upon congressional authorization. See 42 U.S.C. § 10161(b)-(c) (1982).

importance of the Annual Capacity Report that would be issued in 1991 – namely, that it would be used as the basis for the DCS process. DX 53 at 60 (HQR0031687).

## V. THE 1987 AMENDMENTS TO THE NUCLEAR WASTE POLICY ACT

On December 22, 1987, after DOE submitted the 1987 Mission Plan Amendment, Congress amended the NWPA "to redirect the program for the management and disposal of spent nuclear fuel and high-level radioactive waste under the [NWPA]." S. Rep. No. 100-152, at 1 (Sept. 1, 1987). The Senate Committee on Energy and Natural Resources reported, in considering legislation to amend the NWPA, that "[t]he schedules included in the NWPA have proven to be overly ambitious" and that "[t]his has been largely due to the need to provide additional time for completion of necessary technical work and additional time for public participation." Id. at 5. The committee reported that, "[i]n the four and a half years since passage of the NWPA, it has become clear that the program laid out in the Act will take longer to complete than was anticipated and that completion will be at much greater cost." Id. It further reported that, "[i]n addition to cost and schedule considerations, a number of other circumstances have changed since passage of the NWPA," including that, "as we approach major decision points in the nuclear waste program, there will be great potential for political opposition . . . ." Id.

The 1987 amendments to the NWPA directed DOE to characterize a single site, at Yucca Mountain in Nevada, for development of a permanent repository and to terminate activities at all other sites. 42 U.S.C. § 10172(a). The 1987 amendments also authorized the Secretary to site, construct, and operate one, but only one, MRS facility. 42 U.S.C. § 10162(b). However, the 1987 amendments provided that "construction of [the MRS] facility may not begin until the

Commission has issued a license for the construction of a repository under section 115(d)." 42 U.S.C. § 10168(d)(1). Finally, they also provided that "the quantity of [SNF] at the site of such facility at any one time may not exceed 10,000 metric tons of heavy metal until a repository under this Act first accepts [SNF]." Id. § 10168(d)(3).[7]

## VI. DOE'S ISSUANCE OF ANNUAL CAPACITY REPORTS

### A. The 1987 Through 1990 Annual Capacity Reports

Beginning in 1987, in compliance with the NWPA and the language of the Standard Contract, DOE issued an "Annual Capacity Report." As each of these ACRs expressly stated, "[a]s specified in the Contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the Purchasers." DX 52 at 2 (HQR0012713), DX 63 at 1 (HQR0012617), DX 87 at 2 (HQR0012494) ("projections in this initial report are based on current plans and best available information; they are not contractually binding"). Further, each of the ACRs from 1987 through 1990 contained the following, or substantially similar, language:

> Beginning in 1991, the ACR acceptance ranking will be converted into an Annual Priority Ranking for receipt of SNF/HLW. In 1992, based on this priority ranking, the Purchasers will submit to DOE for approval, Delivery Commitment Schedules identifying the SNF/HLW that Purchasers propose to deliver to the DOE waste management system (WMS). Once approved, these schedules will become the basis for Final Delivery Schedules to be submitted by the Purchasers not less than 12 months before the date of DOE's anticipated acceptance of title to the SNF/HLW and subsequent transport to a DOE facility.

---

[7] The 1987 amendments to the NWPA also established the Office of the Nuclear Waste Negotiator. 42 U.S.C. § 10242(a). That office was to seek to enter into negotiations with states and Indian tribes to "attempt to reach a proposed agreement" with them through which a state or Indian tribe "would agree to host a repository or [MRS] facility with such State or reservation." Id. § 10243(a). The authorization for that office expired in 1994, id. § 10250, without any agreements with any states or Indian tribes.

DX 52 at 2 (HQR0012713), DX 63 at 2 (HQR0012618), DX 87 at 2 (HQR0012494).

B. The 1991 Annual Capacity Report

In December 1991, DOE issued its "Annual Capacity Report" for that year, DOE-RW-331P. DX 108 at 1-2 (HQR0020797-HQR0020798). The 1991 ACR was significant because it was the last ACR that would be issued before the contract holders were to begin submitting DCSs beginning January 1, 1992. See 10 C.F.R. § 961.11, Art. V.B.1. In that regard, the 1991 ACR provided that, "[b]eginning in January 1992, the Purchasers may submit Delivery Commitment Schedules (DCS) to DOE identifying the range of SNF that the Purchasers propose to deliver to the Federal Waste Management System (FWMS) beginning sixty-three months thereafter." DX 108 at 2 (HQR0020804). It also stated that "[t]he Purchasers' allocations for each delivery year are presented in Tables A.1 through A.10 in Appendix A, and should be used as the basis for submitting DCSs." Id. at 2, 7.

As dictated by the Standard Contract, the 1991 ACR specified the rate of acceptance for the first 10 years of the DOE program, beginning in 1998. Specifically, the 1991 ACR specified the following acceptance rate:

TABLE 2.1

Projected Waste Acceptance Rates for Spent Nuclear Fuel

| Year | | SNF (MTU) |
|---|---|---|
| 1998 | | 400 |
| 1999 | | 600 |
| 2000 | | 900 |
| 2001 | | 900 |
| 2002 | | 900 |
| 2003 | | 900 |
| 2004 | | 900 |
| 2005 | | 900 |
| 2006 | | 900 |
| 2007 | | 900 |
| 2008 | | 900 |
| | TOTAL | 8,200 |

DX 108 at 5 (HQR0020807). This rate was created with the knowledge that no permanent repository would be available by January 31, 1998. Id. at 4 (HQR0012365). Instead, "the waste acceptance projections used in this ACR are representative of a FWMS [Federal Waste Management System] configuration authorized by the NWPA, which includes a Monitored Retrievable Storage (MRS) facility." Id. In particular, the rates were "consistent with the 10,000 MTU storage capacity limit contained in the NWPA for an MRS facility before a repository starts operation." Id. DOE noted, however, that the schedule assumed that the schedule linkages between the MRS construction and repository construction authorization would be eliminated. Id.

In a memorandum dated December 20, 1991, Ronald A. Milner, Associate Director for Storage and Transportation, stated in a memorandum to John Bartlett, Director, Office of Civilian Radioactive Waste Management, as follows:

> The 1991 ACR assumes that FWMS [Federal Waste Management System] operations commence in 1998 and the system configuration is that authorized by the Nuclear Waste Policy Amendments Act of 1987, specifically a Monitored Retrievable Storage facility with a 10,000 MTU storage limit prior to repository operations.
>
> The 1991 ACR differs from previously published ACRs for two reasons. First, while the information in the ACR has traditionally been used for planning purposes only, the allocations in the 1991 ACR will also serve as the basis for submission of Delivery Commitment Schedules (DCS) by the Contract holders. These DCSs, which will provide planning information for waste acceptance activities, may be submitted to the Department as early as January 1, 1992.

DX 112.

The utility industry recognized the importance of the 1991 ACR in the determination of delivery commitments for performance beginning in 1998. See, e.g., DX 113 at 2 and 3 (SN169910) (UWASTE memorandum explaining that the ACR and APR "are necessary to properly complete the DCS forms"); DX 114 at 2 (SN170373) (same); DX 54 at 8 (YDK038298) (UNWMG memorandum describing the 1991 ACR as "contractually binding").

C. The 1992 Through 1995 Annual Capacity Reports

The 1992 ACR, which was issued in May 1993, contained the same acceptance rates as the 1991 ACR. DX 128 at 4 (HQR 0012324). The 1992 ACR also provided that, "[d]uring the first ten years following projected commencement of the Civilian Radioactive Waste Management System (CRWMS) operation, the total quantity of SNF that could be accepted is projected to be 8,200 MTU." DX 128 at v (HQR 0012319). It stated that "[t]his is consistent with the storage capacity licensing conditions imposed on an MRS facility by the NWPA." Id.

In 1995, DOE issued a combined APR and ACR, to "establish[] the order in which the Department allocates the projected acceptance capacity for commercial [SNF]" and to appl[y] projected nominal acceptance rates for the system to the priority ranking in the APR, resulting in individual allocations for the owners and generators expressed in metric tons per uranium (MTU)." DX 163 at 1 (HQR-029-0676). The 1995 ACR contained substantially similar SNF acceptance rates as the 1991 and 1992 ACRs, identifying a projected nominal waste acceptance rate of 8,200 for the first 10 years of SNF acceptance. Id. at 4 (HQR-029-0681). The 1995 ACR also contained the following statement:

> The ACR (see Appendix B) applies a 10-year projected nominal waste acceptance rate to the APR, resulting in individual capacity allocations. In the previous ACR, the projected nominal acceptance rate was based on the assumption of SNF acceptance beginning in 1998 at a Monitored Retrievable Storage facility prior to repository operations. Due to the uncertainty associated with the date of commencement of operation of the waste management system, the annual nominal waste acceptance rates are presented by year(s) of operation of the system rather than by specific calendar year(s). The projected nominal acceptance rates also reflect the capacity limit imposed by the Act on such a storage facility prior to repository operations. These projected nominal waste acceptance rates are presented in Table 1. The Department will continue to process DCS submittals on an annual basis.

Id. at 3-4 (emphasis added). The 1995 ACR further provided that the capacity allocations listed in the ACR "form the basis for the Purchasers' submittal" of DCSs. Id. at 1.

## VII. PROGRAM DOCUMENTS REFLECT PLANNED ACCEPTANCE AT AN MRS FACILITY

### A. Program Reassessment And 1991 Draft Mission Plan Amendment

In November 1989, the Secretary of Energy submitted a report to Congress regarding DOE's reassessment of the program. In this report, DOE stated that it would be unable to begin

operations at a permanent repository until 2010, because there was insufficient time to perform the scientific investigation necessary. DX 76 at vii-ix (DB0001448-50). However, DOE also stated that it planned "to work with Congress to modify the current linkages between the repository and the MRS facility and to embark on an aggressive program to develop an integrated MRS facility for spent fuel." Id. at ix-x (DB0001450-51). DOE further advised that, "if the linkages [were] modified, it [was] likely that waste acceptance at an MRS facility could begin by 1998 or soon thereafter." Id.

In September 1991, DOE issued another Draft Mission Plan amendment, which provided further details upon the "action plan" set forth in the Secretary's 1989 Reassessment. DX 102 at HQR0030799. In accordance with the 1989 Reassessment, the 1991 Draft Mission Plan Amendment reaffirmed DOE's plans to begin performance in 1998 at an MRS.

