**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
(Electronically Filed on October 23, 2006)

| | | |
|---|---|---|
| **NORTHERN STATES POWER COMPANY,** Plaintiff, v. **THE UNITED STATES**, Defendant. | ) | No. 98-484C (Senior Judge Wiese) |

**NORTHERN STATES POWER COMPANY'S RESPONSE TO DEFENDANT'S MOTION IN LIMINE TO EXCLUDE TESTIMONY REGARDING MINNESOTA STATE LEGISLATION**

Alex D. Tomaszczuk
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7940
(703) 770-7901 (fax)

Counsel of Record for Plaintiff
Northern States Power Company

*Of Counsel:*

Jay E. Silberg
Daniel S. Herzfeld
Jack Y. Chu
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
2300 N Street, N.W.
Washington, D.C. 20037
(202) 663-8000
(202) 663-8007 (fax)

Kerry C. Koep
**XCEL ENERGY**
414 Nicollet Mall, 5th Floor
Minneapolis, MN 55401
(612) 215-4583
(612) 215-4544

October 23, 2006

# TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... ii

BACKGROUND .......... 1

ARGUMENT .......... 3

I. FORESEEABILITY AND CAUSATION ARE QUESTIONS OF FACT TO BE DETERMINED AT TRIAL .......... 3

II. THE MANDATES WERE FORESEEABLE (OR ACTUALLY FORESEEN) .......... 4

A. The Law On Foreseeability Favors NSP's Position .......... 4

B. NSP Either Had The Choice of Mitigating Its Damages By Accepting The Mandates Or Closing Its Prairie Island Plant .......... 6

C. It Was Foreseeable, And In Some Cases Foreseen, That A State Might Impose Conditions On Siting A Storage Facility In The Highly Regulated Nuclear Industry .......... 8

1. In A Heavily Regulated Environment, Actions Of Regulatory Bodies Are Foreseeable .......... 8
2. The Minnesota Mandates Are Equivalent To Other Forms Of Taxation Or Rate-Setting .......... 10
3. It Was Foreseeable That Breach Of A Contract Born Of Political Action Would Result In Political Consequences .......... 10
4. The Need To Investigate Alternative Sites Was Foreseeable .......... 11
5. Assistance Payments Were Foreseeable .......... 12

III. THE GOVERNMENT'S BREACH CAUSED NSP TO INCUR COSTS FROM THE MANDATES .......... 13

IV. THE FORMER LEGISLATORS SHOULD BE ALLOWED TO TESTIFY .......... 16

V. CONCLUSION .......... 18

# TABLE OF AUTHORITIES

## Cases

*Bluebonnet Sav. Bank, FSB v. United States*,
266 F.3d 1348 (Fed. Cir. 2001) .......... 3, 8

*Bonham v. District of Columbia Library Admin.*,
989 F.2d 1242 (D.C. Cir. 1993) .......... 16

*California Fed. Bank, FSB v. United States*,
395 F.3d 1263 (Fed. Cir. 2005), *cert. denied*, 126 S. Ct. 344 (2005) .......... 13

*Citizens Fed. Bank, FSB v. United States*,
59 Fed. Cl. 507 (2004) .......... 10

*Commonwealth Edison Co. v. United States*,
271 F.3d 1327 (Fed. Cir. 2001) (*en banc*) .......... 8

*Dept of Energy v. Westland*,
565 F.2d 685 (C.C.P.A. 1977) .......... 17

*Duquense Light Co. v. Barasch*,
488 U.S. 299 (1989) .......... 8

*Edwards v. Aguillard*,
482 U.S. 578 (1987) .......... 16

*Gardner & North Roofing & Siding Corp. v. Board of Governors of the Fed. Reserve Sys.*,
464 F.2d 838 (D.C. Cir. 1972) .......... 17

*Gardner Displays Co. v. United States*,
346 F.2d 585 (Ct. Cl. 1965) .......... 4, 5, 6

*Hendler v. United States*,
175 F.3d 1374 (Fed. Cir. 1999) .......... 3

*Hughes Communications Galaxy, Inc. v. United States*,
271 F.3d 1060 (Fed. Cir. 2001) .......... 6

*Indiana Mich. Power Co. v. United States*,
422 F.3d 1369 (Fed. Cir. 2005) .......... 4, 5, 6, 13

*In re Independent Spent Fuel Storage Installation*,
501 N.W.2d 638 (Minn. Ct. App. 1993) .......... 2, 8



400474383v2

*Jackson v. Metropolitan Edison Co.*,
419 U.S. 345 (1974)........ 8

*Landmark Land Co. v. FDIC*,
256 F.3d 1365 (Fed. Cir. 2001)........ 3

*Locke v. United States*,
283 F.2d 521 (Ct. Cl. 1960)........ 14

*Maine Yankee Atomic Power Co. v. United States*,
44 Fed. Cl. 372 (1999), *aff'd*, 271 F.3d 1357 (Fed. Cir. 2001)........ 8

