# Lake Barrett

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-----------------x
YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C.
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C
-----------------X
(Caption continued on the next page)

Deposition of LAKE H. BARRETT
Washington, D. C.
Monday, April 22, 2002
9:31 a.m.

Job No.: 11792-4
Pages 1 through 272, Volume 1
Reported by: Diane Gomez, RPR



DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
-----------------X



Deposition of LAKE H. BARRETT, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public in and for the District of Columbia.



APPEARANCES

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:

DEVON E. HEWITT, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:

JEFFREY L. HANDWERKER, ESQUIRE
HOWARD CAYNE, ESQUIRE
RONALD A. SCHECHTER, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004-1206
(202) 942-5000

37

Q Correct?
MR. CRAWFORD: Objection, asked and answered. Objection, argumentative.
**A That's true.**
Q And, similarly, it was not your opinion in 1986, that a repository could not be operational by 1998, correct?
MR. CRAWFORD: Objection, form. Objection, vague.
**A You're asking what I thought --**
MR. CRAWFORD: Objection, foundation, too. Go ahead.
**A Are you asking what I thought in 1986, or are you asking what I think looking back over history?**
Q I'm asking that you put yourself in the shoes of Lake Barrett in 1986.
MR. CRAWFORD: Objection, foundation.
**A Okay. We went to '86. Before we were -- your line of questioning was going to mid-'84. You want to go to '86 now?**
Q Yes, sir.
**A In '86 I was working for the Department of**

38

**Energy, okay, so I had different knowledge. So the question is in 1986 did I think something. Now tell me what that something was again.**
Q In 1986 was it your opinion that a repository could not be operational -- a repository for the disposal and storage of spent nuclear fuel could not be operational by 1998?
**A I don't recall what I thought in 1986. Because in 1986 I was at the Department of Energy in a systems job probably, and the colleagues down the hall were working the repository. I did not. I don't recall what the repository schedule was in 19 -- what I personally thought in 1986.**
Q When did you join the Department of Energy?
**A Summer of '85 or spring of '85.**
Q What was your position between the summer of '84 and the spring of '85?
**A I was the branch chief of the engineering branch in the office -- the Division of Waste Management in the Office of Nuclear Materials Safety and Safeguards of the Nuclear Regulatory Commission.**
Q Please describe for me your

39

responsibilities in that position.
**A I was responsible for engineering for uranium mill tailings, low-level waste disposal sites and high-level waste disposal sites for the Nuclear Regulatory Commission is what my duties were.**
Q Did you work with issues relating to the disposal of spent nuclear fuel in that position?
**A Yes.**
Q And can you describe for me your work on those issues?
**A It was the engineering aspects of repository reviews for all media, including the development of branch technical positions and regulatory guidance and the regulations for high-level waste is what you asked about.**
Q I asked about spent nuclear fuel.
**A Well, okay, spent nuclear fuel and high-level waste.**
Q Using the term "spent nuclear fuel" to cover both?
**A Right.**
Q Did you work with officials at the

40

Department of Energy in this position?
**A Yes.**
Q And which offices did you work?
**A With the office that I'm presently in.**
Q Do you recall which individuals at the Department of Energy you worked with during this period?
**A Specific names, Ben Rusche is the only name that comes to mind, who was the director who I worked for years ago in the seventies.**
Q When did you work for him in the seventies?
**A Mid-seventies is the best I can recall.**
Q Was that Electric Boat?
**A No, at the Nuclear Regulatory Commission. So it would have been like '75, '76. He was the director of the Office of Reactor Regulation in the mid-seventies in the Nuclear Regulatory Commission, and he was the first confirmed director of the Office of Civilian Radioactive Waste Management. So he was one I know I talked to, but I did not talk much to the DOE people when I served at NMSS between -- that short period from mid-'84 to mid-'85.**

Q How long did you work for Mr. Rusche? Was it approximately a year?
**A At the Nuclear Regulatory Commission?**
Q Yes.
**A I don't remember, a couple of years.**
Q And did you report directly to him?
**A No. He was twice removed. He was my boss's boss. Maybe my boss's boss's boss. I can't remember the structure.**
Q Did you ever meet with him or work with him directly during the period '75, '76?
**A Repeat the question.**
Q Did you ever work directly with him during that period?
**A Directly with him. I was in contact with him on various issues that we mutually worked upon. I mean, I did not report to him. I mean, he was my boss's boss or something.**
Q Did you believe that he was competent in his field of expertise?
**A Very.**
Q Why do you say very?



