113

A **Probably.**
Q And in 1987 did you personally read the amendments to the Nuclear Waste Policy Act?
A **I'm sure -- well, did I sit down and actually read it? I mean, I dealt with it a lot, but yes, I'm sure I read most of it at one time or another.**
Q In 1985 when you took on your position at DOE did you read the standard contract?
A **No, actually I didn't.**
Q Have you ever read the standard contract subsequently?
A **Cover to cover, no.**
Q Have you read portions of it?
A **Yes.**
Q What portions have you read?
MR. CRAWFORD: Objection, vague.
A **I don't know. I would have to go -- you know -- the '98 date, the section. I mean I -- I don't know. I would have to look.**
Q Do you think you read at least three-quarters of the contract?

114

MR. CRAWFORD: Objection. Asked and answered. Objection, vague.
A **I doubt I've read --**
MR. CRAWFORD: Objection, foundation.
A **I doubt I've read three quarters of that contract.**
Q Do you think you read at least half of that contract?
MR. CRAWFORD: Objection, asked and answered. Objection, vague. Objection, burdensome.
A **I don't know.**
Q Is it possible you did?
MR. CRAWFORD: Objection, asked and answered. Objection, vague, burdensome.
A **I just don't know how much of it I read.**
Q So it is possible that you have not read half of the provisions of the standard contract, correct, sir?
MR. CRAWFORD: Objection, argumentative. Objection, asked and answered. Objection, vague, burdensome.
A **Possible.**

115

Q Is it possible that you've read less than a quarter of the provisions, sir?
MR. CRAWFORD: Objection, argumentative, burdensome. Objection, asked and answered.
A **I don't know.**
Q So it is possible that you, in your years at the Department of Energy or before, have read personally less than 25 percent of the provisions of the standard contract, correct?
MR. CRAWFORD: Objection, argumentative. Objection, foundation. Objection, asked and answered.
A **I probably read more than a quarter of it.**
Q Are you certain?
MR. CRAWFORD: Objection, argumentative.
Q Are you certain?
MR. CRAWFORD: Objection, argumentative.
A **No, I'm not certain.**
Q I would like to return to paragraph three on the top of page seven. Have you had a chance to read that?
A **Yes.**
Q Can you explain that objective to me?

116

A **That was an objective, okay, to receive waste in 1998 and along with the acceptance schedule it's -- in accordance with the acceptance schedule provided in the standard contract, okay. So that was the goal.**
Q And you're comfortable with that goal?
MR. CRAWFORD: Objection.
A **It wasn't mine. It wasn't my goal.**
Q But you understand that was a goal of the program?
A **Yeah.**
Q In 1985, correct?
A **That's correct.**
Q And what acceptance schedule did the standard disposal contract provide for?
MR. CRAWFORD: Objection, foundation. Objection to the extent it calls for speculation.
A **I think the contract references other documents that references things, and I don't specifically know.**
Q So is it your testimony that it provided for a schedule but you don't sitting here today know

what that schedule is?
MR. CRAWFORD: Objection. Argumentative.
A **The receipt rate of January -- excuse me, the receipt date of January 31, 1998, clearly was always a goal. Okay. Regarding the acceptance rate of so many tons year one, year two, year three, okay, you know, that has changed over time. My focus has always been to create a siting process that got us a site to allow us to have the -- a reasonable receipt rate going toward the steady state 3,000 tons per year, and that's where my focus has always been, not on contract details. Okay. I am not a lawyer, I'm an engineer, okay, so I have not gone into the contract in any great detail at all.**
**Okay, now regarding your question here about the acceptance schedule in the contract, actually I don't recall seeing a metric ton per year in the contract.**
Q Let me step back a second, Mr. Barrett. You just referred to a reasonable receipt rate going toward the steady state 3,000 tons per year.
A **Right.**



Q "That's where my focus has always been." Do you recall that testimony?
A **That's what I just said I think.**
Q Does that continue to be your focus to this very day, sir?
A **Yes.**
Q And does that continue to be the focus of the Department of Energy's spent nuclear fuel program?
MR. CRAWFORD: Objection to the form. Objection to the foundation. Objection, vague.
A **We are still trying to perform under the Nuclear Waste Policy Act to receive the waste into the federal system as soon as we can under the constraints of the law. So, yes, that remains my goal and the organization's goal.**
Q Again, just so the record is clear, your goal and the organization's goal is to achieve a reasonable receipt rate going towards the steady state of 3,000 tons per year, correct?
MR. CRAWFORD: Objection to the extent it mischaracterizes prior testimony. Objection, foundation. Objection, vague.



