**A Yes. And that was the -- that was the plan. In calendar '93, in the FY '94 budget proposal, that the Indian nations would present a proposal that would change the linkages and be able to operate in 1998. And the denial of Congress to develop those proposals led to -- and there was no chance of modifying the linkages nor getting the site in any practical sense was -- led to the inability or the unlikelihood of meeting the '98 date.**

Q But it was your view, am I correct, in 1993 that had Congress acted differently, had Congress authorized the grants, had Congress repealed the linkages, then the MRS facility could have commenced operations on or before January 31st, 1998, correct?

**A Correct. That's my recollection.**

MR. CRAWFORD: Let's take a break.

MR. CAYNE: Sure.

(There is a recess from the record.)

(Deposition Exhibit Barrett 9 was marked for identification and was retained by counsel.)

Q Mr. Barrett, going back to our previous line of discussion, do you recall that you testified



that the linkages to which we were referring would have had very little effect on the ultimate failure of the MRS proposal? Do you recall that?

**A Yes.**

MR. CRAWFORD: Objection.

Q To the extent you've refreshed your recollection on that proposal and the implications of the linkages, would you want to amend in any way that answer?

**A Refresh me on the two linkages.**

Q Well, the linkage that I was referring to was the linkage that was proposed in the DOE report.

**A I never knew DOE ever proposed a linkage, but the linkage -- the linkages in my mind are the ones in Congress. There's two of them.**

Q I will hand them to you, sir.

**A And then we'll come back and clear this -- well, we'll come back to this since your question is on those linkages, though.**

**(Deposition Exhibits Barrett 10 and Barrett 11 were marked for identification and were retained by counsel.)**



Q Mr. Barrett, you've been handed two additional exhibits marked for identification as Exhibit 10, which is a copy of Section 10165 of Title 42 and Exhibit 11, which is a copy of Section 10168 also Title 42. Do you have those two before you?

**A Yes.**

Q And I understand you're reviewing these copies of the statutes now to refresh your recollection on the linkages about which you've testified?

**A Correct.**

MR. CRAWFORD: It might help if you would direct him to some part of it.

**A On ten?**

Q Yes.

**A The linkage is B, the secretary may not select the site under subsection A until the secretary recommends a repository.**

Q Okay.

**A That in a -- and the reason I said that the failure of the grants was the primary reason why we would not do it was the proposal to Congress would be**



**the Indian nation in that case proposing to be the site, volunteering to be the site which would negate the secretary selecting a site. So the lack of a volunteer, you know, agreed to by Congress was more important than this limitation B.**

Q Could I also ask you to look at section little d of Exhibit 11.

**A Yeah, I was doing ten and then we'll do -- so that's ten.**

**And the concept in the proposal would be to modify this linkage as well. If the --**

Q This linkage being sub (d)?

**A Sub (d), correct.**

Q Of 11?

**A D of 11, would be to modify these as well, at least -- (d)(1) would be that they would propose to change the one that they could start construction prior to construction authorization for the repository but (d)(2) would remain.**

Q What about (d)(3)?

**A (D)(3) would remain.**

Q With the 10,000 limit?

A Right. And (d)(4) would remain. And they were not limiting as to starting in '98. But (d)(1) of Exhibit 11 would be modified by the proposal as would B of Exhibit 10. This was in a proposal to Congress by the Native American nations that would volunteer. But there was never any indication to my recollection that they would change the mass limits of Exhibit 11 (d)(2), (3) and (4). That was the premise that we were working on circa '93 for the proposal.
So I answered the primary reason for the ability to meet the '98 date in early '93 was a proposal to modify those two linkages. So in my mind in my original answer was the lack of -- the congressional refusal to go forward with those proposals was the primary reason that the MRS was not available in 1998. Not the linkages per se. Because if we had a volunteer, in my judgment, those linkages would have been modified by Congress if it was acceptable to the volunteer host.
Q But without modifying linkages that you've identified, the proposal could not have gone forward, correct?



