calls for speculation.
A **I believe they could have and would have.**
Q And do you believe then that the political establishment, using your phraseology, of the State of New York, would also support the siting and operation of an MRS facility in the Adirondack Mountains in New York State?
MR. CRAWFORD: Objection to the extent it calls for speculation.
A **They may not have vigorously opposed it.**
Q And on what do you base that testimony?
A **Since you're asking me to speculate on these line of questions, it's my opinion based on working with organizations and political establishment.**
Q Do you know who the senators were of the State of New York at the time of the proposals referenced in Exhibit 18?
A **I don't know specifically, but it was Senator Moynihan I think and I forget the other one. I think a republican.**
Q And do you believe that Senator Moynihan,



Senator D'Amato would have supported the establishment and operation of an MRS facility in the Adirondacks in 1989 or after?
MR. CRAWFORD: Objection. Speculation.
A **I didn't use the word "support." I said not vigorously oppose. I don't think they would support it.**
Q Do you think they would not vigorously oppose it?
A **I think it would have been more difficult for them to oppose a sovereign Indian nation who volunteered to do a national service arrangement. I think it would have been a better situation certainly than was in Tennessee.**
Q And why would it be better than Tennessee?
A **Because you would have a sovereign Indian nation standing up and saying I would go along with this.**
Q Have there been any sovereign Indian nations in Nevada or elsewhere that have offered or expressed interest in the siting of an MRS facility or a permanent repository?



A **Yes.**
Q And where did that occur?
A **New Mexico, Oregon and Utah.**
Q And were those -- have those proposals been advanced -- are those proposals still under consideration?
A **No.**
Q And why not?
A **Because Congress didn't provide the funding in FY '94 to go forward and develop it.**
Q And did the local politicians of each one of those states that you just referenced, New Mexico, Oregon and Utah, oppose the siting of an MRS or repository within their state borders?
A **Not to my knowledge.**
Q You don't think the state officials challenged it?
MR. CRAWFORD: Objection. Asked and answered.
A **I don't recall them.**
Q Why did Congress not provide funding?
A **The -- I don't know who started it, but**



**clearly the Senate and House of Representatives canceled the funding before it got going.**
Q What was the proposal before the Congress in 1994 that was not funded?
A **The proposal was to provide grants to those three -- the tribes to develop proposals to Congress, and Congress did not provide that funding for us to be able to do that.**
Q When did the process begin that led to the consideration of those proposals? Was it in '92 or '93?
A **It started in, you know, earlier than that. Probably '89, '90. '89 I think.**
Q Was there ever a time between '89 and '94 when Congress failed to provide the funding that you believed that those three proposals or one of those three proposals would likely be approved by the United States Congress?
A **Say that again.**
Q Did you ever believe that any of the three proposals involving the States of New Mexico, was it Utah, and Oregon would be approved by Congress?

**A If the process was allowed to proceed, yes, I had -- I believed it could happen.**
Q You believe what?
**A I believed it could happen, it could be approved.**
Q And you believed that firmly enough to invest a lot of personal energy and energy of your department and office in pursuing those possibilities, correct?
MR. CRAWFORD: Objection to the form of the question. Objection to the foundation.
Q Correct?
**A Yes. Yes, that was the only alternative I had under the act to be able to meet the '98 date, so I pursued it with all the energy I could.**
Q And you thought you had a reasonable possibility of success, correct?
**A Yes.**
Q And you thought wrong, didn't you?
**A History turned out that that wasn't the way it's going to be.**
Q It's not easy to get fair legislation, is



it?
MR. CRAWFORD: Objection to the vagueness of that.
**A That particular issue never even got to be considered. I think you're surmising that if the proposal had been laid before Congress what was going to happen and you're speculating on that. But I wouldn't speculate like you are.**
Q But what you saw is sometimes you can't even get your proposal before Congress?
**A That's correct. That was cut off before the proposal was ever given to them.**
Q Not only do you have to get Congress to approve your proposal, you have to get Congress to look at it, right?
**A Say that again.**
Q Let me ask you, on page ten of Exhibit 18, you see on the top column under program element, it goes out to 2010.
**A Yes.**
Q Does it go out to 2010 because that was the projected date of repository -- the first date of --



