Q What lower receipt rate studies were you just referring to?
**A Oh, I don't know. Some of those ones you had back here.**
Q Could you go through the exhibits and please identify for me which ones you were referring to.
**A Which one is that OMB one that had the -- all the 2007, 2010, 2000 whatevers? Not this one.**
Q You mean Exhibit 42?
**A 43 I think.**
Q 43?
**A I think 43 had some lower receipt rates in it.**
Q And those lower receipt rates in Exhibit 43 were based upon what?
**A Funding constraints.**
Q Funding constraints imposed by Congress?
**A Yes.**
Q Did Congress impose such funding constraints?
**A They certainly have.**



Q When were those funding constraints imposed?
MS. HERRMANN: Can we just give him a minute to get what he's looking at.
**A About every year. For the last five years. We've been funding-constrained by Congress for the last five years.**
Q Those funding constraints had an ability (sic) on your office's capability to begin the acceptance of spent nuclear fuel on a timely basis?
MS. HERRMANN: Objection. Calls for a legal conclusion.
**A They've slowed us down.**
Q Substantially?
**A Months.**
Q Years?
**A If you add them all up, probably a year or so.**
Q Getting back to the ACR, what is the relevance of an ACR with an acceptance rate of 400, 600, 900 MTUs per year in today's environment where there is a stand-alone repository?



MS. HERRMANN: Objection. Vague, calls for a legal conclusion.
**A I don't know.**
Q Is there any?
MS. HERRMANN: Same objections.
**A Only as it relates to the legalities of contracts.**
Q The 400, 600, 900 MTUs standard was pertinent in the context where an MRS would have gone into effect in 1998 and have been in operation for ten to 12 years prior to repository, correct?
**A That's my understanding.**
Q And that's the only circumstance in which a 400, 600, 900 MTU take-rate had any relevance, correct?
**A That was the basis at that time.**
Q At that time, you're referring to what time?
**A Back in the eighties when that was -- late eighties, early nineties when that was established, that's correct.**
Q So in the late eighties, early nineties



when the 400, 600, 900 MTU take-rate was established, the only relevance that take-rate had was in the context where an MRS would commence operations in 1998 and would operate by itself for ten to 12 years prior to the time that a repository, a permanent repository, began operations, correct?
**A Correct.**
Q Back to Exhibit 6. WMS stands for waste management system, correct, on page ten of Exhibit 6?
**A I think so.**
Q And what is the waste management system?
MS. HERRMANN: Objection. Foundation.
Q You've used that term, haven't you?
**A I generally don't.**
Q Have you ever heard it used?
**A Yes.**
Q Do you have an understanding what it means?
**A I think that was the overall -- yes. I think I do. I think it was the overall system as they described it back at that time.**
Q And the overall system as described back at that time involved what?

954

A A repository, a transportation, an MRS.
Q What is system operating capacity?
A I don't know how they used it in this document.
Q How do you use it?
A I use it as that's what you really expect to operate at.
Q Okay. Using the term "system operating capacity" as you just defined it --
A Okay.
Q -- and the term "WMS" as you just defined it also, do you agree with this statement on page ten?
MS. HERRMANN: Which statement?
Q That the projected WMS capacity equals the system operating capacity?
A What was the question, do I agree with it?
Q Yes.
A No.
Q Why don't you agree with that?
A Because I believe that the system operating capacity should exceed the system operating requirement. It would appear to me in this, back in

955

'87 they were setting the system operating capacity exactly equal to the requirement, which I think is the wrong way to design a system.
Q But that is what the Department of Energy did in 1987?
A I don't know what they did in '87. I wasn't involved in this.
Q Did you ever discuss this issue with your predecessor?
A The issue of what?
Q The issue of setting the operating capacity exactly equal to the requirement.
A No. Not that I recall. Let me phrase it that way.
(Deposition Exhibit Barrett 45 was marked for identification and retained by Counsel.)
Q The court reporter, Mr. Barrett, has handed you a document marked for identification as Exhibit 45, bearing HQR-025-5075 --
MS. HERRMANN: Can I get one of those?
Q -- through 5139.

