IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - - -x

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
---------------------xSypolt)

McLean, Virginia
Tuesday, April 9, 2002

Deposition of ALAN BROWNSTEIN, a witness, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, LLP, 1650 Tysons



Boulevard, McLean, Virginia 22102-4859, at 9:30 a.m., Tuesday, April 9, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.



APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) (770-7901)

On behalf of Plaintiff Sacramento Municipal Utility District:
DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301



APPEARANCES: (Continued)
On behalf of Plaintiffs Southern Nuclear Operating Company, Alabama Power Company, Georgia Power Company:
JEFFREY L. HANDWERKER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-6101

On behalf of Plaintiff Wisconsin Electric Power Company:
DONALD J. CARNEY, ESQ.
Perkins Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
(202) 434-1675

On behalf of Plaintiff Commonwealth Edison Company:
NORMAN M. HIRSCH, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

Page 58

A. I do not recall. This is, the date is June '85. It was before my time.
Q. I appreciate that. Do you recall whether you read this document at or about the time you became a DOE employee or shortly thereafter?
A. I believe I read excerpts from it.
Q. Did you use the document to implement the terms of the standard contract?
A. I used -- yes, in part.
Q. And what parts did you use?
A. I used the waste acceptance rates. Hesitation in the response is whether I used the '85 or the subsequent mission plan.
I don't recall which, but I certainly used the mission plan or its predecessor documents for the waste acceptance rates.
Q. Do you know whether there was an earlier version of this mission plan?
A. I don't believe there was.
Q. The reason I ask, sir, is because I believe you used the term this document or its predecessor. I was trying to --
A. Subsequent documents; it's amended documents after. I'm sorry.

Page 59

Q. Let me hand you, Mr. Brownstein, I'm going to have this marked as Brownstein Exhibit 3, what appears to be Volume 1 of a draft mission plan dated December 20, 1983.
(Brownstein Exhibit No. 3 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Have you ever seen that document before?
A. I cannot recall ever seeing this document.
Q. Can I direct your attention to page 2-1 under the heading II, program strategy?
I would direct your attention to the first paragraph under that heading, program strategy.
(The witness reviewed the document.)
THE WITNESS: Okay.
BY MR. TOMASZCZUK:
Q. Do you see the last two sentences of that paragraph?
A. Yes.
Q. It states, "The waste materials will be accepted in accordance with a Waste

Page 60

Acceptance Schedule designed to provide an acceptance rate in the first five years such that no utility will have to provide additional storage capacity after January 31, 1998. Subsequently, the acceptance rate will be equal to or greater than the actual discharge rate of spent fuel each year."
That's what is stated there, correct?
A. Correct.
Q. Was that DOE's policy at the time you became an employee?
A. I've never seen this document.
MR. BANES: Objection -- vague.
THE WITNESS: And I do not believe it reflects the policy.
BY MR. TOMASZCZUK:
Q. It does not reflect the policy?
A. I do not believe it does.
Q. It was not DOE's policy under the contract to provide an acceptance rate in the first five years such that no utility will have to provide additional storage capacity after January 31, 1998?
MR. BANES: Objection -- asked and answered.

Page 61

THE WITNESS: It may have been a goal. I mean I was not with the program and had not seen this document.
May have been a goal, but in terms of the policy with respect to the contract, I don't believe that reflects that.
BY MR. TOMASZCZUK:
Q. And it's your testimony that you haven't seen this document before today as best you can recall?
A. As best I recall, I have not seen this document.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. Let's go back to Brownstein Exhibit 2, which was the June 1985 mission plan.
And I believe you testified if I understood it, Mr. Brownstein, that you used the waste acceptance schedules in the mission plan to implement the terms of the contract?
A. And --
MR. BANES: Objection. Go ahead.
BY MR. TOMASZCZUK:
Q. I understood that to be your

