They asked for it for planning purposes, not for binding purposes.

That's what we stated in the contract, and that's what we tried do.

We tried to keep them updated on what our plans, recognizing and as we stated in all the documents that those plans would change as laws changed, as situations changed, as the system evolved in developing a very complex system.

(There was a pause in the proceedings.)

BY MR. TOMASZCZUK:

Q. Can I direct your attention to the next page of this response?

A. Sure.

Q. At the top of page 3 in particular, if you would just focus on that paragraph?

(The witness reviewed the document.)

THE WITNESS: Okay.

BY MR. TOMASZCZUK:

Q. Okay. There is a sentence in the middle of the paragraph at the top of page 3 that says that, quote, "The Department will continue to give Purchasers' views due



consideration, and utilities will continue to have access to such program documents as the ACR, Mission Plan, Annual Report, System Requirements Documents, Fee Adequacy Report, Congressional budget submittals, and testimony before the Congress."

A. Yes.

Q. What process existed for the department to give purchasers' views due consideration as that phrase is used here in the language I just quoted?

A. I think that comes in many forms. In terms of the contract, we met on a regular basis with utilities to discuss their concerns, and tried to address them.

We reported that in the, in subsequent issues of the ACR.

They would testify before Congress. We would, you know, look at their statements.

There were regular meetings with other parts of RW other than mine, and they, you know, as an example, they would regularly go out to Nevada and -- to look at the Yucca Mountain project.

They met with project people. They



made their views known, and I believe there was a, an effort on everybody's part to understand, you know, what their concerns were, what their points were, and try to address them.

I believe we ran this whole program, I think we did, and I think we do today, run this as an open and transparent program, and ignore no one's views, and that's how I interpret due consideration.

Q. Was there any advantage or benefit to be gained by the utilities in having access to program documents and in particular the program documents that are referenced here?

A. I don't understand.

Q. Okay. What was the purpose of giving the utilities access to the program documents such as the ACR, mission plan, annual report, system requirements document?

A. I see.

MR. BANES: Objection. Calls for a legal conclusion in part.

THE WITNESS: I think all those documents describe different aspects of what the program was doing.

In other words, this program was



spending the utilities' money, and the utilities, this was a way to impart, make sure the utilities knew how their money was being spent.

(There was a pause in the proceedings.)

BY MR. TOMASZCZUK:

Q. In the previous page, there is a, this reference to letter and spirit of the NWPA and the contract.

What was the letter and spirit of the NWPA and the contract?

MR. BANES: Objection. Calls for a legal conclusion, and calls for speculation.

THE WITNESS: I believe I have already answered the question actually.

BY MR. TOMASZCZUK:

Q. That it was, that it was to, simply to take one spent fuel rod?

That was the answer that you're referring to?

MR. BANES: Objection. Calls for a legal conclusion.

MR. TOMASZCZUK: I'm trying to clarify what his answer was.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - -x
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
---------------------xSypolt)
McLean, Virginia
Wednesday, April 10, 2002
Continued deposition of ALAN BROWNSTEIN, a witness, recalled for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being previously duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman,



LLP, 1650 Tysons Boulevard, McLean, Virginia 22102-4859, at 9:26 a.m., Wednesday, April 10, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.



APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) (770-7901)

On behalf of Plaintiff Sacramento Municipal Utility District:
DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301



APPEARANCES: (Continued)
On behalf of Plaintiffs Southern Nuclear Operating Company, Alabama Power Company, Georgia Power Company:
JEFFREY L. HANDWERKER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-6101

On behalf of Plaintiff Wisconsin Electric Power Company:
DONALD J. CARNEY, ESQ.
Perkins Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
(202) 434-1675

On behalf of Plaintiff Commonwealth Edison Company:
NORMAN M. HIRSCH, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

Page 291

based could have caused perturbations really to the utilities, some to us.
That's an example.
Q. Since you raised the subject, exchanges are mentioned here as the fourth issue to be addressed in the APR?
A. Right.
Q. And the first sentence under the issue says purchasers have the right to exchange approved DCSs subject to DOE approval?
A. Correct.
Q. Did you agree with that statement?
A. Yes, I did.
MR. BANES: Objection. Calls for a legal conclusion.
THE WITNESS: Sorry. Yes, I do.
BY MR. TOMASZCZUK:
Q. Going back to the first page, the draft briefing paper goes on to state this option, and I presume that's the option of delaying the APR and DCS process, was rejected because of the purchasers' perceived need not to support any action that could be viewed as acquiescing on the 1998 date?
A. Correct.

