IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - - - -x

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

Page 468

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
- - - - - - - - - - - - - - - - - - - - -xSypolt)
McLean, Virginia
Thursday, April 11, 2002
Continued deposition of ALAN BROWNSTEIN, a witness, recalled for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being previously duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman,

Page 469

LLP, 1650 Tysons Boulevard, McLean, Virginia 22102-4859, at 9:38 a.m., Thursday, April 11, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

Page 470

APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 770-7901

On behalf of Plaintiff Sacramento Municipal Utility District:
DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

Page 471

APPEARANCES: (Continued)
On behalf of Plaintiffs Southern Nuclear Operating Company, Alabama Power, Georgia Power:
JEFFREY L. HANDWERKER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-6101

On behalf of Plaintiff Wisconsin Electric Power Company:
DONALD J. CARNEY, ESQ.
Perkins Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
(202) 434-1675

On behalf of Plaintiff Commonwealth Edison Company:
NORMAN M. HIRSCH, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

Page 548

proceedings.)
BY MR. BANES:
Q. Okay. Let's see here. Turning back to Exhibit 43, Mr. Brownstein --
MR. HIRSCH: Which one is 43?
MR. BANES: I think that's one of the, one of these vugraphs.
MR. HIRSCH: Off the record.
(There was a pause in the proceedings.)
BY MR. BANES:
Q. Okay. Now let's see if you could open to Exhibit 43, page 262 -- I just asked him to hold Exhibit 42, page 43 exhibit, or page 262 open for a moment.
And then let's see. I have got now Brownstein Exhibit 36.
Now yesterday we were talking about the, with Mr. Tomaszczuk, we were talking about at what point we are in, the DOE and the purchasers are in the process of the standard contract for setting a rate?
A. Right.
Q. Do you recall that testimony now?
A. Yes, I do.

Page 549

Q. And I think you testified that the, that the point of the process that we're in is in the, in the DCS?
We're still in the DCS process, is that correct.
A. Yes.
Q. Now the utilities and the utilities and the -- to, to your recollection, have you, the utilities and DOE ever agreed upon a mutually acceptable schedule?
MR. HIRSCH: Objection -- vague. Calls for a legal conclusion.
THE WITNESS: Some utilities have submitted the DCSs, and we have approved them.
BY MR. BANES:
Q. Okay. And for those that you haven't approved, what's the process for after disapproval occurs?
MR. HIRSCH: Objection -- vague, no foundation.
Calls for a legal conclusion.
THE WITNESS: I don't know how to identify these boxes.
This exhibit shows the path. If -- once we have completed our review, which is

Page 550

indicated in the box.
BY MR. BANES:
Q. The number in the upper left-hand corner?
A. 005; if we disapprove it and it goes to box 025, then it lays out a series of steps.
We, we disapprove it. We notice the utility of that disapproval, and then the utility is supposed to revise their DCS and submit it to us.
We then go through another review process, and again, we then have two options.
We can approve the DCS, or we can disapprove it.
If we disapprove it again, there is, appears to be two links.
We notify purchaser, and the purchaser -- or we can then propose a DCS to the purchaser. That's a little different than the first one, and I believe that's consistent with the contract.
Do you want me to continue on with the steps?
Q. Sure.
MR. HIRSCH: I'm going to make the

Page 551

same objection I made to the previous question.
THE WITNESS: There is another review process.
Once again, you can end up with an, with approved DCS or, or we could then disapprove what the purchaser proposed, which leads into negotiations between DOE and the purchasers.
BY MR. BANES:
Q. Okay. Now let's go to, let's go to the contract for a minute, Exhibit 1.
A. Okay.
Q. All right. And turn to page 660 of the Exhibit 1.
A. Okay.
Q. And is the process you have just described located, contained somewhere in the contract here?
MR. HIRSCH: Objection -- vague. Calls for a legal conclusion.
THE WITNESS: Yes.
BY MR. BANES:
Q. And where is that?
MR. HIRSCH: Same objection.
THE WITNESS: Under Article V.B.1 and

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - - - - X

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :
Plaintiffs, :
v. :
THE UNITED STATES, :
Defendant. :

\- - - - - - - - - - - - - - - - - - - - X

Washington, D.C.
Thursday, May 23, 2002

Deposition of ALAN BROWNSTEIN, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by JAN A. WILLIAMS, a Notary Public in and for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., 20005-3305, at 8:40 a.m., Thursday, May 23, 2002, the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.

