# Susan Klein (vol 2)



IN THE UNITED STATES COURT OF FEDERAL CLAIMS
------------------------------------------X
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese, J.) :
DUKE POWER, a Division of DUKE ENERGY CORP.:
(98-485C)(Sypolt, J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, et al. :
(98-614C)(Merow, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C) (Allegra, J.) :
GPU NUCLEAR, INCORPORATED :
(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY : VOLUME
(00-697C)(Merow, S.J.) : II
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :Discovery
(01-116C)(Sypolt, J.) :Judge:
TENNESSEE VALLEY AUTHORITY :(Judge
(01-249C)(Bruggink, J.) :Sypolt)
Plaintiffs, :PAGES
v. :275 - 533



THE UNITED STATES, :
Defendant. :
------------------------------------------X

Deposition of Susan Klein
Washington, DC
Thursday, April 25, 2002

Reported by: Denise Dobner Vickery, RMR, CRR
JOB NO. 144540



April 25, 2002
9:54 A.M.

Deposition of Susan Klein, held at the offices of:

Jenner & Block
601 13th Street, NW
12th Floor
Washington, DC 20005

Pursuant to notice, before Denise Dobner Vickery, a Registered Merit Reporter, Notary Public of the District of Columbia.



APPEARANCES:

Jenner & Block
For the Plaintiff COMMONWEALTH EDISON
One IBM Plaza
Chicago, IL 60611-7603
(312) 222-9350
BY: Norman M. Hirsch, Esq.

Shaw Pittman Potts & Trowbridge
For the Plaintiffs NORTHERN STATES POWER COMPANY, et al.
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7962
BY: Alex D. Tomaszczuk, Esq.

Balch & Bingham LLP
For the Plaintiffs SOUTHERN NUCLEAR OPERATING COMPANY, et al.
1275 Pennsylvania Avenue, NW, Tenth Floor
Washington, DC 20004

is the Nuclear Waste Disposal Fund and the other is the Defense Waste Disposal Fund. Some of it is appropriated for the purpose of disposing of defense waste. But we use all that money for the program.
BY MR. TOMASZCZUK:
Q. You testified in response to some of the questions posed by Mr. Hirsch that DOE expected for planning purposes when it begins performance to ramp up to 3,000 MTU rate and stay at that steady state rate for a number of years. Do you recall that testimony?
A. Yes, I do.
Q. And that's reflected in various documents that Mr. Hirsch showed you yesterday and today as well?
A. Yes.
Q. And you used that term planning purposes in your answer?
A. Yes.
Q. That intention of DOE to ramp up to the 3,000 MTU rate, is that being used by DOE for purposes other than planning purposes?
A. No, not that I know of.
Q. Is that 3,000 MTU rate the rate that DOE was



to use to determine if the fees are sufficient?
MS. SULLIVAN: Objection, beyond the scope. Answer if you know.
THE WITNESS: I don't know. I'd have to look at the TSLCC to know.
BY MR. TOMASZCZUK:
Q. Would you do so. If you need to refer to a document to answer the question, that's fine. TSLCC, Number 16.
A. That's the most recent one. I have a few of them here. And would you repeat the question?
MR. TOMASZCZUK: Ms. Reporter, could you read it back.
(Requested material was read.)
THE WITNESS: (Pause). I haven't found it. I'm working on it.
BY MR. TOMASZCZUK:
Q. That's all right. Take your time.
A. It appears from this document that those are the rates that we assumed in determining the cost of the program.
Q. And did you have a page of the document that



you referred to?
A. Well, page 4-14 has the -- actually 4-13 says assumptions about. These are the assumptions on waste acceptance. The table that's on page 4-14. That's what I based my answer on.
Q. All right. Can I just direct your attention also to the letter, which is the third page in Exhibit 16. It's the third page. I think you passed it.
A. Not the iii page you mean. Where is it? There we go.
Q. And you're welcome to read the entire letter. I was going to direct your attention to the third paragraph, first sentence.
A. Okay. I've read the third paragraph, yes.
Q. All right. Could you read the first sentence for me out loud.
A. "The TLSCC analysis provides the basis for assessment of the adequacy of the Nuclear Waste Fund fee as required by the NWPA."
Q. And that's in a letter from Mr. Barrett, right, to the readers?
A. That's correct.



