# Michael Lawrence

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY, )
et al., )
)
Plaintiffs, )
vs. ) No. 98-126C
UNITED STATES, )
Defendant. )

DEPOSITION OF MICHAEL J. LAWRENCE, VOLUME I

May 20, 2002
Richland, Washington

Q. Was the objective, then, to -- to come up with an overall strategy that would maximize the public good, so to speak?
MS. HERRMANN: Objection. Foundation.
THE WITNESS: There was a general approach that we wanted to be fair in our handling of this and in a -- for instance, where a reactor -- a utility just wanted to ship their fuel, but they didn't have a pressing need, but they just wanted to ship it, and there was a utility that had a shutdown site that they could permanently shut it down should they be allowed to ship it. We would give preference, in theory and in general, to that utility that could shut their reactor site down once they were allowed to ship it.
Q. (By Mr. Shapiro) Turn to another exhibit, Mr. Lawrence.
(Exhibit No. 5 marked for identification.)
Q. (By Mr. Shapiro) Mr. Lawrence, you've been handed what's been marked as Lawrence Exhibit 5. This one is a letter from Northwest Utilities to Mr. Morgan, commenting on the draft contract.



Again, let me ask -- not that I would expect that you recollect -- but do you have any specific recollection of this specific letter?
A. No, I really don't.
Q. I'm going to point your attention, first, to the second page. First underlined item refers to "Receipt of Spent Fuel."
Do you see that?
A. Yes.
Q. And the second sentence there -- first sentence refers to the primary goal of the Act is to have a repository in place by the late '90s. And then the second sentence urges that to meet this goal, it is necessary for the spent fuel contract to contain an obligation by the Federal Government to remove specific quantities of spent fuel from each reactor over a specific period of time.
Do you recall utilities asking for that type of specificity?
A. I do recall that -- that some utilities wanted specificity, but that we were in no position to provide that.
Q. And you were in no position to provide that because you didn't know what DOE's capabilities were going to be down the line?



A. We had not finalized designs and receipt rates and transport capabilities. Consequently, we were not in a position to commit to a specific receive rate.
Q. There was, again, in -- in Exhibit 5, there's a specific suggestion, in the next sentence, that the specific receipt rate to be put in the contract should be a removal rate equal to the amount of -- of spent feel generated -- or really discharged, I believe is what they meant, but it says generated -- plus an amount that will eliminate the backlog of spent fuel over a five-year period.
Do you have an understanding of what that's referring to? What that sentence is referring to?
MS. HERRMANN: Objection. Foundation.
THE WITNESS: It appears to me, this is what they would desire or like to have. I don't recall whether the Nuclear Policy Act specifically specified that or not.
Q. (By Mr. Shapiro) Do you recall consideration -- regardless of whether or not the NWPA specified that criteria, do you recall within RW consideration as to whether or not to -- to undertake to -- to accept spent fuel at that kind



of rate?
A. I don't recall any specific discussions of it. However, based upon my experience, I would -- my belief is is that would put a very great demand on the Department that would be very, very difficult for us to meet.
Q. Why is that?
A. Because of the excess capacity that would be needed to take not only what was being generated daily, annually, plus working off the entire backlog of over 30 years of operation of nuclear plants within a five-year period. That would result in substantial additional cost and capacity which ultimately the ratepayer would have to bear. And it was not -- it's not clear to me now, at least, that that would have been warranted -- why five years would have been warranted; whereas, some other time frame, where you could do it perhaps more economically might be the better way to go.
Q. And we don't have to focus on -- on Exhibit 5 necessarily, because I'm not sure I would interpret it the same way. But do you recall the concept of -- let me ask a slightly different question.

Page 122

THE WITNESS: Upon reading the contract, it does seem to have other dates or time frames in here, such as 12 months prior to delivery date, within 30 days, other things like that, which would indicate to me that there are other interim steps in here. It's just the main feature of the contract was to begin taking the fuel in '98.

