Page 198

remove from at-reactor storage all waste that is more than five years old.
A. Uh-huh. (Witness answers affirmatively.)
Q. Does the fact that this concept is in the December 20th draft, does that refresh your recollection at all as to the significance of that concept?
MS. HERRMANN: Objection. Vague. Speculation.
THE WITNESS: I have to admit, I doubt if there is something that could refresh my memory from something this long ago. But certainly the concept described here is consistent with my recollection of how we were trying to implement the Act so as to preclude unnecessary additional storage and unnecessary additional expense.
Q. (By Mr. Shapiro) Again, this time pointing your attention to Page 2-1, two more pages into the document. The second paragraph there says that "The Department does not intend to delay or postpone the acceptance of civilian radioactive wastes even if a permanent geologic repository is not completed by 1998."
Do you recall that intent?
MS. HERRMANN: Objection. Foundation.
THE WITNESS: I -- I did not recall this

Page 199

provision or this portion of the -- of the strategy. Even though I would say it's consistent with my understanding of what we were trying to -- or hopeful of doing. But even as it states here, that was -- probably went beyond the original Nuclear Waste Policy Act and called for additional Congressional approval to make it possible.
Q. (By Mr. Shapiro) You needed additional Congressional approval because you might need some additional facilities?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: Some of the things we were proposing, we did not have the legislative authority to do.
(Recess 4:34 - 4:54 p.m.)

(Exhibit No. 12 marked for identification.)

EXAMINATION (Continuing)
BY MR. SHAPIRO:
Q. Mr. Lawrence, you were just handed what we've marked as Lawrence Exhibit 12. It's titled "Proceedings of the 1983 Civilian Radioactive

Page 200

Waste Management Information Meeting, December 1983." The document is dated February of '84.
Do you recall this meeting at all?
A. No, I wasn't there.
Q. Do you recall Mr. -- helping Mr. Morgan prepare for this meeting?
A. No, I don't.
Q. Let me turn your attention to the second page of this exhibit. It says, at the bottom, actually, 12. It's -- last three numbers, Bates No. 600. And the second paragraph that starts on that page says, "We are concerned with the schedule on the repository is extremely optimistic for getting to 1998."
Do you recall that concern?
A. Yes.
Q. Is that consistent with your recollection? Were you concerned that having a repository operational by 1998 was extremely optimistic?
A. I -- I've previously stated that it required a number of things to occur and the possibility that any or all of those could be delayed would jeopardize the date. So I mean, this is consistent with what I've said.
Q. I know there were things that would jeopardize the

Page 201

repository happening, but do you think it was likely that the repository would be operational by 1998 or did you think that was extremely optimistic thinking?
MS. HERRMANN: Asked and answered several times.
THE WITNESS: The '98 date was doable.
(Exhibit No. 13 marked for identification.)

Q. (By Mr. Shapiro) Mr. Lawrence, we've handed you what we've had marked as Lawrence Exhibit 13, which is titled "Statement of Michael Lawrence, Accounting Director, RW." It's dated February 22, 1984.
Do you recall this statement?
A. I remember a number of Congressional hearings, not necessarily this specific one.
Q. Is it fair to say that this document represents your written testimony to the committee?
A. Yeah.
Q. I want to turn your attention, Mr. Lawrence, to the -- I guess it's the third page of the document, although it says 2 at the top. The last three numbers are the Bates No. 228. The last



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Page 202

paragraph on that page says, "By achieving this fundamental objective and implementing an appropriate waste acceptance schedule, this will initially preclude the need for additional at-reactor storage by nuclear utilities after January 31, 1998."
Is it fair, then, to say that as of February 22, '84, the plan was still to accept spent fuel at a rate that would preclude the need for additional at-reactor storage after January 31, 1998?
A. Assuming we had a repository in place by January 31, 1998.
Q. And that was also part of the plan, to have a repository operational by 1998?
A. Well, the statement you're referring to says, by achieving this fundamental objective, which was beginning to accept it no later than January 31, 1998. So I was just linking those two thoughts. You can't decouple them.
Q. I think you just referred to having a repository operating by 1998 and I don't quite see that in this statement.
A. I'm sorry. You're right. It says we're beginning to accept high-level radioactive waste for safe

