Page 316

Exhibit 1 is EEI's unsolicited comments on the contract.
Q. Actually, I -- Exhibit 1 is a -- is a marked-up draft that EEI must have received and then made comments on. Is that -- is that correct?
A. I -- I don't know.
Q. Okay.
A. Is your comment reflected -- referred to Exhibit 1?
Q. Exhibit 1, yes, I believe so.
A. And would you repeat the question?
MS. HERRMANN: Off the record for a second.
(Off the record discussion.)
Q. (By Mr. Tompkins) I'd like to refer your attention to Page 4 of Exhibit 1, which is Bates No. SN048687.
A. Uh-huh. (Witness answers affirmatively.)
Q. Section B here states Schedule for Delivery Commitments. And we -- I believe with Mr. Shapiro yesterday you -- you discussed that the statement under B, 1, and the last section of this sentence, "if approved by DOE, shall become a part of this contract. Such delivery commitment shall

Page 317

specify."
Maybe I -- maybe I misheard, but my impression was yesterday you indicated that this was something that you did not want to do and in fact that was why this particular statement didn't make it into this final version of the final contract reflected in Exhibit 7.
MS. HERRMANN: Objection to the extent that it mischaracterizes his testimony. Foundation. Speculation.
THE WITNESS: I don't recall the specific context of the discussion nor the specific answer that I gave at that time. But I believe what I was -- what I was trying to convey was that we weren't in a position in 1983/'84, to commit to a specific delivery schedule; that that was something that would have to be done much later in -- in time, but prior to the opening of the repository. And consequently, a process needed to be described in the contract that would allow as more information became available and -- and we got closer to the actual transfer date, that the -- that the information could be -- could be conveyed and approved such it became a contractual commitment.

Page 318

Q. (By Mr. Tompkins) This particular section in this draft contract is not in the final version of the contract, though, is it?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: I'd have to go through the contract as -- as approved in the Federal Register to see what is and what is not in there. I don't know. However, I referred early to a provision in the contract which calls -- which describes a delivery commitment schedule, which seems to serve the purpose of establishing a delivery schedule, and have that schedule as part of the contract.
I also note that from the dates and time frames here, that it envisions that that delivery schedule could only be firmed up or become a reality and part of the contract on an order of a year to several years prior to the actual ability of the government to take -- to take the waste.
Q. (By Mr. Tompkins) I'll refer you to -- I'll refer you to Page 16601 of --
A. Of what?
Q. -- Lawrence Exhibit 7.
A. Okay. What page?
Q. 16601.

Page 319

A. Okay.
Q. In the middle column, beginning on part (b) Article -- Article V, Subpart (b)1.
A. Uh-huh. (Witness answers affirmatively.)
Q. This particular section here does not include the same language stating that the DCS shall become part of this contract; is that correct?
MS. HERRMANN: Objection. The document speaks for itself.
THE WITNESS: I mean, I just know what it says here in the actual contract which was approved.
Q. (By Mr. Tompkins) Right. Does it contain the statement in the approved version?
A. Could you repeat the question?
Q. Does this approved version contain this same language that -- that the DCS will become part of the contracts?
MS. HERRMANN: Objection. Document speaks for itself.
THE WITNESS: Well, Article V, Section (b) is part of the contract, as I -- as I understand it. So I -- as such, I think it's --
Q. (By Mr. Tompkins) I'm trying not to be too confusing, Mr. Lawrence. I'm sorry.

Page 324

Does this objective infer that an MRS facility was going to be a backup to a repository?
MS. HERRMANN: Objection. Asked and answered.
THE WITNESS: I think that that was at least one of the intents.
Q. (By Mr. Tompkins) So the primary focus of the Act was to dispose of waste in a repository and not an MRS?
MS. HERRMANN: Objection. Asked and answered. Calls for a legal conclusion.
THE WITNESS: I believe that the original intent was repository, yes.
MR. TOMPKINS: I'd like to take a short break. I'm expecting a document and I need to check to see if it's arrived.
(Recess 2:21 - 3:06 p.m.)

EXAMINATION (Continuing)
BY MR. TOMPKINS:
Q. I'd like to apologize for the delay, but technology was conspiring against us in addition to other things.
(Exhibit No. 22 marked for identification.)

