MR. SHULTIS: Objection -- vague.

THE WITNESS: I don't know that I could call out any particular area.

BY MR. TOMASZCZUK:

Q. Are there aspects of the Civilian Radioactive Waste Program with which you're not familiar?

MR. SHULTIS: The same objection.

THE WITNESS: Probably.

BY MR. TOMASZCZUK:

Q. Do you know what they are?

A. I would be hard pressed to call it out.

Q. The reason I ask the question, Mr. Milner, is you have been in the office of OCRWM for a long time, and I'm trying to find out areas where you might have particular expertise and knowledge, and if there are some, it would I think speed things along if you could identify those for me.

If you can't, then I will have to assume that all areas are fair game and I'll proceed accordingly.

Are there any areas that you feel you have particular expertise or knowledge in?



A. No, I wouldn't say so.

Q. In preparation for your deposition here today, did you review any documents?

A. No, I did not.

Q. Did you speak with anyone concerning your deposition?

A. Very briefly with the two Justice Department attorneys.

Q. Other than counsel for the Department of Justice, did you speak with anyone concerning your deposition?

A. No, not concerning the deposition.

Q. Did you speak with anyone at OCRWM concerning their deposition?

A. No.

Q. Did you speak with anyone at OCRWM concerning any topics or issues on which you thought I might ask you about?

A. No.

MR. SHULTIS: Objection -- asked and answered.

BY MR. TOMASZCZUK:

Q. Are you familiar with the standard contract for disposal that's at issue in these cases, for disposal of spent nuclear fuel and



high-level radioactive waste?

A. Yes.

Q. Did you have any role to play in the drafting of this, what I'll refer to as the standard contract?

A. No, I did not.

Q. It had already been executed at the time you became an OCRWM employee?

A. Correct.

Q. At the time you became an OCRWM employee, did you have occasion to read the contract?

A. Yes.

Q. At the time that you became an OCRWM employee, did you read any other documents?

A. I'm not sure I understand that question.

Q. Okay. I understood you became a branch chief at OCRWM in, in or about 1984?

A. Um-hm.

Q. Right. And you have testified you have read the standard contract?

A. Um-hm.

Q. At or about that time, correct?

A. Um-hm.



Q. Did you read any other documents relating to OCRWM or its programs at that time?

A. Relating to OCRWM, yes.

Q. Okay. And what were they?

A. The most recent total system life cycle cost report, final draft of the Mission Plan, most recent fee adequacy analysis report.

Q. Why did you read those documents?

A. Those are items under my responsibility.

Q. Do I understand it correctly that at the time you became the branch chief, a total systems life cycle cost report had already been prepared?

A. Yes.

Q. All right. I'm going to refer to that as a TSLCC report.

A. Much easier.

Q. Right -- certainly easier to say. And what was the -- you said, I believe you have testified that you had read the final draft of the Mission Plan.

Had a final Mission Plan been prepared at the time you became the branch chief?

A. No, it had not.

Page 38

year, I believe it was 400 metric tons, second year, 600 metric tons, the third year, 900 metric tons, and I believe the following year, it went up to 1200.
Q. And any understanding beyond that?
MR. SHULTIS: Same objection.
THE WITNESS: I recall that peaks at 2000.
BY MR. TOMASZCZUK:
Q. Your understanding is that it peaks at 2000, and then does it stay at 2000 for a number of years?
A. I believe so.
MR. SHULTIS: Same objection.
THE WITNESS: I believe so.
BY MR. TOMASZCZUK:
Q. Do you know if that understanding is reflected in any documents?
MR. SHULTIS: Objection -- vague.
THE WITNESS: I believe it is.
BY MR. TOMASZCZUK:
Q. Okay. Can you identify for me the documents -- when I say documents, I'm referring to DOE or OCRWM documents -- can you identify for me the documents that reflect the acceptance

Page 39

rates you just referred to?
A. I don't know that I can recall all of the documents that's reflected in.
Q. Any of them?
A. It's reflected in the ACR. It's reflected in the program plan.
Q. And in what year was the ACR that you just referred to in your last answer published, do you know?
A. I don't recall.
Q. Do you know when the last ACR was published by OCRWM?
A. No, I don't.
Q. If I said 1995, would that sound about right to you?
MR. SHULTIS: Objection -- asked and answered.
THE WITNESS: Roughly.
BY MR. TOMASZCZUK:
Q. With what, with which support contractors do you work most closely now in your role as COO?
A. Booz Allen Hamilton.
Q. Over the course of your career at OCRWM, have there been any personnel employed by

