Page 444

relate, it would never reflect the Department's position, it would simply input data to it.
Q. The Department would have to subsequently take a separate position which might or might not approve or reflect what the contractor recommended?
A. The Department would take a position based on information from a number of sources including its contractor's input.
Q. I see the last sentence of the second paragraph on this page states that, the next to the last sentence, "Based on the preliminary evaluations of the cost, complexity, maintenance requirements, and the accuracy and timeliness of the information provided through these various options, the Department has decided to develop a PC-based electronic bulletin board system, the DCS exchange network."
A. I'm sorry; what paragraph are you reading from?
Q. The second paragraph under introduction, sir.
A. Okay.
Q. The next to the last sentence. You see it states that the Department has decided to develop a PC-based electronic bulletin board system?

Page 445

A. Okay, yes.
Q. Do you know, did the Department ever make such a decision?
A. I don't recall that.
Q. Do you know why the contractor would have included a statement like this?
MR. SHULTIS: Calls for speculation.
THE WITNESS: No, I don't.
BY MR. NESLIN:
Q. In your opinion, did the Department have an interest in providing this kind of information to purchasers to assist them in assessing exchange opportunities?
A. To the best of my recollection the Department certainly considered providing that information, I don't know I would characterize it as interest.
Q. It's something the Department considered doing?
A. Yes. Oftentimes the Department considered a number of things, and discussed that with industry representatives, and no longer considered it based on their input.
Q. Do you recall receiving any input from the industry indicating they weren't interested in a

Page 446

system of this sort?
A. On that specific issue, I don't recall, no.
MR. SHULTIS: Are we moving on to a different document, Dave?
MR. NESLIN: Yeah.
MR. SHULTIS: Do you think we could take a break, please?
MR. NESLIN: If you'd like to, sure.
(Recess.)
BY MR. NESLIN:
Q. Mr. Milner, before we get to another document, let me ask you just a couple of follow-up questions. You mentioned that you had, in considering the exchange provision, you had maintained a list of approved DCS's and compared those to utilities which might be needing more pool space?
A. We certainly maintained a list of approved DCS's, I don't recall whether we actually ever got into any analysis of looking at utilities that might be potential exchanges, I don't recall that.
Q. You don't recall --
A. No.
Q. -- that comparison?

Page 447

A. No.
Q. I thought that you testified that you also considered the potential for brokering exchanges between utilities?
A. Yeah, as a concept, yes.
Q. What do you mean, what do you mean by as a concept?
A. We were -- well, looking at the concept of was it appropriate for the Department to do that sort of thing.
Q. What was your opinion?
A. My personal opinion was that it potentially could serve a useful purpose if the utilities desired such an activity.
Q. And what do you mean by useful purpose, what would that purpose be?
A. Well, certainly one purpose could have been if one utility that was needing to build a dry storage that was farther down in the queue, and another utility that had a higher priority that either didn't at that particular time or perhaps even life of plant storage, which I don't recall anybody was that high in the queue that they had life of plant, but you could preclude the need for constructing dry storage if such an exchange were



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

core reserve capacity in the pool, or --
A. I don't know.
Q. We previously marked -- I believe it was Wednesday we previously marked the 1987 mission plan amendment or actually one of the appendixes to it. This is also an excerpt of that same mission plan amendment. It's just a portion of the text rather than the appendix we looked at previously.
(Milner Exhibit No. 72 was marked for identification.)
BY MR. TOMPKINS:
Q. I believe you testified yesterday that you had some involvement in preparing this mission plan amendment?
A. I believe I would have, yeah.
Q. Okay. I'd like to call your attention to page 6 of this excerpt. The third full paragraph under extension of the schedule for the first repository, this indicates that at this time the program in OCWRM was projecting a delay in start of repository operations from 1998 to 2003; is that correct?
A. That's what's indicated here, yes.
Q. Okay. It indicates that this five-year extension is necessary for technical planning in the



