Page 4742

A No, not that I'm aware.

Q At the time DOE issued the 1991 ACR, was DOE planning to accept waste at a 3,000 MTU rate beginning in 1998?

A No.

Q Why not?

A At – at that time, we assumed that an MRS would be operational in the system. The MRS had a capacity limit of 10,000 metric tons, so a ramp-up rate was designed such that you would not exceed that rate before the repository began operation.

Q Mr. Milner, during Dr. Bartlett's tenure as director, do you recall consideration of the idea that DOE should remove all five-year-old cooled fuel from shutdown reactors?

A What I recall is Dr. Bartlett on occasion mentioning that gee, that would be something that would be good to do or that perhaps we might should look at. I would characterize it as thinking out loud, I guess, really.

Q Do you recall receiving any direction from Dr. Bartlett to implement an acceptance rate that would have allowed all five-year-old cooled fuel to be removed from shutdown reactors?

A No.

Page 4743

Q Would you have been responsible during Dr. Bartlett's tenure for determining what such an acceptance rate would be if you had been directed to develop one?

A I – I would have, yes.

Q Mr. Milner, do you recall attending industry meeting – sorry, attending meetings with utility representatives with Dr. Bartlett?

A Yes.

Q Was attending utility meetings with Dr. Bartlett among your responsibilities?

A It was, yes.

Q Do you recall any meetings at which utility representatives expressed great interest in pursuing exchanges?

A No.

MS. SULLIVAN: One moment, Your Honor. Your Honor, I have nothing further at this time. I would move for admission of Plaintiff's Exhibit 629. That's an exhibit that was on Plaintiff's may-use list. I notified Mr. Shapiro the night before last that we expected that we might use it with Mr. Milner. Mr. Milner's identified the document and authenticated it.

MR. SHAPIRO: We have no objection, Your

Page 4744

Honor.

JUDGE MEROW: Plaintiff's 629 is admitted in evidence.

(PX Exhibit 629 was received in evidence.)

MS. SULLIVAN: Thank you, Your Honor. Might we have a break for the witness?

MR. SHAPIRO: Certainly.

JUDGE MEROW: Do you want to take a – sure. Return about – on the hour?

MR. SHAPIRO: 3 o'clock?

JUDGE MEROW: 3 o'clock.

MS. SULLIVAN: Thank you, Your Honor.

(Recess taken from 2:47 p.m. through 3:03 p.m.)

JUDGE MEROW: Mr. Shapiro?

MR. SHAPIRO: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. SHAPIRO:

Q My name is Robert Shapiro.

A Uh-huh.

Q I'd like to start out asking you some questions about the rate of acceptance. You discussed that topic in various planning documents in your direct examination.

Now, if I understand correctly, the

Page 4745

Department of Energy's purpose in publishing the information contained in documents like the mission plan was for utilities to use it for – for planning purposes, correct?

A Well, in the mission plan at – at that time, since it was the very beginning of the program, we were simply trying to illustrate how a system might operate. I think at that stage of the game, it was too early to say you could use that for planning purposes.

Q What about the mission plan amendment?

A Oh, I think that might have been suitable for some very early planning.

Q And let me turn to the TSLCC. One of the objectives of the TSLCC report is to make cost estimates that reflect as closely as possible the most current Department of Energy program strategy for – for meeting the – the legislative milestones, correct?

A True.

Q And one of your concerns has been to try to ensure that the program is using the same set of numbers and the same assumptions in various documents, correct?

A Well, if you're talking about from – from

Page 4758

Q And that's because that – that three-year difference between repository and MRS opening, that represented the department's best estimate of how quickly it could get an MRS up and running given the linkages?
A Correct.
Q Now, you believed at the time of that November 1989 report to Congress on the reassessment of the Civilian Radioactive Waste Management Program that if the statutory linkages were modified, that the department could begin to accept waste beginning in 1998?
A Yes.
Q And by 1991, you believe that if the linkages between the MRS construction and the repository authorization were maintained so the initial acceptance by DOE could not begin until 2007?
A Correct.
Q And ultimately, the DOE abandoned its effort to site an MRS sometime roughly between 1991 and 1994?
A Yeah, I think it was probably closer to 1994.
Q And even by February of 1994, RW was doing contingency planning for the possibility that an MRS

