Page 3654

And I didn't have any agreement with Mr. Mills.
Q All right, sir. I believe you said that you recalled Mr. Mills discussing with you the rates that are reflected in the draft mission plan –
A Yes.
Q – that we've been talking about –
A Yes.
Q – is that correct?
Do you recall that he said that the rates, the schedule there didn't comport with the utilities' understanding that he thought he had with you and other DOE officials about the acceptance rate that they expected under the contract?
A I did not have any agreements with Mr. Mills or any of the utilities as to rates of acceptance.
Q Under the contract?
A Under the contract or relative to this schedule, this table.
Q All right, sir. Just a few more questions and I believe I'll be finished with my direct testimony, Mr. Morgan.
Do you recall if before the Nuclear Waste Policy Act, was there a specific statutory direction to DOE to develop a repository?
A Not that I know of.

Page 3655

Q Okay. By the way, after you took over the program, did Mr. Brewer, Mr. Coffman, did they have anything to do with decision making on the program?
A No.
Q All right. So you and your new staff in the – in the office were the – were you the sole individuals responsible for implementing the act?
A I was responsible –
Q You were?
A – for implementing the act.
Q The buck stopped with you; is that correct, sir?
A Yes, sir.
Q I'm sorry?
A Yes, sir.
Q And you reported to Secretary Hodel; is that correct?
A That's correct.
Q Okay. Between the time the draft contract was published and the final contract was published, had you begun to develop the design for the repository?
A That was in the process. So, yes, we would have started development of a design.
Q Okay. What about specific design –

Page 3656

repository design receipt rates? Had you begun to do that at the time the contract was formed?
A No.
Q Do you recall Mr. Mills representing to you or arguing to you that the acceptance rate under the contract should be the repository design receipt rate?
A There wasn't a receipt rate under – in the contract.
Q Yes, sir.
A So the question again?
Q Yes. Do you recall that Mr. Mills asserted to you that that's the rate that should be in the contract, the repository design receipt rate?
A I don't – I'm sure that he could have. I don't know.
Q Okay, sir. Had he done so at the time, would you have made a representation to him that the contract receipt rate would be the repository design receipt rate?
A Absolutely not.
Q And why was that? Why would you not have done so?
A Because we dealt with that in the rule-making process. And there was no way that I would go through a rule-making process without, you

Page 3657

know, in the contract, and denying a receipt rate and turn around and make a – an agreement otherwise. That's ludicrous.
Q All right, sir. Do you recall if the contract did address the manner in which DOE would accept spent nuclear fuel from the utilities?
A Yes. In the appendices.
Q All right. And do you recall what the contract said about it in general?
A That there would be a process that would be an acceptance rate that would be negotiated with DOE at a later point in time.
Q All right, sir. At the time the contract was finalized, did you know what that rate would be?
A No.
MR. MILLER: All right, sir. Just one moment, Your Honor, to make sure –
THE COURT: Take all the time you need.
MR. MILLER: All right. Your Honor, due to the lateness of the hour, is it all right that we break for tonight? It may be I have a few additional questions. I would sort of like to, especially considering the hour, to consider that.
THE COURT: Sure. We can do that.
MR. MILLER: All right. Thanks, Your Honor.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY, )
CONNECTICUT YANKEE ATOMIC POWER )Case Nos.:
COMPANY, and MAINE YANKEE ATOMIC ) 98-126C
POWER COMPANY, ) 98-154C
Plaintiffs, ) 98-474C
)
THE UNITED STATES, )
Defendant. )

Courtroom 5
National Courts Building
717 Madison Place, N.W.
Washington, D.C.

Tuesday, August 3, 2004
Volume 16

The parties met, pursuant to the notice of the Judge, at 10:00 a.m.

BEFORE: THE HONORABLE JAMES F. MEROW



APPEARANCES:

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY and MAINE YANKEE ATOMIC POWER COMPANY:

JERRY STOUCK, ESQ.
ROBERT SHAPIRO, ESQ.
PETER J. SKALABAN, JR., ESQ.
VIVEK K. HATTI, ESQ
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005
(202) 898-5800

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY:

MERRILL J. ATKINS, ESQ.
Assisting General Counsel
19 Midstate Drive
Auburn, Massachusetts 01560
(508) 721-3042

(Appearances Continued on the Next Page.)



