# Thomas Pollog

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - - - -x
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126c) (Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER :
COMPANY, (98-154C) (Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C) (WILSON, J.) :
NORTHERN STATES POWER COMPANY :
(98-484c (Wiese, J.) :
DUKE POWER, A Division of DUKE :
ENERGY CORP. (98-485C) (Sypolt, J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C) (Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY :
DISTRICT (98-488c) (Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY :
et. al. (98-488c) (Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621c) (Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C) (Allegra, J.) :
GPU NUCLEAR, INCORPORATED :
(00-440C) (Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C) (Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF :
NEW YORK (00-703C) (Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C) (Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C) (Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C) (Bruggink, J.) :
Plaintiff, :
:
vs :
:
THE UNITED STATES, :
Defendant. :
- - - - - - - - - - - - - - - - - - - - - - -x

McLean, Virginia
Thursday, April 11, 2002

Deposition of:
THOMAS POLLOG,
the witness, called for examination by counsel for the defendant, pursuant to notice and agreement, commencing at 10:10 a.m., at the offices of Shaw, Pittman, 1650 Tysons Boulevard, McLean, Virginia, before Linda C. Marshall, RPR, a Notary Public in and for the Commonwealth of Virginia, when were present on behalf of the respective parties:

APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District, Nebraska Public Power District:
DEVON E. HEWITT, ESQUIRE
JACK CHEW, ESQUIRE
Shaw, Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
703-770-7962

On behalf of the Plaintiffs Southern Nuclear Operating Company, Alabama Power, Georgia Power:
KRISTI L. REMINGTON, ESQUIRE
Balch & Bingham, LLP
Tenth Floor,
1275 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
202-347-6000



APPEARANCES CONTD:

On behalf of Plaintiff Commonwealth Edison Company:
THEODORE T. EIDUKAS, ESQUIRE
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 50511-7603
312-222-9350

On behalf of Plaintiff SAcramento Municipal Utility District:
TIMOTHY R. MACDONALD, ESQUIRE
Arnold & Porter
Suite 4500
370 Seventeenth Street
Denver, CO 80202-1370

On behalf of Plaintiff Wisconsin Electric Power Company:
SUZETTE W. DERREVERE, ESQUIRE
Perkins Coie, LLP
607 14th Street, N.W.
Washington, D.C. 20005-2011
202-434-1675

On behalf of the Defendant:
MARIAN SULLIVAN, ESQUIRE
ERIN POWELL, ESQUIRE
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D.C.
202-514-7300



I-N-D-E-X


| Witness: | Page |
|---|---|
| Thomas Pollog | |
| Examination by Ms. Hewitt | 5 |


E-X-H-I-B-I-T-S


| | Page |
|---|---|
| No. 1 - | 20 |
| No. 2 - | 28 |
| No. 3 - | 44 |
| No. 4 - | 71 |
| No. 5 - | 103 |
| No. 6 - | 112 |
| No. 7 - | 122 |
| No. 9 - | 164 |




P-R-O-C-E-E-D-I-N-G-S
(Pollog Deposition Exhibit No. 8 was marked off the record.)
Whereupon,
THOMAS POLLOG,
called as a witness herein, having been first duly sworn, was examined and testified as follows:
EXAMINATION ON BEHALF OF THE PLAINTIFF
BY MS. HEWITT:
Q Good morning, Mr. Pollog. My name is Devon Hewitt of the law firm of.
Shaw, Pittman. I represent ten of the utilities that are in litigation with the Department of Energy regarding spent nuclear fuel. And I take it you're familiar with this litigation?
A Yes, I am.
Q I understand you've been deposed before in this litigation. I'll go over some ground rules to make sure they're on the record, but I'm sure you've heard these instructions before. I'll ask you a series of questions and I ask that you answer them truthfully.
If you don't understand something that

Page 30

that could fall within this paragraph?
A I would imagine so.
Q Could you identify some of those documents?
A Excuse me.
Q That's all right. Could you identify some of those documents?
A I would say the Mission Plan.
Q And you're referring to the 1995 Mission Plan?
A Well, there have been various mission plans.
Q There were various drafts. I think it's called a 1985 Mission Plan. I understand there were two drafts to that.
A Two drafts after that, and there were amendments thereafter.
Q Right.
A The TSLCC reports, there were, I believe, annual reports to Congress. They are the only ones that come to mind right now that broadly fit into the --
Q If you'd flip the page over and take a look at Sub-section B talking about --
A Did you say B?

