by date and date only.
Q Okay. When was the first time that DOE began to allocate acceptance slots, if you understand that term, acceptance slots to utilities based upon acceptance priority ranking?
A Based on the contractually requirement of a 1991 APR, the first allocation slots as you used the term, we called them allocations, would have been in the 1991 ACR.
Q And so can you show me where that's reflected here in this document?
A Table 3.1.
Q Is there a page number?
A Yeah, nine.
Q And is it fair to say the purchasers that are listed -- well, the purchasers listed in the left hand column are listed by, it appears, alphabetical order, not by priority ranking; is that correct?
A Yes.
Q So, in order to determine what their priority ranking would be, would you have to look somewhere else in this document or another document?
A No, you'd look right in this table.



Q How would you do that?
A You would go year one, year two across the top and you could see what year you had an allocation in. If you looking for allocation, if you looking for rankings, that would be another document.
Q So, for example, in year one, Commonwealth Edison, and Connecticut Yankee both have allocations in year one; is that correct?
A Yes.
Q And is there a priority between Commonwealth Edison and Connecticut Yankee with respect to when their fuel would be taken in year one?
A No.
Q And would that be true for any of the utilities who have allocations in year one?
A Yes.
Q Was it your testimony that the APR document was required by the standard contract?
A Yes.
Q And is there a difference in significance between the APR document and the ACR document published by DOE relative to the standard contract?



A I'm not sure how to answer that. They're both required by their contract. They're both documents that we produced that we need, that we use. I'm not sure any one is more significant than the other.
I can't answer, because you need -- both of them are needed in order to develop a system.
The APR, you can't do an ACR without an APR.
Q But you can do an APR without an ACR?
A Yes.
Q I'm going to hand to you the 1992 Annual Capacity Report, which oddly is dated March, 1993. Take a look at that document? Are you familiar with this document?
A Yes.
Q Do you know why this document was published in 1993 rather than 1992?
A I believe so.
Q Why?
A DOE's concurrence process sometimes is very slow. It just took months for all the people who had to sign off on it to sign off on it.



Q Can you describe that concurrence process as you used that term?
A Sure.
Q Please do?
A Whoever is the responsible individual will prepare the document, and I believe a forwarding letter for the contracting officer's signature. They will give that to their superior for their review and comment, and then it will go through a formal concurrence process.
They will determine the effective parts of the organization that needs to see it and concur upon it, and agree with it. They will distribute to those people, get their comments and address their comments.
Through this process, after all the parallel or at the same level as the division director or person responsible for it, then it goes to that person's superior, that person's superior, that person superior and that person's superior until you reach the top of the line.
Q Any reason that it took longer in the '92, '93 period than it would in any other time, the ACRs issued?
A I do not know.



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

Page 174

Q Were ACRs ever issued for comment to purchasers or utilities?
A I don't believe the ACRs were ever issued for comment.
Q Were purchasers allowed to object or was there a process for them to state their objection for something that was included in the ACR?
A I believe the contract, if it comes out under the contracting officer's signature, the contract allowed purchasers to send a letter to the contracting officer with their objections to something that's sent out under the contracting officer.
Q And what exactly are you referring to in the standard contract that allows them to do that?
A I think there's a dispute clause or some clause like that that allows them to dispute some action taken by the contracting officer. I'm not sure if that's the exact section, but there's some verbiage to that effect in there.
Q Why don't we take a look at the acceptance rates included in the 1992 Annual Capacity Report. I believe they are found on --

Page 175

Page 4, Table 2.1. Do you know what the basis was for the derivation of these numbers included into Table 2.1 on page four?
A It was taken from the prior years' ACR.
Q There's no other input in these numbers other than just physically taking it from a prior ACR?
A As far as I know, it was just copied from the prior years' ACR.
Q And the same considerations that led to including those numbers in the prior year's ACR, would they be the same considerations for including these numbers in this 1993 ACR?
A Yes.
Q I'm actually not going to hand you this, but there's a '92 Annual Capacity Report that was published again as revision dated 9 May, 1993?
A Yes.
Q Do you know why this revision was published?
A I don't recall at this time.
Q All right. I'm going to hand it to you. Have you seen this document before, Mr. Pollog?

