operational life before you would need to basically just get rid of it and buy new stuff of 25 years.
Q. So the 3000, or the rate that was generated by looking at that, the rate was based on the calculation or the estimation that the life of this equipment would be about 25 years, not vice versa? I sense by your expression they were as clear as mud?
A. The vice versa, I wasn't sure.
Q. Sorry. In other words, as I understand it, the DOE in developing this acceptance schedule or this acceptance rate didn't approach it in the manner of we want a rate of 3000 and then let's calculate what the life of this equipment would be.
Rather, they took the 70,000 MTU limit or what they felt would be the limit on the acceptance, what the repository would accept and then looked at the life of the equipment, what they expected the life of the equipment would be and took those numbers and then came up with the 3000, not the other way around.
A. We looked at what the life of the equipment was and not -- and then divided the total anticipated capacity to determine the rate. We didn't look at the rate first. We did not look at



the rate first and then back calculate what the life of the equipment would be.
Q. Okay. I think that expressed what I was trying to say. Was there any expectation by the DOE that the program would last longer than this 25 years? In other words, that they would have to go out and buy a new set of this equipment?
A. Well, if you look at the early documents, it actually includes two repositories. So the first one would be operating for approximately 25 years and then the second one coming on line or starting several years, I'm thinking -- it varied at different points of permanence, but I'm going to say approximately 10 years after the first one so that would be 25 years past, so you're talking approximately 35 years or so.
Q. At each repository, was there any expectation that at each of the repository there would be a replacement of the equipment so that each repository would be operating for more than 25 years?
A. I don't believe so. Well, let me just clarify that. When you say operation, you mean you're still going to be done after no more fuels come in after the repository. The acceptance part of files coming into the gate was expected to last 25



years.
There are additional requirements such as everything would not necessarily be in place within that 25 year period of time. It would take a little bit longer to work off the backlog, and I believe the nuclear policy act specifies we have to provide a 50-year retreatability, capability at the repository. So there would be certain activities going on to fulfill those statutory requirements. But regarding I think accepting fuels through the front gate and doing what we need to do to get into placement would last 25 years plus a few additional years to work off any lag fuel storage.
Q. I think with that clarification we're still on the same page as far as what I meant by operational life and what you said in your earlier testimony -- just to clarify, when you were talking about operational life of the equipment, you've been referring to the operation life of the acceptance equipment?
A. For the most part, yes.
Q. Briefly look at the 1997 annual capacity report. And again, it should be one of the middle -- or early documents, No. 4.
A. Okay.



Q. I'm going to focus on the bottom of page 4 and top of page 5. It's a Section 1.2.3. Submittal of comments on the annual capacity report. Yesterday I believe you were asked that question about whether or not -- and I can't remember the exact question. But I believe it was a question as to whether or not the standard contract required comments or provided for a method for commentary on the annual or draft annual capacity reports.
And I believe you gave some testimony as to whether -- you know, that the standard contract provided a mechanism for comment when something had been delivered to a purchaser by a contracting officer, do you remember giving testimony like that?
A. Yes.
Q. If you could just take a look at Section 1.2.3 on Exhibit 4 there, you'll see it -- I'll read it. It just starts, "Wherein comments are requested, specifically from the purchasers, on the content of this initial ACR."
Do you know whether or not this request for comments was being made pursuant to the standard contract?
MS. SULLIVAN: Objection beyond the scope. You can answer if you know.

