# Nancy Slater (Thompson)

**Page 1**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---------------X

YANKEE ATOMIC ELECTRIC :
COMPANY, :
Plaintiff, : Case No. 98-126C
v. : Senior Judge
: Merow
THE UNITED STATES, :
Defendant. :

---------------X

Washington, D.C.
Wednesday, April 21, 1999

Deposition of NANCY H. SLATER, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to agreement, the witness being duly sworn by JAN A. WILLIAMS, a Notary Public in and for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 10:10 a.m., Wednesday, April 21, 1999, and the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.

**Page 2**

APPEARANCES:

On behalf of the Plaintiff:
ROBERT L. SHAPIRO, ESQ.
JERRY STOUCK, ESQ.
PETER J. SKALABAN, JR., ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5854

On behalf of the Defendant:
MARIAN E. SULLIVAN, ESQ.
Trial Attorney
Commercial Litigation Branch
U.S. Department of Justice
1100 L Street, N.W.
Room 10150
Washington, D.C. 20530
(202) 307-6289

**Page 3**

CONTENTS

WITNESS EXAMINATION BY COUNSEL FOR PLAINTIFF
NANCY H. SLATER
By Mr. Shapiro 4
Afternoon session - 94

EXHIBITS

SLATER EXHIBIT NO. PAGE NO.
1 - Letter dated 3/1/99 50
2 - Letter dated 4/28/87 82
3 - Memo dated 6/29/87 95
4 - Letter dated 10/2/87 97
5 - Letter dated 11/10/87 99
6 - Standard Contract Issue Resolution Process 122
7 - Preliminary Draft dated 12/19/92 152
8 - Handwritten documents dated 8/29/91 161
9 - Memo dated 6/18/92 171
10 - Preliminary Draft dated 12/22/92 175
11 - Preliminary Draft dated 12/19/92 177
12 - Fax dated 9/1/93 181
13 - Spent Fuel Acceptance Scenarios devoted' to Shutdown Reactors dated 10/89 185
14 - Letter dated 1/26/93 191
15 - Fax dated 6/2/94 194
16 - Memo dated 7/25/94 199

**Page 4**

PROCEEDINGS

Whereupon,

NANCY H. SLATER,

was called as a witness by counsel for Plaintiff, and having been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY COUNSEL
FOR PLAINTIFF
BY MR. SHAPIRO:

Q. Would you state your name for the record, please.
A. Nancy H. Slater.
Q. Ms. Slater, my name is Robert Shapiro, we're here for your deposition. Have you ever had your deposition taken before?
A. No.
Q. Do you have some understanding of what's going to happen today?
A. Yes.
Q. What do you understand is going to happen today?
A. I understand that I'm going to be a factual deponent and that you're interested in asking me questions about my knowledge of the waste acceptance area during the time I was in

Page 29

instance, DOE's obligations under the contracts?
A. Actually I can give you an example of what I would have looked at that might clarify this a little, and that is utilities are entitled to deliver five-year-old fuel. If the requirements document were to say ten-year-old fuel, I would have to call that out as something that needed to be corrected. So that's the kind of thing that you would have looked for, the inconsistencies between the contract and the requirements documents.
Q. Let me go back to that again. Suppose your contracts required you ultimately to take 100,000 MTU and you see that the system is only calling for 70,000. Wouldn't that be an inconsistency?
A. I don't believe that it would be. You understand that the 70,000 MTU is legislatively mandated. So, therefore, you understand that there is no flexibility to change the capacity of the repository willy-nilly.
But, if you've read the legislation, I'm sure you also understand that at one point a second repository was contemplated. So no, I could not do anything about 100,000 MTU limit

Page 30

because I cannot change legislation.
Q. Again so I understand the difference is that you were really looking at things for which there might be some flexibility to change, those were the kinds of things that you were examining, to see if those items were consistent with the contract?
A. Right, or there were some items that might have been inflexible and someone made an error and transposed a number. So we were looking at a lot of things, again with the ultimate goal of assuring that the contract was consistent with program documents, no new requirements imposed indirectly.
Q. But, if there was a legislative limit such as the 70,000 K limit, you weren't going to look at that to see how that would fit in with the contracts?
A. No. And I don't believe that the 70,000 limit is discussed in the contract.
Q. When you were looking at these kinds of requirements, did you ever look at the time frame called for in the contract for starting waste acceptance and how that fit in with the system requirements?

