Page 242

have an allocation in this year or, B, you've exceeded the allocation to which you're entitled, you need to provide me with a DCS that is consistent with the terms and conditions of the standard contract, and we understand those to mean.

Yankee resubmitted and submitted identical DCS's. So this is discussing that second letter, because that would -- from the department. The second letter from Yankee submitting the same DCS's would have kicked us into let's sit down and talk about this and try to understand why we don't seem to be able to come to closure on this issue.

So this was at the end of that process. There is a formal response required. And it is a final decision, if you will.

Q. Now, I want to point your attention to the second page of this memorandum, one of the points in the middle, where it says submitting acceptable DCS's would not preclude their rights under the contract should the department subsequent to rulemaking grant such priorities. Do you see that?

A. Yes.

Page 243

Q. What was meant there?

A. Oh, I recall that precisely. Yankee's concern as expressed to us was that, well, suppose I submit a DCS to you, suppose I have a ten MTU allocation in the first year, I don't recall what it was precisely. I really want to empty my site in five years.

And that would mean that I need to submit a DCS to you for 100 MTU. If I go ahead and submit a ten MTU DCS to you now, does that mean after rulemaking, if everyone could agree that priority should be afforded to shutdown reactors, that I could still only deliver ten MTU.

And our response to them was no. Submitting an accurate DCS now does not preclude you from availing yourselves of the opportunity to ship additional fuel, more than ten MTU, were the decision made that priority should be afforded to shutdown reactors.

And the reason for doing this in rulemaking is again, as I have stated over and over again, this is a utility equity issue. And both, while I was at the utilities and at the DOE, I was personally involved and personally

Page 244

aware that the utility industry did not support priority for shutdown reactors. In fact, their stated consensus position was that priority should not be afforded to shutdown reactors.

Q. So it was not intended that the delivery commitment schedule process be a gotcha process?

A. A static process.

Q. Right, that, gee, you only requested five and now, even though we can accommodate 20, you've wanted all along to do 20, we're not going to let you because you only asked for five, that was not the intention?

A. That's correct, it was not our intention to do that.

Q. And we might have covered this yesterday, but let me just make sure it's clear, that the delivery commitment schedule was intended to indicate how much spent fuel the utility wanted to deliver up to the limit of their allocation?

A. In part, because recall that the discharge date of the fuel earned you a slot in the acceptance priority ranking, but the fuel you could actually deliver did not have to be the

Page 245

fuel that earned you the slot.

So simply going to the APR and drawing a line at 300 MTU wasn't a good way of predicting what you were likely to get, because people who had older plants might decide to put their older plant's fuel in dry storage and might want to empty the pools at some of the younger plants.

So the DCS was intended to provide us with an indication of the age of the fuel, the location of the fuel. Multiplant utilities could deliver from any site as long as they met the conditions established in the standard contract.

So it wasn't as clear as looking at the APR. The DCS was intended to provide a little bit more sound information for planning purposes.

Q. Focusing just on quantity then, the DCS was not intended to indicate what quantity the utility really wanted to deliver, it was limited to the allocation provided in the APR?

A. Right. Now, theoretically they could have delivered -- they could have said, jeez, I don't want to disrupt my operations and I'm not going to deliver at all. But they could not ask for -- they could not have more than what they

Page 246

were allocated because of the equity issue.
There's only so much system capacity. If I accept more from someone else, I accept less from someone else.
Q. And then briefly I want to point your attention to the next sentence on page 2 of Slater Exhibit 20 that says they have the contractual right to exchange allocations with other interested utilities, what was that referring to?
A. That's the DCS exchanges. They have the contractual right to exchange their slot in the queue with someone else in the queue and conceivably either obtain the ability to deliver in a year in which they weren't originally scheduled to deliver or obtain the ability to deliver more than they were scheduled to deliver.
Q. And so the availability of the right to exchange was being offered to the director of the program as another justification as to why it was appropriate to deny the priority request that Yankee Atomic was making, because they had the right to accomplish what they wanted through the exchange process?
A. Yes.

