included and doesn't include Volumes II and III of the entire mission plan.

Q. I also was going to refer there was a page out of order. There was like a cover page for part 2 of Volume I.

A. Oh, it's the one that was in place at page 13 in the front section.

Q. Right. So the page that's Bates numbered CE 14820 is out of place. It should go later in the document and then, in addition to that, I've also represented and the witness has confirmed I believe that Chapter 11 of this volume, Volume I, is not present and Volume II and Volume III of the mission plan are also not present and part of this exhibit.

Is that an accurate statement of what --

MR. SHULTIS: That's consistent with my understanding. Mr. Trebules found the discrepancy. So...

THE WITNESS: I think that covers it.

MR. SHULTIS: Okay.

BY MR. EIDUKAS:

Q. Okay. With all of those caveats and



clarification as to what is present in Exhibit 6 for this deposition, is what is present here, those portions here, are they from the June 1985 mission plan that you worked on?

A. I believe so, yes.

Q. If you could turn to page 3. It's titled Chapter 1 Introduction and that section appears to go through page 13 that we added to this document. Is this the chapter that you testified to earlier as being the author of?

A. Yes.

Q. If you could turn to pages 6 and 7, and in particular on page 7 there's a section that starts: "The following specific program objectives have been established to implement the provisions of the Act. They evolve from the previously mentioned policy goals."

And then the third objective listed here says "To insure the acceptance of waste for disposal by January 31, 1998 in accordance with the acceptance schedule provided for in the DOE standard disposal contracts and in conformance with the Act."



My question is: When you wrote this section, what did you mean by "the acceptance schedule provided for in the DOE standard disposal contracts"?

MR. SHULTIS: Objection, calls for a legal conclusion.

THE WITNESS: This is on page 7 with the introductory sentence that says, again, "The following specific program objectives have been established." So, again, this was an objective for the program. It was a goal or a target. And we identified the five objectives. One of our objectives was to insure the acceptance of waste. It says for disposal by January 1998. Again, this is one of our objectives.

"In accordance with the acceptance schedule provided in DOE standard disposal contract." My understanding was that the contracts that the government entered into with the utilities at some point in the future would have more detailed schedule information, and I believe that was to be provided after, you know, later. It was to come after this mission plan and when those specific schedules were developed, that's what we would -- that's what the



government would target to meet.

BY MR. EIDUKAS:

Q. The language you used here does say that "the acceptance schedule provided for in the DOE standard disposal contracts" and I would just, if you could tell me, what it is, what are you referring to in the contracts in this passage?

MR. SHULTIS: Objection, calls for legal conclusion.

THE WITNESS: Again, I was not the person that worked directly on the standard disposal contracts. My understanding was that they were to -- I'm trying to think of the terms. There were going to be documents issued later in the late 1980s or early 1990s and I think they were related to -- and these are documents I'm not familiar with -- the annual capacity report, annual priority rankings that were to be -- I think they were going to be negotiated with utilities and those would become the specific schedules that the government would try to meet in terms of accepting spent fuel.

BY MR. EIDUKAS:

waste, in addition to spent nuclear fuel.
Q. Do you know why was that added? Why was that added in the final mission -- in this schedule that appears in the final mission plan, if you know?
A. I need a second to check one thing before I answer.
Q. Sure.
A. Has to do with Section 8. Okay. Between the time that the April 1984 draft of the mission plan was issued and the publication of the June 1985 version, we completed an evaluation under Section 8 of the Nuclear Waste Policy Act, which basically said unless there are compelling reasons, which basically required us to look at whether or not a separate repository needed to be constructed for the disposal of high level waste from the defense activities in the Department of Energy from the weapons activities.
We completed that evaluation and we made a recommendation to the President that we did not need to construct a separate repository. That it could be combined with the repository for spent nuclear fuel, and the President completed his evaluation and he then



