A reference, which I think is where the data is from.
If we were to look at current estimates, you don't know whether or not they'd be similar, more, less, the same?
A. No, I don't.
Q. Okay. But I believe you also testified that the current plans today, in your job today, the current plans -- it's not written down anywhere, but the thinking is that if and when the repository begins operation, the annual acceptance rates will, at least at the steady state, the ultimate steady state rate, will be approximately 3,000 tons a year; is that right?
A. I think that's one of our design objectives still, yes, that's right.
Q. And is that also related in some way to an objective of being able to accommodate all of the aggregate industry wide annual generation of spent fuel?
MR. SHULTIS: Objection, asked and answered.
THE WITNESS: I'm hesitant because when we prepared these schedules back in 1985, we were considering the two-repository system and, remember,



our objective was to try to reach 3,000 metric tons with the first repository. And then when the second repository came online with its added capacity, we would begin to reduce the backlog. Because of the evolution of the program, the fact that Congress told us to delay work on the second repository, you know, our current design objectives are for a single repository. Again, I think at about the 3,000 metric ton rate, which has impacts on future generation.
BY MR. STOUCK:
Q. Okay. I didn't understand the last part. Why does it have impacts on the future generation?
A. Well, again, as I just mentioned, I don't know what the current projections are, but if you look at Table 2-2.
Q. Yes.
A. Spent fuel generation, okay? Around 1998-2000, the spent fuel generation rate was about 3,000 metric ton per year, which the one repository system could accommodate, but this shows that the numbers continued to grow, okay, to, you know, in the 4,000 range, you know, or higher and obviously the one



repository system wouldn't be able to accommodate that.
Q. Okay. And so --
A. I thought your question had to do with, you know, if our current plans enough to accommodate --
Q. Right.
A. -- the current spent fuel generation rates.
Q. Okay. What you're saying, you don't know?
A. Yeah, I don't know.
Q. But if they're the same generation rates, --
A. Right.
Q. -- then it would not be able to accommodate because the number is smaller than these numbers here?
A. Exactly.
Q. Okay. I see. And so that suggests to me that I think it just follows that the three -- well, what is the 3,000 ton? So it seems to follow that the 3,000 ton a year acceptance rate that is in the current planning, current as of today planning, thinking for this program when it starts operating, it sound like is not based on a consideration of the actual annual discharge rates in the future and an ability to accommodate them. Would you agree with that?



MR. SHULTIS: Objection, mischaracterizes --
BY MR. STOUCK:
Q. At least to your knowledge it's not based?
MR. SHULTIS: -- prior testimony.
THE WITNESS: Again, I haven't kept up on the current generation rates. I do believe, though, that the total amount of spent fuel that was expected to be generated has continued to shrink substantially. We're no longer considering 130,000 metric tons as the '85 mission plan did. I think the number in total is down to around 90,000 metric tons.
BY MR. STOUCK:
Q. Okay.
A. Of spent fuel generated.
Q. Okay.
A. So there are significant changes, you know, that would have to be looked at to update this table, and I'm just not familiar with all the current numbers.
Q. That's fine. All I'm saying is, you are familiar with what the current planning and thinking is about the annual acceptance rates once the repository

# David Zabransky

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-----------------x

YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C

-----------------X

(Caption continued on the next page)

Deposition of DAVID ZABRANSKY
Washington, D.C.
Wednesday, April 17, 2002
9:38 a.m.

Job No.: 12597-1
Pages 1 through 226, Volume 1
Reported by: Diane Gomez, RPR



DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :

-----------------X



Deposition of DAVID ZABRANSKY, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D.C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public of the District of Columbia.



