197

to make at this time for his kids.
MR. BLANTON: Sure.
(There is a recess from the record.)
(Deposition Exhibit Zabransky 26 was marked for identification and was attached to the transcript.)
Q Mr. Zabransky, I've marked as Exhibit 26 to your deposition a document entitled Preliminary Projection of Spent Fuel Acceptance Rate Point Beach Nuclear Plant. Do you see that?
**A Yes, I see that.**
Q Do you need a second to review it?
**A Yes, I do.**
**Okay.**
Q Do you recognize that document?
**A I recognize the document.**
Q Did you prepare it?
**A I prepared the transmittal memo, yes.**
Q How about the attachment?
**A No. That was prepared by Energy Resources International.**
Q Okay. Is the fact that it was prepared by

198

ERI reflected on it? Right here, okay.
What was the purpose of preparing this acceptance schedule?
**A It was to, as it says in the document, respond to information requests from Tsien-Lit Poon, who was Public Service Commissioner of Wisconsin staff.**
Q Can you explain a note that -- there is a footnote that says "After 2015 projected spent-fuel acceptance rates are based on a projection of total spent-fuel discharges and projected OFF priority ranking." But could you explain, as I understand it, at the point in time when the 1991 ACR was issued, the ACR contained projections of spent fuel acceptance through 2008. Is that right?
**A Through 2007.**
Q 2007?
**A Yes.**
Q How were the projections after 2007 done for this table?
**A From 2007 to 2009, 2008 and '9 specifically, it continued the rate at the 900 tons a**

199

**year consistent with the 10,000 ton statutory limitation. Beyond that the assumption was the repository was in operation at -- in 2010 and, therefore, the rates were now unconstrained. The 1800 to 3,000 per year rate were provided by Energy Resources International as their best estimate as to what the DOE rate would be.**
Q Do you know what that was based on?
**A No, I do not. That was why we paid them to do this.**
Q During this time frame was the Wisconsin Citizens Utility Board asking questions frequently regarding the standard contract and what your expectations were for performance of the standard contract by DOE?
**A Wisconsin CUB was asking questions all the time about all kinds of things, so I don't know specifically -- I have no recollection of what they were asking at this point but, yes, they were asking all kinds of questions about Point Beach.**
**(Deposition Exhibit Zabransky 27 was marked for identification and was attached to the**

200

**transcript.)**
Q I marked as Exhibit 27 to your deposition, Mr. Zabransky, a letter dated February 16, 1994, to a Mr. Dennis Dums, which is an unfortunate name for a regulator.
**A He wasn't a regulator.**
Q Well, whatever he was.
**A He was a nuclear intervenor.**
Q From Stephen Parker at Wisconsin Electric Power Company, and attached is, it appears, some questions. I think we've got a document in the file that reflects this, but to save time, do you recall whether you were responsible for answering these particular questions on behalf of Wisconsin Electric?
MR. CRAWFORD: You're referring now to the second page?
MR. BLANTON: Yes, sir.
Q And specifically 3A and 3B.
**A I presume I was involved with this. It would have been something I was doing. I don't rec[illegible] the specific exercise, but it was the time frame and my name is on here, so I'm sure I worked on this.**

227

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - x
YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C
- - - - - - - - - - - - - - - - - X
(Caption continued on the next page)

Continued Deposition of DAVID ZABRANSKY
Washington, D.C.
Thursday, April 18, 2002
9:44 a.m.

Job No.: 112597-2
Pages 227 through 458, Volume 2
Reported by: Diane Gomez, RPR

228

DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
- - - - - - - - - - - - - - - - - X

229

Continued Deposition of DAVID ZABRANSKY, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D.C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public of the District of Columbia.

