forms. And is it correct that a utility did not have to identify specific assemblies --
A That's correct.
Q Let me just finish. -- in the DCS form?
MR. OLSEN: Objection, calls for a legal conclusion. Objection, asked and answered.
A That's correct.
Q I would like to go back to the Wisconsin Electric DCS forms.
I've referred you back to Zabransky Deposition Exhibit 30, which I think you previously identified as Wisconsin Electric DCS submissions.
A Yes.
Q Do you see that? And do the Wisconsin Electric DCS submissions identify range of discharge dates -- let's look at the one labeled 472. That range of discharge dates is 20 years. Is that right?
A That's correct.
Q So according to this form Wisconsin Electric could have submitted any fuel assemblies discharged any time during that 20-year period. Is that correct?



A Correct.
Q Will you look at, continuing on in Deposition Exhibit 30, the page labeled 483 at the bottom.
A Yes.
Q Does this DCS form reflect that Wisconsin Electric was submitting a range of discharge dates from 1972 to '01, 2001?
A That's what the form reflects.
Q All right. And so that would reflect that Wisconsin Electric was going to supply fuel assemblies discharged anywhere during approximately a 29-year period?
MR. OLSEN: Objection. Calls for speculation and objection to the extent it calls for a legal conclusion and also the form speaks for itself. You may answer.
A That reflects that the range of discharge dates that could be selected for delivery would be in that period of 29 years.
Q Do you know what the planning value to the DOE would be of getting a DCS form that indicated that it was going to get some spent fuel assemblies discharged anywhere during a 29-year period?
MR. OLSEN: Objection. Foundation. Objection, calls for speculation.
A Planning value is they're going to Point Beach and they're picking up fuel from Point Beach.
Q And apart from the location, there really isn't much planning value associated with this, is there?
MR. OLSEN: Objection, vague. And objection, borderline argumentative here, so...
A The form was filled out in accordance with the instructions.
Q Could you answer my question, please.
MR. OLSEN: Argumentative, please.
A There's planning value here to the extent they were required to provide it.
Q Well, Mr. Zabransky, there's a tremendous range in terms of I guess what you refer to as the heat of the spent fuel in fuel that's been discharged over a 29-year period, isn't there?
A There could be, yes.



Q And apart -- well, can you identify what the planning considerations were for getting this DCS information?
MR. OLSEN: Objection, vague. Go ahead.
A At this point in time, before delivery, it was primarily to get an idea of where people expecte[d] us to go and what they expected us to do so we could plan at that level and start deciding what the appropriate equipment would be.
Q Well, where people expected you to go was what reactor. Is that correct?
A Correct.
Q And how would that impact on the DOE's plan?
A To know what kind of equipment that would need, whether it would be a truck site, a rail site whether it was going to be in Maine or in California.
Q Well, apart from whether the location would be served by truck or rail or the general geographic area of the country, were there any other planning considerations associated with the location?
A To the extent it was made available, some

**idea of the fuel that would be provided.**
Q Well, is it correct, Mr. Zabransky, that Wisconsin Electric didn't provide much of an idea of what fuel would be provided? Is that correct?
**A They provided the information they had available, which is they would select later on from that inventory.**
Q And that was the inventory over 29 years?
**A That's correct.**
Q I think you also said where people expected us to go and what they expected us to do. Do you recall that?
**A I think I just said that, yeah.**
Q What do you mean "what they expected us to do"?
**A Approximately how much fuel that we'll pick up. And this at least says the maximum number of assemblies it could be.**
Q Well, when you identified the maximum number of assemblies, did you have a sense of what percentage range that could include?
MR. OLSEN: Objection, vague. And



objection, foundation.
**A No. We based it on the directions that say what's the maximum number it could be for assemblies that hadn't yet even been discharged or purchased.**
Q So Wisconsin Electric was submitting DCS forms for fuel that it hadn't purchased yet. Is that correct?
**A It's correct to my knowledge that by 1993 we hadn't purchased the fuel that was in the reactor as of 2001.**
Q How long in advance of putting a fuel in a reactor would the utility purchase the fuel, based on your experience at Wisconsin Electric?
**A Fuel designs are probably set two years ahead of time, three years ahead of time.**
Q So generally you would arrange a purchase of fuel two or three years ahead of time that went into the reactor?
**A That's when you would set the final design, two years or so, three years ahead of time.**
Q Now, I believe this got discussed a little earlier, but is it also correct that under the



