IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY, ) CONNECTICUT YANKEE ATOMIC POWER )Case Nos.: COMPANY, and MAINE YANKEE ATOMIC ) 98-126C POWER COMPANY, ) 98-154C Plaintiffs, ) 98-474C ) THE UNITED STATES, ) Defendant. )

Courtroom 5
National Courts Building
717 Madison Place, N.W.
Washington, D.C.

Thursday, August 5, 2004
Volume 18

The parties met, pursuant to the notice of the Judge, at 10:00 a.m.

BEFORE: THE HONORABLE JAMES F. MEROW



APPEARANCES:

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY and MAINE YANKEE ATOMIC POWER COMPANY:
JERRY STOUCK, ESQ.
ROBERT SHAPIRO, ESQ.
PETER J. SKALABAN, JR., ESQ.
VIVEK K. HATTI, ESQ
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005
(202) 898-5800

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY:
MERRILL J. ATKINS, ESQ.
Assisting General Counsel
19 Midstate Drive
Auburn, Massachusetts 01560
(508) 721-3042

(Appearances Continued on the Next Page.)



APPEARANCES CONTINUED:

ON BEHALF OF MAINE YANKEE ATOMIC POWER COMPANY:
JOSEPH D. FAY, ESQ.
General Counsel
Maine Yankee
321 Old Ferry Road
Wiscasset, Maine 04578
(207) 882-5603

On Behalf of the Defendant:
HAROLD LESTER, JR., ESQ.
JOHN EKMAN, ESQ.
MARIAN E. SULLIVAN, ESQ.
HEIDE L. HERRMANN, ESQ.
R. ALAN MILLER, ESQ.
KEVIN B. CRAWFORD, ESQ.
RUSSELL SHULTIS, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7562

***Index appears at end of transcript***



P R O C E E D I N G S

\- - - - - -

MS. SULLIVAN: Good morning, Your Honor. We're ready to call our next witness unless there's anything we need to handle preliminarily.

THE COURT: Okay.

MS. SULLIVAN: The government calls David Zabransky.

Whereupon--

DAVID ZABRANSKY

a witness, called for examination, having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. SULLIVAN:

Q. Good morning, Mr. Zabransky. Are you currently employed at the Department of Energy?

A. Yes, I am.

Q. And to what office within the Department of Energy are you currently assigned?

A. I'm in the Office of Civilian Radioactive Waste Management, and I work in the Office of Systems Analysis and Strategy Development within that office.

Q. What are your current responsibilities?

A. I report to Chris Kouts, and I work on issues related to the standard contract, other

Page 4151

for the decision to stop processing was based upon a belief that the DCSes were binding commitments, and we should not enter into binding commitments that we know we couldn't meet at that point in time.

Q. And in fact, not only did the Department stop approving those delivery commitment schedules and not even start processing final delivery schedules because of its desire not to commit itself, but on the advice of counsel, you actually went back and voided some previously approved delivery commitment schedules, isn't that correct?

A. There were a number of documents that were in the process of being approved, but had never been transmitted to the utilities. So these were documents that because, again, all correspondence goes through a review and legal review, was part of that review, that were in the system to be processed, that I had signed off on and sent on to the contracting officer, and that the contracting officer, in some cases, had signed off on, but had never been transmitted.

And prior to the final transmittal to the utilities, the review was, it was concluded that those should not be processed, and they were voided.

Q. But nevertheless, if I understand what

Page 4152

you've just said correctly, there were indeed some delivery commitment schedules submitted by utilities that reached not only your approval as contracting officer's technical representative, but the final sign-off by the contracting officer, and yours might have been the final sign-off in some occasions, yet nevertheless, those final approvals were voided?

A. Well, again, my approval as COTR would have just merely advised the contracting officer the form was ready for her to approve, so it wouldn't have been final in any case if I had signed off on it.

There were a few that Beth Tomasoni, I believe was the CO at the time, signed off on, that prior to transmittal, she rescinded.

