**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
(Electronically Filed on February 9, 2007)

| | |
|---|---|
| **NORTHERN STATES POWER COMPANY,**<br><br>Plaintiff,<br><br>v.<br><br>**THE UNITED STATES,**<br><br>Defendant. | No. 98-484C<br>(Senior Judge Wiese) |

**NORTHERN STATES POWER COMPANY'S POST-TRIAL BRIEF**


Alex D. Tomaszczuk
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7940
(703) 770-7901 (fax)

Counsel of Record for Plaintiff
Northern States Power Company

*Of Counsel:*

Jay E. Silberg
Daniel S. Herzfeld
Jack Y. Chu
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
2300 N Street, N.W.
Washington, D.C. 20037
(202) 663-8000
(202) 663-8007 (fax)

Kerry C. Koep
**XCEL ENERGY**
414 Nicollet Mall, 5th Floor
Minneapolis, MN 55401
(612) 215-4583
(612) 215-4544


February 9, 2007

**TABLE OF CONTENTS**


TABLE OF AUTHORITIES ........ v

I. INTRODUCTION ........ 1

II. FINDINGS OF FACT ........ 6

A. The Nuclear Waste Policy Act Is Enacted To Codify The Federal Government's Longstanding Policy To Dispose Of Spent Nuclear Fuel And To Provide A Firm Schedule For Disposing Of The Waste ........ 6

B. NSP's Three Standard Contracts And The Expectations At The Time The Contracts Were Signed ........ 8

1. NSP's Three Contracts And Its Nuclear Plants ........ 10

2. Both Parties To The Contracts Expected DOE To Perform At A Rate Sufficient To Remove The Need For Utilities To Acquire Additional Storage Capacity After 1998 And To Begin To Remove The Backlog ........ 12

C. NSP Monitors DOE's Program And Recognizes That Based On DOE's Projected Delay NSP Will Need To Provide Storage Through The End Of The Life Of The Plants As Licensed By NRC ........ 15

D. NSP Decides To Use Dry Storage Technology To Meet Its Need to Provide Storage Until The End Of Life Of The Plants ........ 19

1. NSP Evaluates Whether To Use Dry Cask Storage Or Rod Consolidation To Provide Storage Through The End Of The Life Of Plants ........ 20

2. NSP Never Seriously Considers Further Reracking Because It Would Not Have Met NSP's Needs To Provide Storage Through The End Of The Life Of Prairie Island's NRC Licenses ........ 23

3. NSP Chooses The Transnuclear 40 Assembly Dry Storage Cask As The Method To Store SNF ........ 27

E. The Certificate of Need Proceedings Before The Minnesota Public Utilities Commission And Appeal To The Minnesota Court of Appeals ........ 28

1. NSP Prepares And Submits An Application For A Certificate Of Need To Increase Storage Capacity At Prairie Island ........ 28

2. The PUC Considers NSP's Application For A Certificate Of Need ........ 31

3. The PUC Decision Is Appealed And Reversed By the Minnesota Court Of Appeals ........ 32

4. During the PUC Proceedings, NSP And The Minnesota Department of Public Service Seek Assurance From DOE Regarding Performance, But Instead DOE States It Has No Obligation To Perform By 1998 Even As It Sends Out Its 1991 ACR ........ 33

F. The 1994 Prairie Island Legislation ........ 37

G. NSP Incurs Costs By Constructing The ISFSI At Prairie Island And Purchasing And Loading Casks ........ 41

H. NSP Pursues Private Fuel Storage And An Alternate Storage Site In Goodhue County, Minnesota ........ 44

1. NSP And Other Utilities Succeed In Licensing Private Fuel Storage Where DOE Failed To Pursue An MRS ........ 44

2. NSP Incurs Costs In Attempting To Site An Alternative Dry Storage Facility In Goodhue County ........ 48

I. The Government Breaches The Standard Contracts In 1998 And, To Date, Has Not Yet Begun Performance ........ 49

1. The Government Renews Its Statement That It Has No Obligation To Perform Beginning In 1998 ........ 49

2. DOE's DCS Process Through The Prism Of Its Expected Non-Performance ........ 50

J. The 2003 Legislation And The Monticello ISFSI ........ 53

1. NSP Incurred Costs Complying With The Biomass Mandate ........ 54

2. NSP Incurred Costs Complying With The Mandate To Pay Into And Manage The Renewable Development Fund ........ 55

3. NSP Incurred Costs Complying With The Settlement Agreement With The Mdewakanton Dakota Tribe at Prairie Island To Lift The 17 Cask Limitation ........ 57

K. NSP Pursues And Receives A Certificate Of Need To Build A Dry Storage Facility At The Monticello Plant ........ 58

L. NSP Incurred Actual Cost Of Capital By Financing Its Mitigation Costs ........ 60

III. CONCLUSIONS OF LAW ........ 61

A. The Standard Of Review For Mitigation Costs For Breach Of Contract Damages.......... 61

1. *Indiana Michigan III* Established Mitigation As The Paradigm for Determining Costs For Past Damages In A Partial Breach Case........ 62

2. NSP's Damages Were Foreseeable........ 63

3. NSP Need Not Prove Causation Based On The Self-Serving "But For" Model Of Causation Contrived By The Government........ 64

B. NSP's Incurred Costs In Licensing And Constructing On-Site Dry Storage Facilities Were Caused By The Government's Breach And Foreseeable........ 67

1. NSP Properly Mitigated The Government's Breach By Licensing And Constructing A Dry Storage Facility And Loading Casks At The Prairie Island Plant........ 67

2. NSP Properly Mitigated Its Damages By Beginning To Plan For The Licensing And Construction Of A Dry Storage Facility At The Monticello Plant........ 71

C. NSP's Incurred Costs In Pursuing Off-Site Dry Storage Through Private Fuel Storage Was Caused By The Government's Breach And Was Foreseeable Or Actually Foreseen........ 72

D. NSP Reasonably Incurred Mitigation Costs Regarding The Mandates, Which Were Caused By The Government's Breach And Were Foreseeable Or Actually Foreseen........ 76

1. In A Heavily Regulated Environment, Actions Of Regulatory Bodies Are Foreseeable........ 78

a. The Minnesota Mandates Are Equivalent To Other Forms Of Taxation Or Rate-Setting........ 80

b. It Was Foreseeable That Breach Of A Contract Born Of Political Action Would Result In Political Consequences........ 81

c. The Need To Investigate Alternative Sites Was Foreseeable........ 81

d. Assistance Payments To The Mdewakanton Dakota Tribe Were Foreseeable Or Actually Foreseen........ 82

2. The Government's Breach And Long Term Expected Non-Performance Caused NSP To Mitigate Its Damages By Complying With The Mandates .............. 84

E. The Government Failed To Show That NSP's Mitigation Efforts Were Unreasonable And, Therefore, Its Asserted Offsets Are Improper ................................. 87

1. The Federal Circuit Did Not Create A Per Se Cut-Off Of 1994 To Recover Mitigation Costs In SNF Cases ................................................................... 87

2. The Government Should Not Receive An Offset For Incremental Labor Costs ........ 89

3. Any Offsets Based On What DOE Might Do When It Picks Up NSP's SNF In The Future Are Speculative............................................................................ 90

F. The Parties Understood That DOE Would Perform At A Rate To Avoid Additional At-Reactor Storage After 1998 And To Begin Reducing the Backlog Of SNF, Which Is A 3,000 MTU Steady-State Rate......................................... 92

1. The DCS Process Did Not Create Binding Commitments ........................................ 93

2. The Parties Expected Contract Performance At A 3,000 MTU Steady-State Rate After A Five Year Ramp-Up ........................................................ 96

G. NSP Should Receive Its Costs of Capital ......................................................................... 98

IV. CONCLUSION............................................................................................................. 100

# TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Brennan*,
952 F.2d 1346 (Fed. Cir. 1991) ........................................................ 66

*Am-Pro Protective Agency, Inc. v. United States*,
281 F.3d 1234 (Fed Cir. 2004)........................................................95

*Baltimore Gas & Elect. Co. v. NRDC, Inc.*,
462 U.S. 87 (1983)........................................................72

*Bigelow v. RKO Radio Pictures, Inc.*,
327 U.S. 251 (1946)........................................................71

*Bluebonnet Sav. Bank, FSB v. United States*,
266 F.3d 1348 (Fed. Cir. 2001)........................................................ 74, 78

*Brandon & Tibbs v. George Kevorkian Accountancy Corp.*,
277 Cal. Rptr. 40 (Cal. Ct. App. 1990)........................................................77

*Cal. Fed. Bank, FSB v. United States*,
395 F.3d 1263 (Fed. Cir. 2005), *cert. denied*, 126 S. Ct. 344 (2005)............... 3, 65, 66, 75, 85

*Centex Corp. v. United States*,
395 F.3d 1283 (Fed. Cir. 2005)........................................................95, 98

*Centex Corp. v. United States*,
55 Fed. Cl. 381 (2003)........................................................98

*Citizens Fed. Bank v. United States*,
No. 05-5173, 2007 WL 162820 (Fed. Cir. Jan. 24, 2007)........................................... 2, 64, 80

*Citizens Fed. Bank, FSB v. United States*,
59 Fed. Cl. 507 (2004)........................................................ 80

*Commonwealth Edison Co. v. United States*,
271 F.3d 1327 (Fed. Cir. 2001) (*en banc*) ........................................................ 78

*Consumers Energy Co. v. United States*,
65 Fed. Cl. 364 (2005)........................................................94

*Duquense Light Co. v. Barasch*,
488 U.S. 299 (1989)........................................................ 79

*Energy Capital Corp. v. United States*,
302 F.3d 1314 (Fed. Cir. 2002)........................................................ 2, 61

*Entergy Nuclear Generation Co. v. United States*,
64 Fed. Cl. 336 (2005) ....................................................................................94

*Essex Electro Eng'rs, Inc. v. Danzig*,
224 F.3d 1283 (Fed. Cir. 2000)...........................................................................95

*First Heights Bank, FSB v. United States*,
422 F.3d 1311 (Fed. Cir. 2005)........................................................................ 66, 87

*Florida Power & Light Co. v. Westinghouse Elec. Corp.*,
826 F.2d 239 (4th Cir. 1987) ........................................................................ 6, 81

*Gardner Displays Co. v. United States*,
346 F.2d 585 (Ct. Cl. 1965) .......................................................................63, 64

*Hendler v. United States*,
175 F.3d 1374 (Fed. Cir. 1999)........................................................................ 74

*Home Savings of Am., FSB v. United States*,
399 F.3d 1341 (Fed. Cir. 2005)...........................................................................63

*In re Application for Certificate of Need for Construction of an Independent Spent Fuel Storage Installation*,
501 N.W.2d 638 (Minn. Ct. App. 1993) ("*In re ISFSI*")...................................31, 32, 79

*In re Kellett Aircraft Corp.*,
186 F.2d 197 (3d Cir. 1950)...............................................................................63

*Indiana Mich. Power Co. v. Dep't of Energy*,
88 F.3d 1272 (D.C. Cir. 1996) ("*Indiana Mich. I*")........................................8, 9, 50

*Indiana Mich. Power Co. v. United States*,
57 Fed. Cl. 88 (2003) ("*Indiana Mich. II*"), *appeal dismissed*,
112 Fed. Appx. 37 (Fed. Cir. 2004).....................................................93, 96, 97

*Indiana Mich. Power Co. v. United States*,
422 F.3d 1369 (Fed. Cir. 2005) ("*Indiana Mich. III*")........................................ *passim*

*Jackson v. Metropolitan Edison Co.*,
419 U.S. 345 (1974)...........................................................................................78

*Koby v. United States*,
53 Fed. Cl. 493 (2002) ....................................................................................63, 69

*Landmark Land Co. v. FDIC*,
256 F.3d 1365 (Fed. Cir. 2001)...........................................................................74

*LaSalle Talman Bank v. United States*,
317 F.3d 1363 (Fed. Cir. 2003) ....................98, 99

*Locke v. United States*,
283 F.2d 521 (Ct. Cl. 1960) ....................65, 71

*Maine Yankee Atomic Power Co. v. United States*,
225 F.3d 1336 (Fed. Cir. 2000)....................1, 8, 96

*Maine Yankee Atomic Power Co. v. United States*,
44 Fed. Cl. 372 (1999), *aff'd*, 271 F.3d 1357 (Fed. Cir. 2001)....................78

*Minnesota v. United States NRC*,
602 F.2d 412 (D.C. Cir. 1979) ....................79

*Northern Helex Co. v. United States*,
524 F.2d 707 (Ct. Cl. 1975) ....................62

*Northern States Power Co. v. United States Dep't of Energy*,
128 F.3d 754 (D.C. Cir. 1997) ("*Northern States I*") ....................50

*Northern States Power Co. v. United States*,
224 F.3d 1361 (Fed. Cir. 2000) ("*Northern States II*") ....................1, 9

*NRDC, Inc. v. United States NRC*,
685 F.2d 459 (D.C. Cir. 1982), *rev'd on other grounds sub nom.*
*Baltimore Gas & Elect. Co. v. NRDC, Inc.*, 462 U.S. 87 (1983)....................72

*Old Stone Corp. v. United States*,
450 F.3d 1360 (Fed. Cir. 2006),
*petition for cert. filed*, 75 U.S.L.W. 3333 (U.S. Dec. 14, 2006) (No. 06-837)....................2, 63, 78

*Pacific Gas & Elec. Co. v. United States*,
73 Fed. Cl. 333 (2006) ....................64, 65, 90, 91

*Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n*,
461 U.S. 190 (1983)....................79, 80

*PSEG Nuclear, LLC v. United States*,
465 F.3d 1343 (Fed. Cir. 2006)....................9

*Robinson v. United States*,
305 F.3d 1330 (Fed. Cir. 2002)....................62

*S. Cal. Fed. Sav. & Loan Ass'n v. United States*,
422 F.3d 1319 (Fed. Cir. 2005),
*cert. denied , sub nom. Martin v. United States*, 126 S. Ct. 2967 (2006) ....................64, 68

*Sacramento Mun. Util. Dist. v. United States*,
70 Fed. Cl. 332 (2006) ("*SMUD*")....................65, 90, 91, 92

*Sys. Fuels, Inc. v. United States*,
65 Fed. Cl. 163 (2005)....................94

*Tecom, Inc. v. United States*,
66 Fed. Cl. 736 (2005)....................95

*Tenn. Valley Auth. v. United States*,
69 Fed. Cl. 515 (2006).................... *passim*

*Wickham Constr. Co. v. Fischer*,
12 F.3d 1574 (Fed. Cir. 1994)....................98, 99

*Yankee Atomic Elec. Co. v. United States*,
54 Fed. Cl. 306 (2002)....................36

*Yankee Atomic Elec. Co. v. United States*,
73 Fed. Cl. 249 (2006).................... *passim*

**Statutes and Codes**

Nuclear Waste Policy Act of 1982,
Pub. L. No. 97-425, 96 Stat. 2201 (1983).................... *passim*

Nuclear Waste Policy Amendments Act of 1987,
Pub. L. No. 100-203, 101 Stat. 1330-227 (1987) ....................18, 72, 81

28 U.S.C. § 2516....................98

42 U.S.C. § 10131....................7, 8, 81, 96, 97

42 U.S.C. § 10132....................72, 81

42 U.S.C. § 10133....................72, 81

42 U.S.C. § 10136....................84

42 U.S.C. § 10137....................83

42 U.S.C. § 10156....................84

42 U.S.C. § 10161....................72, 81

42 U.S.C. § 10162....................18, 34, 72, 81

42 U.S.C. § 10168....................18

42 U.S.C. § 10169 ....................72, 81, 84

42 U.S.C. § 10173 ....................83

42 U.S.C. § 10173a ....................83

42 U.S.C. § 10195 ....................83, 90

42 U.S.C. § 10199 ....................83, 90

42 U.S.C. § 10222 ....................8, 9, 81, 96

42 U.S.C. § 10241 ....................34

42 U.S.C. § 10251 ....................34

1994 Minn. Sess. Laws Ch. 641 .................... *passim*

2003 Minn. Sess. Laws, 1st Special Session, Ch. 11 ....................40, 53, 55, 58

Minn. Stat. § 116C.77 ....................37, 38

Minn. Stat. § 116C.771 ....................38, 39

Minn. Stat. § 116C.773 ....................41

Minn. Stat. § 116C.779 ....................40, 55, 56

Minn. Stat. § 116C.80 ....................39, 40

Minn. Stat. § 116C.83 ....................53

Minn. Stat. § 216B.1645 ....................58

Minn. Stat. § 216B.2411 ....................40

Minn. Stat. § 216B.2423 ....................39

Minn. Stat. § 216B.2424 ....................40, 54, 86

**Rules, Regulations, & Draft Standard Contract**

10 C.F.R. Part 50, App. F ....................6

18 C.F.R. Part 101 ....................61, 99

35 Fed. Reg. 17,530 (Nov. 14, 1970) ....................6

48 Fed. Reg. 5458 (Feb. 4, 1983) .....9

48 Fed. Reg. 16,590 (Apr. 18, 1983) .....9

Final Interpretation of Nuclear Waste Acceptance Issues,
60 Fed. Reg. 21,793 (May 3, 1995) .....50

Notice of Inquiry,
59 Fed. Reg. 27,007 (May 25, 1994) .....49, 50

71 Fed. Reg. 66,806 (Nov. 16, 2006).....11, 59

**Other Authorities**

13 Wkly. Comp. Pres. Doc. 502 (1977).....7

11 JOSEPH R. PETRILLO, CORBIN ON CONTRACTS (Rev. ed. 2005).....77

3 DAN B. DOBBS, DOBBS LAW OF REMEDIES (2d. ed. 1993).....76

3 E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS (3d ed. 2004).....63

H.R. Rep. No. 97-491, pt. 1 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3792 .....6, 81

H.R. Rep. No. 97-785, pt. 1 .....7

RESTATEMENT (SECOND) OF CONTRACTS § 205.....95

RESTATEMENT (SECOND) OF CONTRACTS § 350 ..... 62, 76

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
(Electronically Filed on February 9, 2007)

| | | |
|---|---|---|
| **NORTHERN STATES POWER COMPANY,** Plaintiff, | ) | No. 98-484C |
| v. | ) | (Senior Judge Wiese) |
| **THE UNITED STATES**, Defendant. | ) | |

**NORTHERN STATES POWER**
**COMPANY'S POST-TRIAL BRIEF**

Pursuant to this Court's December 4, 2006 Order, Plaintiff Northern States Power Company ("NSP"), respectfully files this post-trial brief, which includes findings of fact and conclusions of law in support of its breach of contract damages claim of $172,154,000.

## I. INTRODUCTION

This trial presented this Court with NSP's compelling claim for breach of contract damages. This Court has already determined that Defendant, the United States (the "Government") is liable for breach of contract. *See* July 31, 2001 Order (granting NSP's renewed motion for summary judgment on liability); *see also generally Northern States Power Co. v. United States*, 224 F.3d 1361 (Fed. Cir. 2000) ("*Northern States II*"); *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1342 (Fed. Cir. 2000) ("The breach involved all the utilities that had signed the contract—the entire nuclear electric industry."). Therefore, the sole purpose of this trial was to determine the quantum of NSP's damages for the Government's partial breach of NSP's contracts.

*The Standard for Determining Damages*: The U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") has provided a legal framework for partial breach cases, in which the non-breaching party has taken steps to mitigate its damages prior to breach. *Indiana Mich. Power Co. v. United States*, 422 F.3d 1369, 1374-75 (Fed. Cir. 2005) ("*Indiana Mich. III*"). "*Indiana Michigan* altered the landscape considerably by parsing utility claims into actual expenditures and framing the inquiry as one of mitigation." *Yankee Atomic Elec. Co. v. United States*, 73 Fed. Cl. 249, 260 (2006). NSP must show that "(1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach is a substantial causal factor in the damages; and (3) the damages are shown with reasonable certainty." *Indiana Mich. III*, 422 F.3d at 1373 (citing *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1320 (Fed. Cir. 2002)). The Government, however, as the breaching party bears the burden of showing that NSP's mitigation efforts as the non-breaching party were unreasonable. *See Tenn. Valley Auth. v. United States*, 69 Fed. Cl. 515, 523 (2006); *see also Old Stone Corp. v. United States*, 450 F.3d 1360, 1370 (Fed. Cir. 2006) (noting that the Government failed to show that costs incurred were unreasonable), *petition for cert. filed*, 75 U.S.L.W. 3333 (U.S. Dec. 14, 2006) (No. 06-837).

Throughout the trial, counsel for the Government attempted to foist on this Court and NSP a self-serving form of causation that lacks any legal foundation. The Federal Circuit has recently stated that "the selection of an appropriate causation standard depends upon the facts of the particular case and lies largely within the trial court's discretion." *Citizens Fed. Bank v. United States*, No. 05-5173, 2007 WL 162820, at * 3 (Fed. Cir. Jan. 24, 2007). The Government's so-called "but for" standard, however, essentially is a "sole causation" standard. As will be discussed below, the Government's breach need not be the "sole cause" of damages

and NSP must only establish a causal connection between the Government's breach of contract as the primary and substantial cause of its mitigation costs. The law provides that other actions may act in confluence with the breach to also cause damages. *Cal. Fed. Bank, FSB v. United States*, 395 F.3d 1263, 1268 (Fed. Cir. 2005) ("*Cal. Fed.*"), *cert. denied*, 126 S. Ct. 344 (2005). NSP has proven and discharged its burden (as well as showing that the magnitude of its losses were generally foreseeable) and the burden has shifted to the Government to show the unreasonableness of NSP's incurred mitigation costs – a burden the Government has failed to discharge.

*Reasonable Certainty*: The Government has agreed that NSP's damages were shown with reasonable certainty by stipulating that NSP actually incurred all damages sought. Trial Transcript ("Tr.") 730-32 (Government stipulating that costs actually incurred). Therefore, the Government apparently challenges NSP's mitigation costs only on the grounds of causation or foreseeability. For the reasons shown at trial and in this brief, however, NSP has fully proven that the Department of Energy ("DOE") caused NSP's damages and foresaw or reasonably could have foreseen the general nature of costs incurred by NSP in its efforts to mitigate the Government's damages. The Government has not otherwise met its burden to show NSP unreasonably incurred these costs.

*Acceptance Rate*: This Court need not resolve the question of the acceptance rate because, as the Government acknowledged in its pre-trial brief, the rate at which DOE would have begun performance in 1998 has no impact on NSP's damages through December 31, 2004. *See* Defendant's Memorandum of Contentions of Fact and Law at 34. Furthermore, NSP need not establish any specific rate because it need only show reasonable mitigation and NSP never considered that DOE would actually perform beginning in 1998 – at any rate – when it made its

decisions to mitigate. NSP discusses and briefs this issue to inform this Court's decision in this case and in the event the Government further presses the acceptance rate issue.

As discussed below, Congress enunciated the purpose of the Nuclear Waste Policy Act of 1982 ("NWPA"), as being to provide a firm schedule with a date certain – January 31, 1998 – when the federal government through DOE would begin removing fuel from commercial utilities. The NWPA expressly stated that the commercial utilities would pay for interim storage only until DOE began removal of fuel based on the schedule in the NWPA. Thus, it is clear that when utilities entered contracts with DOE all parties had the expectation (based on the purpose of the NWPA) that utilities would not have to provide for additional at-reactor storage after 1998. A 3,000 Metric Ton of Uranium aggregate annual steady-state rate after a five year ramp-up would best meet that need (and begin working off the backlog of accumulated waste).

*Summary of Damages*: NSP has proven its incurred mitigation costs through December 31, 2004 for:

(1) ***On-site storage*** of spent nuclear fuel ("SNF") at its nuclear plants, which includes its licensing and operation of its SNF dry storage facility at its Prairie Island nuclear plant and its costs of licensing and beginning to construct a dry storage facility at its Monticello nuclear plant;

(2) ***Alternate storage facilities***, which include (a) its costs for its participation in Private Fuel Storage, LLC (and its predecessor), which successfully received a license from the Nuclear Regulatory Commission to construct a dry storage facility in Utah and (b) its efforts to license an away-from-reactor SNF storage facility in Goodhue County, Minnesota, which effort was a condition of NSP receiving permission from Minnesota to build a dry storage facility at the Prairie Island nuclear plant;

(3) The costs of implementing up to 125 megawatts (later lowered to 110 megawatts) of ***mandated biomass generation***, which was imposed by the Minnesota legislature as a condition of NSP being allowed to build its dry storage facility and load casks at the Prairie Island nuclear plant;

(4) ***Other mandated payments***, which include, *inter alia*, (a) a mandated payment into and administration of a fund for renewable energy – the Renewable Development Fund – for every dry storage cask that remained at Prairie Island after 1999 – the year that the DOE would have begun picking up NSP's SNF had it not breached the contract, and (b) settlement payments to the Mdewakanton Dakota Tribe, whose land sits immediately next to the Prairie Island nuclear plant, which payments were a condition placed by the Minnesota legislature in lifting the 17 cask limitation imposed by the 1994 Minnesota legislation. A summary of NSP's damages in both nominal and present value dollars corresponding to the above bolded categories follows:

**SUMMARY OF DAMAGES (in Millions of Dollars)**[1]

| CATEGORY | NOMINAL DOLLARS | ADJUSTED FOR WEIGHTED AVERAGE COST OF CAPITAL |
|---|---|---|
| *On-Site Storage* | $ 44,190,000 | $ 78,920,000 |
| *Alternate Storage Facilities* | 27,587,000 | 40,045,000 |
| *Mandated Biomass Generation* | 23,142,000 | 26,231,000 |
| *Other Mandated Payments* | 22,738,000 | 26,958,000 |
| TOTAL | $117,657,000 | $ 172,154,000 |

[1] As noted above, the cut-off date for damages in this case is December 31, 2004. Damages incurred by NSP after that date will be the subject of a future action.

