IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| NORTHERN STATES POWER COMPANY, Plaintiff, | ) | |
| v. | ) | No. 98-484C (Senior Judge Wiese) |
| UNITED STATES OF AMERICA, Defendant. | ) | |

# DEFENDANT'S POST-TRIAL BRIEF

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

HAROLD D. LESTER, JR.
Assistant Director

ANDREW P. AVERBACH
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tele: (202) 305-3315
Fax: (202) 307-2503

OF COUNSEL:
JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Avenue, S.W.
Washington, D.C. 20585

ALAN J. LO RE
Senior Trial Counsel

STEPHEN P. FINN
JOSHUA E. GARDNER
MARIAN SULLIVAN
Trial Attorneys
Commercial Litigation Branch
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

March 27, 2007

Attorneys for Defendant

# TABLE OF CONTENTS


TABLE OF AUTHORITIES . . . . . . . . . . vi

SUMMARY OF ARGUMENT . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . 9

I. CHRONOLOGY OF EVENTS RELEVANT TO NSP'S CLAIM . . . . . . . . . . 9

II. FACTS RELATING TO STANDARD CONTRACT AND RATE OF ACCEPTANCE . . . . . . . . . . 17

A. The Original Provisions Of the Nuclear Waste Policy Act . . . . . . . . . . 17

B. The "Standard Contract For Disposal Of Spent Nuclear Fuel And/Or High-Level Radioactive Waste" Was Created Through Notice And Comment Rulemaking In The Federal Register . . . . . . . . . . 20

1. The Proposed Rule . . . . . . . . . . 20

2. Public Comments . . . . . . . . . . 21

3. The Final Rule . . . . . . . . . . 24

C. Plaintiff's Execution Of Its Standard Contracts . . . . . . . . . . 27

D. Issuance Of The Mission Plan And Its Amendments . . . . . . . . . . 27

E. The 1987 Amendments To The Nuclear Waste Policy Act . . . . . . . . . . 29

F. DOE's Issuance Of Annual Capacity Reports . . . . . . . . . . 31

1. The 1987 Through 1990 Annual Capacity Reports . . . . . . . . . . 31

2. The 1991 Annual Capacity Report . . . . . . . . . . 33

3. The 1992 Through 1995 Annual Capacity Reports . . . . . . . . . . 35

G. Program Documents Reflect Planned Acceptance At An MRS Facility . . . . . . . 37

1. Program Reassessment And 1991 Draft Mission Plan Amendment . . . 37

2. Preliminary Estimates Of The Total-System Life Cycle Cost For The Restructured Program . . . . . . . . . . 38

H. Industry Submission Of Delivery Commitment Schedules . . . . . . . . . . . . . . . . . 39

I. NSP's Submission Of Delivery Commitment Schedules . . . . . . . . . . . . . . . . . . 40

DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

I. REGARDLESS OF WHETHER IT CHARACTERIZES ITS EXPENDITURES AS "MITIGATION DAMAGES," NSP BEARS THE BURDEN OF ESTABLISHING ALL ELEMENTS OF ITS DAMAGES CLAIM, INCLUDING CAUSATION, FORESEEABILITY, AND REASONABLE CERTAINTY . . . . . . . . . 41

A. NSP's Effort To Characterize Its Damages As "Mitigation Damages" Does Not Eliminate Its Obligation To Prove Causation, Foreseeability and Reasonableness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

B. NSP's Burden Includes The Obligation To Establish A Reasonable "But For" World Against Which To Measure Whether DOE's Delay "Caused" It To Incur Incremental Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

C. NSP Has The Burden Of Demonstrating That Its Claimed Damages Were Foreseeable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

D. NSP Must Prove Its Damages With Reasonable Certainty . . . . . . . . . . . . . . . . . 54

II. NSP CANNOT ESTABLISH THE NECESSARY CAUSAL LINK BETWEEN CERTAIN OF ITS CLAIMED DAMAGES AND DOE'S DELAY, OR THAT ALL OF ITS CLAIMED DAMAGES WERE FORESEEABLE AND REASONABLY CERTAIN . . . . . . . . . . . . . . . . . . . . . . . . . . 55

A. NSP Would Have Built A Dry Storage Facility Regardless Of DOE's Delay In Accepting SNF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

1. The Time At Which DOE Would Have Arrived To Accept NSP's Spent Fuel Was Not Known At The Time Of The Decision . . . . . . . . . . 55

2. Substantial Uncertainty Existed In The Late 1980s As To The Extent To Which A Third Rerack Would Increase The Capacity Of The Spent Fuel Pool At Prairie Island . . . . . . . . . . . . . . . . . . . . . . 55

3. Even Assuming DOE Performance Commencing In 1998, The Potential For A Plant Shutdown And Worker Exposure Would Have Rendered A Third Rerack Cost Prohibitive . . . . . . . . . . . . 60

4. In Light Of Its Prior Representations To The Minnesota Public Utilities Commission, NSP Is Estopped From Asserting That It Would Have Performed A Third Rerack At Prairie Island . . . . . . . . . . . . . . . . . . . . . . 74

5. Effect Upon Damages Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

B. NSP's "Mitigation" Efforts Stem From Decisions Made Prior To The Time That That It Was Clear That DOE Acceptance Would Be Delayed And, In The Absence Of Efforts To Obtain Adequate Assurances, Their Costs Are Not Recoverable As Damages . . . . . . . . . . . . . . . . . . . . . . . . 79

C. The Damages Sought By NSP For Costs Resulting From State Legislative Mandates Are Unrecoverable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

i. The Government Is Not Responsible For The Downstream Political Consequences Of Its Delayed Performance . . . . . . . . . . . . . . . . . 83

ii. Effect Upon Damages Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

D. NSP's Investment In The Private Fuel Storage Venture Is Not Recoverable . . . 92

i. The Investment In PFS Was Unforeseeable And Speculative . . . . . . . . . 92

ii. NSP Has Failed To Establish That It Has Actually Been Damaged By Its Investment In PFS . . . . . . . . . . . . . . . . . 93

iii. Effect Upon Damages Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

E. NSP Cannot Establish Causation For Certain Costs That It Allegedly Incurred For Internal Labor And "Overheads" . . . . . . . . . . . . . . . . . . 98

i. NSP's Internal Labor And Overheads Were Not Incremental . . . . . . . . . 98

ii. Effect Upon Damages Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

F. Additional Issues Affecting Costs That Would Have Been Incurred Had DOE Timely Commenced Performance . . . . . . . . . . . . . . . . . . . 102

1. NSP Would Have Expended $30,679,574 On A Dry Storage Facility In The "But For" World . . . . . . . . . . . . . . . . . . . . . . . . 102

2. An Offset Is Warranted For The Cost NSP That Avoided Of Loading Casks To DOE . . . . . . . . . . . . . . . . . . . . . . . 104

3. The Government Is Not Responsible For The Costs That NSP Incurred In Obtaining A Transportation License For Its TN-40 Casks . . . 106

4. An Adjustment Is Warranted For Dry Storage Costs At GE-Morris . . . 107

III. NSP'S CLAIM FOR ITS "COST OF CAPITAL" IS A LEGALLY UNSUPPORTED ATTEMPT TO RECOVER PREJUDGMENT INTEREST . . . 114

A. Interest Is Not Recoverable Against The United States Government Under The Standard Contract . . . 107

B. NSP's Cost Of Capital Damages Constitute Interest In Violation Of The No-Interest Rule . . . 110

C. Even If NSP Was Correct That Cost of Capital Is The Same As AFUDC, It Has Identified No Waiver Of Sovereign Immunity That Would Allow Such Recovery . . . 112

D. Effect Upon Damages Claim . . . 113

IV. NSP HAS FAILED TO ESTABLISH THAT DOE WAS OBLIGATED TO ACCEPT SNF AT A RATE SUFFICIENT TO PRECLUDE THE NEED FOR ADDITIONAL AT-REACTOR STORAGE AFTER 1998 OR AT A SIMILAR RATE . . . 114

A. NSP Cannot Recover Damages Without Demonstrating Entitlement To The Rate Of Acceptance That It Advocates . . . 114

B. NSP Has Failed To Prove That DOE Was Obligated To Perform At A 3,000 Rate Sufficient To Preclude Additional At-Reactor Storage After 1998 . . . 120

1. NSP Ignores The Contractual Mechanism For Ascertaining The Acceptance Rate Under The Standard Contract . . . 120

a. From The Time Of Contract Formation, The Parties Expected That The DCS Process Would Be The Mechanism Through Which The They Would Make Their Respective Commitments . . . 120

b. NSP Actively Engaged In The DCS Process . . . 122

c. The Suspension Of The DCS Process in 1996 Neither Undermines The Validity Of The 1991 ACR Nor Evidences Bad Faith . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

2. NSP Has Failed To Establish That The Parties Expected A Rate Sufficient To Preclude The Need For Additional Storage After 1998 . . 127

a. As A Matter Of Law, This Court Should Not Consider Parol Evidence In Determining DOE's Performance Obligations Under The Standard Contract . . . . . . . . . . . . . . . . . . 127

b. Even If The Court Were To Consider Parol Evidence, NSP Has Failed To Establish That The Parties Understood That DOE Would Accept SNF At The Rate It Claims . . . . . . . . . . . . 130

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137

# TABLE OF AUTHORITIES

## Cases

Abbott Labs. v. Brennan,
952 F.2d 1346 (Fed. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

AES Tech. Sys., Inc. v. Coherent Radiation,
583 F.2d 933 (7th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

American Sci. & Eng'g, Inc. v. United States,
8 Cl. Ct. 129 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Am-Pro Protective Agency, Inc. v. United States,
281 F.3d 1234 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

Aviation Contractor Employees, Inc. v. United States,
945 F.2d 1568 (Fed. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

Barrow Utils. & Elec. Co-op. v. United States,
20 Cl. Ct. 113 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Bell v. United States,
404 F.2d 975 (Ct. Cl. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

Bel Pre Health Care Center, Inc. v. United States,
24 Cl. Ct. 495 (1991), aff'd, 980 F.2d 745 (Fed. Cir. 1992) (table) . . . . . . . . . . . . . . . 116

Blake v. Califano,
626 F.2d 891 (D.C. Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

Bluebonnet Savs. Bank v. United States,
67 Fed. Cl. 231 (2005), aff'd, 466 F.3d 1349 (Fed. Cir. 2006) . . . . . . . . . . . . . . . . . . . . 45

Bluebonnet Savs. Bank v. United States,
266 F.3d 1348 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Boyajian v. United States,
423 F.2d 1231 (Ct. Cl. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

Brandon & Tibbs v. George Kevorkian Accountancy Corp.,
277 Cal. Rptr. 40 (Cal. Ct. App. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Brookfield Constr. Co. v. United States,
228 Ct.Cl. 551, 661 F.2d 159 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

California Fed. Bank v. United States,
395 F.3d 1263 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Castle v. United States,
48 Fed. Cl. 187 (2000), aff'd in relevant part, 301 F.3d 1328 (Fed. Cir. 2002) . . . . . . 108

Citizens Fed. Bank v. United States,
474 F.3d 1314 (Fed Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 88

City of Tacoma, Dep't of Public Utilities v. United States,
31 F.3d 1130 (Fed. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

Coast Fed. Bank, FSB v. United States,
48 Fed. Cl. 402 (2000), rev'd on other grounds, 309 F.3d 1353 (Fed. Cir. 2002),
vacated, 320 F.3d 1338 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Columbia First Bank v. United States,
60 Fed. Cl. 97 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Craft v. United States,
233 F.3d 358, 374 (6th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

Coyle's Pest Control, Inc. v. Cuomo,
154 F.3d 1302 (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

Cuyahoga Metropolitan Housing Auth. v. United States,
65 Fed. Cl. 534 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

Danzig v. AEC Corp.,
224 F.3d 1333, (Fed. Cir. 2000), cert. denied, 532 U.S. 995 (2001) . . . . . . . . . . . . . . . . 81

Data Gen. Corp. v. Johnson,
78 F.3d 1556 (Fed. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

David Nassif Assocs. v. United States,
214 Ct. Cl. 407, 557 F.2d 249 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115, 117

Davis v. Wakelee,
156 U.S. 680 (1895) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

Department of Energy v. Westland,
565 F.2d 685 (CCPA 1977) . . . . . . . . . . 129

District of Columbia v. United States,
67 Fed. Cl. 292 (2005) . . . . . . . . . . 108

England v. Contel Advanced Sys., Inc.,
384 F.3d 1372 (Fed. Cir. 2004) . . . . . . . . . . 108, 112

Energy Capital Corp. v. United States,
302 F.3d 1314 (Fed. Cir. 2002) . . . . . . . . . . 46

Gardner Displays Co. v. United States,
171 Ct. Cl. 497, 346 F.2d 585 (Ct. Cl. 1965) . . . . . . . . . . 52

Glendale Fed. Bank, FSB v. United States,
239 F.3d 1374 (Fed. Cir. 2001) . . . . . . . . . . 45

Granite Mgt. Corp. v. United States,
74 Fed. Cl. 155 (2006) . . . . . . . . . . 45

Hercules, Inc. v. United States,
24 F.3d 188, 200 (Fed. Cir. 1994), aff'd on other grounds, 516 U.S. 417 (1996) . . . . . 91

Hughes Communications Galaxy, Inc. v. United States
271 F.3d 1060 (Fed. Cir. 2001) . . . . . . . . . . 51

In re Application for Certificate of Need for
Construction of an Independent Spent Fuel Storage Installation,
501 N.W. 2d 638 (Minn. Ct. App. 1993), review denied (July 15, 1993) . . . . . . . . . 13, 85

Indiana Michigan Power Co. v. Department of Energy,
88 F.3d 1272 (D.C. Cir. 1996) . . . . . . . . . . 80, 131

Indiana Michigan Power Co. v. United States,
60 Fed. Cl. 639 (2004), aff'd,, 422 F.3d 1369 (Fed. Cir. 2005) . . . . . . . . . . 109

Indiana Michigan Power Co. v. United States,
422 F.3d 1369 (Fed. Cir. 2005) . . . . . . . . . . passim

J.D. Hedin Constr. Co. v. United States,
456 F.2d 1315 (Ct. Cl. 1972) . . . . . . . . . . 47, 49

Jetco, Inc. v. United States,
11 Cl. Ct. 837 (1987) . . . . . . . . . . 108

Julius Goldman's Egg City v. United States,
697 F.2d 1051 (Fed. Cir. 1983), cert. denied, 464 U.S. 814 (1983) . . . . . . . . . . 123

Krauss v. Greenbarg,
137 F.2d 569 (3d Cir. 1943) . . . . . . . . . . 48, 49

Krofft Entertainment, Inc. v. CBS Songs,
653 F. Supp. 1530 (S.D.N.Y. 1987) . . . . . . . . . . 48

Landmark Land Co. v. Federal Deposit Insur. Corp.,
256 F.3d 1365 (Fed. Cir. 2001) . . . . . . . . . . 52

Lewis Jorge Constr. Mgmt, Inc. v. Pomona Unified Sch. Dist.,
102 P.3d 257 (2004) . . . . . . . . . . 53

Library of Congress v. Shaw,
478 U.S. 310 (1986) . . . . . . . . . . 108, 113

McAbee Constr, Inc. v. United States,
97 F.3d 1431 (Fed. Cir. 1996) . . . . . . . . . . 128

Maine Yankee Atomic Power Co. v. United States,
225 F.3d 1336 (Fed. Cir. 2000) . . . . . . . . . . 109

Marshall v. United States,
164 F. Supp. 221 (Ct. Cl. 1958) . . . . . . . . . . 112

Massengill v. Guardian Mgt. Co.,
19 F.3d 196 (5th Cir. 1994) . . . . . . . . . . 118

Mays v. Trump Indiana, Inc.,
255 F.3d 351 (7th Cir. 2001) . . . . . . . . . . 116

Menne v. Celotex Corp.,
861 F.2d 1453 (10th Cir. 1988) . . . . . . . . . . 48

Modern Sys. Tech. Corp. v. United States,
979 F.2d 200 (Fed. Cir. 1992) . . . . . . . . . . 116

Myerle v. United States,
33 Ct. Cl. 1 (1897) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53, 87

National By-Prods., Inc. v. United States,
186 Ct. Cl. 546, 405 F.2d 1256 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132

Nebraska Public Power District v. United States,
73 Fed. Cl. 650, 673,appeal certified, 74 Fed. Cl. 762 (2006),
petition for appeal granted, Misc. Docket No. 843,
2007 WL 779291 (Fed. Cir. Mar. 1, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Neeley v. Bankers Trust Co. of Tex.,
757 F.2d 621 (5th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

Northern States Power Co. v. United States Dept. of Energy,
128 F.3d 754 (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Old Stone Corp. v. United States,
450 F.3d 1360 (Fed. Cir. 2006),
cert. denied, 2007 WL 789098 (U.S. Mar 19, 2007) . . . . . . . . . . . . . . . . 51, 52, 53, 86, 87

Pacific Gas & Electric Co. v. United States,
73 Fed. Cl. 333, reconsideration denied, 74 Fed. Cl. 779 (2006),
appeal pending, No. 2007-5046 (Fed. Cir. docketed Jan. 24, 2007) . . . . . . . . . . . . passim

Point Productions A.G. v. Sony Music Entertainment, Inc.
215 F. Supp. 2d 336 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Precision Pine & Timber, Inc. v. United States,
72 Fed. Cl. 460 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Quiman, S.A. de C.V. v. United States,
39 Fed. Cl. 171 (1997), aff'd, 178 F.3d 1313 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . 53

Ramsey v. United States,
121 Ct. Cl. 426, 101 F. Supp. 353 (1951) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Ridge Runner Forestry v. Veneman,
28 F.3d 1058 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

Roseburg Lumber Co. v. Hadigan,
978 F.2d 660 (Fed. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Rumsfeld v. Applied Cos.,
325 F.3d 1328 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

Sacramento Mun. Util. Dist. v. United States,
70 Fed. Cl. 332 (2006), appeal pending, No. 2007-5052
(Fed. Cir. docketed Feb. 6, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 84, 103

Selman v. United States,
204 Ct. Cl. 675, 498 F.2d 1354 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

Shann v. Dunk,
84 F.3d 73 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

Shyface v. Secy of Health and Human Servs.,
165 F.3d 1344 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Singer Co. Librascope Div. v. United States,
215 Ct. Cl. 281, 568 F.2d 695 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

Tennessee Valley Authority v. United States,
69 Fed. Cl. 515 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 100, 110

Transamerica Equip. Leasing Corp. v. Union Bank,
426 F.2d 273, 274 (9th Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

United States v. Mescalero Apache Tribe,
207 Ct. Cl. 369, 518 F.2d 1309 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

United States v. Thayer-West Print Hotel Co.,
329 U.S. 585 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

United States Steel Corp. v. United States,
618 F. Supp. 496 (CIT 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

Wang Lab., Inc. v. Applied Computer Sciences, Inc.,
958 F.2d 355 (Fed. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

Wells Fargo Bank, N.A. v. United States,
88 F.3d 101 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Wickham Contracting Co. v. United States,
12 F.3d 1574 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107, 112

Wickham Contracting Co. v. GSA,
GSBCA No. 8675, 92-3 BCA ¶ 25040, 1992 WL 88326 (GSBCA 1992),
aff'd, 12 F.3d 1574 (Fed. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

Wilner v. United States,
23 Cl. Ct. 241 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

Wilson v. Marquette Elecs., Inc.,
630 F.2d 575 (8th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

Yankee Atomic Elec. Co. v. United States,
73 Fed. Cl. 249, 292 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

**Statutes**

28 U.S.C. § 2516 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

41 U.S.C. § 601 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

42 U.S.C. § 10131 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

42 U.S.C. § 10132 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

42 U.S.C. § 10133 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132

42 U.S.C. § 10134 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

42 U.S.C. § 10135 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

42 U.S.C. § 10139 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

42 U.S.C. § 10161 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 29

42 U.S.C. § 10162 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

42 U.S.C. § 10168 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

42 U.S.C. § 10172 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

42 U.S.C. § 10221 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 27, 132

42 U.S.C. § 10222 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 38, 39

42 U.S.C. § 10242 . . . . . 30

42 U.S.C. § 10243 . . . . . 31

42 U.S.C. § 10250 . . . . . 31

Minn. St. § 116C.77 . . . . . 30, 75

Minn. St. § 116C.771 . . . . . 14, 71

Minn. St. § 116C.773 . . . . . 15, 90

Minn. St. § 116C.779 . . . . . 88, 96

Minn. St. § 116C.83 . . . . . 16, 96

Minn. St. § 216B.1645 . . . . . 16, 90, 92

**Legislative Materials**

S. Rep. No. 100-152 (Sept. 1, 1987) . . . . . 29

**Regulations and Administrative Materials**

10 C.F.R. § 72.22 . . . . . 94

10 C.F.R. § 961.11 . . . . . 25, 27, 33

48 C.F.R. § 43.205 . . . . . 113

48 Fed. Reg. 5458 (Feb. 4, 1983) . . . . . 20, 21

48 Fed. Reg. 16590 (Apr. 18, 1983) . . . . . 24, 25

**Other Sources**

Arthur L. Corbin & Joseph M. Perillo, Corbin on Contracts (rev. ed. 2005) . . . . . 50, 52, 88

Dan B. Dobbs, Law of Remedies (2d ed. 1993) . . . . . 54

Keeton et al., Prosser and Keeton On The Law Of Torts (5th ed. 1984) . . . . . 47

Restatement (Second) of Contracts, § 344 . . . . . 41

Restatement (Second) of Contracts, § 351 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 52, 84

Rstatement (Second) of Contracts, § 352 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| NORTHERN STATES POWER COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | ) | No. 98-484C<br>(Senior Judge Wiese) |

DEFENDANT'S POST-TRIAL BRIEF

Pursuant to this Court's order dated December 4, 2006, defendant, the United States, respectfully submits the following post-trial brief.

SUMMARY OF ARGUMENT

At the beginning of trial, we explained to the Court that this case is about causation. Although plaintiff, Northern States Power Company ("NSP"), has advocated a relaxed standard of causation in its post-trial brief and has even eschewed the issue of causation in favor of a mitigation analysis, the parties' dispute requires resolution of one critical factual issue: whether NSP would have opted in the late 1980s to construct a dry storage facility at Prairie Island had it believed that the Department of Energy ("DOE") would timely commence accepting fuel pursuant to the Standard Contract in 1998. If NSP would have decided to build dry storage irrespective of the delay in DOE's performance, then, no matter what label is attached to the legal

standard, any partial breach by the Government cannot be said to have "caused" the vast majority of the damages that NSP claims.[1]

NSP failed at trial to meet its burden of proving that it would have decided not to build a dry storage facility if it believed that DOE would have commenced performance pursuant to the Standard Contract in 1998. In fact, the evidence that NSP offered conclusively demonstrated that dry storage was necessary and was the only reasonable option available at the time. The same considerations that underlie NSP's primary argument in its post-trial brief – that it acted reasonably by building a dry storage facility in the "actual" world – dictate that it would have

---

[1] The Court has already made a finding with respect to liability in this case. However, in contesting the existence of a breach the Government was specifically enjoined, via a writ of mandamus issued by the United States Court of Appeals for the District of Columbia Circuit, from relying upon the "Unavoidable Delays" clause of the Standard Contract to excuse its delayed performance. See Northern States Power Co. v. United States Dept. of Energy, 128 F.3d 754, 760 (D.C. Cir. 1997).

We have consistently argued that the D.C. Circuit overstepped its jurisdiction and authority in issuing this writ of mandamus (given that the judicial review provision of the NWPA, 42 U.S.C. § 10139, does not permit the D.C. Circuit to review contract administration matters). Recently, in Nebraska Public Power District v. United States,73 Fed. Cl. 650, 673 (2006) (Allegra, J.), this Court determined that the writ of mandamus was void because, in issuing the writ, the D.C. Circuit "operated in excess of its jurisdiction and, specifically, without an appropriate waiver of sovereign immunity." This Court subsequently certified its decision for interlocutory appeal to the United States Court of Appeals for the Federal Circuit, Nebraska Public Power District v. United States, 74 Fed. Cl. 762 (2006), and, on March 1, 2007, the Federal Circuit issued an order granting Nebraska Public Power's petition for permission to appeal. Nebraska Public Power District v. United States, Misc. Docket No. 843, 2007 WL 779291 (Fed. Cir. Mar. 1, 2007). The Government reserves the right to challenge any determination of liability with respect to the Standard Contract if the writ of mandamus is lifted or otherwise deemed inapplicable.

made the same prudent decision in the absence of a partial breach by DOE (i.e., in the "but for" world).

In the actual world, NSP opted in the late 1980s for dry storage, as opposed to other alternatives, because of the prohibitive cost of a plant shutdown and the possibility that these alternatives would not create enough space to ensure Prairie Island's continuous operation. This same consideration would undoubtedly have driven NSP's decisionmaking process in the "but for" world, as the company weighed the very realistic possibility that, even had DOE begun industry-wide performance in 1998, a rerack of Prairie Island's spent fuel pool (the alternative NSP now claims it would have chosen) would not have created enough space to keep Prairie Island in continuous operation. Such a decision would necessarily have been made in the presence of substantial uncertainty not only about how much additional space a rerack could have created, but also about when and at what rate DOE would begin accepting fuel at Prairie Island. Similarly, in the actual world, NSP rejected a potential alternative for its storage needs, rod consolidation, because it determined that that alternative would have endangered the health and safety of its employees. In the "but for" world, NSP, as a rational decisionmaker, an employer, a publicly held company, and a utility regulated by the state of Minnesota, would have had no reasonable choice but to reject an alternative that would have subjected its employees to the same hazards. NSP's statements that it acted reasonably in the actual world simply prove too much.

An array of witnesses who appeared at trial concluded that the only reasonable alternative for NSP to take in the "but for" world was the same as the one it took in the actual world – to construct a dry storage facility. Tellingly, this conclusion was articulated not only by the Government's witnesses (including Dr. Jonathan Neuberger, whose analysis the Court repeatedly

endorsed as a proper method for predicting how a company might make a rational decision in the presence of uncertainty), but by NSP's own employees and spokespersons, whose testimony confirms that the company would not have performed a rerack in the absence of a breach. Indeed, in an effort to convince the Minnesota authorities in the early 1990s to approve the company's plans for dry storage, NSP representatives stated without qualification that dry storage would be a superior option to reracking, even if DOE were to begin accepting fuel from the nuclear industry in 1998 (in other words, under the same circumstances that comprise the "but for" world). NSP believed (and, in a recurring theme of this litigation, its employees and representatives consistently testified in judicial proceedings) that reracking would be an inferior option to dry storage even in the event of DOE performance, yet now would have the Court believe that, in the "but for" world, it would have taken the road that it so thoroughly discredited before the Minnesota authorities. NSP should be bound to the sworn testimony and representations that it provided when it sought permission to build a dry storage facility, even if the truths that it offered concerning reracking are no longer convenient.

Because NSP failed to meet its burden of establishing that it would have performed a third rerack at Prairie Island had it believed that DOE would timely commence accepting spent fuel, the only form of damage to which NSP may be entitled in this case is the difference between the cost of the dry storage facility that it constructed in the actual world and the cost of the dry storage facility that it would have constructed in the "but for" world, together with the costs that NSP incurred through 2004 in connection with the Monticello dry storage facility. This amount totals $20,802,226.

Even if NSP had proven that it would not have constructed a dry storage facility at Prairie Island in the "but for" world, several components of the damages that it claims must necessarily be excluded either as a matter of fact or as a matter of law, or both. First, any amounts that NSP has been required to pay arising from the mandates enacted by the Minnesota legislature and from NSP's settlement with the Mdewakanton Dakota Tribe at Prairie Island are not properly claimed against the Government. The legislative mandates themselves were unforeseeable to NSP's own employees, including its own Chief Executive Officer, James Howard, in the early 1990s and, a fortiori, were unforeseeable to DOE nearly ten years earlier, at the time of contract formation. Further, both the mandates and the tribal settlement are several causal steps removed from the decision to build dry storage and are the result of unforeseeable and intervening forces, most notably the independent decision of the Minnesota legislature to enter the fray and exact concessions from NSP because of NSP's desire to continue generating nuclear power. The United States is not a guarantor against state legislation aimed at its contracting partners and, in the event of a breach, is not responsible for additional costs imposed upon its contracting partners by the states in which they conduct business.

Second, the United States is not responsible for any losses that NSP claims to have incurred as a result of NSP's participation in a speculative business venture known as Private Fuel Storage LLC ("PFS"). The United States Court of Appeals for the Federal Circuit has unequivocally held that investment in PFS is too speculative and unforeseeable to form the basis of a damage award in a spent nuclear fuel case. Indiana Michigan Power Co. v. United States, 422 F.3d 1369, 1376 (Fed. Cir. 2005). This analysis is particularly apt where, as here, NSP continued investing in PFS long after it had made arrangements for its spent fuel needs at Prairie

Island and could have placed its spent fuel in PFS as a customer rather than an owner. Further, the evidence adduced at trial proves only that NSP made an investment in PFS. Regardless of whether NSP's participation in PFS was motivated by profit, there is no evidence anywhere in the record suggesting that the staggering sum that NSP invested (which exceeded the contribution of all other utilities) has been reduced to nothing or that the company, in which NSP has an ownership interest, has absolutely no cash or other assets on hand. In the absence of proof demonstrating that NSP's investment is valueless, there is no basis for a damage award.

Third, NSP has failed to prove that several of the components of damage that it has identified are incremental to the partial breach. Most notably, it has failed to demonstrate that certain overheads, internal labor costs, and the auxiliary building crane upgrade that it performed would not have occurred in the absence of the Government's failure timely to commence spent fuel acceptance. In fact, the evidence adduced at trial indicates that NSP would have incurred the same costs in these categories irrespective of the delay in DOE's performance. In the absence of proof that these costs were incremental to the partial breach, NSP is not entitled to recover these components of its damages claim.

Fourth, NSP's claim for its cost of capital is, as Dr. Neuberger and our accounting expert, Larry Johnson, described, conceptually and practically identical to prejudgment interest that is not available against the Government unless otherwise provided by contract or statute. NSP's cost of capital damages are little more than an attempt to obtain an award of prejudgment interest despite the absence of any waiver of sovereign immunity relating to such an award, and are not an appropriate component of damage.

Finally, NSP asserts that the Court need not resolve the issue of the acceptance rate, yet, at the same time, attempts to demonstrate that the parties contemplated that the DOE would begin accepting at a rate sufficient to preclude the need for additional at-reactor storage after 1998. NSP's legal and factual arguments on this issue are unavailing. To the extent that NSP asserts that the Court need not resolve the issue of rate, it is not correct. There is no dispute that, no matter what acceptance rate is applied, NSP would not have had any allocations for Prairie Island until 1999, at the earliest, and that it needed some way to meet its spent fuel storage needs between 1994 (when NSP originally believed that its spent fuel pool capacity would be exhausted) and the date of DOE's acceptance of enough fuel from Prairie Island to keep the plant operating. However, the company cannot prove what the "but for" world would have looked like (and thereby provide a basis for comparison to the actual world for purposes of damages) without establishing a rate at which DOE was required to accept spent fuel.

Further, the rate of acceptance is central to the issue of causation. NSP cannot prove that the "but for" world would have been different – i.e., that it would have decided in the late 1980s to perform a third rerack – without showing that it could reasonably have believed, given the terms of the Standard Contract, that a rerack would be sufficient to bridge the gap between 1994 and the date of DOE's initial acceptance of fuel. NSP failed to make such a showing.

NSP suggests that, pursuant to the Standard Contract, it was entitled to believe that "DOE would perform at a rate to avoid additional at-reactor storage after 1998." Pl. Post-Tr. Br. at 12, 92. However, such a belief is belied by DOE's repeated rejections of requests by industry groups, of which NSP was a member, to agree to any contract obligation imposing such a rate or contractually to tie the rate of acceptance to the industry generation rate or the need to reduce the

accumulated backlog of spent fuel. NSP, in essence, maintains an indefensible proposition that a reasonable rate under the contract is one that was specifically rejected during contract negotiations and that the nuclear industry, including NSP, unsuccessfully attempted to insert through amendment.

