IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-----------------x
YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C.
CONNECTICUT YANKEE ATOMIC POWER : 98-154C. 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C.
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C.
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C.
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY: : 00-703C, 01-115C.
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C
-----------------X
(Caption continued on the next page)

Deposition of LAKE H. BARRETT
Washington, D. C.
Monday, April 22, 2002
9:31 a.m.

Job No.: 11792-4
Pages 1 through 272, Volume 1
Reported by: Diane Gomez, RPR



DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
-----------------X



Deposition of LAKE H. BARRETT, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public in and for the District of Columbia.



APPEARANCES

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:
DEVON E. HEWITT, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:
JEFFREY L. HANDWERKER, ESQUIRE
HOWARD CAYNE, ESQUIRE
RONALD A. SCHECHTER, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004-1206
(202) 942-5000

57

testimony.
A **Yes.**
Q Can you describe for me how the department actually arrived at the 3,000 number?
A **I don't --**
MR. CRAWFORD: Objection, foundation.
A **I don't recall how it was done.**
Q Do you recall the general issues that were considered?
A **No more than what I've just said to you before.**
Q Well, would you please state for me your understanding of the issues that were considered in establishing the 3,000 rate.
A **The 3,000 number was there prior to my -- I didn't do the 3,000 number. My understanding of my predecessor's was that 3,000 --**
MR. CRAWFORD: I'm going to object to the extent the question calls for speculation.
MR. CAYNE: Again, I'm going to object to counsel's continuing the interruption of the witness.
Q Please continue.

58

A **That my predecessors did some of these balances of performance, reduction of the inventory, the cost and the complexities and the siting and had as a planning purpose the 3,000 number.**
Q Did you consider political factors in coming up with the 3,000 number?
MR. CRAWFORD: Well, let me object to the extent it assumes facts not in evidence. Objection to foundation.
A **Political, no. Not political. There was policy regarding Congress would or would not approve an MRS and those sorts of things. And schedules.**
Q Was the 3,000 MTU take rate related to the Department of Energy's estimate of the utilities' discharge rate?
MR. CRAWFORD: Objection, foundation. Objection, speculation.
A **I personally don't know. I assume -- I don't know.**
Q You assumed what?
A **That when they -- the production rate at the time was around 2,000. So I assumed that the**

59

**3,000 that existed was chosen in consideration with the production rate, you know, the cost and the transportation and the other issues involved.**
Q So based on your prior testimony, Mr. Barrett, the 3,000 rate would be consistent with your understanding of the intent of the act to reduce over a reasonable period of time the backlog of spent nuclear fuel throughout the nation, correct?
MR. CRAWFORD: Objection, speculation. Objection, foundation.
A **Yes.**
MR. CRAWFORD: Can we take a break here.
MR. CAYNE: Certainly.
(There is a recess from the record.)
Q Mr. Barrett, how long did you hold the director position that you discussed?
A **The division director?**
Q Yes.
A **I don't recall. Somewhere -- when I first came to the department, so that would have been '85, spring of '85 until I was assigned to be QA director I think. I don't know, a couple of years.**

60

Q I'm sorry?
A **A couple of years.**
Q Assigned to be what director?
A **I became QA director.**
Q Quality assurance?
A **Quality assurance. But I wasn't sure if that was a detail or an assignment.**
Q That would have been in what year?
A **'87, '88.**
Q Who did you report to in that position --
A **The office of the director, which then I believe was acting director was Ed Kay.**
Q When did Mr. Rusche leave?
A **'87ish. I think it was before the act was amended, so '86, '87.**
Q Did he retire?
A **He left. That's all I remember. I think he -- I don't know if he retired from federal service or what he did, but he left.**
Q And Mr. Kay took over at that time?
A **As the acting.**
Q In either of the two positions you've

65

**was in QA, so I personally, the QA office was, very little impact. I had no personal involvement in the linkages then.**
Q But in your position you did attend, did you not, staff meetings in which the linkages were discussed, correct?
**A Probably did. I just don't recall the specifics. But I'm sure there was general discussion about many things that happened in the amendments act.**
Q Well, based on your general recollection of the discussions in which you personally participated, Mr. Barrett, how did the linkages imposed by the '87 act affect the administration of the program?
MR. CRAWFORD: Objection, foundation. Objection, speculation.
**A Given that the MRS was basically linked and disapproved as we had proposed it and we had only one site, there was a lot of discussion about how we could best design the program to be successful, and which success included doing all we could do to meet the '98 date.**
Q And, again, when you say meet the '98 date,

