273

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-----------------x
YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C.
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C
-----------------X
(Caption continued on next page)

Continued Deposition of LAKE H. BARRETT
Washington, D. C.
Tuesday, April 23, 2002
9:36 a.m.

Job No.: 11792-5
Pages 273 through 526, Volume 2
Reported by: Diane Gomez, RPR

274

DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
-----------------X

275

Continued Deposition of LAKE H. BARRETT, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public in and for the District of Columbia.

276

APPEARANCES

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:

DEVON E. HEWITT, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 893-0527

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:

JEFFREY L. HANDWERKER, ESQUIRE
HOWARD CAYNE, ESQUIRE
RONALD A. SCHECHTER, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004-1206
(202) 942-5000

fuel.

MR. CRAWFORD: Same objections.

A **Probably.**

Q Probably. Now, let's return to the scenario I asked you to consider a few moments ago, that the repository design receipt rate is set at a level of 900 MTUs. Do you recall we discussed that?

A **Yes.**

Q And do you recall that you indicated that in order to eliminate the backlog under an annual receipt rate of 900 MTUs, it could take 80, 90, even more years? Do you recall that?

MR. CRAWFORD: Objection to the foundation. Objection to the hypothetical.

A **It will take considerably longer at 900 versus the 3,000.**

Q Wouldn't that fact that it would take considerably longer have an effect on the adequacy of the fee assessment in light of your testimony that the program was intended to be operated on a full cost recovery basis?

MR. CRAWFORD: Objection to the form.



Objection, vague.

A **Not necessarily.**

Q And why did you say that, sir?

A **Because it all depends upon the amount of capital is there, the return on the investment versus the expenditures. There are different scenarios that were timed generally is on the side to make the fee more adequate.**

Q But are there definitely scenarios that you can envision sitting here today, Mr. Barrett, that a repository design receipt rate set at 900 MTUs would have required the Department of Energy to have imposed a higher fee assessment upon the operators of nuclear reactors?

MR. CRAWFORD: Objection to the foundation. Objection, vague.

A **Repeat the question again.**

Q Certainly. Sitting here today can you identify scenarios under which a repository design rate set at 900 MTUs per year would have required the Department of Energy to have imposed a higher fee assessment upon the operators of nuclear reactors,



higher than the fee assessment that in actuality was imposed by the department?

A **No.**

Q You don't see any circumstance in which the fact that the department would be required to operate the repository for 80, 90 or more years as opposed to in the ballpark of 30 years would require the assessment of higher fees. Is that your testimony?

A **Yes.**

Q And what is the basis of that testimony?

A **Because the rate of return on the monies not spent would more than pay for the additional costs due to the extended time because this program is front-end loaded dollarwise, it is not back-end loaded dollarwise. So I cannot -- at those low expenditure rates of a 900-ton-per-year system you most likely -- the value of the time of your investments would exceed your costs so that your fee adequacy is probably better. The only exception where you would get into trouble with that in finance space would be if there were other costs on the waste fund that are not part of the system. Such as damages.**



Q Is it your testimony then that it would have been less costly for the Department of Energy to operate a repository for a period of 80, 90 or more years than it would have been for the department to operate a repository in the ballpark of 30 years?

MR. CRAWFORD: Objection to the foundation. Objection, vague.

A **No.**

Q In fact, it would have been much more expensive to the department to operate the repository for a period of 80, 90 or more years as contrasted with operations in the ballpark of 30 years, correct?

A **Yes.**

Q Are you aware of any TSLCC or fee adequacy study undertaken at any time that assumed a repository design receipt rate of 900 MTUs per year on a steady state basis?

A **No.**

Q Are you aware of any TSLCC or fee adequacy study that assumed a 900 MTU per year acceptance rate on a steady state basis?

