IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - -x

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C) (Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C) (Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C) (Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C) (Wiese, J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C) (Sypolt, J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C) (Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C) (Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C) (Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C) (Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C) (Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

Page 243

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
--------------------xSypolt)

McLean, Virginia
Wednesday, April 10, 2002

Continued deposition of ALAN BROWNSTEIN, a witness, recalled for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being previously duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman,

Page 244

LLP, 1650 Tysons Boulevard, McLean, Virginia 22102-4859, at 9:26 a.m., Wednesday, April 10, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

Page 245

APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) (770-7901)

On behalf of Plaintiff Sacramento Municipal Utility District:
DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

Page 246

APPEARANCES: (Continued)
On behalf of Plaintiffs Southern Nuclear Operating Company, Alabama Power Company, Georgia Power Company:
JEFFREY L. HANDWERKER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-6101

On behalf of Plaintiff Wisconsin Electric Power Company:
DONALD J. CARNEY, ESQ.
Perkins Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
(202) 434-1675

On behalf of Plaintiff Commonwealth Edison Company:
NORMAN M. HIRSCH, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

Energy's plans for nuclear waste at Yucca Mountain?
A. What time period are you referring to?
Q. March 14th of this year.
A. No.
Q. Did you ever discuss that testimony with Mr. Barrett?
A. Not that I recall.
Q. Do you know whether Mr. Barrett testified on the Hill on March 14th?
A. I believe he did.
Q. And what do you know about that subject?
A. I wasn't involved in the preparation of that testimony, and I don't believe I actually reviewed, reviewed that testimony. I wasn't involved in that one at all.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. Give me just a second, okay?
A. Sure.
(There was a pause in the proceedings.)
MR. TOMASZCZUK: Mr. Brownstein, at



this time, I don't have any further questions for you. I would like to thank you for your time and your cooperation. I very much appreciate it.
I know it has been a long day and a half, and I need to adjourn the deposition because there are some documents which we believe still have not been produced that may bear upon your testimony, so I reserve the right to call you back if and when those documents are produced, and that includes but are not limited to documents on a privilege log that the government has provided to us, but at this time, I have no further questions, and I adjourn subject to those conditions.
THE WITNESS: Okay.
MR. BANES: We reserve the right to, we reserve the right to object to reopening, so with that, I'm going to ask a few questions.
EXAMINATION BY COUNSEL FOR DEFENDANT
BY MR. BANES:
Q. So Mr. Brownstein, let's see here if you could just get out Exhibit 1. It's the contract. It's in there



somewhere.
(There was a pause in the proceedings.)
THE WITNESS: Okay.
BY MR. BANES:
Q. Let's see. Turn to page, there is a Bates stamp number the bottom. It says ADM-001, and then I'm going to use that last four digits if you could turn to page 660 for a moment in Exhibit 1?
A. Okay.
Q. Mr. Tomaszczuk was asking you several questions about the Delivery Commitment Schedules and how they related to the contract. Do you remember that testimony?
A. Yes.
Q. Turn to paragraph or Article V.B that's located down there on this page 660.
A. Okay.
Q. Was this the paragraph you were talking about earlier that was the basis for Delivery Commitment Schedule instructions?
A. Yes.
Q. Now turning to where it says beginning January 1st, 1992, purchaser shall submit to DOE



the Delivery Commitment Schedules or schedule which shall identify all SNF or HLW the purchaser wishes to deliver beginning 63 months thereafter.
Now can you tell me, could you just explain for me how you interpreted that paragraph and how it translated into the Delivery Commitment Schedule instructions?
MR. TOMASZCZUK: Objection. It's compound, calls for a legal conclusion.
(The witness reviewed the document.)
THE WITNESS: I combined that paragraph with Appendix C of the contract.
BY MR. BANES:
Q. Okay. And did you believe that the delivery -- let's take a look at the Delivery Commitment Schedule. Pull that out for a minute. That was Exhibit 34.
A. Yes.
Q. Did you believe that those, Exhibit 34 was consistent with the provisions of the contract regarding Delivery Commitment Schedules?
A. We used the Appendix C as a basis for that, yes.

