IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :
Plaintiffs, :
v. :
THE UNITED STATES, :
Defendant. :

- - - - - - - - - - - - - - - - - - - - x

Washington, D.C.
Friday, June 14, 2002

Continued deposition of ALAN BROWNSTEIN, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being previously duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., 20005-3305, at 8:40 a.m., Friday, June 14, 2002, the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.

Page 279

person to sign was based on the Department of Energy's desire to have a proper certification from the utility, that that utility, quote, has the legal right to deliver such SNF. Is that why DOE was interested in getting the right person, because it wanted to have a proper certification?

MR. CRAWFORD: Objection, asked and answered and objection to the lack of foundation. He has answered your question.

You can give another answer if you like.

THE WITNESS: Well, I don't know any other answer to give other than the one I've given.

BY MR. STOUCK:

Q. Which is?

MR. CRAWFORD: Well, objection asked and answered. He's given you that answer. He stated it might be something required by the contractor by procurement. That's what he said.

THE WITNESS: I don't know what to say to you beyond that.

BY MR. STOUCK:

Q. You don't know or you don't recall whether that was why --

A. Well, I don't recall.

Q. But that seems to be what these words seem

Page 280

to indicate on these instructions, that that was at least a reason why the Department of Energy wanted to have the proper person?

MR. CRAWFORD: And I didn't interject a bunch of objections about best evidence because he and you both have that section right in front of you. And that seems to be what it says to me.

And I certainly wasn't involved in the process, but I mean it says what it says, Jerry. You know, he's told you that he doesn't recall anything beyond that, why that section was put in like that. I think our record is clear on that now.

MR. STOUCK: Okay. If that's what it seems to mean to you, I guess I'll take that.

MR. CRAWFORD: Well, what I've got to say about it doesn't mean anything other than from an objection standpoint. And I mean the man has given you his answer to your question several times. And that's all I'm saying. And the document simply says what it says.

BY MR. STOUCK:

Q. Let's go back to the cask issue that you pointed out on the first page.

A. Okay.

Q. Actually let me ask one more question

Page 281

about this other thing. Do you know why DOE was interested in whether or not the purchaser had the legal right to deliver SNF?

MR. CRAWFORD: Objection to the lack of foundation and objection to the vagueness of that.

You may answer.

THE WITNESS: I do not know how to answer beyond what I've already answered you. I've given you --

BY MR. STOUCK:

Q. Well, you just basically don't recall, is that what you're telling me?

A. No. What I said was I don't recall whether that language arose because that was part of the contract, there was some language in the contract, or it was part of -- or it was some contracting officer, therefore, procurement regulation, guidance, rule, you know, I don't know. I keep telling you that's all I know about that section, that's all I recall about that section.

Q. Back to the cask issue. Do you know whether what is referred to in this letter as an apparent inconsistency would have been a basis for disapproving the DCSs or this DCS?

And I'll just note for the record, as

Page 282

you'll see this paragraph does not indicate that it was being disapproved on that basis. So that's obvious from the document. But do you know whether this kind of inconsistency would be a basis for disapproval?

A. I do recall that they would not be a basis for disapproval.

Q. Do you recall why that was so, why this kind of inconsistency would not be a basis for disapproval?

A. The way I recall it now is these go back to the broader issue of the DCSs. These were all for planning purposes. And planning purposes as I have testified before had, you know, some use to the utilities, they had some use to us; for us in the early stages of trying to put together a system and whether to early plan for what type of cask we would need, whether it would be a BWR or a PWR or a rail or a truck cask. And we -- this was another piece of the puzzle.

