IN THE UNITED STATES COURT OF FEDERAL CLAIMS
(Electronically Filed on April 27, 2007)

**NORTHERN STATES POWER COMPANY,**

Plaintiff,

v.

**THE UNITED STATES,**

Defendant.

No. 98-484C
(Senior Judge Wiese)

**NORTHERN STATES POWER COMPANY'S POST-TRIAL REPLY BRIEF**

Alex D. Tomaszczuk
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7940
(703) 770-7901 (fax)

Counsel of Record for Plaintiff
Northern States Power Company

*Of Counsel:*

Jay E. Silberg
Daniel S. Herzfeld
Jack Y. Chu
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
2300 N Street, N.W.
Washington, D.C. 20037
(202) 663-8000
(202) 663-8007 (fax)

Kerry C. Koep
**XCEL ENERGY**
414 Nicollet Mall, 5th Floor
Minneapolis, MN 55401
(612) 215-4583
(612) 215-4544 (fax)

April 27, 2007

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iii

I. CHRONOLOGY OF KEY EVENTS RELEVANT TO NSP'S CLAIM ........ 3

II. *INDIANA MICHIGAN III* ESTABLISHES THE PROPER FRAMEWORK FOR DETERMINING THIS CASE ........ 8

- A. The Government Bears The Burden Of Showing NSP's Mitigation Costs Are Unreasonable Once NSP Has Discharged Its Showing Regarding Causation, Foreseeability, And Reasonable Certainty ........ 9
- B. Substantial Causation, Not Sole Causation, Is The Appropriate Standard ........ 10
- C. Foreseeability Only Required The Foresight That Prairie Island Would Shut Down Absent NSP's Efforts To Mitigate ........ 14

III. AS A RESULT OF THE GOVERNMENT'S IMPENDING BREACH, NSP REASONABLY INCURRED MITIGATION COSTS BY LICENSING AND CONSTRUCTING AN ON-SITE DRY STORAGE FACILITY AT PRAIRIE ISLAND ........ 16

- A. NSP's Decision Was Unaffected By The Specific Rate Of Acceptance ........ 18
- B. The Federal Circuit Did Not Create A Per Se 1994 Cut-Off To Recover Mitigation Costs In SNF Cases ........ 20
- C. NSP Could Have And Would Have Re-Racked Had It Expected DOE To Perform ........ 24
- D. The Risk Of A Prairie Island Shutdown With A Third Re-Rack Is No More Than The Risk With Dry Storage ........ 28

IV. NSP'S PRAIRIE ISLAND DRY STORAGE MITIGATION COSTS SHOULD NOT BE REDUCED FOR OTHER REASONS ........ 31

- A. NSP Is Entitled To Recover Its Internal Labor And Overhead ........ 31
- B. NSP Should Not Have To Pay Now For Future Costs Of Loading DOE Casks ........ 33
- C. The Government Should Not Receive An Offset For NSP's Decision To Upgrade Its Auxiliary Building Crane At Prairie Island ........ 34
- D. NSP's Pursuit Of A Transportation License For The TN-40 Casks Was Reasonable Mitigation ........ 36
- E. NSP's Damages Should Not Be Reduced By Its Costs For the GE-Morris Facility Security Upgrade ........ 37




400555920v5

V. NSP MAY RECOVER ITS MITIGATION COSTS REGARDING PRIVATE FUEL STORAGE, LLC ........ 38

A. The Federal Circuit's *Indiana Michigan III* Decision Does Not Preclude NSP, As A Matter Of Law, From Recovering Its PFS Costs ........ 38

B. NSP Did Not Invest In PFS To Make A Profit And NSP Continues To Have An Incentive To Move Its Fuel From Minnesota To An Out-Of-State Facility Like PFS ........ 39

VI. NSP MAY RECOVER ITS COSTS FROM THE MANDATES BECAUSE THEY MITIGATED THE POTENTIAL LOSS OF A PLANT SHUT DOWN ........ 42

A. NSP Would Not Have Incurred The Costs Of The Mandates Had NSP Believed DOE Would Timely Perform ........ 43

B. DOE Foresaw Or Could Have Foreseen Legislative Intervention Over Concerns That An Interim Spent Fuel Storage Facility Would Become Permanent ........ 45

C. The Size, Scope, And Amount Of The Mandates Are Well Below The Foreseeable Results Of The Government's Failure To Perform And The Payments NSP Has Had To Make To The Nuclear Waste Program ........ 47

D. NSP Need Not Show That The Government's Actions Proximately Caused NSP's Damages ........ 48

VII. NSP SHOULD BE AWARDED ITS INCURRED COSTS OF CAPITAL ........ 49

VIII. DOE WOULD HAVE PERFORMED AT A RATE SUFFICIENT TO ASSURE THAT UTILITIES WOULD NOT NEED TO ADD AT-REACTOR STORAGE AFTER 1998 ........ 52

A. Determination Of The Acceptance Rate Is Irrelevant For Determining Causation ........ 52

B. The NWPA And The Parties Expected DOE To Perform At A Rate Sufficient To Avoid The Need For Additional At-Reactor Storage After 1998 ........ 54

1. The Standard Contracts Are Not Too Indefinite To Enforce ........ 58

2. The DCSs Did Not Create Binding Commitments ........ 61

3. The Parol Evidence Rule Has No Application Here, Because The Government Also Relies On Parol Evidence ........ 66

IX. CONCLUSION ........ 69

## TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Brennan*,
952 F.2d 1346 (Fed. Cir. 1991)........................................................................................ 13

*Alabama Power Co. v. United States*,
307 F.3d 1300 (11th Cir. 2002) ........................................................................................ 60

*Atacs Corp. v. Trans World Communications, Inc.*,
155 F.3d 659 (3d Cir. 1998)............................................................................................ 59

*Aviation Contractor Employees, Inc. v. United States*,
945 F.2d 1568 (Fed. Cir. 1991)........................................................................................ 59

*Bell v. United States*,
404 F.2d 975 (Ct. Cl. 1968) ....................................................................................... 49, 51

*Bluebonnet Sav. Bank, FSB v. United States*,
266 F.3d 1348 (Fed. Cir. 2001)........................................................................................ 38

*Bullcreek v. NRC*,
359 F.3d 536 (D.C. Cir. 2004) .................................................................................... 39, 54

*Cal. Fed. Bank v. United States*,
395 F.3d 1263 (Fed. Cir. 2005), *cert. denied*, 126 S. Ct. 344 (2005) ...................................... 11

*Centex Corp. v. United States*,
55 Fed. Cl. 381 (2003),
*aff'd*, 395 F.3d 1283 (Fed. Cir. 2005) .............................................................................. 49

*Chain Belt Co. v. United States*,
115 F. Supp. 701 (Ct. Cl. 1953)........................................................................................ 32

*Citizens Fed. Bank v. United States*,
474 F.3d 1314 (Fed. Cir. 2007)............................................................................ 11, 15, 47

*Commonwealth Edison Co. v. United States*,
46 Fed. Cl. 158 (2000), *aff'd*,
271 F.3d 1327 (Fed. Cir. 2001) (*en banc*) ......................................................................... 56

*Consumers Energy Co. v. United States*,
65 Fed. Cl. 364 (2005) ..................................................................................................... 63

*Coyle's Pest Control, Inc. v. Cuomo*,
154 F.3d 1302 (Fed. Cir. 1998)........................................................................................ 60

*Energy Capital Corp. v. United States*,
302 F.3d 1314 (Fed. Cir. 2002).......................................................................................... 8

*Entergy Nuclear Generation Co. v. United States*,
64 Fed. Cl. 336 (2005) ..................................................................................................... 64

*First Heights Bank, FSB v. United States*,
422 F.3d 1311 (Fed. Cir. 2005).................................................................................. 10, 18



400555920v5

*In re Application for Certificate of Need for Construction of an Indep. Spent Fuel Storage Installation*, 501 N.W.2d 638 (Minn. Ct. App. 1993) ("*In re ISFSI*") .................................................. 44, 46

*In re Kellett Aircraft Corp.*, 186 F.2d 197 (3d Cir. 1950)................................................................................. 15

*Indiana Michigan Power Co. v. Dep't of Energy*, 88 F.3d 1272 (D.C. Cir. 1996) ("*Indiana Mich. I*") .......................................................... 58, 63

*Indiana Mich. Power Co. v. United States*, 57 Fed. Cl. at 88 (2003) ("*Indiana Mich. II*"), *appeal dismissed*, 112 Fed. Appx. 37 (Fed. Cir. 2004) .................................................... passim

*Indiana Michigan Power Co. v. United States*, 422 F.3d 1369 (Fed. Cir. 2005) ("*Indiana Mich. III*") ...................................................... passim

*J.D. Hedin Constr. Co. v. United States*, 456 F.2d 1315 (Ct. Cl. 1972) ............................................................................. 11

*Koby v. United States*, 53 Fed. Cl. 493 (2002) ....................................................................................... 14

*LaSalle Talman Bank v. United States*, 317 F.3d 1363 (Fed. Cir. 2003)........................................................................... 51

*Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336 (Fed. Cir. 2000)................................................................ 19, 51, 54

*Maine Yankee Atomic Power Co. v. United States*, 44 Fed. Cl. 372 (1999), *aff'd*, 271 F.3d 1357 (Fed. Cir. 2001)................................................ 47

*Massengill v. Guardian Mgmt. Co.*, 19 F.3d 196 (5th Cir 1994) ..................................................................................... 60

*McAbee Constr., Inc. v. United States*, 97 F.3d 1431 (Fed. Cir. 1996)............................................................................. 68

*NRDC, Inc. v. United States NRC*, 685 F.2d 459, 502, 510 (D.C. Cir. 1982), *rev'd on other grounds sub nom. Baltimore Gas & Elect. Co. v. NRDC, Inc.*, 462 U.S. 87 (1983)............................................ 39

*Old Stone Corp. v. United States*, 450 F.3d 1360, 1370 (Fed. Cir. 2006), *cert. denied*, 75 U.S.L.W. 3333, 75 U.S.L.W. 3490, 75 U.S.L.W. 3497 (U.S. Mar. 19, 2007)...........................................................8, 10, 16, 48

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190 (1983)................................................................................................. 46

*Pac. Gas & Elec. Co. v. United States*, 73 Fed. Cl. 333 (2006), *appeal pending*, No. 2007-5046 (Fed. Cir.)........................................................................... 32, 33, 37

*Roedler v. Dep't of Energy*,
255 F.3d 1347 (Fed. Cir. 2001)........ 20, 54

*Sacramento Mun. Util. Dist. v. United States*,
70 Fed. Cl. 332 (2006) ("*SMUD*"), *appeal pending*,
No. 2007-5052 (Fed. Cir.)........ 32, 33, 37, 53

*Shyface v. Sec'y of Health & Human Servs.*,
165 F.3d 1344 (Fed. Cir. 1999)........ 13

*Sylvania Elec. Prods., Inc. v. United States*,
458 F.2d 994 (Ct. Cl. 1972)........ 66

*Sys. Fuels, Inc. v. United States*,
65 Fed. Cl. 163 (2005)........ 64

*Sys. Fuels, Inc. v. United States*,
66 Fed. Cl. 722 (2005)........ 63

*Tenn. v. Herrington*,
806 F.2d 642 (6th Cir. 1986)........ 46

*Tenn. Valley Auth. v. United States*,
69 Fed. Cl. 515 (2006)........ passim

*Westfed Holdings, Inc. v. United States*,
407 F.3d 1352 (Fed. Cir. 2005)........ 11

*Wickham Contracting Co. v. United States*,
12 F.3d 1574 (Fed. Cir. 1994)........ 51

*Yankee Atomic Elec. Co. v. United States*,
54 Fed. Cl. 306, 316 (2002)........65

*Yankee Atomic Elec. Co. v. United States*,
73 Fed. Cl. 249 (2006), *appeal pending*,
Nos. 2007-5025, 2007-5026, 2007-5027,
2007-5031, 2007-5032, 2007-5033 (Fed. Cir.)........ passim

**Statutes and Codes**

42 U.S.C. § 10131........ 19, 54

42 U.S.C. § 10151........ 14

42 U.S.C. § 10155........ 14

42 U.S.C. § 10162........ 58

42 U.S.C. § 10168........ 56

42 U.S.C. § 10221........ 55

42 U.S.C. § 10222........ 19, 54, 56, 59

1994 Minn. Sess. Laws Ch. 641........ 36, 41, 42, 44, 45

2003 Minn. Sess. Laws, 1st Spec. Sess, Ch. 11 .......... 42
Minn. Stat. § 116C.77 .......... 41
Minn. Stat. § 116C.771 .......... 44, 45
Minn. Stat. § 116C.775 .......... 36, 42
Minn. Stat. §116C.777 .......... 36, 42
Minn. Stat. §116C.779 .......... 42, 45

**Rules and Regulations**

18 C.F.R. pt. 101 .......... 50
48 C.F.R. § 52.233-1 .......... 51
48 C.F.R. § 52.243-1 .......... 51
48 C.F.R. § 52.243-2 .......... 51
48 C.F.R. § 52.243-3 .......... 51
48 C.F.R. § 52.243-4 .......... 51
59 Fed. Reg. 27,007 (May 25, 1994) .......... 6
60 Fed. Reg. 21,793 (May 3, 1995) .......... 7

**Other Authorities**

Statement of Ben C. Rusche, Director, DOE's Office of Civilian Radioactive Waste Acceptance, Statement before the Committee on Energy and Natural Resources, United States Senate, Senate Hearing Rep. 100-230, pt. 2 .......... 56
11 JOSEPH M. PERILLO, CORBIN ON CONTRACTS (rev. ed. 2005) .......... 15, 47
3 DAN B. DOBBS, DOBBS LAW OF REMEDIES (2d ed. 1993) .......... 15
3 E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS (3d ed. 2004) .......... 13, 15
RESTATEMENT (SECOND) OF CONTRACTS § 350 .......... 10, 14
RESTATEMENT (THIRD) OF TORTS § 26 (Proposed Final Draft No. 1) .......... 12
*Energy Proposal Leaves Some Grumbling*, STAR NEWS, Apr. 17, 2007, *available at* http://www.erstarnews.com/2007/April/17xcel.html (visited Apr. 19, 2007) .......... 42

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
(Electronically Filed on April 27, 2007)

| | |
|---|---|
| **NORTHERN STATES POWER COMPANY,**<br>Plaintiff,<br>v.<br>**THE UNITED STATES**,<br>Defendant. | No. 98-484C<br>(Senior Judge Wiese) |

**NORTHERN STATES POWER COMPANY'S POST-TRIAL REPLY BRIEF**

Pursuant to this Court's December 4, 2006 Order, Plaintiff Northern States Power Company ("NSP"), respectfully files this post-trial reply brief. In Defendant United States' (the "Government's") March 27, 2007 post-trial brief, the Government refuses to accept the proper framework to determine damages in a mitigation case, continues to require a sole causation standard, and steadfastly refuses to acknowledge that it bears any burden to challenge the reasonableness of NSP's mitigation costs. Furthermore, the Government simply ignores the overwhelming evidence that the Government's impending breach was the primary, direct, substantial, and but-for cause of NSP seeking a spent nuclear fuel ("SNF") storage solution allowing operation of the plant until the end of the licensed-life of the Prairie Island nuclear plant. Indeed, the Government acts as if NSP were the breaching party. Throughout the 1980s and 1990s, NSP evaluated and accurately assessed that DOE would fail to perform its Standard Contract obligations. Ironically, the Government now seeks to penalize NSP for its foresight.

The Government seeks to subtract much of NSP's actually incurred mitigation costs. The Government seeks to penalize NSP by arguing, but failing to establish, that (1) a third re-rack of

the Prairie Island spent fuel pool was technically impossible; and (2) NSP would have built its dry storage facility even if it had expected the Department of Energy ("DOE") to perform. As NSP demonstrated during the trial and in its post-trial brief (and as further discussed below), the Government cannot further penalize NSP based on this theory, because NSP could have and would have re-racked its Prairie Island pools a third time.

The Government continues to assert that NSP may not recover for the mandates. Indeed, the mandates were a direct result of DOE's impending failure to meet its 1998 obligation, leading the Minnesota agencies, courts, and legislature to fear that DOE would not remove NSP's spent fuel. NSP has shown that the mandates were foreseeable, as evidenced by similar provisions in the Nuclear Waste Policy Act ("NWPA") and by the concerns of DOE's first acting-director of the Office of Civilian Radioactive Waste Management – Mr. Robert Morgan – that states would put up roadblocks to establishing a SNF storage facility. This key evidence the Government essentially ignores.

The Government asserts that NSP should be barred from recovering its costs for pursuing an out-of-state spent fuel storage facility through Private Fuel Storage, LLC ("PFS"), based on the false assertion that NSP entered that arrangement as a money making venture. It did not. As NSP proved at trial, the Government's impending breach caused NSP to pursue PFS. Furthermore, the Government is wrong in claiming that the U.S. Court of Appeals for the Federal Circuit's ("Federal Circuit's") factually-based decision in *Indiana Michigan III*, based on the evidence in that case, somehow precludes NSP from proving with substantial evidence in this case that the Government should have foreseen that NSP would seek an alternative off-site storage facility, and that the Government's impending breach caused NSP to pursue PFS.

The Government has retreated from its pre-trial position that the acceptance rate is irrelevant to the question of causation and damages. The Government now claims causation cannot be determined without determining the acceptance rate and submits arguments similar to those in its 2001 summary judgment motion. For the reasons stated below, this Court need not determine the acceptance rate. To the extent that it does, NSP has proven that the NWPA required DOE to perform at a rate sufficient to avoid utilities from adding at-reactor storage after 1998. The Government's claim that the Annual Capacity Report ("ACR")/Delivery Commitment Schedule ("DCS") process leads to a 900 metric tons of uranium ("MTU") per year acceptance rate is unsupportable. The ACRs and DCSs were not contractually binding. And, the 900 MTU rate is based on an MRS facility that never existed and was then (and still is today) prohibited by the explicit provisions of the NWPA.[1]

## I. CHRONOLOGY OF KEY EVENTS RELEVANT TO NSP'S CLAIM

Pursuant to the Court's request, and in response to the timeline set forth in the Government's Post-Trial Brief, we provide the following chronology of key events relevant to NSP's claim now before the Court.

| Date | Event[2] |
|---|---|
| 1970 | Monticello plant enters service with 40-year license. |
| 1973 | Prairie Island Unit 1 enters service with 40-year license. |

[1] The Government does not contest the award of damages based on NSP's efforts to mitigate the Government's breach by pursuing a dry storage facility at the Monticello plant and, therefore, NSP does not address that issue further in this brief. Defendant's Post-Trial Brief ("Govt. Post-Trial Br.") at 4.

