IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| NORTHERN STATES POWER COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | No. 98-484C<br>(Senior Judge Wiese) |

**DEFENDANT'S POST-TRIAL REPLY BRIEF**

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

HAROLD D. LESTER, JR.
Assistant Director

ANDREW P. AVERBACH
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tele: (202) 353-0527
Fax: (202) 305-2118

Attorneys for Defendant

OF COUNSEL:
JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Avenue, S.W.
Washington, D.C. 20585

ALAN J. LO RE
Senior Trial Counsel

STEPHEN FINN
JOSHUA E. GARDNER
MARIAN SULLIVAN
Trial Attorneys
Commercial Litigation Branch
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

May 16, 2007

# TABLE OF CONTENTS


TABLE OF AUTHORITIES . . . . . iii

SUMMARY OF ARGUMENT . . . . . 1

DISCUSSION . . . . . 2

I. THE DISPUTE IN THIS CASE IS NOT ABOUT THE REASONABLENESS OF NSP'S COSTS . . . . . 3

II. THE "SUBSTANTIAL FACTOR" TEST DOES NOT REDUCE NSP'S BURDEN . . . . . 5

III. DOE'S "IMPENDING" BREACH PROVIDES NEITHER A LEGAL NOR FACTUAL BASIS FOR NSP'S CAUSATION ARGUMENTS . . . . . 7

IV. NSP IS NOT ENTITLED TO RECOVER THE COST OF THE "MANDATES" . . . . . 10

A. NSP Has Inaccurately Described Its Burden With Respect To The Foreseeability Of The Damages That It Seeks To Recover . . . . . 10

B. NSP's Additional Arguments Concerning The Mandates Are Unavailing . . . . . 13

V. NSP HAS NOT RESOLVED AND CANNOT RESOLVE THE UNCERTAINTIES CONCERNING ITS ABILITY TO SATISFY ITS SPENT FUEL STORAGE NEEDS THROUGH RERACKING . . . . . 14

VI. NSP HAS MISAPPREHENDED THE IMPORT OF DR. NEUBERGER'S TESTIMONY . . . . . 17

VII. NSP MISAPPREHENDS OUR ARGUMENTS CONCERNING INTERNAL LABOR AND OVERHEAD . . . . . 18

VIII. NSP'S ARGUMENTS RELATING TO OTHER COSTS ARE FLAWED . . . . . 19

IX. NSP'S ARGUMENTS CONCERNING PRIVATE FUEL STORAGE ARE UNAVAILING . . . . . 21

X. NSP'S "COST OF CAPITAL" IS PREJUDGMENT INTEREST . . . . . 23

XI. NSP'S FAILURE TO PROVIDE PROOF THAT THE RATE WHICH IT ADVOCATES IS PART OF THE STANDARD CONTRACT IS FATAL TO ITS THEORY OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

# TABLE OF AUTHORITIES

## Cases

Bluebonnet Savs. Bank, FSB v. United States,
67 Fed. Cl. 231 (2005), aff'd, 466 F.3d 1349 (Fed. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . 6

Centex Corp. v. United States,
55 Fed. Cl. 381 (2003), aff'd, 395 F.3d 1283 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . 23, 24

Citizens Federal Bank v. United States,
474 F.3d 1314, petition for rehearing pending (Fed. Cir. filed May 9, 2007) . . . . . . . . . 12

Coast Fed. Bank, FSB v. United States,
48 Fed. Cl. 402 (2000), rev'd on other grounds,
309 F.3d 1353 (Fed. Cir. 2002), vacated, 320 F.3d 1338 (Fed. Cir. 2003) . . . . . . . . . . . . 6

David Nassif Assocs. v. United States,
226 Ct. Cl. 372, 644 F.2d 4 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Exxon Co., U.S.A. v. Sofec, Inc.,
517 U.S. 830 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Framlau Corp. v. United States,
568 F.2d 687 (Ct. Cl. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Gevyn Constr. Corp. v. United States,
827 F.2d 752 (Fed. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Glendale Fed. Bank, FSB v. United States,
239 F.3d 1374 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Granite Mgt. Corp. v. United States,
74 Fed. Cl. 155 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Indiana Michigan Power Co. v. United States,
60 Fed. Cl. 639 (2004), aff'd, 422 F.3d 1369 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . 7

Indiana Michigan Power Co. v. United States,
422 F.3d 1369 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

LaSalle Talman Bank v. United States,
317 F.3d 1363 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24. 25

Lewis Jorge Constr. Mgmt, Inc. v. Pomona Unified Sch. Dist.,
102 P.3d 257 (Cal. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Maine Yankee Atomic Power Co. v. United States,
225 F.3d 1336 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

National Controls Corp. v. National Semiconductor Corp.,
833 F.2d 491 (3d Cir.1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Old Stone Corp. v. United States,
450 F.3d 1360 (Fed. Cir. 2006), cert. denied, 127 S. Ct. 1831 (2007) . . . . . . . . . . . . . . . 11

Pacific Gas & Electric Co. v. United States,
73 Fed. Cl. 333, reconsideration denied, 74 Fed. Cl. 779 (2006),
appeal pending, No. 2007-5046 (Fed. Cir. docketed Jan. 24, 2007) . . . . . . . . . . . . passim

Sacramento Mun. Util. Dist. v. United States,
70 Fed. Cl. 332 (2006), appeal pending,
No. 2007-5052 (Fed. Cir. docketed Feb. 6, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Singer Co. Librascope Div. v. United States,
568 F.2d 695 (Ct. Cl. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Tennessee Valley Authority v. United States,
69 Fed. Cl. 515 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Wickham Contracting Co. v. United States,
12 F.3d 1574 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

**Statutes**

Minn. St. § 116C.83 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Minn. St. § 116C.779 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

**Other Materials**

Restatement (Second) of Contracts § 351 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 12

Restatement (Third) of Torts § 26 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

Richard A. Lord, 24 Williston on Contracts (4th ed. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . 11

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| NORTHERN STATES POWER COMPANY,<br>Plaintiff,<br>v.<br>UNITED STATES OF AMERICA,<br>Defendant. | No. 98-484C<br>(Senior Judge Wiese) |

DEFENDANT'S POST-TRIAL REPLY BRIEF

Defendant, the United States, respectfully submits this post-trial reply brief, responding to the issues that plaintiff, Northern States Power Company ("NSP") addressed in its post-trial reply brief dated April 27, 2007.

SUMMARY OF ARGUMENT

NSP contended at trial and contends throughout its post-trial submissions that it was forced to confront its spent fuel storage needs because of a partial breach of the Standard Contract by the Department of Energy ("DOE"). This premise is flawed, and this flaw fatally undermines the theory upon which NSP's claim of entitlement to damages is based. NSP was forced to make a decision regarding spent fuel storage in the late 1980s, long before any breach of the Standard Contract occurred and long before DOE would have begun accepting fuel even under the most optimistic scenario, because the company projected in the late 1980s that it would run out of space for its spent fuel as early as 1994. Although NSP's lawyers refer to the company's decision to construct dry storage as one of "mitigation," there was simply nothing to mitigate when NSP decided to construct dry storage. As a result, NSP's focus upon a mitigation theory and the reasonableness of its actions obscures the larger issues in this case – whether a

decision that predates the partial breach can be said to have been "caused" by such a partial breach, and whether NSP would have made the decision to construct a dry storage facility even if it believed that timely performance by DOE would be forthcoming.

