IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| NORTHERN STATES POWER COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | ) | No. 98-484C<br>(Senior Judge Wiese) |

DEFENDANT'S MOTION FOR RECONSIDERATION

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

HAROLD D. LESTER, JR.
Assistant Director

ANDREW P. AVERBACH
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tele: (202) 305-3315
Fax: (202) 307-2503

OF COUNSEL:
JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Avenue, S.W.
Washington, D.C. 20585

ALAN J. LO RE
MARIAN SULLIVAN
Senior Trial Counsel

STEPHEN P. FINN
JOSHUA E. GARDNER
Trial Attorneys
Commercial Litigation Branch
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

October 11, 2007

Attorneys for Defendant

## TABLE OF CONTENTS


TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I. THE COURT HAS AUTHORITY TO RECONSIDER ITS OPINION. . . . . . . . . . . . . . . . 1

II. THE COURT FAILED TO DETERMINE WHETHER THE ACTIONS IN WHICH PLAINTIFFS ENGAGED WERE CAUSED BY DOE'S FAILURE TO ACCEPT FUEL BEGINNING IN 1998. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

A. The Court's Legal Analysis Overlooks The Requirement Of Causation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

B. The Court's Analysis Of NSP's Public Statements Concerning Reracking Is Fundamentally Flawed. . . . . . . . . . . . . . . . . . . . . 3

III. THE COURT ERRED IN REPLACING THE FORESEEABILITY REQUIREMENT WITH A REASONABLENESS REQUIREMENT. . . . . . . . . . . . . . . . . 7

IV. THE COURT'S AWARD OF COSTS FOR PRIVATE FUEL STORAGE, LLC IS ERRONEOUS AND FAILS TO CONSIDER SEVERAL SALIENT POINTS. . . . . . 10

V. THE COURT'S OPINION FAILS TO CONSIDER SEVERAL INDEPENDENT ARGUMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

## TABLE OF AUTHORITIES

Indiana Michigan Power Co. v. United States,
422 F.3d 1369 (Fed. Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Bluebonnet Savs. Bank, F.S.B. v. United States,
339 F.3d 1341 (Fed. Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

In re Application for Certificate of Need for Construction of an Independent Spent Fuel Storage Installation,
501 N.W. 2d 638 (Minn. Ct. App. 1993), review denied (July 15, 1993). . . . . . . . . . . . . . . 9

Myerle v. United States,
33 Ct. Cl. 1 (1897). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Paalan v. United States,
58 Fed. Cl. 99 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Pacific Gas & Electric Co. v. United States,
73 Fed. Cl. 333, 385 (2006), appeal pending, No. 2007-5046
(Fed. Cir. docketed Jan. 24, 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Ramsey v. United States,
121 Ct. Cl. 426, 101 F. Supp. 353 (1951). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Yuba Natural Resources, Inc. v. United States,
904 F.2d 1577 (Fed. Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| NORTHERN STATES POWER COMPANY, Plaintiff, | ) | |
| v. | ) | No. 98-484C (Senior Judge Wiese) |
| UNITED STATES OF AMERICA, Defendant. | ) | |

DEFENDANT'S MOTION FOR RECONSIDERATION

Pursuant to Rule 59 of the Rules of the Court of Federal Claims ("RCFC"), defendant, the United States, respectfully requests that the Court reconsider its opinion dated September 26, 2007.

DISCUSSION

I. THE COURT HAS AUTHORITY TO RECONSIDER ITS OPINION

RCFC 59(a)(1) authorizes this Court to reconsider prior rulings. Specifically, "reconsideration may be granted to . . . any of the parties and on . . . part of the issues, for any of the reasons established by the rules of common law or equity applicable as between private parties in the courts of the United States." RCFC 59(a)(1). The Court has discretion to decide whether to grant reconsideration. Yuba Natural Resources, Inc. v. United States, 904 F.2d 1577, 1583 (Fed. Cir. 1990); Paalan v. United States, 58 Fed. Cl. 99, 105 (2003). Reconsideration of a determination is confined to those situations where the Court's decision is based "upon manifest error of law [] or mistake of fact." Id. at 105 (quoting Bishop v. United States, 26 Cl. Ct. 281, 286 (1992)). Respectfully, the Court's opinion contains several fundamental factual and legal

errors and fails to address several issues that are necessary to resolution of the parties' dispute and, therefore, warrants reconsideration.

