**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
(Electronically Filed on November 13, 2007)

| | |
|---|---|
| **NORTHERN STATES POWER COMPANY,**<br><br>Plaintiff,<br><br>v.<br><br>**THE UNITED STATES,**<br><br>Defendant. | No. 98-484C<br>(Senior Judge Wiese) |

**NORTHERN STATES POWER COMPANY'S**
**RESPONSE TO DEFENDANT'S MOTION FOR RECONSIDERATION**

Alex D. Tomaszczuk
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7940
(703) 770-7901 (fax)

Counsel of Record for Plaintiff
Northern States Power Company

*Of Counsel:*

Jay E. Silberg
Daniel S. Herzfeld
Jack Y. Chu
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
2300 N Street, N.W.
Washington, D.C. 20037
(202) 663-8000
(202) 663-8007 (fax)

Kerry C. Koep
**XCEL ENERGY**
414 Nicollet Mall, 5th Floor
Minneapolis, MN 55401
(612) 215-4583
(612) 215-4544 (fax)

November 13, 2007

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... ii

I. STANDARD OF REVIEW – MANIFEST ERROR OF LAW OR MISTAKE OF FACT ..... 1

II. THE COURT APPLIED THE PROPER STANDARD OF CAUSATION AND MITIGATION FROM *INDIANA MICHIGAN* ..... 2

III. THE COURT PROPERLY CONCLUDED THAT NSP IN THE BUT-FOR WORLD WOULD HAVE RE-RACKED ITS PRAIRIE ISLAND SPENT FUEL POOL ..... 4

- A. A 30 Percent Re-Rack Would Have Provided Sufficient Storage to Avoid Shutting Down Prairie Island ..... 4
- B. NSP Would Have Re-Racked Even If There Were The Potential For A Slightly Higher Level Of Radiation Exposure ..... 6
- C. NSP Could Have Re-Racked Its Prairie Island Pool A Third Time ..... 8

IV. THE COURT PROPERLY CONCLUDED THAT THE MANDATES WERE FORESEEABLE AND RECOVERABLE MITIGATION COSTS ..... 10

V. THE COURT PROPERLY AWARDED NSP ITS PRIVATE FUEL STORAGE COSTS ..... 12

VI. THE COURT'S DECISION OTHERWISE CORRECTLY DISPOSES OF THE GOVERNMENT'S REMAINING ARGUMENTS ..... 16

VII. CONCLUSION ..... 19

# TABLE OF AUTHORITIES

**CASES** **PAGE**

*ACE Constructors, Inc. v. United States*,
70 Fed. Cl. 253, (2006) *aff'd*, 499 F.3d 1357 (Fed. Cir. 2007)....17

*Bullcreek v. NRC*,
359 F.3d 536 (D.C. Cir. 2004)....13

*Caldwell v. United States*,
391 F.3d 1226 (Fed. Cir. 2004)....1

*Cal. Fed. Bank v. United States*,
395 F.3d 1263 (Fed. Cir. 2005)....10

*Chain Belt Co. v. United States*,
115 F. Supp. 701 (Ct. Cl. 1953)....17

*Citizens Fed. Bank v. United States*,
474 F.3d 1314 (Fed. Cir. 2007)....10, 11

*Data Gen. Corp. v. Johnson*,
78 F.3d 1556 (Fed. Cir. 1996)....4

*Energy Capital Corp. v. United States*,
302 F.3d 1314 (Fed. Cir. 2002)....10

*First Heights Bank, FSB v. United States*,
422 F.3d 1311 (Fed. Cir. 2005)....3

*Indiana Michigan Power Co. v. United States*,
422 F.3d 1369 (Fed. Cir. 2005)....2

*In re Application for Certificate of Need for Construction of an Indep. Spent Fuel Storage Installation*,
501 N.W.2d 638 (Minn. Ct. App. 1993)....4

*In re General Elec. Co.*,
15 N.R.C. 530 (1982)....13

*In re Private Fuel Storage, LLC*,
56 N.R.C. 390 (2002)....13

*Myerle v. United States*,
33 Ct. Cl. 1 (1897)....10, 11

*New Hampshire v. Maine*,
532 U.S. 742 (2001) ... 4

*Northern States Power Co. v. United States*,
78 Fed. Cl. 449 (2007) ... *passim*

*Ramsey v. United States*,
101 F. Supp. 353 (Ct. Cl. 1951) ... 10

*Roedler v. Dep't of Energy*,
255 F.3d 1347 (Fed. Cir. 2001) ... 15

*Southern Nuclear Operating Co. v. United States*,
77 Fed. Cl. 396 (2007) ... 3, 17

*Southern Nuclear Operating Co. v. United States*,
No. 98-614C, 2007 WL 3277271 (Fed. Cl. Nov. 1, 2007) ... 2

*Stockton East Water Dist. v. United States*,
76 Fed. Cl. 497 (2007) ... 2

*Sys. Fuels, Inc. v. United States*,
No. 03-2623C, slip op. (Fed. Cl. Nov. 9, 2007) ... 2