> To achieve the objective of timely and adequate waste acceptance, we plan to develop an MRS facility that is to start waste acceptance in 1998. To make this possible, the President's legislative package for the National Energy Strategy includes a provision to repeal the schedule linkages established in the Nuclear Waste Policy Amendments of 1987 (Amendments Act). This could also be achieved by congressional enactment of a negotiated siting agreement reached through the efforts of the Nuclear Waste Negotiator.

Id. at 18 (HQR0030825). The schedule set forth in the 1991 Mission Plan Amendment showed acceptance by DOE up to the 10,000 MTU limit upon the MRS until the repository began operations in 2010. Id. at 205-206.

### B. Preliminary Estimates Of The Total-System Life Cycle Cost For The Restructured Program

DOE's anticipation of performance at an MRS was also reflected in the cost analyses that it performed around the time of the 1991 ACR to support the adequacy of fees collected for the

Nuclear Waste Fund. The fee paid by utilities, 1 mil per kilowatt hour, was established by Congress in enacting the NWPA. 42 U.S.C. § 10222(a)(2). Pursuant to the NWPA, DOE is required annually to assess whether the fees collected pursuant to statute are adequate to fund all of the efforts necessary to implement the NWPA. 42 U.S.C. § 10222(a)(4). The Secretary is to advise Congress if the fee is found to be inadequate. Id. To determine whether the fee is adequate, DOE first prepares a Total System Life Cycle Cost report, in which it projects the total cost of the program. This total system cost projection is based upon the projected number of years that the program is estimated to operate, projected transportation requirements, projected interest rates, and other factors. The current program plans, including acceptance rate projections, type and location of receiving facilities, and scope of the transportation program, are the basis for the total cost estimate.

In its Preliminary Estimates of the Total System Life Cycle Cost For The Restructured Program: An Addendum to the May 1989 Analysis of the Total Life Cycle Cost for the Civilian Radioactive Waste Management Program, December 1990 ("1990 PETSLCC"), DOE utilized a schedule that was explicitly based upon acceptance starting at an MRS. DX 88 at A-1. The first ten years are identical to the ACR schedule, with the exception of the second year of acceptance, where the 1990 PETSLCC contemplates that 400 MTU rather than 600 MTU of SNF would be accepted. Id. This schedule also shows what DOE anticipated the transition from a repository to an MRS would look like. Id. In year eleven and year twelve of acceptance, 900 MTU would be accepted at a permanent repository. In years thirteen through seventeen 1,800 MTU would be accepted. And only in year eighteen (2015) would the system accept 3,000 MTU. Id.

## VIII. INDUSTRY SUBMISSION OF DELIVERY COMMITMENT SCHEDULES

By letter dated March 4, 1992, the DOE contracting officer issued a letter to NSP and other utilities, along with the instructions for the submission of DCSs. DX 116 and 117. The contracting officer stated that "[t]he allocations in the 1991 Annual Capacity Report (ACR) should be the basis for the DCS submittals." Id. The accompanying instructions provided that purchasers could "begin submitting to the Department of Energy (DOE) Delivery Commitment Schedules (DCS) that identify all spent nuclear fuel (SNF) the Purchasers plan to deliver to DOE beginning 63 months thereafter." DX 117 at 4 (SN172070). The instructions stated that "[t]he DCS provides the Purchasers with the opportunity to inform DOE of their plans for utilizing their allocations of projected Federal waste management system (FWMS) acceptance capacity." Id. They further provided that, "[f]or each allocation listed in the 1991 ACR (or subsequent ACRs, as appropriate), a Purchaser must submit at least one DCS for that allocation at least 63 months prior to the date that the allocation occurs (e.g., if a Purchaser has an allocation in 1998, a DCS must be submitted for that allocation by September 30, 1992)." Id. The instructions also required that the utilities list upon the DCSs the method of delivery to DOE (truck, barge, or rail) and fuel handling crane capacities.

The DCS instructions were developed with the full participation of the nuclear industry. See, e.g., DX 99 (Minutes of Standard Contract Task Force meeting, during which members met with DOE to discuss and provide comments upon the draft DCS instructions); DX 106 at 3 (SN169920) (UWASTE memorandum advising members that Standard Contract Task Force had provided comments to DOE upon another draft of the DCS instructions); see DX 79 (Minutes of High-Level Waste/Spent Fuel Storage Working Group Meeting stating that "[b]y 1/1/92, each

utility is required to submit a DCS to DOE" and that the task force would be "following this closely."). After DOE issued the instructions, utilities met with DOE again to discuss the instructions. DX 117.

Recognizing the need to submit DCSs to claim allocations, many utilities submitted timely DCSs that were approved by DOE. For example, Wisconsin Electric Power Company ("WEPCO") submitted DCSs for all of its allocations in the first ten years of acceptance in 1992. Eight other utilities, including NSP, also submitted DCSs for all of their allocations in the first ten years of contract performance after 1998. Moreover, every utility with an allocation in 1998 and 1999, with the exception of one utility, submitted a DCS for that allocation. All of those DCSs were approved by DOE. All but two utilities with allocations in 2000 submitted DCSs that were approved by DOE.

NSP submitted its first DCS for the Prairie Island plant in 1993. DX 137. This first DCS requested a delivery date of 1999, in accordance with the 1991 ACR, which provided that NSP's first acceptance allocation would be in 1999. Id. NSP continued to submit DCSs, in accordance with the DCS instructions, for allocations continuing through the year 2007. See DX 160, 181, 188, 189, 198, 203, 213, 221, 229 The DCSs submitted by NSP comported with the rate of acceptance set forth in the 1991 ACR and reflected NSP's allocations under that rate. NSP did not challenge or object (formally or informally) to DOE's instructions concerning the submittal of DCSs.

## IX. NSP DECIDES TO BUILD AND OBTAINS LEGISLATIVE AUTHORIZATION FOR A DRY STORAGE FACILITY

In the late 1980s, as plaintiff acknowledges, NSP was faced with the need to increase its storage capacity, knowing that the spent fuel pool at its Prairie Island plant would run out of

space by 1995, three years before DOE was required to begin acceptance of SNF from the industry as a whole. Pl. Br. at 9. NSP had already twice previously reracked its Prairie Island pool. The evidence will show that, when it was considering its capacity-increasing options, NSP believed that a third reracking was not technically feasible. DX 61, Attachment 3 at 3 (NSP0072972) and DX 78 at 8 (NSP0027299). NSP decided by the end of 1988 that it would construct a dry storage facility at Prairie Island.

Based upon existing law, NSP believed that, to construct a dry storage facility, it needed to obtain regulatory approval from the Minnesota Public Utilities Commission ("PUC"). Accordingly, in 1991, NSP submitted an application for a Certificate of Need from the PUC. The PUC found that reracking was "technically inferior" to dry cask storage, that reracking was a greater health and safety risk than dry storage, and rejected the reracking option for reasons of cost, practicality, and safety. DX 123 at 22-23 (NSP0001491-92). It was based upon this determination that, in August 1992, the PUC granted a Certificate of Need for the Prairie Island dry storage facility.

The PUC's grant of a Certificate of Need was appealed to the Minnesota Court of Appeals, which held that, contrary to NSP's belief and over its objection, the construction of a dry storage facility required the approval of the Minnesota Legislature. In re Independent Spent Fuel Storage Installation, 501 N.W.2d 638 (Minn. Ct. App. 1993). The Minnesota Supreme Court denied NSP's petition for review of this determination.

At this point, NSP sought legislative approval for the construction of the ISFSI before the Minnesota Legislature. As part of a compromise among NSP, various environmental groups, and other special interests, including the Mdewakanton Dakota Tribal Council (owner of the land

adjacent to the Prairie Island plant), the Minnesota Legislature authorized the immediate loading of five casks into dry storage at Prairie Island and the conditional loading of 12 additional casks. See 1994 Minn. Sess. Law Ch. 641 (S.F. 1706). Reflecting the growing opposition to nuclear power and the increased influence of the environmental lobby and other interests, the legislation also required NSP to employ "biomass" and wind power to add a total of 550 additional megawatts of energy to its capacity, id. Art. 3 §§ 2, 3 (codified as amended at Minn. Stat. §§ 216B.2423, 216B.2423); to consider an alternate site for the dry storage facility in Goodhue County, Minnesota (that is, a site other than Prairie Island), id. Art. 6 § 1 (codified at Minn. Stat. § 116C.80); and to create a "Renewable Development Fund" to develop renewable energy sources, id. Art. 2 § 10 (codified as amended at Minn. Stat. § 116C.779). The statute conditioned the authorization for additional dry storage upon the execution of a contract between the Governor of Minnesota and NSP for the biomass and wind power mandates, and specifically named the Mdewakanton Dakota Tribal Council as an intended third party beneficiary of the agreement. Id. Art. 1 § 4 (codified at Minn. Stat. § 116C.773).

In 2003, the Minnesota Legislature expanded its prior authorization for dry cask storage to allow sufficient dry cask storage capacity at the Prairie Island ISFSI to permit each of the two units at Prairie Island to operate through expiration of their respective licenses. 2003 Minn. Sess. Law 1st Sp. Sess. Ch. 11 (H.F. 9) (codified at Minn. Stat. § 116C.83). At the same time, NSP entered into a settlement agreement with the Prairie Island Mdewakanton Dakota Community at Prairie Island, wherein it agreed to "settle and resolve their rights" under the 1994 agreement between NSP and the State of Minnesota and in which NSP agreed, among other things, to pay the Tribal Community $2,250,000 on an annual basis, with payments linked to the

continued operation of the Prairie Island nuclear plant (and, for a minority of the payments, to the storage of spent fuel at Prairie Island). The agreement also called upon NSP to pay $25,000 toward an engineering study for the construction of a railroad overpass. NSP seeks recovery for each of these payments in this lawsuit.

## DISCUSSION

### I. NSP BEARS THE BURDEN OF ESTABLISHING ALL ELEMENTS OF ITS CLAIM, INCLUDING LIABILITY, CAUSATION, FORESEEABILITY, AND REASONABLE CERTAINTY

#### A. NSP Has The Burden Of Proving All Elements Of Its Case

"To recover for breach of contract, a party must allege and establish: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." San Carlos Irrig. & Drainage Dist. v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989). As the United States Court of Appeals for the Federal Circuit recently recognized, the mere fact of DOE's breach of the Standard Contract does not "perforce" make all of a utility's costs "to store its SNF recompensable: [a plaintiff] must prove foreseeability, causation, and reasonableness," Indiana Michigan Power Co. v. United States, 422 F.3d 1369, 1376 (Fed. Cir. 2005), and it must prove these three elements "by a preponderance of the evidence." Alaska Pulp Corp. v. United States, 59 Fed. Cl. 400, 413-14 (2004). Further, the "measure of damages to be applied in the particular case is irrelevant until the claimant has established the fact of losses that were the natural and proximate result of the breach of contract." Willems Indus., Inc. v. United States, 155 Ct. Cl. 360, 376, 295 F.2d 822, 831 (1961). "Absent tangible proof of damages, [a party] may not recover for an alleged injury." Roseburg Lumber Co. v. Madigan, 978 F.2d 660, 667 (Fed. Cir. 1992).