*National Sch. of Aeronautics, Inc. v. United States*,
142 F. Supp. 933 (Ct. Cl. 1956)........ 17

*Northern Helex Co. v. United States*,
524 F.2d 707 (Ct. Cl. 1975)........ 6

*Old Stone Corp. v. United States*,
450 F.3d 1360 (Fed. Cir. 2006)........ 7

*Olin Jones Sand Co. v. United States*,
225 Ct. Cl. 741 (1980)........ 5

*Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n*,
461 U.S. 190 (1983)........ 9

*Ramsey v. United States*,
101 F. Supp. 353 (Ct. Cl. 1951)........ 5

*Regan v. Wald*,
468 U.S. 222 (1984)........ 17

*Selman v. United States*,
498 F.2d 1354 (Ct. Cl. 1974)........ 17

*Underwood v. Waddell*,
743 F. Supp. 1291 (S.D. Ind. 1990)........ 16

*United States Steel Corp. v. United States*,
618 F. Supp. 496 (C.I.T. 1985)........ 17

*Yankee Atomic Elec. Co. v. United States*,
2006 WL 2848615 (Fed. Cl. Oct. 4, 2006)........ 6, 10

### Statutes and Codes

Nuclear Waste Policy Act of 1982,
Pub. L. No. 97-425, 96 Stat. 2201 (1983) .......... 4, 11

Nuclear Waste Policy Amendments Act of 1987,
Pub. L. No. 100-203, 101 Stat. 1330-228 (1987) .......... 11

42 U.S.C. § 10131 .......... 11

42 U.S.C. § 10132 .......... 11

42 U.S.C. § 10133 .......... 11

42 U.S.C. § 10136 .......... 12

42 U.S.C. § 10156 .......... 13

42 U.S.C. § 10161 .......... 9, 13

42 U.S.C. § 10169 .......... 13

42 U.S.C. § 10173 .......... 12

42 U.S.C. § 10173a .......... 12

42 U.S.C. § 10195 .......... 12

42 U.S.C. § 10199 .......... 12

42 U.S.C. § 10222 .......... 11

1994 Minn. Sess. Laws Ch. 641 .......... 2, 14, 15

2003 Minn. Sess. Laws, 1st Spec. Sess, Ch. 11 .......... 16

Minn. Stat. § 116C.80 .......... 15

Minn. Stat. § 216B.1645 .......... 16

Minn. Stat. § 216B.2424 .......... 2, 14

### Rules and Regulations

RCFC 7 .......... 1



400474383v2

RCFC 7.2 .......... 1

RCFC 56 .......... 3

**Other Authorities**

H.R. Rep. No. 97-491, pt. 1 (1982),
*reprinted in* 1982 U.S.C.C.A.N. 3792 .......... 10-11

Restatement (Second) of Contracts § 350.......... 6

3 Dan B. Dobbs, Dobbs Law of Remedies (2d ed. 1993).......... 5, 7

3 E. Allan Farnsworth, Farnsworth on Contracts (3d ed. 2004).......... 4

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
(Electronically Filed on October 23, 2006)

| | |
|---|---|
| **NORTHERN STATES POWER COMPANY,**<br>Plaintiff,<br>v.<br>**THE UNITED STATES,**<br>Defendant. | No. 98-484C<br>(Senior Judge Wiese) |

**NORTHERN STATES POWER COMPANY'S RESPONSE TO DEFENDANT'S MOTION IN LIMINE TO EXCLUDE TESTIMONY REGARDING MINNESOTA STATE LEGISLATION**

Pursuant to RCFC 7 & 7.2, Plaintiff Northern States Power Company ("NSP") responds to Defendant United States' ("the Government's") October 4, 2006 motion in limine to exclude testimony at trial regarding the Minnesota mandates and testimony from former legislators ("Gov't Br."). In particular, the Government asserts that, as a matter of law, NSP's costs for mitigating its damages incurred in complying with these mandates were unforeseeable and not caused by the Government's breach.

## BACKGROUND

For NSP to be able to build the dry storage facility at the Prairie Island nuclear facility, Minnesota state law required that it apply for and receive a "Certificate of Need" from the Minnesota Public Utilities Commission. NSP applied for the Certificate of Need in 1991. In 1992, the Commission in Docket No. E002/CN-91-91 reviewed the proposed facility and approved the Certificate of Need for a dry storage facility and seventeen storage casks. On appeal of that decision by opponents of the proposed facility, the Minnesota Court of Appeals