**A Because he was a very knowledgeable individual in my opinion.**
Q In what field was he knowledgeable?
**A In nuclear matters.**
Q Such as?
**A Regulatory safety, which is what we did.**
Q Did you ever speak with him in the period following the period during which you worked with him and the summer of 1984?
**A Yes. In spring of '79 we worked together. I didn't work for him at Three Mile Island. He was brought in as a temporary manager for Metropolitan Edison, and I worked for the Nuclear Regulatory Commission. So we were -- we worked on the stabilization of Three Mile Island Unit 2 for several months.**
Q So he was in private industry at that point?
**A Correct.**
Q Did you continue during that period to find him competent in nuclear matters?
**A Yes.**



Q Did you continue to describe him as very competent?
**A Yes.**
Q When did you next deal with him?
**A Pardon?**
Q When did you next deal with Mr. -- how do you say his name?
**A Rusche.**
Q Rusche.
**A Well, he became my -- when I came to the Department of Energy in the spring of '85 he was my boss's boss.**
Q How did it come to be that you left the NRC and went to the Department of Energy in 1985?
**A Somebody told me that a fellow named Roger Hilley who worked for Ben Rusche wanted someone like myself there, and we had a phone call and asked me to come down and talk and one thing led to another and I transferred.**
Q Do you recall who had that initial communication with you?
**A No.**



Q Did you speak with Mr. Rusche before you took your position?
**A I don't remember. Probably did but I just don't remember.**
Q What was your initial position at the Department of Energy?
**A Division director, systems and transportation or something to that effect.**
Q And what did that position involve?
**A I was responsible for the development of the transportation systems to move spent fuel and high-level waste to the DOE facilities from their current locations was the primary job, and also for the systems engineering for the entire program.**
Q Entire program you're referring to what?
**A The civilian and all the different sites that we were looking at, the systems engineering requirements documents and the systems engineering structure for all of the civilian radioactive waste management program.**
Q To whom did you report when you held this position?

A **Roger Hilley.**
Q And he reported to Mr. Rusche?
A **Correct.**
Q Are you familiar with the acronym MRS?
A **Yes.**
Q What does that stand for?
A **Monitored retrievable storage facility.**
Q Were you involved with monitored retrievable storage facilities during this period?
A **Secondarily, yes. Insofar as in the -- that was the facility that the transportation --**
MR. CRAWFORD: Objection. Let me objec here and -- the objection is to vagueness. What period are you referring to?
MR. CAYNE: First I'm going to object for the record to counsel continuing to cut off the witness while he's in the process of answering a question. And I believe the witness has answered m question.
MR. CRAWFORD: Then I didn't cut him off.
Q For how long did you hold this position?
A **I don't recall.**



Q Two or three years?
A **Probably.**
Q Were you involved in issues relating to the siting and development of a repository during this period?
A **In a general sense. I did not have direct line responsibility for repository development. Tha was another group.**
Q But you said in a general sense. What did you mean?
A **I would hear in staff meetings in various work we did together the general state of where the repository programs were, but I had no direct, you know, responsibility in that area.**
Q You were a division director, correct?
A **Correct. In the storage and something, whatever Hilley's organization title was. Which wa not the repository. That was a completely different office did the repository. We were storage and transportation systems I think was the name of our office.**
Q Were you involved in issues relating to the



rate at which spent nuclear fuel would be accepted for disposal during your time as director of this division?
A **Probably. I don't -- probably.**
Q You don't recall?
A **I don't recall detailed discussions regarding the acceptance rates. I know that we had acceptance rates in various documents for the repository and for the proposed MRS, which was not authorized at that time, for planning purposes.**
Q Were you an advocate of the MRS during this period?
MR. CRAWFORD: Objection, vague.
A **Advocate. I would say that I thought an MRS was -- we were proposing an MRS to Congress, an yes, I was an advocate. I thought that would have made a much better system if we had it.**
Q Why were you of that view?
A **Because -- one of the reasons was we were striving to meet the '98 removal date to the best of our ability, and an MRS circa early -- let's see in the late eighties the MRS we proposed to do it because**