A **That has been our goal to do that.**
Q And it continues to be your goal today, correct?
A **Correct.**
Q And it was your goal in 1985, correct?
A **Correct.**
Q And it was the goal of the department in 1982 when the standard contracts were signed, correct?
MR. CRAWFORD: Objection, vague. Objection, calls for speculation. Objection to the extent it mischaracterizes his prior testimony.
A **I wasn't there in '82 so I don't know about '82, but in '85 and today it has always been our intent to try to do what we can from a technical point of view to receive the materials at a reasonable rate.**
Q And the reasonable rate is the rate that would ramp up -- is a rate that would ramp up towards 3,000 MTUs per year, correct?
MR. CRAWFORD: Objection, vague. And foundation.
Q I believe your counsel cut you off. What was your answer, sir?



A **That has been our intent.**
Q Let's go back to paragraph three, page seven. You referred to January 31st, 1998, as being a goal. Was it something more, wasn't it a contractual commitment and a statutory command?
MR. CRAWFORD: Objection, argumentative. Objection, best evidence. Objection to the extent it calls for a legal conclusion.
A **As an engineer, okay, and as a program administrator, okay, and dependent on what the contract said or what courts said, we were always trying to achieve that goal.**
Q And why did you establish that goal for yourself?
A **Because --**
Q And your department?
A **It was set in the law, okay, that our goal was to try to create a facility and to create a system that would meet that goal of January 31st, 1998, to start to receive fuel. And it has always been an important objective and goal.**
Q To start to receive fuel on January 31st,

1998, at a ramp-up level that would -- in a reasonable amount of time and at a 3,000 per year MTU acceptance rate, correct?
MR. CRAWFORD: Objection to the form. Objection to the mischaracterization of prior testimony. Objection to the extent it assumes facts not in evidence.
A **It was a systems goal to receive the material at a reasonable rate, okay, of which the 3,000, ramp up to 3,000 tons was a reasonable rate. It was never a -- in my opinion it was never a legal requirement to do 3,000 tons per year.**
Q You base the goal on the statute, correct? That's what you've testified to, correct?
A **Yes.**
Q Back to paragraph three --
A **Excuse me. Let me go back to that. When you say the statute does not say 3,000, okay, that was a judgment part. It is the receipt in January 31, 1998, is in the statute. The rate to my knowledge is not in the statute.**
Q So why did you set the 3,000 MTU goal?



A **That was a --**
MR. CRAWFORD: Objection to the fact that that question assumes facts not in evidence.
A **That was in our judgment a reasonable rate, steady state rate to move up to under the circumstances we were in.**
Q Paragraph three. I'm not certain I understand your testimony. I'm still unclear what you're referring to with respect to the acceptance schedule. You see that language, acceptance schedule in paragraph three?
A **You asked me to interpret this paragraph three which I never wrote.**
MR. CRAWFORD: He's asking you whether you see that.
A **Do I see it? I see that line.**
Q And what do you understand that to be referring to? What acceptance schedule did the standard disposal contract provide for?
MR. CRAWFORD: Objection to the foundation of the question and objection, best evidence.
A **I don't know because I do not recall an**



**acceptance schedule in the contract itself. So I would have -- I don't know what this means.**
MR. CAYNE: It's 12:30. Let's break for a one-hour lunch.
(A luncheon recess is taken.)