A Without -- these linkages prevent us from going forward without a volunteer to change the linkage.
Q And linkage (d)(1) in Exhibit 11 is similar, is it not, to the linkage proposed by the Department of Energy in the last Exhibit 9 that we were referring to a few moments ago?
MR. CRAWFORD: Objection, vague. Objection, foundation, and objection to assumes facts not in evidence.
A The proposal from the Department of Energy that's in one of these things here which I guess would have been 9. You tell me where it was because that's where we started.
Q I'm sorry. Exhibit 8.
MR. CRAWFORD: The last paragraph or last section.
A 58?
Q Yes.
A I was unaware, and I don't know if this is really true or not, that he did this, although it says it here, that the Department of Energy proposed that.



The working hypothesis that I had in '93, because I was not intimately involved in the policy aspects in the eighties, was that this was imposed by Congress, which it was.
Q This being?
A The linkage that you could not -- that the MRS could not start receiving fuel. This was congressionally imposed. There's no number of volumes in here in the DOE -- I didn't know DOE had proposed anything to Congress regarding linkages. I was aware that they had dialogues about a concern that the MRS be -- appear to be a replacement for the repository and that there needed to be ties. I did not know the department went so far as to make a congressional recommendation.
Q You believe that they made that recommendation to make it even clearer that the MRS was not a replacement for the repository?
MR. CRAWFORD: Objection to the foundation. Objection to speculation.
A I don't know. I don't know what those who did this at that time did or didn't do. I was not in



a policy role in the 1980s.
Q So prior to today you were not aware, Mr. Barrett, that the Department of Energy had made any proposals to Congress with respect to the linkages we have been discussing, correct?
A That's correct.
Q And sitting here today you do not know why the Department of Energy made the proposal with respect to the linkage, the proposed linkage referenced on page 58 of Exhibit 8, correct?
A I do not know.
Q So my question is correct, yes?
MR. CRAWFORD: Objection. Asked and answered.
A State your question again.
Q I just want the record to be clear, sir.
A Well, state your question again. Let's see if I can try to give a yes or no.
Q And sitting here today you do not know why the Department of Energy made the proposal with reference to the linkage, the proposed linkage referenced on page 58 of Exhibit 8, correct?

273

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-----------------x
YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C.
CONNECTICUT YANKEE ATOMIC POWER : 98-154C. 98-474C.
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C. 98-486C.
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C. 99-447C.
Division of DUKE ENERGY CORP.; : 00-440C. 00-695C.
INDIANA MICHIGAN POWER COMPANY; : 00-703C. 01-115C.
SACRAMENTO MUNICIPAL UTILITY : 01-116C. 01-249C
-----------------X
(Caption continued on next page)

Continued Deposition of LAKE H. BARRETT
Washington, D. C.
Tuesday, April 23, 2002
9:36 a.m.

Job No.: 11792-5
Pages 273 through 526, Volume 2
Reported by: Diane Gomez, RPR

274

DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
-----------------X

275

Continued Deposition of LAKE H. BARRETT, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public in and for the District of Columbia.

276

APPEARANCES

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:
DEVON E. HEWITT, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 893-0527

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:
JEFFREY L. HANDWERKER, ESQUIRE
HOWARD CAYNE, ESQUIRE
RONALD A. SCHECHTER, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004-1206
(202) 942-5000

THE WITNESS: Can we take a break?
MR. CAYNE: Certainly.
THE WITNESS: About 60 seconds.
(There is a recess from the record.)
A **Before we start with the next question, I would like to revisit something.**
Q Mr. Barrett, before you speak, let me ask you, since we broke a few moments ago, have you spoken with your counsel concerning your testimony that you just provided?
MR. CRAWFORD: Yeah.
A **Yes.**
Q Please proceed.
A **Okay. My concern here, I'll give you -- you asked a question; I'll give you an answer. You will restate the questions -- my answers, excuse me, slightly differently. You will introduce words that I did not use. And then you ask me to say yes or no to that. Okay. I don't like your recharacterizing my answer differently than I did. And it puts me in a position I don't want to say yes to something that's slightly different. Now, you may be close but they're**