the projected date of repository operations?
**A Yes.**
Q What was the process that led to the extension of that date, the delay of that date out to 2010?
**A I don't remember the details as to what happened with the schedules, but it's my recollection that when you put together the site characterization plan implementation and the processes spelled under the act, and that it was going to take until 2010 to emplace fuel.**
Q Was there a formal process within the Department of Energy that was undertaken that led to the determination that this projection should be delayed to 2010?
**A There was a review done by the staff in the program that came up with the schedule you see on Figure 1.**
Q And who would have been involved, what offices would have been involved in that review?
**A Pretty much all the offices in the program.**
Q Who would have signed off on that



determination to delay the projected start date of the permanent repository?
**A You know, Mr. Ruosso, who I think was the acting director at the time; Mr. Peters, who was the deputy director. I was involved. I might have signed off on it. Then there were dozens of other staff people involved.**
Q Let me ask you to look, it's towards the middle of this document. 1997 it states "start construction 1/1/97." Do you see that?
**A Yes.**
Q You see that that refers, does it not, to the start -- what type of construction is that referring to? Construction of what?
**A That's the MRS facility.**
Q And how long does this Figure 1 indicate it would take for the completion of that facility from start to finish?
**A Construction?**
Q Yes. Construction and to be placed in a position that it would be ready to receive spent nuclear fuel.

Q And the premise that I put on it you understand to be that the law remained as it stood on February 5th -- federal law remained as it stood on February 5th, 1990, correct?
MR. CRAWFORD: Objection. Vague.
**A Under that premise what you say is true.**
Q What I say is that under that premise the MRS could not begin to accept spent nuclear fuel until approximately October 2006 according to your calculations, correct?
MR. CRAWFORD: Objection. Asked and answered.
**A With your assumptions, yes.**
Q The only -- when you say your assumptions, what are you referring to? Are you simply referring to the fact that -- strike that. What assumption are you referring to?
**A You make the statement there would be no change in the linkages. The premise that we had for January '98 was that there would be a change in the linkage which could accompany any year with the appropriations process, and it could be changed. In**



**that time period, in the 1990s and eighties it was very -- relatively simple to change statute regarding this program, because Bennett Johnston ran both authorized and appropriations committee and that's how he made the amendment in '87. And he could have done it like that.**
Q You're confident of that?
**A Confident? I believe that that was a very plausible scenario, and that's why we adopted that as an approach for the program.**
Q Was Senator Johnston able to push through the legislation desired by the Department of Energy in 1987?
**A No.**
Q He was unsuccessful that time around?
**A Correct. Because it wasn't done in appropriations.**
Q You believe that the congressmen, senators should have followed different legislative procedures in order to accomplish the goals of the Department of Energy at that time, correct?
**A No. There's a lot of flexibility for the**



**legislative branch to do what they wish to do.**
Q Let me ask you, back to Exhibit 19. You indicated that this projection was based on the premise that federal law would be amended, correct?
**A Correct.**
Q And specifically the linkages would be repealed or modified, correct?
**A Correct.**
Q If that assumption was being made, why was there not also a proposal to increase the statutory MTU limit of 10,000 to a higher figure such as 15,000 or greater?
**A I don't recall exactly why the program at the time chose to deal with the linkage and not with the mass limits.**
Q You have no knowledge of that issue?
**A Say your question again.**
Q I'm asking why -- let me step back. The projections and proposals referenced on Exhibit 19 assume the enactment of federal legislation, correct?
**A Correct.**
Q In light of the fact that your office was



assuming that the law was changed, why wasn't your office also assuming that that change in law would increase the MTU limit that I believe that the Department of Energy had initially opposed in 1987?
**A My -- I don't know if it's speculation, but my belief, okay, when this was discussed was that there had to be a balance in the eyes of the volunteer that they had some protections. We did not make it an issue to remove all elements like the metric tonnage limits as well as the time linkages, because the thing that was most important to us was that we start moving materials of reasonable quantity, of which 10,000 tons was a reasonable quantity, as soon as we could with '98. So we did not -- my recollection is we did not try to remove everything because it would have been harder to ever get a volunteer or to get it through the political process, that we chose to leave the linkages and not make the linkages a statutory initiative like we did the time linkages, because it was secondary and would have detracted our ability to ever get it approved by Congress as you asked earlier.**
**So in my mind, as I recall this, was we**