956

A 50?
Q 5075.
A Down the bottom here?
Q Yeah, bottom right.
A I got 176202.
MS. HERRMANN: We're not looking at the same document.
Q The Bates numbers I just read into the record are wrong. The correct Bates numbers are PA-176202 through PA-176266. The document is called Analysis of Total System Life Cycle Cost of Civilian Radioactive Waste Management Program dated September 1995. Do you have that document before you?
A I do.
Q Would you turn to page five. What was the purpose of this document?
MS. HERRMANN: Objection. Foundation.
A This is the total life-cycle cost analysis that we do periodically to determine -- to estimate the total cost of the system so we can do a fee adequacy report as to the adequacy of the charge to the utilities.

957

Q Now, in 1995, in September 1995 your office in performing the total system life-cycle cost analyses assumed that there would not be a monitored retrievable storage facility, correct?
A I have to check what the time is. September '95 we probably did not assume there was an MRS. I don't know what this document says.
Q Well, I refer your attention to page five, the third-to-the-last paragraph on page five.
A Okay. Does not.
Q Could you turn to page eight.
A Yes.
Q What does Table 1-2 represent?
MS. HERRMANN: Objection. Foundation.
A It says "monitored geologic disposal system receipt/emplacement rates."
Q What were the rates reflected on Table -- how were the rates reflected on Table 1-2 determined?
MS. HERRMANN: Objection. Foundation.
A I don't know.
Q You have no idea?
A No.

962

about the nuclear waste negotiator, correct?
A **Yes.**
Q And am I correct that the activities of the nuclear waste negotiator were terminated in 1995?
A **I don't know the exact date, but somewhere in the mid-nineties.**
Q Were they terminated at that point?
MS. HERRMANN: Objection. Foundation.
A **I believe the term of office of Mr. Stallings, the last negotiator, expired by statute.**
Q Do you know why his mandate was not renewed?
MS. HERRMANN: Objection. Foundation, speculation, calls for a legal conclusion.
A **No.**
Q What effect did the termination of the Office of Nuclear Waste Negotiator have on the planning activities of your office?
MS. HERRMANN: Objection. Foundation.
A **Not appreciable that I recall.**
Q Did it have any effect on your

963

consideration, for example, of the viability of an MRS facility?
A **No, because -- not to my recollection, because the viability of an MRS facility was, you know, negative based on the budget enactment of FY '94.**
Q So would you agree that the MRS facility was effectively dead prior to the time that the Office of the Nuclear Waste Negotiator terminated?
A **I don't know when the term -- the office actually terminated. So I don't know. You said '95. I don't know when the negotiator officially terminated.**
Q Take a look at page 33 of Exhibit 45. I refer you to paragraph 4.7.
A **Uh-huh.**
Q Does that indicate that the negotiator's activities terminated in 1995?
A **It looks like it.**
Q But based on that would you agree that the viability -- that an MRS facility was nonviable significantly before the time the Nuclear Waste

964

Negotiator's Office terminated?
A **Well, in my opinion the MRS siting was not viable once the Congress act on the FY '94 appropriations prohibiting me from providing grants to the Indian tribes. That's in my mind when it became not viable. Exactly when a negotiator terminated I don't remember.**
Q Do you remember we discussed the 1995 ACR in the last session of the deposition?
A **Not really.**
Q Do you recall discussing it at all?
A **We had -- there were multiple ACRs of different dates. So that much I remember we talked about, but the '95 one versus other dates I don't recall.**
Q You're referring to Exhibit 39?
A **39. I have it.**
Q Take a moment to look through it and see if it refreshes your recollection that we discussed it during the last session of this deposition.
A **What's the question? I see an ACR.**
Q Do you recall that we discussed this ACR?