testimony?
A. In the mission plan or the mission plan amendments.
Q. Okay. And how did you go about doing that?
Explain to me what you mean by that.
A. My responsibilities did not include developing a waste acceptance rate that was done by other parts of the program, and in order to complete the things that I was responsible for, we needed a waste acceptance rate, and I used documents available elsewhere in the program.
Q. Who was responsible for developing the waste acceptance rates reflected on page 26 of Exhibit 2?
A. I don't recall. As I testified, this document came out before I was an employee, so I don't know who, who was responsible for that.
I don't recall who was responsible for that.
Q. What office within DOE was responsible for preparing this data, do you know?
A. OCRWM.
Q. Was there a division or branch within OCRWM that was responsible for preparing the



waste acceptance schedule at page 26 of Brownstein 2?
A. There probably was, but I just don't recall.
Q. Do you see the first sentence of this section under the heading 2.7, waste-acceptance schedules, on page 25?
(The witness reviewed the document.)
THE WITNESS: Yes.
BY MR. TOMASZCZUK:
Q. It says, "The DOE is committed to accept waste from the signatories of the standard disposal contracts on a firm schedule that begins no later than January 31, 1998"?
A. Yes.
Q. Is that an accurate statement?
MR. BANES: Objection. Calls for a legal conclusion.
It's vague.
BY MR. TOMASZCZUK:
Q. I'm not asking for your understanding as a, as an attorney.
A. The statement is what it is. You read it correctly.
Q. Is it an accurate statement? Do you

understand my question?
A. I don't.
MR. BANES: Same objection.
BY MR. TOMASZCZK:
Q. Well, is it true that DOE under the contract is committed to accept waste from the signatories of standard disposal contracts on a firm schedule that begins no later than January 31, 1998?
MR. BANES: Objection. Calls for a legal conclusion.
Go ahead.
THE WITNESS: I don't believe that. I believe that this is a, a goal.
I don't believe that it accurately represents what the contract calls for.
BY MR. TOMASZCZUK:
Q. Did you ever discuss that view with anyone?
A. I'm sure that I must have, but I don't recall specifically who or circumstances.
Q. You would at least agree the first sentence doesn't talk about goals, does it?
MR. BANES: Objection -- vague, argumentative.



THE WITNESS: The word goal is not used in the first sentence.
BY MR. TOMASZCZUK:
Q. Do you know to whom this mission plan was disseminated?
A. The document was public. It was all -- it was public, all interested parties, all interested people.
I don't know the mailing list.
Q. Do you know why it was prepared?
A. I believe, I believe it was required under the NWPA.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. There are two tables which appear near the end of this excerpt on pages 26 and 27.
(The witness reviewed the document.)
THE WITNESS: Okay.
BY MR. TOMASZCZUK:
Q. And are you familiar with these two tables?
A. I have seen them before, generally familiar with them.
Q. Do you know what they purport to

Page 86

Q. For the first repository; sitting here today, do you recall what, if anything, changed between the original mission plan in 1985 and this mission plan amendment in June 1987 which caused the data on these tables to change a little bit?
MR. BANES: Objection -- lack of foundation.
Go ahead.
THE WITNESS: Section F.2 talks about the key changes between the rates in the two documents you talk about, so there is a list of --
BY MR. TOMASZCZUK:
Q. All right.
A. Causal factors if you will.
Q. Did you prepare any of this, any of the items on this list at F.2 that you just alluded to?
A. I'm going to review the list.
Q. Absolutely.
A. One more time.
Q. Please, take your time.
(The witness reviewed the document.)
THE WITNESS: I, I do not believe that

Page 87

I wrote any of these.
BY MR. TOMASZCZUK:
Q. Okay. Did someone tell you to use the data in these tables in the preparation of the ACR?
A. When you say tell you, you mean like nobody ordered me to do it.
I discussed what I was going to do with, with my superiors and peers, so I think, you know, discussing it is the better acronym.
Nobody told me.
Q. Okay. And with whom did you discuss that subject?
A. In '87, I certainly would have discussed it with Mr. Brandt.
I certainly would have discussed it with Mr. Milner.
I'm sure I discussed it with the then director, who I believe was Rusche at the time, and there was a reporting chain above me, so you know, those people that I knew that were going to have to concur in the document, you know, I coordinated with them beforehand, so I spoke to a number of people about that.
Q. Was it your decision to use the data