Page 292

Q. And is that statement consistent with your understanding of the rejection of this option?
A. Yes, it is.
Q. The purchasers were concerned that they not take any action that could be viewed as extending the 1998 date in the contract?
A. Yes.
Q. Do you know why?
MR. BANES: Objection -- lack of foundation.
Calls for speculation.
BY MR. TOMASZCZUK:
Q. Let me go back. Did you have any discussions with utility representatives concerning this issue?
A. I did.
Q. And you understood the utility representatives to advise you that they were not willing to take actions that could be perceived as acquiescing on an extension of the January 31, 1998 date?
A. We referred to the ACR issue resolution process yesterday, and these were basically staff-to-staff technical discussions.

Page 293

We discussed many issues associated with the contract, some of which are listed in this paper.
When we had those discussions with the technical people, as I recall it, they understood, you know, a host of implementation problems, and as I recall it, were sympathetic to the need to try to resolve those, you know, before we moved on.
They went back, as I understand it, after our meetings to their respective management and to their legal counsel, and came back and said something to the order of while we understand, we have been advised not to proceed down that course.
This is many years ago, but that's how I recall the, the events.
Q. And did any of those utility personnel explain that to you or tell you anything further about that?
A. My only recollection is for whatever the reason that I remember, they came back and said there was a group or an individual, I don't recall, that Jay Silberg, they had reviewed the issue with Jay Silberg, and he had advised them

Page 294

in part because of, you know, legal concerns, not to do that, again, to the best of my recollection.
Q. Okay.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. There is a reference here at the bottom of page 1 to an option for dealing with the waste acceptance rate issue as I understand it?
A. Correct.
Q. And it refers to the need or desire to allow the purchasers to cooperatively avoid out-of-pool storage requirements based on RW-859 data?
A. Correct.
Q. Do you see that?
A. Yes, I do.
Q. Was it DOE's intention at the time to structure the program such that purchasers would avoid out-of-pool storage requirements based on RW-859 data?
MR. BANES: Objection -- vague.
THE WITNESS: In my mind, there's a



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Page 295

fundamental difference between goals and objectives and policy and contractual commitments.
There was no contractual commitment to do any such thing.
Was there a goal to try to avoid additional storage? Sure, but that's separate and apart from contractual commitment.
BY MR. TOMASZCZUK:
Q. So at least in that context, you understood a distinction between contractual commitments and other things?
MR. BANES: Objection. Mischaracterizes prior testimony.
THE WITNESS: Every time I use, whether today or yesterday, every time I use the word goal or objectives, to me, that's separate, distinct and apart from a contractual commitment.
MR. TOMASZCZUK: All right. Ms. Reporter, would you mark as Brownstein Exhibit 26 a memorandum dated April 15th, 1991?
And the subject is approval for issuance of a comment draft of the annual Acceptance Priority Ranking.

Page 296

It has on it the Bates numbers HQR-001-1538 through 1539.
(Brownstein Exhibit No. 26 was marked for identification.)
THE WITNESS: Okay.
BY MR. TOMASZCZUK:
Q. Have you seen the document before today?
A. I have.
Q. Did you draft it?
A. To the best of my recollection, I did, or played a major role in doing so.
Q. All right. Your name appears in handwriting in the upper right-hand corner?
A. That's my name, not my handwriting, but yes.
Q. And this was a memorandum sent through the deputy director of OCRWM to the director, correct?
A. Correct.
Q. And at that time, Mr. Milner was acting as the deputy director?
A. I don't believe that's accurate, no.
Q. But Mr. Milner signed the memo on the