BY MR. STOUCK:
Q. At the time the list was developed which I think was about the time of the '90 or '91 --
A. No.
Q. When was it?
A. The list of 34 issues?
Q. Yes.
A. My recollection is that was done earlier.
Q. Much earlier?
A. Yeah.
Q. Whatever time it was developed, at that time RW thought that those issues had to be resolved before the department could commence acceptance of spent fuel pursuant to the contracts; is that right?
MR. CRAWFORD: Objection to the foundation; objection to the extent it calls for a legal conclusion.
THE WITNESS: We thought it was important. I don't think anybody made the distinction between important versus, if it did not happen, could we not move forward.
BY MR. STOUCK:
Q. Okay. That's fair. I understand that and I thank you for that clarification.
Take a look at page 4 of Exhibit 35. And



there's a paragraph numbered 12 there. Do you see that?
A. Yes.
Q. It's a proposed change to the definition of high-level radioactive waste. Would you please review that and I've got a question for you about it or two maybe. Let me ask the question, it might help you as you read it.
A. Okay.
Q. The question is going to be, aside from what you read on this piece of paper, do you have a recollection of proposals to change the definition of high-level radioactive waste in a way that would affect GTCC? You know, if you read this, I think you will see that this is a proposal to change it in a way that would affect GTCC waste. But independent of this do you recall that there were proposals to change the contract in that manner?
MR. CRAWFORD: Let me object just to best evidence.
BY MR. STOUCK:
Q. Would you answer the question.
A. By who? I mean this is --
Q. By RW. I mean this is a proposal --
A. Oh, no oh, no.



Q. You don't recall that?
A. No, no, wait a second.
Q. What am I not understanding?
A. This is a contractor document. Contractors make suggestions and recommendations to the department all the time. Because a contractor says something doesn't mean, you know, the department either wanted it or agrees with it. This was a contractor input.
Q. I understand that. That's fair enough. And this contractor input apparently is suggesting or at least describing a change to the definition of high-level radioactive waste?
A. That's correct.
Q. Do you know -- maybe I don't have to preface it by saying independent of this document. Even not independent of this document, do you know whether that kind of change was ever discussed, making that change was ever discussed within RW; that is, a change to the standard contract to the meaning of the term high-level radioactive waste that would affect coverage of GTCC?
A. We talked about this subject before and there was testimony before. And I think you asked a similar question. I told you --



Q. Well --
A. There were two people I talked about.
Q. Okay.
A. And this was something that I didn't believe in, didn't accept, and, you know, I had discussions with two people as I recall. Probably staff too.
Q. I thought what you said you didn't believe in or accept before was that GTCC was covered by the contract. This is a little bit different question which is do you recall whether there were any discussions that you were part of or any effort at RW to amend the contract in a manner that would affect GTCC waste? That's what I'm asking now.
A. Sorry. As I recall, when I read this, I may have discussed it with Nancy and my staff. But I know that I did not take this thing forward because I didn't believe --
Q. What is it that you didn't believe?
A. I didn't believe that we should or needed to make a change to the contract.
Q. Because it was clear in your mind that it wasn't covered?
A. That's correct.

didn't have a facility, with respect to the first caveat; with respect to the second, what would happen if they had an approved DCS but took no action to submit an FDS, we never really addressed that, I never really addressed that.

You know, every stage -- you know, whether it was the APR or the DCSs, I know in correspondence we urged -- we told the utilities this was consistent with the contract, but we never said -- well, we never did the what-if questions.

BY MR. STOUCK:

Q. So you didn't have any understanding one way or the other about my question which is you have the DCS, but you don't have anything subsequent, you just never thought about it, never focused on it; is that fair?

MR. CRAWFORD: Same objections.

THE WITNESS: I did not think we had a binding obligation with respect to my first caveat which is because the commencement of facility operations. We never really addressed the second caveat situation, where we had that and it stopped.

BY MR. STOUCK:

Q. You never formed that understanding?

A. No.



Q. You agree with my statement, never formed an understanding?

A. Yes.

Q. And you expected that utilities, you expected them in the course of the processes discussed in the standard contract, that at some point in time utilities would submit final delivery schedules, that's the way you thought about it?

A. I had every reason to expect that utilities, you know, participated, if you will, in both the ACR, in the development of the APR, and in responding to our instructions on the DCS.

Q. Okay. So you did expect that there would be FDSs for all spent fuel described in a DCS?

A. I did.

Q. And do you know whether it would be possible for DOE to accept spent fuel from a utility if that utility had submitted a DCS to DOE, proper DCS, completely filled out, but had not submitted an FDS? And, just to amplify my question, is there enough information specified in the DCS to allow DOE to accept spent fuel for disposal even if DOE does not subsequently get the additional information specified in the FDS?

MR. CRAWFORD: Objection, compound, vague,



and to the foundation and to the extent it calls for a legal conclusion.

THE WITNESS: Not necessarily. Let me try to give you an example. And frankly I would have to go back and review, it's been a long time, whether it's a real example or not. But let's say a utility owned a couple reactors and say one -- a couple examples, one was a PWR and one was a BWR or one facility could accommodate rail and one facility can only do truck.