Q. All right. So, DOE is using the 3,000 MTU rate for the purposes of determining adequacy of the fee, correct?
MS. SULLIVAN: Objection, beyond the scope and also the document speaks for itself. You can answer the question.
THE WITNESS: Yes.
BY MR. TOMASZCZUK:
Q. They're using that rate basically to design the facility that they're planning to build at Yucca Mountain; is that right?
A. Yes.
Q. They're using it in any number of documents that we've seen here over the last couple of days, correct?
[redacted]
Q. Wouldn't it be fair to say, Ms. Klein, that the lower rate that DOE is using, that is, the rate that goes up to 900 MTU and stops there, is being used for one purpose and that is for this litigation?
MS. SULLIVAN: Objection, beyond the scope. You can answer as to your personal opinion.

# Susan Klein (vol 2)



Oh, also to the extent it calls for legal conclusion.
THE WITNESS: That seems to be a legal conclusion, but I'm thinking, though, whether this is only for this litigation. I would say no.
BY MR. TOMASZCZUK:
Q. What other purpose is it using that for?
MS. SULLIVAN: Objection, beyond the scope.
THE WITNESS: We have always thought of the DCSs -- approved DCSs as our legal obligation even before the litigation. So that's why I would say no. But we do use it for purposes of determining our legal obligation and -- yeah.
BY MR. TOMASZCZUK:
Q. Did you want to add to your answer or are you finished?
A. No.
MR. TOMASZCZUK: Ms. Reporter, I'd like to mark as Klein Exhibit 32 a set of documents which were attached to the government's Motion for Summary Judgment on the spent nuclear fuel acceptance rate and these are a series of DCSs -- since you've just



referred to DCSs in your answer -- and related correspondence from one of my clients, Duke Energy Corporation.
(Thereupon, the reporter marked for identification Deposition Exhibit No. 32.)
MS. SULLIVAN: I'm sorry. Exhibit?
THE WITNESS: 32.
MR. TOMASZCZUK: 32 I believe.
THE WITNESS: Yes.
BY MR. TOMASZCZUK:
Q. Have you seen any of those pages of that document before today?
A. I've seen some of them, yes.
Q. Okay. And it appears to reflect as I represented, a series of DCS forms and letters back from the DOE to Duke, correct?
A. Yes.
Q. Can I direct your attention, Ms. Klein, to the DCS which has the page number Bates number 0297 at the bottom. It's about I guess --
A. I have it.
Q. -- five, six pages back.



A. I have it.
Q. All right. And this appears to be a DCS form and in Section 4.0 the "Approved" box is checked, correct, at the bottom of the page?
A. Yes, it is.
Q. And do you know whether that's Mr. Zabransky's signature?
A. It kind of looks like it. It is hard to tell, but I think that he was the person to sign that during -- what year was this? 199 -- when was this?
Q. This looks like 1995.
A. '5. Yes.
Q. Can I direct your attention about a third of the way down.
A. Yes.
Q. And you see there's two asterisks on the right-hand side of the page with some text which follows?
A. Yes, I do.
Q. All right. And can you read that for me, that text?
A. "The proposed delivery date is dependent upon



the existence of an operational repository or an interim storage facility constructed under the" -- and I assume it says "Act." I can't read it and I assume it means the Nuclear Waste Policy Act.
Q. Do you know the source of that notation on this page?
A. No, I don't.
Q. Do you know whether you drafted that notation?
A. I did not. I don't remember drafting that notation.
Q. Do you know whether somebody within OCRWM drafted it?
A. No, I don't know.
Q. Do you know whether someone within the DOE Office of General Counsel drafted it?
A. No, I don't. I don't remember this being done, actually. I'm not saying it wasn't directed by the Office of General Counsel. It could have been, but I don't remember.
Q. You don't recall any discussions with anyone at OCRWM concerning the insertion of this notation on this DCS?

MR. TOMASZCZUK: I believe that's the page that's in front of the witness.
MS. SULLIVAN: That's what she's looking at. I want to make sure.
THE WITNESS: Personal knowledge at the time. We have discussed this. I have some knowledge because I just discussed it with my counsel, but I was not involved with it. I don't remember. I might have been involved. I just do not remember what happened here. I'm sorry.
BY MR. TOMASZCZUK:
Q. You have no knowledge independent of that which you just obtained from discussion with your counsel?
A. And a discussion with counsel last, yeah.
MS. SULLIVAN: Don't --
THE WITNESS: Yeah, just instruction with counsel.
MS. SULLIVAN: I instruct you.
THE WITNESS: Yes.
BY MR. TOMASZCZUK:
Q. All right. I'm going to move on and reserve



the right to seek testimony from an appropriate Rule 30(b)(6) witness on those issues.
Ms. Klein, can I ask you to get in front of you Klein Exhibit Number 5.
A. Yes.
Q. And this document is the APR and ACR for March of 1995; is that right?
A. That's right.
Q. And as I understood your testimony, this was the last APR/ACR issued by the government; is that correct?
A. Yes.
Q. And this was the APR/ACR on which the utilities were to or which the utilities were to use in submitting the DCS forms submitted after it was published in March of 1995?
A. Yes.
Q. Could I direct your attention to page 1 of this document.
A. Got it. Introduction.
Q. You're welcome to read the whole page.
A. Yes.