Q. (By Mr. Shapiro) Point your attention to further down in the same paragraph that we were talking about, really the next concept, wherein in addition to there not being other milestones -- or at least that's the complaint of Edison Electric Institute -- the letter complains that the contract does not commit DOE to accept any given quantity of -- of spent fuel or -- or high-level waste.

Do you recall that complaint?

A. Where are we here in this --

Q. The top paragraph on Page 8 of Exhibit 6.

A. Uh-huh. (Witness answers affirmatively.) Oh, I see it.

I previously commented that the utilities wanted to know and have more specific information regarding difficulties, but that we were in no position to provide that.

Page 123

Q. Do you recall any discussions with utilities, back-and-forth discussions about that issue?

A. No specific discussions, no.

Q. If RW was not in a position to commit itself to a specific rate, was RW -- did you understand RW, then, to be committing itself to -- to take spent fuel that -- at a reasonable rate that would ultimately develop as you did more work?

MS. HERRMANN: Objection. Foundation. Speculation. Calls for a legal conclusion.

THE WITNESS: That would be an objective, but by no means were we in any position then to make any commitments regarding that. And it may not ever materialize.

Q. (By Mr. Shapiro) What do you mean, it may not ever materialize?

A. There could be just basic constraints on the ability of the system, receipt capability of the transport system, to move the fuel at a rate equal to or greater than its generation. I mean, I can speculate, but I won't as to what might that cause that -- reasons for that. And so consequently, although it's something that you would like to be able to have, we certainly were in no position to commit to it.

Page 124

Q. And I think I asked about a reasonable rate and you referred to a rate that was equal to or greater than the rate at which spent fuel was generated. Does that reflect your understanding that in an abstract sense, accepting spent fuel --

A. I don't recall the specific context of that. We'd have to go back and look at that.

Q. Okay. Let me just ask what -- what -- what you meant -- would you mean, then, in the abstract, if -- if RW could accept spent fuel at a rate that was -- that was at least equal to the discharge rate that that would be something that would be reasonable.

MS. HERRMANN: Objection to the extent it mischaracterizes prior testimony. Speculation.

THE WITNESS: I'm not recalling the context in which we were discussing it before. I would think that you would want to -- it would be desirable if at all possible to not only take the waste that was being generated, but to over a -- some reasonable period of time -- which I'm not sure what that would be -- you could work off the backlog. So it would have to be greater.

Q. (By Mr. Shapiro) And the countervailing pressure on achieving that rate would be the technical

Page 125

ability to do it?

A. Technical and other institutional issues that could come up. For instance, if restrictions were placed on the transport of nuclear material so that you could only move so many shipments in a month or a year, that could put a constraint on the -- on the system, as well.

Q. What sort of restrictions are you referring to?

A. Well, just to give a contemporary example, the Governor of South Carolina is refusing any shipment of plutonium into South Carolina right now. If you face challenges like that or you get states saying, You cannot ship through this state, that presents obstacles and impediments.

Q. What about institutional issues within DOE? Did you view those as something that -- that might keep you from -- from otherwise taking spent fuel at a rate that was at least equal to the discharge rate?

MS. HERRMANN: Objection. Foundation. Speculation. Vague.

THE WITNESS: I know of no institutional issues within DOE and the implementation of the Act.

Q. (By Mr. Shapiro) Let me turn your attention to

Page 23 of -- I believe it's Attachment A to Exhibit 6. The last three Bates numbers are 906.
A. Uh-huh. (Witness answers affirmatively.)
Q. Specifically Comment 14 there.
A. Uh-huh. (Witness answers affirmatively.)
Q. Which is asking for more planning information, particularly projection of the rate at which DOE expects that it -- it will be receiving spent fuel. Do you recall that concept?
A. Yes, I do.
Q. What do you recall about that concept?
MS. HERRMANN: Objection. Vague.
THE WITNESS: I recall a concept that said we would share information with you utilities about our ability to accept fuel as that information was developed and we could make reasonable projections and commitments based upon that.
My reading of this indicates that -- if this is an accurate reflection of what's in the contract -- that it appears to me as if we were anticipating being able to provide some such information around the 1991 time frame.
Q. (By Mr. Shapiro) What was your understanding of the purpose of -- of this -- this additional