Page 203

management, storage, and permanent disposal on firm schedule, beginning not later than January 31, 1998.
Q. So as of February of '84, taking this spent fuel as of 1998 to -- fast enough to preclude the need for at-reactor storage was not necessarily linked to having a repository operating.
MS. HERRMANN: Objection to the extent it mischaracterizes his testimony.
THE WITNESS: I believe, but I would need to go look at the Act, that there were certain things that had to occur before you could start shipping and accepting waste. Although I don't recall exactly, I think it might have been things like you had a license to construct the repository. You had selected the site. A number of things had been approved.
So this statement here, in quotes, would -- I think has a number of other activities that have gone on before it that would have had to have occurred.
It then says, By achieving this objective, meaning all those predecessor events would have occurred, it says, "this will initially preclude the need for additional at-reactor storage" and

Page 204

"ultimately remove all eligible waste." That -- that to me indicates some uncertainty of whether or not it would always preclude the need for additional storage.
Q. (By Mr. Shapiro) Turn your attention, Mr. Lawrence, to Page 13 of this -- of this statement. The third paragraph says that when finalized in mid 1984, the Mission Plan will be submitted to Congress. I'll represent to that you the Mission Plan was not finalized until midyear 1985. Do you recall what caused the delay in -- in finalizing the Mission Plan?
A. No, I don't. All I -- I -- I believe -- and I'm sure you can check this -- that we issued the draft -- well, I've been saying the Draft Mission Plan in May, but sometime while I was the director of the Office, which would have been between January and July.
Q. Well, I'll represent to you that it was -- it was dated April of '84.
A. Okay.
Q. And there is a --
A. So I mean --
Q. -- there is a transmittal from you dated May 2nd of '84, so you're right on.

Page 205

A. Okay. Okay. Yeah, I left the program to come out here in the end of June 1984, so I -- and I really don't have any recollection or experience with what caused the delay in getting it out.
(Exhibit No. 14 marked for identification.)

Q. (By Mr. Shapiro) Mr. Lawrence, you've been handed what has been marked as Lawrence Exhibit 14, which is a memorandum on Battelle letterhead dated April 26, 1984, and subject line is MRS Institutional Report.
I want to turn your attention, first, to the third page of the document. The paragraph in the middle of the page under subject "Domenici Asks DOE to Address Environmentalists' Demands." It says, "Michael Lawrence, acting director of the waste program, said that he had discussed the same points raised by Domenici in an interview with Berick but Lawrence still says DOE believes that the 'key thing to maintain is the 1998 date as a commitment.'" That "even if full-scale operation cannot be achieved by 1998, some initial capacity could be available to receive spent fuel."
Do you recall that statement?

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY, )
et al., )
)
Plaintiffs, )
vs. ) No. 98-126C
UNITED STATES, )
Defendant. )

DEPOSITION OF MICHAEL J. LAWRENCE, VOLUME II

May 21, 2002
Richland, Washington

Page 252

version of the standard contract set forth in Exhibit 7?

MS. HERRMANN: Objection. Foundation. Speculation. Standard contract is the best evidence of its contents and speaks for itself.

THE WITNESS: I'd have to read the contract to find out what the contract says. As I read this comment, however, I can understand why the utility would feel that way. But I also believe -- my belief now and I believe it would have been then, that we would not have been able to accommodate that contract, because it says to take title to the fuel as expeditiously as practicable upon request of the generator or owner. And my belief is that the Nuclear Waste Policy Act, which we were operating to fulfill, said we'd take title to it once we had an operating repository.

Q. (By Mr. Macdonald) If you would look at Exhibit 7, Page 16600, the second "whereas" clause --

A. Uh-huh. (Witness answers affirmatively.)

Q. -- we just looked at, states that DOE has the responsibility to take title to the spent nuclear fuel as expeditiously as practicable upon the request of the generator or owner of such waste or

Page 253

spent nuclear fuel, correct?