Page 325

Q. (By Mr. Tompkins) I'm showing you, Mr. Lawrence, Exhibit No. 22.
Exhibit 22 is a document that we pulled off of RIS-Web. And I was just looking for a Bates number to put in the record; however, it doesn't look like there is one except for the number on the side, which is 90002 and then it's 2008.
Mr. Lawrence, is this a letter that you wrote?
A. (Examination of documents.) Although I don't recall -- recall this specific letter, that is my signature. The letter itself appears to have been written by a person with the initials RDH, and I don't recall who that was.
Q. This letter is dated July 23rd, 1984. Had you moved to Richland by this point?
A. I couldn't recall the exact date, but it's obvious that I was the manager on that date, because I signed it as such.
Q. Okay. Am I correct in interpreting the letter that they're commenting from the Richland office about the Draft Mission Plan that we had looked at previously, dated April 1984?
A. The third page here is entitled "RL Comments on the Draft Mission Plan Dated April 1984." And I

Page 326

assume that reflects the fact that these are RL's comments, or Richland Operations comments. And as stated here -- I guess that's enclosure one.
Q. What role would the Richland Operations Office have had in reviewing the -- the Draft Mission Plan?
A. The Mission Plan called for a process to select a repository site and also to provide for taking both commercial and Defense wastes into the repository. Richland would have had two primary areas of interest.
One, Richland was at that time under consideration for a geologic repository. So it would have been appropriate to comment on the site -- the siting and the site selection process.
Rockwell, who was our contractor at that time, was managing the program at Hanford, looking at the basalt under the Hanford site for a repository.
The other aspect, the second aspect that we would have been interested in, would have been the fact that Pacific Northwest Laboratory was responsible for tracking the spent fuel storage needs of the utilities and so, consequently, they would have -- or could have provided comments.

Page 327

And according to this letter, I assumed they and Rockwell did provide comments on. But NPL would have provided comments on the commercial spent fuel storage needs.
Q. On the first page of this letter, it states, "The most significant comments, some of which are discussed in detail" below "are as follows:" Number one, it states, "It should be noted that to eliminate the need for additional at-reactor storage after January 31, 1998, the initial waste acceptance rate for 1998 should be about 2,800 MTU plus some amount up to 630 MTU, depending upon the extent Federal Interim Storage is utilized."
Do you know if this 2,800 MTU plus some amount is sufficient -- is sufficient to eliminate the need for additional at-reactor storage?
Perhaps more precisely, do you have any reason to doubt the adequacy of this forecast?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: If I -- you know, I signed this letter, so I -- I know no reason why to doubt that estimate.
Q. (By Mr. Tompkins) You said you didn't remember this specific letter. Would you have reviewed

this letter, though, before you signed it. I do see that it has your signature on it.
A. I certainly would have read the letter before signing it.
Q. And would you have agreed with its contents before signing it?
A. Based upon my knowledge at that time, I -- I would believe that whatever I put in this letter and signed would reflect my views or what I reasonably expected to be accurate.
Q. Now, this letter is addressed to Mr. Ben Rusche, a director. Was he the director at this point? You had left, obviously, and gone to Richland, but --
A. Yes, we've already established that he was the first director of the Office of Civilian Radioactive Waste Management, who was, you know approved by the Senate.
Q. Comment No. 2, the second sentence states, "If title to the fuel passes to the DOE on January 31, 1998, as implied in the DOE/utility disposal contracts, the financial responsibility for this post-1997 storage could rest with DOE. This cost has not yet been considered in the Nuclear Waste Fund Fee Adequacy Analysis."
Did this comment reflect your viewpoint at



this time?
MS. HERRMANN: Objection. Calls for a legal conclusion. Relevance. Speculation.
THE WITNESS: This -- reading this section -- or this comment No. 2, it states an implication, therefore not a -- a specific, but an implied or an implication of the contracts. And points out that these are costs that were not in the nuclear waste fund fee adequacy analysis that we, I think, have here as document, Exhibit 17.
Q. (By Mr. Tompkins) This Statement 2, however, does imply that someone at Richland was concerned that DOE would be responsible for storage after January 31, 1998 -- financially responsible?
MS. HERRMANN: Objection. Speculation. Calls for a legal conclusion.
THE WITNESS: It would indicate to me that someone raised the possibility that if the government was responsible for storage after 1998, that the costs would be significant and that cost had not yet been put into the fee adequacy analysis.
Q. (By Mr. Tompkins) Well, the statement specifically implied in the DOE/utility disposal contracts. That's on the top of Page 2.