Page 40

contractors with whom you have worked particularly closely?
A. Yes.
Q. Can you state for me their names?
A. Not all of them.
Q. Okay. Those that come to mind?
A. Charles Metzger.
Q. Metzger you say?
A. Metzger; Richard Goffi, Robert Bauer, probably those would be the closest.
Q. Are those individuals employed by Booz Allen?
A. Robert Bauer is not.
Q. But Mr. Goffi and Mr. Metzger are?
A. Correct.
Q. And who is Mr. Bauer's employer?
A. He was employed by the former support service contractor at OCRWM -- Weston.
Q. Did you ever have occasion to work with a support contractor that I'll refer to as PNL?
A. Yes.
Q. And when was that?
A. That would have been in mid-'80s.
Q. Did you ever have occasion to work

Page 41

with or speak with Pat McDuffie?
A. No. I don't recall that name.
Q. What role have you had in DOE's administration or implementation of the standard contract?
MR. SHULTIS: Objection -- vague.
THE WITNESS: A variety of roles.
BY MR. TOMASZCZUK:
Q. Okay. Can you explain that for me or detail that for me?
A. At various positions or during various positions that I held, administration of the standard contract again was done by an element under my supervision.
Q. Is that one of your roles or duties today?
A. In a very rough sense, yes.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. When is the last time you had occasion to read the standard contract?
A. It's probably been several years since I have read it in its entirety.
Q. And when you last read it in its

(Milner Exhibit No. 4 was marked for identification.)

BY MR. TOMASZCZUK:

Q. Are you familiar with this document, Mr. Milner?

A. Very vaguely. This would appear, judging by the date, to be an early draft.

Q. Early draft of a Mission Plan?

A. Yes.

Q. And is this a document that you read at or about the time you became an employee of OCRWM?

A. I don't believe I would have reviewed this draft.

Q. You would have reviewed another draft?

A. Subsequent draft.

Q. A later draft do you think? And why do you say that?

A. Only judging by the date; I'm assuming that drafts would have occurred between December '83 and April of '84.

Q. And why do you make that assumption?

A. Typically over that intervening period, the document would have been refined and



further drafts produced.

(There was a pause in the proceedings.)

BY MR. TOMASZCZUK:

Q. At the time you became an OCRWM employee, was it a goal of OCRWM to provide an acceptance rate in the first five years such that no utility would have to provide additional storage capacity after January 31, 1998?

A. I don't recall that being a goal.

Q. Could I direct your attention to page 2-1 of the document under the heading program strategy?

A. Oh, 2-1.

(The witness reviewed the document.)

BY MR. TOMASZCZUK:

Q. Do you see the last two sentences of the first paragraph on page 2-1?

A. Yes.

Q. It states in part the waste materials would be accepted in accordance with the waste acceptance schedule designed to provide an acceptance rate in the first five years such that no utility will have to provide additional storage capacity after January 31, 1998?



A. Um-hm.

Q. And you disagree that that was an intention of DOE at or about this time?

MR. SHULTIS: Objection. Mischaracterizes the prior testimony.

Calls for calls for a legal conclusion.

BY MR. TOMASZCZUK:

Q. I didn't mean to mischaracterize your testimony.

I understood it to be that you did not agree with that statement.

A. I did not recall that that was a goal at that time.

Q. Okay. Having read it, do you now recall that that was a goal?

A. I don't recall whether that language was in the final Mission Plan.

Q. Okay. Even if it wasn't, was that a goal of DOE at or about this time?

MR. SHULTIS: Objection -- asked and answered.

THE WITNESS: I don't recall it.

BY MR. TOMASZCZUK:

Q. The text of this paragraph goes on to



state subsequently, the acceptance rate will be equal to or greater than the actual discharge rate of spent fuel each year.

At or about this time, did DOE intend that the acceptance rate would be equal to or greater than the actual discharge rate of spent fuel each year?

MR. SHULTIS: Objection. Calls for a legal conclusion.

Also Mr. Milner is not a 30(b)(6) witness.

THE WITNESS: I didn't recall that.

BY MR. TOMASZCZUK:

Q. The next page of this document, 2-2, under the heading waste acceptance schedule, and this paragraph states that the department has prepared a waste acceptance schedule which specifies in the aggregate the quantities of commercial nuclear waste that the program will accept beginning in 1998.