A. Yes.
Q. It wasn't intended to operate alone or as a permanent place for storage in disposal?
A. No.
Q. I'd like to talk to you about page 12 now, in particular the last full paragraph or actually the last paragraph which goes on to the next page under the heading MRS facility. It stays that on March 31st, 1987 the DOE submitted to Congress a proposal for construction of an MRS facility. To allay concerns that the MRS facility could become a substitute for a permanent repository whose development remains the highest priority, DOE asked Congress to limit the MRS storage capacity to 15,000 metric tons of uranium and to specify that the MRS cannot start receiving fuel until a construction authorization for the repository has been received from the Nuclear Regulatory Commission.
Is this an accurate statement that the DOE was the organization that requested the linkages between the repository and the MRS?
MR. SHULTIS: Objection, the document speaks for itself.
THE WITNESS: Certainly the DOE was the entity that requested Congress, my recollection of



program?
A. I don't see where it refers to technical planning.
Q. Okay.
A. It seems to indicate that the schedule was certainly due to budget reductions.
Q. Are you aware of any other reasons why the schedule would have slipped at this point?
MR. SHULTIS: Objection, mischaracterizes the document.
THE WITNESS: No, not offhand, I don't recall.
BY MR. TOMPKINS:
Q. Also in this same paragraph this amendment indicates as explained later, the DOE could nonetheless start accepting waste in 1998 in an MRS facility. Was this consistent with DOE planning at the time in 1987?
A. I believe it was.
Q. So they were going to operate an MRS from 1998 until about 2003 when a repository opened?
A. I think the intention was that the MRS would continue operating beyond 2003.
Q. In fact the MRS was intended to be an integral part of the whole waste acceptance system?



the origins of those linkages were at that time, DOE was developing a site specific proposal for an MRS facility, actually at the old Clinch River Breeder reactor site at Oak Ridge, and I believe the local community had requested the Department insert those linkages.
BY MR. TOMPKINS:
Q. The capacity limit of 15,000 metric tons, do you know where the Department would have come up with that number?
A. I believe that was the request or recommendation of the local community at the time.
Q. At the time as we saw in the previous page this was assuming that the MRS would operate for only about five years prior to being able to move additional waste from the MRS and start feeding into the repository?
A. It was intended to operate for five years before it began shipping waste and it certainly was going to operate longer than five years.
Q. But over the course of that five years, would this limit on the capacity of 15,000 metric tons have been a significant restraint on the ability of the Department to operate this facility?
A. It certainly would have been a constraint.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY, and MAINE YANKEE ATOMIC POWER COMPANY,
Plaintiffs,
v.
THE UNITED STATES,
Defendant.

Case Nos. 98-126C, 98-154C, 98-474C

Courtroom Number 5

National Courts Building
717 Madison Street, Northwest
Washington, D.C.

Wednesday, August 11, 2004

VOLUME 21

The parties met, pursuant to the notice of the Judge, at 10:06 a.m.

BEFORE: THE HONORABLE JAMES F. MEROW



APPEARANCES:
ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY and MAINE YANKEE ATOMIC POWER COMPANY:
JERRY STOUCK, ESQ.
ROBERT SHAPIRO, ESQ.
SPRIGGS & HOLLINGSWORTH
1350 I Street, N.W.
Washington, DC 20005
(202) 898-5800

ON BEHALF OF THE UNITED STATES:
HAROLD LESTER, JR., ESQ.
JOHN EKMAN, ESQ.
MARIAN E. SULLIVAN, ESQ.
HEIDE L. HERRMANN, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
(202) 305-7562

*** Index appears at end of transcript ***



P R O C E E D I N G S

JUDGE MEROW: Ms. Herrmann?
MS. HERRMANN: Ready to continue with Mr. Buchheit, Your Honor?
MR. STOUCK: I've got a couple of preliminary points if I could mention it, Your Honor.
JUDGE MEROW: Sure.
MR. STOUCK: One is we do want to get to the exhibits that came up yesterday. We do want to get to the exhibits from yesterday. I've looked at the transcript and we're certainly ready to deal with those. We're not proposing at this moment because we would like to get finished with Mr. Buchheit, but either between witnesses or at the end of the day.
JUDGE MEROW: Fine.
MR. STOUCK: That's number one. Number two, also, I would like today to address the counterclaim, the motion to amend the counterclaim, which we've given some thought to.
Thirdly, one thing I need to take care of right now, on the question of notice and documents, as I was looking back over the transcript thinking about the exhibit issues, I noticed that little colloquy and I just didn't want there to be any remaining