Page 4759

might not be sited at all. True?
A I don't recall that, but potentially.
Q Well, let me ask you again about your deposition. And this was a short one. Let me ask you if you recall the following question and giving the following answer. Page 359 if counsel wants to follow.
MS. SULLIVAN: Which day?
MR. SHAPIRO: It's May 2.
BY MR. SHAPIRO:
Q Are you on that page, Mr. Milner?
A Yes, sir.
Q Start on line 5. Do you recall being asked the following question and giving the following answer?
Question: So at least as of February of 1994, OCRWM was concerned about the possibility that an MRS might not be sited?
Answer: We were certainly doing contingency planning for that, yes.
That was your testimony, Mr. Milner?
A Yes, it was.
Q And that was accurate testimony?
A Yes, at the time.
Q Do you have a different opinion now,

Page 4760

Mr. Milner?
A Well, that was two and a half years ago. I have different recollections than what I did two and a half years ago, but no, that would be accurate.
Q Now, as of December 1994, that – the end of that year, there was no development work on an interim storage facility, was there, Mr. Milner?
A By that time no, I don't believe so.
Q And DOE has no current plans to site an MRS?
A No.
Q Do you believe that – that an MRS would have offered a better opportunity for the department of meeting the objective of accepting waste by 1998?
A Yes, I do.
Q I'm going to turn to the subject of delivery commitment schedules. You touched on that a little bit during your direct testimony. I'd like to ask you two questions. First, you would agree that if there was no facility to accept fuel in 1998, then the delivery commitment schedules that were entered into between utilities and the department would not be binding and would have to be reevaluated, true?
A Well, I certainly recall discussions as to what would – what would happen in that case and yeah,

Page 4761

I think we would have certainly had to reevaluate what would have occurred.
Q So the delivery commitment schedules could change if circumstances change?
A Potentially, that would have to be evaluated, yes.
Q If circumstances change, the DCSs could change. True?
A I'd have to know what the circumstances were before I knew whether they would change or not.
Q In your opinion, the delivery commitments were really best estimates, good-faith commitments on quantity and timing?
A No, I viewed the DCSs as a binding commitment.
Q Let me go back to your deposition again, once again May 2, the same day that we were at, this time page 396. Have you found that page, Mr. Milner?
A Yes, I have.
Q I'm going to start on line 12. Do you recall being asked the following question and giving the following answer?
Question: Does it change your view about the binding commitment reflected in the DCS? There was an objection from Mr. Shultis.

# Robert Morgan

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC )
COMPANY, CONNECTICUT YANKEE ) Case Nos.:
ATOMIC POWER COMPANY, and MAINE ) 98-126C
YANKEE ATOMIC POWER COMPANY, ) 98-154C
Plaintiffs, ) 98-474C
v. )
THE UNITED STATES, )
Defendant. )

Courtroom Number 5

National Courts Building
717 Madison Place, N.W.
Washington, D.C.

Monday, August 2, 2004

VOLUME 15

The parties met, pursuant to the notice of the Judge, at 10:03 a.m.

BEFORE: THE HONORABLE JAMES F. MEROW



APPEARANCES:
ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY and MAINE YANKEE ATOMIC POWER COMPANY:
JERRY STOUCK, ESQ.
ROBERT SHAPIRO, ESQ.
CATHERINE R. BAUMER, ESQ.
PETER J. SKALABAN, JR., ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005
(202) 898-5800

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY and CONNECTICUT YANKEE ATOMIC POWER COMPANY
MERRILL J. ATKINS, ESQ.
Assisting General Counsel
19 Midstate Drive
Auburn, Massachusetts 01560
(508) 721-3042



APPEARANCES CONTINUED:

ON BEHALF OF MAINE YANKEE ATOMIC POWER COMPANY:
JOSEPH D. FAY, ESQ.
General Counsel
Maine Yankee
321 Old Ferry Road
Wiscasset, Maine 04578
(207) 882-5603