APPEARANCES CONTINUED:

ON BEHALF OF MAINE YANKEE ATOMIC POWER COMPANY:

JOSEPH D. FAY, ESQ.
General Counsel
Maine Yankee
321 Old Ferry Road
Wiscasset, Maine 04578
(207) 882-5603

On Behalf of the Defendant:

HAROLD LESTER, JR., ESQ.
JOHN EKMAN, ESQ.
MARIAN E. SULLIVAN, ESQ.
HEIDE L. HERRMANN, ESQ.
R. ALAN MILLER, ESQ.
KEVIN B. CRAWFORD, ESQ.
RUSSELL SHULTIS, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7562

***Index appears at end of transcript***



P R O C E E D I N G S

\- - - - -

MR. MILLER: Your Honor, we appreciate the Court's indulgence in letting us get our thoughts together over the evening hours. I just have one additional question for Mr. Morgan on my direct examination.

THE COURT: Go ahead, whenever you're ready.

Whereupon--

ROBERT MORGAN

a witness, called for examination, having been previously duly sworn, was examined and testified further as follows:

DIRECT EXAMINATION (Resumed)

BY MR. MILLER:

Q. All right. Sir, if we could go back on Plaintiff's 678. Mr. Morgan, you recall we talked about this exhibit yesterday in your testimony?
A. Yes.
Q. And you recall this document, do you not?
[redacted]
Q. Mr. Morgan, you recognize this, do you not, as the second page of the statement you made at the December 1983 information meeting?
A. Yes.

Page 3665

Q. Sir, if you can, just reading from the one-sentence paragraph that begins, "This is our basic strategy," do you see that?
A. Yes.
Q. If you could just read that to the end of the page, the rest of the page, please, sir and then let me know when you're done.
A. I'm done.
Q. Could you just explain to the Court, Mr. Morgan, what it was you were trying to convey in this last part of your statement?
A. I was trying to convey that, although the schedules we felt were very tight, it was our intent to meet the requirements of the Nuclear Waste Policy Act and receive fuel in January 1988.
Q. I'm sorry, sir, you said January 19 --
A. 1998.
Q. All right, sir.
A. And that even though it was tight, we had the alternative to kick in, which was the monitored retrievable storage program, and that would be the back up. We were also trying to do everything we could relative to the repository by doing as many things in parallel as we could to reduce the schedule.

Page 3666

Q. All right, sir, and so that's what you were trying to convey as a result of your, of the last part of your statement there?
A. Yes.
Q. All right, sir.
MR. MILLER: No further questions at this time, Your Honor.
THE COURT: Okay. Cross-examination.
MR. MILLER: Mr. Morgan, do you need some water up there?
THE WITNESS: I would appreciate it.
MR. MILLER: All right.
CROSS-EXAMINATION
BY MR. SHAPIRO:
Q. Good morning, Mr. Morgan.
A. Good morning.
Q. I have a few questions for you. Let me start off about, and I just want to confirm something I think I understood from your direct testimony. You first got a copy and read the Nuclear Waste Policy Act after the Secretary asked you to take your deposition, is that right?
A. That's correct.
Q. So you weren't involved at all in the development of that Act?

Page 3667

A. That's correct.
Q. And after your approximately one-year tenure as acting director of the Nuclear Waste Project Office, you didn't follow what happened with the nuclear waste program after that time, did you?
A. No, I was busy with other activities.
Q. And you didn't subsequently consult with any entity on issues that involved commercial spent nuclear fuel?
A. I think that when Mr. Rusche was appointed, we shared an apartment in Washington, D.C. and to say that we never talked about the Nuclear Waste Policy Act would be incorrect.
Q. But other than your informal interactions with Mr. Rusche?
A. That's correct.
Q. Now, you spoke a number of times in your direct examination, Mr. Morgan, about what you did not agree to in terms of putting into the contract, but actually, while you were at the Nuclear Waste Project Office, the Department of Energy never really defined how the scheduling process for accepting spent fuel would work, isn't that true?
A. I believe that was in the appendices of the contract.