Page 31

Q Yes, the first full paragraph on the left hand column addresses the publication of the annual capacity report.
It states in this paragraph that the DOE shall issue an annual capacity report for planning purposes.
Do you know what that term, planning purposes, means used in the standard contract?
MS. SULLIVAN: Objection, calls for legal conclusion.
You can answer, if you know.
THE WITNESS: I would speculate that it meant the utilities could make plans regarding how they want to handle spent nuclear fuel.
BY MS. HEWITT:
Q You have no knowledge about how this provision was interpreted or what it was suppose to mean?
A How we dealt with or how we tried to fulfill our obligation under the contract to meet this would be to produce information contained in the ACR that utilities could use for their plans.
Q And what kind of plans would utilities be making that would need guidance from DOE?
A Spent fuel management decisions.

Page 32

Q Such as?
A How they would want to handle their spent fuel after it was discharged.
Q And would some of those decisions regard how they should store the spent nuclear fuel?
A Yes.
Q And how would the annual capacity report help them in that regard?
A It would inform the purchaser of potential waste acceptance schedules; would inform them where their place might be in the queue, when they might expect service.
Q That paragraph also indicates that DOE would provide that information for ten years following the projected commencement of operatioi of the initial DOE facility. You see that reference?
A Yes.
Q Why was ten years picked?
MS. SULLIVAN: Objection, calls for a legal conclusion.
You can answer the question, if you know.
THE WITNESS: I don't know.

Page 33

BY MS. HEWITT:
Q Further down in Article 5, there's a section addressing delivery commitment schedules. Are you familiar with that term?
A Yes.
Q What is a delivery commitment schedule?
A That is Appendix C to the standard contract.
Q And can you describe it?
A I can read it for you if you like.
Q Can you describe in your own words what it is?
A Let me look at it first.
Q Certainly.
A Delivery commitment schedule is a commitment on both the purchasers' and DOE's, when they're both signed, part to commit parties to delivering a range of spent fuel in a year from a specific site.
Q When did the delivery commitment schedules have to be submitted to DOE by the purchasers?
A That would depend upon where their allocation is.
Q How would that influence when they

Page 34

needed to submit their delivery commitment schedules?
A Because the delivery commitment schedules are to be submitted 63 months prior to the year of delivery.
Q Why 63 months?
A I don't know.
Q And when you made reference to the term, year of delivery, are you referring to a calendar year of delivery?
A Yes. Not specifically any, you know, year, but a 12-month period corresponds to something from January to December. Not specifically any specific year, but a 12-month period.
Q Let me ask you the question then. They would have to know what the calendar year is in order to be able to back out 63 months, right? It would have to be, for example, year 2000?
A Yes.
Q It would have to be a calendar, a number of years?
A Yes.
Q Because you're aware, obviously, that DOE had at one point published ACRs in calendar

Page 35

years which were not used?
A Yes.
Q Once a delivery commitment schedule was submitted to DOE, what was DOE's role in reviewing them?
A They would be reviewed to see if they had the proper information on them.
Q What do you mean by proper information?
A They identified a location that the purchaser actually owned or had a site at; if the amount of fuel identified in that schedule, the MTU's would correspond to an actual allocation they had. If it was the right type of fuel, for example, BWR or PWR fuel they owned.
Q Anything else?
A Nothing that comes to mind.
Q When you answered that it had to correspond to an allocation that they had, what are you referring to?
A The amount of fuel in the DCS that they were submitting it for had to correspond to an allocation in the ACR. Not just the '88 ACR, but the '91 ACR.
Q Did that requirement come from the contract, the standard contract?