Page 176

A Yes, I have.
Q If you look at page four, again, and there's another Table 2.1 which contains the same acceptance rates that were included in the earlier version of this document.
With regards to these numbers, if you take a look at page three, the page before, the first or the second paragraph. And I'm right in the middle of the page. It says, The acceptance rates included in Table 2.1 are nominal and do not reflect the MRS facility linkages with repository developed imposed by MWPA.
First of all, what does the term nominal mean in that sentence?
A I would suggest it means, just for example, illustrative.
Q And it says in the same sentence that they do not reflect the schedule linkages with the repository development. I believe that with regard to these rates and I may be wrong, but please clarify if I am.
You said the rates were chosen here because of the restrictions imposed by the Nuclear Waste Policy Amendments Act of 1987 and that one of those restrictions was the linkages

Page 177

with the operation of the repository or the construction of the repository?
A The operation of the repository.
Q Operation of the repository. And does this sentence on page three indicate otherwise?
A There are linkages in addition to the one I've stated about the 10,000 MTU limit that reflect into when the MRS becomes operational and excepting it. So it does not reflect all of the linkages in the Amendments Act of '87.
Q Which doesn't it -- does it reflect?
A It reflects the 10,000 MTU capacity limit prior to repository operations. In addition to that limit -- in addition to that linkage, there are additional linkages also in the Amendments Act that it does not reflect.
Q Now, going back through -- because I don't think that was clear with regard to some of the other capacity reports. Would that be true of the prior version '92 Annual Capacity Report, which includes the exact same numbers on page 4, Table 2.1?
A Yes, that would be true of the Exhibit 13.
Q Okay. And if we go back then to 1991

Page 182

A I believe they did.
Q And what was the estimate?
A If I remember correctly, the last estimate I saw was approximately five years, seven years.
Q Pardon me?
A Five to seven years.
Q And had -- what was the first step in that process of getting an MRS ready, up and running?
A Finding a site.
Q And had DOE found a site by December, 1995 or by the time this ACR was issued in 1995?
A No.
Q Had DOE found a site by the time the APR was issued in 1993?
A APR or ACR?
Q ACR, I'm sorry. You're absolutely right?
A No.
Q And had DOE found a site by the time the APR was issued in 1991.
A APR or ACR?
Q Did I say APR? I meant ACR, but they were both issued in 1991?

Page 183

A Yes, they were issued in 1991.
No, there was no site designated or found by -- in 1991.
Q So in other words, to have an MRS up and running using the shorter time frame, five years, from 1998, then DOE would have had to have a site by at least 1993; is that correct?
A Partially.
Q Why is that partially correct?
A There were certain options being examined. We could fast track licensing process, do a modular design, except in dual purpose systems where we wouldn't have to have storage systems actually built on-site that would reduce the time needed for developing a full MRS, including all the things you would need if you were not using dual purpose systems and you did not need to get licensing from NRC.
Q And that would reduce the time from seven years to five, or from five years to something less than five years.
A If I remember correctly, I think the fastest I saw for an expedited process with modular design, which is basically accepting a dual purpose system such that would be stored

Page 184

on-site. I think I saw somewhere where they were able to do it in about three years.
Q So by 1995 then, if that process hadn't been started, then it was very unlikely that an MRS would be up and running by 1998?
MS. POWELL: Again, I'll object. You can answer as to your personal knowledge, but this is way beyond the scope of what you've been asking.
The documents referred to in your exhibit is marked 1987, and you're only talking about acceptance rates.
He can answer as to his personal knowledge, but --
BY MS. HEWITT:
Q Well, acceptance rates included in the 1995 ACR APR assume an MRS in operation in 1998. So to the extent that's an assumption that was faulty --
MS. POWELL: I'm not stopping him from answering the question. My objection is it's beyond the scope.
MS. HEWITT: Okay.
BY MS. HEWITT:
Q Why don't we take a look at the 19 MRS