Page 46

THE WITNESS: No, I don't.
BY MR. MACDONALD:
Q. Are you aware of a provision in the standard contract that provides authority to DOE to give shutdown reactors a priority in the acceptance of SNF?
A. I'm aware of a provision that DOE may provide priority for shutdown reactors.
Q. Do you know why that provision was put in the standard contract?
A. No, I do not.
Q. Would you turn to page 2-5?
A. The same document?
Q. Same document. The first full paragraph on page 2-5 begins, "The main plan and primary effort is to have an operating geologic repository in 1998."
Do you see that?
A. Yes.
Q. As of December 20, 1983, the date of this document, was it DOE's main plan and primary effort to have a repository?
MS. SULLIVAN: Objection. Beyond the scope. You can answer if you know.
THE WITNESS: I believe it was the objective of the Department to have a repository

Page 47

operating by 1998.
BY MR. MACDONALD:
Q. Would you turn to page 3-B-12. It's a ways in the back.
A. 3-B-12?
Q. Yes. And in particular, if you would look at the paragraph B entitled Licensing.
A. Yes. I'm there.
Q. I had some questions about this which maybe you will be able to explain. This paragraph states that, "It has been estimated that the Nuclear Regulatory Commission would require two-and-a-half years to review and monitor retrievable storage facility licensing application."
Can you explain to me what would go into that estimate of why it would take two-and-a-half years for the NRC to review an NRS licensing application?
MS. SULLIVAN: Objection. Beyond the scope. You can answer as to your personal knowledge.
THE WITNESS: I must admit I'm not that familiar with NRC licensing regarding a facility, so I can't explain to you why it would take two-and-a-half years to do that.
BY MR. MACDONALD:

Page 48

Q. Is the 2.5 year time period consistent with your current understanding of how long the NRC would take to license an MRS?
MS. SULLIVAN: Same objection.
THE WITNESS: My current understanding is based on work that was done I believe a CISF, centralized interim storage facility submittal we sent to NRC in the late 1990s, and I believe the licensing time approximates that.
BY MR. MACDONALD:
Q. And what was again the CISF proposal that you're talking about?
MS. SULLIVAN: Same.
THE WITNESS: Centralized interim storage facility.
BY MR. MACDONALD:
Q. And you worked on that proposal in what period of time?
A. I did not work on that proposal.
Q. When was that proposal sent in?
MS. SULLIVAN: Same objection.
THE WITNESS: I believe in the late '90s, mid to late '90s.
BY MR. MACDONALD:
Q. If you didn't work on it, how are you

Page 49

aware of the time that the study estimated for NRC approval of an MRS license?
A. I believe I picked a copy up just for some general light reading one afternoon.
Q. You're an engineer at heart. Do you know who did work on that?
MS. SULLIVAN: Same objection.
THE WITNESS: Yes, I do.
BY MR. MACDONALD:
Q. Who was that?
MS. SULLIVAN: Same objection.
THE WITNESS: Dan Kane, K-a-n-e.
BY MR. MACDONALD:
Q. In 1983, did DOE anticipate that utilities would have to build additional on-site storage facilities?
A. I believe so, yes.
Q. Did DOE anticipate the utilities would have to about the additional on-site storage facilities after 1998?
A. I believe so.
Q. Why do you believe so?
A. Because we believe utilities would need to build additional on-site storage facilities by the mid-'90s.

Page 50

Q. Would they -- I think my question may have been poorly worded. DOE anticipated that the utilities would have to build storage in the mid-'90s.
Did DOE anticipate that utilities would have to build storage after January 31, 1998?
MS. SULLIVAN: I'm going to object to this as beyond the scope. You can answer as to your personal knowledge.
THE WITNESS: You're talking about 1983?
MR. MACDONALD: Correct.
THE WITNESS: I think DOE anticipated at that time that it was possible that utilities would need to build additional on-site storage after 1998. If DOE did not start accepting fuel by that date, by that time frame. DOE believed it was also possible but difficult to speculate that far even if we did accept fuel starting in 1998, if utilities would need to build additional on-site storage because we hoped to take rates who reduced the need, but that would be in a perfect world with perfect trading and one could not speculate how an exchange process would work 20 years in the future.
BY MR. MACDONALD:
Q. But the waste acceptance schedule in 1983