Page 31

A. I'm not sure I understand the specific point you're trying to get at with that question.
Q. Well, you understand the contract called for --
A. January 31, 1998, right.
Q. Called for waste acceptance that began on that date?
A. Right.
Q. Did you ever look at whether or not any of the system requirements called for waste acceptance to start at a later point in time, would you have looked at that kind of issue?
A. I would have looked at that kind of issue. And my recollection at the time I was there is that the documents were consistent with the contract.
Q. The system requirements documents called for waste acceptance to begin by January 31, 1998?
A. I believe so.
Q. Do you recall how the system planned to start taking spent fuel in '98?
A. No, I don't.
Q. The system requirements documents, when

Page 32

you looked at them, in the '91 to '95 period, they didn't call for taking spent fuel by 1998 in a repository, did they?
A. I think the subject of acceptance, transportation, storage, and disposal was in the main addressed independent of date. The same activities have to be performed no matter the date you start them.
Q. Do you recall looking at any discussions in the system requirements documents of taking spent fuel at a location other than the one repository?
A. No.
Q. So the system as we've been talking about, as you've been referring to it, was the system for the one repository?
A. Yes.
Q. And earlier you had mentioned that there was some discussion that the system might include two repositories?
A. No. There was legislation that discussed the second repository.
Q. Let me go back to your background. Prior to 1991, when you joined DOE, what was your prior position?

Page 33

A. I worked for the Edison Electric Institute in two positions. Lastly in the fossil power area, managing two committees, prime movers and chemistry. But prior to that, when I joined the institute, I was program manager for the Utility Nuclear Waste Management Group.
Q. What was your job title when you were working in the fossil fuel area?
A. Program manager.
Q. And how long were you in the fossil fuel area?
A. My recollection is perhaps a little over two years.
Q. How come you left EEI to go to the government?
A. Oh, this will sound like one of those idealistic answers, but truthfully I grew up in the generation that was taught that you do not solve problems from the outside, you solve them from the inside, you have to be part of the solution. And I was on a "mission from God".
Q. What do you mean you were on a "mission from God"?
A. It's a line from the Blues Brothers. I was very committed to the whole concept of

Page 34

disposal.
Q. When you say the issue of disposal, you mean spent fuel disposal?
A. Yes, nuclear waste disposal, whether it's spent fuel or high level waste.
Q. And we've covered the period when you were with the fossil fuel group. When did you start with the nuclear waste group?
A. That would have been in 1991, April -- no, actually sorry about that, April of '86, because I was with EEI for roughly five and a half years.
Q. So roughly '86 to '89 you were in the nuclear waste of EEI and then '89 to '91 the fossil fuel area?
A. Right.
Q. How come you moved in '89 from the nuclear area to the fossil fuel area?
A. Truthfully because I had a manager who was the most obnoxious person I have ever worked for. And it is just as important to me who I work for as what I do.
Q. You had an obnoxious manager in the nuclear area?
A. Nuclear area.