Page 247

Q. Perhaps if you could turn to page 3 of Slater Exhibit 20. And, on the right-hand side, it has that long list of concurrences. Could you run down that and tell me what was the role of the various people in that concurrence chain.
A. You know my role, I'm the originator, the technical lead, if you will. Alan Brownstein would have been the branch chief. Jim Carlson would have been the -- I think we called them divisions then, division director.
Q. It says RW-43, that was his division, Mr. Carlson's division?
A. Forty-three, right.
Q. What division would that have been?
A. I don't recall the name specifically. We've shifted names so many times.
Q. But approximately what --
A. Waste acceptance and transportation perhaps. Ron Milner would have been the office director.
Q. And that RW-40 is the designation for that office?
A. For that office. Dick Nelson and Jerry Saltzman would have been in what we called the front office as support directly to the director

Page 248

of the program.
Q. And their office is indicated as RW-2?
A. Yes. And Lake Barrett as RW-1, and I cannot make out the last one, I can't make the last one out. I believe it's Charlie Smith. And again that would have been front office support, support directly to the director of the program.
Q. So the director is the only one with RW-1?
A. Yes.
Q. And his support people are RW-2?
A. Yes. The deputy director of the program, for example, would be an RW-2 and there are usually two or three others who are support directly to the director.
Q. And you had pointed out previously an indication noting that you were the originator of the document. And there's a line below that, Correspondence Reviewer. What's the role of the correspondence reviewer?
A. I don't recall.
Q. And the concurrence line, there's no indication of a review by the contracting officer. Why would that have been?
A. That depends on the version of this

Page 249

that you pulled from the files. In fact, I have right now unrelated to this case a version of a document to review. I have a concurrence sheet and I will be concurring for myself and for the division director. It will be an attachment to a separate records package that, when put together with this, will form a complete picture.
Q. So there may have been another version of this memo with a concurrence by the contracting officer?
A. It would have been the same version of this memo that would have gone over separately for concurrence in another office because that would speed the process.
(Slater Exhibit No. 21 was marked for identification.)
BY MR. SHAPIRO:
Q. Ms. Slater, you've been handed what's been marked as Slater Exhibit 21. If you could take a look and tell us if you recognize this document?
A. Okay. I believe this is the letter that would ultimately have been sent to Yankee, to Mr. Buchheit, that would have been the result of the director's approval to communicate with

Page 250

Yankee that we could not accept.

Q. So, after the director would have proved Slater Exhibit 20, then Slater Exhibit 21 would have gotten drafted?

A. Actually does this have a date on it? I cannot determine whether this is the letter that would have gone with the original DCS's that were incorrect or subsequent to the negotiations. If I were to do a cold reading of this --

Q. You asked about the date. Let me point your attention to the last page on the left, where there's that indication of you as originator that you pointed out in the previous document. It appears to be a date 6/24/93.

A. This would have been the final letter. I've read enough in the letter to know that it's the final letter.

Q. And, in fact, it appears that Slater Exhibit 20 and Slater Exhibit 21 were at least originated by you on the same day?

A. Actually not necessarily originated on the same day. But it was standard practice, when you submitted a memo like this to the director, to provide him with the opportunity to see the

Page 251

letter itself so he knew what he was likely to be recommending be signed by the contracting officer. And that's what this would have been. So the total concurrence package would have contained both.

Q. So there would be no disconnect between the approval memo and the actual product that went out of the office?

A. Yes. And I cannot determine whose comments these would be on here.

Q. That was going to be one of my questions. There's some handwriting on the second page of Slater Exhibit 21. And you don't recognize that handwriting?

A. No, I don't.

Q. It's not your handwriting?

A. Certainly not mine. Mine would have been an absolutely clean copy. And actually --

Q. Can you tell from the concurrences, does that give you any clue as to whose writing it would have been?

A. No.

Q. Let me point your attention to the last paragraph of this draft letter, the second sentence in that paragraph that says, if an

Page 252

acceptable year one DCS is not received within 30 days, the contracting officer will issue a decision regarding the status of YAEC's year one allocation. What was meant by that sentence?

A. You would have to question the contracting officer particularly concerning that. My recollection is that, if a utility does not submit an acceptable DCS, one of the concerns I do know, I do recall from the utility days is, if they decided not to submit an acceptable DCS, did that mean that then they were relinquishing their right to an allocation in that year.