directed the Secretary to proceed for the combined repository option in conformance with the Act.
So, based on that study, we then started incorporating in our waste acceptance schedules provisions for high level waste disposal, in addition to spent nuclear fuel. So you'll see in Table 2.2 of the June '85, Exhibit 6 version, high level waste acceptance beginning around 2003 I guess. So we then combined the total metric tons on an equivalent basis of the spent fuel and the high level waste for the total acceptance at the repository. Up to that same limit of 70,000 metric tons, which meant that there's less spent fuel going in the first repository. Okay?
Also, by this time another key difference in these waste acceptance schedules between Exhibit 5 and Exhibit 6 is that the cumulative amount of spent fuel that we expected to have to deal with in 1984 was still 140,000 metric tons. By 1985, that number was down to 130,000 metric tons. There are a few other differences, but they're relatively minor compared to those. For example, the annual spent fuel generation rate numbers are different in the two versions. The



early one starting out at 2,700 metric tons in 1998. The later one showing 2,900 metric tons in 1998.
Q. But with those changes that you've identified or those differences between the acceptance schedule on page 26 of the 1985 mission plan and the acceptance schedule in Exhibit 5, which was the 1984 draft of the mission plan, just looking at the rate, the ramp-up rate for the acceptance of spent fuel, there does not appear to be a change between those two documents; is that correct? It's 400, 400, 400, 900, 1800, 3,000 for spent fuel in both documents?
A. Right, the early ramp-up rates are the same.
Q. And the steady state rate of 3,000, looking at the first repository, is also the same?
A. I don't believe so.
Q. Well, in terms of maybe not the duration, the number of years at which fuel is accepted at that rate, but it's the same maximum or steady state? The rate itself 3,000 is the same?
A. That's true, but I think the duration is different.
Q. Right. Is that a function of both the



difference in spent fuel generation projections and the acceptance of high level waste?
MR. SHULTIS: Objection, compound.
THE WITNESS: It's primarily a function of the 70,000 metric ton capacity, and now that you're adding high level waste to the spent fuel, you reach that 70,000 metric ton capacity with a combination of the two, which means there's less spent fuel in the first repository.
BY MR. EIDUKAS:
Q. With the determination that there would also begin to be acceptance of high level waste beginning in 2003 at a rate of 400 metric tons per year, in addition to the steady state rate of 3,000 metric tons of spent fuel per year at the repository, did there need to be a change in the design of the repository because of that additional, the additional acceptance of high level waste?
MR. SHULTIS: Objection, vague.
THE WITNESS: I'm not the best person to ask that question of. My intuition says yes, but I can't give you any specifics.

BY MR. EIDUKAS:
Q. Okay.
A. There's obviously a different heat load that the repository has to accommodate and the size of -- which is why we put the pictures in the document. The size of the waste forms we're dealing with are significantly different. If you look at the spent fuel picture on page 9, okay? We would design waste packages to accommodate multiple fuel assemblies, you know, from reactors. The spent fuel assemblies.
The high level waste is in the form of the picture on page 11, you know, which is a different geometry. So, I mean, to me it's obvious. There's got to be some differences in the design now that you're going to accommodate a different waste geometry, waste form, waste heat load, but I can't give you any of the specifics of what those design changes would be.
Q. Okay. But the decision was made apparently that there might be a design change, but there was not going to be a difference in what the steady state rate of accepted spent fuel range was going to be?
MR. SHULTIS: Objection, vague, assumes



facts not in evidence.
THE WITNESS: As best as I could remember, again our objectives were to try to reach a steady state rate, you know, along the lines that we talked about to preclude for need for utilities to add storage, which, you know, was still estimated to be around 3,000 metric tons per year. And that's still supported by the spent fuel generation column on both waste acceptance schedules. There's still around 3,000 metric tons per year in the early years of repository operation.
BY MR. EIDUKAS:
Q. So, even after it was determined that you were going to start accepting the high level waste in addition to spent nuclear fuel, the objective to continue accepting at the 3,000 rate or because of the objective you've identified, you didn't decrease the 3,000 steady state rate in order to accommodate the additional need to accept high level waste. Is that a fair statement?
A. I believe that's a fair statement.
Q. Okay. Turning to the -- you're looking at



the next. Do you need a break? We've been going for a while.
A. I'm okay.
Q. Going to the next page, waste acceptance schedule on page 27. This is for the improved performance system or plan that we've discussed today, correct?
A. Right.
Q. Okay. Did you work on developing this acceptance schedule?
A. Yes.
Q. And is this the first acceptance schedule involving an integral MRS facility that the DOE published?
A. To the best of my recollection it is.
Q. So, because we didn't see an acceptance schedule like this involving an MRS in the earlier drafts of the mission plan, right?
A. The reason I'm hesitating is I don't know if there were any presentations like that one meeting you referred to. You had the handout from that one meeting. I don't know if there were any others at the