APPEARANCES

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:

ALEX D. TOMASZCZUK, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:

JEFFREY L. HANDWERKER, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D.C. 20004-1206
(202) 942-5000

that's it.
Q So without a DCS is it your testimony that without a DCS process there can be no rate under the contract?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion, and asked and answered.
**A It's my belief that an approved DCS is required to establish a rate and date for acceptance.**
Q All right, sir. Are you aware of any plans that the Department of Energy has to recommence the process of reviewing and processing delivery commitment schedules?
**A I am not.**
Q And as long as that condition exists, do I understand your testimony to be that the Department of Energy has no obligation with respect to the rate of spent fuel acceptance?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
**A No further obligation than that already established in approved DCSs.**
Q All right. Which means that utilities who



don't have spent fuel in that first ten years could never have had an obligation with respect to rate. Is that right?
MR. CRAWFORD: Objection. Mischaracterizes prior testimony. Objection to the extent it calls for a legal conclusion. Asked and answered.
**A To the extent they don't have an approved DCS, that would be the case.**
Q Okay. What reasons would purchasers have for wanting to reevaluate DCSs based on the failure to begin acceptance in 1998, to your knowledge?
**A I'd have to speculate as to what they would consider if they wanted to --**
Q Well, based on your experience at WEPCO what would the considerations be?
MR. CRAWFORD: Well, objection to the extent it calls for speculation or assumes facts not in evidence.
Q Well, you said that you were at WEPCO when WEPCO submitted delivery commitment schedules, weren't you?
**A Yes, I was.**



Q And those were approved, weren't they?
**A Yes, they were.**
Q Based on what you know about the submittal of those DCSs, what purpose would a utility have for wanting to reevaluate a DCS?
MR. CRAWFORD: Same objection.
**A I can't speak for WEPCO, but DCSs in general contain fuel ranges that would be proffered for delivery by the utility to the Department of Energy. It could be the case -- again we're speculating -- that the fuel range on the original DCS that was submitted and approved would no longer be the fuel they wished to deliver because something else had been done to it, like we put in dry storage. And then, therefore, it would not be in that utility's best interest perhaps to take that fuel and offer it to the delivery but instead to offer different fuel. So it may wish to evaluate that DCS.**
Q Was the primary purpose of the DCS process to identify which fuel of a given allocation the utility wanted to deliver to DOE?
MR. CRAWFORD: Objection. Vague.



Q Do you understand my question?
**A There are many purposes for the DCS process. One of them was to identify the range of fuels the utility may wish to deliver.**
Q I don't understand what you mean by "range of fuels." Could you explain that?
**A Yes, I could.**
Q Will you?
**A Yes, I will. Fuel from a given reactor -- one of the purposes is to identify the range of fuels. Fuels from a given reactor require different shipping equipment, shipping casks, depending upon when it was discharged, how highly it was enriched, how highly it was burned, how long it's been postreactor basically. So fuel of a certain class wouldn't necessarily be fungible from a technical standpoint with fuel of a different class. So one of the purposes of the DCS was to establish for DOE's planning to fulfill the need to supply a cask suitable for the utility's use was to identify what fuel the utility wished to have moved. And the fuel that would be moved ultimately would be a subset of the fuel specified on the DCS.**

Q Okay. As implemented by DOE, was the purpose ever to determine the quantity of spent nuclear fuel?
A **Yes.**
Q How so?
A **By taking the MTUs and also by asking them to provide the number of assemblies that could be contained in those MTUs.**
Q The way the process was implemented by DOE, did the utility have any discretion about how many MTUs to put in the DCS?
A **No.**
Q So that was dictated by the Department of Energy.
A **The MTUs was as per the instructions from the ACR. The number of assemblies contained was to some extent the utility's discretion.**
Q Okay. Let me get you to look back at Exhibit 1 to your deposition and specifically Article 5.B of the standard contract.
Does Article 5.B deal with a delivery commitment schedule process?



A **Yes, it does.**
Q Where in Article 5.B does the contract limit the quantity of spent nuclear fuel the utility can put on a DCS to the amount in the ACR?
A **It doesn't.**
Q Where did that requirement come from?
A **That requirement came from the contracting officer when the contracting officer transmitted the instructions for completing DCSs to the utilities.**
Q Under the process as you understand it, during the period of time when DOE processed delivery commitment schedules, if a DCS came to the Department of Energy or submitted to the Department of Energy and had a quantity of spent fuel that was greater than that shown in the ACR, what happened?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion. Objection to foundation.
A **When DOE was processing DCSs, if the DCS contained a quantity of SNF -- MTUs greater than that in the current ACR, it was more than likely rejected by DOE, sent back by the contracting officer as**