230

A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:
ALEX D. TOMASZCZUK, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:
JEFFREY L. HANDWERKER, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D.C. 20004-1206
(202) 942-5000

Q Do you have any military experience or anything like that?
**A No.**
Q I'm going to show you what's been marked as Zabransky Number 29.
(Deposition Exhibit Zabransky 29 was marked for identification and was attached to the transcript.)
Q Which purports to be a letter dated February 2, 1994, from you to the Energy Information Administration titled Transmittal of EIA Nuclear Fuel Data Form.
Do you recognize that letter?
**A I don't remember this letter, but I'm reading it now. Yes, I'm sure I wrote it and signed it.**
Q Was it part of your responsibility to submit the RW 859 forms to the EIA --
**A Yes.**
Q -- at Wisconsin Electric?
**A Yes, under my -- it was under my area of responsibility, yes.**



Q Somebody else prepared the form and gave it to you, and you put a cover letter on it and sent it?
**A Correct.**
Q The middle paragraph of that letter, would you read that to yourself, please.
**A That's correct.**
**Okay. I've read it.**
Q Was it a regular practice of Wisconsin Electric when it was transmitting information either to the EIA or to the Department of Energy to remind the Department of Energy of its obligations under the terms of the contract for disposal of spent nuclear fuel to begin acceptance of Wisconsin spent fuel no later than January 31, 1998?
**A I think it had become at that point in time.**
Q At what point did it become the regular practice?
**A I don't recollect which point it became.**
Q Okay. Now, at this point in time Wisconsin Electric had approved delivery commitment schedules. Is that right?

**A Yes, it did.**
**(Deposition Exhibit Zabransky 30 was marked for identification and was attached to the transcript.)**
Q I've handed you Zabransky Exhibit Number 30.
MR. BLANTON: And I'm one copy short on that one, guys. Sorry.
Q Which purports to be a document dated September 21, 1992, to the U.S. Department of Energy contracting officer, signed by Bob Link, officer of placement and administration -- or, excuse me, DOE contracting officer in the office of placement administration. Do you recognize that document? And it has several pages of documents attached to it. It goes from page 0469 to page 0486.
**A I've seen this document.**
Q What is that document?
**A Well, the cover letter is a transmittal letter from Bob Link sending in DCSs for approval to Point Beach --**
Q Okay.



**A -- for the ten years of allocations beginning in 1998.**
Q Did you participate in the process of generating these DCS submittals?
**A One of my staff did it, but, yes, I was involved with it.**
Q Would the submittals have gone through you to Mr. Link?
**A Yes, they would have.**
Q I want to ask you about a notation that appears on each of the DCS documents.
**A Okay.**
Q On line 2.7 there's a line for metric tons of uranium, and then in parenthesis, initial, and it has 43.0.
MR. OLSEN: Which one are you --
MR. BLANTON: I'm sorry. Look at page 0745.
MR. OLSEN: Okay.
**A Okay.**
Q See where it has metric tons, uranium 43?
**A Yes.**

Q And underneath that, under 2.8 it has, Number of assemblies, 119?
A Yes.
Q Then it has an asterisk that says, Maximum number of assemblies deliverable per instruction 2.8.
A Yes.
Q Now, do you recall where Wisconsin Electric got the 43 number to put in line 2.7?
A **That came out of the 1991 ACR.**
Q Okay. And where did Wisconsin Electric get the 119 number?
A **That came out of the lightest assemblies we have in inventory, that we anticipated having in inventory in its date range to maximize the number o assemblies that fit within that ACR MTU limit.**
Q Was that the typical practice, you tried to get as many assemblies as you possibly could into a given weight limit?
MR. OLSEN: Objection. Vague.
Q At Wisconsin Electric was that what you guys tried to do?
A **I think at this point in time what we tried**



**to do was inform DOE for planning purposes that the 43-ton allocation could be as many as that assemblies so they could plan accordingly for the number of casks they would need.**
Q What does the notation "Maximum number of assemblies deliverable per instruction 2.8" mean?
A **I would have to refer to instruction 2.8.**
Q I think the instructions are Exhibit 4 to your deposition.
Well, I don't see instruction 2.8 in these instructions.
A **I think it means instruction 2.6. Don sometimes made mistakes.**
Q What's the date of this form? You sent this in in --
A **'92.**
Q '92.
A **It came right after the instructions.**
Q And these are the revised '93 instructions, so is it possible there was a 2.8 in the instructions that you had?
A **Oh, I don't know.**