contract a utility could submit up to 20 percent more fuel in terms of metric tons than the amount that it had identified on a DCS form?
MR. OLSEN: Objection to the extent it calls for a legal conclusion. And objection, it's vague.
**A If you're saying that could a utility when it put forth its FDS used the adjustment of plus or minus 20 percent provided for in the contract, the answer is yes.**
Q And the adjustment of 20 percent up or down is an adjustment by weight. Is that correct?
**A By MTU.**
Q Okay. And MTU is metric tons?
**A Metric tons of uranium, yes.**
MR. OLSEN: Can we go off the record for one second.
(There is a discussion off the record.)
Q Once a utility had submitted a DCS form that had been approved by the DOE for a particular range of fuel at a reactor, could the utility submit, when it came time to submit the final delivery



schedule, fuel in a different range or from a different reactor?
MR. OLSEN: Objection to the extent it calls for a legal conclusion. And I believe this question has been asked and answered already.
**A It was DOE's position that the FDS needed to be a subset of the DCS.**
Q And where is that provided in the DCS instructions?
**A It's not provided in the DCS instructions.**
Q Well, where is it provided in the contract?
MR. OLSEN: Objection. The contract speaks for itself.
**A The contracting officer has discretion for the basis of approval or disapproval.**
Q Well, Mr. Zabransky, is it correct that the contract did not specifically address the issue of whether a utility could provide different fuel than fuel identified in a DCS form?
MR. OLSEN: Objection. The contract speaks for itself, and objection to the extent it calls for a legal conclusion.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - x
YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C
- - - - - - - - - - - - - - - - - X
(Caption continued on the next page)

Continued Deposition of DAVID ZABRANSKY
Washington, D. C.
Friday, April 19, 2002
10:03 a.m.

Job No.: 12597-3
Pages 460 through 722 - Volume 3
Reported by: Diane Gomez, RPR



DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
- - - - - - - - - - - - - - - - - X



Continued Deposition of DAVID ZABRANSKY, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public in and for the District of Columbia.



A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:
ALEX D. TOMASZCZUK, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:
JEFFREY L. HANDWERKER, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004-1206
(202) 942-5000

628

state "The proposed delivery date is dependent upon the existence of an operational repository or an interim storage facility constructed under the act."

A **Yes.**

Q And do you know the source, Mr. Zabransky, of those notations?

A **Not specifically, no.**

Q Did you place those notations on these DCS forms?

A **I did not.**

Q Did I understand your testimony, Mr. Zabransky, to be that the DCSs represented binding commitments by DOE and the affected utility?

A **That is my belief, yes. Approved DCSs.**

Q And per the instructions those DCSs were to be based on, Zabransky Number 4, the instructions. And I want to direct your attention if I can, Mr. Zabransky, to Exhibit 4, the instructions, and in particular the second paragraph on page one.

MS. SULLIVAN: Here. Look at the right exhibit.

A **Second paragraph on page one?**

629

Q Yes.

A **Who should submit?**

Q Yes. And that says "The DCS should be submitted by all purchasers with allocations in the 1991 ACR or subsequent ACRs as appropriate as specified in Article 5.B of the standard contract."

A **That's what it says, yes.**

Q And do I understand that instruction to be that in completing the DCS forms the utilities were to use the information contained in the 1991 ACR, which is Zabransky Exhibit 36?

MS. SULLIVAN: Objection. The document speaks for itself.

A **That's what it says, yes.**

Q Okay. And could you get Exhibit 36 in front of you, Zabransky 36. It's the 1991 ACR.

A **Okay. Okay.**

Q And in Zabransky Exhibit 36 the allocations that are referred to, as I understand the instructions, is that the Table 3.1 that appears at page nine?

A **That's a summary of the allocations, yes.**

630

**Yes. Table 3.1 on page nine.**

Q Yes.

A **Yes.**

Q All right. And so the utility is to use this table and submit its DCS, and once it's approved it's binding, as I understand your testimony?

A **That's my belief, yes.**

Q Can I direct your attention to page one of this Exhibit 36.