Q. And you would not have taken the action to void those except under the direction of counsel, correct?

A. Counsel provided us advice that it would no longer be appropriate to keep signing those documents, yes.

Q. And that's why you voided those?

A. Yes.

Q. And although counsel instructed you to void your signature on some of those approved delivery commitment schedules, isn't it correct that you would

Page 4153

not presume that once you had received an approved document, that it could be voided unilaterally by the Department, isn't that correct?

MS. SULLIVAN: Objection, mischaracterizes the witness' previous testimony.

THE COURT: When you say, when the utility had received it or?

BY MR. SHAPIRO:

Q. No, I'm talking about simply, once the Department, once Mr. Zabransky and the contracting officer have approved it, that Mr. Zabransky's belief that, is that, but for the advice of counsel, that the Department was not free simply to void those unilaterally?

A. But, again, the Department never communicated its approval. The documents never left the Department. They were, the ones that the CO voided were voided before they were ever transmitted. The approval never really took place from that perspective.

Q. But you would not presume once you had received an approved document that it could be voided unilaterally?

THE COURT: I don't get the "received an approved document."

Page 4154

THE WITNESS: I'm not sure who's receiving what in your question.

THE COURT: What do you mean by "received an approved document"?

BY MR. SHAPIRO:

Q. If you get back from the contracting officer an approved document, an approved delivery commitment schedule, you wouldn't think that you could simply void that, would you?

A. I didn't void her signature. She voided her signature.

Q. Didn't you void some delivery commitment schedules yourself, some approved delivery commitment schedules yourself?

A. I only voided my signature, to my knowledge.

Q. And did your signature appear on the approved delivery commitment schedule?

A. Yes.

Q. And you voided that?

A. The contracting officer decided not to transmit and execute the final approved DCS, and we voided them, yes.

Q. And you voided your own signature as well?

A. I did, yes.

Page 4155

THE COURT: Does any of this relate to a delivery commitment schedule binding the Plaintiffs, or is this –

MR. SHAPIRO: No, it goes, Your Honor, to Mr. Zabransky's testimony that he thinks that the delivery commitment schedules have some significance, that they were binding, he thought, when they were at WEPCO, and they're important at DOE. But it would seem that the Department also feels that they can void them at the Department's whim, and that they're otherwise subject to counsel's direction to the Department not to grant them at all. That's the line of questioning.

THE COURT: I just wanted to make sure you weren't talking about Yankee Atomic or Connecticut Yankee or Maine Yankee DCS.

MR. SHAPIRO: I don't believe any of those were voided.

THE WITNESS: And, again, I think you mischaracterized what I said. The Department didn't void any DCSes that were approved and sent out and received by utilities. It recognized that once they received them, they were approved, and they had those approved DCSes. It ceased sending them out. It ceased the approval process in

Page 4156

mid-process. Transmittal letters transmitting them to the utilities were never signed, and they were never sent out by the contracting officer.

BY MR. SHAPIRO:

Q. Now, approved delivery commitment schedules are of limited value, aren't they? For example, despite having approved delivery commitment schedules when you were at WEPCO, you didn't rely on those approved delivery commitment schedules as a solution for WEPCO's near term fuel storage needs, did you?

A. When I was at WEPCO and we were contemplating needing additional storage in the '92 time frame when those schedules came up, I think it was our belief that there was some uncertainty as to whether the Department would actually come forth and perform in 1998. And as a result, we built into our thinking for storage at Point Beach, that we needed to have reliance to keep the plan operating on our own ability to store the spent fuel. And that the commitments that we have from the Department of Energy, we were glad we happened to sign them, because we thought there might be some recourse someday, but we weren't going to rely on them to put the plant in jeopardy.

Page 4157

So, again, we relied on them in the effect they were a contractual commitment, but we also made sure we had the capability to maintain the plant in operation in case the Department didn't follow through or wasn't able to follow through on that commitment.

Q. So the answer to my question is, yes, WEPCO did not rely on its approved delivery commitment schedules to provide for its, a solution for its near term spent fuel storage needs?

A. And I think that sort of mischaracterized what I said, is we went and got off as soon as we could as many commitments as we could, in case they would, for some reason, stop processing them, so we had some recourse, pursuant to the contract. But, yes, we also built facilities that made sure that, in case something happened, we weren't putting our facilities in jeopardy.