## II. FINDINGS OF FACT

### A. The Nuclear Waste Policy Act Is Enacted To Codify The Federal Government's Longstanding Policy To Dispose Of Spent Nuclear Fuel And To Provide A Firm Schedule For Disposing Of The Waste

Early in the history of American atomic power, the Government acknowledged a definite federal responsibility to provide for the permanent disposal of SNF and high-level waste ("HLW") byproduct from the commercial use of nuclear power. *See Florida Power & Light Co. v. Westinghouse Elec. Corp.*, 826 F.2d 239, 244 (4th Cir. 1987) (discussing President Eisenhower's Atoms-for-Peace commercial nuclear program and the passage of the Atomic Energy Act).[2]

The Government's effort to manage the disposal of SNF and HLW was redirected when President Carter announced in 1977 that the Government intended to postpone indefinitely reprocessing in the United States. 13 Wkly. Comp. Pres. Doc. 502, 503 (1977) . As a result, "[t]he domestic nuclear industry was confronted not only with a shift in its technical future but with a sudden and unanticipated liability in the form of spent fuel stored at reactor sites with no near-term destination." H.R. Rep. No. 97-491, pt. 1, at 27 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3792, 3793. In the "1977 timeframe, the federal government prohibited reprocessing and prevented us from implementing what our design was for that plant." Tr. 776 (Kapitz) (referring to Prairie Island). The majority of spent fuel pools existing at nuclear reactor sites, including those at NSP's Prairie Island and Monticello nuclear plants, were sized with the

[2] This commitment is reflected, for example, in the Atomic Energy Commission's ("AEC") statement of its "Policy Relating to the Siting of Fuel Reprocessing Plants and Related Waste Management Facilities," adopted in 1970, which provides that "[d]isposal of high-level radioactive fission product waste material will not be permitted on any land other than that owned and controlled by the Federal Government." 10 C.F.R. Part 50, App. F. In announcing this policy, the AEC reaffirmed that "high-level waste repositories should be under Federal ownership and responsibility." 35 Fed. Reg. 17,530, 17,532 (Nov. 14, 1970).

intention that SNF would be stored therein temporarily before being shipped to a reprocessing facility. Tr. 775-76 (Testimony of Kapitz) ("[W]hen Prairie Island was first built, our spent fuel pool had very limited space . . . . When we built the plant, the design was to have enough space for one reload of fuel, typically around 40 fuel assemblies, and then also for the other unit, the 121 spaces, in case for maintenance or inspections, we needed to off-load the entire core. But each reload would be shipped off-site for reprocessing prior to the next refueling that occurred at the site."); *see also, e.g.*, H.R. Rep. No. 97-785, pt. 1, at 47. The lack of reprocessing meant that SNF had to be removed and stored somewhere outside the pool if plant operation was to continue. H.R. Rep. No. 97-785, pt. 1, at 47.

On January 7, 1983, President Reagan signed into law the Nuclear Waste Policy Act of 1982, Pub. L. No. 97-425, 96 Stat. 2201 (1983) ("NWPA") (codified as amended at 42 U.S.C. §§ 10131-10270). The NWPA formalized the Government's long-standing policy of accepting responsibility and providing for the timely disposition of commercial SNF and HLW. *See* 42 U.S.C. § 10131(b)(2) (indicating that one purpose of NWPA was "to establish the Federal responsibility, and a definite Federal policy, for the disposal of such waste and spent fuel"). Mr. Jon Kapitz – a long-time nuclear engineer at the Prairie Island plant, who served as both project engineer and project manager of the Prairie Island dry storage project (Tr. 746, 748-49 (Kapitz)) – explained that he understood the NWPA's disposal program as a "one for one exchange" where the DOE was "substituting their program, which was to take our fuel directly and dispose of it directly[,] for our reprocessing plan, which was what the plant was built on . . . ." Tr. 777 (Kapitz).

In the NWPA, Congress expressly acknowledged that "[a] national problem has been created by the accumulation of . . . spent nuclear fuel from nuclear reactors . . . ." 42 U.S.C. §

10131(a)(2)(A). To solve this problem, the NWPA acknowledged that one of the key purposes of the Act was to impose upon the Government a firm schedule and deadline by which the Government would assume responsibility for the disposal of commercially-generated SNF. *See* 42 U.S.C. § 10131(b)(1) (indicating that one purpose of the NWPA was "to establish a schedule for the siting, construction, and operation of repositories" to receive SNF and HLW).

The NWPA specified the date – January 31, 1998 – when DOE was required to begin removing SNF from commercial nuclear reactors. 42 U.S.C. § 10222(a)(5)(B); *Maine Yankee,* 225 F.3d at 1342 ("Congress found this objective so important when it promulgated the Act that it took the unusual action of specifying that all the contracts must contain this explicit requirement."). While the NWPA lodged the responsibility with the utilities for paying for DOE's disposal program and to provide interim storage of SNF, the utilities only had the responsibility for the costs of interim storage "until such waste and spent fuel is accepted by the Secretary of Energy in accordance with the provisions of this Act . . . ." 42 U.S.C. §§ 10131(a)(4) & (5); *see also* Plaintiff's Exhibit ("PX")275, 1983 Draft Mission Plan at 2-1 (SN045172) ("Until 1998, each utility will be responsible for providing its own additional on-site interim storage . . . .").

### B. NSP's Three Standard Contracts And The Expectations At The Time The Contracts Were Signed

The NWPA created a quid pro quo arrangement so that utilities, such as NSP, would pay fees into the Nuclear Waste Fund in exchange for the Government's performance of SNF and HLW disposal services beginning no later than January 31, 1998. *See Indiana Mich. Power Co. v. Dep't of Energy*, 88 F.3d 1272, 1277 (D.C. Cir. 1996) ("*Indiana Mich. I*"); 42 U.S.C. § 10222(a)(5)(B). The NWPA instructed DOE and commercial nuclear utilities to enter into

contracts for the disposal of each utility's SNF and HLW. NWPA, Pub. L. No. 97-425, § 302, 96 Stat. 2201, 2257 (1983) (codified at 42 U.S.C. § 10222(a)(1)); *see also Northern States II*, 224 F.3d at 1364.

Pursuant to NWPA § 302, DOE created a "Standard Contract for the Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste," ("Standard Contract"). *Northern States II*, 224 F.3d at 1364. While DOE developed the Standard Contract by use of a rulemaking process, the NWPA did not require that method and DOE did so only for its convenience. *See PSEG Nuclear, LLC v. United States*, 465 F.3d 1343, 1350 (Fed. Cir. 2006) ("However, the DOE was not statutorily required to use the administrative rulemaking process or to even develop a Standard Contract. Rather, it did so because it preferred developing a contract with standard provisions that could be used with multiple contractees to the extent practicable.") (citing 48 Fed. Reg. 5458, 5459 (Feb. 4, 1983)(Defendant's Exhibit ("DX") 2.01 in this case). In promulgating the final terms of its Standard Contract, DOE recognized, "The 1998 date is called for in the Act, and we believe it to be a realistic date. Our performance will be judged by meeting this date." DX2.02, 48 Fed. Reg. 16590, 16598 (Apr. 18, 1983); Tr. 3872-76 (Morgan).

Based on the NWPA, the failure of a utility to sign a contract with DOE would have led to the shut down of its reactors. Tr. at 3863-64 (Morgan) ("My understanding is that [the Nuclear Regulatory Commision], which regulates reactor operation, said that or directed people that if they didn't sign the contract, they would have to shut down the reactors."); *see also Indiana Mich. III*, 422 F.3d at 1372; 42 U.S.C. § 10222(b)(1).

### 1. NSP's Three Contracts And Its Nuclear Plants

On June 20, 1983, NSP entered into three of these "Standard Contracts" with DOE for the disposal of its SNF and HLW (1) at NSP's Prairie Island nuclear plant, (2) at NSP's Monticello nuclear plant, and (3) for NSP's SNF from Monticello that was subsequently shipped to the General Electric plant in Morris, Illinois. PX56 (Prairie Island), Tr. 129 (Bomberger); PX57 (Monticello), Tr. 130 (Bomberger); PX58 (Monticello-GE Morris), Tr. 131-34 (Bomberger).

Xcel Energy Inc. ("Xcel") is a public utility holding company that has various operating subsidiaries including NSP. Tr. 91-92 (Bomberger). The Nuclear Management Company ("NMC") – co-owned by four utilities including Xcel at the time of trial – currently operates the Prairie Island and Monticello plants. Tr. 103-04 (Bomberger).

Prairie Island is a two-reactor plant located near Red Wing, Minnesota, on the Mississippi River, generating approximately 1176 megawatts of net energy. Tr. 96 (Bomberger); Second Amended Complaint & Supplemental Complaint ¶ 2. Prairie Island's two reactors are both pressurized water reactors. Tr. 96 (Bomberger). The NRC licensed Prairie Island's unit 1 reactor in 1973 and it began commercial operation in the same year. Tr. 97 (Bomberger). Unit 1 is currently licensed by the NRC to operate until August 2013. Tr. 168 (Bomberger); Tr. 427-28 (McCarten). Prairie Island's unit 2 reactor began commercial operation in 1974. Tr. 97 (Bomberger). Unit 2 is currently licensed by the NRC to operate until 2014. Tr. 168 (Bomberger); Tr. 427-28 (McCarten). Prior to signing the Prairie Island Standard Contract with DOE, NSP had re-racked the spent fuel pools at Prairie Island twice – completed in 1977 and



400510160v8

1981 – increasing the total storage capacity of the spent nuclear fuel pools from approximately 200 assemblies to 1,386 assemblies.[3] Tr. 414-15 (McCarten); Tr. 775, 778 (Kapitz).

Monticello is a single reactor plant located in Monticello, Minnesota, also on the Mississippi River. Tr. at 97 (Bomberger); Tr. 1802 (McKeown); PX389 at NSP-0052224 (Monticello Certificate of Need). The Monticello nuclear plant uses a boiling water reactor, which generates 600 megawatts of net electricity. Tr. 1802 (McKeown); Tr. 97 (Bomberger). The Monticello nuclear plant was licensed for commercial operation in 1970 and is currently licensed to operate until September 2010. Tr. 97 (Bomberger); Tr. 1802 (McKeown). NSP recently completed a license renewal application with the NRC, which will extend the license from 2010 to 2030. Tr. 1802-03 (McKeown).[4] Prior to signing its two Standard Contracts for Monticello spent fuel with DOE, NSP had re-racked its spent fuel pool at the Monticello nuclear plant once – in 1978 – increasing its total storage capacity to 2,237 assemblies. Tr. 1805, 1818 (McKeown); Monticello Certificate of Need Application, PX389 at NSP-0052203 ("In 1978 all but one low-density storage rack in the pool was replaced with higher density racks in order to

[3] The capacity of a spent fuel pool refers to the total number of spent fuel assemblies that can be safely stored in the spent fuel pool. Tr. 415-16 (McCarten). Generally, "a fuel assembly is an array of individual fuel rods held together by hardware, the hardware provides structural integrity, so you can handle fuel assembly" and also "provides a spacing of the fuel rods so that there [are] individual fuel rods and area that's free around them to allow for water flow" in the spent fuel storage pool. Tr. 416-17 (McCarten); *see also* Tr. 755-56 (Kapitz). Each fuel rod is a long metal tube that includes enriched ceramic uranium pellets inside the tube. Tr. 755 (Kapitz). The Prairie Island fuel rods individually (or together in an assembly) are approximately 14 feet tall. Tr. 758 (Kapitz). The Prairie Island pool includes 10 7-by-7 racks (with 49 spaces per rack) and 16 7-by-8 racks (with 56 spaces per rack). Tr. 5078-79 (Kapitz); Tr. 414, 464-68 (McCarten). Reracking is the process of removing a rack and replacing the rack with one that includes a greater array of spaces – for example 8-by-8 (or 64 spaces) instead of 7-by-7 (or 49 spaces) – without taking apart the fuel assembly. Tr. 5078-80 (Kapitz).

[4] On November 8, 2006, NRC granted the license renewal. *See* NRC, Monticello Nuclear Generating Plant – License Renewal Application, *available at* http://www.nrc.gov/reactors/operating/licensing/renewal/applications/monticello.html (visited Feb. 1, 2007); *see also* 71 Fed. Reg. 66,806 (Nov. 16, 2006).

establish today's capacity."); Annual Nuclear Waste Management Report (2004), PX475 at NSP-0040588.

Between 1984 and 1987, NSP shipped 1,058 spent fuel assemblies from its Monticello nuclear plant to General Electric's ("GE") Morris, Illinois spent fuel storage facility. Tr. 413 (McCarten); Tr. 134-35 (Bomberger); Tr. 1803 (McKeown). NSP and GE had entered into an agreement to have GE store these spent fuel assemblies. Tr. 132 (Bomberger); Tr. 1803 (McKeown). NSP's "Morris" contract with DOE encompasses these spent fuel assemblies shipped to the GE Morris facility. PX58; Tr. 134-35 (Bomberger).

To date, NSP has paid DOE approximately $334 million for nuclear waste disposal services and is continuing to pay at a rate of approximately $12 million per year. Tr. 135 (Bomberger); Second Amended Complaint & Supplemental Complaint ¶ 9.

#### 2. Both Parties To The Contracts Expected DOE To Perform At A Rate Sufficient To Remove The Need For Utilities To Acquire Additional Storage Capacity After 1998 And To Begin To Remove The Backlog

As noted above, one of the purposes of the NWPA was to create a firm schedule for the removal of the accumulated SNF at commercial nuclear reactors. At the time the Standard Contracts were signed, both DOE and NSP expected that DOE would perform at a rate sufficient to remove the need for NSP (or any utility) to acquire additional storage capacity after 1998 – the statutorily mandated date to begin performance – and to begin removal of the accumulated backlog of SNF that increased at NSP's (and other utilities') facilities.

The Government's witnesses (and contemporaneous DOE documents) acknowledged that DOE implemented a strategy for performance that would avoid the need for additional at-reactor storage after 1998 and work off the backlog of generated SNF. Robert Morgan, the first acting-

director of DOE's Office of Civilian Radioactive Waste Management ("OCRWM"), Tr. 3779 (Morgan), stated at a December 20, 1983 DOE-sponsored conference: "The basic strategy which we have outlined in the mission plan is that, beginning in 1998, utilities will not have to provide any additional storage facilities on-site." Tr. 3882 (Morgan); PX286, Robert Morgan, *Program Overview*, Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting at 11 (SN069599) (Feb. 1984). Mr. Morgan acknowledged that this strategy was consistent with his understanding of the purposes of the NWPA. Tr. 3882-83 (Morgan). At the same conference, Mr. Morgan also stated, "During the first year of operation of the repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities, either on-site or at another location." Tr. 3884 (Morgan); PX286 at 11 (SN069599). Mr. Morgan also acknowledged that DOE intended to begin working off the backlog of fuel. Tr. 3884 (Morgan); PX286 at 11-12 (SN069599-600). Similarly, DOE acknowledged the same strategy of performance in its 1983 Draft Mission Plan, a draft required by the NWPA and overseen by Mr. Morgan. Tr. 3885-87 (Morgan); *see also* PX275, Civilian Radioactive Waste Management Program Mission Plan at 2-1 through 2-4 ("The waste materials will be accepted in accordance with a Waste Acceptance Schedule designed to provide an acceptance rate in the first five years such that no utility will have to provide additional storage capacity after January 31, 1998."); *see also* Tr. 2118-21 (Supko) (discussing PX275).[5]

[5] In the subsequent 1984 Draft Mission Plan and the final 1985 Mission Plan, DOE continued to use similar acceptance rates for the industry in the aggregate. *See* Tr. 2128-35 (Supko); Mission Plan for the Civilian Radioactive Waste Management Program at 2-1, 2-2 (Draft 1984), PX276; Mission Plan for the Civilian Radioactive Waste Management Program at 381 (1985), DX45 at 381 ("[I]f the DOE fails to meet the schedule shown in Table 9-2 or 9-3 [using a steady-state rate of 3,000 MTU after a five-year ramp-up], then the additional storage capacity needed to accommodate the delay in schedule will be provided by the DOE, possibly at reactor sites."); Supko Demonstratives 2-5, PX1055; *see also* Tr. 2133 (Supko).

Mr. David Zabransky – DOE's current contracting officer, Tr. 4326 (Zabransky), understood when he worked at Wisconsin Electric Power Company ("WEPCO") that DOE had a goal to have an acceptance rate that reflected the aggregate rate of discharges and would work off the backlog of SNF. Tr. 4445-46 (Zabransky). Mr. Thomas Pollog, currently DOE's contracting officer's technical representative, Tr. 3604 (Pollog), admitted that during the mid-1980s, one of the goals of the DOE program was to have acceptance rates sufficient to alleviate the need for purchasers' to have storage outside of their pools. Tr. 3699 (Pollog).

NSP had the same expectation. Mr. James Karalus, who assisted in preparing NSP's comments to DOE on the draft Standard Contract, stated that it was his understanding that DOE "would begin taking the fuel at that time [January 31, 1998] or very shortly after that date at a rate that was commensurate with our generation of spent fuel, on an industry basis – . . . . And eventually ramp up to take all of the spent fuel . . . ." Tr. 323 (Karalus). Mr. Jon Kapitz, a longtime nuclear engineer at Prairie Island, understood that "the Department of Energy would then take our fuel at the rate at which we generated and also faster than that, . . . such that once they begin taking fuel from Prairie Island, [NSP] would no longer have the need to find additional storage space on-site." Tr. 774-75 (Kapitz). Finally, Ms. Laura McCarten also stated that she recognized in 1987 that the DOE was projecting rates that would have been sufficient to avoid obtaining additional at-reactor storage after 1998. Tr. 454-55 (McCarten).

A 3,000 metric tons of uranium ("MTU") steady-state rate after approximately a five-year ramp-up period would best meet the intent of the program and expectations of the parties of a rate sufficient to remove the need to acquire additional at-reactor storage capacity after 1998 and to begin removal of the accumulated backlog of SNF. Tr. 2118 (Supko); Deposition of Lake Barrett at 10-11, 58-59 (Apr. 22, 2002) (deputy and one-time acting director of DOE's OCRWM

acknowledged that the 3,000 rate "was chosen in consideration with the production rate" of SNF and was consistent with his understanding of the intent of the NWPA); *see also* Deposition of Lake Barrett at 1163-64 (May 10, 2002). The design documents for the facility and total system life-cycle cost documents since the dawn of the program in 1983 repeatedly used the 3,000 MTU steady-state rate. Tr. 2136-42, 2220-22 (Supko); Deposition of Lake Barrett at 1334-35 (May 10, 2002).[6]

### C. NSP Monitors DOE's Program And Recognizes That Based On DOE's Projected Delay NSP Will Need To Provide Storage Through The End Of The Life Of The Plants As Licensed By NRC

In 1987, NSP was determining how it should meet SNF storage needs for its nuclear plants in light of DOE's responsibilities under the NWPA and NSP's Standard Contracts. Tr. 418 (McCarten). NSP was faced with the need to increase storage capacity at Prairie Island, as its spent fuel pools would run out of space in approximately 1994. Tr. 420-21, 439 (McCarten).

---

[6] For example, DOE issued Nuclear Waste Fund fee adequacy assessments, which were "to determine whether the 1 mil per kilowatt hour fee [charged to utilities] was adequate to cover the life cycle cost of the Civilian Radioactive Waste Management system," and, for example, the 1986 Assessment used a 3,000 MTU steady-state rate after a five year ramp-up period as one of its assumptions. Tr. 2136-38 (Supko); Nuclear Waste Fund Fee Adequacy: An Assessment at 4 (Mar. 1986), PX271; PX1055, Supko Demonstrative 6. Additionally, similar to the fee adequacy assessments prepared by DOE, it also prepared total system life cycle cost ("TSLCC") analyses of the program "to project what the life cycle cost of the waste management system would be and for the purposes primarily of ensuring that the 1 mil per kilowatt hour fee would be adequate to cover the cost of the program." Tr. 2139 (Supko). The TSLCC studies regularly used as an assumption that DOE would perform at a 3,000 MTU steady-state (usually with a five-year ramp-up period). *See, e.g.*, Tr. 2140-42 (Supko); Analysis of the Total System Life Cycle Cost for the Civilian Radioactive Waste Management Program at 22, 28 (Apr. 1986), PX302; PX105, Supko Demonstratives 7-8; Tr. 2150-52 (Supko); PX1055, Supko Demonstrative 12; Analysis of the Total System Life Cycle Cost for the Civilian Radioactive Waste Management Program at 2-8 (Table 2-2), PX262; Tr. 2202 (Supko); Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program at 4-14 (May 2001), PX162; PX1055, Supko Demonstrative 18.

In January 1987, DOE issued a draft Mission Plan Amendment, in which it projected at least a five-year delay in opening a repository and, instead proposed that DOE might be able to meet its waste acceptance obligations beginning in 1998 through the use of a monitored retrievable storage facility. Tr. 430-35 (McCarten); Draft Mission Plan Amendment at 1015, 1018 (Jan. 1987), PX303 (concluding that DOE needed to "reassess and rebaseline the program for the first repository and revise its schedule" and noting that the "new schedule shows a five-year extension of the date for waste acceptance at the first repository, from 1998 to 2003").

Ms. Laura McCarten – in 1987 working as a consultant within NSP's Special Nuclear Programs department, Tr. 407, 411-12 (McCarten) and later in 1990 the project manager of the Prairie Island dry storage project, Tr. 408 (McCarten) – reviewed DOE's program including the 1987 Draft Mission Plan Amendment. Tr. 433 (McCarten). In August 1987, Ms. McCarten prepared a report for NSP management that evaluated the DOE program and also looked at the storage needs of NSP's nuclear plants to determine whether there was a "mismatch" between when DOE storage would be available and NSP's storage needs. Tr. 418 (McCarten). In the report, she recognized that DOE was now projecting a five-year delay in opening a repository. Tr. 419-20, 423; Laura McCarten, Spent Nuclear Fuel Strategic Plan at NSP-001635 (Aug. 1987), PX398B ("On January 28, 1987, the Federal government proposed a five year delay in opening the first repository. Under a revised program management plan published by the DOE, the first repository would not be completed until the year 2003."). Ms. McCarten recognized that DOE would not begin performance at a repository until at least 2003. Tr. 422-24 (McCarten) ("My understanding was that the DOE was projecting that the first repository would not operate prior to 2003."); PX398B at NSP-0001636.

Ms. McCarten also concluded that NSP "couldn't really realistically count on" DOE having an authorized monitored retrievable storage facility ("MRS") to meet the 1998 performance date. Tr. 425-26 (McCarten). In her report, Ms. McCarten conveyed "that although the MRS seemed like a good step, there were so many linkages and conditions associated with it, that it was not something to really put a lot of stock into or put a lot of reliance on or have confidence about." Tr. 425 (McCarten); PX398B at NSP-00001638 ("The DOE's waste acceptance schedule will depend on whether or not Congress authorizes construction of an MRS, the linkage between MRS operation and the first repository development, and when the first repository begins operating."). The report states:

> If Congress does not authorize an MRS, then NSP must provide storage for its spent fuel out to at least 2005. This is consistent with the delay recently announced by DOE. However, ***given the uncertainties and opportunities for further delay, NSP should anticipate having to provide storage for its fuel out to the end of the life of the plants***. Monticello's 40 year operating license will expire in 2010. Prairie Island's Unit 1 and 2 licenses expire in 2013 and 2014, respectively.

PX398B at NSP-0001638 (emphasis added); *see also* Tr. 427-28 (McCarten).

In June 1987, DOE issued its final Mission Plan Amendment to Congress detailing the need for Congress to authorize an interim storage facility – an MRS – if DOE was to be able to begin timely disposing of SNF by 1998. OCRWM Mission Plan Amendment at 63 (June 1987), PX304; *see also* Tr. 452-53 (McCarten) (noting her review of the document). DOE stated, "If Congress does not approve the MRS facility, the transfer of waste to DOE facilities may not be able to begin in 1998." PX304 at 63.

In December 1987, Congress passed the Nuclear Waste Policy Amendments Act, which nullified DOE's earlier proposal for an MRS at Oak Ridge, Tennessee, authorized DOE to build an MRS facility, though with restrictive scheduling and capacity linkages to the permanent

repository. Pub. L. No. 100-203, § 5021, 101 Stat. 1330-227, 1330-232, 1330-236 (1987) (codified, as amended, at 42 U.S.C. §§ 10162, 10168(d)(1)). DOE had requested that Congress include linkages between the MRS and repository over the objections of the commercial nuclear utilities. Tr. 3400-02 (Kouts); DX49 at 29; Tr. 2606-07 (Supko); DX53 at HQR0031748 (stating DOE's support for linkages in its MRS proposal to Congress); *see also* DX53 at HQR0031747, HQR0032039 (stating utility industry's opposition to including linkages).