NSP's inability to prove that the rate that it advocates was incorporated into the Standard Contract is fatal to its causation argument. Under the terms of the Standard Contract, which did not require publication of a allocation commitment for individual reactors until 1991, the precise contours of DOE's performance would not have been known to NSP in the late 1980s, when the company was forced to decide how to resolve its fuel storage dilemma. In the absence of the specific rate that NSP advocates, the rate of acceptance was yet another uncertainty that the company would have needed to consider in making its operating decisions. Faced with the possibility of running out of space in its spent fuel pool in 1994, NSP was required in the late 1980s to determine how to meet its storage needs with incomplete information about how much fuel DOE would accept once it began accepting fuel and when it would accept it. Moreover, it would have been imprudent for NSP to make decisions about its future storage needs based solely upon a confluence of favorable events. Thus, even if NSP were confident in the late 1980s that DOE would, in fact, begin industry-wide performance in 1998, NSP would still have been required to make its decision with uncertainty concerning the rate of acceptance, the exact time that DOE would arrive to accept its spent fuel, and the efficacy of in-pool technology to permit it to bridge the gap between 1994 and the date of DOE's arrival. NSP made the only appropriate choice in the actual world and, operating under the uncertain conditions that necessarily confronted it, would have made the same prudent decision in the "but for" world.

## STATEMENT OF FACTS

### I. CHRONOLOGY OF EVENTS RELEVANT TO NSP'S CLAIM

Pursuant to the Court's instructions issued in Court on December 1, 2006, we provide the following chronology of events relevant to NSP's satisfaction of its spent fuel storage needs, including its decision to construct a dry storage facility at Prairie Island, its investment in PFS, and proceedings before the Minnesota Public Utilities Commission ("PUC") and Legislature. A recitation of facts pertaining to identification of the rate of acceptance pursuant to the Standard Contract is provided in a separate section that appears after this chronology.

| **Date** | **Event** |
|---|---|
| **1983** | NSP executes three Standard Contracts covering spent fuel stored at Prairie Island (PX 56), spent fuel generated and stored at Monticello (PX 57), and spent fuel generated at Monticello but stored by General Electric in Morris, Illinois (PX 58). |
| **1987** | Laura McCarten prepares a spent nuclear fuel strategic plan with respect to Prairie Island. NSP projects that, based upon current conditions, the accumulation of spent fuel at Prairie Island will exceed the effective pool capacity of 1354 fuel assemblies by 1994. NSP proceeds with a rod consolidation demonstration program as a possible solution. Reracking is not listed among the alternatives considered. PX 398B at NSP-0001635, NSP-0001638; Tr. 417:18-421:21, 604:10-12 (McCarten).<br><br>*NSP News* publishes an article stating that reracking is impossible because the "current racks have the assemblies as close together as possible." DX 47 at NSP-0073091; Tr. 948:21-952:18 (Kapitz). |
| **April 11, 1988** | McCarten circulates a draft public information strategy report containing a "Rod Consolidation Q & A." In response to the question, "Why doesn't NSP re-rack the fuel pool to hold more assemblies as it has done before?," the Q & A states that "NSP already has re-racked the Prairie Island spent fuel pool to the fullest extent possible. There is not enough room to move whole assemblies any closer together." Tr. 593:17-596:21 (McCarten); DX 61 at NSP-0072972. |

| | |
|---|---|
| **September 1988** | Laura McCarten and Jon Kapitz prepare a "Prairie Island Spent Fuel Storage Technology Evaluation Report," in which they recommend that NSP pursue dry storage at Prairie Island instead of rod consolidation. McCarten and Kapitz recommend rejecting rod consolidation as an alternative due to the potential for rod consolidation to negatively affect plant operations and the potential for personnel exposure. PX 399 at NSP-0037000; Tr. 478:21-479:11, 604:18-605:21, 620:4-13 (McCarten). |
| **Late 1988/ early 1989** | NSP decides to construct a dry storage facility. PX 400; Tr. 655:13-657:6 (McCarten). At time of this decision, James Howard, NSP's Chief Executive Officer, understood that the last rerack had put the assemblies as close together as technically possible. Howard participated in and approved the decision. Tr. 1943:9-1944:11, 2000:1-13 (Howard). |
| **February 1990** | *NSP News* publishes another article stating that the second rereack at Prairie Island "put the assemblies as close together as possible." DX 78 at NSP-0027299. McCarten and Howard still believe this to be true at the time the article is published. Tr. 611:8-612:12 (McCarten), 2000: 1-14 (Howard). McCarten also states in the article that dry storage "will be less intrusive on plant operations and offers the advantage of being modular. That is, NSP can buy the casks as needed and stop buying them when the DOE starts accepting spent fuel." DX 78 at NSP-0027299; Tr. 617:15-618:9 (McCarten). |
| **1990** | McCarten prepares a handwritten document entitled, "Cost for rerack and two-tiered rack," in which she assumes, based upon her "engineering judgment," that a rerack of Prairie Island pool could increase its capacity by 20 percent. DX 77; Tr. 518:12, 520:10-17, 505:7-17 (McCarten). McCarten believes that a 20 percent increase would enable the plant to continue to operate until "sometime in 1999." McCarten provides this information to the Minnesota Environmental Quality Board ("MEQB"). Tr. 519:13-16. |
| **1991: Application for Certificate of Need** | In April, NSP applies for a certificate of need ("CON") to the PUC. PX 403. The application is amended in November to correct various errata. PX 60; Tr. 544:11-14 (McCarten). In its November submission, NSP informs the PUC that "[i]t may be possible to increase the PI Pool capacity by reracking. However, the maximum increase achievable by reracking is estimated to be about 20%." PX 60 at KRGNSP03789; Tr. 663:3-20 (McCarten). The estimated cost of a rerack is $8-10 million. PX 60 at KRGNSP03832; Tr. 550:18-23 (McCarten). NSP projects that, assuming a rerack, normal plant operation could continue "[t]hrough 1998" before the pool is exhausted. Id.; Tr. 550:13- |

17(McCarten). NSP estimates that the cost of a dry storage facility loaded with 48 casks would be $40 million. PX 60 at KRGNSP03833.

The CON application is accompanied by and expressly incorporates an environmental impact statement ("EIS"), which the MEQB prepared at the request of NSP. The EIS is based in large part upon information provided directly by NSP. PX 403 at NSP-0070247, PX 420; Tr. 496:16-497:18 (McCarten). On the basis of information provided by NSP, the MEQB concludes that, "[b]ased on engineering judgment, reracking the pool to a more compact rack design would gain only 200-250 more spaces," an increase of between 14.4 percent and 18 percent of licensed capacity. PX 420 at NSP-0063082; Tr. 637:8-639:2 (McCarten). Neither the MEQB nor the PUC performs an independent engineering analysis of the reracking assertions that NSP provided to the MEQB. The MEQB later notes that "the record established that a third reracking (single level) would provide approximately 200 to 250 more spaces (20 percent) or about enough for three years of storage (1998)" and that "there was no technical or procedural basis for challenging NSP's reracking analysis." PX 679 at NSP-0057469; Tr. 4232:4-4233:3 (Leonard).

NSP's recognition in 1991 that the 20-percent figure represented the maximum amount of increase that it believed it could achieve is corroborated by subsequent statements by two employees. In 1994, Joe Jensen writes that NSP has "consistently stated" that "rerack is an inferior option to dry cask storage" and would "increase storage capacity only 20%," DX 145 at NSP-0100713; 1068:7-15 (Kapitz). Another employee, James Alders, compiles a "Dry Cask Alternatives Study" in 1995 for submission to the Minnesota Legislature and concludes, in a description of the events leading to the CON application, that "the rerack option[] was originally rejected because . . . [r]erack would only have increased the plant's storage capacity by 20 percent" and would "result in increased radiation exposure to plant workers," and that "[t]he costs associated with rerack and a premature plant shutdown would have been excessive." PX 489 at NSP-0001409; PX 49 at KRGNSP11063; Tr. 1393:22-1396:2 (Alders).

In sworn testimony in support of NSP's application for a CON, McCarten states that "[a] 20 percent increase in the pool capacity would take up, allow normal operation, full power operation, though 1998. We would then be faced with shutdown in 1999." DX 107 at 56-57; Tr. 634:17-635:23 (McCarten). NSP's application for a CON includes a table indicating that, based upon projected discharge rates, Prairie Island will have accumulated 1,665 spent fuel assemblies by May 26, 1999, an

amount that exceeds the licensed capacity of the pool even after a rerack that achieves a 20-percent increase. PX 403 at NSP-007268; Tr. 644:18-645:10 (McCarten).

In the errata to the CON application, NSP also states that the dry cask storage facility is a better option for its storage needs, even if DOE were to commence performance under the Standard Contract by accepting spent fuel not at a repository but at an MRS. NSP states that dry storage "provides optimal flexibility and allows NSP to obtain only the storage needed until the DOE begins removing spent fuel from PI for shipment to a monitored retrievable storage facility or a permanent repository." NSP further notes that "the possibility of an MRS facility becoming available [prior to 2010] strongly supports the use of a Dry Cask Storage Facility because of its ability to add additional storage capacity in small increments." PX 60 at KRGNSP03789, KRGNSP03795; Tr. 628:2-12, 631:16-24 (McCarten), 4275:18-4276:11 (Schwartz); see also DX 95 at NSP-0000277; Tr. 4321:1-13 (Schwartz) (table appended to CON application indicating that, were DOE to begin performing in 1998, NSP would still require dry storage).

In October 1991, Michael Schwartz , President of Energy Resources International and consultant to NSP, provides rebuttal testimony in further support of NSP's application for a CON. Schwartz, whom NSP later characterizes as the "most knowledgeable witness" to have testified before the PUC because of his extensive experience as the nuclear industry's liaison to DOE, states that performance at a monitored retrievable storage facility ("MRS") beginning at 1998 is "not an unrealistic possibility." DX 103 at NSP-0003124; PX 778 at NSP-0055798; Tr. 4263:6-7, 4302:1-12 (Schwartz). However, Schwartz, who was operating under the assumption that allocations could not be shared between Prairie Island and Monticello, cautions that NSP will not receive allocations for Prairie Island until 2001 (pursuant to the oldest fuel first ("OFF") queue that the Standard Contract mandates). For this reason, Schwartz states that the PUC should assume that any authorization for a dry storage facility should be enough to carry NSP not merely through 1999, but through 2001, when Prairie Island has its first allocation. DX 103 at NSP-0003124-25; Tr. 4264:7-23, 4317:24-4318:23 (Schwartz). In a brief submitted to the PUC in February 1992, NSP relies on Schwartz's testimony to support its contention that DOE could begin accepting fuel pursuant to the Standard Contract at an MRS in 1998, but that, even if it did, NSP would need to make arrangements to store spent fuel through 2001. PX 778 at NSP-0055717; Tr. 4292:1-4295:1 (Schwartz).

| | |
|---|---|
| **September 18, 1991 to April 15, 1992** | James Howard writes to Secretary of Energy James Watkins, seeking assurance that DOE will timely perform under the Standard Contract. Howard seeks such an assurance as a means of demonstrating to the "nay sayers" in Minnesota that the proposed dry storage facility will not be permanent. PX 492, 496; Tr. 2024:11-2031:20 (Howard). |
| **April 1992** | An administrative law judge of the PUC recommends denial of NSP's application for certificate of need on the grounds that the application is for a permanent facility and therefore requires legislative approval under Minnesota law. However, the ALJ finds (and the PUC subsequently endorses the conclusion) that reracking and rod consolidation, among others, are "not the first choices of any party" and are "technically inferior to dry cask storage due to substantially higher risks of accidents and worker exposure." PX 61 at KRGNSP04125-26; PX 749; Tr. 673:3-674:4 (McCarten).<br><br>The ALJ's decision with respect to the permanence issue is subsequently reversed by the PUC, which grants a limited certificate of need for a dry storage facility. PX 61 at KRGNSP04136; Tr. 566:1-567:3 (McCarten). However, on June 8, 1993, the ALJ's decision is reinstated by the Minnesota Court of Appeals, and, on July 15, 1993, the Minnesota Supreme Court denies to review the matter, prompting legislative review. See In re Application for Certificate of Need for Construction of an Independent Spent Fuel Storage Installation, 501 N.W. 2d 638 (Minn. Ct. App. 1993), review denied (July 15, 1993). |
| **May 29, 1992** | Secretary Watkins responds to James Howard's April 15, 1992 letter, stating that DOE is "committed to fulfill the mandates imposed by the [NWPA]" and, specifically, to begin performance through an MRS in 1998. Howard is "delighted" to receive this letter and issues a news release the same day. According to Howard, NSP "supports the MRS concept," and the schedule proposed by Secretary Watkins, which contemplates performance at an MRS beginning in 1998, represents a "firm commitment with a solid timetable." DX 314, PX 497; Tr. 2034:3-2038:22 (Howard) |
| **1993** | The Minnesota Legislature conducts hearings related to NSP's application for a certificate of need. Tr. 1244:3-12 (Novak). These hearings, conducted during an interim session, are the most extensive in the history of the state and involve the "most controversial issue that the state has dealt with." Tr. 1270:5-1271:13 (Novak). Kris Sanda, at the time the Commissioner of the Minnesota Department of Public Services, describes the legislative process as a "long, contentious and winding road" in which |

| | |
|---|---|
| | one never knew from one day to the next what was going to happen. Tr. 1126:19-23, 1202:2-1202:24 (Sanda). |
| **Early 1994** | A bill authorizing the construction of a dry storage facility at Prairie Island and containing wind mandates is introduced by State Senator Steven Novak. Tr. 1228:9-22 (Merriam). Although the bill initially stalls in the Environment and Natural Resources Committee, in the estimation of Senator Raymond Merriam, it is going to get to the Senate floor and ultimately pass, without additional mandates. Tr. 1219:4-1222:10; 1230:1-10 (Merriam). Sensing an opportunity "to get something in addition to what was in" the original version, Senator Merriam introduces several additional energy source requirements (i.e., mandates other than that pertaining to wind energy) into the bill. Tr. 1222:9-15; 1230:1-23 (Merriam). |
| **March 1994** | In response to an inquiry concerning the feasibility of reracking, McCarten informs Senator Novak by letter that the PUC had previously found pool reracking to be technically inferior to dry storage and entailed a greater health and safety risk, and that the PUC "rejected reracking for reasons of cost, practicality, and safety." McCarten estimates that a plant shutdown from May 1995 through early 1998 will cost between $408 and $560 million, mostly attributable to the cost of replacement power. The Minnesota Legislature has this information at its disposal in considering legislation. PX 592; Tr. 1289:5-1290:24 (Novak). |
| **March 1994** | The dry storage facility is completed and casks are ready to be loaded, pending legislative approval. Tr. 1492:5-24 (Northard). |
| **March 24, 1994** | David Sparby of NSP makes a presentation in Mescalero, New Mexico, to approximately 20 utilities as part of effort to enlist other utilities in the PFS venture. At this time, PFS was not assumed to be in operation until 2002. DX 143 at SN179006; Tr. 1494:23-1497:5 (Northard). |
| **May 10, 1994** | Minnesota Session Law Ch. 641, S.F. No. 1706, is enacted into law. The law authorizes the immediate loading of five casks of spent fuel onto a dry storage facility at Prairie Island, an additional four casks upon certification from the MEQB that NSP has made progress toward siting an additional dry storage site in Goodhue County and has complied with certain mandates concerning wind power, and an additional eight casks upon satisfaction of additional mandates concerning wind power and biomass power. PX 198 at KRGNSP11417 (Minn. Laws 1994, Ch. 641, S.F. No. 1706, Art. I, Sec. 2, codified at Minn. St. § 116C.771). |

The law further provides that the authorization for dry cask storage

> is not effective until the governor, on behalf of the state, and the public utility operating the Prairie Island nuclear plant enter into an agreement binding the parties to the terms of sections 2 and 3 and the mandate for 200 megawatts of windpower and 75 megawatts of biomass required by December 31, 2002, in article 3, section 2, subdivision 1, and section 3. The Mdewakanton Dakota Tribal Council at Prairie Island is an intended third-party beneficiary of this agreement and has standing to enforce the agreement.

PX 198 at KRGNSP11417-18 (Ch. 641, S.F. No. 1706, Art. I, Sec. 4, codified at Minn. St. § 116C.773).

**May 20, 1994** NSP and the State of Minnesota execute the contract contemplated by Minn. Stat. Ch. 641, S.F. No. 1706, Art. I, Sec. 4. PX 804; Tr. 1694:12-1695:18 (Wilensky).

**November 1995** NSP makes its initial capital contribution to PFS. PX 1057 (Sieracki Demonstrative No. 39); Tr. 2707:25-2709:9 (Sieracki); 1504:20-24 (Northard) (identifying work order number 12.40.27-03 as PFS capital contributions).

Thirty-three utilities, including NSP, make contributions to phase I of PFS, which includes a feasability study for the project. Twelve utilities, including NSP, subsequently make contributions during phase II (preliminary design work and licensing study); and eight, including NSP make contributions during phase III (preparation of NRC license). NSP also makes contributions during Phase IV, which includes subscription agreements and the construction phase. NSP contributes more to the project than any other utility. Tr. 1506:7-1511:25 (Northard).

**Fall 2002** NSP decides to seek legislative authorization for additional dry storage at Prairie Island. Tr. 1674:4-8 (Wilensky).

**Early 2003** In an effort to be a "good neighbor," NSP begins discussions with the Mdewakanton Dakota Tribe at Prairie Island concerning its request for legislative authorization for additional casks. During these discussions, the tribe raises concerns that would exist regardless of whether NSP receives authorization to store additional assemblies in dry storage, namely, the tribal land's proximity to the Prairie Island plant and the

health and safety hazards posed by a catastrophic nuclear accident. Tr. 1734:10-1737:6 (Wilensky).

NSP begins negotiations with the tribe even though NSP publicly states that it believes that the legislature possesses the authority to increase the amount of casks authorized for dry storage at Prairie Island. Tr. 1731:15-1732:22, 1734:24-1735:5.

**May 29, 2003** Minnesota Session Law Ch. 11 (H.F. 9), is enacted into law. Among other provisions, the law authorizes NSP to store spent fuel in dry storage at Prairie Island through the expiration of the individual reactor units NRC license (2013 for Unit 1 and 2014 for Unit 2), and grants to the PUC initial responsibility for the authorization of additional dry cask storage at nuclear generating facilities, subject to subsequent legislative review. PX 198 at KRGNSP11390 (Minn. Laws 2003, Ch. 11, H.F. No. 9, Art. I, Sec. 2, codified at Minn. St. § 116C.83).

The statute further compels the PUC to approve a rate schedule, which the PUC subsequently approves, "providing for the automatic adjustment of charges to recover the costs or expenses of a settlement" between NSP and the Mdewakanton Dakota Tribal Council at Prairie Island. The settlement is to provide for annual payments from NSP, not to exceed $2,500,000 annually, "to be used for, among other purposes, acquiring up to 1,500 contiguous or noncontiguous acres of land in Minnesota within 50 miles of the tribal community's reservation at Prairie Island to be taken into trust by the federal government for the benefit of the tribal community for housing and other residential purposes." The statute specifically contains an acknowledgment that "the intent to purchase land by the tribe for relocation purposes is part of the settlement agreement and this act." PX 198 at KRGNSP11392 (Minn. Laws 2003, Ch. 11, H.F. No. 9, Art. I, Sec. 3, codified at Minn. St. § 216B.1645); Tr. 289:12-290:2 (Bomberger).

This provision reflects an agreement in principle already reached between NSP and the Mdewakanton Dakota Tribal Council, which is ultimately reduced to a written agreement calling for the annual payment to the tribe of approximately $2.25 million. PX 187 at KRGNSP 01397-1405; Tr. 1718:6-1719:18 (Wilensky). The agreement calls, among other things, for a $1 million payment for each year that Prairie Island is in operation; $700,000 annually for expenses associated with the acquisition of land to be held in trust for the tribal community or for other community purposes; $100,000 annually for health studies, emergency management activities, and other community purposes; and $25,000 for an engineering study for construction of a railroad overpass. PX 187 at KRGNSP01397-98.

| | |
|---|---|
| **June 2004-December 2004** | NSP makes capital contribution to PFS totaling $3.485 million. PX 1057 (Sieracki Demonstrative No. 39); DX 318; Tr. 2707:25-2709:9 (Sieracki), 277:24-279:11 (Bomberger). |
| **2005** | NSP makes capital contributions to PFS totaling $800,000. PX 1057 (Sieracki Demonstrative No. 39); DX 318; Tr. 2707:25-2709:9 (Sieracki), 279:12-19 (Bomberger). |

## II. FACTS RELATING TO STANDARD CONTRACT AND RATE OF ACCEPTANCE

### A. The Original Provisions Of the Nuclear Waste Policy Act

On January 7, 1983, the Nuclear Waste Policy Act of 1982 ("NWPA"), Pub. L. 97-425, 96 Stat. 2201 (codified at 42 U.S.C. §§ 10101-10270 (1982)), was enacted. In its statement of the statutory purposes underlying the NWPA, Congress identified the following four objectives: (1) developing repositories to ensure the protection of the public and the environment from the hazards posed by spent nuclear fuel ("SNF") and high level radioactive waste ("HLW"); (2) establishing Federal responsibility and policy for the disposal of SNF and HLW; (3) defining the relationship between the Federal Government and state governments regarding SNF and HLW disposal; and (4) establishing

> . . . a Nuclear Waste Fund, composed of payments made by the generators and owners of such waste and spent fuel, that will ensure that the costs of carrying out activities relating to the disposal of such waste and spent fuel will be borne by the persons responsible for generating such waste and spent fuel.

Id. § 10131(b).

The NWPA sets forth a specific process by which the Secretary of Energy, the President of the United States, and the United States Congress would determine a site for a repository for the permanent deep geologic disposal of SNF. See 42 U.S.C. §§ 10132, 10134, 10135. In

addition to this process for the siting of a repository, the Secretary was to "prepare a comprehensive report, to be known as the mission plan, which shall provide an informational basis sufficient to permit informed decisions to be made in carrying out the repository program and the research, development, and demonstration programs required under this chapter." 42 U.S.C. § 10221(a) (1982). The Secretary was to provide a draft mission plan to the states, affected Indian tribes, the NRC, and other Federal Government agencies within 15 months of the date of the NWPA's enactment. Id. § 10221(b)(1). The Secretary was to obtain those entities' comments, revise the draft mission plan in response to them, and, within 17 months of the NWPA's enactment, to provide the appropriate committees of Congress with the mission plan. Id. § 10221(b)(2)-(3).

Congress also included in the NWPA provisions allowing the Secretary to study the possibility of creating MRS facilities, with Congress finding that "long-term storage of high-level radioactive waste or spent nuclear fuel in monitored retrievable storage facilities is an option for providing safe and reliable management of such waste or spent fuel." 42 U.S.C. § 10161(a)(1) (1982). By July 1, 1985, the Secretary was to "complete a detailed study of the need for and feasibility of, and shall submit to the Congress a proposal for, the construction of one or more monitored retrievable storage facilities for high-level radioactive waste and spent nuclear fuel." Id. § 10161(b)(1). The proposal was to "include, for the first such facility, at least 3 alternative sites and at least 5 alternative combinations of such proposed sites and facility designs . . . ." Id. § 10161(b)(4). However, the NWPA provided that any MRS facility that Congress might authorize in response to the Secretary's proposal could "be constructed in any State in which

there is located any site approved for site characterization under section 10132 of this title." Id. § 10161(g).

The NWPA was not self-executing. Instead, the NWPA provided that the Secretary would enter into contracts with the owners and generators of SNF of domestic origin for "the acceptance of title, subsequent transportation, and disposal of such [SNF]." 42 U.S.C. § 10222(a)(1) (1982). The contracts had to "provide for payment to the Secretary of fees . . . sufficient to offset expenditures" described elsewhere in the statute. Id. The NWPA also required that:

> Contracts entered into under this section shall provide that –
>
> (A) following commencement of operation of a repository, the Secretary shall take title to the high-level radioactive waste or spent nuclear fuel involved as expeditiously as practicable upon the request of the generator or owner of such waste or spent fuel; and
>
> (B) in return for the payment of fees established by this section, the Secretary, beginning not later than January 31, 1998, will dispose of the high-level radioactive waste or spent nuclear fuel involved as provided in this subtitle.

42 U.S.C. § 10222(a)(5). The NWPA did not identify any other contractual requirements for the contracts authorized by 42 U.S.C. § 10222(a)(5). More specifically, the NWPA contained no provisions concerning the specific rate of acceptance to be included in the contracts or concerning qualitative standards that DOE was obligated to include in the contract with respect to the rate of SNF acceptance. See generally 42 U.S.C. §§ 10101-10270; see also Tr. 3829:14-23, Tr. 3840:20-25 (Morgan) (NWPA does not contain language that DOE would be required to accept spent nuclear fuel at such a rate to preclude utilities from adding additional at-reactor storage after 1998).

B. The "Standard Contract For Disposal Of Spent Nuclear Fuel And/Or High-Level Radioactive Waste" Was Created Through Notice And Comment Rulemaking In The Federal Register

1. The Proposed Rule

On February 4, 1983, DOE – in furtherance of its obligations pursuant to the NWPA, 42 U.S.C. § 10222 – published a notice of proposed rulemaking in the Federal Register, proposing terms for the "Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste" ("Standard Contract") mandated by the NWPA, 42 U.S.C. § 10222. See 48 Fed. Reg. 5458 (Feb. 4, 1983). The proposed Standard Contract provided a mechanism for determining both the order in which, and the rate at which, the various contract holders' SNF would be accepted. As for the order of SNF acceptance, the Standard Contract proposed that DOE would issue an "acceptance priority ranking" ("APR") of SNF and/or HLW, through which SNF and/or HLW would receive acceptance priority based generally upon its age. Id. at 5464 (Art. VI.B.3). Although the proposed Standard Contract itself did not identify a specific rate by which DOE would accept contract holders' SNF, it provided for DOE's issuance of documents for planning purposes to assist in the eventual definitization of the specific rate and order of SNF acceptance and disposal. Id. at 5463 (Art. V.B.5 & Art. V.B.6). The proposed contract further provided that, following DOE's issuance of planning documents, rates of SNF acceptance, as well as the specific order of SNF acceptance from particular contract holders, would be defined through the contract holders' submission of, and DOE's approval of, delivery commitment schedules ("DCSs"). Id. at 5462. The proposed Standard Contract also provided for the contract holders' subsequent submission of Final Delivery Schedules ("FDSs"), which would serve to take the annual allocation defined in a DCS and further refine it to reflect as closely as possible

the month(s) and day(s) upon which SNF acceptance would occur in that year. Id. at 5463 (Art. IV.C).

The term "DOE facility" in the proposed Standard Contract referred to a facility for disposal, in a permanent repository, of the SNF and/or HLW. Id. at 5462 (Art. I.11). The proposed rule provided that written comments had to be submitted by March 7, 1983. Id. at 5458.

Like the NWPA, the proposed Standard Contract did not contain any agreement by DOE to accept SNF at a particular rate.

2. Public Comments

Domestic nuclear utilities – including NSP – and their industry representatives were very involved in the drafting of the Standard Contract and its terms. Indeed, DOE received numerous comments in response to the proposed rule. See DX 2.01-2.86. One of the issues that pervaded the comments that utility and industry representatives made concerned the rate at which DOE would be obligated, by contract, to accept SNF from the contract holders.

The Edison Electric Institute ("EEI"), an association of investor-owned utilities, and the Utility Nuclear Waste Management Group ("UNWMG"), a consortium of 43 utilities with specific interests relating to nuclear waste management expressly recognized that "the contract may not be the appropriate place to commit DOE to a specific, numerical receiving rate." DX 2.34 at ARC0010334.[2] However, EEI and UNWMG requested that a term be added to the Standard Contract that would require DOE to "design its facilities with the capacity to receive

[2] NSP was a member of EEI and UNWMG. Tr. 3904:23-25 (Mills). NSP's CEO, James Howard, served as chairman of EEI during the early 1990s. Tr. 2059:22-25 (Howard), Tr. 3905:1-9 (Mills).

SNF/HLW at a rate commensurate with the amount of SNF/HLW then being generated together with the accumulated backlog of SNF/HLW." Id. Specifically, EEI and UNWMG suggested the inclusion of the following language, intended to add an obligation upon DOE beyond that imposed by the proposed rule:

> WHEREAS, DOE recognizes that its ability to take delivery of spent nuclear fuel and/or high-level radioactive waste must be commensurate with the amount of such fuel and waste then being generated together with the amount of such fuel and waste previously generated, and consistent with its obligation to take title to such fuel and waste as expeditiously as practicable upon the request of the owner or generator of such fuel and waste.

Id. at ARC0010335.

Other utilities submitted similar comments seeking firm commitments regarding the rate of DOE performance. For instance, Tennessee Valley Authority ("TVA") submitted a comment, stating that "a commitment to do no more than start accepting deliveries by 1998 is empty and meaningless without setting forth some reasonable minimum rate of acceptance which corresponds to the purposes of the Act." DX 2.63 at ARC0010537. TVA recognized that, "[o]f course, under the priority ranking system in the draft contract, it would be difficult at the time contracts are executed to give each Purchaser assurances of delivery acceptance at any specific rate," but suggested that "[t]his could, however, be done on an industry wide basis." Id. TVA suggested that DOE add a contract provision to provide that "DOE shall start accepting delivery of SNF or HLW not later than January 31, 1998, at not less than the annual rate [at which] SNF and/or HLW is then being produced from civilian nuclear power plants covered by contracts." Id.

DOE also received comments seeking a commitment for DOE to accept SNF at the rates set forth in the forthcoming mission plan. For instance, Florida Power & Light Company, expressly stated that DOE should create a mandatory obligation that would require DOE to accept SNF and HLW at the rates identified in the mission plan, once that plan was approved by Congress:

> The [NWPA] specifically requires the Department of Energy to prepare a Mission Plan detailing a schedule for the construction of repositories and their capacities (Section 301). It is proposed that once this Mission Plan has been approved by Congress (18 months after the enactment of the [NWPA]), it becomes the standard by which contract performance by the DOE is judged. It is suggested that Article V B (3) be modified to include the statement:
>
>> "Should the DOE fail to meet the schedule and capacities detailed in the approved 1984 DOE Mission Plan, because of Force Majeure or other causes, DOE shall, to the extent permitted by the [NWPA], as it may be amended from time to time, bear the reasonable and necessary incremental costs of storage or alternative disposal incurred by the Purchaser."

DX 2.43 at ARC0010439.[3]

EEI also suggested that "[t]he definition of 'DOE Facility' (Article I.11) should be broadened to include destinations other than the repository." DX. 2.34,at ARC0010336. EEI stated that "[t]he contract does not recognize the possibility that DOE might send SNF/HLW to

---

[3] DOE also received comments that would require a permanent repository be in place by January 31, 1998, or, in the alternative, that DOE obligate itself to accept SNF, beginning no later than January 31, 1998, at a rate commensurate with that which would be expected if a repository were operational by January 31, 1998. DX 2.17 at ARC0010216. EEI and UNWMG requested that DOE modify the proposed Standard Contract to read that "[t]he services to be provided by DOE under this contract shall commence on a schedule consistent with the commencement of disposal services [i.e., in a repository] not later than January 31, 1998 . . . ." DX 2.34 at ARC0010342-43. Others requested an express contractual provision tying the repository to a January 31, 1998 date. DX 2.36 at ARC0010414.

an intermediate location (such as a monitored retrievable storage facility) before it goes to a repository" and that, "[t]o accommodate this, the definition of 'DOE Facility' should be broadened." DX 2.34 at ARC0010337; see also DX 2.14 at ARC0010180 (change to contract language "would implicitly recognize DOE's option to reprocess SNF or to utilize Monitored Retrievable Storage prior to permanent disposal"); DX 2.69 at ARC0010625 ("[t]his change would recognize the possibility of DOE shipping SNF/HLW to an intermediate storage facility such as a monitored retrievable storage facility").[4]

3. The Final Rule

On April 18, 1983, DOE issued the Standard Contract as a final rule. 48 Fed. Reg. 16590 (April 18, 1983). The final rule, as promulgated, made several important modifications to the Standard Contract set forth in the proposed rule. First, and in response to the comments from the industry, the Standard Contract eliminated any requirement for DOE to begin SNF "disposal" in a permanent repository by January 31, 1998. Id. Instead, the final Standard Contract only required DOE to begin SNF acceptance by January 31, 1998, after the commencement of "facility" operations:

> This contract applies to the delivery by Purchaser to DOE of SNF and/or HLW of domestic origin from civilian nuclear power reactors, acceptance of title by DOE to such SNF and/or HLW, subsequent transportation and, with respect to such material, establishes the fees to be paid by the Purchaser for the services to

---

[4] EEI and UNWMG suggested that "[t]he definition of 'DOE Facility' (Article I.11) be broadened to include destinations other than the repository," such as an MRS. DX 2.34 at ARC0010336-37; see also DX 2.14 at ADM002.0125 (change to contract language "would implicitly recognize DOE's option to reprocess SNF or to utilize Monitored Retrievable Storage prior to permanent disposal"); DX 2.69 at ADM002.0570 ("[t]his change would recognize the possibility of DOE shipping SNF/HLW to an intermediate storage facility such as a monitored retrievable storage facility").