66

you're referring to what?
**A To be able to move fuel into the federal system with a target of January '98.**
Q And in your view did the '87 act have the effect of reducing the take rate?
MR. CRAWFORD: Objection, foundation.
**A Yes, it did. Because the only way at the time for '98 would have been -- to receive the material in '98 was with an MRS, and the MRS could only be achieved in 1998 through a volunteer site, through congressional approval of a volunteer site. And that there were linkages in the statute, and that's when the discussion started about the change to the 900, which was caused by the statutory linkages.**
Q So is it your testimony that it was the statutory linkages imposed by the '87 legislation that reduced the annual acceptance rate from 3,000 MTUs to 900 MTUs?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion. Objection, foundation.
**A The linkages imposed by law complicated the receipt rates and work was done, and the specifics of**

67

**it I don't recall, regarding how we could best operate the program with those congressionally mandated linkages.**
Q But I'm not sure if you answered my question. Did those linkages have the effect of reducing the take rate, which I understand you to have testified was 3,000 prior to the '87 amendments, to the 900 level that subsequently followed?
MR. CRAWFORD: Objection to the foundation. Objection to the extent it mischaracterizes prior testimony. Objection to the extent it calls for a legal conclusion.
**A We still -- my recollection is we still kept the 3,000 ton receipt design, but we had to reconcile the fact that we would hit the limits, and it was -- my recollection is I just don't remember what we did and how we did balance those.**
Q What did you mean, Mr. Barrett, when you just referred to the 3,000 MTU receipt design?
**A You would have to look at the document -- the systems documents circa '87, '88. I believe they still had 3,000 ton receipt for a volunteer MRS but**

68

**acknowledge the fact that that would have to be addressed as related to linkages.**
Q So if I understand correctly based on your -- well, let me step back a second.
The word "design," what are you referring to when you say receipt design. What design are you referring to?
**A The MRS, which would be the first ability to receive materials, was the receipt rate design was 3,000 tons per year is my recollection. I would have to check that. I haven't gone over any old documents. Was 3,000. So the designing of the transportation system, the design of the hot cells and receiving facilities was a nominal 3,000 ton capability per year.**
Q When you use the word "nominal," what do you mean?
**A That the normal operational rate of receipt was designed 3,000 tons per year of the MRS.**
Q A few moments ago you answered a question and you stated we had to reconcile the fact that we would hit the limits. Do you recall that?

69

A Uh-huh.
Q What did you mean when you stated "we would hit the limits"?
A **The linkages in the amendments act were such that you could not operate at 3,000 tons per year very long before you hit the statutory limits, and we had to look at -- my recollection is that we had to look at how that all would work. For example, you would not want the system to operate at a high rate and then stop to reconcile that.**
Q Why is it that you could not operate at the 3,000 ton per year very long before you hit the statutory limits?
A **The statute had linkages that said you could not receive more than certain tonnages for certain events. I don't recall the details of what they were, but there was a 10,000 ton limit and there was something else that you couldn't do. And that was tied to the repository.**
Q How many years would it take after licensing of the repository for the repository to be built?

70

MR. CRAWFORD: Objection to foundation. Objection to the extent it calls for speculation.
A **Repeat the question again, please.**
Q Based on your projections, after licensing of a repository how many years do you project that it would take the repository to become operational?
MR. CRAWFORD: Same objection.
A **When you say after licensing, you mean upon receipt of a construction authorization?**
Q Yes.
A **Depends on the design of the facility.**
Q With respect to the facility that you had under design in the 1987 time frame, how many years after receiving construction authorization would the repository become operational?
MR. CRAWFORD: Objection, vague. Objection, foundation.
A **I don't recall the repository construction schedule circa '88/'89. I just don't recall it.**
Q Would five years be a good approximation?
MR. CRAWFORD: Objection to the vagueness of it and objection to the foundation. Objection to

71

the extent it calls for speculation.
A **Five years probably was what was in the records then.**
Q And with respect to the repository under design today, how many years do you project that it will take for that repository to become operational after receipt of the necessary construction authorization?
MR. CRAWFORD: Objection to the foundation.
A **It depends upon what the design configuration is of the repository, and also the degree of preparatory work that we're allowed to do prior to the construction authorization.**
Q Do you have current projections with respect to the repository under consideration by the department today?
MR. CRAWFORD: Objection, vague.
A **Today's proposal and plan is if we see budgets and if things go according to -- as we would wish them to, if we change to a modular construction approach, it is possible to be receiving material in basically a two to three-year period.**