A **No.**

349

Q In fact, Mr. Barrett, to your knowledge have not all of the TSLCC and fee adequacy studies assumed 3,000 MTU per year acceptance rates or repository design receipt rates?
MR. CRAWFORD: Objection to the foundation.
Q To your knowledge, sir.
**A Repeat the question again.**
Q To your knowledge, Mr. Barrett, have all TSLCC or fee adequacy studies issued on or after 1982 assumed a 3,000 per annum MTU acceptance rate or a repository design receipt rate?
MR. CRAWFORD: Objection to the foundation.
**A Some had more.**
Q Some had more? Which ones had more?
**A Ones that had two repositories in it had rates higher than 3,000.**
Q What was the highest annual aggregate rate of any of the TSLCC or fee adequacy studies that you're referring to?
MR. CRAWFORD: Objection. Best evidence.
**A Some of the earlier ones, pre-'87, had two repositories at steady state which would run higher at**

350

**nominal 6,000 tons.**
Q Per year?
**A Per year. All recent ones, since '87 or so to my knowledge are basically steady state at 3,000.**
Q And by recent ones -- I'm sorry.
**A In the 1990s the TSLCCs had a state steady receipt rate at 3,000 tons per year.**
Q And what about the most recent study?
**A I believe the most recent ones --**
MR. CRAWFORD: Objection, best evidence.
**A -- is 3,000 tons per year steady state.**
**(Deposition Exhibit Barrett 15 was marked for identification and was retained by counsel.)**
Q Mr. Barrett, the court reporter has handed you a document marked for identification as Exhibit 15, which is a multipage document, the first page of which is a routing and transmittal slip directed to L. Barrett, J. Hale, S. Brocoum, B-r-o-c-o-u-m, A. Brownstein, B-r-o-w-n-s-t-e-i-n, W. Danker, D-a-n-k-e-r, MRS team and D. Shelor, S-h-e-l-o-r. And attached to that is a multipage memorandum that the subject line reads "Document Change Proposal to

351

Baseline, the Proposed Waste Acceptance Schedule." Do you have that document before you?
**A Yes.**
MR. CRAWFORD: Howard, why don't we go ahead and note the Bates range on the record.
MR. CAYNE: The Bates range of this document is CTR-045-1032 -- doesn't look like it's in -- these numbers are off.
MR. CRAWFORD: I think it's 1041 is probably the last one.
MR. CAYNE: That's correct.
Q Do you have that document, Mr. Barrett?
**A Yes.**
Q Could you identify for me who S. Brocoum is?
**A He worked in the Office of Geologic Repositories at that time.**
Q What was his position?
**A I don't recall what his title was.**
Q Who is W. Danker?
**A He worked on international matters. That's all I remember.**

352

Q And who is D. Shelor?
**A He worked storage and systems engineering work.**
Q Who is Joe Daly?
**A He was a cost analysis type person. Cost analyst I guess is the right term.**
Q Is this your writing on the first page?
**A No, it is not.**
Q Are you able to read the handwriting under the black box in the upper left-hand side of this page?
**A No.**
Q Looks to me like "handed over," but I'm not certain.
**A I don't know what that says. No, I can't figure that out. "Over" looks like the last word. The front part of that, I don't know what it is.**
Q Have you seen this document and the attached memorandum in the past?
**A I don't recall ever seeing it.**
Q You don't recall ever seeing the attached memorandum? Did you not write the attached

527

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - x
YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C
- - - - - - - - - - - - - - - - - X
(Caption continued on the next page)

Continued Deposition of LAKE H. BARRETT
Washington, D. C.
Friday, April 26, 2002
8:10 a.m.

Job No.: 11792-8
Pages 527 through 825, Volume 3
Reported by: Diane Gomez, RPR

528

DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
- - - - - - - - - - - - - - - - - X

529

Continued Deposition of LAKE H. BARRETT, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public in and for the District of Columbia.