Page 391

Q. Okay. Now with respect to when a purchaser would submit a Delivery Commitment Schedule, let's say a purchaser wanted to, pursuant to this paragraph B on the contract, Article V.B., if a purchaser wanted to deliver SNF beginning in say 1998, when would they have to submit a Delivery Commitment Schedule?
A. It's clear in our mind you would have to subtract 63 months from that date.
Q. Okay. Now if they didn't want to, if a purchaser did not want to deliver any SNF in 1998, would they have to submit a DCS 63 months prior to that?
A. No. It states that purchaser shall identify all SNF and/or HLW the purchaser wishes, emphasize wishes, to deliver to DOE beginning 63 months thereafter.
Q. So but was this, was the submission of a DCS a prerequisite, pursuant to the contract in your opinion, was submission of a DCS a prerequisite to acceptance of a purchaser's spent nuclear fuel?
A. In my mind, it was.
Q. And was that pursuant to this, was it a prerequisite 63 months prior to the date they

Page 392

wished delivery to occur?
MR. TOMASZCZUK: Objection to the form.
I don't know what "this" is.
BY MR. BANES:
Q. Was it, was such a, was such acceptance of spent nuclear fuel a prerequisite, or was submission of a DCS 63 months prior, in your opinion, a prerequisite to DOE's acceptance pursuant to the contract to such spent nuclear fuel?
A. Yes.
Q. All right. Now if a, if a utility decided not to submit a DCS -- well, strike that.
If a utility -- let's see. Prior to, I think you testified earlier prior to acceptance of spent nuclear fuel, who in your opinion was responsible for this, for storage of the spent nuclear fuel?
A. I think it is in my mind, and based on several documents, it is clear that the utilities remained responsible until DOE accepted it.
Q. In the documents you prepared, did you

Page 393

convey that to the purchasers?
A. I did.
Q. All right. Now let's take a look at --
(There was a pause in the proceedings.)
BY MR. BANES:
Q. Okay. With respect to, with respect to the rates, acceptance rates contained in each of these documents we have looked at, I think that you testified earlier that they were subject to a whole host of assumptions, is that correct?
A. Yes.
Q. Now so let's take a look at Exhibit 6 and go to Table 2 dash 1 or 2.1 on page 7.
(There was a pause in the proceedings.)
THE WITNESS: Okay.
BY MR. BANES:
Q. Now on page 7 of this document, there is a, there is what purports to be called illustrative waste acceptance schedule.
And then at the top there, it says the waste acceptance schedule, or excuse me -- this

Page 394

schedule is only an approximation, approximation of how the system may operate and is subject to uncertainties that are recognized in the mission plan.
Why did you include that language in this Annual Capacity Report?
A. We knew that there were, you know, at different times in the program, you know, whether there were legal restrictions, we certainly knew that there were challenges, and we wanted to make it clear to the utilities and everyone understood that we were at the early stages, and these were our best projections at the time, and we tried to be clear over the years of why, and, and that they were subject to change.
Q. In your opinion, with respect to Table 2 dash 1, would it be appropriate to read 2.1 in this 1987 Annual Capacity Report without reading the entire document?
A. Well, I believe it's always inappropriate to pull out any excerpt from a document.
A document's prepared. All words have meaning, and should be read in the context of

Page 399

proceedings.)
MR. BANES: Okay, sir. Just a second here.
(There was a pause in the proceedings.)
BY MR. BANES:
Q. Okay. Turn to Exhibit 26 for a minute, sir?
A. I really need to organize this. If these are going to be the subjects of questions, I have to get them in some order.
Twenty-six, I've got it.
Q. Okay. Okay. All right. Turn to Exhibit 26.
Let's go back to that paragraph you were discussing with Mr. Tomaszczuk. It starts the publication of the ACR, APR.
If you would just read that entire paragraph for me?
You don't have to read it outloud. You can read it to yourself.
A. Thank you.
(The witness reviewed the document.)
THE WITNESS: Okay.
BY MR. BANES:

Page 400

Q. All right. Now in the statement there, I think Mr. Tomaszczuk asked you what you meant by the publication of the APR begins the contractually binding waste acceptance process.
Does the remainder of that paragraph refresh your recollection what, why that word begins is there?
A. Well, in my mind, the contract laid out a process, as I have testified, beginning with the ACR, ACR following with the APR, to be followed by the DCS to be followed by the FDS.
That's what I was referring to.
Q. Okay. And all right. So as far as this contractually binding waste acceptance process, were you referring to all of that process, or just the APR?
A. No. Begin the process, the APR was the sort of the second step, well, the first step in the process leading to the FDSs, which is the last step leading to the, to the actual acceptance.
Q. And with respect to the process, while it hasn't been marked as an exhibit, Mr. Tomaszczuk showed you the what has been kind of referred to as the Starship Enterprise chart?