When the FICA, the facility interface capability assessment -- we had a large database that provided a lot of information, some all being old, on each utility site. And we thought we understood what the capabilities and flexibilities of those sites

Page 283

were. You now have a situation where a utility is now providing you further information.
And it was our responsibility to check. Now, if there was something -- they said they could handle one type of cask and that wasn't consistent with our information, they could submit whatever they wanted to DCS. It wouldn't be a basis for a disapproval.
But it would be a basis for us to understand for our planning purposes why, did they make a mistake here, for approval or disapproval, was work done on the FICA inappropriate, were there more generic things that would cause us to reevaluate -- we needed to understand why there was that difference again based on our early planning efforts.
Q. And so, as this letter reflects, it says DOE would appreciate an explanation of this apparent inconsistency. So it had an opportunity to correct the inconsistency or correct the capabilities at the site?
A. We needed to understand why, whether they had mischaracterized it, whether we had mischaracterized it in the FICA, whether we mischaracterized the information that we had, just trying to get the record.

Page 284

Q. And there would be ongoing communication about that between DOE and the utilities or the --
A. I don't know about ongoing. There would usually be a phone call or a letter to try and -- I mean this was not a point -- I do not recall any of these being points of contention.
They were points of information and clarification. And the communication would have been either written or oral, I don't specifically recall.
Q. Well, was this a common occurrence; in other words, you know, do you recall that there were, you know, numerous instances in which the information about either casks required or other information similar to that were discrepant between the information that DOE had and what was shown on the DCSs?
MR. CRAWFORD: Objection, vague; objection, best evidence.
THE WITNESS: I really don't recall. I can tell that you I don't recall that this was unique; in other words, that this was the only time. And I don't believe that they were numerous, that there were a lot of others put out. So, to the best of my recollection, there were a few.
BY MR. STOUCK:

Page 285

Q. Okay. Actually we did find on the database the second page of this letter, a different copy. Let me just note for the record, I'm not going to re-mark the exhibit or anything. But this is HQ 0011135 and 36. And the second page reads in toto as follows, should you have any questions concerning this action, please contact Nick Graham of my staff, and there's a phone number, or Nancy Montgomery of the department's Office of Civilian Radioactive Waste Management, again with the phone number, signed, Linda Strand, contracting officer, cc: Jay McKissick.
A. Okay. Thank you.
Q. Who was Nick Graham by the way?
MR. CRAWFORD: Objection, lack of foundation, to the extent it calls for speculation.
THE WITNESS: I think he worked for the contracting officer. There were so many people that went through that office. I recall the name, I think he was with the contracting office.
BY MR. STOUCK:
Q. Do you know if he was a lawyer?
A. I don't think so.
Q. You don't think so?
A. I don't think so.

Page 286

Q. Now, I think I understand this issue about the apparent inconsistency on the casks. But I don't still understand why that inconsistency was not a basis for disapproval, whereas the wrong signature was a basis for disapproval. And so I would like to ask you if you can just define for me where the dividing line was between problems or mistakes or inconsistencies that would lead to disapproval and problems or mistakes or inconsistencies that would not lead to disapproval.
MR. CRAWFORD: I'll object to the foundation for that, to the extent it calls for speculation, and to the vagueness.
THE WITNESS: I mean you want me to use this example or a general example?
BY MR. STOUCK:
Q. It's a good example because we've got one issue that did lead to disapproval and one issue that didn't lead to disapproval. If that's helpful to your answer, fine.
MR. CRAWFORD: Well, probably not, because you really don't have what's being talked about here in front of him. So I'll object to the foundation, again to the extent it calls for speculation, and to the vagueness of it.



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - X

YANKEE ATOMIC ELECTRIC :
COMPANY, MAINE YANKEE ATOMIC :
POWER CO., and CONNECTICUT :
YANKEE ATOMIC POWER CO., : Case No. 98-126C
Plaintiffs : 98-474C, 98-154C
-v- : (Senior Judge
: Merrow)
UNITED STATES OF AMERICA, :
Defendant :

- - - - - - - - - - - - - - - - X

ORIGINAL

Washington, D.C.
Thursday, June 13, 2002

Deposition of NANCY SLATER THOMPSON, a witness herein, called for examination by counsel for the Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 9:40 a.m., Thursday, June 13, 2002, and the proceedings being taken down in Stenotype by DEBORAH K. WILKINS, RPR, and transcribed under her direction.

issues that relate to you. I am sure we will have to deal with Ms. Sullivan and the government on that, but except for that possibility I don't think we will have further questions for you.