[2] In the interests of brevity, formal citations for cases, statutes, and regulations referenced herein have not been provided, but can be located in NSP's Post-Trial Brief dated February 9, 2007 or this brief. Certain transcript references have also been shortened but complete transcript references to all factual events discussed can also be located in NSP's briefs.

| | |
|---|---|
| 1974 | Prairie Island Unit 2 enters service with 40-year license. |
| 1977 | President Carter announces suspension of reprocessing in the U.S. 13 Wkly. Comp. Pres. Doc. 502, 503. Prairie Island SNF pools are re-racked for the first time. Tr. 414-15 (McCarten); Tr. 775, 778 (Kapitz). |
| 1978 | Monticello SNF pool is re-racked, increasing total storage capacity to 2,237 assemblies. Tr.1805, 1818 (McKeown). |
| 1981 | Prairie Island pools are re-racked for the second time, increasing total storage capacity to 1,386 assemblies. Tr. 775, 778 (Kapitz). |
| 1983 | NWPA enacted. NSP executes three Standard Contracts at risk of having to shut down its reactors if it does not sign. Tr. 3863-64 (Morgan). Article II of each Contract requires DOE to commence performance by January 31, 1998. PX56, 57, 58. NSP makes one-time fee payment to DOE and begins payment of quarterly fees to DOE, which average approximately $12 million per year for each year going forward after 1983. At December 20, 1983 conference, OCRWM's then-acting Director tells assembled utilities, "The basic strategy which we have outlined in the mission plan is that, beginning in 1998, utilities will not have to provide any additional storage facilities on site." PX286; Tr. 3882 (Morgan). |
| 1984-87 | NSP ships 1,058 assemblies from Monticello to GE facility in Morris, Illinois, thus easing the SNF storage problem at Monticello. Tr. 134-35 (Bomberger). |
| 1985 | DOE issues Mission Plan for waste program. DX 45. The Mission Plan envisions repository acceptance at a 3,000 MTU rate after a 5-year ramp-up period. The Plan states at 381: "[I]f the DOE fails to meet the schedule shown in Table 9-2 or 9-3, then the additional storage capacity needed to accommodate the delay in schedule will be provided by the DOE, possibly at reactor sites." |
| 1987 | DOE issues draft Mission Plan Amendment, projecting at least a five-year delay in opening a repository and raising the possibility of performance at an MRS. PX303. Having solved the immediate SNF storage problem at Monticello, NSP and Ms. McCarten turn their attention to the SNF storage problem at Prairie Island. Ms. McCarten assesses that the Prairie Island pools will run out of space in approximately 1994. Tr. 420-21, 439 (McCarten). Ms. McCarten prepares a report for senior management apprising them that DOE will not perform at a repository until 2003 and that NSP cannot count on DOE having an MRS available by the Contract performance date of January 31, 1998. PX398B. The report advises that, "given the uncertainties and opportunities for further delay, NSP should anticipate having to provide storage for its fuel out to the end of life of the plants." *Id.* at NSP-0001638. Congress enacts amendments to the NWPA, establishing statutory linkages between the MRS and the repository which remain |

in effect today. NSP authorizes and conducts rod consolidation demonstration project. Tr. 768-72 (Kapitz). NUTECH issues draft report containing structural analysis of SNF pool at Prairie Island. PX595.

1988 Ms. McCarten issues revised report to NSP senior management concerning the DOE program and the Prairie Island spent fuel situation. PX398A. In this report, Ms. McCarten observes that linkages will limit MRS development and again advises that "NSP will have to provide storage for its spent fuel out to end-of-life of the plants." *Id.* DOE issues draft Mission Plan Amendment showing that MRS will not be available until 2003. PX279. Later in the year, Ms. McCarten and Mr. Kapitz issue a Prairie Island Spent Fuel Storage Technology Evaluation Report in which they recommend that NSP pursue dry storage and not rod consolidation. PX399. Rod consolidation is not pursued due to the slow speed of the process, the amount of radioactive debris produced, and damage to fuel rods. Tr. 769-72 (Kapitz). Although re-racking is a proven technology, a third re-rack is not pursued because it will not accomplish the goal of storing fuel at Prairie Island until the end of its license (2013). Tr. 870-74 (Kapitz). NSP management approves McCarten/Kapitz recommendation that NSP build dry storage at Prairie Island. Tr. 1943-44 (Howard).

1989 Ms. McCarten and Mr. Kapitz conduct evaluation of dry cask vendors and recommend that NSP acquire Transnuclear (TN)-40 casks. NSP management approves this recommendation. Tr. 795 (Kapitz). Minnesota Environmental Quality Board begins preparation of Environmental Impact Statement for dry cask facility ("ISFSI") at Prairie Island. Tr. 495 (McCarten).

1990 NUTECH issues final study advising that NSP can add 416 additional assemblies to the SNF pool at Prairie Island - this equates to a 29% re-rack. DX322; Tr. 795-802, 5349-50 (Kapitz). NSP submits application to the NRC for license to build and operate an ISFSI at Prairie Island capable of handling 48 TN-40 casks. Tr. 819-22 (Kapitz). NSP begins preparation of Certificate of Need ("CON") application to the Minnesota PUC. Ms. McCarten prepares hand-written note estimating cost of third re-rack that would increase pool capacity by 20%. DX77.

1991 In April, NSP submits its initial CON application to the Minnesota PUC. NSP now projects shutdown of the Prairie Island plant in 1995 unless some action is taken. The CON application is amended in August and November. Shutdown is projected to cost a billion dollars in replacement power costs. PX60. DOE issues 1991 ACR with acceptance rates based on MRS that is prohibited by the NWPA's statutory linkages. DX108. In September 1991, U.S. General Accounting Office issues report concluding that an MRS by 1998 is highly unlikely. PX288 at 5.

1992 In April, ALJ Klein issues decision recommending that the PUC deny the CON application because of "permanence" concerns. PX749. In May, then-DOE Secretary Watkins sends a letter to NSP's James Howard advising NSP that DOE is "committed to fulfill the mandates imposed by the [NWPA]" and attaching

milestones to measure DOE's MRS performance. DX314. DOE fails to meet any of the MRS milestones. Also in May (two days before the previous letter), DOE Secretary Watkins sends another letter advising, "If, contrary to our current expectations, we are not able to begin spent fuel receipt at an MRS facility by January 31, 1998, the Department has determined that it is not legally obligated to accept SNF." PX491. In August, the full PUC rejects the ALJ recommendation and authorizes a limited CON – up to 17 casks – for an ISFSI at Prairie Island. PX61. In accordance with the decision, NSP begins construction of the ISFSI pad and related activities.

1993 In June, the Minnesota Court of Appeals determines that the ISFSI is "permanent" and therefore requires approval by the Minnesota legislature. NSP's appeal to the Minnesota Supreme Court is unsuccessful. NSP suspends all construction work on the ISFSI. Tr. 862-63 (Kapitz). NSP engages the legislature.

1994 In May, the Minnesota legislature enacts legislation permitting NSP to build the ISFSI at Prairie Island. The law allows the placement of 17 casks, five of which can be loaded immediately. The legislation includes four key mandates: (1) alternate site in Goodhue County, (2) biomass (and wind) generation, (3) Renewable Development Fund, and (4) agreement with Minnesota Governor giving third-party beneficiary status to the Mdewakanton Dakota Tribe. NSP works feverishly to complete construction of the ISFSI site, procure casks, and comply with the new mandates. NSP begins to investigate alternative storage sites outside of Minnesota. DOE publishes "Notice of Inquiry" in the Federal Register announcing its proposed position that it has no statutory obligation to begin disposing of spent fuel by 1998 in the absence of a repository or MRS. 59 Fed. Reg. 27,007 (May 25, 1994). By the end of this calendar year, DOE's efforts to site an MRS (which remained subject to statutory linkages) collapse. Tr. 1984-85 (Howard).

1995 In May, the first casks are loaded at the Prairie Island ISFSI. Tr. 865 (Kapitz). Holtec issues report stating that pool capacity can be increased by 40%/50% via a third re-rack. PX435. NSP determines to participate actively in Private Fuel Storage ("PFS") as an out-of-state solution to the long-term SNF storage problem in Minnesota, which remains a concern even after enactment of the 1994 legislation. Tr. 2005-06 (Howard). NSP submits application to Minnesota Environmental Quality Board ("EQB") for siting of dry storage facility in Goodhue County; NSP also submits NRC license application for Goodhue County site. In March 1995, DOE issues the 1994 APR/ACR, PX314, utilizing acceptance rates carried-over from the 1991 ACR, even though the MRS is no longer a possibility and it would still be prohibited by the NWPA. DOE uses these rates in an effort to minimize its obligations to utilities. Tr. 4460-66 (Zabransky). The 1994 APR/ACR no longer uses actual performance dates but instead uses "Year 1" through "Year 10." DOE also publishes its "Final Interpretation" in the Federal Register announcing that DOE has no obligation to commence performance on January 31, 1998 due to the unavailability of a

repository site, and that it will not commence performance until 2010 at the earliest. 60 Fed. Reg. 21,793 (May 3, 1995).

1996 Minnesota EQB denies NSP request to site an SNF storage facility in Goodhue County, but determines that NSP made a good faith effort in support of the Goodhue County site. PX142. Compliance with this and other mandates allows NSP to load casks six-nine. Tr. 1363-64 (Alders). DC Circuit issues *Indiana Michigan I* decision determining that DOE's failure to site a repository or MRS does not excuse its failure to comply with the NWPA.

1997 In March, the DOE Contracting Officer "voids" NSP's previously approved DCS. PX589A. By letter dated March 13, 1997, DOE advises all utilities with approved DCSs (including but not limited to NSP) that DOE will not be able to approve further DCSs and "waived" the "requirement" that utilities continue to submit DCSs. PX589A. DC Circuit issues *Northern States* decision declining to issue "move fuel" order but leaving NSP to pursue its contractual remedies.

1998 In June, NSP files suit in the Court of Federal Claims alleging, *inter alia*, partial breach of contract.

2000 In August, the Federal Circuit issues decisions in *Maine Yankee* and *Northern States* cases determining that DOE has breached its contracts with the entire nuclear industry.

2003 Minnesota legislature amends the 1994 law which allowed NSP to load 17 casks at the Prairie Island ISFSI. The amendment allows NSP to load up to 48 casks at the site, subject to various mandates. The biomass mandate is lowered from 125 to 110 megawatts. The required payments into the Renewable Development are increased from $500,000 per cask to $16 million per year starting in 2004. As a result of 1994 contract between NSP and Minnesota which conferred third-party beneficiary status on the Mdewakanton Dakota Tribe, NSP negotiates a settlement with the Tribe requiring annual payments of $2.25 million per year. PX187. This tribal settlement was essential to obtaining legislative approval lifting the 17-cask limitation in the 1994 legislation. Tr. 1682-83, 1690-93 (Wilensky).

2004 NSP prepares CON application to construct ISFSI at Monticello. PX389. In July, after a nine-year hiatus, DOE issues a new APR/ACR. PX163. This APR/ACR utilizes acceptance rates which ramp-up to 3,000 MTU in the aggregate in the fifth year of repository operations. DOE advises that DCSs submitted in response to this 2004 APR/ACR are to "replace, rather than supplement" previously approved DCSs. Tr. 4427, 4486-87 (Zabransky). In December 2004, DOE suspends the DCS process again. Tr. 4406-07 (Zabransky). It remains suspended. Tr. 240-41 (Bomberger), 4475 (Zabransky). On December 31, 2004, by agreement of the parties, the damages that NSP seeks in this case are cut-off.

## II. *INDIANA MICHIGAN III* ESTABLISHES THE PROPER FRAMEWORK FOR DETERMINING THIS CASE

*Indiana Michigan III* created the framework for determining damages based on a utility's actual mitigation costs. *Indiana Michigan Power Co. v. United States*, 422 F.3d 1369, 1375 (Fed. Cir. 2005) ("*Indiana Mich. III*"); *Yankee Atomic Elec. Co. v. United States*, 73 Fed. Cl. 249, 260 (2006) ("*Indiana Michigan* altered the landscape considerably by parsing utility claims into actual expenditures and framing the inquiry as one of mitigation."), *appeal pending*, Nos. 2007-5025, 2007-5026, 2007-5027, 2007-5031, 2007-5032, 2007-5033 (Fed. Cir.). As NSP has previously stated, NSP Post-Trial Br. at 2, 61-67, the *Indiana Michigan III* framework requires NSP to show "(1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach is a substantial causal factor in the damages; and (3) the damages are shown with reasonable certainty." *Indiana Mich. III*, 422 F.3d at 1373 (citing *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1320 (Fed. Cir. 2002)). Once NSP has discharged this requirement, the Government bears the burden of showing that NSP's mitigation costs were unreasonable. *See Tenn. Valley Auth. v. United States*, 69 Fed. Cl. 515, 523 (2006); *see also Old Stone Corp. v. United States*, 450 F.3d 1360, 1370 (Fed. Cir. 2006) (noting that the Government failed to show that costs incurred were unreasonable), *cert. denied*, 75 U.S.L.W. 3333, 75 U.S.L.W. 3490, 75 U.S.L.W. 3497 (U.S. Mar. 19, 2007).

The Government would have the Court believe that it agrees that the Federal Circuit's *Indiana Michigan III* decision governs this case. But then the Government does everything to undermine the framework set forth in that case for determining damages. Govt. Post-Trial Br. at 41-55. Notwithstanding the *Indiana Michigan III* framework the Government claims to adopt, the Government incorrectly asserts that it has no burden to show the unreasonableness of NSP's mitigation costs after NSP has shown substantial causation, foreseeability, and reasonable

certainty. Furthermore, the Government continues to assert that the proper standard for causation is "sole causation," not "substantial causation" as clearly expressed in *Indiana Michigan III*. Finally, as to the proper framework, the Government appears to assert incorrectly that the Government needed to actually foresee each element of NSP's damages for NSP to recover. None of these contentions is valid.

### A. The Government Bears The Burden Of Showing NSP's Mitigation Costs Are Unreasonable Once NSP Has Discharged Its Showing Regarding Causation, Foreseeability, And Reasonable Certainty

The Government continues to shirk its burden to show that NSP's mitigation costs are unreasonable once NSP has shown that it incurred its damages. Govt. Post-Trial Br. at 41-43. In this regard, the Government erroneously asserts that the *Tennessee Valley Authority* trial decision incorrectly applies the *Indiana Michigan III* framework. However, unlike the Government's arguments, *Tennessee Valley Authority* and *Yankee Atomic*, among others, have faithfully followed the dictates of the Federal Circuit in *Indiana Michigan III*.

In *Tennessee Valley Authority*, Judge Lettow properly applied the framework in *Indiana Michigan III*, by requiring the utility plaintiff – Tennessee Valley Authority ("TVA") – to show that the Government caused TVA to incur mitigation expenses, TVA's expenses were foreseeable, and the expenses were proven with reasonable certainty. *Tenn. Valley Auth.*, 69 Fed. Cl. at 526-28. Once TVA discharged its burden, under the law of mitigation, the burden shifted to the Government to prove that TVA's mitigation expenses were unreasonable. *Id.* at 523; *see also Yankee Atomic*, 73 Fed. Cl. at 264 ("Defendant has the burden of showing that plaintiffs' mitigation efforts were unreasonable.").

This burden-shifting, which the Government resists and treats as putting the "cart before the horse," Govt. Post-Trial Br. at 42, is consistent with the RESTATEMENT (SECOND) OF CONTRACTS and Federal Circuit precedent. *See Tenn. Valley Auth.*, 69 Fed. Cl. at 523 ("'The amount of loss that [the non-breaching party] could reasonably have avoided by . . . making substitute arrangements or otherwise is simply subtracted from the amount that would otherwise have been recoverable as damages.'") (quoting RESTATEMENT (SECOND) OF CONTRACTS § 350 cmt. b); *see also Old Stone*, 450 F.3d at 1370 ("The government has not shown that it was unreasonable for OSC to replace the entire amount of regulatory capital that was eliminated by FIRREA."). Therefore, the Government bears the burden of showing that NSP's mitigation costs were unreasonable and cannot mask its claims by trying to transform them into questions of causation. *See First Heights Bank, FSB v. United States*, 422 F.3d 1311, 1317 (Fed. Cir. 2005) ("We thus conclude that the government's so-called causation argument is identical to the government's mitigation argument and reject it for the reasons described above.").

### B. Substantial Causation, Not Sole Causation, Is The Appropriate Standard

There is nothing in *Indiana Michigan III*, nor anywhere else, that requires NSP to prove the Government's self-serving "but for world" of sole causation. If a sole causation standard is not the proper test, then the Government's defense that there were other potential causes for NSP's actions falls like a house of cards, because NSP has clearly shown that the direct, principal, substantial, and but for (or necessary condition) cause of NSP's damages was the Government's impending breach. Even assuming *arguendo* that NSP must show sole causation, it has shown that DOE's impending breach was the sole reason NSP sought storage sufficient to allow Prairie Island to run until the end of its licensed life.

The Government asserts that the traditional standard of causation requires a plaintiff to prove that a claimed damage "was attributable solely" to the Government's breach. Govt. Post-Trial Br. at 47, 49 (citing and quoting *J.D. Hedin Constr. Co. v. United States*, 456 F.2d 1315, 1330 (Ct. Cl. 1972). Notwithstanding the language in *J.D. Hedin*, the Federal Circuit has stated just the opposite, noting that the breach need not be the "sole factor or sole cause" of a plaintiff's loss. *Cal. Fed. Bank v. United States*, 395 F.3d 1263, 1268 (Fed. Cir. 2005), *cert. denied*, 126 S. Ct. 344 (2005). Furthermore, when the Government has attempted to argue that the sole causation standard is a *sine qua non* for proving causation and relied on *J.D. Hedin*, the Federal Circuit has given it a cool reception. *See Westfed Holdings, Inc. v. United States*, 407 F.3d 1352, 1361-63 (Fed. Cir. 2005) (distinguishing *J.D. Hedin* by noting that the plaintiff in *J.D. Hedin* had taken on "numerous other obligations" that undercut its assertion that it borrowed money due to the Government's actions). Thus, the Government's sole causation standard enjoys no support.