These issues can be resolved by reference to basic principles of causation. As a matter of both law and logic, a decision made in the 1980s cannot be caused by a breach that did not occur until years later. Further, if NSP would have made the same imminently reasonable decision to construct dry storage in the 1980s had it believed that DOE would perform, there would simply be no basis upon which to conclude that a partial breach of the Standard Contract "caused" NSP to embark upon the course of action that it ultimately followed.

As the evidence adduced at trial demonstrates, and as we established in our post-trial brief, NSP decided to construct dry storage in the 1980s because of (1) the company's recognition that it needed additional storage space as early as 1994; and (2) the unmistakable conclusion, supported by the testimony of NSP's own witnesses at trial and by the statements made to the Minnesota authorities for the purpose of securing permission to construct dry storage, that, even if DOE began accepting fuel in 1998 in accordance with the Standard Contract, reracking the spent fuel pool at Prairie Island would not necessarily create enough fuel storage space to prevent a shutdown. Simply stated, NSP made its decision before the partial breach and would have made the same decision in the absence of a partial breach. No authority that NSP cites, and no rule of law of which we are aware, supports a finding of causation under these circumstances. As a result, any assessment of damages in this manner should exclude not only those that were not foreseeable or not proven to a reasonable certainty, but also those that

are a result of the company's pre-breach decision to construct a dry storage facility and that would have been incurred in the absence of a partial breach.

## DISCUSSION

### I. THE DISPUTE IN THIS CASE IS NOT ABOUT THE REASONABLENESS OF NSP'S COSTS

NSP asserts on page 9 of its reply brief that the Government has "shirk[ed] its burden to show that NSP's mitigation costs are unreasonable once NSP has shown that it incurred its damages." This argument, which NSP has repeated throughout its post-trial briefing, ignores the simple fact that we do not contend that NSP acted unreasonably. In fact, as we made plain at trial and in our post-trial brief, NSP's decision to construct dry storage was imminently reasonable. What we contest, and what this dispute is about, is whether what NSP refers to as "mitigation costs" are in fact "damages." Borrowing from NSP's heading on page 9 of its reply brief, the issue is not reasonableness, but, rather, the predicate inquiry of whether "NSP has discharged its showing regarding causation, foreseeability, and reasonable certainty."

There should be no substantial question that NSP bears the burden of proof with regard to these issues. Nonetheless, in various portions of its submissions the company continues to suggest otherwise. See, e.g., Pl.'s Post-Tr. Reply Br. at 13 ("[T]he Government has offered no credible evidence to disprove that NSP's decision to mitigate using dry storage was caused by the Government's impending breach.") (emphasis added). The Federal Circuit has made clear that classifying damages as mitigation costs is not the magic bullet that NSP apparently believes it to be. As it explained in Indiana Michigan Power Co. v. United States, 422 F.3d 1369 (Fed. Cir. 2005), "[t]he presence of a duty to mitigate does not perforce make the pre-breach costs incurred

by Indiana Michigan to store its SNF recompensable; appellant must prove foreseeability, causation, and reasonableness." Id. at 1376.

Contrary to NSP's assertions, our arguments focus entirely upon the company's failure of proof with regard to these issues. We do not act, as NSP's hyperbole on the first page of its reply brief suggests, "as if NSP were the breaching party." We simply seek to hold NSP to its burden of proof, a burden carried by every plaintiff before this Court.

At bottom, NSP's characterization of its claim as one for "mitigation damages" and its focus upon the Government's burden to prove the unreasonableness of its costs paints a false impression of the circumstances that the company faced. There is no dispute that NSP needed to make a decision about its storage plans years before 1994, the date when the company would have faced the specter of running out of space in the Prairie Island spent fuel pool and being forced to shut down. Given the timing of its projected fuel discharges, the need to make this decision would have confronted NSP regardless of whether DOE timely began acceptance. Thus, it is incorrect to suggest that NSP "mitigated" the damages that it would incur in the event of a breach by choosing to construct a dry storage facility. Although NSP elected to construct a dry storage facility as a means of avoiding a shutdown, the company needed to do something to prevent a shutdown, and needed to decide what to do a decade before DOE was required to begin accepting NSP's spent fuel. Thus, the question is not, as NSP would have it, whether building dry storage was a reasonable response to DOE's partial breach. Because of the timing of NSP's discharges and of DOE's acceptance, such a decision never confronted NSP. Rather, the question is whether NSP's decision, made years before the partial breach, would have been any different in the absence of such a breach. This question is one of causation, not of mitigation.

## II. THE "SUBSTANTIAL FACTOR" TEST DOES NOT REDUCE NSP'S BURDEN

In our post-trial brief, we explained that the "substantial factor" test of causation was in fact more restrictive that the "but for" test. NSP's arguments in no way detract from that conclusion, and, for that reason, we need not address them here. However, NSP suggests that its invocation of the "substantial factor" test somehow relieves a plaintiff of the need to establish what the world would have looked like in the absence of a breach. This argument is unavailing.

Nowhere is NSP's misapprehension of the scope of its burden more apparent than in its citation to the most recent draft of the Restatement (Third) of Torts. NSP correctly notes the prevailing rule that, where there are multiple causes of a tort, "[a]n actor's conduct need only be a factual cause of the other's harm." Restatement (Third) of Torts § 26 cmt. b (Proposed Final Draft No. 1) (emphasis in original). However, the commentary continues by stating that, "so long as the harm would not have occurred absent the tortious conduct, the tortious conduct is a factual cause." This language is critical, for it confirms the well-established principle that, even if some variant of the "substantial factor" test is applied, a harm that still would have occurred absent the conduct complained of (that is, in the world that would have existed "but for" that conduct) cannot be deemed to have been caused by the conduct at issue. In other words, application of the substantial factor test still requires "but for" causation.[1]

---

[1] Recently, the drafters of the Restatement (Third) of Torts have announced their intention to abandon the "substantial factor" test in tort cases because of its widespread misapplication by courts. They specifically represented that "some courts have accepted the proposition that, although the plaintiff cannot show the defendant's tortious conduct was a but-for cause of harm by a preponderance of the evidence, the plaintiff may still prevail by showing that the tortious conduct was a substantial factor in causing the harm," but that this "proposition is inconsistent with the substantial-factor standard adopted in Restatement Second of Torts

(continued...)