## II. THE COURT FAILED TO DETERMINE WHETHER THE ACTIONS IN WHICH PLAINTIFFS ENGAGED WERE CAUSED BY DOE'S FAILURE TO ACCEPT FUEL BEGINNING IN 1998

### A. The Court's Legal Analysis Overlooks The Requirement Of Causation

In Indiana Michigan Power Co. v. United States, 422 F.3d 1369, 1376 (Fed. Cir. 2005), the United States Court of Appeals for the Federal Circuit explained that "[t]he presence of a duty to mitigate does not perforce make the pre-breach costs incurred by Indiana Michigan to store its SNF recompensable; appellant must prove foreseeability, causation, and reasonableness." Id. at 1376. Consistent with Indiana Michigan, the primary thrust of our arguments at trial and during post-trial briefing was that the expenditures for which NSP sought reimbursement in the form of damages had not been "caused" by DOE's delay in spent fuel acceptance.

The Court's opinion contains language suggesting that it ignored NSP's fundamental obligation to establish that "mitigation damages" were, in fact, caused by the Government's delay in performance. Nowhere is this more apparent than in the Court's discussion of labor charges (on page 28 of its opinion), in which the Court stated that "[o]ur concern here, it should be noted, is not in determining whether a loss was caused by the breach (in which case, the issue of causation that defendant raised would, of course be relevant), but, rather, whether the cost was incurred to ameliorate the effects of a breach." Respectfully, this statement of the law, which appears to reflect the Court's consideration mot merely of the labor charges but of all the damages that NSP seeks, manifestly conflicts with the three-part analysis that is required by

Indiana Michigan. Even if, as NSP contends, the company had the right or duty to expend costs to mitigate the effects of the delay in DOE's performance, it still must demonstrate that the expenditures for which it seeks reimbursement were caused by DOE's delay and, as Indiana Michigan specifically makes clear, would not have been incurred even in the absence of such a delay. Indiana Michigan, 422 F.3d at 1376 (finding that the expenditures for which plaintiff sought compensation were not caused by DOE's delay because they would have been incurred "irrespective of" timely performance by DOE). To permit NSP to recover for expenditures that may have been incurred even had DOE begun accepting fuel in 1998 would violate a cardinal principle of awarding damages for injury to a plaintiff's expectation interest – that the plaintiff not be placed in a better position than it would have occupied in the absence of the conduct complained of. See, e.g., Bluebonnet Savs. Bank, F.S.B. v. United States, 339 F.3d 1341, 1344-45 (Fed. Cir. 2003) (citing White v. Delta Constr. Int'l, Inc., 285 F.3d 1040, 1043 (Fed. Cir. 2002)) ("the non-breaching party 'should on no account get more than would have accrued if the contract had been performed.'"); Pacific Gas & Electric Co. v. United States, 73 Fed. Cl. 333, 385 (2006), appeal pending, No. 2007-5046 (Fed. Cir. docketed Jan. 24, 2007) (same).

B. The Court's Analysis Of NSP's Public Statements Concerning Reracking Is Fundamentally Flawed

At trial, we went to great length to establish that NSP's claim that it would have reracked had DOE commenced performance in January 1998 was expressly contradicted by its statements in legal proceedings and the sworn testimony of its own witnesses in the early 1990s that reracking presented an inferior option to dry storage. We argued, for this reason, that plaintiffs should be judicially estopped from taking a contrary position during these proceedings or that, at

a minimum, the statements that plaintiffs made in the early 1990s, before this litigation commenced, were more persuasive.

We recognize that invocation of judicial estoppel is a matter reserved to the Court's discretion. However, the Court's opinion contains no mention of our arguments concerning NSP's prior public statements. The Court does note in its opinion that, in the late 1980s, "plaintiff had no need to perform an in-depth assessment of the increase in storage capacity achievable through reracking" and therefore discounts the import of NSP's contemporaneous statements concerning the storage capacity increase that could have been gained through a rerack. However, this analysis ignores three fundamental problems.