*Tenn. Valley Auth. v. United States*,
69 Fed. Cl. 515 (2006), *appeal dismissed*,
188 Fed. Appx. 1006 (Fed. Cir. 2006) ... 17

**STATUTES, REGULATIONS, & RULES**

Nuclear Waste Policy Act of 1982,
Pub. L. No. 97-425, 96 Stat. 2201 (1983) ... 12

42 U.S.C. § 10132 ... 12

42 U.S.C. § 10133 ... 12

42 U.S.C. § 10156 ... 16

42 U.S.C. § 10161 ... 13

10 C.F.R. § 20.1201 ... 7

10 C.F.R. part 72 ... 13

Final Interpretation of Nuclear Waste Acceptance Issues,
60 Fed. Reg. 21793 (May 3, 1995) ... 16

RCFC 59 ....................................................................................................................................1

**OTHER AUTHORITIES**

RESTATEMENT (SECOND) OF CONTRACTS § 351 ..................................................................................9

*Nuclear Fuel & Management Act: Hearing on S. 2589 Before the S. Comm. On Energy & Natural Resources* (2006).............................................................................................14



400663296v4

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
(Electronically Filed on November 13, 2007)

| | | |
|---|---|---|
| **NORTHERN STATES POWER COMPANY,** Plaintiff, v. **THE UNITED STATES,** Defendant. | ) | No. 98-484C (Senior Judge Wiese) |

**NORTHERN STATES POWER COMPANY'S**
**RESPONSE TO DEFENDANT'S MOTION FOR RECONSIDERATION**

Pursuant to RCFC 59(b) and this Court's October 16, 2007 Order, Plaintiff Northern States Power Company ("NSP") respectfully submits this response to Defendant the United States' ("Government") motion for reconsideration of several portions of this Court's trial decision – *Northern States Power Co. v. United States*, 78 Fed. Cl. 449 (2007). For the reasons discussed below, NSP respectfully requests that this Court deny the Government's motion for reconsideration. The Government has failed to show any error of law or mistake of fact, let alone the manifest error of law or mistake of fact required to support a motion for reconsideration.

## I. STANDARD OF REVIEW – MANIFEST ERROR OF LAW OR MISTAKE OF FACT

"Motions for reconsideration must be supported by a showing of extraordinary circumstances which justify relief." *Caldwell v. United States*, 391 F.3d 1226, 1235 (Fed. Cir. 2004) (citation and internal quotation omitted). While a motion for reconsideration is within this Court's discretion, "[t]o prevail, the moving party must meet the exacting standard of identifying

a manifest error of law or mistake of fact." *Southern Nuclear Operating Co. v. United States*, No. 98-614C, 2007 WL 3277271, at *1 (Fed. Cl. Nov. 1, 2007). "To sustain its burden, the movant must show: (1) that an intervening change in the controlling law has occurred; (2) that previously unavailable evidence is now available; or (3) that the motion is necessary to prevent manifest injustice." *Stockton East Water Dist. v. United States*, 76 Fed. Cl. 497, 499 (2007); *see also Sys. Fuels, Inc. v. United States*, No. 03-2623C, slip op. at 2-3 (Fed. Cl. Nov. 9, 2007).

The Government has met none of these showings and clearly not the manifest error of law or mistake of fact standard. Instead, the Government has simply used its motion for reconsideration (1) as an opportunity to re-argue points already considered and rejected by this Court and (2) offer new arguments that it could have presented but failed to make, prior to this Court's decision. *See Southern Nuclear*, 2007 WL 3277271, at *1.

## II. THE COURT APPLIED THE PROPER STANDARD OF CAUSATION AND MITIGATION FROM *INDIANA MICHIGAN*

Contrary to the Government's argument that this Court "overlooks the requirements for causation," Defendant's Motion for Reconsideration at 2 ("Gov't Motion"), this Court faithfully followed the Federal Circuit's decision in *Indiana Michigan Power Co. v. United States*, 422 F.3d 1369 (Fed. Cir. 2005) and properly applied the standard of causation in this case. *Northern States*, 78 Fed. Cl. at 458-62.

The Government asserts that this Court somehow ignored NSP's burden to show that the Government's breach caused it to build a dry storage facility (and incur related costs). *See* Gov't Motion at 2. Yet, this Court comprehensively considered the issue of causation, *Northern States*, 78 Fed. Cl. 458-62, and concluded that "DOE's partial breach was the cause-in-fact of plaintiff's



400663296v4

decision to build a dry storage facility at Prairie Island and that the costs of these damages are therefore recoverable." *Id.* at 462.