B. NSP Must Prove That Its Damages Were Directly Caused By The Government's Breach

"One of the basic principles of contract damages is that 'damages for breach of contract shall place the wronged party in as good a position as it would have been in, had the breaching party fully performed its obligation.'" Bluebonnet Sav. Bank, F.S.B. v. United States, 339 F.3d 1341, 1344-45 (Fed. Cir. 2003) (quoting Massachusetts Bay Transp. Auth. v. United States, 129 F.3d 1226, 1232 (Fed. Cir. 1997)). "Thus, the non-breaching party should not be placed in a better position through the award of damages than if there had been no breach." Id. (citing White v. Delta Constr. Int'l, Inc., 285 F.3d 1040, 1043 (Fed. Cir. 2002)). "[T]he non-breaching party 'should on no account get more than would have accrued if the contract had been performed.'" White, 285 F.3d at 1043 (quoting DPJ Co. v. FDIC, 30 F.3d 247, 250 (1st Cir. 1994)).

The plaintiff seeking damages bears the burden of proving, by a preponderance of the evidence, that the Government's breach caused it to incur each of the costs that it seeks. Alaska Pulp Corp. v. United States, 59 Fed. Cl. 400, 413-14 (2004). A plaintiff must introduce clear proof that it was injured as a direct result of the defendant's breach. Myerle v. United States, 33 Ct. Cl. 1, 27 (1897). "For a damage to be direct there must appear no intervening incident . . . ; the cause must produce the effect inevitably and naturally, not possibly nor even probably." Ramsey v. United States, 101 F. Supp. 353, 357 (Ct. Cl. 1951). Further, "[t]here must not be two steps between cause and damage." Myerle, 33 Ct. Cl. at 27. Similarly, the loss must be one which the non-breaching party can show that, "but for" the breach of contract, would not have been suffered. Fawick Corp. v. United States, 149 Ct. Cl. 623, 637 (1960); see San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997) ("[a] plaintiff

must show that but for the breach, the damages alleged would not have been suffered" (emphasis added)).

C. Regardless Of Whether NSP Characterized Its Damages As "Mitigation Costs," NSP Bears The Burden Of Establishing That Its Costs Were Incurred As A Result Of The Breach And Would Not Have Been Incurred In The "But For" World

On page 2 of its brief, NSP asserts that it seeks "mitigation damages" through December 31, 2004, and that, as the breaching party, the Government "bears the burden of showing that NSP's mitigation efforts as the non-breaching party were unreasonable." These assertions obscure both the nature of the damages that NSP seeks and the settled principle that, as plaintiff, NSP bears the burden of establishing that damages were incurred and caused by the breach at issue and of establishing a plausible "but for" world in which such damages would not have been incurred.

In Indiana Michigan Power Co. v. United States, 422 F.3d 1369 (Fed. Cir. 2005) the Federal Circuit explained that damages for breach of contract are recoverable where the damages were (1) reasonably foreseeable at the time of contracting; (2) caused by the breach; and (3) shown with reasonable certainty. Id. at 1373; see also California Fed. Bank v. United States, 395 F.3d 1263, 1267-68 (Fed. Cir. 2005) (rejecting the "substantial factor" test of causation and noting that the "causal connection between the breach and the loss of profits must be "definitely established"). The Federal Circuit offered this three-pronged test in considering the "mitigation costs" that the utility in that case sought – including the reracking and expansion of its spent fuel pool – and in concluding the plaintiff had failed to meet its evidentiary burden with respect to damages. Id. at 1376 ("The presence of a duty to mitigate does not perforce make the pre-breach costs incurred by Indiana Michigan to store its SNF recompensable; appellant must prove

foreseeability, causation, and reasonableness. It failed to make such a showing."). Most significantly, the Federal Circuit determined that the plaintiff's "decision to perform a full, instead of a partial, rerack in 1995 was purely a business judgment which it would have had to pursue irrespective of DOE's partial breach." Id. at 1376. The plaintiff in Indiana Michigan thus failed to establish the requisite degree of causation for its "mitigation costs" because it failed to establish that these costs would not have been incurred in the "but for" world. Regardless of whether the damages were labeled as "mitigation costs," only a showing that they would not have been incurred in the "but for" world would have discharged the plaintiff's evidentiary burden.

The principle upon which the Federal Circuit relied in Indiana Michigan is not unique to spent nuclear fuel cases or to cases involving the "mitigation costs" that NSP seeks. Indeed, any plaintiff who seeks to be placed back in the position that it would have occupied had the contract been performed[8] bears the burden of establishing a "plausible but-for world," Bluebonnet Savings Bank, FSB v. United States, 67 Fed. Cl. 231, 238 (Fed. Cl.), appeal docketed, No. 06-5024 (Fed. Cir. Nov. 10, 2005), and of demonstrating "what might have been," Glendale Fed. bank, FSB v. United States, 239 F.3d 1374, 1380 (Fed. Cir. 2001). The failure of a plaintiff to prove that certain costs would not have been incurred in the "but for" world precludes a finding

---

[8] This characterization is typically referred to as a the party's "expectation interest." See Restatement (Second) of Contracts § 344(a) (1981). Although NSP refers repeatedly to "mitigation damages" in its brief, it is the damage to NSP's expectation interest (as opposed to its reliance or restitution interest) for which NSP seeks recovery. Indeed, on page 2 of its brief, NSP refers to the state of the law concerning "expectancy damages," and the very first sentence of the section of its brief entitled "Legal Authority" invokes its entitlement to relief pursuant to an expectancy theory: "[G]enerally, the remedy for breach of contract is damages sufficient to place the injured party in as good as a position as it would have occupied had the breaching party fully performed." Pl. Br. at 20 (emphasis added; quotation marks omitted).

that the incurral of costs, whether designated as "mitigation" or otherwise, was caused by the breach.

This conclusion does not mean that the issue of mitigation is completely irrelevant. The doctrine of mitigation prevents a party from recovering damages "for loss that he could have avoided by reasonable efforts." Indiana Michigan, 422 F.3d at 1375. "Mitigation is appropriate where a reasonable person, in light of the known facts and circumstances, would have taken steps to avoid damage." Id. The doctrine only requires a plaintiff "to make fair and reasonable efforts under the circumstances, and the government has the burden of proving that [the plaintiffs] efforts were anything other than fair and reasonable." Home Savings of America, FSB v. United States, 339 F.3d 1341, 1352-53 (Fed. Cir. 2005). Yet, with respect to whether a cost actually bears a direct causal connection to the breach of the Standard Contract, NSP maintains the burden on this issue and, as a result, maintains the burden of establishing a plausible "but for" world in which that cost would not have been incurred.

NSP relies upon Tennessee Valley Authority v. United States, 69 Fed. Cl. 515 (2006), to bolster its arguments concerning the Government's burden of proof. With all due respect, Judge Lettow's decision in TVA is inconsistent with the Federal Circuit's holding in Indiana Michigan and, therefore, is not persuasive. In TVA, Judge Lettow concluded that, because the plaintiff had taken steps to mitigate its damages in response to the partial breach, the expenses that it incurred as a result of its mitigation efforts were "recoverable to the extent they [we]re reasonable" and that the Government "ha[d] not met its burden of showing that TVA [would have had to incur] the costs at issue for dry storage] even if DOE had performed under the contract." 69 Fed. Cl. at 523, 533 (emphasis added). However, the Court's allocation of the burden of proof to the

Government with respect to the cause of these costs in the first instance conflicts with the holding in Indiana Michigan that the utility had failed to establish causation because it failed to establish that its "mitigation costs" would not have been incurred in the "but for" world. As the Federal Circuit expressly stated, the mere fact that NSP had labeled its costs as "mitigation costs" does not mean that they were caused by the breach (and would not have been incurred in the "but for" world). See Indiana Michigan, 422 F.3d at 1376 ("The presence of a duty to mitigate does not perforce make the pre-breach costs incurred by Indiana Michigan to store its SNF recompensable; appellant must prove foreseeability, causation, and reasonableness. It failed to make such a showing."). Rather, the plaintiff in a spent fuel case, like the plaintiff in Indiana Michigan and like any plaintiff in this Court, that seeks to be placed in the position it would have occupied but for the breach alleged must establish, by demonstrating the existence of a plausible "but for" world, that any injury it claims to have suffered would not also have befallen it in the event of full performance by the Government. To the extent that TVA suggests otherwise, it is incorrect.

Finally, the nature of NSP's damage calculations implicitly concede the proper allocation of the burden of proof. As NSP states on page 22 of its pre-trial brief, its "damages calculations include an offset in favor of the Government, because NSP would have had to provide SNF storage at Prairie island from 1994 through 1999 (whether or not DOE ever performed)." Undoubtedly, NSP has included this offset because of its recognition that an accurate assessment of any damage caused by breach of the Standard Contract requires the establishment of a "but for" world in which certain expenses (such as the cost of a re-rack) would have been incurred, and in which certain others (that is, those for which it seeks recovery in this lawsuit) would not.

Without a plausible calculation of the costs incurred in the "but for" world from which a comparison to the actual world can be made, there is no basis for a damage award and, as in Indiana Michigan, a failure of proof with respect to damages.

D. The Damages Available To NSP For Breach Of Contract Are Limited To Those That Are Foreseeable As The Probable Outcome Of The Breach

NSP also must establish that its damages were foreseeable. Indiana Michigan, 422 F.3d at 1376. Foreseeability is measured based upon what the parties contemplated at the time of contract formation, rather than from the date of breach. See Northern Helex, 207 Ct. Cl. 682, 524 F.2d at 714; Bohac v. Department of Agric., 239 F.3d 1334, 1340 (Fed. Cir. 2001); Prudential Ins. Co. v. United States, 801 F.2d 1295, 1300 (Fed. Cir. 1986) (affirming trial court's finding of no foreseeability when plaintiff landlord claimed damages for losses of leased property in excess of what Government leased from plaintiff in Government tenant holdover of lease). As part of the foreseeability determination, NSP must demonstrate that both the magnitude and type of damages were foreseeable at the time of contract formation. See Landmark Land Co. v. Federal Deposit Insur. Corp., 256 F.3d 1365, 1378 (Fed. Cir. 2001) (affirming trial court's denial of damages because the magnitude of damages was not foreseeable); Wells Fargo, 88 F.3d at 1024-25 (rejecting remote and conjectural damages claim because type of damages were not foreseeable at time of contract formation). "The mere circumstance that some loss was foreseeable, or even that some loss of the same general kind was foreseeable, will not suffice if the loss that actually occurred was not foreseeable." Restatement (Second) of Contracts § 351, cmt. a (cited in Landmark Land, 256 F.3d at 1378).