ruled that approval by the Minnesota legislature was also required. *See In re Independent Spent Fuel Storage Installation*, 501 N.W.2d 638 (Minn. Ct. App. 1993) ("*In re ISFSI*"). In 1994, following extensive legislative proceedings, the Minnesota Legislature enacted 1994 Minn. Sess. Laws Ch. 641. This law provided legislative authorization for the Prairie Island dry storage facility, but conditioned that authorization by imposing on NSP a number of costly mandates. Among other conditions, the Minnesota legislature (1) required NSP to implement up to 125 megawatts of mandated biomass generation,[1] 50 megawatts by December 1, 1998 and an additional 75 megawatts by December 31, 2002, (2) mandated payment into a fund for renewable energy – the Renewable Development Fund – of $500,000 each year for every dry storage cask that remained at Prairie Island after 1999 – the year that the Department of Energy ("DOE") would have begun picking up NSP's SNF had DOE not breached its contracts with NSP, and (3) mandated NSP to investigate an alternative site for the Prairie Island dry storage facility to be located elsewhere in Goodhue County, Minnesota. In 2003, the Minnesota legislature required NSP to make annual settlement payments not to exceed $2.5 million to the Prairie Island Indian Community, whose land sits immediately next to the Prairie Island nuclear plant, and changed the payments into the Renewable Development Fund to $16 million per year while Prairie Island remained in operation with dry casks on-site (and $7.5 million per year while shut-down with dry casks on-site).

NSP's first and second amended complaints allege that as a result of the breach NSP has incurred damages relating to regulatory costs and mandates imposed by the State of Minnesota and, by way of its motion in limine, the Government seeks dismissal of these elements of

[1] Subsequently, the Minnesota legislature reduced the biomass mandate to 110 megawatts. *See* Minn. Stat. § 216B.2424, subdiv. 5a.

damages. *See, e.g.,* Second Amended & Supplemental Complaint ¶¶ 21, 38; First Amended Complaint ¶ 21.[2] For the reasons discussed below, testimony and evidence relating to NSP's costs to comply with these mandates should be heard at trial because foreseeability and causation are questions of fact and because the evidence will show that the costs NSP seeks in damages as a result of these mandates were both foreseeable and caused by the Government's breach of contract.

## ARGUMENT

### I. FORESEEABILITY AND CAUSATION ARE QUESTIONS OF FACT TO BE DETERMINED AT TRIAL

The determination of foreseeability is a question of fact. *Bluebonnet Sav. Bank, FSB v. United States*, 266 F.3d 1348, 1355 (Fed. Cir. 2001) ("Foreseeability is a question of fact reviewed for clear error."); *Landmark Land Co. v. FDIC*, 256 F.3d 1365, 1379 (Fed. Cir. 2001) ("Foreseeability is a question of fact."). Furthermore, the determination of causation is also a question of fact. *Bluebonnet*, 266 F.3d at 1356 ("Causation is also a question of fact reviewed under the clear error standard."); *Hendler v. United States*, 175 F.3d 1374, 1384 (Fed. Cir. 1999) (noting that a theory considered by the trial court involved "causation, a question of fact").

While use of a motion in limine might be appropriate to narrow issues or exclude cumulative or prejudicial evidence, or prevent nonqualified experts from testifying, it should not be used to as a substitute for a Rule 56 summary judgment motion, nor should it be used to

[2] Although the Government titles its pleading as a "Motion in Limine," it is, in large part, a motion for summary judgment on NSP's claim for damages relating to the mandates. In addition to the fact that the standards and elements relating to granting a motion for summary judgment as opposed to a motion in limine are quite different, the Government's motion and brief fail to comply with the procedural and structural requirements for a summary judgment motion and brief, and NSP has not been given the amount of time to which it is entitled to respond to such a motion.

exclude disputed factual issues properly before the court. NSP should be allowed to present evidence of foreseeability and causation at trial regarding the mandates. Contrary to the Government's assertion, testimony and evidence regarding these mandates is not irrelevant or immaterial (it pertains directly to the claims asserted), and it is not cumulative or extraneous (the testimony and evidence sought to be excluded relates to both the causation and foreseeability of NSP's damages claims against the Government). NSP incurred costs that were foreseeable and caused by the Government's breach – the Court should not preclude NSP from providing this factual evidence at trial.[3]

## II. THE MANDATES WERE FORESEEABLE (OR ACTUALLY FORESEEN)

### A. The Law On Foreseeability Favors NSP's Position

Contrary to the Government's contentions, the mandates for which NSP seeks damages were foreseeable or actually foreseen. In this regard, "what must be foreseeable is only that the loss would result if the breach occurred. There is no requirement that the breach itself or the particular way that the loss came about be foreseeable." 3 E. Allan Farnsworth, Farnsworth on Contracts § 12.14, at 260-61 (3d ed. 2004); *see also Gardner Displays Co. v. United States*, 346 F.2d 585, 589 (Ct. Cl. 1965) (labeling as "specious" the Government's argument that plaintiff's damages were "consequential," and stating that the "cause or cost of such increases is not in every case material to and does not determine their foreseeability").