**the repository date was post -- somewhere in that period it was post-1998. So, yeah, it was post-1998 in the mid-eighties. So the MRS was our primary mean to remove fuel by 1998.**
Q You referred to the '98 removal date a moment ago. Do you recall that?
A **Yes.**
Q What were you referring to when you referred to the '98 removal date?
A **The statute said that -- had a January 1998 target date in it for removal of the fuel. We were trying to meet that to the best of our ability.**
Q And what was it that you were trying to accomplish by January 1998?
A **To accept fuel into the federal disposal system, which we were proposing to include an MRS in that mid -- I'm trying to get the years straight. Yeah, mid-eighties. '86 we made a proposal.**
Q How much fuel were you attempting to accept at that point?
A **I don't recall the numbers, but I would have to go back and look in the records. I don't**

**recall specific receipt rates.**
Q Were you attempting to accept more than a single spent nuclear fuel assembly?
**A Yes.**
Q Was it ever the intent of your office to be able to accept a single spent fuel assembly by January 31st, 1998?
MR. CRAWFORD: Objection, vague. Objection to the extent it might call for a legal conclusion.
**A From a systems perspective it was our intention to build a system that would take more than one fuel assembly.**
Q From a systems perspective was it ever your intention to build a system that would take only -- be able to take only a single fuel assembly by January 31st, 1998?
**A That was never our intention, to do just one fuel assembly.**
Q Was it ever the intention of your office at any time subsequent to the period in which you held the position -- was it director of --
**A Division director.**



Q Was it ever the position of your office subsequent to that time that the goal would be to be in a position to accept a single spent fuel assembly by January 31st, 1998?
MR. CRAWFORD: Objection, vague. Objection, foundation, and objection to the extent it calls for a legal conclusion.
**A It was never our plans to take one fuel assembly to my recollection.**
Q Do you recall ever having any discussions internally whether the acceptance of a single fuel assembly would satisfy the department's obligations under the contract, the standard contract?
**A I never recall any discussions from a systems perspective about the contract, so, no, I don't recall ever having a discussion.**
Q What do you mean from a systems perspective?
**A We were -- our job was to develop the systems to receive the material, and we never, to my recollection, we never discussed about a system that would receive one fuel assembly. Okay. We always**



**talked about more.**
Q From a systems perspective was it ever your intention to design a system that could only accept 900 MTUs of spent nuclear fuel per year?
MR. CRAWFORD: Objection, vague. Objection, foundation. Objection to the extent it calls for a legal conclusion.
**A Repeat the question.**
Q From a systems perspective was it ever your intention to design a system that could only accept 900 MTUs of spent nuclear fuel per year?
**A There's different things happened as a function of time, okay. What time are you referring to?**
Q In 1986.
**A In '86, no.**
Q In 1986 how many MTUs per year did you attempt to design a system to accept?
**A I don't recall a specific number, but it was -- I don't recall a specific number. It's in the records.**
Q Would 3,000 refresh your recollection?