AFTERNOON SESSION
BY MR. CAYNE:
Q Good afternoon. Mr. Barrett. Who are the individuals that report directly to you in your position as deputy director?
A **Now?**
Q Yes.
A **Dr. Russell Dyer, project manager Yucca Mountain project; Sandra Waisley who is the acting director of the U.S.A. subprogram administration; and Mr. Jeffrey Williams who is the acting director of office of waste acceptance and transportation international or technology -- technology and QA director. Mr. Ron Murthey, and Mr. Ronald Milner who is the chief operating officer.**
Q Do you work with Mr. David Zabransky?
A **Yes.**
Q And what position does he hold?
A **I think he is now the acting director of transportation and waste acceptance.**
Q And in that capacity to whom does he report?

MR. CRAWFORD: Objection. Lack of foundation.

Q You see B, the waste receipt rate?

A Uh-huh.

Q Are you familiar with the basis for the 3,000 MTU per year receipt rate in 1985?

MR. CRAWFORD: Objection, asked and answered. Objection, foundation.

**A I'm familiar with it. It was established before my arrival or personal participation in establishing that number. It seemed like a reasonable number to me then as it does today.**

Q Has there ever been a time since you've been at the Department of Energy that a 3,000 MTU per year rate did not seem reasonable?

MR. CRAWFORD: Objection, vague. Objection, asked and answered. Objection, lack of foundation.

**A As this is used in this case, as an assumption for an operating facility rate and capacity, it was a reasonable number.**

Q In C, do I understand this correctly that



after two years the MRS would have been operating at full -- at the full acceptance rate?

MR. CRAWFORD: Objection, vague.

**A That's what it says. I never thought it was that fast, but that's what it says.**

Q Do you have any basis to disagree with the statement in C?

**A I think going from zero to 3,000 in a two-year period is extremely challenging and questionable to go that fast.**

Q Do you believe that the individuals in the Office of Civilian Radioactive Waste Management program were careless in establishing this two-year ramp-up period?

MR. CRAWFORD: Objection, foundation. Objection, speculation.

**A I don't believe they were careless at all. I believe that's overaggressive in my judgment based on what history has shown us how difficult nuclear facility creation implementation is.**

Q Would you believe it to be overly aggressive in 1985?



MR. CRAWFORD: Objection, foundation.

**A I don't think I ever really tuned in on it.**

Q Did you ever have discussions with anyone in your office concerning the reasonableness of the two-year ramp-up period?

**A Not that I recall.**

Q Who would have made the final decision in your office to authorize the two-year ramp-up period?

MR. CRAWFORD: Objection, vague. Objection, foundation.

**A That would have been Roger Hilley who is responsible for that office.**

Q Do you believe he was a competent individual?

**A Yes, I do.**

Q Do you believe he had good professional judgment?

MR. CRAWFORD: Objection, foundation.

**A As a senior manager, yes.**

Q Did you find him to be overly aggressive in his administration of the program?

MR. CRAWFORD: Objection, foundation.



Objection, vague.

**A No.**

Q Can you turn your attention to page 26. You see page 26 consists of a chart. Would you take a moment to refresh your recollection concerning its contents.

**A Okay.**

Q Are you familiar with this chart?

**A Vaguely.**

Q Have you seen the column labeled Spent Fuel, the fourth column to the right?

**A There's four, four, four, four, nine, 18?**

Q Right.

**A Yeah.**

Q Are you familiar with the basis for the projection that the ramp-up would go from 400 to 900 at the third year?

**A I'm sorry, repeat the question.**

Q Are you familiar with the basis, technical or otherwise, for the determination that the acceptance rate would ramp up from 400 to 900 between the third and the fourth year of the acceptance of the

answered.
**A I have no idea how many meetings.**
Q A handful?
MR. CRAWFORD: Objection. Asked and answered. Objection, foundation.
**A Don't know.**
Q Could it have been as many as five?
MR. CRAWFORD: Objection, asked and answered. Argumentative. Foundation.
**A Don't know.**
Q You don't know whether it was as many as five?
**A Could have been.**
MR. CRAWFORD: Objection, argumentative.
Q Over what period of time did these meetings occur?
MR. CRAWFORD: Objection, argumentative. Objection, foundation and asked and answered.
**A In the post-'94 budget decision when the MRS volunteer was unlikely to go forward.**
Q Do you know whether there were any contacts made by any member of your office to Secretary Hodel