**different. They're yours, not mine. I did not use the word "danger" in that previous series; you did. Okay. But you're recasting them all slightly different, and I think, that's my perception, setting up a record and putting words in this that I don't necessarily agree to. It's going to take a long time if we're going to go on every single phrase that you recast them because you don't like the way I answered it. That's a problem. All right? So I don't know how to work it out but...**
Q I appreciate the lecture, Mr. Barrett. Let me explain to you this is the process of examination in a judicial proceeding. I ask you the questions. The issue is not whether you like or enjoy the question. Your job here today is to provide the best, most honest, most direct answer. If you think I misstated something, you point it out to me. If you don't like the terms I use, you make that clear in your answer. Okay, sir? I am attempting to determine factual issues to be used in the trial of this proceeding, and I have to ask the questions the way I deem best. You have to give me your most direct and



honest questions. Do you understand the process, sir?
A **I understand the process.**
Q Thank you, sir.
I would like to turn your attention to page two of the same exhibit.
A **Page two or page two of the attachment?**
Q Page two of the attachment. Can you take a look at the first paragraph on the top of page two.
A **Yes.**
Q Take a moment to read it.
MR. CAYNE: Let me state that Steve Cohn, C-o-h-n, counsel for Sacramento Municipal Utility District has entered the deposition room.
A **So you want me to read the paragraph on top of page two?**
Q Yes. Have you had a chance to read it?
A **Yes.**
Q Do you agree with the statement contained in that paragraph?
MR. CRAWFORD: Objection, vague.
A **The points one, two, and three?**
Q Let's go through it. It states that "the



commission recognized the perceived concern that an unlinked MRS facility might be recorded as a de facto repository." Do you see that?
A **I see that.**
Q Did you share that concern at the time of this memorandum?
A **I had no opinion. That was a statement from the commission.**
Q But did you as an individual, sir, as the director or acting director of RW have a concern that an MRS unlinked to a permanent repository might in fact be regarded as a de facto repository?
A **I wasn't the director or the acting director.**
Q In the capacity that you held at this time did you have that concern?
A **I knew that was -- it was a policy issue in the United States Congress.**
Q Did you have a view on that issue of any type?
MR. CRAWFORD: Objection. Asked and answered.

A **There was an issue that I knew existed. It was immaterial what I personally felt one way or the other.**

Q Fine. But my question, Mr. Barrett, is whether you personally had a view on that question, not whether or not your view was material to anything.

A **I wished that Congress didn't have such a strong view about it, but that's what they had and that's the way it was.**

Q Why did you wish that Congress did not have such a strong view about it?

A **Because it really restricted our ability to take material into federal responsibility.**

Q You're referring to the linkages imposed by the 1987 amendments to the Nuclear Waste Policy Act of 1982, correct?

A **Correct. That's what this says.**

Q And that was your view?

A **Yes.**

Q Do you understand the statement "and notwithstanding their finding that there is no technical basis for the linkages between the MRS and



the repository," do you know what that statement means?

A **I don't know what it means.**

Q You have no idea whatsoever?

A **I can surmise what it means.**

Q Well, what is your professional surmise, sir?

MR. CRAWFORD: Well, objection to the form.

Q Please answer the question, Mr. Barrett.

A **All right. There is no technical reason for linkage other than the perception of the host of the storage facility that it is unfair for it to be there because it will stay for a long time and it may stay there forever, therefore they wanted, from a policy matter, a statutory linkage that prevented it from happening.**

Q Does that mean that there was no technical basis for the provisions of the 1987 amendments to the Nuclear Waste Policy Act that imposed the linkages between the construction and operation of a permanent repository and the construction and operation of an MRS facility?



A **Yes.**

MR. CRAWFORD: Objection. Foundation.

Q What is the term "technical basis," what do you understand that term to refer to?

A **That there's no scientific nor -- there's no technical or scientific reason that there needs to be a linkage.**

Q So to be blunt, the linkages involve pure politics. Is that what you're saying?