**chose not to try to force the tonnage, as we chose to really address the time linkage. Because it was a secondary -- of secondary importance relative to the time. So that is why we left the metric tonnage there. Although we initially never wanted the metric ton limits, they were a fact and they were law at that time, period. So we were trying to make the best of a bad statutory situation we found ourself in with the '87 amendment.**

Q Did the Department of Energy have a congressional lobbyist in 1990?

**A We don't have lobbyists.**

Q Do you have officials whose primary duty is dealing with the federal legislature?

**A We have an Office of Congressional Affairs.**

Q And who was that office run by in 1990?

**A I don't recall.**

Q Do you frequently deal with that office?

**A No.**

Q Did you deal with that office in 1990?

**A Probably.**

Q But maybe not?



**A I don't remember.**

Q Do you recall whether in 1990 you sought advice from that office on the likelihood of federal legislation being enacted to modify or amend the statutory linkages?

**A I don't remember the Office of Congressional Affairs really ever being in tune with much of this at all. This was done primarily with Secretary Watkins' office.**

Q But the Office of Congressional Affairs did deal with congressmen, senators on a daily basis, correct?

**A I don't know what they did.**

Q You don't know the function?

**A I know -- no, I don't.**

Q And I take it you never involved that office in discussions relating to efforts to cause Congress to consider the repeal or amendment of the linkages, correct?

MR. CRAWFORD: Objection. Foundation.

**A There were probably some congressional affairs staffers around at meetings.**



Q But you're not sure?

**A I'm not sure.**

Q And you don't recall ever having a conversation with the head of that office or any staffer relating to the likelihood of congressional legislation -- the likelihood that congressional legislation would be enacted to modify or repeal the statutory linkages, correct?

MR. CRAWFORD: Objection to the foundation. Objection to the form of the question.

Q Correct?

**A I don't recall any ones that I did. Sam Ruosso or Frank Peters, who were my superiors, might well but I didn't. That I recall. I know there were staffers around. I never recall having a meaningful discussion with somebody from that office who really knew anything.**

Q And don't recall ever having such a conversation in 1990 or any other time, correct?

MR. CRAWFORD: Objection to the form of the question. Objection to the foundation.

**A You're talking about 1990.**



Q Did you ever have a conversation with anyone from that office concerning the issue of congressional legislation to amend or repeal the linkages at any time, 1990 or at any time prior to or subsequent to 1990?

MR. CRAWFORD: Objection to the form and foundation.

**A Probably did in '93ish. But not in 1990. I don't recall any in 1990, '89 or 1990.**

Q Can you recall a specific discussion in '93ish?

MR. CRAWFORD: Objection to the form. Objection to the foundation.

Q Or do you just think you might have had such conversations?

**A No, I know in '93, '93 was different because I was now -- a change of time. I was acting director in '93. So I can't remember who it was but there was -- and I did have discussions with that office regarding all my testimony and dealing with stuff with Secretary O'Leary, so, yeah, I worked with that office but I don't remember like who was in**

527

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-----------------x

YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C

-----------------X

(Caption continued on the next page)

Continued Deposition of LAKE H. BARRETT
Washington, D. C.
Friday, April 26, 2002
8:10 a.m.

Job No.: 11792-8
Pages 527 through 825, Volume 3
Reported by: Diane Gomez, RPR

528

DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :

-----------------X

529

Continued Deposition of LAKE H. BARRETT, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public in and for the District of Columbia.