965

A **Yes.**
Q What was the purpose of the 1995 ACR?
MS. HERRMANN: Objection. Foundation, calls for a legal conclusion.
A **Something that relates to the contract.**
Q Do you have any more knowledge about the purpose of the 1995 ACR?
A **No.**
Q Did your office use the 1995 ACR for any purpose?
MS. HERRMANN: Objection. Asked and answered.
A **I'm sure people in the office used it, okay.**
Q For what purpose?
A **For whatever they used it for. I don't know.**
Q You didn't use it for any purpose?
A **Does this have the table in it that I do use?**
Q Which table are you referring to?
A **The only thing I'm familiar with in this is**

966

**page six, Table 2. That's the only thing I ever**
**personally used out of this document.**
Q The only thing you ever used is the summary
of the purchaser's annual allocations?
A **Right.**
Q And for what purpose did you use that
chart?
A **I used that to have an understanding of**
**which utilities had what allocations in the year one,**
**year two, year three, year four. For policy reasons**
**is why I wanted to know.**
Q What policy reasons?
A **Just if I ever have to talk to various**
**executors from various companies where they stood in**
**the queue.**
Q Look at page four, please.
A **Yes.**
Q Did you use the table on page four for any
purpose?
A **No.**
Q None at all?
A **No.**

967

Q What was your position in March 1995?
A **I think I was the deputy director.**
Q Who prepared the table on page four?
MS. HERRMANN: Objection. Foundation.
A **I don't know. Some people in the waste**
**acceptance area.**
Q People who worked for you?
A **Yes.**
Q For what purpose?
MS. HERRMANN: Objection. Foundation.
A **Part of what they consider the business of**
**the office, which I agreed with.**
Q You agreed with what?
A **Them doing what they felt they needed to**
**do.**
Q In March 1995 you did not expect to be
picking up spent nuclear fuel at the rates referenced
in Table 1, correct?
MS. HERRMANN: Objection. Vague.
A **Repeat the question again.**
Q In March 1995 you did not expect that the
Department of Energy would be picking up spent nuclear

968

fuel at the rates reflected on Table 1?
MS. HERRMANN: Same objection.
A **It was my desire and intention that we**
**would pick up in year two, three, four a rate higher**
**than this.**
Q But there was no, in 1995 there was no
expectation in the Office of Civilian Radioactive
Waste Management that spent fuel would, in fact, be
picked up at the rates reflected at Table 1, correct?
MS. HERRMANN: Objection. Foundation.
A **Did you say no expectation?**
Q Right. In March 1995, at which time, as
you've testified, the MRS was not viable, your office
did not expect that spent fuel would be picked up at
the rates reflected on Table 1, correct?
MS. HERRMANN: Same objection.
A **I ask you to clarify the word "expect." I**
**didn't know what to expect. It was our intention and**
**desire with all our energies to pick it up at a rate**
**that we desired to pick it up, which was a higher**
**rate than this.**
Q That was the rate that moved up to 3,000

969

MTUs per year, correct?
A **That was our desire, that was our goal, and**
**we strived to do that. What actually would happen we**
**did not know. So my expectation was very uncertain.**
**So you asked to say what I expect. The**
**expectation, I have to say that I don't know what to**
**expect. We were trying to run it as high as we could**
**run it.**
Q But you had various -- your office, the
Office of Civilian Radioactive Waste Management
Control, had various plans that it followed pursuant
to which your activities were conducted, correct? You
had various plans?
A **We had plans and goals in trying to achieve**
**the intent of the act.**
Q Right. And in 1995, March of 1995, there
was not a plan in effect that would have called for
the acceptance of spent fuel at the rates reflected in
Table 1, correct?
A **Correct.**
Q In fact, the plan that was in place in 1995
called for the acceptance of spent fuel at a rate that

1104

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-----------------x

YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C

-----------------X

(Caption continued on the next page)

Continued Deposition of LAKE H. BARRETT
Washington, D. C.
Friday, May 10, 2002
8:06 a.m.

Job No.: 11792-11
Pages 1104 to 1437, Volume 5
Reported by: Diane Gomez, RPR

1105

DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :

-----------------X

1106

Continued Deposition of LAKE H. BARRETT, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public in and for the District of Columbia.