Page 88

in the mission plan amendment in the first ACR, or was it someone else's within DOE?
A. I believe it was my recommendation that others concurred on.
Q. And why did you use the data in Table F-1 to prepare the first ACR?
A. I have not looked at the ACR in a long time, so I'm assuming based on your statement that, that I did.
I mean I need to review it to make sure.
Q. That's fair. And I base my statement on what I understood your testimony to be.
A. Okay.
MR. BANES: Objection -- lack of foundation.
THE WITNESS: In implementing the terms of the contract, the, I didn't view -- there are many factors that go into the waste acceptance rate that are not contractual.
There are logistical. There are engineering. There are other concerns that, responsibilities of other parts of the office, not mine.
I needed a waste acceptance rate in

Page 89

order to carry out my responsibilities in the contract.
It was not my responsibility to, to do, to put that together, so I took information that the department was publishing at the time and used that.
It was, it was more simple as opposed to more complicated in terms of the decision.
BY MR. TOMASZCZUK:
Q. In or about June of 1987, Mr. Brandt was your immediate supervisor?
A. Yes.
Q. Okay. And where was Mr. Milner in the supervisory chain?
A. To the best of my recollection, in June of '87, he was not in my supervisory chain.
He was, he was I believe a division director in another division within one of the offices within RW, so he was someone that I regularly consulted with on a number of issues associated with the contract.
Q. Okay, but you, just so I understand your testimony, you didn't report to him directly at that time?
A. At that time, I did not.



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Page 110

responsible for it under my direction.
Q. Okay.
(There was a pause in the proceedings.)
MR. BANES: The draft has been produced. It was produced in the initial production.
MR. TOMASZCZUK: Do you know under what identification?
MR. BANES: Just for the record, I don't have the Bates stamp with me, but it's in there.
BY MR. TOMASZCZUK:
Q. Did any entities provide comments to you on the ACR after it was published?
A. I believe we did get some letters from some of the utilities.
Q. And do you recall the contents of those letters?
A. No, I don't.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. Did you ever have any occasion to meet with utility representatives concerning the

Page 111

acceptance rate schedule referenced in the ACR?
MR. BANES: Objection -- vague. In this ACR?
MR. TOMASZCZUK: Yes.
MR. BANES: Okay. All right.
THE WITNESS: No.
BY MR. TOMASZCZUK:
Q. Do you recall when the first draft of the ACR was prepared?
A. No.
Q. Were drafts of the ACR prepared?
A. Yes.
MR. TOMASZCZUK: Let me ask the reporter to mark another document as Brownstein Exhibit No. 7, and it is, appears to be a letter dated April 28, 1987, to Mr. Christopher Jedrey, and the letter is signed by S. Kraft on behalf of an organization I believe is UNWMG.
(Brownstein Exhibit No. 7 was marked for identification.)
THE WITNESS: Okay.
BY MR. TOMASZCZUK:
Q. Do you recall seeing this letter before today?

Page 112

A. Yes.
Q. And in what context had you seen it before?
A. In my review of carrying out my program responsibilities.
Q. Mr. Jedrey at the time was the contracting officer responsible at DOE for the standard contract?
A. Yes. He was part of procurement. He was the contracting officer.
Q. And did you have occasion to work with him at this time?
A. I did.
Q. Okay. So presumably he gave a copy to you at or about the time you received it?
A. I'm sure he did.
Q. Okay. And did you do anything about the issues identified in this letter?
MR. BANES: Objection -- compound and vague.
BY MR. TOMASZCZUK:
Q. What did you do with this letter after you got a copy of it, if anything?
A. I can't recall whether we responded to it or not, to be frank with you.