Page 297

second page of it?
A. Yes, that's correct.
Q. And he sent it through RW-2, the deputy director's office?
A. That's correct.
Q. And who would that have been at the time, do you know?
A. We can clearly go back to the charts if I had to.
Q. Can you tell from that initial there next to RW-2 who that might be?
(The witness reviewed the document.)
THE WITNESS: I really can't.
BY MR. TOMASZCZUK:
Q. Okay. Can you tell who approved the action?
A. Yes.
Q. As set forth in the memorandum?
A. Yes, I can.
Q. And who is that?
A. That signature there is J.B., stands for John Bartlett, and a guess, that, that mark may have been Frank Peters.
Q. Okay. And the subject of the memo is the front office approval if you will for

Page 298

issuance of a draft of the APR?
A. Well, for a comment draft of the Acceptance Priority Ranking report, yes.
Q. Do you see in the second paragraph under the heading discussion?
A. Yes.
Q. Can you read the first sentence for me?
A. The publication?
Q. Um-hm.
MR. BANES: You're not limited to that.
THE WITNESS: "The publication of the APR begins the contractually binding waste acceptance process."
BY MR. TOMASZCZUK:
Q. Did you write that?
A. I did, or am responsible for it, yes.
Q. Is it a true statement?
MR. BANES: Objection -- vague, and calls for a legal conclusion.
THE WITNESS: It is, it is accurate in the context that I have testified earlier today and yesterday of how I interpret contractually binding.

Page 319

going to be here a long time if you continue to make objections which I consider to be ill-advised and not consistent with the rules of the court.

I would encourage you to make your objection. Fine, go ahead make it.

MR. BANES: Are you just telling me that I just did something inconsistent with the rules of the court?

All I did was ask you to set a foundation for this document.

He doesn't remember it. He didn't write it, and he has testified that he doesn't know what it means other than just reading what it says.

That's a valid objection. If you want to ask him what something means, you need to lay a foundation for it first.

BY MR. TOMASZCZUK:

Q. At or about the time you received this document in August 14th, 1991, did you understand this to be a draft document?

A. This was a, this was, clearly was a contractor document.

Contractors prepare studies all the

Page 320

time at DOE's direction.

That automatically means to me that it was, it was a, it was something that DOE had not signed off on.

Now whether this was the first draft or the last draft, who knows? But it was a contractor document.

The contractor documents are regularly prepared. They regularly go through extensive review and modification before they're, if they're ever accepted as a DOE document,

Q. After you received the document, did you do anything other than read it?

A. I cannot specifically recall. My normal operation would be to, to read it.

If I had comments, I would make those comments either verbally or in writing. I use both.

Q. And do you recall sitting here today whether you made any comments on this particular document?

A. I honestly cannot recall.

Q. All right.

(There was a pause in the proceedings.)

Page 321

MR. TOMASZCZUK: Mr. Brownstein, let's mark as, and Ms. Reporter, as Brownstein Exhibit 30 the Annual Capacity Report dated December 1991.

It has on it the Bates stamp numbers HQR-001-2357 through 2373.

(Brownstein Exhibit No. 30 was marked for identification.)

THE WITNESS: Okay.

BY MR. TOMASZCZUK:

Q. And have you seen the document before today?

A. Yes.

Q. And were you responsible for preparing it?

A. Consistent with how I have testified about those documents, yes.

Q. All right. At Roman Numeral Five of the summary, there is a reference to, in the second paragraph, to statutory schedule linkages between the MRS facility and the repository set forth in the Nuclear Waste Policy Act, Nuclear Waste Policy of 1982 -- it looks like the word act is missing -- as amended will be modified.

Page 322

Are those, or when you wrote the term linkages there, were you referring to the linkages that I asked you about in your testimony this morning?

A. Yes.

Q. This paragraph goes on to state that during the first ten years following commencement, projected commencement of federal waste management system operation, the total quantity of SNF that could be accepted is projected to be 8,200 MTU.

And my question to you, Mr. Brownstein, is do you know what the source of that statement is or was.

(The witness reviewed the document.)

THE WITNESS: I don't specifically recall.

(There was a pause in the proceedings.)