In the DCS they may put a range of fuel down that encompassed both situations. Under that situation we would not necessarily have enough information whether to show up with the right type of cask, whether it be a BWR, PWR, or a rail or a truck cask. So that's not -- that's why I said not necessarily.

BY MR. STOUCK:

Q. Okay. So there are circumstances such as the examples you just gave me where, in the absence of the additional information set forth in the FDS, DOE would not be in a position to accept spent fuel just on the basis of the information set forth in a DCS with respect to the same fuel?

MR. CRAWFORD: Objection, asked and



answered.

THE WITNESS: If that was the only information we have, that could be a problem.

BY MR. STOUCK:

Q. Well, would it be a problem in at least some circumstances, maybe not all, but at least some?

MR. CRAWFORD: Same objection.

THE WITNESS: I would expect it would be a problem especially in the initial years, whenever those initial years were, as we were -- we would be -- we would be ordering casks, for example, we would understand -- the vision was that we would understand what casks of what type we would need and what year.

And we would begin to order that, you know, in an efficient manner from the manufacturers. It wouldn't be a -- we viewed it not as a prudent use of nuclear waste fund dollars to take a look at what we would need over ten years and order that on day one.

So, in the initial years, we may have a limited number of truck and rail casks and those orders would, in fact, be based in part on information that was exchanged in both the DCS and the FDS. That's the basis for how I'm giving you the

# Susan Klein

# Susan Klein

Page 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
------------------------------------------X
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese, J.) :
DUKE POWER, a Division of DUKE ENERGY CORP.:
(98-485C)(Sypolt, J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, et al. :
(98-614C)(Merow, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C) (Allegra, J.) :
GPU NUCLEAR, INCORPORATED :
(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY : VOLUME
(00-697C)(Merow, S.J.) : I
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :Discovery
(01-116C)(Sypolt, J.) :Judge:
TENNESSEE VALLEY AUTHORITY :(Judge
(01-249C)(Bruggink, J.) :Sypolt)
Plaintiffs, :PAGES
v. :1 - 274

Page 2

THE UNITED STATES, :
Defendant. :
------------------------------------------X

Deposition of Susan Klein
Washington, DC
Wednesday, April 24, 2002

Reported by: Denise Dobner Vickery, RMR, CRR
JOB NO. 144539

Page 3

April 24, 2002
9:37 A.M.

Deposition of Susan Klein, held at the offices of:

Jenner & Block
601 13th Street, NW
12th Floor
Washington, DC 20005

Pursuant to notice, before Denise Dobner Vickery, a Registered Merit Reporter, Notary Public of the District of Columbia.

Page 4

APPEARANCES:

Jenner & Block
For the Plaintiff COMMONWEALTH EDISON
One IBM Plaza
Chicago, IL 60611-7603
(312) 222-9350
BY: Norman M. Hirsch, Esq.

Shaw Pittman Potts & Trowbridge
For the Plaintiffs NORTHERN STATES POWER COMPANY, et al.
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7962
BY: Alex D. Tomaszczuk, Esq.

Balch & Bingham LLP
For the Plaintiffs SOUTHERN NUCLEAR OPERATING COMPANY, et al.
1275 Pennsylvania Avenue, NW, Tenth Floor
Washington, DC 20004

Thereupon,

SUSAN KLEIN

was called for examination, and, after having been duly sworn or affirmed, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFF, COMMONWEALTH EDISON

BY MR. HIRSCH:

Q. Ms. Klein, my name is Norm Hirsch. I'm a lawyer at Jenner & Block in Chicago. I represent Commonwealth Edison Company. I'm going to be asking you some questions today.

If you don't understand a question I've asked, please tell me and I'll try and rephrase it. Otherwise, I'll assume you understood my question.

A. (Nods head).

Q. If you need a break at any point today, please let me know and we'll stop and take a break.

A. (Nods head).

Q. Mr. Zabransky -- I'm sorry.

A. That's okay. You got Zabransky on your brain.

Q. Move from the last deposition.



Ms. Klein, are you aware that there's a protective order in the spent nuclear fuel cases?

A. I think there is, yes.

Q. All right. What I'm going to do is I'm going to hand you a copy of the protective order and I'd like you to take a minute to look at it.

A. Okay.

MR. HIRSCH: Mark that as Exhibit 1.

(Thereupon, the reporter marked for identification Deposition Exhibit No. 1.)

THE WITNESS: (Pause). Okay. I don't fully understand it at this point, but I've read through it.

BY MR. HIRSCH:

Q. Okay. Would you generally agree to abide by the terms in the protective order, Ms. Klein?

A. If something is labeled confidential, yes, I will keep it confidential.

Q. Okay. All right. That's fine.

Ms. Klein, I've handed you what's been marked as Klein Deposition Exhibit 1 or I'm handing you that document, which is the notice of deposition that was



issued on April 18th for today's Rule 30(b)(6) deposition. And if you look on the exhibit page, you'll see four topics. That's page 5. You see those topics?