Q. I'm going to ask you some questions about the text which appears at the bottom.
A. Okay.
Q. All right. And the last sentence states: "As specified in the standard contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the purchasers." Is that right?
A. That's what it says here, yes.
Q. All right. And is that to the best of your knowledge a true statement?
MS. SULLIVAN: Objection, beyond the scope. You can answer the question.
THE WITNESS: Well, once it was sent out with the CO's instructions and made a requirement of the contract, the department believes it is a requirement of the contract. Once it was sent out by the contracting officer to each individual purchaser, it became a commitment.
BY MR. TOMASZCZUK:
Q. I'm sorry. What became a commitment?
A. The allocation for each particular -- well, it



became a commitment if -- the conditioned upon the allocation for each purchaser became a commitment between the department and that purchaser if they submitted a DCS and it was approved. It became a commitment.
Q. But it was a commitment that was based on underlying data which was not contractually binding; is that fair?
MS. SULLIVAN: Objection, beyond the scope. You may answer.
THE WITNESS: It was -- I don't see what relevance it has. There was a commitment that we made based on information. Most commitments are based on information that are not contractually binding, I mean. I guess I don't understand the question.
BY MR. TOMASZCZUK:
Q. Well, I guess I don't understand your testimony.
A. Yeah.
Q. In all candor.
A. Uh-huh.
Q. Is it your testimony that the ACR is now a

contractually binding document?

MS. SULLIVAN: Objection, beyond the scope. You may answer.

THE WITNESS: What I am testifying is that the allocation once it's -- not until the DCS based on this allocation is submitted to the department and the department approves it. Then it becomes a contractually binding commitment. Then there is a legal obligation. And whether or not the background that got us to that amount was legally binding or contractually binding I don't think is relevant to the fact that the DCS becomes a legally binding commitment between the department and the purchaser.

BY MR. TOMASZCZUK:

Q. Do you know in what document, if any, the utilities were so advised?

MS. SULLIVAN: Objection, vague.

THE WITNESS: It was the 1991 -- it's in here somewhere. Letter that the contracting officer sent with instructions.

BY MR. TOMASZCZUK:

Q. Okay. Let's look at that.



A. Do you know what exhibit number that is? I think it was 30. Exhibit 2. Actually, this is not the whole letter. I don't think we have it in the exhibits. Attached to it are the instructions. I think there's actually more information in the 1991 letter from the contracting officer to the utilities. But this will do.

Q. All right. And where in this document, Klein Exhibit 2, were utilities advised that once their DCSs based on the then-current ACR were submitted and approved that that represented a binding commitment of the parties?

MS. SULLIVAN: Objection, beyond the scope. Objection, the document speaks for itself.

THE WITNESS: The allocations in the --

BY MR. TOMASZCZUK:

Q. I'm sorry. I just was asking where are you reading, please?

A. I'm sorry. Right now I'm reading the beginning of the second paragraph. "The allocations in the 1991 Annual Capacity Reports should be the basis for the DCS submittals. Once purchaser has an



allocation, an equivalent quantity of spent fuel owned by the purchaser can be designated for delivery within the limits of that allocation." There's also a provision -- I'm not sure where it is here -- where this becomes a basis for exchanges is the DCS. That's the basis for exchanges with other utilities.

"Once a purchaser has an allocation" --

Q. I'm sorry. Where are you reading?

A. I'm sorry. Page 27-B. "Once a purchaser has an allocation, any SNF owned by the purchaser can be designated for delivery against that allocation." That's not the exchange provision, but that's consistent with what I read in the beginning.

Q. Does any of the language you just referred to advise the utilities that the DCS based on the then-current APR once submitted and approved represents a binding commitment of the parties?

MS. SULLIVAN: Objection, beyond the scope. Objection, the document speaks for itself.

THE WITNESS: Does not use those exact words, but that appears to me to be a commitment. It's a delivery commitment schedule.