information that DOE would provide?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: That it would allow the utilities to at least estimate some idea of when and how much fuel they may be allowed to ship to DOE.
Q. (By Mr. Shapiro) You didn't view this information as presenting a binding commitment on RW's part or on the utilities part, that this is how much DOE would be receiving?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: I recall that we were all very concerned about entering into any binding obligation beyond those specifically required by the Nuclear Waste Policy Act that we -- that we were not in a position of -- of committing to or -- or at least fulfilling.
Q. (By Mr. Shapiro) And even this additional information, which might not start for several years hence into the contract performance period, projecting forecasts of the rate at which DOE would accept spent fuel, your view is that those were simply forecasts and not binding on -- on



either party?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: Well, just going by what I'm reading here, not going back and looking at its source document in the contract, it appears to me that the criteria are by no means a commitment. Criteria are just factors to be considered in ultimately coming to a commitment. So, you know --
Q. (By Mr. Shapiro) Do you have any recollection of this issue, independent of reading the various exhibits I've shown you, as to what the thought progress was of RW back in 1983 time period?
MS. HERRMANN: Objection. Vague. Compound.
THE WITNESS: Our activities then were set up -- we -- we tried to do things that would be as transparent and as useful to the utilities as we could without unduly obligating and committing the U.S. Government to activities that we didn't have total control over.
Q. (By Mr. Shapiro) Did you ever view this concept of -- of having RW subsequently project its acceptance rate as a means for RW to limit its



obligation to accept spent fuel from utilities at a particular rate?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: At this particular point in time, I wouldn't feel as if we were limiting anything because we weren't making an obligation with regard to acceptance rate. The only obligation we felt we were making was to begin accepting waste or spent fuel beginning in '98.
Q. (By Mr. Shapiro) Now, I know you've testified that it was your understanding that eventually things would get -- at least utilities would get additional information from RW as to how fast we would be able to deliver spent fuel to RW.
Did you foresee a time when the government would be obligated to accept a certain amount of spent fuel from utilities within a particular amount of time?
MS. HERRMANN: Objection. Calls for a legal conclusion. Speculation.
THE WITNESS: Yes, I think we always anticipated that when it was clear what our capabilities were, and we felt confident enough in those capabilities, that we could commit that we

would say that we needed to have the flexibility and judgment to determine what we could and could not do, as the time got closer and we knew our capabilities.
Q. (By Mr. Shapiro) Was the intent, then, to have the acceptance of failed fuel depend on DOE's abilities to actually take the failed fuel as the time approached when DOE was actually taking spent fuel?
MS. HERRMANN: Objection. Foundation. Speculation. Calls for a legal conclusion.
THE WITNESS: We needed more information to knowing our capabilities, the impact, before we could commit to such an acceptance of failed fuel. And certainly in 1983, '84, we weren't in that position.
Q. (By Mr. Shapiro) Provided that DOE had the technical capability to handle the spent fuel, was it intended that DOE would -- would take it consistent with the -- the rate at which it was taking other spent fuel?
MS. HERRMANN: Foundation. Speculation. Calls for a legal conclusion. Asked and answered.
THE WITNESS: Yeah, I -- you know, I can't add any more than what I've already said



about that.
Q. (By Mr. Shapiro) I'd like you to answer that question, if -- if you can.
A. Would you rephrase the question?
Q. Provided that DOE had the technical ability to accept the failed fuel at a point in time in the future, was it DOE's intent that it would take that failed fuel at a rate consistent with which it's taking other spent fuel at that future time?
MS. HERRMANN: Objection. Foundation. Speculation. Calls for a legal conclusion. Asked and answered.
THE WITNESS: I really can't speak to what the intent was other than to say that ultimately we would take the failed fuel, but it would be difficult -- not impossible -- to say in what relation to other fuel that we would be accepting.
Q. (By Mr. Shapiro) Is part of the reason for your difficulty in speaking to the intent is that right now you don't have a recollection as to what the intent was specifically with respect to the contract for failed fuel?
A. That certainly is part of it. The other part is as -- if I were in that position, I would want to