A. Uh-huh. (Witness answers affirmatively.)

Q. Is that not the same language set forth in Exhibit 18, as requested by Alabama Power?

MS. HERRMANN: Objection. Both documents are the best evidence of their contents and speak for themselves.

THE WITNESS: No, I don't believe that accurately reflects what's in document 18, because it's -- it's preceded document -- item -- Exhibit 7, says, "following commencement of the operation of a repository to take title to the spent fuel." That provision -- that comment is not included in Alabama's comment.

Q. (By Mr. Macdonald) I believe you testified yesterday that it was DOE's intent, expectation, that a repository be operational by January 31, 1998. Is that correct?

A. That's correct.

Q. And in fact, if you would look at Lawrence Exhibit 2, the February 4, 1983, published version of the draft standard contract, if you will look at second page of Exhibit 2, the third --

A. What page is that?

Q. That's page 5458. I know the print is a little

Page 254

bit hard to read, but if you would look at the third column, about middle of the page, the last paragraph -- the last sentence of the paragraph that begins, "The proposed standard contract would establish." The last sentence of that paragraph states, "the Act directs DOE to begin repository operations no later than January 31, 1998."

A. Uh-huh. (Witness answers affirmatively.)

Q. Do you see where I'm reading?

A. Yes.

Q. Do you agree with that statement that the Act directs DOE to begin repository operations no later than January 31st, 1998?

MS. HERRMANN: Objection. Calls for a legal conclusion.

THE WITNESS: That is one of many things that the Act directs the DOE to do, but it also directed it to get approvals and -- and a number of other actions, prior to that occurring, which could make that impossible to do.

Q. (By Mr. Macdonald) I understand it could be impossible --

A. Yeah.

Q. -- for a variety of reasons. But you would --

A. Otherwise, it does direct the Department to do

Page 255

so -- to have a repository in operation by January 31st, 1998.

Q. And based on what we just discussed in Exhibit 7, final version of the standard contract, DOE also obligated itself to take fuel as expeditiously as practicable once that repository was operational, correct?

MS. HERRMANN: Objection. Foundation. Calls for a legal conclusion. The document speaks for itself. Asked and answered.

THE WITNESS: I think the "whereas" clause we're referring to is fairly clear in what it says. Including the phrase "as expeditiously as practicable," which implies a number of considerations.

Q. (By Mr. Macdonald) I appreciate that "as expeditiously as practicable" means -- could mean a variety of things. But you would agree that, as we just discussed in Lawrence Exhibit 2, the Act directed DOE to begin repository operations by January 31st, 1998. And as set forth in Exhibit 7, DOE also is obligated take fuel as expeditiously as practicable once that repository was operating, correct?

MS. HERRMANN: Objection. Calls for a

Page 256

legal conclusion. Now it's compound. Asked and answered.
THE WITNESS: To the extent that you just quoted two statements from two documents that -- they appear to be, you know, what the documents say. But the documents themselves are -- you know, clearly state those positions.
I -- I -- I'm just -- I'm wondering how we go from a draft document to a final document. I would think that the only applicable document is the final, which is Exhibit 7.
Q. (By Mr. Macdonald) What do you understand "as expeditiously as practicable" to mean?
MS. HERRMANN: Objection. Foundation. Speculation. Calls for a legal conclusion.
THE WITNESS: That the Department would not unduly restrict or delay receipt and transfer of fuel; that it would -- if it had the ability to do so, it would begin accepting waste according to the priorities and the -- the acceptance criteria that was to be laid out, and would do so once it knew just what its capabilities, in terms of receipt, were.
Q. (By Mr. Macdonald) When you say, "it would not unduly delay receipt and transfer of fuel," do you