A. Uh-huh. (Witness answers affirmatively.)
Q. So this is inferring that -- that DOE has responsibility for these costs under the standard contract?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: No, I would not characterize it the way you did.
Q. (By Mr. Tompkins) How would you characterize it
A. I would say if the DOE were to -- I think it means there's an uncertainty here. Because I cannot -- because I would assume all costs that we knew would be incurred would be put into the fee adequacy report. And so they're drawing attention to the fact that there is uncertainty or could be uncertainty about the costs for this additional storage, and therefore drawing attention to Mr. Rusche, that that is something that should be considered.
I'd go further. That my recollection is that although we knew that a goal -- or we established as a goal for the Department was to preclude the need for building additional at-reactor storage after we began accepting the waste, that was a goal which we couldn't guarantee and could not



commit to take the fuel such that that would not occur.
Now, one possible -- and I'm just speculating here -- but one possible explanation is, from the time I left and Mr. Rusche came on board, Mr. Rusche being a -- the -- a full -- fully appointed and approved director of the Office of Civilian Radioactive Waste Management, may have been stating services or capabilities that he now wanted to bring to the program that went beyond what was in our original -- what was in the Mission Plan in April of '84.
And I recall -- I'll call your attention to Exhibit 16, which states, basically he wanted to do something which was further -- or beyond wha I was talking about. So consequently, if subsequen to Mr. Rusche being confirmed and coming into position as director, he had contemplated the possibility of the government assuming a contractual responsibility for all fuel and storage post '98, it would seem reasonable to point out what the cost of that assumption or desire could be so that he could factor into -- that into his consideration.
But what it says here doesn't change what's

Page 332

in the Mission Plan, and it certainly doesn't change what's in the contract.
Q. But this statement specifically says, "as implied in the DOE/utility disposal contract." It doesn't -- it doesn't reference any -- any new policy imposed by Mr. Rusche.
MS. HERRMANN: Is that a question?
Q. (By Mr. Tompkins) Does it?
MS. HERRMANN: Objection. Speculation The document speaks for itself.
THE WITNESS: Well, I -- I -- I'm going to speculate that the use of the word "implied" is clear and that it doesn't say as "stated in the disposal contract" or "as required in the disposal contract." Implied means that it is something not clearly and specifically spelled out.
If I felt it was a contractual obligation, I do not believe I would have used the word "implied."
Q. (By Mr. Tompkins) And yet someone, either the person that wrote this letter for you or you at this time, recognized that that was the implication from the contract, even if it wasn't clearly stated?
MS. HERRMANN: Objection. Calls for a

Page 333

legal conclusion. Speculation.
THE WITNESS: I can't recall what -- what would have been going through my mind at this point in time.
Q. (By Mr. Tompkins) Moving to the first enclosure attachment to this letter, enclosure one, which at the top is titled "RL Comments on Draft Mission Plan."
Could you read, for now, just the -- the paragraph under Item No. 3.
A. (Witness complies.) Okay, I've read 3.
Q. Okay. We had talked briefly -- or actually at some length earlier about the -- the goal of precluding the need for additional at-reactor storage. In this first paragraph under No. 3, the third sentence, I believe, in states that "This would be consistent with the NWPA intent that no power reactor would require additional spent fuel storage after January 31, 1998."
Doesn't this statement imply that it was actually the intent and goal of the NWPA to preclude the need for -- the need for additional at-reactor storage and not just a goal of the Department?
MS. HERRMANN: Objection. Calls for a

Page 334

legal conclusion. Document speaks for itself.
THE WITNESS: I think the statement is rather clear. And I would specifically note the use of the word "intent" rather than "requirement."
Q. (By Mr. Tompkins) Well, certainly in trying to implement the NWPA, DOE was -- and RW was -- was charged with -- was implementing Congress's intent. Is that true?
MS. HERRMANN: Objection. Calls for a legal conclusion. Vague.
THE WITNESS: Clearly we were charged with carrying out the requirements of the law and, to the degree we possibly could, to meet the intent of the law, to the best we could discern it and the best we could do it.
Q. (By Mr. Tompkins) Well, the intent of the law is reflected in the requirements, is it not?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: Yes. And to the best of my knowledge, the Act does not say it is a requirement of this Act that facilities be provided such that no additional storage capacity is necessary. But I don't recall that specially.