This schedule is presented in Table 2-1, and then turning to Table 2-1 whenever you're ready --

(The witness reviewed the document.)

BY MR. TOMASZCZUK:

speculation, and compound.
THE WITNESS: I have personal opinions in some regards.
BY MR. TOMASZCZUK:
Q. Okay. And I'm anxious to hear about those.
Would you tell me what your personal opinions in that area are?
MS. HERRMANN: Objection -- vague.
THE WITNESS: Well, one opinion is that in some areas, I do believe it is incomplete.
One example would be that the contract doesn't clearly define how you would deal with non-standard fuel.
It doesn't clearly define how you deal with non-fuel bearing components of the fuel assembly.
BY MR. TOMASZCZUK:
Q. Any other opinions that fall within these four areas?
MS. HERRMANN: Objection -- vague.
THE WITNESS: No.
(There was a pause in the proceedings.)



MR. TOMASZCZUK: Ms. Reporter, would you mark as Milner Exhibit 11 another document entitled briefing for OCRWM Executive Committee dated November 1986, disposal contract and Annual Capacity Report?
(Milner Exhibit No. 11 was marked for identification.)
MS. HERRMANN: Do we get one?
MR. TOMASZCZUK: Oh, I'm sorry -- absolutely.
BY MR. TOMASZCZUK:
Q. Have you seen this document before today, Mr. Milner?
A. Not that I recall, no.
Q. Did you participate in any briefing of the OCRWM Executive Committee in November of 1986 concerning the disposal contract and Annual Capacity Report?
A. Not that I recall.
Q. Can I direct your attention to Bates page number PNL-102-1182?
And this appears to be a listing of bullet points relating to the purpose and background for the Annual Capacity Report?



A. To my understanding, yeah.
Q. Was it your understanding that the ACR was intended to lead to contractually binding waste acceptance commitments starting in 1992?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: My recollection is not so much the timeframe, but yes, they would lead to a binding commitment.
BY MR. TOMASZCZUK:
Q. At the time the ACR was issued, was it binding?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: My personal opinion was that no, it was not.
As indicated here, it was for planning purposes.
BY MR. TOMASZCZUK:
Q. But the ACR issued for planning purposes in your understanding would lead to a mutually binding commitment on the parties?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: That would have been my



understanding.
BY MR. TOMASZCZUK:
Q. And is your understanding today?
A. Yes.
(There was a pause in the proceedings.)
MR. TOMASZCZUK: Let's mark as Milner Exhibit 12 the Annual Capacity Report dated June 1987.
(Milner Exhibit No. 12 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Actually, Mr. Milner, before I ask you about that, I had a couple of questions on the OCRWM Executive Committee I forgot to ask you about.
Were there any minutes of the meetings of that committee do you know?
MS. HERRMANN: Objection -- foundation, speculation.
THE WITNESS: None that I can recall. I simply don't know on that one actually.
BY MR. TOMASZCZUK:
Q. Do you know insofar as the meetings

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - - - - -x

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
---------------------xSypolt)

McLean, Virginia
Thursday, May 2, 2002

Continued deposition of RONALD A. MILNER, a witness, recalled for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, LLP, 1650 Tysons



Boulevard, McLean, Virginia 22102-4859, at 9:51 a.m., Thursday, May 2, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.



APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) (770-7901)

On behalf of Plaintiff Sacramento Municipal Utility District:
DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301



APPEARANCES: (Continued)
On behalf of Plaintiffs Southern Nuclear Operating Company, Alabama Power Company, Georgia Power Company:
RONALD A. SCHECHTER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5160

On behalf of Plaintiff Wisconsin Electric Power Company:
SUZETTE W. DERREVERE, ESQ.
Perkins Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
(202) 434-1609

On behalf of Plaintiff Commonwealth Edison Company:
CHRISTOPHER P. TOMPKINS, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

Page 390

Shelor's office that prepared it?
A. I believe so.
Q. Now at some point in time, you came back to that office, that is, the Office of Waste Acceptance, Storage and Transportation, is that right?
A. That's correct.
Q. But that would have been after this APR/ACR was published?
A. I believe it was.
Q. Notwithstanding the fact that your office didn't publish this, did you have occasion to review this and sign off on it before it was published?
A. I don't recall specifically, but it's likely that I would have concurred in it.
Q. Can I ask you to look at page 1 of the document? And the second paragraph is what I'm going to ask you a few questions about.
There is a reference to the APR and the ACR?
A. Um-hm.
Q. And then there is a sentence in the middle of the paragraph which states the ACR applies projected nominal acceptance rates for