misunderstanding. We certainly have worked well, you know, for six years and don't want to run into a misunderstanding now. There's really two rules: one is disclosure and the other is cross-examination.
There certainly may be documents that we want to show the government's witnesses that we don't want to show the government's lawyers the night before and, you know, unless we get some different direction, we're not intending to do that, and I just don't want to be vilified again if that comes up, because I think it might.
JUDGE MEROW: Okay.
MR. LESTER: I think we addressed this several times. The issue here is the difference between impeachment documents and documents which the plaintiffs are going to ask be introduced as substantive evidence. We did not play this kind of game when we were doing our cross-examination. We didn't pull out unidentified exhibits and then just sort of pop them in during the cross-examination, then say please admit this as a substantive exhibit. We didn't do that.
We identified our exhibits, and if and when we identified that there's an exhibit on our may-use list that we're going to want to introduce as

memo to which the plaintiffs have referred that Mr. Rusch had – that has Mr. Rusch's name on it in fact somehow goes with the concurrence on the prior page.

With that understanding, we will not object to this series of documents being admitted as a single exhibit.

JUDGE MEROW: Well, okay. Then with that explanation, Plaintiff's Exhibit 1972 is admitted into evidence.

(PX Exhibit 1972 was received in evidence.)

MR. LESTER: I've been told, Your Honor, the prior exhibit the plaintiffs had tried to introduce was Plaintiff's Exhibit 1951, and I understand that that exhibit's being withdrawn and that it will not be admitted here.

MR. SHAPIRO: That's correct, Your Honor. That was subsumed within the larger one.

JUDGE MEROW: Okay. 1951 is considered withdrawn. Does that take up our prelunch – anything else?

MR. STOUCK: Take up the other matters at the end of the day.

JUDGE MEROW: Fair enough. We'll break



for lunch. And what time?

MR. LESTER: I'm told Mr. Milner cannot be here until 2 o'clock, so if we could resume at 2, that would be great.

JUDGE MEROW: Okay, we'll resume at 2 o'clock.

(Luncheon recess taken from 12:40 p.m. through 2:06 p.m.)

- AFTERNOON SESSION -

MS. SULLIVAN: Government's ready to call its next witness.

JUDGE MEROW: Fine.

MS. SULLIVAN: We call Ronald Milner to the stand, please.

(The witness was sworn.)

MS. SULLIVAN: Thank you, Your Honor.

RONALD MILNER

was sworn and testified as follows:

DIRECT EXAMINATION

BY MS. SULLIVAN:

Q Good afternoon, Mr. Milner.
A Good afternoon.
Q Mr. Milner, are you currently employed in the Office of Civilian Radioactive Waste Management at the Department of Energy?



A Yes, I am.
Q What is your current position?
A Chief operating officer.
Q What are your responsibilities as chief operating officer?
A I assist the deputy director for strategy and program development in the day-to-day management of that office.
Q And do you report to the deputy director?
A Yes, I do.
Q And who is the department director?
A Ted Gerrish.
Q Does anybody report to you?
A Not directly.
Q How long have you served as chief operating officer?
A In total, about four years.
Q When did you first join the Office of Civilian Radioactive Waste Management?
A I believe it was April of '84.
Q What was your first position? And I'm going to refer to it as RW, if that's all right.
A Okay.
Q What was your first position with RW?
A I was the branch chief of the



organization.
Q What were your responsibilities in that position?
A Preparation of total system life cycle cost, adequacy analyses and the first mission plan.
Q What position did you next hold in RW?
A I was a division director.
Q And what were your responsibilities in that position?
A Budget, human resources, total system life cycle costs, fee adequacy analyses.
Q And what position did you next hold in RW?
A Next, I was first acting director and then permanent director of the Office of Storage and Transportation.
Q And do you remember when you became acting director of the Office of Storage and Transportation?
A Roughly 1990.
Q And how long did you serve as director of the Office of Storage and Transportation?
A About four years.
Q What were your responsibilities as acting and then director of the Office of Storage and Transportation?
A Management of the MRS monitor to treatable