ON BEHALF OF THE DEFENDANT:
HAROLD LESTER, JR., ESQ.
JOHN EKMAN, ESQ.
MARIAN E. SULLIVAN, ESQ.
HEIDE L. HERRMANN, ESQ.
R. ALAN MILLER, ESQ.
KEVIN B. CRAWFORD, ESQ.
RUSSELL SHULTIS, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7562

** Index appears at the end of transcript **



P R O C E E D I N G S

MR. STOUCK: Your Honor.
THE COURT: Yes.
MR. STOUCK: Good morning.
THE COURT: Good morning.
MR. STOUCK: I believe I owe the Court and Mr. Lester a response on whether our case is done. It was left sort of dangling on Thursday. And I would like to address that if I may.
THE COURT: Sure.
MR. STOUCK: Okay. And, frankly, it provides an opportunity, I think, to address in a more comprehensive way -- I think we have this 1726 question.
THE COURT: Oh, fine.
MR. STOUCK: And I would like to do that. It's come up most days but it's been a little piecemeal. I want to make sure we've not been whipsawed, on the one hand under a pretrial process that encourages dealing with a lot of details out of court, and then we get to court and then we are told that we really need to have more witnesses here.
So if I could just address our position on this --
THE COURT: Sure.

normal way of doing business.
Q Do you recall that it translated into any specific requirements that you are aware of?
A No. No, sir.
Q All right, sir. Mr. Morgan, do you recall discussing with Mr. Mills the utilities' belief that the contract – I'm sorry, I already asked that question.
I believe you testified that Mr. Mills discussed with you his belief that the utilities – I'm sorry, the utilities' belief that the contract should contain an acceptance rate; is that correct?
A That's my understanding, correct.
Q And do you recall how he conveyed that idea to you?
A Correctly.
Q Okay. Face to face?
A Yes.
Q In discussions with you in your office?
A Well, he said that, yes, it should include a rate, and I said no.
Q And why did you tell him no?
A Because that was contrary to what was in the rule-making process. That was – several of the comments from utilities had requested that. And in



the process of resolution and prior to publishing the final rule-making, that was denied.
Q All right, sir. Do you recall why it was that that was denied?
A Because of the uncertainties. We didn't know at that time what an acceptance rate would be or could be, and that we had no conceptual design of facilities. We were looking at three different media. One was basalt, one was tuff, and one was salt. And there's no question that the activities in a salt dome would be much less of a construction problem than in the other media. And you could actually run the drifts faster in a salt media.
Q All right, sir. What about plans for transportation at the time the contract was formed? Did you have plans for transportation at the time the contract was being – I'm sorry, when I say at the time the contract was formed, I mean between the time that the draft contract was published and the time the contract was published.
A I was aware that there were inadequate commercial licensed casks available for what would be needed, and that we had to establish a program to get NRC certified casks.
Q All right. So during the time the contracts



were formulated, did you have a plan, a specific plan to be able to do that?
A No.
Q All right, sir. Mr. Morgan, Mr. Mills testified earlier in this trial that after his discussion with you and other program leaders, you agreed that the acceptance rate under the contract would be sufficient to cover the rate of the generation of spent nuclear fuel at the time plus some amount to work off the backlog. Did you agree to that?
A No.
Q Did you make any representations to Mr. Mills or any other representative of the utilities concerning a specific –
A No.
Q – rate?
A No.
Q Did you ever tell Mr. Mills or anyone else that, even though the contract itself would not contain a specific acceptance rate, nonetheless, you agreed that the rate the utilities wanted would be the rate that DOE would begin to use?
A No.
MR. SHAPIRO: Objection. Leading.