Page 3668

Q. But while you were there, did the project office define how the scheduling process would work?
A. Well, that was defined in the contract.
Q. I want to ask you a few questions about the contract in just a moment. Mr. Morgan, while you were acting director, did you deal with actual pickups of spent nuclear fuel and high-level waste?
A. Did I deal with the acceptance of fuel?
Q. Right.
A. We accepted no fuel during the time that I was there.
Q. So you didn't have occasion to deal with those issues?
A. That's correct.
Q. Now, you were not actually involved in the decision to develop the standard contract on rule-making, were you? You weren't the one who decided to use a notice and comment rule-making process to develop the project?
A. No, that had started before I arrived.
Q. And in fact, you don't know why, in fact, the Nuclear Waste Policy Act even specified that the program would be pursued through contracts, do you?
A. I didn't, I don't understand the question.
Q. The Nuclear Waste Policy Act directs that

Page 3673

Q. But nevertheless, Mr. Morgan, the subject to make sure that the fee will provide sufficient revenues to cover the program, that was important, wasn't it?
A. Yes.
Q. And that was something that would have concerned you when you were acting director of the program?
A. It was required by the Act to assess the one mill per kilowatt after a year.
Q. Well, this document actually came out in June 1983, closer to six months, didn't it?
A. That's what it says. I don't know if it was published at that point in time or if it was published later.
Q. And this document was prepared after extensive analyses, wasn't it?
MR. MILLER: Objection, Your Honor, foundation, the witness said he hadn't seen the document.
BY MR. SHAPIRO:
Q. You were director of the program, weren't you?
A. Yes.
Q. Well, if I could turn your attention to the

Page 3674

third paragraph on the first page, the same page we're looking at, I'll read that first sentence of that paragraph to you. "This report presents the results of extensive analyses that explore the cost of implementing a nuclear waste disposal program."
A. Yes.
Q. Do you recall such analyses?
A. I don't recall such analyses. This was not required by the Act until one year after the Act was enacted.
Q. But it was important, whenever the timing was, to make sure you got the analysis right to make sure the fee covered the cost of the program, wasn't it?
A. That's correct.
Q. If I could ask you to turn your attention to page 11 of this document, do you see that, Mr. Morgan?
A. Yes.
Q. And on this page, in fact, there is a reference case for receipt of spent nuclear fuel by the government. It's shown there in that, in this table?
A. That's correct.
Q. And this was part of the analysis that

Page 3675

determined whether or not that fee was going to be adequate?
A. I testified regarding this table, which is, I believe, the exact same numbers that were in the mission plan, and that's what I testified to yesterday.
Q. And you thought that these numbers were reasonable for purposes of the analysis of making sure that the fee was adequate?
A. At this time, it was.
Q. And other than the acceptance rate shown on this table on page 11 of Plaintiff's Exhibit 971, there is not another reference case for waste acceptance, other than this one, when you were acting director, was there?
A. This table was published in the mission plan that came out in December 1983.
Q. And this was, and the acceptance rate that's shown here, roughly 1,800 MTU per year for the first five years and then 3,000 MTU thereafter, that was really the only acceptance reference piece –
A. That was a reference case we were using at the time.
Q. You certainly weren't looking at any reference case that would accept lesser amounts of

Page 3676

spent fuel, were you, than what's indicated here in 978?
A. No, but I do recall that the mission plan that was finally submitted the following year by Mike Lawrence had reduced numbers in it.
Q. Well, I suspect we'll get to that mission plan when we get to Mr. Lawrence or even Mr. Rusche following your testimony, Mr. Morgan.
A. Fine.
Q. I appreciate your help with that document. I want to turn now to a slightly different subject. Actually, it really concerns the document that Mr. Miller just asked you about, but let me ask you a few questions before we turn to that document. It was your belief, when you were acting director, that the Department of Energy should adopt a strategy such that no utility would have to plan or construct additional at-reactor storage after 1998, isn't that correct?
A. That's correct. Let me just add that there would, there might have to have been contracts by the utilities entered into prior to January 1998 where construction would be going on after that date, so that there would be no new contracts required by the utilities. That was our intent.