Page 36

MS. SULLIVAN: Objection, vague.
BY MS. HEWITT:
Q Did the requirements that the DCS correspond to an allocation in the ACR come from the standard contract?
A I'd have to read through the standard contract and see.
Q Why don't you take a look at the standard contract.
A I believe so.
Q And what in the standard contract makes you say so?
A Well, the standard contract sets up a process for both parties to follow. And if you follow through the process, the only thing we can use to really compare if the allocation is correct is the process sets up the requirements for us to compare if the allocation is correct from what they submit and what the ACR says.
Q I'm not sure that's responsive to my earlier question. Does the standard contract require offerors to deliver commitment schedules based on the allocations identified in the ACR?
A Okay. Now, I think what you said now may be a little different. I interpret it

Page 37

differently than what you said before.
Q It could be slightly different, so please clarify for me.
A Can you say what you said the second time, one more time. I think there was a slight difference. At least, I interpreted a slight difference.
Q Okay. Does the standard contract require purchasers to base their delivery commitment schedules on the allocations made by the ACR?
A Does it require the purchasers to submit their --
Q Right.
A -- allocations based on what's in the ACR? Yes.
Let's read this again. I got a different interpretation the last time.
Q Can you explain to me your confusion? You are suppose to be prepared to answer these type of questions. So I'm trying to be very clear, but just explain to me your confusion and I'll try to clear it up. I'm not sure how my questions are different.
A Previously we talked about DOE's review

Page 38

and approval, what's required by DOE. And now you're saying what's required by the purchasers.
Q Okay. We had been talking about a DOE process and you said they had to correspond to the allocations in the ACR. And my question was, was that required by the standard contract?
A Required by who? Required on the purchasers? Were the purchasers required to do that or was the DOE required to do that by the standard contract?
Q Okay. I guess -- I'll ask both questions ultimately.
So the issue is, does the standard contract require purchasers, first of all, to submit DCSs based on allegations in the ACR?
MS. SULLIVAN: Objection, legal conclusion.
You can answer, if you know.
THE WITNESS: You're talking purchasers this time?
BY MS. HEWITT:
Q Yes.
A I believe so.
Q Why?
A Because the purchasers have to start

Page 39

submitting their DCSs after the publication of the APR, okay. And the APR is used to develop the ACR.
Q But it's different than the ACR; isn't that right?
A Well, they are different documents. They're not doing the same thing.
The APR is used to develop an ACR. One cannot do one without the other. One cannot do the ACR without an APR.
One can do an APR without an ACR, but one cannot do an ACR without an APR.
Q And where in the contract does it say that the delivery commitment schedule has to reflect the ACR?
A It doesn't say that, but it says it has to be done after the APR. And then we take the APR and give them an ACR. So it's like a flow from one to another trying to connect different boxes.
Q My question is, where is the connection between the ACR and DCS process in the contract?
A I would say it comes from the APR.
Q But it does not come from the ACR?
A It says the -- let me read this a

Page 40

second.
Well, if you -- I read Article 4B, 5D -- excuse me, 5B.
Q Yes.
A That's where the purchasers get their annual acceptance ranking relative to DOE contract for disposal. I would say it comes from there.
Q And the acceptance ranking there, I think you're referring to the acceptance priority ranking there. That's the phrase that's used in that paragraph, fourth line down, fifth line down.
A Excuse me. You say fourth?
Q I mean, you're the one that used the term. And the term that's used here is, acceptance priority ranking. Is that what you're talking about in your prior answer?
A Annual acceptance ranking relative to DOE contracts. I don't believe it's the same as the APR.
Q Where are you reading from, sir?
A Page 525, upper left corner.
Q Yes.
A B, beginning not later than July 1st,