Page 185

Submission to Congress. Actually, let's take a look at the fee adequacy report. I'm going to hand you a document entitled Nuclear Waste Funds Fee Adequacy dated March, 1986. Have you seen this document before, Mr. Pollog?
A Yes.
Q Can you just summarize what the purpose of this document is?
A The standard contract required utilities to pay a ongoing fee of one mil per kilowatt hour of electricity generated and sold.
I believe the Nuclear Waste Policy Act requires the secretary to make evaluation as to whether that fee is adequate. This reflects one of those valuations.
Q Did the acceptance rate factor into this evaluation?
A Yes.
Q And how did the acceptance rate factor into the evaluation?
A As part of developing what the cost of the program would be, you would need to determine what the cost of your transportation program is, how many cast you would need. And that's directly related to what your acceptance rate is

Page 206

ground.
Q And it indicates in this paragraph that the receipt rates included in, I guess, prior ACRs were really reflecting in-placement rates; is that correct?
A I don't think any ACRs were developed prior to issuance of this document.
Q Does this document indicate that receipt rates that would be included in ACRs would reflect in-placement rates?
A I don't think this document makes any statements regarding whether the ACR would reflect in-placement rates.
Q Okay. Take a look at page 2.17 under section entitled accelerated acceptance rate. On that first paragraph, I think the third sentence starts, For some reactors, this initial allocation may not provide sufficient acceptance rates to prevent encroachment or pool core reserve. (Storage reserved to allow complete discharge of the core if required.)
What is the term initial allocation referring to?
A I would believe it refers to the initial allocation as identified for a facility,

Page 207

for a purchaser in an ACR.
Q And is that going to be -- I see. And is that going to reflect the acceptance priority ranking?
A The acceptance priority ranking would be used in developing initial allocation.
Q And what does it mean -- although there's an explanation here, but what does it mean or what is the significance of not having sufficient acceptance rate to prevent encroachment on full core reserve. Do you know what that term means?
A Yes I do.
Q What does it mean?
A A reactor's spent fuel pool is so big. It has a certain limited capacity. Generally speaking, not always, but generally utilities like to maintain so many open spaces. It's considered good management and good operating procedures. It's not required by NRC or anyone else.
In event of some situation of the reactor, they would need to offload the full core. They would have sufficient spaces in their whole pool to take every assembly out of the core

Page 208

and transfer it to the pool.
Q And does this sentence indicate then that the initial allocation in an ACR may not allow all utilities to maintain that ability for full core reserve?
A Yes.
Q Then the next sentence says that additional storage capacity or reallocation of acceptance rights would be required for those particular sites; is that right?
A Yes.
Q Okay. Then it goes on to define the term additional storage capacity. And you and I have tried to define that term earlier today.
This definition refers to consolidation of continued storage in a nuclear -- in the reactor pool; transfer to on-site dry storage, transfer to off-site storage to maintain full core reserve capacity in the reactor pool. Do you agree with that definition?
A Yes.
Q So, consolidation for continued storage in the reactor pool, is that the same thing as re-racking?
A No.

Page 209

Q What is the difference?
A Re-racking is physically making the racks or spent fuel assemblies stored in the pool closer together. It's just pushing everything a little bit closer together so you can fit additional storage cells in the pool.
Consolidation entails taking apart the assemblies rod by rod and putting several assemblies of rods into one sell.
It's consolidating -- for example if you have consolidation ratio of five to one, taking five assemblies, putting all the rods together in one canister or something like that and storing all five assemblies worth of rods into one canister which would go into one cell.
Q Okay. The paragraph goes on to say that the standard utility contract and I presume that means the standard contract provides a method of reallocation of acceptance rights through training process is that the exchange process that you referred to earlier?
A Yes.
Q Then it goes on to say that the initial acceptance rate must exceed the utility's needs for additional storage capacity before any