Page 51

was designed so that no utility would have to provide additional on-site storage after January 31, 1998?
MS. SULLIVAN: Objection, vague. It was designed as I've testified, two things in mind. One thing was to hopefully reduce or if in a perfect world eliminate the need for additional on-site storage, and it was also designed with the objectives we talked about earlier, and that is a 70,000 MTU limit at a repository divided by 25 years and you come to the number of approximately 3000. It had two objectives I think regarding -- or two reasons why that rate was chosen.
BY MR. MACDONALD:
Q. Would you turn to page 2.1 of the same document, the 1983 draft mission plan?
A. You said 2.1?
Q. Yeah, 2-1. And in the first paragraph, this document states, "The waste materials will be accepted in accordance with a waste acceptance schedule designed to provide an acceptance rate in the first five years such that no utility will have to provide additional storage capacity after January 31, 1998."
So my question is was the waste acceptance schedule "Designed to provide an acceptance rate in

Page 52

the first five years such that no utility will have to provide additional storage capacity after January 31, 1998?"
A. Yes.
Q. Do you know why this document doesn't discuss or mention the second objective that you had talked about, the 25-year life of the operations?
A. No, I do not.
Q. I'd like to talk briefly about the 1984 draft mission plan which should be Exhibit 8. Conveniently, I'd like you to turn also to page 2-1 of this document, the 1984 draft mission plan. And in particular I wanted to ask a few questions about the language that Ms. Hewett identified yesterday for you in the second paragraph. In specific, the first sentence which talks about providing owners and generators of SNF with planning schedules sufficiently early to determine their on-site interim storage needs.
What's your understanding of what "sufficiently early" in that sentence means?
MS. SULLIVAN: Objection. Asked and answered. You can answer again if you recall your answer.
THE WITNESS: I'm having trouble finding

Page 53

sufficiently early. Can you point it out to me?
MR. MACDONALD: It's the second paragraph, the fourth line.
THE WITNESS: Oh, I'm sorry. I'm looking under A. I believe that would mean they would not have to be in a situation where their spent fuel pool was full before they had to make a decision about what they were going to do next.
BY MR. MACDONALD:
Q. And we talked a little bit about this yesterday, but I just want to clarify it. The reason the utilities need advanced notice is because if DOE was not going to pick up fuel starting in 1998, the utilities would need to make arrangements for storage on their own, is that correct?
MS. SULLIVAN: Objection, beyond the scope. You can answer as to your personal knowledge.
THE WITNESS: They would have to make arrangements.
BY MR. MACDONALD:
Q. Would those arrangements potentially entail building additional dry storage facilities?
MS. SULLIVAN: Same objection.
THE WITNESS: It could.
BY MR. MACDONALD:

Page 90

Q. And do you know when generally, what year SMUD would have submitted and had DCSs approved?
A. Yes.
Q. What year generally would that have been?
A. I believe it would have started in 1992.
Q. And would have been approved under the contract shortly after being sent in -- there were time lines set out in the contract for when they had to be approved?
A. There are time lines set into the contract for specific actions regarding approval of DCSs, yes.
Q. So at the time that they were approved, assume that was in 1992 or 1993, it was DOE's position that it was contractually obligated to begin picking up fuel from SMUD on this schedule set out here that we're looking at?
A. It was the DOE's contention that once the DCSs submitted by SMUD and approved by the department, it was obligated to pick up set amounts in those DCSs of fuel.
Q. If you would look at Exhibit 3 to your deposition which should be the DCS instructions. Were the DCS instructions based on allocations in the 1991 ACR?
MS. SULLIVAN: Objection. Vague.

Page 91

THE WITNESS: I don't quite understand what you're asking. I'm sorry.
BY MR. MACDONALD:
Q. Well, the purchasers had to submit DCRs based on some allocation, correct?
A. Yes.
Q. My question is, on what allocation in what DOE document were the purchasers' DCS submissions based?
A. The purchasers were supposed to use for their DCS submittals allocations in the 1991 ACR.
Q. Is there anything in the DCS instructions that would suggest to a utility that DOE believed that the DCSs would be contractually binding?
A. If you allow me several minutes to review this very quickly.
Q. Please take as much time as you need.
(Witness reviewing document)
THE WITNESS: I'm ready. Can you repeat that question for me?
THE REPORTER: "Question: Is there anything in the DCS instructions that would suggest to a utility that DOE believed that the DCSs would be contractually binding?"
THE WITNESS: I think there's something