Page 35

Q. Who would that have been?
A. Steven Kraft.
Q. What was Mr. Kraft's position?
A. He would have been the director.
Q. Director of the Utility Nuclear Waste Management Group?
A. Right. There were two program managers, one handled low level waste and I handled spent fuel and high level waste.
Q. I'm not sure how EEI was organized. What was the level above Mr. Kraft?
A. It would have been a vice president.
Q. And who was that?
A. Loring Mills.
Q. During the two years you were with the fossil fuel group, did you have any residual involvement at all in the nuclear side of things?
A. None. I was asked to come back and I refused.
Q. Who asked you to come back?
A. Steve Kraft.
Q. What sort of issues did you work on with the Utility Nuclear Waste Management Group from '86 to '89?
A. As I recall we were routinely involved

Page 36

in assessing the adequacy, both financial and technical, of DOE's program. We would visit the sites. I remember at that time there were three.
We would meet with department personnel to discuss issues that were of interest to us. And we were also involved in an effort that related to the standard contract. And involved identifying issues that might require clarification.
Q. Did this group have any involvement in legislation?
A. Not directly, no.
Q. What about indirectly?
A. Indirectly as you know EEI is a trade association and dealt with -- I'm not sure what it stands for, ANEC which would have been the lobbying arm. And so that's how any legislative connection would have been made. But I have no personal knowledge of that.
Q. Now, if I understand correctly, did this part of EEI, the Utility Nuclear Waste Management Group, what happened to that group?
A. Well, let's see. Ultimately I believe they were absorbed by NEI, but I can't tell you

Page 81

A. Mr. Kraft rarely attended the working group meetings and tended to focus his efforts more on what was going on in the legislative front. And the day-to-day operations for the group were left to me.

Q. You said there was a long list of issues that the utilities looked at that they thought might need some benefit or need some clarification that are in this standard contract. Do you recall any others besides these three?

A. Let's see. The term domestic origin, for example, I do recall that one.

Q. What was the nature of that issue?

A. What does -- what is fuel domestic origin, is it fuel that's mined in this country or is it fuel that's burned in this country. And as you know utilities buy their fuel from a variety of places. And so one of the things that needed to be interpreted and clarified was that it means fuel burned in a reactor in this country.

Q. Did the group reach closure on that issue?

A. Oh, yes, they did. And subsequently,

Page 82

when I came to DOE, I wrote the letter that answered the question yet again for one of the utilities.

Q. Which way did you answer the question?

A. Burned in a U.S. reactor.

Q. Just to rephrase, DOE agreed that, as long as the fuel is burned in a U.S. reactor, it was considered fuel of domestic origin?

A. Domestic origin, right, right.

Q. Do you recall the utility working group looking at the issue of the rate at which DOE would accept spent fuel?

A. Not really. And only in the sense that whatever DOE came up with the utilities obviously wanted more.

(Slater Exhibit No. 2 was marked for identification.)

BY MR. SHAPIRO:

Q. Ms. Slater, if you would take a look at a document that we've had marked, Slater Exhibit 2. Do you recognize this document?

A. Let me look through it.

Yes, I do.

Q. Can you tell us what the document is?

A. You'll remember that I said that there

Page 83

were issues that were identified based on review that both DOE and the utility group believed needed to be resolved. Some of the issues were coincident, some were not.

And this represented the utility group's effort to not only request a clarification but influence the outcome of the clarification because only the contracting officer had the ability to opine on the standard contract.

Q. Now, you'll see in the last page of this document that it's signed by Mr. Kraft. Do you recall, would you have written this document for him?

A. No, I would not.

Q. Were you involved in the creation of this document?

MS. SULLIVAN: Do you need to take time to review the document before you answer any further questions?

THE WITNESS: Yes, I was involved.

BY MR. SHAPIRO:

Q. What was the nature of your involvement?

A. Explaining issues to the individuals

Page 84

who would have been responsible for drafting this response, this request.

Q. Who would have drafted this letter?

A. To the best of my knowledge, it would have been individuals like Jay Silberg at Shaw, Pittman, Potts & Trowbridge and Mike Bauser at Newman, Holtzinger.

Q. So it would have been drafted by outside counsel for the Utility Nuclear Waste Management Group?

A. With some support from perhaps technical contractors if it dealt with technical issues.

Q. I see you looking through the document. Do you want some more time to look through it?

A. No.

Q. Just a moment ago, you said something, and I didn't understand what you said. You had said that utilities had looked at issues and DOE had looked at issues that might need clarification, you said some were coincident and some were not. I guess I'm not sure what you mean.