And the utility's understanding at the time I was in the industry was that that's precisely what it meant. And this letter stopped short of saying, guys, the contract has requirements, you signed the contract. You need to behave consistent with the contract.

So I don't know precisely what the contracting officer envisioned as the ultimate consequence of not submitting an appropriate DCS. But I recall from the utility days that that's one of the things utilities were concerned about.

Q. So it would have been a fair

Page 253

interpretation on Yankee Atomic's part on receiving that letter that this is saying submit the delivery commitment schedule we want or we're not going to give you any allocation at all?

A. No. It would be a fair interpretation to say submit the delivery commitment schedule that you were contractually obligated to submit, not the one we want, contractually obligated to submit, or we will have to make a further determination about where we go from here.

Q. Who would have drafted this particular language, would that have been you?

A. It could have been me, it could have been Alan Brownstein, it could have been Beth Tomasoni, it could have been Nick Graham.

Q. Who was Nick Graham?

A. I do not particularly remember drafting that paragraph. Nick Graham supported Beth Tomasoni. He would have been my equivalent, if you will, in terms of I reported to Alan, Nick reported to Beth.

Q. Now, you said the intent of that sentence that we just discussed was to tell Yankee Atomic to submit a delivery commitment schedule consistent with their obligations under

Page 254

the contract. Can you tell us what part of the contract you were referring to?

A. I can't recall the specific article number. But, if you go to the standard contract, you will find a section that is labeled delivery commitment schedules.

And under that section you will find that there are certain steps that must be executed by both the department and the purchaser. And there are timetables associated with each of those steps. And that's in there.

(Slater Exhibit No. 22 was marked for identification.)

BY MR. SHAPIRO:

Q. Ms. Slater, you've been handed what's been marked as Slater Exhibit 22. Would you take a look and tell us if you recognize this document?

A. I recognize this generally to be the contract executed by Yankee with the Department of Energy consistent with the standard contract. Knowing that these contracts were subject to individual modifications, for example, payment of fees, the schedule in which fees might be paid, I can't tell you what the particulars are.

Page 255

Q. But generally the terms of the contracts were largely the same?

A. Standard.

Q. Can you point us to the language of the contract you were just referring to as far as Yankee Atomic's obligation with respect to the delivery commitment schedule?

A. Yes, if you turn to page 11, it's Article V B.2., DOE shall approve or disapprove -- actually let's go to B.1., DOE shall approve or disapprove such schedules within three months after receipt. This is the initial submittal. In the event of disapproval, DOE shall advise the purchaser in writing of the reasons for such disapproval, which we discussed, and request a revised schedule from the purchaser to be submitted to DOE within 30 days after receipt of DOE's notice of disapproval.

DOE shall approve or disapprove such revised scheduled within 60 days after receipt. In the event of disapproval, DOE shall advise the purchaser in writing of the reasons for such disapproval and shall submit its proposed schedule. If these are not acceptable to the purchaser, the parties shall promptly seek to

Page 256

negotiate mutually acceptable schedules.

The terms and conditions for this process, this iterative process are very clear. And, in fact, you know, we did engage in the negotiations. In fact, another letter came back that said no.

Q. But what in the contract says that after the parties try to come up with a mutually agreeable result, it says that if they can't come up with something that both agree on, that the contracting officer gets to decide the issue?

MS. SULLIVAN: Objection. You're asking her for an interpretation of the contract. And Ms. Slater is not a lawyer. If you would like to ask her a question about her opinion or whether she finds guidance to that effect, that's fine. But her interpretation of the contract, she's not the contracting officer or an attorney.

BY MR. SHAPIRO:

Q. Answer the question.

A. That's why I stated earlier that I have no personal knowledge of how the last paragraph of Exhibit 21 which was the letter to Mr. Buchheit at Yankee Atomic was drafted,

Page 257

because it appears to me that that portion of the letter would have been drafted by the contracting officer or their staff. And I have no knowledge of what led them to those statements.

Q. So you can't point to a clause of the contract from your knowledge and experience working with it that says that the contracting officer gets to resolve those disputes that the parties can't agree upon, that the contracting officer gets to resolve that herself?