time where DOE might have, you know, released some preliminary numbers. This is the one first one I'm aware of.
Q. Okay.
A. I can answer it that way. This is the first one I'm aware of.
Q. So one of the additions, changes here is that there's a column for MRS acceptance, which is the third column. What's the basis or how was this rate for the MRS facility determined?
A. The best answer I could give you is that we, again, had as -- it can sound repetitive, but we again had as our objective to accept spent fuel to preclude the need for additional at-reactor storage, which again was 3,000 metric tons per year at that time. That was our projection. In 1984-'85 we were trying to anticipate what the spent field generation rate would be, you know, some 13, 14 years into the future. So, again, based on the EIA projections, it looked like it would be about 3,000 metric tons per year based on the number of nuclear power plants online. So that was our design target for the MRS. Okay.

Q. So, before you go on, so, is it fair to say that that objective, which you've stated several times now, that objective was the basis for the design rate of the MRS you were anticipating at the time of this document?

A. That's correct. If you look at the column on page 27, column 4, MRS Acceptance, you'll see that it starts out at 2200 metric tons first year, 3,000 metric tons the second year and stays at 3,000 metric tons. Again, remember, that was our design target, our design objective. You could have probably designed a smaller MRS, you could have designed a bigger MRS, but this was our designed target.

Inventory at MRS is the next column, column 5, which increases the first couple of years but then in 1998 starts to discharge to the repository. So it continues to increase until its rate of receipt equals its rate of discharge where then it stays constant, you know, until the MRS ceases operation and then the MRS eventually unloads into the repository. Okay?

Let me caution you one thing about this Table 2.3. The first year was 2200 metric tons does not



necessarily mean that in 1998 we would have accepted 2200 metric tons. That column is entitled, if you look over on the far left, Pre-1998 and, again, it looked like there was a chance we could get the MRS into operation in 1996. So it would be '96, '97, '98, the total of those three years that would have gotten us up to 2200 metric tons. Again, we thought we needed a ramp-up during that period before we reached a steady state rate of 3,000 metric tons.

Q. Okay. And would that ramp-up rate be similar to what would be the ramp-up rate that was proposed for the repository in the other schedule; the 400, 400, 400, 900, 1800?

A. I don't remember what the exact numbers are.

Q. Okay.

A. I mean, the only thing I could refer you to was the number in the table where it says pre-1998, you know, 2200.

Q. And as this proposed system would work, would there be -- would the MRS -- would any of the spent fuel accepted at the MRS be accepted or moved to the second repository, or was it planned that waste would



be received directly at the second repository from the utilities?

A. I need a second because I believe we talked about that as an option, but I don't remember where. (Pause). All right. Let me refer you to page 25. The bottom paragraph, the one starts: "On the basis of the integrated system approach described in the approved performance plan, the DOE has identified many possible waste acceptance schedules."

Again, one of the caveats, this is only an illustrative schedule that we're talking about. There were many others, you know, with all the questions and uncertainties. Depending on the size and operating characteristics of the system facilities. That's MRS and the repository. One such waste acceptance schedule that illustrates -- and again illustrates was the word we coined to try to, again, sort of serve as caveat.

That illustrates the quantity of waste that we feel we could accept beginning in 1996 with the completion of the integral MRS facilities presented in Table 2-3. The schedule assumes that one MRS facility



services the first repository. Other scenarios are possible, such as a larger MRS facility servicing part or all of both repositories or two MRS facilities serving two repositories.

Again, a lot of different ways you could design and operate the system. The schedules we presented were illustrative only for those two concepts. But we indicated that, again, there were lots of different ways to do the job.

Q. Even though that -- so, if these are illustrative schedules and as this section indicates that the DOE has in effect many possible ways to do acceptance schedules, to your knowledge, were all those schedules, though, consistent with the objective you've identified of ramping up to a steady state rate that would act to eliminate the need for additional at-reactor storage?

MR. SHULTIS: Objection, calls for speculation.

THE WITNESS: There are a couple of places in this chapter. If I had more time I could probably find better words, but let me just show you a few that

I think get to your question. On page 24 under Section 3. Assumptions about an MRS facility.