**disapproved.**
Q Now, I have referred you to Article 5.B of the standard contract and asked you about any relationship between the DCS and the ACR in there. But I want to be fair. Is there anyplace else in the standard contract that authorizes the rejection of a DCS because it does not match the quantity of spent nuclear fuel in an ACR?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
A **The process for filling out DCSs was transmitted with the contract instructions, I believe. I am not aware of other provisions in the contract that deal with the ACR and the DCS process.**
Q All right. When did DCS forms first begin to be submitted, if you know?
A **I don't have an exact date.**
Q Early nineties?
That's a question.
A **It would have been the early nineties. My recollection would have been -- from my experience at WEPCO it would have been 63 months -- no later than 63**



**months prior to January 31st, 1998, or January 1st, 1998.**
Q Okay.
A **Sometime in September of '92.**
Q Okay. At that point in time was there a general understanding in the utility industry and the department -- well, strike utility industry. In the Department of Energy as far as you know about whether a repository was going to be available in 1998?
A **I wasn't at the Department of Energy in '92 so I don't know what the general understanding was at the Department of Energy.**
Q What was the general understanding in the utility industry?
MR. CRAWFORD: Objection to the extent it calls for speculation.
A **I don't know.**
Q What did you think?
MR. CRAWFORD: Objection to the foundation.
Q What did you think in 1992 about whether or not there was going to be a repository in 1998, Mr. Zabransky?

61

A **Mr. Zabransky thought in 1992 that there was still a possibility for a monitored retrievable storage facility by 1998.**
Q But not a repository?
A **But not a repository.**
Q Okay. What had to happen in order for a monitored retrievable storage facility to be available by 1998 as of 1992?
MR. CRAWFORD: Objection to the extent it calls for speculation. Objection, foundation.
A **I don't know the exact steps that would have been required.**
Q Okay. Now, as I understand your testimony, you were not involved in any standard contract issues at the time the standard contract was promulgated. Is that correct?
A **That is correct.**
Q Let me back up from my line of questioning. I just started to ask the question that just got passed to me.
Do you recall when you concluded that there would be no spent fuel acceptance in 1998?

62

MR. CRAWFORD: What was your question again? Hang on, I just --
Q I assume you concluded at some point that there would be no spent fuel acceptance in 1998. Is that right?
A **Yeah. Obviously at some point I concluded that wasn't going to happen.**
Q When did you conclude that, do you recall?
A **No, I don't recall exactly when that was.**
Q Were you involved in any way in any of the activity that led up to the passage of the Nuclear Waste Policy Act of 1982?
A **No, I was not.**
Q Were you involved in the process that led to the promulgation of the standard contract in 1983?
A **No, I was not.**
Q Did you review the standard contract for either Wisconsin Electric or any utility industry group during the period between the time it was proposed and the time it became final?
A **No, I did not.**
Q Were you privy to any conversations between

63

the Department of Energy and utilities about the standard contract during that period of time?
A **During -- before it became final?**
Q Between the February to June '83 time frame.
A **No, I was not.**
MR. CRAWFORD: Stan, is this an appropriate time to take a break?
MR. BLANTON: It's a fine time to take a break.
(There is a recess from the record.)
Q Mr. Zabransky, I got another couple of questions I need to ask you about Exhibit 5, which is the annual capacity report for 1995.
A **Okay.**
Q The last sentence of page one of the document says "As specified in the standard contract the ACR is for planning purposes only and thus is not contractually binding on either DOE or the purchasers."
And then if I could refer you over to page four. And referring to Table 1, the projected nominal

64

acceptance rates for spent nuclear fuel, the second sentence after Table 1 says "This table provides only an approximation of system throughput rates and is subject to change depending on congressional action regarding the conditions for site and construction, operation of an interim storage facility, if any, the repository, and the system design and configuration."
Do you see where I've read from?
A **Yes, I do.**
Q What would happen to the DCS if DOE changed the waste acceptance rates set forth in the ACR upon which the DCS was based?
MR. CRAWFORD: Objection. Vague. Objection to the extent it calls for a legal conclusion.
Q Do you understand my question?
A **Which DCS?**
Q The ones that have been approved.
A **The ones that have been approved by the contracting officer are binding.**
Q Whether or not the ACR changes?
A **That's correct.**

125

**and the industry that became known as the ACR issue resolution process. I don't know when it began exactly. My recollection is sometime in the '86ish time frame, '87ish time frame. But I don't have knowledge as to when it started.**

Q Would the ACR issue resolution process have dealt with changes to the contract?