Q Okay. But there is an instruction on the number of assemblies, BWR, PWR, and other, right?
A **Uh-huh.**
Q When I said that I was referring to Exhibit 4.
A **Yes, instruction 2.6 in Exhibit 4, which appears to be what 2.8 refers to in this document.**
Q Can you tell me how the instruction limits the number of -- or does the instruction limit the number of assemblies deliverable?
A **Well, it says, Enter the number of assemblies corresponding to the metric tons indicated in item 2.6. If the SNF designated -- and I skipped over some words. If the SNF in the designated range of designated -- If the SNF in the designated range of discharge dates encompasses assemblies in a wide range of MTUs per assembly, state the maximum number of assemblies that may be delivered. That's what we did.**
Q I'm just slow. I'm sorry. Can you explain to me in lay terms how the instruction limits the number of assemblies? Is it the metric tons that limit the number of assemblies?



A **Yes. Each assembly has a certain number of metric tons in it, and generally for a given class of fuel designs they're all the same. Wisconsin had used -- Wisconsin Electric had used several classes of fuel designs, and the assemblies ranged anywhere from .36 metric tons to .42 metric tons.**
Q Okay.
A **So to tell DOE as to what we were planning on doing or to give them the maximum amount of assemblies that could be moved within that MTU allocation, we provided this information.**
Q Why do you think it was necessary to tell DOE that was the maximum number of assemblies deliverable?
MR. OLSEN: Objection. Vague.
A **Well, I don't know why -- again, from my perspective I felt it was reasonable to tell DOE this so they could plan on the number of casks they would need to move the fuel.**
Q Did Wisconsin Electric object to the limit on the metric tons of uranium DOE had limited it to in submitting the DCS?

247

MR. OLSEN: Objection, vague, and objection to the extent it calls for a legal conclusion.
Q I'm not asking for a legal conclusion.
**A Not to my knowledge.**
Q Mr. Zabransky, what is failed fuel?
MR. OLSEN: Objection to the extent it calls for a legal conclusion.
Q Are you responsible for determining what failed fuel is for the Department of Energy?
**A In the context of the contract, failed fuel is described in Appendix E.**
Q Well, you skipped over a question. Is part of your responsibility providing technical input to the contracting officer about what constitutes failed fuel?
**A Yes, it would be.**
Q Okay. Can you describe what failed fuel is?
MR. OLSEN: Again, objection to the extent it calls for a legal conclusion.
Q That's fine. Your technical understanding of what failed fuel is. As described in the contract.

248

**A As described in the contract, it's any assembly that, once inspected, exhibits deformity, damage to cladding or spacers or other physical characteristics that may require special handling.**
Q What does "special handling" mean?
**A Cannot be handled with normal fuel-handling equipment in the way you would normally handle a fuel assembly at a reactor site for normal cores or loading casks for storage or transport.**
Q Do you know whether any of the spent fuel included in the delivery commitment schedule submitted with Mr. Link's letter of September 21, 1992, Exhibit 30 to your deposition, contained failed fuel under the definition you just gave?
**A Don't know. I'm sure some of it was, but, again, what WEPCO did in submitting its DCSs was to include all the fuel in its inventories at that point in time, as a date range.**
**If you notice on 2.6, the date range of discharge on document 475, you want to look at that one, is 9/30/72 to 10/31/93. That covers every assembly ever generated by Point Beach between the**

**date of operation and five years prior to 1998.**
Q Right.
**A So any of your assemblies at that point in time would have been covered by this DCS. We didn't specify which fuel would be covered by this DCS.**
Q Okay. You only specified a quantity of tons and a number of assemblies but not which assemblies?
**A It's not required, and we felt it was in our best interest to keep it as broad as possible since an FDS, which is the next submittal, is a subset of a DCS.**
Q In order to come up with the 119 assemblies did WEPCO internally have to identify to itself which assemblies those were?
**A No. We just took the lowest one we had in inventory and said this was the lowest weight we had and divided that into the number of tons and got the maximum number of assemblies it could possibly be.**
Q Did you have 119 assemblies of the lightest weight assemblies?
**A Not necessarily. But that was the maximum**