A **Yes.**

Q You see the Section 1.1 there towards the bottom?

A **Yes.**

Q And can you read the last two lines there at the bottom of this page one?

A **Beginning with "although"?**

Q Starting with "as specified."

A **"As specified in the standard contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the purchasers."**

Q And my question to you, sir, is given that

631

language, if the ACR is for planning purposes only and the DCS is based on the ACR, how can the DCS be binding?

MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Answer the question to your knowledge.

A **The contracting officer chose to use the ARC when he gave instructions as to how to approve the DCS and entered into a binding commitment.**

Q Was the data in the ACR subject to change?

MS. SULLIVAN: Objection, vague.

A **I'm not sure what you mean.**

Q Were the allocations in the ACRs as reflected, for example, in Table 3.1 at page nine of Zabransky 36 subject to change?

A **If you're asking me did the allocations in ACRs change between ACRs, the answer to that is yes.**

Q So the commitment reflected at the DCSs was subject to change. Would that be a fair statement?

A **No. That upon signature by the contracting officer became a firm commitment for that quantity, even if DOE changed it.**

636

Q Mr. Zabransky, in Exhibit 5, can I direct your attention to page six. Given the department's decision to suspend the DCS approval process in or about February or March of 1997, was there any need for any utility to submit DCS approval forms after that date?
MS. SULLIVAN: Objection, vague. Objection to the extent it calls for a legal conclusion.
**A I don't know that the department ever told utilities not to continue to submit. So whether there was need or not was up to the utility from their perspective.**
Q The Department of Energy did tell utilities in or about March 13th, 1997, that they were -- that it, the Department of Energy, was no longer going to act upon DCS forms. Isn't that true?
**A At that time, yes.**
Q And has that direction changed since March 13th, 1997?
MS. SULLIVAN: Objection, vague.
**A That position has not changed.**
Q And has the department approved any DCS

637

forms submitted after March 13th, 1997?
**A Not to my knowledge.**
Q And you would know if they had, would you not?
**A I would hope I would.**
Q Now, I understood your testimony to be that DOE's current intention is to begin contract performance in 2010?
**A That's DOE's current plans.**
Q And if I could direct your attention to page six of Exhibit 5, do you have that?
**A Yes.**
Q So in interpreting this table, is it fair that year one should now be read to mean year 2010?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
**A That's a way of interpreting this table.**
Q Is there any other way to interpret it?
**A I'm sure there are. I don't know.**
Q Can you tell me what they are?
**A Interpret year one to be any year you want but I don't know how else -- it seems reasonable from**

638

**your statement that year one was the first year of operations.**
Q And your testimony is, as I understand it, that DOE's current intention is to begin performance in 2010?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
**A That's DOE's current plans, are repository plans commence in 2010.**
Q And you would agree this the last APR ACR that was published by DOE, correct?
**A Yes, I would agree with that.**
Q Are you aware of any other guidance, instruction, memoranda or other information provided by DOE to the utilities concerning how to utilize this table and the instructions for purposes of determining when to submit a DCS?
**A No, I'm not.**
Q Do you have an understanding of the term "nonbreach world."
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. And it's also beyond

639

the scope but I'll allow him to answer.
**A I have heard the term used, and I believe I have an understanding of it.**
Q Can you tell me, sir, what your understanding of it is?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. You can answer the question.
**A My understanding is what would have happened had DOE not breached its obligation to begin performance in 1998.**
Q And do you have an understanding, sir, as to what rate DOE would use for acceptance of spent nuclear fuel in the nonbreach world?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. You can answer the question.
**A Had DOE begun performance in '98 as originally anticipated, at an interim storage facility, it would have been the rates in the ACR.**
Q You understand the term "nonbreach world" to assume an interim storage facility?

MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
**A DOE's plans for 1998 performance included, required the use of an interim storage facility.**
Q Did that change at some point in time?
**A Not --**
MS. SULLIVAN: Objection, vague.
**A Not for 1998 performance.**
MR. TOMASZCZUK: I just want to look at my notes.
Q Mr. Zabransky, could you identify for me all of the assumptions on which you relied or do rely in your understanding of the term "nonbreach world."
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Objection as to relevance. You can answer the question.
**A In my understanding it would have been that DOE had performed in accordance with the contract at its facility which I believe would have been in interim storage before a repository and would have been in accordance with the DCSs in the contract. That were approved.**



Q And those approved DCSs were subject to a 20 percent adjustment, right?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. You may answer.
**A The contract allows the purchaser to adjust the DCSs plus or minus 20 percent.**
Q I don't have any further questions at this time, Mr. Zabransky. I'm going to reserve the right to call you back based on some instructions not to answer, number one. And second, based on certain documents which have been designated by the government as privileged as to which we have a dispute with the government. And subject to that right, I want to thank you for your time and cooperation, and as Mr. Oehler has correctly pointed out, we have just gotten some documents as well that we have not had a chance to review prior to the taking of your deposition. I want thank you for your time. Depositions can be tedious and litigation is a tough business. I appreciate your cooperation.
EXAMINATION BY COUNSEL FOR PLAINTIFF
SACRAMENTO MUNICIPAL UTILITY DISTRICT

BY MR. MACDONALD:
Q Mr. Zabransky, good afternoon. My name is Tim Macdonald. We met earlier off the record the last couple today of days. I represent Sacramento Municipal Utility District, another one of the plaintiffs in this litigation. I'll refer to them as SMUD as lots of people do. I assume you've heard that acronym before?
**A Yes, I have.**
Q When you were speaking with Mr. Tomaszczuk he was asking you about assumptions for your view of what would happen in the nonbreach world. Do you recall that testimony?
**A I recollect, yes.**
Q And I believe your testimony was that as one of the assumptions performance would have to be consistent with the contract. Is that correct?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
**A Yes, I guess that's one of my assumptions.**
Q Is another one of your assumptions that performance would have to be consistent with the



statute?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
**A I believe we would have to be consistent with the statute from what I know about legal things, but, yeah.**
Q Mr. Tomaszczuk also asked you a series of questions about communications you had with his collection of clients.
**A Yes.**
Q And I would like to ask you the same question with respect to SMUD. So I think the first question was whether you remember having conversations with SMUD employees while you were at WEPCO about matters relating to performance under the standard contract?
**A I don't recollect a conversation with SMUD employees when I was at WEPCO.**
Q The second question then is while you have been an employee of DOE have you had or do you recollect having conversations with SMUD employees regarding issues related to the performance under the

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC :
COMPANY, MAINE YANKEE ATOMIC :
POWER CO., and CONNECTICUT :
YANKEE ATOMIC POWER CO., : Case No. 98-126C,
Plaintiff, : 98-474C, 98-154C
vs. : (Senior Judge Merrow)
UNITED STATES OF AMERICA, :
Defendant. :

\- - - - - - - - - - - - - - - - x

Washington, D.C.
Thursday, June 6, 2002

Deposition of DAVE ZABRANSKY, Volume II, a witness herein, called for examination by counsel for the Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., commencing at 9:32 a.m., Thursday, June 6, 2002, and the proceedings being taken down by Stenotype by CAPPY HALLOCK, RPR-CRR, and transcribed under her direction.

CONTAINS CONFIDENTIAL INFORMATION
PURSUANT TO THE PROTECTIVE ORDER

Page 229

A. I don't know how to answer that question.
Q. I'm asking what you think.
A. I have no idea what people would do. As many people as there are out there, I don't know what they all think.
Q. What do you think WEPCO would have done?
MR. CRAWFORD: Objection, calls for speculation. Objection, assumes facts not in evidence.
A. I think WEPCO would have done what WEPCO did. They understood the basis for prioritization and acted accordingly. WEPCO didn't like the quantities but WEPCO signed up for the quantities, bought as many as it could as soon as it could.
Q. Didn't WEPCO do that in part because it didn't have confidence that the department was going to be able to accept spent fuel when WEPCO really needed the department to do that?
MR. CRAWFORD: Objection, calls for speculation.
A. I think WEPCO signed up for that for the reason it saw it as a binding commitment, and