Q. Well, the reason I'm asking the question more than once is I'm not sure you're answering my question. You're concerned about putting in a caveat that I don't understand, Mr. Zabransky. So the bottom line is that, notwithstanding the fact that WEPCO had approved delivery commitment schedules and maybe had some recourse down the line,

Page 4158

WEPCO didn't rely on those to provide for its near term spent fuel storage needs, correct?

A. And I think, like I said, the answer is, yes, it has no – as would anybody else with a valuable asset that needed to make it operate, continue to operate, wouldn't put it in jeopardy solely on something beyond its control.

Q. And isn't it true that when DOE approved delivery commitment schedules, that it conditioned the approvals on the existence of a repository?

A. I think there was a point in time where DOE did that. The original DCSes in the early years, and I don't know when it changed, did not contain that conditioned statement.

Q. Well, what about the ones at WEPCO?

A. Those –

Q. That was one of the reasons you didn't rely on those is because DOE conditioned those, isn't that correct?

A. I don't believe those contained any kind of conditional statement.

Q. But others did contain conditions?

A. At some point, that was the Department's policy or was advised a statement saying these were conditioned upon the existence of the facility

Page 4159

constructed under the Act, yes.
Q. Now, for the currently approved delivery commitment schedules, the ones that, before the last week's ACR and new delivery commitment schedule instructions came out, isn't it true that you don't see any good use for the information on those approved delivery commitment schedules because the Department's current plan for its waste management system uses different acceptance rates than those upon which the earlier delivery commitment schedules were based?
A. I think your statement is partially correct. It's true that our current plans in the ACR that we just put out last week are for greater acceptance rates beginning in 2010 through 2019 then in the first 10 years of the previous ACR, but it's also correct that some of the information provided by the utilities may no longer be valid, and they may have other plans for what they wish to have done beginning in 2010.
Q. So the bottom line, again, the real crux of my question is that you wouldn't see any good use for the information on the currently approved delivery commitment schedules?
A. Those supported operations beginning in

Page 4160

1998. I don't think they're valid for use supporting operations in 2010.
Q. And it's your belief that DOE has to renegotiate those delivery commitment schedules, isn't that correct?
MS. SULLIVAN: Objection, vague. Which delivery commitment schedules are we talking about?
MR. SHAPIRO: The previously approved delivery commitment schedules.
THE WITNESS: I think the disposition of those needs to be resolved. We haven't resolved in the Department how to address that yet, but the DCSes that would be coming in under the APR that we issued last week for 2010 would be for the same fuel that were covered by the DCSes that came in previously. So we'd have to resolve that with the utilities, yes.
THE COURT: Before I forget it, do you agree with Mr. Pollog that the DCSes, well, the allocation under the capacity report is strictly for an allocation of quantity and that you can, the utility can substitute any fuel, they can list any fuel?
THE WITNESS: On the DCS?
THE COURT: On the DCS.
THE WITNESS: Yeah, I believe, I agree with

Page 4161

Tom, and that was a position I held when I was at the utility and which DOE has put forth, that the age of the fuel, the allocation really gives you a place in line, a ticket. And when it comes time to proffer your DCS and actually deliver fuel, it's any fuel that meets the criteria under the contract.
THE COURT: I guess I was kind of misled. On page 15 of Defendant's Exhibit 7, which is the contract, in article, I think it was Article V – no, Article VI.
THE WITNESS: Article VI, sir?
THE COURT: Article VI, B1(a).
THE WITNESS: B(1)(a)?
THE COURT: B(1)(a), it says, "DOE would first accept from purchaser the oldest SNF and/or HLW for disposal in the view of facilities accepted otherwise provided in paragraph B, D and E."
THE WITNESS: Yes.
THE COURT: And B, D and E talk about exchanges or things like that, so I assume the contract required the utility to deliver the oldest fuel they had first.
THE WITNESS: I think this is another case where the contracting officer issued in her directions the guidance that utilities were free to