In June 1988, Ms. McCarten provided a revised report to NSP senior management regarding the DOE program and the timeframe that NSP would have to provide storage for its fuel before DOE performed. *See* Laura McCarten, Northern States Power Company Spent Nuclear Fuel Strategic Plan (June 1988), PX398A; Tr. 437-38 (McCarten). As a result of the enactment of the Amendments Act, Ms. McCarten noted that the law "created a restrictive link between the MRS construction schedule and the repository development schedule." PX389A at NSP-0001623; Tr. 442-43 (McCarten); *id.* 441 (McCarten) (stating "that an MRS facility had been authorized by Congress, but that there were also pretty severe restrictions or linkages between the MRS and the first repository"). Re-enforcing her preliminary conclusions of a year earlier, Ms. McCarten again concluded that NSP could not rely on DOE to perform before the end of the NRC-licensed life of the plants:

> As explained in Section 1.2, the DOE could begin accepting utility spent fuel in 2004. This date is based on the assumption that the NRC will issue construction authorization for the first repository in 1998, thus clearing the way for MRS construction to begin in 1998, and using the DOE estimate of six years to construct the MRS. However, given the uncertainties and opportunities for delay, NSP should anticipate having to store all spent fuel out to at least 2006-2007. Furthermore, ***interim storage technologies implemented should be compatible with the likelihood that NSP will have to provide storage for its spent fuel out to end-of-life of the plants.***

PX389A at NSP-0001624 through NSP-0001625 (emphasis added); Tr. 444-45 (McCarten) (discussing this section of her report); *see also* Tr. 762-63 (Kapitz).

Notably, also in June 1988, DOE recognized that the Amendment Act's linkages between the construction of the MRS and the construction of the repository were too restrictive and that DOE would not be able to perform by 1998 if the law was not altered. Draft 1988 Mission Plan Amendment at 18-19, PX279; Tr. 2148 (Supko) (noting that the Draft 1988 Mission Plan Amendment "showed the MRS facility beginning operation in 2003"). "The DOE recognizes that, under current conditions, waste acceptance at a waste-management facility cannot begin in 1998; furthermore, the delay in the repository schedule and the linkages between that schedule and key milestones in the siting and construction of an MRS facility make it unlikely that the DOE will be able to start accepting waste significantly before 2003." PX279 at 18-19.

### D. NSP Decides To Use Dry Storage Technology To Meet Its Need to Provide Storage Until The End Of Life Of The Plants

Based on Ms. McCarten's assessments of the DOE program, NSP concluded that it could not rely on DOE timely performing and, therefore, had to evaluate storage technologies that would take NSP through the end of the licensed life of its plants. Tr. 448-49 (McCarten) ("[N]othing before 2006 and 2007 was to our mind even possible and that it would be prudent to look at life at the plant, so we wanted to look at not just small increments of storage but what was the biggest amount of storage we could get. So we were looking at a certain timeframe, that we thought it only made sense to look at a certain increment of additional storage because of where we felt the DOE was in terms of realistically coming out to start accepting spent fuel from us at Prairie Island."); *see also* Tr. 762 (Kapitz); *see id.* at 870-71 (discussing that NSP "needed to double the storage space that we had" because "it was highly likely that the Department of

Energy would not begin accepting any fuel during the license of the plant, which was 40 years out to the year 2013").

### 1. NSP Evaluates Whether To Use Dry Cask Storage Or Rod Consolidation To Provide Storage Through The End Of The Life Of Plants

In light of this reality, Ms. McCarten and Mr. Kapitz evaluated NSP's options for storing its SNF, including whether to consolidate the fuel rods at Prairie Island to create additional space in the pools or to construct an on-site dry storage facility using storage casks. Tr. 460-61 (McCarten); Tr. 763-64 (Kapitz); Prairie Island Spent Fuel Storage Technology Evaluation Report at NSP-0036996 (Sept. 6, 1988), PX399. Again, that report reiterated the doubts that NSP had about the DOE program and cited those doubts to explain why NSP needed to use a technology that would give the Prairie Island plant sufficient SNF storage space to take the plant through the end of its licensed life. PX399 at NSP-0036996 ("The DOE's revised program schedule projects an MRS operational by 2004 and the first respository fully operational by 2006. *This schedule is optimistic by at least three years*. . . . Notwithstanding DOEs projected schedules and possibilities for an earlier MRS operation, *it is conceivable that a permanent repository will not be operational by 2013-2014*, when [Prairie Island's] current licenses will expire.") (emphasis added); Tr. 462, 470-73 (McCarten); Tr. 5360-61 (Kapitz) (noting that in 1987, NSP had no confidence because DOE's "complete failure to show any progress" and that DOE was "essentially losing ground faster than they were making up" left NSP "no confidence that we could make any plans at that plant based on any date that they were giving us").

As noted above, in their report, Ms. McCarten and Mr. Kapitz primarily looked at two alternative technologies – rod consolidation and dry cask storage. Given the choice and the

political consequences of building an entirely new facility for dry storage, NSP looked to rod consolidation as a storage solution that would keep the fuel in the pool. Tr. 5362-63 (Kapitz).

Rod consolidation technology involved taking apart the spent fuel assemblies so that the spent fuel rods could be stored in the spent fuel pool in a "two to one" ratio of fuel into the same space – *i.e.*, a cell of a storage rack. Tr. 445-46 (McCarten); Tr. 759-60, 5089-91 (Kapitz). Thus, "a cell that could hold a single fuel assembly could hold a canister with two fuel assemblies worth of fuel rods if they are packed that closely together and touching." Tr. 446 (McCarten); Tr. 758-59 (Kapitz) (stating that in rod consolidation "you disassemble the fuel assembly and take all the fuel rods from two assemblies . . . into one canister, which is essentially the same dimensions as one fuel assembly. . . . [W]here you normally would see one fuel assembly sitting there with 179 rods, we can get two assemblies with each of their 179 rods into one location into one canister.").[7]

In October and November 1987, NSP conducted a rod consolidation demonstration project (in conjunction with Westinghouse Electric) at Prairie Island to determine whether rod consolidation could meet NSP's storage needs. PX399 at NSP-0037004; Tr. 751-52, 767-68 (Kapitz). Based on the demonstration project, however, NSP determined that rod consolidation would not meet NSP's needs because of the inadequate performance of this method during the

[7] Rod consolidation differs from reracking. Tr. 464-68 (McCarten); Tr. 5052-53 (Kapitz). Rod consolidation takes apart the individual fuel rods from two assemblies, consolidates the individual fuel rods as closely together as possible, places them into a single canister, and uses the existing fuel pool storage space in existing racks to achieve a two-to-one ratio in space savings. Tr. 464-68 (McCarten); Tr. 755, 758-60 (Kapitz). Reracking leaves the fuel rods in the assemblies and, instead, replaces the racks with newer, more compact racks to allow for more spaces in each rack – e.g. replacing a 7-by-7 rack that held 49 intact assemblies with a 8-by-8 rack that can hold more than 60 intact assemblies. Tr. 933-34 (Kapitz); Tr. 464-66, 468, 506-07 (McCarten); *see also* Demonstrative of Re-Racking (discussed at Tr. 927-34 (Kapitz)).

demonstration project. Tr. 769-70 (Kapitz); PX399 at NSP-0037007. Mr. Kapitz noted that the demonstration project showed that rod consolidation (1) "was a very slow process," (2) created a "large amount of debris," leaving "significant concerns" about the "spread of radioactive contamination and exposure to individuals," (3) left one fuel rod damaged and NSP, therefore, had concerns "about damaging fuel rods and breaking them open," and (4) did not allow for as tight of compaction for the leftover assembly hardware as predicted. Tr. 769-72, (Kapitz); PX399 at NSP-0037006 through NSP-0037008, NSP-0037018 to NSP-0037019; *see also* Tr. 474-75 (McCarten).

With the failure of rod consolidation to meet NSP's needs, NSP then investigated the use of dry storage casks at an independent spent fuel storage installation ("ISFSI"). Tr. 462-64 (McCarten); PX399 at NSP-0037029, NSP-0037034. The use of dry storage casks and an ISFSI is a technology that does not "rely on water to provide cooling or shielding of spent nuclear fuel" and places the SNF into a cask or "container that is just a dry container, a metal container, or some sort of a concrete container or concrete bunker type of system, and generally, these would be located on a site outside the existing plant and be managed by the plant staff as part of the overall plant activities." Tr. 463 (McCarten). In their investigation of this technology, Ms. McCarten and Mr. Kapitz consulted with colleagues in the industry that had experience with this technology and visited Virginia Electric Power Company's Surry plant in Virginia, which had a dry storage facility. Tr. 780-782 (Kapitz); Tr. 468-69 (McCarten); *see also* PX399 at NSP-0037033. Ultimately, Ms. McCarten and Mr. Kapitz recommended (and NSP agreed) to pursue dry storage technology rather than rod consolidation. Tr. 469-70, 481-82 (McCarten); Tr. 780-81 (Kapitz); PX399 at NSP-0036988 ("A recommendation is made to pursue a dry storage

technology rather than fuel consolidation."); Tr. 1943-44 (Howard) (noting that as CEO, he approved the decision to go to dry storage).

### 2. NSP Never Seriously Considers Further Reracking Because It Would Not Have Met NSP's Needs To Provide Storage Through The End Of The Life Of Prairie Island's NRC Licenses

As noted above, NSP concluded that it could not rely on DOE to perform under the Standard Contracts before the end of the NRC-licensed life of its plants and, therefore, would have to provide for this storage capacity in some form for the life of the plant – 2013 for unit 1 and 2014 for unit 2 at Prairie Island. Tr. 505-06, 701-02 (McCarten); Tr. 870-74, 5360-62 (Kapitz). In preparing the Certificate of Need application for dry storage, Ms. McCarten stated that after the in-pool option of fuel consolidation failed to present a good solution, "[o]ur judgment was reracking would give you less additional storage than fuel consolidation, so we didn't feel it would be a sensible recommendation" because of the "gap in time" between when NSP's Prairie Island fuel pool would be exhausted and when DOE would begin performance. Tr. 505-06 (McCarten); *see id*. at 492-93; *id.* at 701-02 ("Because our starting point was how many more years of storage capacity is needed at Prairie Island, and the maximum amount from the pool with rod consolidation, rerack would have offered something less, so as time had passed, even over the course of doing that [rod consolidation] demonstration [in 1987], there was no good news coming from the DOE front."). Mr. Kapitz agreed that, based on the expected non-performance of DOE and the need to double the storage capacity at Prairie Island, NSP never pursued reracking, because "there was nothing in reracking that could double the amount of fuel you had in there, so we never pursued it with any rigor." Tr. 870-71, 900, 5050-54 (Kapitz); *see also* Tr. 1997-98 (Howard) ("[I]t was my understanding, after briefing and so forth,

that reracking would not solve my problem, our problem, that was to keep the Prairie Island Plant open until the end of its licensed life.").

Had NSP known that DOE would timely perform, NSP would have re-racked its Prairie Island spent fuel pools for a third time rather than constructing a dry storage facility. Tr. 873 (Kapitz). NSP would not have needed to double its capacity, but could have added as little as 20 percent capacity to meet its needs, if DOE had been expected to perform. Tr. 873-74 (Kapitz); *see also* DX77 (estimate of 20 percent increase through reracking, prepared by Ms. McCarten); Tr. 505 (McCarten)(discussing Ms. McCarten's "engineering judgment" that NSP could achieve a 20 percent increase in storage capacity). Mr. Kapitz testified that he had "no doubt" that NSP could have performed a third re-rack. Tr. 874 (Kapitz); *see also* Tr. 2707 (Sieracki) (expert witness testifying that the Ginna and Vermont Yankee plants had both re-racked a third time). The 20 percent increase of additional storage space in the Prairie Island pools would have met NSP's storage needs until DOE had begun performing and picked-up NSP's fuel in 1999. Tr. 901 (Kapitz); Tr. 506 (McCarten) (noting that a 20 percent rerack would have provided capacity through 1999); Tr. 2663-64 (Sieracki). NSP would have pursued a strategy of re-racking the pool, because it was more politically palatable to keep the fuel in the pool. Tr. 5363 (Kapitz).

In this regard, even assuming *arguendo* that in the non-breach world DOE performed but only arrived at the end of 1999 or early 2000, NSP had several options to keep the plant operating. Tr. 901, 5095 (Kapitz). First, NSP could have lengthened the time between refueling outages – known as fuel cycles – from 12 months to 18-21 months (as actually happened). Tr. 901-02, 5095-96 (Kapitz); Tr. 2665-66 (Sieracki) (noting that fuel cycles at Prairie Island steadily increased from 18 months up to approximately 21 months in the 1990s, resulting in less spent fuel discharged that needed storage). NSP could achieve this by increasing the uranium

enrichment in the fuel assemblies to allow for increased fuel burn-up that would allow fuel assemblies to remain in the reactors longer. Tr. 901 (Kapitz). In 2001, when DOE looked at options that Prairie Island had to allow the plant to keep running past 2003 (in the absence of a change in state laws that then limited dry storage at Prairie Island), DOE acknowledged that increasing the average fuel burn-up was one such option. Tr. 3732 (Pollog); PX1019 at 6 (NSP-0001832). Second, NSP could have reduced spent fuel discharges between refueling outages, by reducing the power output; or, powering down over a longer period of time and doing so during a non-peak period. Tr. 902, 5096 (Kapitz). DOE recognized this was also an option that NSP could consider. Tr. 3732 (Pollog); PX1019 at 6 (NSP-0001832). Third, NSP could have stored SNF in transportation casks (either DOE or privately provided) until DOE arrived. Tr. 902-04 (Kapitz).[8] Finally, NSP could have removed the hardware from the rod consolidation project that currently occupies 38 spaces in the spent fuel pool and placed it in a canister in a radioactive waste storage building at the Prairie Island site, thus creating additional room for spent fuel in the pool. Tr. 5092-93 (Kapitz).

---

[8] The Standard Contracts require DOE to provide the transportation casks and furnish them "sufficiently in advance to accommodate scheduled deliveries." Tr. 136-37 (Bomberger); *see, e.g.*, Standard Contract, Article IV.B.2, PX56 at KRGNSP07980; Tr. 4472-73, 4488-89 (Zabransky). Furthermore, while DOE's experts – Dr. Jonathan Neuberger and Mr. John Leonard – opined that it would have been a thin margin for NSP to have re-racked and that the time for delivery was unknown, the Standard Contract called for the submission of final delivery schedules whereby the ***Purchaser*** provides DOE with the window of when fuel would have to be picked up. *See, e.g.*, Standard Contract, Appendix D, PX56 at KRGNSP08011 (indicating the "Purchaser's Delivery Estimate" and noting the "First" and "Last" month, day, and year). And, in fact, DOE generally would have performed by bringing transportation casks to avoid the need for utilities to incur additional expenses for at-reactor storage. Tr. 2741-42 (Sieracki). Thus, if DOE followed the contract, it would have provided the transportation cask sufficiently in advance to assure that it could pick up the SNF within the window requested by NSP. Tr. 136-37 (Bomberger); Tr. 2741-42 (Sieracki).

Furthermore, Mr. Kapitz stated that a third rerack could have achieved up to a 30 percent increase in capacity, which would have provided NSP sufficient storage capacity through approximately 2002. Tr. 814, 877-80, 5363-64 (Kapitz). The NUTECH Company ("NUTECH") had conducted a structural evaluation of the Prairie Island spent fuel pools in 1987, prior to NSP's decision to go to dry cask storage. Tr. 782-86 (Kapitz); NUTECH, Structural Evaluation Of Spent Fuel Storage Rack For Consolidated Fuel At The Prairie Island Nuclear Generating Plant (1987), PX595. NUTECH updated this study in 1990, prior to the implementation of dry cask storage, and concluded that NSP could achieve up to a 30 percent increase of storage in the pool. Tr. 795-802, 5349-50 (Kapitz); PX1018; *see also* DX322. The final version of the study explicitly stated that NSP could store up to 416 additional spent fuel assemblies in the pool. Tr. 5285, 5289-90 (Leonard); DX322 at NSP-78819. From a criticality, structural, seismic, and thermal standpoint, NSP could have performed a third re-rack. Tr. 5054-80 (Kapitz).

A 1995 study by Holtec International ("Holtec") concluded that NSP could in fact have achieved a 40 percent increase in storage capacity. Tr. 887-92 (Kapitz); PX435 at NSP-0069365. In fact, Holtec had informed NSP that beginning in 1989 the technology for analyzing pools had improved to allow for better analysis of spent fuel pool storage. Tr. 1403-04 (Alders); PX489 at 10-11 (NSP-0001409-10) ("Holtec informed NSP that there had been three major developments in spent fuel pool analytical methods since NSP's last analysis . . . .").

Ultimately, NSP's decision to use a technology that would provide storage through the end of the NRC-licensed life of the Prairie Island plant proved prescient because DOE has not performed (and has stated it will not perform before 2013 or 2014) and NSP's Prairie Island

plant will be able to continue to run. Tr. 1945 (Howard) (noting that "hindsight's great, that it was the right decision").[9]

### 3. NSP Chooses The Transnuclear 40 Assembly Dry Storage Cask As The Method To Store SNF

In July 1989, Ms. McCarten, Mr. Kapitz, and a colleague prepared a report evaluating several dry casks and recommending the use of the Transnuclear ("TN")-40 dry storage casks. Tr. 483-91 (McCarten); Tr. 787-95 (Kapitz); *see* Prairie Island Dry Spent Fuel Storage System Evaluation and Recommendation (July 17, 1989), PX400. NSP solicited various dry cask storage vendors through a request for proposals. Tr. 485-89 (McCarten); Tr. 787-88 (Kapitz). Based on the bids received, Ms. McCarten and Mr. Kapitz determined that the TN-40 cask presented the "best value" to NSP because of its design and cost-effectiveness. Tr. 487-88 (McCarten); Tr. 791-95 (Kapitz). NSP management approved the recommendation to use the TN-40 casks. Tr. 490-91 (McCarten); Tr. 795 (Kapitz).

The TN-40 cask is "an all-metal cask, and it's a bolted design" with each cask holding up to 40 fuel assemblies. Tr. 790, 792 (Kapitz). The design of the cask also had political advantages because "it looked less permanent than some concrete bunker type of designs, and we felt that that was a legitimate factor, given the need to get state approval and the expectation that

[9] On July 19, 2006, DOE announced that the "best-achievable" date to begin receipt of SNF is now March 31, 2017. Even this date, signifying a breach of at least 19 years, is one that DOE characterizes as "aggressive" and assumes among other highly optimistic assumptions "the absence of litigation related delays." *See* Statement of Edward F. Sproat III, Director Office of Civilian Radioactive Waste Management U.S. Department of Energy Before the Subcommittee on Energy and Air Quality Committee on Energy and Commerce U.S. House of Representatives (July 19, 2006), www.ocrwm.doe.gov/info_library/program_docs/testimonies/July_19_**Sproat**_testimony.pdf (visited Jan. 29, 2007); Tr. 3313 (Kouts) (noting that the repository "is currently projected for 2017 for initial operation").

that was going to be difficult because of anti-nuclear sentiment here in the state . . . ." Tr. 487 (McCarten).

### E. The Certificate of Need Proceedings Before The Minnesota Public Utilities Commission And Appeal To The Minnesota Court of Appeals

To build a dry storage facility at Prairie Island, NSP had to seek a license from the NRC to increase its storage capacity, build, and operate its ISFSI (*i.e.*, its dry storage facility)[10] and petition the Minnesota Public Utilities Commission to issue a Certificate of Need. Tr. 449-50 (McCarten); Tr. 819 (Kapitz) (discussing need for NRC license for ISFSI and casks); PX398A at NSP-0001627.

In August 1990, NSP submitted its request for an NRC license to build and operate an ISFSI at Prairie Island with 48 TN-40 casks. Tr. 819-22 (Kapitz). In October 1993, NRC issued the requested license to NSP. Tr. 821-22, 849 (Kapitz); Tr. 579 (McCarten).

As noted above, NSP expected to face some political opposition in receiving a Certificate of Need before the Minnesota Public Utilities Commission. Tr. 487 (McCarten); Tr. 1949 (Howard).

#### 1. NSP Prepares And Submits An Application For A Certificate Of Need To Increase Storage Capacity At Prairie Island

Generally, a Certificate of Need was required by Minnesota state law for any increases in spent fuel storage capacity above 20 percent. Tr. 450-51, 587 (McCarten); Minn. Stat. § 216B.243, subdiv.2 (requiring a certificate of need for any "large energy facility"). As part of the Certificate of Need process, the Minnesota Environmental Quality Board first conducts an

[10] Prairie Island's dry storage ISFSI consists of two large concrete pads used to store dry casks, surrounded by a security fence. Tr. 848 (Kapitz).

environmental review and then the Minnesota Public Utility Commission reviews an application for a Certificate of Need. Tr. 493-95 (McCarten).

As a first step in the Certificate of Need process, the Minnesota Environmental Quality Board ("EQB") initiated an environmental review and began preparing an environmental impact statement ("EIS") in late 1989. Tr. 495 (McCarten); PX420. NSP provided input to the Minnesota EQB's analysis and the EQB and NSP conducted "dialogue and discussion," but the EQB looked to "a variety of sources to get the information they needed to put together a complete EIS." Tr. 513 (McCarten). At that time, the EQB had technical staff including people with engineering expertise. Tr. 1310-11 (Alders) ("There are environmental planners, people with experience and expertise in the evaluation of environmental impacts and there are some staff with engineering expertise at the EQB, as well."). With some issues, the EQB provided its own analysis and derived its own calculations. Tr. 508-10 (McCarten) (noting the EQB's calculation of the 20 percent rerack did not match Ms. McCarten's calculations as submitted to the EQB); *compare* PX420 at NSP-0063082 (EQB without explanation concluding that NSP could add only 200 to 250 spaces to Prairie Island spent fuel pools through a 20 percent re-rack), *and* DX77 (Ms. McCarten estimating a conservative "engineering judgment" of 277 additional spaces with a 20 percent re-rack); Tr. 924-25 (Kapitz).[11]

---

[11] The 200 to 250 spaces is apparently a math error on the part of the EQB, given the fact that the 20 percent figure (equivalent to 277 spaces) is used consistently in EQB and NSP documents, and the 200-250 number does not appear to have any factual foundation and does not appear in any NSP documents or calculations. Tr. 924-25 (Kapitz). If it is true that the EQB did not perform an "independent engineering analysis" and NSP never used the 200-250 number, then that means only a mathematical error could account for the discrepancy. *See* PX679 at NSP-0057469 (in which the EQB repeats the 200-250 number as equaling 20 percent and then states that it performed no "independent engineering analysis").

As part of the EIS, the EQB concluded (as had NSP) that it was "far from certain" when DOE would take NSP's spent fuel. Tr. 497-98 (McCarten); PX420 at NSP-0062983. As part of its EIS, the EQB reviewed the viability of various storage alternatives, including the dry storage solution proposed by NSP, a "no action" alternative (*i.e.*, "NSP filling the existing pool storage and forcing shut down"), reduced operation of the plant, increased conservation, dry storage, increased in-pool storage, sending the spent fuel to off-site storage, and reprocessing. Tr. 500-504 (McCarten); PX420 at NSP-0063054.

As a second step, NSP prepared its application for a Certificate of Need, which it submitted with the Minnesota EQB's environmental impact statement to the Minnesota Public Utility Commission ("PUC"). Tr. 496 (McCarten)(noting that the EIS "was prepared in order to be included in the certificate of need proceeding"); Application for Certificate of Need, PX403; PX420. NSP submitted its initial application in April 1991. Tr. 528-29 (McCarten); PX403. In the application, NSP related that it would need to provide additional storage capacity by February 1995 to avoid shut down of the unit 1 reactor and by October 1995 to avoid shut down of the unit 2 reactor. Tr. 536-38 (McCarten); PX403 at NSP-0070267 through 70269.[12] In November 1991, NSP amended its original application with revisions from August 1991. Tr. 544, 549-50 (McCarten); PX60 at KRGNSP03742 (cover letter submitting errata on November 11, 1991) & KRGNSP03774 (noting revision as of August 30, 1991). The amended application discussed the viability of alternatives, including the potential costs – such as the possibility of $1 billion for replacement power if the plant shuts down under the no action alternative. Tr. 546-51

[12] Originally, in her 1987 and 1988 reports, Ms. McCarten had estimated that the Prairie Island plant would have to shut down in 1994. Tr. 533 (McCarten). However, NSP later projected that unit 1 would shut down in January 1995 based on changes in the fuel cycle and revised data generated between 1987 and 1991, when NSP submitted the application for a Certificate of Need. Tr. 534 (McCarten).

(McCarten) (discussing application and alternatives); PX60 at KRGNSP03832 through 3833 (noting under no action alternative the cost would be "[a]t least $1 Billion for Replacement Power"); *see also* Tr. 158-59 (Bomberger) (discussing analysis later that reconfirmed the $1 billion figure when NSP sought 2003 legislation).

**2. The PUC Considers NSP's Application For A Certificate Of Need**

The PUC referred the certificate of need application to an administrative law judge ("ALJ") for a contested case hearing, which included numerous filings, 18 days of evidentiary hearings, anti-nuclear opposition, and three days of public hearings. Tr. 556-58 (McCarten); *see also In re Application for Certificate of Need for Construction of an Indep. Spent Fuel Storage Installation*, 501 N.W.2d 638, 641 (Minn. Ct. App. 1993) ("*In re ISFSI*").