> be rendered hereunder by DOE. The SNF and/or HLW shall be specified in a delivery commitment schedule as provided in Article V below. The services to be provided by DOE under this contract shall begin, after commencement of facility operations, not later than January 31, 1998 and shall continue until such time as all SNF and/or HLW from the civilian nuclear power reactors specified in Appendix A, annexed hereto and made a part hereof, has been disposed of.

10 C.F.R. § 961.11, Art. II (emphasis added). The "facility" was re-defined to encompass either a permanent repository to be constructed pursuant to the NWPA or such other facility to which SNF might be shipped by DOE prior to its transportation to a permanent repository. Id. § 961.11, Art. I.10; see also 48 Fed. Reg. 16590, 16591 (Apr. 18, 1983).

With respect to the order of SNF acceptance, the Standard Contract retained the proposed rule's intention to provide SNF acceptance priority among contract holders upon an "oldest fuel first" basis, 10 C.F.R. § 961.11, Art. VI.B.1, and, like the proposed rule, provided for DOE's issuance of an acceptance priority ranking beginning April 1, 1991. 10 C.F.R. § 961.11, Art. IV.B.5.a. However, DOE adopted EEI's proposed term allowing for exchanges among contract holders, with modification allowing DOE, in its sole discretion, to approve or reject proposed exchanges. 10 C.F.R. § 961.11, Art. V.E

With respect to the rate of SNF acceptance, DOE did not adopt the suggestion of EEI and many of the utilities to incorporate into the contract a requirement that DOE accept SNF at a rate equal to the annual generation rate plus some additional amount to reduce the accumulated backlog. DOE determined it could not include this requirement due to the number of uncertainties concerning the acceptance of SNF by DOE in 1998. Tr. 3782:3-20 (Morgan). Mr. Morgan testified regarding the inclusion of a qualitative description of the rate of acceptance:

"Because of the uncertainties of the program[, it] would be unconscionable for me to commit the government to things that I felt were extremely difficult and had the potential that we might not meet them." Tr. 3796:22-3798:16 (Morgan). Instead, the Standard Contract provided that the acceptance rate would be developed later. 10 C.F.R. § 961.11, Art. IV.B.5; Tr. 3154:6-21 (Kouts).

The utilities acknowledged that DOE rejected their request regarding the inclusion of a qualitative description of the acceptance rate in both internal memoranda and correspondence with DOE. For example, TVA noted that its request regarding the acceptance rate term had been rejected:

> DOE did not accept TVA's suggestion that DOE should start accepting delivery of SNF and HLW in 1998 at a rate not less than that which they are being produced by the civilian nuclear power industry as a whole. The final contract does obligate DOE to issue, not later than July 1, 1987, an annual capacity report for planning purposes and, beginning April 1, 1991, annual capacity priority rankings (the oldest SNF and HLW having priority) for receipt by the DOE repository. DOE is also obligated to provide annual reports giving the waste disposal programs' plans and cost projections.

DX 32 at TV1471.

The final Standard Contract included a "Disputes" clause, the purpose of which was to provide a mandatory administrative mechanism for the resolution of contract disputes arising under the contract:

> Except as otherwise provided in this contract, <u>any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer</u>, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Purchaser. <u>The decision of the Contracting Officer shall be final and conclusive unless within</u>

> ninety (90) days from the date of receipt of such copy, the Purchaser mails or otherwise furnishes to the Contracting Officer a written appeal addressed to the DOE Board of Contract Appeals (Board). . . .

10 C.F.R. § 961.11, Art. XVI.A (emphasis added).

Finally, the final Standard Contract contained an integration clause, precluding reliance upon any representation, promise, or condition not expressly incorporated into the contract:

> This contract, which consists of Articles I through XXII and Appendices A through G, annexed hereto and made a part hereof, contains the entire agreement between the parties with respect to the subject matter hereof. Any representation, promise, or condition not incorporated in this contract shall not be binding on either party. No course of dealing or usage of trade or course of performance shall be relevant to explain or supplement any provision contained in this contract.

10 C.F.R. § 961.11, Art. XXII.

### C. Plaintiff's Execution Of Its Standard Contracts

On June 20, 1983, NSP executed three Standard Contracts with DOE, covering spent fuel generated at Prairie Island (DX 56) and Monticello (DX57), and a third covering the fuel generated at Monticello but stored at General Electric's Morris facility in Morris, IL ("Morris") (DX 58). All of these Standard Contracts contained the same terms and conditions as the final rule promulgated by DOE on April 14, 1983.

### D. Issuance Of The Mission Plan And Its Amendments

In June 1985, DOE issued the Mission Plan, in accordance with the requirements of 42 U.S.C. § 10221 (1982), which was to "provide an informational basis sufficient to permit informed decisions to be made in carrying out the repository program and the research, development, and demonstration programs required under this chapter." 42 U.S.C. § 10221

(1982). In the 1985 Mission Plan, DOE projected for informational purposes that an initial permanent repository would begin operations in 1998 and that a second permanent repository would commence operations in 2006. DX 45 at HQR0031129 ("Assumptions About Geologic Repositories, A. Number of Repositories, Two"); id. at HQR0031130 ("Table 2-2 shows a schedule that is based on the current estimated emplacement capacities of the two planned geologic repositories, one of which is currently authorized"). Based upon these assumptions, the Mission Plan at HQR0031130-31 in Tables 2-2 and 2-3 uses a two repository assumption and the following waste acceptance rates (the improved system with an MRS):

| | Authorized System | | Improved System |
|---|---|---|---|
| Year | First Repository MTU | Second Repository | MTU |
| Pre-1998 | | | 2,200 |
| 1998 | 400 | | 3,000 |
| 1999 | 400 | | 3,000 |
| 2000 | 400 | | 3,000 |
| 2001 | 900 | | 3,000 |
| 2002 | 1,800 | | 3,000 |
| 2003 | 3,000 | 400 | 3,000 |
| 2004 | 3,000 | 400 | 3,000 |
| 2005 | 3,000 | 400 | 3,000 |
| 2006 | 3,900 | 400 | 3,900 |
| 2007 | 4,800 | 400 | 4,800 |
| Total | 21,600 | | 34,900 |

DX 45 at HQR0031130-31. These same schedules projected annual generation rates of approximately 3,000 MTU in 1998 and increasing in future years. Id.

The Mission Plan noted that these schedules were "only an approximation of how the system may operate and is subject to considerable variation. The DOE will further define and specify the system acceptance parameters as the program progresses." DX 45 at HQR0031133. The Mission Plan further advised that

> [u]nder the terms of the contracts for disposal services that have been signed between the DOE and the utilities, an annual capacity report with projected annual receiving capacities and rankings will be issued by the DOE beginning in 1987. In 1991, the DOE will begin to publish firm waste-acceptance schedules for individual reactors, including shipment allocations.

DX 45 HQR0031133.

In the 1987 Mission Plan Amendment, which DOE submitted to Congress in June 1987, DOE recommended deferral of the date contemplated for operation of the first repository from 1998 to 2003, with the second repository becoming operational by 2023. It explained that this recommendation was based upon experience gained in the program, a budget decrease for fiscal year 1987, and budget uncertainty for fiscal year 1988. The Mission Plan also noted that DOE could nonetheless start accepting waste in 1998 at an MRS facility.[5] DX 53 at HQR0031634.

Further, in the 1987 Mission Plan Amendment, DOE stated that, "[l]ike the schedule in the 1985 Mission Plan, the schedule presented here is only an approximation of how the system may operate and is subject to considerable variation." DX 53 at HQR0031687. The 1987 Mission Plan Amendment also acknowledged the importance of the Annual Capacity Report that would be issued in 1991; namely, that it would be used in the DCS process. Id.

E. The 1987 Amendments To The Nuclear Waste Policy Act

On December 22, 1987, after DOE submitted the 1987 Mission Plan Amendment, Congress amended the NWPA "to redirect the program for the management and disposal of spent nuclear fuel and high-level radioactive waste under the [NWPA]." S. Rep. No. 100-152, at 1 (Sept. 1, 1987). The Senate Committee on Energy and Natural Resources reported, in

---

[5] The ability to start accepting waste in 1998 at an MRS facility was dependent upon congressional authorization. See 42 U.S.C. § 10161(b)-(c) (1982).

considering legislation to amend the NWPA, that "[t]he schedules included in the NWPA have proven to be overly ambitious" and that "[t]his has been largely due to the need to provide additional time for completion of necessary technical work and additional time for public participation." Id. at 5. The committee reported that, "[i]n the four and a half years since passage of the NWPA, it has become clear that the program laid out in the Act will take longer to complete than was anticipated and that completion will be at much greater cost." Id. It further reported that, "[i]n addition to cost and schedule considerations, a number of other circumstances have changed since passage of the NWPA," including that, "as we approach major decision points in the nuclear waste program, there will be great potential for political opposition . . . ." Id.

The 1987 amendments to the NWPA directed DOE to characterize a single site, at Yucca Mountain in Nevada, for development of a single permanent repository and to terminate activities at all other sites. 42 U.S.C. § 10172(a). The 1987 amendments also authorized the Secretary to site, construct, and operate one, but only one, MRS facility. 42 U.S.C. § 10162(b). However, the 1987 amendments provided that "construction of [the MRS] facility may not begin until the Commission has issued a license for the construction of a repository under section 115(d)." 42 U.S.C. § 10168(d)(1). Finally, it also provided that "the quantity of [SNF] at the site of such facility at any one time may not exceed 10,000 metric tons of heavy metal until a repository under this Act first accepts [SNF]." Id. § 10168(d)(3).[6]

---

[6] The 1987 amendments to the NWPA also established the Office of the Nuclear Waste Negotiator. 42 U.S.C. § 10242(a). That office was to seek to enter into negotiations with states and Indian tribes to "attempt to reach a proposed agreement" with them through which a state or Indian tribe "would agree to host a repository or [MRS] facility with such State or reservation." (continued...)

F. DOE's Issuance Of Annual Capacity Reports

1. The 1987 Through 1990 Annual Capacity Reports

Beginning in 1987, in compliance with the NWPA and the language of the Standard Contract, DOE issued an "Annual Capacity Report." The 1987 ACR stated, "[a]s specified in the Contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the Purchasers." PX 254 at HQR0012713; see also PX 257 at HQR0012494 (1990 ACR stating that "projections in this initial report are based on current plans and best available information; they are not contractually binding"). The 1987 ACR warned contract holders that the waste acceptance schedule was uncertain and presumed both a repository and an MRS in 1998. PX 254 at HQR0012714-15. Further, the ACRs contained the following, or substantially similar, language:

> Beginning in 1991, the ACR acceptance ranking will be converted into an Annual Priority Ranking for receipt of SNF/HLW. In 1992, based on this priority ranking, the Purchasers will submit to DOE for approval, Delivery Commitment Schedules identifying the SNF/HLW that Purchasers propose to deliver to the DOE waste management system (WMS). Once approved, these schedules will become the basis for Final Delivery Schedules to be submitted by the Purchasers not less than 12 months before the date of DOE's anticipated acceptance of title to the SNF/HLW and subsequent transport to a DOE facility.

PX 254 at HQR0012713; see also PX 257 at HQR0012494.

Prior to the issuance of the 1990 ACR, DOE prepared a report to Congress entitled "Reassessment of the Civilian Radioactive Waste Management Program." DX 76. As a result of

---

[6](...continued)
Id. § 10243(a). The authorization for that office expired in 1994, id. § 10250, without any agreements with any states or Indian tribes.

the reassessment detailed in this report, DOE determined that the repository would not open until 2010, but that the MRS should open by 1998. DX 76 at EDB-001-1463; Tr. 3185:3-6, 3189:12-3190:14 (Kouts).

The 1990 ACR contained "upper bounding" and "lower bounding" schedule projections for SNF acceptance by DOE. For purposes of simplicity, the "upper bounding" projection contained a shorter ramp-up, a 3,000 MTU per year receipt rate, and 24,000 MTU total acceptance for the first 10 years of operation. PX 257 at HQR0012497-99. The "lower bounding" projection contained a lower receipt rate and longer ramp-up (400, 600, 875 MTU per year), and a 7,375 MTU total acceptance for the first 10 years of WMS operation. Id. The 1990 ACR contained the following admonitions:

> The two waste acceptance schedule projections used in this ACR are representative of the bounding cases for a WMS configuration authorized by the Nuclear Waste Policy Amendments Act of 1987 (Amendments Act), which includes an MRS facility. The upper bounding case is representative of the receipt rate of a WMS that is not restricted by MRS storage capacity limits of 10,000 MTU before repository operations and a maximum of 15,000 MTU at any time as imposed by the Amendments Act. This case is also not restricted by the MRS site selection and construction schedule linkages with the repository as imposed by the Amendments Act. The lower bounding case represents a receipt rate that would be in compliance with the Amendments Act restrictions on storage limits at an MRS before a repository starts operation. However, this case assumes removal of the schedule linkages with the repository imposed by the Amendments Act.

PX 257 at HQR0012496 (emphasis added). As with the earlier ACRs, the 1990 ACR expressly represented that the information in the 1990 ACR was "not contractually binding on either DOE or the Purchasers." PX 257 at HQR0012494. In a memorandum to Dr. John Bartlett, Director, OCRWM, dated December 21, 1990, Ronald A. Milner, then Associate Director for Storage and

Transportation, informed Dr. Bartlett that the 1990 ACR was for planning purposes only and would be replaced "by a contractually binding annual acceptance priority ranking report" in April 1991. DX 89 at EDB0011518.

2. The 1991 Annual Capacity Report

In December 1991, DOE issued its "Annual Capacity Report" for that year. DX 108 at HQR-002-0803 to HQR-002-0804. The 1991 ACR was significant because it was the last ACR that would be issued prior to the contract holders' submission of DCSs beginning January 1, 1992. See 10 C.F.R. § 961.11, Art. V.B.1. In that regard, the 1991 ACR provided that, "[b]eginning in January 1992, the Purchasers may submit Delivery Commitment Schedules (DCS) to DOE identifying the range of SNF that the Purchasers propose to deliver to the Federal Waste Management System (FWMS) beginning sixty-three months thereafter." DX 108 at HQR-002-0804. It also stated that "[t]he Purchasers' allocations for each delivery year are presented in Tables A.1 through A.10 in Appendix A, and should be used as the basis for submitting DCSs." Id.; see id. at HQR-002-0809 ("[t]hese allocations are the basis for DCS submittals").

The 1991 ACR specified the following acceptance allocations:

TABLE 2.1

Projected Waste Acceptance Rates for Spent Nuclear Fuel

| Year | | SNF (MTU) |
|---|---|---|
| 1998 | | 400 |
| 1999 | | 600 |
| 2000 | | 900 |
| 2001 | | 900 |
| 2002 | | 900 |
| 2003 | | 900 |
| 2004 | | 900 |
| 2005 | | 900 |
| 2006 | | 900 |
| 2007 | | 900 |
| 2008 | | 900 |
| | TOTAL | 8,200 |

DX 108 at HQR-002-0807. These allocations were created with the knowledge that no permanent repository would be available by January 31, 1998. Id. at HQR0012365. Thus, as DOE explained, "the waste acceptance projections used in this ACR are representative of a FWMS [Federal Waste Management System] configuration authorized by the NWPA, which includes a Monitored Retrievable Storage (MRS) facility." Id. In particular, they "are consistent with the 10,000 MTU storage capacity limit contained in the NWPA for an MRS facility before a repository starts operation." Id. DOE noted, however, that the schedule assumed that the schedule linkages between the MRS construction and repository construction authorization would be broken. Id.

In a memorandum dated December 20, 1991, Ronald A. Milner, Associate Director for Storage and Transportation, stated in a memorandum to John Bartlett, Director, Office of Civilian Radioactive Waste Management, as follows:

> The 1991 ACR assumes that FWMS [Federal Waste Management System] operations commence in 1998 and the system configuration is that authorized by the Nuclear Waste Policy Amendments Act of 1987, specifically a Monitored Retrievable Storage facility with a 10,000 MTU storage limit prior to repository operations.
>
> The 1991 ACR differs from previously published ACRs for two reasons. First, while the information in the ACR has traditionally been used for planning purposes only, the allocations in the 1991 ACR will also serve as the basis for submission of Delivery Commitment Schedules (DCS) by the Contract holders. These DCSs, which will provide planning information for waste acceptance activities, may be submitted to the Department as early as January 1, 1992.

DX 112.

The utility industry recognized the importance of the 1991 ACR in the determination of delivery commitments for performance beginning in 1998. See, e.g., DX 113 at SN169910 (UWASTE memorandum explaining that the ACR and APR "are necessary to properly complete the DCS forms."); DX 114 at SN170373 (same); DX 54 at YDK038298 (UNWMG memorandum describing the 1991 ACR as "contractually binding.").

3. The 1992 Through 1995 Annual Capacity Reports

The 1992 ACR, which was issued in May 1993, contained the same acceptance rates as the 1991 ACR. PX 259 at CTR-003-0565. The 1992 ACR also provided that, "[d]uring the first ten years following projected commencement of the Civilian Radioactive Waste Management System (CRWMS) operation, the total quantity of SNF that could be accepted is projected to be 8,200 MTU." PX 259 at CTR-003-0560. It stated that "[t]his is consistent with the storage capacity licensing conditions imposed on an MRS facility by the NWPA." Id. The ACR also stated that, "[a]s specified in the Standard Contract, the ACR is for planning purposes only and,

thus, is not contractually binding on DOE or the Purchasers." PX 259 at CTR-003-0562 to CTR-003-0563.

In 1995, DOE issued a combined APR and ACR, to "establish[] the order in which the Department allocates the projected acceptance capacity for commercial [SNF]" and to appl[y] projected nominal acceptance rates for the system to the priority ranking in the APR, resulting in individual allocations for the owners and generators expressed in metric tons per uranium (MTU)." PX 314 at 1. The 1995 ACR contained substantially similar SNF acceptance rates as the 1991 and 1992 ACRs, identifying a projected nominal waste acceptance rate of 8,200 for the first 10 years of SNF acceptance:

Table 1. Projected Nominal Waste Acceptance Rates for Spent Nuclear Fuel

| Year | SNF (MTU) |
|---|---|
| Year 1 | 400 |
| Year 2 | 600 |
| Year 3 | 900 |
| Year 4 | 900 |
| Year 5 | 900 |
| Year 6 | 900 |
| Year 7 | 900 |
| Year 8 | 900 |
| Year 9 | 900 |
| Year 10 | 900 |
| TOTAL | 8,200 |

PX 314 at 4; see DX 108 at HQR-002-0807, PX 259 at 4 (CTR-003-0565). The 1995 ACR also contained the following statement:

> The ACR (see Appendix B) applies a 10-year projected nominal waste acceptance rate to the APR, resulting in individual capacity allocations. In the previous ACR, the projected nominal acceptance rate was based on the assumption of SNF acceptance

> beginning in 1998 at a Monitored Retrievable Storage facility prior to repository operations. Due to the uncertainty associated with the date of commencement of operation of the waste management system, the annual nominal waste acceptance rates are presented by year(s) of operation of the system rather than by specific calendar year(s). The projected nominal acceptance rates also reflect the capacity limit imposed by the Act on such a storage facility prior to repository operations. These projected nominal waste acceptance rates are presented in Table 1. The Department will continue to process DCS submittals on an annual basis.

PX 314 at 3-4 (emphasis added). The 1995 ACR also provided that, "[a]s specified in the Standard Contract, the ACR is for planning purposes only and, thus, is not contractually binding on either DOE or the Purchasers." Id. at 1. However, it also provided that "[t]hese capacity allocations, as listed in the ACR, form the basis for the Purchasers' submittal of Delivery Commitment Schedules (DCS)." Id.

### G. Program Documents Reflect Planned Acceptance At An MRS Facility

#### 1. Program Reassessment And 1991 Draft Mission Plan Amendment

In November 1989, the Secretary of Energy submitted a report to Congress regarding DOE's reassessment of the program. In this report, DOE stated that it would be unable to begin operations at a repository until 2010, because there was insufficient time to perform the scientific investigation necessary. DX 76 at EBD-001-1451 to EDB-001-1452. However, DOE also stated that it planned "to work with Congress to modify the current linkages between the repository and the MRS facility and to embark on an aggressive program to develop an integrated MRS facility for spent fuel." Id. at EBD-001-1452. DOE further advised that, "if the linkages [were] modified, it [was] likely that waste acceptance at an MRS facility could begin by 1998 or soon thereafter." Id.

In September 1991, DOE issued another Draft Mission Plan amendment, which provided further details upon the "action plan" set forth in the Secretary's 1989 Reassessment. DX 102 at HQR-003-0799 ("[1989 Reassessment] stated that further details on the Secretary's action plan would be provided in a revised Mission Plan."). In accordance with the 1989 Reassessment, the 1991 Draft Mission Plan Amendment reaffirmed DOE's plans to begin performance in 1998 at an MRS:

> To achieve the objective of timely and adequate waste acceptance, we plan to develop an MRS facility that is to start waste acceptance in 1998. To make this possible, the President's legislative package for the National Energy Strategy includes a provision to repeal the schedule linkages established in the Nuclear Waste Policy Amendments of 1987 (Amendments Act). This could also be achieved by congressional enactment of a negotiated siting agreement reached through the efforts of the Nuclear Waste Negotiator.

DX 102 at HQR-003-0825. The schedule set forth in the 1991 Mission Plan Amendment showed acceptance by DOE up to the 10,000 MTU limit on the MRS until the repository began operations in 2010. DX 102 at HQR-003-1000 to HQR003-1002.

2. Preliminary Estimates Of The Total-System Life Cycle Cost For The Restructured Program

DOE's anticipation of performance at an MRS was also reflected in the cost analyses that it performed around the time of the 1991 ACR to support the adequacy of fees collected for the Nuclear Waste Fund. The fee paid by utilities, 1 mil per kilowatt hour, was determined by Congress in enacting the NWPA. 42 U.S.C. § 10222(a)(2). Pursuant to the NWPA, DOE is required annually to assess whether the fees collected pursuant to statute are adequate to fund all of the efforts necessary to implement the NWPA. 42 U.S.C. § 10222(a)(4). The Secretary is to

advise Congress if the fee is found to be inadequate. Id. To determine whether the fee is adequate, DOE first prepares a Total System Life Cycle Cost report, in which it projects the total cost of the program. Tr. 3289:2-3300:23 (Kouts).

In its Preliminary Estimates of the Total-System Life Cycle Cost For The Restructured Program: An Addendum to the May 1989 Analysis of the Total Life Cycle Cost for the Civilian Radioactive Waste Management Program, December 1990 ("1990 PETSLCC"), DOE utilized a schedule that was explicitly based upon acceptance starting at an MRS. PX 263 at PNL-107-1666. The first ten years are identical to the ACR schedule, with the exception of the second year of acceptance, where the 1990 PETSLCC contemplates that 400 MTU rather than 600 MTU would be accepted. Id.; DX 108 at HQR-002-0807. This schedule identifies what DOE anticipated the transition from a repository to an MRS would look like. Id. In year 11 and year 12 of acceptance, 900 MTU would be accepted. In years 13 through 17, 1800 MTU would be accepted. Only in year 18 would the system accept 3,000 MTU. Id.

H. Industry Submission Of Delivery Commitment Schedules

In 1992, the DOE issued instructions to contract holders for the submission of delivery commitment schedules. PX 585. The contracting officer stated that "[t]he allocations in the 1991 Annual Capacity Report (ACR) should be the basis for the DCS submittals." Id. at NSP-0001725. The instructions provided that purchasers could begin submitting to the DOE DCSs 63 months prior to requested delivery. Id. at NSP-0001727. The instructions stated that "[t]he DCS provides the Purchasers with the opportunity to inform DOE of their plans for utilizing their allocations of projected Federal waste management system (FWMS) acceptance capacity." Id. They further provided that, "[f]or each allocation listed in the 1991 ACR (or subsequent ACRs,

as appropriate), a Purchaser must submit at least one DCS for that allocation at least 63 months prior to the date that the allocation occurs (e.g., if a Purchaser has an allocation in 1998, a DCS must be submitted for that allocation by September 30, 1992)." Id.

Recognizing the need to submit DCSs to claim allocations, many utilities submitted timely DCSs that were approved by DOE. For example, Wisconsin Electric Power Company ("WEPCO") submitted DCSs for all of its allocations in the first ten years of acceptance in 1992. WEPCO submitted these DCSs for approval, believing that they represented a commitment. Tr. 4335:11-4338:10 (Zabransky); see also Zabransky Demonstrative No. 1.

### I. NSP's Submission Of Delivery Commitment Schedules

NSP had no allocations for 1998 under the 1991 ACR. DX 108 at HQR-002-0811. However, beginning in September 1993 (63 months prior to the date of its first allocation in 1999), NSP submitted DCSs on an annual basis, seeking acceptance by DOE of the exact amounts of spent fuel allocated to NSP in the 1991 ACR. The first three of these DCSs were approved by DOE. Tr. 997:1-1017:10 (Kapitz), 1885:2-1906:1:(Closs), 4402:12-19 (Zabransky); DX 108 at HQR-02-0811, DX 139 (DCS for 1999 allocation of 26.13 MTU of spent fuel), DX 160 (DCS for 2000 allocation of 83.5 MTU of spent fuel, DX 181 (DCS for 2001 allocation of MTU of 29.9 spent fuel), DX 188 (DCS for 2002 allocation of 33.9 MTU of spent fuel), DX 198 (DCS for 2003 allocation of 17.6 MTU of spent fuel), DX 203 (DCS for 2004 allocation of 32.51 MTU of spent fuel), DX 213 (DCS for 2005 allocation of 42.23 MTU of spent fuel); Zabransky Demonstrative No. 1. Significantly, NSP never submitted any of these DCSs under protest. Tr. 267:17-268:4 (Bomberger); 1017:11-14 (Kapitz). In fact, NSP did not present any evidence reflecting any objection, whether expressed within NSP, to other utilities, or to DOE, to using the

ACR promulgated by DOE as the basis for acceptance until 2002 – nine years afer NSP prepared its first DCS and four years after this litigation commenced – when NSP representatives penned a protest letter in consultation with the company's General Counsel. Tr. 267:7-270:5 (Bomberger); PX 377. In short, rather than objecting to the allocations in received through the 1991 ACR, NSP actively engaged in the process.

## DISCUSSION

### I. REGARDLESS OF WHETHER IT CHARACTERIZES ITS EXPENDITURES AS "MITIGATION DAMAGES," NSP BEARS THE BURDEN OF ESTABLISHING ALL ELEMENTS OF ITS DAMAGES CLAIM, INCLUDING CAUSATION, FORESEEABILITY, AND REASONABLE CERTAINTY

#### A. NSP's Effort To Characterize Its Damages As "Mitigation Damages" Does Not Eliminate Its Obligation To Prove Causation, Foreseeability and Reasonableness

In Indiana Michigan Power Company v. United States, 422 F.3d 1369 (Fed. Cir. 2005), the United States Court of Appeals for the Federal Circuit unequivocally defined the scope of a spent nuclear fuel plaintiff's burden with respect to damages. In Indiana Michigan, as in this case, the plaintiff sought damages for its efforts to expand its storage capabilities and, specifically, the costs that it incurred for a rerack and expansion of its spent nuclear fuel pool. Id. at 1372. In addressing these costs, which (like NSP in this case) the plaintiff characterized as "mitigation damages,"[7] the Federal Circuit explained that "[t]he presence of a duty to mitigate

[7] The amount necessary to restore a party to the position that it would have occupied had a breach not occurred is typically referred to as the restoration of the party's "expectation interest." See Restatement (Second) of Contracts § 344(a) (1981). Although NSP refers repeatedly to "mitigation damages" in its post-trial brief, it is the damage to NSP's expectation interest (as opposed to its reliance or restitution interest) for which NSP seeks recovery. Indeed, the very first sentence of the section of NSP's brief entitled "Conclusions of Law" invokes its entitlement to relief pursuant to an expectancy theory: "[G]enerally, the remedy for breach of (continued...)

does not perforce make the pre-breach costs incurred by Indiana Michigan to store its SNF recompensable; appellant must prove foreseeability, causation, and reasonableness." Id. at 1376.

The Federal Circuit's holding in Indiana Michigan is binding precedent upon this Court and necessarily dictates the appropriate framework for the resolution of the issues presented in this case. For this reason, the question is not, as NSP has repeatedly and mistakenly contended both during trial and in its post-trial brief, simply whether the decision to build dry storage was a "reasonable" business judgment made in an effort to limit its damages. Indeed, characterizing the costs that it incurred as "mitigation damages" puts the cart before the horse. As a threshold matter, NSP must prove, as a means of demonstrating that the costs that it incurred were "caused" by the partial breach, that it would not have incurred these so-called mitigation costs regardless of any delay.

This requirement is apparent from Indiana Michigan itself, where the plaintiff sought to recover the cost of a rerack that it allegedly performed because of the breach but failed to make the requisite showing with respect to causation. The Federal Circuit affirmed the trial court's determination that the utility failed to meet its burden, noting that the utility's "decision to perform a full, instead of a partial, rerack in 1995 was purely a business judgment which it would have had to purse irrespective of DOE's partial breach." Id. (emphasis added). Stated differently, the Federal Circuit affirmed the trial court's finding that the utility had failed to meet

[7](...continued)
contract is damages sufficient to place the injured party in as good as a position as it would have occupied had the breaching party fully performed." Pl. Post-Tr. Br. at 61 (emphasis added; quotation marks omitted).

its burden of proof because the utility would have made the same business judgment to rerack its spent fuel pool even had DOE timely commenced performance.

NSP relies extensively upon Tennessee Valley Authority v. United States, 69 Fed. Cl. 515 (2006), to bolster its argument that the Government bears some form of burden with respect to causation because its mitigation damages are "reasonable." With all due respect, Judge Lettow's decision in TVA is inconsistent with the Federal Circuit's holding in Indiana Michigan and, therefore, is not persuasive. In TVA, Judge Lettow concluded that, because the plaintiff had taken steps to mitigate its damages in response to DOE's partial breach, the expenses that it incurred as a result of its mitigation efforts were "recoverable to the extent they [we]re reasonable" and that the Government "ha[d] not met its burden of showing that TVA [would have had to incur] the costs at issue for dry storage even if DOE had performed under the contract." TVA, 69 Fed. Cl. at 523, 533 (emphasis added). However, the Court's allocation of the burden of proof to the Government with respect to the cause of these costs (as opposed to their reasonableness) in the first instance conflicts with the holding in Indiana Michigan that the utility had failed to establish causation because it failed to establish that its reracking costs would not have been incurred in the absence of a partial breach. The mere fact that NSP has labeled its costs as "mitigation costs" does not mean that they were caused by the partial breach (and would not have been incurred in the "but for" world). See Indiana Michigan, 422 F.3d at 1376 ("The presence of a duty to mitigate does not perforce make the pre-breach costs incurred by Indiana Michigan to store its SNF recompensable; appellant must prove foreseeability, causation, and reasonableness. It failed to make such a showing.").

B. NSP's Burden Includes The Obligation To Establish A Reasonable "But For" World Against Which To Measure Whether DOE's Delay "Caused" It To Incur Incremental Costs

The Federal Circuit's holding in Indiana Michigan that the utility in that case had not met its burden with respect to causation makes clear that the plaintiff in a spent fuel case must establish that the injury that it claims to have suffered would not also have been incurred had DOE timely performed. For this reason, a plaintiff in a spent fuel case must establish the "but for" world so that the Court can identify whether its claimed damages are, in fact, incremental to DOE's partial breach.

This Court's recent decision in Pacific Gas & Electric Co. v. United States, 73 Fed. Cl. 333, reconsideration denied, 74 Fed. Cl. 779 (2006) ("PG&E"), appeal pending, No. 2007-5046 (Fed. Cir. docketed Jan. 24, 2007), recognizes the controlling nature of the Federal Circuit's decision in Indiana Michigan and the general principle that, when seeking expectancy damages, a plaintiff must establish a plausible "but for" world. In PG&E, the Court addressed the applicable legal standard by recognizing at the outset that "[t]he goal of awarding damages for breach of contract – that of placing the injured party in as good a position as it would have been had the breaching party fully performed under the contract – is well settled." PG&E, 73 Fed. Cl. at 378. Significantly, in reaching that conclusion, the Court cited to, among other authorities, the Federal Circuit's decision in Indiana Michigan. Id. Further, in addressing the issue of the DOE's contractual obligation regarding a rate of acceptance under the Standard Contract, the Court acknowledged that "[p]laintiff bears the burden of 'establishing what might have been' with reasonable certainty had defendant performed the Standard Contract." Id. at 386; see id. at 406 ("To derive the proper amount for the damages award, the cost resulting from the breach must be

reduced by the costs, if any, that the plaintiff[] would have experienced absent a breach."). The Court further clarified that the plaintiff's alleged expectancy damages could only be measured by reference to a world where DOE performed, and that without reference to a performance world, the measure of plaintiff's damages would be "irrelevant." Id. at 375 n.38.