72

Q After receiving construction authorization?
A **Correct.**
Q And your best recollection of that period from the 1987 time frame would have been five years back then, correct?
MR. CRAWFORD: Objection to the extent it mischaracterizes prior testimony.
A **As it related to the plans of a repository at that time, five years was probably right.**
Q Had the MRS that you proposed to Congress in 1987 been approved, how long would the construction of that facility have taken from start to receipt of spent nuclear fuel?
MR. CRAWFORD: Objection, vague.
A **I don't recall that.**
Q I'm trying to refresh your recollection. Would two years be a good estimate of that time frame?
MR. CRAWFORD: Objection, vague.
A **I'd have to go -- MRS schedules are 15 years old in my brain. I don't remember what the MRS schedules were at all.**
Q The MRS would have taken less time than the

MR. CRAWFORD: Objection to the foundation. Objection, assumes facts not in evidence.
**A Please restate that question.**
Q As a matter of design and systems engineering, would it have been possible for a repository to accept spent nuclear fuel at a beginning rate in excess of 400 MTUs?
**A Yes.**
Q And as a matter of design and system engineering would it have been possible for a repository to begin the acceptance of spent nuclear fuel at an annual MTU rate of 1,800?
MR. CRAWFORD: Objection, vague.
**A When you use the word "possible" versus practicable there's a difference. You ask possible, the answer is yes. With time and money you can do almost anything.**
Q Do you believe it would not have been practicable?
**A It would have been hard to go from zero to 1800 in my opinion. Possible, yes.**
Q Well, the ramp-up rate you referred to was



five years, correct?
MR. CRAWFORD: Objection, vague.
**A Yes, but not starting at 1800 the first year.**
Q Would it have been practicable for the ramp-up rate to occur in a period of less than five years?
MR. CRAWFORD: Objection, vague. Objection, foundation.
**A You could.**
Q For example, would it be practicable for the ramp-up rate to take place within a period of three years?
MR. CRAWFORD: Objection, vague. Objection to the foundation. Objection to the extent it calls for speculation.
**A These are all degrees of more difficult and less difficult practicalities.**
Q You used the word "practicable" and that's simply what I'm asking you. Would it have been practicable for the ramp-up rate to have occurred within a three-year period, the ramp-up to have



occurred within a three-year period?
MR. CRAWFORD: Objection. Same objections.
**A It's possible. These are different degrees of practicality on how quickly you ramp up under what circumstances. I don't remember -- I don't recall what the rates were circa '87. Given the national mood and concerns about things nuclear, it's not very practicable today I believe to ramp up in less than three years to 3,000. Not to say it could not be done.**
Q Putting aside issues of national mood and concerns, as a matter of systems engineering and design would it have been practicable to have the ramp-up occur within a three-year period?
MR. CRAWFORD: Objection, vague. Objection to the foundation. Objection to the extent it calls for speculation.
**A I don't know. I would have to look at all the economics, the cash flow, the preparations for institutional aspects of transportation. You know, I don't know if it would be practicable or not.**
Q So sitting here today you can only state,



am I correct, that it might have been practicable for the ramp-up to have occurred within three years, correct?
MR. CRAWFORD: Objection to the extent it mischaracterizes his prior testimony. Objection, asked and answered. Objection, vague. Objection, foundation. Objection, to the extent it assumes facts not in evidence.
**A It's possible.**
Q Are you aware, Mr. Barrett, whether the fees that the utilities were required to pay under the standard contract were developed or determined based on a particular acceptance rate and ramp-up schedule?
MR. CRAWFORD: Objection, lack of foundation. Objection to the extent it calls for speculation.
**A It's my understanding the monies paid by the utilities were a function of the kilowatt hours of nuclear energy delivered, not on the system design that we're doing.**
Q You don't believe the fees had any relation to the system design?