530

A P P E A R A N C E S
ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:
DEVON E. HEWITT, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:
HOWARD CAYNE, ESQUIRE
JEFFREY L. HANDWERKER, ESQUIRE
RONALD A. SCHECHTER, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004-1206
(202) 942-5000

699

need to find out if you have an understanding of what's in this document, sir.
This morning you testified that DCS stood for delivery commitment schedule. Do you recall that?
**A Yes.**
Q What, without looking at the document, are you able to tell me is the purpose of a DCS?
**A I believe they were something to do with the planning for the receipt of material into our system in the future, ten years or something in the future. And it related to the contract.**
Q Why did you view it as administrivia?
**A Because I did not consider it pertinent to the primary business, which was to determine if the repository site was suitable so we can get on to build the facility to be able to receive it.**
Q What consideration did you personally give to the data produced by a DCS?
**A What?**
Q What consideration did you give to the data produced on a DCS?
MR. CRAWFORD: Objection, vague.

700

Objection, foundation.
Q Did you give any?
**A What consideration -- repeat the question again.**
Q A DCS form contains certain data, correct?
**A I really don't know if it has data in it or not.**
Q Let me ask you to look at item number two on the first page, "Who should submit." Do you see that item?
**A Yes.**
Q Why does that item provide that the DCS should be submitted by all purchasers with allocations in the '91 annual capacity report?
MR. CRAWFORD: Objection, foundation, vague.
**A I don't know.**
Q Do you know why the '91 annual capacity report was a report that was chosen?
MR. CRAWFORD: Objection, foundation.
**A No.**
Q Could a nuclear utility that submits a DCS

701

or submitted a DCS request an allocation amount that was different than the amount specified in the 1991 annual capacity report?
MR. CRAWFORD: Objection, assumes facts not in evidence. Objection, foundation.
**A I don't know.**
Q Let's turn to page two. Can you read, take a look at entry 7C.
**A Okay. I've read it.**
Q Now, you see that it states that the DCS -- do you know what FWMS stands for? Is that federal waste management system?
**A I think so.**
MR. CRAWFORD: Objection, best evidence.
Q You see the statement that "The process described herein assumes that the federal waste management system will be able to accept the purchasers' SNF beginning in 1998 according to the acceptance rate reflected in the ACR"?
**A I see that.**
Q Based on your testimony earlier today, as of what date in your opinion would that have been an

702

unreasonable assumption that spent fuel acceptance would be beginning in 1998? Did you indicate earlier today that that projection became unreasonable sometime in mid to late 1993?
MR. CRAWFORD: Objection. Mischaracterizes his prior testimony.
**A In late '93 it became, you know, in my mind unlikely to happen.**
Q Do you know why this instruction form for completing DCSs contains that assumption?
MR. CRAWFORD: Objection to the extent it calls for speculation.
**A No.**
Q Do you know what the relevance of that assumption was in connection with the DCS process?
MR. CRAWFORD: Objection, foundation, vague, and objection to the extent it calls for any kind of a legal conclusion.
Q Let me strike that question and ask you to -- subparagraph C, it says "In the event that such circumstances change" -- referring to the assumption that you and I just discussed, Mr. Barrett. Do you

**readiness for earlier transportation should a site for federal interim storage become available sooner than a repository." I believe that's the only part in here on the MRS.**

Q You believe that's the only reference in this document to an MRS?

**A My quick scan here, my recollection was I don't remember anything else. Somebody else may have read it closely.**

Q Turn your attention to page one, Bates 174286.

**A I'm sorry, page one?**

Q Page one on the bottom, paragraph one.

**A Okay.**

Q On the end of the introduction section it states that "By 1993 it became clear that continuation of the program in accordance with the then-current approach was no longer a viable option." Do you see that?

**A Yes.**

MR. CRAWFORD: Where is that?

MR. CAYNE: Last sentence of the



introduction.

**A Yes, I see it.**

Q What was the then-current approach that's being referred to in that statement?

**A That was the volunteer MRS that would -- had a reasonable chance of success for 1998. That was no longer a viable option.**

Q So that was no longer a viable option?

**A I would have used the word "unlikely," but it's certainly not the central premise for waste acceptance anymore.**

Q The department used the word "viable," correct?

**A That's what it says.**

Q And you would have seen this document before it was issued, correct?

**A Yes.**

Q And I assume you were in the chain of command that had to approve this document?