Page 401

A. Yes.
Q. Did that, did that chart lay out what this process, this process was supposed to be from the beginning of the contract all the way to acceptance and delivery?
A. That was, that was its intent.
Q. And looking at this, we just I guess won't mark it, but --
MR. TOMASZCZUK: I'm going to come around.
THE WITNESS: If we're going to do it, could we move it closer?
This is not the easiest thing in the world to read.
Can you see it from here?
(A discussion was held off the record.)
BY MR. BANES:
Q. All right. Now I wanted to ask a little bit about the mechanics of the chart?
A. You understand I haven't seen this in, I haven't looked at this in years.
Q. Can you tell where the Annual Priority Ranking first appears, or that let's start with the Annual Capacity Report.

Page 402

Where is that?
A. That's right there.
Q. Let the record reflect that the witness is pointing to a box that has the number 060 in the upper left-hand corner.
And on the far left of the chart, towards the far left of the chart, now there is a dark line here.
A. Right.
Q. What is that dark, what is that dark line supposed to represent? Annual Capacity Report and Annual Priority Ranking?
A. The dark line under the legend indicates the optimum path.
The whole chart is divided basically into two parts which is, which is the first part is if everything went right, this is, this is how the process would go.
And then there were, there were other possibilities, other things that could go, other things that could happen, and what I had asked the contractor to do was to lay out all those other things that could happen and contingencies, and that's what they tried to do here.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - -x

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

Page 468

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
---------------------xSypolt)
McLean, Virginia
Thursday, April 11, 2002
Continued deposition of ALAN BROWNSTEIN, a witness, recalled for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being previously duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman,

Page 469

LLP, 1650 Tysons Boulevard, McLean, Virginia 22102-4859, at 9:38 a.m., Thursday, April 11, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

Page 470

APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 770-7901

On behalf of Plaintiff Sacramento Municipal Utility District:
DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

Page 471

APPEARANCES: (Continued)
On behalf of Plaintiffs Southern Nuclear Operating Company, Alabama Power, Georgia Power:
JEFFREY L. HANDWERKER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-6101

On behalf of Plaintiff Wisconsin Electric Power Company:
DONALD J. CARNEY, ESQ.
Perkins Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
(202) 434-1675

On behalf of Plaintiff Commonwealth Edison Company:
NORMAN M. HIRSCH, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

Page 548

proceedings.)
BY MR. BANES:
Q. Okay. Let's see here. Turning back to Exhibit 43, Mr. Brownstein --
MR. HIRSCH: Which one is 43?
MR. BANES: I think that's one of the, one of these vugraphs.
MR. HIRSCH: Off the record.
(There was a pause in the proceedings.)
BY MR. BANES:
Q. Okay. Now let's see if you could open to Exhibit 43, page 262 -- I just asked him to hold Exhibit 42, page 43 exhibit, or page 262 open for a moment.
And then let's see. I have got now Brownstein Exhibit 36.
Now yesterday we were talking about the, with Mr. Tomaszczuk, we were talking about at what point we are in, the DOE and the purchasers are in the process of the standard contract for setting a rate?
A. Right.
Q. Do you recall that testimony now?
A. Yes, I do.

Page 549

Q. And I think you testified that the, that the point of the process that we're in is in the, in the DCS?
We're still in the DCS process, is that correct.
A. Yes.
Q. Now the utilities and the utilities and the -- to, to your recollection, have you, the utilities and DOE ever agreed upon a mutually acceptable schedule?
MR. HIRSCH: Objection -- vague. Calls for a legal conclusion.
THE WITNESS: Some utilities have submitted the DCSs, and we have approved them.
BY MR. BANES:
Q. Okay. And for those that you haven't approved, what's the process for after disapproval occurs?
MR. HIRSCH: Objection -- vague, no foundation.
Calls for a legal conclusion.
THE WITNESS: I don't know how to identify these boxes.
This exhibit shows the path. If -- once we have completed our review, which is

Page 550

indicated in the box.
BY MR. BANES:
Q. The number in the upper left-hand corner?
A. 005; if we disapprove it and it goes to box 025, then it lays out a series of steps.
We, we disapprove it. We notice the utility of that disapproval, and then the utility is supposed to revise their DCS and submit it to us.
We then go through another review process, and again, we then have two options.
We can approve the DCS, or we can disapprove it.
If we disapprove it again, there is, appears to be two links.
We notify purchaser, and the purchaser -- or we can then propose a DCS to the purchaser. That's a little different than the first one, and I believe that's consistent with the contract.
Do you want me to continue on with the steps?
Q. Sure.
MR. HIRSCH: I'm going to make the