A. I understand. Thank you.

MS. SULLIVAN: I have a couple questions.

EXAMINATION

BY MS. SULLIVAN:

Q. Ms. Thompson, do you recall your testimony in response to some questions from Mr. Shapiro as to whether you had any knowledge as to what the approved DCSs would be used for?

A. Yes, I do, and I believe I had indicated to him that I didn't have a real knowledge of what others were using those for.

Q. Sitting here today, do you have an understanding as to what aspects of the program would use approved DCSs for planning purposes?

A. I think it would be safe to say that the transportation group would probably find the most utility in the DCSs.

Q. Do you have or have you ever had responsibility for transportation planning for the program?

A. No.
Q. Ms. Thompson, while you were in the waste acceptance division, do you recall disapproving delivered commitment schedules delivered by utilities?
A. Yes.
Q. Given your testimony that delivery commitment schedules are largely for planning purposes only, why would you disapprove a delivery commitment schedule?
A. There could be multiple administrative reasons like the DCS not signed, signed by a person not identified as having ability to sign, but primarily for exceeding their allocation for a particular year.
Q. And do you have an understanding as to the effect of the utility's failure to submit a DCS in a year in which they have an allocation?
A. Yes. I believe it was always our intent that if a utility failed to submit a DCS in that year that it would be a waiver of their desire to deliver, and we would have reallocated that capacity to the next utility or utilities in the cue.
Q. I believe Mr. Shapiro has asked you

previously today about the provision of the Standard Contract or whether there was a provision of the Standard Contract that told purchasers that they were limited in their DCSs to the allocation set forth in the ACR.

Other than in the Standard Contract, is there another place that purchasers were informed that they were limited to the amount set forth in the ACR when submitting their DCSs?

A. I am positive it's in the DCS instructions.

Q. Could you turn to Exhibit 10, please, to your deposition.

Are these the DCS instructions to which you are referring?

A. Yes.

Q. Could you point to me where in these instructions purchasers were informed that they were limited to the amounts set forth in the ACR?

A. Give me a minute.

Q. Sure.

A. Page 2, number 7E, the last sentence.

Q. Could you read that for me, please?

A. Exceeding the allocation will result in disapproval of the DCS.

Q. Thank you.
While you were in the waste acceptance division at DOE, what was your understanding of the effect of the DCSs with regard to DOE's performance in 1998, if DOE had begun performance in 1998?
MR. SHAPIRO: Objection. Vague.
Q. Do you want me to clarify the question?
A. Please.
Q. I believe you testified that in your opinion the DCSs were for planning purposes only. While you were in waste acceptance, did you ever have an understanding as to the role of the DCSs if DOE had started performance in 1998?
MR. SHAPIRO: Objection. Vague.
A. My understanding of the role of the DCSs, if we had begun to accept in 1998, is that those individuals who had submitted DCSs and had them approved for year 1, which the question you are posing would be 1998, those would be the utilities that I would expect to receive FDSs from, and they would be the utilities that would deliver in that year.
Q. I am not sure whether Mr. Shapiro

asked you this specific question. Is it your understanding that the final delivery schedules submitted by purchasers and approved by DOE would be binding on the parties?

A. Are you asking me for my personal opinion?

Q. Yes.

A. My personal opinion is that given that the FDSs are submitted a year before actual acceptance is to start that they are supposed to include the actual reactor, the actual age, discharge date of the fuel, and that that's the basis on which we actually begin to mobilize the system to come get it, yes.

Q. And one final question with regard to multi-element sealed canisters, or MESCs, that we discussed. Do you have an understanding as to whether, while you were in the waste acceptance division, those were considered a standard waste form?

A. My recollection is that they were not.

MS. SULLIVAN: Thank you.

MR. SHAPIRO: I just have a couple follow-up questions for you.

EXAMINATION