Furthermore, the Government attempts to write-out of *Indiana Michigan III* the language stating that the "breach is a *substantial causal factor* in the damages . . . ." 422 F.3d at 1374 (emphasis added); Govt. Post-Trial Br. at 46. The Government asserts that a later decision, *Cal. Fed. Bank v. United States*, somehow undermines any reliance on the *Indiana Michigan III* standard. Govt. Post-Trial Br. at 45-46. The *Cal. Fed.* decision, however, does nothing of the sort. *Cal. Fed.*, 395 F.3d at 1268 (noting that the breach need not be the "sole cause or sole factor" of damages); *see also Citizens Fed. Bank v. United States*, 474 F.3d 1314, 1319-20 (Fed. Cir. 2007) (concluding that the "substantial causal factor" test as enunciated in *Indiana Michigan III* remains an appropriate standard to judge causation).

In an attempt to muddy the clear language of *Indiana Michigan III*, the Government seeks to force-fit its "but for world" test into that decision by pointing to a particular factual

finding – that the plaintiff there failed to show causation in that a "decision to perform a full, instead of a partial, rerack in 1995 was purely a business judgment which it would have had to pursue irrespective of DOE's partial breach." *Indiana Mich. III*, 422 F.3d at 1376; Govt. Post-Trial Br. at 44-45. However, the Government ignores the immediately preceding sentence, which states that the "trial court found that Indiana Michigan's rerack schedule was not affected by 1987 and 1989 announcements projecting delays in the scheduled January 1998 acceptance start date." *Id.* In other words, the Federal Circuit (and trial court) said the plaintiff in that case had failed to prove that its decision to perform a full rerack was caused by the Government's breach at all. There was no "but for world" at issue. Indiana Michigan simply failed to discharge its burden of proof that its decision to rerack was caused by DOE's impending breach. The instant case, however, relies upon different facts, different parties, different witnesses, and nuclear plants (Prairie Island and Monticello) that were not at issue in Indiana Michigan. In this case, NSP presented 1987 and 1988 memoranda and reports, with supporting, credible testimony, that DOE's impending breach caused NSP to focus exclusively on storage technologies that would allow Prairie Island to have storage until the end of its Nuclear Regulatory Commission ("NRC")-licensed life. NSP Post-Trial Br. at 15-23.

The Government also tries to rely on tort law to support its sole causation standard and the alleged need for NSP to prove a "but for world." Govt. Post-Trial Br. at 47-49. The Government's arguments are rebutted by the discussion of the "but for" standard in a recent draft of the RESTATEMENT (THIRD) OF TORTS § 26 cmt. b (Proposed Final Draft No. 1) (emphasis in original):

> An actor's tortious conduct need only be *a* factual cause of the other's harm. The existence of other causes of the harm does not affect whether specified tortious conduct was a necessary condition for the harm to occur. Those other causes may

> be innocent or tortious, known or unknown, influenced by tortious conduct or independent of it, but so long as the harm would not have occurred absent the tortious conduct, the tortious conduct is a factual cause. Recognition of multiple causes does not require modifying or abandoning the but-for standard in this Section. Tortious conduct by an actor need be only one of the causes of another's harm.

Nor do the Federal Circuit tort decisions relied upon by the Government support the Government's causation standard. *Shyface v. Sec'y of Health & Human Servs.*, 165 F.3d 1344, 1353 (Fed. Cir. 1999) ("Thus although the Shyfaces did not prove that the DPT vaccine was the only or predominant cause of his death, the requirements of the Vaccine Act are met *prima facie* upon proof of the substantial factor criterion."); *see also Abbott Labs. v. Brennan*, 952 F.2d 1346, 1353 (Fed. Cir. 1991) (noting in the tort context that "[c]ommentators have explained that the 'but for' and 'substantial factor' standards of causation generally yield identical results").

Here, the Government has offered no credible evidence to disprove that NSP's decision to mitigate using dry storage was caused by the Government's impending breach. Logic and common sense dictate that, absent the Government's breach, NSP would not have undertaken the time, effort, aggravation, and expense associated with building its dry storage facility at Prairie Island and later would not have been forced to pursue the construction of a dry storage facility at Monticello. Even if the Government can prove other causes (which it has failed to do), they are irrelevant, because the evidence in this case shows that NSP's decision to use a storage technology sufficient to store SNF through the end of the licensed-life of the Prairie Island plant was primarily, directly, and substantially caused by the Government's impending breach. *Yankee Atomic*, 73 Fed. Cl. at 298 ("That there was an independent or secondary reason for building the ISFSIs does not detract from the primary or substantial causal factor-the delay of over a decade in DOE's acceptance, transportation and disposal."); *see also* 3 E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS § 12.1, at 148-49 (3d ed. 2004) ("Breach may not

be precluded, however, by the presence of other contributing causes . . . . Although the injured party's own failure to avoid loss may bar recovery for that loss, this is not thought of as a consequence of a requirement of causation but of a limitation under a 'mitigation' rule.") (footnotes omitted).

### C. Foreseeability Only Required The Foresight That Prairie Island Would Shut Down Absent NSP's Efforts To Mitigate

NSP agrees that the proper framework for determining foreseeability is set forth in *Indiana Michigan III*, 422 F.3d at 1373. However, the Government's discussion of foreseeability throughout this case wholly ignores what loss was foreseeable and what loss must be mitigated. The foreseeable loss in this case is that NSP's plant would shut down with a resulting loss of over $1 billion.[3] *See* NSP's Post-Trial Br. at 30, 31, 76; PX60 at KRGNSP03832 (no action alternative discussed in Certificate of Need would mean $1 billion in replacement power costs); Tr. 546-51 (McCarten) (discussing alternatives); Tr. 158-59 (Bomberger). NSP's duty to mitigate and its response to this duty prevented this loss with far less costly measures. *Indiana Mich. III*, 422 F.3d at 1375 (stating that "'[o]nce a party has reason to know that performance by the other party will not be forthcoming, . . . he is expected to take such affirmative steps as are appropriate in the circumstances to avoid loss by making substitute arrangements or otherwise'") (quoting RESTATEMENT (SECOND) OF CONTRACTS § 350, cmt. b). Thus, the question becomes whether these mitigation measures were reasonable under the circumstances. *Indiana Mich. III*, 422 F.3d at 1375; *Koby v. United States*, 53 Fed. Cl. 493, 497 (2002) ("'The rule of mitigation of damages may not be invoked by a contract breaker as a basis for hypercritical examination of the conduct of the injured party, or merely for the purpose

---

[3] The NWPA recognized (in 1983) that adequate spent fuel storage capability was linked to "the continued, orderly operation of [civilian nuclear power] reactors." 42 U.S.C. § 10151(a)(3); *see id.* §§ 10155(b)(1)(A), (b)(2), & (g).

of showing that the injured person might have taken steps which seemed wiser or would have been more advantageous to the defaulter.'") (quoting *In re Kellett Aircraft Corp.*, 186 F.2d 197, 198-99 (3d Cir. 1950)).[4]

Moreover, the doctrine of foreseeability does not require that a breaching party foresee the exact method of mitigating costs and the exact type of damages incurred. The Government's argument to the contrary is simply wrong. *See Citizens Fed.*, 474 F.3d at 1321 ("If it was foreseeable that the breach would cause the other party to obtain additional capital, there is no requirement that the particular method used to raise that capital *or its consequences* also be foreseeable.") (emphasis added); 11 JOSEPH M. PERILLO, CORBIN ON CONTRACTS § 56.7, at 108 (rev. ed. 2005) ("Just as reason to foresee does not mean actual foresight, so also it is not required that the facts actually known to the defendant are enough to enable the defendant to foresee that a breach will cause a specific injury or a particular amount in money."). It only requires that the magnitude and type of losses that will result from a failure to perform be reasonably foreseeable. 3 E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS § 12.14, at 260-61 (3d ed. 2004) ("[W]hat must be foreseeable is only that the loss would result if the breach occurred. There is no requirement that the breach itself or the particular way that the loss came about be foreseeable."). It would be folly to assert that a utility would be charged with showing that the exact manner in which it mitigated damages must be exactly foreseeable over time, where it was generally known that the magnitude and type of loss avoided were the costs of

[4] It is in this context that Professor Dobbs's comments regarding foreseeability and mitigation become meaningful; once it becomes clear that there is a foreseeable loss, how a non-breaching party mitigates that loss becomes far less important, so long as it finds a way to mitigate the costs of the breach. *See* 3 DAN B. DOBBS, DOBBS LAW OF REMEDIES § 12.6(2), at 138 (2d ed. 1993).

replacement power from a plant shutdown. *Cf. Yankee Atomic*, 73 Fed. Cl. at 286 ("[M]itigation in a contract that spans the ages is not limited to decades-old technology.").

In its brief, the Government incorrectly asserts that NSP must show proximate causation in addition to showing substantial causation and foreseeability. Govt. Post-Trial Br. at 52-54. For this purpose, the Government invokes the Federal Circuit's decision in *Old Stone*, 450 F.3d at 1375, and asserts that the Federal Circuit considered proximate causation in the context of foreseeability. While *Old Stone* did involve the principle of mitigation, the plaintiff in that case also brought damages claims based, in part, on its reliance interest. *Id.* at 1370-71, 1374-75. In the portion of the decision relied upon by the Government, the Federal Circuit was clearly discussing reliance damages, which require proving both proximate causation and foreseeability. *Id.* at 1375 ("[R]eliance damages are subject to two pertinent limitations-the damages must have been both proximately caused by the breach, and foreseeable."). NSP has brought its claims based on an expectancy theory (not reliance) and therefore does not need to show proximate causation. *See Indiana Mich. III*, 422 F.3d at 1373 (discussing "substantial causal factor" but making no mention of proximate causation).

## III. AS A RESULT OF THE GOVERNMENT'S IMPENDING BREACH, NSP REASONABLY INCURRED MITIGATION COSTS BY LICENSING AND CONSTRUCTING AN ON-SITE DRY STORAGE FACILITY AT PRAIRIE ISLAND

As proved at trial and in NSP's initial post-trial brief at 15-19, NSP determined in 1987 and 1988 to seek spent fuel storage at Prairie Island sufficient to meet its needs through the end of the NRC-licenses. *See* PX398A at NSP-0001624 through NSP-0001625; Trial Transcript ("Tr.") 444-45 (McCarten); *see also* PX389B at NSP-0001638; Tr. 427-28 (McCarten). NSP (and Ms. Laura McCarten, in particular) presciently concluded that NSP needed this amount of



400555920v5

storage because NSP lacked confidence that DOE would perform before the end of the NRC-licensed life of Prairie Island – 2013 for unit 1 and 2014 for unit 2 of the plant. PX398B at NSP-0001623 through NSP-000162 5; Tr. 444-45, 448-49 (McCarten). Therefore, NSP's accurate prediction of DOE's breach was the basis of NSP's decision to seek such extended storage. *See Yankee Atomic*, 73 Fed. Cl. at 265 ("[T]he intent of the NWPA and the parties to the Standard Contract was to avoid the construction by utilities of additional at-reactor storage after January 31, 1998. DOE's failure to perform under the Standard Contract thus has led to the very thing the NWPA and the Standard Contract were designed to forestall., *i.e.*, the construction of dry storage facilities for spent nuclear fuel at nuclear power electricity generating plants throughout the United States.") (internal quotations omitted); *see also Tenn. Valley Auth.*, 69 Fed. Cl. at 519.

The Government argues that NSP is not entitled to recover its costs of licensing and constructing the Prairie Island dry storage facility and may not recover any costs relating to the first seven casks. Govt. Post-Trial Br. at 4. The Government asserts four purported justifications why a significant portion of NSP's actual costs for its Prairie Island dry storage facility should be ignored: (1) because NSP in 1987 and 1988 could not know the specific rate DOE that would perform under the Standard Contracts in 1998, NSP could not have known the amount of storage to build when it made its decision; (2) NSP should be precluded from recovering any damages incurred prior to 1994; (3) NSP supposedly believed that a third re-rack was technically impossible or that a third re-rack would not have provided sufficient storage until DOE arrived; and (4) NSP would never have performed a third re-rack because of the uncertainty involved in avoiding a plant shutdown. Govt. Post-Trial Br. at 55-83.

Because the Government is attempting to reduce NSP's mitigation costs, the Government bears the burden of showing that NSP's actions were unreasonable. *Tenn. Valley Auth.*, 69 Fed.

Cl. at 529-30 ("The government frames this argument as one of causation . . . but in the circumstances of this case, it realistically is a contention aimed at limiting the amount of damages [the plaintiff] may recover as a result of its mitigation efforts. The government contends that [the plaintiff's] damages should be constrained to the difference between the costs of building the dry storage facilities in the present (breach) world versus the costs of building the facilities later in the but-for, non-breach world . . . Because the government seeks to limit the non-breaching party's recovery for mitigation, the government bears the burden of proof."); *cf. also First Heights Bank*, 422 F.3d at 1317 ("We thus conclude that the government's so-called causation argument is identical to the government's mitigation argument and reject it for the reasons described above."). The Government has failed to meet its burden. But, regardless of which party bears the burden of proof, the Government's arguments do not bear scrutiny.

**A. NSP's Decision Was Unaffected By The Specific Rate Of Acceptance**

In making its determination as to how to provide additional storage at Prairie Island, the Government asserts that NSP was left with complete uncertainty as to how DOE was expected to perform and, therefore, NSP could not have based any decision on DOE's performance. Govt. Post-Trial Br. at 55-60. The Government's arguments are meritless. First, the trial evidence shows that NSP reasonably (and correctly) believed DOE would not perform before the end of Prairie Island's licensed-life, making the annual acceptance rate at which DOE would perform a moot point. Second, the Government's effort to further reduce NSP's damages (to the costs of a third re-rack), ignores NSP's reasonable, "non-breach" expectation that DOE would fulfill its statutory obligation and would pick up fuel at a rate sufficient to avoid the need for additional at-reactor storage after 1998.

As noted above, in the actual world, the rate at which DOE might potentially have performed never played a major factor in NSP's determination. *See* PX398A; PX398B. Ms. McCarten extensively testified that "nothing before 2006 and 2007 was to our mind even possible and that it would be prudent to look at the life at the plant . . . . So we were looking at a certain timeframe, that we thought it only made sense to look at a certain increment of additional storage because of where we felt the DOE was in terms of realistically coming out to start accepting spent fuel from us at Prairie Island." Tr. 448-49 (McCarten); *see also* Tr. 762, 870-71 (Kapitz). Thus, in the real world, the question of rate was never a key factor in NSP's determination to provide storage until the end of the licensed-life of Prairie Island's spent fuel pools.

However, in the but-for world, had NSP expected DOE to perform and believed that it needed only sufficient storage to meet its needs until DOE would begin to pick up NSP's fuel – 1999 – the reasonable expectation would have been that DOE would perform at a rate sufficient to assure NSP would not need to add storage capacity after 1998. *See* Tr. 774-75 (Kapitz); Tr. 454-55 (McCarten). While the NWPA lodged the responsibility with the utilities to pay for DOE's disposal program and to provide interim storage of SNF, the utilities only had the responsibility for the costs of interim storage "until such waste and spent fuel is accepted by the Secretary of Energy in accordance with the provisions of this Act . . . ." 42 U.S.C. §§ 10131 (a)(4) & (5). The NWPA specified the date – January 31, 1998 – when DOE was required to begin removing SNF from commercial nuclear reactors. 42 U.S.C. § 10222 (a)(5)(B); *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1342 (Fed. Cir. 2000) ("Congress found this objective so important when it promulgated the Act that it took the unusual action of specifying that all the contracts must contain this explicit requirement."). Based on the intent of

the NWPA, DOE was expected to perform its contractual obligations at a rate sufficient to avoid additional storage after 1998. *See Roedler v. Dep't of Energy*, 255 F.3d 1347, 1352 (Fed. Cir. 2001) (interpreting the NWPA and stating that "[f]or determination of contractual and beneficial intent when, as here, the contract implements a statutory enactment, it is appropriate to inquire into the governing statute and its purpose").

The Government asserts that NSP could not have known this, because the 1985 Mission Plan and other documents stated that a specific acceptance allocation would not be made available until 1991. Govt. Post-Trial Br. at 57 (citing 1985 Mission Plan, DX45). However, the same 1985 Mission Plan stated: "[I]f the DOE fails to meet the schedule shown in Table 9-2 or 9-3 [using a steady-state rate of 3,000 MTU after a five-year ramp-up], then the additional storage capacity needed to accommodate the delay in schedule will be provided by the DOE, possibly at reactor sites." DX45 at 381; *see also* Tr. 2133-34 (Supko). Thus, the same 1985 Mission Plan that allegedly created "uncertainty" about when DOE would perform also pronounced that, if DOE was unable to meet its required performance, DOE would provide storage for utilities after 1998 as expected under the NWPA.[5]

### B. The Federal Circuit Did Not Create A Per Se 1994 Cut-Off To Recover Mitigation Costs In SNF Cases

The Government asserts that the *Indiana Michigan III* Federal Circuit decision created a 1994 cut-off for the recovery of mitigation costs and, therefore, NSP may not recover costs prior to 1994. Govt. Post-Trial Br. at 79-83. The Government's assertion is wrong. *See* NSP Post-Trial Br. at 87-89.

---

[5] While the 1985 Mission Plan states that the "schedule is an approximation," DX45 at 29 (HQR-003-1133), so too did the 1991 ACR. DX108 at 4 (noting that the ACR provides "only an approximation of the system throughput rates").

First, the Government asserts that NSP may not recover costs prior to 1994 because the Federal Circuit allegedly "held" that Indiana Michigan could not recover damages prior to DOE's 1994 Notice of Inquiry. Govt. Post-Trial Br. at 79. *Indiana Michigan III* includes no such holding. As NSP explained in its initial brief at 87-89, *Indiana Michigan III* limited damages based on the facts in that case. *Yankee Atomic*, 73 Fed. Cl. at 261 ("Reasonableness, in light of particular facts and circumstances, is plaintiff-specific. The 1994 date is the latest date when mitigatory obligations arose – whether that obligation or right ripened earlier is dependent on the facts and circumstances of each case and will be examined in appropriate circumstances.") (discussing *Indiana Mich. III*).