Recognition of the need to present a "but for" world as a means of testing causation explains the numerous decisions of this Court that we have cited (and that NSP does not even mention, let alone attempt to explain or distinguish) requiring a plaintiff to establish what the world would have looked like in the absence of a breach. See, e.g., Granite Mgt. Corp. v. United States, 74 Fed. Cl. 155, 169 (2006) (plaintiffs bear burden of propounding realistic "but for" scenario); Bluebonnet Savs. Bank, FSB v. United States, 67 Fed. Cl. 231, 238-39 (2005), aff'd, 466 F.3d 1349 (Fed. Cir. 2006); Coast Fed. Bank, FSB v. United States, 48 Fed. Cl. 402, 403 n.25 (2000), rev'd on other grounds, 309 F.3d 1353 (Fed. Cir. 2002), vacated, 320 F.3d 1338 (Fed. Cir. 2003); see also Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1380 (Fed. Cir. 2001) (plaintiffs bear burden of demonstrating "what might have been . . . ."); Pacific Gas & Electric Co. v. United States, 73 Fed. Cl. 333, 386 reconsideration denied, 74 Fed. Cl. 779 (2006), appeal pending, No. 2007-5046 (Fed. Cir. docketed Jan. 24, 2007) ("PG&E") ("Plaintiff bears the burden of 'establishing what might have been' with reasonable certainty had defendant performed the Standard Contract."). In addition, and of particular significance to this case, the need to establish what the world would have looked like in the absence of a breach conforms with the rationale that the Federal Circuit provided in Indiana Michigan for its conclusion that the plaintiff had failed to meet its burden of proof with respect to causation – that the decision in question "was purely a business judgment which [the plaintiff] would have had to pursue

---

[1](...continued)
§ 431, Comment a." Restatement (Third) of Torts (Proposed Final Draft) § 26 cmt. j (2006). As the drafters recognized, "[t]he [causation] element that must be established by whatever standard of proof is the but-for or necessary-condition standard of this Section." Id. Accordingly, the proposed final draft of section 26 of the Restatement (Third) of Torts provides the following test for causation, in place of the "substantial factor" test: "Conduct is a factual cause of harm when the harm would not have occurred absent the conduct."

irrespective of DOE's partial breach." 422 F.3d at 1376 (emphasis added). Indiana Michigan stands for the simple proposition that a spent nuclear fuel plaintiff fails to prove causation if it fails to demonstrate that actions allegedly taken in "mitigation" would not have occurred "irrespective of DOE's partial breach."

III. DOE'S "IMPENDING" BREACH PROVIDES NEITHER A LEGAL NOR FACTUAL BASIS FOR NSP'S CAUSATION ARGUMENTS

As we explained in our post-trial brief, the Federal Circuit held in Indiana Michigan that the plaintiff was not entitled to recover damages arising before 1994 because the plaintiff's duty to mitigate only arose when DOE issued its May 1994 notice of inquiry "unequivocally announcing" that it would not perform by January 31, 1998. 422 F.3d at 1375 (citing 59 Fed. Reg. 27,007-08 (May 25, 1994)). This holding is significant because, as described above, NSP made its decision to construct dry storage long before May 1994 and, as a result, long before any duty to mitigate could conceivably have arisen.

In response to our argument, NSP repeatedly characterizes DOE's actions dating back to the late 1980s as an "impending" breach and suggests that, unlike the plaintiff in Indiana Michigan, it somehow "knew" that DOE would not begin accepting fuel in 1998. These arguments are unavailing for several reasons. First, NSP's arguments ignore the fact that, in Indiana Michigan, the utility specifically asserted, as NSP does here, that the duty to mitigate was triggered by documents issued by DOE as early as 1987. See Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639, 649 n.22 (2004), aff'd, 422 F.3d 1369 (Fed. Cir. 2005).[2]

[2] The pre-1994 documents considered by the Indiana Michigan Court – the Office of Civilian Radioactive Waste Management Mission Plan Amendment (June 1987) and the Report to Congress on Reassessment of the Office of Civilian Radioactive Waste Management Program (continued...)

Evaluating the course of DOE's announcements regarding its acceptance of spent fuel, the Federal Circuit rejected this argument and held that, "because the government unequivocally announced in 1994 that it would not meet its contractual obligations beginning in 1998, the utilities were in fact obligated to take mitigatory steps" at that time. 422 F.3d at 1375 (emphasis added). NSP has advanced and can advance no explanation as to how, in the late 1980s, it achieved the degree of certainty sufficient to trigger the duty to mitigate when its knowledge of the status of the DOE program was based upon the same program documents that the Federal Circuit deemed insufficient to trigger such a duty in Indiana Michigan.

Second, and as we explained in our post-trial brief, the "knowledge" that NSP purported to have of DOE's "impending" breach at the time of its decision to construct dry storage (and, in fact, for several years thereafter) was merely the knowledge that DOE would not begin accepting fuel at a repository, as opposed to a Monitored Retrievable Storage ("MRS") facility, in 1998. The quoted testimony to which NSP cites on pages 21 and 22 of its post-trial reply brief illustrates Laura McCarten's mere suspicion, as opposed to her knowledge, that DOE would not begin accepting fuel anywhere in 1998. Such suspicion simply does not rise to the "unequivocal" level of certainty that the Indiana Michigan Court required to trigger the duty to mitigate. To recognize a duty in such a circumstance would be to permit the award of "mitigation" damages

---

[2](...continued)
(Nov. 1989) – were admitted into evidence at trial as PX 304 and DX 76, respectively. Each document reflects DOE's assessment that, although it would not have a repository available by 1998, it still anticipated being able to begin spent fuel acceptance at a temporary facility in 1998. PX 304 at HQ0005848, DX 76 at DB0001448-49. Significantly, as NSP describes on page 17-19 of its post-trial brief, Laura McCarten considered the same 1987 Mission Plan Amendment, including its planned reliance upon an MRS, in preparing her assessment of the DOE program, which, in turn, led to NSP's decision to construct a dry storage facility shortly thereafter.

incurred at a time that performance is still possible, and to raise the possibility that a party could recover "mitigation" damages where no breach ever occurs.

NSP also attempts on pages 22 and 23 of its reply brief to disassociate itself from statements made in the 1990s by its Chief Executive Officer, James Howard, and its representative before the Public Utilities Commission, Michael Schwartz, each of which demonstrate NSP's understanding that the possibility of performance at an MRS had not been foreclosed. These arguments, which include accusations that we have "misrepresented" the statements of NSP's spokespersons, are unavailing. NSP made its decision to construct a dry storage facility in the 1980s, well before these statements were made. Thus, even if NSP somehow "knew" in the early 1990s that DOE was not going to begin accepting fuel in 1998, such knowledge does not change the fact that the company decided to construct dry storage before it had knowledge of the "impending" partial breach and does not undermine the unassailable conclusion that a decision made before a breach has occurred can not be caused by the breach. Moreover, the statements of Mr. Howard and Mr. Schwartz upon which NSP relies are, like those of Ms. McCarten, merely reflective of a suspicion of nonperformance. As we explained in our post-trial brief, these witnesses relied upon the realistic possibility of DOE performance at an MRS as a means of securing governmental approval for the construction of a dry storage facility. Either NSP's representatives deliberately and intentionally presented false statements to the public and to Minnesota authorities in the 1990s as a means of securing

permission for its dry storage facility, or its self-described "prescience" concerning the specter of DOE's nonperformance was not the sure thing that it now suggests.[3]

## IV. NSP IS NOT ENTITLED TO RECOVER THE COST OF THE "MANDATES"

### A. NSP Has Inaccurately Described Its Burden With Respect To The Foreseeability Of The Damages That It Seeks To Recover

In our post-trial brief, we explained that, to satisfy the foreseeability requirement, NSP must establish that its losses were foreseeable to DOE "as a probable result of the breach," meaning that it "followed from the breach either (a) in the ordinary course of events; or (b) as a result of special circumstances beyond the ordinary course of events that the party in breach had reason to know." Indiana Michigan, 422 F.3d at 1376; see Restatement (Second) of Contracts § 351(1), (2). As this Court explained in PG&E, the "loss" that was foreseeable to the Government at the time of contracting was the need to store fuel that would otherwise have been accepted by DOE. 73 Fed. Cl. at 418-19. It is for this reason that we do not challenge the foreseeability of NSP's direct expenditures on additional storage space that would not have been required had the DOE timely commenced the acceptance of fuel.