First, the Court's opinion apparently credits Jon Kapitz's testimony that a rerack that achieved a 30-percent increase in storage capacity would have enabled the company to operate until 2003. However, Mr. Kapitz made clear on the witness stand that his calculation was merely a rough estimate that he performed in his head:

> Q. And that would have carried you through your storage needs through what year?
>
> A. I have to calculate that out. I think 25 the 20 percent would just get us to where the Department of Energy was, and that was about, what, five years, four to five years, and that would give us another 50 percent margin on there, so two or three years beyond that, so you're probably looking at seven years, eight years, the year 2002 timeframe maybe, 2002 or 03.
>
> Q. And how do you know that?
>
> A. That it would get us that far?
>
> Q. Yes.

> A. Well, I know 20 percent would just get us to the 1998, 1999 timeframe, and that's another five years of storage from 1994 to the year 1999. So 30 percent, you know, is half, again, from the 20 percent, so you take five years, add another two-and-a-half on that, that you seven-and-a-half years, so two-and-a-half years on 1999, you're into the 2002 timeframe, roughly that.

(Tr. 877:24-878:19). In fact, however, NSP had submitted a detailed analysis of its projected spent fuel discharges to the Minnesota Public Utilities Commission in connection with its application for a Certificate of Need (PX 403 at KRGNSP-0070268), which unequivocally concluded that NSP would discharge, by the middle of 2001, more spent fuel than the amount that could be stored in a spent fuel pool that had achieved a 30-percent increase in capacity through reracking.[1] This fact is significant for, at the time of these proceedings, NSP believed, and its witnesses testified before the PUC, that, even assuming that DOE began accepting spent fuel in 1998, NSP would not receive any allocations from DOE for Prairie Island until 2001 and that the company, therefore, needed a solution that would enable it to store fuel through 2001. See DX 103 at NSP-0003124-25, PX 778 at NSP-0055717; Tr. 4264:7-23, Tr. 4292:1-4295:1 4317:24-4318:23 (Schwartz). In a nutshell, even a rerack that achieved a capacity increase of 30 percent would require the company, in making its decisions with respect to spent fuel storage, to confront the same "razor thin" margin of error that the Court recognized at trial.

Second, the Court's opinion never addresses an equally critical component of NSP's actual-world decision not to perform a rerack – its conclusion, expressed to the PUC and endorsed by the administrative law judge that considered the matter, that reracking would have

---

[1] The Prairie Island spent fuel pool has a licensed capacity of 1,386 assemblies. A rerack that achieves a 30-percent increase would create an additional 416 spaces, meaning that the pool could accommodate 1,802 fuel assemblies. NSP stated in its PUC application that it would have discharged 1,809 fuel assemblies by July 11, 2001. (PX 403 at NSP-0070268).

entailed a much higher safety risk for NSP's employees. For example, on November 18, 1991, in response to a question about why NSP did not select reracking, Laura McCarten testified before the Public Utilities Commission that reracking "entail[ed] the generation of a significant quantity of low level waste and personnel exposure." DX 107 at 117; see also PX 592 (March 2, 1992 letter from Laura McCarten to Sen. Steven Novak explaining that the PUC "rejected reracking for reasons of cost, practicality, and safety").

The evidence demonstrated, without contradiction, that NSP was concerned about the safety of its workers in the actual world and that this concern was one of the primary reasons why the company rejected the option of reracking. There is absolutely no reason to believe (and NSP offered no evidence suggesting) that the company would not have been motivated by such a concern in the absence of DOE's delay in accepting spent fuel. Thus, even if, as NSP contends and the Court found, a rerack was technically possible, the evidence compelled the conclusion that the company would still not have performed a rerack because such activity, as NSP repeatedly told the Minnesota authorities, would have endangered the safety of its employees. The Court's failure to discuss this critical issue suggests a fundamental flaw in its reasoning that requires reconsideration.