The Government overlooks this portion of the Court's decision and, instead, cherry-picks one phrase from the opinion regarding the reasonableness of labor costs associated with NSP's efforts to construct its dry storage facility and load casks. Gov't Motion at 2. At the point in the opinion from which the Government selects this quote, the Court had already concluded that NSP had proven causation and as the appropriate next step in the analysis, was determining whether the award of damages caused by the Government should be reduced as unreasonable mitigation. 78 Fed. Cl. at 467-68. Thus, the Government is not directly challenging the Court's causation decision at all, nor can it based on the evidence of causation provided by NSP at trial.[1] The Government instead seeks to attack the Court's application of the law of mitigation. However, applying mitigation principles, this Court properly shifted the burden to the breaching party to show the unreasonableness of the non-breaching party's mitigation efforts after causation had been established. *Id.* at 468; *see also First Heights Bank, FSB v. United States*, 422 F.3d 1311, 1317 (Fed. Cir. 2005) ("The clear import of the government characterizing its argument as one of causation is to avoid the reasonability element of the mitigation doctrine."); *Southern Nuclear Operating Co. v. United States*, 77 Fed. Cl. 396, 433 (2007) ("Defendant conflates mitigation and causation . . . ."). Thus, the Government's argument (and its continued

[1] In this regard, as to the dry storage facility (including the internal labor required to build the facility and load the casks), this Court credited the testimony of Ms. Laura McCarten by quoting her 1988 memorandum (PX398A) regarding NSP's need to use a technology that would provide sufficient storage space until the end-of-the-life of the plants. *See Northern States*, 78 Fed. Cl. at 459-60 (discussing and quoting memo); *see, e.g., also* NSP Post-Trial Reply Brief at 16-18, 31-32; NSP Post-Trial Brief at 15-19, 89-90.

denial of its obligation to bear any burden of proof once causation has been proven) should be rejected.

## III. THE COURT PROPERLY CONCLUDED THAT NSP IN THE BUT-FOR WORLD WOULD HAVE RE-RACKED ITS PRAIRIE ISLAND SPENT FUEL POOL

The Government attempts to re-argue three issues of fact regarding whether NSP would have re-racked the Prairie Island spent fuel pool had it believed the Government would have begun to perform by 1998. It has shown no mistake of fact justifying reconsideration of this Court's decision. This Court fully considered and rejected the Government's arguments contesting the ability of NSP to perform a third re-rack. *See, e.g.*, *Northern States*, 78 Fed. Cl. at 460-62.[2]

### A. A 30 Percent Re-Rack Would Have Provided Sufficient Storage to Avoid Shutting Down Prairie Island

The Government contends that even with a 30 percent re-rack NSP would not have met its needs at Prairie Island because (1) Mr. Michael Schwartz – who testified for NSP in the Minnesota Public Utility Commission ("PUC") hearings in 1991 – estimated 2001 as the year of

[2] The Government continues to assert that NSP should be "judicially estopped" from taking a different position as to the but-for world (where it would have pursued vigorously a third re-rack) than it took in the actual world (where it was forced to pursue dry storage based on the Government's breach). Gov't Motion at 3-4. The Government's statement makes no sense for many different reasons. Aside from the "apples to oranges" nature of the Government's comparison between the but-for world and the actual world, judicial estoppel only applies where the party against whom the doctrine is asserted has prevailed in the prior proceeding. *See New Hampshire v. Maine*, 532 U.S. 742, 749-51 (2001); *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1565 (Fed. Cir. 1996) ("The doctrine of judicial estoppel is that where a party successfully urges a particular position in a legal proceeding, it is estopped from taking a contrary position in a subsequent proceeding where its interests have changed."). NSP's position never prevailed in a judicial or administrative forum. *See In re Application for Certificate of Need for Construction of an Indep. Spent Fuel Storage Installation*, 501 N.W.2d 638, 648 (Minn. Ct. App. 1993) (reversing the Minnesota Public Utility Commission's grant of a limited Certificate of Need to NSP for the Prairie Island dry storage facility).

the Government's first acceptance of fuel at Prairie Island, and (2) a 30 percent re-rack would only provide sufficient storage through 2001. The Government's new take on an old argument is analogous to moving the goalposts after the game is over and then asking whether the winning team still would have made the game-winning kick. The argument should be rejected for several reasons.

First, regardless of the rate of acceptance, there is no dispute that NSP was entitled to deliver its first shipment of SNF to the Department of Energy ("DOE") in 1999. *See Northern States*, 78 Fed. Cl. at 462 n.13. NSP's first delivery commitment schedule for calendar year 1999 deliveries to DOE called for DOE to pickup fuel from Prairie Island. *See* DX139 (delivery commitment schedule). While the Government attempts to make much of Mr. Schwartz's PUC testimony, his analysis in that proceeding was focused on the likelihood that DOE would not commence acceptance of any spent fuel for any utility prior to 2015. *See* NSP Post-Trial Reply Brief at 22-23; Trial Transcript ("Tr.") 4305-07, 4314-16 (Schwartz); DX103 at NSP-0003125 through NSP-0003126; DX95 at NSP-0000274 & NSP-0000287. His testimony before the PUC did not address whether a re-racking would achieve sufficient space to meet NSP's needs in the "but for world." Tr. 4321 (Schwartz). Nor did Mr. Schwartz address whether NSP could have used its 1999 allocation for its Monticello plant at Prairie Island. Tr. 4309-12 (Schwartz). As this Court concluded, "Plaintiff did not focus on reracking in the real world (as distinguished from the but for world) because reracking would not have satisfied the utility's need for a long-term storage solution." *Northern States*, 78 Fed. Cl. at 461. Thus, Mr. Schwartz's testimony is simply not relevant to the argument repeated by the Government in its motion for reconsideration.