As this Court recently explained, "[i]n order to recover a damage, there must be no intervening incident (not caused by the defaulting party) to complicate or confuse the certainty of

the result between the cause and the damage; the cause must produce the effect inevitably and naturally, not possibly nor even probably." SAB Constr., Inc. v. United States, 66 Fed. Cl. 77, 88 (2005) (quoting Myerle v. United States, 33 Ct. Cl. 1, 26, 1800 WL 2024 (1897)), appeal pending, No. 2006-5009 (Fed. Cir.).

The facts of SAB Construction illustrate the exacting degree of causation required to demonstrate damages arising out of liability for breach of contract (as opposed to tort). There, the plaintiff sought damages for breach of contract because of the discovery of asbestos at the site of a renovation project. Among the damages sought were the litigation expenses incurred in separate litigation against another contractor, which litigation, according to the plaintiff, was caused by the "nature of the government's breach." SAB Constr., 66 Fed. Cl. at 88. The Court rejected this theory of damage, explaining that the mere fact that the breach may have been a "but for" cause of the separate litigation, "this theory of causation is too broad. The decision to bring the suit, and to incur the costs, rested with the plaintiff. The plaintiff's decision breaks the chain of causation between the government's alleged breach and the litigation because the litigation did not flow inevitably and naturally from the government's alleged breach." Id.

E. NSP Must Prove Its Damages With Reasonable Certainty

NSP also has the burden to establish "reasonable certainty" as to each item within its damages claims. Wells Fargo, 88 F.3d at 1023; see Restatement (Second) of Contracts § 352 cmt. a ("[a] party cannot recover damages for breach of a contract for loss beyond the amount that the evidence permits to be established with reasonable certainty"). To support its claim, NSP must provide appropriate documentary or other support from its records to establish its damages claims. See Roseburg Lumber, 978 F.2d at 667 (plaintiff must provide adequate

support for claimed costs). A contractor's failure to present any documentary support for its assertions that it incurred costs, precluding the Government from verifying that the costs were incurred and the reasons for their incurrence, precludes any recovery of those costs. Barrow Utils. & Elec. Co. v. United States, 20 Cl. Ct. 113, 121 (1990). Without proper records, NSP's cannot meet its burden of establishing reasonable certainty.

F. After Establishing The Legal And Factual Predicates To Damages, NSP Must Demonstrate That Its Action Mitigated Those Damages

As we have discussed, NSP's pre-trial brief conflates the concepts of mitigation and damages, which are distinct legal concepts. If NSP fails to meet its burden of establishing causation, foreseeability, or reasonable certainty for any of its alleged damages, a mitigation analysis is unnecessary as the factual predicate to the obligation to mitigate – "damage" – would not exist.

If NSP satisfies its burden of proving causation, foreseeability, and reasonable certainty for any of its categories of costs, the general rule in any damages claim is that "a party cannot recover damages for loss that he could have avoided by reasonable efforts." Robinson v. United States, 305 F.3d 1330, 1333 (Fed. Cir. 2002) (quoting Restatement (Second) of Contracts § 350, cmt. b) (emphasis in original). Under Indiana Michigan, NSP was obligated to begin mitigating any alleged damages in May 1994. Indiana Michigan, 422 F.3d at 1375. NSP also must attempt to mitigate any potential damages "at the least cost to the defendant." LaSalle Talman Bank, F.S.B. v. United States, 45 Fed. Cl. 64, 111 (1999) (quoting Northern Helex, 207 Ct. Cl. 862, 524 F.2d at 713), rev'd on other grounds, 317 F.3d 1363 (Fed. Cir. 2003). The least-cost principle "precludes rewarding a plaintiff for undertaking a form of mitigation that is considerably more costly than other available means of mitigation." Id. To determine whether

an attempt at mitigation was appropriate, courts consider whether a reasonable person, in light of the known facts and circumstances, would have taken steps to avoid certain damages. Koby v. United States, 54 Fed. Cl. 493, 497 (2002).

## II. THE RATE OF ACCEPTANCE TO BE APPLIED TO THE STANDARD CONTRACT IS IRRELEVANT FOR THE PURPOSES OF DETERMINING CAUSATION AND DAMAGES THROUGH 2004

In the majority of the spent fuel cases pending in this Court, resolution of the rate of acceptance applicable to the Standard Contract is required for the purposes of determining causation and damages. Here, however, the rate of acceptance is irrelevant to any consideration of causation and damages through 2004. Whether this Court were to apply a 900 MTU steady-state acceptance rate or the 3,000 MTU rate advocated by NSP, NSP's Prairie Island facility would be required to load the identical number of casks in the "but for" world through 2004. Likewise, NSP's Monticello facility is unaffected by the applicable rate of acceptance through 2004. After 2004, the applicable rate of acceptance will affect causation and damages analyses for NSP. However, for the purposes of this case, which litigates damages through 2004, causation can be litigated without reference to rate. Indeed, regardless of the rate that this Court applies, if any, NSP will be unable to establish causation for the ISFSI that it decided to construct in the late 1980s and that was loaded with spent fuel beginning in 1995 – four years before the parties agree that DOE would have accepted SNF from the Prairie Island facility.

## III. TO THE EXTENT THAT THE COURT DETERMINES THAT THE RATE OF ACCEPTANCE SHOULD BE DEFINED IN THIS LITIGATION, REGARDLESS OF ITS EFFECT UPON DAMAGES, NSP CANNOT MEET ITS BURDEN OF PROVING THAT DOE WAS OBLIGATED TO ACCEPT SNF AT AN ANNUAL RATE OF 3,000 MTU

### A. NSP Cannot Establish That DOE Was Obligated To Accept SNF At A Rate Sufficient To Preclude The Need For Additional At-Reactor Storage And Some "Backlog" Of Utility-Stored SNF

In its brief, NSP asserts that, at the time of contracting, the parties expected that DOE would perform at a rate that would (1) avoid the need for utilities to provide additional at reactor storage (presumably after January 31, 1998), and (2) would reduce the backlog of SNF already stored by the utilities up until that deadline. Pl. Br. 34. Significantly, NSP does not appear to allege that these expectations are contractual obligations. Based upon the application of NSP's alleged expectations, NSP asserts that DOE was obligated to accept SNF beginning in 1998 at an annual rate of 3,000 Metric Tons Uranium ("MTU"), after a short five-year "ramp-up" period. Id. NSP fails, however, to establish that this two-part test and resultant rate of acceptance were incorporated into the Standard Contract as obligations or that the "test" and rate even are supported by the alleged "intent" of the NWPA.

NSP's entire argument regarding the rate of acceptance rests upon this Court's consideration of extra-contractual evidence that post-dates the formation of the Standard Contract.[9] As a matter of law, with respect to the introduction of parol evidence at trial concerning the parties' intent, the Standard Contract contains an integration clause, which expressly provides that the written language in the Standard Contract "contains the entire

[9] While not presented in its memorandum, NSP's arguments regarding rate of acceptance can be gleaned from its opposition to the Government's motion for partial summary judgment, dated December 10, 2002, and from the proposed deposition designations filed by NSP on September 1, 2006.

agreement between the parties with respect to the subject matter hereof." 10 C.F.R. § 961.11, Art. XXII(A). The contract further provides that "[a]ny representation, promise, or condition not incorporated in this contract shall not be binding on either party" and that "[n]o course of dealing or usage of trade or course of performance shall be relevant to explain or supplement any provision contained in this contract." Id. NSP's interpretation of the Standard Contract, which reads into the agreement selective alleged program hopes and goals over a 20-year period, completely eradicates the integration clause. Although "parol evidence 'must be admissible on the issue of the extent to which a written agreement is integrated, for . . . the writing cannot prove its own integration,'" McAbee Constr, Inc. v. United States, 97 F.3d 1431, 1434 (Fed. Cir. 1996) (quoting Sylvania Elec. Prods., Inc. v. United States, 198 Ct. Cl. 106, 458 F.2d 994, 1006 (1972)), the fact that the Standard Contract contains an integration clause makes NSP's burden of establishing a lack of integration "extremely heavy." Id. Additionally, because the Standard Contract was promulgated through notice-and-comment rulemaking, any parol evidence should consist solely of the record of administrative rulemaking, in accordance with the proper means of interpreting regulations. See Honeywell, Inc. v. United States, 228 Ct. Cl. 591, 596, 661 F.2d 182, 186 (1981). NSP's efforts to introduce extensive deposition and trial testimony and documents to identify the contractual intent evidenced by the language of the Standard Contract are legally unsupported.

Significantly, much of the "evidence" upon which NSP apparently intends to rely to support the alleged intent of the Standard Contract and the NWPA is not even admissible for that purpose. For example, NSP has designated the deposition testimony of Lake Barrett, former Deputy Director of the Office of Civilian Radioactive Waste Management ("OCRWM"), as

evidence of the "intent" of Congress in promulgating the NWPA. This method of discerning the intent of these documents is inadmissible, because even the opinions of individuals who actually participated in the legislative process are irrelevant to a proper interpretation of the requirements of a statute. See, e.g., Selman v. United States, 204 Ct. Cl. 675, 685 n.6, 498 F.2d 1354, 1359 n.6 (1974) (affidavit of a United States Senator concerning particular legislation was "without evidentiary value" because "no member of a legislature, outside of the legislature, is empowered to speak with authority for that body"); accord Department of Energy v. Westland, 565 F.2d 685, 690-91 (CCPA 1977); United States Steel Corp. v. United States, 618 F. Supp. 496, 500 n.5 (CIT 1985).[10]

Alternatively, if the Court allows the presentation of parol evidence concerning the intent of the parties to the Standard Contract, the evidence at trial will contradict NSP's assertions that the parties intended that DOE would create an acceptance rate that satisfied NSP's "two-part test." DOE published the Standard Contract at issue here as a "proposed rule" in the Federal Register. 48 Fed. Reg. 5458 (Feb. 4, 1983). In response to that proposed rule, several nuclear utilities and industry groups, including NSP, submitted comments requesting, among other things, that DOE place into the Standard Contract an obligation requiring DOE to accept SNF at a pre-determined minimum rate, to adopt as contractual obligations the acceptance rates that would be identified in the statutorily-required Mission Plan, or to accept SNF at a rate commensurate with the amount of SNF then being generated together with the accumulated

---

[10] Mr. Barrett was not involved with the program at the time of the enactment of the NWPA. Even if extrinsic evidence was allowed, NSP should not be allowed to rely upon the beliefs of various individuals who began working with the NWPA long after Congress enacted it as to the meaning that Congress presumably intended when it passed the Act as evidence of the obligations to be imposed upon DOE for the measurement of damages.

backlog of SNF. See, e.g., DX 2.63 at 5 (ARC0010537). Although DOE "carefully reviewed and fully considered" the comments in its formulation of the final rule (48 Fed. Reg. 16,590, 16,590 (Apr. 18, 1983)), DOE specifically and intentionally excluded from the contract any contractual obligations to meet a pre-determined acceptance rate because it could not know, in 1983, the scope and extent of the technical and other obstacles that it would face in attempting to develop an operational repository.