Normally, foreseeability is measured from the time of contract formation. *See Indiana Mich. Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005). However, the Court of Claims has commented, "There may even be valid reason to fix the foreseeability *at the time of*

[3] And, in some cases the Government essentially foresaw these mandates as exemplified by the Nuclear Waste Policy Act of 1982, as discussed further below.

*the breach rather than at the time of the agreement*, for it is at the breach time that the consequences of wrongdoing are more apparent and assessable, and the deterrent accordingly greater." *Gardner Displays*, 346 F.2d at 589 (emphasis added). NSP fully believes that its damages were foreseeable at the time of contract formation, but should the Court disagree it should consider this test from *Gardner Displays* in light of the long-term nature of the contracts at issue and the long-term nature of the Government's breach. It would stretch logic beyond its limits to require that the specific types of damages that could be incurred for the breach of a contract whose performance has already stretched into its third decade and will undoubtedly extend for many decades more, must have been anticipated at the time that the parties entered into the contract.

In its brief, the Government makes the unsupported assertion that "consequential damages . . . can never be recovered against the Government . . . ." Gov't Br. at 6. While it cites a treatise by Dan Dobbs for this proposition, the treatise says nothing about the Government and directly refutes the Government's assertion that consequential damages cannot be recovered. *See* 3 Dan B. Dobbs, Dobbs Law of Remedies § 12.4(1), at 63 (2d ed. 1993) (noting that, subject to certain qualifications, "the plaintiff can often recover consequential damages for breach of contract"). Like the recovery of any breach damages, consequential damages are subject to the test of foreseeability, causation, and reasonable certainty. *See, e.g., Indiana Mich.*, 422 F.3d at 1373; *see also Olin Jones Sand Co. v. United States*, 225 Ct. Cl. 741, 742 n.2 (1980) (noting that "damages are recoverable whenever the [foreseeability] tests set forth in *Ramsey* and *Gardner* are met, even though in one sense such damages can be broadly designated as 'consequential'") (citing *Ramsey v. United States*, 101 F. Supp. 353, 357 (Ct. Cl. 1951) and *Gardner Displays*, 346 F.2d at 589).

NSP's damages for the costs of the mandates are not consequential, but merely mitigation costs of covering the Government's breach. Nevertheless, there is nothing in NSP's three contracts with the Government that prevents the recovery of so-called "consequential" damages. *See Hughes Communications Galaxy, Inc. v. United States*, 271 F.3d 1060, 1068 (Fed. Cir. 2001) (noting that the contract at issue had a clause preventing recovery of consequential damages, but based on analogy to the U.C.C. cover costs were still recoverable and consequential costs may have been recoverable absent the contract clause preventing recovery).

### B. NSP Either Had The Choice of Mitigating Its Damages By Accepting The Mandates Or Closing Its Prairie Island Plant

The "guiding principle" in determining mitigation damages is grounded in whether a plaintiff acted with "reasonable commercial judgment." *Northern Helex Co. v. United States*, 524 F.2d 707, 718 (Ct. Cl. 1975) (citations omitted); *see also Yankee Atomic Elec. Co. v. United States*, 2006 WL 2848615, at *16 (Fed. Cl. Oct. 4, 2006) . Had NSP not complied with the Minnesota mandates after they were enacted into law, NSP would have been forced to shut down the Prairie Island nuclear units and would have faced over $1 billion in costs to replace the power that it generates. Thus, under the law of mitigation, NSP had a duty to mitigate the Government's breach by incurring the costs imposed by the mandates, which, while substantial, were far less expensive than costs that the shut down of its Prairie Island reactors would have caused. *Indiana Mich.*, 422 F.3d at 1375 ("'Once a party has reason to know that performance by the other party will not be forthcoming, . . . he is expected to take such affirmative steps as are appropriate in the circumstances to avoid loss by making substitute arrangements or otherwise.'") (quoting Restatement (Second) of Contracts § 350, cmt. b). In so doing, NSP made a commercially reasonable judgment.

While NSP must show foreseeability, it need not necessarily show foreseeability (although it can) for each category of the mandates damages incurred to mitigate the breach. *See* 3 Dan B. Dobbs, Dobbs Law of Remedies § 12.6(2), at 138 (2d ed. 1993) ("These [mitigation] expenses are clearly themselves in the category of special damages. But they seem to be recoverable not so much because they are damages within the contemplation of the parties at the time the contract was made as because they set appropriate incentives to minimize damages. For this reason, the rule in *Hadley v. Baxendale*, limiting special damages to those within the contemplation of the parties, seems to have no application to reasonably incurred expenses of minimizing damages.") (footnotes omitted).

It takes little to imagine the Government's reaction had NSP chosen to forego accepting the costs of the mandates, but instead shut down when NSP ran out of spent fuel storage space, and sought damages for the far greater costs of replacing the power that Prairie Island generates. The Government would, without a doubt, have complained that NSP should not be allowed to recover the replacement power costs since it acted unreasonably by not implementing the mandates and incurring lesser damages. The Government cannot have it both ways. If the relatively smaller costs of the mandates are not properly considered mitigation damages, then NSP would have to be allowed to recover the plant shutdown costs.