**A That's probably about right.**
Q And how did you come to the 3,000 number?
MR. CRAWFORD: Objection, foundation.
**A I'd have to go back and look at records, which I have not done. It is the evolution of the design receipt rates for the first repository, second repository, the MRS in the system. My recollection is the MRS was to receive 3,000 tons a year circa that time prior to the amendments act, which was in excess of the generation rate of around 2,000.**
Q That was important, wasn't it, that it be in excess of the generation rate?
MR. CRAWFORD: Objection, vague.
**A Well, important? Yes, in my opinion it was significant that you design a system to remove the backlog of materials that were accumulating under the intent of the act.**
Q And why was that significant in your view?
**A Because the concept of a Nuclear Waste Policy Act was to -- for the federal government to take the materials from the high-level waste and spent fuel sites into federal custody.**

**was in QA, so I personally, the QA office was, very little impact. I had no personal involvement in the linkages then.**

Q But in your position you did attend, did you not, staff meetings in which the linkages were discussed, correct?

**A Probably did. I just don't recall the specifics. But I'm sure there was general discussion about many things that happened in the amendments act.**

Q Well, based on your general recollection of the discussions in which you personally participated, Mr. Barrett, how did the linkages imposed by the '87 act affect the administration of the program?

MR. CRAWFORD: Objection, foundation. Objection, speculation.

**A Given that the MRS was basically linked and disapproved as we had proposed it and we had only one site, there was a lot of discussion about how we could best design the program to be successful, and which success included doing all we could do to meet the '98 date.**

Q And, again, when you say meet the '98 date,



you're referring to what?

**A To be able to move fuel into the federal system with a target of January '98.**

Q And in your view did the '87 act have the effect of reducing the take rate?

MR. CRAWFORD: Objection, foundation.

**A Yes, it did. Because the only way at the time for '98 would have been -- to receive the material in '98 was with an MRS, and the MRS could only be achieved in 1998 through a volunteer site, through congressional approval of a volunteer site. And that there were linkages in the statute, and that's when the discussion started about the change to the 900, which was caused by the statutory linkages.**

Q So is it your testimony that it was the statutory linkages imposed by the '87 legislation that reduced the annual acceptance rate from 3,000 MTUs to 900 MTUs?

MR. CRAWFORD: Objection to the extent it calls for a legal conclusion. Objection, foundation.

**A The linkages imposed by law complicated the receipt rates and work was done, and the specifics of**



**it I don't recall, regarding how we could best operate the program with those congressionally mandated linkages.**

Q But I'm not sure if you answered my question. Did those linkages have the effect of reducing the take rate, which I understand you to have testified was 3,000 prior to the '87 amendments, to the 900 level that subsequently followed?

MR. CRAWFORD: Objection to the foundation. Objection to the extent it mischaracterizes prior testimony. Objection to the extent it calls for a legal conclusion.

**A We still -- my recollection is we still kept the 3,000 ton receipt design, but we had to reconcile the fact that we would hit the limits, and it was -- my recollection is I just don't remember what we did and how we did balance those.**

Q What did you mean, Mr. Barrett, when you just referred to the 3,000 MTU receipt design?

**A You would have to look at the document -- the systems documents circa '87, '88. I believe they still had 3,000 ton receipt for a volunteer MRS but**



**acknowledge the fact that that would have to be addressed as related to linkages.**

Q So if I understand correctly based on your -- well, let me step back a second.

The word "design," what are you referring to when you say receipt design. What design are you referring to?

**A The MRS, which would be the first ability to receive materials, was the receipt rate design was 3,000 tons per year is my recollection. I would have to check that. I haven't gone over any old documents. Was 3,000. So the designing of the transportation system, the design of the hot cells and receiving facilities was a nominal 3,000 ton capability per year.**

Q When you use the word "nominal," what do you mean?

**A That the normal operational rate of receipt was designed 3,000 tons per year of the MRS.**

Q A few moments ago you answered a question and you stated we had to reconcile the fact that we would hit the limits. Do you recall that?

**A Uh-huh.**
Q What did you mean when you stated "we would hit the limits"?
**A The linkages in the amendments act were such that you could not operate at 3,000 tons per year very long before you hit the statutory limits, and we had to look at -- my recollection is that we had to look at how that all would work. For example, you would not want the system to operate at a high rate and then stop to reconcile that.**
Q Why is it that you could not operate at the 3,000 ton per year very long before you hit the statutory limits?
**A The statute had linkages that said you could not receive more than certain tonnages for certain events. I don't recall the details of what they were, but there was a 10,000 ton limit and there was something else that you couldn't do. And that was tied to the repository.**
Q How many years would it take after licensing of the repository for the repository to be built?