in 1994 concerning the contents of Secretary Hodel's letter of September 7th, 1984?
**A I don't know of any.**
Q Do you recall whether during any of the meetings you attended in which Exhibit 3 was discussed whether any member of your office, the Office of Civilian Radioactive Waste Management Program, whether any member of your office expressed the view that there were misstatements of fact or law in Secretary Hodel's letter?
MR. CRAWFORD: Objection. Asked and answered. Objection, foundation.
**A Repeat how you phrased that.**
Q Do you recall whether during any of the meetings you attended in 1994 in which Exhibit 3 was discussed, whether any member of your office took the position that there were -- that the letter of Secretary Hodel dated September 7th, 1984, contained any misstatements of fact or law?
MR. CRAWFORD: Same objection.
**A Don't know.**
Q No recollection?



**A Don't recall.**
Q Page 97, Exhibit 2, the same paragraph we've been referencing. Can you tell me what the reference is in the fourth line to a firm schedule?
**A Fourth line of which paragraph? Oh, I see. Okay.**
MR. CRAWFORD: Objection, foundation. Objection to the extent it calls for speculation.
**A I don't know what more to say than what it says here. I don't know what they were talking about.**
Q What is your understanding of the term "firm schedule" as it is used in this document?
**A Firm or just the word "schedule" beginning in '98, which is repeating back what the statute says. So adding the word "firm" in front of "schedule" is meaningless to me, but maybe it meant something to the writer.**
Q Do you recall whether that term was discussed by any members of your staff in the 1994 time period?
**A I have no recollection of the word "firm" being used in front of any schedule in this program**



**ever.**
Q Would you turn to page 99 of Exhibit 2. Take a look at the third full paragraph on page 99 that starts, "the owners and generators." Do you see that?
**A Uh-huh.**
Q Take a moment to read that.
**A Okay.**
Q Are you familiar with the position stated there?
**A Yes.**
Q What is your familiarity with that position?
**A That the act requires the utilities to store the waste until January 31, 1998.**
Q And after January 31, 1998, whose obligation is waste storage?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion. Objection to the foundation.
**A My interpretation is it's silent about that.**

Q Is this consistent with your understanding?
MR. CRAWFORD: Objection, asked and answered.
**A I go back to the act. The act says that the utilities are responsible for storage until the department takes the waste, and it gave a date of January 31, 1998, to start. It was always the tenant that, even when we started, if we started as advertised -- I mean, there would be some storage going on afterwards anyway. So the utility is responsible for safe storage of the waste.**
Q You refer to some storage. What storage were you referring to?
**A Some utilities are still going to have to do storage of the waste while we were operating. It may not have had allocations. There are many different things.**
**(Deposition Exhibit Barrett 4 was marked for identification and was retained by counsel.)**
Q Mr. Barrett, the court reporter has handed you a document marked for identification as Exhibit 4. Do you have that in front of you?



**A Yes, I do.**
Q And this document is a draft of the Civilian Radioactive Waste Management Program Mission Plan as of December 20th, 1983. Do you see that?
**A Yes.**
Q I would like to refer your attention to the third paragraph under Introduction.
MR. CRAWFORD: What page are we on?
MR. CAYNE: Page 1-1.
**A Okay.**
Q Please let me know after you've read that.
**A Okay. I read it.**
Q Do you agree with the statement made in Exhibit 4 that the waste acceptance schedule will initially preclude the need for additional at-reactor storage after January 31st, 1998, and ultimately remove from at-reactor storage all waste that is more than five years old?
MR. CRAWFORD: Objection, vague. Objection, foundation.
**A I don't know. I would have look in here and see what it did.**



Q Well, would the mission plan as it stood in 1985, based on your knowledge of it, preclude the need -- had it been implemented as it stood in 1985, would that have precluded the need for additional at-reactor storage after January 31st, 1998?
MR. CRAWFORD: Objection, vague. Objection, foundation.
**A Not necessarily.**
Q Might it have?
**A Might have; might not have, too.**
Q How would you make that determination?
MR. CRAWFORD: Objection, vague. Objection, foundation. Objection to the extent it calls for speculation.
**A You would have to look to see what utilities could go when under the oldest-fuel-first allocation and all that. So it becomes very complicated to figure out if someone would have to do additional storage or not.**
Q Did anyone in your office ever make, attempt to make that determination on a utility-by-utility basis?