MR. CRAWFORD: Objection. That's not what he's saying.

A **Pure policy.**

Q Pure policy?

A **Policy.**

MR. CAYNE: And I object to counsel for the government advising the witness as to what he has said or hasn't said or how he should testify. That is totally improper.

MR. CRAWFORD: It's proper for me to say when you're mischaracterizing what he said.

MR. CAYNE: It's totally improper, counsel.

MR. CRAWFORD: No, it's not.



Q I would like to direct your attention to the next section on page two, "DOE generally agrees with the commission's conclusions." Do you see that?

A **Yes.**

Q The paragraph has a statement, "The commission found that while no single factor could favor an MRS over the no-MRS option, cumulatively" --

A **Excuse me. Are you reading here?**

Q Under "DOE generally agrees with the commission's conclusions" on page two of the exhibit.

A **Halfway down or --**

Q Oh, about five lines down. Do you see that?

A **Right. Start again.**

Q "The commission found that while no single factor would favor an MRS over the no-MRS option, cumulatively the advantages of an MRS would justify the building of an MRS if, one, there were no linkages of between the MRS and the repository." Do you see that?

A **Yes.**

Q Do you agree with that statement?

**wasn't scheduled until after 1998, which would preclude a '98 fuel receipt.**
Q The repository operation wasn't scheduled in 1989 to commence until the year 2010, correct?
**A It says construction authorization.**
Q Well, I just asked you about operation.
**A That's correct.**
Q The operations of the repository were not intended to commence until 2010, correct?
**A That's correct.**
Q And as it was then planned with a 2010 operation date, when was it anticipated that the repository -- the construction of the repository would be authorized?
**A I don't recall, but I think it was something like 2005.**
Q Somewhere between 2005 or somewhere between 2005 and 2007?
**A Somewhere in there. I don't -- 2005 plus or minus a couple of years.**
Q So based on the testimony you just provided, sir, am I correct that, returning your



attention to Exhibit 16, that the MRS facility referenced in the bottom of page two of the attachment to that exhibit, the MRS facility that is referred to there under the law that was in existence at that time could not begin operations until, at the earliest, sometime between the period 2005 and 2007, correct?
MR. CRAWFORD: Objection to the form of the question.
Q Correct, Mr. Barrett?
**A Without any changes to the law, that is correct.**
Q It is correct that the repository -- that the MRS facility could not become operational until sometime in the time frame 2005 and 2007?
**A Under the statute currently in place, without a change.**
Q And the statute currently in place was existing federal law, correct?
**A The statute also provided for a volunteer process that could change the linkages.**
Q And the volunteer process itself would require the enactment of additional federal



legislation, correct, Mr. Barrett?
**A Correct.**
Q And what is the nature of the additional federal legislation that would have been necessary in order to authorize a volunteer -- the siting of an MRS facility at a location owned by a volunteer?
**A It would require proposal from the volunteer to the Congress with their proposal that could change the linkages.**
Q And it would take federal law, an act of the United States Congress to both approve the linkages and to authorize the construction and operation of a facility on the location owned by the volunteer, correct?
**A Basically, yes.**
Q Let me rephrase my last question. And it would take federal law, an act of the United States Congress to either modify or eliminate -- to both modify or eliminate the linkages and to authorize the construction, operation of a facility on the location owned by the volunteer, correct?
**A Close.**



Q What is -- why only close, sir? And let's try to get it right.
**A It's my recollection the facility was authorized by the amendment, so it didn't need to be reauthorized. So it was -- the MRS was already authorized by Congress. It didn't need to be reauthorized. There's something else in your statement that was close but not quite.**
Q The Congress would have been required to either modify, substantially modify or eliminate the linkages, correct?
**A And you used "or." The last time you used an "and."**
Q Okay. Or?
**A If you say it with "or" and "authorize," I agree.**
Q And the volunteer would have to be approved, the siting of the facility at the location of the volunteer, and by volunteer you're referring to a volunteer state or Indian tribe, correct?
**A Correct.**
Q And the location of the volunteer state or

Indian tribe would also specifically have to be approved by affirmative federal legislation, correct?