530

A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:

DEVON E. HEWITT, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:

HOWARD CAYNE, ESQUIRE
JEFFREY L. HANDWERKER, ESQUIRE
RONALD A. SCHECHTER, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004-1206
(202) 942-5000

699

need to find out if you have an understanding of what's in this document, sir.
This morning you testified that DCS stood for delivery commitment schedule. Do you recall that?
**A Yes.**
Q What, without looking at the document, are you able to tell me is the purpose of a DCS?
**A I believe they were something to do with the planning for the receipt of material into our system in the future, ten years or something in the future. And it related to the contract.**
Q Why did you view it as administrivia?
**A Because I did not consider it pertinent to the primary business, which was to determine if the repository site was suitable so we can get on to build the facility to be able to receive it.**
Q What consideration did you personally give to the data produced by a DCS?
**A What?**
Q What consideration did you give to the data produced on a DCS?
MR. CRAWFORD: Objection, vague.

700

Objection, foundation.
Q Did you give any?
**A What consideration -- repeat the question again.**
Q A DCS form contains certain data, correct?
**A I really don't know if it has data in it or not.**
Q Let me ask you to look at item number two on the first page, "Who should submit." Do you see that item?
**A Yes.**
Q Why does that item provide that the DCS should be submitted by all purchasers with allocations in the '91 annual capacity report?
MR. CRAWFORD: Objection, foundation, vague.
**A I don't know.**
Q Do you know why the '91 annual capacity report was a report that was chosen?
MR. CRAWFORD: Objection, foundation.
**A No.**
Q Could a nuclear utility that submits a DCS

701

or submitted a DCS request an allocation amount that was different than the amount specified in the 1991 annual capacity report?
MR. CRAWFORD: Objection, assumes facts not in evidence. Objection, foundation.
**A I don't know.**
Q Let's turn to page two. Can you read, take a look at entry 7C.
**A Okay. I've read it.**
Q Now, you see that it states that the DCS -- do you know what FWMS stands for? Is that federal waste management system?
**A I think so.**
MR. CRAWFORD: Objection, best evidence.
Q You see the statement that "The process described herein assumes that the federal waste management system will be able to accept the purchasers' SNF beginning in 1998 according to the acceptance rate reflected in the ACR"?
**A I see that.**
Q Based on your testimony earlier today, as of what date in your opinion would that have been an

702

unreasonable assumption that spent fuel acceptance would be beginning in 1998? Did you indicate earlier today that that projection became unreasonable sometime in mid to late 1993?
MR. CRAWFORD: Objection. Mischaracterizes his prior testimony.
**A In late '93 it became, you know, in my mind unlikely to happen.**
Q Do you know why this instruction form for completing DCSs contains that assumption?
MR. CRAWFORD: Objection to the extent it calls for speculation.
**A No.**
Q Do you know what the relevance of that assumption was in connection with the DCS process?
MR. CRAWFORD: Objection, foundation, vague, and objection to the extent it calls for any kind of a legal conclusion.
Q Let me strike that question and ask you to -- subparagraph C, it says "In the event that such circumstances change" -- referring to the assumption that you and I just discussed, Mr. Barrett. Do you

**readiness for earlier transportation should a site for federal interim storage become available sooner than a repository." I believe that's the only part in here on the MRS.**

Q You believe that's the only reference in this document to an MRS?

A **My quick scan here, my recollection was I don't remember anything else. Somebody else may have read it closely.**

Q Turn your attention to page one, Bates 174286.

A **I'm sorry, page one?**

Q Page one on the bottom, paragraph one.

A **Okay.**

Q On the end of the introduction section it states that "By 1993 it became clear that continuation of the program in accordance with the then-current approach was no longer a viable option." Do you see that?

A **Yes.**

MR. CRAWFORD: Where is that?

MR. CAYNE: Last sentence of the



introduction.

A **Yes, I see it.**

Q What was the then-current approach that's being referred to in that statement?

A **That was the volunteer MRS that would -- had a reasonable chance of success for 1998. That was no longer a viable option.**

Q So that was no longer a viable option?