1107

APPEARANCES

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:

DEVON E. HEWITT, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:

HOWARD CAYNE, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004-1206
(202) 942-5000

because of short-cooled fuel"?
MS. HERRMANN: Objection. Speculation.
A **No.**
Q Do you understand the term "derate"?
A **I understand the term as I use it. How the author is using it I don't know.**
Q How would you use it?
A **It is to reduce the design capacity or reduce the output.**
Q And do you understand the term "short-cooled fuel"?
A **Yes.**
Q What does that mean?
A **Lower megawatt days per metric ton on the fuel.**
Q Based on the understanding of those two terms you just expressed, if the author of that sentence used those two terms in the way you just explained them, do you understand this sentence?
MS. HERRMANN: Objection. Speculation.
A **No.**
**(Deposition Exhibit Barrett 57 was marked**



**for identification and was attached to the transcript.)**
Q Mr. Barrett, the court reporter has handed you a document marked for identification as Exhibit 57. It is captioned Determination of Cost-effective Waste Management Receipt Rates. It is by R.W. McKee, M-c-K-e-e. It starts at Bates PA-221971. And it continues through PA-221980. Do you have that document before you?
A **I believe so. I can't read the Bates number at the bottom, but go ahead. Yes.**
Q And you'll see that the first two pages of this consecutively-Bates-numbered document appear to be the same other than the fact that the first page looks as if a buck slip covered over a portion of the left-hand column, correct?
A **Correct.**
Q Do you know a person named R.W. McKee?
A **No.**
Q Have you ever heard of that person?
A **I've heard the name.**
Q Are you familiar with Pacific Northwest



Laboratory?
A **Yes.**
Q What is Pacific Northwest Laboratory?
A **It's a contractor in Richland, Washington.**
Q Were those contractors relied on often by the Department of Energy in connection with the development, design, and construction of the waste management system?
MS. HERRMANN: Objection. Vague.
A **We use them as advisors and analysts for the waste management system.**
Q Do you continue to so use them through today?
A **No.**
Q Through when did you use them?
A **Through the late eighties.**
Q There's also another name at the top of the first page, H.D. Huber, H-u-b-e-r. Do you know that individual?
A **No.**
Q Did you ever rely on the work of Pacific Northwest Laboratory?



MS. HERRMANN: Objection. Vague.
A **I used it as input.**
Q For what purposes?
A **For advice on systems analysis.**
Q Did you ever personally assign work out to be performed by Pacific Northwest Laboratory?
A **I don't remember me personally, but my staff did.**
Q Did you authorize your staff to assign work out to Pacific Northwest Laboratory?
A **Yes.**
Q I take it then you considered the work of Pacific Northwest Laboratory to be competent?
A **Yes.**
Q I turn your attention to page Bates number PA-221972. It's the second page of the document. Actually, returning to the first page, do you see the buck slip on the first page? It says, '91 HLRWM conference papers, volume two, "high priority."
A **I see it.**
Q Is that your writing?
A **No.**

1340

answered.
A It was, you know, a relatively small amount. We had also gotten information -- we also put the transportation RFP which had the higher rates in it, and we thought we could get that extra out of the system. So we have always strived to perform at this high-as-possible, high-as-practicable rate we could operate at, so that's why.
Q Is it your testimony that the highest practicable rate that you could perform at for year 2011 would be 600 MTUs on an annual basis?
A We didn't really look hard to try to raise -- to see if we could raise that or the 1200 to 1300. I felt that was a lower priority item and didn't try to push it much. Didn't push it at all.
Q Do you know whether the acceptance rates that are included in this document are the same acceptance rates that are included in the 1995 TSLCC report?
MS. HERRMANN: Objection. Best evidence.
A I thought we just described it a little bit. The 300 to 400. Other than that, I think