Page 113

I mean I know we worked on and analyzed it. I know it was discussed.
I can't tell you what we did with it. I don't recall.
Do you have the letter we can see?
Q. Did you ever have occasion to discuss the subjects in the letter with the author, Mr. Kraft?
A. I, I spoke to, to Kraft on a relatively regular basis, so I'm sure we discussed at least parts of this at some point, yeah.
Q. Do you recall anything specific with respect to your discussions with Mr. Kraft?
A. That was a long time ago. I don't recall the specific conversations.
I'm sure that I had them with him, but I just don't recall the specifics.
It was a long time ago. I can't even recall what we, as a department, how we responded to it.
Q. Directing your attention to page 2 of the letter?
A. Okay.
Q. The heading A, which is underlined at



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Page 114

the top of the page, there is a reference in that underlined language to performance standards?
A. Yes.
Q. Do you recall that issue being discussed at this time?
A. Generally, I do.
Q. And what do you recall about that subject, if anything?
A. To the best of my recollection, I believe we didn't think that was necessary and was something that the department was not willing to agree to.
We thought the law and the contract were sufficient clarity, so we weren't, as I recall, we weren't amenable to do that, and I'm sure the conversations reflected that.
Q. The DOE was not amenable to the inclusion of performance standards in the contract?
A. Right. We thought they were unnecessary.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:

Page 115

Q. When you got this letter and saw the reference to performance standards, did you understand that to be milestones in meeting the January 31, 1998 date, or did you have a different understanding of that term?
MR. BANES: Objection -- vague and lack of foundation.
I think the words are additional performance standards.
MR. TOMASZCZUK: I appreciate that. That's fair.
THE WITNESS: Okay. Could you restate the question?
BY MR. TOMASZCZUK:
Q. When you got this copy of this letter from Mr. Kraft, what did you understand the term additional performance standards to mean in your mind?
A. In my mind, they, they wanted us to be clearer in terms of what we were going to do and when we were going to do it than was included in either the NWPA or the contract itself.
We felt both documents were sufficiently clear.
Q. And did you understand the term

Page 116

additional performance standards to mean milestones for meeting the January 31, 1998 date, or did you understand it to mean something other than that?
MR. BANES: Objection -- compound, vague.
THE WITNESS: In my mind, the January 31st, 1998 date, as I have stated previously, was always a conditional requirement, and it was conditioned clearly both on the law and the contract, on the commencement of the facility operations, and so while we, as I indicated to you earlier today, we had, I think you used the word goals or objectives of accepting fuel as early as possible, that is separate and apart from the contractual, conditional contractual commitment which predicated the acceptance on commencement of facility operations.
That's how I used it.
BY MR. TOMASZCZUK:
Q. Did you understand when you saw the term additional performance standards that the utilities were asking DOE to adopt a minimum acceptance rate for the facility?
A. One of the things that was implied in

Page 117

the letter that Mr. Kraft was concerned about was in his mind, the department could potentially meet its obligation again in my mind, following commencement of facility operations by accepting a single fuel assembly from a utility, and, and they were concerned about that.
Q. Did you have a view about that issue?
A. We viewed the contract and the law, you know, contain sufficient performance standards.
It was clear that in return for payment, ultimately and conditionally, we would be required to take their waste, and that's the ultimate performance standard.
Everything else were intermediate milestones or goals as opposed to contractual commitments.
Q. Do you know whether the federal Courts of Appeal have adopted your view as to the conditional nature of DOE's performance that you just articulated?
A. They have not, but that is how we, that is what we believed, and that's how we acted really at all times prior to that decision

Page 126

impression that you had that they were positioning themselves for quote, unquote, future action, right?
A. Yes.
Q. What about the conversation left you with that impression?
A. I testified before I didn't, don't recall.
This is the best reflection of what I believed at the time, and I have no reason to either add to it or take away from it.
I mean that's what I wrote, and that's what I believed at the time.
I don't recall anything else.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. Was it your common or regular practice to prepare memos to file like this?
A. I did it on occasion. It was not common, and it was not regular.
Q. Do you recall other occasions where you prepared such memoranda?
A. In terms of memos to the files?
Q. Yes, like this.