BY MR. TOMASZCZUK:

Q. Mr. Brownstein, are you comparing this ACR to the previous ACR?

A. I am.

Q. And that would be, you would be comparing it to Brownstein Exhibit 24, the

Page 387

Energy's plans for nuclear waste at Yucca Mountain?
A. What time period are you referring to?
Q. March 14th of this year.
A. No.
Q. Did you ever discuss that testimony with Mr. Barrett?
A. Not that I recall.
Q. Do you know whether Mr. Barrett testified on the Hill on March 14th?
A. I believe he did.
Q. And what do you know about that subject?
A. I wasn't involved in the preparation of that testimony, and I don't believe I actually reviewed, reviewed that testimony.
I wasn't involved in that one at all.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. Give me just a second, okay?
A. Sure.
(There was a pause in the proceedings.)
MR. TOMASZCZUK: Mr. Brownstein, at

Page 388

this time, I don't have any further questions for you.
I would like to thank you for your time and your cooperation. I very much appreciate it.
I know it has been a long day and a half, and I need to adjourn the deposition because there are some documents which we believe still have not been produced that may bear upon your testimony, so I reserve the right to call you back if and when those documents are produced, and that includes but are not limited to documents on a privilege log that the government has provided to us, but at this time, I have no further questions, and I adjourn subject to those conditions.
THE WITNESS: Okay.
MR. BANES: We reserve the right to, we reserve the right to object to reopening, so with that, I'm going to ask a few questions.
EXAMINATION BY COUNSEL FOR DEFENDANT
BY MR. BANES:
Q. So Mr. Brownstein, let's see here if you could just get out Exhibit 1.
It's the contract. It's in there

Page 389

somewhere.
(There was a pause in the proceedings.)
THE WITNESS: Okay.
BY MR. BANES:
Q. Let's see. Turn to page, there is a Bates stamp number the bottom. It says ADM-001, and then I'm going to use that last four digits if you could turn to page 660 for a moment in Exhibit 1?
A. Okay.
Q. Mr. Tomaszczuk was asking you several questions about the Delivery Commitment Schedules and how they related to the contract.
Do you remember that testimony?
A. Yes.
Q. Turn to paragraph or Article V.B that's located down there on this page 660.
A. Okay.
Q. Was this the paragraph you were talking about earlier that was the basis for Delivery Commitment Schedule instructions?
A. Yes.
Q. Now turning to where it says beginning January 1st, 1992, purchaser shall submit to DOE

Page 390

the Delivery Commitment Schedules or schedule which shall identify all SNF or HLW the purchaser wishes to deliver beginning 63 months thereafter.
Now can you tell me, could you just explain for me how you interpreted that paragraph and how it translated into the Delivery Commitment Schedule instructions?
MR. TOMASZCZUK: Objection. It's compound, calls for a legal conclusion.
(The witness reviewed the document.)
THE WITNESS: I combined that paragraph with Appendix C of the contract.
BY MR. BANES:
Q. Okay. And did you believe that the delivery -- let's take a look at the Delivery Commitment Schedule. Pull that out for a minute. That was Exhibit 34.
A. Yes.
Q. Did you believe that those, Exhibit 34 was consistent with the provisions of the contract regarding Delivery Commitment Schedules?
A. We used the Appendix C as a basis for that, yes.

Q. Okay. Now with respect to when a purchaser would submit a Delivery Commitment Schedule, let's say a purchaser wanted to, pursuant to this paragraph B on the contract, Article V.B., if a purchaser wanted to deliver SNF beginning in say 1998, when would they have to submit a Delivery Commitment Schedule?
A. It's clear in our mind you would have to subtract 63 months from that date.
Q. Okay. Now if they didn't want to, if a purchaser did not want to deliver any SNF in 1998, would they have to submit a DCS 63 months prior to that?
A. No. It states that purchaser shall identify all SNF and/or HLW the purchaser wishes, emphasize wishes, to deliver to DOE beginning 63 months thereafter.
Q. So but was this, was the submission of a DCS a prerequisite, pursuant to the contract in your opinion, was submission of a DCS a prerequisite to acceptance of a purchaser's spent nuclear fuel?
A. In my mind, it was.
Q. And was that pursuant to this, was it a prerequisite 63 months prior to the date they