A. Yes, I see those topics.

Q. And you understand you're supposed to be the Rule 30(b)(6) designated Department of Energy witness for these four topics?

A. Yes.

Q. What's your current position, Ms. Klein?

A. I'm a senior policy adviser to the Director and Deputy Director of the Office of Civilian Radioactive Waste Management at the Department of Energy.

Q. And how long have you been the senior policy adviser?

A. For about three years.

Q. So, since about 1999?

A. Yes. I was transferred there but detailed back to general counsel for a couple years.

Q. When was your detail back to General Counsel's Office?



A. I think it was '97 that I was transferred to RW, but I was detailed back to general counsel to work with the general counsel at the time on any legal issues and then later on it was limited to issues involving this litigation.

Q. Okay. We'll get back to that in a second. But who do you report to as the senior policy adviser?

A. Lake Barrett. Ron Milner and Lake Barrett.

Q. And Mr. Barrett's current title is?

A. Deputy Director of the Office of Civilian Radioactive Waste Management.

Q. And Mr. Milner's title is?

A. He's the COO, the Chief Operating Officer of the Office of Civilian Radioactive Waste Management at DOE.

Q. And is the Office of Civilian Radioactive Waste Management otherwise known by its acronym as OCRWM?

A. OCRWM, yes, and actually with regard to Ron, I think now I just report to Lake. I was reporting to Ron when he was also Acting Deputy, but now that Margaret is here, to just correct the record. I don't

Page 61

you can answer to your personal knowledge.
BY MR. HIRSCH:
Q. And what was the acceptance rate in the 1995 ACR report from the DOE?
MS. POWELL: Same objection. You can answer.
THE WITNESS: Okay. 400 the first year, 600 the second year, 900 the third year, and then steady state 900, and that was just through the first 10 years of operation.
BY MR. HIRSCH:
Q. So when the utilities started submitting DCS forms, they were relying on whether they had an allocation in what was then I guess the 1991 ACR; is that correct?
MS. POWELL: Objection, beyond the scope. You can answer.
THE WITNESS: Yes, I think. Yeah.
BY MR. HIRSCH:
Q. And I take it from your -- strike that?
Referring to the 1995 ACR rates that you just recited, I take it from your earlier testimony that the

Page 62

D OE is not planning on using those rates in terms of when it starts accepting spent nuclear fuel?
A. No. Well, once there's an operational repository, we are planning to use the larger rates that were -- that I have mentioned. I don't know if we'll be accepting it outside of a repository. That's yet to be. It depends upon your definition of accept I guess.
Q. Do you know when the last time the DOE used the acceptance rates in the 1995 ACR for planning purposes?
MS. POWELL: Object to beyond the scope. You can answer to your personal knowledge.
THE WITNESS: No, I don't.
BY MR. HIRSCH:
Q. I --
A. I don't know.
Q. Let me say, I don't think this one is beyond the scope because I think it relate to the acceptance rate question.
Well, I take it from your answer that the DOE is not currently planning on using the acceptance rates

Page 63

stated in the 1995 ACR; is that correct?
A. We are planning to use the larger rates for an operational repository. If for some other reason we would accept it in a different way, we view the 4, 6, 9 as the binding legal obligation.
Q. And why is the 400, 600, 900 considered to be a binding legal obligation?
MS. POWELL: Object again, beyond the scope. You can answer.
THE WITNESS: Those are the rates in the 1995 ACR upon which the current DCSs are based and the department views the DCSs as the binding legal obligation of the department.
BY MR. HIRSCH:
Q. You mean the approved DCS is binding?
A. Approved. Yes, thank you. Approved.
Q. Will you look at page 2 of the general instructions, Ms. Klein.
A. Yes.
Q. And in particular, I'd like you to look at paragraph 7(b) of the instructions.
A. Uh-huh.

Page 64

Q. You see where it says: "Once a purchaser has an allocation, any SNF owned by the purchaser can be designated for delivery against that allocation. The DCS does not restrict the purchaser to deliver the specified SNF that was the basis for the allocation."
Do those instructions reflect that once a utility had a place in the ACR cue by virtue of the age of its spent nuclear fuel, it could supply any spent nuclear fuel from any reactor as long as it met the basic contract requirements?
MS. POWELL: Objection to beyond the scope. You can answer.
THE WITNESS: Yes, any of their own reactors.
BY MR. HIRSCH:
Q. Their. You mean the utilities' own reactors?
A. I mean that utility's reactor, yeah.
Q. All right. Now, is it also correct that in terms of the DCS instructions that utilities did not have to identify specific fuel assemblies in responding to the DCS instructions?
MS. POWELL: Same objection, but you can