BY MR. TOMASZCZUK:

Q. Are you still --

A. I think I'm done. I just couldn't find it, but exchange provision in there somewhere.

Q. Just so the record is clear. Do you believe that somewhere in that exhibit the utilities were advised that once their DCS had been submitted and approved, it represented a binding commitment on both the government and the utility?

MS. SULLIVAN: Objection, beyond the scope. Objection, the document speaks for itself. Objection to the extent it calls for a legal conclusion, and asked and answered.

THE WITNESS: And what?

MS. SULLIVAN: Asked and answered, but you can answer again.

THE WITNESS: Okay. It does not have those exact words binding commitment, but it does have the word commitment and it does say this is your allocation once approved. And I believe that is and the department believes that is a binding legal commitment of the department.

Yeah, we were waiting to get the response to Beth's request for the views of all contractors -- contract holders before we would respond to the statement. I mean, that seems quite logical and appropriate to me. If we got one tomorrow, we might respond and just repeat what we said, also. When we said it a few times, maybe we wouldn't keep on repeating it, but that the ACR -- 1995 ACR is the basis for these submissions.

BY MS. REMINGTON:

Q. Maybe I misunderstood your testimony earlier.

A. Uh-huh.

Q. Did you actually see response letters that went out that used that language that the utilities' allocations were based on the '95 ACR and that's --

A. Yes, I have. I have seen those letters.

Q. Do you recall who those -- what utilities received such response?

A. I do remember that letters have come in over the years which would be as you said. They didn't use the word protest, but they would say -- I think it came -- it happened -- actually it happens most often



when they're talking about priority for shutdown reactors, and we would respond to them and say that we're using the cue as in the 1995 ACR. And then in that case we'd often attach a letter where we, Lake or someone had said that. So I have seen -- I have seen those letters.

Q. Could you explain to me how whether or not the utility has a DCS would affect its rights to have its fuel picked up?

MS. SULLIVAN: Objection, beyond the scope. Objection, calls for a legal conclusion. You may answer the question.

THE WITNESS: If a utility has an approved DCS, that would be the legally binding commitment of the department to accept their spent fuel.

BY MS. REMINGTON:

Q. And if the utility does not have an approved DCS, does it have the right to have its fuel picked up?

A. It does --

MS. SULLIVAN: Objection, vague. Objection, calls for a legal conclusion. Objection, beyond the scope.



THE WITNESS: If they have a standard contract with the department, they do have a right to have their fuel picked up, but the timing would perhaps be different than what's in the ACR if they did not submit the DCS on time.

BY MS. REMINGTON:

Q. And if they did submit their DCS on time but it just wasn't approved, then what are their rights?

MS. SULLIVAN: Objection, beyond the scope. Objection, asks for a legal conclusion. You may answer the question.

THE WITNESS: I think that is a legal conclusion. That it would seem to me that they would -- if they had submitted a timely DCS, that once we began operation and started the approval process, they would be in their proper place in the cue that as in accordance with the ACR.

BY MS. REMINGTON:

Q. Does DOE have any current plans to publish a new ACR?

MS. SULLIVAN: Objection, beyond the scope. You may answer the question.



THE WITNESS: I can't say that we have a plan for specific date or time, but I would -- I would guess we'd have to reevaluate the situation once we get a facility, and it might result in a new ACR. I don't know.

BY MS. REMINGTON:

Q. But currently there's no -- there's nothing being done to publish a new ACR at this time?

A. That's correct.

Q. I think you mentioned in your testimony several times that DOE plans to begin acceptance at a repository in 2010?

A. That's correct.

Q. How would a utility know when to begin resubmitting their DCSs or submitting DCSs for that new repository?

MS. SULLIVAN: Objection, beyond the scope. You can answer the question.

THE WITNESS: I assume at some time the department will send -- the contracting officer will send letters to the purchasers. I don't believe we have a plan set forth right now on how that will be

# Christopher Kouts

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

TENNESSEE VALLEY AUTHORITY, )
Plaintiff, ) Case No. 01-249C
v. )
THE UNITED STATES, )
Defendant. )

Courtroom 4
National Courts Building
717 Madison Place NW
Washington, D.C.

Tuesday, July 12, 2005
Volume 8

The parties met, pursuant to the notice of the Judge, at 10:10 a.m.