maintain sufficient flexibility in my acceptance planning to allow me to deal with any circumstances that might come up 10, 15, 20 years hence. And I have no idea what those might be.
(Exhibit No. 8 marked for identification.)
Q. (By Mr. Shapiro) Mr. Lawrence you've been handed what's been marked as Lawrence Exhibit 8, which appears to be an agenda for a seminar on the Nuclear Waste Policy Act. This one is from May of 1983. The second page of this document you're listed as -- as giving a presentation on the implementation of the provisions of the Nuclear Waste Policy Act and describing the spent fuel storage program.
Do you recall this -- this presentation?
A. Not at all.
Q. Do you recall making presentations like this?
A. Yes.
Q. In fact, I think you said at a break that you made a presentation like this in Hawaii to some state attorneys general.
A. Not -- not to this degree of specificity, but, yes.



Q. What do you tell people in sessions like -- like the one that is depicted here in Exhibit 9? I'm sorry, Exhibit 8.
MS. HERRMANN: Objection. Vague.
THE WITNESS: At this particular point in time, we probably were just saying what we were doing in -- in -- in implementing the Act.
Q. (By Mr. Shapiro) Do you recall any questions or concerns being voiced by participants in this program or similar programs?
MS. HERRMANN: Objection. Vague.
THE WITNESS: Yeah, that was very vague.
Q. (By Mr. Shapiro) Do you recall at any of these sessions where you gave oral presentations to interested parties on the Nuclear Waste Policy Act, particular concerns voiced by participants about how the Department was implementing the Act?
MS. HERRMANN: Objection. Vague.
THE WITNESS: In a very general sense, I recall that there was a desire to get the government to commit to and be as specific as possible, which we, or I necessarily, was reluctant to do because the technical basis and the information to allow us to do so just were not there. And I could not and would not commit the

government to something which we may not be able to deliver on.
Q. (By Mr. Shapiro)
(Exhibit No. 9 marked for identification.)

Q. (By Mr. Shapiro) Mr. Lawrence, you've been handed what we've had marked as Lawrence Exhibit 9, which has a cover letter and then has a Report on Financing the Disposal of Commercial Spent Nuclear Fuel and Processed High-level Radioactive Waste.
Do you recall this report?
A. Not specifically, no, I don't.
Q. Do you recall it generally?
A. Yeah. The -- the title rings a bell, Report on Financing the Disposal of Commercial Spent Nuclear Fuel and Processed High-level Radioactive Waste.
Q. What was the purpose of this report, to the extent that you recall?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: My recollection was that the utilities needed to get this money added -- the fee added to their rate base -- or the charges added to their rate base, and they needed some



basis or documentation to take to the Public Utility Commissions to allow that to occur.
And I don't know if this is the report or whatever. But we -- if we were going to collect the fee, we needed to provide some basis for how the numbers were arrived at.
Q. (By Mr. Shapiro) So this report was intended to -- to show the relationship between the costs of the disposal program and the 1.0 mill per kilowatt fee?
A. I can't say that that's specifically what that report was doing. I was speculating to that.
Q. Let me point you to that cover letter signed by Mr. Rosselli. The second paragraph there, second sentence of that paragraph says the report "Demonstrates the methodology which will be used to evaluate whether the revenues resulting from the mandated 1.0 mill per kilowatt hour fee will be sufficient to offset the costs of disposal of commercially generated spent nuclear fuel and solidified high-level radioactive waste."
A. Uh-huh. (Witness answers affirmatively.)
Q. Does that refresh your recollection at all as to what --
A. Yeah, I think that adds -- it speaks for itself.