Page 257

mean -- I guess, what do you mean? Where there would be no technical barriers to the receipt of fuel?
MS. HERRMANN: Objection to the extent it mischaracterizes his testimony.
THE WITNESS: Would you repeat the question.
Q. (By Mr. Macdonald) You testified a minute ago that you understood "as expeditiously as practicable" to mean that the Department would not unduly restrict or delay receipt and transfer of fuel. Do you recall that testimony?
A. Yes.
Q. I'm just trying to understand what you mean by the Department would not unduly restrict or delay receipt and transfer of fuel.
A. As an example, if a fuel shipment was very low on the priority list and there were higher priority shipments out there, that would -- that would classify as higher priority shipments would be out there, but for whatever reason they weren't going to be shipped, then the government would move to -- to -- to go down on the priority list and take fuel earlier.
Q. Was it DOE's intention to accept fuel once the

Page 258

repository was up and running at its design rate?
MS. HERRMANN: Objection. Foundation. Calls for a legal conclusion. Asked and answered.
THE WITNESS: I've already testified that the design rate was something we knew would not be achieved initially and it would take time to get to it. And no matter what the design rate was, it was always our -- our receipt would always be driven by our physical capability to safely receive and -- and process the waste.
Q. (By Mr. Macdonald) I understand you testified about a reasonable ramp-up period that you characterized, if I remember from yesterday, around three to five years. Is that correct?
A. That was -- that was an estimate that we used for planning purposes only. But that was used.
Q. Did you believe that a three- to five-year ramp-up was a reasonable ramp-up period?
MS. HERRMANN: Objection. Foundation. Speculation. Asked and answered repeatedly yesterday.
THE WITNESS: Based upon technical judgment some 15 years ahead of the fact, it appeared at that time a three- to five-year ramp-up was a reasonable amount of -- rate of

Page 259

time.
Q. (By Mr. Macdonald) Did you understand DOE to have an unconditional obligation to begin accepting spent fuel on January 31st, 1998?
MS. HERRMANN: Objection. Calls for a legal conclusion. Vague.
THE WITNESS: As I understand the question, absolutely not.
Q. (By Mr. Macdonald) And why do you say that?
MS. HERRMANN: Same objections.
THE WITNESS: Because I felt the Department could only receive the waste once we had a repository licensed and in operation.
Q. (By Mr. Macdonald) So in your view, until DOE had a repository licensed and in operation, it had no obligation to accept spent fuel?
MS. HERRMANN: Objection. Calls for speculation.
THE WITNESS: It was my belief that the contract which we signed did commit the government to begin accepting title to the fuel and take responsibility -- begin taking title to the fuel by January 31st, 1998. But we did not know then at what rate that could be or what that would ultimately entail.

Page 260

Q. (By Mr. Macdonald) When you say "begin accepting title to the fuel," are you positing that that would have been done possibly at the reactor site?
MS. HERRMANN: Objection. Speculation. Asked and answered yesterday.
THE WITNESS: That was a possibility.
Q. (By Mr. Macdonald) And you felt that was a possibility consistent with the Nuclear Waste Policy Act and the standard contract?
MS. HERRMANN: Same objections. And now it calls for a legal conclusion.
THE WITNESS: I would have to state I believe the contract has to speak for itself. My personal views and opinion don't alter anything in the contract. I did believe then and now that when we entered into these contracts, we were committing to have a capability or take responsibility by '98. But I also was concerned then, as I am now, that we could not and did not make any commitment as to the rate at which we would be able to begin taking responsibility and ownership of the fuel.
Q. (By Mr. Macdonald) I'm not sure that answers exactly the question I asked. And I'll rephrase it because I'm not sure you liked the question,

Page 261

but I'll --
With respect to the standard contract, did you believe that taking title of the spent fuel at the reactor site was consistent with the Nuclear Waste Policy Act?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: No, I don't believe that was consistent with the intent of the Nuclear Waste Policy Act. The intent of the Nuclear Waste Policy Act, in my opinion, was for us to have a repository in operation by January 31st, 1998. And all of the other provisions of the Act and subsequently the contract were based upon that premise.
MR. MACDONALD: Take a five-minute break?
MS. HERRMANN: Sure.
(Recess 10:27 - 10:35 a.m.)
(Exhibit No. 19 marked for identification.)