Page 335

Q. (By Mr. Tompkins) But this intent, as reflected here in this document, conflicts with the requirements of the Act?
MR. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: I would have to reread the Act, but I believe this intent goes beyond the requirement of the Act.
Q. (By Mr. Tompkins) There is no provision in the Act, however, that the intent was not to preclude the additional -- was not to preclude the need for additional at-reactor storage?
MS. HERRMANN: Objection.
THE WITNESS: There are too many negatives in there. Could you repeat the questions?
Q. (By Mr. Tompkins) Sure. I'd be glad to.
There's -- there aren't any provisions in the Act which state that the purpose of the Act is not -- is -- I'm sorry. Yeah.
A. Yeah.
Q. This is getting a little out there.
The Act does not contain any provisions which state that the purpose of the Act is anything other than to preclude the need for additional

at-reactor storage?
MS. HERRMANN: Objection. Calls for a legal conclusion. Nuclear Waste Policy Act is the best evidence of its contents.
THE WITNESS: There's still too many negatives in your question for me to understand it. I would maybe try to offer some helpful -- it might be easier to say that there is no provision in the Act requiring the Department to ensure that additional storage space is not required by the utilities after 1998.
Q. (By Mr. Tompkins) Well, there's -- there's nothing in the Act that's -- that states that DOE's mission is anything other than to -- to preclude at-reactor storage?
MS. HERRMANN: Objection. Calls for a legal conclusion. Best evidence.
THE WITNESS: My recollection and understanding was that Congress in passing the Act wanted to ensure a system was in place to safely dispose of nuclear waste by 1998. It was also my understanding that many of these supporters of the Act felt that a benefit of doing so would be to preclude the need for additional and costly at-reactor storage to be provided. And therefore,



by having a repository in place by '98 and to begin accepting waste by '98, it was hoped that additional storage at reactors could be precluded.
In the Mission Plans, both drafts that we've looked -- talked about, it states that the Department sought to provide capability such that additional storage would not have to be provided. All of those, I think, are reflected in writing in the exhibits we've got here.
But having said that, I saw nothing in those documents that said it was a legal requirement of the Act that that be the case.
Q. (By Mr. Tompkins) This statement here, though, does link up that goal with the Act and the purpose of the Act.
A. It links it up with -- via the word "intent," which to me implies that it was something desirable but not a specific requirement.
My belief is I would have used the word "requirement" because it's a much stronger word and -- and something that -- certainly conveys much more of a commitment or an obligation than the word "intent."
Q. This paragraph goes on to discuss the appropriate acceptance rate to achieve that goal.



A. Uh-huh. (Witness answers affirmatively.)
Q. Again, it states that the acceptance rate should start at 2800 MTU per year and increase to 2500 MTU per year in six years rather than starting at 400 MTU per year and increasing to 3,000 MTU per year.
A. Uh-huh. (Witness answers affirmatively.)
Q. Are you aware of where these numbers would have been generated or how they would have been calculated?
MS. HERRMANN: Objection. Foundation and speculation.
THE WITNESS: I don't recall specifically, but that is the type of information that we relied upon PNL to provide. And consequently, since the '84 Mission Plan -- Draft Mission Plan had the acceptance rate, which we've previously discussed, at the buildup, this would have been drawing attention to the fact that what was in the Mission Plan, and the stated objectives in the Mission Plan, resulted in an -- in an inconsistency.
Q. (By Mr. Tompkins) It implies that the -- the ramp-up in the Mission Plan, which started at 400 MTUs, was insufficient to preclude more at-reactor



storage during the first five years.
MS. HERRMANN: Objection to the characterization of what's written in the document. The document speaks for itself.
THE WITNESS: This statement is commenting on a draft plan and saying that based upon the analysis that was conducted by individuals here, they felt that it was insufficient.
Q. (By Mr. Tompkins) The -- the second paragraph, first sentence, makes a reference to selective acceptance of spent fuel only from reactors having difficulty maintaining a full core reserve.
A. Uh-huh. (Witness answers affirmatively.)
Q. What is full core reserve?
A. Full core reserve is the amount of space that the utility needs available in its spent fuel storage basin to accommodate the capability to discharge all the fuel that is in the core of the reactor at any given time. It is considered a desirable but not essential capability. Its impact, if not available, is that a utility could have a protracted outage if it needed to remove the fuel from its reactor to do any repairs or work necessary. And it was therefore something that