Page 391

the system to the priority ranking and the APR, resulting in individual allocations for the owners and generators expressed in metric tons of uranium.
Do you have an understanding of what is meant by the phrase nominal acceptance rates in that sentence.
A. No. I don't know.
Q. Did you have any discussions with any OCRWM employees concerning what was meant by that phrase nominal acceptance rates?
A. Not that I recall.
Q. The last sentence of this paragraph states as specified in the standard contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the purchasers, right?
That's what it says?
A. That's correct.
Q. Did I understand your testimony earlier, Mr. Milner, to be that the DCSs represented a binding commitment of the parties?
A. That was my opinion, yes.
Q. And the DCSs as indicated by this paragraph, are based on the capacity allocations

Page 39

as listed in the ACR, right?
A. Correct.
Q. Can you explain to me how it is that if the ACRs which form the basis for the DCSs are not binding, that the DCSs are binding?
MR. SHULTIS: Objection. Calls for a legal opinion.
THE WITNESS: The DCSs were submitted by the utilities to the department based upon the information in the ACR, the allocations.
Then the department would either approve or disapprove those, and if approved, then in my opinion, that became a binding agreement.
A utility could certainly choose to submit a DCS which reflected lower amounts than were contained in the ACR.
BY MR. TOMASZCZUK:
Q. Is there any reason of which you're aware why a utility would do that?
A. None that I know of.
Q. Wouldn't it be in the utility's interest to try and put as much fuel as they could in the DCS to get that fuel moved off site?

Page 393

MR. SHULTIS: Calls for speculation.
THE WITNESS: If I were a utility fuel manager, I would have.
BY MR. TOMASZCZUK:
Q. Can I ask you to look back at the DCS instructions?
We looked at those this afternoon -- 43.
And in particular, I was going to ask you to look at, Mr. Milner, paragraph 7C.
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. And this paragraph reflects in the first sentence that the rates in the ACR provide an approximation and are for planning purposes, right?
A. Correct.
Q. And then the next sentence, there is an assumption stated that the waste management system will begin acceptance of spent nuclear fuel in 1998, correct?
A. Correct.
Q. And then there is this third sentence in the event that such circumstances change, all DCSs previously approved by DOE may need to be

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - - - - X

YANKEE ATOMIC ELECTRIC COMPANY, (98-126C) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY (98-154C) :
MAINE YANKEE ATOMIC POWER COMPANY (98-474C) :
FLORIDA POWER & LIGHT COMPANY (98-483C) :
NORTHERN STATES POWER COMPANY (98-484C) :
DUKE POWER, A Division of DUKE ENERGY CORP. (98-485C) :
INDIANA MICHIGAN POWER COMPANY (98-486C) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT (98-488C) :
SOUTHERN NUCLEAR OPERATING COMPANY, et al., (98-614C) :
COMMONWEALTH EDISON COMPANY (98-621C) :
BOSTON EDISON COMPANY (99-447C) :
GPU NUCLEAR, INCORPORATED (00-440C) :
WISCONSIN ELECTRIC POWER COMPANY, (00-697C) :
POWER AUTHORITY OF THE STATE OF NEW YORK (00-703C) :
OMAHA PUBLIC POWER DISTRICT (01-115C) :
NEBRASKA PUBLIC POWER DISTRICT (01-116C) :
TENNESSEE VALLEY AUTHORITY (01-249C) :

Plaintiffs, :

v. :

UNITED STATES OF AMERICA, :

Defendant. :

\- - - - - - - - - - - - - - - - - - - - X

Washington, D.C.

Friday, May 3, 2002

Continued Deposition of RONALD MILNER, a witness herein, called for examination by counsel for

Page 404

Plaintiffs in the above-entitled matter, pursuant to notice, the witness being previously duly sworn by CATHERINE S. BOYD, Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, 1650 Tysons Boulevard, McLean, Virginia, at 9:15 a.m., Friday, May 3, 2002, and the proceedings being taken down by Stenotype by CYNTHIA R. SIMMONS, RMR, CRR, and transcribed under her direction.