Page 4714

storage program, transportation program, waste acceptance issues, such as preparation of the annual capacity reports, processing of delivery commitment schedules and so forth.
Q You said that you were responsible for management of the MRS process. What specifically were you doing?
A At that point in time, we were attempting to find a volunteer site to construct an MRS.
Q Do you recall, was Dr. Bartlett the director of the program while were you the acting director and director of the Office of Storage and Transportation?
A Yes, he was.
Q Did you report to Dr. Bartlett?
A Yes.
Q After serving as the director of office – of storage and transportation, what position did you next hold?
A Director of the Office of Program Management and Integration.
Q And what were your responsibilities in that position?
A The program's budget, human resources, preparation of total system life cycle costs and fee

Page 4715

adequacy analysis.
Q Did you also have responsibility for regulatory interface with the NRC?
A Yes, uh-huh.
Q And then what position did you hold next after you were director of program management and integration?
A After that, I was appointed the acting deputy director of the program.
Q Do you recall approximately when that was?
A I believe that was 1996.
Q And how many times have you served as deputy director of the program?
A I was acting deputy two different times.
Q And what time periods were those?
A It was '96 through '99, roughly, and then 2001 through 2002, roughly.
Q What position did you hold in between these periods that you were data director?
A Chief operating officer.
Q And were your responsibilities as the chief operating officer then substantially the same as they are today?
A Substantially the same, yes.
Q And then in 2002, is that when you became

Page 4716

chief operating officer again?
A Yes, uh-huh.
Q Mr. Milner, prior to joining RW, where were you employed?
A With the Department of Energy with the – first with the Strategic Petroleum Reserve and then with the Office of Conservation and Renewable Energy.
Q Prior to becoming a DOE employee, where were you employed?
A Prior to that, I served eight years as a Naval officer.
Q Mr. Milner, do you hold a Bachelor's degree?
A Yes, I do.
Q In what?
A Mechanical engineering.
Q Where did you obtain that degree?
A University of Mississippi.
Q When?
A 1966.
Q And do you also hold a Master's degree?
A I do.
Q In what subject?
A Also mechanical engineering.
Q When did you obtain that degree?

Page 4717

A 1967.
Q Was that also from the University of Mississippi?
A Yes.
Q Can we have Plaintiff's Exhibit 95, please?
MS. SULLIVAN: May I approach?
JUDGE MEROW: Sure.
MS. SULLIVAN: We're going to look at several different pages of this exhibit, so I'd like to provide copies to the Court as well.
JUDGE MEROW: All right.
MS. SULLIVAN: Plaintiff's Exhibit 95 is a multivolume set. What I provided to the Court and the witness is simply an excerpt of that document.
BY MS. SULLIVAN:
Q Mr. Milner, do you have water there? Do you want a cup of water?
A Yeah, that would be great.
MS. SULLIVAN: Could I get a cup of water for the witness, Your Honor?
JUDGE MEROW: Of course.
BY MS. SULLIVAN:
Q Mr. Milner, do you recognize the document that I've handed to you and put up on the computer

Page 4722

Q Thank you. Mr. Milner, did DOE evaluate possible contingencies in the mission plan?

A Yes, it did.

Q Can we go to page 20 of this document? Can you highlight the text on the page? Mr. Milner, could you read the highlighted sentence?

A Should no repository be constructed and an MRS facility not be authorized, utilities would continue to be responsible for storing the spent fuel at reactor sites.

Q Was one of the contingencies that DOE evaluated in the mission plan the possibility that DOE could not construct either an MRS or a repository?

A Yes, it certainly was.

Q Mr. Milner, I believe you testified that DOE prepared the mission plan because it was a requirement of the NWPA.

A That's correct.