THE COURT: Well, I take it that you are asking about specific – I'll overrule the objection. The answer can stand. I think it was a no.
BY MR. MILLER:
Q Mr. Morgan, when you were director of the program, did you ever make any representations to utility representatives in private that were different than the public positions that you took on the program?
A No.
Q And conversely, did you make any public announcements with respect to the program and then in private give different assurances?
A No.
Q Mr. Mills testified earlier in this trial, Mr. Morgan, that you and other DOE officials discouraged written communications with him about the various aspects of the program that you discussed with him. Do you – did you do that?
A That's simply not true.
Q What about your staff? Are you aware that your staff did that?
A No.
Q All right. After publication of the draft contract in the Federal Register, did EEI give you

Page 3630

written input on their position?
A Yes.
Q All right. I would like to show you what's been identified as Defendant's Exhibit 2.034.
MR. MILLER: Your Honor, I have a paper copy for the Court if you would like it.
THE COURT: Thank you, Mr. Miller.
MR. MILLER: Mr. Morgan, do you need a paper copy?
THE WITNESS: No, thank you.
BY MR. MILLER:
Q Mr. Morgan, I'm showing you now on the screen what's been admitted as Defendant's Exhibit 2.034. And I'll ask you if you recognize that.
A Yes, I do.
Q What is it? What do you recognize it to be?
A It's a letter from Edison Electric Institute to me as the project director on – the subject being the standard contract.
Q All right, sir. And do you recognize this to be EEI's comments on the draft contract?
A Yes.
Q All right. Specifically, I'll refer you to page 8 of that letter in the first paragraph. Do you see that?

Page 3631

A Yes.
Q All right, sir. It's been blown up on the screen for you there. Can you see it?
A Yes.
Q All right, sir. If you would, sir, read the first sentence into the record, please, sir. It begins with although.
A Although the contract is generally comprehensive and complete, there are two significant issues on which the proposed contract is silent, DOE performance standards and purchaser remedies. Article 2 states that the disposal services shall commence not later than January 31, 1998, a provision consistent with the Nuclear Waste Policy Act.
Q All right, sir. I'm sorry. Would you go on and just read the next two sentences?
A However, no other milestones are included. Nor does the contract commit DOE to accept any given quantity of SNF/HLW, period.
Q All right, and SNF refers to spent nuclear fuel?
A Yes. And HLW is high-level waste.
Q All right, sir. And do you recall that statement to be true, that last statement that you read, that is, that the draft does not – the draft

Page 3632

contract did not commit DOE to accept any given quantity of SNF?
A That's correct.
Q All right, sir. I'll next refer you to page 2 of appendix A, which is an attachment of this letter. And if you'll look at the second paragraph, please, sir.
All right. Do you see that blown up on the screen for you, sir?
A Yes.
Q All right, sir, beginning in the sentence in the middle of the page that begins while the contract, do you see that?
A Yes.
Q Would you read that, please, sir?
A While the contract may not be the appropriate place to commit DOE to a specific, numerical receiving rate, DOE should recognize, at least quantitatively, the need to have adequate annual receiving capacity to handle industry needs.
Q All right, sir. Please go on.
A This would be consistent with the direction of section 302(a)(5) of the act that DOE will take title to spent nuclear fuel and high-level waste as expeditiously and practicable upon request of the

Page 3633

generator or owner.
Q All right. That's "as expeditiously"?
A Expeditiously as practical. Right. Excuse me.
Q That's all right, sir. Start with the sentence that begins with "a new clause."
A A new clause should be added, and then there's a clause.
Q All right, sir. Would you just read that?
A Whereas DOE recognizes that its ability to take the delivery of spent nuclear fuel and/or high-level radioactive waste must be commensurate with the amount of such fuel and waste then being generated, together with the amount of such fuel and waste previously generated, and consistent with its obligation to take title to such fuel and waste as expeditiously as practicable upon the request of the owner or generator of such fuel and waste.
Q All right, sir. Now, do you recall that to be the acceptance rate that Mr. Mills discussed with you when he came to talk to you about the contract acceptance rate?
A Yes.
Q And, sir, when you published the final rule in April of 1983, did you include that qualitative

Page 3634

whereas clause that was requested?
A No.
Q And why? For what reason did you take that – did you not include it, if you will?
A Because the entire program had not been defined. We did not know what the acceptance rate would be. And we felt that that should be included in the mission plan.
Q All right, sir. We'll talk about the mission plan a little bit later. But did you – even though you didn't put an acceptance rate in the final contract, did you give any different assurances to anyone about some unwritten agreement on acceptance rates in the contract?
A No.
Q In that regard, Mr. Morgan, do you recall Mr. Mills asserting to you that the 1-mill fee be paid – that was being paid under the contracts was in return for a specific rate of performance on DOE's part?
A I don't know that I can say that was what was specifically said, but that was certainly part of the – what I understand the message that he was transmitting.
Q Okay. And did you ever agree with Mr. Mills