Page 3685

we get to that now since you've asked for it? I don't want to deny you the document. As you'll see, this one is marked Plaintiff's Exhibit 636.

A. Correct.

Q. And we were starting to talk about the acceptance rates, which you spoke about to some extent yesterday, and those were on a table on page 2-3. Do you see that table?

A. Yes.

Q. And do you see the acceptance rate that's indicated there, again, it's 1,800 MTU for five years and then 3,000 MTU thereafter?

A. Yes.

Q. And you thought that was a reasonable acceptance rate for the program, correct?

A. At that time, yes.

Q. And this acceptance rate, again, the 1,800 MTU for five years and 3,000 MTU thereafter, this acceptance rate in the draft mission plan was intended to be enough, as you indicated earlier, to avoid the need for additional at-reactor storage after January 31, 1998, correct?

MR. MILLER: Objection, asked and answered numerous times.

THE COURT: Well, one more time won't hurt.

Page 3686

I'm going to overrule the objection. If you will answer?

THE WITNESS: Again, you will note that when the first repository opens in 1998, there is still, on the right-hand column, an increase in the backlog, and that, when I testified earlier, I believe said that there would be no need for additional commitments for construction of on-site storage facilities, but that there would be some commitments that would be in construction during that time, after 1998.

BY MR. SHAPIRO:

Q. You couldn't solve all of the problems that utilities would have in storing spent fuel, but you could solve a lot of them, is that what you're saying?

A. That was our attempt.

Q. The bottom line is that, in your opinion, DOE should perform the removal of spent nuclear fuel as fast as it reasonably could, didn't you?

A. I believe that was the intent of Congress and the Act.

Q. I want to switch subjects just a little bit to the kinds of things that the program was intended to accept. I want to focus on high-level waste. Was

Page 3687

your understanding that the standard contract's definition of high-level waste covered waste from utilities that they had taken from the core of their reactors that the NRC considered high-level waste, correct?

A. The Act says that, if the NRC defines core components as high-level waste, they will be accepted in the repository. They have to be defined as high-level waste by NRC.

Q. I want to get to your understanding, Mr. Morgan.

A. That was my understanding of what was in the Act.

Q. Let me ask you just a couple more questions. Wasn't it your understanding that this high-level waste included material that utilities had taken from their core, including shrouds, holders, end caps?

A. At that time, there had not been a definition by NRC that this was to be considered high-level waste, so I did not consider it. I believe it was still GTCC.

Q. I'm going to turn back to your deposition again, and this is on a different day. And here, I have a question and answer that's a little bit longer

Page 3688

than the last one. Maybe it would make sense to put that in front of you, so we can make sure we're all on the same page, June 25th of 2002. Mr. Morgan, I'm going to refer you to page 24.

A. At which tab?

Q. The June 25th tab, the last one.

A. What page, please?

Q. 24.

A. Yes.

Q. And I'll read it for you. It's a little bit long. I'm going to start on line 13 where a question begins. It starts:

"Okay. And then starting on line 11, your next answer, you said this, 'This to me deals with some of the high-level waste that some of the utilities had taken from their core that the Nuclear Regulatory Commission considered defined as high-level waste' or maybe defining, it might be a transcription error."

"My question is, Can you tell me just a little bit more about what you had in mind with this phrase 'high-level waste' that some of the utilities had taken from their core? What materials are we talking about?"

And your answer, "Some of the material that

Page 3693

proceeding, there might have been a little bit of confusion on that point.
But ultimately, we're talking about the same relevancy. Thank you for your time.
THE WITNESS: You're welcome.
THE COURT: Any redirect?
MR. MILLER: Short redirect, Your Honor.
THE COURT: One more round here.
REDIRECT EXAMINATION
BY MR. MILLER:
Q. You thought you were going to get away, didn't you, Mr. Morgan?
THE COURT: I don't blame you, you want to go back to Oregon, I think.
THE WITNESS: I now live in Colorado.
THE COURT: Oh, Colorado.
BY MR. MILLER:
Q. Mr. Morgan, did DOE elect not to put a rate of acceptance in the standard contract?
A. Yes.
Q. Was that a deliberate choice on your part?
A. Yes.
Q. Did DOE feel – well, can you tell me why you didn't, that you didn't put a specific rate of acceptance in the contract?