Page 41

1987.
Q Right, okay. But that's not under the delivery commitment schedule process?
A True.
Q Okay. I guess we'll have to go over this testimony a little bit. You said in delivery commitment schedules, the purchasers would include proper information, which included identified location of the fuels and corresponding to the allocations in the ACR?
A Yes.
Q And you mentioned the right kind of fuel?
A Yes.
Q And you said PWR versus?
A BWR.
Q And that is boiled water reactor versus?
A Pressurized water reactor versus boiling water --
Q And did they also have to include the quantity of fuel they're going to deliver?
A I believe so.
Let's look at the -- they would identify the metric tons of uranium initial and

Page 42

number of assemblies.
Q Why did DOE need this information?
A We would use that information to try and develop a transportation program.
Q And when you said transportation program, what are you referring to specifically?
A A group of hardware essentially; casks, whatever associated with equipment, yokes, lifting equipment, transporters, receipt facilities to transport spent fuel from purchasers to a DOE facility. Whatever is included with that regarding hardware; and also, planning systems.
Q What do you mean by planning systems?
A Well, you have X amount of casks and you try and maximize your fleet. So you don't want to have ten purchasers needing the same cask at the same day. So you prefer to have, you know, the minimum number of casks as possible, so you try to plan most efficiently to use your system.
Q Now, did DOE have the ability to reject DCSs that were submitted by purchasers?
A Yes.
Q And on what basis could they reject

Page 43

them?
A If they believed there's information that was incorrect on them.
Q And how would they determine that?
A Oh, you would compare the allocation that the utilities put down on their DCS to see if it was correct in comparison with what was in the ACR, '91 ACR.
We could see if they put down a facility that they didn't own. If they put down a pressurized water fuel and this utility only owned boiling water reactor fuel.
If they put down a range of discharge dates that don't correspond to any fuel they have range of discharge dates within.
Q What happened after DOE rejected a delivery commitment schedule submitted by a purchaser?
A They would return it to the purchaser.
Q And what is the purchaser supposed to do at that point?
A Re-submit the DCS.
Q With what -- why would they have to re-submit the DCS?
A If they wanted to have it approved,

Page 44

they would have to re-submit it.
Q Was there a point in time in which the DOE and the purchaser would negotiate mutually acceptable delivery commitment schedules?
A Yes.
Q And what time would that occur?
A Let me read the process here to refresh my memory.
That would come after, providing there was a second disapproval.
Q And what would the negotiations entail? How would that work?
A The parties would come together and try and sit down and discuss the issues and reach an agreement.
Q And if they couldn't reach an agreement, what would happen?
A Speculative. I don't know of any case of that happening.
Q I'm going to hand you a copy of the DCS instructions that were distributed by DOE to offerors. We'll make this Exhibit 3 to the deposition.
(Whereupon, Pollog Deposition Exhibit No. 3 was marked for identification.)

Page 45

BY MS. HEWITT:
Q Have you ever seen this document before, Mr. Pollog?
A Yes.
Q Did you have any role in drafting the document?
A Can you explain for me by drafting, you mean actual writing? You mean any part in the eventual development?
Q Why don't we say the latter.
A Yes.
Q What was your role in the development of this document?
A I believe I've seen draft versions submitted by DOE to contractors and provided comments.
Q Do you remember what kind of comments you provided?
A No.
Q Was this document distributed to purchasers in preparation for them submitting their DCSs?
A Yes.
Q And it was distributed by DOE, correct?
A Yes.

Page 58

So all of your questions as to whether or not a delivery commitment schedule, a final delivery schedule would be rejected for certain aspects are beyond his testimony because those criteria haven't been developed.
MS. HEWITT: I also asked him whether or not DOE ever discussed the final delivery commitment schedules in their role or purpose, and he said he doesn't know.
MS. SULLIVAN: Well, he's testified that the criteria hasn't been developed.
MS. HEWITT: That's one question, but you can ask more than one question about the final delivery commitment schedules. He doesn't seem to have any knowledge beyond that one question I asked him.
So we can address that later. But that seems to be a very thin basis on which he's designated as representative on this topic anyway.
So, just for the record, we're very concerned that he's not prepared, at least fully, to speak on this topic.
MS. SULLIVAN: Objection noted.
BY MS. HEWITT:

Page 59

Q Mr. Pollog, I assume you don't know any information about how DOE would address problems in final delivery commitment schedules that were submitted by offerors?
A Correct.
Q Why were --
MS. SULLIVAN: Can we take a break?
MS. HEWITT: Yes.
(Brief recess.)
BY MS. HEWITT:
Q Mr. Pollog, you mentioned that DOE did not develop any criteria for review of the final delivery schedules a few minutes ago. Do you recall giving that testimony?
A Yes.
Q Why did they not develop any criteria in this regard?
A I don't think we were ever at that point problematically where we saw FDSs coming in that we would be processing.
Q You also mentioned earlier that it was DOE's intent that DCSs that were signed by both parties were contractually binding. You used that term?
A Yes.

Page 60

Q What do you mean by contractually binding?
A It's a contractual commitment for DOE to meet obligation under the contract for whatever is in the DCSs. Same way with purchasers.
Q Do you mean by that that DOE could not change what was in the DCS that was signed by both parties?
A DOE couldn't change? Are you asking me --
Q Either the parties could change what was agreed to or what was both signed by both parties?
A Well, I don't think DOE could change what was our obligation. The purchasers did have a right to exchange that DCS with another purchaser provided DOE approved that exchange.
So I guess you could say the purchaser could change in the sense that they could take that DCS and trade it to another purchaser, and then we'd have to pick up at another site.
Whether we could pick up another type of fuel or not would also be part of the approval process, if we go from PWR to BWR fuel.

Page 61

Q But it was your testimony that DOE couldn't change its commitment as expressed in the delivery commitment schedule?
A Yes.
Q We noted on the instruction though that if the year in which DOE would begin the program or begin taking spent nuclear fuel changed, the instructions at least appeared to allow DOE to change the year it would come and get the fuel designated in the delivery commitment schedule; is that right?
A Well, I think it says, In the event that such circumstances change, all DCSs approved by DOE may need to be re-evaluated by DOE and the purchasers.
We would re-evaluate them. That's what we stated we could do.
Q And does that give DOE the opportunity to change the date at which it would come take the spent nuclear fuel from utilities?
A I don't think that's ever been evaluated.
Q You don't think what has ever been evaluated?
A If we evaluated, we could change the

date based upon the statement that's here.
Q Is it your testimony that DOE would never consider changing the date?
A My testimony is, I don't know that it's ever been evaluated whether we could change the date in the delivery commitment schedule consistent with the statement here.
Q I'm asking you what DOE's view is, whether they could change the commitment schedule?
A I don't know. I mean, I have not thought about that question before, if we could.
Q You don't know the answer?
A No, I've never thought of that question before. I know of no discussion concerning that.
Q But you don't have an answer as to what DOE's position is in that regard?
A I don't.
Q Why would they re-evaluate them if they weren't going to consider to change the date?
A Can you say it again slower this time?
Q Why would DOE re-evaluate, as they indicated they might do in this instruction, if they weren't going to change something about the delivery commitment schedule, presumably the



date?
A There were other things we might seek from purchasers.
Q Such as?
A There were other things on the DCSs, like whether they would ship by truck, rail or barge. I mean, there were certain things that we might find beneficial for the system, such as doing more rail shipment as opposed to more truck shipment.
Q And is it your testimony that DOE would seek to change that term or requirement in the DCS?
A I wouldn't say we would seek to change it. We would seek to negotiate it with the utility or purchaser if we had a wish for something that would be beneficial for the system.
Q But how would that relate to changing the dates from 1998 to some time later?
A I don't think it would relate to that.
Q And of course, what the sentence says is if the circumstances change with regard to 1998, then they would re-evaluate. So it suggests the re-evaluation would be based on



changing the date, not on other circumstances.
A Okay. Is that a question?
Q Yes. My question is, you said they would re-evaluate them based on these other issues. But that sentence talks about re-evaluation with regards to the date, which you previously said doesn't relate to these other issues you mentioned.
A Okay. So is there a question there?
Q So, my question is, the re-evaluation that's referenced in this instruction would be based on the changing of the dates, not on transportation issues as you identified?
A Is that a question?
Q Yes, that is a question.
A What's the question?
Q Can you repeat the question?
(Whereupon, the question was read by the court reporter as requested.)
THE WITNESS: Yes.
BY MS. HEWITT:
Q The DCSs were a reflection of allocations awarded purchasers in the ACRs; is that correct?
A I wouldn't use awarded.