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - - - - - - X

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese, J.) :
DUKE POWER, A Division of DUKE ENERGY CORP. :
(98-485C)(Sypolt, J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, et al. :
(98-614C)(Merow, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(98-477C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

Page 2

(98-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :
THE UNITED STATES, :
Defendant. :
- - - - - - - - - - - - - - - - - - - - - - X
Discovery Judge (Judge Sypolt)
McLean, Virginia
Friday, April 12, 2002
VOLUME II
Continued deposition of THOMAS POLLOG, a (30)(B)(6) witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness having been previously sworn, taken at the offices of Shaw

Page 3

Pittman, 1650 Tysons Boulevard, 14th Floor, McLean, Virginia, at 9:00 a.m., Friday, April 2, 2002, and the proceedings being taken down by Stenotype by BRYAN WAYNE, RPR, and transcribed under his direction.

APPEARANCES:
On behalf of Plaintiff Northern States Power:
DEVON HEWITT, ESQ.
JACK Y. CHU, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard, 14th Floor
McLean, Virginia 22102-4859
703-770-7901

On behalf of Plaintiff Commonwealth Edison:
THEODORE T. EIDUKAS, ESQ.
Jenner & Block
One IBM Plaza
Chicago, Illinois 60611-7603
312-923-2829

Page 4

APPEARANCES: (Continued)

On behalf of Plaintiff Wisconsin Electric:
SUZETTE W. DERREVERE, ESQ.
Perkins Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
202-434-1609

On behalf of Southern Nuclear Operating Company:
KRISTI L. REMINGTON, ESQ.
Balch & Bingham, LLP
Tenth Floor
1275 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
202-347-6000

On behalf of Sacramento Municipal Utility District:
TIMOTHY P. MACDONALD, ESQ.,
Arnold & Porter
Suite 4500
370 Seventeenth Street
Denver, Colorado 80202-1370
(303) 863-2334

Page 5

APPEARANCES (Continued)

On behalf of the Defendant:
MARIAN E. SULLIVAN, ESQ.
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D.C. 20530
202-514-7300

Page 6

CONTENTS


| WITNESS | EXAMINATION BY COUNSEL FOR | |
|---|---|---|
| THOMAS POLLOG | NORTHERN STATES POWER | |
| By Ms. Hewitt | | 8 |
| | COMMONWEALTH EDISON | |
| By Mr. Eidukas | | 18 |
| | SACRAMENTO MUNICIPAL UTILITY DISTRICT | |
| By Mr. Macdonald | | 33 |
| | DEFENDANT UNITED STATES | |
| By Ms. Sullivan | | 160 |
| | SOUTHERN NUCLEAR OPERATING CO. | |
| By Ms. Remington | | 162 |

Afternoon Session - Page 115


EXHIBITS


| POLLOG EXHIBIT NO. | PAGE NO. |
|---|---|
| 19 - 1985 Mission Plan | 10 |
| 20 - 1984 Mission Plan | 32 |
| 21 - Mission Plan Strategy Memo, 9/15/83 | 60 |
| 22 - Excerpt of Government's Brief | 87 |
| 23 - DOE Notice, 5/25/94 | 100 |
| 24 - DOE Notice, 5/3/95 | 105 |
| 25 - 1988 Draft Mission Plan Amendment | 128 |
| 26 - Analysis of TSLCC of CRWMP | 146 |


Page 7

EXHIBITS (Continued)


| POLLOG EXHIBIT NO. | PAGE NO. |
|---|---|
| 27 - 1995 APR ACR | 154 |
| 28 - 1996 APR ACR | 157 |
| 29 - Georgia Power Letter to Robert Morgan | 163 |
| 30 - Protest of 1998 Mission Plan & ACR | 168 |
| 31 - Letter, Certified Mail, 9/9/88 | 173 |
| 32 - Handwritten Notes | 173 |


Page 8

PROCEEDINGS

Whereupon,

THOMAS POLLOG,

was called as a witness by counsel for Plaintiff, and having been previously sworn, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFF

NORTHERN STATES POWER

BY MS. HEWITT:

Q. Morning, Mr. Pollog. We're going to continue my portion of your questioning. As I mentioned yesterday, I apologize, but we didn't have one of the documents available that was identified on your list, and I do want to ask you about that, but hopefully it won't take very long?