Page 92

here that suggests it's contractually binding for the purchaser, but not for DOE.
BY MR. MACDONALD:
Q. And when you say for the purchaser not DOE, could you explain what you mean, contractually?
A. Yeah. If you look on page 5 under certifications, it says, "Any individual duly authorized to bind the purchaser must sign DCS certifying the purchaser has a legal right to deliver such SNF to DOE."
Q. And explain to me why that suggests that the DCSs are contractually binding for the purchaser but not DOE.
A. I didn't say they weren't contractually binding for DOE. I just said that the statement here indicates to me it binds the purchaser to DCSs instructions. But there's no statements in here that state that it binds DOE.
Q. And in fact, this statement doesn't state that the DCSs bind the purchaser; it states that a certification that the individual authorized to bind the purchaser must sign the DCS certifying that the purchaser has the legal right to deliver such SNF to DOE.
MS. SULLIVAN: Object. The document

Page 93

speaks for itself. You can answer.
THE WITNESS: It says any individual that we must certifying that the purchaser has legal right to deliver such SNF to DOE.
BY MR. MACDONALD:
Q. So this provision is speaking to whether or not the purchaser has the legal right to deliver the SNF to DOE, correct?
A. I believe so.
Q. Other than that statement, is there anything in these DCS instructions that suggest DOE believed that the DCSs were contractually binding?
A. No.
Q. If I could ask you to turn to page 2, little paragraph C, just take a quick look at that paragraph. Is there anything in these DCS instructions that suggest that the DCSs are not binding commitments on behalf of DOE?
A. No.
Q. The sentence they believe you spoke discussed with Ms. Hewett yesterday that's in little subparagraph C says, "In the event that such circumstances change, all DCSs previously approved by DOE may need to be reevaluated by DOE and the purchasers."

Page 114

sentence, the document states that, "Until the SNF is accepted by the Department, Section 111(a)(5) of the Act assigns the waste owners and generators the primary responsibility to provide for, and pay for the costs of, interim storage."
If DOE believed this statement at the time, wouldn't it suggest that the it would not begin picking up the fuel base on the approved DCSs?
MS. SULLIVAN: Objection beyond the scope, objection argumentative, objection vague. You can answer as to your personal knowledge.
THE WITNESS: Could you repeat that again?
BY MR. MACDONALD:
Q. Let me rephrase it. The premise of this sentence is that until SNF is accepted, the purchasers will have to pay for and provide the cost of interim storage. Strike that.
MR. MACDONALD: You want to break for lunch?
MS. SULLIVAN: Sure.
(Whereupon, at 1:30 p.m., the deposition in the above-entitled matter was recessed, to reconvene at 2:15 p.m., this same day.)

Page 115

AFTERNOON SESSION
(2:15 p.m.)
Whereupon,
THOMAS POLLOG,
the witness testifying at the time of recess, having been previously duly sworn, was further examined and testified further as follows:
EXAMINATION BY COUNSEL FOR
PLAINTIFF SACRAMENTO MUNICIPAL (RESUMED)
BY MR. MACDONALD:
Q. Mr. Pollog, when did you form the opinion that DCSs are contractually binding?
A. When did I, Tom Pollog?
Q. Yeah.
A. I believe in -- that DCSs are binding, is that what your question is?
Q. I guess I should preface the question. Do you, Tom Pollog, believe that the DCSs are contractually binding?
A. Yes, I do.
Q. When did you form that belief?
A. I believe I formed that belief in approximately 1991.
Q. And how did you form that belief in 1991?
A. General waste -- no. At that point in