A. DOE, for example, might not have

Page 105

DOE didn't have any viewpoint?
A. Priority for shutdown reactors was a classic.
Q. Any others?
A. I don't recall specifically. I remember that one in particular because it was so contentious within the industry.
Q. What about issues on which DOE did have a viewpoint, which of those do you recall being worked on?
A. I know we had a viewpoint as DOE on final delivery schedules and what information those FDS's should include. And I know that DOE based that on operational considerations, similar to the safeguards and security operational considerations I explained to you earlier this morning.
Q. Let me make sure I've got the right time frame in mind. We're still talking about the time when you were working for the Utility Nuclear Waste Management Group?
A. Yes.
Q. And during that period do you recall any other issues coming up where DOE was proposing a clarification?

Page 106

A. Not specifically.
Q. What about when you actually started working with Mr. Brownstein over at DOE, this process was still ongoing?
A. It was still ongoing.
Q. And then you sort of reversed roles in some respects and you started working on that process from the DOE side?
A. Yes.
Q. What did you do in this process on the DOE side?
A. For example, on -- I continued to work on developing positions on issues where DOE felt it had an interest, communicating with the utility group.
Q. Which issues do you recall working on once you joined DOE?
A. Delivery commitment schedules, delivery commitment schedule exchanges, final delivery schedules, standardized canisters, oldest fuel first. I don't remember whether domestic origin was one of those issues or not. There were a significant number of issues.
Q. You mentioned delivery commitment schedules. What was the nature of the issue with

Page 107

respect to delivery commitment schedules?
A. Delivery commitment schedule had to be -- the instructions for completing the DCS had to be developed, the DCS itself had to be approved by is it OMB or -- OMB. The DCS's had to be transmitted, actual forms had to be transmitted to the utilities.
Q. What was the issue as part of the ACR resolution process that was trying to be resolved with respect to delivery commitment schedules?
A. One of the issues that I recall, and this was from the utility side, the DCS asks for the discharge date on the fuel. Now, the department would have liked to have had a very specific discharge date because it tells them a lot about the characteristics of the fuel. It lets them plan very accurately.
The utilities didn't want to do that. The utilities wanted to give them a range of discharge dates that might have been for ten years, because they wanted -- they believed they needed to preserve their flexibility to reach into that pool of fuel, pull it out, and give them anything they felt like giving them. And that was the issue. DOE wanted specific

Page 108

discharge date, they wanted broad discharge dates.
Q. Do you recall how that issue got resolved, did it get resolved?
A. By default it did because the DCS's were submitted with a range of discharge dates. And on my side on DOE I recognized that, in the final delivery schedule, I would get the specific discharge dates. So, in fact, it ceased to be an issue.
Q. Do you remember any other issues coming up in this ACR resolution process with respect to delivery commitment schedules?
A. Not that I recall.
Q. What about delivery commitment schedule exchanges, what was the issue there?
A. Do you wish me to address that from the utility side or from the DOE side?
Q. Well, let's start with the utility side.
A. From the utility side, the issue there centered around let's assume that two utilities wanted to make an exchange. Could a utility that had BWR, boiling water reactor, fuel exchange with a utility that had pressurized water reactor

Page 161

address one issue, that you would go to rulemaking to address the entire suite of issues, some of which could take longer to resolve than others. So a timing issue.

Q The timing issue being that DOE wanted to wait before going further on this issue until other issues were more ripe?

A. Until we completed the effort, the ACR issue resolution process, and been able to go to rulemaking with a more complete set of changes.

(Slater Exhibit No. 8 was marked for identification.)

BY MR. SHAPIRO:

Q. Ms. Slater, you've been handed what we've had marked as Slater Exhibit 8. Do you recognize this document?

A. No. I don't recall this. This is my handwriting. And these appear to be the meeting minutes from a standard contract task force that would have been a utility group task force in August 29, 1991, five days after I joined DOE.