A. No, I can't point to anything in the contract that tells me where we go once the utility has repeatedly refused to honor the terms and conditions of the contract.

Q. You said when a utility refuses to honor the terms and conditions of the contract. What term and condition of the contract are you saying that Yankee Atomic wasn't honoring?

A. Submit an acceptable delivery commitment schedule.

MS. SULLIVAN: Give me a chance to object before you answer the question.

BY MR. SHAPIRO:

Q. What part of the contract tells you that Yankee Atomic's delivery commitment

**Page 258**

schedules weren't acceptable?
MS. SULLIVAN: Same objection. She can answer as to her opinion.
THE WITNESS: In my opinion I cannot give you a specific section because I haven't looked at this contract in years. I can refer you to the procedures, instructions that were provided to the utilities that were reviewed with the utilities that specifically state that an acceptable DCS is one which does not exceed the individual utility's allocation in a given year.
BY MR. SHAPIRO:
Q. Can you take a look now at the contract and tell me where that would be.
MS. SULLIVAN: Same objection to the extent you're asking for a legal interpretation of the contract.
You can answer the question.
THE WITNESS: You recall that we discussed the identification as part of the ACR issue resolution process, the issue of delivery commitment schedules. Do you recall that? If we need to discuss that again to refresh your memory, I'll be happy to.
One of those issues was delivery

**Page 259**

commitment schedules. And primarily the issue there was the need for the department to issue instructions on how to complete the form.
One of the issues associated with completing the instructions to complete the form was what is an acceptable DCS. Those instructions as I believe -- I'm not sure, I believe it was exhibit -- maybe it was seven yesterday. It was my handwritten meeting minutes from the standard contract task force.
I attended the meeting, Dave Zabransky I believe chaired that task force, at which we discussed with the utilities the contents of those instructions. So it was recognized by both the industry and DOE that clarification was required and an effort was embarked upon jointly to develop the instructions for completing the form.
Those instructions were formally issued to the utilities. And I base my definition of an acceptable DCS on that entire package which is not just the original contract, it is the supporting documents that are official including the instructions for completing those forms.
~~BY MR. SHAPIRO:~~

**Page 260**

Q. And I certainly understand that and I understand your counsel's objection that you were never the contracting officer. But, if I understand correctly, I mean you just took a little while to look at Yankee Atomic's contract. And looking at it you can't point to a particular clause or combination of clauses that you would have relied upon to say that Yankee Atomic's submitted delivery schedule were not acceptable?
MS. SULLIVAN: Same objection.
THE WITNESS: I believe that the discussion contained in the contract on the acceptance priority ranking and the annual capacity report, when viewed together and in the context of a theoretical acceptance capacity and repository, fairly clearly indicate what the amount of the allocation is for a utility in any given year.
BY MR. SHAPIRO:
Q. But you can't point to a clause in the contract that sets that out?
A. That sets what out?
Q. That sets out that Yankee Atomic's proposed delivery commitment schedules

**Page 261**

were not acceptable?
MS. SULLIVAN: Same objection.
THE WITNESS: No, I can't, because I'm not the contractual expert.
BY MR. SHAPIRO:
Q. Beth Tomasoni who was the contracting officer at the time of final denial of Yankee Atomic's proposed delivery commitment schedule, she might be able to tell us more specifically what clause of the contract was being relied upon?
A. She might be able to give you the basis for her approval of this letter.
Q. Who else might be able to tell us more specifically what contract provision was being relied upon?
A. That would be someone in the contracting officer's office, perhaps herself or himself at the time, herself and her staff.
Q. How large was the contracting officer's staff?
A. I really do not know.
Q. You didn't work closely with those people?
A. I worked closely with a couple of

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - X
YANKEE ATOMIC ELECTRIC :
COMPANY, MAINE YANKEE ATOMIC :
POWER CO., and CONNECTICUT :
YANKEE ATOMIC POWER CO., : Case No. 98-126C
Plaintiffs : 98-474C, 98-154C
-v- : (Senior Judge
: Merrow)
UNITED STATES OF AMERICA, :
Defendant :
- - - - - - - - - - - - - - - - - - - X