BY MR. EIDUKAS:

Q. Okay.

A. If you look down to B, waste receipt rate. "The waste acceptance rate will be approximately 3,000 metric tons per year of spent fuel or equivalent high level waste." Again, the 3,000 was based on the EIA projection of the amount of spent fuel we thought would be generated in that time frame. So, again, that was sort of like our target. That was a design objective.

If you also look on page 28, for example. These are just some I can find relatively quickly. Down at the bottom of the page, it's got numbers 1 and 2.

Q. Yes.

A. Number 1 says, if you look at the sentence: "The rate at which an integral MRS facility would accept spent fuel is based on two major considerations. The need to relieve the utilities of on-site fuel storage pressures that could result in the disruption of orderly nuclear reactor operations after January



1998." Again, the need to relieve utilities of on-site fuel storage pressures. Those were some of our considerations, our planning objectives. Our targets that, you know, we incorporated into the plan.

Jumping ahead, the unfortunate thing about all these references to the MRS facility is that when we proposed it to Congress, they didn't accept it.

Q. Or didn't they accept it with certain linkages that made it possible to --

A. We proposed a specific site and a design for the MRS. We proposed the Clinch River breeder reactor site down in Tennessee with a number of different design concepts. Congress said, if I remember right, we accept the concept of an MRS, but don't build it at Clinch River. You know, go find another site. And then they put linkages on it, too, like it couldn't begin until a repository goes into operation or it passes a certain licensing phase, which made it impractical. I mean, the real one is you got to have a site to build it, okay, and that's a whole other story with the nuclear waste negotiator, the volunteer siting process and all that other stuff.



MR. EIDUKAS: Okay. Why don't we take off record.

(Recess, 3:30 to 3:43 p.m.)

BY MR. EIDUKAS:

Q. Mr. Trebules, we've looked at Chapters 1 and 2 of the section of the '85 mission plan that's contained in Exhibit 6. What other, if any, portions of what's in Exhibit 6 here did you have involvement in preparing yourself? You know, if it would be easier, if you want to look at the table of contents, if that would help.

A. Yeah, I think so. For example, at page 55, the small section on sub-seabed disposal, I was involved in probably writing or getting the information from the other office in DOE that was in charge of that activity to put it in the plan.

I think the easiest way to answer this was my job was to coordinate the preparation of the mission plan, which meant I had to write individual sections if there was no one else in the program that was the recognized expert, or I had to make sure that we had people assigned to these other areas to draft up the



material. In most cases, I would review and comment on their input to make sure it was consistent in content and style and level of detail with other parts of the plan.

There were probably some other individual sections that I wrote, but I'd have to go through sort of page by page to try to remember which those are. But, for example, Chapter 9 and 10 of Volume II, the waste generation rates, requirements for disposal of past or repository schedules, I believe I wrote or compiled, you know, much of that information directly.

Chapter 10, cost of managing the program. I played a substantial part in that. Chapter 11, which is not even in this exhibit, I contributed to that. Probably the list of acronyms and abbreviations, which, you know, is a very important. I probably put that together. And the other two volumes that aren't in here, the responses to comments, you know, I wrote many of those sections individually. In general, that was my responsibility with this document at that time.

Q. Turning to -- you said you did some work on Chapter 9. I just want to direct your attention. We

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-------------------------------------------X
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese, J.) :
DUKE POWER, a Division of DUKE ENERGY CORP.:
(98-485C)(Sypolt, J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, et al. :
(98-614C)(Merow, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C) (Allegra, J.) :
GPU NUCLEAR, INCORPORATED :
(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :VOLUME
(00-703C)(Damich, J.) : II
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :Discovery
(01-116C)(Sypolt, J.) :Judge:
TENNESSEE VALLEY AUTHORITY :(Judge
(01-249C)(Bruggink, J.) :Sypolt)
Plaintiffs, :PAGES
v. :242 - 396



THE UNITED STATES, :
Defendant. :
-------------------------------------------X

Deposition of Victor W. Trebules, Jr.
Washington, DC
Thursday, April 18, 2002

Reported by: Denise Dobner Vickery, RMR, CRR
JOB NO. 144459



April 18, 2002
9:30 A.M.