**A It would have dealt with issues that the utilities as a group and DOE thought required discussion for clarification. It could have resulted in changes to the contract.**

Q Okay. Do you recall what those issues were?

**A Specifically, no. There were 30-something-odd issues I believe, but I don't recall offhand what they were.**

Q Do you recall ever any discussion -- and I'm looking at the first page of Exhibit 12 to your deposition where in the whereas clause it has "Whereas the DOE has responsibility following the commencement of operation of a repository," and has a change indicated and has "delete the word 'repository' and

126

insert the phrase 'DOE facility.'" do you remember that ever being a subject of the ACR issues task force?

**A It was not.**

Q Or, excuse me, ACR issue resolution process?

**A I don't -- I don't recall it as one of the issues, no.**

Q Do you recall in any other context a question regarding changing the word "repository" to "DOE facility" in that clause?

**A I do not recall that.**

Q Even since you've been at DOE?

**A No, do not recall.**

MR. CRAWFORD: Can we take a break?

MR. BLANTON: Yeah, we sure can.

(There is a recess from the record.)

Q Mr. Zabransky, Exhibit 13 to your deposition is a document entitled Index to Tables of Issues Related to the Standard Contract and has a Bates number CTR 0060139 at the bottom. And goes from 0139 to 0174 on the Bates numbers.

(Deposition Exhibit Zabransky 13 was marked for identification and was attached to the transcript.)

Q Do you recognize this document?

**A I don't recognize this specific document, no.**

Q Do you recognize any of the issues as issues that the ACR issues resolution process addressed?

**A This appears to be some of the issues, if not all the issues -- some of the issues that were developed as part of the ACR issue resolution team meeting the DOE process, whatever you want to call it.**

Q Can you tell, based on your experience at DOE, what the function of this particular document is? Is this a particular type of document that gets generated in the course of processing changes to a contract at DOE?

**A No, I don't know what the function of this document is.**

Q Let me get you to look for a second at -- it's going to be -- the Bates number at the bottom of

128

the page is going to be CTR -- excuse me. That's not right either. CTR 0060158. This is talking generally about the purchaser's right to adjust the quantities of SNF and HLW plus or minus 20 percent from its delivery commitment schedule.

**A Yes.**

Q Do you remember that being an issue in the ACR issues resolution process?

**A That was an issue that was identified.**

Q Could you describe what the issue was?

**A Well, the issue that was identified by DOE was that -- and again, I was not at the DOE at the time, but as DOE identified the issue for our discussion was that how was that going to work and what did that mean. And how would that be -- how would that affect transportation cask planning and procurement. So it was a scheduling and procuremen and cask availability issue that they wanted to discuss.**

Q And the "that" being the option of the purchaser to adjust the quantities listed in the DCS by 20 percent? When you say "that," is that what

you're referring to?
A **To adjust the DCS number in the FDS plus or minus 20 percent.**
Q How does DOE take that into account, that right into account in connection with the limit on the quantity of fuel that can go on a DCS?
A **It doesn't. I don't -- I believe the adjustment goes to the FDS.**
Q Okay. What happens if everybody increases their quantities on their DCS by 20 percent and it ends up being the total quantity would be more than the acceptance rate in the ACR?
A **That was the issue DOE identified that they needed to work through.**
Q Do you recall how that was resolved?
A **It wasn't resolved.**
Q Has it ever been resolved?
A **Not to my knowledge.**
Q Does that issue reflect an inconsistency between the contract and the practice of DOE of limiting the quantities in DCSs to the allocations in the ACR?