250

**number of assemblies. It wasn't -- it couldn't be more than that. That's how we interpreted this.**
Q Okay. So whether or not you actually had 119 assemblies of whatever the lightest weight was was not something you looked at?
**A No, we did not.**
Q So from Wisconsin Electric's standpoint this DCS on page 475 covered an unspecified 119 fuel assemblies of Wisconsin Electric? Am I following you?
**A Up to 119 assemblies.**
Q Okay.
**A The most or the most -- let's see. And I would also say that the discharge no later than 12/31/93.**
Q Did you say that a final delivery schedule is a subset of the delivery commitment schedule?
**A That was my understanding when we did this form.**
Q Can you explain what that means? I don't follow you.
**A Am I speaking from my Wisconsin Electric perspective as to what it meant?**

Q Just what you know right now, how you know it.

A Well, the FDS process which occurs one year prior to the delivery specifies the date one wants it delivered, and you go to the contract and see what else it specifies. The number of assemblies per cask, the metric tons of uranium, the range of discharge dates, and it gets down to be more specific from the number of assemblies because it's nearer to the time a cask must be provided a planning document. This is a five-years-out planning document. This is a one-year-out planning document. We are now actually getting down to discharging or dispatching casks to go pick up specific fuel.

So the understanding that I had then and understanding I have now is that once one submitted a DCS that blocked out a certain amount of fuel, the FDS needed to be a subset of the DCS, that one couldn't now say, Okay, I said this range over here, but now that I'm submitting my FDS I want to submit hotter fuel, different fuel, etc., because DOE's planning would have been on a different basis.



Q So is what you're saying that the FDS is a much more specific document and identifies more closely which fuel out of the universe of fuel contained on the DCS?

A That's --

MR. OLSEN: Objection to the extent it calls for a legal conclusion.

A That was my understanding of how the documents were worked and how the process would work and that's still my understanding. And as a result of that understanding for Wisconsin Electric we kept the DCS as broad as possible.

Q Okay. Given that, what value is that to DOE? What did DOE do with the DCS?

MR. OLSEN: Objection, vague. Objection, foundation.

A Given that information, DOE now knows Wisconsin Electric intends to have fuel picked up from Point Beach in that year and it's in the date range. For Wisconsin Electric, that's the value to DOE. It knows that, Wisconsin Electric. For other utilities with other reactors it would know which reactor and



which type of fuel they wanted to have picked up, if they had multiple reactors with multiple types of fuels. And they would plan accordingly.

Q I don't understand, though, and help me. What does the DCS, the way Wisconsin Electric filled it out, what the DCS tell DOE about the kind of fuel that will actually be delivered to DOE on the day DOE shows up with the truck?

A Well, from my perspective at that point in time it put them on notice that it's going to be anything like this, and it was their obligation to keep it open and service my needs.

Q Sort of anything and everything?

A That's right. I was allowed to do it, and that's what I did.

Q Okay. So from my standpoint, the way you filled out the DCS does not narrow it down much for DOE in terms of what it's actually going to get?

A That's correct.

Q I think I know the answer to this question, but I'll ask it anyway. Has DOE approved any final delivery schedules for anybody?



MR. OLSEN: Objection to the extent it calls for a legal conclusion.

A No.

Q Has DOE received submission of a final delivery schedule from anybody?

A I believe so.

Q Oh, you do. From who?

A I don't recollect exactly.

Q Okay. These DCSs were all approved by DOE. Is that right?

A Correct. Wisconsin Electric was of the opinion that the DCS was a binding commitment and took the opportunity to send it all ten years at once just on the chance that DOE may stop approving them in the future.

Q Did you have any indication that that was going to happen at the time?

A No indication, but counsel advised us that that would be a prudent thing to do.