Page 230

it was concerned that the department would some day stop approving these documents and wanted them signed before they came to their senses.
Q. I'm asking you to suppose a different world.
A. I can't suppose a different world. I don't know what would have happened and I can't speculate about things I have not thought about.
Q. I'm asking you to think about it right now.
A. I will try.
MR. CRAWFORD: Indulge Mr. Shapiro.
THE WITNESS: I will indulge him to the extent that I can.
Q. If WEPCO had not had a concern that the department would stop approving delivery commitment schedules, if WEPCO didn't have a concern that the department would not be picking up spent fuel at a rate of, let's say, 3,000 metric tons per year from utilities, if it didn't have those concerns, do you think WEPCO would have asked for all of its spent fuel to be picked up as soon as possible?
MR. CRAWFORD: Objection to the extent it assumes facts not in evidence. Objection to

Page 231

the speculation.
A. I don't know what WEPCO would have done. I would not have recommended that WEPCO take such an action.
Q. Take what action?
A. To request that all its spent fuel be picked up immediately.
Q. Why wouldn't you have recommended that?
A. Because it makes no sense either.
Q. Why doesn't it make any sense for a utility to have all of its spent fuel picked up immediately?
A. Assuming our group, and utilities are a group, everybody wanted to go first, and in that idiot fashion no one would go anywhere. It didn't make sense. Everybody had their allocation but it was the world we had to live with. Utilities that didn't buy into that acted differently. We didn't act that way at WEPCO.
Q. I'm not sure you are understanding my hypothetical --
A. That's probably true.
Q. -- So let me try to rephrase and make it simpler.

Page 232

Other than a concern that it will not be able to get the department to pick up its spent fuel at a later time, why would a utility want to have the department come to pick up its spent fuel earlier if the presence of that spent fuel in its pool is not causing that utility any marginal cost?
A. Again, you will have to ask those utilities who did that. I can't speculate what their motivation was. I never could figure out their actions. Ask those utilities. Don't ask me to speculate. I never could figure it out.
Q. So you're saying you don't see a reason why a utility would be anxious to have the Department of Energy pick up its spent fuel early if the utility otherwise had confidence that the department would later come to pick up its spent fuel when the utility needed to have the spent fuel picked up?
MR. CRAWFORD: Objection. Calls for speculation --
Don't speak over me. Wait until I finish. Then you can respond to Mr. Shapiro.
Objection to the extent it calls for speculation.

Go ahead.
A. Again, we are sitting here saying why would someone act that way? The way I acted, I signed a deal. The deal says it works this way. We worked that way. It said there was a line, we got in line.
Q. That's where I'm not sure you understand my hypothetical. You got in line because you were concerned that the department was not going to accommodate everyone in line on a timely basis.
MR. CRAWFORED: Objection to the extent it mischaracterizes the prior testimony.
A. I didn't say that. How do you draw that from what I said? What are you trying to say that I said?
Q. Why were you, and I assume you were talking about WEPCO, why was WEPCO anxious to get in line as early as possible?
A. To get in line? We were in line. You're in line from the basis of discharging fuel, so I'm not sure what you are alluding to.
Q. I thought you said that's the way your understanding was that the system was set up and you got in line?



A. We were in line. You were in line pursuant to being in the contract. You don't get in line, you are in line. You got in line when you signed the contract.
Q. We will move on.
Another thing we covered yesterday, Mr. Zabransky, was the acceptance rates in the Annual Capacity Report, and if you recall, you distinguished between the acceptance rates in documents such as the program plan versus acceptance rates in an Annual Capacity Report. You said one would be -- the one in a program plan would simply be a plan of what the system might be capable of doing, but it was your opinion that the projections in the Annual Capacity Report should reflect what you referred to as dependable performance.
Do you recall that testimony?
MR. CRAWFORD: Objection to the extent it mischaracterizes his prior testimony.
A. I think what I was trying to refer to or trying to state was the fact that when the contracting officer chose a document to bind the government, which I believe they were doing, they should base it on the maximum dependable capacity



not on an engineer's planned capacity, so even though the APR or the ACR was a planning document when it was utilized for the basis of the DCSs, it became a commitment document, and the contracting officer needed to exercise judgment that that was the right amount to commit to. Apparently they did.
Q. Well, you're aware that earlier Annual Capacity Reports used acceptance rates that were consistent with the planning documents that went right up to 3,000 BTU. Are you saying that was ill-advised?
MR. CRAWFORD: Objection to the lack of foundation. Objection in that it calls for speculation. And objection, it may call for a legal conclusion.
A. I'm saying they were never used by the contracting officer for the submittal or approval of DCSs.
Q. Is it your understanding that the department made a decision to reduce the amounts of spent fuel in its projections in the Annual Capacity Reports once those could be used for the purpose of submitting delivery commitment schedules?