Page 4162

submit, or free to put forth any spent fuel they had that met the criteria as spent fuel under the contract and, again, explained that the allocation provision really made sense. And that it gave you a place in line, but then let you manage your fuel inventories as you saw appropriate, so that was another clarification that was also, I believe, in the instruction transmittal letters from the DCSes.
BY MR. SHAPIRO:
Q. I want to get one more concern with the delivery commitment schedules, Mr. Zabransky. Under the contract, utilities have the express right to vary the quantities of spent fuel and high-level waste that DOE would pick up by 20 percent from the amounts on those approved delivery commitment schedules at many point before issuance of the final delivery schedule, isn't that correct?
A. I believe that's correct, yes.
Q. But if everybody adjusts their allocation upward by 20 percent, so that the quantity to be accepted is more than the total acceptance rate that the Department has planned for that year, you don't know how the Department would accommodate that contract work, do you?

Page 4219

can't plan for it."
Q. Thank you. Mr. Zabransky, do you have an understanding that utility discharges earn a utility, an allocation, an acceptance allocation as set forth in – let me back up.
Do you understand that the acceptance priority ranking issued by DOE contains discharges reported by utilities?
A. Yes, the APR is a listing of all the discharge reported by utilities to the Department.
Q. And do you understand that those discharges earn utilities allocations in the acceptance ranking?
A. The discharges in the APR form is the basis for the allocations in the ACR, that's correct.
Q. And could those discharges that earn a utility an allocation include failed fuel?
A. Yes, I'm sure they do.
Q. And when will a determination be made as to whether failed fuel needs special handling?
A. Well, after the utility requests the Department to review a specific instance of a failed fuel, we have, I think, pursuant to the contract, 60 days to make that determination.
Q. Could we pull up Defendant's Exhibit 30.001? Mr. Zabransky, I'll represent to you that

Page 4220

Defendant's Exhibit 30.001 is a transmittal letter to Mr. Buchheit from Mr. Detmer, the contracting officer, in March of 1992, forwarding what are referred to as the delivery commitment schedules. Do you see that on the screen? I don't have copies of this document.
A. Yes, I'm looking at it.
Q. Could we go to the third page of the instructions, which is the fifth page of the document, and could you highlight paragraph H, please? Mr. Zabransky, could you read that excerpt from the DCS instructions, please?
A. Yes. "Since the DCS does not require the identification of specific fuel to be delivered, each DCS is assumed to be for standard fuel, Class S1 or S2 as defined in Appendix E of the standard contract. An approved DCS should not be interpreted as a commitment by DOE to accept other than standard fuel. The standard contract makes specific provisions for delivery of other than standard fuel. If a purchaser intends to deliver other than standard fuel, the purchaser must submit proposed handling/shipping procedures to DOE for evaluation and confirmation as to the technical feasibility of accepting the delivery on the schedule in the

Page 4221

approved DCS. Submittal of these proposed handling/shipping procedures is not required until after the DCS has been approved. If the acceptance of other than standard fuel cannot be accommodated, the purchaser has the option to deliver standard fuel on the schedule in the approved DCS or to exchange the approved DCS with another purchaser, provided contractual time limitations can be met."
Q. Mr. Zabransky, is the portion of the DCS instructions that you just read, is that your understanding as to where the contracting officer communicated the assumption that the DCSes would cover standard fuel?
A. That's what I was referring to when I testified earlier, yes.
Q. Thank you. And could we pull up Plaintiffs' – excuse me, Defendant's Exhibit 7, which is the Yankee Atomic standard contract? Could we go to page 12 of this document? Do you have that in front of you, Mr. Zabransky?
A. I have it on the screen, yes.
Q. Could you highlight the exchanges provision at the bottom there, please? I want to clear up some confusion about the Oldest Fuel First. Could you

Page 4222

read the first sentence of that provision under exchanges?
A. Yes. "Exchanges, Purchaser shall have the right to determine which SNF and/or HLW is delivered to DOE, provided, however, that the purchaser shall comply with the requirements of this contract."
Q. Mr. Zabransky, is it your understanding that this sentence is what gives utilities the right to designate specific fuel it wishes to deliver to DOE outside the Oldest Fuel First queue?
A. Yes, this is my – my understanding is this is what was relied upon by the contracting officer when it gave the instructions that utilities could do that.
Q. Could we go to page 11? Mr. Shapiro also asked you about the provision in the standard contract that allows a purchaser to adjust the quantities of spent nuclear fuel and HLW plus or minus 20 percent in the delivery schedule, up to two months. Do you remember that testimony?
A. Yes, I do.
Q. And is that provision of the contract paragraph number two here on this page?
A. Yes, it's contained in paragraph two.
Q. Do you understand that that adjustment

occurs after the approval of a DCS? Maybe we need to go back.