In April 1992, the ALJ recommended that the PUC deny the certificate of need unless the legislature authorized the project or until there was reasonable certainty that the dry casks would be removed from Minnesota. Tr. 559-61 (McCarten); PX749 at NSP-0054411 & 54454. In particular, the ALJ expressed concerns with the "permanence problem" of the fuel remaining in Minnesota indefinitely. PX749 at NSP-0054455; Tr. 563-64 (McCarten). In this regard, he noted that the record reflected "that the casks will not be gone in 25 years and may never leave Prairie Island." Tr. 564 (McCarten); PX749 at NSP-0054455; *see also In re ISFSI*, 501 N.W.2d at 642 (discussing the ALJ's conclusion that because Minnesota law required legislative approval of a "permanent" storage facility and the DOE's inability to "take spent fuel away from Prairie Island in the predictable future" meant the ISFSI would be permanent); *see also* Tr. 4315-16 (Schwartz) (noting that NSP projected that DOE would not begin performing until 2015 as the most realistic scenario when it presented its application to the Minnesota PUC). The ALJ referred his decision to the Minnesota PUC for consideration. Tr. 565-66 (McCarten).

In August 1992, the PUC rejected the ALJ's recommendation and granted a limited Certificate of Need to NSP to build an ISFSI. *See* Tr. 566-71 (McCarten); Order Granting Limited Certificate of Need, PX61; *see also* PX853 (memo by Ms. McCarten summarizing PUC decision). While the PUC granted a limited certificate of need, it echoed the ALJ's concerns as to the permanence of NSP's Prairie Island ISFSI and, as a result, limited the number of casks that NSP could use at its ISFSI to only 17 (instead of the 48 requested) and imposing other conditions on NSP and Prairie Island. Tr. 567-72 (McCarten); *see also* PX61 at 10 (KRGNSP04113)("One of the main reasons the Commission is limiting the number of casks, though, is to guard against the possibility that the federal government will be unable to site, construct, and open a permanent national repository within its projected time frame and cost constraints. Should that happen, the environmental and cost assumptions underlying this limited certificate of need will no longer apply, and other resource options will have to be re-evaluated in light of the new situation."). Thus, the PUC by limiting the Certificate of Need, concluded that it assured the ISFSI would not be a "permanent" storage facility and, therefore, did not require approval by the Minnesota legislature. *See In re ISFSI,* 501 N.W.2d at 642.

**3. The PUC Decision Is Appealed And Reversed By the Minnesota Court Of Appeals**

Several of the opponents to the Certificate of Need appealed the PUC's decision to the Minnesota Court of Appeals. Tr. 573 (McCarten). The appellate court reversed the PUC's grant of the limited Certificate of Need, concluding that the Prairie Island ISFSI would be "permanent" under Minnesota law and, therefore, would have to receive approval from the Minnesota legislature. Tr. 574-75 (McCarten); PX768 (slip decision of *In re ISFSI*); *In re ISFSI*, 501 N.W.2d at 648; *see also* Tr. 1215 (Merriam) (discussing that Minnesota had "enacted legislation that required more than an administrative sign-off, but would require legislative approval of any

final site decision by the [Minnesota] state government" out of concern that DOE would site a permanent storage facility in Minnesota). NSP petitioned the Minnesota Supreme Court to review the Court of Appeals' decision, but the Minnesota Supreme Court denied review. Tr. 576 (McCarten).

#### 4. During the PUC Proceedings, NSP And The Minnesota Department of Public Service Seek Assurance From DOE Regarding Performance, But Instead DOE States It Has No Obligation To Perform By 1998 Even As It Sends Out Its 1991 ACR

Throughout the period in which the ALJ and the PUC considered NSP's application for a Certificate of Need, in an effort to alleviate the concerns raised during the proceedings that the Prairie Island ISFSI would be permanent, NSP and Ms. Krista Sanda, then Commissioner of the Minnesota's Department of Public Service, Tr. 1126-27 (Sanda), sought assurances from DOE that it would perform.[13] DOE rebuffed these efforts. As NSP's then-CEO Mr. James Howard stated, NSP had to make "a prima facie case that this would not be permanent, and we couldn't do that because the DOE not only wouldn't commit, but somewhere along the line in here, they made the statement that, we believe we don't really have a legal obligation to ever take this spent fuel . . . ." Tr. 1950-51 (Howard).

In 1990, Mr. Howard traveled to Yucca Mountain – DOE's chosen site for a repository – and concluded that it looked like a "hopeful dream" and that it "wasn't going to be the

[13] The Department of Public Service was a Minnesota regulatory agency and as Commissioner, Ms. Sanda served on the EQB and as Minnesota's liaison to the NRC. Tr. 1126-27 (Sanda). Ms. Sanda was concerned that the rate-payers of Minnesota were paying into the Nuclear Waste Fund ("NWF") and wondered "what are we getting for our [$]180 million" that had been paid into the NWF by 1991. Tr. 1135-36 (Sanda). The Department had a role as the principal intervenor in the Prairie Island PUC Certificate of Need proceedings. Tr. 1175, 1182 (Sanda).

answer." Tr. 1946-47 (Howard). Similarly, in June 1991, Commissioner Sanda took a trip to investigate Yucca Mountain and "was dismayed at what I found." Tr. 1134 (Sanda).

In September 1991, the General Accounting Office released a report that concluded that DOE would not meet the 1998 performance date, because its MRS facility would not be ready (and no other facility was then planned or available to be ready by 1998). PX288 at 3, 16; Tr. 3473, 3475-78 (Kouts). While the 1987 Amendments Act provided DOE with the ability to site an MRS, DOE never actively pursued siting an MRS; instead DOE implemented a strategy to leave it to the Nuclear Waste Negotiator – an independent position created by the 1987 Amendments Act with a separate ability to negotiate an MRS site. Tr. 3424-25, 3444, 3464-65 (Kouts); *see* 42 U.S.C. § 10162(b) (discussing DOE's authorization to pursue an MRS); *id.* §§ 10241-10251 (discussing the creation and duties of the Nuclear Waste Negotiator to independently investigate an MRS). Three months later, in DOE's 1991 Annual Capacity Report ("ACR") (on which the Government has relied in making its acceptance rate argument in this case), DOE acknowledged that it would not be able to perform until 2007 at the earliest (absent Congress's removal of the linkages in the Amendments Act). DX108 at HQR-002-0806 ("If the current linkages between MRS facility construction and repository construction authorization are maintained, it is estimated that the commencement of facility operations and initial acceptance of SNF by DOE could not start until at least 2007."); Tr. 3685-88 (Pollog) (acknowledging that a change in the law was required); Tr. 3480-81 (Kouts) (noting that the rates in the 1991 ACR do not reflect the Amendments Act's schedule linkages).

After their site visits to Yucca Mountain and growing concerns that the Prairie Island ISFSI would become a permanent storage facility, Mr. Howard and Commissioner Sanda put these concerns in writing in an effort to get some assurance that DOE would perform or provide

monetary relief if DOE could not perform. On September 18, 1991, Mr. Howard wrote DOE's Secretary – Admiral James Watkins – requesting that DOE commit to taking spent fuel as soon as possible as a means to blunt anti-nuclear organizations' concerns in the Minnesota PUC proceedings that NSP's Prairie Island storage facility would become permanent. Tr. 1949-51 (Howard); PX492 (noting anti-nuclear concerns that "temporary storage of NSP fuel will become permanent because DOE will not be able to site either monitored retrievable storage (MRS) or a permanent disposal facility") (emphasis in original). DOE's Under Secretary – John Tuck – responded to Mr. Howard, who was "really disappointed" by the letter and took it as "a nice letter to get me off the back of the Secretary of Energy and to go away." Tr. 1952-54 (Howard); PX493.[14]

In August 1991, Commissioner Sanda had met with Under Secretary Tuck in Washington, DC and received similar treatment. Tr. 1137-38 (Sanda) (noting that "it was quite obvious, to me at least, that [Under Secretary Tuck] was trying to take my measure" and attempting to determine "how long am I going to be in office, and how long am I going to be a burr under their saddle"). On September 30, 1991, Commissioner Sanda sent a letter and petition for rulemaking to Secretary Watkins, seeking a credit from the Nuclear Waste Fund because she concluded that "it is highly probable that your department will experience significant delay in meeting its obligation to begin taking high-level radioactive waste in 1998." Tr. 1137-42

---

[14] The letter from John Tuck (PX493) – the Under Secretary – referred Mr. Howard to DOE's 1989 "Report to Congress on Reassessment of the Civilian Radioactive Waste Management Program" as a basis to rely on DOE's performance. However, the 1989 Report to Congress projected additional delay by DOE and that DOE would not be able to perform with an MRS prior to 2007 without a change in law and with a repository prior to 2010. *See* DX76 at 12 (EDB-001-1464); Tr. 3184 (Kouts).

(Sanda); PX498 & PX499.[15] In response, DOE stated, "Neither the Nuclear Waste Policy Act nor the standard contract imposes an unconditional obligation on the Department to accept spent nuclear fuel by January 31st, 1998." Tr. 1142-45 (Sanda); PX501. Thus, through February 1992, DOE provided no assurance that it (1) would take the fuel to avoid the SNF from permanently remaining at Prairie Island or (2) even had an obligation to begin doing so by 1998.

After the ALJ's decision in April 1992, on April 15, 1992, Mr. Howard again attempted to have DOE provide some commitment that DOE would remove Prairie Island's spent fuel because of the ALJ's (and others') concerns that "our temporary facility will become permanent because the Department of Energy will fail in its attempt to establish a permanent spent fuel disposal facility for the nuclear industry." Tr. 1956-57 (Howard); PX496. On May 29, 1992, Secretary Watkins responded with a letter that Mr. Howard was able to use for public relations purposes, but which Mr. Howard realized "unless Secretary Watkins knew something, a lot of something that I didn't know about, it seemed highly unlikely that he could make good on that closure in this timetable." Tr. 1966, 1973-74 (Howard); DX314; Tr. 3583 (Kouts) (noting that DOE never met any of the milestones in Secretary Watkins' letter). In fact, on May 27, 1992, just two days prior to his letter to Mr. Howard, Secretary Watkins sent a letter to Alan Keesler of the American Committee on Radwaste Disposal and stated, "If, contrary to our current expectations, we are not able to begin spent fuel receipt at an MRS facility by January 31, 1998, the Department has determined that it is not legally obligated to accept SNF." PX491; Tr. 1159 (Sanda) ("In your letter to Mr. Howard, you discuss your commitment to accept spent nuclear

[15] The petition for rulemaking – PX499 – sent by Commisioner Sanda prompted Judge Sypolt to rule in the coordinated discovery (in which NSP and the Government participated) that "it is evident that litigation was 'fairly foreseeable' by the agency as early as September 30, 1991, when the Minnesota Department of Public Service wrote to the Secretary of Energy . . . ." *Yankee Atomic Elec. Co. v. United States*, 54 Fed. Cl. 306, 316 (2002).

fuel in 1998 and your obligations under 10 CFR, Part 961, to accept title to transport and dispose of spent nuclear fuel. Only two days earlier[,] [y]our letter to Mr. Keesler made it clear that you believed DOE has no such obligation.") (quoting PX506).

Based on the inconsistent responses from DOE, which provided little assurance that DOE intended to honor (or recognize) its obligations, the Minnesota PUC and Court of Appeals had little evidence that the Prairie Island ISFSI would not result in a permanent facility. NSP had no choice but to go to the legislature to gain approval to build the dry storage facility at Prairie Island to avoid a shut down. Tr. 1950-51, 1978 (Howard).

### F. The 1994 Prairie Island Legislation

Based on the Minnesota Court of Appeals decision, NSP's pursuit of an ISFSI moved from a court of law to the state legislature. In 1994, the Minnesota legislature passed legislation allowing NSP to build an ISFSI at the Prairie Island plant. *See* PX198, 1994 Minn. Sess. Laws Ch. 641. However, throughout the legislative process of allowing NSP to build its Prairie Island ISFSI, the Minnesota legislature took note of the permanence question caused by the impending non-performance by DOE. *See* Tr. 1264-65 (Novak) (noting that Minnesota state senators visited Yucca Mountain in 1993-94 and concluding the repository "would not happen" in time for the 1998 performance date).

The law ratified the PUC's grant of a limited Certificate of Need for only 17 casks. *See* Tr. 1980 (Howard); Tr. 581 (McCarten); PX198, 1994 Minn. Sess. Laws Ch. 641, Art. 1, § 1 (codified at Minn. Stat. § 116C.77); Tr. 1319 (Alders). The law provided that NSP could immediately fill and store five casks at Prairie Island. Tr. 583-84 (McCarten) (noting the

importance of being able to proceed immediately with filling five casks); Tr. 1320 (Alders); PX198, 1994 Minn. Sess. Laws Ch. 641, Art. 1, § 2(a) (codified at Minn. Stat. § 116C.771(a)).

However, the legislation conditioned NSP's ability to load the additional 12 casks based on its meeting certain legislative mandates. Tr. 580-82 (McCarten); Tr. 1320 (Alders); PX198, 1994 Minn. Sess. Laws Ch. 641, Art. 1, § 2(codified at Minn. Stat. § 116C.771(b)-(c)). Initially, without some of these mandates, the Minnesota Senate Committee on the Environment voted the measure down with the possibility that Prairie Island would have to shut down in short order. Tr. 1219-21 (Merriam); Tr. 1250-51 (Novak). The legislation added the mandates as "sweeteners" for legislators that originally voted down the bill. Tr. 1217-19 (Merriam). Because of the high risk to NSP, Senators understood that NSP "would be vulnerable to demands that we could negotiate significant increases in the mandates that were contained within the bill." Tr. 1222 (Merriam); Tr. 1981 (Howard) ("It was everybody that had an issue, had an opportunity to sort of take a bite out of us . . . ."); Tr. 1180-81 (Sanda) (noting that the legislation "basically became a trade-off"); Tr. 1264, 1295 (Novak) (stating that the mandates would not have passed "except for this extraordinary set of circumstances").

After NSP's CEO – Mr. Howard – met with the then-Minnesota Senate Majority Leader Roger Moe, Senator Novak, and the members of the Minnesota Senate's Environment Committee, a compromise was reached that enabled NSP to avoid shutting down the Prairie Island plant. Tr. 1260-61 (Novak); Tr. 1979-81, 2006-07 (Howard), Tr. 1222-23 (Merriam). Ultimately, the legislature imposed the mandates only on NSP and not on other utilities "because there would be insufficient political support to get them enacted." Tr. 1224 (Merriam) (also noting that there had been many failed attempts to enact many of these mandates "going back to the '70s"); Tr. 1300-01 (Novak) (noting that he was able for the first time to impose a wind

mandate on NSP because of NSP's need for dry storage; previous efforts had proven unsuccessful).

The law imposed a host of mandates on NSP, but NSP seeks damages primarily for four mandates imposed by the 1994 legislation. Tr. 1262 (Novak) (stating that the mandates applied only to NSP) (Section II.J below discusses the 2003 legislation's mandates, including changes to the 1994 legislation's mandates.). Kenrich Expert Report, PX1056 at 22-25; Kenrich Errata, PX200; PX1058, Metcalfe Demonstrative Slide 10. In particular, the 1994 legislation included (1) the ISFSI alternate-siting requirement in Goodhue County, (2) the biomass mandate, (3) the Renewable Development Fund mandate, and (4) a requirement that NSP enter into an agreement with the Mdewakanton Indian Tribe located on Prairie Island.[16]

*Goodhue County Site*: The law required NSP to attempt to site an alternate ISFSI in Goodhue County, Minnesota (but not on Prairie Island, which is also in Goodhue County). Tr. 1320-21 (Alders); PX198, 1994 Minn. Sess. Laws Ch. 641, Art. 6, § 1 (codified at Minn. Stat. § 116C.80); *id.*, Art. 1, § 2(b) (codified at Minn. Stat. § 116C.771). In particular, the legislation conditioned approval of NSP loading casks six through nine based on NSP's "good-faith efforts" to attempt to site a spent fuel storage facility in Goodhue County (discussed further below). Tr. 1319-21 (Alders); PX198, 1994 Minn. Sess. Laws Ch. 641, Art. 1, § 2(b) (codified at Minn. Stat. § 116C.771(b)). The legislation also provided the procedures for siting the off-site storage facility in Goodhue County. Tr. 1321 (Alders); PX198, 1994 Minn. Sess. Laws Ch. 641, Art. 6, § 1, subdivs. 2-3 (codified at Minn. Stat. § 116C.80). NSP's compliance and incurred costs regarding this mandate are discussed below in Section II.H.2.

[16] The 1994 legislation also imposed a wind power mandate, but NSP does not seek damages for this mandate. *See* PX198, 1994 Minn. Sess. Laws, Ch. 641, Art. 3, § 2 (codified, as amended, Minn. Stat. § 216B.2423).

*Biomass Mandate*: The law required NSP to add up to 125 megawatts of "farm grown closed-loop" biomass energy capacity to its energy resources for producing power, instructing that the first 50 megawatts must be procured by December 31, 1998. Tr. 1600-01, 1608 (Engelking); PX198, 1994 Minn. Sess. Laws Ch. 641, Art. 3, § 3 (codified, as amended, at Minn. Stat. § 216B.2424).[17] NSP's compliance with and its incurred costs from this biomass mandate are discussed below at Section II.J.1.

*Renewable Development Fund*: The law required NSP to create and administer a fund to develop renewable energy sources. Tr. 1550-52 (Swanson). The law directed NSP to pay "$500,000 each year for each dry cask containing spent fuel that is located" at Prairie Island's ISFSI after January 1, 1999. Tr. 1550-51 (Swanson); Tr. 3026 (Metcalfe); PX198, 1994 Minn. Sess. Laws Ch. 641, Art. 1, § 10 (codified, as amended, at Minn. Stat. § 116C.779); PX1058, Metcalfe Demonstrative Slide 32. NSP's compliance with and its incurred costs from this Renewable Development Fund mandate are discussed below at Section II.J.2.

*Contract with Mdewakanton Dakota Tribe of Prairie Island*: The legislature also required NSP to sign a contract with the Governor as a condition of NSP's ability to load *any* of the 17 casks at Prairie Island. Tr. 1679-80, 1694 (Wilensky); PX198, 1994 Minn.

---

[17] In 2003, the legislature defined "biomass" to include:

> (1) methane or other combustible gases derived from the processing of plant or animal material; (2) alternative fuels derived from soybean and other agricultural plant oils or animal fats; (3) combustion of barley hulls, corn, soy-based products, or other agricultural crops; (4) wood residue from the wood products industry in Minnesota or other wood products such as short-rotation woody or fibrous agricultural crops; and (5) landfill gas, mixed municipal solid waste, and refuse-derived fuel from mixed municipal solid waste.

PX198, 2003 Minn. Sess. Laws, 1st Special Session, Ch. 11, Art. 2, § 6, subdiv. 2(c) codified at Minn. Stat. § 216B.2411, subdiv. 2(c)); *see also* Tr. 1600-01 (Engelking).

Sess. Laws Ch. 641, Art. 1, § 4 (codified, as amended, at Minn. Stat. § 116C.773). The legislature sought to contractually bind NSP to the mandates and other portions of the law. Tr. 1680 (Wilensky); PX198, 1994 Minn. Sess. Laws Ch. 641, Art. 1, § 4 (codified, as amended, at Minn. Stat. § 116C.773). The legislation also required that the contract accord the Mdewakanton tribal council third-party beneficiary status with standing to enforce the agreement. Tr. 1679-81 (Wilensky); PX198, 1994 Minn. Sess. Laws Ch. 641, Art. 1, § 4 (codified, as amended, at Minn. Stat. § 116C.773) ("The Mdewakanton Dakota tribal council at Prairie Island is an intended third-party beneficiary of this agreement and has standing to enforce the agreement."). For example, the legislature imposed the contractual requirement and allowed third-party standing on the tribe so that the tribe could enforce the 17 cask limitation imposed by the legislature (even if the legislature later changed its mind). Tr. 1684-88 (Wilensky). NSP signed the contract with the Minnesota Governor on May 20, 1994. Tr. 1694-95 (Wilensky); PX804.

### G. NSP Incurs Costs By Constructing The ISFSI At Prairie Island And Purchasing And Loading Casks

Pursuant to the passage of the legislation, NSP was able to construct its dry storage facility, including building its ISFSI and loading 17 dry casks through December 31, 2004. Tr. 937-38 (Kapitz). NSP incurred a total of $53,538,000 for the on-site storage of SNF at Prairie Island. Tr. 2670-71 (Sieracki); PX1057, Sieracki Demonstrative Slide 12; Tr. 937-38 (Kapitz).

In particular, NSP spent $11,220,000 in licensing, engineering, and constructing the ISFSI at Prairie Island. Tr. 2671-72 (Sieracki). In this regard, NSP incurred costs for its use of Stone & Webster Corporation to assist in preparing the NRC application (including the safety analysis report, environmental report, and the proposed technical specifications) and designing

the ISFSI. Tr. 820-23 (Kapitz). Additionally, the costs in this category include NSP's costs of hiring Shingobee Construction Company in the "construction of the ISFSI site, the fences, the roadways, the concrete pad, the buildings" and essentially "all the on-site construction, with the exception of the security system, which was installed by Prairie Island electricians." Tr. 847-48 (Kapitz). Shingobee constructed two concrete pads as part of the ISFSI, each pad capable of holding 24 TN-40 casks. Tr. 848 (Kapitz). NSP also incurred costs in purchasing a cask transport vehicle (which was seen during the Prairie Island site visit). Tr. 834-39, 842 (Kapitz). NSP purchased this vehicle from Ederer, the same firm that provided the upgrade to the auxiliary building crane. Tr. 842 (Kapitz).

NSP also expended $33,770,000 for the 17 dry storage casks (the TN-40s) that NSP procured and loaded. Tr. 2672, 2679-80 (Sieracki); Tr. 937 (Kapitz) (noting that NSP spent over $30 million in three procurements that procured a total of 17 casks). The $33.77 million figure also includes $4,483,000 of NSP's costs for the manufacturing of casks 18 to 20, which was underway prior to the December 31, 2004 damages cut-off date in this case. Tr. 2681-82 (Sieracki); *see also* PX1057, Sieracki Demonstrative Slide 19.

Additionally, NSP expended $6,891,000 in operation and maintenance ("O&M") costs, which includes (among other costs) NSP's costs in upgrading the auxiliary building crane. Tr. 2686-87 (Sieracki); PX1057, Sieracki Demonstrative Slides 22-24. As part of these costs, NSP used its own full time employees for various activities, including (among others) employees supporting the Certificate of Need proceedings and loading the casks. Tr. 850-55 (Kapitz).

Additionally, as part of the O&M costs, NSP upgraded the auxiliary building crane to assure that it was single-failure proof based on the height and weight of the TN-40 cask. Tr. 843

(Kapitz). While the crane could handle a 125 ton load, it was not rated to be single failure proof – *i.e.* there was no "built-in redundancy and safety feature that any single failure of any component of the crane itself would not result from the load dropping, impacting the bottom of the spent fuel pool." Tr. 844-45 (Kapitz); Tr. 1787 (McKeown). Because of the use of the TN-40 cask, NSP could not use "alternative methods of complying with control of heavy loads." Tr. 1793 (McKeown). For example, the licensed transportation casks at that time would allow for the control of heavy loads through the use of either a crash pad or internal impact limiters on the casks. Tr. 1793 (McKeown); Tr. 843-44, 845-46 (Kapitz). In this regard, NRC's NUREGs 0612 and 0554 governed the upgrade of the crane and NSP successfully sought and received approval from NRC to upgrade its crane. Tr. 1781-82, 1785-91 (McKeown); PX806 at NSP-0056889 (NRC's approval of NSP's modified auxiliary building crane design). NSP contracted with Ederer to design and build the crane, but used mostly NSP's own internal labor to install the crane in the auxiliary building at Prairie Island. Tr. 1794-95 (McKeown). NSP would not have needed to upgrade the crane had DOE performed, because NSP's crane was rated to handle virtually all licensed transportation casks. Tr. 846 (Kapitz); Tr. 1797-98 (McKeown) (noting that "our licensing basis and our design basis at the power plant allowed for handling of licensed shipping casks"); Tr. 2918-19 (Sieracki).

Finally, NSP incurred other miscellaneous costs of $1,657,000 related to its on-site dry storage facility at Prairie Island. PX1057, Sieracki Demonstrative Slide 21. NSP initially paid NRC $750,000 associated with reviewing the application and issuing the application, and has continued to pay the NRC for subsequent inspections and reviews for total incurred NRC fees of $1,400,000. Tr. 822-23 (Kapitz); Tr. 2683 (Sieracki); PX1057, Sieracki Demonstrative Slide 21. This category of costs also includes ISFSI security, the training videos (PX220 constitutes the

seven training videos at issue, which were viewed by the Court at Prairie Island, Tr. 390-91), and a TN-40 transport license (which has not been approved yet). Tr. 2682-83 (Sieracki); PX1057, Sieracki Demonstrative Slide 21.

### H. NSP Pursues Private Fuel Storage And An Alternate Storage Site In Goodhue County, Minnesota

#### 1. NSP And Other Utilities Succeed In Licensing Private Fuel Storage Where DOE Failed To Pursue An MRS

By 1994, the Government had all but abandoned the idea of trying to site, locate, and build an MRS facility. Tr. 1984-85 (Howard); Tr. 3474, 3476 (Kouts) (acknowledging that in order to have a facility by 1998, DOE would have had to have a site for an MRS by 1993); *id.* at 3481 (Kouts) (acknowledging that an MRS was only a "faint glimmer" by 1994, '95 time frame); PX 288 (1991 GAO report noting that DOE would not be able to make the 1998 date because it would not have a site for an MRS by 1992). As noted above, DOE's efforts to site and build an MRS facility was always speculative based on the linkages in the Amendments Act. *See also e.g.*, PX288 (GAO Report); 1991 ACR, DX108 at HQR-002-0806 (acknowledging that the Act's schedule linkages would have to be removed before DOE could perform at an MRS before 2007).