Contrary to NSP's repeated assertions, this assertion is neither "self-serving" nor a departure from existing precedent. Rather, it reflects the burden imposed upon all parties seeking to be restored to the positions that they would have occupied in the absence of a breach. See, e.g., Granite Mgt. Corp. v. United States, 74 Fed. Cl. 155, 169 (2006) (plaintiffs bear burden of propounding realistic "but for" scenario); Bluebonnet Savs. Bank, FSB v. United States, 67 Fed. Cl. 231, 238-39 (2005), aff'd, 466 F.3d 1349 (Fed. Cir. 2006); Coast Fed. Bank, FSB v. United States, 48 Fed. Cl. 402, 403 n.25 (2000), rev'd on other grounds, 309 F.3d 1353 (Fed. Cir. 2002), vacated, 320 F.3d 1338 (Fed. Cir. 2003); see also Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1380 (Fed. Cir. 2001) (plaintiffs bear burden of demonstrating "what might have been . . . ."). A plaintiff cannot recover as damages from the Government any costs that it would have incurred in the absence of a breach. Bluebonnet Savs. Bank, 339 F.3d at 1345; see also Indiana Michigan, 422 F.3d at 1376. Without establishing a "but for" world in which no partial breach occurred, NSP leaves the Court with no mechanism by which to determine whether its claimed costs were incremental to the Government's partial breach, or whether they would have been incurred regardless of any delay.

NSP, through its own damage calculations, concedes its responsibility for proving what the "but for" world would have looked like. As NSP states on page 68 of its post-trial brief, its calculations include "an offset to its dry storage mitigation costs based on a third re-rack that it

would have conducted had it expected DOE to perform by 1998 and begin picking up fuel from NSP in 1999." Undoubtedly, NSP has included this offset because of its recognition that an accurate assessment of any damage caused by partial breach of the Standard Contract requires the establishment of a "but for" world in which certain expenses (such as the cost of a re-rack) would have been incurred and in which certain others (that is, those for which it seeks recovery in this lawsuit) would not. Without a plausible calculation of the costs incurred in the "but for" world from which to make a comparison to the actual world, there is no basis for a damage award and, as in Indiana Michigan, a failure of proof with respect to damages.

Relying on Indiana Michigan, NSP asserts that it need only establish that the partial breach was a "substantial causal factor" of the damages that it incurred. Pl.'s Post-Tr. Br. at 64 (citing Indiana Michigan, 422 F.3d at 1373. However, the language to which it refers in Indiana Michigan cites solely to the Federal Circuit's opinion in Energy Capital Corp. v. United States, 302 F.3d 1314, 1320 (Fed. Cir. 2002). That portion of the Energy Capital opinion discusses the trial court's approach to the damages determination and mentions nothing about the application of a "substantial factor" standard to the causation determination. Id. Likewise, there is nothing in the legal discussion or holdings of the Indiana Michigan opinion to support the use of a "substantial factor" standard. Id. at 1324-34. Moreover, in a more recent opinion, the Federal Circuit distinguished its use of the term "substantial causal factor" in Bluebonnet Savings Bank v. United States, 266 F.3d 1348 (Fed. Cir. 2001), rejecting its use as a standard for causation determinations and reaffirming that the "but for" test is still an appropriate methodology for testing causation. California Fed. Bank v. United States, 395 F.3d 1263, 1267-68 (Fed. Cir. 2005).

NSP also relies upon Citizens Fed. Bank v. United States, 474 F.3d 1314, 1318 (Fed Cir. 2007) for the proposition that "the selection of an appropriate standard depends upon the facts of the particular case and lies largely within the trial court's discretion."[8] We do not understand Citizens Federal, which cites to Indiana Michigan, to have undermined the causation standard established in that case with respect to spent fuel cases. Thus, even assuming that extent the question of the appropriate causation standard is indeed within the discretion of the trial court, the appropriate exercise of that discretion is clearly circumscribed by the Federal Circuit's holding in Indiana Michigan, and, specifically, that court's determination that a spent nuclear fuel plaintiff cannot meet its burden of proof unless it establishes that it would not have made the same decision with respect to its storage needs in the absence of a partial breach by DOE. Regardless of whether the test is labelled as "substantial factor" or "but for," Indiana Michigan makes clear that a utility cannot recover so-called mitigation costs to the extent those costs would have been incurred "irrespective of DOE's partial breach." 422 F.3d at 1376.

Moreover, NSP's reliance upon Citizens Federal, and its endorsement of a "substantial factor" test of causation, only serves to obscure the causation issue. The traditional causation standard in breach of contract cases in the Federal Circuit requires the plaintiff to prove that the claimed damage "was attributable solely to, and was therefore directly caused by, the [breach]." J.D. Hedin Constr. Co. v. United States, 456 F.2d 1315, 1330 (Ct. Cl. 1972). The "substantial factor" test, by contrast, originated in tort law to analyze concurrent cause cases. See Keeton et al., Prosser and Keeton On The Law Of Torts, 266-68 (5th ed. 1984). However, even in tort

[8] The Department of Justice is currently evaluating whether to seek further review of this decision.

cases, the substantial factor test has not "replaced the need for each liable defendant to be a but-for and substantial contributor to the indivisible injury," Menne v. Celotex Corp., 861 F.2d 1453, 1461 (10th Cir. 1988), and the courts have made clear that, when the claimed damages could have resulted from multiple factors, the plaintiff "must establish that the breach alone would have been sufficient" to cause the claimed damage and that it would not have occurred "but for" the breach. Point Productions A.G. v. Sony Music Entertainment, Inc. 215 F. Supp. 2d 336, 341 (S.D.N.Y. 2002).

The Federal Circuit requires application of both tests, even in the tort context. Shyface v. Secy of Health and Human Servs., 165 F.3d 1344, 1352 (Fed. Cir. 1999). Thus, the "substantial factor" test may only be applied in place of a "but for" test if doing so would "generally yield identical results." Abbott Labs. v. Brennan, 952 F.2d 1346, 1352-53 (Fed. Cir. 1992); Columbia First Bank v. United States, 60 Fed. Cl. 97, 105 (2004) (under the substantial factor test, plaintiff required to show that the breach "directly and primarily" caused the alleged loss); Krauss v. Greenbarg, 137 F.2d 569, 572 (3d Cir. 1943) (defining substantial factor to mean the "predominating" factor). Indeed, in Abbott the Federal Circuit observed that the "substantial factor" test is more rigorous than the "but for" test and further explained that "no case has been found where the defendant's act could be called a substantial factor when the event would have occurred without it . . ." Id. (citing Prosser & Keeton, The Law of Torts, 268).[9] Consequently,

---

[9] A concurrent causation issue was addressed in Krofft Entertainment, Inc. v. CBS Songs, 653 F. Supp. 1530 (S.D.N.Y. 1987). There, Krofft claimed that CBS breached a licensing agreement which caused Krofft to be unable to obtain financing to produce a Broadway play. CBS maintained that there could be no causation if it established that, even if it had not breached the license agreement, Krofft would still have been unable to obtain financing. The district court agreed. In addressing the law of causation, the district court cited C. McCormack, Handbook on (continued...)

precedent makes clear that the substantial causal factor test is no less demanding than the "but for" standard for determining causation as, even under the substantial factor test, courts require a plaintiff to show that the breach was the primary or predominant cause of the loss. Columbia First, 60 Fed. Cl. at 105 (under the substantial factor test, plaintiff required to show that the breach "directly and primarily" caused the alleged loss); Krauss, 137 F.2d at 572 (3d Cir. 1943) (defining substantial factor to mean the "predominating" factor). For this reason, there is no distinction between the substantial causal factor test and the longstanding causation principles applicable in this Court. For example, in J.D. Hedin Constr. Co. v. United States, 197 Ct. Cl. 782, 456 F.2d 1315 (1972), the court barred a claim for borrowing costs where the plaintiff's financial trouble resulted from both the breach and other factors, because "the proof is not sufficient to show that plaintiff's financial stringency leading to the borrowing of these funds was attributable solely to, and was therefore directly caused by, the improper termination." 197 Ct. Cl. at 782, 456 F.2d at 1330. At a minimum, then, binding precedent compels NSP to show that "there [a]re no other substantial causes" for its alleged damages. American Sci. & Eng'g, Inc. v. United States, 8 Cl. Ct. 129, 139 (1985).

---

[9](...continued)
the Law of Damages § 73 at 261 (1935), for the proposition that in a breach of contract case a breaching party's act or omission ordinarily can only be considered a "substantial factor" in causing the damage "where the damage would not have occurred 'but for' the alleged wrongful act or omission . . . ." Id. at 1534. Similarly, the court cited 5A Corbin on Contracts §§ 992 at 6-7, and 997 at 21 (1964) for the proposition that "[i]t must be shown that but for the breach" the damages would not have been incurred. Id. "Corbin concludes that a plaintiff cannot charge the other party with losses and disappointments that would have occurred in the absence of any breach by the other party, since such losses were 'not caused by the other party's breach of duty.' Id. § 992 at 6." Id.

Finally, in an effort to recharacterize its burden of proof, NSP asserts that the requirement that it prove a "but for" world "represents a 'moving target' that the Government manipulates to reduce or preclude NSP's damages." Pl. Post-Tr. Br, at 65. NSP's complaints are not well founded. Notwithstanding NSP's suggestion that the "but for" world is a bizarre construct incapable of proof, courts routinely must resolve what would have happened had a breaching party performed. As Professor Corbin has explained, in language that this Court endorsed in PG&E, "[t]he position that one would have occupied if history had been different is purely hypothetical. And yet that is the problem that the trial court . . . [is] required to solve . . . The working rules of law by which court[s] are directed are never capable of exact and perfect application." 11 Arthur L. Corbin, Corbin on Contracts, § 53.3 (rev. ed. 2005) (emphasis added), cited in PG&E, 73 Fed. Cl. at 397.

If anything, NSP's view of the ethereal nature of the "but for" world is situational, depending solely upon whether it is seeking to increase its damages or to avoid decreases in its damages. When NSP seeks to increase its damages – as, for example, when it argues in favor of a 3,000 MTU rate of acceptance – the "but for" world appears to be anything but speculative. It is only when the Government challenges the inclusion of non-incremental costs in NSP's damages claim – and seeks to eliminate those costs from damages – that NSP complains that it is forced to "disprov[e] every contingency contrived by the Government." Pl. Post-Tr. Br. at 65. Simply put, although it is true that the "but for" world has never occurred, that is true in all breach of contract cases. Yet, absent consideration of the "but for" world, the Court will have no baseline against which to compare the expenditures that NSP claims constitute damages, and

NSP will potentially be placed in a better position than had the contract been performed. See PG&E, 73 Fed. Cl. at 397.

In sum, both the law of this Circuit NSP's actions in this litigation make clear that, to be awarded damages in this case, NSP must establish that DOE's partial breach was the cause of its claimed costs. This burden entails a showing that, had DOE performed under the Standard Contract, NSP would not have incurred the costs that it now seeks to recover. To make such a showing, it is incumbent upon NSP to prove a plausible "but for" world. Should NSP fail to do so, mere evidence that it has incurred that it seeks is, standing alone, "irrelevant." Id. at 375 n.38.

### C. NSP Has The Burden Of Demonstrating That Its Claimed Damages Were Foreseeable

NSP also must establish that its damages were foreseeable to DOE "as a probable result of the breach," meaning that it "followed from the breach either (a) in the ordinary course of events; or (b) as a result of special circumstances beyond the ordinary course of events that the party in breach had reason to know." Indiana Michigan, 422 F.3d at 1376; see Restatement (Second) of Contracts, § 351(1), (2). Foreseeability is measured based upon what the parties contemplated at the time of contract formation, rather than from the date of breach. Old Stone Corp. v. United States, 450 F.3d 1360, 1375 (Fed. Cir. 2006), cert. denied, 2007 WL 789098 (U.S. Mar 19, 2007); Cal. Fed., 395 F.3d at 1267; Hughes Communications Galaxy, Inc. v. United States, 271 F.3d 1060, 1066 (Fed. Cir. 2001); see also Sacramento Mun. Util. Dist. v. United States, 70 Fed. Cl. 332, 360 (2006) ("The plaintiff ... must establish that ... any losses incurred as a result of a partial breach of contract reasonably were foreseeable by the defendant

when the contract was executed."), appeal pending, No. 2007-5052 (Fed. Cir. docketed Feb. 6, 2007).[10]

As part of the foreseeability determination, NSP must demonstrate that both the magnitude and type of damages were foreseeable at the time of contract formation. See Landmark Land Co. v. Federal Deposit Insur. Corp., 256 F.3d 1365, 1378 (Fed. Cir. 2001) (affirming the trial court's denial of damages because the magnitude of damages was not foreseeable). "The mere circumstance that some loss was foreseeable, or even that some loss of the same general kind was foreseeable, will not suffice if the loss that actually occurred was not foreseeable." Restatement (Second) of Contracts § 351 cmt. a (cited in Landmark Land, 256 F.3d at 1378). This limitation exists even where, as alleged here, the loss is incurred in an effort to mitigate damages. In such a case, "the injury actually suffered must be one of a kind that the defendant had reason to foresee and of an amount that is not beyond the bounds of reasonable prediction." 11 Joseph M. Perillo, Corbin on Contracts § 56.7, at 108 (2005 rev. ed.) (quoted in Citizens Federal, 474 F.3d at 1321).

The requirement that a loss be foreseeable "as a probable result of the breach" also requires a showing that the loss be more than a "merely remote or possible" consequence. Old Stone, 450 F.3d at 1375 (considering proximate causation in connection with its foreseeability

[10] NSP cites Gardner Displays Co. v. United States, 171 Ct. Cl. 497, 505, 346 F.2d 585, 589 (Ct. Cl. 1965), for the proposition that "[t]here may even be reason to fix foreseeability at the time of the breach rather than at the time of the agreement." However, as this Court recently recognized in Precision Pine & Timber, Inc. v. United States, 72 Fed. Cl. 460, 478 (2006), in Gardner Displays itself, "the Court of Claims actually assessed foreseeability at the time of contracting, not at the time of breach." The proposition that NSP advocates from Gardner Displays is dicta and conflicts with the unambiguous holdings to the contrary from the Federal Circuit.

analysis). For this reason, NSP bears the burden of introducing clear proof that it was injured as a direct result of DOE's delay in accepting its SNF. Myerle v. United States, 33 Ct. Cl. 1, 27 (1897); Quiman, S.A. de C.V. v. United States, 39 Fed. Cl. 171, 183 (1997), aff'd, 178 F.3d 1313 (Fed. Cir. 1999). "For a damage to be direct there must appear no intervening incident . . . ; the cause must produce the effect inevitably and naturally, not possibly nor even probably." Ramsey v. United States, 121 Ct. Cl. 426, 434, 101 F. Supp. 353, 357 (1951); see Quiman, 39 Fed. Cl. at 171. In other words, "[t]here must not be two steps between cause and damage." Myerle, 33 Ct. Cl. at 27.

The Federal Circuit's discussion of foreseeability and proximate causation in Old Stone confirms the continuing viability of the directness requirement. In support of its statement that losses must be proximately caused by the breach, the Court selected as an illustrative example a state court case from California, Lewis Jorge Constr. Mgmt, Inc. v. Pomona Unified Sch. Dist., 102 P.3d 257, 265 (2004). In a parenthetical, the Federal Circuit described Lewis Jorge Construction as having held that a "breach did not 'directly or necessarily cause [the contractor's] loss,' where [the] contractor alleged [that the] breach caused the contractor's surety to reduce [the] contractor's 'bonding' rating, and that reduction in bonding rating caused [the] loss of other prospective contracts." Old Stone, 450 F.3d at 1375. As the Federal Circuit's description of Lewis Jorge Construction indicates, the loss claimed by that contractor in that case was not proximately caused by the breach because the chain of causation between the breach (the termination of a construction contract by a school district) and the adverse consequences (the contractor's loss of future contracts) was interrupted by the intervening actions of a third party, specifically, the surety's decision to reduce the contractor's bonding rating.

Finally, the Federal Circuit's holding in Indiana Michigan belies NSP's suggestion that the well-settled rules concerning the need to prove foreseeability are not applicable because the damages that it incurred were incurred as part of the company's mitigation efforts. See Pl. Post-Tr. Br. at 77 (relying on Professor Dobbs for the suggestion that the "rule of Hadley v. Baxendale, limiting special damages to those within the contemplation of the parties, seems to have no application to reasonably incurred expenses of minimizing damages").[11] Indeed, Indiana Michigan makes plain that, even where a utility seeks to recover the costs incurred allegedly in mitigation of its damages, it still must demonstrate foreseeability. Indiana Michigan, 422 F.3d at 1376.

D. NSP Must Prove Its Damages With Reasonable Certainty

NSP also has the burden to establish "reasonable certainty" as to each item within its damages claims. Wells Fargo Bank, N.A. v. United States, 88 F.3d 101, 1023 (1996); see also Restatement (Second) of Contracts § 352 cmt. a ("[a] party cannot recover damages for breach of a contract for loss beyond the amount that the evidence permits to be established with reasonable certainty"). To support its claim, NSP must provide appropriate documentary or other support

[11] Tellingly, Professor Dobbs's suggestion is not supported by any case law or any other authority, see 3 Dan B. Dobbs, Law of Remedies § 12.6(2), at 138 (2d ed. 1993), and NSP has supplied none. In Brandon & Tibbs v. George Kevorkian Accountancy Corp., 277 Cal. Rptr. 40 (Cal. Ct. App. 1990), the only case that NSP has cited in support of its argument, the court did not award damages taken in mitigation that were not foreseeable at the time of contracting. In fact, precisely the opposite is true. In Brandon & Tibbs, the court affirmed the award to the plaintiff (subject to certain offsets) of the operating losses the plaintiff incurred over a three-year period after taking the reasonable step of opening its own accounting practice following the defendant's breach of a joint venture agreement. Id. at 50-52. That award was premised upon the court's specific factual determination, evidencing the foreseeability of the damages that plaintiff incurred, that "[n]ew accounting practices generally experience large losses for at least the initial three years." Id. at 44.

from its records to establish its damages claims. See Roseburg Lumber Co. v. Hadigan, 978 F.2d 660, 667 (Fed. Cir. 1992) (plaintiff must provide adequate support for claimed costs). A contractor's failure to present any documentary support for its assertions that it incurred costs, precluding the Government from verifying that the costs were incurred and the reasons for their incurrence, precludes any recovery of those costs. Barrow Utils. & Elec. Co-op. v. United States, 20 Cl. Ct. 113, 121 (1990).

## II. NSP CANNOT ESTABLISH THE NECESSARY CAUSAL LINK BETWEEN CERTAIN OF ITS CLAIMED DAMAGES AND DOE'S DELAY, OR THAT ALL OF ITS CLAIMED DAMAGES WERE FORESEEABLE AND REASONABLY CERTAIN

### A. NSP Would Have Built A Dry Storage Facility Regardless Of DOE's Delay In Accepting SNF

#### 1. The Time At Which DOE Would Have Arrived To Accept NSP's Spent Fuel Was Not Known At The Time Of The Decision

The centerpiece of NSP's argument with respect to causation is its assertion, bolstered primarily by the trial testimony of Jon Kapitz, that, "[h]ad NSP known that DOE would timely perform, NSP would have re-racked its Prairie Island spent fuel pools for a third time rather than constructing a dry storage facility." Pl. Post-Tr. Br. at 24. Beyond obscuring its burden of proof with respect to causation, NSP's argument is inconsistent with the testimony adduced at the trial of this case and with the evidence that NSP submitted when it petitioned the Minnesota Public Utilities Commission for a Certificate of Need to construct a dry storage facility.

As an initial matter, the relevant question is not simply, as NSP would have it, "what would NSP have done if it had known that DOE would timely perform?" In the late 1980s, when it was forced to decide whether to construct a dry storage facility so as to prevent a shutdown in 1994, NSP could not have "known" what DOE performance beginning in 1998 would have

looked like. As a result, the relevant question is, "What would NSP have done in the late 1980s, when it needed to make a decision concerning its future storage needs, if it had the information that was available to it at the time but had no reason to expect that DOE would not begin industry-wide acceptance in 1998?"

In framing what the "but for" world would have looked like at the time its decision was made, NSP is certainly entitled to expect performance by DOE. But, even assuming timely performance by DOE upon an industry-wide basis, at the time the decision was made, NSP faced uncertainty as to (a) when DOE would arrive at Prairie Island to accept its spent fuel, both in terms of the specific year in which DOE would arrive for the first time and a specific date within that year on which DOE would arrive; and (b) the extent to which a third rerack, in light of existing technology, would expand the storage capacity of the spent fuel pool. This uncertainty necessarily clouds the question of whether, in the "but for" world, NSP would have been able to satisfy its storage until the date of DOE arrival simply by reracking its spent fuel pool. As described below, and as our economics expert, Dr. Jonathan Neuberger, testified, any adequate assessment of whether NSP would have moved forward with a rerack necessarily entails an analysis of how NSP, as a rational actor and a publicly traded utility subject to extensive state and Federal regulation, would have made its decision in the presence of these formidable uncertainties.

In the late 1980s – when NSP was required to decide upon its spent fuel storage needs after 1994 – NSP faced substantial uncertainty about when DOE would accept NSP's spent fuel. This uncertainty existed not only with respect to the year in which DOE would arrive at Prairie

Island, but also with respect to the time within the particular year that DOE would commence receiving NSP's spent fuel.

With respect to the year of DOE arrival, even if NSP believed that DOE would timely commence performance, it could not possibly have known in the late 1980s the year when DOE would be arriving. As described above, the Standard Contract required DOE to issue an annual capacity report ("ACR") in 1987 "for planning purposes." The Standard Contract did not require DOE to identify definitive acceptance rates until 1991, via promulgation of the annual priority ranking ("APR") that would in turn provide a framework for DOE acceptance of fuel beginning in 1998. PX 56, Art. IV.B.5, Art. V.B.1. Prior to 1991, having not yet received a firm waste acceptance schedule, NSP was not in a position to ascertain the particular year in which it could expect DOE to arrive. Although NSP relies upon a variety of planning documents issued by DOE to suggest that it anticipated a 3,000 MTU rate after a brief ramp-up, the documents that DOE issued prior to 1991 all contain statements reflecting their preliminary nature. See, e.g., DX 45 at HQR-003-1134 (1985 Mission Plan describing a schedule that would "serve as a planning base which will be updated annually" and stating that "[i]n 1991, the DOE will begin to publish firm waste acceptance schedules for individual reactors, including shipment allocation").

Further, the first few years of performance by DOE, which would necessarily be the most relevant to NSP's analysis given that NSP, under a "best case" scenario, would exhaust its space in or about 1999 if it were in fact able to perform a rerack, were to be "ramp-up" years, the rate for which was necessarily subject to the inherent vagaries of commencing a project as complicated and ambitious as the acceptance of spent fuel from utilities all across the country. Indeed, despite advocating an eventual rate of 3,000 MTU annually, NSP itself has not identified

the rate at which it believed, in the late 1980s, that DOE would be performing during these critical ramp-up years. At this time, NSP simply could not have predicted when DOE would pick up NSP's spent fuel for the first time.

An equally significant complicating factor from NSP's perspective is the fact that it did not know in the 1980s whether it could use acceptance allocations at Prairie Island based upon fuel that had been used at Monticello. NSP's earliest allocations were based upon fuel that had been discharged at Monticello. DX 108 at HQR-002-0819 (1991 ACR reflecting initial NSP allocation). Unless NSP assumed that it would be permitted to make an intra-utility swap of its allocations (such that NSP could use Monticello's place in the queue as the basis for a pickup at Prairie Island), the date of its first allocation could be pushed back by a crucial year or two.

The most contemporaneous documentation indicates that NSP believed at the time that it could not perform such a swap. Michael Schwartz, whom NSP represented at the time to be the most knowledgeable witness with respect to issues concerning the rate of acceptance, testified before the PUC in 1991 that, even under the 1990 ACR (under which NSP had an allocation in 1999 based upon its discharge of fuel from Monticello, see PX 257 at HQR-001-2555), DOE would not be arriving at Prairie Island until 2001. DX 103 at 3124; Tr. 4264:7-23, 4317:24-4318:23 (Schwartz). This testimony demonstrates that, even in a world in which DOE was expected to perform, NSP did not believe that DOE would be arriving at Prairie Island until long after 1998. At a minimum, it confirms NSP's significant uncertainty as to the year of DOE's first arrival.

Even assuming that, in the late 1980s, NSP could somehow have reasonably believed that DOE would arrive in 1999, it had no reason to believe that DOE would arrive at the beginning of

the year. As NSP's witness Laura McCarten (among others) conceded, under the terms of the Standard Contract, NSP "had no reason to know during what month DOE would have shown up in any particular year." Tr. 658:13-24 (McCarten). This uncertainty is itself critical because the analysis McCarten shared with the PUC indicated that, even if NSP could achieve a 20-percent capacity increase by reracking the spent fuel, it would have to shut down at some unspecified point in 1999. DX 107 at 56-57; Tr. 635:11-19 (McCarten); see also PX 403 at NSP-007268; Tr. 644:18-645:10 (McCarten) (table in NSP's application, indicating that, based upon projected discharge rates, Prairie Island's discharges would exceed the capacity of a reracked spent fuel pool by May 26, 1999). If DOE did not arrive early enough in 1999, NSP still faced the costly prospect of shutting down Prairie Island.[12]

NSP would have the Court believe that, even if it did not know in 1988 precisely what the rate would ultimately be, whatever rate DOE published in the 1991 ACR would, pursuant to the Standard Contract, necessarily be sufficient to prevent the need for additional at-reactor storage after 1998. See, e.g., Tr. 996:12-21 (Kapitz) (suggesting that any rate that would have required NSP to expand its storage requirements beyond 1998 was in contravention of the Standard Contract). In framing what the world would have looked like absent a partial breach, NSP is not entitled to rely upon such a strained reading of DOE's contractual obligations. As described in greater detail in Part IV infra, the test that NSP advocates in this case was not only not part of the

[12] Ms. McCarten testified during direct examination that a third rerack "would have taken us out to – from 1994 to sometime in 1999." Tr. 506:10-15 (McCarten) (emphasis added). Magically, this testimony has morphed into an assertion, based on Ms. McCarten's testimony, that "a 20% rerack would have provided capacity through 1999." Pl. Post-Tr. Br. at 24 (emphasis added). Particularly given the unambiguous nature of Ms. McCarten's testimony that she did not know when in 1999 the fuel pool would be exhausted, NSP's distortion of this critical piece of testimony should not go unnoticed.

Standard Contract, but was expressly and repeatedly rejected by DOE when industry groups, of which NSP was a member, requested this and related performance standards. Thus, even if NSP had assumed in the late 1980s that DOE would begin performance in 1998, it had no legitimate expectation, under the terms of the contract, that it only needed to bridge the gap until 1998. NSP may well have hoped that in 1991 DOE would adopt an acceptance rate would preclude the need for at-reactor storage beyond 1998. But a prudent decisionmaker cannot assume the rosiest of possible outcomes. In the end, the rate at which DOE would accept fuel and, as a result, the time that DOE would begin accepting NSP's spent fuel was, in 1988, something about which NSP had no firm guarantee, even if it assumed timely performance.

2. Substantial Uncertainty Existed In The Late 1980s As To The Extent To Which A Third Rerack Would Increase The Capacity Of The Spent Fuel Pool At Prairie Island

In addition to facing uncertainty as to the time of DOE's arrival, NSP also faced enormous uncertainty in the late 1980s with respect to the other important variable in its analysis – the date through which a rerack would permit NSP to operate without shutting down.

The uncertainty as to the efficacy of rerack is confirmed by the enormous range of opinions presented at the trial as to what a rerack could achieve. At one end of the spectrum, there is substantial evidence in the record supporting the conclusion that NSP believed, as it was making the decision to build dry storage in the late 1980s, that reracking the spent fuel was technically impossible. For example, in April 1988, Laura McCarten prepared a "Rod Consolidation Q & A" designed to answer questions about NSP's rod consolidation efforts, which contained the following question and answer:

> Q: Why doesn't NSP rerack the fuel pool to hold more assemblies as it has done before?
>
> A: NSP already has reracked the Prairie Island spent fuel pool to the fullest extent possible. There is not enough room to move whole assemblies any closer together.

Tr. 591:1-596:21 (McCarten); DX 61 at NSP-0072972. Tellingly, Jon Kapitz (the champion of NSP's litigation position that reracking could have achieved as much as a 30 percent increase in capacity) was designated as a recipient of the report and was asked to provide comments or corrections, but at trial could not recall having made any changes to it. Tr. 955:11-20 (Kapitz). Further, it was McCarten's belief at the time that the pool could not be reracked further. Tr. 598:25-602:2 (McCarten). James Howard, who approved the decision to build a dry storage facility upon the recommendation of McCarten and her colleagues, shared the same belief when he approved the decision to build dry storage, and both he and McCarten still believed as late as February 1990 that the assemblies in the pool were "as close together as technically possible." Tr. 1943:9-1944:11, 2000: 1-14 (Howard), 612:5-12 (McCarten); DX 78 at NSP-0027299

Beginning in 1990, and apparently spurred by the need to rule out other methods of storage in its application for a CON, NSP began believing that reracking might yield an increase in capacity of as much as 20 percent. However, the achievability of even this figure, particularly in the late 1980s (when the decision to build dry storage was made), is far from certain. In 1991, the MEQB concluded that the increase to be achieved from a rerack might be as little as 200 to 250 spaces (between 14.4 and 18 percent of licensed capacity), and the record conclusively established NSP was the source of the information contained in the MEQB's report. PX 420 at NSP-0063082, PX 679 at NSP-0057469 (letter from executive director of MEQB explaining that neither the MEQB nor the PUC prepared an independent engineering analysis of the reracking

assertions that NSP provided); Tr. 637:25-639:2 (McCarten), Tr. 4232:4-4233:3 (Leonard).[13] Further, NSP's own submissions to the Minnesota authorities acknowledged that a 20-percent rerack figure was the maximum increase that the company could reasonably hope to obtain. See PX 60 at KRGNSP033857 (application for certificate of need stating that "[i]t may be possible to increase the PI Pool capacity by reracking. However, the maximum increase achievable by reracking is estimated to be about 20%") (emphasis added); PX 49 at KRGNSP11063 (Dry Cask Alternatives Study prepared and submitted to state authorities pursuant to requirement of 1994 legislation concluding that "rerack would only have increased the plant's storage capacity by 20%").

Notwithstanding the evidence of uncertainty in its ability to perform a rerack that would even achieve a 20-percent increase, NSP now asserts that studies performed by two of its engineering consultants make "clear" that NSP could have performed a rerack that would have increased the pool capacity by as much as 30 percent "in the early 1990s time frame." Pl.'s Post-Tr. Br. at 69. This argument fails for a number of reasons. First, as NSP's own attorneys took pains to argue during the trial, "the decision that NSP made to go to dry storage was made in the late 1980s[;] it was not made in 1991." Tr. 2162:2-5; see also PX 400; Tr. 655:13-657:6

---

[13] Incredibly, NSP now asserts in its post-trial brief that the 200-250 figure is a "math error" committed by the MEQB based upon a calculation for which it had no responsibility. Pl. Post-Tr. Br. at 29 n.11. However, NSP has pointed to no testimony to support such an argument. Further, NSP neglects to mention that the MEQB report was submitted as part of NSP's application for a CON. PX 403 at NSP0070427 ("[I]n December 1989 NSP voluntarily requested the [MEQB] to prepare an EIS, which is attached to and incorporated into this application as Volume 2"). NSP went to great length to correct erroneous statements made in its application or statements made by other parties during the proceedings, see, e.g., PX 60 (errata to CON application spanning 343 pages), yet would now have the Court believe, without the benefit of any evidence to support its characterization, that it somehow missed an error of this magnitude.

(McCarten). Proof of what may have become technologically feasible in the early 1990s does not establish that NSP would have made a different decision in the late 1980s.

Second, NSP's assertion that reracking would have resulted in a pool increase of as much as 30 percent is dubious at best. If it were "clear" in the early 1990s, as NSP now asserts, that reracking would have achieved an increase in pool capacity of this amount, the company would not have consistently advised Minnesota authorities, including in its certificate of need application, that the "maximum" amount of increase that a rerack could achieve was 20 percent. See PX 60 at KRGNSP03857; see also PX 49 at KRGNSP11062 (1995 Dry Cask Alternatives Study explaining that, in 1991, the increase in pool capacity attributable to a rerack was limited to 20 percent "based upon NSP's assessment of existing rerack technology, with pool geometry the limiting factor"). Similarly, if it were clear that reracking could achieve as much of an increase in capacity as NSP now claims, the company would not have projected in its CON application that a rerack of the spent fuel pool would only enable operation "through 1998." PX 60 at KRGNSP03832; Tr. 550:13-17 (McCarten).