81

A Not to my recollection.
Q For how long did you hold your position in quality assurance?
**A I don't know, a year or so.**
Q What position did you next take on?
**A I don't remember my official titles. I became responsible for programmatic aspects of the repository. I became responsible for programmatic aspects of the MRS facility. And I was responsible for business development contracts for awhile.**
Q And when did you take on those responsibilities?
MR. CRAWFORD: Objection. Asked and answered.
**A I don't know, '88, '89, until I was sent by Admiral Watkins to defense programs in the spring of '90.**
Q And what were your duties when you were responsible for the programmatic aspects of the repository?
**A Project manager of Yucca Mountain project at the time reported to me.**

82

Q Were you required to appear before Congress during this period?
**A Not that I recall. I might have but I don't remember it.**
Q Were you involved in the development of acceptance rates during this period?
**A Not to the degree that I remember. I might have been.**
Q Wouldn't you have been if you were responsible for the programmatic aspects of the repository?
MR. CRAWFORD: Objection, argumentative.
**A I don't -- you know, I was responsible for the programmatic aspects. If we ever did anything regarding acceptance rates at that time, I don't recall doing anything.**
Q Do you recall if you were involved in the establishment or analysis of acceptance rates prior to your next position in 1990?
**A I don't recall anything. I might have.**
Q We'll go through some documents later to refresh your recollection, but I just -- a lot of

83

documents actually.
**A Whatever.**
Q I just want to know what you recall.
MR. CRAWFORD: Objection. Form.
**A 14 years ago. I don't remember specific documents at this time.**
Q What was the position you took in 1990?
MR. CRAWFORD: Objection, form. Objection, vague.
**A I was detailed initially and then transferred to the Office of Defense Programs. I was the -- what was my title? I don't know. I was director of the Rocky Flats program office.**
Q And what responsibilities did that position involve?
**A It was the restart of the Rocky Flats nuclear weapons production plant after the FBI raid.**
Q Did you have continuing responsibilities for or involvement with the spent nuclear fuel program during this period?
**A None whatsoever.**
Q For how long did you hold this position?

84

**A Until January of '93.**
Q And in January 1993 what position did you take?
**A Admiral Watkins made me acting director of RW.**
Q And RW stands for?
**A Offices of Civilian Radioactive Waste Management.**
Q And what were your duties in that position?
MR. CRAWFORD: Objection, vague. Objection, lack of foundation.
**A The duties of the director of the Office of Radioactive Waste Management.**
Q You ran the program at that point, correct?
**A That's correct.**
Q And have you basically held that position either as acting director, director, or deputy director through today?
MR. CRAWFORD: Objection, vague.
**A I was never the director. I was either the acting director or the deputy director.**
Q And today you are the deputy director,

117

what that schedule is?
MR. CRAWFORD: Objection. Argumentative.
**A The receipt rate of January -- excuse me, the receipt date of January 31, 1998, clearly was always a goal. Okay. Regarding the acceptance rate of so many tons year one, year two, year three, okay, you know, that has changed over time. My focus has always been to create a siting process that got us a site to allow us to have the -- a reasonable receipt rate going toward the steady state 3,000 tons per year, and that's where my focus has always been, not on contract details. Okay. I am not a lawyer, I'm an engineer, okay, so I have not gone into the contract in any great detail at all.**
**Okay, now regarding your question here about the acceptance schedule in the contract, actually I don't recall seeing a metric ton per year in the contract.**
Q Let me step back a second, Mr. Barrett. You just referred to a reasonable receipt rate going toward the steady state 3,000 tons per year.
**A Right.**

118

Q "That's where my focus has always been." Do you recall that testimony?
**A That's what I just said I think.**
Q Does that continue to be your focus to this very day, sir?
**A Yes.**
Q And does that continue to be the focus of the Department of Energy's spent nuclear fuel program?
MR. CRAWFORD: Objection to the form. Objection to the foundation. Objection, vague.
**A We are still trying to perform under the Nuclear Waste Policy Act to receive the waste into the federal system as soon as we can under the constraints of the law. So, yes, that remains my goal and the organization's goal.**
Q Again, just so the record is clear, your goal and the organization's goal is to achieve a reasonable receipt rate going towards the steady state of 3,000 tons per year, correct?
MR. CRAWFORD: Objection to the extent it mischaracterizes prior testimony. Objection, foundation. Objection, vague.

119

**A That has been our goal to do that.**
Q And it continues to be your goal today, correct?
**A Correct.**
Q And it was your goal in 1985, correct?
**A Correct.**
Q And it was the goal of the department in 1982 when the standard contracts were signed, correct?
MR. CRAWFORD: Objection, vague. Objection, calls for speculation. Objection to the extent it mischaracterizes his prior testimony.
**A I wasn't there in '82 so I don't know about '82, but in '85 and today it has always been our intent to try to do what we can from a technical point of view to receive the materials at a reasonable rate.**
Q And the reasonable rate is the rate that would ramp up -- is a rate that would ramp up towards 3,000 MTUs per year, correct?
MR. CRAWFORD: Objection, vague. And foundation.
Q I believe your counsel cut you off. What was your answer, sir?