**A I was responsible, I'm sure. I don't know if I ever signed it off or not.**

Q You would have been satisfied with the



language of this document, correct, before it became final?

**A Yes.**

MR. CRAWFORD: Objection, asked and answered. Argumentative.

**A I would have accepted those words there.**

Q The words being "no longer a viable option," correct?

MR. CRAWFORD: Objection, asked and answered. Argumentative.

Q Correct?

MR. CRAWFORD: Objection, asked and answered, argumentative.

**A Correct.**

Q Page four, please, bottom of page four. The first sentence. "When the Nuclear Waste Policy Act was enacted, it was envisioned that the department would have had a facility available in 1998 to accept waste for disposal, and the department entered into contracts with utilities on that basis." Do you see that?

**A Yes.**



Q What does that mean, that the department entered into contracts with utilities on the basis that it would have a facility available in '98 to accept waste for disposal?

MR. CRAWFORD: Objection to the extent it calls for speculation.

**A Just what it says.**

Q Do you understand what that means?

**A The act says we should have a contract within the time frame, and they put those contracts together under the limited time there in '83, '84. The base operating premise was it would have a facility ready to accept in 1998.**

Q The time the contract was signed or contracts were signed in 1983, that is what the government and the nuclear utilities intended?

MR. CRAWFORD: Objection --

Q Correct?

MR. CRAWFORD: -- to the extent it calls for speculation. Objection to the extent it calls for a legal conclusion.

**A I wasn't there. I wasn't involved in a**

743

**program then, so I don't know what they envisioned.**
Q But is that your understanding?
MR. CRAWFORD: Objection to the extent it calls for speculation. Objection to the extent it calls for a legal conclusion.
**A Yes.**
Q Page nine, please. Under Waste Acceptance Storage and Transportation Approach, towards the bottom of the page it says, The main aspects of the approach for waste acceptance storage and transportation are to" -- and it gives then six separate entries on pages nine and ten. Do you see that?
**A Yes.**
Q And specifically on the top of page ten, the first line it says "Because more detailed work would not be useful until a specific site has been selected, no development work is included in the current plan." Do you see that?
**A Yes.**
Q Is that referring to an MRS facility?
**A Site-specific MRS facility is what that**

744

**refers to.**
Q And again by "site-specific MRS facility," specifically what are you referring to?
**A The actual siting of a facility. If we did generic work was the previous sentence. We did generic work for a generic facility. It could be sited anywhere. So if a site develops through some political process, we would be able to quickly build such a facility to receive fuel as quickly as possible.**
Q And at this time the department did not think that to be a viable option, correct?
MR. CRAWFORD: Objection. Best evidence.
**A There was a low probability.**
Q Low probability did you say?
**A Yes.**
Q And, in fact, such a specific site never did become available through today?
**A Correct.**
**(Deposition Exhibit Barrett 37 was marked for identification and was retained by counsel.)**
Q Exhibit 36, under Fiscal -- on page 14,

745

under Fiscal Year 2000 it states that "The site recommendation will be submitted in a report to the President in 2000." Correct?
MR. CRAWFORD: Objection, vague.
**A Yes, it says that.**
Q And the page before to which that refers, the caption of that page is Major Milestones for Program Success. Do you see that, page 13?
**A I see the chart.**
Q So according to this chart, the recommendation, the site recommendation to the President was one of the major milestones for program success, correct?
**A Yes.**
Q And that milestone, in fact, has occurred two years later than planned for in the radioactive management program plan set forth in Exhibit 36, correct?
**A Close.**
Q What's close? It occurred two years after the date, correct?
**A Including FY '02, but depending on when in**

746

**the year, a little less than two years.**
Q Is it fair to say that as of now the program is at least a little less than two years behind schedule, as reflected by the major milestones for program success?
**A As defined back in '94, yes.**
Q The court reporter has handed you a document marked for identification as Exhibit 37. It is a memorandum, Subject: Total life cycle cost 1995 assumptions package from Ronald A. Milner, Director, Office of Program Management and Integration, bearing Bates HQR-057-1493 through HQR-057-1569. Do you have that document before you?
**A Yes.**
Q Could you please turn to page Bates number 14 -- oh, this is -- it says RW-30 in the top left corner. Do you see that?
**A Yes.**
Q Could you please refer to Bates 057-1498. First, what would your involvement in this, in the preparation or review of this document have been?
**A I would have signed off on a final total**

1104

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-----------------x
YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C
-----------------X
(Caption continued on the next page)

Continued Deposition of LAKE H. BARRETT
Washington, D. C.
Friday, May 10, 2002
8:06 a.m.