Page 551

same objection I made to the previous question.
THE WITNESS: There is another review process.
Once again, you can end up with an, with approved DCS or, or we could then disapprove what the purchaser proposed, which leads into negotiations between DOE and the purchasers.
BY MR. BANES:
Q. Okay. Now let's go to, let's go to the contract for a minute, Exhibit 1.
A. Okay.
Q. All right. And turn to page 660 of the Exhibit 1.
A. Okay.
Q. And is the process you have just described located, contained somewhere in the contract here?
MR. HIRSCH: Objection -- vague. Calls for a legal conclusion.
THE WITNESS: Yes.
BY MR. BANES:
Q. And where is that?
MR. HIRSCH: Same objection.
THE WITNESS: Under Article V.B.1 and

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - x
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :
Plaintiffs, :
v. :
THE UNITED STATES, :
Defendant. :
- - - - - - - - - - - - - - - - - - - - x

Washington, D.C.
Thursday, May 23, 2002

Deposition of ALAN BROWNSTEIN, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by JAN A. WILLIAMS, a Notary Public in and for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., 20005-3305, at 8:40 a.m., Thursday, May 23, 2002, the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.

Page 166

didn't have a facility, with respect to the first caveat; with respect to the second, what would happen if they had an approved DCS but took no action to submit an FDS, we never really addressed that, I never really addressed that.
You know, every stage -- you know, whether it was the APR or the DCSs, I know in correspondence we urged -- we told the utilities this was consistent with the contract, but we never said -- well, we never did the what-if questions.
BY MR. STOUCK:
Q. So you didn't have any understanding one way or the other about my question which is you have the DCS, but you don't have anything subsequent, you just never thought about it, never focused on it; is that fair?
MR. CRAWFORD: Same objections.
THE WITNESS: I did not think we had a binding obligation with respect to my first caveat which is because the commencement of facility operations. We never really addressed the second caveat situation, where we had that and it stopped.
BY MR. STOUCK:
Q. You never formed that understanding?
A. No.

Page 167

Q. You agree with my statement, never formed an understanding?
A. Yes.
Q. And you expected that utilities, you expected them in the course of the processes discussed in the standard contract, that at some point in time utilities would submit final delivery schedules, that's the way you thought about it?
A. I had every reason to expect that utilities, you know, participated, if you will, in both the ACR, in the development of the APR, and in responding to our instructions on the DCS.
Q. Okay. So you did expect that there would be FDSs for all spent fuel described in a DCS?
A. I did.
Q. And do you know whether it would be possible for DOE to accept spent fuel from a utility if that utility had submitted a DCS to DOE, proper DCS, completely filled out, but had not submitted an FDS? And, just to amplify my question, is there enough information specified in the DCS to allow DOE to accept spent fuel for disposal even if DOE does not subsequently get the additional information specified in the FDS?
MR. CRAWFORD: Objection, compound, vague,

Page 168

and to the foundation and to the extent it calls for a legal conclusion.
THE WITNESS: Not necessarily. Let me try to give you an example. And frankly I would have to go back and review, it's been a long time, whether it's a real example or not. But let's say a utility owned a couple reactors and say one -- a couple examples, one was a PWR and one was a BWR or one facility could accommodate rail and one facility can only do truck.
In the DCS they may put a range of fuel down that encompassed both situations. Under that situation we would not necessarily have enough information whether to show up with the right type of cask, whether it be a BWR, PWR, or a rail or a truck cask. So that's not -- that's why I said not necessarily.
BY MR. STOUCK:
Q. Okay. So there are circumstances such as the examples you just gave me where, in the absence of the additional information set forth in the FDS, DOE would not be in a position to accept spent fuel just on the basis of the information set forth in a DCS with respect to the same fuel?
MR. CRAWFORD: Objection, asked and

Page 169

answered.
THE WITNESS: If that was the only information we have, that could be a problem.
BY MR. STOUCK:
Q. Well, would it be a problem in at least some circumstances, maybe not all, but at least some?
MR. CRAWFORD: Same objection.
THE WITNESS: I would expect it would be a problem especially in the initial years, whenever those initial years were, as we were -- we would be -- we would be ordering casks, for example, we would understand -- the vision was that we would understand what casks of what type we would need and what year.
And we would begin to order that, you know, in an efficient manner from the manufacturers. It wouldn't be a -- we viewed it not as a prudent use of nuclear waste fund dollars to take a look at what we would need over ten years and order that on day one.
So, in the initial years, we may have a limited number of truck and rail casks and those orders would, in fact, be based in part on information that was exchanged in both the DCS and the FDS. That's the basis for how I'm giving you the