Second, the Government asserts that three facts and circumstances of NSP's case do not justify finding any differently in the instant case than in *Indiana Michigan III*: (1) the 1987 report prepared by Ms. McCarten; (2) the 1992 press release from NSP's CEO Mr. James Howard; and (3) Mr. Michael Schwartz's alleged position during the certificate of need proceedings. None of these facts and circumstances support the Government's assertions. The Government incorrectly insists that Ms. McCarten's 1987 report that DOE was unlikely to perform, looked solely to the repository and did not foreclose the possibility DOE would perform at a Monitored Retrievable Storage ("MRS") facility. Govt. Post-Trial Br. at 80. In fact, Ms. McCarten's 1987 and 1988 reports equally rejected the likelihood that DOE would perform by 1998 either at a repository or, based on the restrictive linkages advocated by DOE and eventually incorporated in the 1987 Nuclear Waste Policy Amendments Act ("Amendments Act"), at an MRS. PX398B at NSP-0001638 (1987 report noting that "waste acceptance schedule will depend on whether or not Congress authorizes construction of an MRS, the linkage between MRS operation and the first repository, and when the first repository begins operating"); Tr. 425

(McCarten) ("[I]n this report, what I thought was very important to convey, that although the MRS seemed like a good step, there were so many linkages and conditions associated with it, that it was not something to really put a lot of stock into or put a lot of reliance on or have confidence about. That's what I was trying to convey here."); PX398A at NSP-0001623 (discussing "restrictive link between the MRS construction schedule and the repository development schedule"); Tr. 440-43 (McCarten). Unlike DOE's predictions, Ms. McCarten's proved to be unerringly accurate.

The Government also asserts that Mr. Howard's June 1, 1992 press release supporting an MRS was evidence that NSP believed that DOE would perform on time. Govt. Post-Trial Br. at 81. However, Mr. Howard was trying to make the most of a letter from DOE, DX314, to show the Minnesota Public Utility Commission that any storage facility built at Prairie Island would not become permanent. Tr. 1966 (Howard) ("[W]e were trying to make the case at a very critical time with the Commission that, in our certificate of need process, which would allow us to build a temporary, make it a temporary facility, rather than permanent facility."). As he acknowledged based on subsequent correspondence, "unless Secretary Watkins knew something, a lot of something that I didn't know about, it seemed highly unlikely that he could make good on that closure in this timetable." Tr. 1973-74 (Howard). Indeed, DOE was not even able to meet the first milestone on the MRS schedule that Secretary Watkins provided to Mr. Howard in May 1992. DX314; Tr. 3583 (Kouts). Furthermore, in 1992 DOE began asserting it had no obligation to perform beginning in 1998, at all. Tr. 1950-51 (Howard); PX501; Tr. 1142-45 (Sanda); PX491; Tr. 1159 (Sanda); PX506.

The Government also misrepresents Mr. Schwartz's testimony in the Certificate of Need proceedings before the Minnesota Public Utilities Commission ("PUC"). The Government

asserts misleadingly that Mr. Schwartz testified that DOE could begin performance at an MRS in 1998, Govt. Post-Trial Br. at 81, but neglects to state that Mr. Schwartz testified that NSP "would not be able to rely on the Department of Energy's program for accepting fuel" because DOE's schedule "had continued to slip over time, and there was great uncertainty as to what ultimately would be the schedule for [its] accepting fuel from Prairie Island" and that the PUC should allow for NSP to have sufficient storage casks through 2014 – the end of the licensed life of its unit 2 reactor. Tr. 4305-4307 (Schwartz); DX103 at NSP-0003125 through NSP-0003126. Furthermore, notwithstanding the Government's assertions to the contrary, in the Certificate of Need application, NSP (and Mr. Schwartz) clearly stated that its "base case" for assessing DOE's performance predicted that DOE would not begin performance prior to 2015. Tr. 4314-16 (Schwartz); DX95 at NSP-0000274 & NSP-0000287. Here too, Mr. Schwartz's predictions, unlike DOE's, turned out to be accurate.

Finally, the Government asserts that NSP was subject to some requirement to seek assurances from DOE before beginning to mitigate damages as if this case was premised on a theory of anticipatory repudiation. NSP (and other utilities) have not brought total breach claims and are, therefore, subject to the law of mitigation, not anticipatory repudiation. *Indiana Mich. III*, 422 F.3d at 1374 (noting that utility "could not have claimed anticipatory repudiation" because the "NWPA itself, and the Standard Contract's terms drafted pursuant to it, compelled Indiana Michigan to bring an action for partial, not total, breach"). Furthermore, even assuming *arguendo* that such a requirement existed, the 1991-1992 correspondence exchanged between Minnesota Department of Public Service Commissioner Krista Sanda, DOE, and Mr. Howard evidences that any attempt to seek such assurances would be (and, in fact, were) rebuffed with statements that DOE had no obligation to begin performance in 1998. PX501 (February 14,

1992 DOE letter responding to Commissioner Sanda that "[n]either the Nuclear Waste Policy Act nor the standard contract imposes an unconditional obligation on the Department to accept spent nuclear fuel by January 31, 1998"); Tr. 1142-45 (Sanda); PX491; PX506; Tr. 1159 (Sanda) (discussing PX506 and the inconsistencies in DOE letters sent to Mr. Howard (DX314) and Mr. Alan Keesler of the American Committee on Radwaste Disposal (PX491) two days apart in May 1992: "In your letter to Mr. Howard, you discuss your commitment to accept spent nuclear fuel in 1998 and your obligations under 10 CFR, Part 961, to accept title to transport and dispose of spent nuclear fuel. Only two days earlier[,] [y]our letter to Mr. Keesler made it clear that you believed DOE has no such obligation."); *see also* NSP Post-Trial Br. at 35-37.

### C. NSP Could Have And Would Have Re-Racked Had It Expected DOE To Perform

As noted in NSP's initial brief at 23-27, NSP would have re-racked its Prairie Island spent fuel pools had it believed DOE would timely perform and likely could have achieved at least a 30 percent (and perhaps a 40 percent) increase in capacity. *See also, e.g.*, Tr. 873-74 (Kapitz).

Contrary to the Government's assertions, NSP did not believe that it was impossible for it to re-rack a third time. The Government points to two NSP summary-level news articles and a draft question and answer packet regarding the rod consolidation project as proof that NSP believed it was impossible to re-rack the pool. Govt. Post-Trial Br. at 9, 60-61. As both Mr. Kapitz and Mr. Howard testified, those articles constituted high-level oversimplifications of the situation. Tr. 1079-83 (Kapitz); Tr. 2000-01 (Howard) (noting that "there was more to it than" stated in NSP News and that "what I was told by my team was that reracking would not solve the issue of keeping Prairie Island open through the end of its license"). Furthermore, these

documents were prepared in the context of NSP already having decided, because of DOE's impending breach, that it needed much more storage capacity than a re-racking would have provided. Tr. 1079-80 (Kapitz); Tr. 594 (McCarten) ("[W]ith regard to the viability of reracking [mentioned in the rod consolidation draft questions and answers], the context of that is not just can it technically be done, but is it something that would meet the needs that we were trying to fulfill. So viability, in terms of how much storage you could get out of that and whether that would close the gap, was part of the issue that we were looking at with all of our storage technology evaluation."). NSP did not believe that it was impossible to re-rack, only that re-racking for a third time would not have achieved the necessary storage to reach the end of licensed-life of the Prairie Island plant.

The Government also asserts that the 20 percent re-racking increase put forward by NSP during the Certificate of Need proceedings should constitute the upper re-racking limit that NSP should be allowed to argue in this case (even to the point of being estopped from arguing otherwise). Govt. Post-Trial Br. at 61-62, 74-78. However, as plainly stated on each of the documents cited and as noted in the testimony of Ms. McCarten and Mr. Kapitz, the 20 percent increase was approximate because NSP had already concluded that re-racking (whether at a 20 percent, 30 percent, or 50 percent increase) would not provide sufficient storage to reach the end of the licensed-life of Prairie Island. Tr. 1073-74, 5079-81 (Kapitz); Tr. 505-06 (McCarten); PX60 at KRGNSP033857 (noting that a third re-rack's maximum increase in storage was "*estimated to be about 20%*") (emphasis added). PX49 at KRGNSP11062 (1995 Dry Cask Alternative Study states that the 1991 Certificate of Need "*estimated* the maximum capacity increase achievable via rerack was 20 percent") (emphasis added); DX107 at 117 (Ms. McCarten testifying at the PUC that "reracking can only accomplish *about a 20 percent increase*

in pool capacity") (emphasis added).[6] NSP simply did not consider – and did not need to consider – more precisely the amount of storage available from a re-rack, because it would not provide enough storage at Prairie Island through the end of its NRC license. Tr. 870-71, 900, 5050-54 (Kapitz).

The Government also takes issue with NSP's evidence showing that a 30 percent increase was possible in the late 1980s. Govt. Post-Trial Br. at 62-63. Had NSP believed DOE would perform in the so-called "but for" world, NSP would have looked more closely at re-racking. Tr. 877-82, 922-23, 5072-73 (Kapitz). Furthermore, although the final NUTECH report was not issued until 1990, the technology for that report did not vary from the original 1987 study by NUTECH. PX595; DX322; PX1018; Tr. 5351 (Kapitz). Based on the NUTECH study and his own intimate knowledge of the pool, Mr. Kapitz was confident that the pool could have accommodated a 30 percent storage increase through a third re-rack. Tr. 814, 877-80, 922, 5362-64 (Kapitz).

The Government also complains that the NUTECH study supporting the 30 percent storage increase related only to rod consolidation and does not account for a different possible distribution in weight from a third re-rack. Govt. Post-Trial Br. at 65-66.[7] Mr. Kapitz's rebuttal

---

[6] The Government asserts that the evidence conclusively proves that NSP provided the 200-250 assembly figure to the Minnesota Environmental Quality Board ("EQB") in conducting the environmental impact study for NSP's Certificate of Need application. Govt. Post-Trial Br. at 61-62. As shown in NSP's post-trial brief at 29 & n.11, however, NSP consistently used a 277 assembly figure to account for the 20 percent increase from a re-rack. Tr. 508-10 (McCarten); DX77 (estimating 277 additional spaces based on 20 percent re-rack); Tr. 924-25 (Kapitz). As a matter of simple mathematics, a 20 percent increase to a pool holding 1386 assemblies would result in an increase of at least 277 assemblies. *See* DX77; Tr. 508-09 (McCarten).

[7] The Government also complains that it was given no notice that Mr. Kapitz would testify that he believed an amount greater than 20 percent was achievable in a third re-rack. Govt. Post-Trial Br. at 65-66 n. 15. However, Mr. Kapitz appeared as a 30(b)(6) witness for

testimony regarding the NUTECH study convincingly showed that the Prairie Island pools met the criticality, structural, seismic, and thermal criteria necessary to perform a third re-rack. Tr. 5054-80 (Kapitz). The Government's own witness – Mr. John Leonard – admitted that the final version of the NUTECH study (DX322) did not include the assumptions he disagreed with in prior drafts. Tr. 5290 (Leonard). Mr. Leonard also acknowledged that the final study showed that the pool could withstand an increase of approximately 30 percent – or 416 additional spent fuel assemblies. Tr. 5288-89 (Leonard). Mr. Leonard acknowledged that the weight distribution discussed in the final NUTECH study (DX322) provided for a homogenous distribution of weight, similar to a re-rack, and that the newer racks would actually weigh less than those considered in the NUTECH study. Tr. 5298-99, 5302, 5304 (Leonard). Finally, Mr. Kapitz stated that it made no difference that the NUTECH study related to rod consolidation, because the study looked at the ability of the Prairie Island pool structure to support a specified weight independent of how the weight was applied (*i.e.* consolidated fuel or re-racking). Tr. 5344-45 (Kapitz).

Ultimately, NSP established that the Prairie Island pool could withstand an approximate 30 percent increase in its capacity and, perhaps, as great as a 40 percent increase. Tr. 887-92 (Kapitz); PX435 at NSP-0069365. Such an increase would easily have allowed NSP sufficient storage through 2002, well beyond the 1999 date when DOE would have come to begin removing NSP's SNF had DOE performed. Tr. 814, 877-80, 5363-64 (Kapitz).

---

NSP, provided the NUTECH study, and told the Government that based on the NUTECH study, *inter alia*, NSP could have achieved a re-racking greater than the 20 percent assumed by the Government's experts. *See* Tr. 815 (counsel for Government acknowledging that PX1018 – letter regarding NUTECH study – was produced at the 30(b)(6) deposition); *see also* Deposition Transcript of Jon Kapitz at 134 (Aug. 1, 2006) ("Based on my knowledge of the studies done in the pool that tell me that more than 20 percent would be possible.") (Attachment 1). Therefore, the Government had adequate notice of Mr. Kapitz's knowledge on this point and the Court properly allowed his rebuttal testimony.

### D. The Risk Of A Prairie Island Shutdown With A Third Re-Rack Is No More Than The Risk With Dry Storage

The Government contends that even if NSP could have re-racked (and assuming a 20 percent maximum), NSP never would have done so because a third re-rack risked shutting down Prairie Island. Govt. Post-Trial Br. at 67-73. As noted above, however, NSP could have achieved more than a 20 percent increase. Even assuming *arguendo* that it could not have achieved more than a 20 percent increase from a third re-rack, NSP would have faced the same risk of a premature shut down from pursuing a dry storage facility. Furthermore, the Government's static analysis ignores the options that NSP had to assure that its plant continued to operate even assuming only a 20 percent re-rack.

The Government (and Dr. Neuberger's analysis) never considered in its so-called "uncertainty analysis" that NSP's pursuit of a dry storage facility also placed NSP in danger of potentially shutting down due to the possibility of political opposition. Tr. 4769-70 (Neuberger) (acknowledging that plant shut down is a possibility if NSP fails to receive permission to build an independent spent fuel storage installation); Tr. 2931-32 (Sieracki) (noting that NSP moved over 1000 fuel assemblies from Monticello to the General Electric – Morris, Illinois facility despite the potential parade of horribles suggested by the Government and that NSP would have been prudent to perform a third re-rack had DOE been expected to perform). As Ms. McCarten and Mr. Kapitz realized, keeping spent fuel in the pool was preferable from a political standpoint because of the political opposition that they correctly expected to dry storage. Tr. 700-01 (McCarten); Tr. 876 (Kapitz) ("[W]ithin the state, our next door neighbors, the Indian community and the state of Minnesota clearly had some concerns about creating a new facility outside the plant and . . . had we stayed within the plant, it was clear there would be less objections to working within the plant than creating a new facility."); *id.* at 5089-92, 5363, 5366-

67, 5369-70 (Kapitz). Moreover, all the concerns discussed in the Government's brief regarding the catastrophic effects of a plant shutdown were in the context of NSP pursuing *dry storage technology* because of the political concern that the dry storage facility would not be approved. *See, e.g.*, PX592 (1994 letter from Ms. McCarten to Senator Novak noting that if the legislature did not approve dry storage, "[a]t this time, because of the steps required for state and federal review and licensing of a rerack project, pool reracking could not be completed in time to avoid a plant shutdown"). Thus, the possibility of the plant shutting down was ever present in any decision in the actual and so-called "but for world." Tr. 4768 (Neuberger) ("Uncertainty, it's actually true in both the actual and the but-for world on an expected basis, nuclear power plants face the possibility that they will need to shut down for one reason or another.").[8]

Furthermore, the Government's "uncertainty" concerns are static and presume that, in reality, NSP had no other options to keep the plant running if it chose to re-rack and only achieved a 20 percent storage increase. Dr. Neuberger himself acknowledged that the degree of uncertainty regarding DOE's performance would change over time. Tr. 4740, 4767-68 (Neuberger). It is simply not reasonable for the Government to assume that NSP would have sat on its hands. Had NSP expected DOE to perform in the so-called "but for world," NSP would have monitored DOE's expected performance and could have taken certain measures to avoid a

[8] In an attempt to contradict the proven decisionmaking of NSP's engineers and management (who testified they could and would have re-racked had they expected DOE to perform because of the preference to keep the SNF in the Prairie Island pool), the Government relies on the judgment of its expert Mr. John Leonard to assert that, even if NSP expected DOE to perform, NSP never would have re-racked. Govt. Post-Trial Br. at 68-69. Mr. Leonard, when he managed the Shoreham nuclear plant, never took into account the political possibility that Shoreham could be shut down, and instead opted to start up the plant and run it at low power. Tr. 4104-07 (Leonard). In fact, the Governor of New York forced the plant's shutdown and, as a result of Mr. Leonard's decision to run the plant, caused hundreds of millions to be spent to dispose of the irradiated fuel and to decommission the plant. Tr. 4100-01, 4105, 4114 (Leonard).

plant shutdown (or plan a plant outage accordingly). Tr. 900-04 (Kapitz). Many of these measures DOE itself acknowledged in a report to Congress regarding Prairie Island. PX1019; Tr. 3732 (Pollog); NSP Post-Trial Br. at 24-25. For example, NSP could have increased the enrichment levels in its fuel assemblies, which would have allowed fuel assemblies to remain in the reactor longer, thus increasing the length of the fuel cycles. Tr. 901 (Kapitz); Tr. 2665-66 (Sieracki);Tr. 3732 (Pollog); PX1019 at 6 (NSP-0001832). In reality, NSP actually generated fewer spent fuel assemblies due to its use of more highly-enriched fuel, leading to more available spaces in the pool. Tr. 4722-23 (Neuberger); Tr. 901-02 (Kapitz). NSP "could have been more aggressive and pursued that sooner and lengthened each of our refueling cycles . . . ." Tr. 901-02 (Kapitz). Additionally, NSP could have stored its fuel in transportation casks until DOE arrived to pick-up the fuel. Tr. 903-04 (Kapitz).[9] None of these available strategies would have required NSP to run at less than full power (as the Government claims in its brief at 66). Furthermore, these scenarios would not increase NSP's costs in the so-called "but for world," because higher enrichments allow the fuel to generate more energy (and, thereby, more electricity is generated from that energy) and any transportation casks were to be provided by DOE as required by the Standard Contracts. *See, e.g.*, Standard Contract, Art. IV.B.2, PX56 at

[9] The Government incorrectly asserts that NSP has failed to explain how it would obtain a license to store a transportation cask and how the transportation cask would fit into a nearly full Prairie Island spent fuel pool. Govt. Post-Trial Br. at 67 n.16. First, the NRC regulations allow for a plant to store spent fuel in transportation (or shipping) casks if a plant – like Prairie Island – is licensed to handle the shipping cask. Tr. 903-04 (Kapitz). Second, Mr. Kapitz explained that available transportation casks in the 1990s did not necessarily require that the full cask be placed in the pool, but instead used smaller transfer casks that would be placed in the pool. Tr. 1087-88 (Kapitz). The casks could be stored outside the pool on-site until DOE arrived. Tr. 902-03 (Kapitz). Finally, contrary to the Government's assertion, the Final Delivery Schedule form in the Standard Contract does allows a utility to provide a "Purchaser's Delivery Estimate" with two dates within a year between which it expects DOE to pick-up SNF. Standard Contract, Appendix D, PX56 at KRGNSP08011. The Standard Contracts also required DOE furnish the transportation casks "sufficiently in advance to accommodate scheduled deliveries." Standard Contract, Art. IV.B.2, PX56 at KRGNSP07980; Tr. 136-37 (Bomberger); Tr. 2741-42 (Sieracki).