[3] Beginning on page 23 of its reply brief, NSP cites to documents reflecting DOE's legal position in the early 1990s that it did not have an unconditional obligation to accept spent fuel in the absence of a repository. Particularly given the potential breadth of the "Unavoidable Delays" clause, it is hardly surprising that DOE would articulate this position. Moreover, the fact that DOE advanced this position does not mean that it would not in fact perform at an MRS beginning in 1998. Indeed, notwithstanding DOE's prior assertion of its legal position in correspondence to Kris Sanda months before, PX 501, Mr. Howard acknowledged that he personally believed that the representations that he received in a letter dated May 29, 1992 from the Secretary of Energy (DX 314) – in which Admiral James Watkins stated that DOE was "committed to fulfill the mandates imposed by the [NWPA]" and, specifically, to begin performance through an MRS in 1998 – were made in good faith. Tr. 2035:8-2036:5 (Howard). Mr. Howard further admitted that, as late as 1994, he was "hopeful" that DOE would begin performance in 1998. Tr. 2014:9-2015:6 (Howard).

Beginning on page 15 of its reply brief, NSP asserts that the downstream consequences of a loss that a non-breaching party has incurred, no matter how remote, are "foreseeable." In support of its contention, NSP advances the novel proposition that the doctrine of proximate causation is limited to cases in which a party seeks to recover for injuries to its reliance interest. This argument is unsupported by any authority.

In Old Stone Corp. v. United States, 450 F.3d 1360 (Fed. Cir. 2006), cert. denied, 127 S. Ct. 1831 (2007), upon which we relied in our post-trial brief in support of the proximate causation requirement, the plaintiff indeed sought reliance damages. However, the Federal Circuit's discussion of proximate causation was by no means limited to this theory of recovery. In fact, two of the cases that the Federal Circuit cited in Old Stone in support of the proximate causation requirement involved "expectation" damages. Specifically, the Federal Circuit cited National Controls Corp. v. National Semiconductor Corp., 833 F.2d 491, 496 (3d Cir.1987), for the proposition that "lost profits, to be recoverable, must be a 'proximate consequence,' and not a 'merely remote or possible' result of the breach," and Lewis Jorge Constr. Mgmt, Inc. v. Pomona Unified Sch. Dist., 102 P.3d 257, 265 (Cal. 2004), for the proposition that certain consequential damages, including the loss of prospective contracts, were not recoverable because they were "directly or necessarily cause[d]" by the breach. The Federal Circuit also cited to Williston on Contracts, the cited portion of which contains a general discussion of consequential damages (not limited in any way to reliance damages) and succinctly explains that such damages "must be proximately caused by the breach." 24 Richard A. Lord, Williston on Contracts § 64:12 (4th ed. 2002). Finally, the Federal Circuit cited the United States Supreme Court's decision in Exxon Co., U.S.A. v. Sofec, Inc., 517 U.S. 830, 839-40 (1996), for the general proposition that,

"[a]lthough the principles of legal causation sometimes receive labels in contract analysis different from the 'proximate causation' label most frequently employed in tort analysis, these principles nevertheless exist to restrict liability in contract as well." There is simply neither support nor logic behind NSP's assertion that an award of expectation damages is not necessarily circumscribed by a proximateness requirement.

As we discussed in our post-trial brief (in a section to which NSP has not responded), the limitations of the "proximate cause" requirement restrict a breaching party's liability for the downstream consequences of an otherwise recoverable loss. These limitations prevent NSP from recovering as contract damages the cost of compliance with the "mandates" imposed by the state of Minnesota as a condition of its construction of a dry storage facility at Prairie Island. Unlike Citizens Federal Bank v. United States, 474 F.3d 1314, 1321, petition for rehearing pending (Fed. Cir. filed May 9, 2007), which NSP cites for the proposition that the "consequences" of actions necessitated by a breach are recoverable, NSP was not required to incur the cost of the mandates because it took steps that were subject to an existing regulatory scheme. Instead, the State of Minnesota – a sovereignty entirely separate from the United States – made the entirely independent decision to enact an entirely new set of mandates that were unprecedented in size or scope as a condition of permitting NSP to undertake its dry storage project. These mandates are a classic example of an intervening act by a third party that breaks the chain of direct causation and, unlike the direct expenditures of sums upon the construction of additional spent fuel capacity or the need to pay associated taxes or expenses pursuant to existing regulations, were not "foresee[able] as the probable result" of the DOE's partial breach. Restatement (Second) of Contracts, § 351(1).

B. NSP's Additional Arguments Concerning The Mandates Are Unavailing

Beginning on page 43 of its reply brief, NSP makes a variety of additional arguments in support of its claim for reimbursement of the cost of complying with the legislation that the State of Minnesota enacted. None is compelling, and none provides a basis for requiring the United States to underwrite the cost utilities may incur to comply with state legislation. However, a few points warrant mention.

First, NSP asserts that the mandates would not have been enacted if NSP had constructed a dry storage facility in the "but for" world. This assertion, which flies in the face of NSP's contentions in other contexts that the contours of the "but for" world are too speculative to prove, is unsupported by any proof in the record. NSP's argument simply underscores the lack of inevitability of the damages that NSP claims to have suffered and, as the very nature of its assertions suggests, confirms that injuries that are caused by the intervening decisions of third parties are not directly caused by a breach of contract.[4]

Second, NSP's suggestion on page 45 of its reply brief that Robert Morgan somehow foresaw the damages that NSP incurred – because he "had concerns in 1983 that states would enact statutes limiting the siting of waste storage facilities" – is likewise unavailing. As we explained in our post-trial brief, the fact that nuclear energy is a heavily regulated industry (and that DOE understood this fact) is by no means surprising. However, this recognition does not

---

[4] In footnote 14 of its reply brief, NSP challenges the conclusion of one of its witnesses, Senator Gene Merriam, that the 1994 legislation authorizing a certificate of need for dry storage at Prairie Island would have passed without the mandates that accompanied it. In support of its argument, NSP cites to the testimony of a different witness whose testimony it presented, Senator Steven Novak. NSP has not sustained its burden of proof with respect to the foreseeability by presenting the conflicting testimony of two witnesses and then choosing the testimony that it likes better.

make it "foresee[able] as the probable result of the breach" that the State of Minnesota would choose to condition the construction of a dry storage facility upon a utility's participation in a comprehensive legislative scheme requiring payments of hundreds of millions of dollars that has no nexus whatsoever to the storage of nuclear waste. Indeed, NSP itself believed that no legislative involvement was required in order to secure a certificate of need to construct a dry storage facility, and the legislators who testified themselves believed that the mandates were, literally, "unprecedented." If NSP were correct, all state regulation of nuclear power, no matter how divorced from the loss actually caused by DOE's partial breach, could be deemed "foreseeable."

Moreover, and rather astonishingly, the portion of Mr. Morgan's testimony that NSP cites for this proposition does not relate to the enactment of limitations upon the siting of a waste storage facility by a utility in the event of a breach by DOE. Rather, Mr. Morgan's testimony relates solely to difficulties that DOE had in attempting to find a site for a repository or another DOE facility in the early 1980s. Tr. 3865:24-3868:17 (Morgan). As a result, it is of no value in ascertaining what losses would be foreseeable to DOE in the event of a failure to timely commence the acceptance of spent fuel and is by no means the "key evidence" to which NSP refers on page 2 of its reply brief.