Third, the Court's conclusion that a full-scale analysis of the feasibility of reracking would have shown that a 30-percent rerack was feasible erroneously assumes that the technology to perform this work was available in the late 1980s, when NSP made its decision to construct a dry storage facility. In addition to squarely contradicting the contemporaneous statements that NSP made about the feasibility of rerack, see, e.g., DX 61 at NSP-0072972 ("NSP already has re-racked the Prairie Island spent fuel pool to the fullest extent possible. There is not enough room

to move whole assemblies any closer together.") ; DX 47 at NSP-0073091 ("current racks have the assemblies as close together as possible"), the Court's view was squarely rejected by NSP's own employee, Joe Jensen. As Mr. Jensen succinctly wrote in 1994,

> The technology that was available when this process started would have resulted in nothing better than a 20% increase in storage capacity. Technology has improved. We cannot hide that fact.

DX 145 at NSP-0100714. No amount of analysis would have enabled NSP to take advantage of technology that did not exist at the time. For this reason, reconsideration of the Court's opinion is warranted.

## III. THE COURT ERRED IN REPLACING THE FORESEEABILITY REQUIREMENT WITH A REASONABLENESS REQUIREMENT

As described above, the tripartite test that Indiana Michigan requires of a plaintiff seeking so-called "mitigation damages" also requires a showing that the damages were foreseeable. Respectfully, the Court's opinion ignored this requirement by concluding, on page 22, that, "[a]s applied in the context of mitigation damages, we read the term 'foreseeabilty' to require only that the injured party's efforts to minimize damages be pursued in good faith and in a commercially reasonable manner." The effect of this conclusion is to saddle the United States with responsibility for the downstream consequences of NSP's decision to construct a dry storage facility – namely, the cost of certain legislative mandates with which NSP was required to comply as a condition to constructing a dry storage facility.

This conclusion eviscerates the "foreseeability" requirement imposed by Indiana Michigan. As we made clear at trial and explained in our post-trial brief, enactment of the mandates was a long and winding road that reflected the independent decision of Minnesota

legislature, which was influenced by a confluence of political, legal, and environmental issues. As a result, enactment of the mandates was by no means the "direct" or "inevitable" result of the delay, as the Court has required for more than 100 years. Myerle v. United States, 33 Ct. Cl. 1, 27 (1897); see Ramsey v. United States, 121 Ct. Cl. 426, 434, 101 F. Supp. 353, 357 (1951) ("For a damage to be direct there must appear no intervening incident . . . ; the cause must produce the effect inevitably and naturally, not possibly nor even probably."). That the mandates were not "inevitable" is underscored by the fact that, in the dozens of spent nuclear fuel cases that have been filed, this form of damage is unique to NSP.

The Court's interpretation of the foreseeability requirement not only conflicts with these longstanding precedents, but has no logical stopping point. Indeed, under the Court's analysis, there would be no reason why the United States would not be responsible for reimbursing NSP for damages that the company would be required to pay in a wrongful death lawsuit if, hypothetically, a worker had died in an accident during the construction of NSP's dry storage facility.

We have consistently acknowledged that the direct costs incurred by spent nuclear fuel plaintiffs to construct additional on-site storage were foreseeable consequences of nonperformance at the time of contracting. It is for this reason that we did not challenge at trial the construction of NSP's dry storage facility or the work that NSP performed at Monticello upon foreseeability grounds. However, extending liability to the Government for costs that are truly caused by the intervening acts of a third party ignores the command of the Federal Circuit in Indiana Michigan. Had that Court wanted to include indirect damages within the scope of costs available to a spent nuclear fuel plaintiff that was mitigating its damages, it would not have

included a "foreseeability" requirement. The Court's focus on whether the mitigation acts were reasonable and undertaken in good faith is not a substitute for this requirement. Respectfully, the Court's decision is directly at odds with the Federal Circuit's command in Indiana Michigan that, to be compensable, damages incurred in mitigation must be foreseeable.