Second, even assuming *arguendo* that NSP would have ignored its right under the Standard Contract to use its Monticello spent fuel allocations for Prairie Island had it decided to re-rack, NSP had other options. It could have extended its fuel cycle. *Northern States*, 78 Fed. Cl. at 460. NSP "could have conserved the use of that [Prairie Island storage] capacity (*i.e.* extended its duration) by reducing the rate of spent fuel discharge through an increase in the uranium enrichment of the fuel assemblies (a measure the utility did in fact adopt incrementally in the 1990s) and by reducing power output during non-peak periods of customer demand." *Northern States*, 78 Fed. Cl. at 460. Additionally, as NSP also noted, it could also have stored some of its fuel in transportation casks prior to DOE's arrival. Tr. 903-04 (Kapitz). Thus, even if the goalposts were moved back, the kick still would have been good.

**B. NSP Would Have Re-Racked Even If There Were The Potential For A Slightly Higher Level Of Radiation Exposure**

There is simply no evidence that justifies the Government's assertion that a third re-racking would have entailed "a much higher risk for NSP's employees" and that this supposed heightened safety risk was "one of the primary reasons the company rejected the option of reracking." Gov't Motion at 5-6. The Government's hyperbole overstates the potential radiation exposure associated with a re-rack and mischaracterizes the facts in the record.

First, the record simply does not support the Government's assertion that one of NSP's "primary reasons" for rejecting a third re-racking was based on radiation exposure to its personnel. In NSP's Application for a Certificate of Need, NSP did not list personnel exposure as one of the reasons for rejecting re-racking. DX95 at NSP-0000210.[3] As noted in the Application and reflected in this Court's decision, NSP primarily rejected re-racking in its

[3] In contrast, NSP's Application for a Certificate of Need did list personnel exposure as one of several reasons for rejecting fuel rod consolidation. DX95 at NSP-0000217.

Certificate of Need application (and never seriously looked at it as an option in the actual world) because re-racking would not have provided sufficient long-term storage capacity in light of the Government's expected breach of contract and the extended and perhaps indefinite duration of that breach. *See Northern States*, 78 Fed. Cl. at 453, 461-62; *see also* DX95 at NSP-0000210.

Second, as to the Government's argument that re-racking "entailed a much higher safety risk for NSP's employees," the Government relies on documentary snippets it never addressed with a witness at trial, which provide no support to the Government's assertion. *See* Defendant's Post-Trial Brief at 76 n. 23 ("Although the transcript of Ms. McCarten's testimony [before the Minnesota PUC] was admitted as an exhibit, this specific excerpt from Ms. McCarten's testimony was not referred to during trial."). Regardless of whether a third re-rack would have involved greater personnel exposure than dry storage (a proposition in support of which the Government has provided no credible evidentiary support), any activities at the Prairie Island site, whether re-racking, dry storage, or routine operation, are subject to the same radiation limits fixed by the Nuclear Regulatory Commission ("NRC"). *See* 10 C.F.R. § 20.1201(a)(1) (total effective dose equivalent of 5 rems to individual adults). Even if re-racking involved higher doses than dry storage, NRC regulations would still permit that activity, so long as regulatory limits were met. The Government presented neither evidence nor argument that such limits would be violated. Moreover, as the Administrative Law Judge recognized, NSP had already twice re-racked the Prairie Island spent fuel pool and successfully managed similar conditions of potential radiation exposure. PX749 at 36 (NSP-0054448) ("NSP has successfully reracked twice before, under the same constraints.").

**C. NSP Could Have Re-Racked Its Prairie Island Pool A Third Time**

Without citation to any evidence (save a discredited statement by Mr. Joe Jensen), the Government offers no evidence that it was technologically impossible or economically impracticable to re-rack the Prairie Island pool for a third time. It merely repeats arguments from its post-trial briefing. This Court already has concluded that NSP could have performed a third re-rack. *Northern States,* 78 Fed. Cl. at 462 ("We therefore conclude that in the but for world plaintiff would have pursued reracking, which would have enlarged its storage pool capacity by 30 percent.").