Nuclear utilities – including NSP – consistently understood that the Standard Contract did not contain those terms. In interpreting the requirements of a contract, the behavior of parties before the "advent of controversy" is often more revealing than the contract language alone. Omni Corp. v. United States, 41 Fed. Cl. 585, 591 (1998). "A principle of contract interpretation is that the contract must be interpreted in accordance with the parties' understanding as shown by their conduct before the controversy." Julius Goldman's Egg City v. United States, 697 F.2d 1051, 1058 (Fed. Cir. 1983), cert. denied, 464 U.S. 814 (1983). Here, the history of the notice-and-comment rulemaking itself is clear in evidencing that DOE did not obligate itself to satisfy NSP's two-part test and that the nuclear utilities were well aware of that fact. In other utilities' internal documents from 1983 and 1984, soon after the Standard Contract was executed, those utilities indicated that DOE had not obligated itself in the contract to satisfy a minimum performance rate, and witnesses from other utilities have previously testified at trial that they understood that DOE had never agreed to satisfy any specific rate of acceptance. See, e.g, DX 32, attachment 2 at 3 (TV1471); DX 39 at 1.[11] Moreover, in correspondence with DOE

[11] Although resort to parol evidence is neither necessary nor appropriate in interpreting an unambiguous contract, particularly one with an integration clause, to the extent that parol evidence is deemed relevant or admissible in interpreting the terms of the Standard Contract, the standardized nature of the contract at issue here requires interpretation of its terms

soon after the publication of the final rule, but prior to the execution of the Standard Contract by individual utilities, the utilities complained about the fact that DOE had not included any additional performance obligations in the contract. DX 34 at 1-2. Clearly, the industry's "understanding" that DOE had some minimum acceptance rate obligation was created after disputes about timely SNF acceptance began.

B. NSP Cannot Rely Upon Program Planning Documents To Establish The Government's Obligation To Accept SNF At An Annual Rate Of 3,000 MTU

Unable to demonstrate that the Standard Contract requires that DOE accept at a 3,000 MTU rate, NSP may attempt to prove that the 3,000 MTU rate is somehow a contractual obligation because it has appeared in numerous DOE planning documents. However, the documents upon which NSP has historically relied to evidence DOE's "intent" to eventually accept 3,000 MTUs of SNF upon an annual basis generally depend upon the existence of an operational repository. Yet, the Standard Contract does not require DOE to begin SNF acceptance at a repository. Indeed, by 1987, the only method of performance available to DOE by 1998 was the MRS facility. The language of the Standard Contract explicitly contemplates that DOE may accept SNF either at a repository or at "such other facility(ies) to which [SNF] and/or [HLW] may be shipped by DOE prior to its transportation to a disposal facility." 10 C.F.R. § 961.11, Art. I.10. In fact, between the proposed rule and the final rule, the definition of the type of "facility" to which DOE could deliver SNF was expanded to expressly state, in

---

in a uniform manner as applied to all contract holders, not simply NSP, "without regard to [a particular contract holder's individual] knowledge or understanding of the standard terms of the writing." Restatement (Second) of Contracts § 211 (1981). Accordingly, to the extent that parol evidence is admissible here, review of other contract holders' understandings of the contract requirements is as relevant as a review of NSP's understanding.

accordance with the [NWPA], that there may be an interim storage facility (or facilities) which DOE may utilize prior to emplacement in a repository." 48 Fed. Reg. 16590, 16591 (Apr. 18, 1983). Pursuant to the rationale of the United States Court of Appeals for the District of Columbia Circuit in Indiana Michigan Power Co. v. Department of Energy, 88 F.3d 1272 (D.C. Cir. 1996), DOE was not obligated to have an operational repository by January 31, 1998, precluding any argument that DOE was somehow obligated to accept SNF at the rates it had hoped to satisfy for SNF acceptance at a repository. Because DOE was entitled to accept SNF at a facility other than a repository, NSP's reliance upon planning documents relating to SNF acceptance at a repository is meaningless.

Moreover, the planning documents upon which NSP intends to rely uniformly and expressly indicate that they are "not contractually binding," that they do not establish acceptance rates that create mandatory obligations, and that they were only for planning purposes. See, e.g., DX 45, Volume 1 at 29 (HQR-003-1133) (in 1985 Mission Plan, DOE expressly represented that "[i]t should be emphasized that this schedule is only an approximation of how the system may operate and is subject to considerable variation" and that "DOE will further define and specify the system acceptance parameters as the program progresses"). In citing to the Mission Plan, NSP is required to cherry-pick certain components of that plan and ignore fundamental assumptions – such as the projected generation rate (consistently in excess of 3,000 MTU), number of operational repositories in the system (2), and the projected annual acceptance rate (6,000 MTUs). Id. Likewise, each Annual Capacity Report issued between 1987 and 1990 expressly advised contract holders that, in 1991, but not before, DOE would begin publishing

firm individual utility acceptance schedules in accordance with the contracts, including shipment allocations.[12]

Likewise, various Total System Life Cycle Cost reports and Fee Adequacy studies that DOE has prepared throughout the program do not support the imposition of a 3,000 MTU rate of acceptance. The purpose of the fee adequacy studies (required by the NWPA) and total system life cycle cost analyses is solely to determine whether the fees paid into the Nuclear Waste Fund are sufficient to pay for the costs of the entire program. The acceptance rate is only one of many assumptions necessary to determine the total cost of the program. The acceptance rate is used to determine the length of time that the DOE acceptance facilities will need to operate. The TSLCC reports incorporate the program assumptions, including acceptance rate, as they exist at the time that they are prepared. For example, in early studies, DOE planned to perform at two repositories, with a cumulative acceptance rate of 6,000, not the 3,000 MTU rate upon which NSP relies. PX 267 at 11 (PNL0202528) and PX 261 at 2-4 (PNL0201505). In the later studies, DOE planned to perform at a repository beginning in 2010. PX 264 at 13 (HQR-025-5094) and PX 265 at 5 (HQR-036-0022). Notably, NSP does not cite to the 1990 PETSLCC, which shows

[12] Importantly, the 1985 Mission Plan was created pursuant to a statutory requirement for submission to Congress. 42 U.S.C. § 10221(b)(3). After DOE submitted the 1985 Mission Plan and a 1987 Mission Plan Amendment to Congress, Congress enacted the 1987 amendments to the NWPA, presumably after considering DOE's Mission Plan submissions and evaluating the state of DOE's program. As it was entitled to do, Congress significantly modified the scope of the program at that time, limiting DOE's focus for development of a repository to one site, Yucca Mountain, and establishing linkages between a Monitored Retrievable Storage ("MRS") facility and a repository. 42 U.S.C. §§ 10133, 10161-69. NSP's reliance upon documents prepared for Congress that relate to possible circumstances and scenarios that could have existed prior to congressional review of and action upon those pre-amendment planning documents does not support its argument that DOE has somehow obligated itself to accept SNF at a 3,000 MTU rate, regardless of whether a repository is available.

performance at an MRS at a steady-state rate of 900 MTU until a repository opens with no ramp-up to 3,000 until 2015. DX 88 at A-1 to A-3.

NSP can identify no language by which DOE somehow agreed or even suggested that the acceptance rates in any planning documents which DOE issued were contractually binding or constituted anything other than DOE's hopes and goals for its program. In National By-Products, Inc. v. United States, 186 Ct. Cl. 546, 405 F.2d 1256 (1969), the Court of Claims recognized that, "[b]efore a representation can be contractually binding, it must be in the form of a promise or undertaking . . . and not a mere statement of intention, opinion, or prediction." Id. at 558-59, 405 F.2d at 1263. In a dispute involving whether the Government had contractually agreed that it would build a right-bank levee, the Court in National By-Products determined that, although the Government's representative had represented during contract negotiations "that in its then view the right-bank dike would eventually come into being," such "a representation, without more, would not indicate the Government's commitment to build it, or its guarantee that it would be built." Id. at 570-71, 405 F.2d at 1270. "Rather, the representation would simply mirror the Government's current belief, opinion or prediction, even its fervent hope that this would occur," which could not constitute a contractual obligation upon the Government's part. Id. at 571, 405 F.2d at 1270; see id. at 570, 575, 405 F.2d at 1269, 1272 ("we attribute the Corps' activity in later acting as a catalyst for local action to provide right-bank protection to its public-minded concern with the problem . . . and not to any feeling of *contractual* liability" (italics in original)); see Commercial Metals Co. v. United States, 176 Ct. Cl. 343, 349 (1966) ("the Railroad's historical practice – which has not been incorporated in any written pronouncement for the information of the public – could not modify the plain language of the sales contract

between the plaintiff and the Railroad . . . ."); Branhill Realty Co. v. Montgomery Ward & Co., 60 F.2d 922, 923 (2d Cir. 1932) (although parties discussed lessee's use of leased premises as chain store, lessee "did not bind itself so to do" in the contract, so that lessee "might, at its option, use them either for a chain store or for any lawful purpose"). Because DOE has never obligated itself to satisfy a 3,000 MTU acceptance rate, the Court cannot incorporate such a requirement into the Standard Contract. Consequently, NSP has failed to satisfy its burden regarding the 3,000 MTU steady-state rate of acceptance.