Ultimately, the Government bears the burden to demonstrate that NSP's mitigation efforts were unreasonable, *Old Stone Corp. v. United States*, 450 F.3d 1360, 1370 (Fed. Cir. 2006), and NSP should be allowed to present evidence and testimony relating to its mitigation and mitigation costs at trial.



400474383v2

### C. It Was Foreseeable, And In Some Cases Foreseen, That A State Might Impose Conditions On Siting A Storage Facility In The Highly Regulated Nuclear Industry

#### 1. In A Heavily Regulated Environment, Actions Of Regulatory Bodies Are Foreseeable

As the Federal Circuit has commented, "the production of energy from nuclear sources is one of the most highly regulated human activities." *Commonwealth Edison Co. v. United States*, 271 F.3d 1327, 1348 (Fed. Cir. 2001) (*en banc*) (quotation omitted). In a highly regulated industry, actions of regulatory bodies become reasonably foreseeable and sometimes, in fact, are entirely foreseen. *Cf. Bluebonnet*, 266 F.3d at 1356 ("It is also foreseeable that the heightened regulatory requirements and Bluebonnet's risk of seizure due to failure to meet those requirements, would heighten the risk of investing in Bluebonnet and thereby increase the cost of securing either debt or equity financing."). In this regard, "[h]eavy industry regulation of the sort seen in the nuclear industry means that few legislative changes can truly be seen as wholly unanticipated." *Maine Yankee Atomic Power Co. v. United States*, 44 Fed. Cl. 372, 381 (1999), *aff'd*, 271 F.3d 1357 (Fed. Cir. 2001); *see also Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 357 (1974) ("The nature of government regulation of private utilities is such that a utility may frequently be required by the state regulatory scheme to obtain approval for practices a business regulated in less detail would be free to institute without any approval from a regulatory body.").

Minnesota's 1994 and 2003 Prairie Island legislation (and its 1977 predecessor legislation) is not unique to the state regulation of utilities. *See In re ISFSI*, 501 N.W.2d at 646-48 (discussing 1977 Minnesota law imposing requirements on the siting of a "radioactive waste management facility"); *see also Duquense Light Co. v. Barasch*, 488 U.S. 299, 313 (1989) ("It cannot seriously be contended that the Constitution prevents state legislatures from giving



400474383v2

specific instructions to their utility commissions.”). For many years prior to the execution of the Standard Contracts between the DOE and NSP, states have imposed siting requirements on the utilities and have imposed conditions on those requirements tied to the disposal of spent nuclear fuel.

For example, in 1976 California enacted amendments to its Warren-Alquist Act, which conditioned the new “construction of nuclear plants on findings by the State Energy Resources Conservation and Development Commission that adequate storage facilities and means of disposal are available for nuclear waste . . . .” *Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm’n*, 461 U.S. 190, 194 (1983). The Supreme Court concluded that the legislation, which clearly created additional economic burdens on nuclear utilities, was not preempted by Federal law. *Id.* at 223. The Court stated that “the legal reality remains that Congress has left sufficient authority in the states to allow the development of nuclear power to be slowed or even stopped for economic reasons.” *Id.*

Since the Supreme Court announced in 1983 that states could totally prohibit nuclear facility construction because DOE had not implemented the disposal of spent nuclear fuel, it was certainly foreseeable even at the time that the contracts were entered into that states could impose costly mandates (though less costly than a total prohibition) on nuclear construction as a result of the DOE’s failure to meet its spent fuel disposal obligation. One purpose of the 1994 and 2003 mandates in Minnesota was to slow the development of nuclear power (and its production of spent fuel), including directing NSP to use biomass and wind energy and to search for other renewable energy through the Renewable Development Fund. Thus, it was clearly foreseeable in 1983 – as reflected by the Supreme Court in *Pacific Gas & Electric* – that any

state regulating a nuclear utility had the power to impose conditions on the continued development of nuclear power.

### 2. The Minnesota Mandates Are Equivalent To Other Forms Of Taxation Or Rate-Setting

The Minnesota legislative mandates are no different than other forms of taxing or rate-setting by a legislature. Such taxes and rates normally are recoverable in suits for breach of contract. *See Citizens Fed. Bank, FSB v. United States*, 59 Fed. Cl. 507, 520 (2004) ("Generally, tax consequences have been awarded as an element of damages when they are reasonably foreseeable and flow from the breach."). For example, recently in another spent fuel damages case, Judge Merow allowed as an element of the utility's damages a $1 million per year fee that was part of a settlement agreement with a local town in order to obtain the zoning permit needed for a spent fuel storage facility. *Yankee Atomic*, 2006 WL 2848615, at *47 (noting, among other requirements that "[t]he settlement agreement also required Connecticut Yankee to pay an annual fee to the City of Haddam beginning at $1 million a year and escalating thereafter until 2011," and that it was foreseeable that mitigation decisions would require regulatory approval). Similar to the settlement agreement in *Yankee Atomic*, the Minnesota legislature imposed mandates such as requiring NSP to pay annual fees into a Renewable Development Fund for each cask pursuant to the 1994 law and to make annual payments to the Mdewakanton Dakota Indian tribe on Prairie Island as part of a settlement agreement pursuant to the 2003 law.