MR. CRAWFORD: Objection to foundation. Objection to the extent it calls for speculation.
**A Repeat the question again, please.**
Q Based on your projections, after licensing of a repository how many years do you project that it would take the repository to become operational?
MR. CRAWFORD: Same objection.
**A When you say after licensing, you mean upon receipt of a construction authorization?**
Q Yes.
**A Depends on the design of the facility.**
Q With respect to the facility that you had under design in the 1987 time frame, how many years after receiving construction authorization would the repository become operational?
MR. CRAWFORD: Objection, vague. Objection, foundation.
**A I don't recall the repository construction schedule circa '88/'89. I just don't recall it.**
Q Would five years be a good approximation?
MR. CRAWFORD: Objection to the vagueness of it and objection to the foundation. Objection to



the extent it calls for speculation.
**A Five years probably was what was in the records then.**
Q And with respect to the repository under design today, how many years do you project that it will take for that repository to become operational after receipt of the necessary construction authorization?
MR. CRAWFORD: Objection to the foundation.
**A It depends upon what the design configuration is of the repository, and also the degree of preparatory work that we're allowed to do prior to the construction authorization.**
Q Do you have current projections with respect to the repository under consideration by the department today?
MR. CRAWFORD: Objection, vague.
**A Today's proposal and plan is if we see budgets and if things go according to -- as we would wish them to, if we change to a modular construction approach, it is possible to be receiving material in basically a two to three-year period.**



Q After receiving construction authorization?
**A Correct.**
Q And your best recollection of that period from the 1987 time frame would have been five years back then, correct?
MR. CRAWFORD: Objection to the extent it mischaracterizes prior testimony.
**A As it related to the plans of a repository at that time, five years was probably right.**
Q Had the MRS that you proposed to Congress in 1987 been approved, how long would the construction of that facility have taken from start to receipt of spent nuclear fuel?
MR. CRAWFORD: Objection, vague.
**A I don't recall that.**
Q I'm trying to refresh your recollection. Would two years be a good estimate of that time frame?
MR. CRAWFORD: Objection, vague.
**A I'd have to go -- MRS schedules are 15 years old in my brain. I don't remember what the MRS schedules were at all.**
Q The MRS would have taken less time than the

MR. CRAWFORD: Objection to the foundation. Objection, assumes facts not in evidence.
**A Please restate that question.**
Q As a matter of design and systems engineering, would it have been possible for a repository to accept spent nuclear fuel at a beginning rate in excess of 400 MTUs?
**A Yes.**
Q And as a matter of design and system engineering would it have been possible for a repository to begin the acceptance of spent nuclear fuel at an annual MTU rate of 1,800?
MR. CRAWFORD: Objection, vague.
**A When you use the word "possible" versus practicable there's a difference. You ask possible, the answer is yes. With time and money you can do almost anything.**
Q Do you believe it would not have been practicable?
**A It would have been hard to go from zero to 1800 in my opinion. Possible, yes.**
Q Well, the ramp-up rate you referred to was



five years, correct?
MR. CRAWFORD: Objection, vague.
**A Yes, but not starting at 1800 the first year.**
Q Would it have been practicable for the ramp-up rate to occur in a period of less than five years?
MR. CRAWFORD: Objection, vague. Objection, foundation.
**A You could.**
Q For example, would it be practicable for the ramp-up rate to take place within a period of three years?
MR. CRAWFORD: Objection, vague. Objection to the foundation. Objection to the extent it calls for speculation.
**A These are all degrees of more difficult and less difficult practicalities.**
Q You used the word "practicable" and that's simply what I'm asking you. Would it have been practicable for the ramp-up rate to have occurred within a three-year period, the ramp-up to have