MR. CRAWFORD: Objection, foundation. Objection, vague.
**A Not to my knowledge.**
Q You made a reference to oldest-fuel-first allocation. To what were you referring?
**A It's my understanding that under the framework of the act that the allocations for service are provided to the contract holders on an oldest-fuel-first basis.**
Q Were there also certain exceptions to that under the act or contract?
MR. CRAWFORD: Objection, compound.
**A What do you mean by exemptions?**
Q Exceptions --
**A What do you mean by that?**
Q For example, for shut-down reactors.
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion. Objection, compound.
**A The framework -- now, I don't know if it's in the statute or if it's in the contract -- is we have the ability to approve, I'll use the words hardship cases to allow people to have an earlier or**

193

less than 2.5 years for its licensing review." Do you see that statement?
A **Yes, I do.**
Q Are you familiar with the basis for that conclusion, that it would require less than 2.5 years to complete that process?
A **In this document, no.**
Q Are you familiar outside of this document with the amount of time it would have taken the NRC to complete this process?
MR. CRAWFORD: Objection, vague.
A **I'm familiar with the NRC processes to approve and, you know -- facility under 10 CFR Part 72 which is what this is.**
Q And do you believe that a projection of that process would take less than 2.5 years to be an appropriate projection?
A **It's around two and a half years, 30 some months I've testified to, which is about two and a half years. Two and a half to three years.**
Q You've testified to today? Is that what you're referring to?

194

A **In the last five years.**
Q Before Congress? Have you testified anywhere in the last five years other than before Congress?
A **What do you mean by testify?**
Q You just referred to testimony you gave in the last five years, correct?
A **Oh, Congress. Yes, I've testified before Congress regarding storage approval times in the last five years.**
Q And you testified that the period in which -- the period that it would take to license an MRS facility would approximate 2.5 years, correct?
A **It could be done that fast.**
Q You testified to Congress that that was an appropriate projection of the required time, correct?
A **I believe so. I would have to go back and look.**
**(Deposition Exhibit Barrett 5 was marked for identification and was retained by counsel.)**
Q The court reporter, Mr. Barrett, has handed you a document marked for identification as Exhibit 5.

195

The first page states Annual Capacity Report Briefing for OCRWM Executive Committee, November, there's no date, 1986. Do you have that before you?
A **Yes, I do.**
Q Were you a member in November 1986 of the OCRWM executive committee?
A **I don't think so.**
Q In November 1986 you were a division director, correct?
A **Correct.**
Q And you don't believe that in that capacity you would have been a member of the executive committee?
A **No, I was not then.**
Q Have you taken a moment to leaf through this document?
A **Okay.**
Q I would like to turn your attention, on the left-hand side it says HQ 0002904.
A **290 --**
MR. CRAWFORD: Wait a minute. Oh, I got you.

196

A **Positions by decision group, current status?**
Q Yes. You see under Decisions Group it has aggregate acceptance, the first entry, system study on technical basis under review confirms 3,000 MTU per year?
A **I see it.**
Q That's consistent with your testimony today, correct, that --
MR. CRAWFORD: Objection.
MR. CAYNE: Could I finish, counsel.
MR. CRAWFORD: Sorry.
Q That's consistent with your testimony today that in 1986 your office was projecting a 3,000 MTU per year acceptance rate, correct?
MR. CRAWFORD: Objection, vague.
A **Seems consistent.**
Q Do you know what the, or are you familiar with the system study that is being referred to in this entry?
A **Not the specific one.**
Q Do you have a general understanding of the

system study being referred to here?
MR. CRAWFORD: Objection. Asked and answered.
**A There were various studies done in the eighties and also in the very early nineties on system performance rate, you know, what the costs were, schedules were, plausibility of them.**
Q And these system studies looked at system issues, correct?
**A Yes.**
Q And am I correct that each one of these studies to which you've just referred confirmed an acceptance rate, an aggregate acceptance rate of 3,000 MTU per year?
MR. CRAWFORD: Well, objection, vague.
**A I think it's overstated to say it confirmed it. It showed that, you know, at 2,000 it does this, at 3,000 it does that, 4,000 it does something different. I don't know if they actually reached an absolute confirmation that 3,000 was the exact number, but generally they supported the system rate of 3,000 was a reasonable rate.**