**A I don't know if the actual site had to. They had to change the linkages. They had to change the linkages. I'm not sure they actually had to approve the site.**

Q You used the term "authorize." What did you mean by authorize?

**A If you read the -- my recollection is if you read the amendments act of '87, they specifically authorize the construction of an MRS that did not exist in the '82 act. But then they put a limitation in the linkages that basically prevented us from ever building. But actually the construction was authorized in the amendments act. You can read it as a matter of record I believe.**

Q Now, I believe you testified that an MRS would have been authorized or was authorized under the '87 legislation provided that the statutorily mandated links were satisfied, correct?

**A That's my understanding.**

Q And I'm referring to the links to the



repository, you understand that?

**A Yes.**

Q But did the '87 legislation authorize the construction and operation of an MRS facility that was not compliant with each of the links established by the 1987 amendments to the Nuclear Waste Policy Act of 1982?

MR. CRAWFORD: Objection, best evidence.

**A I think the way you phrased that the answer is no.**

Q Did you not understand the question?

**A Your phraseology had a double negative in it, so I think the answer was no.**

Q Let me try to ask the question again, because we want the record clear. Did the 1987 legislation authorize the construction and operation of an MRS facility that was not compliant with each of the links established by the 1987 amendment to the NWPA?

**A No.**

MR. CRAWFORD: Objection. Best evidence.

Q So you agree with me that such an MRS was



not lawful in 1989, correct?

MR. CRAWFORD: Objection. Asked and answered.

**A The answer is yes.**

Q And in fact --

**A I do.**

Q And, in fact, such an MRS never became lawful under the laws of the United States, correct?

**A Yes.**

Q Turn your attention to page four of Exhibit 16, please. The second full paragraph, Mr. Barrett. Are you there?

**A Yes.**

MR. CRAWFORD: What page?

MR. CAYNE: Page four of the attachment to Exhibit 16.

MR. CRAWFORD: Which paragraph are we on?

MR. CAYNE: The second full paragraph.

Q It starts, in conclusion number four, "The commission found that an MRS link as provided in the current law would not be justified, especially in light of uncertainties in completion time for the



repository." Do you agree with that statement or did you agree with that statement in 1989?

MR. CRAWFORD: Objection. Relevance.

**A I don't recall what I felt in '89, but I basically agree with that.**

Q And then it proceeds, "As a result of that conclusion the commission does not recommend a linked MRS as required by the current law." Do you now or did you then agree with that recommendation?

**A Basically, yes.**

Q Turn your attention to page five of the same document, the final paragraph. Towards the middle of the paragraph. And you can take your time again to read any part of this page or any part of this entire document that will assist you in responding to my inquiry. The part of the paragraph I'd like to focus your attention on is towards the middle. It states, "The capacity limit would be reached within a few short years, assuming any sort of reasonable acceptance rate for the waste management system." Do you see that statement?

**A Yes.**

425

**consternation about what constitutes an emergency. So neither of those in my recollection did I consider practical. And we didn't pursue them.**
Q What did you mean by the last statement, "The MRS review commission recommendations are viewed as an interim solution to a problem that requires long-range planning and thought"?
A **That their recommendations didn't make any sense but we were being nice about it.**
**(Deposition Exhibit Barrett 17 was marked for identification and was retained by counsel.)**
Q The court reporter has handed you, Mr. Barrett, a document marked for identification as Exhibit 17, which is encaptioned Nuclear Waste. Is there a need for federal interim storage by the U.S. monitored retrievable storage review commission? November '89, bearing Bates numbers PA-172230 through PA-172270. Do you have that document before you?
A **Yes.**
Q And let me tell you that this document is an excerpt from the entire -- of the entire report issued by the U.S. monitored retrievable storage