A **I would have used the word "unlikely," but it's certainly not the central premise for waste acceptance anymore.**

Q The department used the word "viable," correct?

A **That's what it says.**

Q And you would have seen this document before it was issued, correct?

A **Yes.**

Q And I assume you were in the chain of command that had to approve this document?

A **I was responsible, I'm sure. I don't know if I ever signed it off or not.**

Q You would have been satisfied with the



language of this document, correct, before it became final?

A **Yes.**

MR. CRAWFORD: Objection, asked and answered. Argumentative.

A **I would have accepted those words there.**

Q The words being "no longer a viable option," correct?

MR. CRAWFORD: Objection, asked and answered. Argumentative.

Q Correct?

MR. CRAWFORD: Objection, asked and answered, argumentative.

A **Correct.**

Q Page four, please, bottom of page four. The first sentence. "When the Nuclear Waste Policy Act was enacted, it was envisioned that the department would have had a facility available in 1998 to accept waste for disposal, and the department entered into contracts with utilities on that basis." Do you see that?

A **Yes.**



Q What does that mean, that the department entered into contracts with utilities on the basis that it would have a facility available in '98 to accept waste for disposal?

MR. CRAWFORD: Objection to the extent it calls for speculation.

A **Just what it says.**

Q Do you understand what that means?

A **The act says we should have a contract within the time frame, and they put those contracts together under the limited time there in '83, '84. The base operating premise was it would have a facility ready to accept in 1998.**

Q The time the contract was signed or contracts were signed in 1983, that is what the government and the nuclear utilities intended?

MR. CRAWFORD: Objection --

Q Correct?

MR. CRAWFORD: -- to the extent it calls for speculation. Objection to the extent it calls for a legal conclusion.

A **I wasn't there. I wasn't involved in a**

743

**program then, so I don't know what they envisioned.**
Q But is that your understanding?
MR. CRAWFORD: Objection to the extent it calls for speculation. Objection to the extent it calls for a legal conclusion.
**A Yes.**
Q Page nine, please. Under Waste Acceptance Storage and Transportation Approach, towards the bottom of the page it says, The main aspects of the approach for waste acceptance storage and transportation are to" -- and it gives then six separate entries on pages nine and ten. Do you see that?
**A Yes.**
Q And specifically on the top of page ten, the first line it says "Because more detailed work would not be useful until a specific site has been selected, no development work is included in the current plan." Do you see that?
**A Yes.**
Q Is that referring to an MRS facility?
**A Site-specific MRS facility is what that**

744

**refers to.**
Q And again by "site-specific MRS facility," specifically what are you referring to?
**A The actual siting of a facility. If we did generic work was the previous sentence. We did generic work for a generic facility. It could be sited anywhere. So if a site develops through some political process, we would be able to quickly build such a facility to receive fuel as quickly as possible.**
Q And at this time the department did not think that to be a viable option, correct?
MR. CRAWFORD: Objection. Best evidence.
**A There was a low probability.**
Q Low probability did you say?
**A Yes.**
Q And, in fact, such a specific site never did become available through today?
**A Correct.**
**(Deposition Exhibit Barrett 37 was marked for identification and was retained by counsel.)**
Q Exhibit 36, under Fiscal -- on page 14,

745

under Fiscal Year 2000 it states that "The site recommendation will be submitted in a report to the President in 2000." Correct?
MR. CRAWFORD: Objection, vague.
**A Yes, it says that.**
Q And the page before to which that refers, the caption of that page is Major Milestones for Program Success. Do you see that, page 13?
**A I see the chart.**
Q So according to this chart, the recommendation, the site recommendation to the President was one of the major milestones for program success, correct?
**A Yes.**
Q And that milestone, in fact, has occurred two years later than planned for in the radioactive management program plan set forth in Exhibit 36, correct?
**A Close.**
Q What's close? It occurred two years after the date, correct?
**A Including FY '02, but depending on when in**