1341

they're the same.
Q If you would take a look at Barrett Exhibit 45, which is the 1995 TSLCC document. And in particular I direct your attention to page eight.
A Yes.
Q And I think you're absolutely right that these rates are almost exactly the rates in the 1998 TSLCC but for the 2010 where you accurately noticed that it's 300 MTUs in the 1995 TSLCC.
When this document was issued in 1995, was this DOE's intention with regard to the acceptance rate it would implement when it began to take spent nuclear fuel from utilities in 2010?
MS. HERRMANN: Objection. Foundation. Mr. Barrett is not a 30(b)(6) witness.
A Restate that question again, please.
MS. HEWITT: Can you read it back.
(The record is read.)
MS. HERRMANN: Same objection.
A This was a cost report. The primary focus was, you know, to do a cost estimate for total life-cycle cost. This was not primarily a waste

1342

acceptance operating-type document. It should reflect what the system was at that time.
Regarding when we reviewed this document, when I reviewed the document, I was not paying much attention to if it was 300, 400, 600, or whatever. This should reflect what the repository design numbers were, and I just don't know what they were at the time. So the only reason I'm going through this is you asked this was the primary DOE document for acceptance rates. It really wasn't. It should have been the systems requirements documents for the repository of whatever were in place in 1995. If there was 100 percent alignment between those documents I honestly don't know.
Q Table 1-2 that we're talking about is entitled MGDS Receipt/Emplacement Rates. What does the acronym MGDS stand for, do you know?
A Mine geologic disposal system I believe.
Q Do you know whether or not the rates that are included in this document are different from the rates that were included in the 1995 APR ACR that was published around the same time?

1343

MS. HERRMANN: Objection. Best evidence.
A I think that the '95 ACR has the four-six-nine constant in it.
Q I think you're right, but if you would like to look at it, that's Exhibit 39.
A Well, that's different than these.
Q It is different?
A Yes.
Q Why was there a difference in rates published in two separate documents that were published around the same time?
A This is a performance document on what we thought we could perform at. That has something to do with the contract.
Q So is it your testimony that DOE could perform at a rate that's different than what it was supposed to perform under the contract?
MS. HERRMANN: Objection. Relevance.
A Yes.
Q Why don't you take a look at Exhibit 39, which is the 1995 APR ACR.
A Okay.

Q I'm going to refer your attention to Table 1 on page four.
A **Yes.**
Q The table is entitled Projected Nominal Waste Acceptance Rates for Spent Nuclear Fuel. My first question is -- and you've used this term quite a bit as well -- what does the term "nominal" mean when the DOE uses it in its documents?
A **Not an exact number. To me the word "nominal" -- I don't know what the authors of this document meant. When I hear the word "nominal" or when I use the word "nominal" it's sort of an average number. It might be more; it might be less, but it's in that order of magnitude.**
Q Now, this table sets forth projected waste acceptance rates for a period of ten years, correct?
A **It appears to.**
Q Do you know why it only sets forth projected acceptance rates for ten years?
A **No.**
MS. HERRMANN: Objection. Speculation.
Q Do you know what the acceptance rate would



have been in year 11?
MS. HERRMANN: Objection. Speculation.
A **No.**
Q Do you have any understanding of whether or not this ACR APR indicates that DOE will take spent nuclear fuel from utilities at a steady-state rate of 900 MTUs per year for the life of the program?
MS. HERRMANN: Objection. Best evidence. Speculation.
A **Repeat the question, please.**
**(The record is read.)**
A **I don't know a relationship between this table and what we'll actually perform at.**
Q Well, do you know what the purpose of issuing this table was?
MS. HERRMANN: Objection. Speculation.
A **No.**
Q Would an annual acceptance rate of 900 MTUs, if implemented by DOE, preclude the need of utilities to make arrangements for additional on-site storage after 1998?
MS. HERRMANN: Objection. Speculation.