Page 127

A. Irregardless of the subject?
Q. Well, I guess yes is the answer to my question?
A. Yes, on occasion.
Q. And do you recall the topics with which they dealt?
A. I recall several that dealt with personnel-related matters.
Q. Do you recall any dealing with spent nuclear fuel disposal or acceptance?
A. I do not. I do not even recall this one.
Q. Do you know whether you prepared a memo to file after each of your meetings with Mr. Kraft or not?
A. I am, I am sure that I did not. This was a rare -- I can't, I cannot testify it was the only, but it was rare.
I met with Steve Kraft regularly.
Q. And sitting here today, you don't recall why you prepared this memo after this meeting and follow-up discussion?
A. My conjecture is that this was a formal letter he sent into the contracting officer, and that since it was, it was, it was

Page 128

dealing with something a little informally submitted that I wanted to be careful since it dealt with legal issues as well as contractual and policy issues that I memorialized that conversation, so it was different than other conversations that I had with him.
Q. Correct me if I'm wrong, but did you not always deal with him on legal and contractual and policy matters?
What else would you have dealt with him on?
A. Well, the distinguishing point of that list was that he had sent in, you know, formal letter to the contracting officer, so because of that distinguishing feature, I'm guessing now that that's why I decided to treat that conversation differently.
MR. TOMASZCZUK: All right. Ms. Reporter, would you mark as Brownstein Exhibit No. 9, that's a copy of a letter from Mr. Jedrey to Mr. Kraft dated October 2, 1987?
(Brownstein Exhibit No. 9 was marked for identification.)
THE WITNESS: I'm anxious to read it.

Page 129

MR. TOMASZCZUK: I'm sure all the warm and fuzzy feelings are coming back!
THE WITNESS: Yes, sir.
(The witness reviewed the document.)
THE WITNESS: Okay. Before we get into this, I'm going to ask for a five-minute break.
MR. TOMASZCZUK: Absolutely.
THE WITNESS: And then I'll read it.
MR. TOMASZCZUK: That's fine. Any time you want a break, just speak up.
THE WITNESS: Okay. Thank you.
(A recess was taken.)
MR. TOMASZCZUK: Back on the record.
BY MR. TOMASZCZUK:
Q. Mr. Brownstein, I actually want you to go back and look at Exhibit No. 7 for just a moment.
That's the April 28, 1987 letter from Mr. Kraft to Mr. Jedrey.
A. Um-hm.
Q. You should have that handy.
A. Yes.
Q. And directing your attention to page 2, under the heading rationale, there is a

sentence slightly more than halfway through that paragraph which states this language, referring to previous language from Article 2 of the contract, could conceivably be read to permit DOE to accept single fuel assembly in 1998 and no more until decades later.
Do you see that?
A. Yes, I do.
Q. Do you agree with that statement?
A. No, I don't.
Q. And why not?
A. We believe that's, that was not the department's intent, and that's a radical view of the contract.
Q. And it wasn't your view?
A. It was not. It was no one's view at the department.
Q. Going back to Brownstein Exhibit No. 9, and I think we took a break just as I was going to start asking you some questions about this one, do you recall this document?
A. It's, it's been 15 years. I didn't when you asked me before, but I certainly do now.
Thank you for jogging my memory.



Q. And this document appears to be the DOE contracting officer's response to Mr. Kraft's earlier letter, right?
A. It is.
Q. Okay. Did you help prepare this response?
A. Yes, I did.
Q. Did you draft it?
A. Large parts of it, not the entire thing.
Q. Can you identify sitting here today what parts you drafted?
A. How about if I do it the other way, the parts that I know that I did not?
Q. Okay. That's fair. I'll take it that way.
A. I know that I was not the primary author on No. 4 beginning on page 3, nor on No. 5.
Q. So it would be fair to assume then that you had a significant hand in drafting responses delineated 1, 2 and 3?
A. I just -- I want to be clear on one thing.
Q. Of course; take your time.