wished delivery to occur?
MR. TOMASZCZUK: Objection to the form.
I don't know what "this" is.
BY MR. BANES:
Q. Was it, was such a, was such acceptance of spent nuclear fuel a prerequisite, or was submission of a DCS 63 months prior, in your opinion, a prerequisite to DOE's acceptance pursuant to the contract to such spent nuclear fuel?
A. Yes.
Q. All right. Now if a, if a utility decided not to submit a DCS -- well, strike that.
If a utility -- let's see. Prior to, I think you testified earlier prior to acceptance of spent nuclear fuel, who in your opinion was responsible for this, for storage of the spent nuclear fuel?
A. I think it is in my mind, and based on several documents, it is clear that the utilities remained responsible until DOE accepted it.
Q. In the documents you prepared, did you



convey that to the purchasers?
A. I did.
Q. All right. Now let's take a look at --
(There was a pause in the proceedings.)
BY MR. BANES:
Q. Okay. With respect to, with respect to the rates, acceptance rates contained in each of these documents we have looked at, I think that you testified earlier that they were subject to a whole host of assumptions, is that correct?
A. Yes.
Q. Now so let's take a look at Exhibit 6 and go to Table 2 dash 1 or 2.1 on page 7.
(There was a pause in the proceedings.)
THE WITNESS: Okay.
BY MR. BANES:
Q. Now on page 7 of this document, there is a, there is what purports to be called illustrative waste acceptance schedule.
And then at the top there, it says the waste acceptance schedule, or excuse me -- this



schedule is only an approximation, approximation of how the system may operate and is subject to uncertainties that are recognized in the mission plan.
Why did you include that language in this Annual Capacity Report?
A. We knew that there were, you know, at different times in the program, you know, whether there were legal restrictions, we certainly knew that there were challenges, and we wanted to make it clear to the utilities and everyone understood that we were at the early stages, and these were our best projections at the time, and we tried to be clear over the years of why, and, and that they were subject to change.
Q. In your opinion, with respect to Table 2 dash 1, would it be appropriate to read 2.1 in this 1987 Annual Capacity Report without reading the entire document?
A. Well, I believe it's always inappropriate to pull out any excerpt from a document.
A document's prepared. All words have meaning, and should be read in the context of

the document.
Q. And is that because in other portions of the document, the assumptions upon which the rates on page 7 are based are described?
MR. TOMASZCZUK: Objection -- leading.
THE WITNESS: In each of the ACRs, and we reviewed several of them here, there were a number of caveats concerning the waste acceptance schedule.
They were in different places in different, different documents as the document evolved, but they were there.
We didn't put them in the same place in the same time.
They were always there somewhere.
BY MR. BANES:
Q. Let's see. Mr. Tomaszczuk showed you Exhibit 2, which was the 1985 mission plan.
Before we get to that, let me ask you a couple of questions.
Did the, in your opinion, did the Nuclear Waste Policy Act require the Department of Energy to accept spent nuclear fuel at any particular rate from the purchasers?
MR. TOMASZCZUK: Objection -- lack of



foundation.
THE WITNESS: There was no rate in the Nuclear Waste Policy Act.
BY MR. BANES:
Q. Okay. And with respect to the standard contract, which is located at Exhibit 1 --
A. Yes, I have that.
Q. Did the standard contract require the Department of Energy to accept spent nuclear fuel from the purchasers at any particular rate of acceptance?
A. There was no rate in the standard disposal contract.
Q. Now going back to the mission plan, which is Exhibit 2, to your knowledge, was the mission plan or any portion thereof ever incorporated into the contract?
A. No.
Q. All right. Now Mr. Brownstein, Mr. Tomaszczuk was asking you about the 1991 APR, which is Exhibit 30. He was referring to page --
A. Wait a second.
Q. I'm sorry. Did you find it?