BEFORE: THE HONORABLE CHARLES F. LETTOW



APPEARANCES:
ON BEHALF OF THE PLAINTIFF:
PETER K. SHEA, ESQ.
EDWIN W. SMALL, ESQ.
TENNESSEE VALLEY AUTHORITY
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1499
(865) 632-7319

ON BEHALF OF THE DEFENDANT:
ALAN J. LO RE, ESQ.
SONIA ORFIELD, ESQ.
SHARON A. SNYDER, ESQ.
KEVIN CRAWFORD, ESQ.
U.S. Department of Justice
1100 L Street, Northwest
Washington, D.C. 20530
(202) 305-7562

***Index appears at end of transcript***



P R O C E E D I N G S
\- - - - -
THE COURT: Good morning. I congratulate our reporter on solving her technical difficulties so promptly. Good job. Do we have any preliminary matters before we continue with the cross-examination of Mr. Kouts?
MR. LO RE: Your Honor, we did have one preliminary matter, and the Court's indulgence, we would like to have a sidebar. Is that possible?
THE COURT: I suppose what we might do -- well, yes, we can always excuse Mr. Kouts temporarily.
MR. LO RE: This is actually something I would prefer is just discussed off --
THE COURT: Let us do this right down by the reporter.
(Discussion off the record.)
THE COURT: The Court thanks counsel and thanks them for their cooperation one with another. With that, Mr. Small, are you ready to continue with your cross-examination?
MR. SMALL: Yes, Your Honor.
Whereupon--
CHRISTOPHER KOUTS



a witness, called for examination, having been previously duly sworn, was examined and testified further as follows:
CROSS-EXAMINATION (Resumed)
BY MR. SMALL:
Q. Good morning, Mr. Kouts.
A. Kouts. Good morning.
Q. I'd like to return first to something you talked about yesterday under the heading M&O contractors. Did I have that right?
A. Yes.
Q. Okay. And what is an M&O contractor again?
A. The M&O designation stands for management and operating contractor.
Q. And I believe you talked about documents that were produced by M&O contractors and how there would be some indication that the Department had approved those documents, is that right?
A. I believe my testimony was to the effect that the contractor document was not accepted by the Department unless it was published under the Department's letterhead with the Department's seal and with the Department's document designation.
Q. Okay. And so a document that did not meet the criteria that you've just testified to would simply be a contractor document, as opposed to a DOE

Page 1577

A. Yes.

Q. I would next call your attention to Plaintiff's Exhibit 25.

A. Okay.

Q. That should be the December 1998 TSLCC.

A. That's correct.

Q. I call your attention to page 15, spent nuclear fuel acceptance rate appear on that page, sir?

A. Yes, it does.

Q. Again, does it show a 2010 start date for spent nuclear fuel acceptance?

A. Yes.

Q. It also shows a ramp-up to 3,000 tons a year beginning in operational year five, doesn't it?

A. Yes, it does.

Q. Thank you, sir. That's all I have for that exhibit. Next call your attention to Plaintiff's Exhibit 29.

A. Okay.

Q. That should be the May 2001 TSLCC, is that correct?

A. That's correct.

Q. I call your attention to page 4-14.

A. Yes.

Page 1578

Q. That also shows a spent nuclear fuel acceptance, doesn't it?

A. Yes, it does.

Q. It shows acceptance beginning in 2010?

A. Yes.

Q. And it shows acceptance ramping up to 3,000 tons a year in operational year five?

A. That's correct.

Q. That's all I have on that document, sir. I would also call your attention to Plaintiff's Exhibit 36.

A. Go ahead.

Q. Call your attention to page two of that document, which should be the July 2004 APR/ACR. Okay. Is that document the July 2004 APR/ACR, sir?

A. Yes, it is.

Q. And on page two, there's a spent nuclear fuel acceptance rate?

A. Yes, there is.

Q. And that shows spent nuclear fuel acceptance starting in 2010?

A. Yes.

Q. And it shows a ramp-up to 3,000 tons a year in operational year five, doesn't it?

A. Yes, it does.

Page 1579

Q. I don't think I've asked you this question, but if I have, I apologize, and I'll say, just say that it's nothing more than I'm asking a second time, and I do apologize if I have. Has the Department ever published a document where it indicated it was going to pick up spent nuclear fuel at the rate of 900 metric tons a year for the life of the program?

MR. LO RE: Your Honor, that's been asked and answered, and I just, rather than put it as an objection, I would just point out that I believe the question was already asked and answered.

THE COURT: Yes, but applying the three strikes rule, I'm not sure it's been asked a third time. The objection is overruled.

THE WITNESS: No.