Q. Is that statement consistent with your recollection of what the purpose of this report was?
A. No, it's somewhat different --
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: No, it's -- it's somewhat different than what I was implying. Although, they may still have had the same -- may have been used by the utilities for that purpose, of justifying a rate.
Q. (By Mr. Shapiro) The statement in the cover letter, does that imply to you that the purpose of this report, Exhibit 9, is more for an internal DOE purpose, to see if the 1.0 mill per kilowatt fee is in fact going to cover the costs?
MS. HERRMANN: Objection. Foundation. Speculation. The document speaks for itself.
THE WITNESS: Yeah, I -- I do not believe this was a strictly internal document. And obviously, the fact that it was sent out to the public means it did serve a broader purpose.
Q. (By Mr. Shapiro) Would you have had any role in the preparation or review of this report?
A. Yes.



Q. What would your role have been?
A. Most likely to review it, make sure it was reasonable, the assumptions were reasonable, the basis was reasonable, and the conclusions were properly characterized.
Q. Do you have any recollection today of -- of that review and -- and any of the issues that might have come up during that review process?
A. No, I don't have any specific recollections of the report.
Q. Let me point your attention, again, to one item of interest to us. On Page 9 of the report --
A. Uh-huh. (Witness answers affirmatively.)
Q. -- there is a table numbered Table 3-1, Key Reference Case Assumptions. The third one down refers to "Repository design receipt rates - first 5 years at 1,800 MT per year. Next 21 years at 3,000 MT per year."
Do you recall assumed design receipt rates at those levels?
A. The -- assuming this is accurate, I'd say this means we were planning on a designed capacity receipt rate of 3,000 metric tons per year for the repository. The earlier first five years, I believe that was just for illustrative calculation

Page 170

purposes here to look at the fee. It was not a -- a commitment on our part.
Q. We previously discussed the concept of a -- of a ramp-up. Would it be fair to say that the first five years at 1800 -- MT stands for metric tons, I believe -- per year. Does that first five years at 1800 metric tons represent a ramp-up?
A. No. It represents a realistic assumption that you will be less than full capacity in the first five years. And for economic analysis or financial analysis purposes, if you assume 1800 tons per year for five years, that says the initial years could be far less, the succeeding years far more, but it would average out to 1800, which might be reasonable.
Q. So over five years, a reasonable ramp-up might b 9,000 metric tons, but it wouldn't necessarily be 1800 MTU per year each of those five years?
A. Most certainly it wouldn't be.
Q. Do you have any recollection as to how these receipt rate assumptions were developed?
MS. HERRMANN: Objection. Foundation.
THE WITNESS: No, I really don't.
Q. (By Mr. Shapiro) Are these receipt rate assumptions consistent with your recollection of

Page 171

what RW's intent was as to how fast it would ultimately start taking spent fuel?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: This document's purpose, as stated on the cover letter and title and everywhere else, was to report on the financing disposal. And I think the assumptions, as I see them here, were there to allow a financial analysis to occur. It does not reflect any contractual obligations or commitments on our part. It was just to allow a financial analysis, economic analysis.
Q. Right now I'm not asking about contractual obligations. I'm just asking for what your recollection of -- was regarding the intent as to how DOE would actually operate once it started accepting spent fuel.
And is your recollection of that intent of how fast it would start accepting spent fuel in 1998 consistent with the receipt rates that we see on this Table 3-1?
MS. HERRMANN: Objection. Foundation Speculation. Calls for a legal conclusion.
THE WITNESS: I do not believe that

Page 172

would represent intent.
Q. (By Mr. Shapiro) Did DOE intend to take spent fuel in 1998 at a lower rate than what's shown on Table 3-1?
MS. HERRMANN: Objection. Foundation. Speculation. Calls for a legal conclusion.
THE WITNESS: In general, we would take the fuel at the rate we could safely receive, handle, and -- and dispose of it. That theoretically could be as much as 3,000 tons per year in the first year. But our experience with the start-up of any complicated nuclear facility is that you never achieve design throughput initially.
Q. Sure.
A. And it only occurred over time and as problems are resolved. So our desire would be to take it as rapidly as we could, consistent with health and safety concerns, but our realistic expectations were that it was going to be at a much lower rate initially and only over time reaching its design capacity.
Q. Let me focus, then, on the 3,000 MTU per year rate that -- that here -- starts in the 6th year. Was that 3,000 MTU rate linked to a -- to a design