EXAMINATION (Continuing)
BY MR. MACDONALD:
Q. Mr. Lawrence, I've had marked for identification

Page 262

as Exhibit 19 a draft memorandum to Michael J. Lawrence and it is from Robert M. Rosselli, and the subject is "Use of Reference Case Assumptions as the Technical/Costing Baseline for OCRWM's Program." Is that document before you?
A. Yes.
Q. I appreciate that this is a draft document. And if you turn to Page 4, 5, and 6 you'll see some handwritten notations. And at the top it states, "Rosselli Comments, Version 2 of 24 February '84." And in parentheses, "(Editorially revised by Head)."
Do you see that --
A. Uh-huh. (Witness answers affirmatively.)
Q. -- notation?
A. Uh-huh. (Witness answers affirmatively.)
Q. Do you know if those are Robert Rosselli's handwritten comments?
A. Umm, I can't -- I can't say whether those are Bob's or not. I get the impression they're Charlie Head's, but that would just be a guess on my part.
Q. What gives you that impression?
A. Well, for one thing it says, "Editorially revised by Head." And I am going to speculate that

Page 263

whoever did that made the -- was Head and made these comments.
Q. Did Charlie Head work for Bob Rosselli?
A. Yes, he did.
Q. As of February of 1984, did Bob Rosselli work for you?
A. Yes, he did.
Q. Do you recall whether you've ever seen Exhibit 19 before?
A. I can't say that I do recall having seen this before.
Q. Having now looked at the document, do you understand what purpose Exhibit 19 was intended to serve?
MS. HERRMANN: Objection. Foundation. Speculation.
Take as much time as you need to read the document.
THE WITNESS: (Examination of documents.)
My reading of the document would lead me to believe that it was to provide assumptions for -- that were then used in what ultimately resulted in Exhibit 17, "Nuclear Waste Fund Fee Adequacy: An Assessment. Second Annual Report."

Q. (By Mr. Macdonald) So you believe that Exhibit 19 was an effort to set forth the baseline assumptions that would govern the July 1984 fee adequacy assessment?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: Exhibit 19 states that OCRWM is obligated to produce a Congressionally mandated fee adequacy report by July 7, 1984. And so consequently, this paper does appear to be establishing the baseline for that report or seeking approval of assumptions used in preparing that baseline report.
Q. (By Mr. Macdonald) Is it consistent, based on your experience in RW, that before a report like Exhibit 17, the 1984 fee adequacy assessment, was distributed, that a set of assumptions would be circulated to you as acting director?
MS. HERRMANN: Objection. Vague.
THE WITNESS: It would be -- I would expect that the assumptions used in that report would have been presented to me in some form, either verbally or in written memo, for my agreement prior to proceeding with all of the effort necessary to produce that report.



Q. (By Mr. Macdonald) And before they -- before the assumptions for the report like the July '84 fee adequacy assessment were publicly distributed, you would have agreed or signed off on those assumptions?
MS. HERRMANN: Objection. Speculation.
THE WITNESS: I would have felt that in a general sense, they were -- the assumptions were adequate for the purpose of the fee adequacy report.
Q. (By Mr. Macdonald) So the record is clear, the Bates numbers on Exhibit 19 are MOV.19990831.0061.
MS. HERRMANN: So the record is more clear, I don't think the official exhibit or my copy have a Bates number.
MR. MACDONALD: It's at the top center of the document.
MS. HERRMANN: Thank you.
MR. MACDONALD: And I believe that Bates notation is only on the first page, which is how the document was produced to us.
Q. (By Mr. Macdonald) If you would turn to Page 2 of Exhibit 19, Mr. Lawrence.
A. (Witness complies.)
Q. The first sentence states that "These proposed