Page 340

many utilities sought to have as somewhat of an insurance policy.
Q. We discussed earlier that RW would be inclined to grant priority to an operating reactor that had some sort of emergency that would preclude it from continuing to operate. Would maintaining full core reserve be this type of emergency that we were speaking about earlier?
MS. HERRMANN: Object to the mischaracterization of prior testimony.
THE WITNESS: No, I would not view that as being an emergency situation.
Having said that, my recollection -- and I'm not certain of this; I -- it's been too long. But I believe there might have been a situation, an isolated situation, or certainly a limited number of situations, where perhaps the -- the operating procedures of a reactor called for full core reserve capability or a requirement of operation costs. But in general, that was not the case, and therefore it would not constitute an emergency.
Q. (By Mr. Tompkins) Moving to the final paragraph. I'll give you a chance to read it first.
A. I have read it.
Q. Okay, you've read it.

Page 341

The second sentence here says, "Assuming DOE would be financially responsible for the additional spent fuel storage after 1997, as reflected in the 17 year excess in the 'remaining backlog' of Table II-1, something on the order of one billion 1983 dollars would be required for this additional interim storage at power reactor."
Do you know if this estimate back in 1983 was accurate?
MS. HERRMANN: Objection. Beyond the scope of this deposition. Objection. Calls for a legal conclusion. Objection. Speculation. Foundation.
THE WITNESS: Based upon the fact that that number is in an enclosure to a document that I signed and sent in, I have no reason to doubt that it was a reasonable estimate based upon the assumptions stated in the paragraph.
Q. (By Mr. Tompkins) Like the text of the letter that we looked at just a little while ago, this comment here also evidences someone's recognition that DOE could be financially responsible for additional storage required after 1997; is that correct?
MS. HERRMANN: Objection. Calls for a

Page 342

legal conclusion. Asked and answered.
THE WITNESS: Could you repeat the question?
Q. (By Mr. Tompkins) This statement evidences that someone at RW, or at the Richland Operations Office, was concerned about the cost of additional at-reactor storage at reactors after 1987, if -- if the '98 date wasn't -- wasn't met, and reflected DOE's potential responsibility for that -- for that amount.
MS. HERRMANN: Same objections and now it's compound.
THE WITNESS: That would not reflect my -- the way I would characterize that. I would -- I would say that this is drawing attention to a potential cost based upon certain assumptions. It is not stating anything in definite or absolute terms whatsoever.
Q. (By Mr. Tompkins) But your interpretation of this comment is reflected in the -- in the cover letter you sent along in -- in Comment No. 2. Again, I don't mean to go back to this again and again, but it says, the fuel passage -- "as implied in the DOE/utility disposal contracts."
MS. HERRMANN: Is that a question?

Page 343

Q. (By Mr. Tompkins) So RW was recognizing that this financial responsibility may -- may rest on DOE and not the utilities?
MS. HERRMANN: I'm just going to object because the two -- to the mischaracterization, because the two passages don't appear to have anything to do with each other.
But if you can, go ahead and answer.
THE WITNESS: I'm having some difficulty because what this document represents are comments provided by individuals and organizations, not part of RW commenting on a document that RW put out. And consequently, the people making these statements, including the fact that I signed it, are comments by people who clearly are looking at potential situations or possibilities, and drawing consequences or -- or results from those assumptions to the attention of the people in RW who do have responsibility for the program.
Nothing that's said here changes what's in the law or what's in the contract or what the commitments are. It says -- and as we've already established, I think, in the Mission Plan, its stated desires, this is the way we wish to implement the program, and it goes beyond the

Page 344

actual requirements of the Act. It says, This is what we plan to be able to do. And so that goes beyond any commitments, legal or contractual.
And this document, then, is people not with the authority to do it, but with -- commenting on -- on that -- on that plan, stating what they believe the impact and consequences would be.
So I don't see how anything in here changes what our legal or contractual -- what the legal or contractual requirements of the Department of Energy and the Office of Civilian Radioactive Waste Management is or were.
Q. (By Mr. Tompkins) Well, these contractors would be providing comments at the direction of RW and DOE, wouldn't they? They wouldn't just provide comments just to provide comments. They would have been requested at some point?
MS. HERRMANN: Objection. Relevance.
THE WITNESS: That -- no, you're right. But being -- the whole -- the public was asked to provide comments. So everyone was asked to provide comments. Certainly the contractors wanted to provide comments. But providing a comment doesn't establish an obligation. And that -- that's where my difficulty is.