Page 405

APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Inc., Power Authority of the State of New York, Omaha Public Power District, and Nebraska Public Power District:

ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Shaw Pittman LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 770-7940

On behalf of the Plaintiffs Yankee Atomic, Maine Yankee and Connecticut Yankee:

PETER SKALABAN, JR., ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Ninth Floor
Washington, D. C. 20005-3305
(202) 898-5821

Page 406

APPEARANCES (Continued):

On behalf of the Plaintiff Wisconsin Electric Power Company:

DONALD J. CARNEY, ESQ.
Perkins Coie LLP
607 Fourteenth Street, N.W.
Washington, D. C. 20005-2011
(202) 434-1690

On behalf of the Plaintiff Southern Nuclear Power:

RONALD A. SCHECHTER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5160

On behalf of the Plaintiff Sacramento Municipal Utility District:

DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

Page 407

APPEARANCES (Continued):

On behalf of the Plaintiff Commonwealth Edison Company:

CHRISTOPHER P. TOMPKINS, ESQ.
Jenner & Block, LLP
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

On behalf of the Defendant:

RUSSELL A. SHULTIS, ESQ.
HEIDE L. HERRMANN, ESQ.
United States Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D. C. 20530
(202) 305-7561

Page 440

A. No.
(Milner Exhibit No. 53 was marked for identification.)
BY MR. NESLIN:
Q. Mr. Milner, you've been handed what's Exhibit 53 to your deposition. This is a March 31st, 1994 letter from James Blandford to you. And an attachment consisting of a preliminary draft of a document captioned, DCS Exchange Network, Software Recommendation.
Are you familiar with this document?
A. I don't recall it specifically, no.
Q. Cover letter states that the attached report provides a recommendation for software on the DCS Exchange Network which will be a computer-based, menu-driven system providing information on approved Delivery Commitment Schedules for their use in assessing opportunities for DCS exchanges with other purchasers.
Do you recall the DOE or its contractors doing any work on a DCS exchange network?
A. What I recall is in general terms a program considering whether or not it should take an active role in encouraging exchanges or simply react to utility requests. And if it ultimately chose to

Page 441

take an active role, how might that be accomplished.
Q. Who at the Department was involved in that consideration?
A. Well, I guess it would have been myself, members of my staff, the director of the program.
Q. Who on your staff?
A. At this point in time, Alan Brownstein, I see two staff members, one name crossed out and the other one, I can't recall what point in time which one left or which one was there, but one of the two, either Nancy Slater or Mary Payton were staff members.
Q. Anyone else?
A. Not that I can recall offhand.
Q. During what period would the Department have been considering this question?
A. In March 31st, 1994.
Q. Do you, sitting here today do you recall over what period of time that consideration extended?
A. No, I don't.
Q. And did the Department reach a decision as to whether it should take an active role in encouraging exchanges or simply respond to utilities?
MR. SHULTIS: Objection, Mr. Milner's not a 30(b)(6) witness.

Page 442

THE WITNESS: I don't recall the Department ever actually taking a position. In essence it became a moot point because we never received a request.
BY MR. NESLIN:
Q. And is it your understanding that you never received a request in part because of the uncertainties that arose in the 1990s as to when a repository would become operational?
MR. SHULTIS: Objection, calls for speculation.
THE WITNESS: I have no such understanding.
BY MR. NESLIN:
Q. Do you believe that, is it your opinion that the uncertainties and delays associated with the start-up date for a repository had no effect on utilities' actions in deciding whether to submit exchange requests?
MR. SHULTIS: Same objection.
THE WITNESS: No, I don't have that opinion. I have no idea why none were submitted.
BY MR. NESLIN:
Q. In considering how the Department might take an active role, what sorts of actions did you

Page 443

consider?
A. I recall maintaining a list of approved DCS's and looking at that list versus utilities which we might be aware were running out of pool space which had a lower priority ranking than another which had sufficient pool space.
And, you know, the potential of in essence brokering something between the two utilities.
Q. And do you recall any consideration of developing a computerized system for providing information among utilities on approved DCSes?
A. I do now reading this.
Q. But you don't have any independent recollection beyond this document?
A. No, I don't.
Q. If I could turn you to the first page of the attached draft report. Do you know whether this report was ever finalized?
A. I don't recall whether it was or not. In any event this is a contractor report which would never relate to a position the Department took, simply input data to it.
Q. You say it would never relate to a position?
A. It would never reflect, I'm sorry; not