Q Okay. Do you remember whether there was specific statutory provision that went to the mission plan?

A I believe there was, yes.

Q Mr. Milner, I've handed you an excerpt from Title 42 of the US Code, Section 10-221, which is titled mission plan. Do you recognize this provision

Page 4723

to be the provision that sets forth the requirements of the mission plan?

A Yes, I do.

Q Mr. Milner, did you have an understanding as to whether this provision contained a requirement for the mission plan to set forth a specific acceptance rate?

A I did not.

Q Why did DOE include acceptance rates in the mission plan?

A Well, one of the requirements for the mission plan was to provide an estimation of – of how long the repository would be in operation before it was closed. To do that, you had to assume an acceptance rate, so there were acceptance rates assumed in the mission plan as examples of how the – the program might be operated.

Q Thank you. And that requirement, is that set forth on – as your understanding of that requirement is set forth in paragraph 9, A9 of this provision?

A Yes.

Q Thank you. Could we go back to Plaintiff's Exhibit 95, please? Page 26. Mr. Milner, for some

Page 4724

reason our electronic copy – I checked it against the paper copy. For some reason, it's turned. I don't know why we turned it but it's – same information is there. I think the information just got squeezed. Mr. Milner, do you recognize the schedule that's set forth on page 26 of the mission plan?

A Yes. That was an example of – of how the authorized system might operate.

Q How many repositories did DOE assume would be constructed at the time the mission plan was prepared?

A Two.

Q Can we go to page 29? Can you bring up the first full paragraph under the numbered paragraphs? Mr. Milner, can you read that section, that highlighted material?

A It should be emphasized that this schedule is only an approximation of how the system may operate and is subject to considerable variation. The DOE will further define and specify the system acceptance parameters as the program progresses.

Q Mr. Milner, does that paragraph accord with your recollection regarding the schedule set forth in the mission plan?

Page 4725

A Yes, it does.

Q Could we bring up the last paragraph on this page and, Mr. Milner, would you read the last two sentences that are highlighted there?

A Under the terms of the contracts for disposal services that have been signed between the DOE and the utilities, an annual capacity report with projected annual receiving capacities and rankings will be issued by the DOE beginning in 1987. In 1991 the DOE will begin to publish firm waste acceptance schedules for individual reactors, including shipment allocations.

Q Mr. Milner, what was your understanding of the term "firm waste acceptance schedules" as that term's used in that paragraph?

A That would be the schedules that DOE was committing to to accept the waste.

Q Did DOE publish, if I recall, waste acceptance schedules in 1991?

A Yes, it did.

Q Where were those schedules set forth in the annual capacity report for that year? And what were utilities to do with these schedules set forth in the annual capacity report?

A They were to utilize those to develop

their delivery commitment schedules, DCSs, for submittal to the department.
Q And which office within DOE prepared the 1991 ACR?
A The Office of Civilian Radioactive Waste Management.
Q And which office within RW?
A The Office of Storage and Transportation.
Q That was your office?
A Yes, it was.
Q Mr. Milner, in your various positions within DOE, have you had responsibility for preparing total system life cycle costs?
A Yes, I have.
Q Have you also had responsibility for preparing what are referred to as fee adequacy studies?
A Yes.
Q Could you explain to the Court what a total system life cycle cost is, or a TSLCC?
A It was a – an estimate at any given time of – of the total costs of – of the entire waste management system from identifying sites, characterizing sites through construction operation of the system and – and ultimately decommissioning.



Q Decommissioning of what?
A Of the repository facilities.
Q What is a fee adequacy study?
A The fee adequacy studies using the – the cost estimates as a basis attempted to analyze whether or not the fee that was being paid by the utilities was adequate to cover the – the costs.
Q Why is a TSLCC, or total system life cycle cost report, prepared?
A Well, one, it's – it's good to keep track of the estimate of the program costs but principally is – is input to the fee adequacy analysis.
Q And why are fee adequacy studies prepared?
A They're mandated by the act.
Q By the Nuclear –
A Waste Policy Act.
Q Are there assumptions made for the preparation of a TSLCC?
A Yes, there are.
Q What is the basis for those assumptions?
A They were the current program planning bases at the time.
Q Has DOE changed the assumptions that form the basis for TSLCCs over time?
A Yes.