Page 3635

that the 1-mill fee was being paid in return for some level of DOE performance under the contract?
A No. I did not agree with that.
Q All right. The question of – I'm sorry. I'll start again.
I'm sorry, you may have answered this. If you did I apologize. Do you recall if Mr. Mills ever equated the rate, the acceptance rate that the utilities wanted in the contract to some specific number of metric tons of uranium per year?
A I don't really recall.
Q All right, sir. Even if he had done so, would a specific number have mattered to you at the time the contract was formed?
A No.
Q Why is that?
A It was premature.
Q Why was it premature?
A Again, because of the status of the program, in the contract, which was, you know, happening immediately after my arrival, that process, that I felt it was inappropriate to – for us to commit to any receipt rates at that time.
Q All right.
A And that it was to be dealt with in the

Page 3636

mission plan.
Q All right, sir. Now, did you ever agree with Mr. Mills that the 1-mill fee was being paid by the utilities in return for a 3,000 MTU acceptance rate?
A No. No.
Q All right, sir. In the context of the contract, do you recall the concept of oldest fuel first or OFF?
A Yes.
Q And what was that concept?
A The concept was to take the oldest fuel first –
Q All right, sir.
A – from the utilities. In other words, first out of the reactor would be the priority of acceptance to the repository.
Q All right. Do you recall, sir, why you indicated that there needed to be a priority of acceptance?
A Well, because everybody would like to get rid of their fuel as quickly as possible. And we felt that we should take the oldest fuel first. And of course that would be the fuel that had the greatest decay so it would have less heat load on the

Page 3637

repository.
Q All right, sir. Did you believe at the time the contracts were formed that you would be able to accept everything utilities wanted you to take all at once?
A No.
Q And why was that, sir?
A It was impossible. It couldn't be done. One for the reason that you're going to have to have a certain rate of acceptance at a repository, which would not meet the – what the utilities would like to release to us.
Q All right, sir. Do you recall a provision in the contract that allowed utilities to exchange their allocations of acceptance?
A Yes.
Q Do you recall if that was requested by the utility?
A Yes. And then there were – during the rule-making process, there were utilities that thought that should be removed. And in the process, we resolved that by leaving that provision in.
Q All right, sir. I'll show you now Yankee Exhibit Number 30.
MR. MILLER: All right, Your Honor, I'm

Page 3642

BY MR. MILLER:
Q Can you see that okay, Mr. Morgan?
A Yes.
Q The cover page of this document says that it's the proceedings of the 1983 Civilian Radioactive Waste Management information meeting, December 12th to the 15th, 1983.
Do you see that?
A Yes.
Q All right. Do you recall this proceeding, Mr. Morgan?
A Yes.
Q All right. Specifically, I'll refer you to page 11. And do you recognize – recognize page 11, Mr. Morgan? Can you see it?
A Yes.
Q I've got a paper copy.
A No, I can see it.
Q Do you recall making a presentation at this December '83 information meeting?
A Yes.
Q All right. I'll refer you specifically to the second column – I'm sorry, to the right-hand column, the second paragraph. And I believe this document refers to your having just received a

Page 3643

preliminary draft of volume 1 of the mission plan. And you hoped to have that available to interested parties, the states and others, by Christmas. Do you see that?
A Yes.
Q And do you recall whether or not you were able to make that draft mission plan available at or around that time?
A I know we put out the mission plan around that time. But I'm not sure whether it made the Christmas date or not.
Q All right. How about the fourth paragraph, sir. Would you have a look at that. I'm sorry. It's the next paragraph. Okay. Do you see that paragraph now, the one that's highlighted, Mr. Morgan?
A Yes.
Q Would you read that first sentence, please, sir?
A I would like to talk a little bit about the strategy as laid out in the mission plan and what we intend to do. I think most of you know that the act requires that we receive waste from the utilities by January 1, 1998.
Q All right, sir. I'm sorry. I was just referring to the first sentence there.