Page 3694

A. I felt that it, because of the uncertainties of the program, which I've discussed earlier, the NRC licensing process characterization, the R&D and other activities, that I thought it was not prudent to put an acceptance rate in the contract.
Q. And what about your knowledge of the technical or technological or scientific capabilities that you were going to have to have at the repository, did you know what those were at that time?
A. Not in total because of the fact that NRC had not identified the requirements for licensing.
Q. Okay.
A. And quite honestly –
Q. I'm sorry.
A. Geologists are great. It's a historical science, not a predictive science, and they can tell you what happened five million years ago, but they won't tell you what's going to happen tomorrow, and that was a problem that we had to deal with.
Q. So that was a concern of yours?
A. Yes, that was a concern of mine.
Q. In your mind, I'm sorry, in your mind, was this program a first of its kind of project?

Page 3695

A. Yes.
Q. Was it possible for DOE to predict, in 1983, what rates they would be able to use in accepting fuel in 1998?
A. No.
Q. Based on your understanding of the Act, the NWPA, did it require that DOE accept spent nuclear fuel and high-level waste starting in '98 at a rate that would preclude utilities from adding further storage facilities on-site?
A. No, that was not part of the Act.
Q. Was that a program goal that you had at the time you were director –
A. That was a program goal that we identified in the mission plan.
Q. And is that a goal that DOE specifically declined to put in the contract?
A. Yes. I must say that we hadn't identified, at the time the contract was signed or prepared, we had not identified the acceptance rates that we later included in the mission plan. We hadn't gotten that far at the time of the contract. The Act required that we have the utilities sign a contract by June 30th, 1983, and we had not gotten to any design, conceptual design on the repository at that time.

Page 3696

Q. All right, sir. In your mind, Mr. Morgan, what's the difference between a program goal and a contractual requirement?
A. They were totally separate. The contract was the agreement between DOE and the utilities, and the program goal was our best efforts at meeting the requirements of the Act. They were totally different.
MR. MILLER: I have no further questions, Your Honor. Thank you, Mr. Morgan.
THE COURT: Anything further?
MR. SHAPIRO: Nothing further, Your Honor.
THE COURT: All right. You're excused, and thank you very much for your testimony.
THE WITNESS: Thank you, sir.
MR. MILLER: Your Honor, the government calls, as its next witness, Mr. Benard Rusche.
Whereupon–
BENARD C. RUSCHE
a witness, called for examination, having been duly sworn, was examined and testified as follows:
THE COURT: Just take a seat.
DIRECT EXAMINATION
BY MR. MILLER:
Q. Are you all set, Mr. Rusche?

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

TENNESSEE VALLEY AUTHORITY, )
Plaintiff, ) Case No. 01-249C
v. )
THE UNITED STATES, )
Defendant. )

Courtroom 4
National Courts Building
717 Madison Place, NW
Washington, D.C.

Thursday, July 14, 2005
Volume 10

The parties met, pursuant to the notice of the Judge, at 9:31 a.m.

BEFORE: THE HONORABLE CHARLES F. LETTOW



APPEARANCES:
ON BEHALF OF THE PLAINTIFF:
PETER K. SHEA, ESQ.
EDWIN W. SMALL, ESQ.
TENNESSEE VALLEY AUTHORITY
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1499
(865) 632-7319

ON BEHALF OF THE DEFENDANT:
ALAN J. LO RE, ESQ.
SONIA ORFIELD, ESQ.
SHARON A. SNYDER, ESQ.
KEVIN CRAWFORD, ESQ.
MARIAN SULLIVAN, ESQ.
U.S. Department of Justice
1100 L Street, Northwest
Washington, D.C. 20530
(202) 305-7562

***Index appears at end of transcript***



P R O C E E D I N G S

\- - - - - -

THE COURT: Good morning, Mr. Lo Re.

MR. LO RE: Good morning, Your Honor. Just one housekeeping note before we begin. We had been scheduled to start Mr. Morgan's video conference at 11:00 a.m. the video conference worked fine. However, there was a little bit of a delay in getting the documents to Mr. Morgan that we'll be using with him, so we are now anticipating doing that at noon, rather than 11.