Q What word would you use?
A Allocated purchasers.
Q Okay. Now, were the ACRs contractually binding?
A No.
Q And why not?
A They were put out as -- for planning purposes.
Q And does that mean that they could change over time?
A Yes.
Q So a purchaser's allocation would change over time?
A Possibly.
Q And if that's the case, then would a delivery commitment schedule change over time?
A No.
Q How would that be if you have a delivery commitment schedule that's supposed to reflect an allocation in ACR, but it changes over time?
A Once they are signed in, those are locked in. Once the DCSs are signed, those allocations were locked in.
Q Of course, they wouldn't be locked in

if you otherwise exchange DCSs with another purchaser?
A Correct.
Q And the new purchaser could submit different fuel from a different location?
A The purchaser would have to trade an approved DCS with the other purchaser.
So, I'm not sure if you're saying the same thing I'm saying. I mean, a purchaser could change in the sense that they could exchange the DCS. But the sum total has to be equal for MTUs. You couldn't exchange ten for five or five for ten. It had to be a zero net sum gain.
And we would have the right to approve or disapprove any such proposed exchange.
Q Do you know who introduced the concept of delivery commitment schedules in the contract?
A No.
Q Was there any comments or discussions regarding the delivery commitment schedule process when the contract was negotiated?
A I don't know.
Q Other than the instructions that we've referred to here today, which are Exhibit 3 to your deposition, did DOE publish any guidelines



with regards to filling out the DCSs?
A I know of nothing else that was published by DOE regarding filling out instructions.
Q Was there something else communicated to purchasers, but not published as I use that term?
A I believe so.
Q And what are you referring to?
A I believe there were several presentations given by either DOE personnel or contractors regarding DCS process at various waste management meetings.
Q And what contractors would have worked on the DCS element of the waste management program?
A The DCS process you're saying?
Q Yes.
A That would have been -- at what point in time? You mean the whole process from --
Q As far as you know.
A From when it started, day one, till today?
Q Yes.
A Contractors?



Q Yes.
A Okay. Scott Vance, Pat McDuffy, Billy Cole, Doug Williamson and, I believe, Bill Tear (ph). They are the ones that I believe I know were involved. There may have been others that had somewhat site involvement. They had direct involvement.
Q Who at DOE had the principal responsibility for the DCS process?
A At what point in time?
Q At any point in time.
A At its origin, it would have been Alan Brownstein.
Q And then subsequent to that?
A Nancy Slater Thompson.
Q Anyone else?
A David Zabransky.
Q Did there come a point in time that DOE did not approve or disapprove delivery commitment schedules submitted by purchasers?
A Yes.
Q And when did that happen?
MS. SULLIVAN: Objection. There's another -- that's another topic of your rule 30(b)6 deposition and will be answered by another



deponent.
MS. HEWITT: Well, I think this comes within the DCS process.
MS. SULLIVAN: Topic 3, DOE's responses to DCS form submitted by utility plaintiffs, including DOE's decision to stop approving such DCS forms.
I read that question as being within Topic 3 and Mr. Pollog is not prepared to answer that question today. It will be answered by another deponent.
BY MS. HEWITT:
Q Do you have any personal knowledge about disapproval of the DCS process? For DCSs submitted by offerors, by purchasers?
A I know we stopped submitting them.
Q Why did DOE stop submitting them?
MS. SULLIVAN: Objection. That's another Rule 30(b)6 witness --
MS. HEWITT: I can ask about his personal knowledge.
MS. SULLIVAN: It's beyond the scope of the Rule 30(b)6 deposition.
MS. HEWITT: I don't think it is, and I think I can ask about his personal knowledge.