MS. SULLIVAN: Before you do that, Mr. Pollog would like to clarify something from his testimony yesterday. Is that all right?

MS. HEWITT: Okay.

THE WITNESS: Yes. I want to clarify concerning the relationship and the importance and the differences between the DCS and the FDS process. Okay, the DCSs and FDSs are of approximately the same influence in a multi-step process that was looked upon going forward for waste acceptance. The

Page 9

difference between the DCS and FDS, there's only two. The DCS, the purchasers and DOE agreed to delivery on a specific year, a calendar year.

Whereas in the FDS the purchaser would identify a range of dates within that year as wide as they want to, could be days or weeks, and DCS if the Department would agree that they would be committing to a specific range of day. So it would narrow down from a full calendar year to a lesser range of dates within that year will be the one difference.

And the second difference where the DCSs are potential low changeable or exchangeable where other utilities, whereas an FDS is not exchangeable.

BY MS. HEWITT:

Q. Is your testimony otherwise that all the information -- if you didn't exchange your DCS. All the information that you included in the DCS had to be the same information in the FDS?

A. That's not my testimony.

Q. Do you know the answer to that?

A. The answer to that is the Department had never decided if everything in a DCS had to be included in an FDS.

Q. Okay. I'm going to ask you about the 1985

Page 10

mission plan. I'll mark it.
(Pollog Exhibit No. 19 was marked for identification.)
MS. SULLIVAN: Is this an excerpt or volume 1?
MS. HEWITT: No. This is volume 1. And actually it's only chapter -- I guess it's only volume 1. I didn't have everything.
MS. SULLIVAN: That's fine.
MS. HEWITT: Actually, I think it's just chapters 1 and 2.
MS. SULLIVAN: Good.
BY MS. HEWITT:
Q. But what I handed you is pages 1 through 29, so make sure you have 29 pages.
(Witness reviewing document)
A. Actually there seems to be --
Q. There's some on your right there?
A. Yeah. These come at the end. Actually page 14 seems to be missing. Let me check one more time.
Q. Okay.
(Witness reviewing document)
MS. SULLIVAN: Yeah.
MS. HEWITT: Page 14's missing?

Page 11

MS. SULLIVAN: That's fine. We can change that later, just note it right now.
MS. HEWITT: Well, yes, page 14 is missing from mine as well.
MS. SULLIVAN: Did you have questions about it.
MS. HEWITT: No. I don't have questions from page 14, but I don't know why -- it might be in the actual original document. In any event, we don't have any questions about page 14. And I apologize. Here's the stapler. Other than that, we are a very sophisticated law firm. We provide extensive resources for our clients.
BY MS. HEWITT:
Q. Anyway, what I'd like to ask you about is the waste acceptance schedules that are included in this document.
Have you had a chance to look at this document before, Mr. Pollog?
A. Yes, I have.
Q. In particular, I think there's a table at the very end on page 26. Have you found that table? It's Table 2-2.
A. Yes, I have.
Q. Set forth here are acceptance rates for

Page 12

repository, first repository and second repository. In particular, I'd like you to look at the spent fuel column under the first repository.
Do you know the basis for the acceptance rate figures listed therein?
A. Are you referring to the section under first repository, spent fuel starting with No. 400 in 1998.
Q. Yes, I am.
A. Yes, I am.
Q. And what is the basis of those acceptance rates?
A. The basis would be twofold, or two parts. One would be, again, we anticipated two repositories of total amount of spent fuel approximately 130 to 140,000 MTUs with equal amounts in both repositories and that number being approximately 70,000 dividing the operational life of approximately 25 years, you get approximately 3000 per year as a steady state rate with a several-year ramp up rate in the early years. It would be part 1.
The second reason for that would be again to try and keep up with spent fuel discharges and the need for alleviating the need for additional on-site dry storage at the purchaser sites.