Page 116

time, I was with the utility interface and logistics branch, which was headed up by Mr. Brownstein and at various points during the work period we would discuss just contract issues, work issues, stuff like that, and we would have general discussions just sitting across a desk or table like this, and I don't have any specific recollection of a conversation or any particular time, and when I started working for Mr. Brownstein around 1991, we had a discussion similar to that and during that period I formed my belief.
Q. Did Mr. Brownstein ever express the same opinion that DCSs were contractually binding?
A. I believe Mr. Brownstein expressed similar beliefs.
Q. Did Mr. Brownstein ever -- did you ever have discussions with Mr. Brownstein where he expressed the view that DCSs may not be binding?
A. I believe he stated that DCSs may not be binding if we didn't commence facility operations.
Q. And did DOE commence facility operations?
MS. SULLIVAN: Objection. Beyond the scope. You may answer the question.
THE WITNESS: Not beyond this point in time, today.

Page 117

BY MR. MACDONALD:
Q. Does DOE -- strike that. DOE is currently continuing plans for acceptance of waste developing program plans for acceptance of waste at Yucca Mountain beginning in 2002, is that correct?
MS. SULLIVAN: Objection. Beyond the scope. You can answer the question as to your personal knowledge.
THE WITNESS: Yes, that's correct.
BY MR. MACDONALD:
Q. In developing those plans, is DOE currently planning to use the approved DCSs for the basis of acceptance starting in 2010?
MS. SULLIVAN: Same objection.
THE WITNESS: We have not had discussions as to how we will begin acceptance in 2010, but we've always believed that the commitment -- we did have a commitment to a legal contractually binding commitment to accept the fuel that is designated on the submitted and approved DCSs.
BY MR. MACDONALD:
Q. Have you participated in any planning or conversations in which DOE discussed modifying the entire DCS and FDS process for acceptance for Yucca Mountain?

Page 158

Q. Does this refresh your recollection as to whether you've ever seen this document before?
A. Yes.
Q. Were you involved in the preparation of this document?
A. No.
Q. Do you know why after DOE had decided not to publish the APR ACR dated September 1996 that we just talked about, why DOE prepared an APR ACR the following year?
MS. SULLIVAN: Objection. Beyond the scope. You can answer as to your personal knowledge.
THE WITNESS: Yes, I do.
BY MR. MACDONALD:
Q. Could you explain why?
A. Yeah. I'm actually going to have to correct what I just said earlier about the Exhibit 27.
Q. Okay. Exhibit 27 being the APR ACR dated September 1996?
A. Yes. After I saw both of these, it brought back a better recollection for me.
Q. Great.
A. In this approximate time frame, September of '96 we had a reorganization, where I went from the

Page 159

engineering division back to the waste acceptance group and several people came and went into different organizations. And we got Exhibit 27 even though it says September of '96 a little bit later than that. And we expected the data for the Exhibit 28 to be coming in fairly soon, so we decided not to issue September '96 edition, Exhibit 27, and just go forth with Exhibit 28 because of the lateness in getting this and the expectation to be getting the data from the 859 form in time to be able to turn Exhibit 28 in a timely manner. So this one we just basically decided not to issue because of the timing.
Q. And this one being, sorry, for the court reporter, the ACR APR dated September '96?
A. That's correct. It was a timing issue that we just never got around to doing it. And then by the time we started -- we got this from our contractor --
Q. This being the APR ACR dated September '97?
A. Yes, Exhibit 28. That's when we received the guidance from the Office of General Counsel to stop doing this.
Q. And what contractor would DOE have received that from?

Page 160

A. TRW.
MR. MACDONALD: I have no further questions at this time. Along the same lines with Ms. Hewett's reservation in light of outstanding document issues, we reserve the right to reopen the deposition if necessary and thank you for your time.
THE WITNESS: I look forward to it.
MS. SULLIVAN: I have a couple of questions.
EXAMINATION BY COUNSEL FOR DEFENDANT
BY MS. SULLIVAN:
Q. Mr. Pollog, could you define the term emplacement rate for me?
A. Yeah. Emplacement rate would be the rate of fuel taken underground at repository if possible, for fuel to be accepted and moved to repository and not be emplaced within a few weeks or a few days, so it might still be in lag storage for a period of time. The emplacement rate would reflect the actual amount of material going from the surface facility underground.
Q. Is there a difference between a waste acceptance rate and an emplacement rate?
A. There can be.
Q. Could you define the term waste