And it looks like it focuses on completing DCS's. And I believe you will note in item 3 that we discussed that range of discharge dates which was one of the issues that was

Page 162

unclear.

Q You said that Slater Exhibit 8 that you're looking at looks to be minutes of a meeting of utilities. Why would you have attended the meeting if you were already at DOE at that point?

A. You recall that we discussed instructions for completing the DCS form. Prior to formalizing the instructions for completing the DCS form, we would have met with the standard contract task force, the utilities, because we had provided them with a copy of the instructions and asked them to review it, asked them if they had any questions, and agreed to discuss the form with them so that we were not imposing something that was unclear and would not work.

And this meeting appears to have done just that, because, if I am reviewing this correctly, starting at item 4, page 3, paragraph 1, page 3 paragraph 3, page 4 at the top, these are all what appear to be pages of the procedure.

Q Let me also confirm something that I think you said earlier, that Slater Exhibit 8, the first page of it looks to be a sign-in sheet for a meeting?

Page 163

A. Yes.

Q. And the subsequent pages appear to be your own minutes or notes of that meeting?

A. My notes for suggested changes, because, in fact, if you look, it says page 4 at the top, article VB, spell it out. And what does approval mean, it has to be signed. So this is exactly what this one is. This was to receive the comments that the utilities had on the DCS procedure and the form itself and go back and review them and then incorporate them.

Q. When you say the DCS procedure, you mean the instructions given to --

A. Instructions.

Q. Given to utilities on how to complete the DCS?

A. Right.

Q. On the second page of Slater Exhibit 8, you have it looks like certain items or issues 1, 2, 3, 4. Could you tell me what the second one is talking about?

A. Let me read it for a moment.

Okay. Submission of the first DCS's was timed, it's explicitly mandated in the contract, 63 months prior to the delivery year,

Page 164

and assumes that delivery would commence in 1998, January 31, '98.

If 1998 were not the year when delivery commenced, utilities would have submitted DCS's for 1998. The question was do they get to go back now and revise their DCS's or are they just overcome by events, are they calendar year specific or year one, is it 1998 or year one.

Q. Year one of what?

A. Of any range of dates. So, if it were year one, no one would have to revise anything. If it's 1998, do I make them go back and revise all their DCS's, do I -- if they have to go back and revise their DCS's, can I revise a DCS or would I have to treat it as an exchange in a given year. So there were procedural questions about that, and that's what this issue is discussing.

Q. You say year one, you mean year one of DOE's acceptance of spent fuel under the waste acceptance system?

A. Yes.

Q. The instructions for the delivery commitment schedules, did they require utilities to not request delivery of more spent fuel than

Page 165

was provided for in their allocation in the published annual priority report?

A. Yes, that would have been the basis for rejection of the DCS.

Q. Was there any discussion of that instruction at this meeting?

A. I don't specifically recall that.

Q. You don't specifically recall that instruction being discussed at any such meetings?

A. No, because I know that, when I was on the utility side, we clearly understand that you weren't supposed to go ask for more than you were entitled to.

Q. What was the point then of the delivery commitment scheduling process if everyone was entitled to a certain amount and everyone knew what that amount was and you couldn't ask for more than that amount? Couldn't DOE have just written -- they knew what the delivery commitment schedules were going to be requesting, didn't they? What was the point of the process?

A. Again, because it's not as clear as you think it is, if there were no DCS exchange process, you might perhaps be correct. But, assuming that people could exchange positions in

Page 166

the queue, could exchange BWR fuel for PWR fuel, could exchange ten-year-old fuel for five-year-old fuel, it could make a very great difference to how you manage your acceptance process.

The DCS was supposed to be a heads-up from the utilities about the type of fuel they would be delivering to us. The utilities didn't want to do that. They did not want to commit themselves to a specific discharge date because they were concerned that, if they did that, they would lock themselves in and there would be no opportunity to deliver anything else.