Washington, D.C.
Thursday, June 13, 2002

Deposition of NANCY SLATER THOMPSON, a witness herein, called for examination by counsel for the Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 9:40 a.m., Thursday, June 13, 2002, and the proceedings being taken down in Stenotype by DEBORAH K. WILKINS, RPR, and transcribed under her direction.

fuel in any NRC licensed container, licensed by the NRC for transport?
MS. SULLIVAN: Objection to your characterization of the department's current plans. Objection, vague. Objection, foundation.
You can answer.
A. No, I am not focusing on anything related to transportation.
Q. The regulatory division that you are acting director of doesn't address transportation regulatory issues at all?
A. No, it does not. There is a separate transportation group that does that.
Q. The regulatory issues that your division is involved in are limited to those of the repository?
A. The repository, and I would say those in part two issues, that would be license and process issues.
Q. Has the issue of greater than class C waste come up in your role in the regulatory division?
A. No.
Q. Do you recall any discussion of whether or not to include greater than Class C



waste in the EIS for Yucca Mountain?
MS. SULLIVAN: Objection. Vague.
A. No, I don't.
Q. Has the issue of high-level waste come up in your role in the regulatory division?
MS. SULLIVAN: Objection, vague. Objection, foundation.
A. I'm not sure I understand what you are driving at here. I mean people know generically that we are accepting high-level waste.
Q. Have you ever had -- has the issue ever come up in the regulatory division in any way? Just to give you a couple examples, you know, how we are going to do it, which high-level waste, what form, how are we going to put it in containers. Have you had to actually focus on any issue concerning high-level waste in the regulatory division?
MS. SULLIVAN: Objection. Vague.
A. I am aware of those discussions. My personal involvement at this point is limited, for example, to issues like safeguards and security, which I explained to you before, and whether or not, for example, I need to tamper indicate canisters of high-level waste that are of low



strategic significance.
Q. A government argument that I have heard made at times, and I will ask if you've heard this before, not necessarily from government counsel, have you ever heard an interpretation of the contract that would say that the government would meet its obligation by accepting one fuel element from one utility by January 31, 1998?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
A. I have never heard that.
Q. Has such an interpretation ever played a role in your work in the waste acceptance division?
MS. SULLIVAN: Objection, foundation. Objection, vague.
A. I have never heard it, and I don't recall even considering that.
MR. SHAPIRO: That's all the questions I have for you at this time, Ms. Slater Thompson. I appreciate your help.
I should note that there's a small chance that we may seek to talk to you yet again, there is an issue concerning some documents that we may or may not get which may or may not address



issues that relate to you. I am sure we will have to deal with Ms. Sullivan and the government on that, but except for that possibility I don't think we will have further questions for you.
A. I understand. Thank you.
MS. SULLIVAN: I have a couple questions.
EXAMINATION
BY MS. SULLIVAN:
Q. Ms. Thompson, do you recall your testimony in response to some questions from Mr. Shapiro as to whether you had any knowledge as to what the approved DCSs would be used for?
A. Yes, I do, and I believe I had indicated to him that I didn't have a real knowledge of what others were using those for.
Q. Sitting here today, do you have an understanding as to what aspects of the program would use approved DCSs for planning purposes?
A. I think it would be safe to say that the transportation group would probably find the most utility in the DCSs.
Q. Do you have or have you ever had responsibility for transportation planning for the program?

Page 150

A. No.
Q. Ms. Thompson, while you were in the waste acceptance division, do you recall disapproving delivered commitment schedules delivered by utilities?
A. Yes.
Q. Given your testimony that delivery commitment schedules are largely for planning purposes only, why would you disapprove a delivery commitment schedule?
A. There could be multiple administrative reasons like the DCS not signed, signed by a person not identified as having ability to sign, but primarily for exceeding their allocation for a particular year.
Q. And do you have an understanding as to the effect of the utility's failure to submit a DCS in a year in which they have an allocation?
A. Yes. I believe it was always our intent that if a utility failed to submit a DCS in that year that it would be a waiver of their desire to deliver, and we would have reallocated that capacity to the next utility or utilities in the cue.
Q. I believe Mr. Shapiro has asked you