Deposition of Victor W. Trebules, Jr., held at the offices of:

Jenner & Block
601 13th Street, NW
12th Floor
Washington, DC 20005

Pursuant to notice, before Denise Dobner Vickery, a Registered Merit Reporter, Notary Public of the District of Columbia.



APPEARANCES:

Jenner & Block
For the Plaintiff COMMONWEALTH EDISON
One IBM Plaza
Chicago, IL 60611-7603
(312) 222-9350
BY: Theodore T. Eidukas, Esq.

Shaw Pittman Potts & Trowbridge
For the Plaintiffs NORTHERN STATES POWER COMPANY, et al.
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7962
BY: Devon E. Hewitt, Esq.

Arnold & Porter
For the Plaintiffs SOUTHERN NUCLEAR OPERATING COMPANY, et al.
555 Twelfth Street, NW
Washington, DC 20004-1206

Page 302

adequacy reports that DOE issues; is that correct?
A. Input into the fee adequacy report.
Q. And what kind of input do you provide to the fee adequacy report?
A. I work on the Yucca Mountain cost and schedule and plans. So I'm right now responsible for coordinating the input of the Yucca Mountain part of the fee adequacy report in the total system life cycle cost.
Q. Are you familiar with the actual fee adequacy reports that DOE issues?
A. Yes.
Q. Do acceptance rates factor into that report?
MR. SHULTIS: Objection, calls for a legal conclusion.
THE WITNESS: I believe the answer is yes. It's a fairly complicated analysis that needs to be prepared, but I believe acceptance rates are one of the parameters that needs to be evaluated.
BY MS. HEWITT:
Q. And how do the acceptance rates affect the fee adequacy analysis?

Page 303

MR. SHULTIS: Objection, vague.
THE WITNESS: This may be a rather long, complicated answer. But basically the fee adequacy analysis, which is required by the Nuclear Waste Policy Act, is analysis that the Secretary of the department has to conduct to evaluate whether the one mill per kilowatt hour fee is judged to be sufficient to cover the total cost of the program.
(Mr. Stouck entered.)
To do that, we prepare what's called a total system life cycle cost analysis, which looks at the cost of basically the facilities we have to build to accept fuel. That would include the surface facilities of the repository, the underground facilities of the repository, the waste package that the waste would be disposed in, the transportation system, equipment needed to move the waste, and we have to estimate the cost of that and balance that against the incoming money from the one mill per kilowatt hour.
And you have to relate the timing of those facilities and when they need to be online to be able to accept the waste. And since there's a time related

Page 304

cost of money depending upon when you build and construct and have facilities in operation, in that sense it relates to the waste acceptance rates.
BY MS. HEWITT:
Q. You mentioned that the total system life cycle cost analysis -- and is that also called the TSLCC analysis?
A. That's the common acronym to describe it; that's correct.
Q. You testified that that analysis comprises cost of the system, which include the facilities; is that right?
A. That's correct.
Q. And when you use the term facilities, are you referring to facilities that would store or dispose of the waste? What do you mean by facilities when you used that term in your prior answer?
A. Generally it's meant to include the waste handling surface facilities at the repository location, the underground area of the repository in which the waste will be placed, and another major component which may or may not fall under the term facilities is the

Page 305

waste package that the spent fuel elements will be placed in for disposal underground. That's a major cost contributor.
Q. So, is it fair to say that when you use the term facilities, you are not including possibility of an MRS in that term?
MR. SHULTIS: Objection, mischaracterizes prior testimony.
THE WITNESS: At one time in the program's evolution, we did include I believe the cost of an MRS facility, but over the past 10 years or so when Congress never acted or we were never able to get an MRS facility authorized, we haven't included it in our TSLCC estimates.
BY MS. HEWITT:
Q. So, the acceptance rates that are used in the TSLCC estimates reflect an acceptance rate of a repository; is that correct?
A. That's correct.
MR. SHULTIS: Object.
THE WITNESS: That's correct.
BY MS. HEWITT:

Page 378

need for storage beginning in 1998, but a utility with an immediate need for additional storage in 1998 did not have an allocation for that year?
MR. SHULTIS: Objection.
BY MR. NESLIN:
Q. Wouldn't that exchange allow those utilities to exchange their rights for that year?
MR. SHULTIS: Objection, calls for speculation. Lack of foundation.
MR. NESLIN: Let me finish my question, counsel.
BY MR. NESLIN:
Q. And would that not assist the system in meeting the objective of avoiding the need for additional storage beginning with that year?
MR. SHULTIS: Same objection, and asked and answered.
THE WITNESS: Yeah, it sounds possible. That's the best way I could answer it now. It sounds reasonable.
BY MR. NESLIN:
Q. You never thought about that before?