A **I would have to go review the contract.**
Q Okay.
(Deposition Exhibit Zabransky 14 was marked for identification and was attached to the transcript.)
A **The contract states that the purchaser shall have the right to adjust the quantities of SNF and/or high-level waste plus or minus 20 percent and the delivery schedule up to two months until the submission of the final delivery schedule.**
Q Is the 20 percent 20 percent of the amount shown on its approved DCS?
A **I believe the answer is yes.**
Q Okay.
A **The amount on the approved DCS.**
Q I think you testified earlier that if a DCS was submitted that had a quantity different than the allocation in the most recent ACR, that that DCS would most likely not be approved?
A **That's what I --**
Q Am I following you?
A **That's correct.**



Q So my question is, is the limit on the DCS to the ACR quantities inconsistent with that provision that allows the purchaser a 20 percent increase over the DCS amounts?
A **My understanding in my reading of this provision is that they could adjust the amount of the approved DCS.**
Q Without respect to what was in the ACR?
A **They could adjust the amount as the contract says in the approved DCS plus or minus 20 percent.**
Q So is it correct then that the amount in the approved DCS was not binding on the customer, on the utility, to the extent it could adjust it under the term of the contract?
A **Plus or minus 20 percent, that's correct.**
MR. CRAWFORD: Let me object to that to the extent it sought a legal conclusion.
Q Has DOE had the occasion to process any request to increase the quantities on approved DCSs?
A **To my knowledge, not subject to this provision, no.**



Q Well, in any other way, has anybody asked to increase the quantity in a DCS that's already been approved?
A **No. Not to my recollection.**
Q Is there any limit until the submission of the final delivery schedule on when the quantities can be adjusted?
A **As the contract says, it states in the last sentence of Article 5.B.2 "Until the submission of the final delivery schedule."**
Q So is it correct that DOE could approve the DCS on day one, and on day two the utility could change the quantity in the DCS by 20 percent?
A **Or decrease it by -- yes, plus or minus 20 percent.**
Q And could do that at any time up until the final delivery commitment schedules are issued?
A **That's what the contract says.**
Q But had a utility submitted a delivery commitment schedule in the first instance that was in excess of the ACR quantities, DOE would reject it?
A **That is my understanding.**

based on this meeting?
A That's what it says.
Q Am I reading that correctly?
A That's what it appears to say.
Q Do you have any idea what you meant by using the term "significant quantities" in 1998 --
MR. CRAWFORD: Objection.
Q -- as used in the minutes marked Zabransky Exhibit 17?
MR. CRAWFORD: Objection. Assumes facts not in evidence.
A I wouldn't know the specific number that I meant at that point in time, but it would have been, from my perspective at that point in time, enough so that I wouldn't have had trouble at my plant. That was my concern.
Q And trouble, define how --
A Having to do with spent fuel that I didn't need to deal with. That was my position, the company's position in 1987.
Q Having to add storage space outside your pool?



A That was the industry position, yes.
Q And you agreed with it?
A Sure. Yes.
(Deposition Exhibit Zabransky 18 was marked for identification and was attached to the transcript.)
Q Mr. Zabransky, I'm going to hand you what's been marked as Zabransky Exhibit 18 which is page 411 through -- what? I can't tell.
A 417, 18, 19?
Q I can't tell. It's a letter, the signature sign is John J. Kearney, Senior Vice President, Edison Electric Institute, a letter to Ben C. Rusche on the draft mission plan amendment. Take a second and review that if you want to.
A In its entirety?
MR. CRAWFORD: Let's get on the record just kind of where this thing was pulled out of.
MR. HANDWERKER: It's from the 1987 mission plan, June '87 mission plan amendment. It's 411 through 418 of the comments.
Q If it helps you, I'm not going to ask you

anything after page four -- well, wait a minute. Maybe I will.
MR. CRAWFORD: Don't tie yourself down.
MR. BLANTON: As a matter of fact, I think I will.
(There is a recess from the record.)
Q Have you had a chance to review number 18, Exhibit 18 to your deposition, Mr. Zabransky?
A Yes, sir.
Q Is this letter the letter that resulted from the meeting that we just talked about that was Exhibit 17 to your deposition? It refers to comments that were transmitted to DOE on April 3, 1987?
A It appears to be.
Q Do you know if you, in connection with your work with the UNWMG, participated in drafting these comments?
A I did not participate in drafting these comments.
Q Did you review and comment on the comments before they went in?
A I would have, yes.