MR. OEHLER: I'm going to object. I'm the counsel for Wisconsin Electric, and Wisconsin Electric has not waived the attorney/client privilege, and

263

Q What was the industry's position about that?
A The industry -- the industry's position was that, no, it should be -- it should accrue to the purchaser to proffer any fuel they wanted to move forth on.
Q What was the DOE's position?
MR. OLSEN: Objection. Foundation.
Q Did DOE express a position during the process?
A I guess reading the instructions and the DCS instructions they wound up coming up with the same position.
Q So we have one resolved, bingo.
A I guess that's true. Yeah. In retrospect, yes.
Q How about number 003, "Adds new purchasers to the acceptance ranking queue." What does that mean?
A I don't recollect what that one was.
Q Do you know what is meant by "new purchaser" in that line?

264

A I don't know. At this point it's been so many years I'm not sure what that one referred to.
Which number is that?
Q We're looking for Exhibit Number 13, I think, which is the --
A Oh, here it is.
Q Do the numbers correspond?
A No. No, because these numbers are different, I think. It's a cross-reference. There was some of these issues that early on dropped off everybody's radar screen because nobody eventually cared about them. So I don't know what these lists are here or how they differ.
Q All right. Well, if somebody figures out where we can find a description of that they'll let us know and we can move on.
A Okay.
Q What is issue number five, do you recall what that was about?
A I think someone -- again, keep in mind these issues were brought up in the mid-eighties which the fact that an issue was identified meant that some

utility member thought it was important. This one to the best of my recollection would have been someone who was worried about if he reprocessed his spent fuel he wanted to deliver high-level waste, how would the metric ton equivalents be calculated.
Q Do you recall what the industry position was on that?
A I don't recall that we ever developed a position on this one.
Q How about number six?
A I don't recall the exact issue. It says we developed a position paper and transmitted to DOE. I don't recall what it was on this one.
Q Do you recall whether that particular issue, issue number six, was resolved by the instruction that said you only put the amount of metric tons on the delivery commitment schedule that is allocated to you in the ACR?
A I don't know what this issue was. I can't draw that conclusion.
Q Have you got Exhibit 13 in front of you?
A Yes, I do.

266

Q Look on page 157, Bates number 157.
A Okay.
Q Does that refresh your recollection about what this issue was and how it was -- or what the status of it was at least?
A No. Again, this document looking at it is '87. I'm not sure how it evolved by this '91 document or where it wound up. I really don't know where that one went.
Q Well, do you recall there ever being a question about whether the contract really meant what it said when it said that the purchaser was to identify all the SNF it wishes to deliver on its DCS?
A My interpretation of that was when we fill out our DCS at Wisconsin it was to put the broadest range down we wished to deliver.
Q Including the quantities, all the quantities it wished to deliver?
A No. All the fuel, the types of fuel, the fuel ranges, heat loads, weights, enrichments.
Q Does the contract clearly identify in any way how much fuel was to be put on the DCS, what

quantity of fuel?

MR. OLSEN: Objection to the extent it calls for a legal conclusion.

A **The contract doesn't give that guidance. The contracting officer's directions gave the guidance of how to complete the DCS form.**

Q Did the contract anywhere say the contracting officer will decide how much fuel goes on the DCS?

MR. OLSEN: I'm sorry, could you repeat?

Q Did the contract say anywhere that the contracting officer was authorized to decide how much fuel the purchaser could put on the DCS?

MR. OLSEN: Objection to the extent it calls for a legal conclusion.

A **The contract doesn't say that specifically, but the contract gives DOE the right to approve or disapprove the DCSs, and the contracting officer provided the basis for the approval or disapproval in the instructions.**

Q Number 33 is legal status of contracts not in compliance with 10 CFR 961. Do you remember what



that was about?

A **If I recollect, and this is one that I think was never worked on or thought about again, either, were some of the contracts that were developed and signed weren't exactly the same as the standard contract that was published in the Federal Register.**

Q Do you remember why?