MR. CRAWFORD: Objection to the lack of foundation and to the extent it calls for speculation.
A. I was not there. I don't know why they do what they do.
Q. Well, for the 1995 Annual Capacity Report, is it your understanding that a lower acceptance rate was put in that report in order to limit the government's commitments to utilities?
MR. CRAWFORD: Objection, asked and answered. Objection, lack of foundation. Objection, speculation.
A. Again, as I stated yesterday, the numbers in the '95 report were carried over from the previous report, and I'm not aware of any discussion about changing them.
Q. Other than yourself, are you aware of anyone else at DOE that shares your view that the Annual Capacity Report should reflect what you term as dependable performance projections as opposed to projections consistent with the department's current plans for spent fuel receiving facilities?
MR. CRAWFORD: Objection to the extent it mischaracterizes the prior testimony.

Page 237

A. I have never had that discussion at DOE.
Q. Let me turn to something that I don't think we discussed specifically yesterday, but I believe was discussed when you were deposed previously by other spent fuel plaintiffs.
Do you recall testimony to the effect that it was your understanding that the department does not have an obligation to accept spent fuel from a utility unless that utility has an approved acceptance delivery schedule?
MR. CRAWFORD: Objection, vague.
A. I guess I do. I'm not sure -- I haven't reviewed my testimony but that's not inconsistent with my belief.
Q. That's consistent with your understanding, that the department does not have an obligation to pick up spent fuel unless the utility has an approved delivery schedule for that amount of spent fuel?
MR. CRAWFORD: I will object to that. That calls for a legal conclusion.
A. That's my understanding.
Q. How does that understanding comport with Article 4B1 of the Standard Contract?

Page 238

Article 4 talks about the parties' responsibilities, 4B1 the Department of Energy's responsibility. Paragraph 1 says that the DOE shall accept title and dispose of all of the spent fuel that a utility has. Isn't that what that paragraph is referring to?
A. That's correct.
MR. CRAWFORD: Objection to the extent that it calls for a legal conclusion.
Q. How do you reconcile that paragraph with your understanding that DOE doesn't have an obligation unless there is an approved delivery commitment schedule?
A. To the extent that it calls for a legal conclusion, and I guess to clarify the statement, not an obligation on that time frame. An overall obligation, yes, schedule to be determined.
Q. Suppose a utility never gets an approved delivery commitment schedule for its spent fuel? Is it your understanding that the department never has an obligation to pick up that utility's spent fuel?
MR. CRAWFORD: Objection to the extent it assumes facts not in evidence. Objection to

Page 239

the vagueness of it. Objection to the extent it calls for speculation.
A. To the extent they never called for delivery, that's correct. The obligation to pick it up is there, the schedule has never been determined.
Q. Suppose the utility keeps submitting delivery commitment schedules and the department does not like those schedules and keeps denying them?
MR. CRAWFORD: Objection to the street extent it calls for a legal conclusion.
A. It can pursue its remedies under the clause of the contract.
Q. But absent getting relief there, you are saying it is your understanding that the department does not have an obligation to pick up that utility's spent fuel?
A. No.
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion. Objection, it assumes facts not in evidence. Objection, calls for speculation.
A. Again, I said the schedule has not been agreed to.

Page 240

Q. I'm not sure, what does it mean to have an obligation to do something if a party never has to do it?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion. Objection to the extent it assumes facts not in evidence. Objection to the extent it calls for speculation.
A. Both parties have obligations, and the utility has an obligation to submit and get a DCS under the contract, so the DOE's obligation is to get rid of the spent fuel per the schedule as determined by the parties. The process is laid out in the contract.
Q. Suppose the utility submits a proposed delivery commitment schedule, the contracting officer disapproved it. The utility can resubmit it, the contracting officer can disapprove it again.
A. Yes.
Q. The parties will negotiate those are all steps in the delivery commitment schedule process --
MR. CRAWFORD: You all are walking all over each other. I don't know when a question is ending and when the answer is being given. Both