A. Yeah, I need to go back to the previous paragraph. It follows the first paragraph, which has the submittal of the DCS and talks about revised schedules. And, yes, it would follow that it's after the approval of the DCS.

Q. So to map out the process, is it your understanding that a utility first submits a DCS?

A. That's correct.

Q. And then DOE will review that DCS and approve or disapprove it?

A. Correct.

THE COURT: Going back to –

MS. SULLIVAN: Pardon me.

THE COURT: I was just going to go back to the exchanges again. If the source of the right to deliver other than Oldest Fuel First is considered an exchange, then I assume it has to be approved by DOE. It does say that any – or is it the approval will only apply to purchaser exchanges?

THE WITNESS: Bear with me, I have to go back.

THE COURT: It's on page 12 of this document.



MS. SULLIVAN: The exchange provision.

THE WITNESS: The contracting officer's letter that was sent out in '92 and the guidance given, when I was outside, I took that to mean I could do my own fuel management internally for my own purposes.

But the next sentence that goes to the approval deals with the exchange of DCSes between purchasers. So DOE's guidance was that the first type of exchange of different fuels that are in the allocation wouldn't require approval.

THE COURT: Maybe DOE is giving a blanket approval for that type of exchange.

THE WITNESS: That's the way I took it, yes.

THE COURT: Go ahead.

BY MS. SULLIVAN:

Q. No, no, is that – let's go back to the previous page, page 11, talking about the 20 percent. So let's assume that a purchaser has an approved DCS.

A. Yes.

Q. Then pursuant to provision B2 on that, on page 11 of the contract, purchaser can adjust the quantities or the delivery schedule, is that your understanding?



A. Yes, plus or minus 20 percent in the schedule up to two months.

Q. Is it then your understanding that the utility is to submit an FDS?

A. That would be the next step in the process.

Q. Okay. And is the FDS subject to DOE's review and approval?

A. Yes, it would be.

Q. To your knowledge, has anyone with an approved DCS notified DOE that it was going to adjust, by two months, its delivery schedule, or by 20 percent, the delivery amount?

A. Not that I'm aware of.

Q. Have you ever had to address whether DOE has to approve an FDS that has added 20 percent, regardless of DOE's circumstances or capacity?

A. No, we have not had to address that.

Q. Once a utility submits such a request, will DOE's response have to go through a series of reviews within DOE?

A. The FDS will have to go through series of reviews in DOE, yes.

Q. Has any such review process ever occurred with regard to the 20 percent adjustment provision?

A. No, it hasn't.



Q. Do you know what will be the result of that, what will result from that review?

A. No, I don't.

Q. Mr. Zabransky, you've talked, both in your direct testimony and on cross-examination, about a contract amendment with regard to multi-element sealed canisters. Do you foresee a unilateral amendment by DOE?

A. When you say, "unilateral," I foresee that would be a modification that the parties would negotiate and agree and enter into through a bilateral contract change.

Q. And do you expect that DOE will seek to negotiate terms that it will benefit from, in response to proposed contract amendments?

A. It's been my understanding that, yes, DOE would look to other provisions of the contract that it finds to be difficult, such as some of the scheduling provisions, and look for some relief there, in return for the agreement to accept the additional burden of multi-element sealed canisters.

Q. I believe you testified that a facility might be built at the repository in which DOE could open sealed canisters. Was that your testimony?

A. I think I testified that I'm aware that the

CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 23rd day of October, 2006, a copy of foregoing "DEFENDANT'S NOTICE OF FILING OF ITS OBJECTIONS TO PLAINTIFF'S DESIGNATIONS OF DEPOSITION AND TRIAL TESTIMONY AND ITS COUNTER-DESIGNATIONS OF DEPOSITION AND TRIAL TESTIMONY," was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Marian E. Sullivan