After DOE's MRS effort collapsed, one of the tribes that had considered hosting an MRS facility on tribal land expressed an interest in hosting a private fuel storage facility. Tr. 1184-85 (Sanda); Tr. 1450-54 (Northard). This tribe, the Mescalero Apache Tribe, with the support of Commissioner Sanda of the Minnesota Department of Public Service, approached NSP with an interest in pursuing a private storage facility with utilities similar to the proposed DOE MRS. Tr. 1184-89 (Sanda); Tr. 1987 (Howard); Tr. 1454 (Northard) ("[T]hey approached Northern States Power to see if Northern States Power would be interested in carrying the program forward as a

private venture and not a federal venture."); *see id.* at 1454-55 (Northard) (noting that the Mescaleros were aware of NSP's difficulties during the 1994 legislative session in 1994). NSP sent representatives (along with other utilities) to Mescalero, New Mexico and formulated a plan to determine "the feasibility of carrying the project forward as a private venture" such as what type of "legal entity," and the "licensing steps with the Nuclear Regulatory Commission and other agencies," and how space would be allocated. Tr. 1457-61 (Northard). NSP and several other utilities created Mescalero Fuel Storage, LLC, to pursue the possibility of a private fuel storage facility with the Mescalero Apache Tribe. Tr. 1465-67 (Northard). Ultimately, however, the utilities broke off their negotiations with the Mescalero Apache Tribe in 1996 and began considering other host sites. Tr. 1469 (Northard).

After contacting other entities, NSP and the other utilities involved in this initiative selected the Skull Valley Band of Goshute Indians in Utah and successfully negotiated a lease agreement with the Band. Tr. 1473, 1475 (Northard). The consortium of utilities changed the name of the entity to Private Fuel Storage, LLC ("PFS"). Tr. 1479 (Northard). After also receiving support from the county in which the Band's reservation was located, PFS submitted a license application to NRC in 1997. Tr. 1475 (Northard). Ultimately, the NRC issued a license to PFS. Tr. 175 (Bomberger); Tr. 1510 (Northard).[18] PFS's application included no schedule linkages to DOE's program and is licensed to hold approximately 40,000 MTU of SNF. Tr. 1477-78 (Northard).

---

[18] DOE contacted PFS about its "experiences in the Nuclear Regulatory Commission licensing process because they understood that they were going through a similar process for the Yucca Mountain repository and wanted to learn from our experiences in order to incorporate any efficiencies they might be able to incorporate in the Yucca Mountain repository licensing." Tr. 1487 (Northard).

NSP was among the lead utilities participating in the effort, in large part because it was unclear how much SNF (or for how long) the Minnesota legislature would allow NSP to store its SNF at Prairie Island. Tr. 1987-89 (Howard); Tr. 1458 (Northard). Despite the 1994 legislation allowing 17 dry storage casks at Prairie Island, NSP continued to pursue this out-of-state storage as a means to move the fuel from its in-state storage site at Prairie Island. Tr. 1989 (Howard) ("It was still a big problem after the legislation was passed in 1994, that didn't go away, it didn't end anything. I mean, the battle just continued, and we were looking for something that was a lot more permanent, out-of-state, than what we had in terms of our dry cask storage at Prairie Island."); *id.* at 2005-06 (Howard); Tr. 175-76 (Bomberger) ("PFS, at that time, was about one of our only credible alternatives to be able to create a spent fuel storage installation that would allow us to have continued operation of Prairie Island. Had we not had an alternative like PFS, we had a state imposed limit on the existing approved and operation ISFSI at Prairie Island of 17 casks."); *id.* at 295-96 (Bomberger); Tr. 1455-56 (Northard). Additionally, "[t]here were some substantial payments and penalties, annual penalties associated with continued storage of the spent fuel at the Prairie Island Plant." Tr. 1476 (Northard).

NSP did not have the objective of making a profit by participating in the efforts to license the PFS facility. Tr. 1468-69 (Northard); Tr. 1988 (Howard); *see also* Business Plan, PX440 at 2 (NSP-0010499) (noting the objectives of building a private fuel storage facility, which objectives did not include making a profit).

In 2001, Congress directed DOE to prepare a report addressing alternatives for storing Prairie Island's SNF, assuming that Minnesota did not lift the 17 cask limitation. *See* PX1019 at NSP-0001829; Tr. 3729-30 (Pollog) (Congress requiring a report "containing a description of all alternatives that are available to the Northern States Power Company and the federal government

to allow the company to continue to operate the Prairie Island nuclear generating plant until the end of the term of the license issued to the company by the Nuclear Regulatory Commission, in view of the law of the state of Minnesota that limits the existing quantity of spent nuclear fuel that may be stored at the plant, assuming that the existing federal and state laws remain unchanged"). In the report, DOE noted that PFS constituted a viable option for NSP to pursue in meeting its needs absent a change in state law. Tr. 3732-33 (Pollog); PX1019 at NSP-0001833 ("Shipments could also be made to a licensed facility owned by another company, such as another utility site, the proposed private fuel storage (PFS) facility which is currently undergoing licensing review by the NRC . . . .").

NSP continued to provide financial support to PFS through 2004 "because it was our main alternative at that time that would have helped us prevent the premature shutdown of Prairie Island." Tr. 176 (Bomberger); *id.* at 292-93 (noting that PFS was "part of a spent fuel strategy" and was an "alternative storage solution"). NSP continued to support PFS because, as Mr. Bomberger stated, "even after the legislation was enacted in 2003, I didn't have a sure thing, I still had to submit a certificate of need," it was unclear "what the outcome of that would be," and the certificate of need was necessary to keep the plants open until the end of their NRC-licensed life. Tr. 294-95 (Bomberger).

***NSP would not have participated in the Mescalero and PFS project "if we had confidence the Department of Energy would have, or would be accepting spent fuel in the near term timeframe to meet their storage contract allocations in 1999 or thereabouts, we would not have had to pursue this project . . . ."*** Tr. 1542 (Northard) (emphasis added); *see also* Tr. 4660 (Neuberger) ("Absent the breach, there probably never would have been a PFS."). NSP seeks its incurred costs of $24,720,000 spent in its successful efforts to license the PFS facility. Tr. 2707-

08 (Sieracki); PX1057, Sieracki Demonstrative Slides 37-39. For example, NSP's costs incurred relate to PFS's use of consultants such as Stone & Webster Corporation to design the facility, Holtec International Company to design the casks, and other technical firms to assemble the NRC application (including the related environmental impact statement). Tr. 1480 (Northard).

### 2. NSP Incurs Costs In Attempting To Site An Alternative Dry Storage Facility In Goodhue County

As noted above, as a condition for NSP to load casks six through nine, the legislature imposed the requirement that NSP make a good faith effort to site an alternative dry storage facility in Goodhue County away from the Prairie Island plant. Tr. 1319-20, 1324-25 (Alders). NSP consulted with the Goodhue County community, initially identified a dozen sites within Goodhue County, conducted on-site boring and geotechnical evaluations, and eventually narrowed its list of potential sites to two. Tr. 1322-24 (Alders).

In July 1995, having narrowed to two sites, NSP submitted an application for a certificate of site compatibility assessment to the Minnesota Environmental Quality Board ("EQB") for the siting of an off-site dry storage facility in Goodhue County, Minnesota as required by the 1994 legislation. Tr. 1326-34 (Alders); Preliminary Application for Goodhue County Independent Spent Fuel Storage Facility, PX150 at KRGNSP13169. While NSP preferred to keep the dry storage facility at the Prairie Island plant, rather than have an off-site storage facility, NSP submitted the application to show that it was making a "good-faith" effort to pursue the facility before the EQB. Tr. 1334 (Alders); PX150 at KRGNSP13171. NSP also submitted a license request to the NRC for the Goodhue County site. Tr. 1327, 1335, 1350-51 (Alders).

Ultimately, on October 2, 1996, the EQB denied NSP's request for certificate of site compatibility, concluding that any other site in Goodhue County would be inferior to the existing

on-site ISFSI at the Prairie Island plant. Tr. 1338-39, 1343 (Alders)(discussing that EQB concluded that an away-from-reactor site in Goodhue County was "less desirable" than having it on-site at the Prairie Island plant); EQB Findings of Fact, Conclusions of Law, & Order, PX142 at KRGNSP13042 & 13061. The EQB also concluded that NSP had complied with the statute by making a good faith effort to site a storage facility in Goodhue County. Tr. 1340-41 (Alders); PX142 at KRGNSP13046. Therefore, because NSP complied with this mandate (and the separate mandate to procure 100 megawatts of wind power), NSP was allowed to load casks six through nine at Prairie Island. Tr. 1363-64 (Alders).

NSP seeks $2,867,000 in incurred costs for investigating alternate sites in Goodhue County. Tr. 2993-94 (Metcalfe); PX1058, Metcalfe Demonstrative Slides 11-12. These costs include the labor for conducting analysis and preparing and submitting the Goodhue County alternative site application to the EQB; this effort included labor from, among others, Mr. Alders, Mr. Kapitz, and Mr. McKeown. Tr. 1325-26 (Alders). Had DOE timely performed under the Standard Contract, NSP would not have incurred these costs. Tr. 1345-46 (Alders).

## I. The Government Breaches The Standard Contracts In 1998 And, To Date, Has Not Yet Begun Performance

### 1. The Government Renews Its Statement That It Has No Obligation To Perform Beginning In 1998

Consistent with DOE's earlier pronouncements in 1988 and its 1992 correspondence with Commissioner Sanda, DOE in 1994 published a "Notice of Inquiry" in the Federal Register stating DOE "has no statutory obligation to accept spent nuclear fuel beginning in 1998 in the absence of an operational repository or other facility constructed under the [NWPA], although the Department in implementing the Standard Contract may have created an expectation that it would begin accepting such spent nuclear fuel in 1998." Notice of Inquiry, 59 Fed. Reg. 27,007,



400510160v8

27,008 (May 25, 1994). A year later, DOE issued its "Final Interpretation of Nuclear Waste Acceptance Issues," which reiterated its interpretation that DOE had no obligation under the NWPA to begin accepting SNF in 1998 absent an operating facility and that DOE's performance would not commence until 2010, at the earliest. 60 Fed. Reg. 21,793, 21,794-95 (May 3, 1995).

In 1996 and 1997, the D.C. Circuit rejected the Government's interpretation of its obligation under the NWPA. *See Indiana Mich. I*, 88 F.3d at 1277; *see also Northern States Power Co. v. United States Dep't of Energy*, 128 F.3d 754, 755 (D.C. Cir. 1997) ("*Northern States I*"). DOE failed to begin performance in 1998 and, to date, has not begun performance of its obligations under NSP's (or any of the utilities') Standard Contracts. Tr. 135-36 (Bomberger).

**2. DOE's DCS Process Through The Prism Of Its Expected Non-Performance**

As noted above, in 1991, DOE issued an ACR and Delivery Commitment Schedule ("DCS") instructions to the utilities, including NSP, for planning purposes. Tr. 4474-75 (Zabransky); Standard Contract, Art. IV.B.5(b), PX56 at KRGNSP07981 ("Beginning not later than July 1, 1987, DOE shall issue an annual capacity report for planning purposes."); Tr. 3704-05 (Pollog); 1991 ACR, DX108 at HQR-002-0803 ("As specified in the Standard Contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the purchasers."); *see also* 1991 DCS Instructions ¶ 7(c), PX424 at NSP-0043857 ("The annual acceptance rates in the 1991 ACR provide an approximation of the [Federal Waste Management System] acceptance capacity and are for planning purposes."); Tr. 3708-09 (Pollog).

DOE also treated the DCSs as planning documents. *See* Deposition of Nancy Slater Thompson at 5, 98 (June 13, 2002) (Acting Division Director of the Regulatory Coordination

Division in DOE's OCRWM stated, "In my personal opinion, they [DCSs] were for planning purposes only and in fact were completed in such a way that not much but planning could be done based on the information contained in them."); Deposition of Alan Brownstein at 9-10, 377-78 (Apr. 10, 2002) (the senior policy adviser to the Director of DOE's OCRWM acknowledging that the DCSs were for planning purposes); Deposition of Alan Brownstein at 282 (June 14, 2002) ("The way I recall it now is these go back to the broader issue of the DCSs. These were all for planning purposes.").

When NSP provided its DCSs to DOE, it understood those documents to be for planning purposes only. Tr. 1090 (Kapitz). For example, Mr. Kapitz spent no more than one hour a year filling out the DCSs. Tr. 1091 (Kapitz). Even the then-deputy director of DOE's program referred to the DCSs as "administrivia." Deposition of Lake Barrett at 217 (Apr. 22, 2002).

The Government made its performance conditional on the availability of a facility. Tr. 1913 (Closs) (noting that NSP had not added the following statement to the DCS, "The proposed delivery date is dependent on the existence of an operational repository or an interim storage facility constructed under the Act."); DX181; Tr. 4403 (Zabransky). The Government also would not approve any DCS forms with allocations larger than those specified in the 1991 ACR. Tr. 1089 (Kapitz); PX424 at NSP-0043857; Tr. 4439-40 (Zabransky); Tr. 3708 (Pollog). The use of instructions to limit allocations appears nowhere in the Standard Contracts. Tr. 1104-05 (Kapitz); Tr. 4440-41 (Zabransky) (admitting that the limitation of allocations from the instructions "was the contracting officer's interpretation of how they were going to do business" and not in the Standard Contracts).

The 1994 Acceptance Priority Ranking/Annual Capacity Report ("APR/ACR") (issued in March 1995) continued to use the acceptance rate allocations from the 1991 ACR, even though the MRS was no longer a possibility. Tr. 4461, 4464 (Zabransky); Tr. 3476, 3481 (Kouts) (noting that to use an MRS, the Nuclear Waste Negotiator would have needed an agreement from a host site by 1992 or 1993 and agreeing that by the 1994-95 timeframe it was a "faint glimmer"); 1994 APR/ACR, DX163.[19] DOE continued to use the lower numbers in an effort to minimize its obligations to utilities. Tr. 4460-66 (Zabransky). DOE also no longer had the pretense to affix specific calendar years for the capacity projections, but instead referred to "Year 1" through "Year 10." *Compare* DX108 at 5 (HQR-002-0807) (using calendar years) *with* DX163 at 4 (HQR-029-0681) (using "Year 1" through "Year 10").

In December 1996, DOE stopped approving DCSs, informed utilities in March 1997 that it would be unable to approve further DCSs, and "waived" the "requirement" that utilities continue submitting DCSs. Tr. 1917-19 (Closs); PX589A; Tr. 4402-03, 4418-20 (Zabransky). In fact, DOE began voiding DCSs that had already been approved, including one submitted by NSP. Tr. 1922-23 (Closs); PX589A; Tr. 4402-03, 4433-36 (Zabransky). In stopping the DCS process and voiding DCSs, DOE believed that it was limiting its liability for damages from the utilities. Tr. 3722-23, 3739-40 (Pollog). DOE believed that it could unilaterally cut off its obligations by no longer approving DCSs. Tr. 3719-20 (Pollog).

DOE did not issue another ACR until 2004. Tr. 4405 (Zabransky). In 2004, DOE once again attempted to begin the process of collecting DCSs, by issuing its 2004 APR/ACR. 2004

---

[19] Notably, DOE included an "upper bounding rate" of 3,000 MTU per year after a five year ramp up period in its 1990 ACR, which like the 1991 ACR assumed the use of an MRS but that both the schedule and capacity linkages from the Amendments Act would be removed. 1990 ACR, DX87 at 5 (HQR-001-2497); Tr. 3697-98 (Pollog); Tr. 2194-95 (Supko).

APR/ACR, PX163; Tr. 181-85 (Bomberger). The DCSs to be submitted in response to this 2004 APR/ACR were to "replace, rather than supplement" any previously approved DCSs. Tr. 4427, 4486-87 (Zabransky); Tr. 3725 (Pollog); 2004 DCS Instructions ¶ 7(a), PX334 at 2 ("Purchasers should submit new DCSs based upon the currently planned operation date of 2010."); Tr. 233-35 (Bomberger). Soon thereafter in December 2004, DOE cancelled the DCS process again. Tr. 239-40 (Bomberger); Tr. 4406-07 (Zabransky) (noting that DOE sent a letter to utilities "suspending the process" and indicating that DOE "would restart it once we had a new date"). To date, DOE has not re-started the process. Tr. 4475 (Zabransky) (stating that DOE has not issued further ACRs but intends to restart that process in the future based on an expected performance date of 2017).

**J. The 2003 Legislation And The Monticello ISFSI**

DOE's continued failure to begin performance required NSP to return to the legislature to seek additional storage capacity for its Prairie Island Plant beyond the initial 17 casks. Tr. 1668 (Wilensky). NSP has also sought a Certificate of Need for an ISFSI at the Monticello plant. Tr. 1800 (McKeown); PX389.

In 2003, the Minnesota legislature amended the 1994 law to provide NSP with the ability to load up to 48 dry storage casks, per its NRC license, through the end of Prairie Island's NRC licensed-life. Tr. 167-69 (Bomberger); PX198, 2003 Minn. Sess. Laws, 1st Spec. Sess, Ch. 11, Art. 1, § 2, subdiv. 1 (codified, as amended, at Minn. Stat. § 116C.83, subdiv. 1). The Minnesota legislature also provided authority to the PUC to make final determinations regarding future expansions of the Prairie Island ISFSI and the establishment of any new ISFSI. *Id.*, subdiv. 2 (codified, as amended, at Minn. Stat. § 116C.83, subdiv. 2).

### 1. NSP Incurred Costs Complying With The Biomass Mandate

The 2003 law lowered the mandated amount of biomass energy the Minnesota legislature required NSP to add to its energy production resources from 125 megawatts of energy to 110 megawatts of energy. Tr. 1608, 1632-33 (Engelking); Tr. 2997-98 (Metcalfe); Tr. 1716-17 (Wilensky); PX198, 2003 Minn. Sess. Laws, 1st Spec. Sess, Ch. 11, Art. 2, § 16, subdiv. 5a (codified, as amended, at Minn. Stat. § 216B.2424, subdiv. 5a).

NSP has complied with the mandate by contracting for 110 megawatts of energy. Tr. 1608-09 (Engelking). To date, NSP has contracted with St. Paul Cogeneration for 25 megawatts of biomass energy generated by burning waste-wood. Tr. 1611-12 (Engelking); PX239 at 9-7. NSP has also contracted with Fibrominn, whose plant is under construction, for 50 megawatts of biomass energy generated by burning poultry litter as fuel. Tr. 1612, 1618-19 (Engelking), PX239 at 9-7. Finally, NSP has entered a contract with the towns of Hibbing and Virginia, Minnesota for 35 megawatts of biomass energy generated by burning wood. Tr. 1620-21 (Engelking), PX239 at 9-7.

NSP's damages from compliance with the biomass mandate only include those based on its costs of procuring the energy from St. Paul Cogeneration, which is a base load facility – *i.e.*, "it generates electricity 24 hours a day, 7 days a week" – because that was the only facility invoicing NSP before the December 31, 2004 cut-off of damages. Tr. 1619-20, 1623 (Engelking). Biomass energy "tends to be some of the most expensive generation on our system . . . ." Tr. 1624 (Engelking). Ms. Engelking and Mr. Kenneth Metcalfe calculated NSP's damages by taking the difference between the incurred costs of $32,747,000 from the St. Paul Cogeneration and subtracted the costs of a reasonable surrogate baseload project from the same time frame (the Manitoba Hydro bid) and concluded that NSP's damages were $23,142,000. Tr.

1640-44 (Engelking); Tr. 2998-3023 (Metcalfe); PX419; PX1058, Metcalfe Demonstrative Slides 19-20.

The added costs that NSP incurred to meet the biomass mandate were incurred solely as a result of NSP's needs for the storage casks at Prairie Island. Tr. 3021-22 (Metcalfe). "There are no other utilities in the state of Minnesota that have a requirement or a mandate to purchase biomass." Tr. 1628 (Engelking). The biomass mandate "was specifically imposed on NSP as a condition to obtain storage casks at the Prairie Island nuclear facility." *Id.* The reason NSP had to contract for this biomass power was a direct result of the Government's failure to perform. Tr. 1644-45 (Engelking). Because it is significantly more expensive, NSP would not have contracted for the biomass energy if it had not been mandated to do so. Tr. 1635-36 (Engelking); Tr. 3004-05, 3021-22 (Metcalfe).

### 2. NSP Incurred Costs Complying With The Mandate To Pay Into And Manage The Renewable Development Fund

The 2003 law also changed NSP's mandated payments into the Renewable Development Fund ("RDF") from $500,000 per cask per year, to a flat $16 million per year starting in 2004. Tr. 1553-54 (Swanson); Tr. 1714-15 (Wilensky); PX198, 2003 Minn. Sess. Laws, 1st Spec. Sess, Ch. 11, Art. 2, § 1, subdiv. 1 (codified, as amended, at Minn. Stat. § 116C.779, subdiv. 1).

NSP's parent, Xcel, administers the fund and is subject to oversight from the Minnesota PUC. Tr. 1555-56, 1561 (Swanson); PX1047 (PUC order setting forth oversight of Renewable Development Fund). As of December 31, 2004, the RDF included five board members, two drawn from the environmental community, two from Xcel (including Ms. Michelle Swanson, who also administered the RDF, Tr. 1561-62), and one from the Mdewakanton Dakota Tribe.

Tr. 1557-59 (Swanson); PX1047 at NSP-500006; PX1050 at 2 (order adding Mdewakanton Dakota Tribe – referred to as "Prairie Island Indian Community" – representative).[20]

NSP has incurred $19,800,000 in costs for projects and administration related to the RDF. Tr. 1576 (Swanson); Tr. 3026-30 (Metcalfe). This $19.8 million in costs funded several categories of projects. First, the RDF Board has conducted several rounds of awarding grant contracts involving wind, biomass, solar, and hydro for (1) research and development and (2) energy production projects. Tr. 1564-67 (Swanson); *see also, e.g.*, Tr. 1570-73 (Swanson); PX128, KRGNSP10146-211 (example of grant contract with DOE's National Renewable Energy Laboratory). The incurred costs of payments made to grantees are part of NSP's claim for breach of contract. Tr. 1576-77 (Swanson). Second, this amount includes a $10 million payment to the University of Minnesota to conduct basic and applied research for renewable resources and payments to energy projects through renewable energy production incentives as directed by the Minnesota legislature. Tr. 1577 (Swanson). Third, the incurred costs include NSP's costs of administering the RDF, including hiring two full-time staff to administer the funds. Tr. 1575, 1577 (Swanson).

No other utility must pay into the RDF. Tr. 1552-53, 1579 (Swanson). NSP would not have established and administered this fund without having been mandated to do so in the 1994 and 2003 legislation, which legislation would not have been necessary had DOE timely performed (or been expected to do so). Tr. 1549, 1553, 1579 (Swanson).

---

[20] Two additional non-Xcel members were added to the RDF Board recently. Tr. 1558-59 (Swanson).

### 3. NSP Incurred Costs Complying With The Settlement Agreement With The Mdewakanton Dakota Tribe at Prairie Island To Lift The 17 Cask Limitation

As noted above, the 1994 legislation imposed a requirement that NSP enter a contractual agreement with the Governor that allowed third-party standing to the Mdewakanton Dakota Tribe to enforce the 17 cask limitation in the legislation. Tr. 1686-88 (Wilensky); PX804. Before NSP could lift the 17 cask limitation through legislation, NSP knew it had to also resolve the contractually-binding 17 cask limitation that the Tribe could independently enforce. Tr. 1682-83, 1690-93 (Wilensky) (noting at Tr. 1683 that "getting legislators to walk the plank on a very difficult vote would have been nearly impossible, if they knew that that vote meant nothing" because the Tribe could prevent additional casks from being loaded through the contract); *see id.* at 1697-98 (Wilensky) (during Minnesota Senate hearings some Senators voiced the sentiment that "if you've got a legal barrier that you can't clearly articulate that you can overcome, we're not going to even take this matter up"); *id.* at 1763-64 (Wilensky).

Xcel's Mr. Scott Wilensky, Executive Director of State Government Affairs, met several times with the chair of the Mdewakanton Dakota tribal council or other members of the Tribe and the parties were able to work out a settlement agreement that released and waived the Tribe's ability to enforce the prior contract, thereby allowing NSP to lift the 17 cask limitation. Tr. 1690-93, 1696-1700, 1705 (Wilensky); PX187 at KRGNSP01399. Ultimately, the parties entered a settlement agreement on or about May 19, 2003, which would pay approximately $2.25 million per year to the Tribe including benefits-type payments for a health study, engineering work for emergency management services, and acquisition of land to be held in trust by the United States (including a good faith effort to have land trust language in the legislation). Tr.

1699-1700, 1706 (Wilensky); PX187 at KRGNSP01379, KRGNSP01398 (noting that the parties would "support and defend legislation" similar to the example in Attachment B).

The legislation codified this settlement between between NSP and the Mdewakanton Dakota Tribe at Prairie Island. Tr. 1717-21 (Wilensky); PX198, 2003 Minn. Sess. Laws, 1st Spec. Sess., Ch. 11, Art. 1, § 3, subdiv. 4 (codified, as amended, at Minn. Stat. 216B.1645, subdiv. 4). In this regard, the legislation reflected the terms that the parties had discussed, including annual payments of up to $2.5 million to the tribe (which the parties ultimately negotiated to be $2.25 million annually) for the purchase of up to 1500 acres of land in Minnesota away from Prairie Island (and the storage facility). Tr. 1717-21 (Wilensky); PX198, 2003 Minn. Sess. Laws, 1st Spec. Sess., Ch. 11, Art. 1, § 3, subdiv. 4 (codified, as amended, at Minn. Stat. 216B.1645, subdiv. 4).