Further, although Jon Kapitz testified, more than 15 years after the fact, that he now believes that a 30-percent increase was possible in 1988, this position was apparently not shared by Laura McCarten, to whom Mr. Kapitz reported, Tr. 963:19-964:5 (Kapitz). Ms. McCarten was the person at NSP "principally responsible for addressing the forthcoming exhaustion of space for spent fuel," Tr. 596:16-21 (McCarten), and it was Ms. McCarten, not Mr. Kapitz, who was made available to provide sworn testimony to the PUC upon behalf of NSP concerning the rerack option. In response to questions that assumed that a rerack would increase capacity by 20 percent (and require shutdown in 1999), Ms. McCarten consistently accepted this premise and in

no way suggested that reracking would achieve a higher result. DX 107 at 56-57; Tr. 635:11-19 (McCarten); see also Tr. 655:5-12 (McCarten) (acknowledging that she did not know, even in 2006, whether a third rerack would have met NSP's needs if DOE had arrived in 1999). Rather, as NSP employee Joe Jensen later explained, NSP "consistently" took the position that a rerack would "increase storage capacity only 20%." DX 145 at NSP-0100713. The opinion that Mr. Kapitz expressed at trial was nowhere to be heard.

Moreover, the documents upon which NSP relies to support its argument do not support the technical feasibility of any rerack, let alone one generating a 30-percent increase in pool capacity, at the time that NSP needed to make its decision. NSP relies upon a study performed by Holtec International to conclude that NSP "could in fact have achieved a 40 percent increase in storage capacity." Pl. Post-Tr. Br. at 26. However, even in 1995, after NSP had obtained a study from Holtec concerning the feasibility of a rerack, NSP reported to the Minnesota Legislature as part of its Dry Cask Alternatives Study that technological developments that began in 1989 merely constituted "preliminary evidence" that "it may be feasible to rerack the Prairie [Island] spent fuel pool to achieve a greater capacity than previously analyzed." PX 49 at KRGNSP11063; Tr. 5138:4-5140:5 (Kapitz) (emphasis added). NSP further explained to the Minnesota Legislature that the Holtec feasibility study was not an engineering design document and did not contain the level of detail necessary to support an NRC review.[14]

---

[14] On page 26 of its brief, NSP cites to a version of this document (PX 489 at NSP0001409-10) that states that technological developments through 1995 "allowed Holtec to show that it is feasible to rerack the Prairie [Island] spent fuel pool to achieve a greater capacity than previously analyzed" (emphasis added). Although it is not clear from the record which version is the final one, both make clear that they are based only upon "preliminary evidence." It also bears noting that the version quoted in the text above is the one that NSP supplied to its (continued...)

NSP also suggests that a 1987 structural analysis of the Prairie Island spent fuel pool performed by the NUTECH Company and updated in 1990, "concluded that [it] could achieve up to a 30 percent increase of storage in the pool." Pl. Post-Tr. Br. at 26. However, NSP fails to mention that the 1987 NUTECH analysis pertained only to rod consolidation. The analysis merely concluded that the existing racks in the Prairie Island spent fuel pool "were capable of storing consolidated fuel and still meeting the [Nuclear Regulatory Commission's] acceptance criteria," Tr. 784:18-23 (Kapitz), and the 1990 update only determined that, from a structural perspective, the pool could withstand a 30-percent increase in weight through rod consolidation, Tr. 799:12-22 (Kapitz). Neither study spoke to the issue of whether, if a third rerack were performed, the fuel could have been moved closer together from a seismic, thermal, or criticality standpoint. Tr. 4053:7-15 (Leonard); DX 302A (Leonard Demonstrative No. 17). In fact, the NUTECH conclusion that the pool could tolerate additional weight is itself a "finite element analysis," which is specifically tailored to the weight distribution that would have been created through rod consolidation and would not permit a conclusion with respect to the pool's structural capacity to withstand to the weight distribution created by a third rerack. Tr. 4051:1-20 (Leonard). At best, the evidence that NSP offered at trial confirms what it told the PUC: that, in the late 1980s, it <u>may</u> have been possible to rerack the pool and achieve a capacity increase of up to 20 percent. It does not eliminate the uncertainty that NSP faced with respect to this issue.[15]

---

[14](...continued)
damages experts. Tr. 5137:25-5138:3 (Kapitz). At a minimum, the discrepancy in language between the two documents reflects the fact that, even in 1995, NSP was unsure as to exactly how much additional space could be achieved through a rerack.

[15] On page 26 of its post-trial brief, NSP cites to the rebuttal testimony of Jon Kapitz for
(continued...)

Finally, in connection with its assertion that a rerack would have been sufficient to ensure continuous operation through the date of DOE acceptance, NSP asserts on page 24 of its brief that, even if DOE did not arrive until late 1999 or early 2000, it still had "several options to keep the plant operating," including lengthening the time between refueling outages, reducing spent fuel discharge, and removing hardware from the rod consolidation project. Its arguments are unavailing for several reasons. First, as the Court observed during the trial, any option that involved running at less than full capacity entails the need to purchase replacement power at prohibitive cost. See, e.g., Tr. 717:8-719:19 (McCarten); Tr. 547:19-548:1 (McCarten) (noting that reduced plant operation would lead to significant replacement power costs). Second, removing hardware from the pool for storage in a canister also necessarily entails a cost, and NSP has made no effort to quantify this cost or to suggest that the space savings achieved from

---

[15](...continued)
the proposition that "from a criticality, structural, seismic, and thermal standpoint, NSP could have performed a third rerack." To the extent that this argument speaks simply to the question of whether a third rerack would have been possible at all, it does not change the overwhelming evidence indicating that, no matter what Mr. Kapitz believed personally in 2006, in the late 1980s NSP faced substantial uncertainty and great variance in opinion as to whether a rerack was possible and, if so, how long a rerack would permit Prairie Island to remain in operation.

However, to the extent that NSP has offered Mr. Kapitz's testimony to support the contention that a rerack could in fact have achieved a capacity increase of 30 percent in 1988, it is not appropriately considered because NSP never designated Mr. Kapitz as an expert witness to express such an opinion. Indeed, the Court sustained our objection to the presentation of Mr. Kapitz's technical opinion that the rerack performed at the Indian Point power plant in New York in the late 1980s was directly applicable to a hypothetical Prairie Island rerack. The Court based its ruling upon the insufficient warning provided by NSP for this testimony. Tr. 905:9-921:7 (Kapitz). Beyond being unsupported by contemporaneous evidence, any purported expert testimony from Mr. Kapitz suggesting that a third rerack would have achieved a pool capacity increase of 30 percent is similarly unsupported by adequate notice. Indeed, NSP never suggested at any time prior to trial that, in the late 1980s, it possessed the capability to achieve a capacity increase of 30 percent through a rerack or that it would present expert testimony to this effect.

hardware removal would meaningfully have affected its projected shutdown date. Third, NSP's assertions directly contradict the unequivocal assertions which it made in testimony before the PUC that a rerack would result in a plant shutdown at some point in 1999. DX 107 at 56-57; Tr. 634:13-635:23 (McCarten). If these options were not sufficient to avoid a shutdown when NSP's representatives provided sworn testimony to the PUC, they should not be deemed to forestall shutdown in these proceedings.[16]

In the end, the evidence shows that, in the late 1980s, NSP faced uncertainty as to just how long, if at all, a rerack might have permitted Prairie Island to operate after 1994. As set forth in the next section, this uncertainty, both by itself and when combined with uncertainty as to the date of DOE's arrival, necessarily influences what decision a prudent decisionmaker would have made in the "but for" world.

3. Even Assuming DOE Performance Commencing In 1998, The Potential For A Plant Shutdown And Worker Exposure Would Have Rendered A Third Rerack Cost Prohibitive

As the evidence described in the preceding two sections indicates, even if it assumed that DOE would timely commence performance under the Standard Contract, NSP would have faced

[16] NSP also asserts that it had the right under the Standard Contract to select the date of DOE arrival and that, in any event, it could have stored fuel in transportation casks pending DOE arrival. Pl.'s Br. at 25 n.8, 70. These arguments are unavailing. First, the delivery schedules upon which NSP relies, PX 56 at KRGNSP08011, request "estimated" delivery dates from utilities and do not "allow NSP to provide a range of dates." Second, NSP has failed to explain how it could store transportation casks, or how it could obtain approval to store transportation casks, either in a pool that had already exceeded its capacity or elsewhere, and has failed to provide any evidence that this process, even if it were possible from a physical and regulatory perspective, would be cost-effective. Finally, as noted above, NSP's argument is inconsistent with NSP's recognition that Prairie Island would face shutdown by a date certain in 1999 if DOE did not arrive. NSP made no allowance for the indefinite storage of fuel in transportation casks before the PUC and cannot do so here.

substantial uncertainty in the late 1980s as to the date that DOE would begin accepting NSP's spent fuel and how much time a rerack would buy. Referring to the table (PX 403 at NSP-07268) that NSP submitted with its CON application that assumed a May 26, 1999 shutdown date in the event of a rerack yielding a 20-percent increase, the Court recognized the import of this uncertainty and properly ascertained that NSP would pay a tremendous price unless all of these uncertainties resolved themselves in a manner most favorably to NSP:

> . . . [I]f we show an exhaustion of the capacity if this pool, assuming it's reracked into the optimum configuration, and we show an exhaustion date according to the chart that's up on the screen now, May 26th, 1999, and we have another table in another exhibit that shows pickups from Northern States power in that same year, it seems to me you've got this thing razor thin.
>
> I mean, if you were to go with reracking, you might not make it. You might be out of business because you have no more space to deposit your fuels, and you don't have DOE showing up at your door sometime in '99. According to this, it better be before May 1999.

Tr. 647:16-648:6 (McCarten). John Leonard, who has extensive experience managing nuclear power plants and making decisions concerning spent fuel management for utilities, Tr. 3753:17-3767:5, 3973:8-3983:18 (Leonard) (detailing management positions at nuclear facilities plants in Virginia and New York over a nearly 25-year period), assessed the situation more bluntly. In response to a question of whether it would have been reasonable in the "but for" world for NSP to pursue a rerack that increased the capacity of the pool by 20 percent, Mr. Leonard responded:

> So, you're operating at a razor thin margin, I guess, if you go ahead and try to do it that way. I mean, and let me say this, I'm not trying to jerk anybody's chain here, but NSP had excellent operating results, I knew the people there. They were smart people. I don't think they would make a stupid decision like that. I just don't think they would make a stupid decision.

Tr. 4034:15-4036:21 (Leonard).[17]

This conclusions was confirmed during the testimony of Dr. Jonathan Neuberger, who testified that a decision to rerack the spent fuel pool would have been inconsistent with principles of economic decisionmaking under uncertain conditions. As Dr. Neuberger explained, a rational economic actor making a decision in the presence of uncertainty must compare not only the cost of its options (that is, rerack vs. dry storage) if events are resolved favorably, but also the cost of its options if events are not resolved favorably. In this case, such an analysis involves a comparison of more than simply the cost of a rerack (approximately $12 million, according to Laura McCarten, and as much as $17 million, according to Jon Kapitz)[18] against the cost of a dry

---

[17] Mr. Leonard based his analysis upon essentially the same scenario that the Court raised with Ms. McCarten. The Prairie Island spent fuel pool is licensed to hold 1,386 assemblies. Assuming that a rerack that would achieve an increase of 20 percent of the licensed (as opposed to usable) space, NSP's pool would have space for 1663 assemblies. The pool gained 18 spaces as a result of the rod consolidation project, but also devotes 42 to hardware from that process and other material. As a result, Prairie Island would exceed its capacity (by 26 spaces) on May 26, 1999, when, according to its CON application, it projected that it would have accumulated 1665 spent fuel assemblies. Tr. 4022:4-16, 4033:21-4034:14 (Leonard); DX 302A (Leonard Demonstrative No. 13); PX 403 at NSP-0070268.

[18] NSP bases its calculation of the cost of a third rerack upon a handwritten cost estimate prepared by Laura McCarten in 1990, and has included the $11,639,966 cost as an offset to its damages. DX 77; Tr. 2697:24-2700:14 (Sieracki). As Ms. McCarten acknowledged, this estimate was part of NSP's effort to eliminate alternatives to dry storage during the CON proceedings and was not the result of thorough analysis. Tr. 524:15-525:4 (McCarten) (noting that the estimate was extrapolated from the cost of previous reracks employing, among other techniques, a "simplistic escalation of dollars"). In 1995, NSP prepared a Dry Cask Alternatives Study that it submitted to the Minnesota Legislature, in which it estimated that a rerack would cost approximately $17 million to complete. PX 49 at KRGNSP11064; Tr. 5141:16-22 (Kapitz). We do not agree that a reracking offset is appropriate because NSP would not have undertaken such a rerack in the "but for" world. However, if the Court were to determine otherwise, the proper amount of such an offset is not the back-of-the-envelope estimate prepared by Ms. McCarten, but, rather, the more thorough analysis prepared by NSP for submission to the Minnesota Legislature.

storage facility necessary to permit storage until the anticipated date of DOE arrival (approximately $30 million, Tr. 4909:1-9 (Johnson)). Proper analysis also requires consideration of the likely cost, with appropriate allowance for the likelihood of such an outcome, of a potential shutdown if reracking the pool did not create enough space to ensure operation until DOE pickup.

As all witnesses agreed, a shutdown would have a catastrophic economic effect upon NSP's operations and the upper midwest's power supply. Tr. 1050:20-1051:21 (Kapitz) (acknowledging that the cost of replacement power for even a six month shutdown could be in the "tens of millions" of dollars), 1943:4-6 (Howard) (Prairie Island "really stabilized the grid in that part of the country, and [if] it went down and closed, there was nothing to replace it"), 1994:17-20 (Howard) (primary concern with respect to Prairie Island was "ensuring that [the plant] remained open"), 473:25-474:2 (McCarten) (failing to take action "would lead to plant shutdown and the value of that plant to our customers was too great for that to happen"). The economic consequences were set forth in a letter written by Laura McCarten to State Senator Steven Novak, in which she estimated that "a plant shutdown from May 1995 through early 1998 would cost between $408 and $560 million, mostly attributable to the cost of replacement power." PX 592. Even assuming that the replacement power component of this cost is only $350 million, and that the period she described spans through the spring of 1998, Ms. McCarten's letter suggests that, in the event of a shutdown the cost of replacement power could approach or even exceed $10 million per month.

The prohibitive cost of a shutdown is the primary driver of any rational economic analysis of whether to rerack or build a dry storage facility. See generally Tr. 4585:17-Tr. 4628:20

(Neuberger). As Dr. Neuberger suggested, in the actual world, NSP made the economically rational decision to build dry storage because the cost of potential shutdown was so large that the "expected" cost of a rerack would dwarf the "expected" cost of constructing dry storage. Tr. 4609:8-4610:17; DX 301A (Neuberger Demonstrative No. 9) [19] Critically, however, Dr. Neuberger testified that the same conclusion is reached in the "but for" world, even where NSP has no reason to suspect that DOE would not begin industry-wide performance in 1998. Tr. 4612:10-4614:10 (Neuberger). Even if NSP believed that DOE was likely to begin performing on time, the cost of shutdown was so prohibitive that the substantial uncertainties confronting

---

[19] Dr. Neuberger's analysis of the actual world comports with the analysis of Laura McCarten as to why NSP opted to build a dry storage facility:

> Based upon my understanding of the federal program, I didn't think that the company could have confidence that spent fuel would start being removed from Prairie Island, even out to [2013-2014], so therefore, we prudently had to plan for a significant timeframe where we would have to meet our own spent fuel storage needs at the plant site because there was no other option. And not doing so would lead to plant shutdown and the value of that plant to our customers was too great for that to happen.

Tr. 473:16-474:2 (McCarten).

In fact, the concern about the cost of a shutdown permeated nearly every aspect of NSP's decisionmaking with respect to Prairie Island. For example, as NSP's former executive director of state government affairs, Scott Wilensky, testified, in 2003 NSP lobbied the Minnesota legislature for authorization to lift the 17-cask limitation at Prairie Island that had been included in the 1994 legislation. Tr. 1663:2-18, 1668:1-15 (identifying the two options available to it as "premature shutdown" or "a change in the law"); PX 198 at KRGNSP11417 (Minn. Laws 1994, Ch. 641, S.F. No. 1706, Art. I, Sec. 2, codified at Minn. St. § 116C.771). When the Mdewakanton Dakota Tribe at Prairie Island objected to this effort, NSP opted to execute a multimillion-dollar settlement with the tribe without consideration of whether the tribe actually had an enforceable right to object to a change in the law. Tr. 1682:12-1683:15 (Wilensky); PX 187 at KRGNSP01397. In the case of the tribal settlement, as in the case of NSP decision to construct a dry storage facility, the cost of a shutdown was simply too great for the company to justify taking the chance that its legal position would not be vindicated.

NSP rendered the expected cost of a rerack substantially higher than the expected cost of a dry storage facility. Tr. 4614:11-4617:14 (Neuberger) (concluding that "when you have an event that is likely to impose substantial costs, even if it's likely to occur at a very low probability, you still have to take those costs into account."). As Dr. Neuberger's testimony makes clear, the same economic principles that made dry storage the rational decision in the actual world would also make it a rational decision in the "but for" world.

Importantly, other factors that militated in favor of dry storage in the actual world also suggest that NSP would also have made a decision to construct dry storage in the "but for" world. Among these factors is NSP's concern for the health and safety of its employees. In the actual world, NSP opted in 1988 not to continue with its rod consolidation project because of, among other factors, the potential for personnel to be exposed to harmful radiation, an issue which NSP "took very seriously and wanted to minimize as much as possible." PX 399 at NSP-0037000; Tr. 478:21-479:11; 620:4-13. (McCarten). However, during the proceedings concerning NSP's application for a certificate of need, both an administrative law judge and the PUC found that reracking the spent fuel pool at Prairie Island was "technically inferior to dry cask storage due to substantially higher risks of accidents and worker exposure." PX 61; PX 749; Tr. 673:3-674:4 (McCarten); see also PX 592 (March 2, 1992 letter from Laura McCarten to Sen. Steven Novak explaining that the PUC "rejected reracking for reasons of cost, practicality, and safety"). If NSP was concerned about the safety of its workers in the actual world, there is no reason to believe that it would not have been motivated by such a concern in the "but for" world.[20]

---

[20] This concern need not have been solely altruistic. As Dr. Neuberger testified, exposing its employees to radiation would also have economic ramifications for the company, including (continued...)

Ultimately, these considerations explain why, during the CON proceedings, NSP expressly recognized the desirability of dry storage, even if DOE were to begin accepting fuel from the industry in 1998 (i.e., in the "but for" world). Although NSP now argues that it "presciently" predicted as early as the late 1980s that the commencement of performance at a repository in 1998 was unlikely, its own representatives testified during the CON proceedings in 1991 that possibility of performance at an MRS was not unrealistic. NSP-0003124; PX 778 at NSP-0055798; Tr. 4263:6-7, 4302:1-12 (Schwartz). Further, NSP explained to the PUC that dry storage "provides optimal flexibility and allows NSP to obtain only the storage needed until the DOE begins removing spent fuel from PI for shipment to a monitored retrievable storage facility or a permanent repository" and concluded that "the possibility of an MRS facility becoming available [prior to 2010] strongly supports the use of a dry cask facility because of its ability to add additional storage capacity in small increments." PX 60 at KRGNSP03789, KRGNSP03795 (emphasis added); Tr. 628:2-11; 629:16-24 (McCarten).[21] This statement is critical because it

[20](...continued)
"workman's compensation costs, health care costs, [and] reputation costs in the community." Tr. 4620:7-15 (Neuberger).

[21] Ms. McCarten stated during cross-examination that this statement simply spoke to an MRS becoming available at some point before 2010, and did not necessarily contemplate DOE performance beginning in 1998. Tr. 676:15-19 (McCarten). However, the next sentence of the application, which NSP specifically corrected in its errata and indicated "L.M." as the sponsor of the information, belies this contention. Offering an illustrative example of the potential benefits of dry storage, NSP stated to the PUC that "[i]f DOE began spent fuel acceptance in 1998 at an MRS facility at DOE's low acceptance rate, only 22 casks would be used at the PI ISFSI." PX 60 at KRGNSP03795 (emphasis added); see Tr. 676:20-677:3. This example confirms that NSP's preference for dry storage would apply not only if DOE were to begin performance at a date near 2010, but also if it were to begin performance, in accordance with the Standard Contract, in 1998.

constitutes a contemporaneous and unambiguous admission of what NSP believed it would have done if DOE had begun performance in 1998 at an MRS: build a dry storage facility.

In the end, a dry storage facility was not only socially responsible, in that it protected the welfare of NSP employees, but economically rational, in that it accounted for the potential cost of a shutdown and required NSP to pay as it went, and to pay for only those storage costs that it incrementally needed. Undoubtedly, these considerations compelled NSP to construct dry storage in the actual world. However, as Dr. Neuberger's testimony confirms, and as NSP even acknowledged in its application for a certificate of need, dry storage was a better option even if DOE's performance under the Standard Contract had not been delayed and an MRS had become available in January 1998. Under these circumstances, NSP cannot meet and has not met its burden of establishing that the decision it made in the late 1980s would have been any different in the absence of a partial breach. Rather, the evidence is clear that, as in Indiana Michigan, the decision to build a dry storage facility is one that NSP would have reached "irrespective of DOE's partial breach." Indiana Michigan, 422 F.3d at 1376.

4. In Light Of Its Prior Representations To The Minnesota Public Utilities Commission, NSP Is Estopped From Asserting That It Would Have Performed A Third Rerack At Prairie Island

Even if NSP could prove that it would have reracked in the "but for" world, it is judicially estopped from doing so because of its clear and unequivocal representations to the PUC, which it made for the purpose of securing authorization to construct a dry storage facility, that reracking was a technologically inferior option that it would not have pursued, even if it were available. In an effort to gain approval for a dry storage facility, NSP thoroughly discredited reracking as a

potential option in sworn testimony and legal arguments made before Minnesota authorities, yet now would have this Court accept the very positions that it eschewed 15 years ago.

"Where a party successfully urges a particular position in a legal proceeding, it is estopped from taking a contrary position in a subsequent proceeding where its interests have changed." Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1565 (Fed. Cir. 1996); see also Davis v. Wakelee, 156 U.S. 680, 689 (1895); Wang Lab., Inc. v. Applied Computer Sciences, Inc., 958 F.2d 355, 358 (Fed. Cir. 1992). Although the decision whether to invoke judicial estoppel lies within the Court's discretion, Data General Corp., 78 F.3d at 1565, the decision is typically informed by consideration of (1) whether the party's later position is "clearly inconsistent" with its earlier one; (2) "whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled"; and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." Cuyahoga Metropolitan Housing Auth. v. United States, 65 Fed. Cl. 534, 554 (2005) (quoting New Hampshire v. Maine, 532 U.S. 742, 750 (2001)).

In this case, NSP advanced a consistent position in proceedings before the PUC upon which it prevailed and, following intervention by the courts, that it ultimately convinced the state legislature to endorse.[22] Uniformly, NSP asserted before the PUC that dry storage was a more

[22] As part of granting NSP authorization to load casks to the dry storage facility, the Minnesota Legislature expressly "ratified and approved" the PUC's grant of a certificate of need to NSP. PX 198 at KRGNSP11416 (Minn. Laws 1994, Ch. 641, S.F. No. 1706, Art. I, Sec. 1, codified at Minn. St. § 116C.77). As a result, NSP cannot credibly contend that its
(continued...)

desirable option than reracking; that reracking would, at best, achieve a pool capacity increase of 20 percent; that a plant shutdown would occur in 1999 absent dry storage; and that NSP would not pursue reracking even in the event of timely performance by DOE.

With respect to the desirability of reracking and what reracking could be expected to achieve, NSP's position was firmly set forth in its application for a certificate of need and the related judicial and administrative proceedings. For example, on November 18, 1991, in response to a question about why NSP did not select reracking, Laura McCarten testified before the PUC as follows:

> First of all, reracking can only accomplish about a 20 percent increase in pool capacity. It only provides a minimal amount of additional storage. Also, that particular alternative entails the generation of a significant quantity of low level waste and personnel exposure.

DX 107 at 117.[23]

---

[22](...continued)
representations in judicial proceedings before the PUC did not ultimately lead to a victory.

[23] Although the transcript of Ms. McCarten's testimony was admitted as an exhibit, this specific excerpt from Ms. McCarten's testimony was not referred to during trial. However, Ms. McCarten's testimony comports with numerous statements in NSP's application for a CON before the PUC, in which NSP stated that "the maximum increase achievable by reracking is estimated to be about 20%," PX 60 at KRGNSP03857; Tr. 663:3-20, as well as the administrative law judge's statement that reracking "was not the first choice of any party," including NSP. PX 61; see also PX 592 (March 1994 letter from Laura McCarten to Senator Steven Novak responding to legislative inquiries concerning reracking and noting that in 1991 the PUC found that "pool reracking [was] technically inferior to dry storage [and] entailed greater health and safety risk, due in part to the fact that it would increase radiation exposure to plant employees."). We offer this testimony simply as a shorthand for the conclusions that NSP consistently offered to Minnesota authorities with respect to the desirability of a rerack.

Ms. McCarten was similarly unequivocal with respect to the timing of a plant shutdown after a rerack:

> A 20 percent increase in the pool capacity would take up – allow normal operation, full power operation, though 1998. We would then be faced with shutdown in 1999.

DX 107 at 56; Tr. 635:11-19 (McCarten)

Finally, NSP made clear in a brief prepared by its lawyers to the PUC that, even though an MRS could become operational in 1998, the timely opening of an MRS should not militate against the grant of a CON for a dry storage facility:

> Even if an MRS becomes operational, the DOE will not begin removing spent fuel from PI until 2001 and will not begin accepting spent fuel at a rate equal to that generated by PI until 2015.
>
> * * *
>
> Dry cask storage is the most economical option because it is the only alternative to match the need for additional temporary storage to PI's operational needs and to the DOE's spent fuel removal options.

PX 778 at NSP-055717, NSP-055768-69; Tr. 4294:2-4297:4 (Schwartz); see also PX 60 at KRGNSP03795 (errata to CON application stating that "the possibility of an MRS facility becoming available [prior to 2010] strongly supports the use of a dry cask facility because of its ability to add additional storage capacity in small increments.").

As the record makes clear, NSP consistently took the position in proceedings before the PUC that (1) reracking was technically inferior to dry storage; (2) reracking would only permit a maximum increase in pool capacity of 20 percent; (3) reracking would only bridge the gap until some point in 1999 before shutdown was required; and (4) even if DOE were to begin

performing under the Standard Contract in 1998, reracking the spent fuel pool would still not be a desirable option for a variety of reasons, including the fact that DOE would likely not arrive until 2001. The positions that NSP articulated at trial and in its post-trial brief – that a rerack would have achieved more than a 20 percent increase in pool capacity; that shutdown could have been forestalled even if DOE arrived after May 1999; and, ultimately, that it would have performed a rerack even if DOE had commenced performance in 1998 – are directly antithetical to the positions that NSP adopted in proceedings before the PUC and before the Minnesota legislature. Although we believe that NSP's contemporaneous statements concerning the feasibility and desirability of reracking are of substantially greater probative value than the positions that it adopted in a trial 15 years later, NSP is, as a matter of law, estopped from taking positions in this litigation that contravene the positions that it took in prior legal proceedings. The contradiction between the positions that NSP adopted in 1991 for the purpose of obtaining a benefit and the positions that it has taken in this case reflects a manipulation of the legal process and should not be countenanced.

5. Effect Upon Damages Claim

The effect of NSP's failure to prove (and estoppel from proving) that it would have performed a rerack at Prairie Island in the "but for" world is quantified in the testimony and demonstrative exhibits of Larry Johnson. As Mr. Johnson testified, because no rerack would have occurred in the "but for" world, a reversal of the credit of $11,639,966 to the damages that NSP provided in its claim for a third rerack is warranted.[24] In addition, an adjustment of

---

[24] As discussed in note 18 supra, that, if the Court were to determine that NSP has proved that it would have performed a rerack in the "but for" world, the proper amount of the credit is (continued...)

$30,679,574 to NSP's damages claim (representing the costs of construction of a dry storage facility in the "but for" world) is required as a result of the company's inability to prove that the cost of dry storage at Prairie Island was incremental to the partial breach. Tr. 4896:17-4909:9 (Johnson); DX 303A (Johnson Demonstrative Nos. 8-12).

### B. NSP's "Mitigation" Efforts Stem From Decisions Made Prior To The Time That That It Was Clear That DOE Acceptance Would Be Delayed And, In The Absence Of Efforts To Obtain Adequate Assurances, Their Costs Are Not Recoverable As Damages

In Indiana Michigan, the Federal Circuit held that the plaintiff was not entitled to recover damages arising before 1994 because the plaintiff's duty to mitigate only arose when DOE issued its May 1994 notice of inquiry "unequivocally announcing" that it would not perform by January 31, 1998. Indiana Michigan, 422 F.3d at 1375 (citing 59 Fed. Reg. 27007-08 (May 25, 1994)). In other words, because mitigation is a duty, and not a right, the obligation to mitigate any alleged breach by the Government necessarily did not arise until the May 1994 notice of inquiry, at the earliest. For the reasons articulated in Indiana Michigan, it follows that, in this case, NSP may not recover any damages that are traceable to so-called mitigation activities that predate DOE's issuance of the May 1994 notice of inquiry. This limitation bars not only the expenses incurred before May 25, 1994, but all those expenditures incurred after May 25, 1994 that result from NSP's decision to build a dry storage facility. By definition, these costs were caused not by a breach but by NSP's unilateral decision to take action in mitigation before the duty to do so arose, and are therefore not recoverable.

---

[24](...continued)
$17 million.

NSP argues that the May 1994 date represents the latest date when mitigation activity was justified and that activities undertaken before that date are still recoverable if they are reasonable. However, there is no reason to depart from the rule enunciated in Indiana Michigan. Indeed, the terms of every Standard Contract are the same. The "facts and circumstances" underlying DOE's administration of these Standard Contracts, as well as its public pronouncements about them, are the same. The argument that the Government can be subjected to conflicting fact-finding in different SNF cases, based upon the same underlying facts and evidence, is inappropriate.

Moreover, even if NSP were correct that the Federal Circuit's holding in Indiana Michigan with respect to commencement of the duty to mitigate does not control the result in this case, there is no reason to depart from that rule in this case. Notwithstanding NSP's suggestion that it began taking actions as early as 1987 as a result of NSP's "impending breach," Pl. Post-Tr. Br. at 88, what NSP now perceives to be a breach in the late 1980s was merely a recognition that DOE was unlikely to perform at a repository beginning in 1998, a conclusion that did not foreclose the possibility of performance under the Standard Contract at an MRS. See PX398B at NSP-0001635; Tr. 419:6-17 (McCarten) (summarizing a report prepared in 1987, PX 398B, by stating that "DOE had proposed a five-year delay in opening the first repository, pushing that date out to the year 2003; see also Indiana Michigan Power Co. v. Department of Energy, 88 F.3d 1272, 1277 (D.C. Cir. 1996) (holding that DOE's obligation to accept spent fuel is not conditioned upon the existence of a repository). I also reported that DOE had submitted a proposal for a monitored retrievable storage facility to Congress, and that that was before Congress, and there would be an action – Congress would have to decide whether or not to authorize that and that the DOE said if that was authorized, they could begin receiving spent fuel

by 1998.”). Indeed, NSP’s own CEO sent out a news release in May 1992 stating that he “support[ed] the MRS concept” that had been proposed that day by the Secretary of Energy and that the schedule circulated at the time, which contemplated performance at an MRS beginning in 1998, represent[ed] a “firm commitment with a solid timetable.” DX 314, Tr. 2034:3-2038:22 (Howard).

Similarly, and contrary to NSP’s current assertions, the company did not “predict” in its CON application that DOE would not perform until 2015. Michael Schwartz, testifying upon behalf of NSP during the CON proceedings, specifically told the Minnesota authorities that performance at an MRS beginning at 1998 was not unrealistic, NSP-0003124, and, in a brief submitted to the PUC in February 1992, NSP relied upon Schwartz’s testimony to support its contention that DOE could begin accepting fuel pursuant to the Standard Contract at an MRS in 1998. PX 778 at 0055717; Tr. 4292:4-4295:1 (Schwartz).