120

**A That has been our intent.**
Q Let's go back to paragraph three, page seven. You referred to January 31st, 1998, as being a goal. Was it something more, wasn't it a contractual commitment and a statutory command?
MR. CRAWFORD: Objection, argumentative. Objection, best evidence. Objection to the extent it calls for a legal conclusion.
**A As an engineer, okay, and as a program administrator, okay, and dependent on what the contract said or what courts said, we were always trying to achieve that goal.**
Q And why did you establish that goal for yourself?
**A Because --**
Q And your department?
**A It was set in the law, okay, that our goal was to try to create a facility and to create a system that would meet that goal of January 31st, 1998, to start to receive fuel. And it has always been an important objective and goal.**
Q To start to receive fuel on January 31st,

1998, at a ramp-up level that would -- in a reasonable amount of time and at a 3,000 per year MTU acceptance rate, correct?

MR. CRAWFORD: Objection to the form. Objection to the mischaracterization of prior testimony. Objection to the extent it assumes facts not in evidence.

A **It was a systems goal to receive the material at a reasonable rate, okay, of which the 3,000, ramp up to 3,000 tons was a reasonable rate. It was never a -- in my opinion it was never a legal requirement to do 3,000 tons per year.**

Q You base the goal on the statute, correct? That's what you've testified to, correct?

A **Yes.**

Q Back to paragraph three --

A **Excuse me. Let me go back to that. When you say the statute does not say 3,000, okay, that was a judgment part. It is the receipt in January 31, 1998, is in the statute. The rate to my knowledge is not in the statute.**

Q So why did you set the 3,000 MTU goal?



A **That was a --**

MR. CRAWFORD: Objection to the fact that that question assumes facts not in evidence.

A **That was in our judgment a reasonable rate, steady state rate to move up to under the circumstances we were in.**

Q Paragraph three. I'm not certain I understand your testimony. I'm still unclear what you're referring to with respect to the acceptance schedule. You see that language, acceptance schedule in paragraph three?

A **You asked me to interpret this paragraph three which I never wrote.**

MR. CRAWFORD: He's asking you whether you see that.

A **Do I see it? I see that line.**

Q And what do you understand that to be referring to? What acceptance schedule did the standard disposal contract provide for?

MR. CRAWFORD: Objection to the foundation of the question and objection, best evidence.

A **I don't know because I do not recall an**



**acceptance schedule in the contract itself. So I would have -- I don't know what this means.**

MR. CAYNE: It's 12:30. Let's break for a one-hour lunch.

(A luncheon recess is taken.)



AFTERNOON SESSION

BY MR. CAYNE:

Q Good afternoon, Mr. Barrett. Who are the individuals that report directly to you in your position as deputy director?

A **Now?**

Q Yes.

A **Dr. Russell Dyer, project manager Yucca Mountain project; Sandra Waisley who is the acting director of the U.S.A. subprogram administration; and Mr. Jeffrey Williams who is the acting director of office of waste acceptance and transportation international or technology -- technology and QA director. Mr. Ron Murthey, and Mr. Ronald Milner who is the chief operating officer.**

Q Do you work with Mr. David Zabransky?

A **Yes.**

Q And what position does he hold?

A **I think he is now the acting director of transportation and waste acceptance.**

Q And in that capacity to whom does he report?

177

answered.
A I have no idea how many meetings.
Q A handful?
MR. CRAWFORD: Objection. Asked and answered. Objection, foundation.
A Don't know.
Q Could it have been as many as five?
MR. CRAWFORD: Objection, asked and answered. Argumentative. Foundation.
A Don't know.
Q You don't know whether it was as many as five?
A Could have been.
MR. CRAWFORD: Objection, argumentative.
Q Over what period of time did these meetings occur?
MR. CRAWFORD: Objection, argumentative. Objection, foundation and asked and answered.
A In the post-'94 budget decision when the MRS volunteer was unlikely to go forward.
Q Do you know whether there were any contacts made by any member of your office to Secretary Hodel

178

in 1994 concerning the contents of Secretary Hodel's letter of September 7th, 1984?
A I don't know of any.
Q Do you recall whether during any of the meetings you attended in which Exhibit 3 was discussed whether any member of your office, the Office of Civilian Radioactive Waste Management Program, whether any member of your office expressed the view that there were misstatements of fact or law in Secretary Hodel's letter?
MR. CRAWFORD: Objection. Asked and answered. Objection, foundation.
A Repeat how you phrased that.
Q Do you recall whether during any of the meetings you attended in 1994 in which Exhibit 3 was discussed, whether any member of your office took the position that there were -- that the letter of Secretary Hodel dated September 7th, 1984, contained any misstatements of fact or law?
MR. CRAWFORD: Same objection.
A Don't know.
Q No recollection?