Job No.: 11792-11
Pages 1104 to 1437, Volume 5
Reported by: Diane Gomez, RPR

1105

DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
-----------------X

1106

Continued Deposition of LAKE H. BARRETT, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public in and for the District of Columbia.

1107

APPEARANCES

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:

DEVON E. HEWITT, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:

HOWARD CAYNE, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004-1206
(202) 942-5000

reference to a variety of DOE documents. My question is do you have an understanding of the term "steady-state rate"?
A **I believe so.**
Q What's your understanding of that term?
A **Basically constant over time.**
Q I believe you testified that there is a relationship between the 3,000 MTU annual steady-state rate and either the discharge rate or generation rate. Is that correct?
A **There's a difference.**
Q Is there a relationship between the two?
A **Discharge rate is what it is. Utilities control that. The receipt rate, which is what you call 3,000, is something that is variable, but depending upon the system we design to build, we can vary that. So there's no direct relationship between the two.**
Q My understanding from your testimony -- and please correct me if I'm wrong -- was that the 3,000 MTU steady-state rate or receipt rate as you just used that term, was chosen in part because it exceeded the



discharge rate or the generation rate by utilities. Is that right?
A **Correct.**
Q What other factors went into choosing a 3,000 MTU receipt rate?
A **The 3,000 rate that we have was established before I was ever involved in the program. It's my understanding that it was looked at then as a proper balance for total life-cycle costs as well as near-term cash flow requirements and performance. If you make the number too high, then you have -- you would quickly work off the backlog, and then you would have a lot of idle capacity. If it was too low, you would have reactors needing to put in dry storage, and 3,000, based on an early 1980s, seemed like a reasonable number to use.**
Q Do you know if there were any studies that talked about the 3,000 rate being a reasonable number to use?
A **I don't know of any that were done back then, but I'm told there were some done. I never had reason to ever look. There were some -- we went**



**through some of them here that were done in the middle eighties and some done in the early nineties that would say that you can run them at a higher rate. And you can run them at a higher rate and there are puts and takes on costs and performance.**
Q And am I right in understanding that the 3,000 steady-state rate has been used as the steady-state rate in the majority of design documents for the facility that DOE will eventually use to take and emplacement spent nuclear fuel?
A **Yes, it's around 3,000.**
Q And am I also right in understanding that the 3,000 steady-state rate has been the rate that is used in the majority of documents issued by DOE with regard to total system life-cycle costs?
A **Correct.**
Q With regard to those documents, the documents issued in connection with estimating total system life-cycle costs, what is that document supposed to reflect, the TSLCC document?
A **Our best estimates of what the costs would be, you know, year by year for the program. And to**



**determine those you would have some assumption as to what the receipt rate would be, and we used 3,000.**
Q And is the receipt rate of 3,000 used because that's what your intention at the time you issued that TSLCC report, is that the intention at that time, to use that rate for whatever facility you would have running when you begin to accept spent nuclear fuel?
MS. HERRMANN: Objection. Foundation.
A **At steady state, yes.**
Q Do you have an understanding of what the term "waste management system" is?
A **Yes.**
Q What's your understanding of that term?
A **That would be the transportation system to remove it from the reactors. It would be an MRS if there were to be an MRS, and it would be the repository, or repositories if we have more than one.**
Q With regard to the transportation system, other than the RFP that we've discussed just a couple of hours ago, were there any other documents that talked about the acceptance rate or the physical