KRGNSP07980 ("DOE shall arrange for, and provide, a cask(s) and all necessary transportation of the SNF . . . ."); Tr. 137 (Bomberger). Therefore, under a more realistic view of what NSP would have done had it expected DOE to perform, NSP could have re-racked its pools even if the increase were assumed to be as little as 20 percent.

## IV. NSP'S PRAIRIE ISLAND DRY STORAGE MITIGATION COSTS SHOULD NOT BE REDUCED FOR OTHER REASONS

The Government comes up with four additional tactics to reduce the award of NSP's dry storage mitigation costs, asserting that NSP (1) should not be able to recover its internal labor and overhead for constructing the Prairie Island facility and loading casks, (2) should not recover for upgrading its auxiliary building crane, (3) should be charged for its future costs of loading fuel into DOE casks, and (4) should not recover for pursuing a transportation license for its TN-40 casks. Govt. Post-Trial Br. at 98-07. Additionally, the Government asserts that NSP should not recover the costs it incurred for increased security at the General Electric ("GE")-Morris, Illinois facility. *Id.* at 107. Each of these arguments is meritless.

### A. NSP Is Entitled To Recover Its Internal Labor And Overhead

During the trial and in its post-trial brief at 41-43, 89-90, NSP proved that it incurred internal labor and overhead costs in conducting breach-related activities such as licensing and constructing the independent spent fuel storage facility ("ISFSI") at both Prairie Island and Monticello, upgrading the auxiliary building crane at Prairie Island, and loading dry storage casks at Prairie Island. *See, e.g.*, Tr. 850-55 (Kapitz); Tr. 2919 (Sieracki). The Government, however, states that NSP should not recover these mitigation costs, because these labor and overhead costs were not "incremental to the breach" as the utility would have paid the salaries and overhead costs regardless of the breach. Govt. Post-Trial Br. at 98.

The Government has regularly made this argument in SNF cases and the Judges of this Court have uniformly rejected the Government's claim that utilities are not entitled to recover for their use of internal labor and overhead to mitigate the Government's breach. *Tenn. Valley Auth.*, 69 Fed. Cl. at 539 ("[T]he fact that [the utility] used its own internal resources to support is mitigation is not fatal to its claim for damages in mitigating a breach of contract. Rather, the test for recovery is a targeted one: whether use of the internal resources by [the utility] deprived it of the ability to employ those resources on other projects. That [the utility] would have paid its employees in all events is not material to this inquiry."); *see also Sacramento Mun. Util. Dist. v. United States*, 70 Fed. Cl. 332, 376 (2006) ("*SMUD*") ("The fact that an injured party has used internal resources to mitigate a breach does not foreclose the injured party from recovering such costs."), *appeal pending*, No. 2007-5052 (Fed. Cir.); *cf. Yankee Atomic*, 73 Fed. Cl. at 322 ("It is concluded that defendant did not establish that the labor cost cited was not incurred."); *Pac. Gas & Elec. Co. v. United States*, 73 Fed. Cl. 333, 408 (2006) ("To the extent that the costs of [the utility's] internal labor were in fact performed on a 'breach-related project,' . . . the court finds that such labor costs should properly be awarded to plaintiff."), *appeal pending*, No. 2007-5046 (Fed. Cir.). Similarly, in *Tennessee Valley Authority*, Judge Lettow awarded all but approximately $100,000 of the $1.7 million in overhead costs sought by the plaintiff. *Tenn. Valley Auth.*, 69 Fed. Cl. at 526, 542; *see also Chain Belt Co. v. United States*, 115 F. Supp. 701, 712 (Ct. Cl. 1953) (awarding partial breach mitigation damages for allocable overhead expenses from cost of "insurance, taxes, watchmen, maintenance and repairs," and "a 5% allowance for general administrative expense"). Therefore, regardless of the Government's disapproval of the decisions of other Judges of this Court, NSP's mitigation costs should not be reduced because NSP used internal labor and overhead to perform breach-related activities.

**B. NSP Should Not Have To Pay Now For Future Costs Of Loading DOE Casks**

The Government also argues that the recovery of NSP's mitigation costs should be reduced to account for the costs NSP will incur in the future to load NSP's spent fuel to DOE casks because in the so-called "but for world" NSP would have had to load DOE casks for delivery. Govt. Post-Trial Br. at 104-06. However, because NSP (and other utilities) have sought damages for only a partial breach, with the expectation that DOE will one day perform, NSP will one day incur these costs. Deducting those costs today from NSP's mitigation damages will have the necessary effect of having NSP pay twice. It is wholly speculative to assess these future costs now. Other Judges of this Court have uniformly rejected the Government's argument on this point. *Tenn. Valley Auth.*, 69 Fed. Cl. at 542-43 ("The alleged benefit stems purely from timing; both DOE and [the utility] contemplate that DOE will still perform under the contract at some future date. As matters now stand, any benefit inhering in [the utility] because of delayed loading costs would be entirely speculative.") (citations omitted); *see also Yankee Atomic*, 73 Fed. Cl. at 286 (calling future potential offsets speculative and citing to *Tenn. Valley Auth.*); *Pac. Gas & Elec.*, 73 Fed. Cl. at 416 ("[I]t would be entirely speculative to offset plaintiff's damages because of a purported benefit it will receive from loading large rail casks in the future rather than 25-ton truck casks in the non-breach world. Plaintiff's loading costs have been deferred rather than avoided, and the court declines to engage in a guessing game as to whether such deferred costs will have increased or decreased by the time (if ever) defendant performs the parties' Standard Contract."); *SMUD*, 70 Fed. Cl. at 372 ("DOE and [the plaintiff] both contemplate that DOE will still perform under the Standard Contract at some future date, any benefit to [the utility], because of delayed loading costs, would be entirely speculative.").

### C. The Government Should Not Receive An Offset For NSP's Decision To Upgrade Its Auxiliary Building Crane At Prairie Island

During the trial and in its post-trial brief at 42-43, NSP proved that NSP would not have upgraded the auxiliary building crane absent the Government's impending breach, because Prairie Island was licensed and capable of handling then-available licensed shipping casks. Tr. 846 (Kapitz); Tr. 1797-98 (McKeown) (noting that "our licensing basis and our design basis at the power plant allowed for handling of licensed shipping casks"); Tr. 2918-19 (Sieracki). In an attempt to undermine this straightforward conclusion, the Government (1) misconstrues Ms. McCarten's testimony during the Certificate of Need proceedings as allegedly stating that NSP would have upgraded the crane regardless of the use of TN-40 casks, (2) asserts that NSP would have built an ISFSI in the "but-for world" and would have used a storage cask that would have required a single-failure proof crane, and (3) speculates that in the "but-for world" DOE would have brought a cask requiring a single-failure proof crane. Govt. Post-Trial Br. at 103-04.

First, the Government's reliance on Ms. McCarten's Certificate of Need testimony is unavailing and misleading, as brought out during re-direct and recognized by the Court. The Government asserts that Ms. McCarten's Certificate of Need testimony related to the costs of upgrading the auxiliary building crane. DX104 at NSP025 0383. However, the testimony cited by the Government relates not to the costs of the auxiliary building crane, but to the costs of the NRC licensing fee associated with it. Tr. 691-693 (McCarten). The Court recognized this point at trial. Tr. 692. Therefore, the Government enjoys no support for its contention that NSP stated that the crane would have to be upgraded regardless of DOE's performance; the evidence proves exactly the opposite. Tr. 846-47 (Kapitz); Tr. 1797-98, 1852-52 (McKeown); Tr. 2918 (Sieracki) ("The crane modification clearly relates to having to handle the TN-40 cask. The TN-

40 cask came about because of the nonperformance of the government. Therefore, there's a cause-and-effect relationship.").

Second, for the reasons stated above, NSP would not have had to build an ISFSI in a "but-for world" in which DOE was expected to perform and, therefore, would not have needed to upgrade its crane to handle a cask such as the TN-40.

Third, the Government also asserts that NSP witnesses believed that in the "but-for world," DOE would have brought a transportation cask similar to the TN-40 used for the ISFSI, therefore requiring the crane upgrade. Aside from the fact that it is wholly speculative as to what type of shipping cask DOE would have provided in 1999, as Mr. Kapitz and Mr. McKeown explained, the Prairie Island plant's crane (before being upgraded) was rated to handle then-licensed transportation casks. Tr. 845-46 (Kapitz); Tr. 1797-98, 1835-36 (McKeown). DOE was bound by the Standard Contracts to arrive with a cask that fit NSP's structure without modification. Tr. 1797-98 (McKeown); Standard Contract, Art. IV.B.2, PX56 at KRGNSP07980 ("Such cask(s) shall be suitable for use at the Purchaser's site . . . .").

The Government also incorrectly asserts that if DOE had used a similar cask to the TN-40 (postulating an example of a transportation cask licensed in the 1990s with similar height dimensions as the TN-40), Mr. Kapitz admitted that NSP would have needed to upgrade the crane. Tr. 1039-40 (Kapitz). Wholly apart from the speculation as to the kind of cask DOE would have provided in the "but-for world," Mr. Kapitz admitted no such thing. Mr. Kapitz was answering questions about the height of the cask on the pad and not about the height of the cask

in the pool, which is the relevant criterion in evaluating the need to upgrade the crane. Tr. 1087-88 (Kapitz). In other words, the Government was comparing apples to oranges.[10]

### D. NSP's Pursuit Of A Transportation License For The TN-40 Casks Was Reasonable Mitigation

The Government objects to NSP's mitigation costs for pursuing a transportation license for its TN-40 casks, arguing that the Standard Contract requires that DOE provide transportation casks. Govt. Post-Trial Br. at 106-107. Although the Government claims that NSP has presented no evidence why it sought to license the TN-40 casks for transportation, *id.* at 106, the Government is wrong. The 1994 Minnesota legislation mandates that NSP attempt to move SNF out-of-state as soon as possible, which necessarily requires NSP to obtain a transportation license for its TN-40 casks. PX198 at KRGNSP11418, 1994 Minn. Sess. Laws Ch. 641, Art. 1, §§ 6 & 8 (codified at Minn. Stat. §§ 116C.775 & 116C.777); Tr. 2684 (Sieracki). The 1994 Minnesota legislation also mandates that when "other containers that allow for transportation as well as storage of spent nuclear fuel exist and are economically feasible for storage and transportation of spent nuclear fuel generated by the Prairie Island nuclear power generating plan[t], the commission shall order their use to replace the casks that are only usable for storage, but not transportation." PX198 at KRGNSP11418, 1994 Minn. Sess. Laws Ch. 641, Art. 1, § 7 (codified at Minn. Stat. § 116C.776); Tr. 2684-85 (Sieracki). Therefore, NSP has taken further steps to

[10] The Government also mischaracterizes Mr. McKeown's testimony, stating that Mr. McKeown agreed that if DOE arrived with a cask of similar dimension to the TN-40, NSP would have had to upgrade the auxiliary building crane. Govt. Post-Trial Br. at 104. However, when the Government asked this question, Mr. McKeown made it clear that the 125 ton weight of the TN-40 cask was the primary concern in upgrading the crane, not the lack of impact limiters. Tr. 1835 (McKeown) ("It was, for all intents and purposes, a 125-ton package. All the evaluations that had been supporting the existing licensing basis using impact limiters and crash pads were a fraction of that size package."). In this regard, the then-existing transportation casks were lighter. Tr. 1835-36 (McKeown). And, the licensed transportation casks usually included their own impact limiters. Tr. 1793 (McKeown).

mitigate its costs associated with the storage of spent nuclear fuel because the cost of licensing its current casks for transportation is significantly less than facing a mandate to purchase a new storage technology and transfer all the spent fuel from the old casks to the new casks. Unlike the plaintiff in *SMUD*, 70 Fed. Cl. at 373-74, NSP's decision to pursue a transportation license is caused by the Government's impending and continuing breach and is linked directly to NSP's efforts to mitigate its damages. The license would allow NSP to transport its fuel to an out-of-state facility such as the NRC-licensed Private Fuel Storage facility (discussed further below). *Cf. Pac. Gas & Elec*, 73 Fed. Cl. at 432 ("Furthermore, the court finds that plaintiff acted reasonably in choosing to utilize dual purpose containers to address its additional onsite storage need cause[d] by the government's partial breach of the Standard Contract . . . .").

**E. NSP's Damages Should Not Be Reduced By Its Costs For the GE-Morris Facility Security Upgrade**

The Government objects to NSP's mitigation costs incurred for a facility security upgrade at the GE – Morris facility. Govt. Post-Trial Br. at 107. NSP shipped spent fuel from its Monticello plant to the GE-Morris facility in the 1980s for storage. Tr. 413 (McCarten); Tr. 134-35 (Bomberger); Tr. 1803 (McKeown). NSP has a Standard Contract that covers its fuel currently stored at the GE-Morris facility. PX58; Tr. 134-35 (Bomberger). Had the DOE performed its obligations under the Standard Contract, there would be no continuing need for NSP to store fuel at Morris. NSP incurred these costs as a result of the Government's continued breach and, therefore, the Government has failed to show that NSP's payment of these costs was unreasonable. Tr. 150-51 (Bomberger); Tr. 2684-85 (Sieracki); PX1057, Sieracki Demonstrative Slide 21.

## V. NSP MAY RECOVER ITS MITIGATION COSTS REGARDING PRIVATE FUEL STORAGE, LLC

The Government opposes NSP's recovery of its mitigation costs for payments to Private Fuel Storage, LLC ("PFS") on two grounds: (1) the Government repeats its canard that the Federal Circuit in *Indiana Michigan III* precluded recovery for PFS costs as a matter of law; and (2) NSP should not be able to recover its costs because they were in the form of capital contributions. Govt. Post-Trial Br. at 92-97. The Government's arguments are unsupported by law and fact.

### A. The Federal Circuit's *Indiana Michigan III* Decision Does Not Preclude NSP, As A Matter Of Law, From Recovering Its PFS Costs

The Federal Circuit did not preclude, as a matter of law, claiming mitigation costs for PFS. As recognized by the Federal Circuit, questions of foreseeability and causation are questions of fact. *See Bluebonnet Sav. Bank, FSB v. United States*, 266 F.3d 1348, 1355, 1356 (Fed. Cir. 2001) ("Foreseeability is a question of fact reviewed for clear error. . . . Causation is also a question of fact reviewed under the clear error standard."). The Federal Circuit concluded that Indiana Michigan could not recover for its PFS costs "based on these facts" and the "credited evidence" of one of Indiana Michigan's own witnesses who believed PFS to be speculative. *Indiana Mich. III*, 422 F.3d at 1375, 1376. In its block quote from the decision, *see* Govt. Post-Trial Br. at 93, the Government deceptively leaves out the sentence focusing on the fact that it was Indiana Michigan's own witness who believed PFS to be speculative: "Its own witness characterized the planned facility, in which it abandoned financial investment in 2002, as 'too speculative' when proposed." *Indiana Mich. III*, 422 F.3d at 1376. That factual finding of the trial court was a predicate to the Federal Circuit's conclusion that the plaintiff utility there could not recover its PFS costs.

Since the Federal Circuit's decision, PFS received an NRC license, which undermines any concern that NSP's payments toward that goal was speculative. *See Yankee Atomic*, 73 Fed. Cl. at 265 n.23 ("Subsequently, NRC granted a license to Private Fuel Storage, LLC to construct and operate an ISFSI in Skull Valley, Utah."); Tr. 175 (Bomberger); Tr. 1510 (Northard).

NSP presented unrebutted evidence during the trial and, in its initial post-trial brief, cited to evidence showing that the Government's breach caused NSP to incur costs for PFS and that the Government not only could have foreseen, but actually foresaw, the possibility of a private facility such as PFS. NSP Post-Trial Br. at 44-48, 72-76; Tr. 4660 (Neuberger) ("Absent the breach, there probably never would have been a PFS."); Tr. 1542 (Northard); *see also Bullcreek v. NRC*, 359 F.3d 536, 542 (D.C. Cir. 2004) (concluding that the NWPA did not pre-empt private away-from-reactor storage because "Congress was aware of the NRC's regulations for licensing private away-from-reactor storage facilities" when it enacted the NWPA); *NRDC, Inc. v. United States NRC*, 685 F.2d 459, 502, 510 (D.C. Cir. 1982) (noting that NRC's rules regarding confidence in storing waste was complicated by the concerns about the unavailability of any facilities and that NRC had "yet to license a private corporation to build a retrievable surface storage facility") (Edwards, J., concurring in part, dissenting in part), *rev'd on other grounds sub nom. Baltimore Gas & Elect. Co. v. NRDC, Inc.*, 462 U.S. 87 (1983).

### B. NSP Did Not Invest In PFS To Make A Profit And NSP Continues To Have An Incentive To Move Its Fuel From Minnesota To An Out-Of-State Facility Like PFS

The Government repeats its unproven assertion that NSP incurred costs for PFS to make a profit, which even the Government ultimately concedes is not supported by the evidence (only



400555920v5

that other entities might have sought a profit). Govt. Post-Trial Br. at 95.[11] NSP's witnesses – Mr. Scott Northard and Mr. Charles Bomberger – made it clear that NSP did not participate in PFS to make a profit and PFS's business plan did not even consider it a primary objective. Tr. 1468-69 (Northard); Tr. 1988 (Howard); *see also* Business Plan, PX440 at 2 (NSP-0010499) (noting the objectives of building a private fuel storage facility, which objectives did not include making a profit). When questioned about this by the Court, Mr. Northard specifically stated that "the return on equity that would be associated with the payments for the storage facility would, in essence, be returned back to ourselves as owners and would offset the costs of storage . . . so there would not be a net profit, for instance, for Northern States Power . . . ." Tr. 1528 (Northard). Thus, NSP's payments to PFS provided (and still potentially provide) a place where NSP can ship its SNF out-of-state until DOE begins performing its duties under the Standard Contract. In other words, the payments represent reasonable efforts by NSP to mitigate the effects of the Government's breach.