## V. NSP HAS NOT RESOLVED AND CANNOT RESOLVE THE UNCERTAINTIES CONCERNING ITS ABILITY TO SATISFY ITS SPENT FUEL STORAGE NEEDS THROUGH RERACKING

At trial and in our post-trial brief, we established that NSP faced two major uncertainties in the late 1980s: the rate at which DOE would accept spent fuel from utilities in general and the Prairie Island plant in particular, and the adequacy of a rerack to satisfy NSP's spent fuel needs

from 1994 until the date of DOE acceptance (and thereafter). As Dr. Jonathan Neuberger testified, these uncertainties made dry storage the only rational choice for NSP in both the actual and the "but for" worlds.

In response to the overwhelming evidence of the uncertainty in the late 1980s concerning the rate of acceptance, NSP does little more than assert that it held the "reasonable expectation" that DOE would accept spent fuel at the rate that the company now endorses – a rate sufficient to preclude the need for additional storage after 1998. Pl.'s Reply Br. at 19. However, NSP makes little effort to explain how, in the 1980s, it could possibly have been certain that DOE would accept fuel at a rate that industry representatives were at the time still seeking to insert into the Standard Contract and that, even after years of litigation, has not been adopted by the courts. NSP ignores the fact that DOE's liability must be based upon its performance obligations under the Standard Contract, not on the rate that NSP believed DOE would or should use. Further, NSP makes no effort to explain the testimony of Michael Schwarz to the Minnesota Public Utilities Commission reflecting the company's belief that DOE might not be arriving at Prairie Island until 2001. DX 103 at 3124; Tr. 4264:7-23, 4317:24-4318:23 (Schwartz).[5] Any assertion that NSP somehow "knew" in the late 1980s that DOE would arrive at the rate it now advocates, in time to prevent a shutdown, is little more than a flight of fancy.

---

[5] In fact, NSP has made no effort in its reply brief to address the numerous inconsistencies between the testimony and arguments it adopted in proceedings before the Minnesota Public Utilities Commission and the positions it adopted at trial, and has not contested the conclusion that, having secured a victory as a result of the positions and testimony it adopted before the Minnesota Public Utilities Commission, it should be judicially estopped from contradicting them here.

Nor can NSP seriously assert that it "knew" at that time that a third rerack of the Prairie Island spent fuel pool would have addressed its spent fuel needs through the date of DOE's initial acceptance (which, as noted above, NSP believed might have been as late as 2001). NSP would have the Court believe that, even though it unequivocally stated as late as 1990 that a further rerack was not possible and told the Minnesota authorities a few years later that, at best, the maximum increase in space achievable through a rerack was 20 percent, what it actually meant when it was making these statements was that it had no doubt that reracking could achieve a 30-percent increase in pool capacity. See Pl.'s Reply Br. at 24. NSP would also have the Court disregard the contemporaneous testimony and public statements of those who were empowered to speak for the company before the Public Utilities Commission and other state regulators in favor of the opinion of one witness, Jon Kapitz, whose public statements on the subject are confined to the testimony that he provided in connection with this litigation and directly contradict the testimony of both his colleagues and his superiors. NSP's statements that further reracking may have been impossible may have been, as NSP now suggests, an "oversimplification." However, no possible reading of these statements or of NSP's contemporaneous assertions concerning the maximum increase in storage capacity obtainable through a rerack could possibly lead to the conclusion that the company had confidence in the late 1980s that reracking would permit the company to achieve a 30% increase in pool capacity.[6]

[6] If NSP had, in fact, been confident of a such a result, it would be difficult not to reach the conclusion that the company's statements to the Minnesota authorities concerning the effectiveness of a rerack were knowingly and materially false.

## VI. NSP HAS MISAPPREHENDED THE IMPORT OF DR. NEUBERGER'S TESTIMONY

NSP attempts to minimize the expert testimony of Dr. Neuberger by suggesting that the company faced the same risk of a shutdown in choosing dry storage as it would have faced had it performed a rerack, and that his economic analysis of decisionmaking under uncertainty therefore does not reveal what a rational decisionmaker would have done in the "but for" world. This argument is unavailing for several reasons.

First and foremost, NSP did not face the same technological uncertainties with respect to dry storage as it did with respect to reracking. Indeed, there is no document in the record suggesting that dry storage was not feasible or that the capacity increase which could be obtained using dry storage was limited. In fact, precisely the opposite is true. In its application for a certificate of need, NSP told the Public Utilities Commission that dry storage "provides optimal flexibility and allows NSP to obtain only the storage needed until the DOE begins removing spent fuel from PI for shipment to a monitored retrievable storage facility or a permanent repository," and it further noted that "the possibility of an MRS facility becoming available [prior to 2010] strongly supports the use of a Dry Cask Storage Facility because of its ability to add additional storage capacity in small increments." PX 60 at KRGNSP03789, KRGNSP03795; Tr. 628:2-12, 631:16-24 (McCarten). Reracking the pool would subject NSP to a category of risk far above and beyond any risks associated with dry storage.

Second, and as we established at trial and in our post-trial brief, the uproar that accompanied the approval of the dry storage project was, literally, a once-in-a-lifetime occurrence that was unlikely to have meaningfully affected any rational decisionmaker's thought process. As noted above, the prevailing wisdom in the 1980s (and the position that NSP

advocated before the Minnesota courts) was that it was not even necessary to obtain the approval of the Minnesota legislature prior to constructing a dry storage facility, and that it would be possible to obtain the necessary approvals simply by petitioning the Public Utilities Commission. As Dr. Neuberger conceded, the possibility of shutdown is always a threat for a nuclear power plant. However, there is nothing in the record (other than the benefit of hindsight) to suggest that this risk was in any way heightened by the decision to construct a dry storage facility or, more importantly, that such a risk would meaningfully have affected NSP's analysis in the 1980s.[7]

In short, NSP faced a much greater risk of shutting down if it pursued a path that, in light of then-existing technology, would only have solved its spent fuel needs through 1998. As Dr. Neuberger testified, under these circumstances, the rational decision in both the actual world and the "but for" world was the one that minimized this risk – the construction of a dry storage facility.

## VII. NSP MISAPPREHENDS OUR ARGUMENTS CONCERNING INTERNAL LABOR AND OVERHEAD

Contrary to NSP's assertion on page 32 of its reply brief, we do not assert that "utilities are not entitled to recover for their use of internal labor and overhead to mitigate the Government's breach." We asserted at trial and in our post-trial brief that, although such overhead and labor costs are potentially recoverable, NSP bears the burden of establishing that

[7] On page 29 of its reply brief, NSP maligns the judgment of our expert, John Leonard, by suggesting that his "decision to run the [Shoreham, New York] plant" despite political pressure to the contrary somehow led to the unnecessary expenditure of "hundreds of millions" of dollars. The distillation of the events at Shoreham into one paragraph and the attempt to foist responsibility upon Mr. Leonard for the events that took place at that plant are little more than an attempt to impose guilt by association and do little to undermine the compelling nature of his testimony or advance NSP's case.

these costs are in fact "incremental" to the partial breach. Because of its mischaracterization of our argument, NSP's assertion that it has been uniformly rejected is incorrect. See Sacramento Mun. Util. Dist. v. United States, 70 Fed. Cl. 332, 360 (2006) ("SMUD") ("Although SMUD properly may have incurred $2,497,724.00 for other overhead costs, SMUD failed to meet the burden of demonstrating that such costs, in fact, were incremental."), appeal pending, No. 2007-5052 (Fed. Cir. docketed Feb. 6, 2007). As at trial and in its post-trial brief, NSP has made no effort in its reply brief to demonstrate that the costs we identified as being non-incremental were in fact caused by the partial breach.[8] As Dr. Neuberger and our accounting expert, Larry Johnson explained, the mere fact that the costs were entered into NSP's accounting system and incurred does not justify their inclusion as damages where the evidence suggests that these same costs would have been incurred in the absence of the partial breach. As in SMUD, NSP has simply failed to meet its burden with respect to these items.