The portion of the Court's opinion addressing the legislative mandates also suggests that we acknowledged that the "legislative effort" was a foreseeable mitigatory response to the breach, and apparently relies upon this admission in support of its conclusion that "fundamental fairness" requires that the Government bear the cost of NSP's compliance with the mandates. See Slip op. at 21-22. In fact, we did not acknowledge that the legislation was foreseeable, and went to great length to point out that not even the legislators, let alone NSP or DOE, foresaw that the mandates would be a possible response to NSP's request to construct a dry storage facility. Further, we noted at trial and during post-trial briefing that it did not become clear that legislative intervention was required in connection with NSP's application for a Certificate of Need until the Minnesota Court of Appeals so ruled in 1993. Until the Minnesota Supreme Court declined to take the appeal of the Court of Appeals' decision, NSP itself argued that legislative approval of its decision to build dry storage was not required. In re Application for Certificate of Need for Construction of an Independent Spent Fuel Storage Installation, 501 N.W. 2d 638 (Minn. Ct. App. 1993), review denied (July 15, 1993). Any reliance upon a perceived admission by the Government that the legislation was foreseeable was, respectfully, error.

## IV. THE COURT'S AWARD OF COSTS FOR PRIVATE FUEL STORAGE, LLC IS ERRONEOUS AND FAILS TO CONSIDER SEVERAL SALIENT POINTS

The Court's award of damages for the costs of Private Fuel Storage, LLC ("PFS") was manifest error for several reasons.

First, for the reasons we have previously explained, in Indiana Michigan, the Federal Circuit ruled that the expenditure of costs associated with PFS was not foreseeable to the Government in 1983 at the time of contracting. Although the Court concluded in its opinion that NSP should not be bound to this decision because NSP was not a party to the Indiana Michigan litigation,[2] NSP did not present any evidence at trial suggesting that PFS was a foreseeable cost to DOE at the time of contracting. The only evidence referenced in the Court's opinion is a DOE report, authored in 2001, summarizing for Congress the storage options available to NSP. This report is simply not probative of the foreseeability of PFS 18 years earlier.

Second, we did not argue, as the Court suggests, that NSP engaged in a "commercially reckless venture" in pursuing PFS. Rather, we argued that NSP's investment in PFS exceeded the amount that was necessary for it to be able to have a backup plan to store fuel. The evidence was undisputed that NSP invested more than any other utility and continued to make contributions long after the vast majority of other utilities had ceased doing so. The evidence was also undisputed that NSP was not required to continue investing (or even to invest at all) in order for it to guarantee space at the facility that PFS was planning to build. Instead, the evidence established that NSP made the business decision to continue investing in PFS after the

[2] NSP is represented by the same attorneys who represented the plaintiff in Indiana Michigan before this Court and before the Federal Circuit.

need to continue doing so ceased.[3] The Court's opinion does not address any of these critical arguments and is therefore critically flawed.

Third, the Court's conclusion on page 26 of its opinion that reimbursing NSP for the costs that it incurred in connection with PFS "simply restores [it] to the position it was in before the breach" is factually incorrect. Assuming payment by the Government of the current judgment in NSP's favor, the company will be in possession not only of the amount that it invested in PFS, but also of a membership interest in a limited liability company that, as we noted in our pretrial brief, had the financial wherewithal to persuade the Nuclear Regulatory Commission that it could operate a dry storage facility pursuant to 10 C.F.R. § 72.22. If NSP were merely to be made whole for its investment in PFS, it would have to transfer its interest in PFS to the Government (which, if the Court's opinion is not modified, will have bankrolled NSP's investment in its entirety) and the potential profit that this interest might generate in the future. NSP, of course, has never offered to transfer its interest in PFS to the Government and failed to demonstrate at trial that its investment in PFS has a nonzero value. In the absence of such a showing, any award to NSP of its PFS costs would overcompensate the company for its investment decision.

[3] The Court's opinion also does not address the only contemporaneous documentation adduced at trial of PFS's financial projections, which included a projected net profit of as much as $324 million. DX 191 at NSP-0003185.

## V. THE COURT'S OPINION FAILS TO CONSIDER SEVERAL INDEPENDENT ARGUMENTS

In grouping its analysis of the individual expenditures for which NSP seeks compensation, the Court failed to consider several discrete issues that we raised that require individualized consideration.