First, the Government again refers to a few non-technical general information pieces that did not focus on the possibility of re-racking – DX61 (draft "Rod Consolidation Q&A" attached to draft public information report) and DX47 (NSP News). NSP repeats its evidentiary response from its Post-Trial Reply Brief at 24-25. Mr. Jon Kapitz and Mr. James Howard both testified that the NSP News article constituted a high-level oversimplification of the situation. Tr. 1079-83 (Kapitz); Tr. 2000-01 (Howard) (noting that "there was more to it than" stated in NSP News and that "what I was told by my team was that reracking would not solve the issue of keeping Prairie Island open through the end of its license"). Furthermore, the Rod Consolidation Q&A was prepared in the context of NSP already having decided, because of DOE's impending breach, that it needed much more storage capacity than a re-racking would have provided. Tr. 594 (McCarten) ("[W]ith regard to the viability of reracking [mentioned in the rod consolidation draft questions and answers], the context of that is not just can it technically be done, but is it something that would meet the needs that we were trying to fulfill. So viability, in terms of how much storage you could get out of that and whether that would close the gap, was part of the issue that we were looking at with all of our storage technology evaluation."). Thus, the Court

properly weighed and discounted the evidence presented by the Government and credited the evidence presented by NSP.

Second, the Government relies on DX145 – a 1994 memo from Mr. Joe Jensen.[4] When questioned about this memo at trial, Mr. Kapitz strongly disagreed with Mr. Jensen's misinformed conclusion:

> Joe was not involved in that process at all in the 1989 -- Joe was not involved in any discussions of reracking until 1994, so I don't think Joe had a basis to make any statement as to whether or not, in 1989, 20 percent was capable, or 30 percent or 50 percent. Joe, at that time, was an instructor in our training center and did not get involved in this until 1994.
>
> * * * * * * *
>
> As I said earlier, Mr. Jensen was not involved in that process in 1989, 1990, he was strictly, I believe, looking at the certificate of need, what we said, really extrapolating what we said there, beyond – we said we never had any study that really came up with that 20 percent number, that was an engineering judgment.
>
> And I think Mr. Jensen has greatly overstated the facts of what he feels that 20 percent is there. I don't agree with that statement at all.

Tr. 1062, 1070-71 (Kapitz). Thus, it is hardly surprising that this Court properly accorded greater weight to the unrefuted credible testimony of Mr. Kapitz, who demonstrated throughout the trial (during vigorous and lengthy cross-examination) an intimate knowledge of the Prairie Island plant, its spent fuel storage capability, and its ability to re-rack a third time, than it did to a memo whose author the Government failed to depose or call as a witness and whose involvement and knowledge during the relevant period of time was at least questionable.

[4] Notably, the Government never deposed Mr. Jensen nor offered him as a witness at trial.

## IV. THE COURT PROPERLY CONCLUDED THAT THE MANDATES WERE FORESEEABLE AND RECOVERABLE MITIGATION COSTS

Contrary to the Government's assertions (which it has now repeated in its pre-trial, post-trial, and post-decision briefing), this Court applied the proper standard of foreseeability when measuring damages, including NSP's incurred costs resulting from the mandates.

This Court quoted from the RESTATEMENT (SECOND) OF CONTRACTS § 351 and stated that the question of foreseeability "refers to probability, *i.e.*, the likelihood of the occurrence of a given event or circumstance as assessed in terms of common experience or specific knowledge." *Northern States*, 78 Fed. Cl. at 449. Notably, the Federal Circuit has also judged foreseeability as a question of probability and relied on RESTATEMENT § 351. *See Citizens Fed. Bank v. United States*, 474 F.3d 1314, 1321 (Fed. Cir. 2007) ("The foreseeability requirement reflects the principle that a breaching party should not be liable for damages that 'it did not at the time of contracting have reason to foresee as a probable result of such a breach.'") (quoting RESTATEMENT (SECOND) OF CONTRACTS § 351, cmt. a); *see also Energy Capital Corp. v. United States*, 302 F.3d 1314, 1325 (Fed. Cir. 2002) (citing RESTATEMENT § 351 and noting that foreseeability relates to the "probable result of the breach").

The Government, citing *Myerle v. United States*, 33 Ct. Cl. 1, 27 (1897), and *Ramsey v. United States*, 101 F. Supp. 353, 357 (Ct. Cl. 1951), asserts that foreseeability actually requires certitude – not probability – claiming that "the cause must produce the effect inevitably and naturally, not possibly nor even probably." Gov't Motion at 8 (quoting *Ramsey*, 101 F. Supp. at 357). However, the Government's quotation from *Ramsey* (which, in turn, is quoting *Myerle*) relates to the Court of Claims' consideration of ***causation***, not foreseeability. *See Cal. Fed. Bank v. United States*, 395 F.3d 1263, 1267 (Fed. Cir. 2005) ("The court relied on *Myerle v.*

*United States*, 33 Ct. Cl. 1, 27 (1897), for the ***standard of causation*** that lost profits must 'inevitably and naturally, not possibly nor even probably' flow from the defendant's breach.") (emphasis added); *see also Citizens Fed.*, 474 F.3d at 1318 (similarly treating *Myerle* in the context of causation analysis). As to causation, the Federal Circuit unequivocally has stated that the *Myerle* standard need not always apply, concluding that "the selection of an appropriate causation standard depends upon the facts of the particular case and lies largely within the trial court's discretion." *Citizens Fed.*, 474 F.3d at 1318. Regardless, NSP presented virtually unrebutted evidence – including substantial live testimony from several key participants involved in the Prairie Island legislation – that the Government's breach directly caused NSP's costs from the mandates. *See* NSP Post-Trial Reply Brief at 48-49; NSP Post-Trial Brief at 37-41, 49, 55, 56, 86-87 (citing Prairie Island legislation and testimony by Mr. James Alders, Ms. Elizabeth Engelking, Ms. Michelle Swanson, and Mr. Scott Wilensky). The Government produced no credible evidence to the contrary. Thus, whether characterized as foreseeability or causation, NSP provided evidence that unequivocally met the *Myerle* standard.