### C. DOE's Acceptance Obligations Should Be Determined Pursuant To The Schedule Mechanism In The Contract

#### 1. The Acceptance Schedule Was Established In The Dealings Between The Parties

Although NSP asks the Court to impose into the Standard Contract an obligation for DOE to accept 3,000 MTUs of SNF every year soon after 1998, the Court, to do so, would have to ignore the actual language of the Standard Contract. That language, instead of creating an obligation to accept 3,000 MTU per year, contains a scheduling provision that ultimately allows DOE to select the appropriate SNF acceptance rate, subject only to a review for abuse of discretion by the Energy Board of Contract Appeals ("EBCA"). Pursuant to this scheduling mechanism, DOE issued the 1991 ACR and requested DCSs from utilities, many of which it then approved, thereby defining the schedule of performance beginning in 1998. If the Court disregards these provisions and the actions of the parties in accordance with these provisions, the Court is left with no method by which to assess damages arising from DOE's delay.

Instead of agreeing to a specific minimum acceptance rate or creating standards that would obligate DOE to satisfy a minimum rate, the Standard Contract recognizes the

uncertainties inherent in the development of the waste management program and, accordingly, creates a contractual mechanism for the development of a specific acceptance schedule that establishes, in essence, a two-phase process. First, the Standard Contract's schedule terms seek to obtain the agreement of the parties to a specific schedule for the acceptance of an individual contract holder's SNF and HLW. Pursuant to the terms of the Standard Contract, DOE was to issue, beginning not later than July 1, 1987, "an annual capacity report [("ACR")] for planning purposes," identifying "projected annual receiving capacity" at any DOE facilities and annual acceptance ranking for acceptance of contract holders' SNF and/or HLW for the first 10 years "following the projected commencement of operation of the initial DOE facility." 10 C.F.R. § 961.11, Art. IV.B.5(b). Subsequently, beginning on April 1, 1991, DOE was to issue "an annual acceptance priority ranking" ("APR") for receipt of the contract holders' SNF, "based on the age of SNF and/or HLW as calculated from [its] date of discharge." Id., Art. IV.B.5(a).

Second, the contract holder, "[a]fter DOE has issued its proposed acceptance priority ranking" on April 1, 1991, and no earlier than January 1, 1992, would submit a delivery commitment schedule ("DCS") identifying "all SNF and/or HLW the [contract holder] wishes to deliver to DOE beginning sixty-three (63) months thereafter," for DOE's approval or disapproval. 10 C.F.R. § 961.11, Art. V.B.1 (emphasis added). If DOE approves the DCS, the parties have effectively agreed and defined the amount of SNF that DOE will accept from that contract holder 63 months later. Id. If DOE disapproves the first DCS submission, the contract holder is entitled to make a second DCS submission, again for DOE's approval or disapproval. Id. If DOE approves the second DCS submission, the parties have, as stated above, effectively defined the amount of SNF that DOE will accept from that contract holder 63 months later. Id.

If DOE disapproves the second submission, DOE responds with its own proposed schedule, which the contract holder may accept or, alternatively, may attempt to negotiate with DOE. Id., Art. V.B.2. If negotiations fail, the contract holder may then submit its dispute to the contracting officer for a decision, the contracting officer issues a decision on the schedule, and the contracting officer's final decision upon the DCS "shall be final and conclusive" until, within 90 days, the contract holder appeals to the Energy Board of Contract Appeals. Id., Art. XVI.A; see McDonnell Douglas Corp., ASBCA No. 26747, 83-1 BCA ¶ 16,377, at 81,421 (1983) (boards of contract appeals "[h]istorically and traditionally" assumed jurisdiction over non-monetary "disputes as to the interpretation of contract provisions and determination of the rights and obligations of the parties under the provisions of the contract"). The EBCA's review of DOE's discretionary decision would not be de novo, but, instead, the "contracting officer's discretionary authority [could] be overturned only by a showing that it was arbitrary, capricious or otherwise an abuse of discretion." Rapid City Indian Health Advisory Bd. of Directors, ASBCA No. 26641, 83-1 BCA ¶ 16,311, at 81,084 (1983); see United States Fidelity & Guaranty Co. v. United States, 230 Ct. Cl. 355, 365-70, 676 F.2d 622, 628-31 (1982); Fraas Surgical Mfg. Co. v. United States, 215 Ct. Cl. 820, 828-29, 571 F.2d 34, 39 (1978).[13]

---

[13] As one of the boards of contract appeals has explained, where a challenge to an agency's decision under a contract "tests the validity of the Contracting Officer's exercise of his judgment and discretion in a matter which by the terms of the contract itself is made discretionary with him," and the board is "reviewing a contractually-provided judgmental decision of the Contracting Officer," the board's review is limited to whether the contracting officer's discretionary decision was in bad faith, was unreasonable, or was arbitrary or capricious. Thomas W. Yoder Co., VABCA No. 997, 74-1 BCA ¶ 10,424, at 49,250-51 (1974). Were the board to engage in a de novo review of the discretionary decision, it would infringe upon the contracting officer's "legal right to exercise his discretion." Id.

DOE and the utilities acted in accordance with these provisions to develop the schedule for waste acceptance beginning in 1998. As we anticipate establishing at trial, the rates of SNF acceptance identified in the 1991 ACR were predicated upon the requirements of the 1987 NWPA amendments, which precluded DOE from accepting more than 10,000 MTUs of SNF for storage at an MRS prior to the operation of a Federal repository. 42 U.S.C. § 10168(d)(1). When developing the 1991 ACR, and anticipating operation of a repository in 2010, DOE divided the 10,000 MTU acceptance limitation across the 12-year period from 1998 (when it anticipated that MRS operations would begin) to 2010.[14]

DOE then drafted, with the assistance of the utilities, the instructions for the submission of DCSs. See, e.g., DX 99. After the instructions were issued, numerous utilities submitted DCSs that were then approved by DOE. In fact, NSP submitted its DCSs for Prairie Island's SNF consistent with the 1991 ACR and without complaint.

2. Some Of The Decisions Issued Concerning The Rate Of Acceptance Incorrectly Analyze The Standard Contract Schedule Provisions

In Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652 (2003), this Court rejected the Government's arguments upon a motion for partial summary judgment that the schedule provisions contained in the Standard Contract provide the mechanism for determining the SNF acceptance schedule. Yet, this Court did not explain the manner in which SNF

[14] In fact, NSP's proposal to obligate DOE to accept 3,000 MTUs of SNF annually after a five-year ramp-up period would have placed DOE in direct conflict with the statutory limitations imposed by the 1987 amendments to the NWPA, which precluded DOE from accepting more than 10,000 MTUs of SNF prior to the operation of a repository. As discussed above, in 1989, DOE informed nuclear utility contract holders that it did not anticipate that a Federal repository would be available until 2010, but that it anticipated being able to begin SNF acceptance at an MRS in 1998.

acceptance would, or will, work absent reference to that schedule mechanism. Finding that the DCS process did not limit the contract holder's damages or limit its right to the acceptance of larger amounts of SNF than identified in those DCSs, the Court found that the DCS process was only "non-binding and preliminary." Id. at 663. However, without the DCS process, the Standard Contract contains no requirement that the contract holder notify DOE of the amount of SNF it wants DOE to take in any particular year (either in advance or upon the day that acceptance is desired); no notice of the location, date, or time for that acceptance within a particular year; and no notice of the characteristics of the SNF that will need to be accepted at that time or the size of the cask that DOE will have to procure to transport the SNF. If the DCSs were not binding, uncertainty surrounding the exchanges of approved DCSs – a causation theory that underlies NSP's damages claim – would be compounded.[15]

In Indiana Michigan Power Co. v. United States, 57 Fed. Cl. 88 (2003), the Court of Federal Claims stated that its "obligation is to provide a rate of [SNF] acceptance that the Department of Energy would have employed in absence of the breach." 57 Fed. Cl. at 100 (emphasis added).[16] With all due respect, that focuses upon the wrong question. The issue presented requires a determination of the rate of SNF acceptance pursuant that DOE was contractually obligated to satisfy in the "but for" world. DOE cannot be held financially

---

15 In fact, at trial, we will show that NSP's theory of liability necessarily assumes that DCSs are binding commitments.

16 The Court's decision in Indiana Michigan upon the Government's motion for summary judgment regarding the rate of acceptance was not necessary to the appeal to the Federal Circuit. The Federal Circuit dismissed the Government's cross-appeal of the decision, stating that the "trial court's rate calculation determination was not necessary to the judgment." Indiana Michigan Power Co. v. United States, 04-5139 (Fed. Cir. Oct. 13, 2004) (unpublished opinion).

responsible in damages for a failure to take actions that it might have elected voluntarily to perform, even though it was not required to do so. The only damages that the Court can properly award are those based upon DOE's breach of its obligation to perform actions that it was contractually obligated to perform. Accordingly, the Court's finding in Indiana Michigan that "[n]othing in the record supports the collection rate that defendant would use – 900 metric tons per year," id. at 98, is not only factually incorrect, but also irrelevant to the identification of the rate at which DOE was contractually obligated to accept SNF.

If the trial court's decisions in Commonwealth Edison and Indiana Michigan eliminate the existing schedule terms from the Standard Contract, the Court is left with no mechanism in the Standard Contract for determining the quantity of SNF that DOE would have accepted, when DOE would have accepted that SNF, and from which utility the SNF would have been accepted had DOE begun timely performance. Further, given that NSP and the other utilities still expect performance upon the Standard Contract, DOE also is left with no mechanism for determining when, how, or where DOE will accept SNF and/or HLW in the future. The Standard Contract does not contain a specific rate of acceptance because of the uncertainties that existed at the time of contract formation in a program that was to be implemented 15 years later. Instead, the contract contains a mechanism for determining the rate of acceptance at a later time, as the program, and its capacity limitations, are further defined. This mechanism was implemented in 1991 and worked until 1995, when DOE finally announced that it could not meet the 1998 acceptance date at the MRS. Going forward, DOE will use the mechanism that generated the

1991 ACR and subsequent DCS submission and approval process to define the rate of acceptance in the future.[17]

The Court of Claims has previously observed that, "[n]ormally, the task of supplying a missing, but essential, term (for an agreement otherwise sufficiently specific to be enforceable) is the function of the court." David Nassif Assocs. v. United States, 214 Ct. Cl. 407, 423, 557 F.2d 249, 258 (1977). However, the limitation upon the Court's ability to supply its own term is clearly stated: "for an agreement otherwise sufficiently specific to be enforceable." Id.