### 3. It Was Foreseeable That Breach Of A Contract Born Of Political Action Would Result In Political Consequences

More generally, the Government clearly knew and could foresee the political difficulty of siting a facility for the storage of spent fuel; the legislative history of the Nuclear Waste Policy Act ("NWPA") reveals it. *See, e.g.*, H.R. Rep. No. 97-491, pt. 1, at 27 (1982), *reprinted in* 1982

U.S.C.C.A.N. 3792, 3793 (discussing the "political uproar" in Michigan that defeated an attempt to site a nuclear waste facility in 1976); *id.* at 31, *reprinted in* 1982 U.S.C.C.A.N. at 3798 (noting "political setbacks" over the prior decade). The NWPA was itself a product of public and state concern over the inadequacy of federal efforts to devise permanent storage solutions, and sought to solve this acknowledged political difficulty by directing DOE to enter into contracts with utilities for the disposal of spent nuclear fuel. *See* 42 U.S.C. § 10222. State and public participation was considered essential. *Id.* § 10131(a)(6). In view of the political nature of the NWPA (and, therefore, the Standard Contract) and the emphasis placed on state participation, the Government cannot claim that it was unforeseeable that a state political body like the Minnesota legislature would step-in (just as Congress did in 1982) to find a solution.

### 4. The Need To Investigate Alternative Sites Was Foreseeable

Furthermore, the Government actually foresaw the need to investigate alternative sites for storage of spent nuclear fuel. In this regard, the NWPA itself directed DOE to investigate various sites in searching for both a repository and its MRS. *See* NWPA, Pub. L. No. 97-425, §§ 112-113, 141, 96 Stat. 2201, 2208-12, 2241-44 (1983) (codified as amended at 42 U.S.C. §§ 10132-10133, 10161) (discussing siting of a repository and investigations of possible sites for an MRS); *see also* Nuclear Waste Policy Amendments Act of 1987, Pub. L. No. 100-203, §§ 5021, 101 Stat. 1330-228, 1330-232 to 1330-236 (1987) (codified, as amended, 42 U.S.C. §§ 10162-10169). The Government can hardly express surprise (or lack of foreseeability) when a state legislature imposes an alternative siting requirement for storage of spent nuclear fuel, when the Congress has imposed similar requirements on the DOE.

**5. Assistance Payments Were Foreseeable**

Similarly, the Government actually foresaw the need to make assistance payments to an Indian tribe for the storage of spent nuclear fuel. In this regard, the NWPA and its amendments provided for benefits agreements with tribes and states. 42 U.S.C. § 10173(a) ("The Secretary may enter into a benefits agreement with the State of Nevada concerning a repository or with a State or an Indian tribe concerning a monitored retrievable storage facility for the acceptance of high-level radioactive waste or spent nuclear fuel in that State or on the reservation of that tribe, as appropriate."). The NWPA provisions concerning benefits agreements even include an annual payment schedule ranging from $5 million to $20 million per year. *Id.* § 10173a (a)(1); *see also id.* §§ 10195 & 10199(a) (providing DOE authority to enter agreements and make payments of up to $3 million to states or tribes that seek to conduct independent testing and monitoring of a site being investigated for storage). The 2003 Minnesota legislation mandated payments from NSP to the Mdewakanton tribe not to exceed $2.5 million per year (negotiated down to $2.25 million by NSP), well below the amount Congress authorized DOE to pay tribes for benefits agreements.

The NWPA also provides for financial assistance to states and localities. For example, for Nevada:

> (i) The Secretary shall provide financial and technical assistance to the State of Nevada, and any affected unit of local government requesting such assistance.
>
> (ii) Such assistance shall be designed to mitigate the impact on such State or affected unit of local government of the development of such repository and the characterization of such site.

42 U.S.C. § 10136(c)(2)(A)(i)-(ii). The NWPA provides for assistance to state and local governments for any federal interim storage, directing DOE to "make annual impact assistance



400474383v2

payments to a State or appropriate unit of local government, or both, in order to mitigate social or economic impacts occasioned by the establishment and subsequent operation of any interim storage capacity within the jurisdictional boundaries of such government or governments . . . ." *Id.* § 10156(e). The NWPA provided for similar "impact assistance" regarding the siting of an MRS. *Id.* § 10161(e); *see also id.* § 10169. Thus, the Minnesota legislature's decision to have NSP pay the Mdewakanton tribe was not only foreseeable, but actually foreseen.