occurred within a three-year period?
MR. CRAWFORD: Objection. Same objections.
**A It's possible. These are different degrees of practicality on how quickly you ramp up under what circumstances. I don't remember -- I don't recall what the rates were circa '87. Given the national mood and concerns about things nuclear, it's not very practicable today I believe to ramp up in less than three years to 3,000. Not to say it could not be done.**
Q Putting aside issues of national mood and concerns, as a matter of systems engineering and design would it have been practicable to have the ramp-up occur within a three-year period?
MR. CRAWFORD: Objection, vague. Objection to the foundation. Objection to the extent it calls for speculation.
**A I don't know. I would have to look at all the economics, the cash flow, the preparations for institutional aspects of transportation. You know, I don't know if it would be practicable or not.**
Q So sitting here today you can only state,



am I correct, that it might have been practicable for the ramp-up to have occurred within three years, correct?
MR. CRAWFORD: Objection to the extent it mischaracterizes his prior testimony. Objection, asked and answered. Objection, vague. Objection, foundation. Objection, to the extent it assumes facts not in evidence.
**A It's possible.**
Q Are you aware, Mr. Barrett, whether the fees that the utilities were required to pay under the standard contract were developed or determined based on a particular acceptance rate and ramp-up schedule?
MR. CRAWFORD: Objection, lack of foundation. Objection to the extent it calls for speculation.
**A It's my understanding the monies paid by the utilities were a function of the kilowatt hours of nuclear energy delivered, not on the system design that we're doing.**
Q You don't believe the fees had any relation to the system design?

81

A Not to my recollection.
Q For how long did you hold your position in quality assurance?
A I don't know, a year or so.
Q What position did you next take on?
A I don't remember my official titles. I became responsible for programmatic aspects of the repository. I became responsible for programmatic aspects of the MRS facility. And I was responsible for business development contracts for awhile.
Q And when did you take on those responsibilities?
MR. CRAWFORD: Objection. Asked and answered.
A I don't know, '88, '89, until I was sent by Admiral Watkins to defense programs in the spring of '90.
Q And what were your duties when you were responsible for the programmatic aspects of the repository?
A Project manager of Yucca Mountain project at the time reported to me.

82

Q Were you required to appear before Congress during this period?
A Not that I recall. I might have but I don't remember it.
Q Were you involved in the development of acceptance rates during this period?
A Not to the degree that I remember. I might have been.
Q Wouldn't you have been if you were responsible for the programmatic aspects of the repository?
MR. CRAWFORD: Objection, argumentative.
A I don't -- you know, I was responsible for the programmatic aspects. If we ever did anything regarding acceptance rates at that time, I don't recall doing anything.
Q Do you recall if you were involved in the establishment or analysis of acceptance rates prior to your next position in 1990?
A I don't recall anything. I might have.
Q We'll go through some documents later to refresh your recollection, but I just -- a lot of

83

documents actually.
A Whatever.
Q I just want to know what you recall.
MR. CRAWFORD: Objection. Form.
A 14 years ago. I don't remember specific documents at this time.
Q What was the position you took in 1990?
MR. CRAWFORD: Objection, form. Objection, vague.
A I was detailed initially and then transferred to the Office of Defense Programs. I was the -- what was my title? I don't know. I was director of the Rocky Flats program office.
Q And what responsibilities did that position involve?
A It was the restart of the Rocky Flats nuclear weapons production plant after the FBI raid.
Q Did you have continuing responsibilities for or involvement with the spent nuclear fuel program during this period?
A None whatsoever.
Q For how long did you hold this position?

84

A Until January of '93.
Q And in January 1993 what position did you take?
A Admiral Watkins made me acting director of RW.
Q And RW stands for?
A Offices of Civilian Radioactive Waste Management.
Q And what were your duties in that position?
MR. CRAWFORD: Objection, vague. Objection, lack of foundation.
A The duties of the director of the Office of Radioactive Waste Management.
Q You ran the program at that point, correct?
A That's correct.
Q And have you basically held that position either as acting director, director, or deputy director through today?
MR. CRAWFORD: Objection, vague.
A I was never the director. I was either the acting director or the deputy director.
Q And today you are the deputy director,