Q So it's your understanding or your knowledge that each of the various system studies to which you just referred that were undertaken in the -- from the mid-1980s to I think you said the mid-1990s, supported an acceptance rate of 3,000 MTU per year, correct?
MR. CRAWFORD: Objection, vague. Objection, assumes facts not in evidence. Objection, mischaracterizes prior testimony.
**A Yes.**
Q I'll ask you to turn to page HQ 0002909 of this same exhibit.
**A Okay.**
Q Do you see under the second entry, allocation of acceptance under consequences of decisions, it says "allocation required to plan maximum storage at some sites." Do you see that statement?
**A I see it.**
Q Do you understand that statement?
**A No.**
Q Do you understand that statement to refer



to the need of the utilities to have significant advanced knowledge of the allocation rankings in order to store the fuel in the most efficient manner?
MR. CRAWFORD: Objection, speculation. Objection to the extent it assumes facts not in evidence. Objection to the foundation.
**A Could be. I don't know.**
Q Do you have any knowledge of the considerations that utilities undertake in attempting to maximize their storage capacity, their existing storage capacity?
**A Yes.**
Q And what considerations are necessary to be undertaken by a utility to do that?
**A Safety considerations, economic considerations, future site use and decommissioning schedules, all sorts of issues a utility needs to consider to make decisions about how best to store the fuel.**
Q And is one of the issues they need knowledge about the priority queue?
**A The likely --**



MR. CRAWFORD: Objection, foundation.
**A The likely removal time for the Department of Energy is an important part of that consideration.**
Q So the failure to provide the utility with that information could cost the utility to store fuel in a less than optimal manner, correct?
MR. CRAWFORD: Objection, speculation. Objection, foundation. Objection to the extent it assumes facts not in evidence.
**A The removal date would be the important thing to the utility planner regarding where you are in your allocation as a subset. The most important part is the when will the federal facility be capable to receive material. So the allocation to me is a secondary issue compared to the rate of development of receiving facility, which is the primary consideration.**
Q You said the most important part. The most important part to what?
**A For a utility deciding what they should do with their storage. The most important -- one of the more important aspects of a utility decision will be**

**when will the federal government start taking waste and at what rate from their facility. The most important part of what the federal removal rate would be is not your allocation so much as is when does the federal system start.**

Q So a utility would need to know when the federal system would start in order to most efficiently utilize its available storage space for spent nuclear fuel, correct?

A **It's an important consideration.**

MR. CRAWFORD: Howard, since we're moving to another document, can we take a break?

MR. CAYNE: Oh, sure.

(There is a recess from the record.)

(Deposition Exhibit Barrett 6 was marked for identification and was retained by counsel.)

Q Mr. Barrett, the court reporter has handed you a document marked as Exhibit 6, which is the June 1987, annual capacity report. Do you have that before you?

A **Yes, I do.**

Q Did you play any role in the preparation or



issuance of this report?

A **None.**

Q Did you ever see this report prior to its issuance?

A **No.**

Q Have you ever had occasion to look at this report before today?

A **Yeah, I've seen it.**

Q In what circumstances have you had occasion to look at this report?

A **There was a big stack of stuff somebody gave me one time.**

Q When would this have been?

A **Somewhere in the early nineties. There's a newer one than this one. No. This was in a stack of stuff. I never read it.**

Q Do you recall for what purpose you were given this document in the early nineties?

A **No.**

Q But you examined a portion of its contents at that time?

MR. CRAWFORD: Objection, asked and



answered.

A **I'm not sure I ever even opened it. Because there was a newer one.**

Q I'd like to step back. Do you recall with respect to the last document I asked you if you were a member of the executive committee of the OCRWM.

A **Yes.**

Q And you answered in the negative?

A **Because I was -- I was not and then I was.**

Q Who would have been members of that committee in November 1986 to your knowledge?