426

review commission.
Did you ever have an opportunity to review this document in the course of the performance of your duties as an official at the Department of Energy?
A **I believe so.**
Q Let me turn your attention to page bearing Bates number PA-172244.
A **Okay.**
Q I'd like to ask you to read the passage, the paragraph that begins at the very bottom of the left-hand column of that page starting, "However, the schedule linkage." Do you see that?
A **Yes.**
Q Could you read that paragraph up to including number five.
A **I've read that.**
Q Okay. Let me ask you to focus your attention to the first statement of that section, specifically, "However, the schedule linkage presently in the NWPAA (MRS construction may not begin until the Nuclear Regulatory Commission issues a license with a construction of a repository) would make it impossible

427

for an MRS to be operational more than three years before the repository." Do you see that statement?
A **Yes.**
Q Do you agree with that statement?
MR. CRAWFORD: Objection. Asked and answered.
A **In general, yes.**
Q Do you agree with it as stated here to be accurate and correct?
A **It's a judgment call.**
MR. CRAWFORD: Same objection.
A **I don't disagree with it -- I don't disagree with that statement.**
**(Deposition Exhibit Barrett 18 was marked for identification and was retained by counsel.)**
Q Mr. Barrett, the court reporter has handed you a document marked for identification as Exhibit 18. Do you have that before you?
A **Yes.**
Q This document is the report to Congress on reassessment of the civilian radioactive waste management program dated November 1989 issued by the

428

U.S. Department of Energy, Office of Civilian Radioactive Waste Management bearing Bates numbers PA-163156 through PA-163188. Did you have any role in the preparation of this report?
A **I think so.**
Q What was your role, Mr. Barrett?
A **I don't specifically remember the details. I remember we did this. This was part of Admiral Watkins', you know, review of this. So I know I was involved in it. I don't remember what my title was then. I was one of the acting office directors. Not the entire program office but one of them.**
Q Do you know whether you would have been a drafter or a reviewer of this document?
A **I did not draft it. I was a reviewer. I was a participant in its generation and development.**
Q In your position would you have been required to approve of or sign off on this document prior to its final issuance?
A **I don't remember if I signed this or not.**
Q You might have?
A **I might have. I wasn't the final, because**

**I was not -- November '89. I was still there but I was not the act -- Sam Ruosso would have been the director, so Sam would have signed this.**
Q But would it be a fair statement that it is likely that you would have been the person who would have had to sign off on this document prior to its final issuance?
MR. CRAWFORD: Objection to foundation.
A **Sam ran things administratively loser than I do. I don't know if I would have signed this or not. I mean, under my regime I would have to sign it. I don't know if I signed it, but I was a participant in it.**
Q You might have signed it?
A **I might have signed it. But I might not have.**
Q I would like to turn your attention to page -- you see page ten?
A **Yes.**
Q In connection with your participation in the preparation of this report, would you have reviewed and analyzed the content of this referenced



**That's my recollection of what it was.**
Q How did the MRS commission report that we just reviewed affect your analysis with respect to your review of Figure 1 on page ten?
MR. CRAWFORD: Well, let me just -- I'll object to the foundation of that and to the form of the question about the statement made by counsel that we just reviewed the MRS commission report. I mean, you certainly asked the witness questions about it.
MR. CAYNE: I object to counsel's testimony and speaking objections. They're improper.
Q Could you please respond to the question, Mr. Barrett.
MR. CRAWFORD: I was speaking to you.
A **Repeat the question, please.**
Q Certainly. How did the report issued by the MRS commission affect your analysis of what appears in Exhibit 18 as Figure 1?
MR. CRAWFORD: Objection, foundation. Objection, vague.
A **What the primary premise in this Figure 1 is is a volunteer MRS that would have a proposal to**



schedule for restructure program, Figure 1?
A **I would have been involved in it. So, yeah, I would have reviewed it probably, yes.**
Q And would you have been in agreement with its contents before this report was issued?
A **Organizationally I would have been. I'm not sure what my personal opinion was versus the organization's. I just don't recall. I don't recall I had a big disagreement or anything with it.**
Q So you believe that as an organizational matter you would have signed off on the contents of Figure 1, correct?
A **I would have supported it, yes.**
Q Let's just walk through -- first, can you explain to me what this Figure 1 represents?
A **In '89 we reviewed the program, where it was in light of the amendments act, in light of the MRS commission report, and basically restructured the program to a degree around the new repository date which now went to 2010 whereas before it had been 2003. We reviewed that and this was the new, the new revised adjusted program based on those events.**