746

**the year, a little less than two years.**
Q Is it fair to say that as of now the program is at least a little less than two years behind schedule, as reflected by the major milestones for program success?
**A As defined back in '94, yes.**
Q The court reporter has handed you a document marked for identification as Exhibit 37. It is a memorandum, Subject: Total life cycle cost 1995 assumptions package from Ronald A. Milner, Director, Office of Program Management and Integration, bearing Bates HQR-057-1493 through HQR-057-1569. Do you have that document before you?
**A Yes.**
Q Could you please turn to page Bates number 14 -- oh, this is -- it says RW-30 in the top left corner. Do you see that?
**A Yes.**
Q Could you please refer to Bates 057-1498. First, what would your involvement in this, in the preparation or review of this document have been?
**A I would have signed off on a final total**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C

- - - - - - - - - - - - - - - - - X

(Caption continued on the next page)

Deposition of LAKE H. BARRETT, VOLUME 4
Washington, D.C.
Wednesday, May 8, 2002
9:31 a.m.

Job No.: 11792-10
Pages: 826 through 1103
Reported by: Diane Gomez, RPR



DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :

- - - - - - - - - - - - - - - - - X



Deposition of LAKE H. BARRETT, VOLUME 4, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D.C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public of the District of Columbia.



APPEARANCES

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:
ALEX D. TOMASZCZUK, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:
HOWARD CAYNE, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D.C. 20004-1206
(202) 942-5000

**executive branch, and we followed that.**
Q So the position advanced by your office was consistent with the administration policy that you just stated, correct?
MS. HERRMANN: Same objections.
**A We accepted that, and we followed that as a member of the administration.**
MR. CAYNE: We're going to the next document. It's 11:55. Why don't we break for an hour lunch now, and we'll return at one.
(There is a discussion off the record.)
(A luncheon recess is taken.)



AFTERNOON SESSION
Q Mr. Barrett, between the time of the last session of this deposition and today did you discuss your testimony with any person?
**A No.**
Q Did you review any documents in preparation for today's session of the deposition?
**A No.**
Q Did you have any conversations with counsel following the completion of the last session and the beginning of today's session?
**A Just to set up the date for today.**
Q Do you recall, Mr. Barrett, that you testified today that the obligation rate is not equal to the system operating capacity?
**A Yes.**
Q What is the basis for that testimony?
**A In designing any system, from an engineering point of view you design the system to meet or exceed the system requirements. In this case -- not case. In this situation designing the system -- I don't want to confuse this with legal**



**cases. We want to design the system to operate at a rate that exceeds the requirements. The requirements that we have are a combination of many factors, which one of them is in the contract, as I understand, relates to the ACR which is the four, six, 900 number. We want to exceed that by a substantial margin. Which the design rate of -- our present reference rate of four, six, 12, 2,000, 3,000, does that.**
Q Your testimony on that point is inconsistent with the position taken by the Department of Energy in 1987, isn't it?
MS. HERRMANN: Objection. Foundation.
**A Not that I know of.**
Q Your testimony that the obligation rate would not equal the system operating capacity, isn't that inconsistent with the position taken by the department in 1987?
MS. HERRMANN: Objection. Foundation.
**A Not that I know of.**
Q Let me turn your attention to Exhibit 6 of this deposition, page ten, which bears Bates --
**A Hold on now. Six? Do you want me to find**



**it?**
Q Yes.
MR. CAYNE: I'll just state for the record that I'm turning the witness' attention to PA-103165.
**A What page number should I be at?**
Q Page ten. Bates 103165.
**A Okay.**
Q Under Section 3.2 there is the following statement: "The waste acceptance schedule presented in this ACR represents the projected WMS capacity available for allocation to the purchasers. The projected WMS capacity equals the system operating capacity," and then you see it continues.
**A I see it.**
Q That statement is inconsistent with the testimony you just gave, is it not?
MS. HERRMANN: Objection. Asked and answered.
**A Yes, I think so.**
Q Who was responsible for issuing this annual capacity report? Was it your predecessor?
**A I don't think it was me. Yeah, Ben Rusche,**