A **I don't know.**
Q How would you figure that out?
A **You would need to -- to calculate that you would need to project what the pool overflow rates would be, would know performance. You would need to then figure out how would the 900, or whatever rate we were going to perform at, how that would be allocated under the contract relationships. And then you could determine who had pool overflows and who did not.**
Q Does DOE have information on what you call pool overflow rates?
A **We have data reported by utilities in their 859 reports that you could derive that from.**
Q Do you know whether or not that consideration, pool overflow, quote/unquote, was a factor in arriving at acceptance rates in this document?
A **I don't know. I don't think so.**
Q Do you know whether pool overflow was a consideration in developing any acceptance rate in any of the acceptance capacity reports issued by DOE?
A **Not that I know of.**



Q Were pool overflow rates a consideration in developing the 3,000 steady-state rate used for the design of the repository?
MS. HERRMANN: Objection. Speculation.
A **Not specifically, but in a gross national sense, yes.**
Q And how in a gross national sense?
A **By setting the performance rate of nominally 3,000 being higher than the production rate of 2,000, that would give a thousand tons per year working off the backlog which should re-present if there was appropriate distribution amongst the contract holders' pool over -- anymore pool overflows.**
Q Do you have an understanding of whether DOE ever established a minimum acceptance rate that would accomplish the need for eliminating pool overflow by utilities after 1998?
A **Not specifically. The only reason I'm pausing, as I recall somewhere having a discussion with staff that the pool overflow rate in the teens, you know, post-2010, was something in the neighborhood of 500 tons per year if there was no -- if we did not**

**perform at all.**
Q And do you recall at all what that figure of 500 tons was based on?
**A Based on somebody's guesstimate of what they realistically thought the pool overflows would be in the 2010 to 2015 time frame.**
Q And was the pool overflow figure that was cited to you, 500 metric tons per year, did that reflect an aggregate number based on all the utilities, do you know?
**A My recollection was that was a national number. You couldn't really do it on a -- we didn't have the data to do it on a utility-by-utility number very clearly.**
Q Well, did the utilities report individually with respect to them this data on their RW 859 documents that they submitted to DOE?
**A I don't know exactly what's on an 859. I think that's being derived from the 859s.**
Q We spoke a little earlier today about the viability assessment. Do you recall that conversation?



**A Vaguely.**
Q And the conversation centered around a reference case for a repository that would be available in 2010 that was actually described in the viability assessment that was published I think by DOE in 1998. Is that correct?
**A I believe so.**
Q And if I remember correctly, the reference case is a repository that is -- I think you described as a nonmodular system. Is that right?
**A Correct.**
Q What are the major milestones that are left between now, May 2002, and 2010 that have to be accomplished before the repository and nonmodular repository can take spent nuclear fuel?
MS. HERRMANN: Objection. Foundation.
**A Have to prepare the license application, go through the licensing process of the NRC, receive a construction authorization, construct it, receive an operating license, build the transportation system, both the hardware aspects of it and the institutional aspects of the transportation system, and then be**



**ready to operate in 2010.**
Q What is a reasonable estimate of time that it would take to construct a nonmodular repository?
MS. HERRMANN: Objection. Speculation.
**A Under normal circumstances a building like that would be approximately five years.**
Q And what's a reasonable time or a reasonable estimate of time that it would take to get your license approved to build such a facility?
MS. HERRMANN: Same objection.
**A The statute says three years.**
Q Do you consider that reasonable?
**A It could be tight.**
Q Why?
**A Well, I think the hearings will be difficult for the NRC to complete within that time period, but it's doable.**
Q And I believe you said in addition to the licensing and the construction there are concerns about building a transportation system as well and getting an operating license. Is that correct? Those are two additional milestones?



**A Two additional milestones. I didn't use the word "concerns."**
Q But they are two additional milestones?
**A They are milestones, yes.**
Q And is the time to get an operating license the same as the time to get your -- for a licensing procedure, is that the same milestone or are those two separate actions?
**A What I refer to in a general sense as the operating license is actually an amendment to our license that we would receive when we get the construction authorization. So it's a license amendment, which should take less time than the original licensing proceeding itself.**
Q And how long would that licensing amendment take?
MS. HERRMANN: Speculation.
**A It will take a couple of years. The actual operating license proceeding will probably start just about when the construction authorization is given.**
Q From what you said it does not appear likely that DOE will accomplish all these milestones

# Alan Brownstein