(The witness reviewed the document.)
THE WITNESS: Not solely, but, but had a large hand in the others, yes.
BY MR. TOMASZCZUK:
Q. Okay. And the first paragraph, the last sentence states, "The Department shares your desire to ensure that the Contract is fair and equitable and that it accurately reflects the intent of the contracting parties."
Do you see that on page 1, first paragraph.
A. Oh, yes.
Q. Last sentence?
A. Yes. I'm sorry. Yes.
Q. And does that accurately reflect a desire of the department at that time?
A. Yes.
Q. What was the intent of the parties at that time concerning the spent nuclear fuel acceptance rate?
MR. BANES: Objection. Calls for a legal conclusion.
THE WITNESS: Well, in, I believe as I testified behalf before, in the broadest of terms, the utilities were responsible for



funding the system, and that we were responsible ultimately to accept their fuel.
BY MR. TOMASZCZUK:
Q. Directing your attention to page 2 of the document --
A. Um-hm.
Q. Under the heading No. 1, additional performance standards?
A. Yes.
Q. Do you see that? Would you look at the second paragraph under this heading?
(The witness reviewed the document.)
THE WITNESS: Yes.
BY MR. TOMASZCZUK:
Q. Do you recall sitting here today whether you drafted this language in this paragraph?
A. I am sure I played a major role in it.
Q. And Mr. Jedrey is telling Mr. Kraft here in the first sentence of the second paragraph under subheading or under heading one additional performance standards, quote, "...I can assure you that the Department intends to honor both the letter and spirit of the NWPA and the contract, rather than seek opportunities to

Page 134

circumvent its obligations"?
A. Yes.
Q. What did you understand by that language, seek opportunities to circumvent its obligations, to mean?
MR. BANES: Objection. Calls for a legal conclusion.
THE WITNESS: I believed what it meant was responding to Mr. Kraft's concern about the possibility of us, of the department accepting a single assembly and walking away.
That to me is a trick, and I think the contracting officer was trying to indicate that was, that type of gamesmanship is not what the department was all about.
BY MR. TOMASZCZUK:
Q. And that would constitute circumventing its obligations under the contract?
MR. BANES: Objection. Calls for a legal conclusion.
THE WITNESS: That's how I interpret it, that sentence.
We're responding to his specific concern.

Page 135

BY MR. TOMASZCZUK:
Q. Could you look at the last sentence of this same paragraph under the heading additional performance standards?
A. Yes.
Q. Last phrase in pertinent part says they provide clear evidence that DOE does not intend to meet its contractual obligation by accepting a single assembly?
A. Yes.
Q. Do you see that?
A. Yes.
Q. Is that a true statement?
MR. BANES: Objection. Calls for speculation.
BY MR. TOMASZCZUK:
Q. You can disagree.
A. I do not disagree. I agree with that sentence.
Q. In the intervening language in this paragraph, there's a discussion about schedules illustrating a planned acceptance rate of 1200 MTU for each of the first five years and then an acceleration to 2,650 metric tons thereafter.
Do you see that?

Page 136

A. I do.
Q. And if my recollection is right, I believe those are the figures that were used in the first ACR which had been published a couple of months prior to this October 1987 letter?
A. They are.
Q. All right. What was your intention or what was the Department of Energy's intention in giving Mr. Kraft that information?
What was he supposed to do with that?
A. This, this was, this entire paragraph is trying to reflect that the department was not only not trying to game the system by accepting a single assembly and walking away, but by demonstrating that the evidence of what our plans were through these other documents clearly showed that we were intending to do something other than take a single assembly.
Q. Was it your intention that the utilities would use or rely on, in any way on that information in preparing their own plans for dealing with their spent nuclear fuel?
A. I believe we addressed that issue in the Annual Capacity Report, and in fact I think it was addressed in the contract itself.

Page 137

The contract said to provide this information for planning purposes recognizing that it would change over time, and so if we went back to the ACR, I think you would see relevant language that addressed what we intended that information to be and not to be.
Q. We saw language that says it's for planning purposes, right?
A. Yes.
Q. And I guess my question to you, Mr. Brownstein, is as a practical matter, what does that mean to a utility that gets it?
What are they supposed to do with it?
MR. BANES: Objection. Calls for speculation.
THE WITNESS: Since the contract was, you know, evolved between two parties, we didn't just write the contract.
The utilities signed it. It was a two-party contract. The utilities wanted information, and they wanted it -- the contract, that's a two-party agreement. The utilities wanted the information to understand, you know, down the road, what our plans were so they can begin their thinking process.