A. No -- Number 30?
Q. Exhibit 30.
MR. HANDWERTER: The ACR.
BY MR. BANES:
Q. Was that the ACR? Excuse me. The ACR is the one I want to talk to you about.
A. I'm sorry. I don't have these things in order.
Okay.
Q. Page 4 for a second of the document under 2.0, waste acceptance projections?
A. Yes.
Q. Mr. Tomaszczuk was asking you whether the rates reflected in Table 2 dash one or 2.1 -- excuse me -- assumed the existence of an MRS facility or a DOE facility.
Do you recall that question?
MR. TOMASZCZUK: Object to the form.
THE WITNESS: Yes.
BY MR. BANES:
Q. All right. And do you recall that you responded to that yes, it did assume the existence of a DOE facility for acceptance of spent nuclear fuel?
A. Yes, an MRS facility, yes.



Q. Now with respect to every, in every document that you, that contained a rate that you worked on, did, did all of those projected rates assume the existence of some type of repository, either repository or MRS, prior to the acceptance of spent nuclear fuel?
MR. TOMASZCZUK: I'm going to object to the form of the question.
I don't understand it.
THE WITNESS: I can still answer?
BY MR. BANES:
Q. Sure, if you understand it, you can.
A. I made the statement in all the documents, as I have testified -- I'm looking at page 4 -- that assumed the commencement of facility operations.
Q. Okay.
A. And I defined facility as either an MRS or a geologic repository.
Q. So in any document in which you would have incorporated a rate, is it fair to say that you would have assumed the, an operational facility being either an MRS or a repository?
A. Yes.
(There was a pause in the

proceedings.)

MR. BANES: Okay, sir. Just a second here.

(There was a pause in the proceedings.)

BY MR. BANES:

Q. Okay. Turn to Exhibit 26 for a minute, sir?

A. I really need to organize this. If these are going to be the subjects of questions, I have to get them in some order.

Twenty-six, I've got it.

Q. Okay. Okay. All right. Turn to Exhibit 26.

Let's go back to that paragraph you were discussing with Mr. Tomaszczuk. It starts the publication of the ACR, APR.

If you would just read that entire paragraph for me?

You don't have to read it outloud. You can read it to yourself.

A. Thank you.

(The witness reviewed the document.)

THE WITNESS: Okay.

BY MR. BANES:



Q. All right. Now in the statement there, I think Mr. Tomaszczuk asked you what you meant by the publication of the APR begins the contractually binding waste acceptance process.

Does the remainder of that paragraph refresh your recollection what, why that word begins is there?

A. Well, in my mind, the contract laid out a process, as I have testified, beginning with the ACR, ACR following with the APR, to be followed by the DCS to be followed by the FDS.

That's what I was referring to.

Q. Okay. And all right. So as far as this contractually binding waste acceptance process, were you referring to all of that process, or just the APR?

A. No. Begin the process, the APR was the sort of the second step, well, the first step in the process leading to the FDSs, which is the last step leading to the, to the actual acceptance.

Q. And with respect to the process, while it hasn't been marked as an exhibit, Mr. Tomaszczuk showed you the what has been kind of referred to as the Starship Enterprise chart?



A. Yes.

Q. Did that, did that chart lay out what this process, this process was supposed to be from the beginning of the contract all the way to acceptance and delivery?

A. That was, that was its intent.

Q. And looking at this, we just I guess won't mark it, but --

MR. TOMASZCZUK: I'm going to come around.

THE WITNESS: If we're going to do it, could we move it closer?

This is not the easiest thing in the world to read.

Can you see it from here?

(A discussion was held off the record.)

BY MR. BANES:

Q. All right. Now I wanted to ask a little bit about the mechanics of the chart?

A. You understand I haven't seen this in, I haven't looked at this in years.

Q. Can you tell where the Annual Priority Ranking first appears, or that let's start with the Annual Capacity Report.



Where is that?

A. That's right there.

Q. Let the record reflect that the witness is pointing to a box that has the number 060 in the upper left-hand corner.

And on the far left of the chart, towards the far left of the chart, now there is a dark line here.

A. Right.

Q. What is that dark, what is that dark line supposed to represent? Annual Capacity Report and Annual Priority Ranking?

A. The dark line under the legend indicates the optimum path.

The whole chart is divided basically into two parts which is, which is the first part is if everything went right, this is, this is how the process would go.

And then there were, there were other possibilities, other things that could go, other things that could happen, and what I had asked the contractor to do was to lay out all those other things that could happen and contingencies, and that's what they tried to do here.