BY MR. SMALL:

Q. Has the Department ever published a document indicating that it was going to use a 2,100 metric ton per year rate for the life of the program?

A. No.

Q. Now, when I say for the life of the program, I of course did not mean to imply that there would not be a short ramp-up period of, say, five years at the beginning, and I assume that in answering those questions, you made that assumption

Page 1580

as well?

A. As well as the ramp down rate at the end of the operational life of the facility.

Q. Yesterday, in discussing the 1995 ACR/APR, you indicated that there had been some clearance problem in getting it approved for publication. Do you recall that testimony?

A. Yes.

Q. Why was there a clearance problem?

A. I don't know. I wasn't involved at the time. I simply was reflecting on the words that were produced in the document.

Q. In the Department's operational planning documents for the spent nuclear fuel program, are operations based on 40-hour workweeks?

A. Not necessarily.

Q. What are they based on?

A. They're based on a – it has varied throughout the development of the program in terms of how often you want to operate the facilities, whether you would operate them on a six-day basis with a day off for maintenance, whether or not you would operate them on a straight, over, around-the-clock basis on a shift basis.

So I'd really have to say that that varied

Page 1581

depending on the various designs, the design that we're looking at and the capabilities of the facilities and the expectations of the amount of maintenance associated with the facilities to keep them operational, so I don't think it's a simple 40 on, 40 off kind of exercise.

Q. All right. Would the assumption be reflected in the TSLCCs?

A. Not necessarily; that's a fairly detailed assumption that would not necessarily be reflected there.

Q. Where would that assumption appear?

A. That would appear, from my own perspective, it would appear with, in relation to the designers of the facilities and what their assumptions are for the capabilities of the facilities and how they would be operated.

Q. Of course, you would have to know that in order to do the TSLCCs, wouldn't you?

A. Well, as I mentioned before, the TSLCCs are fairly conservative estimates in terms of the total cost of the program. We typically have leaned over the years on the high-end cost because we're trying to determine whether or not a high-end cost would still be adequate. In other words, the fee would

Page 1582

still be adequate under those conditions. So in terms of what individual assumptions and what the cost assumptions were, based on the operations of the facilities, I don't know whether it got down into the details of how many shifts were operated in any one year it would have took to do any specific capacity.

Q. I take it then you personally don't know what assumptions were embodied in any particular TSLCC?

A. Not to that level of detail, no.

Q. Would it be fair to say that a primary, not the sole, but a primary purpose of the MRS proposal that DOE made in 1987 was to allow DOE a way to meet the 1998 start date?

A. Yes.

Q. Because without the MRS, it was very unlikely that DOE would meet that 1998 start date, correct?

A. If you remember my testimony from yesterday, and the proposal itself, we stated the repository was not going to be operational until 2003. Therefore, without the MRS available in the 1998 time frame, we would not have a facility available to receive materials in 1998.

Page 1583

Q. I'd like to call your attention, sir, to Defendant's Exhibit 51, which is the June 1987 mission plan minutes.

A. Okay. I've got it.

Q. And I'd like to call your attention to page 63 of that document, sir.

A. Okay.

Q. Do you see the heading, "F3, Contingency Plans"?

A. Yes, I do.

Q. The first sentence under there says, "If the Congress does not approve the MRS facility, the transfer of waste to DOE facilities may not be able to begin in 1998." Did I read that correctly?

A. Yes.

Q. Now, in fact, that very contingency occurred, that is to say the contingency that DOE did not begin in 1998, didn't it, sir?

A. That's correct.

Q. Now, the second sentence says, "The DOE will continue to encourage and expedite the effective use of available storage and the development of necessary additional storage at reactor sites." Did I correctly read that, sir?

A. Yes.

Page 1584

Q. Okay. Now, we know that the contingency occurred, that is to say that DOE was unable to begin in 1998, so my question is, what did DOE do to fulfill that second sentence?

A. Well, I think the Department undertook one action which was to develop a multi-purpose canister system in the '90s to help facilitate the storage at reactor sites, that that would have been a canister that would have been storable, transportable, and disposable in a repository facility, and I think undertook that effort, and due to Congressional budget cuts, we had to terminate that program. But I would cite that as an example of what we were doing to encourage and expedite the effective use of available storage and development of additional storage at reactor sites. If that system had come into play, it would have facilitated, potentially facilitated the transfer of those materials into the system.

Q. And that's because once a utility loaded spent fuel into an MPC, it could be used for any purposes, is that correct?

A. That's correct. It would limit the, it would potentially limit the amount of additional packaging and handling that the Department would need