Page 173

concept?
MS. HERRMANN: Objection. Foundation. Speculation. Asked and answered.
THE WITNESS: I don't recall the specific number, but assuming, the way it's written here, it is accurate, but I'm assuming we -- we were specifying at that point in time that our acceptance rate -- our design basis would be 3,000 tons per year. And that would by necessity have to assume certain things in terms of failed fuel, high-level waste from Defense purposes, and other things.
So it would be very difficult to translate that one number into a rate that utilities could ship to the repository.
Q. (By Mr. Shapiro) You referred to the -- you referred in your prior answer, I believe, to the expectation that DOE would take the spent fuel as fast as it reasonably could, given technical constraints, health and safety, that sort of thing. And that experience showed that it takes a number of years to get up to the -- the full design capacity. What -- what experience are you referring to?
A. Historical experience in the operation of nuclear

Page 174

facilities, which would go back to, for instance, the ability of the West Valley Nuclear Fuel Services reprocessing plant to receive and process fuel or our DOE nuclear facilities to get up to design capacity.
Q. How much time are we talking about, rough order of magnitude, to get up to design capacity?
MS. HERRMANN: Objection. Vague. Speculation.
THE WITNESS: I'd say anywhere from three to five years would be a reasonably successful start-up period, but, you know, there are examples where it's taken far longer.
Q. (By Mr. Shapiro) Are there any examples where it's taken less time?
A. Not that I can think of.
Q. What examples do you have in mind that have taken far longer than five years?
A. The -- the Defense waste processing facility at Savannah River, which is supposed to process their Defense liquid waste and put it into glass logs, has been in operation close to ten years now and it still hasn't reached its design capacity, to the best of my knowledge.
Q. Mr. Lawrence, I want to now turn your attention to

Page 175

Page 35 of this study. Page 35 there is a Table 6-2. It says, "Comparison of Key Parameters." There seems to be, other than this report, two other studies that are referenced, one in 1978 and one in 1980. And I'm focusing on the receipt rate issue.
Each of these have different receipt rate assumptions with them. At least -- let me start with the 1978 study. It says, "Preliminary Estimates of the Charge for Spent-Fuel Storage and Disposal Services."
Do you have any recollection of that report?
A. I don't recall that specific report.
Q. Would that report have been prepared by the office that -- where you were director of storage and transportation back in that time frame?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: It would have been prepared by the office that I was in, the broad office, and that dealing with the spent fuel storage and transport part would have fallen under my area of responsibility. But it was 24 years ago, and I don't remember it.
Q. (By Mr. Shapiro) The -- the number on that

Page 176

report, by the way, it's -- it begins DOE/ET.
A. Energy Technology.
Q. That was the broader office that you were part of?
A. Well, yeah. It would have been under -- they were one of the -- it was Assistant Secretary for Energy Technology that would have fallen into that.
Q. Do you have any recollection whether that receipt rate referenced for that 1978 study, 1800 metric tons for the first five years and then 5,000 metric tons per year afterward, any recollection of how that was derived?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: I would speculate that it was based upon looking at the needs and requirements at that particular point in time, but also recognizing we had no authority or responsibility to take it at that point in time.
Q. (By Mr. Shapiro) Am I understanding correctly, that you think that -- speculating, that the rates in the 1978 report might have reflected needs of utilities at that time as compared with, let's say, the 1983 report, which is more focused on the then-current design plans for repository?