reference case assumptions have been reviewed by all of the OCRWM offices and each concurs that these assumptions accurately represent the current program baseline."
Do you see where I'm reading?
A. Yes.
Q. Just a moment ago you testified that the assumptions would be adequate for the purpose of the fee adequacy report. Do you remember that?
A. I believe I prefaced that by saying "in general."
Q. Does this suggest that the assumptions would represent the current program baseline?
MS. HERRMANN: Objection. Foundation. Speculation. The document speaks for itself.
THE WITNESS: I really can't answer that because this is a draft memo that never -- at least -- I don't know what the final version said. And it's -- without some indication of concurrence from the other, that might be what they're saying here, but it may not actually represent the facts. So I -- I have no way of -- of assessing that.
Q. (By Mr. Macdonald) Do you understand or have any reason to believe that the assumptions that ultimately went into Exhibit 17 were not the current program baseline as of the date of



publication of the fee adequacy report, July of 1984?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: In looking at Exhibit 17, I see at least one thing which would lead me to believe it was -- numbers used there as assumptions were not the programmatic baseline, but may have been used for economic analysis purposes.
Q. (By Mr. Macdonald) And what numbers suggest that to you? What aspect of Exhibit 17, the assumptions -- and for the record, we're looking at Page 3 of Exhibit 17.
A. In particular, and as I testified yesterday, the receipt rates stated in that document. Assuming 1,800 metric tons yearly for the first five years, I do not believe represent an accurate or a practical ramp-up of receipt rates. But also, as I testified yesterday, my assumption or speculation was, is that they were -- these numbers were used here to be the same as numbers used in a previous economic analysis and would be sufficient for the purpose of this document, which was just to assess the adequacy of the fee.

Page 292

A. Uh-huh. (Witness answers affirmatively.)
Q. It then states, "In the event of a delay in the availability of the repository, the Department plans to provide the capability to accept waste at the reactor site in accordance with the waste acceptance schedule so that utilities will not be required to continue adding additional storage capacity beyond 1998."
A. Yes.
Q. Do you see that?
A. Uh-huh. (Witness answers affirmatively.)
Q. And I know we've just been talking about this concept, but, again, there's no suggestion here that DOE believed this was unauthorized, is there?
MS. HERRMANN: Objection. The document speaks for itself. Compound.
THE WITNESS: You know, I don't want to get into semantics, but it does say "plans to provide" instead of "the Department will provide." And that does indicate some ambiguity on my part -- on the part of this document as to what would occur. Because as I've previously testified, and I remain thinking, I do not believe we had the authority to do that.
Q. (By Mr. Macdonald) If DOE didn't have a

Page 293

repository available in 1998, were there any options available to DOE absent Congressional action to deal with the storage problem?
MS. HERRMANN: Objection. Vague. Calls for a legal conclusion.
THE WITNESS: It's my opinion that at that point in time, there was no option to it.
Q. (By Mr. Macdonald) DOE had no other options except the repository absent Congressional action?
MS. HERRMANN: Calls for a legal conclusion. Asked and answered.
THE WITNESS: That's my recollection and understanding.
(Exhibit No. 21 marked for identification.)
Q. (By Mr. Macdonald) Mr. Lawrence, I've had marked as Exhibit 21 excerpts from Volume II of the 1984 Mission Plan. I believe we already have marked as another exhibit, Exhibit 15, excerpts from Volume I of the Mission Plan.
Do you have that document before you?
A. Yes, I do.
Q. And again, this was the document that you were responsible for issuing when you were acting

Page 294

director, correct?
A. That's correct.
Q. And if you would turn to Table 9.2. It's on Page 9.5.
A. (Witness complies.)
Q. This table contains a waste acceptance schedule that we've discussed previously; is that correct?
A. That's correct.
Q. And that waste acceptance schedule shows a ramp-up beginning in 1998 of 400, 400, 400, 900, 1,800, 3,000; is that correct?
A. That's correct.
Q. I believe yesterday you testified that you reviewed the Draft Mission Plan to ensure that it was reasonable, practicable, and doable. Do you recall that testimony?
A. In general I recall that testimony. But I also recall saying for a planning document.
Q. But for a planning document, you believed that the rates contained in here were reasonable, practicable, and doable at the time as of --
A. At that time --
Q. -- April of 1984?
A. At that particular point in time. But also as I testified yesterday, in terms of acceptance rate,