Page 345

If -- if in signing this document, sending in the comments of the Richland office and contractors to Mr. Rusche -- I can assure you that if the document that I was sending was anywhere binding or a commitment, it would have had far greater review, each line, each word, for accuracy and relevance than a transmittal letter sending comments on a Draft Mission Plan. Consequently, there might be, you know, some casual language in here or language that maybe does not accurately reflect the true commitments and obligations of the Act. Likewise, I would imagine that comments came in on the Mission Plan saying, don't do this and don't do that, a number of things commenting on the plan.
So I -- I'm just having a very difficult time seeing how commenting on the plan could establish any responsibility or any commitments beyond what was in -- in either the law or the contract.
Q. (By Mr. Tompkins) Well, it may not establish a commitment itself, but it does reflect someone's reading of those commitments, doesn't it?
MS. HERRMANN: Objection. Speculation.
THE WITNESS: I can assure you from all of the many people working on the Nuclear Waste

Page 346

Policy Act, that there were many interpretations of the Act. And I can generally recall some from antinuclear groups that completely changed the intent of the Act.
So just because people had different impressions, didn't really change anything. The law is the law and the contract is the contract.
MR. TOMPKINS: I'd like to mark as Lawrence Exhibit 22 -- 23 --
(Exhibit No. 23 marked for identification.)

Q. (By Mr. Tompkins) Mr. Lawrence, do you recognize the handwriting in this letter?
A. No, I don't. It -- let me put it this way: It's not mine.
Q. It's not yours?
A. It's pretty good, though. Wish it were mine.
Q. The -- under this heading, Background --
A. Excuse me. Can I -- let me just --
Q. Oh, sure.
A. -- go through it.
MS. HERRMANN: While he's reading, can we get an identification of this on the record?
MR. TOMPKINS: Sure.

Page 347

This also came from RIS-Web. And the Bates number at the top, on the first page, is MOV.1999 -- I don't know if that's an 8 or a 0 -- 831.0058.
THE WITNESS: Are there multiple Page 6s?
Q. (By Mr. Tompkins) Well it looks like there is three separate Page 6s. Two of them were crossed out and one I believe --
A. Are the -- the first two that are crossed out, are they the same?
Q. They look identical, but they came through on the fax as two separate pages, so I kept the document together as I thought it originally was. But it may have been a fax error.
A. Okay. Go ahead.
Q. On the -- on the first page, the second-to-last paragraph states, "The first schedule appeared in the December 20th, 1983 draft of the Mission Plan and was based on preliminary analysis of repository emplacement capabilities and spent fuel discharge projections."
Would if be correct to assume that this is referring to the December 1983 draft that we discussed earlier, which is marked as Exhibit 11?


Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

# Ronald Milner

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - - - - - -x
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
- - - - - - - - - - - - - - - - - - - - -xSypolt)
McLean, Virginia
Wednesday, May 1, 2002

Deposition of RONALD A. MILNER, a witness, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, LLP, 1650 Tysons



Boulevard, McLean, Virginia 22102-4859, at 9:30 a.m., Wednesday, May 1, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.



APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) (770-7901)

On behalf of Plaintiff Sacramento Municipal Utility District:
DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301



APPEARANCES: (Continued)
On behalf of Plaintiffs Southern Nuclear Operating Company, Alabama Power Company, Georgia Power Company:
RONALD A. SCHECHTER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5160

On behalf of Plaintiff Wisconsin Electric Power Company:
DONALD J. CARNEY, ESQ.
Perkins Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
(202) 434-1675

On behalf of Plaintiff Commonwealth Edison Company:
CHRISTOPHER P. TOMPKINS, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350