Q Can we have Plaintiff's Exhibit 248, please?
Mr. Milner, I've handed you what's been marked as Plaintiff's Exhibit 248. Do you recognize this document?
A Yes, I do.
Q Could you tell the Court what the document is?
A Well, it – again, it's – the title basically says preliminary estimate of the restructured program, which was an addendum to a prior – prior TSLCC analysis.
Q Were you involved in the preparation of this document?
A No, I was not.
Q Okay. Are you familiar with this document based upon your work with other TSLCCs?
A Yes.
Q Can we go to page 1, please? Can we bring out the first paragraph on the page and highlight the third sentence?
Mr. Milner, would you read the highlighted portion into the record, please?
A The primary use for the total system life cycle costs, TSLCC, analysis is to provide cost data



necessary for determining whether the fees paid by the waste generators will be sufficient to fully cover the costs of the program, parentheses, the fee adequacy analysis.
Q Okay, thank you. For our court reporter, as you read things, you can take your time. Thank you.
Mr. Milner, the sentence that you read, does – just read, does that sentence accord with your understanding as to the purpose of the TSLCC?
A Yes, it does.
Q Can we go to page 2, please? And in the first full paragraph, bring that out. The first two sentences.
Mr. Milner, would you please read those – the highlighted material into the record?
A It must be recognized that the waste management program is continually evolving. The TSLCC estimates represent snapshots in time which incorporated all available and appropriate information on program activities up to a specific point in – specific point in time in order to develop comprehensive set of cost estimates for the system.
Q Mr. Milner, do you agree with that statement regarding the nature of TSLCCs?

Page 4730

A Yes, I do.
Q Can we go back to page 1 of this document, that first paragraph again? Mr. Milner, in that paragraph there's a reference to report to Congress on reassessment of the Civilian Radioactive Waste Management Program issued by the Secretary of Energy in November of 1989.
A Yes.
Q Do you recall that reassessment?
A Yes, I do.
Q Do you recall what the result of that reassessment was?
A I think principal result of that reassessment was the repository would not be able to be opened until the your 2010.
Q Okay. As a result of that reassessment, was there a date by which the MRS was to be opened?
A 1998.
Q Can we go to pages 4 and 5? Could I ask you to read the highlighted sentences into the record?
A The TSLCC estimates presented in this report are updated estimates from the May 1989 TSLCC analysis which reflect the changes in the system outlined in the secretary's reassessment of the Waste Management Program. As such, these estimates are

Page 4731

derived in the same manner as those presented in May 1989, since the majority of the assumptions and methodologies have remained unchanged; however, a major change in the schedule had a significant impact on the updated estimates. Thus, the difference between the May 1989 estimates and the updated estimates represent the overall cost impact due to the restructured program.
Q Mr. Milner, were you responsible for the preparation of the 1989 TSLCC?
A I believe I was.
Q It was a long time ago. Could we go to appendix A, page A1? Mr. Milner, what information is presented in table A1 of this document?
A That's the waste acceptance schedule, which included acceptance rates, amount of material that would be stored at the MRS at any given point in time, cumulative numbers.
Q So is it your understanding that these are the waste acceptance assumptions for the preparation of this TSLCC?
A Yes.
Q This is an addendum to the 1989 TSLCC. Can we have Plaintiff's Exhibit 976, please?

Page 4732

Mr. Milner, do you recognize what's been marked as Plaintiff's Exhibit 976?
A Yes. It's the 1986 TSLCC estimate.
Q Were you involved in the preparation of this document?
A I believe I was, yes.
Q Can we go to page 2? And can we highlight the first three sentences of the first paragraph? Mr. Milner, could you read the highlighted portion, please?
A Two important program developments pertinent to the TSLCC analysis have emerged since the previous analysis in January 1985. First, the president has determined that defense high-level waste, parentheses, DHLW, should be emplaced in the civilian geologic repositories. Second, the DOE has announced its plans to seek Congressional approval for a monitored retrievable storage, parentheses MRS, facility that will be fully integrated into the overall waste management system.
Q Thank you. Mr. Milner, based upon what you just read, do you recall what the basis for the 1986 TSLCC was?
A Essentially would have been the mission plan.