Page 3644

And long about the middle of the paragraph where it says the basic strategy, do you see that?
A Yes.
Q Would you read that, please, sir?
A The basic strategy which we've outlined in the mission plan is that beginning in 1998 utilities will not have to provide any additional storage facilities on the site.
Q All right, sir. Now the word you used there was strategy. Did you believe that the information you set out in the mission plan was a contractual requirement?
A No.
Q What was it then?
A As required by the act, section 3, it was an informational document, clearly not contractual.
Q All right, sir. And in your mind what did it represent to the program?
A It represented the goals and what we would like to accomplish relative to specific activities.
Q All right, sir. And so with respect to your previous statement about dealing with the acceptance rate in the mission plan, we'll talk a little bit about the mission plan in a minute, but did you perceive the rates in the mission plan to be

Page 3645

contractual requirements?
A No.
Q All right, sir. Now, I would like to refer you to the last sentence in that paragraph – I'm sorry, Dawn. The last sentence in that same paragraph.
Would you just read that, please, sir?
A During the first year of operation of the repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on site or at another location.
Q All right, sir. Did you feel that statement reflected contractual intent on the part of the Department?
A No.
Q All right, sir. Once, again, sir, what did you think it represented?
A It was in the plan to notify or let the utilities realize that they would not have to make additional commitments for on-site storage after the beginning of 1998. But they would – if you look at the mission plan, it shows –
Q Which we're going to do in just a minute.
A It shows an increase of stored fuel because

Page 3646

the rate starting in 1998 did not meet the discharge rates until later on in the program.

Q All right, sir. We'll look at that now, if you don't mind.
Yankee Atomic Exhibit 636. All right.
Mr. Morgan, I'm showing you now what's Plaintiffs' Exhibit 636. Do you recognize this document, sir?
A Yes.
Q And is this the document that was – that was produced by the program during your tenure?
A Yes.
Q All right, sir. If you'll look at page 1-2, please, sir, and the last paragraph. And the first sentence in that paragraph, sir, would you just read it.
A It is the department's intent to update this mission plan periodically as the program progresses.
Q I'm sorry, sir. The first sentence that's highlighted there.
A Oh, the first sentence.
Q Yes, sir. In that paragraph?
A The mission plan has been prepared as a means of both planning the program and demonstrating its conformance to the requirements of the act.
Q All right, sir. And do you recall that –

Page 3647

that that's what you intended the mission plan to be at the time you published this document?
A Yes. It was an informational document.
Q All right, sir. What relationship did it have to the department's contract with the utilities?
A None.
Q And once again, sir, did this statement that's contained in the – I apologize. Let me move on to page 2-1, please.
And actually, I want to – sorry. Can you blow this up.
The last paragraph is the one I wanted to ask you about there, Mr. Morgan. Do you see that?
A Yes.
Q All right, sir. Once again, that first sentence there, would you read that?
A This approach is designed to ensure that all utilities will be able to establish firm planning schedules for the disposition of their radioactive waste sufficiently early to determine their on-site interim storage needs prior to 1998.
Q All right, sir. And just go on. Read the –
A Until 1998, each utility will be responsible for providing its own additional on-site interim

Page 3648

storage unless the utility applies for and is certified for the Federal Interim Storage Program.
Q All right, sir. Do you recall that that represented your view at the time, that was that utilities were responsible for providing their own additional on-site interim storage?
A Yes.
Q And once again in your mind, you intended this plan to inform the utilities about what they could anticipate as far as their additional storage?
A Yes.
Q All right, sir. If we go to the bottom of 2-2 and the top of 2-4.
All right, now, Mr. Morgan, I believe that in between pages 2-2 and 2-4 there's a table that we'll talk about in a minute. But I believe that this language that's highlighted here on 2-2, 2-4 – 2-4 is a continuation of 2-2. So I'll ask you to read that – just read it to yourself and let me know when you're finished.
A I'm finished.
Q All right, sir. Now in the first sentence there you say: While the department's acceptance rate during the initial 5 years is set to prevent, in the aggregate, the need for utilities to provide