We are anticipating less than an hour of testimony with Mr. Morgan, and what we would propose is that perhaps we could push our lunch break to closer to 1 p.m., rather than the usual 12:30, and that way, I believe that, I've spoken with counsel from TVA on this, and I believe that we could get Mr. Morgan finished maybe, just with the consequence being we just take a slightly later lunch.

THE COURT: Mr. Shea?

MR. SHEA: We're certainly agreeable, Your Honor.

THE COURT: Thank you. We will do that.

MR. LO RE: Thank you, Your Honor.

THE COURT: Mr. Crawford.



MR. CRAWFORD: Thank you, Your Honor.

THE COURT: See, if I don't hear Chapman's name, I'm fine.

MR. CRAWFORD: Well, unfortunately, we'll probably hear it a couple more times today, but no problem, I respond to either one. Just point at me, and I'll know who you're talking about.

Whereupon--

STEPHEN KIRALY

a witness, called for examination, having been previously duly sworn, was examined and testified further as follows:

DIRECT EXAMINATION (Resumed)

BY MR. CRAWFORD:

Q. All right. Mr. Kiraly, where we left off yesterday, you had just told us about the fact I think you had received some more support from TVA after the time of, after the submission of your report. And once again, can you just tell us what that labor support consisted of?

A. Yes, excuse me. After the submission of my report, I received the same type of labor data that I had received for Browns Ferry for fiscal year 2004. This labor support was for the rest of Browns Ferry during the claim period, as well as for Sequoyah, and it allowed me to do the same type of analysis that I

Page 2186

THE COURT: Mr. Kiraly, I believe – Mr. Crawford?

MR. CRAWFORD: No further questions.

THE COURT: Mr. Shea, may I excuse Mr. Kiraly as a witness?

MR. SHEA: You may, Your Honor.

THE COURT: Mr. Kiraly, I may now excuse you as a witness, and I do so with appreciation, and thanks for your testimony here yesterday and today. You are excused.

THE WITNESS: Thank you, Your Honor.

THE COURT: Thank you. Now, before Ms. – while we're getting set up and Mr. Palmer and others would start getting set up, may I use this little hiatus to make my request to counsel? It really is directed, Ms. Orfield, to the lead counsel and Mr. Shea as the counsel of record. Obviously, there are embedded in Mr. Kiraly's testimony, as there have been some other witnesses, but especially Mr. Kiraly's testimony, some legal concepts. And to my mind, some of those, not all, but some of those legal concepts are reflected in a decision by the Federal Circuit styled Wickham Contracting Company v. Fischer, 12 FR 3d 1574, decided in 1994. That deals specifically with

Page 2187

overhead and AFUDC, what might pass in this case for AFUDC, but that is a case in which a government contractor was making a claim.

This case is a little different. This is just the reverse because the government is providing the service to the private party, rather than the private party providing a service to the government. And my, what I would ask counsel to do when you're engaged in post-trial briefing in this case is to deal with the converse situation in contrast to a case such as Wickham. Am I getting through? I'm trying to be as brief and concise as I can in making this request.

MS. ORFIELD: I think it's clear, Your Honor.

THE COURT: Thank you, Ms. Orfield. Mr. Shea?

MR. SHEA: Absolutely clear, Your Honor, you may have recalled, but I sort of argued that to begin the litigation.

THE COURT: I understand, I understand. It's just that because of Mr. Kiraly's testimony, it's embedded all the way through, and I just think we have to deal with this explicitly. Are we ready, Ms. Sullivan?

Page 2188

MS. SULLIVAN: We are, Your Honor.

MR. LO RE: Your Honor, I wondered if maybe we could just take a very quick break while we set up and if we could reconnoiter here momentarily?

THE COURT: Yes, in fact, we'll go off the record for a minute. Everyone can stay, or they may leave. It's up to them.

MS. SULLIVAN: Thank you, Your Honor.

(Whereupon, a short recess was taken.)