Page 13

Q. And these were the same reasons for the acceptance rates that were included in prior drafts of the mission, this mission plan, is that correct?
A. I believe so.
Q. And we may have discussed this yesterday with regard to the drafts, but the ramp-up rates from 400 in the first three years to 900 and then 1800, why were the numbers segregated that way for the ramp-up years?
A. Can you explain for me what you mean by segregated?
Q. Yes. Why was 400 chosen for the first three years and then 900 for the fourth year and then 1800 for the fifth year?
A. Okay. Originally we had suggested an earlier drafted mission plan, 1800 metric tons per year for the ramp-up period. I believe we received public comments, the document mission plan itself, including the schedules and one of the comments or several, I'm not sure how many, stated that they thought that would be an overly ambitious ramp up rate to go from zero to 1800 in your first year and suggested scaling back which way were initial ramp up would be.
In response to those comments, I think the

decision was made to reduce the ramp up the numbers in the early years in order to get the system going from basically zero up to the 3000.

Q. Do you know why it was broken down to 400 and then 900 and then 1800? There seems to be a relationship between those numbers but I would rather not guess.

A. I think they were just approximately doubling every -- you do a couple of years at 400 and you double that and get comfortable with that and you double that again until you reach your essential steady state rate.

Q. Okay. If you take a look at the next chart that follows that on page 27, Table 2-3, have you located that chart?

A. Yes.

Q. What is the difference between this chart and the prior chart that we just were discussing?

A. This chart is for improved performance system which includes an MRS in the waste manageme t system.

Q. Okay. And is the idea that the waste would be transferred first to an MRS before going to a repository? Is that what this chart reflects?

A. Let me examine it for a second.



(Witness reviewing document)

MS. HEWITT: Can we go off the record for a second?

(Discussion off the record)

THE WITNESS: I believe this chart includes a system where waste would first go in the first, from pre-'98 through 2005, if I'm reading this across correctly. To an MRS and then to the first repository and then starting I believe in 2006, waste would still be going to an MRS to a first repository and some of it would be going straight to a second repository. Some would be going to an MRS and some would be going to a second repository, starting in I believe if I'm reading this chart correctly, 2006. Yeah, I believe 2006.

MS. SULLIVAN: Are --

BY MS. HEWITT:

Q. What is the basis for the acceptance rates that are listed here for the MRS?

A. I believe the basis is the 3000 again comes from the two objectives we had discussed just a few minutes ago, the first one being looking at how much was going to eventually, to the first repository being the 70,000 MTUs, taking that number and looking at the lifetime -- anticipated lifetime for the MRS



repository for approximately 25 years dividing 75,000 by 25 and reaching an approximate number of 3000 per year in steady state and the second being the goal to alleviate the additional need for dry storage or out of full storage at a facility, at a purchaser's facility.

Q. How come there's not a ramp up rate for the MRS acceptance?

A. Well, I believe there is. If you look at the pre-'98, it doesn't give specific years. It just says pre-'98. So I believe that includes more than one year, the 2200 number.

Q. I see. And do you know when this assumes the MRS would be operational or able to take spent nuclear fuel?

A. I believe it was based on starting in 1996.

Q. I don't think I have any more questions for you Mr. Pollog. I will turn it over to my colleagues. I will note for the record that you did yesterday not know some basis for some of the rates in the ACRs which was supposed to be part of your responsibility, so I'm not going to end my questioning and just keep it open. And I don't know whether they're going to bring you back to speak on



that after you've learned more about it or have another witness for that, but there were a couple of areas that you didn't know any information about. So I just reserve that right on an examination basis for a 30(b)(6) witness, whoever that might be.