Page 161

acceptance?
A. Yeah. When title is transferred from the purchaser to the Department of Energy.
Q. I'm sorry, I should have -- waste acceptance within the context of the program that we've been discussing. Is that your definition?
A. Yes. That would be when title was transferred from the purchaser to the Department of Energy for particular SNF, spent nuclear fuel.
Q. Is there a difference between waste acceptance and waste disposal?
A. There can be.
Q. And what is that difference? What can be that difference?
A. The waste acceptance rate can be higher than what the waste emplacement rate is if there is cause for lag storage or storage needed at a disposal facility.
Q. Mr. Pollog, could you look at Exhibit 3, which are the instructions for completing the Appendix C delivered commitment schedule. And could I direct your attention to paragraph 7 C on page 2. And I'm going to read a sentence that you've been read a number of times, the third sentence in that paragraph. "In the event that such circumstances

Page 162

change, all DCSs previously approved by DOE may need to be reevaluated by DOE and the purchasers."

Can you describe what circumstances would require reevaluation of DCSs?

MR. MACDONALD: Objection. The document speaks for itself. Calls for a legal conclusion.

BY MS. SULLIVAN:

Q. Would you like to answer?

A. Yes, I would.

Q. Would you please?

A. Yes. An example of this would be where a purchaser indicated that they would like to be served via a truck cask as opposed to a rail or barge. If DOE thought it might be in the best interest of the system to service them via a rail cask which is larger and would reduce the number of casks and shipments, we would seek to negotiate with a purchaser and with both parties agreeing, try and service them with the rail cask.

MS. SULLIVAN: Okay. Nothing further.

MR. MACDONALD: Nothing further from me.

(Recess.)

EXAMINATION BY COUNSEL
FOR SOUTHERN NUCLEAR OPERATING COMPANY

BY MS. REMINGTON:

Page 163

Q. Hello, my name is Kristi Remington and I work for Balch & Bingham and we represent Southern Company. And I just have a few questions that shouldn't take too long. I'm going to go back to the topic of DCSs very quickly. And can you just tell me when you came to learn that DOE's official position was that accepted DCSs would be contractually binding?

A. I would say it would be in the 91-'92 time frame and we were discussing what the ramifications would be of the DOE contracting officer signing off on the DCS. That would be an official -- a real commitment for the Department.

Q. Is it the position of the Department of Energy that an approved DCS would not be contractually binding if there were no operating facility in 1998?

A. I don't believe that's the official position of the Department of Energy.

MS. REMINGTON: I'm going to show you a document that's going to be marked Exhibit 29.

(Pollog Exhibit No. 29 was marked for identification.)

BY MS. REMINGTON:

Q. And that is a DCS submitted by our

Page 164

company, Southern Nuclear Company. If you would take a minute and look at it.

A. (Witness reviewing document.)

Q. I'm actually not going to ask you any questions on the attachments, but you're more than welcome to read them.

A. Okay.

Q. If you'll look on the second page of the letter, the first full paragraph, it states, "The attached meets the notice obligations under the spent fuel disposal services fuel contracts but does not indicate Southern Nuclear's acceptance of the removal rates contained in the current ACR. Southern Nuclear believes that ACR rates are too low and are therefore inadequate."

Have you ever seen this document before today?

A. I don't recall.

Q. Do you know whether DOE would consider that last paragraph that I just read to you a protest of the acceptance rates?

MS. SULLIVAN: Objection. Beyond the scope. You can answer the question as to personal knowledge. Also calls for a legal conclusion.

THE WITNESS: I guess I'm a little puzzled

Page 165

by what you mean by consider.

BY MS. REMINGTON:

Q. Would the contracting officer read this and make a determination that it was a protest of the acceptance rates?

MS. SULLIVAN: Same objection.

THE WITNESS: He might.