So in the end it wasn't much of a heads-up because they had tremendous ranges. In fact, there was a discussion that they would like to include in that range of discharge dates fuel that had not even been discharged at the time the form was submitted because obviously five years later, if it were four-year-old fuel, now it would be nine-year-old fuel.

So again, you know, the heads-up that it was supposed to be in the end turned out to be not much of a heads-up at all. But by completing the DCS -- you had to have a signed DCS in order

Page 167

to exchange. So, by completing and filing the DCS, you were providing yourself with a future instrument to adjust your position in the queue.

Q. But, other than actually coming up with a formalized signed piece of paper, pretty much anyone looking at the process could have predicted what any given utility's DCS was going to look like?

A. I would say that I could predict looking at the APR who was going to deliver -- this is absent an exchange process. Who was going to deliver and how much they were going to deliver. I couldn't predict what they were going to deliver, the age of it, that was just not possible.

Q. As far as the age, what you're saying is most of the utilities were fairly vague as to indicating how old the fuel was that they intended to deliver anyway?

A. They provided a tremendous range so that they would have the flexibility to pick what they wanted when it came time to deliver. And for us, you know, we wanted to know because there are limits. There's the certificate of compliance for each cask and there are I believe

Page 168

thermal load limits, radiation level limits. And that is dependent on the age and burnup of the fuel.

So, if you're trying to schedule acceptance of fuel, you to a certain extent arrive at the number of casks you need to deliver by the type of fuel you're going to pick up. So we had thought we would get a heads-up on what we would be picking up and that would permit the department to plan out its transportation program. It didn't quite work out that way.

Q. The DCS process would also I guess have allowed a utility to request delivery of less fuel than their allocation?

A. Yes. Let's assume that someone -- I don't believe this was the case. But let's suppose someone was permitted to discharge -- to deliver one fuel assembly in year one. Remember, every time you deliver fuel, you disrupt your operations in order to do that. So the utility would likely ask themselves is it worth it to me to deliver one assembly.

Q. Do you recall, did any utility submit proposed delivery commitment schedules requesting delivery of less than their full allocation?

Page 173

and there.

Q. And the bottom paragraph talks about a marathon session and mentions comments from others, you are mentioned and then the next entity is PNL. Is that Pacific Northwest Labs?

A. Yes.

Q. What would the nature of their involvement have been?

A. PNL was involved in -- as a contractor in originally drafting -- helping to draft the standard contract. Now, precisely what their involvement was I don't know. And in this capacity they may have been consulting for Billy Cole.

Q. So PNL would have been a subcontractor of TRW?

A. I think, I'm not sure.

Q. And then the next entity referred to is M&O Transportation?

A. That's TRW, that's management and operating, their transportation group. And the next organization would be the M&O MRS, monitored retrievable storage design group.

Q. What would the nature of those two organizations have been in the process of

Page 174

finalizing those issues?

A. If there were any design considerations for which we were unaware, because, remember, we were focusing on contractually based issues. If there were design considerations that we needed to consider or that we had overlooked, it would be their opportunity to inform us.

Q. At the top of the memo, there's a cc list with a number of people. These people were all individuals involved in DOE's resolution of these issues?

A. Some directly, some indirectly. Alan Brownstein, of course, was my boss. Jim Clark was M&O, the supervisory level, I don't know how directly he was involved. E.R. Johnson is the managing officer of JAI, and I don't know how directly he would have been involved.

M.C. Klose I don't recall. Ernie Leonard, a staffer to the M&O. Nora McDonald, M&O, data manipulation. Doug Williamson, M&O, nuclear engineering background. And Glen Vawter, I don't have the vaguest idea of why he's on this distribution list, he's M&O.

Q. What do you recall Mr. Vawter's position being with the M&O group?

Page 175

A. I don't recall his position with the M&O.

(Slater Exhibit No. 10 was marked for identification.)