Page 151

previously today about the provision of the Standard Contract or whether there was a provision of the Standard Contract that told purchasers that they were limited in their DCSs to the allocation set forth in the ACR.
Other than in the Standard Contract, is there another place that purchasers were informed that they were limited to the amount set forth in the ACR when submitting their DCSs?
A. I am positive it's in the DCS instructions.
Q. Could you turn to Exhibit 10, please, to your deposition.
Are these the DCS instructions to which you are referring?
A. Yes.
Q. Could you point to me where in these instructions purchasers were informed that they were limited to the amounts set forth in the ACR?
A. Give me a minute.
Q. Sure.
A. Page 2, number 7E, the last sentence.
Q. Could you read that for me, please?
A. Exceeding the allocation will result in disapproval of the DCS.

Page 152

Q. Thank you.
While you were in the waste acceptance division at DOE, what was your understanding of the effect of the DCSs with regard to DOE's performance in 1998, if DOE had begun performance in 1998?
MR. SHAPIRO: Objection. Vague.
Q. Do you want me to clarify the question?
A. Please.
Q. I believe you testified that in your opinion the DCSs were for planning purposes only. While you were in waste acceptance, did you ever have an understanding as to the role of the DCSs if DOE had started performance in 1998?
MR. SHAPIRO: Objection. Vague.
A. My understanding of the role of the DCSs, if we had begun to accept in 1998, is that those individuals who had submitted DCSs and had them approved for year 1, which the question you are posing would be 1998, those would be the utilities that I would expect to receive FDSs from, and they would be the utilities that would deliver in that year.
Q. I am not sure whether Mr. Shapiro

Page 153

asked you this specific question. Is it your understanding that the final delivery schedules submitted by purchasers and approved by DOE would be binding on the parties?
A. Are you asking me for my personal opinion?
Q. Yes.
A. My personal opinion is that given that the FDSs are submitted a year before actual acceptance is to start that they are supposed to include the actual reactor, the actual age, discharge date of the fuel, and that's the basis on which we actually begin to mobilize the system to come get it, yes.
Q. And one final question with regard to multi-element sealed canisters, or MESCs, that we discussed. Do you have an understanding as to whether, while you were in the waste acceptance division, those were considered a standard waste form?
A. My recollection is that they were not.
MS. SULLIVAN: Thank you.
MR. SHAPIRO: I just have a couple follow-up questions for you.
EXAMINATION

# Victor Trebules

# Victor W. Trebules, Jr.

Page 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
------------------------------------------X
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese, J.) :
DUKE POWER, a Division of DUKE ENERGY CORP.:
(98-485C)(Sypolt, J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, et al. :
(98-614C)(Merow, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C) (Allegra, J.) :
GPU NUCLEAR, INCORPORATED :
(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :VOLUME
(00-703C)(Damich, J.) : I
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :Discovery
(01-116C)(Sypolt, J.) :Judge:
TENNESSEE VALLEY AUTHORITY :(Judge
(01-249C)(Bruggink, J.) :Sypolt)
Plaintiffs, :PAGES
v. :1 - 241

Page 2

THE UNITED STATES, :
Defendant. :
------------------------------------------X

Deposition of Victor W. Trebules, Jr.
Washington, DC
Wednesday, April 17, 2002

Reported by: Denise Dobner Vickery, RMR, CRR
JOB NO. 144458

Page 3

April 17, 2002
9:32 A.M.

Deposition of Victor W. Trebules, Jr., held at the offices of:

Jenner & Block
601 13th Street, NW
12th Floor
Washington, DC 20005

Pursuant to notice, before Denise Dobner Vickery, a Registered Merit Reporter, Notary Public of the District of Columbia.

Page 4

APPEARANCES:

Jenner & Block
For the Plaintiff COMMONWEALTH EDISON
One IBM Plaza
Chicago, IL 60611-7603
(312) 222-9350
BY: Theodore T. Eidukas, Esq.

Shaw Pittman Potts & Trowbridge
For the Plaintiffs NORTHERN STATES POWER COMPANY, et al.
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7962
BY: Devon E. Hewitt, Esq.

Arnold & Porter
For the Plaintiffs SOUTHERN NUCLEAR OPERATING COMPANY, et al.
555 Twelfth Street, NW
Washington, DC 20004-1206