Page 379

MR. SHULTIS: Objection, relevance.
THE WITNESS: I probably have. I don't remember specifically at this time, you know, thinking about it in detail or in-depth, but, you know, I'm sure over the course of 20 years I probably, you know, thought about it to some extent.
BY MR. NESLIN:
Q. Do you recall in your work on the mission plan in 1984-1985 any consideration of exchanges as part of the mission?
MR. SHULTIS: Objection, asked and answered.
THE WITNESS: I'm fairly certain back in the '84-'85 time frame I probably didn't consider it at all. It was probably subsequent to that.
BY MR. NESLIN:
Q. Mr. Trebules, can you explain to me how you would meet this objective if utilities did not exchange allocations?
MR. SHULTIS: Objection, vague.
THE WITNESS: I'm not sure I --
BY MR. NESLIN:

Page 380

Q. Do you understand my question, sir?
A. If you can repeat it again, please.
Q. How would the department meet the objective of avoiding the need for utilities to have to add storage beginning in January of 1998 if utilities did not exchange -- did not have the right to exchange allocations?
MR. SHULTIS: Objection, calls for speculation.
THE WITNESS: I'm not sure I'm able to answer that question at this time. Again, as I indicated earlier, our primary objectives when we put together those initial schedules were to twofold. To begin accepting by 1998 and in a grosser aggregate sense to preclude the need for the utilities to add additional storage. Because we based our planning on the EIA projections, which looked at utilities as a whole and came up with that number of about 3,000 metric tons per year.
I don't remember that we focused on particular storage capabilities at individual utilities, you know, within that context of, you know,

Page 381

they would be producing 3,000 metric tons per year. I don't think I ever got into those kind of considerations.
BY MR. NESLIN:
Q. Well, sir, if the objective was that utilities would not have to add additional storage after 1998, wasn't that objective intended to apply either at a gross or at an individual level? You understand my question?
MR. SHULTIS: Objection, vague, and I think he's answered the question.
MR. NESLIN: No.
BY MR. NESLIN:
Q. You may answer, sir.
A. Again, our objective was to try to accept once we reached the steady state operation of 3,000 metric tons, which we thought would be about the generation rate from the utilities as a whole, and I believe we were assuming that up until we reached that point, it was the utilities' responsibility in the aggregate to provide for the storage of the fuel up to 1998 and to continue to add storage up until the time we reached

that 3,000 metric tons per year.
So we didn't look at -- at least I never looked at individual utilities' capabilities. We just assumed that they would, you know, provide the required storage until we reached that steady state operation. Now, I think your question says now beyond that some utilities might be generating more and not have additional capability. Others may have additional storage capability that they may not need and they were going to try to mix and match. Okay.
But as far as my involvement in the planning process went, I never got into those kind of considerations when we put together our plans, which were, you know, plans sort of in the aggregate.
Q. Do you recall in your work on the planning documents any consideration of exchanges and shutdown reactors?
MR. SHULTIS: Objection, asked and answered. Calls for speculation.
THE WITNESS: Again, I don't remember specifically considering exchanges. I know there were discussions on trying to respond to what I thought were



requests from particular utilities to give priority to shutdown reactors, but I don't know that the department ever reached a clear policy decision on how to handle that. I remember people continuing to talk about the basic approach of oldest fuel first.
BY MR. NESLIN:
Q. Do you remember the department receiving requests for priority from shutdown reactors?
A. I believe I heard people talk about -- I was never involved directly in any specific request, but I believe there were discussions within the department about receiving indications or requests from some utilities for that.
Q. Do you know who was involved in those discussions?
A. Again, not specifically. I can't trace it to a particular meeting or particular group of people, other than the ones that I've already mentioned before that were more involved in those issues than I was.
Q. Do you recall the time period that those discussions would have occurred?
A. I can't be specific, you know, other than



during my, you know, 18 years of involvement. It was probably in the latter stages more so than the earlier stages. I mean, again back in the time of the early mission plans, the '84 draft, the '85, I don't have any recollection at that time because I maybe didn't understand the issue. But, you know, after I had some experience in the program, I remember that became a topic of discussion.
Q. So, would you be talking about the 1990s, the late '80s?
MR. SHULTIS: Objection, asked and answered.
THE WITNESS: Again, I can't pin it down other than maybe I just understood it more so, you know, in the '90s rather than the '80s.
BY MR. NESLIN:
Q. Do you recall which utilities were involved in those requests?
A. I remember I believe one of the Yankee plants being mentioned more than others, and I think there was another -- well, there were various plants that were shut down, you know, for whatever reason. I think in



addition to the Sacramento Municipal District Plant, the Trojan plant I think was shut down. Most of the time I think I heard of -- and I don't know which of the Yankee plants, but it was one of the Yankee plants I think.
Q. Do you recall how that issue was resolved?
MR. SHULTIS: Objection, asked and answered.
THE WITNESS: Yeah. As I think I indicated, I don't remember a clear policy decision on the part of the DOE, other than the oldest fuel first principle, sort of what we were talking about earlier.
BY MR. NESLIN:
Q. Let's come back to exchanges. Mr. Trebules, did you participate in developing any agency guidance or procedures for the agency's review of exchange requests by utilities?
MR. SHULTIS: Objection, asked and answered.
THE WITNESS: No, none that I could remember.
BY MR. NESLIN:

Page 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-------------------------------------------X

| | |
|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY | :VOLUME |
| (98-126C)(Merow, S.J.) | : I |
| CONNECTICUT YANKEE ATOMIC POWER COMPANY | :Discovery |
| (98-154C)(Merow, S.J.) | :Judge: |
| MAINE YANKEE ATOMIC POWER COMPANY | :(Judge |
| (98-474C)(Merow, S.J.) | :Sypolt) |
| Plaintiffs, | : |
| v. | : |
| THE UNITED STATES, | :PAGES |
| Defendant. | :1 - 160 |

-------------------------------------------X

Deposition of Victor W. Trebules, Jr.
Washington, DC
Thursday, April 18, 2002

Reported by: Denise Dobner Vickery, RMR, CRR
JOB NO. 144559

Page 2

April 18, 2002
2:15 P.M.

Deposition of Victor W. Trebules, Jr., held at the offices of:

Spriggs & Hollingsworth
1350 I Street, NW
Ninth Floor
Washington, DC 20005-3305

Pursuant to notice, before Denise Dobner Vickery, a Registered Merit Reporter, Notary Public of the District of Columbia.

Page 3

APPEARANCES:

Spriggs & Hollingsworth
For the Plaintiffs YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY AND MAINE YANKEE ATOMIC POWER COMPANY
1350 I Street, NW
Ninth Floor
Washington, DC 20005-3305
(202) 898-5839
BY: Jerry Stouck, Esq.

Jenner & Block
For the Plaintiff COMMONWEALTH EDISON
One IBM Plaza
Chicago, IL 60611-7603
(312) 222-9350
BY: Theodore T. Eidukas, Esq.

United States Department of Justice, Civil Division
For the Defendant THE UNITED STATES
Commercial Litigation Branch

Page 4

Federal Claims Section
1100 L Street, NW
Washington, DC 20530
(202) 305-7561
BY: Russell A. Shultis, Esq.
Heide L. Herrmann, Esq.

I N D E X


| | | |
|---|---|---|
| EXAMINATION OF VICTOR W. TREBULES, JR. | | PAGE |
| BY MR. STOUCK | | 5 |
| TREBULES DEPOSITION EXHIBITS: | | PAGE |
| No. 14 | Defendant's Witness List. | 51 |
| 15 | Documents CTR 006-1645, 1648 to 53, 1657 to 58, 1661 to 65. | 71 |
| 16 | Documents DB-110060 to 70. | 71 |
| 17 | Letter of April 19. HQR 064-2234 to 2253. | 71 |
| 18 | Memo of 6-21-93. HQR 064-6684 to 85. | 71 |
| 19 | Memo of 7-28-93. DE-108508 to 8515. | 71 |
| 20 | NCAI Briefing. HQR 064-5423 to 5435. | 71 |
| 21 | Privilege Log Excerpts. | 145 |


**Exhibits are attached.