Q Okay. Do you recall whether you disagreed with any of these comments?
A I did not, to my knowledge, disagree with any comments as far as I'm aware.
Q On page 417 of the comments they say "A significant change between the mission plan DMPA" -- which I assume refers to the draft mission plan amendment -- "occurs in the magnitude, time of, and rate at which DOE will accept spent fuel." Do you see that?
A Uh-huh.
Q Do you recall any discussions about the content of that particular paragraph among the UNWMG members?
A Not specifically about that particular paragraph, no.
Q Are you aware of whether what is expressed in this paragraph is generally the same subject matter as what you discussed in the meeting on March 25th, 1987, as chairman of the Program Strategy and Schedule Task Force?
A I have no reason to believe it isn't a

**draft letter that was discussed.**

Q Okay. Well, and what I'm talking about are the problems with the draft mission plan this identifies. Would that have been part of your discussion on the --

**A I have no specific recollection of that.**

Q Okay. Do you have any reason to think it would not have been?

**A I have no reason to think it would not have been.**

Q On page 412, the second page of the letter, the comments address a five-year slippage in the first repository operations day. Do you see that?

**A What's the side bar number there?**

Q Two and three over there in the brackets.

**A I see, yes.**

Q Okay. The middle of that paragraph the comments say "This change can be acceptable to the electric utilities if and only if DOE makes a more substantial and achievable commitment to begin taking spent fuel in January 1998 as required under the NWPA and the standard contract."



**A Yes.**

Q Do you recall at that time what you believed the DOE contractual commitment to be other than --

MR. CRAWFORD: Objection.

Go ahead.

MR. BLANTON: Go ahead.

MR. CRAWFORD: Well, no. You finish the question.

Q -- other than to accept fuel in January 1998?

MR. CRAWFORD: Well, objection. Assumes facts not in evidence, foundation, relevance. It's vague.

**A Specifically with the contractual commitment, no, I don't recall beyond the fact that I believe we believed we were advised by counsel that there was a contractual commitment to begin accepting in 1998.**

Q Was the issue of the quantity of fuel that they would accept part of that commitment, in your judgment?



**A The reason for the sternly worded letter was our concern that there appeared to be no commitment to the quantity of fuel and that we were upset and wanted them to commit to a large quantity of fuel but we saw no such commitment.**

Q In the draft mission plan amendment?

**A Anywhere.**

Q Would a commitment to accept spent fuel in 1998, without some commitment to accept a sufficient quantity to relieve the utilities of its storage problems as you referred to a second ago, have been of any real use to the utilities?

**A Yes.**

Q In what way?

**A Ultimately even with respect to -- without regard to the amount of storage required, they need to dispose of the spent fuel.**

Q But that implies, doesn't it, that they're going to pick up all of it?

**A Eventually, yes. That's a necessity. That's of value to the utilities, as you asked me.**

Q Is there some period of time in your



judgment beyond which that process becomes unreasonable?

MR. CRAWFORD: Objection. Speculation.

Q How long is it supposed to take to pick up the spent fuel?

MR. CRAWFORD: Objection. Vague.

**A I don't have an answer. I don't know.**

Q In your judgment would 80 years to clear out spent fuel from a reactor site be consistent with DOE's commitment and obligation under the contract?

MR. CRAWFORD: Objection. Argumentative. Lack of foundation, speculative, vague.

**A I don't believe the contract contains a commitment with respect to rate.**

Q So is the answer to my question no, it's not unreasonable for DOE to extend the period of performance under the contract for 80 years?

MR. CRAWFORD: Objection to the extent it calls for a legal conclusion and all the other objections to the first question.

**A If that's how long it takes to remove the spent fuel, that's how long it takes to remove the**