A **Well --**

Q Excuse me. Do you remember how they were different than what was in 10 CFR Part 961?

A **Some -- again, there are some contracts that were signed that have different provisions because they're different circumstances in the department and the purchaser agreed to sign a slightly different contract pursuant to I guess the deviations provision of the contract.**

Q Okay. Have any of the contracts executed by the Department of Energy and the utilities been amended without going through a rulemaking process?

Do you understand what I mean when I say "rulemaking process"?

A **(The witness nods.)**



Q She can't take down a nod.

A **I'm thinking. I'm not answering yet.**

**There were contracts that were changed before they were signed that were different from the standard contract that was published in the Federal Register. I'm trying to recollect if there are any since then that were modified without having published something in the Federal Register. And the only thing that might approach that or might be in that class would be the settlement agreement signed with PECO Energy.**

Q Okay. And that was the one I was thinking about, too. And the question is did DOE go through any notice and comment rulemaking process prior to entering into that amendment?

A **No.**

Q Do you know why it didn't?

MR. OLSEN: Objection to the extent it's going to cause you to reveal attorney/client privileged information and information related to a settlement agreement.

Q I'm just asking you in terms of



administrative procedure why you amended that contract without following the rulemaking process?

A **Advised by counsel it wasn't necessary.**

Q Okay. Is issue 24 the same issue that we talked about yesterday in terms of nonfuel parts of an assembly that aren't connected to an assembly, or is that something different?

A **It's a portion of that same discussion, yes.**

Q Okay. Does the discussion yesterday apply to that, or is it different in some fashion?

A **This issue I think primarily dealt with that what would be the basis for putting these materials that were no longer part of the assembly in the queue. How would they be picked up? How would they be allocated space? It hadn't been determined.**

Q What was the industry's position on that?

A **I don't recollect. I think -- I don't recollect. I would have to go back and review whatever documents were provided to DOE.**

Q As I recall, yesterday you said you felt like the material that had once been a part of an

395

**president after Jim. Jim Zach took over for Bob Fay. After Jim left Bob Link took over for Jim. Ed left, I reported to Bob, and eventually a short time after that Gary Krieser came in and I reported to Gary Krieser.**
Q So you reported to Gary Krieser who reported to Bob Link?
**A That's correct.**
Q And as far as the vice president of the nuclear area, it went from Bud Fay to --
**A Jim Zach to Bob Link.**
Q To Bob Link. Was Mr. Link still there when you left WEPCO in 1994?
**A Yes, he was.**
Q You said Mr. Lipke left. Did he leave Wisconsin Electric?
**A Yes, he did.**
Q In your position as manager of nuclear fuel services did you have the authority to bind or commit Wisconsin Electric?
**A At the end I was able to sign commitments for deliveries of materials, yes. In the beginning,**

396

**no.**
Q Approximately what time would you have had that authority?
**A Not until I believe late '93, mid -- yeah, late '93, '94.**
Q And can you describe more specifically for me the precise authority that you had?
**A From my recollection I was able to commit to orders for materials and deliveries of uranium and things like that.**
Q In that position did you, when you had this authority did you represent the position of Wisconsin Electric with regard to the Department of Energy for example?
**A I always represented the position of the company but I never had the authority to bind the company in those areas, and that's the reason, for example, that Bob signed all the DCSs. Bob had the authority to sign the company, and that's how Wisconsin Electric did business and kept the authority at the vice president level.**
Q When you left Wisconsin Electric and joined

397

the Department of Energy, did you take any Wisconsin Electric records or documents with you?
**A Not that I recall.**
Q I would like to ask you to look at Zabransky Exhibit 1.
MR. OLSEN: Is that also the contract?
MR. OEHLER: Yes.
**A Is it the '83 or the --**
MR. CRAWFORD: The final one.
MR. OLSEN: It's the final contract.
**A Okay.**
Q And I'd ask you to look at Article 5, please.
**A Okay.**
Q And I believe that you reviewed with Mr. Blanton Article 5.B regarding delivery commitment schedules. Is that correct?
**A Yes.**
Q And I believe that during that discussion he gave you delivery commitment schedules for Wisconsin Electric which you then reviewed. Is that correct?

398

**A Yes. We looked at the ones that were sent in, yes.**
Q And you indicated that those were approved by the Department of Energy?
**A Yes.**
Q Okay. I would like you to look at subsection C under Article 5. Can you tell me what that is entitled?
**A Final Delivery Schedule.**
Q Am I correct that the final delivery schedule would come after approval of the delivery commitment schedule?
MR. OLSEN: Objection, calls for a legal conclusion.
**A The sequence is the contract calls for that to come after the approval of the delivery commitment schedule.**
Q Okay. And do you know whether Wisconsin Electric submitted final delivery schedules to the U.S. Department of Energy?
**A I don't recollect.**
MR. OEHLER: I'm going to have marked as

that did not include counsel, what do you recall about those discussions?
A **We discussed that we needed to discuss with counsel how to deal with this.**
Q Do we call that punting?
A **We call that having received prior direction.**
Q Could you look down at the third paragraph. There's a reference to a letter from GA.
A **Yes.**
Q Do you know who GA is?
A **I believe that would be General Atomics.**
Q I want to refer you to the date again of Exhibit 47, January 5th, 1998.
A **Uh-huh.**
Q Do you remember --
A **Okay.**
Q January 5th of 1998?
A **Yeah.**
Q Okay. Do you remember six months later Wisconsin Electric asking DOE to accept certain fuel assemblies from Wisconsin Electric because Wisconsin



Electric was concerned that it had no place to store those assemblies and that it might have to shut down the Point Beach nuclear plant?
A **I remember that discussion took place, yes.**
Q Okay. My recollection is that DOE did not agree to pick up any fuel assemblies from the Point Beach nuclear plant. Is that correct?
A **I think that's my recollection, too.**
Q Wisconsin Electric, however, I believe you also testified had approved delivery commitment schedules?
A **That's correct.**
Q And I believe that you indicated that while you were at Wisconsin Electric one of the reasons why Wisconsin Electric submitted the delivery commitment schedules was they found that to be I believe your term was a binding commitment. Do you recall that discussion?
A **That's correct.**
Q If DOE approved Wisconsin Electric delivery commitment schedules and they represented, to use your words, a binding commitment, why did DOE refuse to



pick up fuel assemblies from Wisconsin Electric in mid-1998 when Wisconsin Electric asked DOE to do so?
A **I think at the time DOE was of the opinion and is of the opinion it has no place to bring that fuel. So that was a discussion that took place with Wisconsin Electric and others, and DOE's position was that it's unable to fulfill that commitment by moving that fuel.**
Q When Wisconsin Electric submitted the DCSs, again in the belief that it was a binding commitment, did Wisconsin Electric rely upon that portion of the contract which included the final delivery schedule provision that we just reviewed?
MR. OLSEN: Objection, vague. Objection, foundation.
A **I'm not sure what you mean by "rely upon."**
Q Okay. Let's go back to what I said.
A **Okay.**
Q You indicated that Wisconsin Electric submitted delivery commitment schedules for approval because it believed that it was a binding commitment.
A **Correct.**



Q Okay. And who made that decision at Wisconsin Electric, that they should submit the ten delivery commitment schedules at one time?
A **I think that was a discussion that took place between me and Bob Link and, if Gary was involved, Gary at the time depending on the time frame and concluded that there were good and sufficient reasons to do that.**
Q And what were those reasons?
A **We felt that it would basically cause the Department of Energy to commit to picking up that spent fuel at those dates. And if they didn't, that we would be able to hold them responsible for not meeting that date. And the reasons to do all ten was to get them in before they changed their mind and stopped doing something.**
MR. OEHLER: Let me have a moment.
MR. OLSEN: Uh-huh.
MR. OEHLER: I have no further questions of Mr. Zabransky at this time. Similarly to Mr. Blanton, however, I reserve my right to continue this deposition after documents that the Department of