NSP has incurred $2,938,000 for complying with this mandate through December 31, 2004. Tr. 1726-27 (Wilensky); Tr. 3023-24 (Metcalfe); PX1058, Metcalfe Demonstrative Slides 42-49. Had NSP expected in 1994 (when the original legislation passed) that DOE would timely perform in 1998 or would have begun performance by 2003 (when the later legislation was needed), NSP would not have incurred the costs of this mandate. Tr. 1726-27 (Wilensky).

### K. NSP Pursues And Receives A Certificate Of Need To Build A Dry Storage Facility At The Monticello Plant

Consistent with the 2003 law, NSP is pursuing the licensing and construction of an ISFSI at Monticello before the Minnesota PUC. *See* Monticello Certificate of Need, PX389. NSP had sufficient storage in the Monticello spent fuel pool to assure operational freedom of the Monticello plant through the refueling outage that would occur in 2010. Tr. 1802-03 (McKeown). By 2003, however, NSP filed a license renewal application with the NRC to allow

the Monticello plant to operate through 2030. Tr. 1802 (McKeown).[21] Had DOE begun performing in 1998 (picking up fuel from NSP in 1999), NSP would not have had to install a dry storage facility at Monticello. Tr. 1821-22 (McKeown).

Before determining how it would expand its storage, NSP reviewed several options and concluded that building a dry storage facility at Monticello was the best method of storage to meet its needs in light of the applied-for NRC license renewal. Tr. 1814-16 (McKeown); PX394 at NSP-0069128. Because of DOE's non-performance and frequent delays in finalizing any firm pick-up date, re-racking would not provide sufficient storage to allow the continued operation of Monticello through 2030. Tr. 1815-16 (McKeown).[22] NSP chose the Transnuclear NUHOMS canister-based dry storage system, because NMC (which, as noted above, now manages NSP's nuclear plants) had a fleetwide contract for these casks and it was the "least cost option for us." Tr. 1822-25 (McKeown).[23]

As of December 31, 2004, NSP had incurred $2,012,000 in costs to increase the storage capacity of the Monticello plant. Tr. 1826-27 (McKeown); Tr. 2671 (Sieracki); PX1057, Sieracki Demonstrative Slide 12. These costs include labor costs for full time employees and contractors hired to study the Monticello fuel pool and the costs of preparing the Certificate of

---

[21] As noted above, the NRC issued the renewed Monticello operating license on November 8, 2006. *See* 71 Fed. Reg. 66806 (Nov. 16, 2006).

[22] NSP realized that it would lose the ability to perform a full core offload at the Monticello plant in 2007 and concluded that it needed to create a contingency plan to assure that the plant could continue running in the event it needed to fully offload. Tr. 1804-09 (McKeown); PX475 at NSP-0040588; PX394 at NSP-0069132-33. As part of this contingency plan, NSP determined that it would acquire a temporary storage rack to be used in the Monticello spent fuel pool for the fuel outage and offload planned for 2007. Tr. 1810-11 (McKeown).

[23] NSP could not have used the TN-40 cask design used at the Prairie Island plant because the TN-40 is only licensed for pressurized water reactor spent fuel and is also "heavier than the Monticello infrastructure would readily support, even with facility upgrades." Tr. 1827-29 (McKeown).

Need to the Minnesota PUC. Tr. 1776 (McKeown); Tr. 2671 (Sieracki). NSP has also incurred $280,000 in security upgrades for the GE-Morris facility where NSP shipped some fuel from the Monticello plant in the 1980s. Tr. 2684-85 (Sieracki); PX1057, Sieracki Demonstrative Slide 21.

### L. NSP Incurred Actual Cost Of Capital By Financing Its Mitigation Costs

In determining NSP's costs of financing its mitigation costs, NSP relies on its weighted average cost of capital for debt and equity in every year in which damages are being claimed. Tr. 3035 (Metcalfe). The cost of capital is a "cost that is actually incurred by the utility for the expenditures that they made that they would not have made but for the breach." Tr. 3035, 3036 (Metcalfe); *id.* at 3101 ("[W]eighted average cost of capital is the actual debt and equity component that the utility actually has on its books and actually incurs costs for."); *see also* PX1058, Metcalfe Demonstrative Slide 52; Tr. 4673-74 (Neuberger) (noting that the costs of capital are the "corporation's costs" and that for equity "the company itself is really incurring those costs"). NSP (like most regulated utilities) does not simply go to the bank to receive financing for any particular project, but instead draws from a pool of available debt and equity. Tr. 3106 (Metcalfe).

"[T]he weighted average cost of capital is generally applied in the utility business, as what is known as AFUDC, allowance for funds used during construction." Tr. 3036, 3045, 3101 (Metcalfe). State public utility commissions vet the use of the equity costs; the debt costs come from the pool of debt used by the utility. Tr. 3041 (Metcalfe); *id.* at 3101-02 ("[B]ecause of the regulatory compact between the utilities and the states, the cost of equity capital is something that is vetted very much by the state commissions."). The Federal Energy Regulatory Commission regulations permit the recovery of AFUDC. Tr. 3096-97 (Metcalfe); *see also* Tr.

1869 (Perkett) (noting that NSP's construction accounting system "follows FERC rules, and where the states have any special rules, we follow those as well"); *See* 18 C.F.R. pt. 101, Uniform System of Accounts Prescribed for Public Utilities and Licensees Subject to the Provisions of the Federal Power Act ("Uniform Systems of Accounts"), Electric Plant Instructions, ¶ 3.A(17) (stating that AFUDC "includes the net cost for the period of construction of borrowed funds used for construction purposes and a reasonable rate on other funds when so used" and listing "average short-term debt," "long-term debt," "preferred stock," and "common equity" as elements that may be included in the AFUDC calculation). The rates used to calculate NSP's cost of capital vary from year-to-year and the yearly rate comes directly from NSP's business records. Tr. 3039-40, 3043 (Metcalfe). Unlike pre-judgment interest, which is calculated from the time a claim is submitted, the cost of capital is "applied from the time damages are incurred or cost is incurred that needs to get this financing cost." Tr. 3044 (Metcalfe).

## III. CONCLUSIONS OF LAW

### A. The Standard Of Review For Mitigation Costs For Breach Of Contract Damages

Generally, the "remedy for breach of contract is damages sufficient to place the injured party in as good a position as it would have been had the breaching party fully performed." *Indiana Mich. Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005)("*Indiana Mich. III*"). "Damages for a breach of contract are recoverable where: (1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach is a substantial causal factor in the damages; and (3) the damages are shown with reasonable certainty." *Id.* (citing *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1320 (Fed. Cir. 2002)). "*Indiana Michigan* altered the landscape considerably by parsing utility claims into

actual expenditures and framing the inquiry as one of mitigation." *Yankee Atomic Elec. Co. v. United States*, 73 Fed. Cl. 249, 260 (2006).

As noted above, the Government has acknowledged that NSP has incurred the costs that it seeks and, therefore, there is no question as to the reasonable certainty of the costs NSP has incurred. Instead, the Government continues to challenge NSP's incurred mitigation costs based on a lack of causation or foreseeability. As discussed below, the Government caused NSP's damages, which were foreseeable or actually foreseen. Thereafter, the Government bears the burden of showing the unreasonableness of NSP's actions, which it failed to do at trial.

### 1. *Indiana Michigan III* Established Mitigation As The Paradigm for Determining Costs For Past Damages In A Partial Breach Case

Generally, "'[o]nce a party has reason to know that performance by the other party will not be forthcoming, . . . he is expected to take such affirmative steps as are appropriate in the circumstances to avoid loss by making substitute arrangements or otherwise.'" *Indiana Mich. III*, 422 F.3d at 1375 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 350, cmt. b). "Mitigation is appropriate where a reasonable person, in light of the known facts and circumstances, would have taken steps to avoid damage." *Id.* (citing *Robinson v. United States*, 305 F.3d 1330, 1334 (Fed. Cir. 2002)). A mitigating party, such as NSP, is "'not precluded from recovery . . . to the extent that [it] has made reasonable but unsuccessful efforts to avoid loss.'" *Id.* (citing RESTATEMENT (SECOND) OF CONTRACTS § 350(2)).

The "guiding principle" in determining mitigation damages is grounded in whether a plaintiff acted with "reasonable commercial judgment." *Northern Helex Co. v. United States*, 524 F.2d 707, 718 (Ct. Cl. 1975) (citations omitted); *see also Yankee Atomic*, 73 Fed. Cl. at 264. Generally, "fair and reasonable efforts to mitigate are all that the law requires." *Home Savings of*

*Am., FSB v. United States*, 399 F.3d 1341, 1353 (Fed. Cir. 2005); *Indiana Mich. III*, 422 F.3d at 1375. "'The rule of mitigation of damages may not be invoked by a contract breaker as a basis for hypercritical examination of the conduct of the injured party, or merely for the purpose of showing that the injured person might have taken steps which seemed wiser or would have been more advantageous to the defaulter.'" *Koby v. United States*, 53 Fed. Cl. 493, 497 (2002) (quoting *In re Kellett Aircraft Corp.*, 186 F.2d 197, 198-99 (3d Cir. 1950)).

The breaching party – here the Government – failed to meet its burden of proving that any of the mitigation efforts of the non-breaching party – NSP – were unreasonable. *Tenn. Valley Auth.*, 69 Fed. Cl. at 523 ("To eliminate or reduce [the utility's] mitigation-related damages, the government bears the burden of showing that [the utility's] mitigation efforts were unreasonable."); *see also Old Stone Corp. v. United States*, 450 F.3d 1360, 1370 (Fed. Cir. 2006) (noting that the Government failed to show that costs incurred were unreasonable), *petition for cert. filed*, 75 U.S.L.W. 3333 (U.S. Dec. 14, 2006) (No. 06-837) ; *Yankee Atomic*, 73 Fed. Cl. at 264 ("Defendant has the burden of showing that plaintiffs' mitigation efforts were unreasonable.").

**2. NSP's Damages Were Foreseeable**

Contrary to the Government's contentions, all of NSP's damages were foreseeable or actually foreseen. In this regard, "what must be foreseeable is only that the loss would result if the breach occurred. There is no requirement that the breach itself or the particular way that the loss came about be foreseeable." 3 E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS § 12.14, at 260-61 (3d ed. 2004); *see also Gardner Displays Co. v. United States*, 346 F.2d 585, 589 (Ct. Cl. 1965) (labeling as "specious" the Government's argument that plaintiff's damages were "consequential," and stating that the "cause or cost of such increases is not in every case

material to and does not determine their foreseeability"); *see also Pac. Gas & Elec. Co. v. United States*, 73 Fed. Cl. 333, 418-19 (2006) (noting that the *loss* that must be foreseeable is that a utility will run out of storage capacity and that how a utility addresses that loss is a question of mitigation and its test of reasonableness).[24] It would stretch logic beyond its limits to require that the specific types of damages that could be incurred to mitigate the breach of a contract whose performance has already stretched into its third decade, and will undoubtedly extend for many decades more, must have been anticipated at the time that the parties entered into the contract.

### 3. NSP Need Not Prove Causation Based On The Self-Serving "But For" Model Of Causation Contrived By The Government

Generally, "the selection of an appropriate causation standard depends upon the facts of the particular case and lies largely within the trial court's discretion." *Citizens Fed. Bank v. United States*, No. 05-5173, 2007 WL 162820, at * 3 (Fed. Cir. Jan. 24, 2007). In *Indiana Michigan III*, the Federal Circuit enunciated the causation test generally appropriate for a case involving mitigation, stating that a utility had to show that the breach was a "substantial causal factor" in mitigating damages. 422 F.3d at 1373; *see also S. Cal. Fed. Sav. & Loan Ass'n v. United States*, 422 F.3d 1319, 1337 (Fed. Cir. 2005) (affirming the Court of Federal Claims' conclusion that "FIRREA was the principal cause of SoCal's recapitalization and was the

[24] Normally, foreseeability is measured from the time of contract formation. *See Indiana Mich. III*, 422 F.3d at 1373. However, the Court of Claims has commented, "There may even be valid reason to fix the foreseeability *at the time of the breach rather than at the time of the agreement*, for it is at the breach time that the consequences of wrongdoing are more apparent and assessable, and the deterrent accordingly greater." *Gardner Displays*, 346 F.2d at 589 (emphasis added). NSP fully believes that its damages were foreseeable at the time of contract formation, but should the Court disagree it should apply the *Gardner Displays* test in light of the long-term nature of the contracts at issue and the long-term nature of the Government's breach. For example, reasonable mitigation of the breach of a long term contract might involve a technology that did not exist at the time of contract formation (*e.g.*, mitigation in 2006 for a contract entered into in the early 1950s might include the cost of personal computers). Barring the recovery of such costs would unfairly reward the breaching party (and perhaps even encourage the breach of long term contracts).

substantial factor in SoCal's incurring higher costs of funds after the breach"), *cert. denied sub nom. Martin v. United States*, 126 S. Ct. 2967 (2006). Other Judges of this Court have likewise adopted the Federal Circuit's "substantial causal factor" standard in determining mitigation damages in SNF cases. *See, e.g.*, *Yankee Atomic*, 73 Fed. Cl. at 267-68 (applying the substantial causal factor test); *see also Sacramento Mun. Util. Dist. v. United States*, 70 Fed. Cl. 332, 365 (2006) ("*SMUD*") (decision to incur pre-breach mitigation costs "was made in anticipation of [DOE's] subsequent January 31, 1998 breach of the Standard Contract, and, therefore, was a substantial causal factor in this decision"); *Pac. Gas & Elec.*, 73 Fed. Cl. at 405 (employing the "substantial causal factor" test from *Indiana Michigan III*).

The Government has argued that this Court should employ a self-serving "but for" standard of causation that bears little support in law and represents a "moving target" that the Government manipulates to reduce or preclude NSP's damages. The Government seeks to require NSP to create a hypothetical alternative universe in which NSP would be charged with disproving every contingency contrived by the Government in this mythical "but for world" with any one failure leading to a failure to show causation. The law, whether termed "substantial factor" or "but for" causation, does not require such proof. *See Locke v. United States*, 283 F.2d 521, 524 (Ct. Cl. 1960) ("The defendant who has wrongfully broken a contract should not be permitted to reap advantage from his own wrong by insisting on proof which by reason of his breach is unobtainable.").

The Federal Circuit ostensibly has employed a "but for" standard of causation in lost profits cases, but that standard bears little resemblance to the standard the Government proposes in this case and, in fact, more closely resembles NSP's understanding of causation. *Cal. Fed. Bank, FSB v. United States*, 395 F.3d 1263, 1268 (Fed. Cir. 2005) ("*Cal. Fed.*"), *cert. denied*,

126 S. Ct. 344 (2005). In particular, the Federal Circuit's decision in *Cal. Fed.* makes clear that a plaintiff need not prove that the breach was the "the sole factor or sole cause" of damages (as the Government's proposed standard in this case would require). *Id.* "The existence of other factors operating in confluence with the breach will not necessarily preclude recovery based on the breach." *Id.* Thus, whether this Court employs the Federal Circuit's "substantial factor" test as enunciated in *Indiana Michigan III* or the "but for" test in *Cal. Fed.*, the same result will issue; neither test requires sole causation. *See Abbott Labs. v. Brennan*, 952 F.2d 1346, 1353 (Fed. Cir. 1991) (noting in the tort context that "[c]ommentators have explained that the 'but for' and 'substantial factor' standards of causation generally yield identical results"). Under either standard, the Government caused NSP to incur its mitigation costs.

Ultimately, this Court should be wary of the Government's arguments. This is a mitigation case. The Government should not be allowed to avoid its burden of proving the unreasonableness of NSP's actions, which it cannot do on these facts, by attempting to cloak its argument as one of causation. *Tenn. Valley Auth.*, 69 Fed. Cl. at 529-30 ("The government frames this argument as one of causation . . . but in the circumstances of this case, it realistically is a contention aimed at limiting the amount of damages [the plaintiff] may recover as a result of its mitigation efforts. The government contends that [the plaintiff's] damages should be constrained to the difference between the costs of building the dry storage facilities in the present (breach) world versus the costs of building the facilities later in the but-for, non-breach world . . . Because the government seeks to limit the non-breaching party's recovery for mitigation, the government bears the burden of proof."); *cf. also First Heights Bank, FSB v. United States*, 422 F.3d 1311, 1317 (Fed. Cir. 2005) ("We thus conclude that the government's so-called causation

argument is identical to the government's mitigation argument and reject it for the reasons described above.").

**B. NSP's Incurred Costs In Licensing And Constructing On-Site Dry Storage Facilities Were Caused By The Government's Breach And Foreseeable**

At trial, NSP proved its damages for (1) licensing and constructing an on-site dry storage facility (the ISFSI) and constructing and loading dry storage casks at its Prairie Island nuclear plant, and (2) its costs of beginning the process of licensing and constructing an on-site dry storage facility at its Monticello Nuclear plant. These were reasonable mitigation costs, eminently foreseeable, and directly caused by the Government's breach.

**1. NSP Properly Mitigated The Government's Breach By Licensing And Constructing A Dry Storage Facility And Loading Casks At The Prairie Island Plant**

It was clearly foreseeable at the time of contract formation that a utility would need to provide alternative storage facilities for SNF if DOE failed to pick-up the fuel. As noted above, one of the primary objectives of the NWPA was to assure that utilities would not have to build additional at-reactor storage after 1998. *See Yankee Atomic*, 73 Fed. Cl. at 265 ("[T]he intent of the NWPA and the parties to the Standard Contract was to avoid the construction by utilities of additional at-reactor storage after January 31, 1998. DOE's failure to perform under the Standard Contract thus has led to the very thing the NWPA and the Standard Contract were designed to forestall., *i.e.*, the construction of dry storage facilities for spent nuclear fuel at nuclear power electricity generating plants throughout the United States.") (internal quotations omitted); *see also Tenn. Valley Auth.*, 69 Fed. Cl. at 519. Thus, it was foreseeable that NSP would have to find alternative storage for its SNF, when DOE failed to perform. *Indiana Mich. III*, 422 F.3d at 1375 ("Having been placed in a position where they are required to find alternate

storage for SNF, the utilities must *de facto* accept responsibility to guard against the environmental impact of improperly-disposed and maintained SNF, a situation which the NWPA was enacted to avoid.").

NSP's decision to build a dry storage facility was caused by DOE's expected breach and long-term non-performance. As discussed above in the Findings of Fact, NSP (based on the prescient advice of Ms. McCarten) concluded in 1987 and 1988 that it would need storage capacity at its Prairie Island plants through the end of the NRC-licensed life (2013 for Unit 1 and 2014 for Unit 2), because DOE could not be expected to perform before then. DOE's expected failure to perform in 1998 and expected non-performance through the end of these plants' lives were the direct, primary, and overwhelming reasons that NSP focused exclusively on storage technologies that would double its storage capacity allowing NSP to continue running its plants through the end of the NRC-licensed life of its plants. DOE's expected breach, therefore, provided the fundamental and principal reason why NSP looked only at dry storage technology and rod consolidation as the means to meet its expected storage needs. *See S. Cal. Sav. & Loan*, 422 F.3d at 1337 (affirming the trial court's determination that the breach was the "principal" and "substantial factor" causing damages). Ultimately, NSP chose dry storage technology, built an ISFSI at Prairie Island, and loaded 17 TN-40 casks (and had procured three additional casks) by December 31, 2004 to mitigate the Government's breach.

In the actual world, as also discussed above, NSP never seriously pursued a third re-rack of its spent fuel pools, because once NSP understood it would have to mitigate DOE's impending breach, such a re-rack could not feasibly provide sufficient storage through the end of the NRC-licensed life of the Prairie Island plant's two reactors. NSP has included, however, an offset to its dry storage mitigation costs based on a third re-rack that it would have conducted had it

expected DOE to perform by 1998 and begin picking up fuel from NSP in 1999. In this regard, NSP had to provide storage capacity from roughly 1995 through 1999, when DOE would have picked-up NSP's fuel. Given the ability to keep the spent fuel in the Prairie Island pool, NSP would have chosen this method due to its lower visibility in the community and reduced political opposition. (The desire to keep the fuel in the pool animated why NSP originally looked at rod consolidation, because that technology would have doubled the storage capacity and kept the fuel in the pool.)

Employing its own standard of causation, however, the Government criticizes NSP's proposed offset for the 1995 to 1999 period by arguing that the offset should be larger because it was not technologically feasible to perform a third re-rack of the Prairie Island spent fuel pools or, alternatively, that NSP would have chosen to have used dry storage technology in the "but for world" because of the "razor thin" margin between when DOE would have performed in 1999 and when NSP's fuel pools would have been filled. *But see Koby*, 53 Fed. Cl. at 497 (noting that a contract-breaker may not employ "hypercritical" assumptions to defeat reasonable mitigation efforts). Based on the testimony of Mr. Kapitz – a nuclear engineer who has worked with the Prairie Island spent fuel pools for twenty years – it is clear that it was technically feasible to perform a re-rack of between 20 percent and 30 percent in the early 1990s timeframe. During the trial, NSP provided the NUTECH study of the Prairie Island pool that was roughly contemporaneous with when NSP would have made that determination, which study showed that it was feasible to increase the storage of the pool by 30 percent. Also as noted above, the 1995 Holtec International study of the spent fuel pools provided further evidence that no technological barrier existed to re-racking the pool, perhaps as much as 40 percent. Much of Holtec's analysis



400510160v8

was available in the 1989-91 timeframe and would have been available to NSP, had NSP (1) believed DOE would perform beginning in 1998 and (2) pursued a third re-rack.

Alternatively, the Government suggested a hypothetical (and hypercritical) scenario in which DOE would not begin to pick-up NSP's fuel until the very last day required by the contract – presuming a late 1999 or early 2000 pick-up. However, this scenario is not a "non-breach" scenario as presented by the Government, but in fact an "alternative breach" scenario. The Standard Contracts allowed NSP to provide the range of dates in the final delivery schedule for when it would be prepared to have DOE pick-up the fuel. *See* Standard Contract, Appendix D, PX56 at KRGNSP08011. The Standard Contracts also required DOE to provide the transportation casks "sufficiently in advance" of deliveries, which as Mr. Kapitz testified to, could have been delivered well in advance of the shipment. *See* Standard Contract, Article IV.B.2, PX56 at KRGNSP07980 ("Such cask(s) shall be furnished sufficiently in advance to accommodate scheduled deliveries."). Mr. Kapitz testified that NSP could even have procured transportation casks to temporarily store its spent fuel until DOE performed. Given that NSP would have been monitoring the DOE program and would have had knowledge about when DOE would have performed, it could have increased the length of its fuel cycles by using more highly enriched fuel (as actually happened). In its 2001 report to Congress about Prairie Island's fuel storage options, PX1019, DOE acknowledged this as one option to prolong the life of the plants without a change in law.

Ultimately, NSP correctly analyzed the real world and with twenty-twenty foresight concluded that DOE could not be expected to perform by the end of the NRC-licensed life of the Prairie Island plant (2013 for unit 1 and 2014 for unit 2). That failure of DOE performance led directly and inexorably to NSP's decision to construct and operate the dry storage facility at

Prairie Island. NSP has also proven that it would have and could have performed a third re-rack had NSP expected DOE to perform. *Locke*, 283 F.2d at 524 (noting that a contract-breaker "should not be permitted to reap advantage from his own wrong by insisting on proof which by reason of his breach is unobtainable"); *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 265 (1946) ("The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created."). Therefore, NSP has proven dry fuel storage mitigation costs of $41,898,000 (which takes account of the offset for the third re-rack).

**2. NSP Properly Mitigated Its Damages By Beginning To Plan For The Licensing And Construction Of A Dry Storage Facility At The Monticello Plant**

Because of DOE's continued non-performance after the 1998 date had passed, NSP had to mitigate the Government's on-going breach by beginning the process of licensing and constructing a dry storage facility at the Monticello plant. For the same reasons stated above, it was foreseeable that the Government's failure to perform would require NSP to find an alternative storage facility. *See Indiana Mich. III*, 422 F.3d at 1375; *Yankee Atomic*, 73 Fed. Cl. at 265; *Tenn. Valley Auth.*, 69 Fed. Cl. at 519. As discussed above, Mr. McKeown (the project manager of the Monticello dry storage project) and Mr. Bomberger (the general manager of NSP's nuclear asset management) stated that NSP would not have needed to begin preparing a license application in 2003 for a dry storage facility at the Monticello plant had DOE begun picking up fuel from the industry in 1998 as required by the NWPA and the Standard Contracts. Therefore, NSP has proven damages of $2,012,000 for beginning the process of licensing and constructing a dry storage facility at the Monticello plant and $280,000 for the costs of security upgrades at the GE-Morris facility (to which Monticello SNF was shipped in the 1980s).

### C. NSP's Incurred Costs In Pursuing Off-Site Dry Storage Through Private Fuel Storage Was Caused By The Government's Breach And Was Foreseeable Or Actually Foreseen

NSP's investigation of alternate sites for storage of its SNF was entirely foreseeable. The Government should not be surprised that a utility would examine alternate sites for storing its SNF. For example, the NWPA itself directed DOE to investigate various sites in searching for both a repository and its MRS. *See* NWPA, Pub. L. No. 97-425, §§ 112-113, 141, 96 Stat. 2201, 2208-12, 2241-44 (1983) (codified as amended at 42 U.S.C. §§ 10132-10133, 10161) (discussing siting of a repository and investigations of possible sites for an MRS); *see also* Nuclear Waste Policy Amendments Act of 1987, Pub. L. No. 100-203, §§ 5021, 101 Stat. 1330-228, 1330-232 to 1330-236 (1987) (codified, as amended, 42 U.S.C. §§ 10162-10169).

As discussed above, the PFS project was a direct result of DOE's failure to successfully pursue the MRS effort, with PFS (and its predecessor Mescalero Fuel Storage) negotiating with tribes such as the Mescalero Apache Tribe that had been part of the MRS effort until DOE ended it, and ultimately entering into a lease with another Tribe – the Skull Valley Band of Goshute Indians. Not only was it foreseeable that utilities could potentially need an away-from-reactor storage facility to ship SNF prior to the repository's construction, the NWPA (and its amendments) provided for just such a facility – the MRS.[25] PFS provides exactly the type of performance expected of DOE under NSP's Standard Contracts: removal of NSP's SNF away from NSP's reactor and out of the state of Minnesota. NSP's pursuit of both PFS (and the

---

[25] The Government's anticipated prior to enactment of the NWPA the possibility of NRC licensing a privately-run away-from-reactor storage facility. *See NRDC, Inc. v. United States NRC*, 685 F.2d 459, 502, 510 (D.C. Cir. 1982) (noting that NRC's rules regarding confidence in storing waste was complicated by the concerns about the unavailability of any facilities and that NRC had "yet to license a private corporation to build a retrievable surface storage facility") (Edwards, J., concurring in part, dissenting in part), *rev'd on other grounds sub nom. Baltimore Gas & Elect. Co. v. NRDC, Inc.*, 462 U.S. 87 (1983).

alternative Goodhue County facility – discussed further below) as off-site storage facilities was foreseeable to the Government.

NSP's decision to pursue the PFS project was directly caused by DOE's impending breach; even the Government's expert – Dr. Neuberger – acknowledged that absent the breach, there would be no PFS. NSP began participation in the PFS project (and the predecessor Mescalero Fuel Storage) in 1994 to investigate and site an out-of-state storage facility. As Mr. Northard, Mr. Bomberger, and Mr. Howard testified at trial, NSP pursued this project to assure sufficient storage for Prairie Island's SNF and as a means eventually to move SNF out of Minnesota. Even after the 1994 Minnesota legislation approved NSP's ability to load 17 dry casks, NSP was still short of sufficient storage capacity to take it until the end of the life of the Prairie Island operating licenses, knowing that DOE would not begin performance before 2013 or 2014. Thus, NSP pursued this storage option as a means to bridge that gap.

The 1994 Minnesota legislation also based some of the mandates on whether dry storage casks remained at Prairie Island. For example, the legislation required NSP to pay $500,000 annually into the renewable development fund for each cask that remained at Prairie Island. In 2003, Minnesota increased these costs to a flat $16 million per year. If NSP could move the spent fuel from Prairie Island to PFS, it would no longer incur these costs. Thus, as Mr. Northard pointed out, NSP has had a strong incentive to mitigate these mandated costs by pursuing PFS, an out-of-state storage option.

Furthermore, independent of this litigation, DOE itself has acknowledged that PFS could serve as an available alternative for storing NSP's Prairie Island SNF. *See* DOE, Spent Fuel Management Alternatives Available To Northern States Power Company Inc. [SIC] & the



400510160v8

Federal Government for the Prairie Island Nuclear Plant, Units 1 & 2 (Jan. 2001), PX1019.[26] As noted above, Congress had requested that DOE prepare a report in 2001 discussing NSP's available options for dealing with its SNF absent a change in state or federal law. In that report, under the responsibility of DOE's Mr. Pollog, DOE acknowledged that PFS could be available as early as 2003 and the facility provided a potential alternative for the storage of Prairie Island's SNF.

In its pre-trial brief, the Government incorrectly asserts that the Federal Circuit's decision in *Indiana Michigan III* regarding PFS as a matter of law somehow precludes a factual decision regarding PFS costs in this case. Defendant's Memorandum of Contentions of Fact and Law at 55-56. However, foreseeability is a question of fact. *Bluebonnet Sav. Bank, FSB v. United States*, 266 F.3d 1348, 1355 (Fed. Cir. 2001) ("Foreseeability is a question of fact reviewed for clear error."); *Landmark Land Co. v. FDIC*, 256 F.3d 1365, 1379 (Fed. Cir. 2001) ("Foreseeability is a question of fact."). Furthermore, the determination of causation is also a question of fact. *Bluebonnet*, 266 F.3d at 1356 ("Causation is also a question of fact reviewed under the clear error standard."); *Hendler v. United States*, 175 F.3d 1374, 1384 (Fed. Cir. 1999) (noting that a theory considered by the trial court involved "causation, a question of fact"). And, the Federal Circuit limited its decision in *Indiana Michigan III* regarding PFS to the facts presented during that trial. *Indiana Mich. III*, 422 F.3d at 1375, 1376 (noting that based "on

[26] Congress had directed DOE to submit a report to Congress "containing a description of all alternatives that are available to Northern States Power Company and the Federal government to allow the company to continue to operate the Prairie Island nuclear generating plant until the end of the term of the license issued to the company . . . ." DOE, Spent Fuel Management Alternatives Available To Northern States Power Company Inc. [SIC] & the Federal Government for the Prairie Island Nuclear Plant, Units 1 & 2, at 3 (Jan. 2001), PX1019. DOE noted that NSP could fulfill its storage needs by making SNF shipments to, among other places, "the proposed Private Fuel Storage (PFS) facility which is currently undergoing licensing review by the NRC . . . ." *Id.* at 7.

these facts" and the "credited evidence" that one of the utility's own fact witnesses described the PFS facility as "too speculative," the Federal Circuit concluded that Indiana Michigan failed to show causation or foreseeability).

In the instant case, however, NSP has presented extensive evidence about why NSP took the lead in pursuing PFS. NSP also presented evidence that DOE acknowledged in a report to Congress that PFS was an option to solve NSP's storage problem at Prairie Island. *See* PX1019. Moreover, as Mr. Northard and Mr. Bomberger stated, the NRC has issued a license to PFS, which license was issued after the trial and appellate decisions in *Indiana Michigan*. *See Yankee Atomic*, 73 Fed. Cl. at 265 n.23 ("Subsequently, NRC granted a license to Private Fuel Storage, LLC to construct and operate an ISFSI in Skull Valley, Utah."). Therefore, this Court should consider and credit the record presented by NSP concerning its PFS costs, because foreseeability and causation are questions of fact.

Finally, NSP did not pursue this project to make a profit, but to fulfill its very real and pressing storage needs.[27] To date NSP has not earned any profit for its successful efforts to site and license PFS with the NRC. The Government's assertion that NSP may one day earn such a profit is speculative and inappropriate to consider in a partial breach case. *See Tenn. Valley Auth.*, 69 Fed. Cl. at 543 (concluding that the Federal Circuit's framework of disallowing consideration of future damages as speculative in *Indiana Michigan III* also dictates disallowance of future setoffs as "too speculative").

[27] Even if the Government could prove that NSP treats some PFS costs as a capital investment in a business venture (which NSP maintains the Government failed to do at trial), profit was not the primary (and certainly not the sole) cause for pursuing PFS. DOE's breach and the resultant need to store NSP's SNF was the primary and direct reason for pursuing PFS. *See Cal. Fed.*, 395 F.3d at 1268.

Ultimately, NSP proved that it reasonably incurred $24,720,000 in mitigation costs in its efforts to license PFS.

### D. NSP Reasonably Incurred Mitigation Costs Regarding The Mandates, Which Were Caused By The Government's Breach And Were Foreseeable Or Actually Foreseen

As the facts above demonstrate, had NSP not agreed to the 1994 Prairie Island legislation and complied with the Minnesota mandates after they were enacted into law, NSP would have been forced to shut down the Prairie Island nuclear units and would have faced over $1 billion in costs to replace the power that it generates. Thus, under the law of mitigation, NSP had a duty to mitigate the Government's breach by incurring the costs imposed by the mandates, which, while substantial, were far less expensive than shutting down the Prairie Island reactors. *Indiana Mich. III*, 422 F.3d at 1375 ("'Once a party has reason to know that performance by the other party will not be forthcoming, . . . he is expected to take such affirmative steps as are appropriate in the circumstances to avoid loss by making substitute arrangements or otherwise.'") (quoting RESTATEMENT (SECOND) OF CONTRACTS § 350, cmt. b). In so doing, NSP made a commercially reasonable judgment and, therefore, reasonably mitigated its damages.

NSP reasonably incurred mitigation costs of $19,800,000 based on the Renewable Development Fund mandate, $23,142,000 based on the biomass mandate, $2,867,000 based on seeking to site an alternative away-from-reactor ISFSI in Goodhue County, and $2,938,000 based on its settlement agreement with the Mdewakanton Dakota Tribe.

While NSP must show foreseeability, it need not necessarily show foreseeability (although it can) for each category of its damages incurred to mitigate the breach. *See* 3 DAN B. DOBBS, DOBBS LAW OF REMEDIES § 12.6(2), at 138 (2d ed. 1993) ("These [mitigation] expenses

are clearly themselves in the category of special damages. But they seem to be recoverable not so much because they are damages within the contemplation of the parties at the time the contract was made as because they set appropriate incentives to minimize damages. For this reason, the rule in *Hadley v. Baxendale*, limiting special damages to those within the contemplation of the parties, seems to have no application to reasonably incurred expenses of minimizing damages.") (footnotes omitted); *see Brandon & Tibbs v. George Kevorkian Accountancy Corp.*, 277 Cal. Rptr. 40, 51 (Cal. Ct. App. 1990) ("Inasmuch as the law denies recovery for losses that can be avoided by reasonable effort and expense, justice requires that the risks incident to such effort should be carried by the party whose wrongful conduct makes them necessary. Therefore, special losses that a party incurs in a reasonable effort to avoid losses resulting from a breach are recoverable as damages.") (internal citations omitted); *see also* 11 JOSEPH M. PETRILLO, CORBIN ON CONTRACTS § 57.16 at 349 (Rev. ed. 2005) ("[S]pecial losses that a party incurs in a reasonable effort to avoid losses resulting from a breach are recoverable as damages.").

It takes little to imagine the Government's reaction had NSP chosen to forego accepting the costs of the mandates, but instead shut down when NSP ran out of spent fuel storage space, and sought damages for the far greater costs of replacing the power that Prairie Island generates. The Government would, without a doubt, have complained that NSP should not be allowed to recover the replacement power costs since it acted unreasonably by not implementing the mandates and incurring lesser damages. The Government cannot have it both ways. If the relatively smaller costs of the mandates are not properly considered mitigation damages, then NSP would have to be allowed to recover the plant shutdown costs.

Ultimately, the Government bears the burden to demonstrate that NSP's mitigation efforts were unreasonable, *Old Stone Corp.*, 450 F.3d at 1370; *Yankee Atomic*, 73 Fed. Cl. at 264.

**1. In A Heavily Regulated Environment, Actions Of Regulatory Bodies Are Foreseeable**

As the Federal Circuit has commented, "the production of energy from nuclear sources is one of the most highly regulated human activities." *Commonwealth Edison Co. v. United States*, 271 F.3d 1327, 1348 (Fed. Cir. 2001) (*en banc*) (quotation omitted). In a highly regulated industry, actions of regulatory bodies become reasonably foreseeable and sometimes, in fact, are entirely foreseen. *Cf. Bluebonnet*, 266 F.3d at 1356 ("It is also foreseeable that the heightened regulatory requirements and Bluebonnet's risk of seizure due to failure to meet those requirements, would heighten the risk of investing in Bluebonnet and thereby increase the cost of securing either debt or equity financing."). In this regard, "[h]eavy industry regulation of the sort seen in the nuclear industry means that few legislative changes can truly be seen as wholly unanticipated." *Maine Yankee Atomic Power Co. v. United States*, 44 Fed. Cl. 372, 381 (1999), *aff'd*, 271 F.3d 1357 (Fed. Cir. 2001); *see also Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 357 (1974) ("The nature of government regulation of private utilities is such that a utility may frequently be required by the state regulatory scheme to obtain approval for practices a business regulated in less detail would be free to institute without any approval from a regulatory body."). In fact, DOE' s first acting director of the Civilian Radioactive Waste program at trial acknowledged he had concerns in 1983 that states would enact statutes limiting the siting of waste storage facilities. Tr. 3866-68 (Morgan).

Minnesota's 1994 and 2003 Prairie Island legislation (and its 1977 predecessor legislation) is not unique to the state regulation of utilities. *See In re ISFSI*, 501 N.W.2d at 646-48 (discussing 1977 Minnesota law imposing requirements on the siting of a "radioactive waste management facility"); *see also Duquense Light Co. v. Barasch*, 488 U.S. 299, 313 (1989) ("It cannot seriously be contended that the Constitution prevents state legislatures from giving specific instructions to their utility commissions."). For many years prior to the execution of the Standard Contracts between the DOE and NSP, states (including Minnesota) imposed siting requirements on the utilities and imposed conditions on those requirements tied to the disposal of spent nuclear fuel. *Cf. Minnesota v. United States NRC*, 602 F.2d 412, 414 (D.C. Cir. 1979) (noting that Minnesota intervened in NRC proceedings when NSP attempted to re-rack its pools at Prairie Island for the first time).

For example, in 1976 California enacted amendments to its Warren-Alquist Act, which conditioned the new "construction of nuclear plants on findings by the State Energy Resources Conservation and Development Commission that adequate storage facilities and means of disposal are available for nuclear waste . . . ." *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 194 (1983). The Supreme Court concluded that the legislation, which clearly created additional economic burdens on nuclear utilities, was not preempted by Federal law. *Id.* at 223. The Court stated that "the legal reality remains that Congress has left sufficient authority in the states to allow the development of nuclear power to be slowed or even stopped for economic reasons." *Id.*

Since the Supreme Court announced in 1983 that states could totally prohibit nuclear facility construction because DOE had not implemented the disposal of spent nuclear fuel, it was certainly foreseeable even at the time that the contracts were entered into that states could

impose costly mandates (though less costly than a total prohibition) on nuclear construction as a result of the DOE's failure to meet its spent fuel disposal obligation. Thus, it was clearly foreseeable in 1983 – as reflected by the Supreme Court in *Pacific Gas & Electric* – that any state regulating a nuclear utility had the power to impose conditions on the continued development and use of nuclear power.

**a. The Minnesota Mandates Are Equivalent To Other Forms Of Taxation Or Rate-Setting**

The Minnesota legislative mandates are no different than other forms of taxing or rate-setting by a legislature. Such taxes and rates normally are recoverable in suits for breach of contract. *See Citizens Fed. Bank, FSB v. United States*, 59 Fed. Cl. 507, 520 (2004) ("Generally, tax consequences have been awarded as an element of damages when they are reasonably foreseeable and flow from the breach."), *aff'd*, No. 05-5173, 2007 WL 162820 (Fed. Cir. Jan. 24, 2007). For example, recently in another spent fuel damages case, Judge Merow allowed as an element of the utility's damages a $1 million per year fee that was part of a settlement agreement with a local town in order to obtain the zoning permit needed for a spent fuel storage facility. *Yankee Atomic*, 73 Fed. Cl. at 292 (noting, among other requirements that "[t]he settlement agreement also required Connecticut Yankee to pay an annual fee to the City of Haddam beginning at $1 million a year and escalating thereafter until 2011," and that it was foreseeable that mitigation decisions would require regulatory approval). The mandates imposed by the Minnesota legislature, such as requiring NSP to pay annual fees into a Renewable Development Fund and annual payments to the Mdewakanton Dakota Indian Tribe, are directly analogous to the settlement payments approved by Judge Merow.

**b. It Was Foreseeable That Breach Of A Contract Born Of Political Action Would Result In Political Consequences**

More generally, the Government clearly knew and could foresee the political difficulty of siting a facility for the storage of spent fuel; the legislative history of the NWPA reveals it. *See, e.g.*, H.R. Rep. No. 97-491, pt. 1, at 27 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3792, 3793 (discussing the "political uproar" in Michigan that defeated an attempt to site a nuclear waste facility in 1976); *id.* at 31, *reprinted in* 1982 U.S.C.C.A.N. at 3798 (noting "political setbacks" over the prior decade); *see also Florida Power & Light*, 826 F.2d at 245 (discussing the failed efforts in the 1970s to locate a storage facility in Lyons, Kansas and in Michigan). The NWPA was itself a product of public and state concern over the inadequacy of federal efforts to solve the spent fuel storage problem. *See* 42 U.S.C. § 10222. State and public participation was considered essential. *Id.* § 10131(a)(6). In view of the political nature of the NWPA and the emphasis placed on state participation, the Government cannot claim that it was unforeseeable that a state political body like the Minnesota legislature would step-in (just as Congress did in 1982) to find a solution.

**c. The Need To Investigate Alternative Sites Was Foreseeable**

Furthermore, the Government actually foresaw the need to investigate alternative sites for storage of spent nuclear fuel. As noted above, the NWPA itself directed DOE to investigate various sites in searching for both a repository and its MRS. *See* NWPA, Pub. L. No. 97-425, §§ 112-113, 141, 96 Stat. 2201, 2208-12, 2241-44 (1983) (codified as amended at 42 U.S.C. §§ 10132-10133, 10161) (discussing siting of a repository and investigations of possible sites for an MRS); *see also* Nuclear Waste Policy Amendments Act of 1987, Pub. L. No. 100-203, §§ 5021, 101 Stat. 1330-228, 1330-232 to 1330-236 (1987) (codified, as amended, 42 U.S.C. §§ 10162-10169). The Government can hardly express surprise (or lack of foreseeability) when a state

legislature imposes an alternative siting requirement for storage of spent nuclear fuel, given that the Congress has imposed similar requirements on the DOE.

Pursuant to the mandates, and as a condition for loading casks six through nine at Prairie Island, NSP made a good faith effort and pursued an alternative site in Goodhue County. NSP can recover these reasonable mitigation costs despite its lack of success in siting the Goodhue County facility. *See Indiana Mich. III*, 422 F.3d at 1375 (noting that a utility is "not precluded from recovery . . . to the extent that it has made reasonable but unsuccessful efforts to avoid loss") (quotation omitted).

**d. Assistance Payments To The Mdewakanton Dakota Tribe Were Foreseeable Or Actually Foreseen**

Similarly, the Government actually foresaw (1) the use of written agreements to assure that Indian tribes and states would have input into a storage site and (2) the need to make assistance payments to an Indian tribe for the storage of spent nuclear fuel, including the use of agreements with an affected state or Indian tribe to assure compliance.

As noted above, Mr. Wilensky testified that the 1994 Minnesota legislation required NSP to enter into an agreement with the Minnesota governor to assure that the Mdewakanton Dakota Tribe would have third-party standing to enforce the 17 cask limitation imposed by the 1994 legislation. Such an agreement, allowing an Indian tribe's participation, was hardly novel or unforeseeable. The NWPA required DOE to enter into "binding written agreements" with affected tribes and states within 60 days of identifying a potential site for a repository, requiring that any such agreement "shall specify procedures for resolving objections of a state and affected Indian tribes at any stage of the planning, siting, development, construction, operation, or closure of such a facility within such State through negotiation, arbitration, or other appropriate

mechanisms." NWPA, Pub. L. No. 97-425, § 117(c)(11), 96 Stat. 2201, 2224 (codified, but later amended, at 42 U.S.C. § 10137). Thus, under the NWPA, Congress foresaw the use of written agreements to ensure involvement by an affected Indian tribe, just as happened with the 1994 Minnesota legislation (albeit through the use of third-party beneficiary standing).

Furthermore, the need for NSP to enter into a settlement agreement with the Mdewakanton Dakota Tribe to remove the 17 cask limitation imposed by the earlier agreement is similar in scope to the benefits agreements foreseen in the NWPA. The agreement provided for health studies related to the ISFSI for the Tribe, which lives on Prairie Island, and the possibility that money from the settlement agreement would be used to purchase land away from Prairie Island later to be placed in trust with the United States. In this regard, the NWPA and its amendments provided for benefits agreements with tribes and states. 42 U.S.C. § 10173(a)(1) ("The Secretary may enter into a benefits agreement with the State of Nevada concerning a repository or with a State or an Indian tribe concerning a monitored retrievable storage facility for the acceptance of high-level radioactive waste or spent nuclear fuel in that State or on the reservation of that tribe, as appropriate."). The NWPA provisions concerning benefits agreements even include an annual payment schedule ranging from $5 million to $20 million per year. *Id.* § 10173a (a)(1); *see also id.* §§ 10195 & 10199(a) (providing DOE authority to enter agreements and make payments of up to $3 million to states or tribes that seek to conduct independent testing and monitoring of a site being investigated for storage). The 2003 Minnesota legislation mandated payments from NSP to the Mdewakanton Dakota Tribe not to exceed $2.5 million per year (negotiated down to $2.25 million by Mr. Wilensky), well below the amount Congress authorized DOE to pay tribes for benefits agreements.

The NWPA also provides for financial assistance to states and localities. For example, the NWPA provides:

> The Secretary shall provide financial assistance and technical assistance to any State requesting such assistance in which there is a site with respect to which the Commission has authorized construction of a repository. Such assistance shall be designed to mitigate the impact on such State of the development of such repository.

NWPA, Pub. L. No. 97-425, § 116(c)(2)(A), 96 Stat. at 2221 (codified, but later amended, at 42 U.S.C. § 10136(c)(2)). The NWPA provides for assistance to state and local governments for any federal interim storage, directing DOE to "make annual impact assistance payments to a State or appropriate unit of local government, or both, in order to mitigate social or economic impacts occasioned by the establishment and subsequent operation of any interim storage capacity within the jurisdictional boundaries of such government or governments . . . ." NWPA, Pub. L. No., § 136(e), 96 Stat. at 2239 (codified at 42 U.S.C. § 10156(e)). The NWPA provided for similar "impact assistance" regarding the siting of an MRS. NWPA, Pub. L. No. 97-425, §§ 141(f), 96 Stat. at 2243; *see also* 42 U.S.C. § 10169 (additional impact assistance added in the 1987 Amendments Act). Thus, the Minnesota legislature's decision to have NSP pay the Mdewakanton Dakota Tribe was not only foreseeable, but actually foreseen.

Ultimately, all of the mandates, and their resulting costs to NSP, were either foreseeable or actually foreseen by the Government at the time it executed its contracts with NSP.

### 2. The Government's Breach And Long Term Expected Non-Performance Caused NSP To Mitigate Its Damages By Complying With The Mandates

At every step of the process to have its Certificate of Need application approved, NSP faced the same principal concern: permanence. The ALJ, the Minnesota PUC, the Minnesota

Court of Appeals, and finally the Minnesota legislature all concluded that the Prairie Island dry storage facility would likely become permanent because DOE could not be expected to perform its obligations under the Standard Contract. The Government's expected breach and long-term non-performance were the primary driving forces that caused the legislature to impose the mandates. The legislature's imposition of the mandates was far from an intervening force, rather it acted in confluence with the Government's breach. *Cal. Fed.*, 395 F.3d at 1268 ("The existence of other factors operating in confluence with the breach will not necessarily preclude recovery based on the breach."). But for the Government's expected failure to perform, NSP would never have faced the choice of either accepting the mandates or shutting the plant down.

At no point did DOE provide a firm commitment to the utility industry and Minnesota that it had any obligation to perform. In this regard, as noted above, in 1992 when it was long since clear that DOE would not begin performance by 1998, DOE chose to inform Commissioner Sanda of the Minnesota Department of Public Service (and the utility industry) that DOE had no obligation to perform beginning in 1998. This only aggravated the already-expected breach and raised Minnesota's concern that the Prairie Island ISFSI would become a permanent storage facility.[28]

[28] DOE's most recent official announcement only confirms Minnesota's prior permanence concerns, because Yucca Mountain will not open before 2017. *See* Statement of Edward F. Sproat III, Director Office of Civilian Radioactive Waste Management U.S. Department of Energy Before the Subcommittee on Energy and Air Quality Committee on Energy and Commerce U.S. House of Representatives (July 19, 2006), *available at* www.ocrwm.doe.gov/info_library/program_docs/testimonies/July_19_**Sproat**_testimony.pdf (visited Jan. 29, 2007). Unofficially, some OCRWM officials have stated that 2020 is more likely. *See* Erica Werner, *Yucca Mountain chief predicts application in 2008, dump by 2020*, Las Vegas Sun, (Mar. 31, 2006), *available at* http://www.lasvegassun.com/sunbin/stories/nevada/2006/mar/31/033110451.html (visited Feb. 5, 2007).

With the belief that DOE could not be expected to perform and that the Prairie Island ISFSI would thereby become permanent, Minnesota legislators had political leverage over NSP to impose the mandates or "sweeteners" (as former-Senator Merriam called them). Because NSP's facility was considered potentially "permanent," NSP's ISFSI needed legislative approval. Former-Senators Merriam and Novak testified that prior efforts to impose these mandates had always failed and only succeeded in 1994 because NSP was forced to build an ISFSI (as a means to mitigate DOE's impending breach). As NSP's then-CEO Mr. Howard related, NSP was left to negotiate with the legislature. NSP either had to accept the mandates or shut the plant down.

Furthermore, as various witnesses noted, within Minnesota only NSP was saddled with these mandates, which were directly attributable to the Government's impending breach and the feared permanence caused by the breach. Ms. Engelking stated that the Minnesota legislature required no other utility to comply with the biomass mandate; that requirement was a direct result of NSP's need to mitigate its damages by building a dry storage facility. *See, e.g.*, PX198, 1994 Minn. Sess. Laws Ch. 641, Art. 3, § 3 (codified at Minn. Stat. § 216B.2424) (the statute limited the biomass mandate to a public utility "that operates a nuclear-powered electric generating plant within this state"). Since its passage in 1994, no other utility has been subject to this mandate.

Ms. Swanson stated that only NSP was obligated to pay into and administer the Renewable Development Fund; that requirement was a direct result of NSP's need to mitigate its damages by building a dry storage facility. *See, e.g.*, PX198, 1994 Minn. Sess. Laws Ch. 641, Art. 1, § 10 ("The public utility that operates the Prairie Island nuclear generating plant must transfer to a renewable development account $500,000 each year for each dry cask containing spent fuel that is located at the independent spent fuel storage installation at Prairie Island after

January 1, 1999.”). Since its passage in 1994, no other utility has been compelled to fund the Renewable Development Fund.

Mr. Alders testified that NSP took reasonable actions to comply with the requirement to site an alternative storage facility in Goodhue County. Mr. Alders also stated that had NSP not needed dry storage – or to load casks six through nine, more specifically – the legislature would not have imposed this mandate. No other utility needed to comply with this mandate.

Finally, Mr. Wilensky testified that NSP incurred its mitigation costs from the 2003 settlement agreement with the Mdewakanton Dakota Tribe because of DOE’s continued non-performance. Had DOE begun performance in 1998 or been expected to begin performance before the end of the NRC-licensed life of the Prairie Island reactor units, NSP would not have had to lift the 17 cask limitation from the 1994 legislation and incur these costs.

### E. The Government Failed To Show That NSP’s Mitigation Efforts Were Unreasonable And, Therefore, Its Asserted Offsets Are Improper

#### 1. The Federal Circuit Did Not Create A Per Se Cut-Off Of 1994 To Recover Mitigation Costs In SNF Cases

As part of its defense, the Government’s expert witnesses were instructed to presume that any of NSP’s damages prior to 1994 were *per se* unreasonable. The Government’s latest *per se* theory cannot stand serious scrutiny and undermines the need to look at the facts and circumstances presented in each case. *See Indiana Mich. III*, 422 F.3d at 1375 (“Mitigation is appropriate where a reasonable person, in light of the known facts and circumstances, would have taken steps to avoid damage.”). The Government should not be allowed to avoid its burden of proving the unreasonableness of NSP’s actions, which it cannot do on these facts, by attempting to cloak its argument as one of causation. *Cf. First Heights Bank*, 422 F.3d at 1317



400510160v8

("We thus conclude that the government's so-called causation argument is identical to the government's mitigation argument and reject it for the reasons described above.").

The Government has seized on the factual findings by Judge Hodges in *Indiana Michigan*, which the Federal Circuit "on these facts" considered "supportable." *Indiana Mich. III*, 422 F.3d at 1375. In this regard, Judge Hodges concluded that Indiana Michigan had failed to prove as a matter of fact that its knowledge of the Government's impending breach constituted the cause of its efforts to conduct a full rather than a partial re-rack. *Id.* at 1376. However, the Federal Circuit clearly limited its ruling to the facts presented in that case. *Yankee Atomic*, 73 Fed. Cl. at 261 ("Reasonableness, in light of particular facts and circumstances, is plaintiff-specific. The 1994 date is the latest date when mitigatory obligations arose – whether that obligation or right ripened earlier is dependent on the facts and circumstances of each case and will be examined in appropriate circumstances.") (discussing *Indiana Mich. III*).

In the instant case, the Government cannot show that NSP's mitigation efforts were unreasonable. Those efforts were clearly undertaken as a result of DOE's impending breach. In this regard, Ms. McCarten and Mr. Kapitz testified that as early as 1987 and 1988 (including Ms. McCarten's contemporaneous memos about the DOE program) NSP concluded it needed to double its storage capacity out until the end of the NRC-licensed life of the Prairie Island plant because DOE would not begin performance before then. NSP's decision to begin mitigation was justified and prescient. Unlike in *Indiana Michigan III*, NSP provided, *inter alia*, (1) unequivocal evidence from NSP's contemporaneous internal documents – the memos from Ms. McCarten (PX398A and PX398B) – that NSP had assessed that DOE was not going to perform; (2) Government documents such as the 1987 Mission Plan Amendment and the Amendments Act, in which the Congress adopted restrictive linkages; (3) NSP's Certificate of Need filings

before the Minnesota PUC (including Mr. Schwartz's testimony that NSP estimated that DOE would not begin performance until 2015 at the earliest); and (4) correspondence between DOE and Commissioner Sanda of the Minnesota Department of Public Service (PX501) and her response (PX506)(copying NSP's Mr. Howard) in 1992, in which DOE stated it had no obligation to perform by 1998 (a position it later amplified in 1994). Therefore, the Government should receive no offset for those NSP costs incurred prior to 1994.

**2. The Government Should Not Receive An Offset For Incremental Labor Costs**

The Government will likely attack a substantial percentage of NSP's labor costs, because the Government claims they are not "incremental." In this regard, the Government contends that NSP's use of its own employees does not constitute an incremental cost and therefore is unreasonable. This argument has been rejected by other Judges of this Court, and should be rejected here.

Mr. Kapitz testified that NSP used its internal labor for, among other activities, licensing and constructing the ISFSI at Prairie Island and loading the 17 storage casks. Mr. Alders testified that Mr. Kapitz and Mr. McKeown, among others, assisted in preparing and submitting the application to the Minnesota EQB regarding the Goodhue County site. NSP also used internal labor for the administration of the cask procurement process, oversight of the PFS project, Prairie Island auxiliary crane upgrade installation, and the Monticello ISFSI licensing, engineering, and construction.

Judge Lettow conducted an exhaustive review of precedents regarding the recoverability of internal labor and concluded,

> [T]he fact that [the utility] used its own internal resources to support is mitigation is not fatal to its claim for damages in mitigating a breach of contract. Rather, the test for recovery is a targeted one: whether use of the internal resources by [the utility] deprived it of the ability to employ those resources on other projects. That [the utility] would have paid its employees in all events is not material to this inquiry.

*Tenn. Valley Auth.*, 69 Fed. Cl. at 539; *see also SMUD*, 70 Fed. Cl. at 376 ("The fact that an injured party has used internal resources to mitigate a breach does not foreclose the injured party from recovering such costs."); *cf. Yankee Atomic*, 73 Fed. Cl. at 322 ("It is concluded that defendant did not establish that the labor cost cited was not incurred."); *Pac. Gas & Elec.*, 73 Fed. Cl. at 408 ("To the extent that the costs of [the utility's] internal labor were in fact performed on a 'breach-related project,' . . . the court finds that such labor costs should properly be awarded to plaintiff."). Therefore, notwithstanding the Government's arguments, NSP's decision to use internal labor to mitigate the damages from the Government's breach was reasonable and is recoverable.

### 3. Any Offsets Based On What DOE Might Do When It Picks Up NSP's SNF In The Future Are Speculative

The Government can be expected to argue that NSP's damages should be offset, because the Government claims NSP benefited from DOE's failure to perform. For example, the Government posits that NSP hypothetically benefited from not incurring cask loading costs – *i.e.*, the costs NSP would have had to expend had DOE timely arrived at Prairie Island and loaded casks per the terms of NSP's Standard Contracts. While such costs may eventually be incurred in the future if and when DOE actually takes spent fuel from the NSP plants, what those costs might have been in a hypothetical, non-breach world is too speculative to consider in a partial breach case. *See Indiana Mich. III*, 422 F.3d at 1376-77 (noting that a claim for partial breach precludes future damages).

In other SNF cases, Judges of this Court have rejected the Government's contentions regarding future offsets as speculative. Judge Lettow concluded,

> [T]he government claims that in the non-breach, but-for world, [the utility] would have had to incur costs in loading casks with SNF for delivery to DOE. As a result of DOE's breach, the government claims that [the utility] has temporarily avoided these costs, that [the utility] has received a benefit as a result, and that the government should be credited with an offset to [the utility's] damages to reflect this benefit.
>
> The alleged benefit stems purely from timing; both DOE and [the utility] contemplate that DOE will still perform under the contract at some future date. As matters now stand, any benefit inhering in [the utility] because of delayed loading costs would be entirely speculative. It is not possible to ascertain the method DOE will ultimately use for SNF acceptance. The size and type of casks to be used to transport the SNF are not known; no casks have been approved for the purpose. The mode of transport has not been determined. Additionally, the date at which DOE will begin to perform in the future cannot even be estimated, let alone determined with reasonable certainty.

*Tenn. Valley Auth.*, 69 Fed. Cl. at 542-43 (citations omitted); *see also Yankee Atomic*, 73 Fed. Cl. at 286 (calling future potential offsets speculative and citing to *Tenn. Valley Auth.*); *Pac. Gas & Elec.*, 73 Fed. Cl. at 416 ("[I]t would be entirely speculative to offset plaintiff's damages because of a purported benefit it will receive from loading large rail casks in the future rather than 25-ton truck casks in the non-breach world. Plaintiff's loading costs have been deferred rather than avoided, and the court declines to engage in a guessing game as to whether such deferred costs will have increased or decreased by the time (if ever) defendant performs the parties' Standard Contract."). Similarly, Judge Braden held that because "DOE and [the plaintiff] both contemplate that DOE will still perform under the Standard Contract at some future date, any benefit to [the utility], because of delayed loading costs, would be entirely speculative." *SMUD*, 70 Fed. Cl. at 372.

### F. The Parties Understood That DOE Would Perform At A Rate To Avoid Additional At-Reactor Storage After 1998 And To Begin Reducing the Backlog Of SNF, Which Is A 3,000 MTU Steady-State Rate

As noted in the Introduction, the Government has stated that NSP's damages through December 31, 2004 do not vary based on the acceptance rate. And, as discussed above, the issue in this case is whether NSP's mitigation efforts were reasonable under the facts that NSP faced. Therefore, there is no need for this Court to determine an acceptance rate in this case. *Cf. SMUD*, 70 Fed. Cl. at 375 n.40 ("The court finds that the evidence presented on the acceptance rate under the terms of the Standard Contract to be highly speculative, therefore, the court declines to make any determination of the acceptance rate based on this record."). Nevertheless, should this Court find the need to address the acceptance rate issue, NSP submits that the evidence overwhelmingly shows that (1) DOE's DCS process was for planning purposes only, rather than to create binding contractual commitments, and was not treated by DOE as a binding contractual process and (2) the parties' expectations of DOE's performance were that it would be sufficient to avoid additional at-reactor storage after DOE began performance and to begin reduction of the backlog of SNF.[29]

[29] NSP also directs the Court to its prior summary judgment briefs on the acceptance rate, in which NSP set forth its arguments regarding this issue in detail. *See* Northern States Power Company's Opposition to Defendant's Motion for Partial Summary Judgment Regarding the Rate of Spent Nuclear Fuel Acceptance and Cross-Motion for Partial Summary Judgment on the Acceptance Rate (Dec. 10, 2002); Appendix to Northern States Power Company's Opposition to Defendant's Motion for Partial Summary Judgment Regarding the Rate of Spent Nuclear Fuel Acceptance and Cross-Motion for Partial Summary Judgment on the Acceptance Rate (Dec. 10, 2002); Northern States Power Company's Proposed Findings of Uncontroverted Fact in Support of its Cross-Motion for Partial Summary Judgment on the Acceptance Rate (Dec. 10, 2002); Northern States Power Company's Reply in Support of its Cross-Motion for Partial Summary Judgment on the Acceptance Rate and Response to Defendant's Supplemental Brief (Mar. 31, 2004).

### 1. The DCS Process Did Not Create Binding Commitments

Contrary to the Government's keystone argument in this (and every other SNF case), the DCS process did not create binding contractual commitments between DOE and NSP. *See Indiana Mich. Power Co. v. United States*, 57 Fed. Cl. 88, 97-98 (2003) ("*Indiana Mich. II*"), *appeal dismissed*, 112 Fed. Appx. 37 (Fed. Cir. 2004). DOE's cavalier manipulation of the process and its belief that it could unilaterally stop and start the process belie the Government's assertion that the DCSs were meant to be, or were in fact, contractually binding commitments.

As discussed above, the process as implemented by DOE through the 1991 ACR was premised on (1) a change in law that never occurred (and that GAO thought was unlikely to happen), (2) an approach to storing SNF using a facility that never existed, (3) a site that was never selected, (4) a design that was never licensed, and (5) an MRS that DOE never actively pursued (leaving the success or failure of the entire nuclear waste program to an independent Nuclear Waste Negotiator that was not bound by DOE's schedule). As Mr. Pollog acknowledged and as stated in the 1991 ACR, absent a change in law, no MRS facility could have been available prior to 2007.

Mr. Barrett (Deputy Director of OCRWM in 2002) referred to the DCSs as "administrivia." Senior DOE officials such as Mr. Brownstein (senior policy advisor to the OCRWM Director) and Ms. Slater Thompson (Acting Division Director of the Regulatory Coordination Division in DOE's OCRWM) both stated that the DCSs were for planning purposes only.

Furthermore, the implementation of the DCS process by DOE belies its stated position now that DCSs somehow constitute binding commitments. At the outset, DOE conditioned the

use (and enforceability) of the DCSs based on the availability of a facility. As noted above and on DX181, after NSP submitted its DCSs DOE unilaterally added language to the DCSs – including NSP's DCSs – conditioning performance on the availability of a facility: "The proposed delivery date is dependent on the existence of an operational repository or an interim storage facility constructed under the Act."

Beginning in December 1996, DOE unilaterally suspended the DCS process and began voiding DCSs (including one of NSP's). *See Tenn. Valley Auth.*, 69 Fed. Cl. at 521 ("DOE effectively short-circuited this process by its failure to perform under TVA's Standard Contract."); *see also Consumers Energy Co. v. United States*, 65 Fed. Cl. 364, 370-71 (2005) (concluding that DOE "abandoned" the DCS process in 1997). In March 1997, DOE wrote all utilities with approved DCSs and advised them formally that the DCS process was suspended. After a seven-year hiatus, in July 2004, as Mr. Zabransky and Mr. Pollog acknowledged in their testimony at trial, DOE re-started the DCS process and informed the utilities that any new DCSs submitted in that process would replace rather than supplement previously submitted and approved DCSs. Approximately six months later, in December 2004, DOE again unilaterally suspended the DCS process. It remains suspended today. *See Sys. Fuels, Inc. v. United States*, 65 Fed. Cl. 163, 167 (2005); *see also Entergy Nuclear Generation Co. v. United States*, 64 Fed. Cl. 336, 340 n.4 (2005) (discussing the 2004 DCS process and that DCSs were meant to replace, rather than supplement prior submitted DCSs).

NSP always treated the DCS submissions as a planning activity. Moreover, given DOE's lack of "real world" progress, NSP treated the DCS submission process as a ministerial act, with Mr. Kapitz spending less than one hour per year in filling-out the forms. The mere fact that NSP submitted DCSs does not somehow create a binding commitment. *See Yankee Atomic*, 73 Fed.

Cl. at 298 ("Parroting DOE's delays and acceptance rates did not and does not evidence acquiesce[nce] in them."). As noted throughout the trial, as early as the late-1980s and early-1990s NSP (including its CEO and continuing through its engineering staff) had essentially given up on DOE performing by 1998 (or before the end of the licensed-life of the plants). Thus, NSP's submission of these planning documents in the early to mid-1990s amounts to nothing more than the bureaucratic task of answering the mail.[30] Any contractual significance to the process had long since been extinguished by DOE's performance failures and manipulation of the process.

[30] To the extent the Court adopts the Government's interpretation that the DCSs constituted binding contractual commitments (which would be contrary to logic, the Standard Contracts, and the understanding of the parties), then DOE's actions evince a clear breach of the implied covenant of good faith and fair dealing by short-circuiting that process. *See Tenn. Valley Auth.*, 69 Fed. Cl. at 521; *see also Essex Electro Eng'rs, Inc. v. Danzig*, 224 F.3d 1283, 1291 (Fed. Cir. 2000) ("Every contract, as an aspect of the duty of good faith and fair dealing, imposes an implied obligation that neither party will do anything that will hinder or delay the other party in performance of the contract.") (internal quotation marks omitted); *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005) ("The covenant imposes obligations on both contracting parties that include the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract."); RESTATEMENT (SECOND) OF CONTRACTS § 205 cmt. d (noting that "evasion of the spirit of the bargain" can constitute bad faith). While many DOE employees undoubtedly worked diligently on Yucca Mountain studies, DOE's activities surrounding the DCS process were at the very least affected by the potential liability facing DOE. Mr. Pollog and Mr. Zabransky both testified that DOE voided DCSs and stopped the DCS process for the express purpose of minimizing DOE's expected liability for damages claims from utilities. Such efforts constitute evidence of "intent to injure" and provide strong support for a breach of the good faith obligation. *See Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1240 (Fed. Cir. 2004) (stating that an "intent to injure" must be shown in the bid protest context); *but see Tecom, Inc. v. United States*, 66 Fed. Cl. 736, 769 (2005) (concluding that "when the government actions that are alleged are not formal, discretionary decisions, but instead the actions that might be taken by any party to a contract, the presumption of good faith has no application" and the more stringent test set forth in *Am-Pro* does not apply).

### 2. The Parties Expected Contract Performance At A 3,000 MTU Steady-State Rate After A Five Year Ramp-Up

The NWPA and the Standard Contract specified the date – January 31, 1998 – when DOE was required to begin removing SNF from commercial nuclear reactors. 42 U.S.C. § 10222(a)(5)(B); *Maine Yankee*, 225 F.3d at 1342 ("Congress found this objective so important when it promulgated the Act that it took the unusual action of specifying that all the contracts must contain this explicit requirement."). While the NWPA and the Standard Contract lodged the responsibility with the utilities for paying for DOE's disposal program and to provide interim storage of SNF, the utilities only had the responsibility for the costs of interim storage "until such waste and spent fuel is accepted by the Secretary of Energy in accordance with the provisions of this Act . . . ." 42 U.S.C. §§ 10131(a)(4) & (5); *see also Indiana Mich. II*, 57 Fed. Cl. at 99-100 ("The parties understood that utilities were not to store additional waste on site after 1998. This was Congress' purpose in passing the Nuclear Waste Policy Act, and it was the parties' intent in signing the Standard Contract. The Department of Energy would have begun performance by collecting 400 metric tons of nuclear waste in 1998, and ramped up to 3,000 metric tons by the end of 2002. Defendant would have continued performance pursuant to the Standard Contract at a minimum rate of 3,000 tons thereafter."). And in carrying out its obligations, DOE was supposed to remedy the "national problem . . . created by the accumulation of . . . spent nuclear fuel from nuclear reactors . . . ." 42 U.S.C. § 10131(a)(2)(A).

Testimony at trial regarding the expectations of the parties buttresses the plain meaning of the NWPA and the Standard Contract. As noted during the testimony of Mr. Morgan (DOE's first acting director of the spent fuel program), Mr. Pollog (DOE's current contracting officer's technical representative), Mr. Zabransky (DOE's current contracting officer) and Mr. Karalus, Mr. Kapitz, and Ms. McCarten (all from NSP), the parties expected DOE to perform at a rate

sufficient to avoid the need for NSP to provide additional at-reactor storage after DOE began performance in 1998 and to begin working off the backlog. *See also Tenn. Valley Auth.*, 69 Fed. Cl. at 519 ("One of the goals of the Nuclear Waste Policy Act was to reduce the backlog of spent nuclear fuel that had accumulated at nuclear power facilities around the nation. Another goal of the waste disposal program was to preclude utilities need to provide for storage of spent fuel outside the pools attendant to their reactors.") (citations omitted). Mr. Barrett – at the time of his deposition, the Deputy Director of OCRWM – also acknowledged that the 3,000 MTU steady-state rate was the one that DOE used for planning the system. Ms. Supko opined that a steady-state rate of 3,000 MTU after a five year ramp-up period would meet this criteria and noted that DOE's program documents regularly referenced the 3,000 MTU steady-state rate as the rate expected for performance. *See Indiana Mich. II*, 57 Fed. Cl. at 99; *see also Tenn. Valley Auth.*, 69 Fed. Cl. at 519-20.

The 900 MTU rate that DOE used in the 1991 ACR, the acceptance rate that the Government insists is contractually obligated, is wholly speculative. The "fairy tale" nature of the 900 MTU rate is demonstrated by the fact that in 1991 (and, in fact, from 1987 to the present) that rate would violate the NWPA. The 900 MTU rate is based on an assumed congressional amendment of the NWPA, removing the linkage between the MRS construction and the licensing of Yucca Mountain, but leaving untouched the capacity linkage between Yucca Mountain operation and the amount of spent fuel stored at the MRS. Just a year earlier, DOE had used a 3,000 MTU "upper bounding rate" (for performance at an MRS beginning in 1998), which assumed that Congress would remove both the schedule and capacity linkages from the Amendments Act. DOE's acknowledgment of the mythological nature of the 900 MTU rate becomes plain in the 1994 APR/ACR (issued in March 1995), where DOE no longer even

bothered to use actual calendar years for performance, but instead simply used "Year 1" through "Year 10." In these circumstances, force-fitting the 900 MTU rate into a contractually binding obligation would elevate a speculative, hypothetical construct over the actual mitigation costs that NSP has incurred in the real world.

**G. NSP Should Receive Its Costs of Capital**

Contrary to the Government assertions, NSP's costs of capital are appropriate and reasonable damages and do not constitute forbidden "pre-judgment" interest. As noted above, even the Government's expert – Dr. Neuberger – recognized that the costs of capital represent actual costs to NSP. *See LaSalle Talman Bank v. United States*, 317 F.3d 1363, 1374-75 (Fed. Cir. 2003) (noting that "capital is not 'costless'"). This Court and the Federal Circuit have allowed recovery of costs of capital where the costs relate to actually incurred financing costs – in other words interest as a component of a claim. *See Centex Corp. v. United States*, 55 Fed. Cl. 381, 390 (2003) ("Courts frequently distinguish, however, between 'interest *on* a claim,' generally precluded by the statute, and 'interest *as* a claim' which courts may treat as an element of compensation. For that reason, it has been held that foreseeable financing costs can be an element of expectancy damages.") (emphasis in original), *aff'd*, 395 F.3d 1283 (Fed. Cir. 2005).

In particular, Judge Lettow ruled that an Allowance for Funds Used During Construction ("AFUDC"), may be recovered against the Government in a SNF damages case, despite the general prohibition against recovery of interest against the Government set forth in 28 U.S.C. § 2516(a). *See Tenn. Valley Auth.*, 69 Fed. Cl. at 541-42. The Federal Circuit recognized the recovery of AFUDC-like financing costs in *Wickham Constr. Co. v. Fischer*, 12 F.3d 1574 (Fed. Cir. 1994), stating that 28 U.S.C. § 2516(a) "does not bar an interest award as part of an equitable adjustment under a fixed-price contract if the contractor has actually paid interest

because of the government's delay in payment." *Wickham*, 12 F.3d at 1582-83. In *Tennessee Valley Authority*, Judge Lettow found that because the facts in the case were conceptually indistinguishable from those in *Wickham*, and because the plaintiff utility established "its use of a widely-accepted, FERC-mandated standard for calculating the cost of the funds used in building the dry storage facilities," its AFUDC costs were recoverable as damages against the Government. *Tenn. Valley Auth.*, 69 Fed. Cl. at 542.

Here, NSP's incurred cost of capital in building the dry fuel storage facilities, licensing and siting alternate storage facilities, and complying with the mandates, like the AFUDC costs in *Tennessee Valley Authority*, is akin to the type of interest award that the Federal Circuit stated was permitted in *Wickham*. NSP's costs of capital are based on its actual weighted average of debt and equity. Its cost of capital rates – used to calculate its AFUDC – are similarly subject to FERC-accounting and its equity cost has been vetted by the Minnesota PUC. *See* 18 C.F.R. pt. 101, Uniform System of Accounts Prescribed for Public Utilities and Licensees Subject to the Provisions of the Federal Power Act ("Uniform Systems of Accounts"), Electric Plant Instructions, ¶ 3.A(17) (stating that AFUDC "includes the net cost for the period of construction of borrowed funds used for construction purposes and a reasonable rate on other funds when so used" and listing "average short-term debt," "long-term debt," "preferred stock," and "common equity" as elements that may be included in the AFUDC calculation). Furthermore, NSP's actual costs of capital do not become impermissible merely because it is formed both by debt and equity. *See LaSalle Talman*, 317 F.3d at 1375 (concluding that trial court erred in not allowing recovery of costs derived from equity, because "the cost of capital does not depend on whether payment is made as debt, or out of anticipated future earnings"). Therefore, NSP may recover its

costs of capital for each category of damages as delineated in the table of its damages in the Introduction of this brief and as proven at trial.

## IV. CONCLUSION

For the foregoing reasons, NSP respectfully requests that this Court enter judgment on NSP's breach of contract claim in the amount of $172,154,000.

Dated: February 9, 2007

s/ Alex D. Tomaszczuk by s/ Daniel S. Herzfeld
Alex D. Tomaszczuk
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7940
(703) 770-7901 (fax)

Counsel of Record for Plaintiff
Northern States Power Company

*Of Counsel:*

Jay E. Silberg
Daniel S. Herzfeld
Jack Y. Chu
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
2300 N Street, N.W.
Washington, D.C. 20037
(202) 663-8000
(202) 663-8007 (fax)

Kerry C. Koep
**XCEL ENERGY**
414 Nicollet Mall, 5th Floor
Minneapolis, MN 55401
(612) 215-4583
(612) 215-4544