NSP’s claim is, by its own admission, premised upon its assertion that it took action as a means of “mitigating” the effects of DOE’s delayed performance. As made clear above, however, NSP began engaging in these alleged “mitigation” activities long before it was clear that DOE would not begin accepting spent fuel in 1998. Had NSP wanted to confirm what it now contends is a pre-breach “reasonable belief” that DOE would not timely perform, it could have sought assurances from DOE that, if not forthcoming, could have provided a basis for such a belief. In the context of anticipatory repudiation, the Federal Circuit has recognized that, where a party fears future non-performance, “the obligee ‘may demand adequate assurance of due performance’ and if the obligor does not give such assurances, the obligee may treat the failure to do so as a repudiation of the contract.” Danzig v. AEC Corp., 224 F.3d 1333, 1337-38 (Fed. Cir.

2000) (quoting Restatement (Second) of Contracts § 251 (1981)), cert. denied, 532 U.S. 995 (2001). Under these circumstances, "reasonable grounds [will then] support the obligee's belief that the obligor will breach the contract." Id. at 1337. Although NSP has made no claim of anticipatory repudiation, the rationale for creating a reasonable basis for a belief of future non-performance is the same where, as here, a party unilaterally takes action and later seeks to recover the cost of such action because it was taken in mitigation. Far from seeking adequate assurance when it made its decision to construct a dry storage facility, NSP embarked on its course of "mitigation" activities long before contacting DOE officials and, even in the early 1990s, used the specter of DOE performance as a means of convincing the Minnesota authorities and the Minnesota Legislature to grant it authorization to construct a dry storage facility.

NSP effectively asserts in this lawsuit that that it can, on its own, subjectively determine that performance may not be forthcoming and charge the Government with future costs, without notice to the Government that it has started incurring costs under such a belief. Indiana Michigan does not permit such a result. Although NSP may have lacked confidence that DOE was going to perform, its own actions demonstrate that any duty to mitigate did not begin until it became clear in 1994 that DOE would not begin accepting spent fuel in 1998. Accordingly, any expenditures that NSP incurred as a consequence of its decision, prior to May 25, 1994, to construct a dry storage facility (including, ultimately, the cost of the facility itself and of the legislative mandates that NSP claims it was forced to comply with in order to secure permission to construct the facility), are not recoverable.

At a minimum, Indiana Michigan compels the exclusion of all costs actually incurred prior to May 25, 1994. This limitation does not further reduce the $20,802,226 in costs that NSP

would not have been required to incur in the "but for" world. However, as set forth in DX 303A (Johnson Demonstrative No. 34), in the event that the Court finds that certain components of damage that NSP claims (such as the cost of the dry storage facility) were, in fact, incremental to DOE's partial breach, $8,273,537 of the amount expended upon these components was incurred prior to May 25, 1994. Similarly, $86,669 of the costs that we believe were not reasonable (related to PFS) were incurred prior to May 25, 1994. The amount of each component of damage attributable to costs actually incurred prior to May 25, 1994, is set forth in the expert report of Larry Johnson (DX 303).

### C. The Damages Sought By NSP For Costs Resulting From State Legislative Mandates Are Unrecoverable

#### i. The Government Is Not Responsible For The Downstream Political Consequences Of Its Delayed Performance

NSP bases four categories of damages upon legislative "mandates" issued by the Minnesota legislature in 1994 and 2003. Specifically, NSP claims damages for: (1) the addition of biomass energy capacity to NSP's energy resources for producing power; (2) the creation and administration of a fund to develop renewable energy sources; (3) the attempt to site a second, alternative site for NSP's dry storage facility, in addition to the site ultimately used by NSP; and (4) a settlement between NSP and the Mdewakanton Dakota Tribe at Prairie Island ("the tribal settlement"), codified by the 2003 legislation. None of the amounts that NSP paid in connection with these mandates is recoverable.

Most fundamentally, if the Court finds that NSP would have built a dry storage facility in the "but for" world, there is no evidentiary basis upon which to require the Government to reimburse NSP for the cost of compliance with the mandates. Indeed, NSP wholly failed to

demonstrate that the mandates would not have been enacted, or that the cost of complying with them would have been any different, in a "but for" world in which NSP constructed a dry storage facility. For this reason, NSP cannot recover the cost of the mandates unless it establishes, as a threshold matter, that it would not have constructed a dry storage facility in the absence of a partial breach.

However, even if NSP could prove that its decision to build a dry storage facility was the result of DOE's delay in acceptance of spent fuel, NSP cannot prove that any of the mandates were foreseeable to DOE, at the time of contract formation, as the probable outcome of any future breach. See Indiana Michigan, 422 F.3d at 1376; Restatement (Second) of Contracts, § 351(1), (2); Sacramento Mun. Util. Dist. v. United States, 70 Fed. Cl. 332, 360 (2006), appeal pending, No. 2007-5052 (Fed. Cir. docketed Feb. 6, 2007). Several reasons dictate the conclusion that the mandates are not foreseeable and, therefore, not recoverable.

First, NSP has incorrectly stated the nature of its burden with respect to the foreseeability of the mandates. Relying on PG&E, NSP states on page 64 of its brief that a utility's exhaustion of its storage capacity is the relevant "loss" that was foreseeable to DOE at the time of contracting and, for that reason, DOE need not have foreseen the particular manner (in that case, the use of dual-purpose fuel canisters) in which the utility addressed its dry storage needs. See PG&E, 73 Fed. Cl. at 418-19. In this case, we do not question, and have never questioned, NSP's assertion that a partial breach of the Standard Contract could cause a foreseeable loss in the form of the exhaustion of storage capacity. For that reason, we have not challenged the cost of constructing a dry storage facility on foreseeability grounds (and, in fact, have acknowledged responsibility for the difference between the direct costs of the storage facility that was actually

constructed at Prairie Island and the storage facility that would have been constructed in the "but for" world). However, the cost of complying with legislative mandates is not akin to the cost of obtaining dual-purpose fuel canisters or any other direct expenditure that a utility might have chosen to incur to increase its storage capacity as a result of DOE's partial breach. If anything, the cost of complying with the mandates would be akin to compliance with a tax on dual-purpose fuel canisters enacted after the utility made its storage decision. To the extent that the mandates, or any other component of damage that NSP seeks, are themselves the downstream consequence of NSP's decision to build a dry storage facility, the Court must ascertain whether the loss incurred as a result of this consequence was foreseeable. The absence of such limitation would subject a party that has breached the contract to liability that far exceeds what was contemplated at the time of contracting.

Second, notwithstanding NSP's arguments on pages 78 through 80 of its post-trial brief, the mere fact that the generation of nuclear fuel is a heavily regulated industry does not mean that the mandates that were imposed by the Minnesota legislature were foreseeable as a probable result of the partial breach, particularly not to DOE in 1983. In 1991, NSP obtained a limited certificate of need from the Minnesota PUC without any legislative involvement. See PX 61 (order granting certificate of need for 17 casks). It did not become clear that legislative intervention was required in connection with NSP's application for a CON until the Minnesota Court of Appeals so ruled in 1993 and, until the Minnesota Supreme Court declined to take the appeal of Court of Appeals' decision, NSP itself argued that legislative approval of its decision to build dry storage was not required. In re Application for Certificate of Need for Construction of an Independent Spent Fuel Storage Installation, 501 N.W. 2d 638 (Minn. Ct. App. 1993), review

denied (July 15, 1993). It is undoubtedly for this reason that the estimate of the cost of a dry storage facility that NSP presented to the PUC did not include an estimated cost of legislative mandates; they were simply not a part of the relevant calculus to NSP in 1991, let alone to DOE in 1983. PX 60 at 69.

Even persons who were insiders in Minnesota politics testified that they could not have foreseen the Minnesota legislature becoming involved in approving an application to construct a dry storage facility. Tr. 1272:7-14 (Novak) (testimony of chairman of Minnesota Senate's energy committee confirming that, in the early 1990s, as chair of the committee, it "never occurred to [him] that the legislature would become involved in decisionmaking with regard to whether Prairie Island could expand its storage capabilities"), 1203:12-21 (Sanda) (prior to 1994, legislature's involvement in prescribing specific remedies related to dry storage construction and mandates for alternative energy was "out of the realm of possibility"). NSP's own CEO testified that, even in 1987, he could not have predicted the involvement of the legislature in these issues. Tr. 2050:8-17 (Howard). Legislative involvement in the approval of a dry storage facility and imposition of a surcharge as a condition for such an approval was by no means the probable result of a partial breach.

Third, even if legislative involvement in dry storage approval were foreseeable on some abstract level, the 1994 and 2003 legislation that contained the mandates at issue cannot reasonably be considered a proximate result of the partial breach. See Old Stone, 450 F.3d at 1376 (considering the issue of proximate cause in connection with foreseeability). Indeed, the witnesses with knowledge of the manner in which the mandates were enacted consistently testified that the legislation that ultimately passed was the result of a heated battle that ultimately

could have gone in any number of different directions. Tr. 1126:19-23, 1202:2-1202:24 (Sanda) (legislative process leading to mandates was a "long, contentious and winding road" in which one never knew from one day to the next what was going to happen), 1271:8-13 (Novak) (approval of dry storage facility was "probably the most controversial issue that the state has dealt with").

Perhaps the most important of these witnesses was Sen. Gene Merriam, who proposed many of the mandates that ultimately were enacted into law. Senator Merriam testified that it was his belief that the law authorizing the certificate of need would have been passed through the Minnesota Senate without the mandates, and that he and a few like-minded legislators inserted them into the bill. Tr. 1228:14-1231;11 (Merriam). To be sure, Senator Merriam's colleague in the Senate, Steven Novak, testified that he believed that the authorization for a dry storage facility at Prairie Island would not have passed without the mandates. Tr. 1293:2-5 (Novak). However, the very fact that there is disagreement between these Senators about whether the legislation would have passed without the mandates indicates that the enactment was not the natural and probable outcome of the partial breach. Indeed, the Minnesota Legislature's authorization of the statue was motivated by a number of different reasons, Tr. 1277:23-1283:10 (Novak), and its independent decision to enact mandates as a condition to its approval of dry storage is an intervening event that breaks the chain of proximate causation. Old Stone, 450 F.3d at 1376; see also Myerle, 33 Ct. Cl. at 27 ("There must not be two steps between cause and damage.").

Fourth, the size and scope of the mandates contravene the requirement that, to be recoverable, the injury must be "of an amount that is not beyond the bounds of reasonable

prediction." 11 Joseph M. Perillo, Corbin on Contracts § 56.7, at 108 (2005 rev. ed.) (quoted in Citizens Federal, 474 F.3d at 1321). As NSP takes great pains to point out, the mandates for which NSP is seeking recovery through 2004 alone exceed $45 million.[25] However, this sum reflects an unpredicted and unpredictable levy imposed by an aggressive legislature that was heavily influenced by politics and emotion. Tr. 1273:18-25 (Novak). In Senator Novak's own words, the sums that NSP is required to pay pursuant to the legislative mandates for both wind (for which NSP is not seeking recovery in this lawsuit) and biomass energy (for which NSP seeks recovery) were "unprecedented." Tr. 1272:15-1273:9 (noting that the wind power mandates resulted in "the entry by NSP into the largest wind contracts in the history of the world"). Particularly given that NSP estimated during the CON proceedings that the cost of a dry storage facility loaded with 48 casks would be only $40 million, PX 60 at KRGNSP-03833, it is difficult to fathom how a set of mandates ultimately requiring NSP to pay amounts in excess of $100 million to build such a facility can be deemed to be within the "bounds of reasonable prediction."

This aspect of the mandates refutes NSP's argument (on page 80 of its post-trial brief) that the damages which it claims are "no different than other forms of taxing or rate-setting by a legislature." Unlike Citizens Federal, to which NSP cites for the proposition that tax consequences are recoverable as damages, NSP was not required to incur the cost of the mandates as a "consequence" of an existing taxation scheme to which it became subject as a result of the mitigation activities that it undertook. Instead, the legislature enacted a new set of

---

[25] NSP continues to be responsible for complying with the mandates. Among other things, the company is responsible for contributing $16 million annually into a renewable development fund for each year that Prairie Island is in operation. See PX 198 at KRGNSP11392-33(Minn. Laws 2003, Ch. 11, H.F. No. 9, Art. 2, Sec. 1, subd. 1 codified at Minn. St. § 116C.779, subd. 1).

mandates that were unprecedented in size or scope as a condition of permitting NSP to undertake these activities. Similarly, the mandates are wholly distinguishable from the settlement agreement discussed in Yankee Atomic Elec. Co. v. United States, 73 Fed. Cl. 249, 292 (2006), in that they require payments due not pursuant to an existing regulatory scheme (as in Yankee, where the payments were necessary to obtain a zoning permit for a dry storage facility), but as a result of a an entirely new legislation that imposed an enormous burden upon NSP and required NSP to engage in activities (such as development of biomass and renewable energy) that bear absolutely no relationship to NSP's dry storage facility. The United States is not a guarantor against the sovereign acts of other jurisdictions, and the damages for breach of contract that a utility suffers cannot include legislative enactments and policy priorities that states, in their own regulatory capacity, may impose as a consequence of utilities' determinations as to how best to address their spent fuel storage needs. Recognition of the mandates as damages in this case would serve as a remarkable incentive for states with operating nuclear power plants to enact taxes or levies upon utilities for storing spent fuel, comforted by the knowledge that the costs of these requirements would not ultimately be borne by the utilities, but by the Federal Government.

Fifth, examination of the individual mandates themselves reflects their inherently unforeseeable nature. Beyond their unprecedented size and scope, as addressed above, several of the mandates are the result of legislative decisions that not even the most attuned observer of nuclear regulation in Minnesota would have believed would be enacted. For example, the 1994 legislation required NSP to search out an alternate site for a dry storage facility in Goodhue County, even though the company already had an adequate site in place picked out on the premises of the Prairie Island plant. Even Senator Merriam, who proposed this requirement,

acknowledged that he believed the mandate was unlikely to yield a fruitful result, Tr. 1231:6-17 (Merriam), and Senator Novak stated that he believed that the Prairie Island facility was already the best site for dry storage. Tr. 1287:11-18 (Novak). It is difficult to understand how a legislative mandate requiring NSP seek out an alternate site for a dry storage facility could be deemed "foreseeable" when NSP had land available at Prairie Island and could obviate the need to ship spent fuel across a significant distance by simply constructing on that site. No one could possibly have foreseen that the legislature would require NSP to subject two sites to the threat of a nuclear incident when the fuel was already at one of the sites and there was ample space to store it there.

Similarly unforeseeable is the cost of the legislative mandates that ultimately resulted in NSP's settlement agreement with the Mdewakanton Dakota Tribe at Prairie Island. In 1994, the Minnesota Legislature conferred third-party standing upon the tribe to enforce certain of NSP's obligations under the legislation. PX 198 at KRGNSP11417-18 (Ch. 641, S.F. No. 1706, Art. I, Sec. 4, codified at Minn. St. § 116C.773). Although NSP believed that the legislature lacked authority to increase the amount of casks authorized for dry storage at Prairie Island, Tr. 1731:15-1732:22, 1734:24-1735:5 (Wilensky), it commenced negotiations with the tribe in an effort to be a "good neighbor" and ultimately agreed to pay substantial sums to the tribe for reasons stemming in large part from the tribe's proximity to the Prairie Island plant and the threat of a nuclear accident. PX 198 at KRGNSP11392 (Minn. Laws 2003, Ch. 11, H.F. No. 9, Art. I, Sec. 3, codified at Minn. St. § 216B.1645) (legislation authorizing settlement and providing for payments not to exceed $2,500,000 annually, "to be used for, among other purposes, acquiring up to 1,500 contiguous or noncontiguous acres of land" and specifically stating that "the intent to

purchase land by the tribe for relocation purposes is part of the settlement agreement and this act."); PX 187 at KRGNSP 01397-1405 (settlement agreement calling for a $1 million payment for each year that Prairie Island is in operation; $700,000 annually for expenses associated with the acquisition of land to be held in trust for the tribal community or for other community purposes; $100,000 annually for health studies, emergency management activities, and other community purposes; and $25,000 for an engineering study for construction of a railroad overpass); Tr. 1718:6-1719:18, 1734:24-1737:6 (Wilensky).

Again, it is difficult to understand how anyone at DOE in the 1980s could have foreseen both (1) the intervention of the Minnesota legislature in conferring third-beneficiary standing upon a neighboring landowner to enforce "rights" under a new statutory scheme and (2) the unilateral decision of NSP to pay millions of dollars annually to that landowner, simply as a consequence of DOE's failure to begin picking up fuel in 1998. Further, NSP's unilateral decision to enter into the agreement with the Prairie Island tribe is yet another intervening act that breaks the chain of causation between the breach and the injury that NSP claims to have suffered. See Hercules, Inc. v. United States, 24 F.3d 188, 200 (Fed. Cir. 1994) (plaintiff's "voluntary decision to enter into settlement" rather than litigating claim precluded recovery for costs of settlement as damages), aff'd on other grounds, 516 U.S. 417 (1996). Although DOE might, as in PG&E, have foreseen the need to construct additional storage as a probable loss resulting from its delay, it is not, as a matter of law, responsible for the unforeseen downstream consequences of NSP's decision to embark upon this path.[26]

---

[26] Two other aspects of NSP's claim for the cost of complying with the mandates also bear noting. First, the parties agreed to a damages cut-off date in this case of December 31,

(continued...)

ii. Effect Upon Damages Claim

The effect of NSP's failure to prove that the expenses it incurred in compliance with the mandates is quantified in the testimony and demonstrative exhibits of Larry Johnson. As Mr. Johnson testified, an adjustment to NSP's claim of $48,747,972 (consisting of $2,868,290 for the Goodhue County siting requirement, $19,800,182 for the renewable development fund, $23,142,000 for biomass generation, and $2,937,500 for the tribal settlement) is warranted for the cost of complying with the mandates. Tr. 4932:19-4935:1 (Johnson); DX 303A (Johnson Demonstrative Nos. 22-24).

D. NSP's Investment In The Private Fuel Storage Venture Is Not Recoverable

i. The Investment In PFS Was Unforeseeable And Speculative

As a matter of law, the Federal Circuit's Indiana Michigan decision precludes recovery of NSP's contributions to the off-site Private Fuel Storage ("PFS") facility. The issue of recoverability of amounts paid to PFS squarely was addressed by the Federal Circuit in Indiana Michigan. In finding that PFS-related costs were not recoverable, the Federal Circuit did not simply uphold the trial court's findings of fact. Instead, the Federal Circuit held:

[26](...continued)
2004. NSP claims to have paid $562,500 pursuant to the settlement agreement in 2004, even though the amount wasn't due until 2005. Tr. 1758:22-1759:3 (Wilensky). Because NSP uses the accrual method of accounting, Tr. 1759:24-1760:1 (Wilensky), these damages were, by definition, incurred in 2005 and therefore not properly included in NSP's claim.

In addition, the 2003 legislation specifically provided for the approval by the PUC "of a rate schedule providing for the automatic adjustment of charges to recover the costs or expenses of a settlement" between NSP and the Mdewakanton Dakota Tribal Council at Prairie Island. PX 198 at KRGNSP11392 (Minn. Laws 2003, Ch. 11, H.F. No. 9, Art. I, Sec. 3, codified at Minn. St. § 216B.1645). Tr. 289:12-290:2 (Bomberger). The PUC approved such a rate schedule and, as Charles Bomberger acknowledged, NSP is not out-of-pocket any money as a result of the settlement. Tr. 289:12-290:2 (Bomberger).

> The credited evidence also showed that the utility's investment in the private storage facility was speculative and that the high cost of the venture was unforeseeable. . . . While DOE should have foreseen that its breach would force Indiana Michigan to find alternate storage for its SNF, it is not liable for such a speculative venture and unforeseeable costs.

Indiana Michigan, 422 F.3d at 1376. In this case, as in Indiana Michigan, NSP did not prove that its investment in PFS was not speculative or that the cost of the venture was foreseeable. Further, because foreseeability is measured from the perspective of the defendant, and given that Indiana Michigan's contract with DOE is materially identical to the contracts at issue here, Indiana Michigan is dispositive of the plaintiff's claim for costs associated with PFS. Likewise, the Federal Circuit's conclusion that the PFS effort was "speculative" should bar any claim for those costs here.

ii. NSP Has Failed To Establish That It Has Actually Been Damaged By Its Investment In PFS

Beyond the fact that the Federal Circuit has held that investments in PFS are not recoverable, NSP has entirely failed to show that its investment in PFS is properly characterized as damage. Notably, the vast majority of sums that NSP claims to have spent on PFS – more than $23.37 million of the $24.72 claimed – were made in the form of capital contributions to Private Fuel Storage LLC. PX 1057 (Sieracki Demonstrative No. 39); Tr. 2707:25-2709:9 (Sieracki); 1504:20-24 (Northard) (identifying work order number 12.40.27-03 as PFS capital contributions). However, NSP failed to offer any evidence, such as balance sheets, cash flow analyses, or other documentation indicating that its capital investment in PFS is valueless. Instead, NSP blithely asserts that the value of its interest as a member in the LLC is worthless, and that it should be compensated for the entirety of its investment.

This omission is particularly troubling given that, in February 2006, PFS obtained a license from the Nuclear Regulatory Commission ("NRC") to operate a dry storage facility. Tr. 174:4-8 (Bomberger). Pursuant to 10 C.F.R. § 72.22, its application for such a license was required to contain

> information sufficient to demonstrate to the Commission the financial qualifications of the applicant to carry out, in accordance with the regulations in this chapter, the activities for which the license is sought. The information must state the place at which the activity is to be performed, the general plan for carrying out the activity, and the period of time for which the license is requested. The information must show that the applicant either possesses the necessary funds, or that the applicant has reasonable assurance of obtaining the necessary; funds or that by a combination of the two, the applicant will have the necessary funds available to cover the following:
>
> (1) Estimated construction costs;
>
> (2) Estimated operating costs over the planned life of the ISFSI; and
>
> (3) Estimated decommissioning costs, and the necessary financial arrangements to provide reasonable assurance before licensing, that decommissioning will be carried out after the removal of spent fuel, high-level radioactive waste, and/or reactor-related GTCC waste from storage.

Regardless of how much NSP made in capital contributions to PFS (an amount we do not dispute), there is simply no reason to believe that its investment is worthless. If it were, it is highly questionable whether PFS would have been able to secure the NRC license that it recently obtained.

If anything, the evidence demonstrates NSP's understanding that its investment was not valueless, and that NSP invested in PFS, and continued investing in PFS, long after other utilities had ceased making capital contributions, because its investment had some (undefined) non-zero

value. Several facts confirm this conclusion. First, in March 1994, NSP's employees delivered a presentation to utility representatives for the purpose of enlisting their participation in the PFS venture. Tr. 1494:23-1495:25 (Northard). This presentation included a set of financial assumptions, including the expectation that investors could expect to receive a return of 22 percent on their investment. DX 143 at SN179006; Tr. 1512:10-1514:5 (Northard). Three years later, PFS circulated a business plan and unequivocally stated, "The business plan results in a net profit of $324 million, from which there is profit-sharing of $49 million with the Goshute[ tribe] as defined in the lease." Tr. 1526:21-1527:1 (Northard) (quoting DX 191 at NSP-0003185).[27] Although NSP's witnesses testified that they did not anticipate making a profit from PFS, Scott Northard, the company employee with the most personal involvement in the project, acknowledged that he "could not speak for all the participants in Private Fuel Storage because everyone has a perhaps a different situation." Tr. 1530:14-17 (Northard). Based upon the projections that PFS prepared (with NSP's assistance), it is easy to understand why others might not have shared the views of NSP's witnesses concerning PFS's projected profitability. At a minimum, it is easy to see that even NSP did not view the value of its holding as being worthless, as it now contends.

Second, NSP continued contributing to PFS long after it needed to do so. NSP made all of its capital contributions to PFS after the 1994 legislation passed authorizing the loading of as many as 17 casks at Prairie Island. PX 1057 (Sieracki Demonstrative No. 39); Tr. 2707:25-2709:9 (Sieracki). This timing belies any contention by NSP that it was compelled to contribute

[27] DX 191 was inadvertently not moved into evidence at trial. We have filed an unopposed motion seeking its admission into the trial record.

as much to PFS as quickly as it did. Even more damningly, NSP made $3.485 million in capital contributions to PFS after enactment of legislation in 2003 that authorized NSP to store spent fuel in dry storage at Prairie Island through the expiration of the individual reactor units NRC operating license (2013 for Unit 1 and 2014 for Unit 2) and removed from the Legislature primary responsibility for authorizing additional dry cask storage at nuclear generating facilities. PX 198 at KRGNSP11390 (Minn. Laws 2003, Ch. 11, H.F. No. 9, Art. I, Sec. 2, codified at Minn. St. § 116C.83); PX 1057 (Sieracki Demonstrative No. 39); DX 318; Tr. 2707:25-2709:9 (Sieracki), 277:24-279:11 (Bomberger). If NSP were correct that it contributed to PFS because it needed to, it would have ceased making capital contributions when it received such a broad authorization from the Minnesota Legislature to expand its dry storage capacity.

Further, NSP's asserted reason for continuing to make contributions after 2003 – that the 2003 legislation required it to pay $16 million per year for each cask that remained at Prairie Island, and that moving the fuel to PFS would prevent it from having to pay this fee, Pl. Post-Tr. Br. at 73 – is belied by the terms of that statute. The 2003 legislation requires the payment of fees to the renewable development fund not as long as the casks remained at Prairie Island, but "as long as the [Prairie Island] plant is in operation." PX 198 at KRGNSP11392-33 (Minn. Laws 2003, Ch. 11, H.F. No. 9, Art. 2, Sec. 1, subd. 1 codified at Minn. St. § 116C.779, subd. 1). NSP had no need to continue contributing to PFS beyond 2003 and simply did so of its own volition, presumably because of its belief that its investment had value.

Finally, the evidence demonstrates that NSP could easily have ceased making capital contributions, with no effect upon its ability to rely upon PFS as an insurance policy, as it now claims. Thirty-three utilities, including NSP, made contributions to phase I of PFS, beginning in

or about 1995. However, only 12 utilities, including NSP, subsequently made contributions during phase II (preliminary design work and licensing study), and only eight, including NSP, made contributions during phase III (preparation of NRC license). NSP wound up contributing more to the project than any other utility, yet the testimony was uncontroverted that PFS had ample room to store the spent fuel not only of its member utilities, but also of its non-member customers, and never turned away a non-member customer because equity members had reserved all the space at the proposed PFS facility. Tr. 284:20-285:5 (Bomberger), 1506:7-1511:25, 1537:2-1538:5 (Northard). As this testimony confirms, NSP contributed to PFS because it wanted to, not because it needed to. The Government is not responsible for this speculative investment decision.

In short, the facts belie NSP's contention that its capital contributions to PFS are valueless. Because NSP has failed to prove with any certainty the extent of any "damage" caused by its investment in PFS, its claim for these capital contributions necessarily fails.

iii. Effect Upon Damages Claim

The effect of NSP's failure to prove that the expenses it incurred in connection with PFS is quantified in the testimony and demonstrative exhibits of Larry Johnson. As Mr. Johnson testified, an adjustment to NSP's claim of $12,359,577 for NSP's claims in connection with each of Prairie Island and Monticello ($24,719,154 in total) is warranted. Tr. 4931:11-4932:12, 4940:21-4941:9 (Johnson); DX 303A (Johnson Demonstrative No. 31).

E. NSP Cannot Establish Causation For Certain Costs That It Allegedly Incurred For Internal Labor And "Overheads"

i. NSP's Internal Labor And Overheads Were Not Incremental

NSP cannot meet its burden of establishing causation with respect to certain costs associated with internal labor and overheads. Because these costs would have been incurred even if DOE had performed under the Standard Contract, they are not incremental to the partial breach and, therefore, not appropriately included as damages.

"It is settled . . . that a [party] is not entitled to recover 'expenses which would properly have been incurred regardless of the [breach].'" Boyajian v. United States, 423 F.2d 1231, 1236 (Ct. Cl. 1970) (quoting Saddler v. United States, 287 F.2d 411, 415 (Ct. Cl. 1961)). Thus, NSP only may recover for labor performed by its employees to the extent that it can show that these labor costs represent an incremental cost to NSP. See Wilner v. United States, 23 Cl. Ct. 241, 258, 262-63 (1991) (allowing recovery for hours that would not have been worked "but for" the delay); Wilson v. Marquette Elecs., Inc., 630 F.2d 575, 586 (8th Cir. 1980) (rejecting claim that $40,000 in "lost time" for employee labor was recoverable because no showing that company lost any money because of time employee was forced to spend upon project); AES Tech. Sys., Inc. v. Coherent Radiation, 583 F.2d 933, 943 (7th Cir. 1978) (plaintiff not entitled to damages where breach did not "prohibit . . . employees from working on other projects").

As part of its claim, NSP has included all internal labor costs that were billed to any allegedly damages-related project. These costs were added to the claim without regard to the job duties of the employees performing the tasks, to the scheduling of the tasks, or to the amount of time spent by each employee upon a damages-related project. Instead, any time that was billed to

a project was charged to the damages claim as well. Tr. 4909:20-4910:14 (Johnson), Tr. 3064:20-3065:7 (Metcalfe).

This analysis encompassed a significant amount of labor costs that would have been incurred with or without the partial breach. As our accounting expert, Larry Johnson, concluded upon the basis of a comprehensive analysis of a type that NSP's experts did not perform, four NSP employees spent substantial periods of time working on projects that were designated as breach-related. Further, some employees were required to work overtime on breach-related projects. Tr. 4912:13-4913:8, 4915:23-25, 4936:6-15 (Johnson). We do not contest that this work would not have been required in the absence of a partial breach, and are not contesting the inclusion of this work in NSP's damage calculation. However, Mr. Johnson also concluded that NSP's computation of labor costs included the work of more than 50 NSP employees who worked an hour or less annually over an eight-year period on breach-related projects. Half of the 200 employees whose work was included within NSP's internal labor costs worked fewer than five hours annually on breach-related projects, and the more than 200 employees who charged time to breach-related projects (other than the four whose time we do not challenge) averaged working less than one hour per week on breach-related projects. Tr. 4913:9-4914:13 (Johnson).

As Mr. Johnson explained, the labor costs for many if not all of these employees, which total $1,945,369, would have been incurred with or without a partial breach because "it's inconceivable . . . that you wouldn't have had th[ose] employees around for the whole year and pay them exactly what you pay them." Tr. 4909:20-4911:23, 4935:17-4936:15 (Johnson); DX303A (Johnson Demonstrative Nos. 24, 31). Dr. Neuberger similarly testified that the additional work performed as a result of the partial breach may have imposed some unspecified

hardship upon employees, but did not impose a cost upon the company. Tr. 4638:14-4640:7 (Neuberger) ("If NSP doesn't pay that employee more, [it hasn't] been damaged."), 256:2-10 (Bomberger) (acknowledging that NSP had not hired new personnel as a result of the delay in performance).[28] After the overtime costs and the hours worked by employees who spent a significant amount of time upon breach-related activities are factored out, NSP's claim for internal labor costs does not in any way reflect damages that are incremental to the partial breach.

NSP relies upon Judge Lettow's determination in TVA that the assignment of employees to breach-related projects "deprived [the company] of the ability to employ those resources on other projects." Pl. Post-Tr. Brief at 90 (citing TVA, 69 Fed. Cl. at 539). NSP's reliance is misplaced. First, as discussed above, the analysis in TVA is premised upon the notion that, in a spent fuel case, the proper inquiry is on mitigation rather than causation. This analysis places the burden of proof upon the wrong party and inappropriately places the focus on the reasonableness of the non-breaching party's conduct as opposed to the incremental nature of the loss. Second, as Larry Johnson testified, there is no evidence in the record to support a finding of opportunity cost to NSP had the employees not been engaged in the damages-related projects. Tr. 4916:6-21 (Johnson). These costs are not incremental simply because NSP so asserts. Instead, NSP bears

---

[28] Tellingly, NSP made the same point as Mr. Johnson during the CON proceedings, where the cost to be borne by NSP ratepayers was a significant concern. Laura McCarten testified before the PUC that an accurate assessment of the cost of the dry storage facility, and specifically the cost of handling casks, should not include cask loading costs performed by existing staff, other than overtime costs. DX 104 at NSP025 0383; Tr. 687:1-25 (McCarten), 4919:13-4920:18 (Johnson). This episode reflects yet another example of NSP taking a position in legal proceedings before the PUC, obtaining a benefit upon the basis of that position, and subsequently abandoning that position.

the burden of establishing that each of the costs asserted in damages is incremental to DOE's partial breach and must do so with admissible evidence. NSP has simply not met that burden.

NSP's claim for $981,512 in overheads fail for a similar reason, the only difference being that none of these costs are incremental to the partial breach. Lisa Perkett, NSP's director of capital asset accounting, acknowledged without qualification that, in the absence of a partial breach, what is currently charged as overhead for dry storage construction would simply have been allocated to a different cost center. Tr. 1859:15-16, 1874:1-24 (Perkett). Because NSP would have incurred these same overheads in the absence of a partial breach, they are not incremental to the partial breach and therefore not properly included as damages. Tr. 4925:3-4930:18 (Johnson) (noting, among other things, that in the "but for" world "[t]he same costs would have been there, they just would have been allocated differently").

ii. Effect Upon Damages Claim

The effect of NSP's failure to prove that its internal labor and overhead costs were incremental to the partial breach is quantified in the testimony and demonstrative exhibits of Larry Johnson. As Mr. Johnson testified, an adjustment to NSP's claim of $1,945,369 (consisting of $1,860,337 for Prairie Island and $85,032 for Monticello) is warranted for non-incremental internal labor costs. Tr. 4909:20-4911:23, 4935:17-4936:15 (Johnson); DX 303A (Johnson Demonstrative Nos. 15-16, 25). In addition, an adjustment of $981,512 (consisting of $787,875 for Prairie Island and $193,637 for Monticello) is warranted for non-incremental "overheads." Tr. 4924:23-4925:20, 4938:10-20 (Johnson); DX 303A (Johnson Demonstrative Nos. 18-20, 28).

F. Additional Issues Affecting Costs That Would Have Been Incurred Had DOE Timely Commenced Performance

1. NSP Would Have Expended $30,679,574 On A Dry Storage Facility In The "But For" World

As described above, the evidence was overwhelming that, even in the "but for" world, NSP would still have constructed a dry storage facility and incurred storage costs through the date of NSP's first acceptance in 1999. Because DOE would have assumed responsibility for accepting spent fuel on that date pursuant to an approved DCS that constitutes a binding commitment between the parties, we do not contest NSP's entitlement to post-1999 storage costs.[29] However, all costs related to the licensing, construction, and loading of casks up until DOE acceptance in 1999 are the responsibility of NSP. The cost of the construction, licensing, maintenance, and loading of such a dry storage facility was, based upon the analysis of Mr. Johnson, $30,679,574. Tr. 4894:2-4908:23; DX 303A (Johnson Demonstrative Nos. 8-12). This calculation conforms with Mr. Leonard's uncontroverted testimony that NSP would have to incur a number of non-variable costs that were not dependent upon the size of the dry storage facility, Tr. 4044:13-4047:25 (Leonard); DX 302A (Leonard Demonstrative No. 16) (referencing NRC fees, operating and maintenance costs, training videos, and a fiber optic security cables as costs that would have been incurred at a smaller facility), and Dr. Neuberger's calculation that, in the "but for" world where DOE performs in accordance with the 1991 ACR, NSP would have been

[29] As we will discuss below, to the extent that the Court believes that the DCSs are not commitments and that the parties have not agreed upon any contractually binding schedule, the Court has no basis upon which to impose an alternative schedule into the Standard Contract, as it would then be creating a contract to which the parties never agreed.

required to load seven casks at Prairie Island before DOE arrived. Tr. 4677:6-4678:10 (Neuberger).

The $30,679,574 adjustment includes the cost of an auxiliary building crane. The evidence was clear that the cost NSP incurred for upgrading this would have been incurred even if DOE had not partially breached the contract. Laura McCarten acknowledged as much in 1991 when, in testimony before the PUC in connection with the CON, she refuted the testimony of a witness who claimed that the "true" cost of the dry storage facility should include the cost of obtaining a license from the NRC for such a crane. In language from which NSP yet again seeks to retreat, McCarten stated under oath:

> I do not agree. Even if the spent fuel storage facility is not built, this crane would have to be modified to handle shipping costs to remove spent fuel from the site. This need exists, regardless of how much fuel is stored at the Prairie Island plant site or whether the spent fuel is stored only in the pool or in both the pool and the proposed spent fuel storage facility.

DX 104 NSP025 0382; Tr. 682:9-683:5 (McCarten). In 1991, when it was in NSP's interests to convince the PUC that the cost of a dry storage facility would not overburden its ratepayers, NSP was content to admit that the auxiliary building crane was something that NSP would have to upgrade with or without a partial breach. Now that the upgrade is paid for, NSP's position has changed.

John Leonard reached the same conclusion during his testimony as Ms. McCarten did 15 years earlier. Mr. Leonard explained that, had DOE performed, NSP would have needed to select a cask of at least the same dimensions as the TN-40 casks that it used for its dry storage facility and that, because of limitations caused by the height of the cask, the depth of the pool, and the consequent unavailability of "impact-limiters" to cushion a blow in the event that a cask was

dropped, NSP would need to employ a single-failure proof crane. Tr. 4067:22:14-4073:24 (Leonard); DX 302A (Leonard Demonstrative No. 30); see also Tr. 1831:14-1836:11 (McKeown) (explaining that impact limiters make the overall height of the cask greater, thus decreasing the distance between the top of the cask and the surface of the pool and limiting the shielding provided by the water when transferring spent fuel over the cask) . This testimony was consistent with that of Jon Kapitz, who assumed that, in the event of DOE performance, the cask that DOE would use would be similar to the TN-40. Tr. 1040:12-17 (Kapitz); see also Tr. 1836:24-1837:7 (McKeown) (agreeing that, if DOE had arrived with a cask of similar dimension to the TN-40, a crane upgrade would be "the appropriate path for that particular technology"). Because the crane would have been upgraded even in the "but for" world, the $3,251,440 cost of the upgrade is properly included in the cost ($30,679,574) of the seven-cask dry storage facility for which NSP is responsible. Tr. 4906:2-20 (Johnson); DX 303A (Johnson Demonstrative No. 11).

2. An Offset Is Warranted For The Cost That NSP Avoided Of Loading Casks To DOE

An offset for the cost of loading casks to DOE upon acceptance (a task that NSP would have been required to perform in the event of timely performance, but, as a result of the breach, was not required to perform) has been improperly excluded from NSP's claimed damages. At the eleventh hour, NSP's damages experts decided to exclude from their damages calculation their prior recognition of an offset for the cost of loading casks to DOE that would have been necessary in the "but for" world. This reversal of the offset was unwarranted.

Experts on both sides agreed that the conceptual framework for measuring the economic harm that NSP sustained as a result of the partial breach was to subtract the costs that would have

been incurred in the "but for" world from the costs that were in fact incurred in the actual world. Tr. 2724:17-24 (Sieracki); 4879:11-18 (Johnson). This calculus includes a recognition that certain expenses that would be incurred in the "but for" world may be saved in the event of a partial breach. Tr. 2731:25-2732:13 (Sieracki) (testimony of plaintiff's damages expert acknowledging consideration of "[a]ny required offsets for nonbreach costs, those costs that would have been incurred by NSP had DOE honored its contractual obligation and begun disposing of spent fuel per the Standard Contract"). It also explains why NSP has included as an offset from its damage claim for the cost of a third rerack; although NSP asserts that it would have performed a third rerack in the "but for" world, its damages calculation contains an offset for the cost of the rerack that, because of the partial breach, it was not required to perform.

In the original damages model presented by NSP, the cost of loading casks to DOE in the "but for" world was included as a credit, as was the cost of a third rerack. This inclusion was supported by the testimony of Jon Kapitz, who testified that the cost of loading casks to DOE would be substantially similar to the cost that NSP actually incurred in loading the casks from the spent fuel pool and transporting them to the Prairie Island dry storage facility. Mr. Kapitz even testified that he believed that, for this reason, the costs of loading to the dry storage facility had been "taken off as a credit." Tr. 1045:23-1046:14. In fact, no such credit was taken, and NSP's experts removed the offset from its damages claim because NSP determined, as it now argues, ascertaining what the cost of loading casks to DOE is "too speculative." PX 200 at 2; Tr. 2645:10-2646:24 (Sieracki).

NSP's argument is unavailing. First, as discussed above, it is plaintiff's burden to prove the "but for" world with reasonable certainty, and the mere fact that such a world may be difficult

to prove does not relieve it of this obligation. Second, NSP's removal of the offset for DOE loading costs contravenes its own experts' methodology for determining damages and its specific allowance for expenses saved as a result of a breach. Finally, the idea that estimating the cost of DOE loading is too speculative is belied by the testimony of Jon Kapitz, who specifically represented that he envisioned that the cost would be nearly the same as the cost NSP actually incurred in loading its casks to the dry storage facility, and in fact believed that an offset had been taken for this amount. Inasmuch as NSP was relieved of the obligation to pay the cost of loading casks to DOE that it would have incurred in the "but for" world (which cost are equivalent upon a cask-by-cask basis to the cask loading costs NSP actually expended), DOE is entitled to an offset of $1,031,125 (consisting of $984,815 for Monticello and $46,310 for Prairie Island). Tr. 4921:2-4924:22, 4936:16-4937:2 (Johnson); DX 303A (Johnson Demonstrative Nos. 16-17, 26-27).

3. The Government Is Not Responsible For The Costs That NSP Incurred In Obtaining A Transportation License For Its TN-40 Casks

Under the terms of the Standard Contract, DOE is required to provide transportation casks suitable for use within the DOE acceptance program. PX 56 at Art. V.B.2. NSP has presented no evidence or explanation as to why it has invested additional sums to obtain a transport license for casks that, under the terms of the Standard Contract, need only be placed in dry storage, or that this additional investment was foreseeable to DOE at the time of the execution of the Standard Contract. See Sacramento Mun. Util. Dist. v. United States, 70 Fed. Cl. 332, 373-74 (2006) (concluding that it was not foreseeable to DOE at the time of contracting that a breach would implement "dual purpose" technology to store spent fuel and that, as a result,

the costs of obtaining casks suitable for transportation were not recoverable). As set forth in the testimony and demonstrative exhibits of Larry Johnson, this conclusion compels a downward adjustment of $109,900 from NSP's claim. Tr. 4930:23-4931:10 (Johnson) DX 303A (Johnson Demonstrative No. 21).

4. An Adjustment Is Warranted For Dry Storage Costs At GE-Morris

Finally, an adjustment of $280,131 is warranted to NSP's claim for increased security costs incurred in connection with spent fuel from Monticello stored at GE-Morris. As the workpapers of NSP's experts make clear, even in the "but for" world NSP would have been required to store fuel at GE-Morris after these security enhancements (undertaken after September 11, 2001) were implemented. See Tr. 4939:5-4940:20 (Johnson); DX 303A (Johnson Demonstratives Nos. 29-30); PX 8 at KRGNSP13704. NSP presented no evidence that these costs would not have been incurred absent a partial breach and, as a result, they are not properly included in its damages calculation.

## III. NSP'S CLAIM FOR ITS "COST OF CAPITAL" IS A LEGALLY UNSUPPORTED ATTEMPT TO RECOVER PREJUDGMENT INTEREST

### A. Interest Is Not Recoverable Against The United States Government Under The Standard Contract

NSP inflates its damages claim by $54.5 million, which it categorizes as "cost of capital." NSP asserts that its cost of capital adjustment is "akin to" the type of interest award permitted by the Federal Circuit in Wickham Contracting Co. v. United States, 12 F.3d 1574 (1994). Pl. Br. at 24. It is mistaken.

Pursuant to 28 U.S.C. § 2516(a), a party may not recover interest upon a claim against the United States in the Court of Federal Claims unless specifically permitted under a contract or Act

of Congress. The "no-interest rule is an aspect of the basic rule of sovereign immunity." England v. Contel Advanced Sys., Inc., 384 F.3d 1372, 1379 (Fed. Cir. 2004). Therefore, "[i]nterest is not recoverable in a suit against the government unless it has expressly provided for its recovery." Jetco, Inc. v. United States, 11 Cl. Ct. 837, 850 (1987); see Craft v. United States, 233 F.3d 358, 374 (6th Cir. 2000) ("A plaintiff may not recover interest from the federal government in the absence of an express waiver of sovereign immunity from suit."); District of Columbia v. United States, 67 Fed. Cl. 292, 340 (2005) ("[s]tatutory entitlement to prejudgment interest or a cost escalation factor must be established for the United States to be held liable for these types of claimed costs").

"There is no doubt as to the historical existence of an entrenchment immunity of the Government from prejudgment interest . . . ." Blake v. Califano, 626 F.2d 891, 893 (D.C. Cir. 1980). In fact, the prohibition on awarding interest against the Government is so well established in this Court that it has been referred to as "the ancient doctrine disallowing interest against the Government." Singer Co. Librascope Div. v. United States, 215 Ct. Cl. 281, 284, 568 F.2d 695, 698 (1977). "In creating the Court of Claims, Congress retained the Government's immunity from award of interest, permitting it only where expressly agreed to under contract or statute." Library of Congress v. Shaw, 478 U.S. 310, 317 (1986). Thus, a provision requiring the Government to pay interest "must be affirmative, clear-cut, [and] unambiguous." United States v. Thayer-West Print Hotel Co., 329 U.S. 585, 590 (1947).

The no-interest rule applies "broadly to claims for interest," Contel Advanced Sys., Inc., 384 F.3d at 1379, and "extends to any form of award for the time value of money that has not been authorized by the express terms of the transaction sued on." Castle v. United States, 48

Fed. Cl. 187, 217 (2000), aff'd in relevant part, 301 F.3d 1328 (Fed. Cir. 2002) (emphasis added). Indeed, "the character or nature of 'interest' cannot be changed by calling it 'damages,' 'loss,' 'earned increment,' 'just compensation,' 'discount,' 'offset,' or 'penalty,' or any other term, because it is still interest and the no-interest rule applies to it." United States v. Mescalero Apache Tribe, 207 Ct. Cl. 369, 389, 518 F.2d 1309, 1322 (1979).

Neither the Nuclear Waste Policy Act of 1982, 42 U.S.C. §§ 10101-10270, nor any other act of Congress has mandated that the United States pay interest on damages claims.[30] Further, no provision of the Standard Contract provides for the payment of interest on damages claims. See Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336, 1340 (Fed. Cir. 2000). In another spent fuel case – litigated by the same plaintiff's counsel – this Court considered, and rejected, a claim for interest identical to plaintiff's claim here. Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639 (2004), aff'd, 422 F.3d 1369 (Fed. Cir. 2005). In Indiana Michigan, the plaintiff stated all costs "both in nominal terms, as of the day the costs were or will be incurred, and in present value," with present value "add[ing] an escalation factor for past costs." Id. at 653. This Court found that the application of "plaintiff's average after-tax cost of capital to damages incurred each year . . . is prejudgment interest, which is not allowable against the United States absent a specific waiver of sovereign immunity." Id. at 660. Because, as in

---

[30] Although the Contract Disputes Act ("CDA"), 41 U.S.C. §§ 601-613, waives the Government's sovereign immunity with regard to interest on certain claims, see Brookfield Constr. Co. v. United States, 228 Ct. Cl. 551, 559, 661 F.2d 159, 165 (1981) ("Because there can be no award of interest against the United States in the absence of a 'contract . . . or Act of Congress expressly providing for payment thereof,' 28 U.S.C. § 2516(a) (1976), the only way plaintiff can recover interest is if the Contract Disputes Act provides for it."), the Standard Contract is not subject to the CDA. Maine Yankee, 225 F.3d 1336, 1340 (Fed. Cir. 2000).

Indiana Michigan, there has been no contractual or congressional waiver of sovereign immunity, as a matter of law, NSP is subject to the no-interest rule.

B. NSP's Cost Of Capital Damages Constitute Interest In Violation Of The No-Interest Rule

In direct violation of the no-interest rule, plaintiff claims $54.5 million of damages that are attributable solely to an economic adjustment utilizing NSP's "weighted average cost of capital" ("WACC"). This adjustment is an interest calculation that accounts for the period of time that elapsed between the incurrence of plaintiff's claimed damages and December 31, 2005, at or near the time when trial was originally scheduled. Tr. 3075:19-3076:7. However, the damage cut-off date in this case is December 31, 2004. The mere fact that NSP has assigned a different date for the recovery of its cost of capital illustrates that this component of its damages is different than the rest of the damages that it seeks, and that it simply seeks compensation for the time value of money, as a litigant would seek in litigation between private parties. The cost of capital is not interest as damages, which in some cases might arguably be allowable against the Government, but interest on damages, which, in the absence of a specific waiver, is not.

NSP relies upon the Court's decision in TVA for the proposition that funds designated as allowance for funds used during construction ("AFUDC") are recoverable against the Government. Pl. Post-Tr. Br. at 99. However, in TVA, the Court awarded AFUDC costs based upon the premise that "a contractor may recover interest actually paid on funds borrowed." 69 Fed. Cl. at 541 (citing Wickham Contracting Co. v. United States, 12 F.3d 1574, 1582-83 (1994)). Unlike TVA, where the utility owner was a public quasi-governmental corporation that had no equity and therefore was required to fund all capital projects through cash flows or debt, id., NSP made no showing that it borrowed any money to fund the cost of construction. Tr.

4889:1-7 (Johnson). Further, to the extent that NSP's WACC includes a return on equity component, our accounting expert, Larry Johnson, offered uncontroverted evidence that this component merely reflected a paper loss. Tr. 4889:8-4890:20 (Johnson) (explaining that this component is not properly characterized an element of cost). Indeed, both Mr. Johnson and Dr. Neuberger agreed that, in the absence of proof of any borrowings, NSP's cost of capital damages were conceptually and practically identical to prejudgment interest. Tr. 4664:21-4667:3 (Neuberger), 4892:4-20 (Johnson).

Moreover, there is no reason to apply NSP's cost of capital adjustment to all of the damages in this case. As NSP itself points out, AFUDC "includes the net cost for the period of construction of borrowed funds used for construction purposes." Pl Post-Tr. Br. at 99 (citing 18 C.F.R. pt. 101, ¶ 3.A(17)). However, the adjustment that NSP calculated using WACC is applied to every category of costs included in the plaintiff's claim and not simply during the time period specified by the definition of AFUDC. Instead, NSP's adjustment using WACC is applied from the moment that a dollar is spent through the date through the original trial date (and, as noted above, even beyond the damages cut-off set by the Court).

NSP's WACC "gross-up" merely represents an economic adjustment applied to the total amount of nominal damages it claims to have incurred to compensate NSP for a loss in the time value of money. This claim is little more than a thinly veiled claim for prejudgment interest and should be denied in its entirety.

C. Even If NSP Was Correct That Cost of Capital Is The Same As AFUDC, It Has Identified No Waiver Of Sovereign Immunity That Would Allow Such Recovery

Even if NSP was correct that its cost of capital is somehow comparable to allowable AFUDC, it has failed to identify any waiver of sovereign immunity, either in a statute or the Standard Contract, that would allow it to recover such interest. "[L]ike interest on substantive claims against the government, '[i]nterest on bank loans made because of financial stringency resulting from a breach by the Government of a contract between it and the borrower is not recoverable.'" Contel Advanced Sys.,Inc., 384 F.3d at 379 (quoting J.D. Hedin Constr. Co. v. United States, 456 F.2d 1315, 1330 (Ct. Cl. 1972)); see Marshall v. United States, 164 F. Supp. 221, 224 (Ct. Cl. 1958) ("interest on borrowed money is not recoverable in suits against the Government unless it is called for in the contract itself or in the governing statute"). Where interest charges resulting from a contract breach are recoverable against the Government, it is only where a statute or contract provision contains language that waives the Government's sovereign immunity for such a claim. The cases that plaintiff cites to support its assertion that interest is recoverable against the Government rely upon a line of cases involving a contract clause – the "Changes" clause contained in most Federal procurement contracts – authorizing recovery of interest. This Court and its predecessor, the Court of Claims, have held in the context of equitable adjustments under the "Changes" clause that, "[a]lthough interest on equity capital is not recoverable, a contractor may recover interest actually paid on funds borrowed because of the government's delay in payments and used on the delayed contract," Wickham Contracting Co. v. Fischer, 12 F.3d 1574, 1582 (Fed. Cir. 1994), reasoning that the "Changes"

clause authorizes such a recovery. Bell v. United States, 404 F.2d 975, 984 (Ct. Cl. 1968).[31] Nevertheless, without a "Changes" clause or similar contractual provision, the statutory provision barring recovery of interest from the Government, 28 U.S.C. § 2516(a), "and its policy" continue to "apply to demands for damages in 'breach' claims against the United States . . . ." Bell, 404 F.2d at 984. Here, the Standard Contract contains no "Changes" or similar clause, and NSP is seeking partial breach damages, not an equitable adjustment. NSP has identified no waiver of sovereign immunity allowing for the recovery of the interest awarded here. "Courts lack the power to award interest against the United States on the basis of what they think is or is not sound policy." Shaw, 478 U.S. at 321. As a result, the Wickham decision is inapposite to the NSP's claim for interest here.

4. Effect Upon Damages Claim

The effect of the exclusion of NSP's cost of capital from damages is quantified in the testimony and demonstrative exhibits of Larry Johnson. As Mr. Johnson testified, an adjustment of $54,496,969 to NSP's damages claim is required. Tr. 4892:21-4894:9 (Johnson); DX 303A (Johnson Demonstrative No. 5).

[31] Although the Federal Circuit's decision in Wickham does not specifically mention the "Changes" clause, it is clear that a "Changes" clause was included in that Federal procurement contract, pursuant to the mandatory language in the Federal Acquisition Regulation ("FAR") that requires the inclusion of that clause in all contracts subject to the FAR. See FAR § 43.205, 48 C.F.R. § 43.205; see also Wickham Contracting Co. v. GSA, GSBCA No. 8675, 92-3 BCA ¶ 25040, 1992 WL 88326, at *1 (GSBCA 1992) (discussing 110 change orders upon which claims were based), aff'd, 12 F.3d 1574 (Fed. Cir. 1994).

## IV. NSP HAS FAILED TO ESTABLISH THAT DOE WAS OBLIGATED TO ACCEPT SNF AT A RATE SUFFICIENT TO PRECLUDE THE NEED FOR ADDITIONAL AT-REACTOR STORAGE AFTER 1998 OR AT A SIMILAR RATE

### A. NSP Cannot Recover Damages Without Demonstrating Entitlement To The Rate Of Acceptance That It Advocates

It is well settled in this circuit that to establish damages in a breach of contract action the non-breaching party must establish a baseline setting forth the breaching parties obligations under the contract. "Because the purpose of a damages award is to put the non-breaching party 'in as good a position as [it] would have been in had the breaching party fully performed,' the logical starting point for a damages analysis is an understanding of the breaching party's obligations under the contract." Rumsfeld v. Applied Cos., 325 F.3d 1328, 1336 (Fed. Cir. 2003) (brackets in original) (quoting Wells Fargo Bank, N.A. v. United States, 88 F.3d 1012, 1021 (Fed. Cir. 1996)); PG&E, 73 Fed. Cl. at 386 ("Plaintiff bears the burden of 'establishing what might have been' with reasonable certainty had defendant performed the Standard Contract.").

NSP argues that it is somehow excused from this obligation because its damages through December 31, 2004, do not vary upon the rate of acceptance. See Pl. Post-Tr. Br. at 92. NSP's assertion is erroneous. As a factual matter, NSP cannot prove that the delay in performance caused it to build a dry storage facility without demonstrating, as part of its claim, the rate that it advocates. As discussed above, the uncertainty that NSP faced in assessing its dry storage needs in the late 1980s was necessarily influenced by the fact that the Standard Contract did not call for promulgation of a rate until 1991. PX 56, Art IV.B.5, Art. V.B.1. Absent a guarantee – in the form of contractual entitlement to a rate that would preclude additional at-reactor storage after 1998 – that the rate that DOE would eventually adopt would ensure Prairie Island's continuous

operation after 1998, a rational decisionmaker could not possibly even have considered performing an expensive rerack that may not have generated enough space to satisfy NSP's spent fuel storage needs. Thus, to prove that it would not have needed any dry storage in the "but for" world, NSP must establish that in that "but for" world, DOE was obligated to begin accepting NSP's spent fuel before NSP would have run out of wet pool storage space. Further, to recover its storage cask costs, NSP must establish the number of storage casks that it would have needed in the "but for" world, a number that is wholly dependent upon the rate of spent fuel acceptance.

NSP's argument also bypasses its legal obligation, as plaintiff, to establish the basis upon which DOE was obligated to perform at any particular rate of acceptance. As we established at trial and as is plain from its language, the Standard Contract does not does not include a specific rate of acceptance. PX 56; Tr. 3919:9-24 (Mills), 3796:14-16 (Morgan). In our pre-trial briefing, we discussed how, even though the Standard Contract does not contain a rate of SNF acceptance, the Contract contains a mechanism by which the parties would define, through agreement pursuant to the terms of the contract, the quantity of SNF that DOE would have accepted, when DOE would have accepted that SNF, and from which utility the SNF would have been accepted had DOE begun timely performance. As we established in our pre-trial brief and at trial, this mechanism was implemented in 1991 and worked until DOE finally announced that it could not meet the 1998 acceptance date at the MRS. Going forward, DOE will use the mechanism that generated the 1991 ACR and subsequent DCS submission and approval process to define the rate of acceptance in the future. Although the Court of Claims has previously observed that, "[n]ormally, the task of supplying a missing, but essential, term (for an agreement otherwise sufficiently specific to be enforceable) is the function of the court," David Nassif

Assocs. v. United States, 214 Ct. Cl. 407, 423, 557 F.2d 249, 258 (1977), the limitation upon the Court's ability to supply its own term is clearly stated: "for an agreement otherwise sufficiently specific to be enforceable." Id.

A court cannot make contracts for the parties. To be valid and enforceable, "a contract must have both consideration to ensure mutuality of obligation . . . and sufficient definiteness so as to 'provide a basis for determining the existence of a breach and for giving an appropriate remedy.'" Ridge Runner Forestry v. Veneman, 28 F.3d 1058, 1061 (Fed. Cir. 2002) (citations omitted). If an agreement is missing one or more essential terms, an agreement to agree upon those terms is unenforceable because it lacks mutuality of intent and sufficient definiteness to determine the rights and liabilities of the parties. See Modern Sys. Tech. Corp. v. United States, 979 F.2d 200, 204 (Fed. Cir. 1992); Bel Pre Health Care Center, Inc. v. United States, 24 Cl. Ct. 495, 496 (1991) ("[i]f an essential term, such as the quantity term, has been omitted then there can be no basis for deciding whether the agreement has been broken; the definiteness necessary for enforceability is lacking"), aff'd, 980 F.2d 745 (Fed. Cir. 1992) (table); Transamerica Equip. Leasing Corp. v. Union Bank, 426 F.2d 273, 274 (9th Cir. 1970) ("[w]here an agreement is not sufficiently definite to enable a court to give it an exact meaning or where an essential element is reserved for future agreement of both parties, a legal obligation cannot result"). "Courts refuse to enforce agreements that contain indefinite promises or terms they deem essential because judicial clarification of the uncertainty entails great danger of creating intentions and expectations that the parties themselves never entertained." Neeley v. Bankers Trust Co. of Tex., 757 F.2d 621, 628-29 (5th Cir. 1985); see Mays v. Trump Indiana, Inc., 255 F.3d 351, 357-58 (7th Cir. 2001) ("mere agreement to agree does not a binding contract make" without agreement upon "all

essential terms that are to be incorporated in the document"); Shann v. Dunk, 84 F.3d 73, 78-81 (2d Cir. 1996) ("[w]e believe the issue of Shann's liability for the deferred payments was of such importance that, if the district court finds the parties failed to agree on it, the court would be required to void the contract for absence of an essential term").

Obviously, as indicated in the Court of Claims' decision in Nassif, certain terms of a contract that are "essential" to it in some respects may, in certain circumstances, be identified by the Court, which must consider what "the parties would have agreed upon at the time of their initial . . . negotiations . . . ." David Nassif, 214 Ct. Cl. at 376, 644 F.2d at 7.[32] However, at a certain point, the missing term becomes so essential to the formation of the contract that the Court, if it supplies the missing term itself, creates a contract to which the parties had never agreed. In this case, the "missing" term that NSP seeks to have the Court impose upon the Standard Contract is one of the central aspects of the Standard Contract and materially increases the past damages that NSP could recover. Moreover, the Court's ruling upon the acceptance term will likely control the future damages to which NSP may be entitled. This enormous variance in the effect of the acceptance schedule term upon the parties' rights, obligations, and damages cannot be said to be minor and, in fact, is one of the most essential terms of the Standard Contract. To the extent that the Court disagrees with our demonstration that the schedule provisions of the Standard Contract and the approved DCSs identify the parties' obligations in this case, the Court cannot merely impose its own view of a reasonable schedule term. A rejection of our position would effectively render the Standard Contract too indefinite to

---

[32] Here, as established by the administrative record developed in response to the proposed rule that generated the terms of the Standard Contract, the utilities suggested that term, but DOE rejected it.

enforce. See Massengill v. Guardian Mgt. Co., 19 F.3d 196, 202 (5th Cir. 1994) ("When a writing does not show the parties' agreement on a minor contract term, the reviewing court may supply a reasonable interpretation. . . . But essential contract terms may not be supplied by a court. 'If any essential term is left unresolved, there is simply no contract and no obligation on the parties.'" (emphasis added; citation omitted; applying Mississippi law)); see also Coyle's Pest Control, Inc. v. Cuomo, 154 F.3d 1302, 1306 (Fed. Cir. 1998) (refusing to read "reasonable" term into contract, court found contract unenforceable as indefinite quantity contract because it lacked minimum quantity term).[33]

As we established at trial, the parties followed the contract's mechanism for a significant period of time, and, as a result, a schedule exists that the Court should view as the contractual "schedule" for purposes of assessing damages: the schedule identified in NSP's approved DCSs. However, NSP ignores those approved DCSs and asks the Court, essentially, to impose some other schedule that is not tied to any contract language or contract requirements. NSP has relied upon various program documents, including the 1983 Draft Mission Plan and several subsequently issued mission plans as the source of DOE's obligation to accept spent fuel at a particular rate. Pl. Post-Tr. Br. at 13. NSP then ignores its obligation to establish a rate of acceptance tied to the contract in this matter, ostensibly because the rates of acceptance set forth

[33] It is true that the Federal Circuit has found that a contract term which allows for future negotiation "impliedly places an obligation on the parties to negotiate in good faith," Aviation Contractor Employees, Inc. v. United States, 945 F.2d 1568, 1572 (Fed. Cir. 1991), and that, where the contract and applicable regulations provide guidelines for negotiations of future agreements, the Court may "determine whether or not the government negotiated according to the contract." City of Tacoma, Dep't of Public Utilities v. United States, 31 F.3d 1130, 1132 (Fed. Cir. 1994). However, that review does not provide the Court with the ability to create a contract for the parties where the "missing" terms are so essential to the central purpose of the contract that the absence of the terms renders the contract too indefinite to enforce.

in certain program documents (such as the 1984 Draft Mission Plan, PX 276 at 2-2; and the 1985 Mission Plan, DX 45 at HQR-003-1130) are the same as those contained in the 1991 ACR (DX 108 at HQR-002-0807) for the first year of the program and would result in NSP receiving its first allocation in 1999, and because these rates all result in the same number of cask loadings in the "but for" world through 2004.

By arguing that damages in this case do not "vary based upon the acceptance rate," NSP begs the question of whether a contractual schedule exists in this case that provides a basis for an award of any damages in this case, given that its arguments, which could eliminate the only contractual schedule upon which the parties have agreed, could result in a contract that is simply too indefinite to enforce. Although we have agreed that, pursuant to the DCS process, DOE would have been obligated to accept some SNF from NSP in 1999, that agreement is based upon our understanding of the effect of the approved DCSs. Without those DCSs, it is entirely possible that a different schedule that resulted in a later first acceptance from NSP could have become the contractual schedule. For the reasons explained above, and in this Court's decision in PG&E, this Court, absent application of the approved DCSs, cannot simply select a different rate to impose into and sufficiently definitize the contract. Further, by arguing that the rates at which DOE was obligated to perform are embodied in the 1983 Draft Mission Plan (or some other document), NSP is asking the Court to make a rate determination, separated from the 1991 ACR/APR and DCS process. To ensure that the Contract in this case is enforceable, and to ensure that causation for all costs claimed, including those related to the number of casks that NSP would have loaded in the "but for" world, are properly evaluated, the Court must evaluate the SNF acceptance rate applicable to this case and its basis.

B. NSP Has Failed To Prove That DOE Was Obligated To Perform At A 3,000 Rate Sufficient To Preclude Additional At-Reactor Storage After 1998

1. NSP Ignores The Contractual Mechanism For Ascertaining The Acceptance Rate Under The Standard Contract

a. From The Time Of Contract Formation, The Parties Expected That The DCS Process Would Be The Mechanism Through Which The They Would Make Their Respective Commitments

In its post-trial brief, NSP argues that the Court should ignore the rate contained in the 1991 ACR and contemplated by the parties through the completion of the DCS process and, instead, determine that DOE was required to perform at a rate sufficient to prelude the need for additional at-reactor storage after 1998, which it contends is a 3,000 MTU rate. Pl's Post-Tr. Br. at 92. NSP offers two theories in support of this argument: (1) the rates contained in the 1991 ACR and contemplated by the parties through the DCS process were not binding because DOE manipulated and suspended the DCS process; and (2) the parties expected contract performance at the rate that NSP now advocates at the time of contact formation. Pl.'s Post-Tr. Br. at 92-98. The Court should reject these contentions because they misconstrue the Government's argument regarding the rate of acceptance and misstate the facts surrounding the development of the Standard Contract.

Ninety-three pages into its post-trial brief, NSP asks the Court to ignore the rate contained in the 1991 ACR and contemplated by its participation in the DCS process, claiming that the alleged manipulation and ultimate suspension of the DCS process somehow requires adoption of an alternate rate. This argument ignores the process contemplated by the Standard Contract for

identification of a rate of acceptance, NSP's participation in that process, and NSP's complete failure to prove that the rate contained in the 1991 ACR was promulgated in bad faith.

As we established at trial, at the time of contract formation, the utilities repeatedly requested that DOE commit to a particular rate of acceptance in the Standard Contract. Robert Morgan, the first Director of the Office of Civilian Radioactive Waste Management, unequivocally testified that, despite these pleas, DOE did not include any particular rate of acceptance into the Standard Contract. As Mr. Morgan explained, uncertainties surrounding the waste acceptance program that existed in 1983 prevented DOE from committing to any particular rate of acceptance in 1998. Those uncertainties included the licensing process for Federal waste site, potential lawsuits brought by members of nuclear fuel industry, and potential intervention in the waste management program by third parties. Tr. 3782:1-20 (Morgan). For this reason, in drafting the Standard Contract, DOE included a provision that obligated DOE to issue an APR in 1987 (after some of the uncertainties Mr. Morgan identified were resolved), and an ACR in 1991 that would in turn lead to the development of the DCSs. Tr. 3154:6-21 (Kouts); PX 56, Art. IV.B.5. These DCSs would serve as the basis for a binding commitment between DOE and the Standard Contract holders regarding the specific amount of spent fuel that DOE would begin taking from particular utilities at particular plants. Tr. 4337:16-4338:10 (Zabransky). DOE explained the process in the 1985 Mission Plan (and in the 1983 Draft Mission Plan upon which it relies) as follows: "In 1991, the DOE will begin to publish firm waste-acceptance schedules for individual reactors, including shipment allocations." DX 45 at HQR-003-1133. In short, under the terms of the Standard Contract, the 1991 ACR was the document that started the process whereby both parties would commit themselves to an acceptance schedule.

b. NSP Actively Engaged In The DCS Process

In response to the promulgation of the 1991 ACR, NSP submitted DCSs seeking acceptance of the exact amounts of spent fuel allocated to NSP in the 1991 ACR, and DOE approved the first three of these submissions. Tr. 997:1-1017:10 (Kapitz), 1885:2-1906:1 (Closs), 4402:12-19 (Zabransky); DX 108 at HQR-02-0811, DX 139 (DCS for 1999 allocation of 26.13 MTU of spent fuel), DX 160 (DCS for 2000 allocation of 83.5 MTU of spent fuel, DX 181 (DCS for 2001 allocation of 29.9 MTU of spent fuel), 188 (DCS for 2002 allocation of 33.9 MTU of spent fuel), DX 198 (DCS for 2003 allocation of 17.6 MTU of spent fuel), DX 203 (DCS for 2004 allocation of 32.51 MTU of spent fuel), DX 213 (DCS for 2005 allocation of 42.23 MTU of spent fuel); Zabransky Demonstrative No. 1. Significantly, NSP never submitted any of these DCSs under protest. Tr. 267:17-268:4 (Bomberger); 1017:11-14 (Kapitz). In fact, NSP did not voice <u>any</u> objection to using the ACR promulgated by DOE as the basis for acceptance until 2002 – nine years afer NSP prepared its first DCS and four years after this litigation commenced – when NSP representatives penned a protest letter in consultation with the company's general counsel. Tr. 267:7-270:5 (Bomberger); PX 377. In short, rather than objecting to the allocations in received through the 1991 ACR, NSP actively engaged in the process.

These facts alone are evidence of a "but for" scenario. If DOE performed under the rates set forth in the 1991 ACR, there is no evidence in the record to suggest that NSP would have considered that to be a breach of DOE's duty under the Standard Contract. Indeed, quite the opposite is true. The record shows that NSP engaged in the DCS process with full knowledge of

the rates set forth in the 1991 ACR and thus considered those rates to represent performance under the Standard Contract.

NSP's argument that the DCSs did not reflect binding commitments upon DOE is factually incorrect and, more importantly, misses the point of our trial presentation. As a threshold matter, we established at trial that both contract holders and DOE considered approved DCSs to be binding commitments by DOE. Tr. 4337:16-4338:10, 4369:15-4370:2, 4397:3-13, 4404:12-18 (Zabransky) Accordingly, it is incorrect for NSP to assert that approved DCSs were not binding commitments.

More importantly, and regardless of whether approved DCSs were or were not "binding commitments," these documents evidence NSP's willing participation in a scenario whereby DOE could have performed pursuant to its obligations under the Standard Contract. The relevant inquiry is not whether DOE in fact performed in accordance with the 1991 ACR or the rates that NSP inserted on its DCS forms but, rather, whether DOE could have preformed at that rate and still satisfied its contractual obligations. The fact that NSP did not object to the process and was an active participation in it is proof positive that this scenario was well within the parameters of NSP's understanding of DOE's obligations under the Standard Contract. See Julius Goldman's Egg City v. United States, 697 F.2d 1051, 1058 (Fed. Cir. 1983), cert. denied, 464 U.S. 814 (1983). ("A principle of contract interpretation is that the contract must be interpreted in accordance with the parties' understanding as shown by their conduct before the controversy."). There is simply no evidence the acceptance rates for NSP set forth in the 1991 ACR and in NSP's DCS submissions represent a breach scenario. Accordingly, the Court should hold NSP to

those rates in identifying the "but for world."[34] In fact, absent that rate and the enforceability of

---

[34] Beginning on page 50 of its post-trial brief, NSP cites to the designated deposition testimony of Alan Brownstein and Nancy Slater-Thompson regarding the role of DCSs in DOE's planning process. However, none of this testimony provides a basis for disregarding the role of DCSs in determining the scope of the Government's obligations to NSP beginning in 1998. Moreover, a full examination of the testimony from Mr. Brownstein and Ms. Slater-Thompson further explains the role of the DCSs in this planning process.

Both Mr. Brownstein and Ms. Slater-Thompson described DCSs as being part of DOE's planning process for the acceptance of SNF from utilities. Mr. Brownstein testified that the submission of a DCS was "a prerequisite to the acceptance of a purchaser's spent nuclear fuel," Brownstein Dep. 391:18-23 (Apr. 10, 2002), and that DCSs were all part of the process established in the contract for the development of a schedule of acceptance. Brownstein Dep. at 400:8-11. Mr. Brownstein further testified that DOE had agreed upon a "mutually agreeable schedule" with some of the utilities through the submission and approval of DCSs. Brownstein Dep. 549:7-14 (Apr. 11, 2002). Finally, Mr. Brownstein testified that he believed that utilities would submit FDSs for all of the SNF described in approved DCSs. Brownstein Dep. at 167:4-15 (May 23, 2002).

Although Ms. Slater-Thompson stated her belief that "DCSs were for planning purposes only," she also testified that, if a utility failed to submit a DCS for a year in which it had an allocation, that utility would have "waived" its right to deliver SNF to DOE in that year. Slater-Thompson Dep. 150:19-24 (Jun. 13, 1002). Ms. Slater-Thompson further testified that, if DOE had begun performance in 1998, it would have received FDSs from utilities with approved DCSs for 1998 and it would have accepted fuel in accordance with those FDSs. Slater-Thompson Dep. 152:11-24 (Jun. 13, 1002). Finally, although Ms. Slater-Thompson testified that she did not believe that DCSs were very helpful in the planning of the waste management system, she acknowledged that the organization responsible for planning for the transportation of the SNF would be the group to use the DCSs and that she had never had responsibility for transportation planning. Slater-Thompson Dep. 149:17-:150:1 (Jun. 13, 1002).

NSP also cites to the testimony of Lake Barrett, former Deputy Director of the Office of Civilian Radioactive Waste Management ("OCRWM") in which he explains that DCSs were "part of the administrative details of the contract that I did not pay much management policy attention to." Barrett Dep. 217:12-14 (Apr. 23, 2002). Mr. Barrett explained that he understood the purpose of a DCS to be related to "planning for the receipt of material into our system in the future." Barrett Dep. 699:6-16 (Apr. 26, 2002). He viewed them as "administrivia" because they were not related to the "primary business, which was to determine if the repository site was suitable so we can get on to build the facility to be able to receive" SNF. Id.; see also Barrett Dep. 117:3-14 (Apr. 22, 2002).

the approved DCSs, NSP has not established how its contract is sufficiently definitized to allow this Court to evaluate causation.

c. The Suspension Of The DCS Process in 1996 Neither Undermines The Validity Of The 1991 ACR Nor Evidences Bad Faith

NSP also argues that DOE's suspension of the DCS process is evidence that the Court should disregard the mechanism for identifying the rate contained in the Standard Contract. Pl. Post-Tr. Br. at 96. This argument is unavailing. As we established at trial, DOE suspended the DCS process in 1996 after it determined that it would be unable to meet its contractual obligation to begin accepting spent fuel in 1998. Tr. 4403:8-22 (Zabransky). This suspension simply shows that DOE realized that there would it would not be able to begin perform under the terms if the Standard Contract. As Mr. Zabransky explained at trial, it made no sense for DOE to continue to commit itself to performance it could not meet. Tr. 4404:4-11 (Zabransky). The suspension of the DCS process years after the contractual mechanism was set (in the Standard Contract) and put into place (through promulgation of the 1991 ACR) in no way detracts from the use of the contractually prescribed method for identifying the "but for" world. That DOE recognized that it would not be able to timely perform the Standard Contract years after the document was executed does not mean that the mechanism which the contract sets for ascertaining the rate of acceptance should be disregarded.

Finally, NSP refers to the suspension of the DCS process as "cavalier manipulation" and suggests that it amounts to bad faith by DOE. Pl. Post-Tr. Br. at 93, 95 n 30. This assertion, which NSP tellingly confines to one footnote in its post-trial brief, is false. To establish bad faith on the part of Government officials, a plaintiff must establish by a clear and convincing evidence

that the Government was acting with malice towards plaintiff with the intention to harm it. Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1240 (Fed. Cir. 2002). NSP did not come close to meeting that standard in this matter. Far from acting in bad faith with the intent of harming NSP, DOE suspended the DCS process because it recognized that it could not meet this obligation and that continuing with the DCS process would require the Government to incur obligations that it could not perform. The Court recognized on the record that it was only in this context that certain DOE non-lawyer employees indicated that the suspension of the DCS process was designed to "limit liability." Tr. 3741:20-3742:15 (Pollog). DOE acted in good faith by informing all Standard Contract holders when it determined that it could not make any promises regarding acceptance. Indeed, as the Court succinctly stated in assessing NSP's assertions of bad faith during trial:

> To me, the evidence is overwhelming that DOE pursued the implementation of this statute through the various reports and planning documents with the utmost good faith. And there was no reason whatsoever to think that anybody in industry took it for anything less than that. And I couldn't possibly support a finding at this juncture on this record that this was a sham done to sabotage a program. That record is not in front of me now.

Tr. 4359:4:15 (Pollog). In any event, were NSP to establish some kind of bad faith, it would, at best, mean that NSP might argue that the contract has no schedule. It would not mean that NSP is somehow entitled to select any schedule that it unilaterally chooses to impose.

In short, DOE's failure to perform in a timely manner in no way undermines the mountain of evidence indicating that, years prior to the suspension of the DCS process, DOE promulgated the 1991 ACR in accordance with the terms of the Standard Contract and that NSP participated in the DCS process without objection or qualification. NSP has simply offered no basis for

deviating from the plain text of the Standard Contract to identify the rate of acceptance in the "but for" world.

2. NSP Has Failed To Establish That The Parties Expected A Rate Sufficient To Preclude The Need For Additional Storage After 1998

a. As A Matter Of Law, This Court Should Not Consider Parol Evidence In Determining DOE's Performance Obligations Under The Standard Contract

Relying on various program documents and statements that reflect the publicly stated goals of DOE instead of its actual obligations, NSP argues that the intent of the NWPA and the understanding of DOE and NSP personnel was that DOE was obligated to begin performance at the rate advocated by NSP during this litigation. In addition to being irrelevant to the determination of what the Standard Contract actually required, this argument is belied by the facts established at trial.

NSP's argument regarding the rate of acceptance rests upon this Court's consideration of extra-contractual evidence that post-dates the formation of the Standard Contract. As a matter of law, with respect to the use of parole evidence concerning the parties' intent, the Standard Contract contains an integration clause, which expressly provides that the written language in the Standard Contract "contains the entire agreement between the parties with respect to the subject matter hereof." PX 56 Art. XXII. The contract further provides that "[a]ny representation, promise, or condition not incorporated in this contract shall not be binding on either party" and that "[n]o course of dealing or usage of trade or course of performance shall be relevant to explain or supplement any provision contained in this contract." Id. NSP's interpretation of the Standard Contract, which reads into the agreement alleged program hopes and goals over a 20-

year period, completely eradicates the integration clause from the contract. Although "parol evidence 'must be admissible on the issue of the extent to which a written agreement is integrated, for . . . the writing cannot prove its own integration,'" McAbee Constr, Inc. v. United States, 97 F.3d 1431, 1434 (Fed. Cir. 1996) (quoting Sylvania Elec. Prods., Inc. v. United States, 198 Ct. Cl. 106, 458 F.2d 994, 1006 (1972)), the fact that the Standard Contract contains an integration clause makes plaintiff's burden of establishing a lack of integration "extremely heavy." Id.; see also PG&E, 73 Fed. Cl. at 385 ("The existence of the integration clause in the Standard Contract, then, militates strongly against modifying or supplementing it by adding a specific acceptance rate term."). NSP failed to present any evidence at trial concerning the lack of integration. As a result, it has not met its burden of proving that the Standard Contract is not fully integrated and, therefore, cannot rely upon extra-contractual evidence of the parties' alleged contractual intentions.

Additionally, because the Standard Contract was promulgated through notice-and-comment rulemaking, any parol evidence should consist solely of the record of administrative rulemaking, in accordance with the proper means of interpreting regulations. NSP's efforts to introduce extensive deposition and trial testimony and documents to identify the contractual intent evidenced by the language of the Standard Contract are legally unsupported.

Finally, part of the "evidence" upon which plaintiffs rely to support the alleged intent of the Standard Contract and the NWPA is not even admissible for that purpose. For example, NSP has designated the deposition testimony of Lake Barrett as evidence of the "intent" of Congress

in promulgating the NWPA. See Pl. Post-Tr. Br. at 14-15.[35] This method of discerning the intent of these documents is inadmissible, because even the opinions of individuals who actually participated in the legislative process are irrelevant to a proper interpretation of the requirements of a statute. See, e.g., Selman v. United States, 204 Ct. Cl. 675, 685 n.6, 498 F.2d 1354, 1359 n.6 (1974) (affidavit of a United States Senator concerning particular legislation was "without evidentiary value" because "no member of a legislature, outside of the legislature, is empowered to speak with authority for that body"); accord Department of Energy v. Westland, 565 F.2d 685, 690-91 (CCPA 1977); United States Steel Corp. v. United States, 618 F. Supp. 496, 500 n.5 (CIT 1985). The opinions of DOE personnel are similarly inadmissible. PG& E, 73 Fed. Cl. at 390 ("The court therefore declines to afford any weight to "after-the-fact" statements made by DOE officials about the intent of Congress in passing the NWPA".).

[35] Even assuming that Mr. Barrett's testimony were probative of Congress's intent, his deposition testimony adds little to NSP's argument. Contrary to NSP's characterization, Mr. Barrett did not know why the 3,000 MTU rate was chosen or whether the production rate was considered in the determination of that rate. As Mr. Barrett testified, the 3,000 MTU design rate for the repository was chosen prior to his employment at DOE and he did not know how it was developed. Barrett Dep. 57:3-58:12 (Apr. 22, 2002); Barrett Dep. 1333:4-1335:10 (May 10, 2002. Further, Mr. Barrett did not testify that the 3,000 MTU rate would meet the intent of the NWPA as he understood it. Instead, in the portion of the deposition cited by NSP, Mr. Barrett testified that the "3,000 rate would be consistent with [his] understanding of the intent of the act to reduce over a reasonable period of time the backlog of spent nuclear fuel throughout the nation." Mr. Barrett also did not testify that his understanding of the NWPA was to preclude the need for additional at-reactor storage and was not asked to define what a "reasonable period of time" would be for the removal of the backlog of accumulated SNF. Mr. Barrett testified that he understood that the NWPA required DOE to begin performance on January 31, 1998, but that some utilities would still have storage requirements after that time. Barrett Dep. 180:16-181:17 (Apr. 22, 2002). Mr. Barrett did not understand there to be any "legal requirement to do 3,000 tons per year." Barrett Dep. 120:22-121:21 (Apr. 22, 2002). Finally, as Mr. Barrett testified, he was not part of the program in 1983 when the contracts were signed, so he could not testify as to what the intent of the program was at that point in time. Barrett Dep. 742:14-743:1 (Apr. 26, 2002).

b. Even If The Court Were To Consider Parol Evidence, NSP Has Failed To Establish That The Parties Understood That DOE Would Accept SNF At The Rate It Claims

NSP seeks the imposition, by this Court, of a qualitative standard by which DOE's performance under the Standard Contract is measured. Specifically, NSP asserts that the NWPA and the Standard Contract obligate DOE to accept SNF from contract holders in a manner that would: (1) eliminate the need for utilities to provide additional on-site storage after 1998; and (2) begin to reduce the backlog of spent fuel. Pl. Post-Tr. Br. at 92. NSP's arguments fail because the documents upon which it relies merely relate to DOE's goals and not its obligations, and because the evidence is clear that DOE rejected during negotiations and attempts to amend the Standard Contract precisely the type of rate that NSP now advocates.

As noted, NSP relies upon various OCRWM program documents to support its contention concerning the parties' understanding. However, the documents upon which NSP relies to evidence DOE's "intent" to accept 3,000 MTU of spent fuel annually depend upon the existence of at least one operational repository. See, e.g., PX 45 at HQR-003-1129 and 1130) (1985 Mission Plan). The Standard Contract does not require DOE to begin spent fuel acceptance at a repository. To the contrary, the language of the Standard Contract explicitly contemplates that DOE may accept SNF either at a repository or at "such other facility(ies) to which [SNF] and/or [HLW] may be shipped by DOE prior to its transportation to a disposal facility." PX 56 at KRGNSP07972. In fact, between the original and promulgation of the Standard Contract, the definition of the type of "facility" to which DOE could deliver SNF was expanded to state, "in accordance with the [NWPA], that there may be an interim storage facility (or facilities) which DOE may utilize prior to emplacement in a repository." 48 Fed. Reg. 16590,

16591 (Apr. 18, 1983). Pursuant to the rationale of the United States Court of Appeals for the District of Columbia Circuit in Indiana Michigan Power Co. v. Department of Energy, 88 F.3d 1272 (D.C. Cir. 1996), DOE was not obligated to have an operational repository by January 31, 1998, precluding any argument that DOE was somehow obligated to accept SNF at the rates it had anticipated for SNF acceptance at a repository. Because DOE was entitled to accept SNF at a facility other than a repository, plaintiff's reliance upon planning documents relating to SNF acceptance at a repository is misplaced.[36]

Moreover, the planning documents upon which plaintiffs intend to rely uniformly and expressly indicate that they are not contractually binding, that they do not establish acceptance rates that create mandatory obligations, and that they were issued for planning purposes only. See, e.g., DX 45 at HQR-003-1133 (1985 Mission Plan in which DOE expressly represented that "[i]t should be emphasized that this schedule is only an approximation of how the system may operate and is subject to considerable variation" and that "DOE will further define and specify

[36] On page 15 of its post-trial brief, NSP relies upon Mr. Barrett's testimony to suggest that various documents since the "dawn of the program" have employed a 3,000 MTU rate. Mr. Barrett did testify that the 3,000 MTU rate has been used as an "assumption" for the determination of the total cost of the system at points during the program, but also pointed out that early studies assumed two repositories and a 6,000 MTU steady-state rate. Barrett Dep. 348:1-340:11 (Apr. 23, 2002). DOE began assuming a 3,000 MTU steady state rate with one repository and no MRS in 1995. Compare PX 302 at 22 (1986 TSLCC, assuming 6,000 MTU steady state rate across two repositories) and PX 263 at PNL-107-1066 (1990 PETSC, assuming operation at 900 MTU steady state rate until 2010, when system begins ramp-up to 3,000 MTU steady-state rate) with PX 264 at 8 (1995 TSLCC, assuming 3,000 MTU steady state rate for one repository which begins operation in 2010). Further, the Court cannot properly draw a link between the 3,000 MTU design rate for the repository and the fees paid by the utilities because the fees paid by the utilities "were a function of the kilowatt hours of nuclear energy delivered, not on the system design that we were doing." Barrett Dep. 80:10-81:1 (Apr. 22, 2002). Moreover, with the passage of the NWPA Amendments in 1987, DOE had to address the 10,000 MTU limitation in its plans for an acceptance rate. Barrett Dep. 65:10-69:19 (Apr. 22, 2002).

the system acceptance parameters as the program progresses").[37] Similarly, the 1987 ACR and its successors expressly advised contract holders that, in 1991, but not before, DOE would begin publishing firm individual utility acceptance schedules in accordance with the Standard Contract. PX 254 at HR-001-2713.

NSP's use of select citations from DOE program documents is nothing more than cherry-picking, and the company can identify no language by which DOE somehow agreed or even suggested that the acceptance rates in its planning documents were contractually binding or constituted anything other than DOE's hopes and goals for its program. As Judge Hewitt properly concluded in declining to rely upon statements of strategy issued by DOE in PG&E, "The court's role is not to enforce and impose on DOE an obligation to carry out a strategy as it was envisioned at that time in the absence of a contractual understanding." 73 Fed. Cl. at 391; id. at 393 ("These and other examples of predictions, hopes, goals, or aspirations adduced at trial do not amount to binding promises that can be enforced by the court through the award of contract damages."); see also National By-Prods., Inc. v. United States, 186 Ct. Cl. 546, 571, 405 F.2d 1256, 1270 (1969) (representation that "simply mirror[ed] the Government's current belief,

---

[37] Importantly, the 1985 Mission Plan upon which NSP relies was created pursuant to a statutory requirement for submission to Congress. 42 U.S.C. § 10221(b)(3). After DOE submitted the 1985 Mission Plan and a 1987 Mission Plan Amendment to Congress, Congress enacted the 1987 amendments to the NWPA, presumably after considering DOE's Mission Plan submissions and evaluating the state of DOE's program. As it was entitled to do, Congress significantly modified the scope of the program at that time, limiting DOE's focus for development of a repository to one site, Yucca Mountain, and establishing linkages between a Monitored Retrievable Storage ("MRS") facility and a repository. 42 U.S.C. §§ 10133, 10161-69. NSP's reliance upon documents prepared for Congress that relate to possible circumstances and scenarios that could have existed prior to congressional review of and action upon those pre-amendment planning documents does not support its argument that DOE has somehow obligated itself to accept spent fuel at a 3,000 MTU rate, regardless of whether a repository is available.

opinion or prediction, even its fervent hope that [event] would occur" could not impose a contractual obligation upon the Government's part."). Because DOE never obligated itself to satisfy a 3,000 MTU annual acceptance rate (or to any other rate), the Court cannot incorporate such a requirement into the Standard Contract. PG&E, 73 Fed. Cl at 391 ("The court concludes that for it to impose on the government an obligation to accept the utilities' spent fuel in accordance with the alleged two-part obligation or at a rate of 3,000 MTU/year would be tantamount to its enacting either legislation or regulations for the nuclear fuel industry that did not exist before this litigation.").

In addition to relying upon documents that do not support its argument, NSP also completely ignores the history of the formation of the Standard Contract and the repeated attempts to amend it, during which DOE rejected efforts to insert the type of rate that NSP now advocates. NSP ignores, among others, the testimony of Loring Mills, a former vice president of nuclear activities at the Edison Electric Institute ("EEI"), a trade association of investor-owned electric utilities of which NSP was a member (and of which James Howard, NSP's CEO, later served as chairman). Tr. 3902:17-3903:1, 3904:23-3605:6 (Mills). Mr. Mills espoused his direct involvement in the development of the NWPA, including the drafting of statements that executive officers of utilities provided to congressional committees in support of the proposed legislation. Tr. 3966:8-24 (Mills). However, Mr. Mills did not to point to any provision of the NWPA – because he cannot – that expressly obligated DOE to begin acceptance of SNF from the contract holders in January 1998 at any particular rate of acceptance, much less one that obviated the need for at-reactor storage after January 31, 1998.

That the NWPA only imposed requirements with respect to the date of commencement of acceptance and not a specific rate of acceptance was confirmed by Robert Morgan, the first Director of OCRWM, whose primary responsibilities during his one year tenure included the development of the Standard Contract through the Federal Register rule-making process, and whose testimony NSP also largely ignores. Tr. 3776:18-22, 3780:12-18 (Morgan). Mr. Morgan testified that he understood that the NWPA contained no requirement regarding the rate at which DOE was required to accept spent fuel. Tr. 3829:14-19 (Morgan).

Beyond their understandings of the statute, Mr. Morgan and Mr. Mills provided testimony about the litany of requests made by industry groups, of which NSP was a member, to include a rate of acceptance in the Standard Contract, all of which were rejected because of the uncertainties surrounding the program. For example, prior to issuance of the draft Standard Contract, Mr. Morgan met with Mr. Mills who, acting as a representative of the nuclear power industry, expressly asked that DOE "put in the contract a rate of acceptance by the Department of Energy." Mr. Morgan denied this request. Tr. 3781:14-3782:9 (Morgan).

When DOE promulgated a draft Standard Contract on February 4, 1983, that did not contain a rate of acceptance, EEI and UNWMG provided their member utilities, including NSP, with their comments. Tr. 3903:7-3904:1 (Mills). EEI's comments expressly recognized the possibility that a rate of acceptance might not be included in the Standard Contract. DX 23 at GPE0010323. By letter dated March 7, 1983, EEI requested that DOE include a two-part test (obligating DOE to pick up at a rate sufficient to meet the industry generation rate and to begin

working off the backlog)[38] and permit Standard Contract holders to negotiate with DOE regarding the rate of acceptance after the promulgation of the Standard Contract. DX 2.34 at ADM002.0277, ADM002.0279-80; see also DX 23 at GPE0010323; Tr. 3920:4-24 (Mills). As the recipient of EEI's letter, Mr. Morgan understood EEI to be requesting that it be permitted to negotiate with DOE about the rate of acceptance after the promulgation and signing of the Standard Contract. Tr. 3796:2-16 (Morgan). DOE rejected EEI's request to incorporate a two-part test "because of the uncertainties of the program" and because it "did not want to make a commitment to an acceptance rate or a performance standard." Tr. 3795:4-3800:16 (Morgan).

After the promulgation and signing of the Standard Contract, representatives of EEI and UNWMG continued to request that DOE impose a specific obligation regarding the rate of acceptance. In December 1983, Mr. Mills delivered a speech at the proceedings of the 1983 Civilian Radioactive Waste Management Meeting in which he suggested that he "fully expected to see a petition for rule-making initiated" regarding several DOE performance standards. PX 286 at SN069619; Tr. 3924:18-3925:1 (Mills). EEI followed up those comments by preparing a draft memorandum in support of rule-making in March 1985. In that draft EEI expressly recognized that the Standard Contract is "silent on the standards for DOE's performance in accepting spent fuel from Purchasers." DX 44 at SMUD 0014896; Tr. 3928:11-3929:4 (Mills). In that same draft EEI proposed that DOE include in the Standard Contract an obligation that

---

[38] This test is similar, if not identical, to the rate (i.e., one sufficient to preclude the need for additional at-reactor storage after 1998) that NSP has urged upon the Court in this case. Plaintiff's own expert, Eileen Supko, equated these two standards during her testimony. Tr. 2380:12-2384:14; DX 13 (Supko). Ms. Supko further testified during trial that the utilities requested during the rulemaking process that the no-additional-storage rate be incorporated into the Standard Contract. Tr. 2335:2336:1 (Supko). This test likewise does not appear in the Standard Contract.

DOE accept SNF at a rate greater than the industry-wide generation rate. DX 44 at SMUD 0014896. But EEI did not simply leave its proposed rule-making in draft form. On April 28, 1987, UNWMG submitted a formal request that DOE "provide for a minimum receiving rate for SNF – an annual receiving rate not less than the rate at which SNF is being discharged– and that DOE commit to accept the entire backlog of SNF over a ten year period." PX 240 at CTR 006-0249.

Mr. Mills, who acknowledged at trial that he was the person at UNWMG ultimately responsible for issue resolution with DOE regarding the Standard Contract, also confirmed at trial that DOE did not accept UNWMG's 1987 request for a minimum receiving rate for SNF. Tr. 3933:22-3934:13 (Mills). Mr. Mills also confirmed that as late as December of 1992, he was still proposing that the Standard Contract holders request that DOE include a rate of acceptance in the Standard Contract. Mr. Mills explained that in late 1992, just months before he retired, he briefed a group called ACORD, which consisted of a group of utilities with nuclear power plants and whose mission was provide overall guidance to Standard Contract holders regarding the Standard Contract. Tr. 3950:16-21, 3966:1-4 (Mills). During that briefing, Mr. Mills explained to ACORD a potential rule-making that would establish a spent fuel acceptance rate under the Standard Contract. Tr. 3953:22-3954:5 (Mills).[39]

---

[39] NSP refers to the expert testimony of Eileen Supko for the proposition that a 3,000 MTU rate annual of acceptance would "avoid the need for NSP to provide at-reactor storage after DOE began performance in 1998 and to begin working off the backlog." Pl. Br. at 97. As we pointed out during trial, Ms. Supko's opinion is both incorrect and irrelevant to the Court's inquiry in this matter. As a threshold matter, Ms. Supko admitted at trial that, even under a 3,000 MTU rate (which NSP equates with the no-additional-storage rate it advocates), there would still be a need for some at-reactor storage after 1998, even at Prairie Island. Tr. 2387:24-2393:4 (Supko). Further, and as discussed above, the evidence adduced at trial clearly demonstrates that (continued...)

Plainly, the trial evidence established that neither the NWPA nor the Standard Contract required DOE to commit to begin accepting SNF/HLW at a particular rate in 1998, and that DOE was only required to begin making such a commitment as the waste program progressed. The nuclear utilities' repeated requests, both before and after contract formation, that a specific rate be included in the Standard Contract is proof positive that such a term was not included in the first instance. Further, there is simply no evidence that DOE's actions either before or after the formation of the Standard Contract ever committed itself to perform a the rate of acceptance that NSP now advocates. Rather, the evidence at trial clearly established that because of the myriad uncertainties of the waste acceptance program, DOE steadfastly rejected requests by DOE to include a two-part test or any rate in the contract and instead waited until the issuance of the 1991 ACR to begin the process of committing itself at a particular rate. NSP has fallen far short of establishing that the rate it wished it had received was somehow magically incorporated into the contract by virtue of DOE's delay in performance.

CONCLUSION

For the reasons outlined above, the Government respectfully requests that the Court require plaintiff to satisfy its burden of proof and eliminate from plaintiff's claim all damages that are unforeseeable, uncertain, or not directly caused by the Government's partial breach.

---

[39](...continued)
DOE repeatedly rejected the insertion of any particular rate into the Standard Contract, let alone the rate about which Ms. Supko opines. Accordingly, Ms. Supko's conclusion is both based upon a flawed premise and not helpful to the Court's inquiry in this matter.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/Andrew P. Averbach
ANDREW P. AVERBACH
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tele: (202) 305-3315
Fax: (202) 307-2503

Attorneys for Defendant

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Avenue, S.W.
Washington, D.C. 20585

ALAN J. LO RE
Senior Trial Counsel

STEPHEN P. FINN
JOSHUA E. GARDNER
MARIAN SULLIVAN
Trial Attorneys
Commercial Litigation Branch
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

March 27, 2007

CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 27th day of March, 2007, a copy of the foregoing "DEFENDANT'S POST TRIAL BRIEF" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Andrew P. Averbach