179

A Don't recall.
Q Page 97, Exhibit 2, the same paragraph we've been referencing. Can you tell me what the reference is in the fourth line to a firm schedule?
A Fourth line of which paragraph? Oh, I see. Okay.
MR. CRAWFORD: Objection, foundation. Objection to the extent it calls for speculation.
A I don't know what more to say than what it says here. I don't know what they were talking about.
Q What is your understanding of the term "firm schedule" as it is used in this document?
A Firm or just the word "schedule" beginning in '98, which is repeating back what the statute says. So adding the word "firm" in front of "schedule" is meaningless to me, but maybe it meant something to the writer.
Q Do you recall whether that term was discussed by any members of your staff in the 1994 time period?
A I have no recollection of the word "firm" being used in front of any schedule in this program

180

ever.
Q Would you turn to page 99 of Exhibit 2. Take a look at the third full paragraph on page 99 that starts, "the owners and generators." Do you see that?
A Uh-huh.
Q Take a moment to read that.
A Okay.
Q Are you familiar with the position stated there?
A Yes.
Q What is your familiarity with that position?
A That the act requires the utilities to store the waste until January 31, 1998.
Q And after January 31, 1998, whose obligation is waste storage?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion. Objection to the foundation.
A My interpretation is it's silent about that.

181

Q Is this consistent with your understanding?
MR. CRAWFORD: Objection, asked and answered.
**A I go back to the act. The act says that the utilities are responsible for storage until the department takes the waste, and it gave a date of January 31, 1998, to start. It was always the tenant that, even when we started, if we started as advertised -- I mean, there would be some storage going on afterwards anyway. So the utility is responsible for safe storage of the waste.**
Q You refer to some storage. What storage were you referring to?
**A Some utilities are still going to have to do storage of the waste while we were operating. It may not have had allocations. There are many different things.**
**(Deposition Exhibit Barrett 4 was marked for identification and was retained by counsel.)**
Q Mr. Barrett, the court reporter has handed you a document marked for identification as Exhibit 4. Do you have that in front of you?

182

**A Yes, I do.**
Q And this document is a draft of the Civilian Radioactive Waste Management Program Mission Plan as of December 20th, 1983. Do you see that?
**A Yes.**
Q I would like to refer your attention to the third paragraph under Introduction.
MR. CRAWFORD: What page are we on?
MR. CAYNE: Page 1-1.
**A Okay.**
Q Please let me know after you've read that.
**A Okay. I read it.**
Q Do you agree with the statement made in Exhibit 4 that the waste acceptance schedule will initially preclude the need for additional at-reactor storage after January 31st, 1998, and ultimately remove from at-reactor storage all waste that is more than five years old?
MR. CRAWFORD: Objection, vague. Objection, foundation.
**A I don't know. I would have look in here and see what it did.**

183

Q Well, would the mission plan as it stood in 1985, based on your knowledge of it, preclude the need -- had it been implemented as it stood in 1985, would that have precluded the need for additional at-reactor storage after January 31st, 1998?
MR. CRAWFORD: Objection, vague. Objection, foundation.
**A Not necessarily.**
Q Might it have?
**A Might have; might not have, too.**
Q How would you make that determination?
MR. CRAWFORD: Objection, vague. Objection, foundation. Objection to the extent it calls for speculation.
**A You would have to look to see what utilities could go when under the oldest-fuel-first allocation and all that. So it becomes very complicated to figure out if someone would have to do additional storage or not.**
Q Did anyone in your office ever make, attempt to make that determination on a utility-by-utility basis?

184

MR. CRAWFORD: Objection, foundation. Objection, vague.
**A Not to my knowledge.**
Q You made a reference to oldest-fuel-first allocation. To what were you referring?
**A It's my understanding that under the framework of the act that the allocations for service are provided to the contract holders on an oldest-fuel-first basis.**
Q Were there also certain exceptions to that under the act or contract?
MR. CRAWFORD: Objection, compound.
**A What do you mean by exemptions?**
Q Exceptions --
**A What do you mean by that?**
Q For example, for shut-down reactors.
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion. Objection, compound.
**A The framework -- now, I don't know if it's in the statute or if it's in the contract -- is we have the ability to approve, I'll use the words hardship cases to allow people to have an earlier or**