The Government also incorrectly asserts that once NSP received legislative permission to build a dry storage facility at Prairie Island in 1994, NSP had no further need to pursue PFS, and this was doubly so (according to the Government) after passage of the 2003 legislation. Govt. Post-Trial Br. at 95-96. However, the 1994 legislation allowed NSP only 17 storage casks and provided significant incentives (by way of penalties) to move those casks out-of-state and away from Prairie Island. Tr. 1989 (Howard) ("It was still a big problem after the legislation was passed in 1994, that didn't go away, it didn't end anything. I mean, the battle just continued, and

[11] The Government also claims that "NSP blithely asserts that the value of its interest as a member in the [PFS] LLC is worthless" or "valueless." Govt. Post-Trial Br. at 93, 94, 97. The Government provides no citations for any of these statements, which to NSP's knowledge have never been made in this case.

we were looking for something that was a lot more permanent, out-of-state, than what we had in terms of our dry cask storage at Prairie Island."); *id.* at 2005-06 (Howard); Tr. 175-76 (Bomberger) ("PFS, at that time, was about one of our only credible alternatives to be able to create a spent fuel storage installation that would allow us to have continued operation of Prairie Island. Had we not had an alternative like PFS, we had a state imposed limit on the existing approved and operational ISFSI at Prairie Island of 17 casks."); *id.* at 295-96 (Bomberger); Tr. 1455-56 (Northard); *see also* PX198, 1994 Minn. Sess. Laws Ch. 641, Art. 1, § 1 (codified at Minn. Stat. § 116C.77).

Moreover, the Government fails to even mention (let alone rebut) the 2001 DOE report to Congress, which DOE prepared to offer potential alternatives for NSP's Prairie Island, should the state and federal law remain unchanged. PX1019. In that report, DOE acknowledged that one possibility for ameliorating the spent fuel storage problem facing NSP was shipping Prairie Island's spent fuel to PFS. *See* Tr. 3732-33 (Pollog); PX1019 at NSP-0001833 ("Shipments could also be made to a licensed facility owned by another company, such as another utility site, the proposed private fuel storage (PFS) facility which is currently undergoing licensing review by the NRC . . . .").

The Government then disingenuously asserts that once the Minnesota legislature passed the 2003 legislation, NSP was making PFS payments "of its own volition. . . ." Govt. Post-Trial Br. at 96. As the evidence at trial showed, the 2003 legislation did not resolve all of NSP's SNF storage problems, because it did not automatically allow a Certificate of Need for the Monticello plant, for example; it was not a "sure thing." Tr. 294-95 (Bomberger).[12] Moreover, NSP

[12] Even today, NSP has not completely cleared the hurdles for a Certificate of Need for a dry storage facility at its Monticello plant. The Minnesota legislature, hearing reports that DOE

continued to have a compelling financial incentive – relief from the required annual payments to the Renewable Development Fund – to remove its fuel from the Prairie Island ISFSI, because the 2003 legislation continued that requirement. Tr. 1476 (Northard); PX198, 2003 Minn. Sess. Laws, 1st Spec. Sess, Ch. 11, Art. 2, § 1, subdiv. 1 (codified, as amended, at Minn. Stat. § 116C.779, subdiv. 1); Tr. 1553-54 (Swanson); Tr. 1714-15 (Wilensky). The Government, in its post-trial brief at 96 asserts inexplicably and incorrectly that the 2003 legislation imposed the $16 million per year payments on NSP regardless of whether casks were stored at Prairie Island. The 2003 law, however, unambiguously states: "The fund transfer must be made *if nuclear waste is stored in a dry cask at the independent spent fuel storage facility at Prairie Island for any part of a year*." PX198 at KRGNSP11393, 2003 Minn. Sess. Laws, 1st Spec. Sess, Ch. 11, Art. 2, subdiv. 1(a) (codified, as amended, at Minn. Stat. § 116C.779, subdiv. 1(a)) (emphasis added); Tr. 1554 (Swanson). Moreover, the 1994 Prairie Island legislation directed NSP to move the spent fuel out of state as soon as a facility becomes available, a mandate which PFS could satisfy. PX198 at KRGNSP11418, 1994 Minn. Sess. Laws Ch. 641, Art. 1, §§ 6 & 8 (codified at Minn. Stat. §§ 116C.775 & 116C.777); Tr. 2684 (Sieracki). In short, NSP still has significant incentives to move its fuel from Prairie Island and the development of the PFS project provided a reasonable substitute for the DOE's failed performance.

## VI. NSP MAY RECOVER ITS COSTS FROM THE MANDATES BECAUSE THEY MITIGATED THE POTENTIAL LOSS OF A PLANT SHUT DOWN

As noted above, the Government's theory of the case never accounts for the loss being mitigated, largely because the Government simply refuses to accept that this case involves

---

is considering abandoning its Yucca Mountain program, is threatening to legislatively intervene in the Certificate of Need (as permitted by the 2003 legislation) and impose additional mandates as a condition to storing fuel at Monticello. *Energy Proposal Leaves Some Grumbling*, STAR NEWS, Apr. 17, 2007, *available at* http://www.erstarnews.com/2007/April/17xcel.html (visited Apr. 19, 2007).

mitigation. However, NSP mitigated more than $1 billion in replacement power costs by accepting the mandates as a necessary condition to construct the Prairie Island ISFSI and load its TN-40 storage casks. *See* NSP's Post-Trial Br. at 30, 31, 76; PX60 at KRGNSP03832 (no action alternative in Certificate of Need would mean $1 billion in replacement power costs); Tr. 546-51 (McCarten) (discussing alternatives); Tr. 158-59 (Bomberger). As compared against this substantial loss, the Government has not shown that NSP's actions were unreasonable.

Nevertheless, the Government asserts that NSP should not recover for its mitigation by complying with the mandates for four reasons: (1) the mandates would have been incurred even if DOE performed due to the Government's theory that NSP had to build a dry storage facility; (2) legislative intervention and the specific mandates were unforeseeable; (3) the size, scope, and amount of the loss NSP incurred was unforeseeable; and (4) the mandates were not the "proximate result" of the breach. Govt. Post-Trial Br. at 83-92. Even assuming *arguendo* that NSP bears the burden of showing the legislative mandates were foreseeable, none of these contentions (some of which reverberate from other arguments addressed above) survive scrutiny.

### A. NSP Would Not Have Incurred The Costs Of The Mandates Had NSP Believed DOE Would Timely Perform

Consistent with its theory that NSP would have built a dry storage facility regardless of whether DOE was expected to perform, the Government contends that NSP would have had to pay for the mandates even had DOE not breached the Standard Contracts. Govt. Post-Trial Br. at 83-84. NSP vigorously disagrees. For a host of different reasons, had DOE performed, NSP would have re-racked its Prairie Island spent fuel storage pools for a third time rather than build a dry storage facility. Thus, NSP would never have been before the legislature and subject to the mandates had NSP expected DOE to perform.

Even assuming in the Government's construct of the "but for" world that NSP would have built a smaller, seven-cask ISFSI, NSP would not likely have faced the permanence concerns that highlighted the PUC decision, resulted in the unfavorable court decisions, and led to the need for legislative approval. Tr. 698 (McCarten) ("The PUC had a concern with how long the spent fuel would remain at the site, and that was due to concerns with performance of the DOE program . . . ."); *see also* PX61 at 10 (KRGNSP04113)("One of the main reasons the Commission is limiting the number of casks, though, is to guard against the possibility that the federal government will be unable to site, construct, and open a permanent national repository within its projected time frame and cost constraints. Should that happen, the environmental and cost assumptions underlying this limited certificate of need will no longer apply, and other resource options will have to be re-evaluated in light of the new situation."); Tr. 2745 (Sieracki); *In re Application for Certificate of Need for Construction of an Indep. Spent Fuel Storage Installation*, 501 N.W.2d 638, 644-45 (Minn. Ct. App. 1993) ("*In re ISFSI*"); PX768 (slip decision of *In re ISFSI*). Had DOE been expected to perform, a smaller ISFSI would not have presented the same political problems triggered by permanence concerns engendered by DOE's non-performance.

Moreover, the 1994 Minnesota legislation itself suggests that a smaller, seven-cask ISFSI would not have incurred most, if not all, of the mandates' costs. First, the 1994 Minnesota legislation allowed NSP to load five casks without complying with any of the mandates. Tr. 583-84 (McCarten) (noting the importance of being able to proceed immediately with filling five casks); Tr. 1320 (Alders); PX198, 1994 Minn. Sess. Laws Ch. 641, Art. 1, § 2(a) (codified at Minn. Stat. § 116C.771(a)). It was only NSP's continued need to load additional casks that triggered the mandates. For example, the legislation conditioned approval of NSP loading casks

six through nine based on NSP's "good-faith efforts" to attempt to site a spent fuel storage facility in Goodhue County. Tr. 1319-21 (Alders); PX198, 1994 Minn. Sess. Laws Ch. 641, Art. 1, § 2(b) (codified at Minn. Stat. § 116C.771(b)). The biomass mandate only was triggered for casks 10 through 17 (which would not have been necessary under the Government's worldview of a smaller seven cask ISFSI). Tr. 583 (McCarten); PX198, 1994 Minn. Sess. Laws Ch. 641, Art. 1, § 2(c)(1) (codified at Minn. Stat. § 116C.771(c)(1)). Payments to the Renewable Development Fund were not required to begin until January 1, 1999, and those payments applied only for each cask that remained at the ISFSI (which would have never risen above seven casks in the Government's "but for" world). Tr. 1550-51 (Swanson); Tr. 3026 (Metcalfe); PX198, 1994 Minn. Sess. Laws Ch. 641, Art. 1, § 10 (codified, as amended, at Minn. Stat. § 116C.779); PX1058, Metcalfe Demonstrative Slide 32. Thus, even under the Government's theory of the case – a seven cask ISFSI at Prairie Island – NSP would only have been subject to the Goodhue County mandate and, perhaps, some of the costs of the Renewable Development Fund for any of the seven casks remaining at Prairie Island after 1999 (and none of the costs associated with the 2003 legislation).

### B. DOE Foresaw Or Could Have Foreseen Legislative Intervention Over Concerns That An Interim Spent Fuel Storage Facility Would Become Permanent

The Government complains that it was impossible to foresee that the Minnesota Legislature would intervene and impose conditions on the construction of a dry storage facility and loading of storage casks. Govt. Post-Trial Br. at 85-86. However, DOE's first acting director of the Office of Civilian Radioactive Waste Management – Mr. Robert Morgan – had concerns in 1983 that states would enact statutes limiting the siting of waste storage facilities. Tr. 3866-68 (Morgan). Furthermore, NSP faced a law on the books that required just such

legislative approval out of concern that DOE would site (whether by default, as has happened, or purposefully) a storage facility in Minnesota. *See In re ISFSI*, 501 N.W.2d at 648; *see also* Tr. 1215 (Merriam) (discussing that Minnesota had "enacted legislation that required more than an administrative sign-off, but would require legislative approval of any final site decision by the [Minnesota] state government" out of concern that DOE would site a permanent storage facility in Minnesota); NSP Post-Trial Br. at 76-87. In response to a challenge to California legislation barring new nuclear power plants until the federal government implemented the disposal of spent nuclear fuel, the U.S. Supreme Court stated in 1983 – the same year the NWPA became law - that "the legal reality remains that Congress has left sufficient authority in the states to allow the development of nuclear power to be slowed or even stopped for economic reasons." *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 194 (1983). The Government makes no effort to respond to this evidence, including Mr. Morgan's admissions that adverse state action was foreseeable.[13]

Furthermore, the Government wholly ignores and fails to rebut that many of the Minnesota mandates (such as the Goodhue County alternative ISFSI site and the payments to the Mdewakanton Dakota Tribe) closely paralleled provisions in the NWPA. NSP Post-Trial Br. at 82-84. The Government wholly ignores that its failure to make progress was the direct cause of Minnesota's concerns that the Prairie Island ISFSI would become a permanent storage facility. *See* Tr. 1264-65 (Novak) (noting that Minnesota state senators visited Yucca Mountain in 1993-94 and concluded the repository "would not happen" in time for the 1998 performance date); Tr. 1946-47 (Howard) (noting after a visit to Yucca Mountain that it was a "hopeful dream"); Tr.

[13] In fact, DOE in its MRS program faced the same type of opposition NSP later faced. *See Tenn. v. Herrington*, 806 F.2d 642 (6th Cir. 1986) (relating to a challenge from Tennessee regarding DOE's proposal to site an MRS in Tennessee).

1134 (Sanda) (noting that she "was dismayed at what I found" when she visited Yucca Mountain).

Ultimately, as noted above, the doctrine of foreseeability does not require that DOE be able to foresee exactly *how* the legislature intervened and what mandates would be imposed, only that it was foreseeable that a state could impose conditions. *See Citizens Fed.*, 474 F.3d at 1321 ("If it was foreseeable that the breach would cause the other party to obtain additional capital, there is no requirement that the particular method used to raise that capital *or its consequences* also be foreseeable.") (emphasis added); 11 JOSEPH M. PERILLO, CORBIN ON CONTRACTS § 56.7, at 108 (rev. ed. 2005) ("Just as reason to foresee does not mean actual foresight, so also it is not required that the facts actually known to the defendant are enough to enable the defendant to foresee that a breach will cause a specific injury or a particular amount in money."); *Maine Yankee Atomic Power Co. v. United States*, 44 Fed. Cl. 372, 381 (1999) ("Heavy industry regulation of the sort seen in the nuclear industry means that few legislative changes can truly be seen as wholly unanticipated."), *aff'd*, 271 F.3d 1357 (Fed. Cir. 2001).

### C. The Size, Scope, And Amount Of The Mandates Are Well Below The Foreseeable Results Of The Government's Failure To Perform And The Payments NSP Has Had To Make To The Nuclear Waste Program

The Government faults NSP for seeking as part of its mitigation damages nearly $46 million in nominal costs attributable to the mandates, complaining that these costs were unforeseeable in size, scope, and amount. Govt. Post-Trial Br. at 87-88. First, in comparison to the $1 billion that a foreseeable Prairie Island shutdown would have caused, the mandates are a pittance. Had NSP not reluctantly accepted the mandates to mitigate a plant closure and the $1 billion replacement power costs, the Government would surely have alleged that NSP acted unreasonably by not incurring the much lower mitigation costs of the mandates. Second, under



400555920v5

the Standard Contracts, NSP has paid the Government approximately $334 million (and continues to pay approximately $12 million per year) in exchange for the Government's obligation to remove, store, and dispose of NSP's SNF. The mandates' cost of $46 million (and, in fact, NSP's entire claim of $172 million) are well below what NSP has paid the Government (and will continue to pay) for the exact services NSP will now be providing for at least 20 years (given that DOE will not begin accepting fuel from utilities until 2017, at the earliest). Thus, the Government's assertion that the size, scope, and amount of NSP's mandates damages were not foreseeable does not bear scrutiny.

### D. NSP Need Not Show That The Government's Actions Proximately Caused NSP's Damages

Although NSP has in fact made such a showing, NSP does not need to show that DOE's actions "proximately caused" the mandates (or any other part of NSP's decision to mitigate), but only that DOE's actions substantially, primarily, and directly caused NSP to mitigate. *Indiana Mich. III*, 422 F.3d at 1373. As noted above, the Government relies on the Federal Circuit's decision in *Old Stone* for the proposition that a party must show "proximate causation." However, to reiterate, proximate causation is a necessary element to recover reliance damages, but it is not an element necessary for the recovery of expectancy damages. *Compare Old Stone*, 450 F.3d at 1375 ("[R]eliance damages are subject to two pertinent limitations-the damages must have been both proximately caused by the breach, and foreseeable.") *with Indiana Mich. III*, 422 F.3d at 1373 (requiring plaintiff to show that breach was a "substantial causal factor in the damages").

To the extent the Government now argues that the Minnesota legislature's actions constituted a break in the chain of substantial causation, it bears noting that NSP is the only

utility subject to these mandates and the mandates are the direct result of the Government's failure to perform.[14] Tr. 1345-46 (Alders) (discussing the Goodhue County alternative site); Tr. 1628, 1644-45 (Engelking) (discussing biomass); Tr. 1549, 1552-53, 1579 (Swanson) (discussing the Renewable Development Fund); Tr. 1726-27 (Wilensky) (discussing the settlement agreement with the Mdewakanton Dakota Tribe).

## VII. NSP SHOULD BE AWARDED ITS INCURRED COSTS OF CAPITAL

Contrary to the Government's assertions, NSP may recover its costs of capital.

The Government asserts that NSP's costs of capital are nothing more than interest. Govt. Post-Trial Br. at 107-09. However, the recovery of interest *as* a claim is recoverable. *See Centex Corp. v. United States*, 55 Fed. Cl. 381, 390 (2003) ("Courts frequently distinguish, however, between 'interest *on* a claim,' generally precluded by the statute, and 'interest *as* a claim' which courts may treat as an element of compensation. For that reason, it has been held that foreseeable financing costs can be an element of expectancy damages.") (emphasis in original), *aff'd*, 395 F.3d 1283 (Fed. Cir. 2005); *see also Bell v. United States*, 404 F.2d 975, 984 (Ct. Cl. 1968). NSP proved that it actually incurred these costs of capital and Dr. Neuberger – one of the Government's experts – acknowledged that NSP's costs of capital constituted a real cost. Tr. 4673-74 (Neuberger) (noting that the costs of capital are the "corporation's costs" and that even for equity "the company itself is really incurring those costs"); Tr. 3035, 3036

---

[14] The Government asserts that the Minnesota legislature could have passed the legislation without any of the mandates, because Senator Merriam believed that the votes were there to remove the bill from committee directly to the Senate floor. However, the legislation as originally introduced already included certain mandates, including biomass. Tr. 1257-58 (Novak). Furthermore, while Senator Merriam believed that the bill could be moved directly to the Minnesota Senate floor, he noted that it was not a "black-and-white issue in my mind." Tr. 1221 (Merriam) (also describing that the limited time to remove a bill made it more "difficult"). More to the point, Senator Novak – the chief sponsor of the bill – described the possibility of removing the bill from committee as "remote." Tr. 1261-62 (Novak).

(Metcalfe) (noting that costs of capital is a "cost that is actually incurred by the utility for the expenditures that they made that they would not have made but for the breach"); *id.* at 3101 ("[W]eighted average cost of capital is the actual debt and equity component that the utility actually has on its books and actually incurs costs for."); *see also* PX1058, Metcalfe Demonstrative Slide 52.

The Government attempts to distinguish Judge Lettow's ruling in *Tennessee Valley Authority*, by asserting that the plaintiff there recovered only because it used borrowed funds earmarked as an Allowance for Funds Used During Construction ("AFUDC"). Govt. Post-Trial Br. at 110-11. However, Judge Lettow awarded AFUDC costs to TVA without TVA showing that it made specific borrowings for its mitigation efforts. *Tenn. Valley Auth.*, 69 Fed. Cl. at 542 ("TVA does not operate in a manner that allows a 'one-to-one' correspondence between specific debt instruments and specific capital projects . . . ."). Utilities do not ordinarily go to a bank to acquire funds for specific projects but rely on the cost of capital (including both equity and debt). Tr. 3105-06 (Metcalfe); Tr. 4956-57 (Johnson). Moreover, as part of the Federal Energy Regulatory Commission's and state utility commissions' regulations governing recovery of AFUDC, a utility may incur its costs of financing construction through both equity and debt. *See* 18 C.F.R. pt. 101, Uniform System of Accounts Prescribed for Public Utilities and Licensees Subject to the Provisions of the Federal Power Act ("Uniform Systems of Accounts"), Electric Plant Instructions, ¶ 3.A(17) (stating that AFUDC "includes the net cost for the period of construction of borrowed funds used for construction purposes and a reasonable rate on other funds when so used" and listing "average short-term debt," "long-term debt," "preferred stock," and "common equity" as elements that may be included in the AFUDC calculation). The Federal Circuit has determined that the equity component of the cost of capital may be recovered.

*LaSalle Talman Bank v. United States,* 317 F.3d 1363, 1375 (Fed. Cir. 2003) (concluding that trial court erred in not allowing recovery of costs derived from equity, because "the cost of capital does not depend on whether payment is made as debt, or out of anticipated future earnings").[15]

Finally, the Government asserts that NSP may not rely on prior decisions of the Federal Circuit (or other courts) that rely on the Changes Clause, because NSP's Standard Contracts do not have a Changes Clause. Govt. Post-Trial Br. at 112-13. For example, the Government takes exception to NSP's reliance on *Wickham Contracting Co. v. United States*, 12 F.3d 1574 (Fed. Cir. 1994), because *Wickham* must have necessarily relied on a Changes Clause and, the Government asserts, standard Federal Acquisition Regulation ("FAR") Changes Clauses include a provision for interest. Govt. Post-Trial Br. at 112. However, the standard FAR Changes Clauses do not explicitly provide for interest. 48 C.F.R. §§ 52.243-1, 52.243-2, 52.243-3, 52.243-4. Thus, the Government regularly provides for interest as a claim under the Changes Clause even though there is no explicit provision for interest in the Changes Clause.[16]

---

[15] To the extent the Court declines to provide NSP its full cost of capital and concludes that any recovery is limited to debt-related costs, the record includes NSP's debt from which its costs can readily be re-calculated. Tr. 3105-06 (Metcalfe); PX15; PX16, PX17; Tr. 4781-89 (Neuberger).

[16] To the extent the Government asserts that the standard Disputes Clause under the Contract Disputes Act ("CDA") (to which the modern Changes Clause cross-references) somehow provides explicit authority to award interest *as* a claim, the Disputes Clause provides no such support, because it only allows interest *on* a claim. 48 C.F.R. § 52.233-1(h). Furthermore, even before the CDA allowed recovery of interest, decisions of the Court of Claims awarded interest as damages based on a Changes Clause that similarly lacked an explicit interest component and a Disputes Clause substantially similar to the one in NSP's Standard Contracts. *See Bell*, 404 F.2d at 984 (awarding interest as a claim under the pre-CDA disputes process because "under generally accepted principles was undoubtedly an increased cost of contract performance attributable to the change"); *see also Maine Yankee,* 225 F.3d at 1340 ("This

## VIII. DOE WOULD HAVE PERFORMED AT A RATE SUFFICIENT TO ASSURE THAT UTILITIES WOULD NOT NEED TO ADD AT-REACTOR STORAGE AFTER 1998

In its post-trial brief, the Government retreats from previous representations to this Court in this case that the acceptance rate is irrelevant. Instead, consistent with its practice in other SNF cases, the Government now attempts to justify DOE's inability to meet its statutory obligations and the multiple representations to the utilities that DOE would perform at a rate sufficient to avoid utilities from adding at-reactor storage after 1998. The Government's arguments on these points are meritless.

### A. Determination Of The Acceptance Rate Is Irrelevant For Determining Causation

This Court need not determine the acceptance rate in this case. Indeed, as detailed below, the Government acknowledged prior to the trial in this case that the acceptance rate was irrelevant to determine causation and damages in this case.

First, the Government stated in its October 10, 2006 memorandum of contentions of fact and law at 34: "The Rate of Acceptance to Be Applied to the Standard Contract Is Irrelevant For The Purposes of Determining Causation and Damages Through 2004." *See also id.* ("[F]or purposes of this case, which litigates damages through 2004, causation can be litigated without reference to rate."). The Government has apparently abandoned this view, now claiming that NSP cannot prove causation without proving the acceptance rate, because it had no basis to know what the acceptance rate would have been when it made its decision to mitigate in the late 1980s. Govt. Post-Trial Br. at 114-15. For the reasons discussed above, this argument does not bear

[Disputes ]clause [in the Standard Contracts] is substantially the same as the standard disputes clause used in government contracts prior to the Contract Disputes Act of 1978.").

scrutiny. The argument directly contradicts the Government's statements to this Court before the trial in this case.

Second, the Government's assertion that the Court must decide the acceptance rate is belied by the Federal Circuit's decision dismissing the Government's cross-appeal in the *Indiana Michigan* case. In that case, Judge Hodges granted plaintiff's cross-motion for summary judgment and determined the rate of acceptance to be 3,000 MTU per year after a brief ramp-up period. *Indiana Mich. Power Co. v. United States*, 57 Fed. Cl. 88, 97-98 (2003) ("The Department of Energy would have begun performance by collecting 400 metric tons of nuclear waste in 1998, and ramped up to 3,000 metric tons by the end of 2002. Defendant would have continued performance pursuant to the Standard Contract at a minimum rate of 3,000 tons thereafter.") ("*Indiana Mich. II*"), *appeal dismissed*, 112 Fed. Appx. 37 (Fed. Cir. 2004). The Government attempted to cross-appeal the acceptance rate ruling when Indiana Michigan appealed the trial decision, but the Federal Circuit dismissed the cross-appeal stating that "the trial court's rate calculation determination was not necessary to the judgment." 112 Fed. Appx. at 38. The Federal Circuit then proceeded to determine the appeal in *Indiana Michigan III* – the appeal of the trial judgment in the same case – without reference to the rate of acceptance. More recently, Judge Braden bypassed a determination on the rate of acceptance, finding such a determination unnecessary and speculative. *SMUD*, 70 Fed. Cl. at 375 n.40 ("The court finds that the evidence presented on the acceptance rate under the terms of the Standard Contract to be highly speculative, therefore, the court declines to make any determination of the acceptance rate based on this record."). Based on the reasoning of the Federal Circuit in *Indiana Michigan* and the reasoning of this Court in *SMUD*, this Court need not decide a rate of acceptance to either determine causation or the reasonableness of NSP's mitigation of the Government's breach.

### B. The NWPA And The Parties Expected DOE To Perform At A Rate Sufficient To Avoid The Need For Additional At-Reactor Storage After 1998

As noted above, the Federal Circuit has instructed that in interpreting the Standard Contracts, it is appropriate to inquire into the NWPA and its purpose. *Roedler*, 255 F.3d at 1352 (interpreting the NWPA and stating that "[f]or determination of contractual and beneficial intent when, as here, the contract implements a statutory enactment, it is appropriate to inquire into the governing statute and its purpose"). In the NWPA, Congress expressly acknowledged that "[a] national problem has been created by the accumulation of . . . spent nuclear fuel from nuclear reactors . . . ." 42 U.S.C. § 10131(a)(2)(A); *Bullcreek*, 359 F.3d at 538 (noting that Congress enacted the NWPA, *inter alia*, "in response to 'a national problem' created by the accumulation of spent nuclear fuel from private nuclear generators"). Also as noted above, while the NWPA lodged the responsibility with the utilities for paying for DOE's disposal program and to provide interim storage of SNF, the utilities only had the responsibility for the costs of interim storage "until such waste and spent fuel is accepted by the Secretary of Energy in accordance with the provisions of this Act . . . ." 42 U.S.C. §§ 10131(a)(4) & (5). The NWPA specified the date – January 31, 1998 – when DOE was required to begin removing SNF from commercial nuclear reactors. 42 U.S.C. § 10222 (a)(5)(B); *Maine Yankee*, 225 F.3d at 1342 ("Congress found this objective so important when it promulgated the Act that it took the unusual action of specifying that all the contracts must contain this explicit requirement."). Based on the intent of the NWPA, DOE was expected to perform its contractual obligations at a rate sufficient to avoid adding at-reactor storage after 1998.

The expectations of the parties and statements by DOE ratified this understanding. In its 1983 Draft Mission Plan and 1985 final Mission Plan, the Government effectively acknowledged the statutory intent and need to provide at-reactor storage after 1998. PX275, 1983 Draft



400555920v5

Mission Plan at 2-1 (SN045172) ("*Until 1998,* each utility will be responsible for providing its own additional on-site interim storage . . . .") (emphasis added); PX276, 1984 Draft Mission Plan at 2-1 ("In the event of a delay in repository operation, the Department could take the waste materials in accordance with the Waste Acceptance Schedule and arrange for either continued storage at the utilities in Federal storage casks, or for storage elsewhere pending transfer to the repository."); DX45 at 381 ("[I]f the DOE fails to meet the schedule shown in Table 9-2 or 9-3 [using a steady-state rate of 3,000 MTU after a five-year ramp-up], then the additional storage capacity needed to accommodate the delay in schedule *will be provided by the DOE*, possibly at reactor sites.") (emphasis added); Tr. 2133-34 (Supko).

Furthermore, as the first acting director of the waste program, DOE's Mr. Morgan represented that DOE intended to implement its program to assure that utilities would not have to provide additional at-reactor storage after 1998. Tr. 3882 (Morgan) ("The basic strategy which we have outlined in the mission plan is that, beginning in 1998, utilities will not have to provide any additional storage facilities on-site."); PX286, Robert Morgan, *Program Overview*, Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting at 11 (SN069599) (Feb. 1984). At trial, Mr. Morgan acknowledged that this strategy was consistent with his understanding of the purposes of the NWPA. Tr. 3882-83 (Morgan). Other witnesses from the Government and NSP likewise acknowledged the same understanding. Tr. 4445-46 (Zabransky); Tr. 3699 (Pollog); Tr. 323 (Karalus); Tr. 774-75 (Kapitz); Tr. 454-55 (McCarten).

Notwithstanding the testimony of DOE's Mr. Christopher Kouts that it was "the bible," Tr. 3145, 3372(Kouts), the Government faults NSP's reliance on that NWPA-mandated 1985 Mission Plan. Govt. Post-Trial Br. at 132 n.37; *see* 42 U.S.C. § 10221(b). The Government's apparent argument is that Congress's 1987 determination to include schedule and capacity

linkages between the MRS and the repository somehow shows that Congress repudiated the NWPA's original intent that DOE will accept waste so as to avoid utilities having to add storage after 1998. DOE proposed to Congress that an MRS would allow DOE to begin accepting fuel in 1998, with that fuel transferred to a repository beginning in 2003 using rates of acceptance comparable to the 1985 Mission Plan. 1987 Mission Plan Amendment, DX53 at HQR0031640; Tr. 2142-44 (Supko); *see also* Statement of Ben C. Rusche, Director, DOE's Office of Civilian Radioactive Waste Acceptance, Statement before the Committee on Energy and Natural Resources, United States Senate, Senate Hearing Rep. 100-230, pt. 2, at 213 ("The 10,000 metric tons that we talked about was the amount of at-reactor storage that could be avoided in the five year period between 1998 and 2003. . . . That is the time between [when] the MRS would come into operation, if the proposal is accepted, and 2003, the date in which we project the first repository would be in operation. That is the origin of those numbers."), Appendix to Northern States Power Company's Opposition to Defendant's Motion for Partial Summary Judgment Regarding the Rate of Spent Nuclear Fuel Acceptance and Cross-Motion for Partial Summary Judgment on the Acceptance Rate at 244 (Dec. 10, 2002).[17] The Amendments Act was consistent with DOE's proposal, including leaving the 1998 date in tact. 42 U.S.C. § 10222(a)(5)(B) (still including 1998 date); *id.* § 10168(d) (adopting linkages between MRS and repository and accompanying limitations on the amount of SNF that may be accepted at an MRS). Thus, the 10,000 MTU capacity limitation proposed by DOE and accepted by Congress was meant to bridge the gap between 1998 to 2003.

[17] The Court may take judicial notice of legislative history. *See Commonwealth Edison Co. v. United States*, 46 Fed. Cl. 158, 160 n.3 (2000), *aff'd*, 271 F.3d 1327 (Fed. Cir. 2001) (*en banc*).

By 1989, DOE issued a report to Congress and signaled a further retreat from its prior representations to Congress and concluded that a repository would not be able to receive SNF at a repository until 2010 (and not until 2007 at an MRS, unless the Amendments Act linkages were removed). *See* DX76 at 12 (EDB-001-1464); Tr. 3184 (Kouts). Subsequently, in the 1991 Annual Capacity Report ("1991 ACR"), the Government simply stretched that 10,000 MTU limitation out over 12 years (from 1998 through 2010) instead of the original five years as Congress expected (1998 to 2003). *See Indiana Mich. II*, 57 Fed. Cl. at 99 n.24; *see also Yankee Atomic*, 73 Fed. Cl. at 273-74 (discussing testimony that the lower rates in the 1991 ACR were used to limit liability); 1991 ACR at HQR-002-0806, DX108 ("The acceptance rates in Table 2.1 do not reflect the MRS facility schedule linkages with the repository development that were imposed by the NWPA, but are consistent with the 10,000 MTU storage capacity limit contained in the NWPA for an MRS facility before a repository starts operation."); Tr. 3685 (Pollog). DOE also acknowledged it could not even perform at these stretched-out rates without a change in the law. DX108 at HQR-002-0806 ("If the current linkages between MRS facility construction and repository construction authorization are maintained, it is estimated that the commencement of facility operations and initial acceptance of SNF by DOE could not start until at least 2007."); Tr. 3685-88 (Pollog) (acknowledging that a change in the law was required); Tr. 3480-81 (Kouts) (noting that the rates in the 1991 ACR do not reflect the Amendments Act's schedule linkages).[18]

[18] Lest the Government argue otherwise, there was no technical impediment to an MRS running at a steady-state rate of 3,000 MTU per year after a five year ramp-up period. The 1990 ACR used this rate in its "upper bounding" scenario for performance using an MRS starting in 1998. PX257 at HQR-001-2497 & HQR-001-2499; Tr. 3697-98 (Pollog).

Despite the Government's post hoc arguments in the instant case that DOE intended to site an MRS, DOE never began the process of siting an MRS despite the authority in the NWPA to do so. Tr. 3423-24 (Kouts); 42 U.S.C. § 10162(b). Instead, DOE relied on the Nuclear Waste Negotiator, who was not bound by the same schedule to have a facility ready by 1998. Tr. 3423-24, 3444, 3464-65, 3473-74 (Kouts); PX288 at 22. In September 1991 (several months before the 1991 ACR), the General Accounting Office ("GAO") concluded an MRS would not be available by 1998. PX288 at 3 ("For a number of reasons . . . an MRS facility is unlikely to be operating by 1998."); Tr. 3473-74 (Kouts). Thus, the Government's use of the 900 MTU rate from the 1991 ACR in this case is contrary to DOE's actions at the time and was prohibited by the NWPA.

Finally, the Government argues that the Standard Contracts are too indefinite to enforce, that the DCSs constituted binding commitments, and that the parol evidence rule somehow prevents this Court from considering NSP's extrinsic evidence, but not the Government's. These additional arguments do not bear scrutiny and are addressed below. They also bring to mind the D.C. Circuit's comparison of the Government's position to the Yiddish proverb, "Here is air; give me money." *Indiana Michigan Power Co. v. Dep't of Energy*, 88 F.3d 1272, 1276 (D.C. Cir. 1996) ("*Indiana Mich. I*"). The proverb is unfortunately as appropriate today as it was in 1997.

### 1. The Standard Contracts Are Not Too Indefinite To Enforce

The Government claims that the acceptance rate term is so essential to the Standard Contract that rejection of the Government's arguments regarding the ACR and DCS procedures would "render the Standard Contract too indefinite to enforce." Govt. Post-Trial Br. 117-18. In support of that argument, the Government claims that if an essential term "is one of the central



400555920v5

aspects" or "is one of the most essential terms of" a Contract, it cannot be provided by the Court. *Id.* at 117. This Court should reject the Government's position.

When determining whether a contract is too indefinite to be enforced, a court first looks to whether the parties intended to create a contract. *Aviation Contractor Employees, Inc. v. United States*, 945 F.2d 1568, 1572 (Fed. Cir. 1991) (noting that "once it is determined that the parties did indeed intend to create a contract, courts should be slow to deny enforcement on the basis of indefiniteness in the contract") (citation and quotation omitted). Thus, even the omission of the contract's price, usually a contract's most essential term, "does not vitiate contract formation if the parties otherwise manifested their mutual assent to the agreement and the terms of that agreement are sufficiently definite." *Atacs Corp. v. Trans World Communications, Inc.*, 155 F.3d 659, 667 (3d Cir. 1998). Although the acceptance rate term is missing from the Contract, the critical obligations – NSP's obligation to pay money into the Nuclear Waste Fund and DOE's corresponding obligation to begin disposing of SNF as of January 31, 1998 – are clearly set forth in the Standard Contract and are sufficiently definite to make the contract enforceable. *See Indiana Mich. II*, 57 Fed. Cl. at 95 ("The Standard Contract and the statute are clear on these points: (1) the Department of Energy must remove all nuclear materials (Standard Contract Art. III); (2) the consideration for removal is 'the payment of fees established by [42 U.S.C. § 10222 (a)(5)(B) ];' and (3) the process must begin 'not later than January 31, 1998 . . . .'"); Tr. 3852 (Morgan) (agreeing that the parties have a "binding contract" even though the Standard Contracts do not have an acceptance rate).

NSP has not argued that the Contract's written provisions are to be ignored in any way. Instead, it is merely advocating the use of the rate expected by the parties and NWPA, which means an acceptance rate sufficient to avoid the need for at-reactor storage after 1998 (which

generally points towards a 3,000 MTU steady-state rate of acceptance after a five-year ramp up rather than the artificially low rate DOE concocted based on the non-existent MRS). *Indiana Mich. II*, 57 Fed. Cl. at 98. The Government has cited two inapposite cases for the principle that the contract is unenforceable, absent the use of the Government's artificially low acceptance rate from the 1991 ACR and 1994 APR/ACR. *Massengill v. Guardian Mgmt. Co.*, 19 F.3d 196, 202, 205 (5th Cir 1994) (finding that various contract formation documents were too contradictory to allow the court to conclude a contract between the parties was formed); *Coyle's Pest Control, Inc. v. Cuomo*, 154 F.3d 1302, 1305-06 (Fed. Cir. 1998) (concluding that the parties entered into a contract that was neither a requirements contract nor an indefinite quantity contract and, thus, the Court would not insert Federal Acquisition Regulation standard clauses to transform the contract into either a requirements contract or indefinite quantity contract). Those cases are simply irrelevant because NSP and DOE clearly intended to enter into a contract, and there is uncontradicted evidence that the intent of the parties and the NWPA was to use a rate of acceptance sufficient to avoid the need for additional at-reactor storage. *See* NSP Post-Trial Br. at 12-15, 92-98.

There is no plausible basis for this Court to find that the parties to the Standard Contract did not intend to enter into a contract, or that the parties' obligations thereunder were too indefinite to be enforceable. The NWPA directed the parties to enter into contracts to formalize the Government's obligation to dispose of SNF. Accordingly, every commercial nuclear utility in the United States did just that. For more than 20 years, utilities have paid, and continue to pay, billions of dollars into the Nuclear Waste Fund pursuant to the Standard Contract. *See Alabama Power Co. v. United States*, 307 F.3d 1300, 1303 (11th Cir. 2002). For the reasons shown at trial and NSP's post-trial brief, it is clear that the parties entered into a bargain

"sufficiently defined to be a contract." Accordingly, this Court should find that the expectations of the parties to the Standard Contracts was that DOE would perform at a rate sufficient to avoid additional at-reactor storage, which would be achieved by a steady-state acceptance rate of 3,000 MTU after a five year ramp-up period. *See Indiana Mich. II*, 57 Fed. Cl. at 99.

### 2. The DCSs Did Not Create Binding Commitments

The Government continues to assert that the submission and approval of delivery commitment schedules ("DCSs") created binding commitments, notwithstanding the overwhelming evidence that the parties never intended any such thing and the absence of support for that position in the Standard Contracts or other contractual documents. Govt. Post-Trial Br. at 120-27. The Government's cavalier manipulation of that process further undercuts the Government's position. It is a classic *heads-I-win-tails-you-lose* scheme for the Government to argue that only an approved DCS obligates the Government when it twice suspended the DCS process, voided DCSs, refused to process submitted DCSs, and unilaterally modified submitted DCSs.

Nowhere in the NWPA, the Standard Contracts, ACRs, DCSs, DCS instructions, or any DOE communications to utilities did DOE ever assert that the DCS constituted a contractually binding document. The uncontested record is that the ACRs and the DCSs were not contractually binding. The Standard Contracts stated that the ACR was to be issued "for planning purposes." Tr. 4474-75 (Zabransky); Standard Contract, Art. IV.B.5(b), PX56 at KRGNSP07981 ("Beginning not later than July 1, 1987, DOE shall issue an annual capacity report for planning purposes."). Each ACR, starting with the first in 1987, explicitly stated that it was for planning purposes only and not contractually binding. *See, e.g.*, 1987 ACR, PX254 at HQR-001-2713 ("As specified in the contract, the ACR is for planning purposes only and, thus,

is not contractually binding on either DOE or the Purchasers."); Tr. 3704-05 (Pollog); 1991 ACR, DX108 at HQR-002-0803 ("As specified in the Standard Contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the purchasers."); 1994 APR/ACR at 1, PX314 (same); 2004 APR/ACR at 1, PX163 (same). The 1991 and 2004 DCS instructions also state they are for planning purposes. 1991 DCS Instructions ¶ 7(c), PX424 at NSP-0043857 ("The annual acceptance rates in the 1991 ACR provide an approximation of the [Federal Waste Management System] acceptance capacity and are for planning purposes."); Tr. 3708-09 (Pollog); 2004 DCS Instructions ¶ 7(a), PX334 at 2 ("The annual acceptance rates in the 2004 APR/ACR provide an approximation of the [Civilian Radioactive Waste Management System] acceptance capacity and are for planning purposes."); Tr. 234 (Bomberger).

The DCSs include no language that they are binding. *See* PX589A. DOE's Mr. Christopher Kouts acknowledged that there was not "specific language" in the Standard Contracts stating that the DCS is binding. Tr. 3483-84 (Kouts). High-level DOE employees Alan Brownstein, Nancy Slater-Thompson, and former acting director Lake Barrett all acknowledged that DCSs were for planning purposes and not binding. Deposition of Lake Barrett at 217 (Apr. 22, 2002); *See* Deposition of Nancy Slater Thompson at 5, 98 (June 13, 2002); Deposition of Alan Brownstein at 9-10, 377-78 (Apr. 10, 2002); Deposition of Alan Brownstein at 282 (June 14, 2002); *see also Indiana Mich. II*, 57 Fed. Cl. at 98 ("The Contract does not use Annual Capacity Reports and Delivery Commitment Schedules to determine an Acceptance Rate. The Department of Energy did not consider these forms to be binding.").[19]

---

[19] The Government asserts that testimony by its Contracting Officer's Technical Representative – Mr. Thomas Pollog – that DOE suspended the process to limit its liability, Tr. 3719-20, 3722-23, 3739-40 (Pollog), should be discounted and that the Court has already concluded that such statements cannot be taken seriously from a non-lawyer. Govt. Post-Trial

Moreover, contrary to the Government's assertion, Govt. Post-Trial Br. at 125-27, the Government's manipulation of the DCS process further speaks directly to DOE's belief of the lack of a binding nature of the DCSs. In late 1996-early 1997, DOE suspended the DCS process and refused to process DCSs submitted by utilities. Tr. 1917-19 (Closs); PX589A; Tr. 4402-03, 4418-20 (Zabransky); *see Tenn. Valley Auth.*, 69 Fed. Cl. at 521 ("DOE effectively short-circuited this process by its failure to perform under TVA's Standard Contract."); *see also Consumers Energy Co. v. United States*, 65 Fed. Cl. 364, 370-71 (2005) (concluding that DOE "abandoned" the DCS process in 1997). Even before suspending the process, DOE believed that absent a facility, its obligations to utilities were conditional, and placed statements on DCSs stating just that. *See* DX181; Tr. 4403 (Zabransky) (noting that until it was rejected by the D.C. Circuit's ruling in *Indiana Mich. I*, DOE took the position "that the obligations of the DCSes *[sic]*, the position the DOE had taken was that they were conditioned upon the existence of a facility").

In conjunction with this suspension of the DCS process, DOE voided previously approved DCSs, including one of NSP's. Tr. 1922-23 (Closs); PX589A (voided DCS); Tr. 4402-03, 4433-36 (Zabransky); *Sys. Fuels, Inc. v. United States*, 66 Fed. Cl. 722, 731 (2005) ("In fact, DOE unilaterally refused in 1996 to approve or disapprove any new DCSs and voided the DCSs from utilities that previously had been approved.").

---

Br. at 125-26. However, if DOE believed that DCSs constituted binding commitments, then a decision to stop approving DCSs would limit its commitments and, thereby, its liability. The evidence on this point is unambiguous and the rationale behind Mr. Pollog's testimony is compelling. Tr. 3719-20, 3722-23, 3739-40 (Pollog). This evidence would support a finding that the Government breached the implied covenant of good faith and fair dealing. *See Tenn. Valley Auth.*, 69 Fed. Cl. at 518.

DOE re-started the DCS process in or about July 2004 (where new DCSs would replace, not supplement previous DCSs) and then six-months later re-suspended the process. Tr. 4406-07, 4427, 4486-87 (Zabransky); Tr. 3725 (Pollog); 2004 DCS Instructions ¶ 7(a), PX334 at 2 ("Purchasers should submit new DCSs based upon the currently planned operation date of 2010."); Tr. 233-35, 239-40 (Bomberger); *see also Sys. Fuels, Inc. v. United States*, 65 Fed. Cl. 163, 167 (2005); *Entergy Nuclear Generation Co. v. United States*, 64 Fed. Cl. 336, 340 n.4 (2005) (discussing the 2004 DCS process and that new DCSs were meant to replace, rather than supplement prior submitted DCSs).

The Government also asserts that NSP's actions in submitting DCSs showed acquiescence in the process. Govt. Post-Trial Br. at 122-25. The mere fact that NSP submitted DCSs, however, does not somehow create a binding commitment or confer legitimacy on DOE's administration of the process. *See Yankee Atomic*, 73 Fed. Cl. at 298 ("Parroting DOE's delays and acceptance rates did not and does not evidence acquiesce[nce] in them."). NSP's employees treated the submittal of DCSs as a ministerial act that had little meaning; Mr. Kapitz spent less than an hour a year in filling out the DCSs. Tr. 1091 (Kapitz). Mr. Kapitz stated it was his understanding that the DCSs were not binding, and were for planning purposes. Tr. 1090 (Kapitz). A former acting Director of DOE's waste program believed the DCSs to constitute "administrivia." *See* Deposition of Lake Barrett at 217 (Apr. 22, 2002). The Government cites neither NSP testimony nor documents to show that NSP believed these DCSs to be binding. The best the Government can do is to cite to the testimony, unsupported by any contemporaneous evidence, of its current Contracting Officer – Mr. David Zabransky – that he believed the DCSs to binding when he worked at another utility, Wisconsin Electric Power Company. Govt. Post-

Trial Br. at 123. However, as noted above, even Mr. Zabransky acknowledged that DOE initially believed its DCS "obligation" was conditional. Tr. 4403 (Zabransky).[20]

In the same vein, the Government asserts that NSP complied with the DCS process as if the "advent of controversy" had not yet begun and, therefore, whether the DCSs are binding is irrelevant. Govt. Post-Trial Br. at 123. However, as early as 1991, Commissioner Sanda and NSP's Mr. Howard were working to determine what DOE would do about its impending breach and seeking some assurance to provide to the Minnesota PUC that the Prairie Island ISFSI would not become permanent. For example, Commissioner Sanda submitted a petition for rulemaking to DOE in 1991, seeking an adjustment to the quarterly fees paid by NSP in view of DOE's inevitable non-performance. Tr. 1137-42 (Sanda); PX498 & PX499. The petition for rulemaking – PX499 – prompted Judge Sypolt to rule in the coordinated discovery proceedings (in which NSP and the Government participated) that "it is evident that litigation was 'fairly foreseeable' by the agency as early as September 30, 1991, when the Minnesota Department of Public Service wrote to the Secretary of Energy . . . ." *Yankee Atomic Elec. Co. v. United States*, 54 Fed. Cl. 306, 316 (2002). The petition was submitted several months before the publication of DOE's 1991 ACR in December 1991. PX258 (also admitted as DX108). In 1992, before NSP submitted any DCSs (which did not occur until 1993), DOE had already informed Commissioner Sanda (who in turn copied Mr. Howard) of DOE's ultimately invalidated position that it had no obligation to begin accepting SNF in 1998. Tr. 1950-51 (Howard); PX501; Tr.

---

[20] The Government also asserts that NSP failed to protest the DCS submissions, as if this is some evidence of further acquiescence. Govt. Post-Trial Br. at 122-23. However, even if NSP believed that the DCSs were binding (which NSP did not), its unclear exactly what a protest would have borne, given that it is unlikely the Disputes Clause of the Standard Contracts covers such a protest. *See* Tr. 3745 (Pollog) (acknowledging in response to questions from the Court that the process for reviewing DCSs is separate from the disputes process).

1142-45 (Sanda); PX491; Tr. 1159 (Sanda); PX506. Thus, the Government's assertion that the advent of controversy had not begun as of 1993 (when NSP submitted its first DCS) is demonstrably wrong.

### 3. The Parol Evidence Rule Has No Application Here, Because The Government Also Relies On Parol Evidence

The Government also asserts that any evidence regarding the parties' expectations under the contract (or the NWPA) constitutes banned extrinsic evidence under the parol evidence rule. Govt. Post-Trial Br. at 127-29.[21] However, this argument emanates from the presumption that the ACR-DCS process was meant to define the rate of acceptance, which it was not. *See also Indiana Mich. II*, 57 Fed. Cl. at 98. Even assuming *arguendo* that the ACR-DCS process was meant to determine the acceptance rate, there is no basis for this Court to simply accept the Government's argument that the 900 MTU rate would have been the one used by DOE in the so-called "but for world." *Yankee Atomic*, 73 Fed. Cl. at 302-06 (rejecting the Government's attempt to limit its damages based on parol evidence argument).

Furthermore, while the Government decries NSP's use of evidence around the time of contract formation (and thereafter) as prohibited parol evidence, the Government, ignoring the inconsistency, relies on similar extrinsic evidence. And, unlike NSP's evidence, the Government's evidence creates inconsistencies and varies the plain meaning of the Standard Contracts. *Sylvania Elec. Prods., Inc. v. United States*, 458 F.2d 994, 1005 (Ct. Cl. 1972)

---

[21] Alternatively, the Government asserts that Mr. Loring Mills' attempts to have DOE formally define the acceptance rate in the Standard Contracts is evidence that the Standard Contract did not include a term that would avoid the need for additional at-reactor storage after 1998. Govt. Post-Trial Br. at 133-36. The acceptance rate was not defined in the Standard Contracts and Mr. Mills' attempts merely sought to have DOE acknowledge what the NWPA unambiguously contemplated – performance at a rate sufficient to keep up with utilities' generating rate, which would avoid the need for post-1998 at-reactor storage. Tr. 3968-70 (Mills).

("Except as preventing the contradiction of written agreements, moreover, the parol evidence rule is no bar, too, to extrinsic, parol evidence supplementing the terms of even a final written agreement by *consistent* additional terms, unless, in the words of the Uniform Commercial Code, 'the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.'") (emphasis in original). For example, the Government relies on the 1985 Mission Plan to assert that the Government intended to use the 1991 ACR to begin publishing firm waste-acceptance schedules and shipment allocations. Govt. Post-Trial Brief at 121.[22] Yet, the Government decries NSP's citation to the 1985 Mission Plan to show that, notwithstanding what was in the acceptance schedules, DOE recognized its liability to utilities to provide post-1998 at-reactor storage. DX45 at 381; *see also* Tr. 2133-34 (Supko).

Moreover, through a sleight-of-hand in this case, the Government has incorrectly asserted that the 1991 ACR was contemplated to provide a firm acceptance schedule and serve as the basis for DCSs. The Standard Contracts, however, say nothing about the use of the 1991 ACR (or any other document) to set forth any firm acceptance schedule; instead the Standard Contracts only discuss the use of the 1991 Acceptance Priority Ranking ("APR"), which was to be a "priority ranking . . . based on the age of the SNF and/or HLW as calculated from the date of discharge" and noting that generally the "oldest fuel or waste will have the highest priority for acceptance . . . ." Standard Contract, Art. IV.5(a), PX56 at KRGNSP07981; *see also* Standard Contract, Art. V.B.1, PX56 at KRGNSP07982 (linking the submittal of DCSs to the "acceptance priority ranking"); Tr. 1103-04 (Kapitz). Based on the APR, the Standard Contracts contemplated that NSP (and other utilities) "shall identify all SNF and/or HLW the Purchaser

[22] Yet, we know from the ACRs and DCS Instructions described above, that the schedules and allocations were anything but "firm."

wishes to deliver to DOE" with the option to increase that amount by plus or minus 20 percent. *See* Standard Contract, Arts. V.B.1 & 2, PX56 at KRGNSP07982; Tr. 2214 (Supko). While the Government sees the question of acceptance capacity as a zero-sum game, the Standard Contract explicitly recognized that DOE might receive DCSs including "more material than the annual capacity of the DOE disposal facility (or facilities) can accommodate." Standard Contract, Art. VI.B.1, PX56 at KRGNSP07985; Tr. 3524-25 (Kouts). Furthermore, the Government's interpretation relegates the provision regarding Final Delivery Schedules (which DOE never approved for any utility) to mere surplussage. Standard Contract, Art. V.C, PX56 at KRGNSP07982; Tr. 178-79 (Bomberger). Of course, this Court must interpret the Standard Contracts to give meaning to all terms and conditions, something the Court cannot do under the Government's reading of the Standard Contracts. *See McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996); *Indiana Mich. II*, 57 Fed. Cl. at 98-99.

Finally, the Government refused to approve DCSs with larger allocations than those specified in the 1991 ACR based on extra-contractual DCS Instructions, notwithstanding the clear language of the Standard Contracts contemplating a possibility that utilities might request greater allocations than a facility could hold and other provisions allowing a utility to identify "all SNF" it wishes to deliver and increase its allocation by 20 percent. Tr. 1089 (Kapitz); PX424 at NSP-0043857; Tr. 4439-40 (Zabransky); Tr. 3708 (Pollog). The use of instructions to limit allocations appears nowhere in the Standard Contracts. Tr. 1104-05 (Kapitz); Tr. 4440-41 (Zabransky) (admitting that the limitation of allocations from the instructions "was the contracting officer's interpretation of how they were going to do business" and not in the Standard Contracts); *Indiana Mich. II*, 57 Fed. Cl. at 98 ("The Standard Contract does not permit

defendant to limit plaintiff's substantive rights in the guise of 'instructions.'"). For all these reasons, the Government's arguments must fail.

## IX. CONCLUSION

For the foregoing reasons, those stated in NSP's initial post-trial brief, and based on the evidence presented at trial, NSP respectfully requests that this Court enter judgment on NSP's breach of contract claim in the amount of $172,154,000.

Dated: April 27, 2007

s/ Alex D. Tomaszczuk by s/ Daniel S. Herzfeld
Alex D. Tomaszczuk
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7940
(703) 770-7901 (fax)

Counsel of Record for Plaintiff
Northern States Power Company

*Of Counsel:*

Jay E. Silberg
Daniel S. Herzfeld
Jack Y. Chu
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
2300 N Street, N.W.
Washington, D.C. 20037
(202) 663-8000
(202) 663-8007 (fax)

Kerry C. Koep
**XCEL ENERGY**
414 Nicollet Mall, 5th Floor
Minneapolis, MN 55401
(612) 215-4583
(612) 215-4544 (fax)