## VIII. NSP'S ARGUMENTS RELATING TO OTHER COSTS ARE FLAWED

On pages 33 to 37 of its reply brief, NSP makes a series of contentions related to the additional adjustments that we identified at trial and in our post-trial brief. Because these contentions do not undermine the validity of these adjustments, we rely upon the evidence adduced at trial and the arguments in our post-trial brief with respect to (1) the offset that is warranted (and that NSP originally credited the Government) in connection with the cost of

---

[8] Unlike NSP's experts, we isolated those labor costs (such as overtime and the salaries of those employees who worked primarily on breach-related activities) that were in fact incremental to the partial breach. The adjustment to damages that we seek does not include these incremental costs.

loading casks to DOE; (2) NSP's pursuit of a transportation license for its TN-40 casks;[9] and (3) the cost of security upgrades at GE-Morris (which NSP's own experts indicate would have been incurred in the "but for" world, an assertion that NSP makes no effort to contest).

With respect to the upgrade of NSP's auxiliary building crane, we similarly rely upon the arguments that we made at trial and in our post-trial brief. However, we note that the argument which we made concerning Laura McCarten's certificate of need testimony is by no means misleading, and that it is NSP which has mischaracterized Ms. McCarten's testimony. Before the Public Utilities Commission, Ms. McCarten refuted the contention of a witness that the cost of the proposed dry storage facility should include the cost of seeking a license to upgrade the crane (and, presumably, would be passed along to NSP's ratepayers). Although Ms. McCarten answered (as NSP contends) that the cost of the licensing fee should not be included in the cost of the dry storage facility, it is the reason for her answer that is relevant and that could not have been more clear: "Even if the spent fuel storage facility is not built, this crane would have to be modified to handle shipping casks to remove spent fuel from the site." DX 104 at NSP025 0382-83; Tr. 682:9-683:5 (McCarten). It is simply difficult to understand NSP's assertion that this language, which constitutes an unqualified admission that NSP would have upgraded the crane regardless of whether it built a dry storage facility, is somehow misleading.

---

[9] To the extent that NSP argues on page 36 of its reply brief that the sums it expended upon seeking a transportation license for its TN-40 casks were necessitated by the mandates imposed by the Minnesota Legislature in 1994, these sums are unrecoverable for the same reason that NSP is not entitled to recover the costs of any of the other mandates.

## IX. NSP'S ARGUMENTS CONCERNING PRIVATE FUEL STORAGE ARE UNAVAILING

NSP's attempts to resurrect its claims for "damages" for investing in Private Fuel Storage LLC ("PFS") are unpersuasive. First and foremost, the investment in PFS that the Federal Circuit deemed unforeseeable and speculative in Indiana Michigan is the same investment for which NSP seeks recovery in this case. NSP has offered no evidence in this trial suggesting that its investment in the facility was anything other than the result of its own unilateral decision to participate in a business venture, and has not explained how the obstacles that that made PFS speculative in the first instance (including political opposition, "NIMBYism," and litigation Tr. 2053:8-2054:17 (Howard)) are any less present in this case than they were in Indiana Michigan. Further, NSP has offered no evidence suggesting that its investment in PFS was any more foreseeable to the Government in this case than it was in Indiana Michigan.

Second, NSP ignores the thrust of our arguments concerning the value of PFS. Regardless of whether NSP was motivated by a potential profit, the company could only recover the entirety of its investment in PFS if its investment is in fact valueless. Had NSP invested in, for example, General Electric as a result of a hypothetical breach of contract, the entirety of its investment in that corporation would only be recoverable as damage if the shares that it purchased turned out to be worth nothing. Otherwise, the company could both recover its investment as damages and still be the owner of valuable assets.

In this case, there is ample reason to believe that NSP's investment is not valueless. Even if the PFS project does not continue to proceed, PFS may have cash on hand, and, if the company were to wind down, that cash would be distributed to its members. This concern is hardly

unrealistic, given the facts that NSP alone has invested in excess of $23 million in PFS, PX 1057 (Sieracki Demonstrative No. 39); Tr. 2707:25-2709:9 (Sieracki), and (as described in our post-trial brief) PFS apparently satisfied the capital requirements necessary to obtain an NRC license (a fact that NSP does not address in its reply brief). In the absence of proof demonstrating that the value of NSP's investment is zero, there is simply no basis upon which to establish a damage award based upon NSP's investment in PFS with reasonable certainty.

Finally, NSP's attempts to show that it needed to continue its participation in PFS even after the 2003 legislation are without merit, and only serve to underscore the fact that NSP's investment in PFS was by no means the direct and probable outcome of the partial breach.[10] As an initial matter, NSP's citation to a newspaper article in footnote 12 of its reply brief (pages 41 and 42) is inappropriate both because it was not presented at trial and because the article is rank hearsay. As to NSP's assertion that a certificate of need for Monticello is not a "sure thing," this argument is not only dubious in light of the much-reduced role of the legislature in certificate of need proceedings following the 2003 amendments, see PX 198 at KRGNSP11390 (Minn. Laws 2003, Ch. 11, H.F. No. 9, Art. I, Sec. 2, codified at Minn. St. § 116C.83), but simply misses the point. NSP was not compelled to continue investing in PFS after 2003. NSP was "pre-approved" by the legislature to load casks at Prairie Island, and a process existed for it to seek a certificate of need for a dry storage facility at Monticello. Tr. 273:23-275:23 (Bomberger).

---

[10] NSP is correct in its assertion on page 42 of its reply brief that the 2003 legislation conditions payment to the renewable development fund upon the storage of spent fuel at Prairie Island. See PX 198 at KRGNSP11392-33(Minn. Laws 2003, Ch. 11, H.F. No. 9, Art. 2, Sec. 1, subd. 1 codified at Minn. St. § 116C.779, subd. 1). However, that requirement does not explain why NSP continued investing when further investment was not required to secure space at the planned PFS facility.

Further, and as NSP itself apparently acknowledges through its silence, it was never necessary to be a member of PFS to be able to store spent fuel there. NSP has simply made a unilateral decision to continue contributing more money to PFS and, regardless of whether that decision is prudent or imprudent, should not be permitted to look to the Government to bankroll its decision.

X. NSP'S "COST OF CAPITAL" IS PREJUDGMENT INTEREST

NSP does not address several of the most salient points that we made in our post-trial brief concerning its claim for pre-judgment interest. Specifically, NSP fails to cite to a waiver of sovereign immunity with respect to its interest claim, fails to explain why it seeks the cost of its capital long after the damages cut-off in this case, and fails even to attempt to account for the trial court's decision in Indiana Michigan that specifically rejected its argument. Instead, NSP begins its defense of its claim for the cost of its capital by distinguishing between interest on a claim and interest as a claim. Pl.'s Reply Br. at 49 (citing Centex Corp. v. United States, 55 Fed. Cl. 381, 390 (2003), aff'd, 395 F.3d 1283 (Fed. Cir. 2005)). Even assuming that this distinction is valid for purposes of the no-interest rule, it fails for the simple reason that, unlike the plaintiff in Centex, there is no proof that NSP made any borrowings to finance construction. Further, in Centex, this Court found that, even if recoverable as interest as a claim, any borrowings that the plaintiff made were not foreseeable and therefore not recoverable. Centex, 55 Fed. Cl. at 390. Thus, even if a party has lost the cost of its capital, as NSP apparently contends in this case, that fact alone does not make the loss recoverable. If NSP were correct, all forms of damage to a party would result in a loss of the cost of capital and would be recoverable as a foreseeable form of damage.

Similarly unpersuasive is NSP's attempt to rely upon the award of "AFUDC" costs in Tennessee Valley Authority v. United States, 69 Fed. Cl. 515 (2006). Unlike TVA, NSP does not seek recovery of its AFUDC. Instead, the adjustment that NSP calculated for its cost of capital is not limited simply to construction costs and is not limited to the time period specified by the definition of AFUDC. It is a gross-up of all costs that NSP claims as damages, covering the entire damages period (and, for some unexplained reason, beyond). Further, the award in TVA was premised upon the Court's recognition that "a contractor may recover interest actually paid on funds borrowed," even if actual, specific borrowings to fund projects could not be identified. 69 Fed. Cl. at 541.[11] As noted above, and unlike TVA and Centex, no borrowings have been identified in this case.[12]

---

[11] This Court's finding that interest on funds actually borrowed may be recovered absent a waiver of sovereign immunity in a contract clause permitting such recovery, and its failure to require identification of specific loans to fund the specific construction project at issue, was error. Even when a "Changes" clause authorizes recovery of actual interest charges, any recoverable interest must have been "actually paid on funds borrowed because of the government's delay in payments and used on the delayed contract." Wickham Contracting Co. v. United States, 12 F.3d 1574, 1582 (1994) (emphasis added). Further, the "changed work either must be directly traced to a specific loan or," for contractors whose business practices include a course of borrowing from lending institutions, "a necessity for increased borrowing must be shown to have been required by extra work or delay caused by the government." Gevyn Constr. Corp. v. United States, 827 F.2d 752, 754 (Fed. Cir. 1987) (emphasis added). "In the latter situation, the allowance of interest depend[s] upon a specific showing that the course of borrowing was affected by the change in question, i.e., that apart from the normal borrowing pattern, there was a necessity to borrow specifically due to the change in question." Singer Co. Librascope Div. v. United States, 568 F.2d 695, 718 (Ct. Cl. 1977); see Framlau Corp. v. United States, 568 F.2d 687, 694 (Ct. Cl. 1977) (to recover interest on borrowings necessitated by changed work, plaintiff must "prove what part, if any, of its large borrowings were attributable to compensable changes" and that it was "forced to borrow to perform the changed work").

[12] In connection with its AFUDC argument, NSP relies upon LaSalle Talman Bank v. United States, 317 F.3d 1363, 1375 (Fed. Cir. 2003) for the proposition that "[t]he Federal Circuit has determined that the equity component of the cost of capital may be recovered."
(continued...)

Finally, NSP refuses to recognize that this case does not arise under the Contract Disputes Act. See Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336, 1340 (Fed. Cir. 2000). As a result, discussion of entitlement to interest under 41 U.S.C. § 611, or any clauses that are mandated by the Federal Acquisition Regulations, are simply irrelevant. NSP has failed to identify any statute or contractual provision that operates as a waiver of sovereign immunity with respect to claims of interest against the Government.

XI. NSP'S FAILURE TO PROVIDE PROOF THAT THE RATE WHICH IT ADVOCATES IS PART OF THE STANDARD CONTRACT IS FATAL TO ITS THEORY OF THE CASE

In our post-trial brief, we explained that, without proof that that, in the late 1980s, it was entitled to rely upon a rate that would preclude the need for additional at-reactor storage after 1998, NSP lacked sufficient assurance that a rerack, even if feasible, would satisfy NSP's spent fuel storage needs until the initial date of DOE acceptance. NSP has responded to this argument as if the question of rate was never in doubt, either in the late 1980s or today, and that it has known all along that the rate which it advocates (and that its representatives repeatedly but unsuccessfully attempted to add to the Standard Contract) would be its security blanket. Presumably, its certainty with respect to this issue explains why it has failed even to acknowledge, let alone identify a flaw in, the conclusion of this Court in Pacific Gas & Electric

---

[12](...continued)
Reliance on LaSalle Talman is misplaced, for that decision rested upon the premise that "the cost of replacement capital can serve as a valid theory for measuring expectancy damages in the Winstar context because it provides a measure of compensation based on the cost of substituting real capital for the intangible capital held by plaintiff in the form of supervisory goodwill." Id. at 1374. This case does not involve NSP's attempt to procure replacement capital or the proper identification of the cost of that attempt.

Co. v. United States, 73 Fed. Cl. 333, 399, reconsideration denied, 74 Fed. Cl. 779 (2006), appeal pending, No. 2007-5046 (Fed. Cir. docketed Jan. 24, 2007) ("PG&E"), that "the use of the acceptance rate and allocations in the 1991 [Annual Capacity Report ("ACR")] and [Annual Priority Ranking ("APR")] and the amount of spent fuel listed for collection in [the utility's] approved [Delivery Commitment Schedules ("DCSs")] is the most suitable" method for ascertaining the rate at which DOE was to accept spent fuel pursuant to the Standard Contract.

NSP's certainty in this regard is ill-founded. Tellingly, NSP makes no attempt to account for the undisputed evidence in the record, describing the unsuccessful efforts of the nuclear industry, including NSP, to insert a rate of acceptance into the Standard Contract both prior to and after 1983. NSP similarly makes no attempt to explain how statements that clearly reflect expectations and plans for the civilian waste management program somehow morphed into contractual obligations. These arguments have been described in detail in our post-trial brief and prior briefing and, in light of NSP's failure to address them, need not be repeated here. However, a few points that NSP raises warrant mention.

First, NSP insinuates that performance through an MRS with no immediate plans for acceptance of fuel at a repository would be "prohibited by the NWPA" and that, as a result, the rate of acceptance postulated by the 1991 ACR cannot provide the basis for the "but for" world. This argument fails for several reasons. As an initial matter, the record is clear that NSP never complained about the rate of acceptance contained in the 1991 ACR, instead submitting DCSs to DOE for approval based upon that rate, and never regarded the schedule upon which it was based as "illegal" or otherwise inconsistent with the Standard Contract. Its chief executive officer issued a news release in June 1992 stating that NSP "support[ed] the MRS concept" and that the

schedule which DOE had proposed (which contemplated commencement of construction of an MRS in 1996, long before the date otherwise permitted by the 1987 NWPA Amendments) a "firm commitment with a solid timetable." DX 314, PX 497; Tr. 2034:3-2038:22 (Howard).

Moreover, the notion that the rate contained in the 1991 ACR violated the statutory "linkages" ignores (1) DOE's own recognition in 1991 ACR that, "to initiate [MRS] operations in 1998 . . . [,] the statutory schedule linkages would have to be removed or modified," DX 108 at HQ0003592; Tr. 3232:7-16 (Kouts); and (2) DOE's conscious decision to embark upon a strategy of permitting the Nuclear Waste Negotiator to attempt to find a willing host site for an MRS, thereby laying a predicate for the lifting of any restrictions for the commencement of MRS construction. Tr. 3436:23-3439:9 (Kouts). The mere fact that this strategy was unsuccessful does not mean that it was conducted in bad faith or, as NSP would now have it despite its prior support of the effort, that the entire endeavor was shrouded in illegality. Congressional modification of the linkages was simply one of the prerequisites to performance, and the fact that this modification did not take place is simply one of ways that the "but for" world differs from the actual world.

Second, NSP misunderstands the essential thrust concerning the essentiality of the rate term of the Standard Contract. Removing the specific mechanism that the parties agreed to use (and in fact used) to identify a rate and replacing it with a rate that the Court deems "reasonable" creates a contract to which the parties never agreed. As the Court properly concluded in PG&E, "the parties understood that the ACR/APR and [Final Delivery Schedule ("FDS")] scheme was the process under the express terms of the Standard Contract by which a firm acceptance rate and delivery schedule would be determined, and the parties substantially carried out this process

before DOE's breach." PG&E, 73 Fed. Cl. at 399. Substitution of a "reasonable" rate term in this instance would not result in a contract that "the parties would have agreed upon at the time of their initial . . . negotiations . . . ." David Nassif Assocs. v. United States, 226 Ct. Cl. 372, 376, 644 F.2d 4, 7 (1977). Rather, substitution of such a term would result in a contract that, at the time of contract formation, DOE specifically declined or to obligate itself to satisfy. Although it may be theoretically possible in some instances to enforce a contract that is missing an important term such as price, it is not possible to do so if inserting a term would result in an agreement upon which the parties would not have agreed. In this sense, disregarding the APR/ACR mechanism for ascertaining a rate of acceptance would make the contract too indefinite to enforce.

Third, NSP's complaints that the approved DCSs are not binding commitments, and that DOE "cavalierly manipulated" the DCS process, miss the point. As we explained in our post-trial brief, NSP's argument ignores the terms of the Standard Contract. More importantly, the fact that the DCS process was suspended in 1996 does not support NSP's allegation that DOE acted in bad faith in setting a rate of acceptance in 1991, and does not alter the conclusion, expressed in PG&E, that using the amounts contained in the approved DCS is the "most suitable" method for ascertaining the rate at which DOE would have accepted fuel in the absence of a breach. PG&E, 73 Fed. Cl. at 399. NSP's willing participation in the DCS process confirms its understanding that the allocations contained in the 1991 ACR represent a contractually permissible schedule for DOE's acceptance of spent fuel from NSP. Although other dates and quantities might have been more desirable from NSP's perspective, NSP is not entitled to select the method of performance that is most to its liking.

Not surprisingly, NSP confines to a footnote its allegations of bad faith, asserting that the testimony of Thomas Pollog provides proof that the Government terminated the DCS process as a means of "limiting liability" in spent fuel litigation. This assertion only serves to obfuscate the issues that are relevant to the case. DOE's actions in 1996 in no way suggest that the rate promulgated in 1991 was the product of "bad faith" or was somehow artificially constrained. Further, as evidenced by the Court's statements concerning this testimony, Tr. 3741:20-3742:15 (Pollog), the clear import of Mr. Pollog's statement was that the cancellation of the DCS process reflected DOE's determination that it should cease entering commitments to accept fuel when it lacked the ability to do so. Remarkably, NSP has attempted to malign DOE's intentions when the record amply demonstrates that DOE was merely seeking to avoid undertaking additional commitments that it could not satisfy.

Finally, NSP asserts that we have improperly sought to exclude extrinsic evidence when we have ourselves relied upon it. This argument is baseless. As described above, the Standard Contract is clear on its face as to the process by which the rate of acceptance is to be ascertained – through promulgation of the APR that would, in turn, provide a framework for the submission and approval of DCSs and FDSs for DOE acceptance of fuel beginning in 1998. PX 56, Art. IV.B.5, V.B.1, V.C.[13] Although we cite to various program documents and statements of

---

[13] On page 67 of its reply brief, NSP accuses the Government of having committed a sleight of hand by relying upon the ACR, as opposed to the APR, in determining the rate in the "but for" world. No such manipulation has occurred. The information contained in the 1991 APR was included as part of the 1991 ACR. See DX 108. However, the APR provides a ranking of permanently discharged fuel in accordance with the oldest-fuel-first principle. The ACR supplements this ranking by applying an annual acceptance rate to the queue set forth in the APR. It is from the combination of these two documents that each utility's acceptance allocations for a particular year can be ascertained. See PG&E, 73 Fed. Cl. at 399 ("[T]he parties (continued...)

industry spokespersons, we do so only because NSP's argument in favor of an extra-contractual rate necessarily relies upon evidence that is beyond the four corners of the Standard Contract.[14] The Standard Contract contains a mechanism to set the rate of acceptance, and NSP has offered no reason to deviate from that mechanism.

## CONCLUSION

For the reasons outlined above and in our post-trial brief and based upon the evidence adduced at trial, the Government respectfully requests that the Court require plaintiff to satisfy its burden of proof and eliminate from plaintiff's claim all damages that are unforeseeable, uncertain, or not directly caused by the Government's partial breach.

---

[13](...continued)
understood that the ACR/APR and DCS/FDS scheme was the process under the express terms of the Standard Contract by which a firm acceptance rate and delivery scheduled would be determined, and the parties substantially carried out this process before DOE's breach.").

[14] In the last paragraph of its reply brief, NSP asserts that the Standard Contract permits utilities to identify "all SNF" that NSP wishes to deliver and that it has the option to increase its allocation by as much as 20 percent. The notion that DOE would be required to accept such an amount is inconsistent both with the mechanism that the Standard Contract contemplates for identifying the rate of acceptance and with DOE's rejection of the industry's request that a specific rate be contained in the Standard Contract. Although a contract holder had a right to increase or decrease the amount of spent fuel identified in an approved DCS by up to 20% before submitting an FDS, DOE had the right to disapprove the FDS with the increased acceptance amount. See PX 56, Art. V.C. Further, any request by a particular utility to increase its annual allocation would necessarily be constrained by DOE's capability to accept that amount of fuel. As David Zabransky succinctly explained with respect to this issue, "There's only a certain amount of capacity that the DOE facilities will have. So without taking from Peter, we can't give it to Paul." Tr. 4442;13-4443:1 (Zabransky).

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/Andrew P. Averbach
ANDREW P. AVERBACH
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tele: (202) 353-0527
Fax: (202) 305-2118

Attorneys for Defendant

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Avenue, S.W.
Washington, D.C. 20585

ALAN J. LO RE
Senior Trial Counsel

STEPHEN FINN
JOSHUA E. GARDNER
MARIAN SULLIVAN
Trial Attorneys
Commercial Litigation Branch
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

May 16, 2007

CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 16th day of May, 2007, a copy of the foregoing "DEFENDANT'S POST-TRIAL REPLY BRIEF" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Andrew P. Averbach