First, the Court's consideration of the "mandates" issue exclusively addressed the issue of foreseeability and, in addition to applying a standard that nullifies this requirement, did not address two additional impediments to recovery that we raised. Specifically, the Court failed to address two arguments that we raised in footnote 29 of our post-trial brief with respect to NSP's settlement with the Mdewakanton Dakota Tribal Council at Prairie Island. First, although the parties agreed to a damages cut-off date in this case of December 31, 2004, the evidence was undisputed that $562,500 of this amount was not due until 2005, and that NSP employs the accrual method of accounting. These damages were, by definition, incurred in 2005 and, therefore, not properly included in NSP's claim. Second, the 2003 legislation that "mandated" the payment to the tribe specifically provided for the approval by the PUC "of a rate schedule providing for the automatic adjustment of charges to recover the costs or expenses" of the settlement agreement, and there was no dispute that the PUC approved such a rate schedule. As a result, the evidence was undisputed that NSP was not out-of-pocket any money as a result of the tribal settlement.

Second, on page 27 of its opinion, the Court purported to address NSP's expenditure of funds upon internal labor and overhead costs. However, its analysis of this subject pertains exclusively to whether NSP's labor costs are properly recoverable. There is no analysis of the issue (which we raised on page 101 of our post-trial brief) of whether NSP was actually damaged

by the redistribution of overhead costs to the cost of NSP's dry storage facility. This omission is particularly glaring because of NSP's unequivocal admission that, in the absence of DOE's delay in acceptance, the $981,512 that NSP charged as overhead for dry storage construction would simply have been allocated to a different cost center. See Tr. 1859:15-16, 1874:1-24 (Perkett); 4925:3-4930:18 (Johnson) (noting, among other things, that, in the "but for" world, "[t]he same costs would have been there, they just would have been allocated differently"). There is no dispute that this sum would have been incurred irrespective of any partial breach by DOE.

Third, at footnote 14 of its opinion (page 14), the Court increased the amount of the offset that it awarded the Government for the cost of the rerack that NSP claims it would have performed. For the reasons that we stated at trial and in our post-trial brief, we dispute the Court's determination that plaintiffs would have engaged in such a rerack. However, even assuming that NSP would, in fact, have performed such a rerack, the cost that NSP would have incurred was, as the Court properly discerned, not $11,640,000. Although the Court attempted to calculate the cost of a rerack that would have achieved a 30-percent increase in pool capacity (and assigned the project a cost of $12,532,000), this calculation simply compounded the error that Laura McCarten made in preparing her original back-of-envelope estimate of the cost of a rerack. See DX 77. As we noted on pages 64 and 78 of our post-trial brief, NSP prepared a Dry Cask Alternatives Study that it submitted to the Minnesota Legislature in 1994 as part of its obligations pursuant to the legislative mandates, in which it estimated that a rerack of the type that Mr. Kapitz contemplated would cost approximately $17 million to complete. PX 49 at KRGNSP11064; Tr. 5141:16-22 (Kapitz). NSP provided no evidence to contest this carefully prepared estimate. To the extent that the Court does not reconsider its causation analysis in light

of the errors we have identified above, the credit that the Court has calculated would grossly underestimate the true cost of the rerack that NSP claims it would have performed.

## CONCLUSION

For the reasons outlined above, the Government respectfully requests that the Court reconsider its opinion dated September 26, 2007, and limit its award of damages to those expenditures that NSP has proven to be foreseeable, reasonably certain, and directly caused by any partial breach by the Government.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/Andrew P. Averbach
ANDREW P. AVERBACH
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tele: (202) 305-3315
Fax: (202) 307-2503

Attorneys for Defendant

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Avenue, S.W.
Washington, D.C. 20585

ALAN J. LO RE
MARIAN SULLIVAN
Senior Trial Counsel

STEPHEN P. FINN
JOSHUA E. GARDNER
Trial Attorneys
Commercial Litigation Branch
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

October 11, 2007

CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 11th day of October, 2007, a copy of the foregoing "DEFENDANT'S MOTION FOR RECONSIDERATION" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Andrew P. Averbach