Moreover, the Government takes umbrage that the Court applied a foreseeability rule that allows for recovery of special losses incurred while mitigating a breach. *Northern States*, 78 Fed. Cl. at 464. In this regard, the Government asserts that the Court somehow has saddled the Government with the "downstream consequences of NSP's decision to construct a dry storage facility . . . ." Gov't Motion at 7. This Court's decision has done nothing of the sort. As the evidence showed during the trial, the foreseeable loss from the Government's breach was the shutdown of the Prairie Island plant at a cost of more than $1 billion in replacement power costs.

*See, e.g.*, NSP Post-Trial Brief at 30-31, 76; NSP Post-Trial Reply Brief at 5, 14, 43.[5] That is the foreseeable loss from the Government's breach. The duty to mitigate required NSP to minimize this foreseeable loss, which it has successfully done by accepting the mandates and avoiding the shut down of its Prairie Island plant. The mandates were not the "downstream consequences" of NSP's efforts to mitigate (as the Government asserts). They were integral to that effort.

## V. THE COURT PROPERLY AWARDED NSP ITS PRIVATE FUEL STORAGE COSTS

Contrary to the Government's assertions, this Court properly awarded NSP its mitigation costs for pursuing and licensing the Private Fuel Storage ("PFS") facility. *Northern States*, 78 Fed. Cl. at 465-68. The Government merely repeats its prior arguments, which this Court has already appropriately rejected.

First, the Government repeats that PFS was not foreseeable and that NSP has presented *no evidence* that PFS was foreseeable. Gov't Motion at 10. However, that is simply incorrect. As NSP noted in its briefs and in elicited testimony from multiple witnesses, PFS arose from the ashes of the Government's monitored retrievable storage ("MRS") program. NSP Post-Trial Brief at 44-47 (discussing, *inter alia*, the testimony of Ms. Krista Sanda, Mr. Scott Northard, and Mr. James Howard regarding the creation of PFS). The Nuclear Waste Policy Act ("NWPA") – as enacted in 1983 – specifically created the concept of the MRS as a potential facility for interim storage that could be used to alleviate the storage problems utilities were facing and meet the Government's obligation to accept spent fuel beginning in 1998. NWPA, Pub. L. No. 97-425, § 141, 96 Stat. 2201, 2241-44 (1983) (codified as amended at 41 U.S.C. §§ 10132-33,

[5] Indeed, DOE's report to Congress on spent fuel management alternatives available to NPS for Prairie Island specifically addressed options "to allow NSP to continue operations at Prairie Island Units 1 and 2." PX1019 at 3 (NSP-0001829).

10161); Tr. 3874 (Morgan) (noting that the MRS could meet the Government's obligations as a back-up plan). PFS is akin to a privatized version of the MRS and provides exactly the type of away-from-reactor storage that the utilities expected under the NWPA and their contracts. Indeed, the volunteer host for the proposed PFS facility was one of the tribes that had been considering volunteering to host the MRS when the Government terminated the MRS siting program being carried out by the Nuclear Waste Negotiator. Tr. 1473 (Northard).

Further evidence of the foreseeability of PFS is evident from the fact that the Nuclear Regulatory Commission ("NRC") promulgated a regulatory structure for private, away-from-reactor spent fuel storage facilities in 1980, three years before the NWPA was enacted. *See Bullcreek v. NRC*, 359 F.3d 536, 538 (D.C. Cir. 2004) (citing 10 C.F.R. part 72). Congress was aware of these regulations when it enacted the NWPA. *See id.* at 542. The General Electric, Morris, Illinois ("G.E.-Morris") facility was an away-from-reactor storage facility licensed by the NRC before the utilities signed their contracts and even before the Nuclear Waste Policy Act became law. *See In re General Elec. Co.*, 15 N.R.C. 530 (1982) (dismissing remaining objections to G.E.'s request for a 20-year license to store spent fuel at its Morris facility); *cf. also* Tr. 412-13 (McCarten) (discussing NSP's shipment of Monticello fuel to the G.E.-Morris facility). Moreover, Congress was well aware of Morris and other away-from-reactor storage facilities when it passed the NWPA, specifically mentioning Morris in the debates leading to the passage of the NWPA. *See In re Private Fuel Storage, LLC*, 56 N.R.C. 390, 402 (2002) ("Congress knew that [away-from-reactor] storage facilities already existed at Morris, West Valley, and Barnwell, because their fate was specifically discussed."), *petition for review denied*, *Bullcreek*, 359 F.3d at 543. The legislative history of the NWPA also provides evidence that a PFS-type project was entirely foreseeable. *See In re Private Fuel Storage, LLC*, 56 N.R.C. at

n.45 ("'[A]s I understand it, you have the power now to expand away from reactor storage, to join together various utilities in establishing common sites away from reactor storage . . . .'") (quoting statement by Congressman Ottinger during hearings considering the NWPA). Thus, trial testimony and judicially noticeable facts (such as caselaw, the NWPA, and legislative history) establish that private, away-from-reactor storage – such as PFS – was not only foreseeable, it was actually foreseen.[6]

Second, the Government asserts that NSP's support for PFS "exceeded the amount" necessary for NSP's needs, NSP unnecessarily continued supporting PFS even after virtually all other utilities ceased support, and NSP could have assured itself sufficient storage at PFS without offering a dime. Gov't Motion at 10-11. Far from failing to address these concerns (as the Government asserts), the Court refuted the Government's simplistic analysis by, *inter alia*, quoting from the testimony of Mr. Charles Bomberger. *Northern States*, 78 Fed. Cl. at 465-66. NSP's allegedly "excessive" payments to PFS were necessary precisely because NSP was one of the last utilities that continued to support PFS's successful effort to obtain a Nuclear Regulatory Commission license. *See id.* at 466 ("[W]e were one of the only remaining members that were very active in providing support for [private fuel storage] . . . ."); *see also* Tr. 293-97 (Bomberger). Had NSP not supported the effort, PFS would not have obtained an NRC license and there would have been no possibility of relying on PFS as a solution to NSP's storage needs. And, as this Court recognized, the evidence showed that NSP still needed PFS for its storage

---

[6] The Government also takes issue with the Court's reliance on the 2001 DOE Report regarding Prairie Island, PX1019. Gov't Motion at 10. However, the Court appropriately credits this evidence as unequivocally establishing the Government's belief that PFS was not speculative. *Northern States*, 78 Fed. Cl. at 466.

needs when it made the payments. *Northern States*, 78 Fed. Cl. at 467. Thus, the Government ignores reality and the unrebutted evidence in this case.

Third, the Court properly rejected the Government's argument that NSP may not recover its PFS costs because NSP is somehow gaining a windfall beyond restoring it to its position before the breach. In this regard, this Court concluded that "[t]he costs plaintiff incurred in pursuit of the off-site private storage facility are conceptually indistinguishable from the costs the utility incurred in developing the similar facility at Prairie Island: each set of costs signifies an expenditure by plaintiff to develop a substitute for the performance lost on account of the breach." *Northern States*, 78 Fed. Cl. at 466-67. The Government's assertion that NSP's continued participation in PFS (and receipt of damages) allows NSP to generate profit was put to rest by the testimony of Mr. Scott Northard, who explained why NSP's support of PFS did not (and will not) equate to NSP making a profit from PFS. NSP Post-Trial Reply Brief at 40 (quoting Mr. Northard – Tr. 1528 – that "the return on equity that would be associated with the payments for the storage facility would, in essence, be returned back to ourselves as owners and would offset the costs of storage . . . so there would not be a net profit, for instance, for Northern States Power").

Finally, the Government shamelessly asserts that NSP "has never offered to transfer its interest in PFS . . . ." Gov't Motion at 11. This argument is a red-herring (and one never raised at trial, or at any point during post-trial briefing). The Government never explains why such a tender was required nor how it is in any way relevant to the damages that NSP has suffered. Moreover, the Government has repeatedly argued that it lacked authority to provide spent fuel

storage at a facility like PFS.[7] Finally, to date DOE has never expressed the slightest interest in using PFS as a means of fulfilling its obligations under the NWPA. *See Nuclear Fuel & Management Act: Hearing on S. 2589 Before the S. Comm. On Energy & Natural Resources* at 68 (2006) (response of David Wright, Comm'r of the S.C. Public Utility Comm'n, to Questions From Senator Larry Craig) (noting that PFS sent a proposal to DOE for the use of the PFS facility and received no response, but that a Deputy Secretary of Energy had remarked to a newspaper that "[w]e have never really considered Private Fuel Storage consistent with our obligations under the Nuclear Waste Policy Act").

## VI. THE COURT'S DECISION OTHERWISE CORRECTLY DISPOSES OF THE GOVERNMENT'S REMAINING ARGUMENTS

The Government repeats three additional miscellaneous arguments, which do not raise a manifest error of law or mistake of fact in this Court's trial decision.

First, the Government complains that NSP should not recover $562,500 for a payment to the Mdewakanton Dakota Tribe made before the damages cut-off date of December 31, 2004, because the payment was not actually due until 2005. Gov't Motion at 12. However, there is no question the payment was made in 2004. Tr. 1758, 1763 (Wilensky). Additionally, the Government raises the canard that NSP should not recover the costs of its tribal payments, because the Minnesota PUC (and the 2003 Prairie Island legislation) provided for NSP's recovery of the costs from ratepayers. Gov't Motion at 12. However, NSP's ratepayers cannot challenge the increased costs caused by the Government's breach of contract. *Roedler v. Dep't*

---

[7] DOE's consistent position has been that it could only provide interim storage as authorized by the NWPA and that the NWPA only authorized such storage under the long-expired provisions of 42 U.S.C. § 10156 or by means of the NWPA's MRS authority, which "is inapplicable, however, because the [Nuclear Waste Policy] Act ties construction of an MRS to the schedule for development of a repository." Final Interpretation of Nuclear Waste Acceptance Issues, 60 Fed. Reg. 21793, 21797 (May 3, 1995).

*of Energy*, 255 F.3d 1347, 1353 (Fed. Cir. 2001) (concluding that NSP's ratepayers have no legally cognizable grounds for recovering damages based on the Government's breach of the Standard Contracts). Thus, only NSP can recover these breach-related costs. How or whether that recovery is passed through to NSP ratepayers will ultimately be determined by the Minnesota PUC. In this respect, the $562,500 payment to the Mdewakanton Dakota Tribe is no different than the costs incurred by NSP in purchasing the spent fuel storage casks or building the concrete pad on which the casks sit.

Second, the Government repeats its assertion that overhead cannot be recovered in the same manner as internal labor. Gov't Motion at 12-13. However, this Court relied on Judge Lettow's conclusion in *Tennessee Valley Authority* that a utility plaintiff may recover for internal labor. *Northern States*, 78 Fed. Cl. at 468 (citing *Tenn. Valley Auth. v. United States,* 69 Fed. Cl. 515, 539 (2006), *appeal dismissed*, 188 Fed. Appx. 1006 (Fed. Cir. 2006)). For the same and related reasons, NSP may recover damages for its overhead, as *Tennessee Valley Authority* and other authorities conclude. *See* NSP Post-Trial Reply Br. at 32 (citing and discussing *Tenn. Valley Auth.*, 69 Fed. Cl. at 526, 542 and *Chain Belt Co. v. United States*, 115 F. Supp. 701, 712 (Ct. Cl. 1953) (awarding partial breach mitigation damages for allocable overhead expenses from cost of "insurance, taxes, watchmen, maintenance and repairs," and "a 5% allowance for general administrative expense")); *see also Southern Nuclear*, 77 Fed. Cl. at 442-43 (awarding costs of overhead along with internal labor); *ACE Constructors, Inc. v. United States*, 70 Fed. Cl. 253, 279 (2006) (recognizing the recoverability of overhead), *aff'd*, 499 F.3d 1357 (Fed. Cir. 2007).

Third, the Government asserts that the offset for costs of installing a third re-rack in the "but for world" should be $17 million rather than the $12,532,000 figure calculated by the Court. *See Northern States*, 78 Fed. Cl. at 462 & n.14. The Court used an appropriate figure. Contrary

to the Government's assertions, several of NSP's witnesses spoke directly to the cost figures used to calculate the third re-rack. The $17 million figure proposed by the Government derives from the 1995 Dry Cask Alternatives Study – several years after when NSP would have needed the racks – as Mr. Kapitz testified. PX49 at KRGNSP11064; Tr. 5204-05 (Kapitz) ("[T]hese are at very different timeframes, so I'm not sure that would be a direct comparison to make."). Furthermore, one of NSP's expert witnesses – Mr. Richard Sieracki – concluded that NSP's estimated cost of a third re-rack fell within the range of the actual costs of other re-racking projects. Tr. 2704-06 (Sieracki) (noting that re-racking projects in the same timeframe ranged from a low of $2.8 million to a high of $14.6 million). This Court's calculation similarly falls within the range of other re-racking projects. Thus, this Court used an appropriate figure to calculate the third re-rack.

## VII. CONCLUSION

Ultimately, the Government has failed to sustain its burden of showing that this Court made any manifest error of law or mistake of fact: (1) there has been no change of law; (2) the Government has not relied on previously unavailable evidence, and (3) the Government has shown absolutely no manifest injustice. For the foregoing reasons, the Government's motion for reconsideration should be denied.

Dated: November 13, 2007

Respectfully submitted,

s/ Alex D. Tomaszczuk by s/ Daniel S. Herzfeld
Alex D. Tomaszczuk
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7940
(703) 770-7901 (fax)

Counsel of Record for Plaintiff
Northern States Power Company

*Of Counsel:*

Jay E. Silberg
Daniel S. Herzfeld
Jack Y. Chu
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**
2300 N Street, N.W.
Washington, D.C. 20037
(202) 663-8000
(202) 663-8007 (fax)

Kerry C. Koep
**XCEL ENERGY**
414 Nicollet Mall, 5th Floor
Minneapolis, MN 55401
(612) 215-4583
(612) 215-4544 (fax)