A court cannot make contracts for the parties. To be valid and enforceable, "a contract must have both consideration to ensure mutuality of obligation . . . and sufficient definiteness so as to 'provide a basis for determining the existence of a breach and for giving an appropriate remedy.'" Ridge Runner Forestry v. Veneman, 28 F.3d 1058, 1061 (Fed. Cir. 2002) (citations omitted). If an agreement is missing one or more essential terms, an agreement to agree upon those terms is unenforceable because it lacks mutuality of intent and sufficient definiteness to determine the rights and liabilities of the parties. See Modern Sys. Tech. Corp. v. United States, 979 F.2d 200, 204 (Fed. Cir. 1992); Bel Pre Health Care Center, Inc. v. United States, 24 Cl. Ct. 495, 496 (1991) ("[i]f an essential term, such as the quantity term, has been omitted then there can be no basis for deciding whether the agreement has been broken; the definiteness necessary for enforceability is lacking"), aff'd, 980 F.2d 745 (Fed. Cir. 1992) (table); Transamerica Equip. Leasing Corp. v. Union Bank, 426 F.2d 273, 274 (9th Cir. 1970) ("[w]here an agreement is not sufficiently definite to enable a court to give it an exact meaning or where an essential element is

---

[17] DOE clearly plans to use ACRs and DCSs to define DOE's acceptance obligations in the future. By letter dated July 28, 2004, DOE's contracting officer, David Zabransky, issued a new ACR and DCS instructions and requested that NSP and other utilities submit DCSs in anticipation of performance in 2010. This process was later suspended.

reserved for future agreement of both parties, a legal obligation cannot result"). "Courts refuse to enforce agreements that contain indefinite promises or terms they deem essential because judicial clarification of the uncertainty entails great danger of creating intentions and expectations that the parties themselves never entertained." Neeley v. Bankers Trust Co. of Tex., 757 F.2d 621, 628-29 (5th Cir. 1985); see Mays v. Trump Indiana, Inc., 255 F.3d 351, 357-58 (7th Cir. 2001) ("mere agreement to agree does not a binding contract make" without agreement upon "all essential terms that are to be incorporated in the document"); Shann v. Dunk, 84 F.3d 73, 78-81 (2d Cir. 1996) ("[w]e believe the issue of Shann's liability for the deferred payments was of such importance that, if the district court finds the parties failed to agree on it, the court would be required to void the contract for absence of an essential term").

Obviously, as indicated in the Court of Claims' decision in Nassif, certain terms of a contract that are "essential" to it in some respects may, in certain circumstances, be identified by the Court, which must consider what "the parties would have agreed upon at the time of their initial . . . negotiations . . . ." David Nassif, 214 Ct. Cl. at 376, 644 F.2d at 7.[18] However, at a certain point, the missing term becomes so essential to the formation of the contract that the Court, if it supplies the missing term itself, creates a contract to which the parties had never agreed. In this case, the "missing" term that NSP seeks to have the Court impose upon the Standard Contract is one of the central aspects of the Standard Contract and materially increases the past damages that NSP could recover. Moreover, the Court's ruling upon the acceptance term will likely control the future damages to which NSP may be entitled. This enormous variance in the effect of the acceptance schedule term upon the parties' rights, obligations, and

---

[18] Here, the evidence will show that the term was offered by the utilities and rejected by DOE.

damages cannot be said to be minor and, in fact, is one of the most essential terms of the Standard Contract. To the extent that the Court disagrees with our demonstration that the schedule provisions of the Standard Contract and the approved DCSs identify the parties' obligations in this case, the Court cannot merely impose its own view of a reasonable schedule term. A rejection of our position would effectively render the Standard Contract too indefinite to enforce. See Massengill v. Guardian Mgt. Co., 19 F.3d 196, 202 (5th Cir. 1994) ("When a writing does not show the parties' agreement on a minor contract term, the reviewing court may supply a reasonable interpretation. . . . *But essential contract terms may not be supplied by a court*. 'If any essential term is left unresolved, there is simply no contract and no obligation on the parties.'" (emphasis added; citation omitted; applying Mississippi law)); see also Coyle's Pest Control, Inc. v. Cuomo, 154 F.3d 1302, 1306 (Fed. Cir. 1998) (refusing to read "reasonable" term into contract, court found contract unenforceable as indefinite quantity contract because it lacked minimum quantity term).[19]

The Standard Contract provides a mechanism for establishing the SNF acceptance schedule, including the rate of SNF acceptance. As we will establish at trial, the parties followed that mechanism for a significant period of time. As a result, a schedule exists that the Court should view as the contractual "schedule" for purposes of assessing damages. Absent the

---

[19] It is true that the appellate court has found that a contract term which allows for future negotiation "impliedly places an obligation on the parties to negotiate in good faith," Aviation Contractor Employees, Inc. v. United States, 945 F.2d 1568, 1572 (Fed. Cir. 1991), and that, where the contract and applicable regulations provide guidelines for negotiations of future agreements, the Court may "determine whether or not the government negotiated according to the contract." City of Tacoma, Dep't of Public Utilities v. United States, 31 F.3d 1130, 1132 (Fed. Cir. 1994). However, that review does not provide the Court with the ability to create a contract for the parties where the "missing" terms are so essential to the central purpose of the contract that the absence of the terms renders the contract too indefinite to enforce.

Court's reliance upon that prior schedule, we cannot identify any basis upon which the Court could justify its imposition of its own schedule into this contract.[20]

## IV. NSP CANNOT ESTABLISH THE NECESSARY CAUSAL LINK BETWEEN CERTAIN OF ITS CLAIMED DAMAGES AND DOE'S DELAY

### A. NSP Would Have Built A Dry Storage Facility Regardless Of DOE's Delay In Accepting SNF

NSP argues that, "had NSP believed with reasonable certainty that DOE would meet its obligation to begin accepting fuel from utilities in 1998, NSP could have re-racked its pool for a third time or used rod consolidation to assure sufficient storage space in its pool without constructing a dry storage facility." The evidence will show, however, that NSP never seriously considered reracking or rod consolidation, as it considered both options inferior to dry storage for technical reasons, completely unrelated to any uncertainty with regard to DOE acceptance.

NSP's decision to pursue dry storage was made in late 1988 because of a need to increase capacity before running out of space in 1995, three years before DOE was required to begin acceptance from the industry as a whole in 1998, and four years before NSP's first allocation for acceptance of SNF in 1999. The evidence will show that rod consolidation was not considered a feasible option, as NSP had already abandoned an unsuccessful rod consolidation program. DX 66 at 2 (NSP0037000-7002). The evidence will further show that NSP believed reracking to be technically infeasible.

NSP's argument that reracking would have been a viable option had DOE begun acceptance in 1998 is based primarily upon a one-page, handwritten estimate, prepared by

---

[20] The Court in Yankee Atomic Electric Co. v. United States, No. 98-126C (Merow, S.J.), made certain findings of fact relative to the rate of acceptance. See Opinion and Order, dated October 4, 2006. We are continuing to review the Court's order and its application of the rate of acceptance to damages in that case.

employee Laura McCarten. DX 77. By her own admission, Ms. McCarten's estimate was prepared in 1990, at least a year after NSP decided it would build a dry storage facility. Ms. McCarten's estimate, which assumed that NSP could achieve a 20-percent increase in capacity, was an "approximation," based upon "engineering judgment," rather than a "rigorous engineering study." Ms. McCarten, the preparer of the estimate, was unsure how likely it was that NSP could actually achieve a 20-percent increase in capacity. Further, other analyses show that NSP might have achieved significantly less than a 20-percent increase in capacity from reracking. For example, the Environmental Impact Statement for NSP's dry storage facility indicates that reracking might only have given NSP a 14 to 18-percent increase in capacity, not enough space to prevent a shutdown of the Prairie Island plant before DOE was scheduled to begin acceptance of SNF. DX 91 at 5.29 (NSP0000567).

Based upon the assumptions contained in the report filed by NSP's experts, even a 20-percent increase in capacity would have taken Prairie Island to 1999, the year in which NSP had its first allocation for acceptance of SNF by DOE. It is important to note that the Standard Contract does not contain a requirement that DOE accept SNF during a certain time of year. Had NSP reracked its Prairie Island pool, and achieved a full 20-percent increase in capacity, allowing the plant to operate until some time during 1999, it is still possible that NSP would have run out of space during the time between its last discharge of SNF and DOE's first pick-up of SNF.

As discussed in more detail by the Government's expert witness, Dr. Jonathan Neuberger, the hypothetical 20-percent increase upon which NSP bases its case, even if attainable, would have been barely enough to get the Prairie Island plant through to DOE

acceptance in 1999. Even if it had been certain that DOE would begin acceptance of SNF on time, prudent management would not have exposed NSP to the significant and potentially costly risks associated with cutting it as close as NSP suggests it would have done. It remains clear that dry storage would have been NSP's only acceptable storage increasing option, regardless of whether DOE had delayed acceptance of SNF. Therefore, the licensing, engineering, and construction costs claimed by NSP are not an incremental result of DOE's breach and should not be recovered by NSP.

### B. The Damages Sought By NSP For Costs Resulting From State Legislative Mandates are Unforeseeable, Consequential Damages, Unrecoverable As A Matter Of Law

As discussed in greater length in our motion *in limine*, filed on October 4, 2006, NSP bases four categories of damages upon legislative mandates issued by the Minnesota legislature in 1994 and 2003. Specifically, NSP claims damages for: (1) the addition of biomass energy capacity to NSP's energy resources for producing power; (2) the creation and administration of a fund to develop renewable energy sources; (3) the attempt to site a second, alternative site for NSP's dry storage facility, in addition to the site ultimately used by NSP; and (4) a settlement between NSP and the Mdewakanton Dakota Tribe at Prairie Island ("the tribal settlement"), codified by the 2003 legislation.

As we have demonstrated in our motion *in limine*, which we incorporate by reference herein, even if NSP could prove that its decision to build a dry storage facility was based upon DOE's delay in acceptance of SNF, NSP cannot prove that any of the mandates would not have happened but for DOE's breach. Upon entering into the Standard Contract with NSP, DOE could not have foreseen, as a probable outcome of any future breach, that the Minnesota

legislature would even become involved in the process of solving NSP's storage problem. Indeed, it did not become clear that such legislative intervention was required until the Minnesota Court of Appeals so ruled in 1993. Until the Minnesota Supreme Court declined to take the appeal of that decision, NSP itself took the position that legislative approval of its decision to build dry storage was not required.

Further, it was even less foreseeable that, as a probable outcome of any future breach, the Minnesota legislature would take the specific actions it did. Upon entering into the Standard Contract with NSP, DOE could not have foreseen that as a result of a future breach the Minnesota legislature would require NSP to invest in renewable energy sources, research a second, alternate site for its dry storage facility that it never intended to use, and pay the Mdewakanton Tribe $2.5 million annually. As we have shown in our motion *in limine*, this legislative intervention is an unforeseeable intervening step that renders the damages claimed by NSP consequential, and unrecoverable.

Even in the event that the Court does not grant the Government's motion *in limine* regarding the inadmissibility of the testimony of individuals regarding the intent of a legislative body, NSP cannot meet its burden of proving a causal connection between DOE's breach and the legislative mandates.

### C. NSP's Investment In The Private Fuel Storage Venture Was Unforeseeable As A Matter Of Law

As a matter of law, the Federal Circuit's Indiana Michigan decision precludes recovery of NSP's contributions to the off-site Private Fuel Storage ("PFS") facility. The issue of

recoverability of amounts paid to PFS squarely was addressed by the Federal Circuit. In finding that PFS-related costs were not recoverable, the Federal Circuit did not simply uphold the trial court's findings of fact. Instead, the Federal Circuit held:

> The credited evidence also showed that the utility's investment in the private storage facility was speculative and that the high cost of the venture was unforeseeable. * * * While DOE should have foreseen that its breach would force Indiana Michigan to find alternate storage for its SNF, it is not liable for such a speculative venture and unforeseeable costs.

Indiana Michigan, 422 F.3d at 1376. Because foreseeability is measured from the perspective of the defendant, and given that Indiana Michigan's contract with DOE is materially identical to the contracts at issue here, Indiana Michigan is dispositive of the plaintiff's claim for costs associated with PFS. Likewise, the Federal Circuit's conclusion that the PFS effort was "speculative" should bar any claim for those costs here.

Outside of the dispositive precedent precluding recovery for PFS, NSP cannot establish that PFS constituted reasonable mitigation. Indeed, based upon the uncertainties concerning licensing, financing, construction, and transportation, among myriad other issues – uncertainties that were known at the time NSP invested in PFS – NSP's investment in PFS fails to meet the reasonableness standards set forth by the Court.

### D. NSP Is Precluded As A Matter Of Law From Recovering Any Of Its Claimed Costs Prior To 1994

In Indiana Michigan, the Federal Circuit held that plaintiffs in spent nuclear fuel cases are not entitled to recover damages arising before 1994 because the plaintiffs' duty to mitigate

only arose when DOE issued its May 1994 notice of inquiry "unequivocally announcing" that it would not perform by January 31, 1998. Indiana Michigan, 422 F.3d at 1375. In other words, because mitigation is a duty, and not a right, NSP's obligation to mitigate any alleged breach by the Government necessarily did not arise until the May 1994 notice of inquiry, at the earliest. Accordingly, as a matter of law, NSP may not recover any alleged costs incurred prior to DOE's issuance of the May 1994 notice of inquiry.

E. NSP's Claim For The Cost Of Capital Is A Legally Unsupported Attempt To Recover Prejudgment Interest

NSP inflates its damages claim by $53 million, which it categorizes as "cost of capital." Plaintiff asserts that its cost of capital adjustment is "akin to" the type of interest award permitted by the Federal Circuit in Wickham Contracting Co. v. United States, 12 F.3d 1574 (1994). Pl. Br. at 24. As we have demonstrated in our motion for summary judgment regarding prejudgment interest, which we incorporate by reference herein, "interest is not recoverable in a suit against the government unless it has expressly provided for its recovery." Jetco, Inc. V. United States, 11 Cl. Ct. 837, 850 (1987); see also 28 U.S.C. § 2516(a) (1976) (interest upon a claim against the United States is precluded unless permitted under a contract or Act of Congress).

The TVA decision, upon which plaintiff relies, relied upon a line of cases involving a contract clause – the "Changes" clause contained in most Federal procurement contracts – authorizing recovery of incurred interest charges in extremely limited circumstances. However, the Federal Circuit and its predecessor, the Court of Claims, have held in the context of equitable adjustments under the "Changes" clause that, "[a]lthough interest on equity capital is not

recoverable, a contractor may recover interest actually paid on funds borrowed because of the government's delay in payments and used on the delayed contract," Wickham Contracting Co., 12 F.3d at 1582, reasoning that the "Changes" clause authorizes such a recovery. Bell v. United States, 404 F.2d 975, 984 (Ct. Cl. 1968). Nevertheless, without a "Changes" clause or similar contractual provision, the statutory provision barring recovery of interest from the Government, 28 U.S.C. § 2516(a), "and its policy" continue to "apply to demands for damages in 'breach' claims against the United States . . . ." Bell, 404 F.2d at 984. Here, NSP's contract contains no "Changes" or similar clause, and NSP is seeking breach damages, not an equitable adjustment. Accordingly, without any statutory or contractual waiver of sovereign immunity regarding the recovery of interest, NSP's claim for prejudgment interest should be denied as a matter of law. See J.D. Hedin, 456 F. 2d at 1330.

F. NSP Cannot Establish Causation For Certain Costs It Allegedly Incurred For Internal Labor And "Overheads"

NSP cannot meet its burden of establishing causation with respect to certain costs associated with internal labor and "overheads." There is substantial evidence that many of these costs would have been incurred even if DOE performed under the Standard Contract.

As part of its claim, NSP has included all internal labor costs that were billed to any allegedly damages-related project. These costs were added to the claim without regard to the job duties of the employees performing the tasks, to the scheduling of the tasks, or to the amount of time spent by each employee upon a damages-related project. Instead, any time that was billed to a project was charged to the damages claim as well. "It is settled . . . that a contractor is not entitled to recover 'expenses which would properly have been incurred regardless of the [breach].'" Boyajian v. United States, 423 F.2d 1231, 1236 (Ct. Cl. 1970) (quoting Saddler v.

United States, 287 F.2d 411, 415 (Ct. Cl. 1961)). Rather, NSP only may recover for labor performed by its employees to the extent that it can show that these labor costs represent an incremental cost to NSP. See also Wilner v. United States, 23 Cl. Ct. 241, 258, 262-63 (1991) (allowing recovery for hours that would not have been worked but for the delay).

Consistent with this principle, salaries or wages generally may represent an incremental cost or damage under two circumstances. First, an employer may recover where the employer actually pays his employee increased wages because of the breach. In this regard, the United States Court of Appeals for the Eighth Circuit has refused to award such damages to a corporate employer where there was no evidence that its employee "requested payment, that payment was made, or that the parties intended such a payment to be made" for the additional time he had worked because of the breach. Wilson v. Marquette Elecs., Inc., 630 F.2d 575, 586 (8th Cir. 1980) (rejecting claim that $40,000 in "lost time" for employee labor was recoverable because no showing that company lost any money because of time employee was forced to spend upon project); see also AES Tech. Sys., Inc. v. Coherent Radiation, 583 F.2d 933, 943 (7th Cir. 1978) (plaintiff not entitled to damages where breach did not "prohibit . . . employees from working on other projects"). Second, courts have generally sustained recovery for employees' lost time only where the plaintiff has foregone other contractual opportunities. Thus, recovery is only available where "salary and other overhead items allocated as a bookkeeping matter to a broken contract would in fact have been recovered in a substitute contract." Autotrol Corp. v. Cont'l Water Sys. Corp., 918 F.2d 689, 693 (7th Cir. 1990) (Posner J.); 22 Am. Jur. 2d *Damages* § 416 (2004); accord S.W. Eng'g Co. v. Cajun Elec. Power Coop., 915 F.2d 972, 978-979 (5th Cir. 1990); Willred Co. v. Westmoreland Metal Mfg. Co., 200 F. Supp. 59, 66 (E.D. Pa. 1961). It is a

question for the fact-finder to determine whether such a contract reasonably could have been acquired. Autotrol, 918 F.2d at 693. Here, this type of damage award is wholly inappropriate where NSP cannot demonstrate any alternative, profitable responsibilities to which it could have allocated its employees but for the Government's breach. Cf. id. (noting that "[t]here was testimony that Autotrol's controls division was consistently overbooked with new projects and had a consistent record of profitability. . . .").

At trial, the Government will show that NSP's damages claim misstates the incremental nature of certain personnel charges and of NSP's overhead and unallocated charges. Additionally, NSP has provided no evidence concerning the work that would have been performed by these employees had they not been engaged in the damages-related projects. These costs are not incremental simply because NSP so asserts. Instead, NSP bears the burden of establishing that each of the costs asserted in damages is incremental to DOE's partial breach and must do so with admissible evidence. As a matter of fact, NSP will not be able to meet that burden.

G. Additional Adjustments Must Be Made To NSP's Claim

The Government's technical expert, John D. Leonard, Jr., has identified and is expected to testify regarding several costs included in NSP's damages claim that are not directly related to the Government's breach. Mr. Leonard will testify, based upon the experience that he gained during more than 40 years in the nuclear industry, that from a technical standpoint, NSP would have had to construct a dry storage facility, as opposed to performing a third rerack, even if DOE had begun accepting SNF from the industry in 1998. For that reason, various costs associated

with the NSP's dry storage facility would have been incurred regardless of DOE's partial breach and should not be included in damages.

Mr. Leonard has also identified several other non-incremental costs that should be removed from NSP's damages claim. Specifically, NSP has included in its damages claim the cost for upgrading its auxiliary building crane. Mr. Leonard has determined that NSP's auxiliary building crane would have required an upgrade even if DOE had begun SNF acceptance in 1998. Likewise, NSP includes the cost of a security upgrade at the G.E. Morris facility, where some of the SNF generated at the Monticello plant is stored. Based upon the assumptions used in the report generated by NSP's experts, this security upgrade was completed before any NSP fuel would have been accepted from G.E. Morris, even if DOE had begun accepting fuel by 1998. Therefore, the costs associated with the crane upgrade and security upgrade are not incremental to the breach and should not be included in NSP's damages claim.

CONCLUSION

For the reasons outlined above, the Government respectfully requests that the Court require plaintiff to satisfy its burden of proof and eliminate from plaintiff's claim all damages that are unforeseeable, uncertain, or not directly caused by the Government's breach.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/Heide L. Herrmann
HEIDE L. HERRMANN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tele: (202) 305-3315
Fax: (202) 307-2503

Attorneys for Defendant

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Avenue, S.W.
Washington, D.C. 20585

ALAN J. LO RE
ANDREW P. AVERBACH
STEPHEN P. FINN
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

October 10, 2006

CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 10th day of October, 2006, a copy of foregoing "DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Heide L. Herrmann