Ultimately, the mandates that the Government seeks to exclude from the trial were costs that were either foreseeable or actually foreseen by the Government at the time it entered its contracts with NSP.

## III. THE GOVERNMENT'S BREACH CAUSED NSP TO INCUR COSTS FROM THE MANDATES

To meet its burden of causation, NSP needs only to show that the Government's breach directly and substantially caused NSP's damages. *See Indiana Mich.*, 422 F.3d at 1373. The Federal Circuit has stated that the breach need not be "the sole factor or sole cause" of damages. *California Fed. Bank, FSB v. United States*, 395 F.3d 1263, 1268 (Fed. Cir. 2005), *cert. denied*, 126 S. Ct. 344 (2005). "The existence of other factors operating in confluence with the breach will not necessarily preclude recovery based on the breach." *Id.* Here, the Government's breach of its contracts with NSP was the direct, substantial, and "but for" cause of NSP's damages. But for NSP's need to build dry storage at the Prairie Island nuclear plant, NSP would have had no reason to require legislative action and the Minnesota legislature would not have had a vehicle to impose any of these costs on NSP.

Contrary to the Government's arguments, the mandates were caused by the Government's breach. In this regard, the Government asserts that NSP cannot prove that the

state of Minnesota would not have otherwise imposed these mandates – particularly the biomass and Renewable Development Fund mandates. Gov't Br. at 7. To the contrary, the evidence which NSP is prepared to present will establish that the mandates would not have been imposed on NSP but for NSP's need for legislative authority to construct the dry storage facility. Each of the mandates was directly and substantially caused by the Government's breach. Furthermore, the inability to prove a negative as the Government suggests, is not fatal to NSP's claims: "The defendant who has wrongfully broken a contract should not be permitted to reap advantage from his own wrong by insisting on proof which by reason of his breach is unobtainable." *Locke v. United States*, 283 F.2d 521, 524 (Ct. Cl. 1960).

First, it is provable that Minnesota only imposed the biomass and renewable development fund mandates on NSP because NSP needed to build a dry storage facility to mitigate its damages caused by the Government's impending breach. Given the opportunity, NSP will provide evidence at trial, including the testimony of Elizabeth Engelking and Michelle Swanson that no other utility in Minnesota must meet the requirements of the biomass and Renewable Development Fund mandates. In addition, NSP will provide evidence by state legislators, including the 1994 bill's chief author, that these mandates were only imposed on NSP because NSP needed the legislative authority to construct the dry storage facility.

In fact, the legislation permitting Prairie Island to have a spent fuel dry storage facility explicitly states that only NSP is subject to the mandates. Specifically, the statute limited the biomass mandate to a public utility "that operates a nuclear-powered electric generating plant within this state . . . ." *See* 1994 Minn. Sess. Laws Ch. 641, Art. 3, § 3 (codified at Minn. Stat. § 216B.2424). NSP was and is the only utility that operates a nuclear plant in Minnesota.

The Renewable Development Fund mandate stated: "The public utility that operates the Prairie Island nuclear generating plant must transfer to a renewable development account $500,000 each year for each dry cask containing spent fuel that is located at the independent spent fuel storage installation at Prairie Island after January 1, 1999." *Id.*, Art. 1, § 10. Notably, the 1994 Minnesota law required NSP's payments into the Renewable Development Fund to begin January 1, 1999, the same year the Department of Energy was expected to begin acceptance of NSP's waste. *Id.* Finally, in the twelve years since this legislation has been in effect, no other utility regulated by Minnesota has been required to add biomass energy to its energy resources, nor has any other utility been required to pay into the Renewable Development Fund.

Furthermore, the costs NSP incurred investigating an alternative site for a dry storage facility were directly and substantially caused by the Government's impending breach. The Minnesota legislature would not have mandated NSP's investigation of an alternative site for dry storage if NSP was not already seeking to build a dry storage facility, which facility NSP only needed to build to mitigate the Government's breach. Given the opportunity, NSP will provide evidence, including the testimony of James Alders, showing that NSP reasonably mitigated its damages by investigating an alternative site. Here, again, the Minnesota statute also directly links this mandate to NSP's need to build dry storage. *See id.*, Art. 6, § 1 (codified at Minn. Stat. § 116C.80) (noting that the Goodhue County alternative site investigation was directed at "the storage of spent nuclear fuel produced by a nuclear reactor at the Prairie Island nuclear power generating plant").

Finally, the Prairie Island settlement with the Mdewakanton Indian tribe was also directly caused by the Government's breach. Given the opportunity, NSP will provide evidence,

including the testimony of Scott Wilensky, showing that NSP reasonably mitigated its damages by entering into this agreement with the Mdewakanton Indian tribe. But for the Government's continuing breach through 2003, NSP would not have had to seek additional storage capacity at its Prairie Island facility, which continuing breach caused the Minnesota legislature to impose the settlement agreement between NSP and the Mdewakanton Dakota tribe. 2003 Minn. Sess. Laws, 1st Spec. Sess, Ch. 11, Art. 1, § 3 (codified at Minn. Stat. § 216B.1645, Subd. 4) (recognizing the settlement agreement between "the public utility that owns the Prairie Island nuclear generation facility and the Mdewakanton Dakota Tribal Council at Prairie Island").

## IV. THE FORMER LEGISLATORS SHOULD BE ALLOWED TO TESTIFY

Contrary to the Government's assertion, the law does not absolutely prohibit the testimony of former legislators regarding legislation. *See Bonham v. District of Columbia Library Admin.*, 989 F.2d 1242, 1245 (D.C. Cir. 1993) ("In determining the legislative purpose of a law or government practice, courts generally look to the text of a statute or rule, legislative history, administrative interpretations, *testimony of parties who participated in the enactment or implementation of the challenged law or practice*, historical context, and the sequence of events leading to the passage of the law or the initiation of the practice.")(emphasis added) (citing *Edwards v. Aguillard*, 482 U.S. 578, 594-95 (1987)); *Underwood v. Waddell*, 743 F. Supp. 1291, 1297 (S.D. Ind. 1990) (while disallowing part of affidavit as hearsay, acknowledging that "the rest of the testimony is instructive in this setting, particularly where the plaintiff has not offered any legislative history to the contrary" and that under Indiana law "testimony from the drafters of legislation may be relevant and useful in ascertaining the meaning of an ambiguous statute"). In the instant case, NSP intends to provide testimony of two former Minnesota Senators, Steven

Novak and Gene Merriam, to discuss the history and purpose of the act, not for the purpose of analyzing the statutory intent.

Furthermore, in this case the testimony of Senators Novak and Merriam is sought only to provide context to a breach of contract case, not to give their personal views on the interpretation of a particular statute – here, the 1994 Prairie Island legislation.[4] In this regard, courts that discounted the views of legislators in the past have primarily done so where an individual legislator's testimony or statements would undermine the statutory language of the bill actually voted upon by the legislature. *See Regan v. Wald*, 468 U.S. 222, 238 (1984) (noting the concern of giving weight to colloquies between legislators would undermine "the language actually voted on by Congress and signed into law by the President"); *National Sch. of Aeronautics, Inc. v. United States*, 142 F. Supp. 933, 938 (Ct. Cl. 1956) ("The debate, which, so far as the lawmaking body is concerned, should have been ended by the enactment of the statute, would be transferred to the court, with disturbing possibilities of embarrassment and friction."). Here, as noted above, NSP is not seeking to use the legislators' testimony to interpret the meaning of the statutory language; NSP (and we presume the Government) is not challenging the interpretation of the legislation. Rather, the testimony of these legislators can provide useful information

[4] In this regard, most of the cases cited by the Government are inapposite because they either relate to the interpretation of a statute, do not involve live testimony, and often are used to challenge the interpretation of an agency covered by the legislation. *See Dept of Energy v. Westland*, 565 F.2d 685, 690 (C.C.P.A. 1977) (rejecting testimony of one legislator where it is introduced to demonstrate that the court had misinterpreted a statute); *Selman v. United States*, 498 F.2d 1354, 1358-59 (Ct. Cl. 1974) (disregarding affidavit of Senator regarding interpretation of statute); *Gardner & North Roofing & Siding Corp., v. Board of Governors of the Fed. Reserve Sys.*, 464 F.2d 838, 842 (D.C. Cir. 1972) (holding that the letter of one congressman, written a year after the passage of the legislation, would not serve to invalidate a Federal Reserve Board's statutory interpretation of a particular piece of legislation); *see also United States Steel Corp. v. United States*, 618 F. Supp. 496, 500 n.5 (C.I.T. 1985) (rejecting the use post-enactment letters from legislators analyzing statutory interpretation).

regarding the history of the passage of this statute and how it resulted from DOE's breach of contract.

## V. CONCLUSION

For the foregoing reasons, NSP respectfully requests that the Court deny the Government's motion to exclude evidence regarding the mandates.

Dated: October 23, 2006

Respectfully submitted,

s/ Alex D. Tomaszczuk by s/ Daniel S. Herzfeld
Alex D. Tomaszczuk
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7940
(703) 770-7901 (fax)

Counsel of Record for Plaintiff
Northern States Power Company

OF COUNSEL:
Jay E. Silberg
Daniel S. Herzfeld
Jack Y. Chu
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
2300 N Street, N.W.
Washington, D.C. 20037
(202) 663-8000
(202) 663-8007 (fax)

Kerry C. Koep
**XCEL ENERGY**
414 Nicollet Mall, 5th Floor
Minneapolis, MN 55401
(612) 215-4583
(612) 215-4544