MR. CRAWFORD: Objection, foundation.

A **Roger Hilley, the depository people. I think Keith Klein was still here then, Ed Kay, Sam Rousso ran admin, and I don't know who else. Wasn't many.**

Q Excuse me?

A **It wasn't very many people.**

Q Who's on it today?

A **It doesn't exist today.**

Q When did it go out of existence?

A **'89, somewhere in there.**



Q You were a member of the committee prior to the time it went out of existence?

A **At the very end I was a member of it.**

Q When did you join, '89?

A **'88, '89, somewhere in there when I was QA director or one or the other jobs. I don't remember. But I was officially a member of it, and I think it had one meeting and then it kind of went away.**

Q Who were the other members of the committee at the time you joined?

A **I don't remember.**

Q You don't recall any of the other members at the time you joined?

A **I guess it would have been Ed Kay who was the acting director. Sam Rousso probably would have been there. After that I just don't remember.**

Q Would you turn to page Roman little v, captioned Summary of Exhibit 6. Are you there?

A **Roman numeral v.**

Q On the bottom. You see that?

A **It says Section 1.**

Q It's the fourth page of the document?

**Energy recommended it, but go ahead.**
Q And it was this linkage that caused the ultimate failure of the MRS proposal, correct?
MR. CRAWFORD: Objection to the extent it calls for speculation. Objection to the foundation.
**A No.**
Q It hindered the continuation of the MRS proposal, correct?
MR. CRAWFORD: Objection. Same objections.
**A No. I don't think so. Let me rephrase it. I don't think so.**
Q I thought you testified this morning that the congressional enactment in 1987 was a large reason why the MRS proposal never was implemented. Is that not correct?
**A That is correct.**
Q And you indicated that this is similar to one of the linkages Congress enacted, this being the linkage referred to on page 58 of Exhibit 8?
**A No.**
Q I'm sorry. No, you did not say --
**A I'm answering your question no.**



Q Okay. I misheard you then. I thought you testified that this linkage was similar to what Congress enacted?
**A Yes.**
Q You did testify to that?
**A Yes.**
Q And did this linkage have an effect on the ability to proceed with the MRS proposal?
**A In a minor way.**
Q And what was that?
**A It limited the usefulness, but it was almost immaterial in the change in '94.**
Q Was there another linkage that had a more adverse effect on the program?
**A Not a linkage.**
Q What resulted in the failure to proceed with the MRS program?
**A Failure to --**
MR. CRAWFORD: Objection, asked and answered.
**A Failure to give the grants to the Indian tribes who wanted to pursue a proposal.**



Q Had Congress enacted the grants that you just referred to in 1984, when would an MRS facility have been able to commence operations?
MR. CRAWFORD: Objection to the extent it calls for speculation.
**A There were no grants in '84.**
Q In '94?
**A Now rephrase your question.**
Q With respect to the grants that you referenced a few moments ago that Congress failed to enact in 1994, I'm asking you to assume that those grants had in fact been authorized. Had those grants been authorized in 1994, when could an MRS have commenced operations?
MR. CRAWFORD: Objection to the extent it calls for speculation.
**A It was still possible to do it in '98, and that was my testimony in the spring of '93.**
Q Your testimony to Congress?
**A Yes.**
Q And did that testimony give consideration to the linkages in the 1987 legislation?



**A I believe it did.**
Q And taking into account the linkages imposed by the '87 legislation, it's your testimony that if Congress had enacted -- authorized the grants in 1994 the MRS would have, could have commenced operations by January 31st, 1998, correct?
MR. CRAWFORD: Objection to the foundation.
**A I go back here on these things. I think what had to happen was I think they had to change the linkages in the proposal, which is what the plan was with the Mescaleros and the Goshoots, was that they would propose the change to the linkages. So I think the linkages had to be modified for performance in '98. The plan was to do that in the proposal to Congress because it would take Congress to act on it. So the linkages may have had to change. I would have to go back and look at what the linkages were which I don't recall now.**
Q So your best recollection is that the 1994 proposal to which you referred would have required two things, that certain grants be authorized and that the linkages enacted in 1987 be amended or repealed?