**Congress which would change the linkages which would allow us to receive waste in 1998. It does not have in it the user-funded facility. It does not have in it the emergency facility that they recommended.**
Q You said it would have a proposal to Congress.
A **Right.**
Q A proposal to Congress would not be sufficient to allow the overall process referenced in Figure 1 to go forward, correct?
A **A proposal from a volunteer site where the proposer agreed to the linkages, where the linkages were invented to protect the MRS site would surely have been approved by Congress in my opinion. So if we had a volunteer site, I thought it would be very easy -- Congress would readily approve the change in the linkages if it was satisfactory to the volunteer.**
Q So you are confident that federal legislation would have been enacted and signed by the President approving any volunteer that came along that was willing to allow the siting of an MRS facility on its property?

433

A Did I use the word "confident"?
Q That's my question, sir.
A No, I'm asking you, did I use the word "confident"?
Q I don't recall. My question is are you confident that federal legislation in fact would have been enacted and signed by the President approving any volunteer that came along that was willing to allow the siting and operation of an MRS facility on its property?
A I would say --
MR. CRAWFORD: Objection, vague.
A -- high probability of success. I would not use the word "confident."
Q What do you base your conclusion that there would be a high probability of success? Let me ask this, have you ever participated in the legislative process?
A Yes.
Q By providing testimony to Congress?
A Yes.
Q And in 1987 did you -- you are aware in

434

1987 that there was an effort to obtain legislation that failed, correct? An effort to obtain legislation by the Department of Energy that failed when Congress imposed linkages that the Department of Energy did not like, correct?
A Correct.
Q But, nevertheless, you sitting here today are confident that if you went back to Congress for legislation to approve a volunteer that came along that was willing to allow the siting of an MRS repository, that Congress would enact and the President would sign into law legislation that would authorize that siting and operation in a form that you would find satisfactory?
MR. CRAWFORD: Objection. Vague.
A I believe that would have a reasonably high chance of success, because the difference being between the two cases is the MRS was proposed to be in Tennessee, which was vigorously opposed by the State of Tennessee and its elected officials, whereas if we had a volunteer site, the premise is that they would not be opposing it because they wouldn't have

435

volunteered. So there would be a very different legislative outcome of the two cases.
Q What states -- an Indian tribe could have been a volunteer, correct?
A Correct.
Q And would it have been just Indian tribes located in certain states?
A No. It could be an Indian tribe federally recognized.
Q Are you aware that there are Indian tribes today located in the State of Connecticut?
A Yes.
Q And are you aware that the Indian tribes in the State of Connecticut run gambling casinos?
MR. CRAWFORD: Objection. Relevance.
Q Are you aware of that?
A Yes, I am.
Q Well, let me ask you to assume that the Indian tribe in the State of Connecticut receives investment advice from its Wall Street bankers that you guys can make more money siting an MRS facility than competing with Donald Trump in Atlantic City. Do

436

you understand the situation I'm posing to you?
A Yes.
MR. CRAWFORD: I object to that.
Q And let me assume the Indian tribe came into your office and said, Mr. Barrett, we're here to volunteer. Let's get moving. We want to set up an MRS facility in our tribe location, which is within spitting distance of Stamford, Westport and Greenwich, Connecticut. But it's our land, our property and we think we would be doing good for the United States of America so we're ready to move. If you had a proposal like that, that would be the type of volunteer you're talking about, correct? The tribe would be volunteering to enter into an agreement with the United States to site and operate an MRS facility on its sovereign land in the State of Connecticut. That would constitute a volunteer under your hypothetical, correct?
A No. You invented some totally hypothetical, incredible situation and I wouldn't consider that credible.
Q I'm asking you if a tribe from the State of