Page 177

MS. HERRMANN: Objection. Foundation. Speculation. Mischaracterization of the prior testimony. Assumes facts not in evidence.
THE WITNESS: In 1978, we were still involved with anticipate -- continuing growth of nuclear power and anticipated shutdown of commercial plants if additional storage capacity was not provided. So it was probably -- and I'm speculating -- looking to see how you could prevent that. But I have also testified that we found that every time we did this, you wait a year and the picture didn't get worse, it actually got a little better. So... (Pause.)
Q. (By Mr. Shapiro) Then the 1980 report, the one titled "Report on Fee for Spent Nuclear Fuel Storage and Disposal Services," do you have any recollection of that report?
A. Not specifically.
Q. Would that report have been prepared in the office that you were in at that time, in 1980?
A. Yes.
Q. And the number for that report starts DOE/SR. Do you recall what the SR would have stood for?
A. I would guess that it stood for Savannah River.
Q. Would you have had any role in developing that

overview proposal that starts on the next page?
Do you recall that overview proposal?
A. No, I don't.
Q. Let me stick to the first page for just a moment, to the -- to the distribution list, to see if I can understand who the various players are.
The distribution list on that starts with Bob Morgan and then yourself.
A. Uh-huh. (Witness answers affirmatively.)
Q. Is that list of names, is that consistent with your recollection of who would have been involved in the preparation of the Mission Plan?
A. I -- I would not characterize it necessarily involved in the preparation. These were key program and policy people who would -- you know, are responsible for aspects of the implementation of the Act and so they would have been involved in certainly reviewing this document and making sure it made sense and having a hand in preparing the Mission Plan.
Q. The name one up from the bottom, Keith Klein, do you recall what his role was?
A. Keith was -- was working on the geologic repository group under Bill Bennett, was my recollection.



Q. Let me turn your attention to a couple of concepts on the next page of the Exhibit 10. It's the Overview Proposal. It refers to the central focus of the program is that DOE will begin accepting spent fuel in significant quantities in 1998.
Do you have any recollection of that statement?
A. No, I don't recall any of the specifics of this document.
Q. Do you have any idea what would have been meant by the term "significant quantities"?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: Well, in -- in reality, I would -- I would say it -- it is -- it is a clear indication that we weren't talking about just accepting one spent fuel element for disposal, but that we did intend to accept as much as we'd reasonably and safely could leading up to eventually reaching capacity, the design capacity.
Q. (By Mr. Shapiro) And there are four dashes under that -- that central focus. The third one says that "The lack of existence of particular type facilities will not delay or postpone the acceptance of spent fuel."



Do you recall that concept?
A. No, I can't say that I do.
Q. What about the next dashed concept, that "This posture is designed to ensure that all utilities will have firm planning schedules for the disposition of their nuclear wastes sufficiently early to determine their on-site interim storage needs during the 1990s"?
Do you recall that concept?
A. I think this is in keeping with what I said earlier, that we wanted to be transparent and work with the utilities and give them as much information when we could. The time frame stated in this -- in here, by the 1990s, during the 1990s, we would have selected a repository -- the repository site for the first repository. Basically either we would be in the final licensing process or close to it and we would have a design. So we could start working with the utilities in the '90s had we been able to maintain the schedules envisioned at this particular point in time.
Q. Do you have any understanding of what the connection would be between not letting the lack of existence of a particular type of facility have



with enabling utilities to have a firm planning schedule for the disposition of their spent fuel?
MS. HERRMANN: Objection. Foundation. Speculation. Assumes facts not in evidence.
THE WITNESS: We had always envisioned a concept where once the repository was under -- was approved and was either under construction or to be constructed, that you would need a receipt in handling capacity or a buffer storage, as referred to here, to -- between the time the fuel actually comes in and the time it goes down the shaft into the repository. So if there were some delay in some subsequent handling capability, you could still begin accepting in the buffer storage facility, but that buffer storage facility was tied to the geologic repository.
Q. (By Mr. Shapiro) Would the buffer storage facility be something at the repository itself or -- or something apart from that?
A. It would --
MS. HERRMANN: Objection. Speculation.
THE WITNESS: It was always envisioned that it would be at the repository site so you wouldn't have to transport things twice.
Q. (By Mr. Shapiro) During earlier parts of today,