Page 295

we would really not be able to firm that up until we had designs and more information in place and anticipated that would be -- and I believe the contract indicated -- that would be something that would be done later in the process.
Q. Do you know if the design rate for the repository -- the design receipt rate after ramp-up is still 3,000 MTU?
MS. HERRMANN: Objection. Foundation. Mr. Lawrence is not a 30(b)(6) witness.
THE WITNESS: Yeah, I have no idea what the current assumptions are.
Q. (By Mr. Macdonald) If you would turn to Page 9.6 of Exhibit 21.
A. (Witness complies.)
Q. And Paragraph 9.4 is entitled "Waste-Acceptance Schedule and the Need for Interim Storage. And it states that "Waste acceptance at the first repository is scheduled to start in 1998. The waste-acceptance schedule for the first and the second repositories is given in Table 9.2."
And you recall that was the acceptance rate and Table 9.2 is what we just discussed?
A. Uh-huh. (Witness answers affirmatively.)
Q. The statement continues, "The at-reactor storage

Page 308

Q. Now, a utility who was looking into the future and seeing what their storage needs were, they would need some sort of lead time to be able to plan to add additional storage if it was anticipated that pickup would begin at a lower rate or wouldn't begin at all in 1998?
A. That's correct.
Q. Do you know how long that lead time would be for a utility if they wanted to add additional dry storage on their site, for example?
MS. HERRMANN: Objection. Speculation.
THE WITNESS: It's difficult to say with any accuracy what that would be, because it would require licensing actions and -- and other activities. But this -- in general, we knew we wouldn't be in a position to give them more information until sometime in the '90s, assuming a '98 opening, and that they would have to plan accordingly prior to that time. And even once we did give them that information, they needed to plan accordingly.
Q. (By Mr. Tompkins) So the utility could be in a position where they should plan for additional at-reactor storage that they never build?
A. Yes.

Page 309

Q. Was this ever communicated to the utilities?
A. I don't have a specific recollection, but I know that we felt and I -- and I believe communicated, but I have no specific recollection, that, you know, the utilities were responsible for the fuel up until the time we took title to it and they had to plan accordingly and provide sufficient storage to -- for the continued operation of their reactors.
Q. The utilities and the Department, however, were aware of a date that -- 1998 that was set in the Nuclear Waste Policy Act?
MS. HERRMANN: Objection. Speculation.
THE WITNESS: I assume. We certainly were aware of the date set in the Act, but a date set in the Act did not mean that the physical, you know, repository would in fact be in place by then. That was our intent and that was our plan. Everyone in this business knows that plans can often change.
Q. (By Mr. Tompkins) In that case, what was the intent of putting a date in the statute? I mean, was -- was it your view or the Department that in passing the Nuclear Waste Policy Act in 1982, Congress, at the very least, put the Federal

Page 310

Government in a position where a policy was disposal would begin in 1998?
MS. HERRMANN: Objection. Foundation. Speculation. Calls for a legal conclusion.
THE WITNESS: The date in the Act was clearly a date that Congress wanted the Department of Energy to meet. But the Congress also put a number of provisions and activities and precursor events that had to occur, I assume with full recognition that if those dates weren't met, that it would make it difficult to meet the '98 date. But they were all prerequisites.
Q. (By Mr. Tompkins) I'd like to go back to Lawrence Exhibit 13. Back on Page 2 again, which is Bates No. PNL-173-0228, I believe you previously testified this quote here in the middle of this page was something that came from the Nuclear Waste Policy Act.
A. That's my assumption.
Q. What is your interpretation of what a "firm schedule" means, as -- as it appears in this quote?
MS. HERRMANN: Objection. Foundation. Speculation. Calls for a legal conclusion.
THE WITNESS: I can't say for certain

Page 311

what Congress meant when they wrote "firm schedule," but in our reading of that, we wanted to lay out a schedule which was expeditious but doable; that we had every intent when we wrote the schedule or the plan of being able to meet.
Q. (By Mr. Tompkins) I'd like to call your attention back to Lawrence Exhibit 15, which is the April 1984 Draft Mission Plan, Volume I.
A. Uh-huh. (Witness answers affirmatively.)
Q. Back on Page 2-1, we already talked about the first paragraph quite a bit. The first sentence in the second paragraph states that "This approach is designed to ensure that all of the owners and generators of spent nuclear fuel and high-level wastes will be able to establish firm planning schedules for the disposition of their radioactive wastes sufficiently early to determine their on-site interim storage needs."
The reference to "firm planning schedules" in this paragraph, would your interpretation be that -- that this is -- this is the same firm schedule that is being referred to in the excerpt that we just talked about of Lawrence Exhibit 13?
A. No, I would not.
Q. Why is that?

Page 312

A. Well, in the earlier case, the quote from the Nuclear Waste Policy Act was calling for a firm schedule for the siting and -- and licensing and construction and operation of a repository. And this is referring to a firm planning schedule for the actual actions of -- the utilities would have to take leading up until the time they could deliver it -- or it would be taken into custody for disposal.
Q. This statement in quotes on Lawrence Exhibit 1 however, does begin with the statement, "to accep high-level radioactive waste"?
A. But the subject of these two activities are different. In the one case, it's for the government to establish a schedule for a repository. And this is to allow the utilities to have a schedule for the management of their wast So even though the end date or objective is the same, the activities which those parties would have to take are different and therefore their plans would be different.
Q. What would be different about those activities?
A. Well, the activities that -- that the Office of Civilian Radioactive Management was to do was t have site -- site selection process and then, you

Page 313

know, go through what is actually occurring right now with nominating a site and the state vetoing it and overcoming the objections and then completing a design and submitting a license application.
All of those -- and leading up to then, construction, cold testing, hot testing, final license and then opening. Okay? Those are -- are some of but not all of the steps necessary in the plan that were to be laid out to have a repository in place by January -- by January 31st, 1998, and would be part of the firm plan -- planning schedule it referred to in the Nuclear Waste Policy Act.
In this document, the firm planning schedule for the disposition of their radioactive waste, referring to -- here the subject is the owners and generators of spent nuclear fuel and high-level waste -- the actions they would have to take are to ensure that they had adequate and sufficient interim storage capacity up until the time based upon their contract and their -- the waste acceptance -- or the waste delivery schedule established in the contract that they could expect the government to take the waste and transport it

Page 314

to a repository.
So they are two very different set of actions.
Q. You just referred to the waste delivery schedule that was established in the contract. Where -- where would a utility go to find this -- this information?
A. This may take a while.
MS. HERRMANN: I'm going to object that the standard contract is the best evidence of its contents.
THE WITNESS: (Examination of documents.) Well, at least in part, in the standard contract that's included in Exhibit 7, under Article V, Paragraph B, Delivery Commitment Schedule, it discusses a delivery commitment -- delivery commitment schedule and a process for submitting and approval of such schedule. And it is that delivery commitment schedule and -- and, ultimately, if the approved and agreed-to delivery commitment schedule, which would dictate what the utility had to do to provide for adequate storage up until the time it could ship fuel according to this schedule.
Q. (By Mr. Tompkins) I thought you testified

Page 315

yesterday that delivery commitment schedules in your opinion were for planning purposes and that even at this date, as specified in the contract, the Department was still not willing to commit to specific rates or allocations of -- of fuel acceptance.
MS. HERRMANN: Objection to the extent it mischaracterizes his testimony.
THE WITNESS: Yeah, what I recall I said was we were certainly in no position in 1983 or '84 to commit to a schedule. But what I'm reading from here, in the contract, that talks about a process that will happen and it anticipates beginning on the order of 63 months after the time this is established.
The contract speaks for itself and clearly talks about a process in the future whereby a delivery commitment schedule would be established.
Q. (By Mr. Tompkins) Didn't you testify yesterday -- and I'm sorry, I don't have a copy of all of the exhibits, however, there was a draft contract yesterday that we discussed. And it actually had a definition of delivery commitment schedules. Do you recall that? I think it's Exhibit 1.
A. I think it's Exhibit 2. Standard contract --