Page 4733

Q Thank you. Can we have Plaintiff's Exhibit 982, please?
MS. SULLIVAN: Your Honor, I should note that on Plaintiff's Exhibit 976, I provided to counsel and to the witness just an excerpt of that document. It also is a multivolume – volume document.
BY MS. SULLIVAN:
Q Mr. Milner, do you recognize Plaintiff's Exhibit 982?
A Yes. It's the 1998 TSLCC analysis.
Q Were you responsible for the preparation of this document?
A Not directly, no.
Q Okay. Would you have reviewed it prior to its issuance?
A Yes.
Q Can we go to page 1 of this document, please? Paragraph one, second sentence. Mr. Milner, can you read that highlighted material, please?
A This estimate is consistent with the viability assessment of a repository at Yucca Mountain, parentheses, VA, design basis and cost estimate, parentheses, DOE 1998, extended to address total system costs for all waste planned for disposal in a geologic repository for the total system life

cycle.
Q Thank you. Mr. Milner, what was the basis for the 1998 TSLCC?
A The viability assessment that was submitted to Congress.
Q Can we go to page little Roman numeral v, the introduction by – actually, let me ask you, this indicates that Lake Barrett was the acting director at the time this document was signed. Were you the deputy director at that time?
A Acting deputy director, yes.
Q Thank you.
Could we highlight the second paragraph, bring up the second paragraph?
Mr. Milner, could you read that portion, the highlighted portion into the record?
A This TSLCC analysis differs from the previous TSLCC analysis published in 1995, as several key assumptions have changed. First, additional waste from US Department of Energy, parentheses DOE, owned and managed SNF and HLW, disposition of surplus weapons plutonium have been included.
Second, the repository would remain open for at least 100 years following initial waste emplacement and would have the capability to be kept



open with appropriate maintenance and monitoring for up to 300 years. Costs are included in this analysis for 100 years of monitoring.
Third, unlike the 1995 TSLCC analysis that relied heavily on the use of multipurpose canisters, this analysis provides the capability to dispose of a wide range of canistered and uncanistered SNF as well as HLW.
Q Thank you. Mr. Milner, once a new TSLCC has been issued, is the old TSLCC still valid?
A No, it is not.
Q Why not?
A Well, you would issue a new one once the assumptions have changed, the program has evolved.
Q Does DOE prepare a test TSLCC every year?
A Not every year.
Q Mr. Milner, I believe you already testified that it was your office that was responsible for the issuance of the 19 – or the preparation of the 1991 ACR, correct?
A Yes.
Q Were you – was your office also responsible for the preparation of the 1990 ACR?
A Yes, it was.
Q Could I have Defendant's Exhibit 130,



please? Mr. Milner, do you recognize this document?
A Yes, I do.
Q Could you identify it for the Court, please?
A Yes. It was my action memo to the director of RW seeking his approval to publish the 1990 ACR.
Q Who was the director at the time you prepared this memo?
A Dr. John Bartlett.
Q Could we go to the second page, if we could? Now, Mr. Milner, is that your signature on the second page of this document?
A Yes, it is.
Q Okay. Do you recognize that other signature to be that of Mr. Bartlett?
A Yes.
Q Or Dr. Bartlett, excuse me.
A Yes.
Q Could we go back to the first page, please? Could we bring out the second paragraph, the first paragraph under discussion, and highlight it? Mr. Milner, would you please read that, the highlighted portion, into the record?
A The ACR is required to project both the



annual receiving capacity of the waste management system and the annual acceptance ranking of contract holders for ten years following projected commencement of facility operations. The information in the ACR is for planning purposes only and is scheduled to be replaced as required by the contract by a contractually binding annual acceptance priority ranking report on April 1991.
Q Thank you. Mr. Milner, does that excerpt that you just read comport with your recollection regarding the issuance of the 1991 ACR?
A Yes, it does.
Q Can we have Defendant's Exhibit 23, please? Mr. Milner, do you recognize Defendant's Exhibit 23?
A Yes, I do.
Q Would you identify it for the Court, please?
A It was my action memorandum to the director, Dr. Bartlett, seeking his approval for issuing the 1991 ACR.
Q At the time you prepared this memo, did you believe that MRS could still be sited so that DOE could accept spent fuel beginning in 1998?
A Yes, at that time.

Page 4738

Q At the time you prepared this memo, were you responsible for MRS siting activities?
A Yes.
Q And approximately at the time of this memo, approximately how much time did you devote to MRS siting activities?
A Oh, probably something like 30 or 40 percent of my time.
Q Can we highlight the second paragraph in the background, please? We haven't highlighted that, but could you read the portion that's been blown up into the record?
A The 1990 ACR stated that it would be the last ACR to be issued and would be replaced by the acceptance priority ranking, parentheses APR. However, based on discussions with contract holders and their representatives, the department elected to continue to publish the ACR. This change in plans was conveyed to contractholders in a May 15, 1991 from – letter from the department's contracting officer.
Q Thank you.
Mr. Milner, does that sentence accord with your recollection of DOE's decision regarding the issuance of the 1991 ACR?
A Yes, it does.

Page 4739

Q Can we go to the second page of this document? Actually, can we stop that for a second? Mr. Milner, is that your signature on that page?
A Yes, it is.
Q Do you recognize the other signature to be that of Mr. – Dr. Bartlett?
A Yes.
Q Now, could we bring up the first paragraph and highlight the second sentence? Mr. Milner, could you read that highlighted portion into the record?
A While not stated in the ACR, this rate was selected because it is theoretically sufficient to eliminate in the aggregate the need for additional at-reactor out-of-pool storage starting in 1998.
Q Mr. Milner, what was your understanding as to the – about the rates that were contained in the 1991 ACR with regard to meeting any additional at-reactor storage needs?
A Well, if – if you looked at, as it says in the aggregate, you looked at each utility and what their projected spent fuel discharges would be, what their pool storage capacities would be and you aggregated the shortcomings, this rate would have in the aggregate prevented any further need for out-of-pool storage.

Page 4740

Q Okay. Plaintiff's Exhibit 629, please?
Mr. Milner, you've been provided with a copy of Plaintiff's Exhibit 629. Do you recognize this document?
A Yes, I do.
Q Would you identify it for the Court, please?
A Yes. It was my memo to the director, Dr. Bartlett, seeking his approval to issue for comment a draft of the annual acceptance priority ranking.
Q Okay. Can we go to the second page of this document? Do you recognize that to be your signature on that page?
A Yes.
Q Could we go back to the first page? Would you bring up the third paragraph, the second paragraph under "discussion"? Mr. Milner, could you read that portion into the record, please?
A The publication of the APR begins the contractually binding waste acceptance process. The APR will be used in conjunction with waste acceptance rates to be published in the 1991 annual capacity report, parentheses ACR, as the basis for purchasers to submit delivery commitment schedules, parentheses

Page 4741

DCS, beginning in January 1992 for the department's approval. In turn, purchasers will have the opportunity to exchange approved DCSs, also subject to departmental approval.
Q Thank you.
Mr. Milner, does this statement that you just read accord with your understanding as to how firm waste acceptance schedules were to be established with individual utilities?
A It does, yes.
Q Mr. Milner, are you familiar with DOE's plans for the steady-state acceptance rate?
A I believe I am, yes.
Q What is that rate that you're familiar with?
A The steady-state acceptance rate, the design rate, if you will, of the system is 3,000 metric tons per year.
Q Thank you. During your tenure at DOE, has DOE assumed any other design rate for the repository?
A No.
Q During your tenure at DOE, are you aware of any planning basis by which – by DOE in which DOE has assumed a three-year ramp-up period to a steady-state rate of 3,000 MTU?