Page 3649

additional on-site storage after 1998. Do you see that there?
A Yes.
Q In that part of that sentence that I read, what does in the aggregate mean? Do you recall?
A The total discharge from the utilities versus the acceptance at the repository.
Q Okay. I'm sorry. When you referred to the in the aggregate, as far as the department's acceptance rate is concerned, what was –
A The total.
Q What did you mean?
A The total. In the aggregate means if you look at the discharge – well, in total, you don't – most of the utilities won't have to add on-site storage.
Q All right, sir. And the sentence that begins the planning basis, do you see that?
A Yes.
Q I'll read that. The planning basis assumes that, after 1998, individual utilities who actually realize this need – and that is the need for expanded storage, I believe – will arrange for the right to ship spent fuel to the Department from a utility who is next in the queue in shipment allocation.

Page 3650

Do you see that?
A Yes.
Q And it goes on to say subject to prior approval by the Department. Do you see that?
A Yes.
Q Do you understand that to refer to the exchange provision?
A Yes.
Q All right, sir. So as far as individual utilities were concerned, if they had individual storage needs after 1998, you anticipated that they could use the exchange provision to cover that?
A Yes.
Q All right, sir. Could we look at table 2-2. I'm sorry. That's table II-1. That's what I intended to refer to. Can you see that, Mr. Morgan?
A Yes, I can.
Q In the lower right-hand corner it looks like this page fell in between pages 2-2 and 2-1, right, sir?
A Yes.
Q Up at the top, that's called the Waste Acceptance Schedule. Do you see that?
A Yes.
Q All right, sir. Do you recognize this waste

Page 3651

acceptance schedule?
A Yes.
Q And what did it indicate to you?
A It indicated our goal on the first repository acceptance MTUs in 1988 for 5 years at one rate, and then subsequent years at 3,000 MTU. It shows the second repository coming on line after the first 5 years. Then it has a column of cumulative acceptance. And the remaining backlog, which doesn't start being reduced until 3 years after the second repository, or 2 years after the second repository is in place and operating.
Q All right, sir. Now, I believe you – you may have misspoken. I believe you said it shows a schedule beginning in 1988. You meant 1998, did you not?
A 1998, yes.
Q All right, sir. And once again, it's – the rates that are reflected in this table, did you consider those to be contractual requirements?
A No.
Q And why was that?
A Because the mission plan as stated in section 3 was an informational document, not a contractual document.

Page 3652

Q All right, sir. And did you ever represent to anybody in discussions with – well, any utility representatives or anyone that the mission plan reflected contractual obligations?
A No, I did not.
Q And is that, sir, because of the many uncertainties that you've already testified to that existed at the time?
A That's correct.
Q All right, sir.
Sir, the column that's entitled – the second column from the left that's entitled annual spent fuel generation, do you see that?
A Yes.
Q Mr. Mills said he believed that this column was not accurate. Did you have any reason then or do you have any reason now to doubt – to doubt the validity of the figures in that column?
A That was the information that we had at the time.
Q All right. Do you recall what the source of the information was?
A No, I don't.
Q All right, sir. But you believe that information to be accurate there?

Page 3653

A Yes.
Q All right, sir. Now, Mr. Morgan, Mr. Mills testified that he met with you after this draft mission plan was issued to register his disappointment, the utilities' disappointment with your statement about the goal of preventing the need for additional at-reactor storage and eventually matching the generation reg. Do you recall him talking to you about that?
A I'm sure he did.
Q All right, sir. And he also said that the acceptance schedule that's reflected in this table II-1 did not comport with the agreed understanding that he had with you and other DOE officials about the acceptance rate that was expected under the contract. Do you remember that?
A I did not have an agreement with him as to acceptance rate, period.
Q All right, sir. But do you recall him expressing that opinion to you about the rates reflected in the mission plan?
A Start back over –
Q All right, sir.
A – because I'm thinking that you're still referring to agreements that I had with Mr. Mills.