MS. SULLIVAN: Your Honor, Ms. Heide Herrmann is with Mr. Morgan in Los Alamos. She's a member of our office. Just to speed things along, may I ask, Ms. Herrmann, could you make sure the following exhibits are easily accessible for Mr. Morgan: The binder containing Defendant's Exhibit 5, the separate documents Defendant's Exhibit 5.034, 5.063, Defendant's Exhibit 28, Defendant's Exhibit 27, and Defendant's Exhibit 37. Do you have all those documents?

MS. HERRMANN: Yes, I believe I do.

(Discussion off the record.)

THE COURT: Ms. Sullivan, would you formally call Mr. Morgan as a witness?

MS. SULLIVAN: Yes, Your Honor. The government calls Robert L. Morgan as its next

Page 2189

witness.

THE COURT: Mr. Morgan, I'm authorized by statute and rule to administer the oath to you by this remote means, if you're testifying by video conference. If I give you the oath, will you respond, please?

THE WITNESS: Yes, I will respond.

THE COURT: All right, thank you.

Whereupon–

ROBERT MORGAN

a witness, called for examination, having been duly sworn, was examined and testified as follows:

THE WITNESS: I do.

THE COURT: Would you please state your full name for the record?

THE WITNESS: Robert L. Morgan.

THE COURT: Thank you, Mr. Morgan. And, Ms. Sullivan, you may proceed.

MS. SULLIVAN: Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. SULLIVAN:

Q. Mr. Morgan, when did you serve as the director of what became known as the Office of Civilian Radioactive Waste Management?

A. From late January 1983 until sometime in

Page 2190

January of 1984.
Q. And was the office called by a different name when you first became director?
A. Yes, it was a different name.
Q. And do you recall that name?
A. It was the Nuclear Waste Project Office, as I recall.
Q. Mr. Morgan, how were you selected to be the director?
A. I was selected by Secretary Hodel.
Q. And as director, to whom did you report?
A. To the Secretary.
Q. How many years were you with the Department of Energy and its predecessor agencies?
A. I joined the Atomic Energy Commission in 1965 and retired in 1988.
Q. Mr. Morgan, do you hold a Bachelor's degree?
A. Yes, I do.
Q. And from where?
A. The United States Military Academy.
Q. When was that degree conferred?
A. 1952.
Q. And in what subject is that degree?
A. Military engineering.

Page 2191

Q. Mr. Morgan, do you also hold a Master's degree?
A. Yes, I do.
Q. And where did you obtain that Master's degree?
A. From MIT.
Q. And when was that degree conferred?
A. 1959.
Q. And what subject is your Master's degree?
A. I have a Master's degree in civil engineering and a Master's degree in nuclear engineering.
Q. Mr. Morgan, did you serve in the Army?
A. Yes, I did.
Q. For how long?
A. 13 years.
Q. And after you left the Army, where were you first employed?
A. At the Savannah River operations office at the Atomic Energy Commission.
Q. Would you please summarize briefly your positions from the time you joined the Atomic Energy Commission until the time you retired from the Department of Energy?
A. From 1965 to 1966, I was division director

Page 2192

of the heavy water organic pool reactor program at Savannah River. 1966 to 1973, I was the senior site representative at Canoga Park, adjoining to the national core of the reactor development and technology division of the Atomic Energy Commission. '73 to 1980, I was deputy manager of the Savannah River operations office. And then in 1980, I was selected as manager of the Savannah River operations office.
Q. And did you remain the manager of the Savannah River operations office until you retired in 1988?
A. Yes, though I had some details in Washington with the Nuclear Waste Policy Act and also the Assistant Secretary for defense programs.
Q. Mr. Morgan, how have you been employed since you retired from the Department of Energy in 1988?
A. Could you repeat the question, please?
Q. Yes. How have you been employed since you retired from DOE in 1988?
A. From 1988 until 1990, I did consulting with various companies that were doing business with the Department of Energy. And then in 1990, I joined an 8A firm called Mesa, which was doing environmental

Page 2193

impact statements for the Department of Energy. I left there in 1995. And then since 1995, I have been in consulting again.
Q. Thank you. Mr. Morgan, what was accomplished during your year as director of the Office of Civilian Radioactive Waste Management?
A. The first activity was the notification of the governments that were affected in the program. They had, there was a requirement within the Nuclear Waste Policy Act that they be notified. The second thing was regarding the contract with the utilities. The Federal Register notice had been sent out as the draft, it actually got to the Federal Register after I had arrived, but I had not seen it when it was transmitted to the Federal Register. We resolved the comments from that and published the final ruling for the contract. We then started into the mission plan, which was to try to integrate all the activities of the repository, the monitored retrievable storage and transportation activities that would be required over the Act.
Q. Thank you. I think you just said the answer to this next question, but let me ask it again. What was the status of the development of the standard contract when you arrived at the Office of

Page 2194

Civilian Radioactive Waste Management?
A. There had been a draft of that contract submitted to the Federal Register, and then we received comments on that draft, and then –
THE COURT: Mr. Morgan, we're making an adjustment, so we don't get feedback on your voice transmission. It'll just take a moment. I think we'll be fine now, Ms. Sullivan.
MS. SULLIVAN: Thank you, Your Honor.
BY MS. SULLIVAN:
Q. Mr. Morgan, let me ask the question again, what was the status of the development of the standard contract when you arrived to be director of the Office of Civilian Radioactive Waste Management?
A. When I arrived or accepted the position in Washington, the draft of the contract had already been transmitted to the Federal Register for publication. After it was published, we received comments from the utilities and the states and other interested parties, and then we resolved those comments and submitted the final ruling to the Federal Register.
Q. Do you recall meeting with utility representatives prior to the publication of the final standard contract?

Page 2195

A. Yes.
Q. With whom did you meet?
A. I met with representatives of Edison Electric Institute and several of the utility members of EEI and, I believe, several states.
Q. And what did you discuss in your meeting with EEI?
A. They felt very strongly that the contract should include a rate of acceptance beginning in 1998, which we denied.
Q. And what did you discuss in your meeting? Actually, let me back up. You testified that you met with several of the utilities. Were there several meetings that you had with individual utility representatives?
A. Primarily, there was a, as I recall, a meeting at EEI where several of the utilities were present, and I met also with General Electric and Westinghouse, and I'm not sure of how many other utilities we met with.
Q. And briefly, what was the issue that you discussed? Do you recall what the issue was that you discussed with GE and Westinghouse?
MR. SMALL: Objection, Your Honor, I don't understand how these discussions are relevant to this

Page 2196

lawsuit, and they're hearsay.
THE COURT: Well, let's sort out relevance first. Ms. Sullivan?
MS. SULLIVAN: Your Honor, my questions are geared to the period of contract formation, meetings and input that DOE had with regard to the final standard contract and what inputs there were to that document. I understand that the standard contract is at issue in this case and what terms were and were not negotiated during the period of contract formation is my question about meetings held with utilities.
THE COURT: Mr. Small, do you have anything further?
MR. SMALL: Your Honor, the question in this case would be whether such a term was negotiated with TVA.
THE COURT: Liability has been established. However, we do have a rate issue in the case that has been raised regarding damages, so I'm going to take the testimony. Now, since we are past the relevance objection, Mr. Small, do you have something further that you'd care to add?
MR. SMALL: Additionally, Your Honor, I also had an objection on the grounds of hearsay

Page 2197

because I anticipated that the witness was being asked what was said at a meeting that occurred many, many years ago.
THE COURT: Well, if Mr. Morgan were to answer that a certain person said a certain thing, which would be absolutely remarkable at this time, that would be hearsay. If he relates what he now believes to be the gist of the meetings and the points or objections that were posed, that's a different matter, that's not hearsay. And so with that as a general guide, let's go forward. Ms. Sullivan?
MS. SULLIVAN: Thank you, Your Honor, and I will tailor my question to the Court's guidance. Thank you.
BY MS. SULLIVAN:
Q. Mr. Morgan, you testified that you met with GE and Westinghouse. Do you recall the topics that were discussed during that meeting?
A. The topic that were discussed were charges relating to fuel prior to the establishment of the 1 mil per kilowatt hour. The problem was that GE's fuel did not have the irradiation that Westinghouse did, and therefore, there was going to be more fuel elements from GE submitted per kilowatt hour than