MS. SULLIVAN: Well, we would object to that because the topics asked for the basis for the ACR rates and he told you they were found in other published documents up until 1991 and was able to explain from 1991 where those rates came from and he did walk you through the mission plan for 1997, although that was not a document and was able to track that back. So we would object to any -- but let's leave it on record right now and we can ask Judge Sypolt.

BY MS. HEWITT:

Q. Let me just clarify. I'm just talking about the rates that appear on two ACRs based on the 1998 mission plan when he said he did not look at and did not know the basis of those generations?

A. The topics set forth the rates in the ACRs. And as the ACRs say, they were found in the mission plans.

MS. HEWITT: But that's all he could say.

MS. SULLIVAN: Then you did put the 1997

mission plan draft amendment in front of him. He was able to.
MS. HEWITT: But he said he had not reviewed the 1998, so --
MS. SULLIVAN: He said he hadn't reviewed the 1998 mission plan.
MS. HEWITT: He did say he had reviewed that.
MS. SULLIVAN: Not recently.
MS. HEWITT: Well, he had reviewed it. Anyway, I'm going to reserve the right. We can discuss that later.
MS. SULLIVAN: Well, we will object and let Judge Sypolt decide. Can we take a few minutes to see if we have any cross?
MS. HEWITT: Sure.
(Recess)
MS. SULLIVAN: Okay. Who's next?
MR. EIDUKAS: I think I'll go next.
EXAMINATION BY COUNSEL FOR PLAINTIFF
COMMONWEALTH EDISON
BY MR. EIDUKAS:
Q. Good morning, Mr. Pollog, my name is Ted Eidukas. I represent Commonwealth Edison.
A. Good morning.



Q. My question is yesterday we had some discussion about plans for spent fuel being sent to the MRS or the repository based on whether they were western reactors or eastern reactors. And I just had a clarifying question.
Was there a specific dividing line as to what was a western reactor and what was an eastern reactor?
A. I know of no dividing line between western and eastern reactors.
Q. So there was no designations made or assignments made as to whether this reactor is an eastern or western?
A. As far as I know, there were no designations made from this reactor is eastern and this reactor is western.
Q. Okay, thank you.
Yesterday you gave some testimony about the 1995 ACR APR and the acceptance schedule present in that document. And I don't remember what exhibit it was, if you want to look at it. But I believe that was the -- and I believe that is an acceptance schedule that uses rather than calendar years, it uses years 1 through 10?
A. Correct.



Q. And just to be -- and I believe you testified that -- and correct me if I'm wrong, but I believe you testified that utilities would be unable to submit DCS based on that schedule because there were no calendar years given but rather years 1 through 10.
A. Yes, I did.
Q. Does the DOE have a position on whether or not after the publication of that ACR, that schedule, does the DOE have a position as to whether purchasers were obligated or required to submit DCSs after that point?
A. We had informed purchasers that at this point in time we weren't going to be further processing schedules starting in 19 -- I believe it was the end of '96. Then after we started, we did not believe it was necessary for purchasers to further submit DCSs.
Q. I'm done with that document. You can put that aside for now. In testifying about the basis for the acceptance schedules found, the acceptance rates found in a lot of these documents, you've testified that there were two objectives or principles that underlied the rate.
One was -- and I'm going to focus on what



I believe you characterized as the first objective being the -- I can have you say that again, but let me see if I understand it.
You believe that each repository would accept up to approximately 70,000 MTU of spent fuel, and then you took the -- you also anticipated that there would be approximately 25-year operational life? And I'm not sure if operational life is the word you've used, and then I'll let you correct me. Operational period or operational life of the facility or the program and by taking and dividing 25 into 70,000, you got approximately a steady rate of 3000.
Is that an accurate paraphrasing of what you've testified or perhaps if you want to --
A. I would say that's close enough.
Q. Close enough, Okay. The 25 years for the anticipated operational life of the facility, could you just clarify again what that 25 years represents?
A. I believe it represents what was anticipated in normal lifetime of the equipment that would be used in one of these facilities such as transportation casks, handling equipment, any type of hardware that was going to need to be purchased to operate the facility was thought to have about an