BY MS. REMINGTON:

Q. If a purchaser would protest DCS, was it the practice of the Department of Energy through the contracting officer to make a determination that a dispute then existed?

A. It could.

Q. Was there a process that the Department of Energy had for responding to a protest to a DCS? Or I'm sorry, to an acceptance rate?

MS. SULLIVAN: Objection. Beyond the scope. You can answer as to your personal knowledge.

THE WITNESS: To an acceptance rate?

BY MS. REMINGTON:

Q. As listed in the DCS.

A. If you're asking me whether a contract holder in the DCS form itself submitted a allocation that was different than what they were given in the ACR, yes, there was a process.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - - - - - - X

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.), :
Plaintiffs, :
v. :
THE UNITED STATES, :
Defendant. :

- - - - - - - - - - - - - - - - - - - - - - - - - X

Washington, D.C.
Thursday, May 16, 2002

Continued deposition of THOMAS POLLOG, a 30(b)(6) witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness having been previously sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 9:30 a.m., Thursday, May 16, 2002, and the proceedings being taken down by Stenotype by BRYAN WAYNE, RPR, and transcribed under his direction.

Q. And why do you think that that wasn't discussed?
MR. CRAWFORD: Objection.
BY MR. SKALABAN:
Q. Or why would you think that wouldn't be discussed?
MR. CRAWFORD: Objection to the extent it calls for speculation.
THE WITNESS: Because I believe we all had the same opinion regarding how much MTUs a purchaser could put down on their DCS.
BY MR. SKALABAN:
Q. And for the record, what was that opinion?
A. That they are limited to the allocations in the 1991 ACR.
Q. Is it your view that the DCSs if submitted by the purchasers and approved by the Department are binding on both the purchasers and the Department?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
THE WITNESS: Yes.
BY MR. SKALABAN:
Q. So is the effect of the DCS instructions that the Department has the discretion to establish what are the binding commitments between the



purchasers and DOE?
MR. CRAWFORD: Same objection.
THE WITNESS: Can you repeat that for me, please?
THE REPORTER: "Question: So is the effect of the DCS instructions that the Department has the discretion to establish what are the binding commitments between the purchasers and DOE?"
MR. CRAWFORD: Best evidence also.
THE WITNESS: I believe it's the contract and the DCS instructions together that result in the 1991 ACR allocations being used for submittal of DCSs.
BY MR. SKALABAN:
Q. Does the contract in any part say that DOE has the discretion to set the annual aggregate rate which will then be allocated to the purchasers?
MR. CRAWFORD: Objection, best evidence.
THE WITNESS: Not in those words.
BY MR. SKALABAN:
Q. Do you think the contract has the words that do exist equal to that effect?
MR. CRAWFORD: Objection, vague and objection to the extent it calls for a legal conclusion.



THE WITNESS: The contract sets up a waste acceptance process. When you use the waste acceptance process in the contract and the DCS instructions together, I believe that's where the Department gave the guidance or -- or that's how the Department developed the position in 1991 ACC is what is to be used for completing DCSs.
BY MR. SKALABAN:
Q. Now, the DCS instructions don't refer -- I'm sorry. The DCS provisions of the contract don't refer to the ACR, do they? And if you would like to, please feel free to look at the contract.
THE WITNESS: Give me a moment.
MR. CRAWFORD: Yeah. Because my objection would have been best evidence.
(Witness reviewing document.)
THE WITNESS: Can you repeat the question then for me please?
THE REPORTER: "Question: The DCS provisions of the contract don't refer to the ACR, do they?"
MR. CRAWFORD: Let me just insert my objection, best evidence.
THE WITNESS: No. They do not refer to the ACR, but they do refer to the APR.



BY MR. SKALABAN:
Q. Now, were the DCS instructions filling in a gap in the contract between the ACR and the DCSs and their relationship?
MR. CRAWFORD: Objection, best evidence and objection to the foundation.
THE WITNESS: I think one could argue that, yes.
BY MR. SKALABAN:
Q. And your understanding of deliver commitment schedule provisions that are provided for in the contract, again, not divorced from the instructions, do they in your view provide for the Department to set in the Department's discretion what the purchaser's allocation must be?
MR. CRAWFORD: Objection, best evidence.
THE WITNESS: When viewing contract in total, yes.
BY MR. SKALABAN:
Q. When you say viewing it in total -- okay. Let me back up for a second. So you agree that this provision on delivery commitment schedules standing alone does not provide the Department the discretion to set the allocation of each purchaser?
MR. CRAWFORD: Objection, best evidence.

Page 323

THE WITNESS: Yes.
BY MR. SKALABAN:
Q. You agree with me on that?
A. Yes.
Q. What do you base your on the contract as a whole interpretation? Can you point to me what your view is based upon?
A. If you read the contract at least for the waste acceptance process that it sets up with the Department producing an ACR starting in 1997 and then an APR in 1991 and then purchasers starting to submit DCSs in '92, I think it lays out different activities of points of time. And when you look at these as an entire process, I think that's where we got the impression or view that the 1991 ACR should be used by purchasers to fill out their DCSs, the allocations from the 1991.
Q. Now, you're essentially making an inference from different provisions of the contract. The contract doesn't expressly tie these together, does it?
A. Objection, best evidence.
Q. In your view.
A. The phrase we use is connects the dots.
Q. And can you explain that for me?

Page 324

A. It gives an activity to occur over a period of time and they're not necessarily all connected very clearly. So we're trying to connect the different activities into one complete process.
Q. So from the language of the contract, the connection is not stated clearly between the different activities?
MR. CRAWFORD: Objection, mischaracterizes prior testimony.
THE WITNESS: Not all the time.
BY MR. SKALABAN:
Q. And how about this connection of ACR, APR, DCS, ACR must be the basis for the DCS? Are the lines connecting those different dots expressly stated in the contract in your view?
MR. CRAWFORD: Objection, best evidence. Objection to the -- that's all.
THE WITNESS: That's certainly subject to interpretation. My view is certain areas it's very clear; in other areas it's not quite as clear. For this specific area we're discussing right now, I think it's pretty clear but maybe not explicitly clear.
BY MR. SKALABAN:
Q. Do you think it's something that's subject

Page 325

to debate?
MR. CRAWFORD: Objection, mischaracterizes prior testimony.
BY MR. SKALABAN:
Q. Let me ask a better question. Could reasonable minds differ on your view on this?
A. I don't want to get into a reasonable minds belief.
MR. CRAWFORD: Objection to the vagueness.
THE WITNESS: That's a difficult question, again, because I don't want to start saying people are reasonable, what their minds are. But I think it's pretty clear in my mind what's intended by it. I would not necessarily want to say a person is unreasonable or had an unreasonable mind if they disagreed with me.
MR. SKALABAN: Okay. Let's go off the record.
(Recess.)
BY MR. SKALABAN:
Q. Mr. Pollog, as part of the ACR issue resolution process, do you remember any Yankee utilities agrees with Department's interpretation of all SNF and wishes-to-deliver that we've been talking about this morning?

Page 326

MR. CRAWFORD: Objection, foundation.
THE WITNESS: I have no specific recollection of the Yankee positions in the ACR issues resolution process.
BY MR. SKALABAN:
Q. And that goes for all of the issues?
A. Essentially goes for all of the utilities and all of the issues; I just do not recall what specific utility and what specific position on any of the issues.
Q. And so you have no recollection then of whether or not the Yankee utilities agreed with the Department's interpretation that it could require the utilities to fill out their DCSs in accordance with the 1991 ACR?
A. I have no recollection.
Q. Now, the DCS instructions we've been looking, at I want to call your attention to page 2 of those instructions. In particular, if you could take a moment to please review part 7(c). What was your understanding of this provision of the statement that the 1991 ACR provides an approximation of the federal waste management systems acceptance capacity?
MR. CRAWFORD: Objection, best evidence.
THE WITNESS: I think it's



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005