BY MR. SHAPIRO:

Q. Ms. Slater, you've been given what we've had marked as Slater Exhibit 10. Do you recognize it?

A. Yes. I would like to look it over, but it is another OCRWM position on one of the 35 issues, this one dealing with the identity of the amount of waste to be identified on the DCS.

Yes. This is a simple issue, simple. The language at the time in the contract implied that ad infinitum, when it became time to submit on that first opportunity of DCS, that you would have to tell us everything you were ever going to deliver.

So the confusion was do I need to submit ten DCS's, 50 DCS's, do I put it all on one DCS, and what is the amount I'm supposed to submit. This was a simple issue in the sense that what we told them was that the DCS is year specific. It's not to include more than one year.

Page 176

You have a DCS for every year. And the amount you put in the DCS for one year is the amount that you're allocated for that year. So there was confusion about how many DCS's did they have to submit for all ten years, could they submit for all ten years if they wanted to.

The questions from the industry were all over the map. Some people thought they didn't have to, some people thought they did. It was just confusion.

Q. Was part of this issue also the notion that the delivery commitment schedules called for the utility not to request more than their allocation; the utilities' statement of how much spent fuel they would like to deliver, if they had complete flexibility, it was constrained by their allocation?

A. Right, absolutely. That was an implicit assumption. And, when I was in the utility side of the business, it was always understood that the DCS's were not to be completed for more than what you had as an allocation.

Q. And DOE shared that understanding?

A. And DOE shared that understanding.

Page 206

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - X
YANKEE ATOMIC ELECTRIC :
COMPANY, :
Plaintiff, : Case No. 98-126C
v. : Senior Judge
: Merow
THE UNITED STATES, :
Defendant. :
- - - - - - - - - - - - - - - X
Washington, D.C.
Thursday, April 22, 1999

Continued deposition of NANCY H. SLATER, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to agreement, the witness being previously duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 2:10 p.m., Thursday, April 22, 1999, and the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.

Page 207

APPEARANCES:

On behalf of the Plaintiff:
ROBERT L. SHAPIRO, ESQ.
SUSAN SACHS, ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W
Washington, D.C. 20005-3305
(202) 898-5854

On behalf of the Defendant:
MARIAN E. SULLIVAN, ESQ.
Trial Attorney
Commercial Litigation Branch
U.S. Department of Justice
1100 L Street, N.W.
Room 10150
Washington, D.C. 20530
(202) 307-6289

Page 208

CONTENTS


| WITNESS | EXAMINATION BY COUNSEL FOR PLAINTIFF |
|---|---|
| NANCY H. SLATER | |
| By Mr. Shapiro | 209 |


EXHIBITS


| SLATER EXHIBIT NO. | PAGE NO. |
|---|---|
| 17 - Memo dated 8/5/94 | 209 |
| 18 - Memo dated 5/16/90 with attachments | 215 |
| 19 - Letter dated 2/10/95 with attachments | 221 |
| 20 - Memo dated 6/24/93 | 233 |
| 21 - Letter dated 6/24/93 | 249 |
| 22 - Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste dated 6/22/83 | 254 |
| 23 - Acceptance Priority Ranking & Annual Capacity Report dated March 1995 | 275 |
| 24 - Complaint | 306 |


Page 209

PROCEEDINGS
Whereupon,
NANCY H. SLATER,
the witness on the stand at the time of recess, having been previously duly sworn, was further examined and testified as follows:
EXAMINATION BY COUNSEL
FOR PLAINTIFF - RESUMED
BY MR. SHAPIRO:
Q. Ms. Slater, we're here for the continuation of your deposition. You understand you're still under oath?
A. Yes.
Q. Do you understand that?
A. Yes, I do.
Q. You may recall at the end of yesterday we were talking about exchanges of approved delivery commitment schedules?
A. Yes.
Q. I want to just have a few more questions on that subject. Let me have another document marked and show it to you.
(Slater Exhibit No. 17 was marked for identification.)
BY MR. SHAPIRO: